EXHIBIT "K"

AMERICAN ARBITRATION ASSOCIATION


GREGORY P. BARNES, JR.,                          )

TRUSTEE OF JOHN L. BITTER,                       )

IRREVOCABLE LIFE INSURANCE                       )

TRUST,                                           )

                                                 ) Case # 74-148-000296-13-S1M

             Claimant,                      )

      vs.                                      )

                                                 )          <u>INTERIM AWARD</u>

WINDSOR SECURITIES, LLC,                          )

                                                 )

            Respondent.                    )

                                             )


## **INTRODUCTION**

      The matter before the Panel concerns a dispute between Claimant Gregory Barnes, as Trustee of the John L. Bitter Irrevocable Life Insurance Trust (referred to as either "Barnes" or "Trust"), and Respondent Windsor Securities, LLC ("Windsor") as to the ownership and right to the death benefits of a life insurance policy insuring the life of Mr. Bitter for which Windsor financed the initial premium payments as well as all subsequent premium payments. The death benefit under the policy is two million dollars ($2,000,000).

The core legal issue is whether Windsor satisfied the requirements of the "Default Sale Right" provision of the Collateral Assignment (Barnes Ex. A. 15, p. 4) and the "strict foreclosure" procedure under California Civil Code ("Cal. Civ. Code") Section 9620, California's version of the Uniform Commercial Code ("UCC") as applied to secured transactions. If so, at the time of Mr. Bitter's death Windsor was the owner of the policy and entitled to the entire death benefit. If not, Windsor's rights were that of a secured party entitled to recover all of the monies it had advanced for premiums, plus interest, closing costs, and expenses as specified in the loan documents, with the Trust entitled to the remaining surplus.

Barnes contends that the Trust was not in default at the time Windsor sought to take ownership of the policy and, assuming it was in default, Windsor failed to satisfy the requirements of the Default Sale provisions of the financing Agreements and Section 9620. Thus, Barnes argues that Windsor is only entitled to the amount of the premium financing loan (principal, interest, and certain other costs), with any surplus to go to the Trust. Windsor contends that it gained Ownership of the policy by reason of the Trust's default in failing to make payment of the loan when it became due in July 2010 and that such ownership became absolute when Barnes signed a Change of Ownership that formally transferred the policy to Windsor on February 14, 2011, and surrendered the original of the policy to Windsor shortly thereafter.

The Panel has considered three days of testimony (February 13-15, 2014), several hours of closing argument on March 5, 2014, hundreds of exhibits, and the matter has been extensively briefed.

This decision is limited to determining the issue of the ownership rights to the death benefit of the policy. Any other issues that might remain will be the subject matter of a Final Award.

## DISCUSSION

### A. FACTUAL BACKGROUND

The life insurance policy ("policy") was issued by Pacific Life Insurance Company ("PAC") to Mr. John L. Bitter ("Bitter"), a Georgia resident, on February 8, 2008, with a face

amount of $2 million. Neither Mr. Bitter nor the Trust ever paid any premium for the policy, all of which was paid by Windsor until Mr. Bitter died in December 2012, well after July 2010 when the loan came due.

Windsor initially funded the loan in the amount of $84,500 at 15% interest to pay the initial premium. The loan was due 28 months after initial funding and the principal balance increased over time as Windsor continued to pay premiums to protect its interest in the policy as collateral.

Mr. Gene Houchins III ("Houchins"), a resident licensed Georgia "life settlement broker"[1] was the broker for sale of the policy to Mr. Bitter. The Trust was created under Georgia law on January 3, 2008. Gregory Barnes ("Barnes"), a Georgia resident acquaintance of Houchins, was appointed as trustee by Bitter based on Houchins' recommendation.

The Windsor loan came due on or about July 8, 2010; no repayment was made subsequent thereto, there was no showing that Mr. Bitter or the Trust ever offered to repay the loan or that they had the ability to make any such repayment.   Windsor, on the other hand, never made a specific demand for repayment nor provided Barnes with a specific amount that needed to be paid to satisfy the indebtedness to Windsor even though it was requested to do so by Houchins on behalf of Barnes and/or Mr. Bitter on at least two occasions subsequent to July, 2010.

