Peter N. Wang
Douglas S. Heffer
Adam G. Pence
Foley & Lardner LLP
90 Park Avenue
New York, New York 10016
Tel: (212) 682-7474
Fax: (212) 687-2329

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

WINDSOR SECURITIES, LLC,

       Plaintiff,

    -against-

ARENT FOX, LLP and JULIUS
ROUSSEAU, III,

      Defendants.

Case No.  1:16-cv-01533 (GBD) (GWG)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL

## <u>TABLE OF CONTENTS</u>

FACTUAL BACKGROUND ............................................................................................. 1

    1.    Windsor's Allegations Against Defendants ............................................ 1

    2.    Defendants' Discovery Requests ........................................................... 4

    3.    The Current Dispute .............................................................................. 4

    4.    Defendants' Motion to Compel ............................................................. 7

ARGUMENT ................................................................................................................... 8

    1.    "At Issue" Waiver ................................................................................. 9

    2.    Waiver in Legal Malpractice Cases .................................................... 11

    3.    Defendants Are Entitled to the Relevant Legal Advice and Work Product ......... 12

CONCLUSION ............................................................................................................. 17

# TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.*,
   210 F.R.D. 506 (S.D.N.Y. 2002) ................................................................................ *passim*

*Bolton v. Weil, Gotshal & Manges, LLP*,
   4 Misc. 3d 1029(A), (Sup. Ct. New York Cty. Sept. 10, 2004).........................................12, 15

*Bowne of New York City, Inc. v. AmBase Corp.*,
   150 F.R.D. 465 (S.D.N.Y. 1993) .............................................................................................9

*In re Buspirone Antitrust Litig.*,
   208 F.R.D. 516 (S.D.N.Y. 2002) ...............................................................................10, 11, 17

*Chin v. Rogoff & Co., P.C.*,
   05 Civ. 8360 (NRB), 2008 U.S. Dist. LEXIS 38735
   (S.D.N.Y. May 6, 2008)........................................................................................................8, 10

*In re County of Erie*,
   546 F.3d 222 (2d Cir. 2008)........................................................................................................10

*Deutsche Bank Trust Co. of Ams. v. Tri-Links Inv. Tr.*,
   43 A.D.3d 56 (1st Dep't 2007) ...............................................................................................9

*Goldberg v. Hirschberg*,
   806 N.Y.S.2d 333 (Sup. Ct. New York Cty. 2005) .......................................................11, 15

*IMO Indus., Inc. v. Anderson Kill & Olick, P.C.*,
   746 N.Y.S.2d 572 (Sup. Ct. New York Cty. 2002) ......................................................12, 15

*Leviton Mfg. Co. v. Greenberg Traurig LLP*,
   09 Civ. 8083 (GBD), 2010 U.S. Dist. LEXIS 128849
   (S.D.N.Y. Dec. 6, 2010)........................................................................................................10

*Martin v. Valley Nat'l Bank*,
   140 F.R.D. 291 (S.D.N.Y. 1991) .............................................................................................9

*Pappas v. Holloway*,
   787 P.2d 30 (Wash. 1990).......................................................................................................12

*Roznitsky v. Schwartz Cobb & Scheinert*,
   98 Civ. 6643 (CSH)(MHP), 1999 U.S. Dist. LEXIS 4449
   (S.D.N.Y. April 2, 1999).........................................................................................................16

*Schutz v. Kagan Lubic Lepper Finkelstein & Gold, LLP*,
   12-CV-9459, 2013 U.S. Dist. LEXIS 93762
   (S.D.N.Y. July 2, 2013) ........................................................................................7

*Tribune Co. v. Purcigliotti*,
   93 Civ. 7222 (LAP)(THK), 1997 U.S. Dist. LEXIS 228
   (S.D.N.Y. Jan. 10 1997)........................................................................................10

## Other Authorities

Federal Rule of Evidence 501 ........................................................................................8

Rules 26, 34, and 37 of the Federal Rules of Civil Procedure ...................................1, 2

FRCP 26(b)(3) ...........................................................................................................1, 9, 10

FRCP 37 ....................................................................................................................1, 8, 18

Defendants Arent Fox LLP ("Arent Fox") and Julius Rousseau, III ("Rousseau", and, collectively, with Arent Fox, "Defendants"), by and through their attorneys, Foley & Lardner LLP, respectfully submit this memorandum of law in support of their motion, pursuant to Rules 26, 34, and 37 of the Federal Rules of Civil Procedure ("FRCP"), for an order compelling Plaintiff Windsor Securities, LLC ("Windsor") to produce certain withheld documents relating to Windsor's legal representation by counsel contemporaneous with and subsequent to Defendants, in response to Defendants' First Set of Requests for the Production of Documents and Things (the "Requests).

