UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
WINDSOR SECURITIES, LLC,                          :

                                                  :          OPINION AND ORDER

                    Plaintiff,                    :          16 Civ. 1533 (GBD) (GWG)

       -v.-                                       :

ARENT FOX LLP et al.,                             :

                                                  :

                    Defendants.                   :
-------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

        The defendants in this case are an attorney and law firm who represented plaintiff

Windsor Securities, LLC ("Windsor") in certain insurance transactions and an arbitration that

arose from one of those transactions.  Windsor eventually fired the defendants, obtained

replacement counsel to represent it in subsequent legal action related to the insurance

transactions, and brought this suit against the defendants for malpractice.  Before the Court is

defendants' motion to compel Windsor to produce communications with its replacement

counsel.[1]  While Windsor asserts that the communications are protected by the attorney-client

privilege and the work product doctrine, defendants argue that Windsor has waived protection of

these communications because it has placed their content "at issue" in this case.  For the

following reasons, defendants' motion to compel is denied.

---

[1]  Notice of Motion, filed May 30, 2017 (Docket # 54); Memorandum of Law in Support
of Defendants' Motion to Compel, filed May 30, 2017 (Docket # 55) ("Defs. Mem.");
Declaration of Julius Rousseau, III in Support of Defendants' Motion to Compel, filed May 30,
2017 (Docket # 56) ("Rousseau Decl."); Declaration of Douglas S. Heffer in Support of
Defendants' Motion to Compel, filed May 30, 2017 (Docket # 57) ("Heffer Decl.");
Memorandum of Law in Support of Plaintiff Windsor Securities LLC's Opposition to
Defendants' Motion to Compel, filed June 13, 2017 (Docket # 60) ("Pl. Opp'n"); Reply
Memorandum of Law in Further Support of Defendants' Motion to Compel, filed June 20, 2017
(Docket # 64) ("Defs. Reply"); Letter from Peter N. Wang, filed June 20, 2017 (Docket # 65).

I.  BACKGROUND

    A.  Complaint and Alleged Malpractice

The allegations in this case arise from Windsor's decision in 2007 to offer life insurance premium financing to five individuals.  See Complaint and Demand for Jury Trial, filed Feb. 29, 2016 (Docket # 1) ("Compl."), ¶¶ 8-10, 15.  In simple terms, Windsor loaned these individuals money to purchase life insurance, with a 15% interest rate on the loans.  Id. ¶ 20.  The life insurance policy was the sole collateral for the loan.  Id. ¶ 10.  Each insured created a trust to receive the loan from Windsor, and the trust acted as the borrower on the loan and owner of the policy.  See id. ¶ 13.  In addition to financing the policies with the initial loan, Windsor would pay the insurance premiums during the term of the loan.  See id. ¶¶ 10, 14, 16, 21.  Prior to the maturity date of the loans — referred to as "Premium Finance Loans" — Windsor's intention was that the insureds would either: (1) cause the trusts to pay off the loan, in which case the trusts would remain the owner of the policy; or (2) "walk[] away from the policy by transferring ownership of the life insurance policy to Windsor," though the individuals would remain the insureds.  See id. ¶ 14.  If option (2) was selected and ownership of the policy was transferred, Windsor would either let the policy lapse for a total loss or "continue to pay the premiums, as owner, with the hope that the ultimate death benefit would exceed the costs put into the policy." Id.  In the event of an uncured default under the terms of the loan, Windsor could also compel transfer of ownership in the policy.  See id. ¶ 19.

In June 2009, Windsor engaged defendant Julius Rousseau, III, and his law firm at the time to "provide general advice and representation to [Windsor] in connection with" the policies. Letter from Jule Rousseau, dated June 5, 2009 (attached as Ex. D to Compl.); accord Compl. ¶ 28.  Rousseau continued to advise Windsor in this capacity after becoming a partner at

defendant Arent Fox LLP in June 2010.  Compl. ¶¶ 29-32.  Rousseau and Arent Fox represented plaintiff "before and at the Maturity Dates for each of the Premium Finance Loans" at issue in this case.  Id. ¶ 34.  Between February 2010 and February 2011, following the advice of defendants, Windsor obtained change of ownership ("COO") agreements from the trusts of the five individual insureds.  Id. ¶¶ 49-50, 82-86, 112-113, 139-140, 162-163.  Defendants specifically advised Windsor that the executed COOs gave Windsor ownership of and entitlement to the death benefits under the policies.  Id. ¶¶ 51, 70-71, 87, 116, 146, 165.  Notwithstanding these assurances, however, the validity of the transfers was eventually called into question.

