Peter N. Wang
Douglas S. Heffer
Adam G. Pence
Foley & Lardner LLP
90 Park Avenue
New York, New York 10016
Tel: (212) 682-7474
Fax: (212) 687-2329

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WINDSOR SECURITIES, LLC, <br><br> Plaintiff, <br><br> -against- <br><br> ARENT FOX, LLP and JULIUS ROUSSEAU, III, <br><br> Defendants. | Case No.  16-cv-01533 (GBD) (GWG) <br><br><br> **<u>Oral Argument Requested</u>** |

**[REDACTED PUBLIC COPY]**

**<u>DEFENDANTS' OBJECTIONS TO</u>**
**<u>THE MAGISTRATE JUDGE'S ORDER OF AUGUST 11, 2017</u>**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND .................................................................................................. 3

**A.**   **Background** ................................................................................................. 3

**B.**   **Defendants' Discovery Requests** .............................................................. 5

**C.**   **The August 11 Order** .................................................................................. 6

ARGUMENT ............................................................................................................................ 6

**A.**   **Windsor's Malpractice Claims Place the Withheld Documents At Issue** ................... 7

**B.**   **The August 11 Order Is Clearly Erroneous and Contrary to Law Regarding the "At Issue" Doctrine In a Legal Malpractice Action Involving Legal Advice from Contemporaneous Counsel and Extensive Litigation by Subsequent Counsel** .................................................................................. 8

   1.   Windsor's Malpractice Allegations Regarding Legal Advice Put "At Issue" Any Related Advice from Other Counsel .................................. 10

   2.   Windsor Effectively Relies on Legal Advice from Contemporaneous and Subsequent Counsel to Establish its Claims ........................................ 12

   3.   The Withheld Materials Are Indispensable to Certain of Defendants' Arguments ............................................................................................ 13

      A.   *Legal Advice From Contemporaneous Counsel Is Critical to Questions Regarding the Applicable Standard of Care* .......................... 13

      B.   *Communications with Other Counsel are Critical to Probing Causation and Damages* ................................................................. 14

**C.**   **The August 11 Order Mischaracterizes the Complaint's Allegations** ...................... 17

**D.**   **The August 11 Order Misapplies *Erie* and the "At-Issue" Waiver** .......................... 18

CONCLUSION ....................................................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aurora Loan Services v. Posner, Posner & Assocs., P.C.*,
    499 F. Supp. 2d 475 (S.D.N.Y. 2007)........................................................................10, 11, 14

*Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.*,
    210 F.R.D. 506 (S.D.N.Y. 2002) ...................................................................................9, 10, 13

*Bolton v. Weil, Gotshal & Manges, LLP*,
    4 Misc. 3d 1029(A), (Sup. Ct. New York Cty. Sept. 10, 2004)...................................10, 11, 13

*Chin v. Rogoff & Co.*,
    05 Civ. 8360 (NRB), 2008 U.S. Dist. LEXIS 38735 (S.D.N.Y. May 6, 2008).......................8

*Goldberg v. Hirschberg*,
    806 N.Y.S.2d 333 (Sup. Ct. New York Cty. 2005) ...........................................................11, 13

*Hearn v. Rhay*,
    68 F.R.D. 574 (E.D. Wash. 1975).............................................................................................19

*In re County of Erie*,
    546 F. 3d 222 (2d Cir. 2008)............................................................................................ *passim*

*Deutsche Bank Tr. Co. of Ams. v. Tri-Links Inv. Tr.*,
    43 A.D.3d 56 (1st Dep't 2007) ..................................................................................................8

*IMO Indus., Inc. v. Anderson Kill & Olick, P.C.*,
    746 N.Y.S.2d 572 (Sup. Ct. New York Cty. 2002) .................................................................14

*John Doe Co. v. United States*,
    350 F.3d 299 (2d Cir. 2003).....................................................................................................12

*Leviton Mfg. Co. v. Greenberg Traurig LLP*,
    09 Civ. 8083 (GBD) (THK), 2010 U.S. Dist. LEXIS 128849 (S.D.N.Y. Dec.
    6, 2010) .....................................................................................................................9, 10, 19, 20

*Nimkoff Rosenfeld & Schechter, LLP v. RKO Props., Ltd.*,
    07 Civ. 7983 (DAB)(HBP), 2016 U.S. Dist. LEXIS 70051 (S.D.N.Y. May 24,
    2016) ................................................................................................................................19, 20

*Rio Tinto PLC v. Vale, S.A.*,
    14 Civ. 3042 (RMB) (AJP), 2016 U.S. Dist. LEXIS 58146 (S.D.N.Y. Mar. 25,
    2016) .............................................................................................................................................6

*Rodriguez v. Pataki,*
   293 F. Supp. 2d 302 (S.D.N.Y. 2003)...................................................................7

*Schutz v. Kagan Lubic Lepper Finkelstein & Gold, LLP,*
   12 Civ. 9459 (PAE), 2013 U.S. Dist. LEXIS 93762 (S.D.N.Y. July 2, 2013) .......7

*Shaub & Williams, L.L.P. v. Augme Techs., Inc.,*
   13 Civ. 1101 (GBD) (JCF), 2014 U.S. Dist. LEXIS 34438 (S.D.N.Y. Mar. 17,
   2014) .......................................................................................................................20

*Tribune Co. v. Purcigliotti,*
   93 Civ. 7222 (LAP)(THK), 1997 U.S. Dist. LEXIS 228 (S.D.N.Y. Jan. 10
   1997) .........................................................................................................................9

