## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **WINDSOR SECURITIES, LLC** | : | |
| | : | |
| | : | **Civil Action No. 16-cv-01533 (GBD)** |
| **Plaintiff** | : | |
| v. | : | |
| | : | |
| **ARENT FOX, LLP** | : | |
| and | : | |
| **JULIUS ROUSSEAU, III, ESQUIRE** | : | |
| | : | |
| **Defendants** | : | |

## PLAINTIFF WINDSOR SECURITIES LLC's RESPONSE TO DEFENDANTS' OBJECTIONS TO THE MAGISTRATE JUDGE'S ORDER OF AUGUST 11, 2017

Alan L. Frank, Esquire
Samantha A. Millrood, Esquire
Alan L. Frank Law Associates, P.C.
135 Old York Road
Jenkintown, PA 19046

1601 Gravesend Neck Rd
Suite 903, 2nd Fl.
Brooklyn, NY 11229

Tel: (215) 935-1000
Fax: (215) 935-1110
afrank@alflaw.net
smillrood@alflaw.net
Attorneys for Plaintiff Windsor Securities, LLC

Dated: October 13, 2017

# TABLE OF CONTENTS

**page**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL BACKGROUND RELEVANT TO DEFENDANTS' MOTION TO COMPEL
AND MAGISTRATE JUDGE GORENSTEIN'S AUGUST 11 ORDER  . . . . . . . . . . . . . . . . . 3

    Windsor Seeks and Retains Counsel to Replace Defendants  . . . . . . . . . . . . . . . . . . . . . 4

    Windsor Engages Judd to Replace Arent Fox and Rousseau in August 2014 . . . . . . . . . 5

    Windsor Engages Antonino in August of 2014 to Assess Potential Claims Against
    Broker Houchins and Broadens the Scope of that Engagement in June of 2015 . . . . . . . 8

    Defendants' Breaches All Occurred Before Windsor Engaged Replacement Counsel . . 10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    1.    The August 11 Order Was Not Clearly Erroneous in Holding That
          Defendants Are Not Required to Learn Replacement Counsels' Privileged
          Communications and Work Product to Address the Causation Question . . . . . . 13

    2.    The August 11 Order Was Not Clearly Erroneous in Concluding That
          Defendants Do Not Need Privileged Communications With Replacement
          Counsel or Their Work Product to Support Their Mitigation Defense . . . . . . . . 19

    3.    Magistrate Judge Gorenstein Did Not Mistakenly Assume "That Even If
          Subsequent Counsel Were Negligent Defendants Could Not Escape Liability" . 21

    4.    The August 11 Order Did Not Mis-Characterize or Oversimplify the Plaintiff's
          Allegations, It Fully Analyzed the Evidence that Bears on Them And Properly
          Concluded That An At Issue Waiver Did Not Occur  . . . . . . . . . . . . . . . . . . . . . 23

    5.    The August 11 Order Did Not Misapply the Case of *In Re County of Erie*  . . . . 24

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

670 Apartments Corp. v. Agric. Ins. Co.,
      1997 U.S. Dist. LEXIS 20689, 1997 WL 801458 (S.D.N.Y. Dec. 30, 1997) . . . . . . . . . 19

Arbor Realty Funding, LLC v Herrick, Feinstein LLP,
      2012 N.Y. Misc. LEXIS 6491, 2012 NY Slip Op 33522(U) (NY Sup. Ct. Aug. 28, 2012)
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Aurora Loan Servs. v. Posner,
      499 F. Supp. 2d 475 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Barnett v Schwartz,
      848 N.Y.S.2d 663, 47 A.D.3d 197, 2007 NY Slip Op 9712 (2d Dept 2007) . . . . . . . . 22

Bovis Lend Lease, LMB, Inc. v. Seasons Contracting Corp.,
      2002 U.S. Dist. LEXIS 23322, 2002 WL 31729693 (S.D.N.Y. Dec. 5, 2002) . . . . . . . . 19

Caidor v. Onondaga Cty.,
      517 F.3d 601 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Carl v. Cohen,
      886 N.Y.S.2d 66, 23 Misc. 3d 1110(A), 2009 Slip Op. 50690(U) (S. Ct. N.Y. Cty. 2009)
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 24

Curto v. Med. World Commc'ns, Inc.,
      2007 U.S. Dist. LEXIS 35464, 2007 WL 1452106 (E.D.N.Y. May 15, 2007) . . . . . . . . 12

Deutsche Bank Trust Co of Ams v. Tri Links Inv. Trusts,
      43 A.D.3d 56, 837 N.Y.S.2d 15, 2007 NY Slip Op 4187 (N.Y. App. Div. 2007) . . 13, 14

FedEx Ground Package Sys.,
      2017 U.S. Dist. LEXIS 21188, 2017 WL 633445 (S.D. N.Y. Feb. 14, 2017) . . . . . . . . 11

Frydman v. Verschleiser,
      2017 U.S. Dist. LEXIS 44349, 2017 WL 1155919 (S.D.N.Y. Mar. 27, 2017) . . . . . . . . 11

IDT Corp. V. Morgan Stanley Dean Witter & Co.,
      107 A.D.3d 451, 967 N.Y.S.2d 51, 2013 NY Slip Op 4123 (1st Dept. 2013) . . . . . . . . . 14

Infinity Headwear & Apparel, LLC v. Jay Franco & Sons, Inc.,
     2017 U.S. Dist. LEXIS 121357, 2017 WL 3309724 (S.D.N.Y. Aug. 2, 2017) . . . . . . . . 11

Jakobleff v. Cerrato, Sweeney & Cohn,
     97 A.D.2d 834, 835, 468 N.Y.S.2d 895 (2d Dep't 1983) . . . . . . . . . . . . . . . . . . . . . . 15, 21

Jewels v. Casner,
     2015 U.S. Dist. LEXIS 156627, 2015 WL 7306454 (E.D.N.Y. Nov. 19, 2015) . . . . 11, 20

Koch v Sheresky, Aronson & Mayefsky LLP,
     33 Misc. 3d 1228(A), 943 N.Y.S.2d 792 (N.Y. Sup. Ct. 2011) . . . . . . . . . . . . . . . . . . . 19

Leviton Mfg. Co. v. Greenberg Traurig LLP,
     2010 U.S. Dist. LEXIS 128849, 2010 WL 4983183 (S.D.N.Y. Dec. 6, 2010)
     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16, 17, 24, 25

Lifeguard Licensing Corp. v. Ann Arbor T-Shirt Co.,LLC,
     2017 U.S. Dist. LEXIS 115365, 2017 WL 3142072 (S.D.N.Y. July 24, 2017) . . . . . . . 11

Nimkoff Rosenfeld & Schechter, LLP v. RKO Props., Ltd.,
     2016 U.S. Dist. LEXIS 70051 (S.D.N.Y. May 24, 2016) . . . . . . . . . . . . . . . . . . . . . . . . 25

Prudential Ins. Co. of Am. v. Coca-Cola Enters.,Inc.,
     1993 U.S. Dist. LEXIS 9993, 1993 WL 276065 (S.D.N.Y. July 21, 1993) . . . . . . . . . . 19

