UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WINDSOR SECURITIES, LLC : <br> : Civil Action No. 16-cv-01533 (GBD) <br> **Plaintiff** : <br> v. : <br> : <br> ARENT FOX, LLP : <br> and : <br> JULIUS ROUSSEAU, III, ESQUIRE : <br> : <br> **Defendants** : | |

### DECLARATION OF JACLYN H. FRANK IN SUPPORT OF
### PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR DISCOVERY

I, Jaclyn H. Frank, pursuant to 28 U.S. Code § 1746 and under penalty of perjury, state and declare as follows:

1. I am a member of the Pennsylvania, New Jersey, and Florida Bars, and am an attorney at Alan L. Frank Law Associates, P.C., attorneys for Plaintiff Windsor Securities, LLC ("Windsor").

2. Alan L. Frank Law Associates, P.C. has been counsel to Windsor since the inception of this litigation, and I have been actively involved in handling the review of documents responsive to Defendants' discovery requests since March of 2017. As a result, I am fully familiar with the facts and circumstances related below.

3. I submit this Declaration in support of Windsor's Opposition to Defendant's Motion for a court order directing that Windsor's production of certain purportedly privileged documents be deemed not inadvertent and that privilege has been waived and directing Windsor to reimburse Defendants for certain costs.

4. Windsor never intended to waive the attorney-client or work product privileges applicable to a number of documents inadvertently produced in this litigation. The inadvertent disclosure resulted solely from an error in the production process, and does not reflect any intentional or unintentional action by the clients. The inadvertent disclosure occurred despite Windsor's counsel having utilized appropriate procedures for privilege review designed to avoid such issues.

5. On June 10, 2016, Defendants served their First Requests for Production of Documents ("Defendant's Requests") on Windsor.

6. In response to Defendant's Requests, Windsor immediately began gathering documents.

7. Sean Meluney, an attorney formerly of Alan L. Frank Law Associates, P.C., began conducting an extensive review of all responsive documents gathered by Windsor. I was not involved in this review, but to my knowledge, in or around early March of 2017, Windsor produced an initial production of approximately 5,000 email communications, as well as a privilege log prepared by Mr. Meluney for approximately 347 documents that Windsor produced in redacted form ("Privilege Log (A)").

8. On March 29, 2017, Sean Meluney left the law firm Alan L. Frank Law Associates, P.C. and withdrew from this litigation as Windsor's counsel.

9. Around the same time, I became involved in the review process for additional responsive documents gathered by Windsor, from Windsor's counsel in the underlying litigation, Lauren Antonino of the law firm The Antonino Firm ("Antonino"), and Darin Judd of the law firm Thompson, Welch, Soroko & Gilbert LLP ("Judd"). After Mr. Meluney's departure, I continued to review all documents gathered for purposes of discovery and responsive to Defendant's Requests.

10. I adhered to a document review protocol instructed by my supervisors, attorneys Samantha Millrood and Alan Frank. The document review protocol set forth instructions for determining whether a document was protected from production by the attorney-client privilege or under the work product doctrine. I understood both the attorney-client and work product privileges and was familiar with identifying privileged documents. During the review process, I reviewed each and every page of the documents provided by Windsor, Antonino and Judd, identified documents as privileged, and flagged them as such. I then separated those documents from the documents Windsor intended to produce.

## Windsor's Productions of Documents and Revisions of Corresponding Privilege Logs

11. The first production of documents that I reviewed began in late March of 2017 and included approximately 3,000 documents. During my page-by-page review of all of these approximately 3,000 documents, I determined that all of the documents were emails by and between Windsor and Windsor's attorneys and thus were covered by the attorney-client and/or work product privileges. I prepared a corresponding privilege log for the approximately 3,000 documents that were withheld on the basis of attorney-client and/or work product privileges ("Privilege Log (B)").

12. On April 10, 2017, Windsor produced Privilege Log (B). Based on my review of the corresponding cover letter, it appears that Windsor also produced approximately 10,000 pages of documents. I was not involved in the review of such documents but have been advised that the same privilege review protocols were adhered to with respect to these documents.

