UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| WINDSOR SECURITIES, LLC | : | |
| | : | |
| | : | **Civil Action No. 16-cv-01533 (GBD)** |
| **Plaintiff** | : | |
| v. | : | |
| | : | |
| ARENT FOX, LLP | : | |
| and | : | |
| JULIUS ROUSSEAU, III, ESQUIRE | : | |
| | : | |
| **Defendants** | : | |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF WINDSOR SECURITIES, LLC'S
MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY ON
COUNT I - PROFESSIONAL NEGLIGENCE/LEGAL MALPRACTICE**

Alan L. Frank, Esquire
Samantha A. Millrood, Esquire
Alan L. Frank Law Associates, P.C.
135 Old York Road
Jenkintown, PA 19046

1601 Gravesend Neck Rd
Suite 903, 2nd Fl.
Brooklyn, NY 11229

Tel: (215) 935-1000
Fax: (215) 935-1110
afrank@alflaw.net
smillrood@alflaw.net
Attorneys for Plaintiff Windsor Securities, LLC

Dated: August 9, 2018

## TABLE OF CONTENTS

**page**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    I.      STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    II.    DEFENDANTS COMMITTED MALPRACTICE AS A MATTER OF LAW
           AND SUMMARY JUDGMENT ON LIABILITY AS TO COUNT I IS
           WARRANTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

**CASES**                                                                 Page(s)

*AmBase Corp. v. Davis Polk & Wardwell*, 8 N.Y.3d 428, 434, 834 N.Y.S.2d 705 (2007) . . . . . 24

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505 (1986) . . . . . . . . . . . . . . . . . . . . 4

*Baker v. Dorfman*, 1998 U.S. Dist. LEXIS 14702, 1998 WL 642762 (S.D.N.Y. Sept. 17, 1998)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 20, 21, 25

*Bernstein v. Oppenheim & Co.*, 160 A.D.2d 428, 554 N.Y.S.2d 487 (1st Dep't 1990) . . . . . . . . 4

*Campagnola v. Mulholland, Minion & Roe*, 76 N.Y.2d 38, 42, 556 N.Y.S.2d 239, 241 (1990) . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*D'Amico v. City of New York*, 132 F.3d 145, (2nd Cir.), *cert. denied* 524 U.S. 911, 118 S. Ct.
2075 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Davis v. Klein*, 224 A.D.2d 196, 637 N.Y.S.2d 137 (1st Dep't 1996) . . . . . . . . . . . . . . . . . . . . . 4

*Deb-Jo Const., Inc. v. Westphal*, 210 A.D.2d 951, 620 N.Y.S.2d 678 (3rd Dept. 1994) . . . 5, 21

*Deitz v. Kelleher & Flink,* 232 A.D.2d 943, 649 N.Y.S.2d 85 (3rd Dept. 1996) . . . . . . . . . . 5, 21

*Den Norske Amerikalinje Actiesselskabet v. Sun Printing & Publ'g Ass'n*, 226 N.Y. 1, 122 N.E.
463 (N.Y. 1919) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 954 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Katsaris v. Scelsi*, 115 Misc. 2d 115, 453 N.Y.S.2d 994, 996 (Sup. Ct. 1982) . . . . . . . . . . . . 21

*Kenford Co. v. County of Erie*, 108 A.D.2d 132, 489 N.Y.S.2d 939 (4th Dep't 1985), *rev'd on
other grounds,* 73 N.Y.2d 312, 540 N.Y.S.2d 1, 537 N.E.2d 176 (1989) . . . . . . . . . . . . . . . . 25

*Leach v. Bailly*, 57 A.D.3d 1286, 870 N.Y.S.2d 138 (3rd Dept. 2008) . . . . . . . . . . . . . . . . . . . 25

*Logalbo v. Plishkin, Rubano & Baum*, 163 A.D.2d 511, 558 N.Y.S.2d 185 (2d Dep't 1990)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 20, 21

*Nomura Asset Capital Corp. v. Cadwalader, Wickersham & Taft LLP*, 26 N.Y.3d 40 (N.Y. App.
Ct. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Northrop v. Thorsen*, 46 A.D.3d 780, 848 N.Y.S.2d 304 (2nd Dept. 2007) . . . . . . . . . . . . . . . . 5

*Perks v. Lauto & Garabedian*, 306 A.D.2d 261, 262, 760 N.Y.S.2d 231 (2nd Dept 2003) . . . . 25

*Red Zone LLC v. Cadwalader, Wickersham & Taft LLP*, 45 Misc. 3d 672, 994 N.Y.S.2d 764 (N.Y, Sup. Ct. 2013), *aff'd,* 118 AD3d 581, 988 NYS2d 588 (N.Y. App. Div. 1st Dep't, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Rudolf v Shayne, Dachs, Stanisci, Corker & Sauer*, 8 NY3d 438, 867 N.E.2d 385, 835 N.Y.S.2d 534 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Shaughnessy v. Baron*, 151 A.D.2d 561, 542 N.Y.S.2d 341 (N.Y. App. Div. 2d Dep't 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Stanski v. Ezersky*, 210 A.D.2d 186, 621 N.Y.S.2d 18 (1st Dep't 1994) . . . . . . . . . . . . . . . . . 21

*Superior Tech. Solutions, Inc. v Rozenholc*, 2013 N.Y. Misc. LEXIS 1423 (NY. Sup. Ct. Apr. 1, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Trimboli v. Kinkel*, 226 N.Y. 147, 149, 123 N.E. 205 (1919) . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## RULES & STATUTES

*Fed. R. Civ. P. 56(e)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## TREATISES

*3 Mallen and Smith,* LEGAL MALPRACTICE § 20:6, 20:10 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 25

## PRELIMINARY STATEMENT

This is a professional negligence/legal malpractice action against Arent Fox, LLP ("Arent Fox") and Julius Rousseau, III, Esquire ("Rousseau") (collectively "Defendants"), a large, well-known law firm and attorney that held themselves out as experts in the field of premium financing of insurance policies. By failing to take simple steps that any reasonably prudent, let alone "expert", attorney would have taken, Defendants badly botched their client's rights to millions of dollars in death benefits on the five (5) life insurance policies at issue in this action, despite specifically advising Plaintiff that it had acquired such ownership, and further induced Plaintiff to litigate and incur hundreds of thousands of dollars in attorneys fees and costs, and by failing to take simple steps that any reasonably prudent attorney would have taken.

Defendants needed only to document that the assignment of the policies and death benefits thereunder were made "in consideration of the full and complete satisfaction of the liabilities" under the Premium Financing Agreements, and did not. Further, Defendants failed to: (1) know and understand that California law applied to the transactions; (2) know and understand that under California law (as opposed to the law of 48 other states) Article 9 of its version of the UCC specifically applies to the transfer of an interest in an insurance policy; (3) comply with the simple requirements of section 9620 of the California Code; (4) follow the correct procedure for triggering the default sale rights contractually provided in the financing packages; (5) document any pre-default assignment of the policies and mutual release of the parties' obligations and rights under their agreements; and (6) heed the errors noted by the Bitter Panel and the pleas of Plaintiff following the Bitter arbitration to address deficiencies on the remaining four (4) policies, Acker Collins, Coppock and Stamatov.