On September 8, 2010, counsel for Windsor sent a letter addressed to Barnes and Mr. Bitter asserting that "since payment was not made when due, title to the policy and its benefits has transferred, by law, to the Lender" and demanded delivery of the original policy and execution by Barnes of a document reflecting Change of Ownership to Windsor. (Ex. DD) When Barnes failed to respond to this demand, Windsor wrote a letter dated January 14, 2011 (Ex. GG) making the same assertions as to its ownership as a matter of law by reason of the default and making the same demand.  Finally, as demanded by Windsor and relying on the advice of

---

[1] Under the Georgia Insurance Code, title 33, chapter 59, section 33-59-2 (10), "A life settlement broker represents only the owner and owes a fiduciary duty to the owner to act according to the owner's instructions, and in the best interest of the owner, notwithstanding the manner in which the life settlement broker is compensated."

3

Houchins, Barnes executed a Ownership, Name, or Beneficiary Change Request ("COO") on February 14, 2011, and subsequently surrendered the original of the policy to Windsor.

Mr. Bitter died 20 months later, on December 23, 2012.

When Windsor sought to collect the policy death benefit from PAC, Barnes filed a civil action against Windsor for declaratory relief on February 13, 2013 in the California Superior Court for the County of Sonoma. Windsor had the matter removed to the U.S. District Court for the Northern District of California in San Francisco and Barnes filed a First Amended Complaint with the District Court on May 28, 2013. PAC filed an interpleader action and the $2 million policy death benefit, less PAC's interpleader expenses, has been deposited in the registry of the District Court.

Pursuant to the Windsor financing documents, all disputes are to be governed by California law and determined by a panel of three arbitrators in San Francisco, California under the Commercial Arbitration Rules of the American Arbitration Association. The District Court stayed the Barnes v. Windsor matter pending this arbitration proceeding.

Although Barnes makes a number of arguments in support of its position that Windsor, at the time of Mr. Bitter's death did not have exclusive ownership rights to the death benefits of the policy, the Panel believes that the only argument which has merit is that Windsor failed to comply with the provisions of the Default Sales provisions of the Collateral Assignment Agreement, Ex. A-15 and Cal. Civil Code §9620.

## B.  THE DEFAULT SALE RIGHT

The Collateral Assignment Agreement, Ex. A-15, p.4, provides for a "Default Sale Right:"

> **Default Sale Right.** Upon occurrence of an Event of Default (as defined in the Agreement) that has not been remedied within the time period required in the Agreement, Assignee shall have the right (the "**Default Sale Right**") but not the obligation to accept, that in consideration of the full and complete satisfaction of the Liabilities (the sufficiency of which consideration is hereby acknowledged) Owner may make a full transfer and assignment of the Insurance Policy to Assignee and thereby forever

4

relinquish any and all rights Owner may have there under, including without limitation any rights to cash surrender value and/or the death benefit provided there under. Upon the exercise of this Default Sale Right, Assignee shall notify Insurer in writing and Insurer shall thereafter recognize Assignee as the sole lawful owner of the Insurance Policy.

There is no direct evidence in this record that Windsor notified Barnes that by reason of the non-payment of the loan it intended to exercise the Default Sale Right provision in the Assignment Agreement. Although the letter from Windsor's counsel of September 8, 2010 in its heading references the Assignment Agreement among other documents, the body of the letter makes reference to Section 6(a) of the Security Agreement as the basis for the demand that Barnes execute the COO transferring all ownership rights to Windsor as a matter of law.

The rights granted to Windsor under the terms of Section 6(a) are solely to protect its secured interests and do not purport to give Windsor unfettered ownership of the policy or a right to keep any death benefits in excess of its secured interests. Windsor argues that even though there may be no direct evidence, the conduct of the parties reflect that Barnes believed that the COO ended any interest the Trust might have in the policy and that Barnes never took any action that would reflect that he believed the Trust retained any right to the benefits once he delivered the COO. It also argues that Windsor took no steps against the Trust once it obtained the COO.