## FACTUAL BACKGROUND

1.    <u>Windsor's Allegations Against Defendants</u>

In this action for legal malpractice, Windsor has alleged that Defendants committed malpractice in connection with their advice concerning, and enforcement of, Windsor's rights under five specific life insurance premium finance loan agreements, relating to life insurance policies for John L. Bitter, Joe E. Acker, Erwin A. Collins, Robert S. Coppock, and Jane Ann Stamatov (hereinafter, the "Loans"). *See generally* Complaint, dated February 29, 2016 (ECF No. 1, hereinafter, the "Compl.").[1]   Prior to Defendants' representation, Windsor had provided premium financing for 10 life insurance policies, whereby Windsor loaned funds (at 15% interest) to certain individuals to purchase life insurance with the policies as collateral. *Id.* ¶¶ 8-11, 15.  Before borrowing the money or purchasing the insurance, the individual insureds created trusts, which were the actual borrowers on the loans. *Id.* ¶¶ 12-14.  The loans were non-recourse, that is, the lender's only recourse in the event of a default was the collateral, not the borrower or

---

[1] The Complaint is attached as Exhibit 1 to the Declaration of Douglas S. Heffer, dated May 30, 2017 (the "Heffer Decl.").

any beneficiaries of the borrower trust.  *Id.* ¶ 14.  Windsor's loans paid the insurance policy premiums during the roughly two-year term of the loans, while neither the insureds nor the trusts made any loan payments to Windsor.  *Id.*  Instead, at the maturity date of the loans, it was agreed that the trusts could either repay all the outstanding loan balance (for the premiums paid by Windsor), with interest, or transfer ownership of the life insurance policies to Windsor in satisfaction of the loans.  *Id.*  Under the loan agreements, Windsor could also demand transfer of ownership if the borrowers defaulted on certain of the loan obligations.  *Id.* ¶¶ 14, 46.  When problems arose with the Loans, Windsor sought advice from various attorneys before eventually hiring Mr. Rousseau and his prior law firm, Herrick Feinstein, LLP ("Herrick").  *Id.* ¶¶ 27-29.[2]

After successfully navigating several problems involving the Loans, with the help of Defendants' advice, Windsor eventually secured change of ownership ("COO") forms for the five policies.  *Id.* ¶¶ 50, 83-86, 113, 140, 163.  Later, however, one of the insureds, John Bitter, passed away, and the trustee challenged the validity of the COO on behalf of Mr. Bitter's widow (hereinafter, the "Bitter Litigation").  *Id.* ¶ 55.  On April 8, 2014, an arbitration panel, in an interim award, ruled that the COO did not transfer full ownership of the policy to Windsor such that Windsor was entitled only to the premiums and interest, but not the full death benefit.  *Id.* ¶¶ 63-66.  After the arbitration award, Windsor consulted other counsel – including but not limited to Darin Judd and Lauren Antonino – regarding the Bitter Litigation, which was still ongoing, and regarding the other four Loans for which Windsor had secured COOs.  Declaration of Julius Rousseau, III (the "Rousseau Decl."), ¶ 3; Heffer Decl., Ex. 10 at 1 (e.g., privilege log entries indicate that Windsor sought additional legal advice from Judd as early as April 16, 2014 "regarding settlement").  Two other insureds, Acker and Collins passed away shortly thereafter,

---

[2] In June 2010, Mr. Rousseau became a partner at Arent Fox.  Compl. ¶ 30.

and their trustees also challenged the respective COOs.  Compl. ¶¶ 72, 92-93, 117-122.  ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ Rousseau Decl. ¶ 3.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████ *Id.* ¶ 4. ██████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████ *Id.* ¶¶ 5-6.  Windsor, through its principal Steven

Prusky, chose not to follow Defendants' advice.  *Id.* ¶ 7.



On September 9, 2014, Windsor terminated Defendants' representation.  Compl. ¶ 36.