On December 23, 2012, the first of the five insureds, John L. Bitter, died.  Id. ¶¶ 37, 52.  When Windsor attempted to collect on the death benefits of Bitter's policy, Bitter's trustee filed a lawsuit on February 13, 2013, challenging Windsor's ownership of the policy.  Id. ¶¶ 54-58.  The dispute was arbitrated as provided for by the financing agreement.  Id. ¶ 59.  Rousseau represented Windsor during the arbitration.  Id. ¶¶ 60-61, 63.  On April 8, 2014, the Bitter arbitration ended with a ruling that, the COO agreement notwithstanding, Bitter's trust "retained ownership" of the Bitter life insurance policy.  See "American Arbitration Association Interim Award," dated Apr. 8, 2014 (attached as Ex. K to Compl.) ("Bitter Arbitration Award"), at 7; accord Compl. ¶ 63.  The arbitration decision found that Windsor failed to comply with a specific provision in the transaction documents and with California Civil Code § 9620 by not making a notification required by one of the loan documents.  See Bitter Arbitration Award at 4-7.  As a result, Windsor was only entitled to the premiums it had paid on the policy and interest at a rate of 10 percent.  Id. at 7; accord Compl. ¶ 63.

At about this time, Windsor began consulting other counsel on this and related issues.

See Rousseau Decl. ¶ 3 (indicating that attorneys Darin Judd and Lauren Antonino started representing Windsor "[a]round July or August 2014" and were from then on included in communications between defendants and Windsor); "Privilege Log," undated (attached as Ex. 10 to Heffer Decl.), at 1 (showing that as early as April 15, 2014, Windsor's principal was receiving legal advice from Judd in this case). The parties dispute the substance and timing of these consultations. Windsor contends that it never "receive[d] concurrent advice from either Judd or Antonino (or their firms) on the issues which are the basis" of the malpractice claims in this action. See Pl. Opp'n at 2-3 (emphasis omitted). According to Windsor, the malpractice in this action was complete before replacement counsel was consulted, and neither Judd nor Antonino "ever gave transactional legal advice to Windsor with respect to the management of any of the policies at issue in this litigation." See id. at 12-13; accord Declaration of Darin T. Judd in Opposition to Motion Seeking to Compel Discovery, dated June 6, 2017 (attached as Attach. 2 to Pl. Opp'n) ("Judd Decl."), ¶¶ 3-7, 11; Affidavit of Lauren S. Antonino, dated June 8, 2017 (attached as Attach. 3 to Pl. Opp'n) ("Antonino Aff."), ¶¶ 2-7, 13. Defendants contend that Windsor received legal advice from counsel other than defendants beginning shortly after the April 2014 Bitter Arbitration Award. See Defs. Mem. at 1-3, 12-13 & n.9.

Windsor terminated Rousseau and Arent Fox on September 9, 2014. Letter from Alan L. Frank, dated Sept. 9, 2014 (attached as Ex. I to Compl.); accord Compl. ¶ 36. On January 29, 2015, Windsor settled the Bitter matter with the assistance of new counsel. See Stipulation and Order to Release Interpleader Funds, dated Feb. 13, 2015 (attached as part of Ex. 2 to Heffer Decl.), at 3. The settlement amount was "significantly less than the full death benefits under the Bitter Policy." Compl. ¶ 68 & n.5.

In light of the adverse arbitration ruling in the Bitter matter, the insurance providers of two other recently-deceased insureds, Joe E. Acker and Erwin A. Collins, filed interpleader actions challenging Windsor's entitlement to these insureds' death benefits. Id. ¶¶ 91-93, 119-121. Both the Acker and Collins trustees were represented by the same counsel who represented the Bitter trustee during the Bitter arbitration, and neither trustee had claimed any problem with Windsor's ownership of the policies until after conclusion of the Bitter arbitration. See id. ¶¶ 92, 94, 120, 122. The litigation with these insureds ended in the same manner as the arbitration — that is, with rulings that Windsor was entitled to only premiums paid on the account plus interest and costs. See Order Granting in Part and Denying in Part Motion for Summary Judgment [in Acker Matter], dated Sept. 21, 2015 (attached as Ex. N to Compl.), at 6-10; Order Granting in Part and Denying in Part Motion for Summary Judgment [in Collins Matter], dated Sept. 21, 2015 (attached as Ex. O to Compl.), at 6-10; accord Compl. ¶¶ 98-99, 124-125. Windsor settled the Acker action on March 28, 2016, and the Collins action on April 15, 2016. See Amended Joint Stipulation and Order to Vacate Settlement Conference [in Acker Matter], dated Apr. 22, 2016 (attached as part of Ex. 2 to Heffer Decl.), ¶ 6; Amended Joint Stipulation and Order to Vacate Settlement Conference [in Collins Matter], dated Apr. 22, 2016 (attached as part of Ex. 2 to Heffer Decl.), ¶ 6.

On January 7, 2015, Windsor brought declaratory relief actions against the trusts of the remaining insureds, Robert S. Coppock and Jane Ann Stamatov. See Compl. ¶¶ 152, 170. Windsor settled these actions in 2016, after the instant action was brought. See Ex Parte Application and Order to Further Extend the Order of Dismissal upon Settlement [in Coppock Matter], dated Mar. 17, 2016 (attached as part of Ex. 2 to Heffer Decl.); Ex Parte Application

and Order to Further Extend the Order of Dismissal upon Settlement [in Stamatov Matter], dated Mar. 17, 2016 (attached as part of Ex. 2 to Heffer Decl.); Compl. ¶¶ 153, 171.