**Statutes**

28 U.S.C. § 636(b)(1) ...................................................................................................6

**Other Authorities**

FRCP 26(b)(3) ...............................................................................................................9

FRCP 72(a) ....................................................................................................................6

Pursuant to Rule 72(a) of the Federal Rules of Civil Procedure ("FRCP"), Defendants Arent Fox LLP ("Arent Fox") and Julius Rousseau, III ("Rousseau," and, collectively, with Arent Fox, "Defendants"), by and through their attorneys, Foley & Lardner LLP, respectfully submit their objections to the August 11, 2017 Opinion and Order of Magistrate Judge Gorenstein (the "August 11 Order" or "Op.") denying Defendants' motion to compel Plaintiff Windsor Securities, LLC ("Windsor") to produce certain withheld documents relating to Windsor's legal representation by counsel contemporaneous with and subsequent to Defendants, in response to Defendants' First Set of Requests for the Production of Documents and Things (the "Requests").  For the reasons set forth below, Defendants request that this Court set aside the August 11 Order (Dkt. No. 66) and compel production of the relevant documents.[1]

## PRELIMINARY STATEMENT

In this legal malpractice action, Windsor has refused to produce thousands of potentially critical documents directly relevant to one of its major damage claims, fees allegedly incurred by Windsor contemporaneous and subsequent to its representation by Defendants.  Simply put, so long as Windsor persists in seeking these fees as damages, the material requested needs to be produced.  However, taking an overly expansive view of attorney-client privilege, and an incorrect and narrow view of the "at issue" doctrine, which is an exception to that privilege, the Magistrate Judge erroneously endorsed the Plaintiff's withholding of documents.  This Objection

---

[1] The underlying motion to compel papers filed by the parties, along with their respective exhibits, and the August 11 Order, have all been e-filed with the Court already.  *See* Defendants' Initiating Motion Papers (May 30, 2017)  (Dkt. Nos. 54-57); Plaintiff's Opposition Papers (June 13, 2017) (Dkt. No. 60); Defendants' Reply Papers (June 20, 2017) (Dkt. No. 64); August 11 Order (Dkt. No. 66).  Because the underlying motion papers incorporated exhibits or otherwise referenced materials designated as Confidential under this Court's Protective Order (Dkt. No. 28), certain papers were redacted on the public docket, pursuant to Defendants' sealing requests (Dkt. Nos. 58, 65), and unredacted courtesy copies were provided to Magistrate Judge Gorenstein.  Similarly, Defendants' objection, which references the same designated materials, is publically filed in redacted form.  Defendants are providing to the Court unredacted courtesy copies of all the underlying motion papers and the objection.

is addressed to making sure that Defendants have access to the documents they need to demonstrate that Windsor's damages were, in large measure, unnecessary, self-inflicted, or exaggerated.

As we will show in this Brief, the August 11 Order is clearly erroneous and contrary to law because it results in a misapplication of the "at issue" waiver doctrine, as applied to the specific facts of this case. The ruling puts beyond reach potential evidence directly bearing on not only the quantum of a key part of Windsor's claimed damages, consisting of fees paid to counsel other than Arent Fox, but also evidence likely bearing directly on the applicable standard of care and causation. Windsor put otherwise privileged materials "at issue" in this litigation by claiming as damages fees incurred in subsequent representations involving five litigations, about which only public filings and settlements are known, but myriad critical issues remain unknown – such as, *inter alia*, why the fees were so high (and so disproportionate to the claim and settlements ultimately reached), what advice was given (and whether it deviated from the advice given by Defendants), and whether the settlements were less favorable than settlements that had been offered previously. Further, the attorney-client privilege and work product protections cannot be used as a shield to prevent Defendants from accessing important and valuable sources of proof as to the causation, reasonableness and quantum of these claimed damages.

The August 11 Order is clearly erroneous in accepting Windsor's characterization of subsequent counsels' work as nothing more than "cleaning up Arent Fox's mess" – without citation to or even allowing *access* to the relevant evidence to test that assertion – because most if not all of those fees invariably would have been incurred by Windsor in seeking to collect the death benefits at issue, irrespective of prior work performed by Defendants. Because the August

11 Order is clearly erroneous and contrary to law in its interpretation of the "at issue" doctrine,

the Order should be reversed and the requested discovery allowed.

## FACTUAL BACKGROUND

### A.      Background

The factual background relevant to this proceeding is not in dispute.  In late 2007 or early

2008, Steven Prusky, Windsor's principal, decided to invest in the premium life insurance

business.  Windsor loaned funds (at 15% interest) for the purchase of ten life insurance policies

with only the policies as collateral.  Five of these policies are relevant to this matter: the policies

insuring the lives of John L. Bitter, Joe E. Acker, Erwin A. Collins, Robert S. Coppock, and Jane

Ann Stamatov  (hereinafter, the "Loans").  Complaint, dated February 29, 2016 (Dkt. No. 1,

hereinafter, "Compl."), ¶¶ 8-11, 15.[2]  In or around June 2009, Windsor sought advice from

counsel about its investments and eventually hired Mr. Rousseau and his prior law firm, Herrick

Feinstein, LLP ("Herrick") to provide legal advice on how to protect the investment Windsor

already had made.  *See id.* ¶¶ 27-29, 45-46.[3]

At or around the maturity date of the Loans, Windsor was informed that the trustees for

the Loans did not intend to repay the policy premiums.   *Id.* ¶ 24.  Windsor decided its best

option was to try to secure change of ownership ("COO") forms for these five policies, with the

hopes of collecting the full death benefit when the insureds died.  *Id.* ¶¶ 50, 83-86, 113, 140, 163.