Raphael v. Clune White & Nelson,
     146 A.D.2d 762, 537 N.Y.S.2d 246 (2d Dep't 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Ross Univ. Sch. of Med., Ltd. v. Brooklyn-Queens Health Care, Inc.,
     2013 U.S. Dist. LEXIS 45949, 2013 WL 1334271 (E.D.N.Y. Mar. 28, 2013) . . . . . . . . 12

Smartix Int'l Corp. v. Garrubbo, Romankow & Capese, P.C.,
     2009 U.S. Dist. LEXIS 29114, 2009 WL 857467 (S.D.N.Y. Mar. 30, 2009) . . . . . . . . . 22

Sommer v. Fed. Signal Corp.,
     79 N.Y.2d 540, 593 N.E.2d 1365, 583 N.Y.S.2d 957 (1992) . . . . . . . . . . . . . . . . . . . . . 22

TIG Ins. Co. v. Yules & Yules,
     1999 U.S . Dist . LEXIS 17607, 1999 WL 1029712 (S.D.N.Y. Nov. 12, 1999) . 14, 17, 24

Hearn v. Ray,
     68 F.R.D. 574 (E.D. Wash 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

U2 Home Entm't, Inc. v. Hong Wei Int'l Trading Inc.,
    2007 U.S. Dist. LEXIS 59233, 2007 WL 2327068 (S.D.N.Y. Aug. 13, 2007) . . . . . . . . 11

Utica Cutlery Co. v. Hiscock & Barclay, LLP,
    109 A.D.3d 1161, 972 N.Y.S.2d 371,, 2013 NY Slip Op 6171 (4th Dep't 2013) . . . . . . 22

Veras Inv. Partners, LLC v. Akin Gump Strauss Hauer & Feld LLP,
    52 A.D.3d 370, 860 N.Y.S.2d 78 (1st Dep't 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Verdi v Jacoby & Meyers, LLP,
    2009 N.Y. Misc. LEXIS 6038, 2009 NY Slip Op 31541(U)
    (N.Y. Sup. Ct. June 30, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## RULES & STATUTES

California Commercial Code Section 9620 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

12 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3069
(2d ed. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Fed. R. Civ. P. 72(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 11, 12

28 U.S.C. § 636(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Plaintiff Windsor Securities, LLC ("Windsor" or "Plaintiff") respectfully submits this Response to Defendants Arent Fox LLP ("Arent Fox") and Julius Rousseau, III ("Rousseau") (collectively "Defendants") Objections, pursuant to Rule 72(a) of the Federal Rules of Civil Procedure, to the August 11, 2017 Opinion and Order of Magistrate Judge Gorenstein (the "August 11 Order") [ECF No. 66] denying Defendants' Motion to Compel Plaintiff to Produce Certain Privileged Documents on the basis of "at issue" waiver.

## PRELIMINARY STATEMENT

Defendants' objections to Judge Gorenstein's August 11 Order is essentially a rehash of the arguments they presented in their Motion to Compel, they avoid any real consideration of the applicable Rule 72 standard which they clearly cannot meet, they ignore Magistrate Judge Gorenstein's thorough analysis of both the applicable law and the arguments presented by the Defendants in their Motion to Compel, they mis-state certain facts, and ultimately fail to demonstrate how the August 11 Order is "clearly erroneous". *See* Fed. R. Civ. P. 72(a).

In this legal malpractice action, Windsor is alleging that, to its significant detriment, it relied upon the erroneous and incorrect legal advice provided by the Defendants relating to premium financing Windsor provided for several life insurance policies and steps to be taken to ensure Windsor's unfettered ownership and entitlement to the death benefits under those policies, and in litigation arising therefrom. Defendants' actions, omissions and malpractice caused an arbitration panel and a Federal Court in two (2) cases to determine that Windsor, whose unequivocal intent was to obtain unfettered entitlement to the death benefits under the life insurance policies it financed, was not entitled to those death benefits; but rather, that Windsor's rights were limited to those of a secured creditor, and was entitled only to collect the premiums it

1

paid for the policies plus 10% interest and expenses, causing it Millions of Dollars in damages. The United States District Court for the Northern District of California in the Acker and Collins Matters and the Arbitration Panel in the Bitter Matter each concluded that there was precise language that ***should have been included*** in documents that the ***Defendants*** had the Trusts execute to properly evidence the post-default mutual walkaway and acceptance by Windsor of the Policies in full satisfaction of the Trusts' loan obligations, which was necessary to avoid ambiguity of the parties' intent and/or to satisfy Section 9620 of the California Code, and if it had been included (which it was not), Windsor would have absolutely, and as a matter of law, been entitled to ***all*** of the death benefits under each of the Policies.

After the arbitration panel's adverse ruling in favor of the Bitter Trust and against Windsor on the entitlement to the death benefits on the Bitter Policy, Windsor made a decision to terminate the Defendants and replace Defendants initially with Darin Judd, Esquire ("Judd") and his firm Thompson, Welch, Soroko & Gilbert, LLP, who was later joined by Lauren Antonino, Esquire ("Antonino"), and her firm, The Antonino Firm, LLC (collectively "Replacement Counsel"), to represent Windsor in litigation and benefit contests that ensued with respect to the 4 remaining insurance policies at issue in this matter, and on which the Defendants had previously provided erroneous transactional legal advice and representation to Windsor. It is the attorney-client communications with, and work product of Replacement Counsel that Defendants sought by way of their Motion to Compel arguing "at issue" waiver.

As described more fully herein, and demonstrated in the Affidavits and Declarations provided in response to Defendants' Motion to Compel, all malpractice by the Defendants had occurred before Replacement Counsel was ever involved with or represented Windsor regarding the policies at issue,

2

and because Windsor did not receive *concurrent* advice from either Judd or Antonino on the issues

which are the basis of Windsor's malpractice claims, are not relying on privileged advice and/or

work product of Antonino or Judd to prove their claims against Defendants in this action, and any

damages relating to Replacement counsel's fees and arguments regarding causation do not require

review of the advice provided by Replacement Counsel, Judge Gorenstein found in his August 11

Order that applicable New York and 2nd Circuit law provides that there was no "at issue" waiver.

The decisions in Magistrate Judge Gorenstein's August 11 Order reflect due consideration of the

facts, the claims and defenses asserted, the Defendants' arguments, and the law addressing "at issue"

waiver.  The substantial legal analysis provided in the August 11 Order demonstrates that Judge

Gorenstein did not make a mistake, and did not fail to apply or misapply relevant case law.  Judge

Gorenstein's holdings in the August 11 Order are sound exercises of discretion and application of

law, and Defendants cannot and have not established otherwise.

## FACTUAL BACKGROUND RELEVANT TO DEFENDANTS' MOTION TO COMPEL AND MAGISTRATE JUDGE GORENSTEIN'S AUGUST 11 ORDER

Defendants in their Objections to the August 11 Order state that "the factual background

relevant to this proceeding is not in dispute" [ECF No. 74 at pg. 3], they go on to state non-

existent "facts", but eventually acknowledge that Defendants alone represented Windsor when

the owners of the Policies "defaulted" and/or changed Policy ownership to Windsor, and

throughout the Bitter Arbitration. Due to page limitations, Plaintiff incorporates the facts set

forth in its Response to Defendants' Motion to Compel [ECF No. 60]. As explained more fully

therein, beginning in 2009, Defendant Rousseau represented Windsor regarding the Premium

Finance Policies, and Defendants represented Windsor before the death of any of the insureds

3

and at the time of default on each of the Policies, and continued said representation until Windsor terminated them by letter dated September 9, 2014, which was following the adverse ruling in the Bitter Arbitration. See, Complaint ¶36 and Exhibit "I" thereto.