13. On April 17, 2017, Windsor challenged the assertion of privilege for a number of emails

listed on the Privilege Log (B), and demanded that Windsor produce the identified documents. Defendants also demanded that Windsor provide narrative descriptions of all communications withheld on the basis of privilege and contained in Privilege Log (A) and Privilege Log (B).

14. Upon receiving Defendant's demands, I immediately re-reviewed the approximately 3,000 documents I originally reviewed in late March and which were accounted for in Privilege Log (B). I gathered all communications for which Defendants challenged our assertion of privilege and, if after re-review determined that they were not privileged, prepared them for production. I also revised Privilege Log (B) to include more complete narrative descriptions of each email listed in the privilege log that Windsor continued to withhold on the basis of privilege or produced in redacted form. I also reviewed the approximately 347 documents originally reviewed by Mr. Meluney and revised the corresponding privilege log, Privilege Log (A), to include more complete narrative descriptions for each document withheld on the basis of privilege or produced in redacted form.

15. Per Defendant's April 17, 2017 demand, on April 28, 2017, Windsor produced revised versions of Privilege Log (A) and Privilege Log (B), as well as produced approximately 356 pages of documents which were originally withheld on the basis of privilege, but that after re-review, were determined not to be privileged.

16. Thereafter, I began reviewing all attachments to the approximately 3,000 email communications listed in Privilege Log (B). The attachments were reviewed separately from their emails because most of the attachments could not be opened directly from their emails and had to be converted into different formats. Some of the emails and/or

attachments had to be reproduced to my office in a different format that was readable. The processing of such attachments took several days before I could access and review them.

17. I reviewed over 10,000 pages of attachments (ultimately produced) and separately approximately 243 attachments (with multiple pages, ultimately withheld on the basis of privilege). I also prepared a corresponding privilege log for the approximate 243 attachments that were withheld on the basis of privilege ("Privilege Log (C)").

18. On May 5, 2017, Windsor produced approximately 10,500 pages of non-privileged attachments, as well as Privilege Log (C), for attachments withheld on the basis of privilege.

19. Thereafter, during a meet and confer in which I did not participate, Defendants again challenged Windsor's assertion of privilege for certain emails contained on Privilege Log (B). In addressing Defendants' concerns, I re-reviewed relevant documents contained within the approximately 3,000 documents listed in Privilege Log (B) and prepared any non-privileged emails for production. I also re-revised and updated Privilege Log (B) to identify communications being produced that were originally withheld on the basis of privilege, provided more narrative descriptions of privileged emails, and corrected dates for some communications, where the month and day had been transposed.

20. On May 10, 2017, Windsor produced approximately 160 documents (425 pages) originally withheld on the basis of privilege, as well as an updated and revised version of Privilege Log (B).

21. Thereafter, Defendants raised concerns with the May 5, 2017 production of email attachments and challenged Windsor's assertion of privilege for certain attachments

contained on Privilege Log (C). In addressing Defendants' concerns, I re-reviewed relevant attachments contained within the approximately 243 attachments listed in Privilege Log (C), and prepared any non-privileged attachments for production. I also re-revised and updated Privilege Log (C) to identify any attachments being produced that were originally withheld on the basis of privilege, provided more narrative descriptions of privileged attachments, and corrected dates that, for some communications, transposed the month and day.

22. On May 23, 2017, Windsor produced approximately 190 email attachments (1,842 pages) that were originally withheld on the basis of privilege, as well as an updated and revised version of Privilege Log (C). For Defendants' convenience, I identified which documents were added to the Privilege Log (C) that were not previously included and which documents were produced that were originally withheld on the basis of privilege.

23. Thereafter, I reviewed, for the first time, a separate set of documents that had been recently prepared and executed, including a release executed between Windsor and the Houchins entities, and communications with Joseph Wood regarding said Houchins Release and Houchins' Affidavit, with attachments.

24. On May 25, 2015, Windsor produced all non-privileged documents relating to the release executed between Windsor and the Houchins entities, and communications with Joseph Wood regarding said Houchins Release and Houchins' Affidavit, with attachments.

25. To my knowledge, and despite multiple productions of documents and revisions of corresponding privilege logs, Windsor did not inadvertently produce any privileged documents in the April 10, April 28, May 5, May 10, May 23, or May 25, 2017 productions.