1

Defendants' actions and omissions, which resulted in the Plaintiff's inability to obtain

unfettered ownership and entitlement to the death benefits for the life insurance policies at issue,

constitute professional malpractice, as a matter of law.  Said malpractice first caused an

arbitration panel - - and then later on a Federal Court in two other cases - - to determine that

Plaintiff had not properly exercised its Default Sales Rights, had not documented any transfer of

the policies in exchange for the satisfaction of all liabilities and obligations under the Premium

Financing Agreements, and was actually not entitled to (the bulk of ) those death benefits.

Rather, the Arbitration panel and the Federal Court determined, with respect to three (3)

of the five (5) policies[1], that because Plaintiff failed to comply with the Default Sales provision

in its Collateral Assignment Agreements and/or the strict foreclosure procedures outlined in

California Civil Code §9620, which specifically applies to life insurance policies, the Trusts for

each respective insured were entitled to retain the death benefits, and that Plaintiff's rights were

limited to those of a secured creditor, and that Plaintiff was entitled to collect only the premiums

it paid for the policies, plus 10% interest and expenses.  Plaintiff lost many millions of dollars as

a direct result of the Defendants' malpractice.

It is particularly noteworthy that the Federal Court in *both* the Acker and Collins cases

thought that the requirements under California Code 9620 and the Premium Financing

---

[1]The first three (3) (of the five (5)) policies at issue in this case were adjudicated by tribunals because Messrs. Bitter, Acker and Collins all died in succession and there were ensuing competing claims to the death benefits under each respective policy.  With respect to the remaining two (2) policies, Coppock and Stamatov, pre-death declaratory judgment actions were initiated by Windsor, but these actions were eventually discontinued as a result of settlements reached in 2016. See Exhibits 105 and 106.

As will be demonstrated at the requested assessment of damages hearing, more that 99% of the damages requested by the Plaintiff against the Defendants herein stems from the Bitter, Acker, and Collins, policies, and not the Coppock and Stamatov policies.

Documents' default sales provisions were *so very clear* that the Court *on summary judgment* determined that the Plaintiff had failed to satisfy them. The Federal Court's entry of Summary Judgment against Plaintiff on the Acker and Collins death benefits tracked --almost completely and word for word -- the Award (and explanation) of the Arbitration Panel in favor of the Bitter Trust in the earlier Bitter matter–words which Defendants could and should have acted upon to "save" the death benefits on the Acker and Collins policies, but willfully chose not to. The United States District Court in both the Acker and Collins Actions and the Panel in the Bitter Arbitration concluded that there was precise and straightforward language that should have been added to the documents that the Defendants had the Trustees execute to demonstrate --unambiguously--that the change in ownership of the insurance policies with the Insurance companies was "***in consideration of the full and complete satisfaction of the liabilities***" under the Premium Finance Packages.

But for the Defendants' malpractice in failing to document that the transfer of the policies and death benefits thereunder were in exchange for a release of all obligations under the loan agreements, Plaintiff would have been entitled to the death benefits under the policies, would not have incurred the legal fees and costs in fighting the Trusts for the death benefits, and would not have incurred the settlement payments.

The facts on which the Defendants' liability is based are both simple and beyond genuine dispute...Defendants failed to follow the contractual and statutory repossession rules (California's uniform version of Article 9 of the UCC) to permit Plaintiff, a secured party, to obtain and retain the collateral (the insurance policies)–in their entirety-- in satisfaction of indebtedness. This was malpractice as a matter of law.

## STATEMENT OF FACTS

Incorporated herein, as if set forth at length, are the facts set forth in Plaintiff's Statement of Undisputed Material Facts as required by Local Civil Rule 56.1.

## ARGUMENT

### I.    STANDARDS

"Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." *D'Amico v. City of New York*, 132 F.3d, 145, 149 (2nd Cir.), *cert. denied* 524 U.S. 911, 118 S. Ct. 2075 (1998).  On a motion for summary judgment, all inferences must be construed in favor of the non-moving party.  However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleadings, but…must set forth specific facts showing that there is a genuine issue for trial." See, Fed. R. Civ. P. 56(e).  The non-movant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505 (1986).

Under New York law, a claim for legal malpractice requires proof of three elements: (1) negligence of the attorney; (2) that the attorney's negligence was the proximate cause of the plaintiff's loss; and (3) actual damages. *Davis v. Klein*, 224 A.D.2d 196, 637 N.Y.S.2d 137, 139 (1st Dep't 1996). The relevant standard of care adopted by courts in this state is the "ordinary and reasonable skill and knowledge commonly possessed by a member of the profession." *Bernstein v. Oppenheim & Co.*, 160 A.D.2d 428, 554 N.Y.S.2d 487, 489 (1st Dep't 1990).

Federal Courts in New York have entered summary judgment on the issue of liability in

legal malpractice actions, and have held "[w]hile the question of whether an attorney acted

negligently normally requires a factual determination by a jury, 'a plaintiff will be entitled to

summary judgment in a case where there is no conflict at all in the evidence, the defendant's

conduct fell below any permissible standard of due care, and the plaintiff's conduct was not really

involved'." *See, e.g., Baker v. Dorfman*, 1998 U.S. Dist. LEXIS 14702,[*7] ; 1998 WL 642762

(S.D.N.Y. Sept. 17, 1998) (quoting *Logalbo v. Plishkin, Rubano & Baum*, 163 A.D.2d 511, 558

N.Y.S.2d 185, 187 (2d Dep't 1990).

New York State Courts have also resolved numerous attorney malpractice cases on

summary judgment where the malpractice could be and was determined as a matter of law. See,

*Northrop v. Thorsen*, 46 A.D.3d 780, 782, 848 N.Y.S.2d 304, 308 (2nd Dept. 2007) ("As a matter

of law, the defendant's disregard or ignorance of such a clearly defined and firmly established

rule, . . . fell below any permissible standard of due care"); *Deitz v. Kelleher & Flink,* 232 A.D.2d

943, 945, 649 N.Y.S.2d 85, 87 (3rd Dept. 1996) ("defendant's failure to commence a lien

foreclosure action or to seek a court order extending the CD/M lien was a breach of defendant's

professional duty as a matter of law"); *Deb-Jo Const., Inc. v. Westphal*, 210 A.D.2d 951, 951, 620

N.Y.S.2d 678, 679 (3rd Dept. 1994) (failure to file a financing statement in the manner required

by law constitutes malpractice as a matter of law.)

Just as in the cases cited above, Plaintiff is entitled to summary judgment on the issue of

liability on its count for Professional Negligence.

## II.    DEFENDANTS COMMITTED MALPRACTICE AS A MATTER OF LAW AND SUMMARY JUDGMENT ON LIABILITY AS TO COUNT I IS WARRANTED

Defendants' failed to know and understand that under California law (applicable to the

premium finance transactions by virtue of the choice of law provisions in the premium financing

5

agreements) life insurance policies *are included* within the scope of California's commercial code, Article 9[2]. As a result, Defendants failed to comply with the default sale provision, Section 9620 of California's UCC. Defendants also failed to comply with the contractual default sales rights specifically laid out in the Premium Financing Agreements. Defendants further failed to document any pre-default agreement between the Plaintiff and the Trustees for surrender of the policies (and death benefits thereunder) ***in consideration for a full and complete satisfaction of all liabilities under the Premium Finance Packages***. As a direct result, Plaintiff lost millions of dollars in death benefits under the life insurance policies at issue, which amounts to malpractice as a matter of law.