Because Section 6(a) contemplated the execution of a COO under circumstances wherein Barnes was not giving up all rights in the policy, its execution is at best ambiguous. Absent express notification to Barnes that Windsor was invoking its Default Sale Right, the record does not support a finding that Barnes' execution of the COO and surrender of the policy conveyed to Windsor unfettered title to the policy and the death benefit.

## C. CAL. CIVIL CODE §9620

Under Cal. Civ. Code § 9620, Windsor had two options to obtain unfettered ownership of the Bitter policy and its death benefit. One option for Windsor was to enter into a written agreement, post-default, with Barnes whereby Windsor released Barnes and the Trust from all obligations in exchange for Barnes conveying outright ownership of the policy.

5

Windsor acknowledges that it did not do so.

Windsor's other option was "strict foreclosure," whereby Windsor agreed to accept the policy as full satisfaction of the Bitter loan pursuant to a "record authenticated" after default.

§ 9620 provides:

(a) Except as otherwise provided in subdivision (g) [consumer transactions], a secured party may accept collateral in full or partial satisfaction of the obligation it secures only if all of the following conditions are satisfied:

    (1) The debtor consents to the acceptance under subdivision (c).

  . . . . . . . . . . . .

(c) For purposes of this section ...:

  . . . . . . . . . . . .

    (2) A debtor consents to an acceptance of collateral in full satisfaction of the obligation it secures only if the debtor agrees to the terms of the acceptance in a record authenticated after default or the secured party does all of the following:

    (A) Sends to the Debtor after default a proposal that is unconditional ....

    (B) In the proposal, proposes to accept collateral in full satisfaction of the obligation it secures.

    (C) Does not receive a notification of objection authenticated by the debtor within 20 days after the proposal is sent.

Neither the parties nor independent research by the Panel has revealed any California decisional authority explaining what is meant by a "record authenticated after default."

6

Windsor contends that in the context of the September 8, 2010 and January 14, 2011, letters from Windsor and its counsel, execution of the COO by Barnes constitutes an authenticated record evidencing that Windsor accepted the COO and surrender of the policy in full satisfaction of the Trust's obligations under the financing documents. The record does not support this contention.

There is nothing in either the September 8, 2010 letter or the January 14, 2011 letter that expresses an acceptance by Windsor of the collateral in full satisfaction of the obligation. Both are silent on the point.

Windsor therefore did not satisfy the "strict foreclosure" requirement under § 9620 (c)(2).

Just as was discussed above in connection with the Default Sale Right, nothing in the demand letters sent by counsel for Windsor or by Windsor itself contained a proposal stating that Windsor was prepared to accept the policy in full satisfaction of the liability owed to it; thus, the execution of the COO by Barnes also does not satisfy the proposal requirements of §9620(c)(2)(A)-(C).

## DECISION

It is the Panel's finding and decision that the Trust at the time of Mr. Bitter's death retained the ownership of the policy and is entitled to the death benefits of the policy subject to Windsor's rights as a secured creditor to collect all sums due it by reasons of its payment of the insurance premiums, including principal, interest at the rate of 10% from the date of initial payment to the present and expenses as defined in the loan documents.

A final award will await presentation of evidence as to the exact amount claimed by Windsor with supporting documents reflecting said amount. In addition, to the extent that either party is asserting a right to attorneys' fees both as a portion of the expenses claimed by Windsor under the loan documents or as attorneys' fees relating to this Arbitration, each party will provide the panel with documents supporting the amount of fees claimed and the legal basis for an award of attorneys' fees. Such submissions will be made no later than April 21, 2014 with opposition papers to be filed no later than May 2, 2014.

7

Date: 4/8/2014

_____

The Honorable Eugene F. Lynch, Panel Chair

_____

Richard A. Brown

_____

Paul A. Renne

8

Date: 4/8/14

_____
The Honorable Eugene F. Lynch, Panel Chair

_____
Richard A. Brown

_____
Paul A. Renne

8