Even though the Bitter settlement agreement was nearly complete in August, Windsor did not

finalize the agreement until January 29, 2015.  Heffer Decl. Ex. 2.  After Windsor fought with

the trustees for the Acker and Collins policies, the respective insurers commenced interpleader

actions for the death benefits, and Windsor proceeded to engage in extensive litigation in both

matters before finally settling with Acker's estate on March 28, 2016 and Collins' estate on April

15, 2016.  Compl. ¶¶ 93, 121; Heffer Decl. Ex. 2.  Further, on January 7, 2015, Windsor

voluntarily commenced actions for declaratory relief on the Coppock and Stamatov loans, which

Windsor did not settle until July 11, 2016 and March 29, 2016, respectively.  Compl. ¶¶ 152,

170; Heffer Decl., Ex. 2.  Attorneys Judd and Antonino continued to represent Windsor after

Defendants were terminated, litigating on behalf of the company on all the above matters.

Rousseau Decl. ¶ 8.

---

[3] ████████████████████████████████████

█████████████████████████████████████████████████████████ Rousseau Decl. ¶¶ 5-6.

On or around February 29, 2016, prior to settling everything but the Bitter Litigation, Windsor commenced this lawsuit. *See generally* Compl. In its Complaint, Windsor alleges, among other things, that Defendants 1) failed to advise Windsor properly with regard to the company's ownership rights and entitlement to death benefits, 2) failed to enforce properly Windsor's rights in the Bitter Litigation, and 3) failed to advise and enforce properly Windsor's rights under the other four Loans after the arbitration decision. *See generally id.* Windsor claims it is entitled to the amount of the death benefits under the policies in excess of any loan and interest payments, *and* the return of any fees paid to Defendants (and Herrick), *and* all costs and fees associated with subsequent counsel's representation of Windsor in the five litigations involving the Loans. *Id.*; Heffer Decl. Ex. 5.

2.      Defendants' Discovery Requests

Defendants served the Requests and Interrogatories, seeking a detailed description of any damages suffered based on Defendants' purported legal malpractice and any steps taken by Windsor or its representatives to mitigate such damages. Heffer Decl. ¶ 6; Exs. 4-5. Defendants' Requests, among others, sought documents or communications with other counsel and materials related to the five litigations (Request Nos. 6-7, 16). *Id.*

In response to the Requests, Windsor completed an initial production of documents and included a short privilege log. Heffer Decl. ¶ 7. In response to Defendants' Interrogatories, Windsor asserted that it was entitled, among other things, to hundreds of thousands of dollars in costs and legal fees paid to Judd's and Antonino's law firms for the above-referenced legal work. Heffer Decl. ¶ 6; Ex. 5.

3.      The Current Dispute

After reviewing the document production and log (and deposing Windsor's principal, Steven Prusky), Defendants sent a deficiency letter to Windsor, seeking, *inter alia*, numerous

4

documents related to the legal services performed after Defendants were terminated, particularly the extensive litigations on the Acker and Collins Loans and Windsor's communications with other relevant third parties. *Id.* ¶ 9, Ex. 6. Defendants also raised concerns about Windsor's privilege log and redactions. *Id.* Windsor's log contained numerous deficient entries and included various communications between Steven Prusky and third parties for which there was clearly no basis to assert privilege. *Id.* Windsor had also heavily redacted most of the legal invoices for which it was seeking repayment as a component of its purported damages. *Id.* Finally, Defendants observed that Windsor had failed to produce (or log) numerous responsive documents and communications involving other legal counsel who performed relevant work for Windsor, and Defendants demanded that Windsor produce such materials or supplement its privilege log to document whatever else was being withheld. *Id.*

On April 10, 2017, Windsor responded with a supplemental privilege log, which included nearly 3,000 new entries but did not revise the original privilege log, and a supplemental document production of around 1,280 documents. Heffer Decl., ¶ 10 Ex. 7.[4] On April 17, 2017, after reviewing the various privilege logs, Defendants sent a second deficiency letter, informing Windsor that they believed Windsor was improperly withholding thousands of documents for which Windsor had waived privilege by placing the subject matter of the documents at issue in this malpractice litigation. *Id.* ¶ 11, Ex. 8.

On April 24, 2017, Windsor replied by letter, denying there was any waiver, and counsel for the parties met and conferred over these issues on April 25, 2017 at 1:00 p.m. for

---

[4] In its April 10, 2017 letter, Windsor also admitted that there were other privileged documents that were still not logged, explaining "those documents are thousands, if not hundreds of thousands," and Windsor raised, for the first time, the proposal that it be allowed to categorize the remaining documents in lieu of an itemized privilege log. *Id.* ¶ 10, Ex. 7. This estimate was since revised to 50,000. *Id.* ¶ 13.

approximately 35 minutes.   Heffer Decl. ¶¶ 12-14, 20-21, Ex. 9.  At the conference, Windsor's counsel inexplicably argued that 1) there was no concurrent representation with Judd or Antonino because their official engagement letters were not executed until August 2014; and 2) Windsor's allegations do not place any of the legal advice or work of the multiple attorneys listed on Windsor's privilege log "at issue," including Judd or Antonino.  *Id.* ¶¶ 14, 20-21. Defendants' counsel explained that these arguments were directly contradicted by Windsor's privilege log, by other arguments asserted in Windsor's April 24, 2017 response letter, and by Windsor's allegations of liability and damages, not just in the Complaint but in subsequent papers.  *Id.* ¶ 14.