Windsor brought the instant action, alleging that defendants committed malpractice, on February 29, 2016. See generally Compl. Windsor alleges that defendants' malpractice led to both a reduced recovery on the various life insurance policies and to Windsor's having to expend legal fees in defending and pursuing litigation related to the COOs. See id. at 53; Plaintiffs' Response to Defendants' First Set of Interrogatories, dated July 11, 2016 (attached as Ex. 5 to Heffer Decl.), at 3-5.

B. The Privilege Dispute

Defendants have sought Windsor's communications with attorneys it consulted regarding the transactions at issue in this lawsuit. Windsor has asserted privilege as to all them (other than its communications with defendants). Defendants argue that Windsor has waived privilege because it has "place[ed] the subject matter of the documents at issue in this malpractice litigation." Defs. Mem. at 5. Defendants argue that "[b]y claiming that Defendants' alleged malpractice foreclosed any possibility of recovering the full death benefits" under the COOs and "by claiming it is entitled to recoup all legal fees and costs related to the five underlying litigations, Windsor has placed the subject matter of its communications with other counsel in those litigations, as well as their work product and billing, at issue." Defs. Mem. at 7-8 (internal quotation marks omitted). According to defendants, the documents would allow them to assess whether "Windsor actually relied on Defendants' legal advice, whether this advice was the proximate cause of Windsor's alleged injuries, and whether Windsor is entitled to such excessive legal fees for other counsel." Defs. Mem. at 13-14.

II.  APPLICABLE LAW

   A.  State-Law Attorney-Client Privilege and Federal Work Product Doctrine

   Under the Federal Rules of Evidence, in civil actions where "state law supplies the rule

of decision" — as is true here — state law also governs matters of privilege.  See Fed. R.

Evid. 501; Mount Sinai Sch. of Med. v. Am. Tobacco Co., 880 F.2d 1520, 1527 (2d Cir. 1989)

(citing Dixon v. 80 Pine St. Corp., 516 F.2d 1278, 1280 (2d Cir. 1975)); accord Vessalico v.

Costco Wholesale Warehouse, 2016 WL 3892403, at *1 (E.D.N.Y. July 14, 2016); HSH

Nordbank AG N.Y. Branch v. Swerdlow, 259 F.R.D. 64, 70 n.6 (S.D.N.Y. 2009); Allied Irish

Banks v. Bank of Am., N.A., 240 F.R.D. 96, 102 (S.D.N.Y. 2007).  Here, both parties agree that

New York law applies to the Court's determination of privilege.  Defs. Mem. at 8-9; Pl. Opp'n

at 24-25, 26-28.

   New York law protects confidential communications made both "between [an] attorney

or his or her employee and the client in the course of professional employment," N.Y. C.P.L.R.

4503(a)(1), and "for the purpose of obtaining legal advice and directed to an attorney who has

been consulted for that purpose," Rossi v. Blue Cross & Blue Shield of Greater N.Y., 73 N.Y.2d

588, 593 (1989) (internal quotation marks omitted) (quoting In re Grand Jury Subpoena Served

upon Bekins Record Storage Co., 62 N.Y.2d 324, 329 (1984)).  Thus, "[t]he attorney-client

privilege shields from disclosure any confidential communications between an attorney and his

or her client made for the purpose of obtaining or facilitating legal advice in the course of a

professional relationship."  Ambac Assurance Corp. v. Countrywide Home Loans, Inc., 27

N.Y.3d 616, 623 (2016) (citing N.Y. C.P.L.R. 4503(a)(1)).

   "While state law governs the question of attorney-client privilege in a diversity action,

federal law governs the application of the work product doctrine."  Egiazaryan v. Zalmayev, 290

F.R.D. 421, 435 (S.D.N.Y. 2013) (citations omitted). This doctrine is outlined in the Federal

Rules of Civil Procedure, which state that "[o]rdinarily, a party may not discover documents and

tangible things that are prepared in anticipation of litigation or for trial by or for another party or

its representative." Fed. R. Civ. P. 26(b)(3)(A). Such materials may be discovered only if "they

are otherwise discoverable" and the requesting party "shows that it has substantial need for the

materials to prepare its case and cannot, without undue hardship, obtain their substantial

equivalent by other means." Id.