Using standard forms obtained from each insurance company, Windsor, without its counsel's

---

[2] The Complaint is attached as Exhibit 1 to the Declaration of Douglas S. Heffer (Dkt. No. 57), dated May 30, 2017 (the "Heffer Decl."), which was part of Defendants' initial motion papers.

[3] A year later, in or around June 2010, Mr. Rousseau became a partner at Arent Fox.  *Id.* ¶ 30.

participation, secured the COOs and facilitated their submission to the insurers. *See id.* ¶¶ 50-51, 82-86, 112-115, 139-141, 162-164.

When Bitter died, his Trustee challenged the validity of the COO on behalf of Mr. Bitter's widow in federal court and a related arbitration (hereinafter, collectively, the "Bitter Litigation"). *Id.* ¶ 55. Defendants represented Windsor in these proceedings. *Id.* ¶ 56. On April 8, 2014, an arbitration panel ruled that the COO did not transfer full ownership of the policy, and as a result, Windsor was entitled only to the premiums and interest on the loans it had made, not the full death benefit. *Id.* ¶¶ 63-66. Two other insureds, Acker and Collins died shortly thereafter, and their trustees also challenged the respective COOs on similar grounds. *Id.* ¶¶ 72, 92-93, 117-122.

During the Bitter Litigation, and after the arbitration award, Windsor consulted other counsel in addition to Defendants – including Darin Judd and Lauren Antonino – regarding the Bitter Litigation, which was still ongoing, as well as the other four Loans for which Windsor had secured COOs.[4] Even though Defendants disagreed with the outcome of the Bitter arbitration and argued that Windsor was entitled to the full death benefit, they nevertheless repeatedly advised Windsor to ██████████████████████████████████[5] ████████████████████

██████████████████████████████████████████████████████████████

---

[4] Declaration of Julius Rousseau, III (the "Rousseau Decl."), dated May 30, 2017 (Dkt. No. 56), ¶ 3; Heffer Decl. Ex. 10 at 1 (e.g., privilege log entries indicate Windsor sought additional legal advice from Judd as early as April 16, 2014 "regarding settlement").

[5] There are many e-mails between and among Windsor and other counsel discussing ███████████ ███████████████████████████████████████████████████████████████ ████████████████████ Rousseau Decl. ¶¶ 5-6.

██████████████████████████████████████████  Rousseau Decl. ¶¶ 5-

6.[6]  Windsor chose not to follow Defendants' advice.  *Id.* ¶ 7.

On September 9, 2014, Windsor terminated Defendants' representation.  Compl. ¶ 36.

Following the termination, Windsor continued to litigate the Bitter case, and engaged in

extensive, highly costly and largely unsuccessful litigation on the Acker and Collins policies

before settling years later.  *Id*. ¶¶ 93, 121; Heffer Decl. Ex. 2.  Windsor also chose to commence

voluntarily actions for declaratory relief on the Coppock and Stamatov policies in January 2015,

which Windsor did not settle until July 11, 2016 and March 29, 2016, respectively (after

commencing this action).  Compl. ¶¶ 152, 170; Heffer Decl. Ex. 2.

On or around February 29, 2016, prior to settling everything but the Bitter Litigation,

Windsor commenced this lawsuit, seeking various categories of damages, including—as

particularly relevant here—massive legal fees, totaling more than $1,330,164.28, related to all

five litigations.  *See generally* Compl.; *see also* Heffer Decl. Ex. 5; *infra* at 7-8.

**B.**     **Defendants' Discovery Requests**

Defendants served Document Requests and Interrogatories, seeking relevant documents

and a detailed description of the alleged damages and steps taken by Windsor or its

representatives to mitigate such damages.  Heffer Decl. ¶¶ 5-6, Exs. 4-5.  In response to

Defendants' Interrogatories, Windsor confirmed it claims many hundreds of thousands of dollars

for fees incurred by other counsel, amounts that well exceed what Defendants charged for the

---

[6] Indeed, Defendants engaged in extensive settlement discussions and entertained specific offers.  Rousseau Decl. ¶¶ 5-6.

Bitter Litigation, but refused on the basis of privilege to produce documents or communications with other counsel and work product related to the five litigations.  Heffer Decl. ¶¶ 7, 10, Ex. 5.[7]

## C.             The August 11 Order

On August 11, 2017, Magistrate Judge Gorenstein issued the August 11 Order denying Defendants' motion to compel Windsor to produce all withheld documents reflecting contemporaneous and subsequent legal advice and work related to the five Loans.  Citing a Second Circuit case that did not involve legal malpractice, nor damage claims consisting of subsequent counsel fees, *In re County of Erie,* 546 F. 3d 222 (2d Cir. 2008), the Magistrate Judge held that there had been no "at-issue" waiver because Windsor stated it did not intend to "rely" on the supposedly privileged communications for evidence of its claims, and the privileged materials were otherwise not "critical" to Defendants' claims and defenses (Op. 10-11, 16-20).