### Windsor Seeks and Retains Counsel to Replace Defendants

As explained above, the only counsel hired by, and from whom Windsor received transactional advice with respect to the 5 Policies at issue in this action, were the Defendants, Rousseau and Arent Fox, and Rousseau's previous firm, Herrick Feinstein, LLP. The Only counsel that represented Windsor during the Bitter arbitration was the Defendants. The only counsel that were engaged by Windsor to replace Defendants, and involved with the litigation regarding the 4 other policies at issue in this action are Judd and Antonino, and their respective firms.[1]

As outlined in the Declaration of Darin Judd, Esquire ("Judd Declaration") and the Affidavit of Lauren Antonino, Esquire ("Antonino Affidavit") [ECF Nos. 60-2, 60-3], Windsor did not begin searching for, and neither Judd nor Antonino were involved with Windsor relating to any of the Policies at issue in this litigation, before the adverse ruling was entered and the Bitter Arbitration had concluded in April of 2014. Further, neither Judd, nor Antonino (or their firms), ever gave transactional legal advice to Windsor with respect to the management of any of the Policies or perfecting entitlement to the benefits thereunder, which was solely the province and responsibility of the Defendants. *See*, Id.

---

[1]In Defendants' Memo of Law in support of their Motion to Compel, at pg. 12, they reference that Prusky admitted in his deposition that Windsor consulted other attorneys about the Loans. Windsor's counsel specifically identified in an April 24, 2107 letter [ECF No. 57-9], that none of the attorneys (or their staff) referenced by Prusky during his deposition, or that appear on the Plaintiffs' Privilege Logs, were involved with ANY of the policies at issue in this action, or the concept of buying them, managing them, or perfecting entitlement to ownership of the benefits thereunder, or litigation of any of the underlying matters, Bitter, Collins, Acker, Coppock or Stamtov.

4

**Windsor Engages Judd to Replace Arent Fox and Rousseau in August 2014**

As outlined in the Judd Declaration, Windsor did not seek any legal services from Judd, or his firm, related to any of the matters that are the subject of this litigation until Judd received an email and phone call from Windsor's principal Prusky on April 15, 2014, in which Prusky explained that Windsor had recently received an Interim Award in a binding arbitration that occurred in California in the matter of *Gregory Barnes as Trustee of John L. Bitter Irrevocable Life Insurance Trust v. Windsor Securities, LLC* (the "Bitter Matter"). Judd Declaration, ¶4 [ECF No. 60-2, ¶5]. Prusky requested that Judd read the panels' decision so Windsor could ask him some general questions regarding California law and how Windsor could proceed if the Interim Award became a final judgment. Id. During this first call, Prusky also asked if Judd and his firm handled legal malpractice claims, as it appeared from the Interim Award in the Bitter Matter that the Defendants may have malpracticed with respect to the transactional advice they provided to Windsor in 2008-2010. Id. Judd advised Prusky that he would read the Interim Award and be available to answer his questions regarding the procedures associated with a binding arbitration, but that Judd and his firm did not handle legal malpractice claims but could recommend attorneys/firms that did. Id.

In April of 2014 Judd did review the Interim Award and answered general questions from Prusky related to arbitration law and procedures under California law, but did not substantively address any issues with respect to the Bitter Policy. Id. Judd also provided Prusky with some recommendations of attorneys in California that handled legal malpractice claims. Id. Judd did not bill Windsor for any of the preceding and at that time had no expectation of doing any further work on the Bitter Matter, and was not aware of the other 4 Policies at issue herein. Id.

5

As Judd explains in his Declaration, despite Defendants' suggestion to the contrary, at no time did Windsor engage Judd or his firm to be contemporaneous legal counsel with Arent Fox related to the Bitter Matter, and at all times Judd knew he and his firm were being engaged by Windsor to replace the Defendants. Id. Judd states that, there were no discussions, calls, or other communications between Arent Fox and Judd's firm prior to the Bitter arbitration, Judd and his firm played no role in the arbitration of the Bitter Matter, and only communicated with Arent Fox when it was determined he would be substituting into the Bitter Matter solely to finalize a settlement that was being negotiated. Id.

As Judd explains in his Declaration, from April 15, 2014 until August 19, 2014, Judd's communication with Prusky, fully identified on Plaintiff's Privilege Logs, dealt exclusively with Windsor's contact with the law firms Judd had previously recommended to handle Windsor's legal malpractice claims against Defendants. Id. On August 19, 2014, Windsor discussed with Judd retaining he and his firm to represent Windsor in the case of *Pacific Life Insurance Company v. Maria Ana Gordillo, as Trustee of the Erwin A. Collins Family Insurance Trust-2008 and Windsor Securities, LLC* (the "Collins Matter"), which had been filed on August 15, 2014, wherein the Collins Trustee was contesting Windsor's entitlement to the death benefits under the Collins Policy (for which Defendants provided the transactional advice). Id ¶7. At this same time, in the end of August of 2014, Prusky notified Judd that the Acker Trustee was also contesting Windsor's entitlement to the death benefits under the Acker Policy (for which Defendants also provided the transactional advice), and that another lawsuit would likely be filed related thereto. Id ¶8. The Judd Declaration confirms that Judd and his Firm had no prior knowledge of either the Collins or Acker Policies, had no involvement in and provided no

6

transactional legal advice to Windsor for these Policies, and only became involved in August of 2014, after the Collins and Acker Trustees were making death benefit contests. Id.

Finally, at and around this same time in the end of August of 2014, Windsor notified Judd that Windsor was in the process of trying to resolve the Bitter Matter, and that Arent Fox had drafted a settlement agreement that was being negotiated. Id ¶9. Prusky requested that Judd review the draft settlement agreement and evaluate if Judd and his firm could substitute in as legal counsel for Windsor to finalize the settlement. Id. This was the first time that Windsor requested that Judd or his firm act as legal counsel to Windsor in the Bitter Matter. Id. Judd did review the draft settlement agreement, advised that he would be willing to replace the Defendants in the Bitter Matter, and participated in a series of conference calls with the attorneys at Arent Fox, specifically Defendant Rousseau and Michael S. Cryan, Esquire[2]. Id ¶9-10. Approximately 2 weeks before Defendants' termination was the first time Judd, or anyone else at his Firm, had any contact with the Defendants regarding the Bitter Matter or any of the Policies at issue in this action. Id. The engagement by Windsor of Judd and his Firm in the Bitter Matter dealt solely with finalizing the settlement, as the Arbitration had already been completed and the adverse ruling entered. Id.

As Judd explains in his Declaration, at no time did he or anyone at his Firm provide any transactional advice regarding the transfer of ownership or the perfecting of Windsor's security interests in the five life insurance Policies that are the subject of the malpractice claims. Id ¶11. The legal advice related to the perfecting of Windsor's security interest in the five life insurance Policies and the transfer of ownership as to the death benefits for each of these Policies all

---

[2]Plaintiff has produced all communications between Replacement Counsel and Arent Fox.

occurred in the time period of 2008-2012, years prior to Judd and/or his firm's involvement and engagement by Windsor. Id.