26. Whenever Defendants raised a deficiency with Windsor's production of documents or privilege logs, I immediately prioritized this litigation before any other matters in my office and began working to address and remedy the deficiencies.

## Events Leading Up To Inadvertent Production of Privileged Documents in August 10, 2017 Production

27. In late July of 2017, my office received another large production of documents from Antonino and Judd of over 100,000 pages. Most of these documents were also in the possession of Windsor and had already been reviewed, non-privileged documents produced and privilege logs provided for documents withheld on the basis of privilege.

28. I reviewed these approximately 100,000 pages and prepared a corresponding Categorical Privilege Log, to which Defendants' counsel was agreeable.

29. The review was complicated because we received the documents in several different formats, and documents were contained within hundreds of different folders, as the documents were delivered to Windsor by Antonino and Judd electronically in the form which they were normally kept by those parties. Moreover, a significant portion of the documents produced by Antonino contained internal errors which prohibited me from initially accessing certain documents. I had to separate any documents that I could not initially access and wait for those documents to be further processed and converted to an accessible format, which caused more difficulty and delay in my review.

30. In my page-by-page review, I separated privileged and non-privileged documents and only intended for the non-privileged documents to be produced. Under no circumstances did I instruct or intend that the segregated privileged documents be produced.

31. On August 10, 2017, Windsor produced approximately 91,124 pages from the Judd and

Antonino production, as well as a Categorical Privilege Log representing an additional approximately 7,556 documents (with multiple pages) from Judd and Antonino that were withheld on the basis of privilege.

32. On September 15, 2017, Defendants informed my office that the August 10, 2017 production might contain privileged material. This was the first instance in which Defendants and/or Windsor discovered that privileged material was inadvertently produced.

33. Upon my office's request that Defendants identify said potentially privileged documents, Defendants directed Windsor's counsel to a 500-page bate stamp range contained in the August 10, 2017 production. At that moment, I immediately began re-reviewing the range of documents identified by Defendants for privileged materials. The minute I discovered the first privileged document in my re-review, I notified Samantha Millrood, who then immediately instructed Defendants to cease their review of the August 10, 2017 production.

34. Over the next few days, I spent a significant amount of time re-reviewing, page-by-page, as many documents as possible within and around the bate stamp range identified by Defendants, I began identifying all privileged materials that I discovered and prepared a corresponding privilege log containing cross-references for privileged communications that appeared multiple times throughout the production[1] ("Privilege Log (D)"). My re-

---

[1] Privilege Log (D) contains cross-references for the same privileged communications, specifically email chains, that appear many times throughout the production. By way of example, for every email chain received from Antonino and Judd, that same email chain would be produced multiple times, once for every original email and once for each response thereafter. Therefore, an email that generated 10 responses would appear 11 different times in the production: the first production containing only the original email, the next containing the original email and the first response generated, the next containing the original email and the first and second responses generated, and so on. As a result, the same email would be produced multiple times, depending on how many responses it generated from its recipients.

review of the approximately 100,000-page production is still ongoing.

35. On September 19, 2017, Windsor provided a claw back list of 113 bate stamp ranges of documents containing privileged material that I discovered during my initial re-review of the August 10, 2017 production. Windsor also produced Privilege Log (D). Samantha Millrood notified Defendants that my re-review was incomplete and ongoing, and that Windsor reserved all rights to claw back any other privileged documents inadvertently produced.

36. On September 20, 2017, Defendants challenged Windsor's assertion of privilege for several communications listed in Privilege Log (D).

37. Following Defendants' challenge, I re-reviewed such documents and determined that two of the communications (produced, in total, five different times), were not privileged. I prepared these two non-privileged documents for production and revised Privilege Log (D), both of which were produced to Defendants on September 22, 2017.

38. Over the next week, I sorted out the remaining clawed back documents that I discovered in my initial re-review. For documents containing both privileged and non-privileged information, I redacted only the privileged information contained in those documents and prepared them for production in their redacted forms. I also revised Privilege Log (D) to reflect itemized communications contained within the bate stamp ranges originally listed, identified which documents were being withheld on the basis of privilege or produced in redacted form, and provided cross-references between documents that were produced multiple times (see Paragraph 34, footnote 1).