The facts upon which Plaintiff's claim for malpractice is based, more fully outlined in Plaintiff's Statement of Material Facts Not in Dispute, are extremely simple and clear, and because they are beyond genuine dispute, entitle Plaintiff to summary judgment on liability as a matter of law.

Defendant Rousseau began representing Plaintiff, in or around April of 2009, while he was with his previous firm Herrick Feinstein, LLP ("Herrick Feinstein"), shortly after Plaintiff extended premium financing for the five (5) policies and executed the Premium Finance Packages for those five (5) policies at issue in this litigation. See Exhibits 23-27. Defendant Rousseau then continued said representation after moving to and becoming a partner at Defendant Arent Fox in June of 2010, until September 2014, when Plaintiff terminated the representation. See Exhibits 36-37, 68-69, and 71.

---

[2]California is one (1) of only two (2) of the fifty (50) states which specifically include life insurance policies as an asset within the scope of article 9.

With respect to four (4) of the five (5) policies at issue herein, Acker, Collins, Coppock and Stamatov, their Trustees each indicated prior to the maturity dates on their respective loans that they had no intention of repaying the loans made by the Plaintiff. See Exhibits 10-12. Windsor, per Rousseau's specific advice, treated the Coppock, Collins, Acker and Stamatov Trustee's indicated intentions as an exercise of the Default Sales Right contained within the Assignment of Life Insurance Policy as Collateral Agreement, (Doc.#15 of 19 in the Premium Finance Packages), which provided Windsor with the *right* to accept the Trust's transfer of title of the insurance policy in full satisfaction of the trust's financial obligations. See Exhibits 7, 11-12, 23-27.

For those four (4) policies, Defendants requested that each Trustee execute *only* the respective insurance company's change of ownership forms (the Insurance companies' respective forms, each with a slightly different title, will be generically referred to hereinafter as "COO"). See Exhibits 11 and 12. Each Trustee executed the COO provided. See Exhibits 10, 13-16, 85-89. Defendants did nothing else whatsoever to memorialize any pre-default agreement between Plaintiff and the Acker, Collins, Coppock, and Stamatov Trusts to transfer the respective policies (the collateral) in satisfaction of all obligations and liabilities under the Premium Finance Packages.[3]

---

[3]The absence of additional steps that should have been taken by Defendants was actually breathtaking –because Rousseau had been provided multiple draft Policy Relinquishment and Loan Satisfaction Agreements while at Herrick Feinstein (which documents went with him in Windsor's file upon his move to Defendant Arent Fox) that he did *not* use. See Exhibits 38-42. Rather, Defendants blithely, but nevertheless, repeatedly assured Plaintiff –even after the careful reasoning of the Bitter Arbitration panel -- that the COOs the Acker, Collins, Coppock and Stamatov Trustees executed were all that was needed to provide Plaintiff with complete ownership of the policies and unfettered entitlement to the death benefits thereunder. See Exhibit 3, at pgs. 160:17 to 161:22, 182:9-16, 245: 2-19.

Rousseau clearly and unequivocally testified in this action, individually and as Defendant

Arent Fox's Corporate Designee, as follows:

**A.** **I can say for certain that, in connection with the change of ownership forms that Houchins got and sent to him [Prusky] in 2010, I did not advise Steven [Prusky] about the Uniform Commercial Code of the State of California. ...**

**Q.** **When you told him that the change of ownership form reflects a change by the carrier once accepted on its books, that he need not worry any further about who owned the policy, because at that point you believed, once the COO was accepted by the carrier, that actual ownership resided with Windsor. Isn't that correct?**

**A.** **Well, yes, that's correct.**

See Exhibit 3, at pgs. 161-162:24, 182.

With respect to the Bitter Policy, on September 8, 2010, Defendants, on Plaintiff's behalf,

sent a letter to Bitter and Bitter's Trustee asserting an event of default for non-payment of the loan

and explaining that, pursuant to Section 6(a) of the Security Agreement[4], Plaintiff was entitled to a

transfer of the collateral and registration of the collateral in Plaintiff's name. See Exhibit 70. The

Bitter Trustee and Bitter failed to respond to Defendant Rousseau's September 8, 2010 letter.

After consulting with Defendant Rousseau and in accordance with Defendant Rousseau's advice,

on January 14, 2011, Plaintiff sent a letter to Bitter and the Bitter Trustee again requesting

execution of the COO that Defendant Rousseau had provided "to conclude the relationship in an

amicable fashion"[5]. See Exhibit 72.

On February 14, 2011, the Bitter Trustee executed the insurance company's Ownership,

---

[4]As will be explained later, the Bitter Arbitration Panel held that this was the wrong section to cite, thus compounding Defendants' extant errors.

[5]Defendants claim that this sentence was sufficient to address California Code 9620's requirement of a proposal in "consideration of the full and complete satisfaction of the liabilities" under the Premium Finance Agreement. The Arbitration Panel in Bitter and the Federal Court in Acker and Collins disagreed.

Name or Beneficiary Change Request (the "Bitter COO"). See Exhibits 10 and 88. Defendants

specifically advised Plaintiff that the executed Bitter COO and surrender of the actual Bitter

Policy effectuated complete ownership and absolute entitlement to the death benefits under the

Bitter Policy. Specifically, Rousseau testified:

> **Q.**   **Is there any point in time prior to December 19, 2013 where you say to Steve**
> **Prusky "Steven, just because you have the COO signed by Barnes [Bitter**
> **Trustee] doesn't mean that you've satisfied the default sale provisions of 9620**
> **of the California Code"? Is there anything like that in the written record that**
> **you remember?**
>
> **A.**   **I don't recall anything of that nature.**

See Exhibit 3, at pg. 215.

Consistent with Rousseau's testimony, Defendants did not suggest or advise that any other

document(s) be executed or any other action be taken by Plaintiff to perfect its ownership in

and/or entitlement to the death benefits under the Bitter, Coppock, Collins, Acker and Stamatov

Policies. Based on Defendants' representations as to Plaintiff's ownership and entitlement to the

death benefits for each of the five (5) policies, from the loan maturity date on each through the

death of each insured (excluding Coppock who is still living), Plaintiff continued to pay the

premiums on each of the five (5) policies. See Exhibits 11, 12, 13, 14, 96, 97, 109.

Following Bitter's death in 2012, and pursuant to the executed Bitter COO, Plaintiff

sought to collect the death benefit under the Bitter Policy from Pacific Life Insurance Company.