Over the course of the next month, Windsor produced over 2,000 more documents and several more versions of its privilege logs, still without the purported 50,000 additionally withheld documents.  Heffer Decl. ¶ 19.  The most recent versions of Windsor's three logs, which were produced as Excel spreadsheets and are attached to the Heffer Declaration as Exhibits 10-12, respectively, are as follows: a log of redacted documents (346 entries); a log of withheld documents, comprising two Excel worksheets (Worksheet 1: 1,856 entries, Worksheet 2: 611 entries); and a log of attachments to certain e-mails in the previous log (160 entries).[5] The logs, which are not numbered other than the Excel rows, contain at least 22 entries with no evident basis for claiming attorney-client or any other evidentiary privilege.  *Id.*

---

[5] These attached privilege logs represent Defendants' best understanding of what documents Windsor has still withheld and the purported basis for doing so (not including the other 50,000 withheld documents).  At the same time, there have been numerous iterations of the multiple privilege logs, the latest versions of which included an extra column identifying some but not all of the documents Windsor produced in response to previous challenges. Defendants' counsel has filtered out any such entries but cannot verify that the attached privilege logs do not contain some other documents that have been produced.  Further, the privilege logs appear to include still documents that are neither relevant to this action nor responsive to any discovery request.  Heffer Decl. Exs. 10-12.

As described in more detail below, most of the entries in all three logs include descriptions of supposedly privileged documents reflecting legal advice and work performed for Windsor by its subsequent counsel concerning various aspects of the "underlying litigations" – i.e., those litigations involving the Loans that are at issue in this action.  These materials include e-mail communications, draft papers and pleadings, and legal invoices (many of which remain redacted) that form part of the basis of damages claims in this case.  *Id.*

    4.   <u>Defendants' Motion to Compel</u>

Defendants now seek to compel all documents reflecting legal advice and work related to the five Loans.  In any legal malpractice action, a plaintiff must establish the necessary elements of malpractice, including an entitlement to specific damages.[6]  Key issues in this case remain open regarding these same elements: did Windsor's legal representation fall below the applicable standard of care?  Did Windsor actually rely on Defendants' legal advice, either in procuring the COOs or during the subsequent litigations?  Was Windsor's purported negligence the proximate cause of the alleged harm, or only a portion of it?  Was subsequent counsel at all responsible for this harm?  Is Windsor entitled to such large legal fees for this counsel's work in the five underlying litigations, or did it fail to mitigate damages?  By claiming that Defendants' alleged malpractice foreclosed any possibility of recovering the full death benefits and by claiming it is entitled to recoup all legal fees and costs related to the five underlying litigations, Windsor has placed the subject matter of its communications with other counsel in those litigations, as well as

---

[6] To prevail on a claim of legal malpractice – a specific form of negligence – a plaintiff must establish the following elements under New York law, which governs here: (1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury (i.e., that the outcome would have been different "but for" the attorney's negligence); and (4) actual damage resulting from the professional's negligence.  *Schutz v. Kagan Lubic Lepper Finkelstein & Gold, LLP*, 12-CV-9459, 2013 U.S. Dist. LEXIS 93762, at *13-21 (S.D.N.Y. July 2, 2013).

their work product and billing, "at issue" in this action, and, accordingly, under the law, waived privilege with regard to these materials.

Under FRCP 37(a), on notice, a party may move for an order compelling disclosure or discovery, including for the production of documents requested under Rule 34.  FRCP 37(a)(1), (a)(3)(B)(4)(iv).  Further, under FRCP 37(a)(5)(A), if the discovery motion is granted (or if the disclosure or requested discovery is provided after the motion was filed) the court must, absent certain specific circumstances not present here, "require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees."