    B. "At Issue" Waiver

    One instance in which a party is deemed to have waived attorney-client privilege or work

product protection occurs when the party places otherwise protected communications "at issue"

in the litigation. See, e.g., John Doe Co. v. United States, 350 F.3d 299, 302 (2d Cir. 2003); In

re von Bulow, 828 F.2d 94, 102 (2d Cir. 1987).[2] New York courts have defined "at issue"

waiver as occurring "where a party affirmatively places the subject matter of its own privileged

communication at issue in litigation, so that invasion of the privilege is required to determine the

validity of a claim or defense of the party asserting the privilege, and application of the privilege

would deprive the adversary of vital information." Deutsche Bank Tr., 43 A.D.3d at 63; accord

_____

    [2] New York courts have frequently cited to federal case law in applying the "at issue"
waiver doctrine. See, e.g., People v. Kozlowski, 11 N.Y.3d 223, 245-46 (2008); Deutsche Bank
Tr. Co. of Ams. v. Tri-Links Inv. Tr., 43 A.D.3d 56, 63-64, 66, 69 (1st Dep't 2007). Consistent
with this practice and because we discern no difference in these two courts' applications of the
"at issue" waiver doctrine, we cite to both state and federal law. See generally Leviton Mfg. Co.
v. Greenberg Traurig LLP, 2010 WL 4983183, at *4 (S.D.N.Y. Dec. 6, 2010) (noting that New
York law follows Second Circuit law on aspects of the "at issue" waiver doctrine); Laborers
Local 17 Health Benefit Fund v. Philip Morris, Inc., 1998 WL 414933 at *1 n.1 (S.D.N.Y. July
23, 1998) ("[T]he law in New York concerning [the at-issue] waiver theory parallels federal
law.") (citation omitted); accord Chin v. Rogoff & Co., 2008 WL 2073934, at *5 n.11 (S.D.N.Y.
May 8, 2008).

Nomura Asset Capital Corp. v. Cadwalader, Wickersham & Taft LLP, 62 A.D.3d 581, 582 (1st Dep't 2009).

The doctrine's goal is to achieve "fairness." See John Doe Co., 350 F.3d at 302 ("[A] party's assertion of factual claims can, out of considerations of fairness to the party's adversary, result in the involuntary forfeiture of privileges for matters pertinent to the claims asserted.") (citations omitted); accord United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991) (communications are put at issue when the party makes an assertion "that in fairness requires examination of protected communications") (citations omitted). It would be unfair for a party who has asserted facts that place privileged communications at issue to deprive the opposing party of the means to test those factual assertions through discovery of those communications.

"Whether fairness requires disclosure has been decided by the courts on a case-by-case basis, and depends primarily on the specific context in which the privilege is asserted." In re Grand Jury Proceedings, 219 F.3d 175, 183 (2d Cir. 2000); accord In re County of Erie, 546 F.3d 222, 229 (2d Cir. 2008). For an at-issue waiver to occur, "a party must rely on privileged advice from his counsel to make his claim or defense." In re County of Erie, 546 F.3d at 229 (emphasis in original); accord Scott v. Chipotle Mexican Grill, Inc., 67 F. Supp. 3d 607, 611 (S.D.N.Y. 2014) (same); Deutsche Bank Tr., 43 A.D.3d at 64 ("[A]t issue waiver occurs when the party has asserted a claim or defense that he intends to prove by use of the privileged materials.") (citations and internal quotation marks omitted); Veras Inv. Partners, LLC v. Akin Gump Strauss Hauer & Feld LLP, 52 A.D.3d 370, 374 (1st Dep't 2008) (same).

Importantly, the question in at-issue waiver cases is not simply whether the requested information is relevant. As the First Department put it: "that a privileged communication contains information relevant to issues the parties are litigating does not, without more, place the

contents of the privileged communication itself 'at issue' in the lawsuit; if that were the case, a privilege would have little effect." <u>Deutsche Bank Tr.</u>, 43 A.D.3d at 64 (citations omitted); <u>accord</u> <u>Veras Inv. Partners</u>, 52 A.D.3d at 374 ("it was error for the [lower court] to find waiver on the basis of relevance alone").

III. <u>DISCUSSION</u>

Windsor's malpractice claim alleges that during the course of his representation Rousseau failed to advise Windsor to take critical steps that would have allowed Windsor to obtain the full value of the life insurance policies. Compl. ¶¶ 182-184. Additionally, Windsor asserts that Rousseau did not give proper advice to Windsor regarding the conduct of the Bitter arbitration and the subsequent negotiations to settle it. <u>Id.</u>

Windsor has made clear that it does not intend to rely on any communications with its replacement counsel in order to prove its claims in this case. Pl. Opp'n at 2-3, 24, 37, 41. This circumstance takes this case outside of the vast majority of cases addressing the "at issue" waiver doctrine. Indeed, case law in many instances presumes as a factual predicate to finding "at issue" waiver that a party will actually rely on privileged communications. For example, the First Department described the "at issue" waiver doctrine as follows:

> "[A]t issue" waiver occurs "when the party has asserted a claim or defense that he intends to prove by use of the privileged materials" (<u>North Riv. Ins. Co. v Columbia Cas. Co.</u>, 1995 WL 5792, *6, 1995 US Dist LEXIS 53, *17 [SD NY 1995] [citations omitted]; <u>see also</u> <u>Manufacturers & Traders Trust Co. v Servotronics, Inc.</u>, 132 AD2d 392, 397 [1987] [no "at issue" waiver where the party asserting privilege "does not need the privileged documents to sustain its cause of action"]). An example of an affirmative act that does constitute "at issue" waiver of privilege is a party's "assert[ing] as an affirmative defense [its] reliance upon the advice of counsel" (<u>Village Bd. of Vil. of Pleasantville v Rattner</u>, 130 AD2d 654, 655 [1987]). "Moreover, selective disclosure is not permitted as a party may not rely on the protection of the privilege regarding damaging communications while disclosing other self-serving communications" (<u>id.</u>; <u>see also</u> <u>Orco Bank v Proteinas Del Pacifico</u>, 179 AD2d 390, 390 [1992]

[attorney-client privilege was waived by client's "selective disclosure" of legal advice]).