## ARGUMENT

Pursuant to 28 U.S.C. § 636(b)(1) and FRCP 72(a), when considering objections to a magistrate judge's order, a "district judge … must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law."  "An order is 'clearly erroneous' when the 'reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"  *Rio Tinto PLC v. Vale, S.A.*, 14 Civ. 3042 (RMB) (AJP), 2016 U.S. Dist. LEXIS 58146, at *6 (S.D.N.Y. Mar. 25, 2016) (quoting *Thompson v. Keane*, 95 Civ. 2442 (SHS) (AJP), 1996 U.S. Dist. LEXIS 6022, at *2 (S.D.N.Y. May 6, 1996)).  An order is "contrary to law" when it "fails to apply or misapplies relevant statutes, case law or rules of procedure."  *Id.*  This Court may review *de novo* a magistrate

---

[7] Many of the privilege log entries include descriptions of supposedly privileged documents reflecting legal advice and work performed for Windsor by other counsel concerning various aspects of the "underlying litigations." These materials appear to include e-mail communications, draft papers and pleadings, and legal invoices (many of which are heavily redacted).  Heffer Decl. ¶ 19, Exs. 10-12.

judge's legal conclusion in a non-dispositive order.  *Rodriguez v. Pataki*, 293 F. Supp. 2d 302, 304 (S.D.N.Y. 2003).

**A.      Windsor's Malpractice Claims Place the Withheld Documents At Issue**

Windsor essentially has alleged that Rousseau, first at Herrick and then at Arent Fox, committed malpractice from 2009 through Defendants' termination on September 9, 2014.  *See, e.g.*, Compl. ¶¶ 34-36, 70-72, 89-91, 116-119, 146-49, 165-68, 172-73, 175, 181-84.  Under New York law, to prevail on a claim of legal malpractice a plaintiff must establish the following elements: (1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury (i.e., the outcome would have been different "but for" the attorney's negligence); and (4) actual damage resulting from the professional's negligence.  *Schutz v. Kagan Lubic Lepper Finkelstein & Gold, LLP*, 12 Civ. 9459 (PAE), 2013 U.S. Dist. LEXIS 93762, at *13-24 (S.D.N.Y. July 2, 2013).

It is apparent that, here, Windsor will need to demonstrate the following: 1) that advice provided by Defendants fell below the standard of care that is followed by other members of the profession in similar circumstances; 2) that Windsor relied on this advice to its detriment; 3) that none of the five trustees for the Loans would have challenged the COOs "but for" the specific substandard legal advice (as opposed to Windsor's own negligent actions);[8] 4) that it was reasonable for Windsor not to settle (as recommended by Defendants) and, instead, litigate extensively and expensively (and to commence voluntarily two of the four additional litigations);

---

[8] For example, Defendants contend that the trustees would have tried to retain the death benefit and therefore challenge the transfer of ownership regardless of Defendants' actions or the arbitration result.  That is, in fact, what the Bitter trustee did, asserting fraud and other theories.  Windsor cannot blame Defendants for having to defend such actions which have to do with the deal Windsor made, not any act or omission by Defendants.

5) that advice by Windsor's subsequent counsel or actions taken by Windsor were not an intervening (or sole) cause of <u>any</u> of the claimed damages, specifically, attorneys' fees of $1,330,164.28 (including Defendants' fees);[9] 6) that these massive fees were reasonable, necessary, and warranted; and 7) that Windsor's eventual settlements were reasonable.

Therefore, the advice of other counsel (including certain advice provided contemporaneously with Defendants' representation of Windsor), the facts on which that advice was based, and the decisions made by Windsor to follow that advice (regardless of whether or not that advice was well-grounded or sound), go directly to the heart of whether advice by Defendants on the same matter fell below the standard of care, whether the fees incurred were occasioned because of Defendants' work as opposed to the business deal Windsor entered into itself, and whether the fees incurred were necessary and reasonable.

**B.**  **The August 11 Order Is Clearly Erroneous and Contrary to Law Regarding the "At Issue" Doctrine In a Legal Malpractice Action Involving Legal Advice from Contemporaneous Counsel and Extensive Litigation by Subsequent Counsel**

Under both federal and New York state law, attorney-client privilege is waived when the subject matter of the communication in question has been placed "at issue" in the litigation. *See, e.g.*, *Deutsche Bank Tr. Co. of Ams. v. Tri-Links Inv. Tr.*, 43 A.D.3d 56, 63 (1st Dep't 2007) (such waiver occurs "where a party affirmatively places the subject matter of its own privileged communication at issue in litigation, so that invasion of the privilege is required to determine the validity of a claim or defense of the party asserting the privilege, and application of the privilege would deprive the adversary of vital information.").[10] For example, "advice of counsel may be

---

[9] Heffer Decl. Ex. 5.  The asserted attorneys' fees inexplicably include $256,944.96 for earlier "premium financing" work performed by Arent Fox and Herrick Feinstein, LLP, Mr. Rousseau's previous law firm. *Id.* It is not at all clear what theory Windsor relies on for that portion of its alleged damages.

[10] New York law on the "at issue" waiver "closely parallels federal law." *Chin v. Rogoff & Co.*, 05 Civ. 8360 (NRB), 2008 U.S. Dist. LEXIS 38735, at *14-16 (S.D.N.Y. May 6, 2008).

placed in issue where … a party's state of mind … is relied upon in support of a claim o[r] defense." *Leviton Mfg. Co. v. Greenberg Traurig LLP*, 09 Civ. 8083 (GBD) (THK), 2010 U.S. Dist. LEXIS 128849, at *7-8 (S.D.N.Y. Dec. 6, 2010).