### Windsor Engages Antonino in August of 2014 to Assess Potential Claims Against Broker Houchins and Broadens the Scope of that Engagement in June of 2015

As Antonino explains in her Affidavit, the first contact Antonino had with respect to Windsor was a phone call from Defendant Rousseau on or about July 8, 2014 to talk about the possibility of Antonino's retention to analyze possible claims against Eugene Houchins, the Insurance Broker who produced the 5 Policies at issue ("Broker Houchins"), not to address or be involved with any litigation regarding the 5 Policies. Antonino Affidavit, ¶5, ¶7 [ECF No. 60-3]. Between July 16 and July 19, 2014, Antonino received a few more calls and/or emails from Defendant Rousseau and/or Prusky, wherein they provided Antonino with background information regarding the life settlement transactions Windsor was involved in, Broker Houchins' roles in them, and damages that Arent Fox and/or Windsor believed Windsor had sustained as a result of possibly tortious conduct by Broker Houchins. Id ¶4.[3]

Antonino was then contacted by Windsor on or around August 19, 2014 indicating that Windsor did want to retain Antonino's Firm to analyze potential claims against Broker Houchins in connection with his role in the financing and handling of life settlement policies that Windsor financed, and a Retainer Agreement was executed on August 20, 2014. Id ¶2,7. As Antonino explains in her Affidavit, "the retention expressly *did not include* [Antonino] serving as counsel in a litigation matter and provided that should it subsequently be agreed that should [Antonino]

---

[3]In July of 2014, Prusky began sending Antonino materials from the Bitter arbitration, but as Antonino explains in her Affidavit, she did not read these materials because at that time she had not been retained and they were extensive and voluminous, and shortly after she received them, Windsor instructed her to "stand down" because Windsor might be settling. Id. ¶6.

get involved in a court proceeding" the retainer agreement would be amended. Id.

Antonino clearly and unequivocally affirms that when she was retained by Windsor, she "was informed that Windsor was looking for potential counsel to file a malpractice claim against Arent Fox." Id ¶8. Antonino further states in her Affidiavit "*[t]here was no discussion* of [Antonino] coming in as co-counsel with Arent Fox in connection with the Bitter Matter, which was then in the process of settling." Id ¶3. As Antonino states in her Affidavit, she understood that Judd's firm was being retained to replace Arent Fox to finish the Bitter settlement and to handle any California litigation or settlement negotiations that might arise from the 4 other Policies at issue in this litigation. Id ¶10.

Shortly after Antonino's retention, she was involved in calls with Judd and Defendant Rousseau regarding the settlement that Arent Fox had been working on in the Bitter Matter, and her involvement was to address what effect the Bitter settlement would have on the potential claims against Broker Houchins, which was the focus of Antonino's engagement. Id. Antonino was not actually engaged to represent Windsor in any litigation involving the Policies at issue in this action until June of 2015, when she and Windsor amended their Original Retainer Agreement to provide that Antonino would assist with discovery in the then pending Acker and Collins Matters, wherein Windsor was being represented by Judd and his firm. Id ¶2.

It is absolutely clear from Antonino's Affidavit, that prior to July 2014, Antonino had never met or spoken with anyone from Windsor and/or Defendants, did not know Windsor, Defendant Rousseau or his law firms, when Defendant Rousseau provided the transactional advice regarding the five (5) Policies at issue in the litigation and when Defendants represented Windsor in the Bitter Matter, and Antonino and her firm *never* gave transactional legal advice to

9

Windsor with respect to any of these Policies or perfecting entitlement to the benefits thereunder before the insureds died and/or contested Windsor's entitlement. Id ¶11-14.

### Defendants' Breaches All Occurred Before Windsor Engaged Replacement Counsel

At all relevant times, Windsor relied on the guidance and advice of Defendants Rousseau and Arent Fox, and depended upon them to appropriately advise it on the Premium Finance Policies, ownership and entitlement to the death benefits thereunder, and litigation strategy with respect to the Bitter matter. Defendants' Motion to Compel was predicated on Judd and Antonino providing concurrent "advice regarding the five loans"; however, the Judd Declaration and Antonino Affidavit confirm that they offered no advice on the loans, ownership, entitlement to death benefits, or conveyance *prior to the deaths of the Insureds or at the time of default by the Trusts.* This timing is material, as any and all action to effectuate the entitlement to the death benefits under the Policies had to have been taken prior to the death of the insureds, and they *were not involved in any way whatsoever* at that time, and therefore there was no concurrent advice. Further, as to the litigation malpractice by the Defendants, the Bitter Matter had been fully arbitrated and an Award had been entered prior to involvement of Replacement Counsel. Thus, each of the errors and omissions and breaches of the Defendants outlined in Plaintiff's Complaint, *all occurred and had been completed well before Replacement Counsel even knew or was involved with Windsor. See,* Judd Declaration, Antonino Affidavit [ECF Nos. 60-2, and 60-3] In addition, and importantly, at the time both Judd and Antonino were first contacted by Windsor, it was communicated to them by Windsor, and they knew and understood that Windsor believed it had malpractice claims against the Defendants and were seeking to replace them. Id.

10

**ARGUMENT**

The court reviews a magistrate judge's decisions concerning nondispositive pretrial

matters like this one under the "clearly erroneous or contrary to law" standard. 28 U.S.C. §

636(b)(1)(A); Fed. R. Civ. P. 72(a); *see also* Caidor v. Onondaga Cty., 517 F.3d 601, 605 (2d

Cir. 2008) ("Matters concerning discovery generally are considered nondispositive of the

litigation."). "An order is clearly erroneous if the reviewing court is 'left with the definite and

firm conviction that a mistake has been committed'." Lifeguard Licensing Corp. v. Ann Arbor

T-Shirt Co.,LLC, 2017 U.S. Dist. LEXIS 115365, 2017 WL 3142072, at *1 (S.D.N.Y. July 24,

2017) (*quoting* Frydman v. Verschleiser, 2017 U.S. Dist. LEXIS 44349, 2017 WL 1155919, at

*2 (S.D.N.Y. Mar. 27, 2017)). "An order is contrary to law when it fails to apply or misapplies

relevant statutes, case law, or rules of procedure." Id. (*quoting* Frydman) "This is a highly

deferential standard, and '[t]he party seeking to overturn a magistrate judge's decision thus carries

a heavy burden'." FedEx Ground Package Sys., 2017 U.S. Dist. LEXIS 21188, 2017 WL 633445,

at *3 (*quoting* U2 Home Entm't, Inc. v. Hong Wei Int'l Trading Inc.,, 2007 U.S. Dist. LEXIS

59233, 2007 WL 2327068, at *1 (S.D.N.Y. Aug. 13, 2007)); *see also* Infinity Headwear &

Apparel, LLC v. Jay Franco & Sons, Inc., 2017 U.S. Dist. LEXIS 121357, 2017 WL 3309724, at