39. On October 4, 2017, Alan Frank notified me that Defendants attempted to use certain privileged documents from the August 10, 2017 production (which were not included in

the September 19, 2017 Clawback identification letter) in the depositions of Darin Judd and Steven Prusky. Mr. Frank immediately asserted Windsor's right to claw back such privileged documents and objected to the use of and questioning on the potentially privileged communications.

40. Immediately upon receiving this information, I re-reviewed the documents and confirmed that they were inadvertently produced and were intended to be withheld on the basis of privilege, though I did not discover them in my initial re-review of the August 10, 2017 production. I added these documents to Privilege Log (D).

41. I was also informed by Mr. Frank that Defendants indicated that they are aware of additional privileged documents in the August 10, 2017 production, but despite our request and demand, have refused to identify the nature or bate stamp numbers of such documents.

42. On October 5, 2017, Windsor produced a number of documents in their redacted forms, as well as the updated and revised Privilege Log (D) reflecting the changes listed in Paragraphs 38-40 above.

43. Since then, I have identified 17 additional privileged documents that were inadvertently produced, and which appear 67 times in the production. I have updated Privilege Log (D) to identify where these 17 documents appear in the production, along with cross-references between duplicate documents that are part of the same email communication.

44. On October 14, 2017, Windsor asserted its right to claw back such additional documents identified in Privilege Log (D).

45. Windsor did not intend to produce any privileged documents in the August 10, 2017 production or in any other productions. Any production of privileged documents was

inadvertent.

46. Defendants and/or Windsor first discovered the inadvertent production of privileged documents on September 15, 2017, all of which were contained within the August 10, 2017 production. The August 10, 2017 production was the first and only production that ever contained inadvertently-produced privileged materials, despite multiple productions of documents during the course of discovery, and the provision of multiple privilege logs, which contained and identified the very same documents as privileged.

47. In total, I spent over 250 hours and reviewed over 354,300 pages and separately over 10,900 documents (with multiple pages) for privilege. I re-reviewed large portions of same pages and documents multiple times for privilege, as outlined above.

48. Based on my review thus far, only 85 documents protected by the attorney-client privilege or work product doctrine were inadvertently produced. These 85 documents appeared 233 times in the August 10, 2017 production (as explained above, many of the same documents were produced multiple times as they were part of multiple email chains). As a result, Windsor initially clawed back 1,062 pages.

49. Out of the 1,062 pages initially clawed back, 128 documents (made up of 657 pages) contained only privileged information and were withheld. The remaining 104 documents (made up of 405 pages) contained both privileged and non-privileged information and were re-produced in redacted form.

50. Out of these 104 documents re-produced in redacted form, only 172 pages out of 405 pages actually contained privileged material.

51. Thus, out of the 1,062 pages that were initially clawed back, only 829 pages contained

privileged material[2] and were thereafter either withheld or produced in redacted form.

52. In total, out of approximately 354,300 pages ultimately produced and separately over 10,900 documents (with multiple pages, ultimately withheld on the basis of privilege) reviewed and re-reviewed by Windsor's counsel, only 85 documents were inadvertently produced documents protected by the attorney-client privilege or work product doctrine.

53. Windsor did not intend to waive privilege as to the documents at issue in Defendant's Motion or with respect to any other communication protected by the attorney-client privilege or work product doctrine. Windsor recalled the relatively few privileged documents it inadvertently produced to Defendants as soon as it discovered such inadvertent production and identified at each bate stamp number where these documents appeared. Windsor's counsel's inadvertent production of 85 documents, produced 233 times, amounting to 829 pages containing privileged material, out of the over 354,300 pages ultimately produced (and over an additional 10,900 documents with multiple pages, ultimately withheld on the basis of privilege) – amounts to less than 0.227% of the total number of pages they reviewed and less than 0.234% of the total number of pages produced – and does not constitute a knowing and intelligent waiver of the privilege.

_____
JACLYN H. FRANK

Sworn to before me this
17th day of October, 2017

_____
NOTARY COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
DAWN M. WELSH, Notary Public
Cheltenham Twp., Montgomery County
My Commission Expires February 27, 2018

---

[2] Total number of pages containing privileged material = 657 pages of documents withheld on the basis of privilege + 172 redacted pages of documents re-produced in redacted form.