See Exhibits 110, 8 and 9, at ¶¶54. On February 13, 2013, the Bitter Trustee filed a civil action

claiming that Plaintiff did not have ownership and/or the rights to the death benefits under the

Bitter Policy. See Exhibits 8 and 9, at ¶¶55. Because the Bitter Premium Finance Package

provided that all disputes were to be determined by a panel of three (3) arbitrators in California,

the case was referred to the American Arbitration Association (the "Bitter Arbitration"). See

Exhibits 8 and 9, at ¶¶59. Defendants represented Plaintiff in the Bitter Arbitration and chose two (2) of the (3) arbitrators. See Exhibit 3, at pg. 199. *The Chair of the Bitter Arbitration Panel was retired Federal Judge Eugene F. Lynch, who served until his retirement on the United States District Court for the Northern District of California.*

Throughout the Bitter Arbitration, Defendants assured Plaintiff that Plaintiff had gained unfettered ownership to the Bitter Policy and the death benefits thereunder by reasons of (1) the Bitter Trust's default in failing to make payment of the loan when it became due in July of 2010; (2) Defendants' September 8, 2010 letter; and (3) Plaintiff's January 14, 2011 letter. Defendants further assured Plaintiff that such ownership became absolute when the Bitter Trustee executed the Bitter COO and subsequently surrendered the original of the Policy to Plaintiff. See Exhibit 3, at pgs. 182, 189, 202-204; and Exhibit 2, at pgs 193, 195-197. In fact, Defendants strongly counseled *against* Plaintiff's suggestion to settle the Bitter Arbitration advising, in part, that Plaintiff had made the "offer" required under either the Default Sale Right in the Premium Finance Package and/or California Code Section 9620. See Exhibit 3, pgs. 182, 189-190, 202-204; and Exhibit 1, at pgs. 193, 195-197.

Conversely, the Bitter Trustee argued that Plaintiff failed to satisfy the requirements of the "Default Sale Right" provision contained in the Bitter Assignment Agreement and also failed to comply with the "strict foreclosure" procedures under California Civil Code Section 9620, and therefore Plaintiff's rights were that of a secured party entitled to recover only the monies it advanced for premiums, plus interest, closing costs, and expenses, and was not entitled the death benefits under the Bitter policy. See Exhibit 73, and Exhibits 8 and 9, at ¶¶62. Simply put, the Trustee raised the fact that there was no offer or proposal made by Plaintiff to accept ownership of

10

the policy "in consideration for the full and complete satisfaction of all liabilities" under the

Premium Financing Agreements.

On April 8, 2014, following three days of hearing testimony from multiple witnesses,

extensive briefing, review of hundreds of exhibits, and hours of argument by counsel[6], the Bitter

Arbitration panel entered an Interim Award in favor of the Bitter Trust, stating:

> **the Trust at the time of Mr. Bitter's death retained the ownership of the policy
> and is entitled to the death benefits of the policy subject to Windsor's rights as
> a secured creditor to collect all sums due it by reason of its payment of the
> insurance premiums including principal, interest, at the rate of 10% from the
> date of the initial payment to the present and expenses as defined in the loan
> documents.**

The Arbitration Panel further specifically found that "[Plaintiff] failed to comply with the

Default Sales provision in the [Bitter] Collateral Assignment Agreement and California Civil

Code §9620" for the following reasons:

> **There is no direct evidence in this record that Windsor notified Barnes [the Bitter
> Trustee] that by reason of the non-payment of the loan it intended to exercise the
> Default Sale Right provision in the Assignment Agreement. Although the letter from
> Windsor's counsel of September 8, 2010** in its heading referenced the Assignment
> **Agreement among other documents, the body of the letter makes reference to Section
> 6(a) of the Security Agreement as the basis for the demand that Barnes execute the
> COO transferring all ownership rights to Windsor as a matter of law.... The rights
> granted to Windsor under the terms of Section 6(a) are solely to protect its secured
> interests and do not purport to give Windsor unfettered ownership of the policy or a
> right to keep any death benefits in excess of its secured interests. ...Because Section
> 6(a)** contemplated the execution of a COO under circumstances wherein Barnes was
> **not giving up all rights in the policy, its execution is at best ambiguous. Absent
> express notification to Barnes that Windsor was invoking its Default Sale Right, the
> record does not support a finding that Barnes' execution of the COO and surrender
> of the policy conveyed to Windsor unfettered title to the policy and the death
> benefit....**

---

[6]The Arbitration Panel's fees alone were in excess of Two Hundred and Fifty Thousand Dollars ($250,000).

11

**Under Cal. Civ. Code § 9620, Windsor had two options to obtain unfettered ownership of the Bitter policy and its death benefit. One option for Windsor was to enter into a written agreement, post-default, with Barnes whereby Windsor released Barnes and the Trust from all obligations in exchange for Barnes conveying outright ownership of the policy. Windsor acknowledged that it did not do so. Windsor's other option was "strict foreclosure," whereby Windsor agreed to accept the policy as full satisfaction of the Bitter loan pursuant to a "record authenticated" after default....Windsor contends that in the context of the September 8, 2010 and January 14, 2011 letters from Windsor and its Counsel, and execution of the COO by Barnes constitutes an authenticated record evidencing that Windsor accepted the COO and surrender of the Policy in full satisfaction of the Trust's obligations under the financing documents. The record does not support this contention. <u>There is nothing in either the September 8, 2010 letter or the January 14, 2011 letter that expresses an acceptance by Windsor of the collateral in full satisfaction of the obligation.  Both are silent on this point.  Windsor therefore did not satisfy the "strict foreclosure" requirement under § 9620(c)(2).</u>**

**Just as was discussed above in connection with the Default Sale Right, <u>nothing in the demand letters sent by counsel for Windsor or by Windsor itself contained a proposal stating that Windsor was prepared to accept the policy in full satisfaction of the liability owed to it; thus, the execution of the COO by Barnes also does not satisfy the proposal requirements of §9620(c)(2)(A)-(C).</u>**

See Exhibit 73, at pgs. 5-7 (emphasis added).

The decision in the Bitter Arbitration was directly based on Defendants' failures and incorrect advice including, but not limited to, the failure to obtain a formal written release from the Trust/Trustee, the failure to document Plaintiff's acceptance of the Bitter Policy *in full satisfaction of the Trust's obligations and liabilities to Plaintiff*, and the fact that Defendants' September 8, 2010 letter quoted and relied upon Section 6(a) of the Security Agreement, which was, in fact, *the wrong section* of the Financing Agreement to rely upon for Plaintiff to exercise its contractual default sales rights and to obtain unfettered ownership of the Bitter Policy and death benefits thereunder.

The fact that Defendants' September 8, 2010 letter quoted the wrong section of the Premium Financing Package and did not contain a proposal in conformance with California Code

9620 stating that Windsor was prepared to accept the Bitter policy in full satisfaction of the liability owed to it, is *astonishing* in light of the fact that Rousseau, while at Herrick Feinstein, was twice provided with a precise proposal *that was in conformance with California Code 9620.* Specifically, Rousseau and his colleague drafted such language for a sixth trust, the Garcia Trust, which was executed by the Garcia Trustee on March 31, 2010. See Exhibit 84. This 9620 proposal executed by the Garcia Trust was contained in Defendant Arent Fox's file for Windsor. See Exhibit 3, at pg. 39. Further, the undisputed record also reveals that on July 16, 2009 Rousseau was sent an email from his colleague at Herrick Fienstein, David Fox, outlining the "summary of the procedure for obtaining title to the insurance policies financed by Windsor" under section 9-620 of Georgia's UCC[7], which is identical in wording and mechanical operation to California Code 9620. See Exhibit 44. Rousseau could have and should have used the very same language that was used for the Garcia Trust, or followed the procedures outlined in David Fox's July 16, 2009 email, but simply failed to do so for the five (5) policies at issue herein.