## ARGUMENT

Windsor improperly has withheld documents asserting both attorney-client privilege and work product immunity.  While the purpose of the attorney-client privilege is to "encourage full and frank communication between attorneys and their clients," the privilege "stands in derogation of the public's right to every man's evidence, … it ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle."  *Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.*, 210 F.R.D. 506, 508 (S.D.N.Y. 2002) (internal citations and quotations omitted).  Under Federal Rule of Evidence 501, when parties are litigating state law claims in federal court, the court utilizes state law to define any purported attorney-client privilege.  *Id.*; *Chin v. Rogoff & Co., P.C.*, 05 Civ. 8360 (NRB), 2008 U.S. Dist. LEXIS 38735, at *12-13 (S.D.N.Y. May 6, 2008) (explaining New York courts have traditionally held that when discovery dispute involves an attorney-client relationship with New York attorney, New York law applies) (internal citations omitted).  Therefore, under New York law, which also applies to the claims at issue in this litigation, the party invoking this privilege

"must demonstrate that the information at issue was a communication between client and counsel …, that it was intended to be and was in fact kept confidential, and that it was made in order to assist in obtaining or providing legal advice or services to the client."  *Bank Brussels Lambert*, 210 F.R.D. at 508-09 (quoting *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 470-71 (S.D.N.Y. 1993)).

Unlike the attorney-client privilege, work product immunity is governed by federal law. *Bank Brussels Lambert*, 210 F.R.D. at 509; *Bowne of New York City, Inc.*, 150 F.R.D. at 470-71. FRCP 26(b)(3) provides for a qualified immunity from discovery for documents "prepared in anticipation of litigation or for trial."  *See also Martin v. Valley Nat'l Bank*, 140 F.R.D. 291, 304 (S.D.N.Y. 1991) (work product protection "applies only to documents prepared principally or exclusively to assist in anticipated or ongoing litigation").

1.      "At Issue" Waiver

Because Windsor here has placed "at issue" in this legal malpractice case the issues of whether Defendants breached a standard of care, reliance upon such advice in connection with determining the causation of alleged damages, and whether Defendants are liable for legal fees paid to other attorneys, Windsor may not shield the requested materials from discovery and admission on the assertion of the attorney-client privilege and the attorney work product doctrine.

Under both federal law in this jurisdiction and New York state law, attorney-client privilege is waived when the subject matter of the document in question has been placed "at issue" in the litigation.  *See, e.g.*, *Deutsche Bank Trust Co. of Ams. v. Tri-Links Inv. Tr.*, 43 A.D.3d 56, 63 (1st Dep't 2007)  ("[W]here a party affirmatively places the subject matter of its own privileged communication at issue in litigation, so that invasion of the privilege is required to determine the validity of a claim or defense of the party asserting the privilege, and

application of the privilege would deprive the adversary of vital information."); *Bank Brussels Lambert*, 210 F.R.D. at 509-10.[7]

Courts in this jurisdiction have also held that the "at issue" doctrine applies to information normally protected by the work product immunity. *Bank Brussels Lambert*, 210 F.R.D. at 511 (compelling disclosure of 1) internal legal documents analyzing transaction at issue in underlying litigation and 2) documents regarding the litigation created by client for in-house counsel and other external counsel but not shared with malpractice defendant); *Tribune Co. v. Purcigliotti*, 93 Civ. 7222 (LAP)(THK), 1997 U.S. Dist. LEXIS 228, at *27-30 (S.D.N.Y. Jan. 10 1997) (noting that even if the "at issue" doctrine only applied to attorney-client privilege, FRCP 26(b)(3) is "substantially similar" to the "at issue" waiver standards).

Finally, this Court has previously applied the "at issue" waiver broadly to both attorney-client privileged communications and work product, including, when appropriate, internal attorney materials not shared with the client because such materials may be the only written discovery available. For example, in *In re Buspirone Antitrust Litig.*, 208 F.R.D. 516, 525-26, (S.D.N.Y. 2002) (Gorenstein, M.J.), an antitrust case involving three meritless patent infringement cases brought by defendant, this Court declined a motion to compel purported "at issue" materials involving the three patent cases but held that if the defendant asserted "good

---

[7] New York law on the "at issue" waiver "closely parallels federal law." *Chin*, 2008 U.S. Dist. LEXIS 38735, at *15-16. Like the Second Circuit, New York courts will not find waiver merely because the privileged information is relevant but will find a waiver when the party asserting privilege relies on the privileged advice to make a claim or defense, or when the privileged communications are "indispensable" to a party's claims or defenses so that fairness requires disclosure. *See In re County of Erie*, 546 F.3d 222, 229 (2d Cir. 2008) (declining to specify what degree of reliance is required); *Leviton Mfg. Co. v. Greenberg Traurig LLP*, 09 Civ. 8083 (GBD), 2010 U.S. Dist. LEXIS 128849, at *7-8 (S.D.N.Y. Dec. 6, 2010) (applying New York law and noting a party "need not explicitly rely upon advice of counsel to implicate privileged communications" and that, as a matter of fairness, "it would be unfair to allow a party to use[] an assertion of fact to influence the decisionmaker while denying its adversary access to privileged material potentially capable of rebutting the assertion") (internal citations and quotations omitted).