Deutsche Bank Tr., 43 A.D.3d at 64 (second and third alterations in original); accord Veras Inv. Partners, 52 A.D.3d at 372 ("'[A]t issue' waiver occurs when a party has asserted a claim or defense that he or she intends to prove by use of the privileged material.").

Because Windsor does not intend to use any of its communications with replacement counsel as evidence in this case — and in any event will now be precluded from doing so — there is no obvious unfairness to defendants in upholding Windsor's claim of privilege. Indeed, case law frequently ends the inquiry into "at issue" waiver once it is established that the party does not intend to use such materials as proof. See, e.g., Stock v. Schnader Harrison Segal & Lewis LLP, 142 A.D.3d 210, 241 (1st Dep't 2016) (finding no waiver where "defendants ha[d] never indicated, and expressly den[ied] having, any intention to use . . . privileged documents to prove any claim or defense" because "such use of privileged materials [is] the sine qua non of 'at issue' waiver") (citation omitted); Mfrs. & Traders Tr. Co. v. Servotronics, Inc., 132 A.D.2d 392, 397 (4th Dep't 1987) ("[Plaintiff] has not waived the attorney-client privilege by injecting privileged material into the lawsuit because [plaintiff] does not need the privileged documents to sustain its cause of action.") (citation omitted). Because Windsor will not be relying on any communications with counsel, it is the defendants' burden to show why the privileged material is so critical to their defense that it would be unfair not to breach attorney-client privilege in order to provide them with it. See IDT Corp. v. Morgan Stanley Dean Witter & Co., 107 A.D.3d 451, 452 (1st Dep't 2013) ("Although the privileged information sought by defendant is relevant to plaintiff's fraud claims, plaintiff disavows any intention to use privileged materials and defendant fails to show that the materials are necessary to determine the validity of the claims or

to its defense against them.  Accordingly, defendant failed to establish that an 'at issue' waiver

of the attorney-client privilege occurred.") (internal citations omitted).

Defendants recite a number of questions that they assert provide the basis for finding a

waiver, Defs. Mem. at 7, and make scattered references elsewhere in their brief to such topics,

id. at 10-11, 13-14, 16.  We do not see, however, how Windsor put any of the topics at issue so

that invasion of the privilege is "required" to determine the validity of Windsor's claims or any

defense.  To address this question, we begin by noting the elements of Windsor's malpractice

claim:

> [T]o recover damages for legal malpractice, a plaintiff must demonstrate that the
> attorney "failed to exercise the ordinary reasonable skill and knowledge
> commonly possessed by a member of the legal profession" and that the attorney's
> breach of this duty proximately caused plaintiff to sustain actual and ascertainable
> damages. To establish causation, a plaintiff must show that he or she would have
> prevailed in the underlying action or would not have incurred any damages, but
> for the lawyer's negligence.

Rudolf v. Shayne, Dachs, Stanisci, Corker & Sauer, 8 N.Y.3d 438, 442 (2007) (internal citation

omitted).[3]  We next turn to the specific factual topics that defendants assert have been placed "at

issue."

Defendants assert that plaintiffs have put at issue what the new counsel "thought of

Windsor's chance of success," Defs. Mem. at 16, and perhaps relatedly the question of

---

[3]  We do not address Windsor's other causes of action, for breach of fiduciary duty and
breach of contract, see Compl. ¶¶ 186-191, 192-194, because under New York law such claims
are duplicative of legal malpractice claims and cannot be pursued separately where, as is true
here, they are based on the same facts and seek the same relief as a legal malpractice claim.  See,
e.g., MIG, Inc. v. Paul, Weiss, Rifkind, Wharton & Garrison, L.L.P., 701 F. Supp. 2d 518, 532
(S.D.N.Y. 2010) ("New York Law holds that, where a breach of contract or breach of fiduciary
duty claim is premised on the same facts and seeks relief identical to that sought in a legal
malpractice cause of action, such claims are redundant and should be dismissed.") (citation and
internal quotation marks omitted).

Windsor's own "evaluations of subsequent counsel's performance," Defs. Reply at 10. But the question before the jury will be whether defendants failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession. That question can easily be answered by resort to expert testimony. Defendants are not "required" to learn what new counsel thought of defendants' performance in order to address this issue. See Deutsche Bank Tr., 43 A.D.3d at 63-64.