The same analysis applies to work product.  While attorney-client privilege is a matter of state law, work product immunity is governed by federal law, and courts in this jurisdiction have held that the "at issue" doctrine applies to information normally protected by the work product immunity.  *Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.*, 210 F.R.D. 506, 509-511 (S.D.N.Y. 2002) (compelling disclosure of 1) internal legal documents analyzing transaction at issue in underlying litigation and 2) documents regarding the litigation created by client for in-house counsel and other external counsel but not shared with malpractice defendant); *Tribune Co. v. Purcigliotti*, 93 Civ. 7222 (LAP)(THK), 1997 U.S. Dist. LEXIS 228, at *27-30 (S.D.N.Y. Jan. 10 1997) (noting that even if the "at issue" doctrine applied only to attorney-client privilege, FRCP 26(b)(3) is "substantially similar" to the "at issue" waiver standards).

Windsor's affirmative allegation that its damages, including subsequent attorneys' fees, were causally linked to Defendants' acts or omissions (and that the related settlements and fees were reasonable), while shielding as privileged the communications that bear directly on whether those assertions are true, raises the familiar dilemma of using privileged communications as both a sword and shield.  As the Second Circuit has explained, it is unfair "when a party uses an assertion of fact to influence the decisionmaker while denying its adversary access to privileged material potentially capable of rebutting the assertion."  *In re County of Erie*, 546 F.3d at 229 (quoting *John Doe Co. v. United States*, 350 F.3d 299, 306 (2d Cir. 2003)).  Similarly, at-issue waiver is applicable when the privileged materials are critical or "indispensable to a party's

claims or defenses." *Leviton Mfg. Co.*, 2010 U.S. Dist. LEXIS 128849, at *10-11 (internal citation omitted).

      1.    <u>Windsor's Malpractice Allegations Regarding Legal Advice Put "At Issue" Any<br>Related Advice from Other Counsel</u>

Under New York law, a defendant who is sued for providing allegedly inadequate legal advice is entitled to discover related legal advice and work product – particularly from contemporaneous or overlapping counsel – provided to the plaintiff because these materials are vital to the legal and factual issues involving the underlying malpractice claim. *See, e.g.*, *Bank Brussels Lambert*, *S.A.*, 210 F.R.D. at 510 (compelling communications and work product of previous counsel providing transactional advice regarding financing agreements at issue in underlying litigation and of co-counsel in litigation, and explaining that because defendant's third party malpractice "claim[] that its problems in the underlying litigation are caused by the actions (or inactions) of [the third party defendant], the legal advice [it] received from any other lawyers on that subject relates to the reasonableness of [its] reliance and is not subject the attorney/client privilege") (citations and internal quotations omitted); *Bolton v. Weil, Gotshal & Manges, LLP*, 4 Misc. 3d 1029(A), at *4-6 (Sup. Ct. New York Cty. Sept. 10, 2004) (plaintiff's allegations that defendant failed to provide proper legal advice about indemnification provisions in music publishing agreement put "at issue" any communications with and work product from plaintiff's contemporaneous personal attorneys regarding the indemnification provision).

In particular, where there are issues regarding damages and causation, courts applying New York law have granted legal malpractice defendants access to related legal advice and work product from other counsel, even when those materials involve subsequent counsel. For example, in *Aurora Loan Services v. Posner, Posner & Assocs., P.C.*, a plaintiff alleged that the defendants neglected numerous foreclosure actions, which led to the plaintiff hiring new counsel

to take over the various actions.  499 F. Supp. 2d 475, 477 (S.D.N.Y. 2007).  The District Court affirmed the Magistrate's decision to allow discovery of documents related to subsequent counsel's representation, even though the foreclosure actions continued for several years after the alleged malpractice because "the public record indicates that the cases went on for years, but does not explain why they went on for so long, *or whether defendant's conduct was in fact the proximate cause of the losses in question*."  *Id.* at 478 (emphasis added).

Similarly, in *Goldberg v. Hirschberg*, plaintiffs alleged defendants provided negligent advice regarding an investment policy, causing plaintiffs to become the subject of lengthy investigations by the SEC and the New York State Attorney General's office.  806 N.Y.S.2d 333, 334 (Sup. Ct. New York Cty. 2005).  Despite the fact that the parties disputed whether the other counsel's representation overlapped with defendants' representation, the court held that, regardless, defendants were entitled to communications and work product from this counsel for the investigations because the *complaint contained allegations that defendants were responsible for all of plaintiffs' subsequent injuries* related to the later investigations, including incurred attorneys' fees.  *Id.* at 336-38 ("This Court cannot in all fairness permit plaintiffs to hold defendants wholly responsible for their predicament and then allow plaintiffs' attorneys to deny defendants the opportunity to examine possibly exonerating documents.").  As the Court explained, defendants were entitled to know what this other counsel – whether contemporaneous or subsequent – thought about the source of plaintiffs' injuries, and, because of the claim for subsequent attorneys' fees, plaintiffs otherwise had placed the other counsel's representation at issue.  *Id.*

2.      Windsor Effectively Relies on Legal Advice from Contemporaneous and
Subsequent Counsel to Establish its Claims

Viewed in light of the foregoing, the August 11 Order was clearly erroneous when it superficially concluded that there "is no scenario under which defendants would be 'required' to learn the content of new counsel's advice in order for defendants to address the causation question" without analyzing the claimed damages and their relationship to the privileged communications (Op. 13), and that any question with regard to the mitigation of damages can be fully addressed through the public filings (Op. 13-14).