*7 (S.D.N.Y. Aug. 2, 2017) ("[M]agistrate judges are given 'broad discretion in resolving

nondispositive disputes and reversal is appropriate only if their discretion is abused.'" ).  Courts

in this Circuit have held that "it is extremely difficult to justify alteration of the magistrate

judge's nondispositive actions by the district judge." Jewels v. Casner, 2015 U.S. Dist. LEXIS

156627 (E.D.N.Y. Nov. 19, 2015)(*quoting* 12 Charles Alan Wright & Arthur R. Miller, Federal

Practice and Procedure § 3069 (2d ed. 2015). Further, deference to a magistrate's discovery

ruling is especially appropriate here, where the magistrate judge's management of discovery gives him a firm basis to understand the relevant factual issues and to assess the discovery sought. Curto v. Med. World Commc'ns, Inc., 2007 WL 1452106, at *4 (E.D.N.Y. May 15, 2007)

Defendants have not and cannot identify any clear error of fact or law in the August 11 Order, so they recycle for this Court their same arguments made in their Motion to Compel, that Windsor has waived privilege with respect to communications between Windsor and its Replacement Counsel, and the Work Product of Replacement Counsel, by placing the subject matter of those communications at issue in asserting the malpractice claims and by seeking damages for Replacement Counsel's fees for representing Windsor in the litigation that arose with respect to 4 of the Policies. By their nature, these types of arguments are usually insufficient to meet the heavy burden required to justify a Rule 72 objection, as they demonstrate no "clear error." *See, e.g.*, Ross Univ. Sch. of Med., Ltd. v. Brooklyn-Queens Health Care, Inc.,2013 U.S. Dist. LEXIS 45949, 2013 WL 1334271, at *5 (E.D.N.Y. Mar. 28, 2013) (upholding the magistrate judge's ruling where the objecting party "merely repeated the same arguments, almost verbatim, that it previously presented in its moving papers"). Moreover, and as will be described more fully below, Judge Gorenstein fully considered and analyzed Defendants' arguments and rejected them based on applicable and prevailing case law.

While the majority of Defendants' Brief in support of its Objections to the August 11 Order is spent explaining why Defendants want to review the privileged communications and work product at issue (not a basis to overturn a magistrate's decision or for a finding of "at issue"

12

waiver[4]), boiled down to its substance, Defendants actually argue that the August 11 Order is "clearly erroneous and contrary to law" because: (1) "it superficially concluded that there is 'no scenario under which the defendants would be 'required' to learn the content of new counsel's advice in order for defendants to address the causation question' without analyzing the claimed damages and their relationship to the privileged communications" [Defs Brief in Support of Obj. pg. 12 [ECF No. 74] ; (2) it superficially concluded "that any question with regard to the mitigation of damages can be fully addressed through the public filings" [Id.]; (3) it "mistakenly assumed that even if subsequent [Replacement] counsel were negligent Defendants could not escape liability" [Id., pg. 15]; (4) it mischaracterizes and oversimplifies the Complaint's allegations and the evidence that bears on them [Id., pg. 17-18]; and (5) it misplaced reliance on *In re County of Erie*, which was not a legal malpractice case and therefore does not apply to this case [Id., pg. 18-20]. As outlined more fully below, Defendants' objections are simply meritless and the August 11 Order is neither "clearly erroneous" and/or "contrary to law".

### 1. The August 11 Order Was Not Clearly Erroneous in Holding That Defendants Are Not Required to Learn Replacement Counsel Privileged Communications and Work Product to Address the Causation Question

Judge Gorenstein appropriately, and in accordance with prevailing State and Federal case law, opined that "[b]ecause Windsor will not be relying on any communications with

---

[4]Both the Second Circuit and New York Courts "will not find an at issue waiver merely because privileged information is relevant to the issues being litigated; [r]ather, at issue waiver occurs when the party has asserted a claim or defense that he intends to prove by use of the privileged materials' or, where rather than being merely relevant, 'the privileged documents are indispensable to a party's claims or defenses'." Leviton Mfg. Co. v. Greenberg Traurig LLP, 2010 U.S. Dist. LEXIS 128849 at [*10-11] (S.D.N.Y. Dec. 6, 2010)(*citing* Deutsche Bank, 43 A.D.3d at 64, 837 N.Y.S.2d at 23;Veras Inv. Partners, LLC v. Akin Gump Strauss Hauer & Feld LLP, 52 A.D.3d 370, 374, 860 N.Y.S.2d 78, 82 (1st Dep't 2008))

[Replacement] counsel, it is defendants' burden to show why the privileged material is so critical to their defense that it would be unfair not to breach the attorney-client privilege in order to provide them with it." [Aug. 11 Order, at pg. 11 (*citing* IDT Corp. V. Morgan Stanley Dean Witter & Co., 107 A.D.3d 451, 452 (1st Dept. 2013))] Acknowledging this burden in both their Motion to Compel and in their Objections to the August 11 Order, Defendants argued that Windsor's communications with and work product of Replacement Counsel is "critical" to probing causation and damages because they "are all central to Defendants' arguments challenging Windsor's assertion that Defendants' advice fell below the standard of care and that the subsequent alleged harm would not have been incurred but for Defendants' acts or omissions." [Defendants' Objections to August 11 Order, at page. 13]  Judge Gorenstein's August 11 Order throughly addressed this very argument, also made in Defendants' Motion to Compel, and properly rejected it opining that "Defendants are not required to learn what new counsel thought of defendants' performance", or "whether Windsor relied on the advice of new counsel" or "whether new counsel contributed to causing Windsor's damages" in Order for Defendants to address the causation question . [August 11 Order, at pg. 13]  While the August 11 Order supported this holding with Deutsche Bank Trust Co of Ams v. Tri Links Inv. Trusts, 43 A.D.3d 56, 63-64 (N.Y. App. Div. 2007), it is also well supported in other prevailing cases with facts similar to those herein, where it was argued that privileged communications with successor counsel was "critical" to challenge causation and damages in legal malpractice cases.

In TIG Ins. Co. v. Yules & Yules, 1999 U.S. Dist. LEXIS 17607, 1999 WL 1029712 (S.D.N.Y. Nov. 9, 1999), TIG asserted professional malpractice claims against the Yules law firm, who had handled a subrogation action on their behalf and failed to file an action within the

14

statute of limitations. The Court denied the request to produce documents created by a successor

law firm at the concluding stages of that subrogation action, finding that access to the successor

firm's confidential communications, who continued to litigate the action, were not required in

order to challenge causation by demonstrating that there were arguments successor counsel could

have made to protect the plaintiff's interests. The court noted, as did Judge Gorenstein in his

August 11 Order, that the "alleged malpractice occurred well before [the successor] firm

appeared in the subrogation case", and stated :

> **Defendants are seeking all communications between TIG and its last set of lawyers
> in the subrogation case, but they do not satisfactorily explain why they require
> disclosure of these communications to address the merits of the malpractice claim.
> Indeed, they cannot make such a showing. As noted, the alleged malpractice
> occurred well before Jones & Briggs appeared in the subrogation case. ..Under these
> circumstances, there is absolutely no necessity that defendants have access to the
> attorney-client communications between that firm and TIG, all of which took place
> long after the alleged malpractice was completed and had doomed TIG's claims.**