Bitter was the only Premium Finance Policy where Defendants sent a default letter following a Trust's failure to repay a loan and the passing of a maturity date. As for the other four (4) policies at issue in this litigation (Collins, Acker, Coppock and Stamatov), the Trustees executed COO's prior to the maturity date for each of the Loans. See Exhibits 85-89. However, the COOs executed by each of the Stamatov, Coppock, Acker, and Collins Trustees *did not* contain any language indicating or providing that the Trusts, Trustees, Insureds and/or Beneficiaries were making a full transfer and assignment of the respective Insurance Policies *in*

---

[7]Georgia's UCC law, however, differs from California's UCC law in that California applies its version of the Uniform Commercial Code specifically to secured transactions involving life insurance and Georgia does not. See Exhibit 29.

***consideration of the full and complete satisfaction of the liabilities and obligations*** under the

Premium Finance Packages, or that they were forever relinquishing any and all rights they may

have had thereunder, including without limitation any rights to cash surrender value and/or death

benefit under the Policy, nor did they indicate or provide that Windsor and/or the Trusts, Trustees,

Insureds and/or Beneficiaries were releasing the other from all liabilities and obligations under the

Premium Finance Packages. See Exhibits 85-89.

Moreover, following the Arbitration Panel's April 8, 2014 Interim Order in the Bitter

Arbitration, Plaintiff and Rousseau specifically discussed protecting the death benefits regarding

the other four (4) Premium Financed Policies (Collins, Acker, Coppock and Stamatov). Prusky,

on Plaintiff's behalf, specifically advised Rousseau that Windsor needed "something concerning

the default sales right" to address the "problems in Bitter". See Exhibits 50-54. Nevertheless,

Rousseau and Arent Fox repeatedly assured Plaintiff that it's ownership of those Policies was

absolute and that Windsor would be, by virtue of the executed COOs, and by operation of law,

entitled to the death benefits for each Policy. See Exhibit 1, at pgs. 207-209, Exhibit 53, Exhibit

55, Exhibit 57. Rousseau specifically suggested that requiring and/or obtaining any further

documentation with respect to each of these Policies could "only cause more trouble." See Exhibit

1, at pgs. 207-209.

In fact, Rousseau testified, individually and as Arent Fox's Corporate Designee, that at no

time during the Bitter Arbitration, and/or once the Bitter Trust's arguments had been articulated,

did Defendants advise Plaintiff of the possible issues and/or vulnerabilities with ownership and

entitlement to the death benefits under the remaining four (4) Policies:

> **Q.**     **Do you remember telling Mr. Prusky prior to the arbitration award on April**
> **8th, 2014 something like "You know, based on the arguments that Mr. Wood**

> [The Trust's counsel] is articulating here, we may have issues or you may have vulnerabilities in your other four policies"?
>
> A.  I don't recall anything of that nature.
>
> Q.  Did it occur to you, as a result of Mr. Wood's arguments in the Bitter proceeding leading up to the hearing in early January or January of 2014, that in fact Mr. Prusky or Windsor was vulnerable to one or two of these arguments that Mr. Wood was advancing?
>
> A.  I don't think it occurred to me that there was a problem with any other case.
>
> Q.  So, it's fair to say that you did not warn Mr. Prusky of any vulnerability or infirmity associated with the certificates of ownership or any other aspect of the paperwork associated with those remaining four policies prior to April 8, 2014, the date of the arbitration award.  Is that correct?
>
> A.  I don't recall discussions along those lines.

See Exhibit 3, at pgs. 232:6 to 233:7.

This is astonishing in light of the fact that Rousseau was previously provided by his colleague David Fox, Esquire, while at Herrick Feinstein, multiple draft Policy Relinquishment and Loan Satisfaction Agreements and Mutual Releases for use with respect to Plaintiff's premium financed Policies, which included the exact language that was needed ("the relinquishment of **the Borrower's rights, title, interest, claims, cash value, dividends, options, riders, benefits, privileges and ownership in and to the Policy (collectively the 'Relinquished Assets') in full and complete satisfaction of the Borrower's and the Insured's obligations under the Financing Agreement and the other Financing Documents"**). See Exhibits 38-42 and 45.  Almost unbelievably, Rousseau never advised Windsor to have these completed draft Agreements (that were in Arent Fox's Windsor files), or even something with similar relinquishment and release language, executed by the Coppock, Stamatov, Acker and/or Collins Trustees.  Rousseau and Arent Fox could have simply used the drafts that were provided to Rousseau during his tenure at Herrick Feinstein and contained within Arent Fox's file for Windsor, but for some bewildering reason chose not to.  See Exhibit 3, at pg. 39.

Within two weeks following the Bitter Arbitration Interim Award Acker died and approximately two months thereafter after Collins died. See Exhibits 111 and 112.[8]

As both Plaintiff and the Acker Trust were claiming the death benefits under the Acker Policy, on October 17, 2014, the John Hancock Insurance Company filed a lawsuit for declaratory relief and interpleader in the United States District Court for the Northern District of California, Case No. 14-cv-04651-WHO (the "Acker Action") to determine entitlement to the Acker death benefits. See Exhibits 8 and 9, ¶¶93, Exhibits 98 and 67. The Acker Trustee filed a cross-claim against Plaintiff alleging, in part, that neither the terms of the Security Agreement, nor any other portion of the Financing Agreement, provided that execution of the COO by the Trustee would make Plaintiff the outright owner of the Acker Policy; or would entitle Plaintiff to any portion of the Death Benefit in excess of the sum due to Plaintiff in its capacity as a secured lender (i.e. the amounts loaned by Plaintiff to the Trust, plus legal interest (10% per annum), and reasonable expenses incurred in enforcing and/or protecting its security interest). See Exhibit 74.

Through its Replacement Counsel, Plaintiff moved for Summary Judgment or, in the alternative, Partial Summary Judgment in the Acker Action claiming, *as Defendants always posited,* that the Acker Assignment (executed as part of the Premium Finance Agreement) and the Acker Trustees execution of the COO demonstrated that there had been an exercise of the Default Sales Right, contained in the Acker Premium Finance Package, and that Plaintiff was entitled to

---

[8]During the period following the April 8, 2014 adverse ruling in the Bitter Arbitration through September 2014, Defendants were actively engaged in settlement negotiations on Plaintiff's behalf with counsel for the Trustees. See Exhibit 58. Plaintiff eventually replaced Defendants in early September 2014 with Darin Judd, Esquire of the firm Thompson, Welch, Soroko & Gilbert, LLP, who was later assisted by Lauren Antonino of the Antonino Firm (Judd and Antonino will be referred to herein as "Replacement Counsel"). See Exhibits 17 and 18. However, the only counsel ever hired by and from whom Plaintiff received transactional advice with respect to the five (5) policies at issue in this action, were the Defendants, and Rousseau's previous firm, Herrick Feinstein. Id.