faith" or "reliance on counsel" defenses in justifying its intent or state of mind in pursuing these patent infringement suits, the defendant "will put at issue its intent not only at the time of filing but also during the prosecution of the suits."  Further, this Court explained that, like here, when the competence of the counsel, or its internal assessment of legal issues, is relevant to the case, the waiver can extend to work product and uncommunicated legal analysis, which will bear on the reasonableness of the purported reliance.  *Id.* at 524-25.  Finally, this Court noted that such uncommunicated opinions and work product must also be disclosed in these circumstances because, as a "practical matter," communications between outside counsel and a client "are rarely if ever exclusively in written form," meaning these materials will be necessary for depositions.  *Id.* at 525 (citing FRCP 26(b)(1) and *Matsushita Elec. Corp. v. Loral Corp.*, 96 Civ. 5461 (SAS), 1995 U.S. Dist. LEXIS 12880, at *4 (S.D.N.Y. Sept. 7, 1995)).[8]

2.    Waiver in Legal Malpractice Cases

Most important, for purposes of this motion, a defendant who is sued in this jurisdiction for providing allegedly inadequate legal advice is entitled to discover contemporaneous related legal advice obtained by, and related work performed for, the plaintiff because these materials are vital to the legal and factual issues involving the underlying malpractice claim, in particular, to questions about whether plaintiff relied on the defendant's advice and whether the alleged damages are solely attributable to the defendant.  *See, e.g.*, *Goldberg v. Hirschberg*, 806 N.Y.S.2d 333, 337 (Sup. Ct. New York Cty. 2005) (because plaintiff was claiming reliance on defendant's legal advice on a certain issue to its detriment, the advice received from and work

---

[8] This Court further noted that "[i]f documents existed, for example, showing that outside counsel believed at one point that the infringement claims were weak or frivolous, the plaintiffs would have a strong basis for probing the [defendant] witnesses' own knowledge of these views of outside counsel regardless of whether a formal document exists communicating such views.  Even if outside counsel's internal discussions end up not being admissible themselves to show [defendant's] intent, the disclosure of such internal discussions would be 'reasonably calculated to lead to the discovery of admissible evidence.'"  *In re Buspirone*, 208 F.R.D. at 525.

product performed by any other lawyers on that issue was discoverable and not subject to the attorney-client privilege); *Bolton v. Weil, Gotshal & Manges, LLP*, 4 Misc. 3d 1029(A), at *4-6 (Sup. Ct. New York Cty. Sept. 10, 2004) (same with regard to communications with plaintiff's contemporaneous personal attorneys); *Bank Brussels Lambert*, 210 F.R.D. at 508, 510 (third-party malpractice defendant law firm entitled to otherwise privileged communications and work product related to underlying matter, particularly those communications analyzing defendant's advice).

Even when the third party legal advice in question is not contemporaneous, but rather is subsequent to the alleged malpractice, the attorney-client privilege is nevertheless waived when the client "places the subject matter of the communication in issue or where the invasion of the privilege is required to determine the validity of the client's claim or defense and application of the privilege would deprive the adversary of vital information." *IMO Indus., Inc. v. Anderson Kill & Olick, P.C.*, 746 N.Y.S.2d 572, 575, 577 (Sup. Ct. New York Cty. 2002); *see also Pappas v. Holloway*, 787 P.2d 30, 36-37 (Wash. 1990) (attorney entitled to discover communications between former client and subsequent counsel related to underlying litigation and settlement because client could not sue for malpractice and "at the same time conceal from him communications which have a direct bearing on this issue") (also cited by *IMO*).

3.   Defendants Are Entitled to the Relevant Legal Advice and Work Product

Through broad allegations of malpractice in the Complaint, and by claiming it is entitled to recoup hundreds of thousands of dollars in costs and legal fees paid to other counsel, Windsor has placed the related legal advice and work product at issue in this case.