Defendants also assert that they need to know whether Windsor "relied" on the advice of new counsel, Defs. Mem. at 7, 11, 13-14, and whether new counsel contributed to causing Windsor's damages such that defendants were not the proximate cause of those damages, id. at 7, 13-14. While this argument has some surface appeal, it fails under scrutiny. There is no scenario under which defendants would be "required" to learn the content of new counsel's advice in order for defendants to address the causation question. We begin by noting that to establish causation, Windsor must show that it would not have incurred the damages alleged "but for" the defendants' allegedly bad advice. Rudolf, 8 N.Y.3d at 442. To the extent defendants are advancing this argument as to the period after Windsor discharged defendants as its attorneys, it is obvious that this argument fails. Whatever allegedly bad advice defendants gave was concluded by the time new counsel was engaged and represented Windsor. Whether defendants' allegedly bad advice caused Windsor to incur damages — specifically, in the manner Windsor litigated or settled the claims against the other insureds — does not depend on the advice of new counsel. To reduce the problem to simple terms: Windsor is alleging that defendants' actions created a mess that it tried to clean up. Windsor hired new counsel to advise it and assist in cleaning up that mess. Whether Windsor and/or new counsel took appropriate actions to clean up that mess will be judged by the actions Windsor and its counsel actually took,

13

not based on the <u>advice</u> its new counsel gave as to how to clean up the mess. Defendants will be free to argue that the method of clean-up was unnecessary or badly performed. But for defendants to make these arguments, it is not necessary for them to learn what was said between Windsor and new counsel.

Defendants themselves provide an example that supports this point. Defendants assert that an email from new counsel to a nonparty sent following defendants' termination shows that Windsor undertook a "strategy [that] was directly contrary to [d]efendants' legal advice" in how it conducted the later arbitrations. Defs. Mem. at 14 (emphasis omitted). Defendants, however, do not need to learn the legal advice of new counsel. Information on the actions Windsor actually took in the later arbitrations will be freely available to defendants. And they will be able to make their arguments that Windsor failed to follow their own earlier advice or increased its damages by undertaking a particular strategy without resort to learning about the communications between new counsel and Windsor.

The Court recognizes that there are cases that have allowed defendants in a malpractice suit to obtain discovery of privileged communications with new attorneys. <u>See</u> <u>Goldberg v. Hirschberg</u>, 10 Misc. 3d 292, 297-98 (Sup. Ct., N.Y. County 2005); <u>Bolton v. Weil, Gotshal & Manges LLP</u>, 4 Misc. 3d 1029(A) (Sup. Ct., N.Y. County 2004); <u>IMO Indus., Inc. v. Anderson Kill & Olick, P.C.</u>, 192 Misc. 2d 605, 610-12 (Sup. Ct., N.Y. County 2002); <u>Chin</u>, 2008 WL 2073934, at *6; <u>Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.</u>, 210 F.R.D. 506, 510-11 (S.D.N.Y. 2002). All of these cases, however, rely either directly or indirectly on an articulation of the at-issue waiver doctrine expressed in <u>Hearn v. Rhay</u>, 68 F.R.D. 574 (E.D. Wash. 1975), which has since been criticized as faulty by the Second Circuit in <u>In re County of Erie</u> because it fails to recognize that, for the "at issue" waiver doctrine to apply, the party

14

asserting the privilege must "rely on privileged advice from his counsel to make his claim or defense." In re County of Erie, 546 F.3d at 229 (emphasis in original) ("We agree with its critics that the Hearn test cuts too broadly and therefore conclude that the District Court erred in applying it here."); see also Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Ams., 2009 WL 3111766, at *16 n.6 (S.D.N.Y. Sept. 28, 2009) (noting the court's reliance on Hearn in Bank Brussels, and the Second Circuit's later rejection of Hearn in In re County of Erie). These cases also fail to distinguish — or even mention — the line of cases that refuse to find a waiver where new counsel has entered the case. New York courts have routinely refused to find an at-issue waiver of privileged communications with successor counsel in malpractice cases. See, e.g., Lue v. Finkelstein & Partners, 67 A.D.3d 1187, 1188-89 (3d Dep't 2009) (finding no waiver where defendants contended that "plaintiff's duty to mitigate his damages and the fact that he settled his claim . . . for less than the total available insurance coverage create[d] a situation where his discussions with his [new] attorney regarding that settlement should be disclosed in [a] malpractice action"); Raphael v. Clune White & Nelson, 146 A.D.2d 762, 763 (2d Dep't 1989) ("By commencing suit against his former attorneys, the plaintiff has not placed in issue privileged communications with his [successor] attorneys. Nor are the plaintiff's claims such that disclosure of the privileged communications is necessary in order to enable the [defendants] to assert defenses.") (internal citation omitted); Jakobleff v. Cerrato, Sweeney and Cohn, 97 A.D.2d 834, 835 (2d Dep't 1983) ("[I]t simply cannot be said that plaintiff has placed her privileged communications with her present attorney in issue, or that discovery of such communications is required to enable defendants to assert a defense . . . . To conclude otherwise would render the privilege illusory in all legal malpractice actions . . . ."); Koch v. Sheresky, Aronson & Mayefsky LLP, 33 Misc. 3d 1228(A) (Sup. Ct., N.Y. County 2011) (privileged

15

communications with successor counsel were not put "at issue" in a suit against previous law firm for malpractice in a matrimonial action, where defendant firm sought "entire legal file" for replacement counsel who continued the action after defendant was terminated); Carl v. Cohen, 23 Misc. 3d 1110(A) (Sup. Ct., N.Y. County 2009) (finding that defendant did not "need further discovery of plaintiff's successor attorneys to determine whether or not [defendant's] actions" were the proximate cause of plaintiff's injuries).