Windsor claims that Defendants provided negligent legal advice regarding Windsor's rights under the premium finance agreements and it was this advice which supposedly precluded Windsor from collecting the full death benefits. Yet, Plaintiff claims that it was reasonable to litigate aggressively for years its ownership rights in the Loans, even after the adverse Bitter arbitration and after adverse summary judgment decisions on certain of the policies, and that it was then reasonable, years later, to settle the five lawsuits under the terms of each agreement. *See infra* 14. By making such assertions, Windsor effectively is relying upon the untested argument that 1) contemporaneous counsel agreed with Windsor's decision not to settle, as Defendants had urged, and 2) that this same counsel agreed with these subsequent strategic decisions. Defendants' primary means of exploring this factual dispute, which was created by Windsor, is to review the withheld communications with counsel. *See John Doe*, 350 F.3d at 304 (citing *United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991)) (explaining disclosure in such circumstances is necessary: because "the legal advice the [party] in fact received might well have demonstrated the falsity of his claim to the jury about his belief, he could not fairly both assert testimony that implicitly communicated his version of the legal advice he received and simultaneously withhold disclosure of the legal advice he actually received").

By claiming damages based on the underlying settlement agreements and based upon the related attorneys' fees, and by claiming that Defendants' representation was defective, Windsor squarely has placed Plaintiff's litigation decisions and the advice of other counsel at issue, including the decisions to pursue litigation and when and how to settle years later. Windsor cannot make these claims and deny access to the relevant evidence in its communications with other counsel. *See Goldberg*, 806 N.Y.S.2d at 337; *Bolton*, 4 Misc. 3d 1029(A), at *4-6; *Bank Brussels Lambert*, 210 F.R.D. at 508, 510.

3.    The Withheld Materials Are Indispensable to Certain of Defendants' Arguments

Windsor has the burden of proving that all its alleged losses are causally related to the alleged acts of malpractice. Whether or not it "intends" to rely upon subsequent advice is irrelevant. Windsor clearly *is* relying both on the outcomes of the five underlying litigations as a measure of its damages, and relying on the fees incurred by Windsor's decisions and its other counsels' advice. These communications and other work product claimed to be privileged from discovery and admission as evidence are all central to Defendants' arguments challenging Windsor's assertions that Defendants' advice fell below a standard of care and that the subsequent alleged harm would not have been incurred but for Defendants' acts or omissions.

A.    *Legal Advice From Contemporaneous Counsel Is Critical to Questions Regarding the Applicable Standard of Care*

Defendants contend that the underlying legal issues in this case, and in particular the issues decided by the Bitter arbitration panel, are ones of first impression, making the advice or analysis from contemporaneous counsel – regarding, among other things, the Bitter arbitration decision, the COOs Windsor had previously obtained, Defendants' representation of Windsor, or Windsor's chances of success in the other four litigations (and the decision to proceed with active litigation) – critical to any analysis of the applicable standard of care. Put another way, if

13

multiple attorneys provided similar advice and analysis to Windsor, that would provide Defendants important factual and legal support to buttress any expert opinion regarding the applicable standard of care in these unique circumstances.

    B. *Communications with Other Counsel are Critical to Probing Causation and Damages*

  In any event, Defendants are entitled to know why Windsor ran up massive fees following the Bitter outcome, why the settlements that were finally reached were accepted and what advice was given by other counsel.  All five underlying litigations at issue in the instant action continued long after Defendants were terminated: the Bitter settlement agreement took another five months to finalize; the Acker and Collins actions included two summary judgment motions before settlement; and the Coppock and Stamatov actions lasted for years, amassing huge legal fees, before Windsor settled by paying the two living insureds "nuisance value" settlements in amounts of $12,000 each.  Compl. ¶¶ 36, 96-102, 123-126; Heffer Decl. ¶ 4, Exs. 2, 5.  Nevertheless, Windsor alleges in its Complaint, which was filed prior to the resolution of everything but the Bitter Litigation, that Defendants' negligence foreclosed the possibility that Windsor could prevail (or achieve a superior or similar result at lower costs) in any of these cases.  *See* Compl. ¶¶ 51-72, 89-102, 111-126, 138-153, 165-171, 173-177.

  The public documents provide only a limited and incomplete avenue for Defendants to explore the merits of the reasonableness or necessity of subsequent counsel's fees or the reasonableness of Defendants' advice in light of advice on the same matters by other lawyers. *See Aurora Loan Servs.*, 499 F. Supp. 2d at 477-78; *IMO Indus., Inc. v. Anderson Kill & Olick, P.C.*, 746 N.Y.S.2d 572, 573-77 (Sup. Ct. New York Cty. 2002) (for malpractice claims related to drafting of joint stipulation, which purportedly resulted in a ruling that IMO had to reimburse its insurer for defense costs, defendant entitled to IMO's communications with concurrent

counsel, who continued representing IMO after defendant, because the communications were vital to determining whether injury was causally related to alleged malpractice and because defendant was entitled to discovery regarding whether malpractice was the "only possible cause of IMO's injury").