> **That this result is compelled under New York law is illustrated by the holding in
> *Jakobleff*, in which the court affirmed the entry of a protective order precluding the
> defendant law firm in that case from discovering communications between the
> plaintiff and her subsequent counsel (who was trial counsel and a third-party
> defendant in that case). The waiver theory offered by defendants there was that
> plaintiff's attorney was at least partly at fault for plaintiff's injury... and that they
> should be able to invade otherwise privileged conversations to demonstrate that the
> successor attorney had failed to protect his client's rights against the husband or to
> advise her how to do so. In rejecting this argument, the court noted that the plaintiff
> was not relying on these conversations, and further observed that defendant did not
> need access to them to demonstrate either that plaintiff had failed to mitigate her
> damages or that the second attorney had failed to act with reasonable professional
> care to protect plaintiff's interests. In this case, to the extent that defendants
> articulate a rationale for setting aside the privilege, they echo the arguments
> asserted unsuccessfully by the defendants in *Jakobleff*. ..As in *Jakobleff*, we do not
> view an invasion of the plaintiff's privileged communications with its subsequent
> attorneys as necessary for defendants to make their case on these points. If successor
> counsel did not act reasonably in protecting plaintiff's interests, defendants may
> demonstrate that failing based on the facts and circumstances of the subrogation
> case and the law applicable to the limitations defense there. They do not require**

**access to plaintiff's attorney-client discussions to do so.**

Id. at [*8-*9](*citing* Jakobleff, 97 A.D.2d at 835, 468 N.Y.S.2d at 898).

Also, in Leviton Mfg. Co. v. Greenberg Traurig LLP, 2010 U.S. Dist. LEXIS 128849,

2010 WL 4983183 (S.D.N.Y. Dec. 6, 2010) the plaintiff Leviton Mfg. Co. alleged in its

Complaint that the defendant Greenberg Traurig LLP was professionally negligent in prosecuting

a number of patent applications, and as a consequence, the "on-sale bar" foreclosed the

patentability of Leviton's inventions.  Before the Court was a dispute over Leviton's invocation of

the attorney-client privilege and work-product doctrine in response to subpoenas, issued by

Defendants to the third-party law firms that assumed responsibility for handling the patents after

Greenberg Traurig was terminated as Leviton's counsel. As the Defendants argue herein,

Greenberg Traurig contended that any privilege had been impliedly waived through the "at issue"

waiver doctrine and "without access to Leviton's communications with successor counsel,

Defendants [we]re deprived of any opportunity to disprove that it was Defendants' professional

errors that were the true reason for the abandonment of the patents and the proximate cause of

Plaintiff's damages." The Court concluded that there had not been a waiver of privilege, and held:

> **Leviton will not rely on privileged advice to prove its claims against Defendants.
> And, it does not intend to rely on any privileged communications in advancing its
> claims. Instead, its claim on this issue is straightforward — Defendants committed
> malpractice when they failed to file timely patent applications, thus resulting in the
> inability to secure patents because of the on-sale bar rule. Although it might be
> useful to Defendants to know what Plaintiff's new attorneys were thinking about the
> patents after Defendants were discharged as counsel, that knowledge is not critical
> to defending against the malpractice claim.  Defendants can attempt to establish that
> they were not professionally negligent, and, even if they were, that their negligence
> was not the proximate cause of injury to Leviton, by demonstrating that they timely
> filed the patent applications or, even if they did not, notwithstanding the on-sale bar
> rule, it was still possible to secure the patents. Those propositions can be established
> by reference to objective facts and law. Leviton's state of mind or advice of counsel**

> **is not in issue....Simply because those communications might be useful in undermining Leviton's explanation does not mean that the attorney client privilege has been impliedly waived. To conclude otherwise would require an implied waiver of privilege in any legal malpractice action in which the defendant attorney challenged causation and claimed that the former client had available, through successor counsel, alternative courses of action to avoid the consequences of his malpractice.**

Id. at. [*13-*14, *18] (*citing* Carl v. Cohen, 886 N.Y.S.2d 66 (S. Ct. N.Y. Cty. 2009)(defendant

attorney in malpractice action was free to argue, and could demonstrate, that successor counsel

could have taken action within the statute of limitations to remedy injury allegedly caused

by defendant attorney, without invading privileged communications of successor counsel); and

TIG Ins. Co. v. Yules & Yules, 1999 U.S. Dist. LEXIS 17607 (S.D.N.Y. Nov. 12, 1999)).

New York State Courts have also held the same, even where actual claims have been

brought against the successor/replacement counsel (here Defendants have not brought third party

claims against Judd or Antonino). By way of example, the widely cited case of Jakobleff v.

Cerrato, Sweeney & Cohn, 97 A.D.2d 834, 835, 468 N.Y.S.2d 895, 898 (2d Dep't 1983) was a

legal malpractice action concerning representation in an underlying matrimonial case where the

plaintiff sought to recover medical expenses incurred because of her former counsel's negligence

in failing to require husband to pay insurance premiums as part of divorce agreement. There, the

defendant law firm asserted a third party claim for contribution against the plaintiff's counsel in

the malpractice action, who was also her replacement counsel in the underlying matrimonial

action. In Jakobleff, the Court refused to allow the invasion of privilege by the legal malpractice

defendant firm. Although the defendant argued that it could only challenge causation through

review of the privileged communications with successor counsel, specifically suggesting that

such communications would show how the expenses could have been avoided and why successor

counsel could have taken remedial actions to avoid paying the expenses, the Court found no waiver of privilege with respect to communications with successor counsel stating "to conclude otherwise would render the privilege illusory in all legal malpractice actions". Id. at 835.

In the case of Raphael v. Clune White & Nelson, 146 A.D.2d 762, 537 N.Y.S.2d 246 (2d Dep't 1989) the plaintiff commenced a case against the attorney defendants for their alleged professional malpractice in handling his personal injury action, which was dismissed on forum non conveniens grounds.  After the case was dismissed, the plaintiff replaced the attorney defendants with English counsel, and the replacement English counsel brought a new personal injury action in England, which was eventually settled. The plaintiff alleged in the legal malpractice suit that he was forced into an inadequate settlement due to the defendant law firm's negligence in having brought the action in the wrong forum.  The defendant law firm argued that they were entitled to discovery of communications between the client and his replacement English counsel because the client had put those communications "at issue" and "that disclosure of the privileged communications [was necessary in order to enable the[m] to assert defenses." Citing Jakobleff, the Court upheld the lower court's denial of the defendants' motion to compel stating "by commencing suit against his former attorneys, the plaintiff has not placed in issue privileged communications with his English attorneys.  Nor are the plaintiff's claims such that disclosure of the privileged communications is necessary in order to enable the appellants to assert defenses." Id. at. 763.

Based upon the foregoing case law and Judge Gorenstein's thoughtful and complete analysis regarding the same, there can be no question that the August 11 Order was not clearly erroneous or contrary to law, and as such, Defendants objections outlined above must be rejected.

18

**2.    The August 11 Order Was Not Clearly Erroneous in Concluding That
Defendants Do Not Need Privileged Communications With Replacement
Counsel or Their Work Product to Support Their Mitigation Defense**

Defendants next argue that the August 11 Order is clearly erroneous because "it

superficially concluded" "that any question with regard to the mitigation of damages can be fully

addressed through the public filings". This is both a mis-characterization of the Court's Order

and a baseless objection.