16

the full amount of death benefits under the Acker Policy. See Exhibit 99. In its response thereto, the Acker Trust did not dispute that it executed the Assignment, nor that it defaulted under the terms of the Acker Premium Finance Agreement; instead, the Acker Trust asserted that the Assignment it entered into was not an exercise of the Default Sales Right (or evidence thereof) and did not comply with California UCC law. See Exhibit 102 and Exhibits 8 and 9 at ¶97.

On September 21, 2015 Judge Orrick in the Federal Court in the Acker Action entered an Order denying Plaintiff's Motion for Summary Judgment, specifically finding that "the Assignment does not constitute an exercise of the DSR [contractual default sales right], and the purported acceptance of the insurance proceeds in full satisfaction of the Trust's debt does not comply with section 9620 [of the California Commercial Code]". The Federal Court further specifically held, as did the Arbitration Panel in the Bitter Arbitration, that "Windsor [wa]s entitled to retain from the Death Benefit *only* a sum equal to the amounts Windsor has loaned to the Trust, plus legal interest thereon, plus Windsor's reasonable expenses, if any exist, incurred in collecting or enforcing the Policy collateral, and that the Trust [wa]s entitled to the portion of the Death Benefit remaining after that sum has been paid." See Exhibit 75. In so holding the Court stated, in relevant part:

> **At issue is whether the Assignment satisfies the provisions of California Commercial Code section 9620(c)(2). This statute contemplates two ways in which a debtor may consent to relinquish its claim to collateral. Windsor argues that it has satisfied the first form of satisfaction and that the Trust "agree[d] to the terms of the acceptance in a record authenticated after default." CAL. COM. CODE § 9620(c)(2). It is undisputed that the Assignment itself does not contain any language that the transfer of ownership satisfied the Trust's liabilities under the PFA. ...Windsor's argument is unpersuasive for several reasons, starting with its understanding of the statute. Section 9620 requires an *agreement* "to the terms of the acceptance in a record authenticated after default." An agreement is not simply a transfer. Section 9602 requires that the agreement include the terms of the acceptance "of collateral in full satisfaction of the obligation it secures." Because the Assignment does not reflect any**

17

agreement to transfer the collateral in exchange for a satisfaction of the Trust's obligations, the Trust cannot be considered to have consented under the terms of section 9620.
\*\*\*

In addition, section 9620 provides that a debtor's consent to acceptance of collateral must be made in an agreement *after default*. The statute repeatedly uses the language of a "record authenticated after default." This is made clear because an agreement to any terms before default would constitute an improper waiver of the rights in section 9620(b). Thus, any construction of the DSR as requiring the Trust to transfer the policy to Windsor in full satisfaction of its obligations pre-default would violate section 9602 . By its plain terms, the Assignment does not satisfy section 9620.
\*\*\*

Windsor is also incorrect in asserting that the Assignment was simply an execution of the DSR. The DSR allows Windsor to request, *"in consideration of the full and complete satisfaction of the Liabilities* . . . [that the Trust] make a full transfer and assignment of the Insurance Policy to Assignee and thereby forever relinquish any and all rights Owner may have thereunder, including without limitation any rights to cash surrender value and/or death benefit provided thereunder."* PFA, Doc. No. 15 at 4 (emphasis added). Again, although the Assignment makes a full assignment of the policy to Windsor, it does not provide that the transfer of title or change in beneficiary was in "consideration of the full and complete satisfaction of the Liabilities." Just as the lack of such language fails to satisfy the requirements of section 9620, it also fails to satisfy the requirements of the DSR as defined in the PSA. Without such language or any reference to the DSR, it is not clear that the document the Trust signed was the DSR. ...even assuming the PFA did not require the Assignment in order for Windsor to foreclose after default, Windsor would not be relieved of its obligation to comply with California law. That Windsor did not need to execute the Assignment does not change the fundamental fact that the Assignment does not discharge the obligations of the Trust under the PFA...Windsor's argument that there was a separate offer and acceptance that satisfies section 9620... fails because section 9620 requires a writing that contains the terms of acceptance.

See Exhibit 75.

Following the September 21, 2015 Order denying Windsor's Motion for Summary

Judgment, on December 22, 2015 the Court in the Acker Action granted the Acker Trust's Motion

for Summary Judgment. See Exhibit 79.

Likewise, with respect to the Collins policy, as both Plaintiff and the Collins Trust were

claiming the death benefits thereunder, on October 17, 2014, the Pacific Life Insurance Company

18

filed a lawsuit for declaratory relief and interpleader in the United States District Court for the

Northern District of California, Case No. 14-cv-03713-WHO (the "Collins Action"). See

Exhibits 8 and 9, at ¶¶121, Exhibit 101. The Collins Trust/Trustee also filed a Cross Claim

against Plaintiff and made the identical arguments of entitlement to the death benefits that were

made in the Acker Action. See Exhibits 76 and 74. On July 8, 2015, Windsor moved for

Summary Judgment or, in the alternative, Partial Summary Judgment in the Collins Action

making the identical arguments made in the Acker Action. See Exhibits 8 and 9, at ¶¶123, and

Exhibit 99. On September 21, 2015 the Federal Court in the Collins Action entered an Order

denying Plaintiff's Motion for Summary Judgment, again specifically finding that "the

Assignment does not constitute an exercise of the DSR, and the purported acceptance of the

insurance proceeds in full satisfaction of the Trust's debt does not comply with section 9620 [of

the California Commercial Code]". See Exhibit 77. As in the Acker case, the Court further

specifically held, as did the Arbitration Panel in the Bitter Arbitration, that "Windsor is entitled to

retain from the Death Benefit *only* a sum equal to the amounts Windsor has loaned to the Trust,

plus legal interest thereon, plus Windsor's reasonable expenses, if any exist, incurred in collecting

or enforcing the Policy collateral, and that the Trust is entitled to the portion of the Death Benefit

remaining after that sum has been paid." Following the September 21, 2015 Order denying

Plaintiff's Motion for Summary Judgment, on December 22, 2015 the Federal Court in the Collins

Action granted the Collins Trust's Motion for Summary Judgment. See Exhibit 78.

Stated plainly, the Federal Court in the Collins and Acker Actions, and the Arbitration

Panel in the Bitter Action, all found as a matter of law that the COO forms that Defendants

presented to and had each of the Trustees execute *did not* evidence a release of liabilities and

obligations under the Premium Finance Packages and *did not* entitle Plaintiff to the death benefits

under the life insurance policies because they *did not* comply with either California Code 9620 or

the premium financing agreements' default sales provisions.  The Federal Court and Arbitration

Panel further found as a matter of law that there was simple language that ***should have been***

***added*** to the documents the Defendants had the Trusts execute (which simple language was

contained in both a 9620 proposal that Rousseau had used with Windsor's Garcia policy, not at

issue in this litigation, and contained in multiple draft Policy Relinquishment and Loan

Satisfaction Agreements that had been provided to Rousseau during his tenure with Herrick

Feinstein by his colleague, David Fox, for use on the Windsor Policies that were contained in

Arent Fox's Windsor file, but which were not ultimately used) to demonstrate unambiguously that

the change in ownership of the insurance policies was "in consideration of the full and complete

satisfaction of the liabilities".