First, Mr. Prusky admitted at his deposition that Windsor consulted other attorneys when hiring Mr. Rousseau to provide advice about the Loans.  Heffer Decl. ¶ 8.  Since Windsor claims that Defendants provided inadequate initial legal advice regarding the Loans, Defendants are

entitled to documents that reflect any related legal advice from other counsel, and are entitled to question Mr. Prusky at his continued deposition about this advice.

Second, with regard to the enforcement of Windsor's rights during the related litigations, it is obvious from the documents produced in this action, and the privilege log entries for the relevant time period (i.e., from around February 2013 to September 2014), that Windsor had sought legal representation from other counsel contemporaneous with the representation by Defendants that Windsor now challenges. ██████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████ *See supra* at 4. ██████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████ *Id.*[9]

Finally, even if these documents somehow did not involve "contemporaneous" legal representation, they still fall within the broader waiver category of documents reflecting subject matter that Windsor has placed "at issue" in this litigation and that are vital to Defendants' ability to maintain their defenses.  In the various document productions over the last month, Defendants' counsel found several previously withheld documents that are not only relevant but whose disclosure is essential to Defendants' ability to litigate the key issues in this case – such as

---

[9] As stated above, Windsor has taken the untenable position that it does not have to provide materials from any attorneys that it consulted but never officially retained, and that it does not have to provide materials for any attorneys it did retain prior to the official engagement.  *See supra* at 6-7.  First, Windsor cannot have it both ways: it cannot withhold these documents on the basis that they are privileged communications with legal counsel and then attempt to escape the "at issue" waiver to this same privilege by claiming these attorneys were not "official" counsel.  Second, it is abundantly clear from the myriad documents produced and privilege log entries that many attorneys, including Judd and Antonino, were performing substantive work for Windsor, regardless of whether an engagement letter had been signed.  For example, Windsor's privilege log descriptions concede that Judd and Antonino were communicating to Windsor during this relevant period about "litigation strategy," "Barnes and Bitter," "settlement agreement," "Motion for Reconsideration [of the arbitration decision]," "Bitter Litigation," "underlying cases," and "underlying litigation."  *See generally* Heffer Decl. Ex. 10.

whether Windsor actually relied on Defendants' legal advice, whether this advice was the proximate cause of Windsor's alleged injuries, and whether Windsor is entitled to such excessive legal fees for other counsel.   *See generally* Compl.; Heffer Decl. Ex. 5 (Interrogatory Responses).

For example, in one previously withheld e-mail, dated October 14, 2014 (just a month after Defendants were terminated), ██████████████████████████████████████ ████████████████████████ Heffer Decl. ¶¶ 24-25, Ex. 14. ██████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████ *See supra* at 4.   The discrepancy cuts to the heart of whether Defendants' differing professional judgment was a breach of the standard of care, whether Windsor actually relied on *Defendants*' legal advice, whether this advice was the proximate cause of Windsor's alleged injuries, and whether Windsor is entitled to legal fees for other counsel.   Defendants believe the materials they now seek to compel concern this same subject matter and are necessary to the adjudication of this case.

Courts applying New York law have consistently allowed defendants to obtain disclosure in similar circumstances where, as here, the legal advice from a subsequent attorney in connection with an underlying matter is central to questions about a plaintiff's alleged reliance and is vital to determining whether the earlier legal advice actually resulted in damages.   The assertion of damages related to legal fees for subsequent representation also incontrovertibly

places that representation at issue. *See IMO Indus., Inc.*, 746 N.Y.S.2d at 573-77 (for malpractice claims related to drafting of joint stipulation, which purportedly resulted in ruling that IMO had to reimburse its insurer for defense costs, defendant law firm entitled to IMO's communications with concurrent firm who continued representing IMO after defendant because the communications were relevant to whether injury was causally related to the alleged malpractice <u>and</u> because defendant was entitled to discovery regarding whether malpractice was only possible cause of purported loss); *Bolton*, 4 Misc. 3d 1029(A), at *4-6; *Bank Brussels Lambert*, 210 F.R.D. at 508-10.

In *Aurora Loan Services v. Posner, Posner & Assocs., P.C.*, plaintiff alleged that defendants neglected numerous foreclosure actions, which led to plaintiff hiring new counsel to take over the actions. 499 F. Supp. 2d 475, 477 (S.D.N.Y. 2007). The district court affirmed the magistrate's decision to allow discovery of documents related to subsequent counsel's representation, even though the actions in question continued for several years after the alleged malpractice because "the public record indicates that the cases went on for years, but does not explain why they went on for so long, *or whether defendant's conduct was in fact the proximate cause of the losses in question*." *Id.* at 478 (emphasis added).