Federal court decisions from this district have similarly held that defendants in a legal malpractice case were not entitled to invade the attorney-client privilege for successor counsel. Leviton Mfg. Co. v. Greenberg Traurig LLP, 2010 WL 4983183, at *6 (S.D.N.Y. Dec. 6, 2010) ("Simply because [communications with successor counsel] might be useful in undermining [plaintiff's] explanation [for its subsequent litigation decisions] does not mean that the attorney-client privilege has been impliedly waived.");[4] TIG Ins. Co. v. Yules & Yules, 1999 WL 1029712, at *2 (S.D.N.Y. Nov. 12, 1999) ("If successor counsel did not act reasonably in protecting plaintiff's interests, defendants may demonstrate that failing based on the facts and circumstances of the [subsequent case filed] and the law applicable to the limitations defense there. They do not require access to plaintiff's attorney-client discussions to do so."). We thus do not follow Goldberg, Bolton, IMO Industries, Chin, and Bank Brussels to the extent they hold that a legal malpractice case puts "at issue" post-termination communications made with successor counsel on the subject of the representation. Instead we follow Lue, Raphael, Jakobleff, Koch, Cohen, Leviton, and TIG Insurance Co., which recognize that disclosure of the

---

[4] Oddly, Leviton cites to Goldberg and Bank Brussels — going so far as to summarize their holdings, Leviton, 2010 WL 4983183, at * 4 — but then decides the case in a manner directly contrary to the rule articulated in those cases.

attorney-client communications of counsel is not necessarily required to defend against a claim of malpractice.[5]

We treat as a separate category what the defendants have referred to as the period of "concurrent" representation: that is, the period starting when Windsor first contacted an attorney other than Rousseau about the transactions and ending when defendants were discharged on September 9, 2014. This category, however, is governed by the same logic as the period following the discharge. While new counsel have sworn that they gave no transactional advice to Windsor during this period, Judd Decl. ¶ 11; Antonino Aff. ¶ 13, it is not necessary to probe this assertion. As a logical matter, if Windsor refused to follow defendants' advice at any time, then Windsor obviously could not claim that defendants were responsible for any damages it incurred as a result of refusing to follow the advice. It would thus be unnecessary to learn whether Windsor failed to follow defendants' advice because Windsor had received contrary advice from new counsel.

We thus turn to the question of what damages Windsor could claim assuming that it followed the advice of defendants. If during the period of concurrent representation Windsor's replacement attorneys advised a course of action that differed from defendants' advice, plainly defendants would have no basis for arguing that the replacement attorneys' advice had any effect on Windsor's conduct. What remains then is whether it is "critical" to defendants' arguments on

---

[5] Defendants also rely on <u>Aurora Loan Services, Inc. v. Posner, Posner & Associates</u>, 499 F. Supp. 2d 475 (S.D.N.Y. 2007), to support their request for Windsor's communications with replacement counsel. Defs. Mem. at 15; Defs. Reply at 10, 11. That decision rested largely on review of a Magistrate Judge's opinion and whether its reliance on <u>Goldberg</u> and <u>IMO</u> was clearly erroneous. <u>Aurora</u>, 499 F. Supp. 2d at 477-78. Thus, the court made the noncommittal determination that "although there [was] support for [p]laintiff's position that there has been no waiver here, there is also support for the position that plaintiff's claim of damages has put communications with its successor counsel 'at issue'." <u>Id.</u> at 478.

causation that they learn if Windsor's replacement attorneys gave the same advice to Windsor as defendants. Once again, we conclude that Windsor's claim that defendants caused their damages does not require that defendants learn this fact. The new attorneys are not parties to this suit and are not the subject of any claim for contribution by defendants. Additionally, under New York law, "a plaintiff in a legal malpractice action must establish that the defendant law firm was a proximate cause of damages, but need not establish that it was the proximate cause." Utica Cutlery Co. v. Hiscock & Barclay, LLP, 109 A.D.3d 1161, 1162 (4th Dep't 2013) (emphases in original) (citing Barnett v. Schwartz, 47 A.D.3d 197, 204-05 (2d Dep't 2007)). Thus, even if Windsor's new counsel gave the same allegedly bad advice that defendants gave, defendants could not use this fact to escape their liability to Windsor. See generally Sommer v. Fed. Signal Corp., 79 N.Y.2d 540, 556 (1992) ("[T]ortfeasors generally are jointly and severally liable for a judgment, meaning that each is responsible for the full amount regardless of culpability."); Ravo v. Rogatnick, 70 N.Y.2d 305, 309 (1987) ("When two or more tort-feasors act concurrently or in concert to produce a single injury, they may be held jointly and severally liable.") (citations omitted); see also O'Connor v. State, 126 A.D.2d 120, 128 n.1 (3d Dep't 1987) ("Because of the doctrine of joint and several liability, all defendants remain liable to the plaintiff for all of his damages . . . .").