Given the fact that Windsor did not settle any of the litigations other than the Bitter Litigation until after commencing *this* lawsuit, there are obviously serious questions regarding Windsor's litigation strategies. There is the "blank check" concern: Did Windsor choose to litigate for so many years because Windsor decided it would be able to claim all its attorneys' fees (no matter how unreasonable) through this malpractice lawsuit? There is also the issue of causation: Did Judd, Antonino, or other counsel provide negligent legal advice in the underlying litigations that led to certain settlements that were inferior to those that had been negotiated by Defendants prior to being terminated? The August 11 Order mistakenly assumed that even if subsequent counsel were negligent, Defendants could not escape liability (Op. 18) – presumably for whatever Plaintiff is claiming – but if subsequent legal advice were below the standard of care, Windsor would have serious problems establishing proximate cause for the damages it is claiming here, consisting of the settlement differential with the death benefit plus the sum total of all subsequent legal fees. Then there is the question of mitigation: What advice was given and what decisions were made to mitigate damages, both with regard to the settlement/death benefit differential and the mounting fees of subsequent counsel?

The October 14, 2014 e-mail (just a month after Defendants were terminated), proffered by Defendants in their motion to compel papers, provides a good example of why the withheld materials are so important. In that e-mail, Prusky brags that ██████████████████████ ████████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████ Heffer Decl. ¶¶

24-25, Ex. 14.  This strategy was directly contrary to Defendants' contemporaneous legal advice,

which was to settle all disputes regarding the loans at issue before there was further litigation.

*See supra* at 4.

More important, however, it appears that Windsor eventually took the opposite approach

that Prusky had suggested and, according to the court dockets, proceeded litigating both cases at

the same time, and even moved for summary judgment in both cases on the same day.  *See* N.D.

Cal. dockets 14-cv-04651 (Acker) (Dkt. No. 30); 14-cv-03713 (Collins) (Dkt. No. 31); *see also*

Compl. ¶¶ 96, 123.  From the court dockets, it is clear that Windsor ignored Defendants' advice,

but without the above e-mail (where privilege has been waived), Defendants would have never

known that Windsor had instructed successor counsel to proceed with an entirely different

litigation strategy, which included █████████████████████████████

(presumably because Prusky was confident he could win).  Defendants should be allowed to

explore why Prusky's suggested strategy was not employed and what, if any, other strategic

discussions took place.  Further, Defendants should be allowed to ask Prusky at his deposition

about these issues, along with his initial strategy with regard to the Acker policy, without Prusky

hiding behind privilege.

While Defendants have numerous independent defenses to Windsor's meritless claims,

the August 11 Order, nevertheless, severely hinders Defendants' ability to challenge the

reasonableness of the alleged damages or establish Windsor's obvious failure to mitigate those

alleged damages.   Defendants cannot, without access to the withheld materials, identify the

strategy or reasoning behind Windsor's litigation decisions that drove the settlement outcomes eventually reached and the constant accrual of massive fee amounts.  If Windsor decided to proceed with these costly litigations because it believed, incorrectly, that Defendants would be forced to pay all attorneys' fees (so there was no risk in litigating), any communications reflecting this analysis would be essential for Defendants to have.

It would be utterly unfair to allow Windsor to use adverse summary judgment decisions in the Acker and Collins cases, where Defendants were not counsel, as some form of "proof" of earlier legal malpractice while not allowing Defendants the ability to probe whether these decisions were the result of other counsel's representation and, simultaneously, probe why Windsor continued to litigate for so long after these decisions (not to mention decided to litigate the matters in the first place).  After all, Windsor had ignored Defendants' advice to settle earlier, and since at least April 2014 had been relying on advice from numerous other attorneys, who may well be the proximate cause of Windsor's purported injuries.  Any such investigations would be extremely prejudiced if Defendants were limited only to the public filings.

### C.   The August 11 Order Mischaracterizes the Complaint's Allegations

The central flaw in the August 11 Order is its misconception of Windsor's claims and the evidence that bears on them.  Windsor argued to the Magistrate Judge that the malpractice allegations are limited to the initial "transactional legal advice," but this argument ignored other allegations of malpractice related to the five subsequent litigations (*see, e.g.*, Compl. ¶¶ 89-91, 116-119, 146-49, 165-68, 172-73, 175, 181-84) and the various categories of damages Windsor attributes to these actions, which include massive legal fees.  While acknowledging that Windsor's allegations may extend beyond the initial "transactional legal advice" (Op. 10), the August 11 Order still accepted Windsor's oversimplification: "To reduce the problem to simple

17

terms: Windsor is alleging that defendants' actions created a mess that it tried to clean up.

Windsor hired new counsel to advise it and assist in cleaning up that mess" (Op. 13).

This narrow view of the malpractice allegations simply assumes the truth of Plaintiff's claim that the subsequent fees were the result of Defendants' acts or omissions and were reasonable in kind and amount. The August 11 Order erroneously concludes that

> [t]here is no scenario under which defendants would be "required" to learn the content of new counsel's advice in order for defendants to address the causation question … Whatever allegedly bad advice defendants gave was concluded by the time new counsel was engaged and represented Windsor. Whether defendants' allegedly bad advice caused Windsor to incur damages – specifically, in the manner Windsor litigated or settled the claims against the other insureds – does not depend on the advice of new counsel (Op. 13).

This analysis is flawed for several reasons. First, there was a five-month period during which Windsor received contemporaneous advice from numerous attorneys (even beyond Judd and Antonino). *See supra* 4-5. Second, and even more importantly, the advice of contemporaneous and subsequent counsel is central to the issue of causation, because Windsor did not "fix" anything with these subsequent litigations. Instead, Windsor did not settle Bitter for many months after terminating Defendants in September 2014 (even though settlement discussions were already concluded and an agreement was nearly finalized) and, for reasons unknown, extended the litigation in the other four cases for many years. Windsor is seeking fees for all of that activity. *See id.* As a necessary result, Defendants should be allowed to probe why Windsor made these decisions, and any such investigation would be impossible without access to the withheld communications with successor counsel.