First, it must be noted that nowhere in the August 11 Order does Judge Gorenstein state

that Defendants mitigation of damages arguments can be addressed through public filings. To

the contrary, the August 11 Order explains:

> **the manner in which Windsor litigated or settled the claims against the other
> insureds does not depend on the advice of new counsel.**
> **\*\*\***
> **The Defendants remaining argument is that they need the communication with new
> counsel to determine if the attorneys fees new counsel charged for subsequent legal
> work was reasonable. We reject this argument as well. Putting aside the issue of
> whether there has been an at issue waiver, the actual communications between client
> and counsel have no relevance to whether attorneys fees are reasonable. Whether
> any attorney's fees claimed were reasonably incurred will be decided by a fact
> finder based on the tasks performed and the amount of time devoted to those tasks.
> What was said between client and counsel is obviously irrelevant to this issue.**

[ECF No. 66, at pgs. 13 and 17 (*citing* 670 Apartments Corp. v. Agric. Ins. Co., 1997 WL

801458, at \*2 (S.D.N.Y. Dec. 30, 1997); Prudential Ins. Co. of Am. v. Coca-Cola Enters.,Inc.,

1993 WL 276065, at \*1 (S.D.N.Y. July 21, 1993); and Bovis Lend Lease, LMB, Inc. v. Seasons

Contracting Corp., 2002 WL 31729693, at \*16 (S.D.N.Y. Dec. 5, 2002))]

In addition to the cases cited by Judge Gorenstein, there are numerous other cases which

support the Court's rejection of "at issue" waiver based on supporting the defenses of a failure to

mitigate or unreasonableness of damages. By way of example, in the case of Koch v Sheresky,

Aronson & Mayefsky LLP, 33 Misc. 3d 1228(A), 2011 N.Y. Misc. LEXIS 5668, 943 N.Y.S.2d

792 (N.Y. Sup. Ct. 2011) the plaintiff, Koch, alleged that the Ragues defendants committed legal

malpractice in an underlying matrimonial action. The plaintiff had replaced the Ragues

defendants in the underlying matrimonial action with  KTHL/Kovarik. The Ragues defendants

sought the entire legal file of KTHL/Kovarik and sought to depose KTHL claiming "at issue"

waiver and arguing that the documents and testimony were necessary, in part, to learn "plaintiff's

mitigation efforts". Id. at [**18]   In denying the Rague defendants' motion based on "at issue"

waiver, and with respect to its argument that such testimony was required to determine

"plaintiff's mitigation efforts" the Court stated:

> **Regarding plaintiff's affidavits from the underlying case, Ragues may obtain
> information about plaintiff's knowledge and understanding of what was in her
> affidavits without invading attorney-client privilege...The same is true of mitigation
> efforts, an issue that plaintiff has not put into issue at all, but that is raised by
> defendants.**

Id. at [**23-**24].

Similarly, in Verdi v Jacoby & Meyers, LLP, 2009 N.Y. Misc. LEXIS 6038, 2009 NY

Slip Op 31541(U) (N.Y. Sup. Ct. June 30, 2009) the plaintiff was involved in a motor vehicle

accident and commenced a legal malpractice action against his former counsel in the underlying

personal injury action contending that they failed to timely assert a claim against the owner of the

offending vehicle. The defendant law firm interposed various affirmative defenses including that

the plaintiff failed to mitigate his damages. The defendant moved for an order to compel

discovery from plaintiff's counsel, who also replaced the defendant in the underlying personal

injury action claiming "that the advice given by counsel to the plaintiff with regard to the

settlement of the underlying action is relevant to the issue of whether the plaintiff duly mitigated

20

his damages.... given that the plaintiff '. . . has specifically and deliberately placed at issue a claim which can only be proven by use of the privileged materials' he has waived attorney client privilege". Id. at. [*10] . The Court denied the defendants' motion to compel stating:

> **The defendants claim the plaintiff has waived such privilege by placing at issue a claim, which can only be proven by use of the privileged materials. This argument is unavailing. Here the plaintiff's claim in the within legal malpractice action is that the defendant law firm failed to properly and timely sue Volvo Financial of North America. Accordingly, the plaintiff will be required to demonstrate that Volvo Financial of North America was in fact the owner of the offending vehicle in the underlying motor vehicle accident and that the defendants failed to timely file an action prior to the effective date of the Graves Amendment. Proof of such a claim, however, is clearly not dependant upon those communications that occurred between the plaintiff and his counsel relative to settling the underlying action.**

Id. at [*12-*13]

The foregoing cases establish that under both 2nd Circuit and New York law there has been no "at issue" waiver by Windsor of the attorney client and/or work product privileges, with respect to Judd and/or Antonino and/or their Firms, based on Defendants' need to support its defenses of failure to mitigate and/or unreasonableness of damages.  Defendants' citation to the case of Aurora Loan Servs. v. Posner, 499 F. Supp. 2d 475 (S.D.N.Y. 2007) does not help its argument as the Court therein specifically noted that the cases of Jakobleff and TIG "stand for the proposition that a plaintiff's assertion of damages in a legal malpractice action *does not waive privilege* on the grounds that such communications implicate whether plaintiff has mitigated damages."Id. at 478.  Ultimately, the Court in Aurora upheld the waiver of privilege based upon the plaintiff's failure to provide an adequate privilege log.

### 3.  Magistrate Judge Gorenstein Did Not Mistakenly Assume "That Even If Subsequent Counsel Were Negligent Defendants Could Not Escape Liability"

Defendants next argue that the August 11 Order mistakenly assumes that "even if

subsequent counsel were negligent Defendants could not escape liability" [ECF No. 74 at pg. 15]. This again is not only a mis-characterization of the August 11 Order, but is also an objection that is widely contradicted by cases in both New York State and Federal Courts.

First, the August 11 Order explains that under New York law, applicable to both the malpractice claim and the privilege dispute, "a plaintiff in a legal malpractice action must establish that the defendant law firm was <u>a</u> proximate cause of damages, but need not establish that it was <u>the</u> proximate cause." [ECF No. 66, at pg. 18 (*citing* <u>Utica Cutlery Co. v. Hiscock & Barclay, LLP</u>, 109 A.D.3d 1161, 1162 (4th Dep't 2013); <u>Barnett v. Schwartz</u>, 47 A.D.3d 197, 204-05 (2d Dep't 2007))]. The August 11 Order further explains "[t]hus, even if Windsor's new counsel gave the same allegedly bad advice that defendants gave, defendants could not use this fact to escape their liability to Windsor." [Id. (*citing* <u>Sommer v. Fed. Signal Corp.</u>, 79 N.Y.2d 540, 556 (1992)] This proposition is well supported in New York and 2nd Circuit cases, such that it could not under any circumstance be considered clearly erroneous or contrary to law. *See e.g.*, <u>Barnett v Schwartz</u>, 47 AD3d 197, 848 N.Y.S.2d 663 (2d Dept 2007)(The Court expressly held that the "but for" standard for attorney malpractice cases does not require proof that the defendant attorney's negligence was the "sole proximate cause" of the plaintiffs losses); <u>Arbor Realty Funding, LLC v Herrick, Feinstein LLP</u>, 2012 N.Y. Misc. LEXIS 6491, 2012 NY Slip Op 33522(U), at [*16] (NY Sup. Ct. Aug. 28, 2012) ("Defendants, however, argue that the requirement that legal malpractice requires a 'but for' cause of plaintiff's injury, rather than a 'substantial cause' of such injury, means that the demonstration of another cause is sufficient to defeat plaintiff's case. According to defendant's theory, a lawyer could only be found liable for malpractice if there were no other proximate cause of the injury...this is incorrect"); <u>Smartix Int'l</u>

*Corp. v. Garrubbo, Romankow & Capese, P.C.*, 2009 U.S. Dist. LEXIS 29114 (S.D.N.Y. Mar.