There are numerous cases in New York State and Federal Courts where Courts have

granted summary judgment to a plaintiff in a malpractice case on the issue of liability under facts

similar to those herein, where the attorney defendant set out to accomplish a specific objective,

but did not because of his or her failure to comply with the express provisions required by the

contract and/or clear statutory law. See, *Logalbo v. Plishkin, Rubano & Baum*, 163 A.D.2d 511,

514, 558 N.Y.S.2d 185, 188 (2nd Dept. 1990)[9]; *Baker v. Dorfman*, 1998 U.S. Dist. LEXIS 14702;

---

[9] In *Logalbo v. Plishkin, Rubano & Baum* summary judgment was granted in this attorney malpractice action where the clients were prospective buyers of a piece of real property, whose contract gave them the right to cancel on three days written notice, the clients orally instructed their lawyer to invoke their right to cancel, and he did so by telephoning counsel for the sellers. The lawyer also sent a written notice of cancellation, but he failed to do so such that the written notice was actually *received* within the cancellation time. The client-buyers were sued for breach of their contract, and they argued that since oral notice had been given and the letter had been sent within the specified time, their cancellation was effective. Their case went all the way to the Court of Appeals – which held that because

1998 WL 642762 (S.D.N.Y. Sept. 17, 1998)[10]; *Red Zone LLC v. Cadwalader, Wickersham & Taft LLP*, 45 Misc. 3d 672, 994 N.Y.S.2d 764 (N.Y, Sup. Ct. 2013), *aff'd,* 118 AD3d 581, 988 NYS2d

---

the sales contract required *written* notice to be *received*, the client-buyers were liable.  On the clients' subsequent action against the lawyer for malpractice, summary judgment was granted to the clients *as a matter of law* and the Court stated:

> **To disregard the long standing rule that written notice of cancellation must be received within the time prescribed [cites omitted] constitutes, as a matter of law (1) negligence, if, knowing the rule, the attorney disregards it, or (2) want of skill, if the attorney was ignorant of the rule.**

[10] *In Baker v. Dorfman* this Court granted summary judgment on liability in favor of the plaintiff client in an attorney malpractice action.  In *Baker,* the client hired the attorney to represent him in an action against a city regarding its negligence in providing the client with an incorrect blood test result that showed that he had the human immunodeficiency virus (HIV). The attorney filed a notice of claim against the city 90 days after the client learned that he was HIV negative because the attorney believed that the cause of action accrued on the date that the client learned of the misdiagnosis. This was wrong and the client replaced the attorney with new counsel who continued to pursue the action on the client's behalf, but the action against the city was dismissed as time-barred. The client then brought the legal malpractice action and contended that he was entitled to partial summary judgment for liability on his malpractice cause of action. This Court agreed and granted the plaintiff's motion for summary judgment as to the defendant's liability for legal malpractice. This Court found that the attorney's failure to conduct a minimal investigation necessary to determine the relevant statute of limitations for filing the client's action constituted negligence as a matter of law.  In so holding this Court stated:

> **The Court finds that Dorfman's failure to conduct the minimal investigation necessary to determine the relevant statutory limitations for filing Baker's claims, and to file those claims in a timely manner, constitutes negligence as a matter of law.  Furthermore, there can be no question that the court would not have dismissed Baker's complaint against the City but for Dorfman's negligence. The Supreme Court dismissed the action solely on the grounds that Baker had failed to comply with the General Municipal Law's limitations as to timing. The Appellate Division unanimously affirmed the lower court's order in a brief opinion reiterating those statutory limitations....Whatever value Baker's action promised vanished solely as the direct result of Dorfman's negligent failure to follow the law.**

*Id* at [*11]-[*13] (citing *Deitz,* 649 N.Y.S.2d at 87 (failure to commence action or seek court order); *Stanski v. Ezersky,* 210 A.D.2d 186, 621 N.Y.S.2d 18, 19 (1st Dep't 1994) (finding negligence as matter of law where attorney failed to effect proper service in client's action and statute of limitations subsequently barred further action); *Deb-Jo Construction, Inc. v. Westphal*, 210 A.D.2d 951, 620 N.Y.S.2d 678, 679 (4th Dep't 1994) (failure to file financing statement to perfect security interest); *Logalbo,* 558 N.Y.S.2d at 188 (failure to adhere to longstanding rule concerning timing of notices of cancellation); *Shaughnessy v. Baron,* 151 A.D.2d 561, 542 N.Y.S.2d 341, 342 (2d Dep't 1989) (failure to comply with procedural requirements of tenant client's property lease); *Katsaris v. Scelsi,* 115 Misc. 2d 115, 453 N.Y.S.2d 994, 996 (Sup. Ct. 1982) (failure to file client's appeal within time allotted)).

588 (N.Y. App. Div. 1st Dep't, 2014)[11]; *Shaughnessy v. Baron*, 151 A.D.2d 561, 542 N.Y.S.2d

341 (N.Y. App. Div. 2d Dep't 1989)[12]; *Trimboli v. Kinkel*, 226 N.Y. 147, 149, 123 N.E. 205

(1919)[13]

    Just like the cases cited above, where the clients gave instructions to and relied upon their

---

[11]*Red Zone LLC v. Cadwalader Wickersham & Taft LLP* was a legal malpractice action arising after the defendant law firm, retained by plaintiff to advise it in connection with its potential acquisition of nonparty entertainment company, drafted a letter memorializing an oral agreement between the plaintiff and nonparty investment bank amending a prior written agreement between them relating to plaintiff's obligation to pay a fee to the bank for its assistance in the acquisition. There, the Court granted summary judgment in favor of the plaintiff client on its claim for malpractice, and held that the plaintiff established as a matter of law that defendant's negligence in drafting the letter proximately caused the plaintiff's injury—its liability for the entire fee following the bank's successful litigation of a claim therefor. Although the plaintiff and the bank orally agreed to limit plaintiffs payment obligation unless it acquired a majority of the entertainment company's common stock and the plaintiff instructed defendant to draft the letter memorializing that oral agreement, it was determined in the underlying litigation that the letter failed to so limit plaintiff's payment obligation and that plaintiff was obligated to pay the entire fee upon its acquisition of control over the entertainment company's board of directors. The Court in the malpractice action held, which was affirmed on appeal, that but for defendant's failure to professionally prepare the letter memorializing the oral agreement with the bank, the underlying litigation would have hinged on the letter such that plaintiff's increased presence on the entertainment company's board of directors would not have obligated it to pay the bank's entire fee. The Court further held that the strategic decisions of plaintiffs successor counsel throughout the underlying litigation did not constitute a superseding cause.

[12]In *Shaughnessy v. Baron*, The Court entered summary judgment on plaintiff's attorney malpractice claim. There the plaintiff's lease for commercial property detailed the requirements for assignment, including a notice provision, and the defendant attorney as counsel to the plaintiff lessee wrote to the landlord to notify him of an assignment, but the attorney failed to comply with any of the contract provisions. The court found "[b]ecause the lease in this case clearly and unambiguously sets forth both notice and assignment provisions, which admittedly were not followed by the defendant, and . . . [he] failed to comply with any of these lease provisions, . . . defendant was negligent as a matter of law."