Similarly, in *Goldberg*, plaintiffs alleged defendants provided negligent advice regarding an investment policy, causing plaintiffs to become the subject of lengthy investigations by the SEC and the New York State Attorney General's office. 806 N.Y.S.2d at 334. The court held that defendants were entitled to communications and work product from subsequent counsel for the investigations, despite the fact that the representation was not concurrent, because the *complaint contained allegations that defendants were responsible for all of plaintiffs' subsequent injuries* related to the later investigations, including incurred attorneys' fees. *Id.* at 336-37. As

the court explained, defendants were entitled to know what subsequent counsel thought about the source of plaintiffs' injuries and, because of the claim for subsequent attorneys' fees, plaintiffs otherwise had placed the subsequent representation at issue. *Id.*

All five litigations at issue in the instant action continued long after Defendants were terminated: the Bitter settlement agreement took another five months to finalize; the Acker and Collins actions included two summary judgment motions before settlement; and the Coppock and Stamatov actions lasted for years, amassing huge legal fees, before Windsor settled by paying the two living insureds the "nuisance value" settlements in amounts of $12,000 each. Heffer Decl. ¶ 4, Exs. 2, 5.  Nevertheless, Windsor alleges in its Complaint, which was filed prior to the resolution of everything but the Bitter Litigation, that Defendants' negligence foreclosed the possibility that Windsor could prevail in any of these cases.  *See* Compl. ¶¶ 51-72, 89-102, 111-126, 138-153, 165-171, 173-177.  Yet, Windsor continued to litigate aggressively all five litigations long after terminating Defendants, and even longer after getting the Bitter arbitration decision.

Given the fact that Windsor's allegations are contradicted by its own actions (both before and after the filing of the Complaint), Defendants should be permitted to review communications between or among Windsor and other counsel regarding legal bills, case strategy, and settlement – i.e., materials that would reflect what Windsor and subsequent counsel thought of Windsor's chances for success, Defendants' performance as Windsor's attorneys, and the decisions to settle each case – because Defendants have no other way to obtain this information.  These materials are solely within Windsor's possession and directly concern each of the elements of Windsor's malpractice claim.  *See Roznitsky v. Schwartz Cobb & Scheinert*, 98 Civ. 6643 (CSH)(MHP), 1999 U.S. Dist. LEXIS 4449, at *9 (S.D.N.Y. April 2, 1999) (explaining the touchstone of the

"at issue" waiver is finding that "invasion of the privilege is required to determine the validity of the client's claim or defense and application of the privilege would deprive the adversary of vital information") (quoting *Jakobleff v. Cerrato, Sweeney & Cohn*, 97 A.D.2d 834, 835, 468 N.Y.S.2d 895, 897 (2d Dep't 1983)); *In re Buspirone*, 208 F.R.D. at 520-21 (Gorenstein, M.J.) ("The 'at issue' waiver doctrine centers on the 'fairness' to the party seeking disclosure.  It would be unfair for a party who has asserted a factual matter that places attorney-client communications at issue to deprive the opposing party of the means to test that factual matter through discovery of these communications.").

Defendants need access to such communications and work product to test Windsor's theories of the case and assert their own defenses.  By withholding these materials, Windsor is depriving Defendants of invaluable information and forcing them to litigate without all the necessary facts.

## <u>CONCLUSION</u>

As explained herein, Defendants are entitled to a court order compelling Windsor to produce all communications with other counsel and related work product, not only for the time period in which these other attorneys served as contemporaneous counsel, but also for the times prior and subsequent to Defendants' representation.

They are entitled to such an order, not only with regard to the documents represented in Windsor's several privilege logs but also with regard to the 50,000 withheld documents for which Windsor has yet to assert any privilege.

Finally, Defendants are entitled, pursuant to FRCP 37(a)(5)(A), to a court order requiring Windsor to pay Defendants' reasonable expenses incurred in making this motion, including attorneys' fees.

Dated: New York, New York
      May 30, 2017

Respectfully submitted,

FOLEY & LARDNER LLP

By: */s/ Peter N. Wang*
    Peter N. Wang (PW 9216)
    Douglas S. Heffer (DH 6082)
    Adam G. Pence (AP 8621)
    90 Park Avenue
    New York, New York 10016
    Tel: (212) 682-7474
    Fax: (212) 687-2329
    pwang@foley.com
    dheffer@foley.com
    apence@foley.com

    *Attorneys for Defendants*
    *Arent Fox, LLP and Julius Rousseau, III*