The principles announced in Jakobleff v. Cerrato, Sweeney & Cohn support this view. In that case, a dissatisfied client sued her former attorney for malpractice, who then impleaded the client's new attorney seeking contribution. Even in that situation, the Second Department held that there was no "at issue" waiver. The Court noted:

> [D]efendants may both raise the defense of plaintiff's failure to mitigate damages and assert a third-party claim for contribution against the present attorney for those damages for which the former attorneys may be liable to plaintiff.

However, it simply cannot be said that plaintiff has placed her privileged communications with her present attorney in issue, or that discovery of such communications is required to enable defendants to assert a defense or to prosecute their third-party claim. To conclude otherwise would render the privilege illusory in all legal malpractice actions: the former attorney could, merely by virtue of asserting a third-party claim for contribution against the present attorney, effectively invade the privilege in every case.

Jakobleff, 97 A.D.2d at 835 (internal citation omitted). We note that at least one other jurisdiction has specifically refused to find a waiver even where there was concurrent representation. See, e.g., Volpe v. Conroy, Simberg & Ganon, P.A., 720 So. 2d 537, 539-40 (Fla. Dist. Ct. App. 1998) (trial court properly refused to invade privileged communications of plaintiff's concurrent attorney, even though the communications may have been relevant to the issues of proximate cause and reasonable reliance).

The defendants's remaining argument is that they need the communications with new counsel to determine if the attorney's fees new counsel charged for subsequent legal work was reasonable. We reject this argument as well. Putting aside the issue of whether there has been an "at issue" waiver, the actual communications between client and counsel have no relevance to whether attorney's fees are reasonable. Whether any attorney's fees claimed were reasonably incurred will be decided by a factfinder based on the tasks performed and the amount of time devoted to those tasks. What was said between client and counsel is obviously irrelevant to this issue. See, e.g., 670 Apartments Corp. v. Agric. Ins. Co., 1997 WL 801458, at *2 (S.D.N.Y. Dec. 30, 1997) ("By claiming that its attorney's fees . . . in the underlying litigation were reasonable, [a party] does not forfeit its protection of the privileged documents, providing it does not rely on the exact nature of the legal advice made at that time or introduce its contents to prove these assertions as part of its legal case.") (quoting Remington Arms Co. v. Liberty Mut. Ins. Co., 142 F.R.D. 408, 414 (D. Del. 1992)); Prudential Ins. Co. of Am. v. Coca-Cola Enters.,

Inc., 1993 WL 276065, at *1 (S.D.N.Y. July 21, 1993) ("[Defendant's] concern about its ability to challenge the reasonableness of [opposing counsel's] fees is exaggerated. [Defendant] has full access to the attorneys' diary entries as well as to the final copies of documents that reflect the ultimate product of [counsel's] labor."); accord Bovis Lend Lease, LMB, Inc. v. Seasons Contracting Corp., 2002 WL 31729693, at *16 (S.D.N.Y. Dec. 5, 2002) ("[T]he reasonableness of the attorneys' fees actually incurred in a case can 'in all probability . . . be determined . . . by examination of attorney time records and documents filed in court.'") (omissions in original) (quoting 670 Apartments, 1997 WL 801458, at *2).

In any event, even if we thought the communications were relevant, we would not find an "at issue" waiver. Deutsche Bank Trust squarely held that "[t]he need to determine the reasonableness of the amounts" plaintiff spent on litigation "does not . . . place at issue the legal advice [plaintiff] received from its attorneys in that litigation, those attorneys' work product, or their private mental impressions, conclusions, opinions or legal theories." 43 A.D.3d at 65.

Our ruling that the attorney-client privilege has not been waived also directs that no finding be made that the claim to attorney-work product protection be waived inasmuch as both questions are governed by the same doctrine. Leviton, 2010 WL 4983183, at *8 (noting that, for at-issue waiver, "[t]he same analysis applies to documents withheld on the basis of the work-product doctrine" as to those withheld as privileged); Resolution Tr. Corp. v. Mass. Mut. Life Ins. Co., 200 F.R.D. 183, 192 (W.D.N.Y. 2001) ("The 'at-issue' waiver applies both to the attorney-client and work-product privileges.") (citation omitted).

20

## IV. CONCLUSION

For the foregoing reasons, defendants' motion to compel (Docket # 54) is denied.[6]

SO ORDERED.

Dated: August 11, 2017
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

---

[6] Obviously, defendants' request for attorney's fees under Federal Rule of Civil Procedure 37(a)(5)(A) is also denied.