### D.    The August 11 Order Misapplies *Erie* and the "At-Issue" Waiver

The August 11 Order erroneously ignores years of analogous legal malpractice case law in its misplaced reliance on *Erie*, which held that, as a general matter (and not in the legal

malpractice context), for an "at-issue" waiver to occur, the party "must *rely* on privileged advice from his counsel to make his claim or defense" or the materials in question are so critical to a claim or defense that it would be unfair not to compel disclosure.  546 F.3d at 229.[11]  *Erie* was not a legal malpractice case and provides little explanation for what constitutes reliance, especially in circumstances, like here, that do not involve "quintessential" examples of at-issue waiver.  *See id.* at 228 (acknowledging that the "quintessential example" of at-issue waiver is the "advice-of-counsel" defense).   In fact, the Second Circuit in *Erie* declined to specify what degree of reliance is actually required for waiver to occur (*id.* at 229), and this Court, after *Erie*, has explained that a party "need not explicitly rely upon advice of counsel to implicate privileged communications."  *Leviton Mfg. Co.*, 2010 U.S. Dist. LEXIS 128849, at *7.  Finally, the Second Circuit in *Erie* was careful to acknowledge that a court assessing  "at-issue" waiver, more than anything else, must consider "fairness" on a case-by-case basis when determining whether disclosure is warranted.  546 F.3d at 229.

Since *Erie*, courts in this jurisdiction have been careful not to foreclose "at issue" waiver in legal malpractice cases, particularly where the alleged malpractice, like here, involves legal advice, where a party will rarely if ever "rely" on privileged communications with other counsel for evidence of malpractice (but would invariably attempt to hide unhelpful evidence behind privilege).  For example, in *Nimkoff Rosenfeld & Schechter, LLP v. RKO Props., Ltd.*, 07 Civ. 7983 (DAB)(HBP), 2016 U.S. Dist. LEXIS 70051, at *20-22 (S.D.N.Y. May 24, 2016), this

_____

[11] The Order essentially ignores any case that incorporates into its analysis the *Hearn* standard that the Second Circuit disfavored in *Erie* (Op. 16-17).  In *Hearn v. Rhay*, the court outlined a three prong "at issue" test: "(1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party to information vital to his defense."  68 F.R.D. 574, 581 (E.D. Wash. 1975).  The cases cited by Defendants in their underlying motion papers involve circumstances, similar to those here, that warrant disclosure under either standard.

Court acknowledged *Erie* and affirmed the Magistrate Judge's denial of the motion to compel communications with prior counsel because the malpractice counterclaim related to the plaintiff's alleged inaction, not erroneous advice.  At the same time, the Court warned that there are clearly circumstances in which the party asserting a malpractice claim could place such subsequent advice "at-issue," even when that party does not "rely" on the materials in the traditional evidentiary sense: the Court explained that "should RKO at trial, in depositions, or at any time during this adversary proceeding, introduce evidence that demonstrates reliance on advice of DHC [other counsel] with respect to the value of the Boymelgreen Action [the underlying action], RKO would be putting the subject matter of the communication with counsel at issue which would result in waiver of the privilege." *Id.* at 22-23.[12]

The August 11 Order, however, fails to acknowledge the inapplicability of *Erie* in legal malpractice cases such as this one, where there are serious questions involving the legal advice provided by other counsel, and the Order essentially forecloses "at-issue" waiver in such cases.

<u>**CONCLUSION**</u>

The August 11 Order of Magistrate Judge Gorenstein is clearly erroneous and contrary to law, and if upheld, would result in gross unfairness to Defendants and an unwarranted extension of Second Circuit law.  Defendants respectfully request that this Court set aside the August 11 Order and compel Windsor to produce all communications with other counsel concerning the

---

[12] To date, courts in this jurisdiction have primarily applied *Erie* in circumstances in which the allegations of malpractice do not primarily involve legal advice, but rather more straightforward alleged malpractice.  *See, e.g.*, *id.*; *Shaub & Williams, L.L.P. v. Augme Techs., Inc.*, 13 Civ. 1101 (GBD) (JCF), 2014 U.S. Dist. LEXIS 34438, at *12-15 (S.D.N.Y. Mar. 17, 2014) (denying motion to compel subsequent counsel because the legal malpractice claim was already dismissed, so the issues of causation and damages that would implicate any "corrective efforts" by other counsel were absent; the court also noted there was no real overlap between the counsel); *Leviton Mfg. Co.*, 2010 U.S. Dist. LEXIS 128849, at *9-11, 13-14 (acknowledging *Erie* and denying motion to compel because alleged malpractice related primarily to the failure to file timely patent applications).

Loans and underlying litigations, and related work product, not only for the time period in which these other attorneys served as contemporaneous counsel, but also for the period subsequent to Defendants' representation.

Dated: New York, New York
        September 15, 2017

Respectfully submitted,

FOLEY & LARDNER LLP

By: */s/ Peter N. Wang*
    Peter N. Wang (PW 9216)
    Douglas S. Heffer (DH 6082)
    Adam G. Pence (AP 8621)
    90 Park Avenue
    New York, New York 10016
    Tel: (212) 682-7474
    Fax: (212) 687-2329
    pwang@foley.com
    dheffer@foley.com
    apence@foley.com

    *Attorneys for Defendants*
    *Arent Fox, LLP and Julius Rousseau, III*