30, 2009) ("it is not necessary to demonstrate sole causation in order to demonstrate proximate or

but-for causation.") Accordingly, what Defendants claim is a mistaken assumption is a well

founded standard under the law and can not be a basis to overturn the August 11 Order.

    **4.    The August 11 Order Did Not Mis-Characterize or Oversimplify the
Plaintiff's Allegations, It Fully Analyzed the Evidence that Bears on Them
And Properly Concluded That An At Issue Waiver Did Not Occur**

Defendants next argue that "the central flaw in the August 11 Order is its misconception

of Windsor's claims and the evidence that bears on them". They further state that "Windsor

argued to the Magistrate Judge that the malpractice allegations are limited to the initial

'transactional legal advice', which the Magistrate Judge accepted in determining that at issue

waiver did not occur and that the "narrow view of the malpractice allegations simply assumes the

truth of Plaintiff's claims that the subsequent fees were the result of Defendants' acts or

omissions and were reasonable in kind and amount". In making these arguments, Defendants

clearly ignore the Court's analysis in the August 11 Order.

First and foremost, Windsor has at all times alleged that Defendants' malpractice

involved both the Defendants' transactional representation and its litigation representation in the

Bitter Arbitration. *See*, [ECF No. 1 and 60]. Moreover, the August 11 Order does not mis-

characterize these allegations, but rather accurately summarizes them stating:

> **Windsor's malpractice claim alleges that during the course of his representation
> Rousseau failed to advise Windsor to take critical steps that would have allowed
> Windsor to obtain the full value of the life insurance policies. Compl. ¶¶ 182-184.
> Additionally, Windsor asserts that Rousseau did not give proper advice to Windsor
> regarding the conduct of the Bitter arbitration and the subsequent negotiations to
> settle it.**
>
> ....

> **To reduce the problem to simple terms: Windsor is alleging that defendants' actions created a mess that it tried to clean up. Windsor hired new counsel to advise it and assist in cleaning up that mess.**

[ECF No. 66, at pg. 10, 13]

Furthermore, the August 11 Order clearly does not assume the truth of Plaintiff's allegations that Replacement Counsels' fees and costs subsequent to Defendants' termination were the result of Defendants acts or omissions; but rather, that Defendants are free to argue that the actions taken by Windsor's Replacement Counsel were "unnecessary or badly performed", and that "Windsor failed to follow their earlier advice or increased its damages by undertaking a particular strategy", but they do not need Plaintiffs' privileged communications and Replacement Counsel's work product to establish those positions. Judge Gorenstein's position on this subject is consistent with both New York and 2nd Circuit case law and therefore is not clearly erroneous or contrary to law. *See e.g.*, Carl v. Cohen, 886 N.Y.S.2d 66 (S. Ct. N.Y. Cty. 2009)(holding the same); Leviton, 2010 U.S. Dist. LEXIS 128849, 2010 WL 4983183 (S.D.N.Y. Dec. 6, 2010) (same); TIG Ins. Co., 1999 U.S. Dist. LEXIS 17607 (S.D.N.Y. November 9, 1999) (same).

### 5.   The August 11 Order Did Not Misapply the Case of *In Re County of Erie*

As the last basis for their objections, Defendants argue that "the August 11 Order erroneously ignores years of analogous legal malpractice case law in its misplaced reliance on *Erie*" because *Erie* was not a malpractice case and provides little explanation for what constitutes reliance". [ECF No. 74 at pgs. 18-19]. This argument is simply the most absurd of all of Defendants' objections for several reasons: (1) virtually every case, including legal malpractice cases, involving "at issue" waiver in this District cite to and rely on the 2nd Circuit's analysis in

*In re County of Erie*[5]; (2) the August 11 Order did not end its analysis or reject "at issue" waiver simply because Windsor confirmed that it does not intend to rely on or use its communications with Replacement Counsel to support its claims, but rather, went on to consider, in detail, whether there was implicit reliance and whether Defendants would be denied access to information vital to their defenses [See ECF No. 66, at pgs. 11-14]; and (3) the August 11 Order applied the holdings from prevailing legal malpractice case law from both New York State and Federal Courts addressing "at issue" waiver, and appropriately rejected certain legal malpractice case law cited by the Defendants, wherein defendants were permitted to obtain discovery of privileged communication, either because those cases relied "directly or indirectly on an articulation of the at issue waiver doctrine expressed in Hearn v. Ray, 68 F.R.D. 574 (E.D. Wash 1975) which was rejected by the 2d Circuit and New York Courts, or because those cases "fail[ed] to distinguish- or even mention-the line of cases [from both New York State and Federal Courts cited in the Opinion] that refused to find a waiver where new counsel has entered the case." [Id. at pg14-15].

Simply put, the Defendants have not a cannot establish that there has been an "at issue" waiver of privilege by Windsor or that the August 11 Order was clearly erroneous. The August 11 Order appropriately found Defendants do not need access to the privileged communications with or work product of Replacement Counsel to "test Windsor's theories of the case" or to

---

[5]*See e.g.,* Nimkoff Rosenfeld & Schechter, LLP v. RKO Props., Ltd., 2016 U.S. Dist. LEXIS 70051, at *18 (S.D.N.Y. May 24, 2016) ( "simply because privileged information is relevant to a claim or defense in the case does not give rise to an implied waiver; rather, to forfeit privilege, 'the party must rely on privileged advice from his counsel to make his claim or defense.'") (*quoting* County of Erie); Leviton Mfg. Co., Inc. v. Greenberg Traurig LLP, 2010 U.S. Dist. LEXIS 128849, 2010 WL 4983183, at *4 (S.D.N.Y. Dec. 6, 2010) (same)

assert its defenses.  Accordingly, pursuant to the cases cited herein, and prevailing 2nd Circuit and New York case law, Defendants have not provided a basis to overturn the August 11 Order and are not entitled to disclosure of the privileged materials withheld.

## CONCLUSION

For all the foregoing reasons, Defendants objections to the August 11 Order must be rejected.

Respectfully submitted,

Alan L. Frank, Esquire
Samantha A. Millrood, Esquire
Alan L. Frank Law Associates, P.C.
135 Old York Road
Jenkintown, PA 19046

1601 Gravesend Neck Rd
Suite 903, 2nd Fl.
Brooklyn, NY  11229

Tel:  (215) 935-1000
Fax: (215) 935-1110
afrank@alflaw.net
smillrood@alflaw.net

Dated: October 13, 2017                     Attorneys for Plaintiff

26