[13]In *Trimboli v. Kinkel* the plaintiffs retained the defendant attorney to search the title to land they were about to buy and the defendant discovered that a previous executor who had a power to sell the land, had instead conveyed his interest in the land in exchange for another parcel of land, and therefore there was a flaw in the record title that the defendant made no mention of to the plaintiffs. The defendant instead reported that the title was good and marketable. The court found "[i]t is negligence to fail to apply the settled rules of law that should be known to all conveyancers" and knowing the facts, the attorney was chargeable with knowledge of their significance.

22

lawyer to get a writing or a transaction done in a legally effective way, by either complying with a

contractual or statutory provision, so did Plaintiff here, and just like *Logalbo and Red Zone*, both

an arbitration panel and the District Court of Northern California have ruled that the Defendants

failed to do so as a matter of law. As determined now by more than one tribunal, Rousseau had

only to: review the Financing Agreements in order to learn that the parties had chosen to have

their secured transactions governed by California law, and consult case law in order to learn that

the parties' choice of law – which violated no public policy of the state in which the Trusts were

located – would be enforced; OR consult Division 9 of the California Commercial Code in order

to learn that the code contained specific language governing the rights and obligations of debtors

and secured lenders following default, and that those rights and obligations could not be abrogated

by agreement of the parties; OR read the decision of the California Supreme Court in *Edwards v.*

*Arthur Andersen LLP*, 44 Cal. 4th 937, 954 (2008), in order to learn that the specific language of

the code would be deemed to have been incorporated, verbatim, into the provisions of the

Financing Agreements; OR read the California Code and case law interpreting it and section 9620

of the UCC to learn that the code would be strictly enforced; OR **review the draft agreements in**

**his own file, that had been provided to him by his colleagues while at Herrick Feinstein, and**

**have the Trustees execute those draft agreements**; OR following the Bitter Interim Award heed

the Panel's holdings for the four other polices. Had Rousseau, who held himself out as an

"expert" in this area, made those minimal efforts, he would have known that in order for Windsor

to assure its entitlement to the death benefits of the Policies, Windsor needed to enter into an

agreement with each of the Trusts under which Windsor would relieve each Trust of any further

liability on its loan in return for Windsor's being granted a form of ownership of the Policy that

23

was (a) unfettered by any obligation to provide to the Trust any amounts remaining from the proceeds of a public or private sale of the Policy and (b) unfettered by any obligation to provide to the Trust any amounts remaining from the death benefit after Windsor had been paid what it was owed on the loan. Moreover, even an inexperienced attorney knows that if he is unable to figure out exactly what the applicable codes and case law mean, he has a duty to seek the advice of someone with greater expertise and to so advise his client, which Rousseau also did not do.

Rousseau took none of these steps. Further, Rousseau ignored the holding of the esteemed Arbitration Panel- led by a retired Federal Court judge – in Bitter, which made it crystal clear what was required. Rousseau and Arent Fox's actions and omissions amount to malpractice as a matter of law, which left Plaintiff with losses in the millions.

There is likewise no genuine dispute over proximate cause, or that Plaintiff suffered significant damages. *See Nomura Asset Capital Corp. v. Cadwalader, Wickersham & Taft LLP*, 26 N.Y.3d 40 (N.Y. App. Ct. 2015)(citing *AmBase Corp. v. Davis Polk & Wardwell*, 8 N.Y.3d 428, 434, 834 N.Y.S.2d 705 (2007)). Had Defendants simply prepared and had the Trustees execute releases that included the simple language required by Windsor's Finance Package and California Statute, or had they drafted and had the parties execute pre-default Loan Satisfaction and Release Agreements, Plaintiff would been absolutely entitled to the death benefits under the policies. Because of Defendants' malpractice, Plaintiff was not legally entitled to the death benefits under the Bitter, Acker and Collins policies, had to settle with each of the Trusts, and had to pay to defend litigation that it should never have been exposed to.

The New York Court of Appeals has held that damages in a legal malpractice case are designed "to make the injured client whole." *Campagnola v. Mulholland, Minion & Roe*, 76

24

N.Y.2d 38, 42, 556 N.Y.S.2d 239, 241 (1990). A plaintiff's damages in a legal malpractice case includes litigation expenses paid to a successor counsel to "avoid, minimize or reduce the damage caused by an attorney's wrongful conduct". *Rudolf v Shayne, Dachs, Stanisci, Corker & Sauer*, 8 NY3d 438, 443, 867 N.E.2d 385, 835 N.Y.S.2d 534, 537 (2007)*(citing 3 Mallen and Smith,* LEGAL MALPRACTICE § 20:6, 20:10 2007); *Leach v. Bailly*, 57 A.D.3d 1286, 1289, 870 N.Y.S.2d 138, 140 (3rd Dept. 2008). This Court and New York Courts have repeatedly held that an plaintiff in a malpractice action may recover the costs and expenses of successor counsel, even where successor's counsel's efforts were unsuccessful.[14] See, *Baker v. Dorfman*, 1999 U.S. Dist. LEXIS 4451 (S.D. N.Y. Apr. 5, 1999) ("an 'injured party . . . will be allowed to recover the expenses of a proper effort [to mitigate damages] even though it proves unsuccessful'." )(citing *Den Norske Ameriekalinje Actiesselskabet v. Sun Printing & Publ'g Ass'n*, 226 N.Y. 1, 122 N.E. 463, 465 (N.Y. 1919); *Kenford Co. v. County of Erie*, 108 A.D.2d 132, 489 N.Y.S.2d 939, 949 (4th Dep't 1985), *rev'd on other grounds,* 73 N.Y.2d 312, 540 N.Y.S.2d 1, 537 N.E.2d 176 (1989))

## CONCLUSION

For all the foregoing reasons, Plaintiff is entitled to summary judgment on the issue of liability on Plaintiff's claim for legal malpractice.

---

[14]It is expected that Defendants will argue that there was a break in the causal chain through the retention of successor counsel. However, while it has been held that predecessor counsel's negligence may not be the proximate cause of plaintiffs' alleged damages when subsequent counsel had a sufficient opportunity to protect plaintiffs' rights (See *Perks v. Lauto & Garabedian*, 306 A.D.2d 261, 262, 760 N.Y.S.2d 231 (2nd Dept 2003), *this rule is inapplicable here*. The undisputed evidence is that successor counsel *did not* represent Plaintiff at the time Defendants counseled it as to the documents required to obtain unfettered ownership and entitlement to the death benefits under the policies and Financing Agreements, were not involved in the Bitter Arbitration, and were not retained until after Bitter, Collins and Acker had died, well after the opportunity to remedy the Defendants' negligence had passed. See, *Superior Tech. Solutions, Inc. v Rozenholc*, 2013 N.Y. Misc. LEXIS 1423 (NY. Sup. Ct. Apr. 1, 2013). Clearly, successor counsel is not an intervening or superseding cause of Plaintiff's damages.

25

Respectfully submitted,

Alan L. Frank, Esquire afrank@alflaw.net
Samantha A. Millrood, Esquire smillrood@alflaw.net
Alan L. Frank Law Associates, P.C.
Attorneys for Plaintiff Windsor Securities, LLC

Dated: August 9, 2018

26