UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| WINDSOR SECURITIES, LLC | : | |
| | : | Civil Action No. 16-cv-01533 (GBD) |
| Plaintiff | : | |
| v. | : | |
| | : | |
| ARENT FOX, LLP | : | |
| and | : | |
| JULIUS ROUSSEAU, III, ESQUIRE | : | |
| | : | |
| Defendants | : | |

## PLAINTIFF'S STATEMENT OF MATERIAL UNDISPUTED FACTS PURSUANT TO LOCAL CIVIL RULE 56.1

Alan L. Frank, Esquire
Samantha A. Millrood, Esquire
Alan L. Frank Law Associates, P.C.
135 Old York Road
Jenkintown, PA 19046

1601 Gravesend Neck Rd
Suite 903, 2nd Fl.
Brooklyn, NY 11229

Tel: (215) 935-1000
Fax: (215) 935-1110
afrank@alflaw.net
smillrood@alflaw.net
Attorneys for Plaintiff Windsor Securities, LLC

Dated: August 9, 2018

### PLAINTIFF'S STATEMENT OF MATERIAL UNDISPUTED FACTS PURSUANT TO LOCAL CIVIL RULE 56.1

Plaintiff Windsor Securities, LLC, by and through its undersigned counsel, Alan L. Frank Law Associates, P.C., herein file its Statement of Material Undisputed Facts, as required by Local Civil Rule 56.1, as follows:

### Facts Relating to The Parties

1.      Plaintiff Windsor Securities, LLC ("Plaintiff" or "Windsor") is a limited liability company in the investment business, its principal and President of its Managing Member is Steven Prusky, and it maintains its principal place of business in Ardmore Pennsylvania. Dep. Tr. Steven Prusky, March 6, 2017, pgs. 54:10-13, 57:3-58:12 [attached to Millrood Declaration as Exhibit 1]; Operating Agreement of Windsor [attached to Millrood Declaration as Exhibit 7 (CONFIDENTIAL)].

2.      Defendant Arent Fox., LLP ("Arent Fox") is a law firm with "more than 400 lawyers" that maintains offices in New York, Washington, D.C., San Francisco, and Los Angeles, California. See, Arent Fox Website (www.arentfox.com/about/history-recognition). [attached to Millrood Declaration as Exhibit 4]; Defendants' Answer, Affirmative Defenses and Counterclaims, at ¶6 [D.E. #19] [attached to Millrood Declaration as Exhibit 9].

3.      Defendant Julius Rousseau, III, Esquire ("Rousseau") is an attorney admitted to the New York Bar, is a Partner with Defendant Arent Fox, who holds himself out as having specialized expertise in the "life settlement business and premium finance structures". Arent Fox website, webpage for Julius Rousseau. III (www.arentfox.com/attorneys/julius-rousseau-iii) [attached to Millrood Declaration as Exhibit 5] ("Rousseau focuses his practice on insurance and

1

reinsurance related matters and litigation.  He advises clients in all areas of the business, including policy and treaty wording, regulatory compliance and strategy.... **Jule [Rousseau] has developed extensive knowledge in the life settlement business and with premium finance structures used in the purchase of life insurance. He represents clients in all facets of this business – policyholders, lenders, life settlement brokers, and providers and hedge funds providing capital to the industry**"); Dep. Tr. Julius Rousseau, III, individually and as Corporate Designee for Arent Fox, March 7, 2017, pg. 9:20-22, 19:18-20:14 [attached to Millrood Declaration as Exhibit 5];  Defendants' Answer, Affirmative Defenses and Counterclaims, at ¶7 [D.E. #19] [attached to Millrood Declaration as Exhibit 9].

### Facts Relating Windsor's Premium Financing of the Life Insurance Policies At Issue

4.      Beginning in 2007, Eugene Houchins, III, through his companies Bonded Life and E.E.H. Consulting, Inc. (collectively "Houchins"), assisted in the procurement of life insurance policies for Joe. E. Acker, Erwin A. Collins, John L. Bitter, Jane Ann Stamatov, and Robert S. Coppock (collectively the "Insureds").   Affidavit of Eugene Houchins, III, dated March 22, 2017, at ¶2 [attached to Millrood Declaration as Exhibit 10].

5.      Specifically, Houchins assisted each of the Insureds in the application process, in the purchase of their respective insurance policy, in the creation of their respective life insurance trust, made recommendations of individuals to act as Trustees for their respective trusts, and after each Insured purchased their respective insurance policy, he discussed premium financing with each Insured, and introduced each Insured to lending broker Wood Hat and Silver, LLC. Affidavit of Eugene Houchins, III, dated March 22, 2017,  at ¶3 [attached to Millrood Declaration as Exhibit 10].

2

6.     In or around 2007, Windsor was introduced to the idea of life insurance premium financing when Windsor was looking to diversify its investments and find investments that had reasonably good rates of return. Dep. Tr. Steven Prusky, March 6, 2017, pgs. 58:19-15, 91:4-92:5, 102:4-9, 114:16-24 [attached to Millrood Declaration as Exhibit 1].

7.     Premium financing is the transactional process of lending funds to a person, company, or trust to cover the cost of an insurance premium.  Premium financing is mainly devoted to financing life insurance (which differs from property and casualty insurance). To finance a premium, the individual, company, or trust requesting the insurance must sign a premium financing agreement with the premium finance company, the loan arrangement may last from one year to the life of the policy, but usually lasts approximately 2 years, and the premium finance company pays the insurance premium and bills the individual, company or trust, usually in monthly installments, for the cost of the loan. This type of arrangement can allow the policyholder to secure a significant amount of life insurance with virtually no out-of-pocket expense for approximately two years.  Wikipedia, Premium Financing (https://en.wikipedia.org/wiki/Premium_financing)[attached to Millrood Declaration as Exhibit 6]; Declaration of Steven Prusky filed in support of Motion for Summary Judgment in John Hancock Life Insurance Co. v. Mindy Goss and Windsor Securities, United States District Court for the Northern District of California, Case No. 14-cv-04651-WHO (the "Acker Action") [Doc. #30-2] [attached to Millrood Declaration as Exhibit 11].

8.     The idea of premium financing was first brought to Windsor by Joseph Aaron, of Wood Hat & Silver, LLC, a California based company, who connected insurance brokers, insureds, and premium finance lenders.  Dep. Tr. Steven Prusky, March 6, 2017, pgs. 116:12-25

3

[attached to Millrood Declaration as Exhibit 1].

9.      The financing agreements between Windsor and each of the Trust/Owners of the

respective insurance policies, comprised of 19 separate documents, were provided as form

documents to Windsor by Joseph Aaron of Wood Hat & Silver, LLC.  Dep. Tr. Steven Prusky,

March 6, 2017, pgs. 122:21- 123:7, 124:4–21, 129:20-22 [attached to Millrood Declaration as

Exhibit 1].

10.     In or around late 2007 and early 2008, as its first foray into premium financing,

Windsor made loans for ten (10) insurance policies; seven (7) such policies were procured

through Houchins, of which five (5) are at issue in this litigation[1], including specifically:

---

[1]There were two policies premium financed by Windsor whereby Windsor entered into
written agreements with the Trusts, Insureds and/or beneficiaries, such that the entitlement to
death benefits were not contested and are thus not at issue in this action: (1) The Stephen R.
Pawlik Family Insurance Trust, insured Stephen R. Pawlik ("Pawlik"); and (2) The Warren E.
Gilbert, Sr. Irrevocable Life Insurance Trust 2007-I, insured Warren E. Gilbert ("Gilbert").  In
2009, well prior to the time that the Pawlik Trust's loan came due, Windsor and Pawlik worked
out a slightly discounted payoff, and the Pawlik Trust paid off the loan, and Windsor and Pawlik
executed mutual releases.  Also in 2009, Gilbert caused the Gilbert Trust to relinquish the policy
on his life to Windsor, by and through the execution of Policy Relinquishment and Loan
Satisfaction Agreement and Mutual Release prepared by Defendant Rousseau while Defendant
Rousseau with his previous firm Herrick Feinstein, LLP. Gilbert Policy Relinquishment and
Loan Satisfaction Agreement and Mutual Release Agreement, attached to Millrood Declaration
as Exhibit 19.

        There was also no death benefit contest in the three remaining policies (1) The Martha G.
Garcia Family Trust, insured Martha G. Garcia ("Garcia"); (2) The Sheldon Hathaway Family
Insurance Trust, insured Sheldon Hathaway ("Hathaway"); and (3) The Leonard Cohen Family
Insurance Trust, insured Leonard Cohen.

        On or about March 31, 2010, Garcia caused the Garcia Trust to relinquish the policy on
her life to Windsor by and through the execution of Herrick Feinstein's written proposal, made
on behalf of Windsor in conformance with California Code Section 9620, to accept the policy in
full satisfaction of the debt. March 16, 2010 proposal, counter-executed by the Garcia Trust on
March 31, 2010 [attached to Millrood Declaration as Exhibit 20]; First Amended Complaint
Windsor Securitites, LLC v. The Lincoln National Life Insurance Co., at ¶15 [attached to
Millrood Declaration as Exhibit 21]. With respect to the Hathaway policy, PHL variable
insurance company rescinded the policy based on alleged misrepresentations in the insured's

4

- Joe E. Acker Family Trust
  Insured Joe E. Acker, Trustee Ronald Mark Goss
  Policy issued by John Hancock Life Insurance Company
  Policy #93783751 issued on March 6, 2008
  Face Amount and Death Benefit Value $1,000,000
  Financing Package Executed on April 10, 2008
  Approximate Maturity Date of Loan- July 10, 2010
  (the "Acker Policy")

- Erwin A. Collins Family Life Insurance Trust
  Insured Erwin A. Collins, Trustee Maria Ana Gordillo
  Policy issued by Pacific Life Insurance Co.
  Policy #VF51701320 issued on March 4, 2008
  Face Amount and Death Benefit Value $2,000,000
  Financing Package Executed on April 15, 2008
  Approximate Maturity Date of Loan- July 29, 2010
  (The "Collins Policy")

- John L. Bitter Irrevocable Life Insurance Trust
  Insured John L. Bitter, Trustee Gregory Barnes
  Policy issued by Pacific Life Insurance Company
  Policy #VF51701770 issued on February 8, 2008
  Face Amount and Death Benefit Value $2,000,000
  Financing Package Executed on April 8, 2008
  Approximate Maturity Date of Loan- July 10, 2010
  (The "Bitter Policy")

- The Jane Ann Stamatov Family Insurance Trust
  Insured Jane Ann Stamatov, Trustee Larry L. Davidson
  Policy issued by PHL Variable Insurance Company
  Policy #97524494 issued on January 28, 2008
  Face Amount and Death Benefit Value $2,000,000
  Financing Package Executed on February 26, 2008
  Approximate Maturity Date of Loan-June 29, 2010
  (The "Stamatov Policy")

---

application, and the rescission was litigated in the United States District Court for the District of Utah. PHL Variable Insurance Co. v. the Sheldon Hathaway Family Insurance Trust, Case No. 2:10-cv-00067-RJS-BCW (D. UT.), Hathaway Motion to Dismiss [attached to Millrood Declaration as Exhibit 22]. With the Cohen and Garcia policies, Windsor foreclosed and offered each of the policies for public sale. Accordingly, none of these policies are at issue in this action.

- Robert S. Coppock Irrevocable Life Insurance Trust
  Insured Robert S. Coppock, Trustee Eliza L. Coppock
  Policy issued by Pacific Life Insurance Company
  Policy #VF51701030 issued on December 2, 2007
  Death Benefit Value $2,000,000
  Financing Package Executed on April 14, 2008
  Approximate Maturity Date of Loan- July 8, 2010
  (The "Coppock Policy")

Plaintiff's Complaint [D.E. #1] [attached to Millrood Declaration as Exhibit 8]; Defendants'

Answer, Affirmative Defenses and Counterclaims [D.E. #19], at ¶¶15 [attached to Millrood

Declaration as Exhibit 9]; Acker Premium Financing Agreement [attached to Millrood

Declaration as Exhibit 23 (CONFIDENTIAL)]; Collins Premium Financing Agreement [attached

to Millrood Declaration as Exhibit 24 (CONFIDENTIAL)]; Bitter Premium Financing

Agreement [attached to Millrood Declaration as Exhibit 25 (CONFIDENTIAL)]; Stamatov

Premium Financing Agreement [attached to Millrood Declaration as Exhibit 26

(CONFIDENTIAL)]; Coppock Premium Financing Agreement [attached to Millrood Declaration

as Exhibit 27 (CONFIDENTIAL)].

The five (5) policies: "Acker", "Collins", "Bitter" Stamatov", and "Coppock", outlined

above, will be collectively referred to herein as the ("Premium Finance Policies"), the five (5)

loans for those Policies will be collectively referred to herein as the ("Premium Finance Loans"),

and the individual trustees for the Premium Finance Loans will be collectively referred to herein

as the ("Trustees")).

11.    All of the Premium Finance Loans by Windsor worked the same way.  In various

combinations, the Trustee for each individual trust, the insured, and Windsor, all together

executed nineteen documents, which, as a group, were expressly deemed by the parties thereto to

comprise a single agreement (the "Financing Agreement Package").  Each loan had a term of 820

6

days or approximately twenty-seven months, was made for a specific amount and, by its terms, would increase based on accrued interest and premium payments that Windsor thereafter elected in its sole discretion to make, and each Financing Agreement Package included default sale right provisions. Affidavit of Eugene Houchins, III, dated March 22, 2017, at ¶5 [attached to Millrood Declaration as Exhibit 10]; Acker, Collins, Bitter, Stamatov, and Coppock Premium Financing Agreement Packages [attached to Millrood Declaration as Exhibits 23-27 (CONFIDENTIAL)].

12.    The Financing Agreement Packages for the Premium Financing Loans for each of the five (5) policies were virtually identical, except for the amounts and maturity dates of the loans and insured, trustee and trust particulars. Acker, Collins, Bitter, Stamatov, and Coppock Premium Financing Agreement Packages [attached to Millrood Declaration as Exhibits 23-27 (CONFIDENTIAL)]; Dep. Tr. Julius Rousseau, III, individually and as Corporate Designee for Arent Fox, March 7, 2017, pg. 56:17-57:2 [attached to Millrood Declaration as Exhibit 3].

13.    Included in each Financing Agreement Package, was: (1) Life Insurance Premium Financing Agreement, and Terms and Conditions for Life Insurance Premium Financing Agreement (Doc.#1 of 19); (2) Promissory Note (Doc.#2 of 19); (3) Trustee's Certificate , with Exhibit A Irrevocable Trust Agreement and  Exhibit B Internal Revenue Service Letter Certifying EIN of Trust (Doc.#3 of 19); (4) Insured's Consent (Doc.#4 of 19); (5) Authorization for Disclosure of Protected Health Information (Doc.#5 of 19); (6) Irrevocable and Durable Limited Power of Attorney (Doc.#6 of 19); (7) Authorization and Direction to Provide Death Certificate (Doc.#7 of 19); (8) Insured's Closing Certificate (Doc.#8 of 19); (9) Acknowledgment and Agreement of Trust and Insured with Respect to Certain Financial Matters (Doc.#9 of 19); (10) Copy of Driver's License (or Other Proof of Insured's Age and Sex) (Doc.#10 of 19); (11)

7

Special Power of Attorney (Doc.#11 of 19); (12) The Insurance Policy (Doc.#12 of 19); (13)

Security Agreement for Beneficiary Interest in Trust (Doc.#13 of 19); (14) Sales Illustration for

the Policy (Doc.#14 of 19); (15) Assignment of Life Insurance Policy as Collateral (Doc.#15 of

19); (16) Assignment of Life Insurance Policy as Collateral and Individual Acknowledgment to

be Signed and Notarized (Doc.#16 of 19); (17) Borrower's Closing Certificate (Doc.#17 of 19);

(18) Life Insurance Premium Finance Program Trust Questionnaire (Doc.#18 of 19); and (19)

Receipt of Funds Confirmation (Doc.#19 of 19).   Acker, Collins, Bitter, Stamatov, and Coppock

Premium Financing Agreement Packages [attached to Millrood Declaration as Exhibits 23-27

(CONFIDENTIAL)].

14.     For each of the Premium Finance Loans, Windsor was obligated to loan the Trust

a particular amount, covering a loan initiation fee and two years of premiums on the subject life

insurance policy, at 15% annual interest[2].   Acker, Collins, Bitter, Stamatov, and Coppock

Premium Financing Agreement Packages [attached to Millrood Declaration as Exhibits 23-27

(CONFIDENTIAL)], at Life Insurance Premium Financing Agreement, Doc.#1 of 19 and

Promissory Note, Doc #2 of 19.

15.     Each Premium Finance Loan was due on the "Maturity Date", 820 days

(approximately 27 months) after the initial funding[3] and the principal balance increased over time

---

[2]Although the Premium Finance Packages provide that interest shall accrue at the rate of
15% per annum, California law, applicable to the Premium Finance Packages, caps annual
interest at a rate of 10% per annum.  Steven Prusky, Dep. Tr. October 4, 2017, pg. 323:12-18
[attached to Millrood Declaration as Exhibit 2]; Dep. Tr. Julius Rousseau, III, individually and as
Corporate Designee for Arent Fox, March 7, 2017, pgs. 72:21-73: 6, 109:17-20 [attached to
Millrood Declaration as Exhibit 3].

[3]Each Financing Agreement provides that the date on which the Loan has occurred shall
be the "Financing Date".  Acker, Collins, Bitter, Stamatov, and Coppock Premium Financing

as Windsor continued to pay premiums to protect its interest in the policies as collateral. Acker, Collins, Bitter, Stamatov, and Coppock Premium Financing Agreement Packages [attached to Millrood Declaration as Exhibits 23-27 (CONFIDENTIAL)]; Dep. Tr. Steven Prusky, March 6, 2017, pgs. 235:13-19, 250:16-17 [attached to Millrood Declaration as Exhibit 1].

16.     Each Financing Agreement Package provided that all notices from Windsor to the remaining parties to the Financing Agreement were required to be in writing addressed directly to the parties. Acker, Collins, Bitter, Stamatov, and Coppock Premium Financing Agreement Packages [attached to Millrood Declaration as Exhibits 23-27 (CONFIDENTIAL)].

17.     Each Financing Agreement Package provided that the Trust was obligated to repay the amount financed/loaned, plus interest thereon, at the end of approximately twenty-seven months. Acker, Collins, Bitter, Stamatov, and Coppock Premium Financing Agreement Packages [attached to Millrood Declaration as Exhibits 23-27 (CONFIDENTIAL)].

18.     Each Financing Agreement Package provided that the Policy was collateral for the loan. Acker, Collins, Bitter, Stamatov, and Coppock Premium Financing Agreement Packages [attached to Millrood Declaration as Exhibits 23-27 (CONFIDENTIAL)].

19.     Crucial to the disposition of the matters int his case, the Premium Finance Packages each state that they are "to be governed by and construed under the laws of the State of

---

Agreement Packages [attached to Millrood Declaration as Exhibits 23-27 (CONFIDENTIAL)], at Terms and Conditions, Doc.#1 of 19. This defined term operates within each Financing Agreement to fix the "Maturity Date" of the loan. The Promissory Note signed by each Insurance Trust states in paragraph 3 that: "The Maturity Date is 820 days (approximately 27 months) from the date Lender [Windsor] disburses funds pursuant to the Financing Documents. Each Financing Agreement provides an estimated Maturity Date, although the exact Maturity Date is dictated by the date of disbursement. The entire principal amount of each Note and all accrued but unpaid interest owed thereunder [was] due and payable by the Borrower on the earlier of (a) the Death Date, or (b) the Maturity Date." Id. at Promissory Note, ¶3, Doc. #2 of 19.

California (without regard to conflict of laws principles that could or would cause the application of any other laws), all rights and remedies being governed by said laws". Acker, Collins, Bitter, Stamatov, and Coppock Premium Financing Agreement Packages [attached to Millrood Declaration as Exhibits 23-27 (CONFIDENTIAL)], all at Doc. #1 of 19, pg. 10; Defendants' Expert James Maxon Report, at pg. 4 [attached to Millrood Declaration as Exhibit 28]; Dep. Tr. Julius Rousseau, III, individually and as Corporate Designee for Arent Fox, March 7, 2017 pg. 57:3-7 [attached to Millrood Declaration as Exhibit 3].

20.     Also highly significant to this controversy, in 48 out of 50 states, Article 9 does not specifically apply to the transfer of an interest in an insurance policy. However, California's law, applicable to the five (5) Premium Finance Loans by virtue of the "Governing Law and Consent to Jurisdiction" provision in each of the Finance Agreement Packages, departs from the uniform version, and is one of the two remaining states (the other being Louisiana) *that specifically provides that insurance policies are brought within the scope of Article 9, and are subject to its rules*. Acker, Collins, Bitter, Stamatov, and Coppock Premium Financing Agreement Packages [attached to Millrood Declaration as Exhibits 23-27 (CONFIDENTIAL)], at Doc. #1 of 19, Section "Governing Law and Consent to Jurisdiction"; Defendants' Expert James Maxon Rebuttal Report, at pg. 1 [attached to Millrood Declaration as Exhibit 29] ("The fact that the State of California applies its version of the Uniform Commercial Code (the U.C.C.) to secured transactions involving life insurance is not in dispute in this matter")

21.     The Premium Finance Agreement Packages contained several provisions that relate to rights and remedies where there has been an Event of Default, including specifically:

*Terms and Conditions, second part, § 6.02, p. 10*:

Upon the occurrence and during the continuance of an Event of Default, in addition to any other rights under this Agreement or any other Financing Documents or otherwise available at law or in equity, the Lender and its assigns shall have all the rights and remedies of a secured party in default under the laws of the State of California and other applicable law to enforce the assignments and security interests contained in the Financing Documents, including the right, subject to compliance with any mandatory requirements under applicable law, to sell or apply any rights and other interests assigned or pledged in the Financing Documents at public or private sale.

*Security Agreement, ¶ 6(a), pp. 3-4:*
<u>Defaults and Remedies.</u>

(a) An "Event of Default" is defined under this Security Agreement to include any of (i) the failure of Beneficiary or Trustee to timely and fully comply with its obligations hereunder; (ii) the breach of any representation, warranty, covenant or other agreement or statement made by the Beneficiary or Trustee each hereunder or by the Borrower within the Financing Agreement or any document executed in connection therewith, (iii) the occurrence of any "Events of Default" under the Financing Agreement or any document entered into between the Borrow and the Lender connection therewith, and (iv) the failure of Beneficiary or Trustee to be in timely and full compliance with each and all of its respective Secured Obligations. Upon the occurrence of an Event of Default, Lender (personally or through an agent or assign) is hereby authorized and empowered to take the following actions without a meeting : (i) transfer the Pledged Collateral and register it in Lender's name or in the name of its nominee; (ii) collect and receive cash and all other distributions made on or with respect to the Pledged Collateral; (iii) sell the Pledged Collateral in one or more sales after ten (10) days notice of the time and place of any public sale or of the time at which a private sale is to take place (which notice Beneficiary and Trustee each agrees is commercially reasonable); and (iv) otherwise act with respect to the Pledged Collateral as though Lender was the outright owner thereof.

*Security Agreement, ¶ 6(b), p. 4:*

Beneficiary and Trustee each hereby irrevocably constitutes and appoints Lender and its assigns as the proxy and attorney-in-fact of Beneficiary and Trustee each, with full power of substitution to do so, and which appointment is coupled with an interest and shall remain in effect until there are no longer any Secured Obligations of Borrower under the Financing Agreement or other Agreement of Lender entered into after the date hereof; provided, however, Lender shall not have any duty to exercise any such right or to preserve the same and shall not be liable for any failure to do so or for any delay in doing so. Any sale shall be made at a public or private sale at Lender's place of business, or at any place to be named in the notice of sale, either for cash or upon credit or for future delivery at such price as Lender may deem fair, and Lender may be the purchaser of the whole or any part of the Pledged

Collateral so sold and hold the same thereafter in its own right free and clear from any claim of Beneficiary or Trustee or any right of redemption (any such right being hereby waived or released). The Lender reserves the right to reject any and all bids at such sale which, in its discretion, it shall deem inadequate or unlikely to settle in a prompt and efficient manner. Demands of performance, except as otherwise herein specifically provided for, notices of sale, advertisements and the presence of property at sale are hereby waived by Beneficiary and Trustee each and any sale hereunder may be conducted by an auctioneer or any officer or agent of the Lender or its assigns.

*Security Agreement, ¶ 6(c), p. 4:*
If, at the original time or times appointed for the sale of the whole or any part of the Pledged Collateral, the highest bid, if there be but one sale, shall be inadequate to discharge in full all the Secured Obligations, or if the Pledged Collateral be offered for sale in fractions, if at any of such sales, the highest bid for a fraction offered for sale would indicate to Lender, in its discretion, that the proceeds of the sale as a whole of the Pledged Collateral would be unlikely to be sufficient to discharge all of the Secured Obligations, Lender may, on one or more occasions and in its discretion, postpone any of said sales by public announcement at the time of sale or the time of previous postponement of sale, and no other notice of such postponement or postponements of sale need be given, any other notice being hereby waived; provided, however, that any sale or sales made after such postponement shall be after ten (10) days' notice to Beneficiary and Trustee.

*Security Agreement, ¶ 6(d), p. 4:*
Beneficiary and Trustee each recognizes that Lender may be unable to effect a public sale of any or all of the Pledged Collateral and may be compelled to resort to one or more private sales thereof. . . .

*Security Agreement, ¶ 6(g), p. 5:*
Application of Proceeds. The proceeds of all sales and collection, and any other monies, the application of which is not otherwise provided for, shall be applied as follows:
FIRST, to the payment of the costs and expenses of such sale or sales and collections, and the compensation of Lender, and its counsel;
SECOND, to the payment of the obligations secured hereby in such order and manner as Lender, in its sole discretion, may determine, until such obligations are paid in full; and
THIRD, any surplus remaining shall be paid to Beneficiary or Trust.

*Assignment of Life Insurance Policy as Collateral, p. 1:*
This Assignment includes, without limitation, assignment of the following rights of Owner:

12

1.    The sole right to collect from Insurer the net proceeds of the Insurance Policy due to the death of the Insured or maturity of the Insurance Policy; ...

8.    The sole right to sell the Policy, but only upon the failure of the Owner to fulfill obligations to the Lender as specified in any agreements of contracts to which lender and Owner are parties. . .

*Assignment of Life Insurance Policy as Collateral, p. 2:*
RIGHTS RETAINED. The following rights, so long as the Insurance Policy has not been surrendered or canceled, are reserved and excluded from this Assignment and do not pass by virtue hereof: ...

2.    The right to designate and change the beneficiary of the Insurance Policy, provided that Assignee shall continue to be the primary assignee of the Insurance Policy; ...

OBLIGATIONS SECURED. This assignment is made, and the Insurance Policy is to be held, as collateral security for any and all liabilities of Owner to Assignee, either now existing or that may hereafter arise under the Life Insurance Premium Financing Agreement dated as of April 8, 2008, among Assignee, Owner and Insured as amended, supplemented, or otherwise modified from time to time (the "Agreement"), and all liabilities, obligations, covenants, duties, indebtedness, fees, expenses and other amounts owing by Owner to Assignee under this Assignment (all of which liabilities of Owner, secured or to become secured, are herein called "Liabilities"). Subject to the terms of this Assignment, Assignee may apply any and all money received under the Insurance Policy to pay Liabilities when due in any order Assignee may choose in its sole discretion.

BENEFITS PAYMENT DIRECTIVE. Owner hereby authorizes and directs Insurer to pay Assignee any and all death benefits and other amounts due under or on account of the Insurance Policy, and Owner shall be considered the Insurance Policy's primary beneficiary, provided, however, that nothing in the paragraph entitles Assignee to retain more than the amount of the Liabilities.

*Assignment of Life Insurance Policy as Collateral, p. 3:*
COVENANTS. Owner and Assignee agree as follows:

1.    That, unless Owner and Assignee have agreed to exercise the Default Sale Right (as defined below), any balance of sums received hereunder from Insurer remaining after payment of the then existing Liabilities, matured or unmatured, shall be paid in full by Assignee to the persons entitled thereto under the terms of the Insurance Policy had this Assignment not been executed. . . .

13

TERMINATION. At such time as the Liabilities have been paid and performed in full, Assignee will promptly terminate this Assignment and the security interests granted hereunder, and will promptly terminate any UCC financing statements filed in connection with this Assignment. ...

*Assignment of Life Insurance Policy as Collateral, p. 4:*
DEFAULT SALE RIGHT. Upon an occurrence of an Event of Default (as defined in the Agreement) that has not been remedied within the time period required in the Agreement, Assignee shall have the right (the "Default Sale Right") but not the obligation to accept, that in consideration of the full and complete satisfaction of the Liabilities (the sufficiency of which consideration is hereby acknowledged) Owner may make a full transfer and assignment of the Insurance Policy to Assignee and thereby forever relinquish any and all rights Owner may have thereunder, including without limitation any rights to cash surrender value and/or death benefit provided thereunder. Upon the exercise of this Default Sale Right, Assignee shall notify Insurer in writing and Insurer shall thereafter recognize Assignee as the sole lawful owner of the Insurance Policy.

*Promissory Note, ¶ 7, pp. 2-3:*
The Borrower hereby . . . .
(iii)    agrees that the Lender shall not be required first to institute any suit, or to exhaust his remedies against the undersigned or any person or party hereunder, or against any collateral in order to enforce payment of this Note;
...

(d)    No Waiver; Remedies Cumulative. None of the rights or remedies of the
Lender are to be deemed waived or affected by failure to delay to exercise the same. All remedies conferred upon the lender by this Note or any other instrument or agreement, including without limitation the Financing Agreement, shall be cumulative, no such remedy is exclusive, and such remedies may be exercised concurrently or consecutively at the Lender's option. ...

*Special Power of Attorney:*
Through this Special Power of Attorney, which Special Power of Attorney is coupled with an interest, the undersigned [the Trust] hereby irrevocably makes and appoints Windsor Securities, LLC, a Nevada LLC, as the undersigned's true and lawful attorney-in-fact for it and in its name, place and stead, an [*sic*] on its behalf, to execute, deliver, endorse and acknowledge any document or instrument concerning or pertaining to all claims, benefits, privileges and rights available upon the death of the insured under the following life insurance policy ...

Acker, Collins, Bitter, Stamatov, and Coppock Premium Financing Agreement Packages

[attached to Millrood Declaration as Exhibits 23-27 (CONFIDENTIAL)].

22.    Each Financing Agreement Package provided that, following default by the Trust

and execution by the Trust of the above-mentioned documents transferring title and beneficiary

status under the Policy, Windsor, subject to Windsor's continuing obligations to the Trust under

the Financing Agreement, had the following options:

(a)    Windsor could allow the Policy to lapse, in which case neither Windsor nor the Trust would obtain any financial benefit from the Policy and the Trust would remain liable to Windsor for the full amount of the loan plus interest thereon, plus reasonable expenses incurred in connection with the loan.

(b)    Assuming the Policy had not been allowed to lapse, Windsor, prior to the death of the insured and pursuant to Windsor's status as secured lender/title holder:

(i)     could sell the Policy at a public or private sale, at which sale both Windsor and the Trust would be allowed to bid;

(ii)    could take from the proceeds of the sale the amount it had loaned to the Trust, plus interest thereon, plus its reasonable costs incurred in connection with the sale; and

(iii)   would be required to provide any excess proceeds to the Trust; or

(iv)    should the proceeds be insufficient to cover what Windsor was owed, could proceed directly against the Trust to recover the deficiency.

(c)    Again assuming the Policy had not been allowed to lapse, and that no sale had been held, Windsor, following the death of the insured, and pursuant to Windsor's status as beneficiary:

(i)     could collect the death benefit from the insurance company;

(ii)    could take from the death benefit the amount it had loaned, plus interest thereon, plus its reasonable costs incurred in connection with collecting the death benefit; and

(iii)   unless the parties had exercised the "Default Sale Right," described below, Windsor would be required to provide the remaining portion of the death benefit to the Trust; or

(iv)    if the parties had exercised the "Default Sale Right," the Trust would have no continuing obligation on the loan and Windsor could retain the entirety of the death benefit.

Acker, Collins, Bitter, Stamatov, and Coppock Premium Financing Agreement Packages

[attached to Millrood Declaration as Exhibits 23-27 (CONFIDENTIAL)]; Expert Report of

Joseph Wood [attached to Millrood Declaration as Exhibit 30].

### Facts Relating to Rousseau's Introduction To and Representation of Windsor

23.     In or around 2008, after the Premium Finance Packages had been executed and

Windsor extended the Premium Finance Loans for the five (5) Policies at issue in this action,

Windsor was first introduced to Defendant Rousseau, who held himself out to Windsor and to

the public as having specialized expertise in both the life settlement business and with premium

finance structures used in the purchase of life insurance.  Dep. Tr. Steven Prusky, March 6, 2017,

pgs.154:13-16, 171:16- 172:7, 177:10-178:4 [attached to Millrood Declaration as Exhibit 1];

Dep. Tr. Julius Rousseau, III, individually and as Corporate Designee for Arent Fox, March 7,

2017, pgs. 19:18-20:14, 23:10- 24:6 [attached to Millrood Declaration as Exhibit 3].

24.     At that time Rousseau was with the firm of Herrick Feinstein, LLP (the "Herrick

Firm").  Complaint [D.E. #1] [attached to Millrood Declaration as Exhibit 8]; Defendants'

Answer, Affirmative Defenses and Counterclaims [D.E. #19], at  ¶¶27 [attached to Millrood

Declaration as Exhibit 9]; Herrick Firm Engagement Letter dated October 20, 2008 [attached to

Millrood Declaration as Exhibit 36 (CONFIDENTIAL)].

25.     By April 2009, Windsor and Rousseau were discussing the insurance policies at

issue in this litigation and Rousseau was providing Windsor legal advice with respect thereto,

and on April 29, 2009, Defendant Rousseau sent Windsor's principal, Steven Prusky, an email

stating "CA law appears to apply to at least some of your cases."  April 29, 2009 Email from

Rousseau to Prusky [attached to Millrood Declaration as Exhibit 43 (CONFIDENTIAL)].

26.     On or about June 5, 2009, Windsor formally engaged Rousseau and the Herrick

16

Firm to "provide general advice and representation to Windsor in connection with a variety of corporate and lending transactions in which you and it [Windsor] are involved including premium finance of life insurance policies and various lending and investment opportunities."[4] Rousseau/Herrick Firm June 5, 2009 Engagement Letter [attached to Millrood Declaration as Exhibit 37 (CONFIDENTIAL)].

27.     From June 5, 2009 through May 2010 Rousseau and the Herrick Firm provided advice and representation to Windsor regarding all of its Premium Finance Loans, including but not limited to, those at issue herein.  Complaint [D.E. #1] [attached to Millrood Declaration as Exhibit 8]; Defendants' Answer, Affirmative Defenses and Counterclaims [D.E. #19], at ¶¶29, [attached to Millrood Declaration as Exhibit 9]; Dep. Tr. Julius Rousseau, III, individually and as Corporate Designee for Arent Fox, March 7, 2017, pgs. 53:13-54:4, 61:15-19, 121:11- 123:2 [attached to Millrood Declaration as Exhibit 3]; Dep. Tr. Steven Prusky, March 6, 2017, pg. 197:16-25 [attached to Millrood Declaration as Exhibit 1].

28.     By way of example in July of 2009, after learning that there had been certain non-monetary defaults on the Policies by virtue of undisclosed changes of Trustees[5] (July 7, 2009

---

[4]Windsor had first engaged Rousseau and the Herrick Firm in October 2008 to assist it with a proposal made to it regarding the possible creation and management of an unrelated fund to purchase life insurance policies (the "Horizon Alpha Matter"), which Windsor ultimately elected not to pursue and which had concluded prior to April 2009, when Windsor first requested Rousseau and Herrick's assistance with the premium financing and insurance policies at issue in this action .  Herrick Firm Engagement Letter dated October 20, 2008 [attached to Millrood Declaration as Exhibit 36 (CONFIDENTIAL)]; Dep Tr. Julius Rousseau, individually and as Corporate Designee for Arent Fox, March 7, 2017, pgs 23:18-24:2, 40:19-41:8 [attached to Millrood Declaration as Exhibit 3]; Dep Tr. Steven Prusky March 6, 2017, pgs. 159:20-160:11, 163:14- 24, 164:13- 170:15 [attached to Millrood Declaration as Exhibit 1].

[5]These non-monetary defaults were addressed and remedied by the Trusts and Insureds.

Rousseau default letters sent to Collins, Coppock, Acker, Stamatov and Bitter Insureds, Trustees

and Beneficiaries [attached to Millrood Declaration as Exhibit 63 (CONFIDENTIAL)]), on July

16, 2009, David Fox, Rousseau's partner at the Herrick Firm sent an email to Windsor and

Rousseau outlining the "summary of the procedure for obtaining title to the insurance policies

financed by Windsor", wherein Mr. Fox outlined the steps to be taken as follows:

1.  **Serve the demand letters you have served demanding possession on those in default**
2.  **Commence a proceeding under the Uniform Commercial Code to obtain possession based on the uncured default. If we look at Georgia, you would bring such a proceeding under OCGA Sec 11-9-609**
3.  **When you obtain possession all you have is possession to the same extent that the holder of a mortgage has a secured interest in real estate. To take title to the policies you can notify the debtor that you propose to accept the policies (the collateral) in full satisfaction of the obligations due under the Loan agreements OCGA Sect 11-9-620(a). If the debtor accepts the proposal you can assume title to the policies and treat them as your own. That agreement has to be in writing OCGA Sect. 11-9-620 (c) [i]f the debtor has had twenty days to object to your retaining possession and fails to do so.**

July 16, 2009 Email from David Fox to Rousseau and Prusky [attached to Millrood Declaration

as Exhibit 44 (CONFIDENTIAL)].

29.     In fact, David Fox, on behalf of Herrick Feinstein and Windsor, followed the

foregoing procedure to obtain ownership and title to Windsor's Garcia policy, when on March

16, 2010 he, on Windsor's behalf, made a written proposal to the Garcia Trustee, the Insured and

the Garcia Trust, in conformance with UCC Section 9620 and California Code 9-620, to accept

the Garcia policy (the collateral) ***in full satisfaction of the obligations***[6] due under Garcia' Loan

---

[6]The bolded language herein was materially missing from all of the transactions that
Defendant Rousseau thereafter handled for Windsor. See record citations below. The underlined
sections were crucial in complying with and understanding the requirements for California Code
Section 9620. Ultimately this missing language fatally doomed Windsor's ability to collect the
Death Benefits on the remaining policies at issue in this case. American Arbitration Association

agreements, which was accepted and countersigned by the Insured and Beneficiary of the Garcia Policy on March 31, 2010.  March 16, 2010 9620 Proposal to accept the Policy in full satisfaction, counter-signed on March 31, 2010 [attached to Millrood Declaration as Exhibit 20].

30.     In addition, Rousseau had been provided several draft Policy Relinquishment and Loan Satisfaction Agreements, with Mutual Release Agreements attached thereto as Exhibit A, for suggested use on the Windsor Policies[7], each with substantially similar content and minor word changes, but all containing language providing that the Borrower, Insured and Beneficiary were willing to give up all right, title, and ownership in the Policy in exchange for full and complete satisfaction of all obligations under the Premium Finance Packages. By way of example, the July 31, 2009 Herrick draft Policy Relinquishment and Loan Satisfaction Agreement, which was to be signed by Windsor and counter-signed by the Borrower (the Trust), the Insured and the Beneficiary of the Policy, states, in relevant part:

> **WHEREAS, the Borrower, the Beneficiary, the Lender and the Insured desire for the Borrower to transfer, convey and assign absolutely all of the Borrower's rights, title, interest, claims, cash value, dividends, options, riders, benefits, privileges and ownership in and to the Policy (collectively, the "Relinquished Assets") and for the Beneficiary to transfer, convey and assign absolutely all of the Beneficiary's rights, title, interest, claims, cash value, dividends, options, riders, benefits, privileges and ownership in and to the Collateral in accordance with the terms and conditions of this Agreement in full and complete satisfaction of the Borrower's, the Beneficiary's and the Insured's obligations under the Financing Agreement (the "Obligations") and the other Financing Documents (as described in the Financing Agreement); and**

---

April 8, 2014 Interim Award, attached to Millrood Declaration as Exhibit 73; Acker Court's September 21, 2015 Order, attached to Millrood Declaration as Exhibit 75; Collins Court's September 21, 2015 Order [ Doc. #50], attached to Millrood Declaration as Exhibit 77.

[7]Rousseau, on Windsor's behalf, obtained from the Gilbert Trust a Policy Relinquishment and Loan Satisfaction Agreement, with Mutual Release Agreement, once the Gilbert Trustee indicated that the Trust did not intend to re-pay the loan and sought to surrender the policy.

WHEREAS, the Lender has agreed that the above described transfers and the acceptance by the Lender of all rights, title, interest and ownership in and to the Relinquished Assets and the Collateral in accordance with the terms and conditions of this Agreement shall constitute the full and complete satisfaction and termination of the Obligations.

....

2. <u>Conveyance of the Relinquished Assets and Collateral.</u>
(a) The Borrower hereby transfers, conveys and assigns the Relinquished Assets, as is, to the Lender, free and clear of all charges, claims, liens, pledges, security interests and encumbrances of all kinds, other than the collateral assignment granted by the Borrower to the Lender, and subject to the terms and conditions hereof. The Lender hereby accepts the Relinquished Assets as is in full and complete satisfaction of the Borrower's Obligations.
(b) The Beneficiary hereby transfers, conveys and assigns the Collateral as is without recourse to the Lender, free and clear of all charges, claims, liens, pledges, security interests and encumbrances of all kinds, other than the granted by the Beneficiary to the Lender, and subject to the terms and conditions hereof. The Lender hereby accepts the Collateral as is in full and complete satisfaction of the Beneficiary's Obligations.
(c) Each of the Borrower, the Beneficiary and the Insured acknowledges and agrees that, in connection with this Agreement, (i) the ownership and designated beneficiary of the Policy will be changed from the Borrower and Beneficiary, as owner and the current beneficiary, to the Lender; (ii) the Borrower and Beneficiary will have no further rights to or benefits under the Policy or other Relinquished Assets or Collateral and (iii) neither the Borrower, the Beneficiary, nor the Insured will receive any of the proceeds of the Policy upon its maturity or be entitled to designate another party to receive such benefits.

3. <u>Consideration for Conveyance of Relinquished Assets.</u> The Borrower is conveying all ownership of any direct or indirect rights that it has in the Relinquished Assets and the Beneficiary is conveying all ownership of any direct or indirect rights it has in the Collateral, to the Lender in consideration for the full and complete satisfaction and termination of the Obligations. Each of the Parties acknowledges and agrees that full and complete satisfaction of the Obligations represents the fair market value of the Policy on the date hereof and valid consideration in exchange for the Lender's receiving ownership of the Relinquished Assets and the Collateral.

4. The Borrower, Beneficiary and Insured, each respectively agree that all of the Obligations. Representations and Covenants set forth in Paragraphs 3, 4 and 5 of the Financing Agreement and the Insured set forth in the Financing Agreement Sections 5.01 to 5.02, inclusive (1) have not been breached as of the date hereof and (2) will remain in full force and effect through the term of the Policy and that they

20

**shall immediately notify the Lender in the event of any breach by any of them of any of said covenants. The Beneficiary hereby agrees to comply with the provisions of Section 5.01 and 5.02 throughout the term of the Policy.**

**5. Mutual Release. Simultaneously with the execution and delivery of this Agreement, each Party shall execute and deliver the Mutual Release Agreement in the form attached as Exhibit A hereto as a condition precedent to the effectiveness of this Agreement.**

Herrick draft Policy Relinquishment and Loan Satisfaction Agreement dated July 31, 2009 [attached to Millrood Declaration as Exhibit 38 (CONFIDENTIAL)]; Herrick draft Policy Relinquishment and Loan Satisfaction Agreement dated August 12, 2009 [attached to Millrood Declaration as Exhibit 39 (CONFIDENTIAL)]; August 25, 2009 Email from David Fox to Rousseau attaching draft Policy Relinquishment and Loan Satisfaction Agreement [attached to Millrood Declaration as Exhibit 40 (CONFIDENTIAL)]; draft Policy Relinquishment and Loan Satisfaction Agreement for Coppock [attached to Millrood Declaration as Exhibit 41 (CONFIDENTIAL)]; Policy Relinquishment and Loan Satisfaction Agreement for Gilbert [attached to Millrood Declaration as Exhibit 19].

31.    In or around January 2010, shortly before the Premium Financed Loans from Windsor to each of the Trusts were due to be repaid, the Acker, Coppock, Collins and Stamatov Trusts, by and through Houchins, informed Windsor of the fact that the Trusts were not willing to take over premium payments on the Policies and would not repay the loans when due. Affidavit of Eugene Houchins, III, dated March 22, 2017, at ¶8 [attached to Millrood Declaration as Exhibit 10]; Declaration of Steven Prusky filed in support of Motion for Summary Judgment in the Acker Action, Case No. 14-cv-04651-WHO [Doc. #30-2], at ¶4 [attached to Millrood Declaration as Exhibit 11]; Declaration of Steven Prusky filed in support of Motion for Summary Judgment in the Collins Action, United States District Court for the Northern District of

21

California, Case No. 3:14-cv-03713-WHO [Doc. #31-2], at ¶4 [attached to Millrood Declaration as Exhibit 12 (without Exhibits thereto as all Exhibits to the Declarations are separately referenced and identified herein)].

32.    Windsor, per Rousseau's specific advice, treated Houchins' communication regarding the Trustees for the Coppock, Collins, Acker and Stamatov Policies intention to not re-pay the loans at the maturity dates as an exercise of the Premium Finance Packages' Default Sales Right[8], which provided Windsor with the right to accept the Insurance Trust's transfer of title of the insurance policy in full satisfaction of the trust's financial obligations, thus allowing the Insurance Trust to walk away from the loan without recourse.  Declaration of Steven Prusky filed in support of Motion for Summary Judgment in the Collins Action, United States District Court for the Northern District of California, Case No. 3:14-cv-03713-WHO [Doc. #31-2], at ¶8, [attached to Millrood Declaration as Exhibit 12 (without Exhibits thereto as all Exhibits to the

---

[8]As outlined above the Premium Finance Packages' Assignment of Life Insurance Policy as Collateral, contains the following Default Sales Right:

**DEFAULT SALE RIGHT. Upon an occurrence of an Event of Default (as defined in the Agreement) that has not been remedied within the time period required in the Agreement, Assignee shall have the right (the "Default Sale Right") but not the obligation to accept, that in consideration of the full and complete satisfaction of the Liabilities (the sufficiency of which consideration is hereby acknowledged) Owner may make a full transfer and assignment of the Insurance Policy to Assignee and thereby forever relinquish any and all rights Owner may have thereunder, including without limitation any rights to cash surrender value and/or death benefit provided thereunder. Upon the exercise of this Default Sale Right, Assignee shall notify Insurer in writing and Insurer shall thereafter recognize Assignee as the sole lawful owner of the Insurance Policy.**

Acker, Collins, Bitter, Stamatov, and Coppock Premium Financing Agreement Packages [attached to Millrood Declaration as Exhibits 23-27 (CONFIDENTIAL)], at Assignment of Life Insurance Policy as Collateral, Doc. #16 of 19, at pg. 4.

Declarations are separately referenced and identified herein)]; Declaration of Steven Prusky filed in support of Motion for Summary Judgment in the Acker Action, Case No. 14-cv-04651-WHO [Doc. #30-2], at ¶8 [attached to Millrood Declaration as Exhibit 11]; Dep. Tr. Julius Rousseau, III, individually and as Corporate Designee for Arent Fox, March 7, 2017, pg. 245:2-7 [attached to Millrood Declaration as Exhibit 3] ("A. My recollection was, each of those policies had been surrendered by the insureds voluntarily exercising their -- and I'm saying insureds; trustees, trustees -- exercising their default sale right")

33.     In response, Windsor, per Rousseau's specific advice, demanded that the Trustees sign the respective Insurance companies' change of ownership and change of beneficiary forms and turn over the policies to Windsor. Declaration of Steven Prusky filed in support of Motion for Summary Judgment in the Acker Action, Case No. 14-cv-04651-WHO, at ¶8 [Doc. #30-2], [attached to Millrood Declaration as Exhibit 11]; Declaration of Steven Prusky filed in support of Motion for Summary Judgment in the Collins Action, United States District Court for the Northern District of California, Case No. 3:14-cv-03713-WHO [Doc. #31-2], at ¶8 [attached to Millrood Declaration as Exhibit 12 (without Exhibits thereto as all Exhibits to the Declarations are separately referenced and identified herein)].

34.     Believing that compliance with said demand was required under the Premium Finance Packages' Security Agreements, Houchins advised the Coppock, Stamatov, Acker and Collins Trustees to comply with Windsor's demand and execute and provide Windsor the requested insurance carriers' respective change of ownership and beneficiary forms. July 21, 2014 Email from Houchins to Prusky [attached to Millrood Declaration as Exhibit 56 (CONFIDENTIAL)].

23

**Facts Relating to Stamatov, Acker, Collins and Coppock Trustees's Execution of Insurance Company's Change Of Ownership Forms**

**Stamatov**

35.     On January 22, 2010 the Stamatov Trustee executed and returned Phoenix Life Insurance Company's Assignment of Life Insurance Policy as Collateral, which expressly reserved to the Owner of the Policy, the Trust, the right to change the beneficiary of the Policy as long as there had been no surrender of the Policy.  Phoenix Life Insurance Company's Assignment of Life Insurance Policy as Collateral [attached to Millrood Declaration as Exhibit 85 (CONFIDENTIAL)].

36.     On February 22, 2010 the Stamatov Trustee executed and returned Phoenix Life Insurance Company's Designation of Owner form wherein it named Windsor as the "New Owner" of the Policy.   Executed Phoenix Life Insurance Company's Designation of Owner form [attached to Millrood Declaration as Exhibit 86].

37.     However, the Phoenix Life Insurance Company Assignment of Life Insurance Policy as Collateral and Designation of Owner forms executed by the Stamatov Trustee ***did not*** contain any language indicating or providing that the Stamatov Trust, Trustee, Insured and/or Beneficiary were making a full transfer and assignment of the Insurance Policy ***in consideration of the full and complete satisfaction of all liabilities and obligations*** under the Premium Finance Package, thereby forever relinquishing any and all rights they may have thereunder, including without limitation any rights to cash surrender value and/or death benefit under the Policy, nor did they indicate or provide that Windsor and/or the Stamatov Trust, Trustee, Insured and/or Beneficiary were releasing the other from all liabilities and obligations under the Premium Finance Package.  Phoenix Life Insurance Company's Assignment of Life Insurance Policy as

24

Collateral [attached to Millrood Declaration as Exhibit 85 (CONFIDENTIAL)]; Phoenix Life

Insurance Company's Designation of Owner form [attached to Millrood Declaration as Exhibit

86].

38.     On or about July 28, 2011, Phoenix Life Insurance Company provided a

Statement of Values which provides that Windsor is Owner/Payor of the Policy, and primary

beneficiary of the Stamatov Policy.  2011 Statement of Values [attached to Millrood Declaration

as Exhibit 95].

39.     Before and thereafter, Windsor continued to make all required premium payments

for the Stamatov Policy, without which the Policy would have lapsed.  Complaint for Declaratory

Relief, Windsor Securities, LLC v. The Jane Ann Stamatov Family Trust, United States District

Court for the Northern District of California, Case No. 3:15-cv-00080-JST (without Exhibits)

[Doc. #1] [attached to Millrood Declaration as Exhibit 96].

**Acker**

40.     On February 19, 2010 the Acker Trustee executed and returned John Hancock's

Absolute/Gift Assignment Form on which the Acker Trustee checked the box providing an

"absolute assignment," which states, "[f]or value received, the undersigned hereby transfers and

assigns absolutely all rights and interest in the above policy(ies) to the assignee", and identified

therein the new owner as Windsor.  John Hancock's Absolute/Gift Assignment Form executed

by the Acker Trustee on February 19, 2010 [attached to Millrood Declaration as Exhibit 107

(CONFIDENTIAL)].

41.     However, the form signed by the Acker Trustee was not the updated form

required by the insurance company and was not witnessed properly, which prompted Windsor to

25

send a letter to the Acker Trustee on the same day, February 19, 2010, wherein Windsor directed

the Acker Trustee to sign an updated form entitled "Change of Ownership (Absolute

Assignment)." Windsor's letter also stated that Windsor understood the Acker Trustee was

"taking this action because the premiums required to keep the policy in force are now beyond the

amount Windsor is responsible for according to financing documents, and [The Acker Trustee]

would therefore rather assign the policy than pay those monies." February 19, 2010 Letter

[attached to Millrood Declaration as Exhibit 64 (CONFIDENTIAL)].

42.     On March 18, 2010, the Acker Trustee signed a second "Change of Ownership

(Absolute Assignment)" form (the "Second Acker COO") which stated that "the undersigned

hereby transfers and assigns absolutely, all rights, title and interest in the above policy(ies) to the

Assignee(s) indicated below and hereby revokes any beneficiary designation or direction of

payment previously made in respect to the proceeds payable on the death of the Life Insured

under the above policy(ies) and directs that such proceeds be paid to the Assignee(s) . . . The

Assignor(s) WARRANT the validity of this assignment.", which included the proper witness

attestation. The executed Second Acker COO named Windsor as the owner of the Acker Policy.

March 18, 2010 Second Acker COO [attached to Millrood Declaration as Exhibit 108

(CONFIDENTIAL)].

43.     However, John Hanckock's Change of Ownership (Absolute Assignment)" form

executed by the Acker Trustee ***did not*** contain any language indicating or providing that the

Acker Trust, Trustee, Insured and/or Beneficiary were making a full transfer and assignment of

the Insurance Policy ***in consideration of the full and complete satisfaction of all liabilities and***

***obligations*** under the Premium Finance Package, thereby forever relinquishing any and all rights

they may have thereunder, including without limitation any rights to cash surrender value and/or death benefit under the Policy, nor did they indicate or provide that Windsor and/or the Acker Trust, Trustee, Insured and/or Beneficiary were releasing the other from all liabilities and obligations under the Premium Finance Package. March 18, 2010 Second Acker COO [attached to Millrood Declaration as Exhibit 108 (CONFIDENTIAL)].

44.     The Second COO executed by the Acker Trustee was registered by John Hancock on March 25, 2010. See May 20, 2010 Letter to Windsor from John Hancock (Bates Stamped PLAINTIFF 000027 CONFIDENTIAL)[attached to Millrood Declaration as Exhibit 118].

45.     Before and thereafter, Windsor continued to make all required premium payments for the Acker Policy, without which the Policy would have lapsed. Declaration of Steven Prusky filed in support of Motion for Summary Judgment in the Acker Action, Case No. 14-cv-04651-WHO, at ¶8 [Doc. #30-2] [attached to Millrood Declaration as Exhibit 11].

**Coppock**

46.     On February 15, 2010, the Coppock Trustee executed Pacific Life Insurance Company's Ownership Name or Beneficiary Change Request form, naming Windsor as the new Owner and Beneficiary of the Coppock Policy. Pacific Life Insurance Company's Ownership Name or Beneficiary Change Request form [attached to Millrood Declaration as Exhibit 87 (CONFIDENTIAL)].

47.     However, Pacific Life Insurance Company's Ownership Name or Beneficiary Change Request form executed by the Coppock Trustee ***did not*** contain any language indicating or providing that the Coppock Trust, Trustee, Insured and/or Beneficiary were making a full transfer and assignment of the Insurance Policy ***in consideration of the full and complete***

27

*satisfaction of all liabilities and obligations* under the Premium Finance Package, thereby forever relinquishing any and all rights they may have thereunder, including without limitation any rights to cash surrender value and/or death benefit under the Policy, nor did they indicate or provide that Windsor and/or the Coppock Trust, Trustee, Insured and/or Beneficiary were releasing the other from all liabilities and obligations under the Premium Finance Package. Pacific Life Insurance Company's Ownership Name or Beneficiary Change Request form [attached to Millrood Declaration as Exhibit 87 (CONFIDENTIAL)].

48.     On February 25, 2010, Pacific Life Insurance Company provided a Title Change Confirmation for the Coppock Policy.  Pacific Life Insurance Company Title Change Confirmation [attached to Millrood Declaration as Exhibit 89 (CONFIDENTIAL)].

49.     On or about March 30, 2010, Broker Houchins communicated to Windsor that the insured, Mr. Coppock, requested that Windsor provide a release to complete his file.  March 30, 2010 Houchins' letter [attached to Millrood Declaration as Exhibit 80].

50.     After consulting with Rousseau and per Rousseau's specific advice, on April 23, 2010, Windsor mailed Mr. Coppock a letter that states: "Please accept this letter as formal notification that pending our ownership of policy #VF5170 1030, *we are releasing you from any future obligations of our financial agreement*." (emphasis added) April 23, 2010 letter [attached to Millrood Declaration as Exhibit 81].

51.     However, previously Rousseau had either drafted or had been provided a draft Policy Relinquishment and Loan Satisfaction Agreement for the Coppock Policy, to be signed by Windsor and counter- signed by the Coppock Trustee, Insured and Beneficiary, but did not advise, or counsel Windsor to provide it to Coppock or the Coppock Trust/Trustee for execution.

28

The draft Policy Relinquishment and Loan Satisfaction Agreement for the Coppock Policy,

which was not provided to Windsor for execution and/or provision to the Coppock Trustee for

execution, states, in relevant part:

> **WHEREAS, the Borrower, the Lender and the Insured desire for the Borrower to transfer, convey and assign absolutely all of the Borrower's rights, title, interest, claims, cash value, dividends, options, riders, benefits, privileges and ownership in and to the Policy (collectively the "Relinquished Assets") in accordance with the terms and conditions of this Agreement in full and complete satisfaction of the Borrower's and the Insured's obligations under the Financing Agreement and the other Financing Documents (as defined in the Financing Agreement) and the Beneficiary's obligations under the Security Agreement (collectively the "Obligations") ; and**
>
> **WHEREAS, the Lender has agreed that the above described transfers and acceptance by the Lender of all rights, title, interest and ownership in and to the Relinquished Assets, in accordance with the terms and conditions of this Agreement shall constitute the full and complete satisfaction and termination of the Obligations.**
>
> ....
>
> 3.   **Consideration for Conveyance of Relinquished Assets.  The Borrower is conveying all ownership of any direct or indirect rights that it has in the Relinquished Assets to the Lender in consideration for the full and complete satisfaction and termination of the Obligations.  Each of the Parties acknowledges and agrees that full and complete satisfaction of the Obligations represents the fair market value of the Policy on the date hereof and valid consideration in exchange for the Lender's receiving ownership of the Relinquished Assets.**
>
> ....
>
> 5.   **Mutual Release.  Simultaneously with the execution and delivery of this Agreement, each party shall execute and deliver the Mutual Release Agreement in the form attached as Exhibit B hereto, and the Lender shall, and Borrower shall cause the Beneficiary to execute and Deliver the Beneficiary's Acknowledgment in the form attached as Exhibit C hereto, in each case as a condition precedent to the effectiveness of this Agreement.**

draft Relinquishment and Loan Satisfaction Agreement for Coppock [attached to Millrood

Declaration as Exhibit 41 (CONFIDENTIAL)].

52.     Rousseau did not advise, and as a result, Windsor did not obtain from Coppock, and/or the Coppock Trustee, and/or the Coppock Beneficiary, a writing (such as the draft Relinquishment and Loan Satisfaction Agreement) wherein Coppock and/or the Coppock Trustee and/or the Coppock Beneficiary agreed that they were providing and Windsor was accepting Coppock's Policy **in full satisfaction of all liabilities and obligations under the Premium Finance Package and/or that they were mutually releasing the other from all liabilities and obligations under the Premium Finance Package**. Dep Tr. Julius Rousseau, individually and as Corporate Designee for Arent Fox, March 7, 2017, pgs 161:14-18 [attached to Millrood Declaration as Exhibit 3]; April 23, 2010 letter [attached to Millrood Declaration as Exhibit 81].

53.     Before and thereafter, Windsor continued to make all required premium payments for the Coppock Policy, without which the Policy would have lapsed.  Complaint for Declaratory Relief, Windsor Securities, LLC v. The Robert S. Coppock Irrevocable Life Insurance Trust, et. al., United States District Court for the Northern District of California, Case No. 3:15-cv-00075 [Doc. #1] (without attached Exhibits), at ¶28 [attached to Millrood Declaration as Exhibit 97].

**Collins**

54.     On or about May 11, 2010 The Collins Trustee executed Pacific Life Insurance Company's Ownership Name or Beneficiary Change Request form, naming Windsor as the new Owner of the Collins Policy.  May 11, 2010 Pacific Life Insurance Company's Ownership Name or Beneficiary Change Request form [attached to Millrood Declaration as Exhibit 91 (CONFIDENTIAL)].

55.     However,  Pacific Life Insurance Company's Ownership Name or Beneficiary Change Request form executed by the Collins Trustee ***did not*** contain any language indicating or

30

providing that the Collins Trust, Trustee, Insured and/or Beneficiary were making a full transfer and assignment of the Insurance Policy *in consideration of the full and complete satisfaction of all liabilities and obligations* under the Premium Finance Package, thereby forever relinquishing any and all rights they may have thereunder, including without limitation any rights to cash surrender value and/or death benefit under the Policy, nor did they indicate or provide that Windsor and/or the Collins Trust, Trustee, Insured and/or Beneficiary were releasing the other from all liabilities and obligations under the Premium Finance Package. May 11, 2010 Pacific Life Insurance Company's Ownership Name or Beneficiary Change Request form [attached to Millrood Declaration as Exhibit 91 (CONFIDENTIAL)].

56.     On May 25, 2010, Pacific Life Insurance Company provided a Title Change Confirmation to Windsor of the Change of Ownership requested and filed on May 11, 2010. The new owner on the Collins Policy was Windsor. Pacific Life Insurance Company Title Change Confirmation [attached to Millrood Declaration as Exhibit 90 (CONFIDENTIAL)].

57.     On August 26, 2010, the Collins Trustee executed and submitted Pacific Life's Ownership, Name, or Beneficiary Change Request form, substituting Windsor as beneficiary of the Policy. August 26, 2010 Beneficiary Change Request [attached to Millrood Declaration as Exhibit 93 (CONFIDENTIAL)].

58.     Again, the Pacific Life Insurance Company's Ownership Name or Beneficiary Change Request form executed by the Collins Trustee on August 26, 2010 *did not* contain any language indicating or providing that the Collins Trust, Trustee, Insured and/or Beneficiary were making a full transfer and assignment of the Insurance Policy *in consideration of the full and complete satisfaction of all liabilities and obligations* under the Premium Finance Package,

31

thereby forever relinquishing any and all rights they may have thereunder, including without limitation any rights to cash surrender value and/or death benefit under the Policy, nor did they indicate or provide that Windsor and/or the Collins Trust, Trustee, Insured and/or Beneficiary were releasing the other from all liabilities and obligations under the Premium Finance Package. August 26, 2010 Beneficiary Change Request Form [attached to Millrood Declaration as Exhibit 93 (CONFIDENTIAL)].

59.     On September 1, 2010, Pacific Life provided a Title Change Confirmation to Windsor of the Change of Beneficiary requested and filed on August 26, 2010. September 1, 2010, Pacific Life Title Change Confirmation [attached to Millrood Declaration as Exhibit 94 (CONFIDENTIAL)].

60.     Before and thereafter, Windsor continued to make all required premium payments for the Collins Policy, without which the Policy would have lapsed. Declaration of Steven Prusky filed in support of Motion for Summary Judgment in the Collins Action, United States District Court for the Northern District of California, Case No. 3:14-cv-03713-WHO [Doc. #31-2], at ¶4 [attached to Millrood Declaration as Exhibit 12 (without Exhibits thereto as all Exhibits to the Declarations are separately referenced and identified herein)].

### Rousseau and Arent Fox's Assurances Regarding Ownership and Windsor's Entitlement to The Death Benefits Under the Policies

61.     Rousseau and Arent Fox specifically assured Windsor that no other documentation, beside the respective Insurance Company's Assignment and Change of Ownership and Beneficiary forms executed by each of the Trustees, was necessary from the Stamatov, Acker, Coppock and Collins Trusts, Insureds, and/or Beneficiaries for Windsor's unfettered ownership of the Policies and Windsor's absolute entitlement to the death benefits

32

thereunder, and did not advise Windsor about application of the California Commercial Code and/or the default sales provisions contained therein, and did not counsel Windsor to obtain writings such as the Policy Relinquishment and Loan Satisfaction Agreements and Mutual Releases that had been previously drafted.  Dep Tr. Julius Rousseau, individually and as Corporate Designee for Arent Fox, March 7, 2017, pgs. 160:17 to 161:22, 182:9-16, 245: 2-19 [attached to Millrood Declaration as Exhibit 3].

62.     Defendant Rousseau did not advise, and therefore Windsor never communicated to any of the Stamatov, Acker, Coppock and/or Collins Trustees and/or Insureds and/or Beneficiaries that: (1) the above outlined Ownership Name or Beneficiary Change Request forms that the Trustees had executed were in return for any agreement by Windsor to relieve the Trusts from any continuing obligation to repay the Loans; and (2) that by executing the above outlined Ownership Name or Beneficiary Change Request forms the Trusts were giving up either (a) the right of the Trusts, pursuant to the Financing Agreements, to receive any proceeds from a public or private sale of the Policies remaining after Windsor was paid what is was owed under the Loans; or (b) the right of the Trusts, pursuant to the Financing Agreements, to receive any proceeds of the death benefit remaining after Windsor was paid what is was owed under the Loans.  Declaration of Mary Ann Gordillo filed in support of Motion for Summary Judgment in Pacific Life Insurance Co. v. Mary Ann Gordillo, as Trustee of the Erwin A. Collins Family Insurance Trust and Windsor Securities, United States District Court for the Northern District of California, Case No. 3:14-cv-03713-WHO (the "Collins Action")[Doc. 40], at ¶8 [attached to Millrood Declaration as Exhibit 13]; Declaration of Ronald Mark Goss filed in opposition of Motion for Summary Judgment in Acker Action, United States District Court for the Northern

33

District of California, Case No. 14-cv-04651-WHO [Doc. #38], at ¶¶9-10 [attached to Millrood

Declaration as Exhibit 14]; Complaint for Declaratory Relief, Windsor Securities, LLC v. The

Jane Ann Stamatov Family Trust, United States District Court for the Northern District of

California, Case No. 3:15-cv-00080-JST, Complaint (without Exhibits) [Doc. #1], at ¶22

[attached to Millrood Declaration as Exhibit 96].

      63.     Windsor continued to pay the premiums for the Stamatov, Acker, Collins and

Coppock Policies, and could have elected not to make the premium payments and the policies

would have lapsed. Declaration of Mary Ann Gordillo filed in support of Motion for Summary

Judgment in the Collins Action, Case No. 3:14-cv-03713-WHO [Doc. 40], at ¶8 [attached to

Millrood Declaration as Exhibit 13]; Declaration of Ronald Mark Goss filed in opposition of

Motion for Summary Judgment in Acker Action, Case No. 14-cv-04651-WHO [Doc. #38], at

¶¶9-10 [attached to Millrood Declaration as Exhibit 14]; Complaint for Declaratory Relief,

Windsor Securities, LLC v. The Jane Ann Stamatov Family Trust, United States District Court

for the Northern District of California, Case No. 3:15-cv-00080-JST, Complaint (without

Exhibits) [Doc. #1], at ¶22 [attached to Millrood Declaration as Exhibit 96]; Complaint for

Declaratory Relief in the Coppock Action, Case3:15-cv-00075 [Doc. #1] (without attached

Exhibits) [attached to Millrood Declaration as Exhibit 97].

      **Bitter**

      64.     In or around April, 2010, Bitter indicated to Houchins, that he was interested in

paying off the Bitter Loan, and in or around July of 2010 Houchins indicated the same to

Windsor. April 5, 2010 email from Bitter to Houchins stating that he wants to keep the policy

and payoff the loan [attached to Millrood Declaration as Exhibit 46 (CONFIDENTIAL)]; E-mail

34

from Gene Houchins to Steven Prusky, dated July 18, 2010, at page 1 [attached to Millrood Declaration as Exhibit 47 (CONFIDENTIAL)]; E-mail string between Gene Houchins and Steven Prusky, dated July 18 - July 19, 2010, at page 67 [attached to Millrood Declaration as Exhibit 48 (CONFIDENTIAL)].

### Facts Relating to Rousseau's Move From Herrick Feinstein to Arent Fox

65.     On or about June 1, 2010, Rousseau left the Herrick Firm and became a partner with Defendant Arent Fox, and became the head of Arent Fox's Insurance and Reinsurance Practice in New York City.  Dep. Tr. Julius Rousseau, III, individually and as Corporate Designee for Arent Fox, March 7, 2017, pgs. 38:1-5 [attached to Millrood Declaration as Exhibit 3]; Pr. Newswire Article of June 17, 2010 [attached to Millrood Declaration as Exhibit 68]; Complaint [D.E. #1] [attached to Millrood Declaration as Exhibit 8]; and Defendants' Answer, Affirmative Defenses and Counterclaims [D.E. #19], at ¶¶30 [attached to Millrood Declaration as Exhibit 9].

66.     All of the documents relating to Windsor that had previously been with the Herrick Firm were transferred to Defendant Arent Fox.  Dep. Tr. Julius Rousseau, III, individually and as Corporate Designee for Arent Fox, March 7, 2017, pgs. 39:14 -39:24 [attached to Millrood Declaration as Exhibit 3].

67.     Rousseau's representation of Windsor continued uninterrupted during his transition from the Herrick Firm to Defendant Arent Fox and the scope of his engagement by Windsor did not change.  Dep. Tr. Julius Rousseau, III, individually and as Corporate Designee for Arent Fox, March 7, 2017, pgs 38:1-11 [attached to Millrood Declaration as Exhibit 3].

68.     Rousseau, while at Defendant Arent Fox, advised and assisted Windsor with each of the Premium Finance Loans and Premium Finance Policies at issue herein, specifically including, but not limited to, Windsor's rights under the Finance Agreement Packages, notices and demands to the Premium Financing Trustees, and preparing and obtaining the documentation necessary to ensure that Windsor had unfettered title and ownership to each of the Premium Finance Policies, and all rights thereunder. Complaint [D.E. #1] [attached to Millrood Declaration as Exhibit 8]; and Defendants' Answer, Affirmative Defenses and Counterclaim [D.E. #19], at ¶¶32 [attached to Millrood Declaration as Exhibit 9]; Dep. Tr. Julius Rousseau, III, individually and as Corporate Designee for Arent Fox, March 7, 2017, pgs. 155:4-14, 159:7-160:16, 162:3-19, 182:9-16 [attached to Millrood Declaration as Exhibit 3].

69.     Despite the fact that Rousseau's representation of Windsor continued without interruption during his transition to Defendant Arent Fox, and the fact that Rousseau continued to provide legal advice to Windsor regarding the Premium Finance Loans and Policies and billed it for the same, Rousseau neglected to provide an official Arent Fox engagement letter to Windsor until April 7, 2011.  April 7, 2011 Arent Fox Engagement Letter [attached to Millrood Declaration as Exhibit 69 (CONFIDENTIAL)]; April 7, 2011 email from Rousseau to Windsor stating, in relevant part "I was recently reminded that I never got you to officially engage us, so here is our std ltr. I included you and Windsor both as clients, though so far we are only repping Windsor" (attached as Exhibit "F" to Plaintiff's Complaint); Dep. Tr. Julius Rousseau, III, individually and as Corporate Designee for Arent Fox, March 7, 2017, pg. 38:1-5 [attached to Millrood Declaration as Exhibit 3].

**Facts Relating to Maturity of Windsor's Premium Finance Loans**

70.     Defendants Rousseau and Arent Fox were representing Windsor before and at the

Maturity Dates for each of the Premium Finance Loans, and specifically provided advice and

representation to Windsor regarding the title to, and ownership and assignment of, the Policies,

actions required for transfer thereof and perfection of entitlement to the death benefits

thereunder, and compliance with the Finance Agreement Packages. Acker, Collins, Bitter,

Stamatov, and Coppock Premium Financing Agreement Packages [attached to Millrood

Declaration as Exhibits 23-27 (CONFIDENTIAL)]; Complaint [D.E. #1] [attached to Millrood

Declaration as Exhibit 8]; and Defendants' Answer, Affirmative Defenses and Counterclaims, at

¶¶32 and ¶¶34 [attached to Millrood Declaration as Exhibit 9]; Dep Tr. Steven Prusky March 6,

2017, pg. 197: 16-25 [attached to Millrood Declaration as Exhibit 1].

71.     There is not a single document executed by the Trustees of the Collins Trust, the

Acker Trust, the Coppock Trust, or the Stamatov Trust, respectively, either before or after

default, or any evidence of any oral agreement between Windsor and the Trusts, either before or

after default, under which these Trusts:

(a) waived all rights in and to the death benefit in return for a forgiveness of their

respective loans by Windsor; and/or

(b) wherein Windsor at any time offered to forgive Windsor's loan to these Trusts in

return for each Trust's agreement to waive, abandon, or assign: (i) the right of the Trust, pursuant

to the Financing Agreement, to receive any proceeds of a public or private sale of the Policy

remaining after Windsor had been paid what it was owed on the loans (*viz.*, premium payments,

interest, and reasonable expenses connected with the sale); and/or (ii) the right of the Trust,

pursuant to the Financing Agreement, to receive any proceeds of the death benefit remaining

after Windsor had been paid what it was owed on the loans (*viz.*, premium payments, interest,

and reasonable expenses connected with collecting the death benefit); and/or

      (c)     Wherein the Trust, at any time, offered to waive, abandon, or assign: (i) the right

of the Trust, pursuant to the Financing Agreement, to receive any proceeds of a public or private

sale of the Policy remaining after Windsor had been paid what it was owed on the loan (*viz.*,

premium payments, interest, and reasonable expenses connected with the sale); and/or (ii) the

right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of the death

benefit remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium

payments, interest, and reasonable expenses connected with collecting the death benefit), in

return for an agreement by Windsor to forgive the loan; and/or

      (d)     comprising an agreement under which the Trust would waive, abandon, or assign:

(i) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of a

public or private sale of the Policy remaining after Windsor had been paid what it was owed on

the loan (*viz.*, premium payments, interest, and reasonable expenses connected

with the sale); and/or (ii) the right of the Trust, pursuant to the Financing Agreement, to receive

any proceeds of the death benefit remaining after Windsor had been paid what it was owed on the

loans (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the

death benefit), in return for Windsor's forgiveness of the loan.

Declaration of Joseph Wood In Support of Motion For Summary Judgment or, in The

Alternative, For Partial Summary Judgment, Collins Action, Case No. 3:14-cv-03713 [Doc. #56],

at pp. 3-4 of 28 [attached to Millrood Declaration as Exhibit 15]; Declaration of Joseph Wood in

Support of Motion For Summary Judgment or, in The Alternative, For Partial Summary

Judgment, in the Acker Action, Case No. 3:14-cv-04651-WHO [Doc. # 78], at pp. 3-4 of 29

[attached to Millrood Declaration as Exhibit 16]; Rebuttal Expert Report of Joseph Wood, at pgs.

33-46 (and record citations provided therein) [attached to Millrood Declaration as Exhibit 32];

Acker Court's September 21, 2015 Order, Case No. 14-cv-04651-WHO [Doc. #68] [attached to

Millrood Declaration as Exhibit 75]; December 22, 2015 Order in Acker granting the Trust's

Motion for Summary Judgment, at pg. 1, Case No. 14-cv-04651-WHO [Doc. #95] [attached to

Millrood Declaration as Exhibit 79]; Collins Court's September 21, 2015 Order [ Doc. #50],

[attached to Millrood Declaration as Exhibit 77]; Collins Court's December 22, 2015 Order

[Doc. #70] [attached to Millrood Declaration as Exhibit 78].

72.     The Bitter Loan became due to Windsor on or about July 8, 2010.   Bitter

Premium Financing Agreement [attached to Millrood Declaration as Exhibit 25

(CONFIDENTIAL)].

73.     No repayment of the Bitter Loan was made by Bitter or the Bitter Trust either

before or subsequent to July 8, 2010.  Barnes Opening Brief in the Bitter AAA Arbitration, at pg.

25 [attached to Millrood Declaration as Exhibit 109 (CONFIDENTIAL)].

74.     On September 8, 2010, Rousseau and Arent Fox, as counsel to Windsor, sent a

letter to Bitter and Bitter's Trustee asserting an event of default for non-payment of the loan and

explaining that, pursuant to Section 6(a) of the Security Agreement, Windsor is entitled to a

transfer of the collateral and registration of the collateral in Windsor's name.  Specifically

Rousseau's September 8, 2010 letter stated in relevant part:

39

I represent the above-named Lender in connection with the loan made under the Financing Agreement. As you know, the maturity date of the loan was July 10, 2010, and payment in full has not been received by the Lender. Mr. Houchins has had several conversations with Mr. Prusky, at the Lender, but the Lender has not heard from the Trustee directly or been told that payment was attempted. Mr. Prusky has advised Mr. Houchins that, since payment was not made when due, title to the policy and its benefits has transferred, by law, directly to the Lender.

Pursuant to the terms of the Security Agreement (attached), the collateral that was posted - the life insurance policy on the insured and all beneficial interests thereto - has become the property of the *Lender. Section 6(a) of the Security Agreement authorized and empowers the Lender to transfer the collateral and register it in the Lender's name by virtue of the Borrower's failure to pay the loan at the maturity date.* The Lender also has irrevocable attorney-in-fact powers to transact the change of ownership.

To expedite the transaction with the life insurance company, we request that the trustee execute on the third page at the "x" by "other required signature," which shows that Mr. Barnes is acting in his capacity as trustee. You are also required to forward the original of the policy to the Lender.

Rousseau's September 8, 2010 correspondence [attached to Millrood Declaration as Exhibit 70

(CONFIDENTIAL)].

75.     The Bitter Trustee and Bitter failed to respond to Rousseau's September 8, 2010

letter.  Windsor's January 14, 2011 letter [attached to Millrood Declaration as Exhibit 72

(CONFIDENTIAL)].

76.     After consulting with Rousseau and in accordance with Rousseau's advice, on

January 14, 2011, Windsor sent a letter to Bitter and the Bitter Trustee reiterating the assertions

in Rousseau's September 8, 2010 letter, stating:

It has been several months since our attorney, Mr. Rousseau wrote to you asking for, among other things, the original insurance policy and - Bitter's signature. We have received no reply. Windsor Securities LLC entered into the Life Insurance Premium Financing Agreement in good faith, and continued to make premiums in good faith. As explained most recently in Mr. Rousseau's September 8 letter (copy enclosed), the Trust defaulted on that Agreement and as a matter of law, Windsor assumed ownership of the Policy. As owner, Windsor has continued to pay

**premiums to Pacific Life since that letter was sent. Windsor has also since been named Irrevocable Beneficiary of the Policy.**

**We ask one more time for your cooperation in sending us the paperwork we requested so that we can conclude our relationship in an amicable fashion. As previously explained to Mr. Houchins we would be more kindly disposed towards the trust should we have your cooperation.**

Windsor's January 14, 2011 letter [attached to Millrood Declaration as Exhibit 72

(CONFIDENTIAL)].

77.     On February 14, 2011, as demanded by Rousseau and Arent Fox and thereafter requested by Windsor, the Bitter Trustee executed Pacific Life's Ownership, Name or Beneficiary Change Request form (the "Bitter COO"), naming Windsor as the new Owner and Beneficiary of the Policy.  Pacific Life's Ownership, Name or Beneficiary Change Request form [attached to Millrood Declaration as Exhibit 88 (CONFIDENTIAL)].

78.     The Pacific Life Insurance Company's Ownership Name or Beneficiary Change Request form executed by the Bitter Trustee ***did not*** contain any language indicating or providing that the Bitter Trust, Trustee, Insured and/or Beneficiary were making a full transfer and assignment of the Insurance Policy ***in consideration of the full and complete satisfaction of all liabilities and obligations*** under the Premium Finance Package, thereby forever relinquishing any and all rights they may have thereunder, including without limitation any rights to cash surrender value and/or death benefit under the Policy, nor did they indicate or provide that Windsor and/or the Bitter Trust, Trustee, Insured and/or Beneficiary were releasing the other from all liabilities and obligations under the Premium Finance Package.  Pacific Life's Ownership, Name or Beneficiary Change Request form [attached to Millrood Declaration as Exhibit 88 (CONFIDENTIAL)].

41

79.    On November 11, 2010, Pacific Life Insurance Company provided a Confirmation of Title Change for the Bitter Policy acknowledging the change of Windsor as irrevocable Beneficiary.  Pacific Life Insurance Confirmation of Title Change [attached to Millrood Declaration as Exhibit 92 (CONFIDENTIAL)].

80.    Rousseau specifically advised Windsor that the executed Bitter COO and surrender of the Bitter Policy effectuated complete ownership of, and entitlement to the death benefits under the Bitter Policy to Windsor.  Rousseau did not suggest or advise that any other document(s) be executed or any other action be taken by Windsor to perfect its ownership in and/or entitlement to the death benefits under the Bitter Policy, and did not discuss Section 9620 of the UCC or California Commercial Code or making a proposal to accept the policy in full satisfaction of all liabilities and obligations.  Dep Tr. Steven Prusky March 6, 2017,  Pgs. 193:12-17, 195:6-12, 196:3-14, 197:2-10 [attached to Millrood Declaration as Exhibit 1]; Dep Tr. Julius Rousseau, individually and as Corporate Designee for Arent Fox, March 7, 2017, Pg. 74:19-22, 152:11-18, 160:17 to 161:22 [attached to Millrood Declaration as Exhibit 3]; December 19, 2013 Email from Rousseau to Prusky [attached to Millrood Declaration as Exhibit 49].

81.    Approximately 20 months later, on December 23, 2012 Bitter died.  Bitter Death Certificate [attached to Millrood Declaration as Exhibit 110 (CONFIDENTIAL)].  Bitter was the first Insured to die, but not the last, as described more fully below.

82.    From the Maturity Date on the Bitter Loan to Bitter's death, Windsor continued to pay the premiums on the Bitter Policy, without which the Bitter Policy would have lapsed. Barnes Opening Brief in AAA Arbitration, at pg. 25 [attached to Millrood Declaration as Exhibit 109 (CONFIDENTIAL)].

42

**Facts Relating to Litigation as to the Death Benefits Under the Bitter Policy**

83.     Following Bitter's death and pursuant to the Pacific Life Change Of Ownership form executed by the Bitter Trustee, Windsor sought to collect the death benefit under the Bitter Policy from Pacific Life Insurance Company.  Complaint [D.E. #1] [attached to Millrood Declaration as Exhibit 8]; and Defendants' Answer, Affirmative Defenses and Counterclaim [D.E. #19], at ¶¶54 [attached to Millrood Declaration as Exhibit 9].

84.     Upon receiving notice of Windsor's attempts to collect the death benefits under the Bitter policy, on February 13, 2013, the Bitter Trustee filed a civil action in the California Superior Court for the County of Sonoma against Windsor claiming that Windsor did not have ownership and/or rights to the death benefits under the Bitter Policy and seeking declaratory relief as to Windsor's entitlement thereto (the "Bitter Action").  Complaint [D.E. #1] [attached to Millrood Declaration as Exhibit 8]; and Defendants' Answer, Affirmative Defenses and Counterclaim [D.E. #19], at ¶¶55 [attached to Millrood Declaration as Exhibit 9].

85.     Windsor was represented in the Bitter Action by Rousseau and Arent Fox. Complaint [D.E. #1] [attached to Millrood Declaration as Exhibit 8]; and Defendants' Answer, Affirmative Defenses and Counterclaim [D.E. #19], at ¶¶56 [attached to Millrood Declaration as Exhibit 9].

86.     Rousseau, on Windsor's behalf, removed the Bitter Action to the United States District Court for the Northern District of California, San Francisco. Complaint [D.E. #1] [attached to Millrood Declaration as Exhibit 8]; and Defendants' Answer, Affirmative Defenses and Counterclaim [D.E. #19], at ¶¶57 [attached to Millrood Declaration as Exhibit 9].

87.     Pacific Life Insurance Company then filed an Interpleader action in the Bitter

43

Action and the Two Million Dollars ($2,000,000) of death benefits under the Bitter Policy, less

Pacific Life's interpleader expenses, were deposited in the registry of the United States District

Court for the Northern District of California.   Complaint [D.E. #1] [attached to Millrood

Declaration as Exhibit 8]; and Defendants' Answer, Affirmative Defenses and Counterclaim

[D.E. #19], at ¶¶58 [attached to Millrood Declaration as Exhibit 9].

88.     Because the Bitter Premium Finance Package provided that all disputes were to be

determined by a panel of three (3) arbitrators in San Francisco, California, under the Commercial

Arbitration Rules of the American Arbitration Association, the Bitter Action was referred to the

American Arbitration Association (the "Bitter Arbitration") and the United States District Court

for the Northern District of California stayed the Bitter Action pending the Bitter Arbitration.

Complaint [D.E. #1] [attached to Millrood Declaration as Exhibit 8]; and Defendants' Answer,

Affirmative Defenses and Counterclaim [D.E. #19], at ¶¶59 [attached to Millrood Declaration as

Exhibit 9].

89.     Rousseau and Arent Fox chose two (2)- of the three (3)- arbitration panel

members in the Bitter Arbitration, and the Chair of the Bitter Arbitration Panel was retired

Federal Judge Eugene F. Lynch, who served until his retirement on the United States District

Court for the Northern District of California.  Dep Tr. Julius Rousseau, individually and as

Corporate Designee for Arent Fox, March 7, 2017, Pg. 199:7-9 [attached to Millrood Declaration

as Exhibit 3] ("Q.  Isn't it true that your side picked two of the three arbitrators?  A.  We did. ");

American Arbitration Association April 8, 2014 Interim Award [attached to Millrood Declaration

as Exhibit 73]

90.     Throughout the Bitter Arbitration, Rousseau and Arent Fox assured Windsor that it had gained ownership to the Bitter Policy by reason of the Bitter Trust's default in failing to make payment of the loan when it became due in July of 2010, Rousseau's September 8, 2010 letter and Windsor's January 14, 2011 letter, and that such ownership became absolute when the Bitter Trustee executed the Bitter COO that formally transferred the Bitter Policy on February 14, 2011 and subsequently surrendered the original of the Policy to Windsor.  In fact, Rousseau and Arent Fox repeatedly strongly counseled against Windsor's suggestion to settle the Bitter Arbitration and Action advising, in part, that Windsor had made the "offer" required under either the Default Sale Right in the Premium Finance Package and/or California law, if and to the extent that California Commercial Code Section 9620 applied when Windsor wrote to the Trustee on September 8, 2010 and January 14, 2011 stating, "We ask one more time for your cooperation in sending us the paperwork we requested so that we can conclude our relationship in an amicable fashion."  Dep Tr. Julius Rousseau, individually and as Corporate Designee for Arent Fox, March 7, 2017, Pg. 182:9-16, 189:18-190:23, 202:7-204:2 [attached to Millrood Declaration as Exhibit 3]; Dep Tr. Steven Prusky March 6, 2017,  Pgs. 193:12-17, 195:6-12, 196:3-14, 197:2-10 [attached to Millrood Declaration as Exhibit 1].

91.     In the Bitter Arbitration, the Bitter Trustee argued that the Bitter Trust was not in default at the time that Windsor sought to take ownership of the Bitter Policy and, even if it was, Windsor failed to satisfy the requirements of the "Default Sale Right" provision contained in the Bitter Assignment and also failed to comply with the "strict foreclosure" procedures under California Civil Code Section 9620, California's version of the Uniform Commercial Code ("UCC"), and therefore Windsor's rights rather were that of a secured party entitled to recover

45

only the monies it advanced for premiums, plus interest, closing costs, and expenses, and was not entitled the death benefits under the Bitter policy. American Arbitration Association April 8, 2014 Interim Award [attached to Millrood Declaration as Exhibit 73]; Complaint [D.E. #1] [attached to Millrood Declaration as Exhibit 8]; and Defendants' Answer, Affirmative Defenses and Counterclaim [D.E. #19],at ¶¶62 [attached to Millrood Declaration as Exhibit 9].

92.     On April 8, 2014, following three days of hearing testimony from multiple witnesses (February 13-15, 2014), extensive briefing by Rousseau and Arent Fox on Windsor's behalf, review of hundreds of exhibits, and hours of argument by Rousseau (on March 5, 2014), the American Arbitration Association panel entered an Interim Award in the Bitter Arbitration in favor of the Bitter Trust, wherein it found and decided that the Bitter Trust at the time of Mr. Bitter's death retained ownership of the Bitter Policy. Specifically the Interim Award states, in relevant part, as follows:

> **the Trust at the time of Mr. Bitter's death retained the ownership of the policy and is entitled to the death benefits of the policy subject to Windsor's rights as a secured creditor to collect all sums due it by reason of its payment of the insurance premiums including principal, interest, at the rate of 10% from the date of the initial payment to the present and expenses as defined in the loan documents.**

American Arbitration Association April 8, 2014 Interim Award, at pg. 7 [attached to Millrood Declaration as Exhibit 73].

93.     The Arbitration Panel specifically found that "Windsor failed to comply with the Default Sales provision in the [Bitter] Collateral Assignment Agreement and California Civil Code §9620." American Arbitration Association April 8, 2014 Interim Award, at pg. 4 [attached to Millrood Declaration as Exhibit 73].

94.     The Arbitration Panel specifically held that Windsor failed to comply with the

Default Sales Provision in the Bitter Collateral Assignment for the following reasons:

> **There is no direct evidence in this record that Windsor notified Barnes [the Bitter Trustee] that by reason of the non-payment of the loan it intended to exercise the Default Sale Right provision in the Assignment Agreement.** *Although the letter from Windsor's counsel of September 8, 2010 in its heading referenced the Assignment Agreement among other documents, the body of the letter makes reference to Section 6(a) of the Security Agreement as the basis for the demand that Barnes execute the COO transferring all ownership rights to Windsor as a matter of law.*
>
> *The rights granted to Windsor under the terms of Section 6(a) are solely to protect its secured interests and do not purport to give Windsor unfettered ownership of the policy or a right to keep any death benefits in excess of its secured interests.* **Windsor argues that even though there may be no direct evidence, the conduct of the parties reflect that Barnes believed that the COO ended any interest the Trust might have in the policy and that Barnes never took any action that would reflect that he believed the Trust retained any right to the benefits once he delivered the COO. It also argues that Windsor took no steps against the Trust once it obtained the COO.**
>
> *Because Section 6(a) contemplated the execution of a COO under circumstances wherein Barnes was not giving up all rights in the policy, its execution is at best ambiguous.  Absent express notification to Barnes that Windsor was invoking its Default Sale Right, the record does not support a finding that Barnes' execution of the COO and surrender of the policy conveyed to Windsor unfettered title to the policy and the death benefit.*

American Arbitration Association April 8, 2014 Interim Award, at pg. 5 (emphasis added)

[attached to Millrood Declaration as Exhibit 73]

95.     The Arbitration Panel specifically held that Windsor failed to comply with

California Civil Code §9620 for the following reasons:

> **Under Cal. Civ. Code § 9620, Windsor had two options to obtain unfettered ownership of the Bitter policy and its death benefit.  One option for Windsor was to enter into a written agreement, post-default, with Barnes whereby Windsor released Barnes and the Trust from all obligations in exchange for Barnes conveying outright ownership of the policy.**
>
> **Windsor acknowledged that it did not do so.**

47

> **Windsor's other option was "strict foreclosure," whereby Windsor agreed to accept the policy as full satisfaction of the Bitter loan pursuant to a "record authenticated" after default.**
>
> **\*\*\***
>
> **Windsor contends that in the context of the September 8, 2010 and January 14, 2011 letters from Windsor and its Counsel, and execution of the COO by Barnes constitutes an authenticated record evidencing that Windsor accepted the COO and surrender of the Policy in full satisfaction of the Trust's obligations under the financing documents. The record does not support this contention.**
>
> **There is nothing in either the September 8, 2010 letter or the January 14, 2001 letter that expresses an acceptance by Windsor of the collateral in full satisfaction of the obligation. Both are silent on this point.**
>
> **Windsor therefore did not satisfy the "strict foreclosure" requirement under § 9620(c)(2).**
>
> **Just as was discussed above in connection with the Default Sale Right, nothing in the demand letters sent by counsel for Windsor or by Windsor itself contained a proposal stating that Windsor was prepared to accept the policy in full satisfaction of the liability owed to it; thus, the execution of the COO by Barnes also does not satisfy the proposal requirements of §9620(c)(2)(A)-(C).**

American Arbitration Association April 8, 2014 Interim Award, at pgs. 6-7 [attached to Millrood Declaration as Exhibit 73].

96.     As outlined above, the decision in the Bitter Arbitration was directly based on Rousseau and Arent Fox's failures and incorrect advice, including, but not limited to, the failure to obtain a formal written release from the Trust/Trustee, the failure to document that Windsor accepted and the Trust transferred the Bitter Policy in full satisfaction of the Trust's liabilities to Windsor, and the fact that the September 8, 2010 letter Rousseau and Arent Fox did send quoted and relied on Section 6(a) of the Security Agreement, which was the wrong section of the Financing Agreement to rely upon for Windsor to have unfettered ownership and clean title in the Premium Finance Policy and all rights thereunder, including entitlement to the death benefit.

American Arbitration Association April 8, 2014 Interim Award [attached to Millrood Declaration as Exhibit 73].

97.     As a result of the adverse ruling by the Bitter Arbitration Panel, Windsor incurred substantial legal fees and was forced to settle the Bitter Action for a fraction of the full death benefits under the Bitter Policy, causing it Millions in damage.  Bitter Settlement Agreement [attached to Millrood Declaration as Exhibit 113 (CONFIDENTIAL)].

### Facts Relating to Defendants' Actions on the Collins, Acker, Coppock, and Stamatov Policies Following the Bitter Arbitration Award

98.     Following the Arbitration Panel's Interim Order in the Bitter Arbitration, Windsor and Rousseau specifically discussed protecting the death benefits regarding the other four (4) Premium Financed Policies (Collins, Acker, Coppock and Stamatov), documentation for those Policies, Windsor's ownership of those Premium Finance Policies, and Windsor's entitlement to the death benefits under each respective Policy, and Prusky, on Windsor's behalf, specifically advised Rousseau that Windsor needed "something concerning the default sales right" to address the "problems in Bitter [which] were: 'nothing in [Rousseau's] 9/8/10 and 9/14/11expressed an acceptance of the COOS as full satisfaction of loan'; nothing in the demand letters by counsel or Windsor contained a proposal sating ... the COO was in acceptance as full satisfaction of liability'; no written agreement post-default; nothing in writing from Barnes that he consented to the deal...".  April 14, 2014 Email from Rousseau to Alan Dubin [attached to Millrood Declaration as Exhibit 51 (CONFIDENTIAL)] ("As I mentioned, we need to advise client on other cases where the borrowers surrendered the policies by signing COO forms. In each of the 4 key cases, the ownership was actually processed by carrier, and the change occurred PRIOR to default, so 9620 is not involved, I believe?. ..."); April 15, 2014 Email from Prusky to Rousseau

subject "Other COOs" ("We need something confirming the default sales right....") [attached to

Millrood Declaration as Exhibit 52 (CONFIDENTIAL)]; April 13, 2014 Email from Prusky to

Rousseau ("right now the most important thing is protecting the other policies. One could die

tomorrow and we'd have this to contend with. Let's get that fixed asap!") [attached to Millrood

Declaration as Exhibit 50].

99.    Nevertheless, Rousseau and Arent Fox assured Windsor that Windsor's

ownership of those Policies was absolute and that Windsor would be, by virtue of the executed

insurance Change of Ownership and Beneficiary Forms, and by operation of law, entitled to the

death benefits for each Policy. Rousseau specifically suggested that requiring and/or obtaining

any further documentation with respect to each of these Policies could "only cause more trouble."

Dep Tr. Steven Prusky March 6, 2017, Pgs. 207:23-209:5 [attached to Millrood Declaration as

Exhibit 1]; April 17, 2014 Email from Alan Dubin to Rousseau [attached to Millrood Declaration

as Exhibit 53 (CONFIDENTIAL)]; July 31, 2014 Email Chain between Rousseau and Prusky

(wherein Rousseau comments on the likelihood of success on each of the other policies)[attached

to Millrood Declaration as Exhibit 57 (CONFIDENTIAL)]; July 14, 2014 Email Chain between

Rousseau and Prusky [attached to Millrood Declaration as Exhibit 55 (CONFIDENTIAL)].

100.    After going back and forth on the issue with Rousseau for two (2) months, and

Defendants providing drafts, Windsor on June 1, 2014 sent to each Trustee (the Collins Trustee,

the Acker Trustee, the Coppock Trustee, and the Stamatov Trustee) a letter reiterating what

Rousseau and Arent Fox had repeatedly advised Windsor, which was that Windsor had received

full ownership of the Policy in 2010 in exchange for a full release of any financial obligations

under the Loan. Letter to Collins Trustee [attached to Millrood Declaration as Exhibit 59

(CONFIDENTIAL)]; Letter to Acker Trustee [attached to Millrood Declaration as Exhibit 60

(CONFIDENTIAL)]; Letter to Coppock Trustee [attached to Millrood Declaration as Exhibit 61

(CONFIDENTIAL)]; Letter to Stamatov Trustee [attached to Millrood Declaration as Exhibit 62

(CONFIDENTIAL)]; April 18, 2014 Emails from to/from Alan Dubin and Rousseau [attached to

Millrood Declaration as Exhibit 54 (CONFIDENTIAL)].

101.    However, unbeknownst to Windsor, on April 15, 2014 Acker died, and shortly

thereafter, on June 19, 2014, Collins died.  Death Certificate for Joe Edwin Acker [attached to

Millrood Declaration as Exhibit 111 (CONFIDENTIAL)]; Death Certificate for Erwin Atchley

Collins [attached to Millrood Declaration as Exhibit 112 (CONFIDENTIAL)].

102.    On November 4, 2014, the Coppock Trustee responded to Windsor's June 1, 2014

letter advising that he had contacted an unnamed attorney and claimed that he disagreed that the

Coppock Trust had no rights to the Policy or any portion of it, though he did not dispute that the

Trust had informed Windsor that it was not willing to repay the Loan. November 4, 2014

Coppock Trustee Letter [attached to Millrood Declaration as Exhibit 82].

103.    On November 12, 2014, the Stamatov Trustee responded to Windsor's June 1,

2014 letter advising that he had contacted an unnamed attorney and that he disagreed that the

Trust had no rights to the Policy or any portion of it, though he did not dispute that the Trust had

informed Windsor that it was not willing to repay the Loan.  November 12, 2014 Stamatov

Trustee letter [attached to Millrood Declaration as Exhibit 83].

### Facts Relating to Windsor's Termination of Defendants Rousseau and Arent Fox and Windsor's Engagement of Replacement Counsel

104.    Defendants Rousseau and Arent Fox advised Windsor after the Bitter Arbitration

and throughout the summer of 2014 in connection with settlement negotiations concerning the

Policies. Emails To/From Prusky and Rousseau [attached to Millrood Declaration as Exhibit 58 (CONFIDENTIAL)].

105.   Rousseau and Arent Fox represented Windsor regarding the Premium Finance Policies until Windsor terminated the representation by letter dated September 9, 2014. September 9, 2014 letter terminating Rousseau and Arent Fox's representation of Windsor [attached to Millrood Declaration as Exhibit 71].

106.   On August 19, 2014, Windsor, by and through Prusky, contacted Darin T. Judd, Esquire regarding retaining he and his firm to represent Windsor in the case of Pacific Life Insurance Company v. Maria Ana Gordillo, as Trustee of the Erwin A. Collins Family Insurance Trust-2008 and Windsor Securities, LLC (the "Collins Matter"), wherein the Collins Trustee was contesting Windsor's entitlement to the death benefits under the Collins Policy. Declaration of Darin T. Judd filed in this action in Support of Windsor's Response to Defendants Motion to Compel Discovery [D.E. #60-2], at ¶7 [attached to Millrood Declaration as Exhibit 17].

107.   At this same time, at the end of August of 2014, Prusky notified Judd that the Acker Trustee was also contesting Windsor's entitlement to the death benefits under the Acker Policy, similar to the Collins Matter, and that another lawsuit would likely be filed by John Hancock Life Insurance Company related thereto, also on which Defendants Rousseau and Arent fox provided the transactional legal advice. Declaration of Darin T. Judd filed in this action in Support of Windsor's Response to Defendants Motion to Compel Discovery [D.E. #60-2], at ¶8 [attached to Millrood Declaration as Exhibit 17].

108.   At no time did Darin Judd or anyone at his Firm provide any transactional advice regarding the transfer of ownership or the perfecting of Windsor's security interests in the five

52

life insurance policies that are the subject of the malpractice claims; rather, Darin Judd and his firm were retained by Windsor to represent it in the litigation that ensued with the Acker, Collins, Coppock and Stamatov Policies, described more fully below. Declaration of Darin T. Judd filed int his action in Support of Windsor's Response to Defendants Motion to Compel Discovery [D.E. #60-2], at ¶11 [attached to Millrood Declaration as Exhibit 17].

109.    The legal advice related to the perfecting of Windsor's security interest in the five life insurance policies and the transfer of ownership as to the death benefit for each of these policies all occurred in the time period of 2008-2012, years prior to Judd and/or his firm's involvement and engagement by Windsor. Declaration of Darin T. Judd filed in this action in Support of Windsor's Response to Defendants Motion to Compel Discovery [D.E. #60-2], at ¶11 [attached to Millrood Declaration as Exhibit 17].

110.    In June of 2015 Lauren Antonino, Esquire and her firm were engaged to represent Windsor and assist Darin Judd and his firm with discovery in the then pending Acker and Collins cases, wherein Windsor was being represented by Judd and his firm. Affidavit of Lauren Antonino, Esquire  Affidavit of Lauren Antonino filed in Support of Windsor's Response to Defendants Motion to Compel Discovery [D.E. #60-3], at ¶2 [attached to Millrood Declaration as Exhibit 18].

111.    Neither Darin Judd (nor any other lawyers from his firm), nor Lauren Antonino (nor any lawyers from her firm), ever gave transactional legal advice to Windsor with respect to the management of any of the policies at issue in this litigation or perfecting entitlement to the benefits thereunder, which was solely the province and responsibility of the Defendants. Declaration of Darin T. Judd filed in this action in Support of Windsor's Response to Defendants

53

Motion to Compel Discovery [D.E. #60-2], at ¶11 [attached to Millrood Declaration as Exhibit 17]; Affidavit of Lauren Antonino filed in Support of Windsor's Response to Defendants Motion to Compel Discovery [D.E. #60-3], at ¶13 [attached to Millrood Declaration as Exhibit 18].

### Facts Relating to the Litigation of the Acker, Collins, Coppock and Stamatov Policies

**The Acker Action**

112.    On or about July 22, 2014, the Acker Trustee sent a letter to John Hancock Life Insurance Company wherein she asserted a claim to the death benefits under the Acker Policy. July 22, 2014 Letter [attached to Millrood Declaration as Exhibit 66 (CONFIDENTIAL)].

113.    As both Windsor and the Acker Trust were claiming the death benefits under the Acker Policy, on October 17, 2014, the John Hancock Insurance Company filed a lawsuit for declaratory relief and interpleader in the United States District Court for the Northern District of California, Case No. 14-cv-04651-WHO (the "Acker Action") to determine the entitlements of the Acker Trust and Windsor in and to the death benefits due under the Acker Policy. Complaint [D.E. #1] [attached to Millrood Declaration as Exhibit 8]; and Defendants' Answer, Affirmative Defenses and Counterclaims [D.E. #19] at ¶¶93 [attached to Millrood Declaration as Exhibit 9]; John Hancock Interpleader Complaint in the Acker Action, Case No. 14-cv-04651-WHO, [attached to Millrood Declaration as Exhibit 98]; July 31, 2014 letter from John Hancock re competing claims to the Death Benefits [attached to Millrood Declaration as Exhibit 67].

114.    In the Acker Action, the Acker Trustee filed a cross-claim against Windsor alleging, in part, that neither the terms of the Security Agreement, nor any other portion of the Financing Agreement, provided that execution of the Assignment and COO by the Trustee would

54

make Windsor the outright owner of the Acker Policy, would entitle Windsor either to the entirety of the Death Benefit under the Policy or to any other amount in excess of the sum due to Windsor in its capacity as a secured lender, viz., the total of the amounts loaned by Windsor to the Trust, plus legal interest (10% per annum) thereon, plus Windsor's reasonable expenses, if any existed, incurred in enforcing and/or protecting its security interest. Answer and Cross Claim of Acker Trustee in Acker Action, Case No. 14-cv-04651-WHO [attached to Millrood Declaration as Exhibit 74].

1156. The Acker Trustee further argued in its Cross Claim that "subsequent to Windsor's having loaned to the Trust all of the monies for premium payments that Windsor was required to provide under the Financing Agreement, the Trust informed Windsor that the Trust would not repay the loan when due. The Trust thereby committed an anticipatory breach of, and default under, the Financing Agreement, entitling Windsor, pursuant to the Security Agreement and to California law governing secured transactions like the one here at issue, to [only] the [following] relief":

    **(a)**    **to sell the Policy collateral at a noticed public or private sale, at which sale Windsor, the Trust, the Insured, or any other person or entity could bid in an effort to purchase the Policy;**

    **(b)**    **to take from the proceeds of that sale a sum equal to the total of the amounts loaned by Windsor to the Trust, plus legal interest (10% per annum) thereon, plus Windsor's reasonable expenses, if any existed, incurred in enforcing and/or protecting its security interest;**

    **(c)**    **to recover from the Trust, with no requirement of first having recourse to the Policy collateral, all monies owed by the Trust by Windsor; and**

    **(d)**    **should sale of the Policy collateral not generate proceeds sufficient to pay what was owed by the Trust to Windsor, to recover from the Trust the amount of any such deficiency.**

**Also pursuant to the terms of the Security Agreement and to California law governing secured transactions like the one here at issue, any proceeds of sale in excess of what was owed by the Trust to Windsor were required to be paid to the**

**Trust by Windsor."**

Answer and Cross Claim of Acker Trustee in Acker Action, Case No. 14-cv-04651-WHO [attached to Millrood Declaration as Exhibit 74].

116.    On July 8, 2015, Windsor moved for Summary Judgment or, in the alternative, Partial Summary Judgment in the Acker Action claiming that the Acker Assignment demonstrated that there had been an exercise of the Default Sales Right contained in the Acker Premium Finance Package and that it was entitled to the full amount of death benefits under the Acker Policy. Complaint [D.E. #1] [attached to Millrood Declaration as Exhibit 8]; and Defendants' Answer, Affirmative Defenses, and Counterclaims [D.E. #19], at ¶¶96 [attached to Millrood Declaration as Exhibit 9]; Windsor's Motion for Summary Judgment or, in the alternative, Partial Summary Judgment in the Acker Action, Case No. 14-cv-04651-WHO [Doc. #30 and 30-1] [attached to Millrood Declaration as Exhibit 99].

117.    In its response thereto, the Acker Trust did not dispute that it executed the Assignment, or that it defaulted under the terms of the Acker Premium Finance Agreement; instead, the Trust asserted that the Assignment it entered into after its anticipatory breach was not an exercise of, or evidence of, an exercise of the Default Sales Right and did not comply with California UCC law. Complaint [D.E. #1] [attached to Millrood Declaration as Exhibit 8]; and Defendants' Answer, Affirmative Defenses, and Counterclaims [D.E. #19], at ¶¶97 [attached to Millrood Declaration as Exhibit 9]; Acker Trust's Response to Windsor's Motion for Summary Judgment or, in the alternative, Partial Summary Judgment in the Acker Action, Case No. 14-cv-04651-WHO [Doc. #37] (without attached Declarations and Exhibits) [attached to Millrood Declaration as Exhibit 102].

118.    On September 21, 2015 the Court in the Acker Action entered an Order denying

Windsor's Motion for Summary Judgment, specifically finding that "the Assignment does not

constitute an exercise of the DSR, and the purported acceptance of the insurance proceeds in full

satisfaction of the Trust's debt does not comply with section 9620 [of the California Commercial

Code]". Acker Court's September 21, 2015 Order, Case No. 14-cv-04651-WHO [Doc. #68]

[attached to Millrood Declaration as Exhibit 75].

119.    The Court further specifically held, as did the Arbitration Panel in the Bitter

Arbitration, that "Windsor is entitled to retain from the Death Benefit ***only*** a sum equal to the

amounts Windsor has loaned to the Trust, plus legal interest thereon, plus Windsor's reasonable

expenses, if any exist, incurred in collecting or enforcing the Policy collateral, and that the Trust

is entitled to the portion of the Death Benefit remaining after that sum has been paid." Acker

Court's September 21, 2015 Order, Case No. 14-cv-04651-WHO [Doc. #68], at pg. 10 [attached

to Millrood Declaration as Exhibit 75 (emphasis added)].

120.    In so holding the Court stated, in relevant part:

**At issue is whether the Assignment satisfies the provisions of California Commercial
Code section 9620(c)(2). This statute contemplates two ways in which a debtor may
consent to relinquish its claim to collateral. Windsor argues that it has satisfied the
first form of satisfaction and that the Trust "agree[d] to the terms of the acceptance
in a record authenticated after default." CAL. COM. CODE § 9620(c)(2). It is
undisputed that the Assignment itself does not contain any language that the
transfer of ownership satisfied the Trust's liabilities under the PFA**

**\* \* \***

**Windsor's argument is unpersuasive for several reasons, starting with its
understanding of the statute. Section 9620 requires an *agreement* "to the terms of
the acceptance in a record authenticated after default." An agreement is not simply
a transfer. Section 9602 requires that the agreement include the terms of the
acceptance "of collateral in full satisfaction of the obligation it secures." Because the
Assignment does not reflect any agreement to transfer the collateral in exchange for
a satisfaction of the Trust's obligations, the Trust cannot be considered to have**

57

consented under the terms of section 9620.
***
In addition, section 9620 provides that a debtor's consent to acceptance of collateral must be made in an agreement *after default.* The statute repeatedly uses the language of a "record authenticated after default." This is made clear because an agreement to any terms before default would constitute an improper waiver of the rights in section 9620(b). Thus, any construction of the DSR as requiring the Trust to transfer the policy to Windsor in full satisfaction of its obligations pre-default would violate section 9602 . By its plain terms, the Assignment does not satisfy section 9620.
***
Windsor is also incorrect in asserting that the Assignment was simply an execution of the DSR. The DSR allows Windsor to request, *"in consideration of the full and complete satisfaction of the Liabilities* . . . [that the Trust] make a full transfer and assignment of the Insurance Policy to Assignee and thereby forever relinquish any and all rights Owner may have thereunder, including without limitation any rights to cash surrender value and/or death benefit provided thereunder." PFA, Doc. No. 15 at 4 (emphasis added). Again, although the Assignment makes a full assignment of the policy to Windsor, it does not provide that the transfer of title or change in beneficiary was in "consideration of the full and complete satisfaction of the Liabilities." Just as the lack of such language fails to satisfy the requirements of section 9620, it also fails to satisfy the requirements of the DSR as defined in the PSA. Without such language or any reference to the DSR, it is not clear that the document the Trust signed was the DSR.

***
...even assuming the PFA did not require the Assignment in order for Windsor to foreclose after default, Windsor would not be relieved of its obligation to comply with California law. That Windsor did not need to execute the Assignment does not change the fundamental fact that the Assignment does not discharge the obligations of the Trust under the PFA
***
Windsor's argument that there was a separate offer and acceptance that satisfies section 9620... fails because section 9620 requires a writing that contains the terms of acceptance.

Acker Court's September 21, 2015 Order,  Case No. 14-cv-04651-WHO [Doc. #68] at pgs. 7-8

[attached to Millrood Declaration as Exhibit 75].

121.    Following the September 21, 2015 Order denying Windsor's Motion for Summary

Judgment, on December 22, 2015 the Court in the Acker Action granted the Acker Trust's

58

Motion for Summary Judgment. Thus, the Acker Court determined - - as a matter of law - - that the legal advice provided by Rousseau and Arent Fox to Windsor regarding ownership of and entitlement to the death benefits under the Acker Policy by virtue of the execution of the COOs, and what was required for Windsor to have executed by the Trustee so that Windsor would unquestionably have unfettered ownership to the Policies and all entitlements thereunder was incorrect, and therein stated that the Court "denied Windsor's motion for summary judgment, principally on the ground that Windsor had not demonstrated compliance with California Commercial Code § 9620, a California statute governing the disposition of collateral in secured transactions." December 22, 2015 Order in Acker granting the Trust's Motion for Summary Judgment, at pg. 1, Case No. 14-cv-04651-WHO [Doc. #95] [attached to Millrood Declaration as Exhibit 79].

122.     The Court in the Acker Action and the Arbitration Panel in the Bitter Action both concluded that there was language that should have been added to the documents executed by the Trust at the time the Trust Executed the Change of Ownership form to demonstrate unambiguously that the change in ownership of the insurance policy was "in consideration of the full and complete satisfaction of the liabilities", and "that the Assignment [Change of Ownership Form] does not establish a legal surrender of the life insurance policy, because the Assignment does not reflect an agreement to accept collateral in full or partial satisfaction of the Trust's obligations under the PFA [Premium Finance Package], as required by section 9620". December 22, 2015 Order in Acker granting the Trust's Motion for Summary Judgment, at pg. 1, Case No. 14-cv-04651-WHO [Doc. #95] [attached to Millrood Declaration as Exhibit 79]; American Arbitration Association April 8, 2014 Interim Award [attached to Millrood Declaration as

Exhibit 73].

123.    Had Rousseau and Arent Fox properly documented Windsor's intent and the

Trust's agreement for Windsor to accept the policy in full satisfaction of the Trust's obligations

under the Premium Finance Package, and included the language that Defendant Rousseau had

previously included and required the Gilbert and Garcia Trusts to execute in the Loan

Satisfaction and Policy Relinquishment Agreement signed by the Gilbert Trust and the 9620

Proposal signed by the Garcia Trust, and/or the draft Loan Satisfaction and Policy

Relinquishment Agreement that David Fox had forwarded to Rousseau on August 25, 2009, any

ambiguity of the parties' intent and/or intent to satisfy the Default Sales Right and/or Section

9620, to the extent applicable, would have been avoided and Windsor would have absolutely and

as a matter of law been entitled to ***all*** of the death benefits of the Acker Policy.  Acker Court's

September 21, 2015 Order [attached to Millrood Declaration as Exhibit 75]; American

Arbitration Association April 8, 2014 Interim Award [attached to Millrood Declaration as

Exhibit 73]; August 25, 2009 Email from David Fox to Rousseau attaching draft Policy

Relinquishment and Loan Satisfaction Agreement [attached to Millrood Declaration as Exhibit

40 (CONFIDENTIAL)]; March 16, 2010 proposal, counter-executed by Garcia on March 31,

2010 [attached to Millrood Declaration as Exhibit 20]; Expert Reports, Rebuttal Reports and

Reply Reports of Sandra Stern and Joseph Wood [attached to Millrood Declaration as Exhibits

30-35].

124.    As a result of the adverse ruling in the Acker Action, Windsor incurred substantial

legal fees and was forced to settle the Acker Action for significantly less than the full death

benefits under the Acker Policy.  Acker Settlement Agreement [attached to Millrood Declaration

as Exhibit 114 (CONFIDENTIAL)].

### The Collins Litigation

125.    On or about July 15, 2014, the Collins Trustee sent a letter to Pacific Life
Insurance Company wherein she asserted a claim to the death benefits under the Collins Policy.
July 15, 2014, Letter to Pacific Life [attached to Millrood Declaration as Exhibit 65].

126.    As both Windsor and the Collins Trust were claiming the death benefits under the
Collins Policy, on October 17, 2014, the Pacific Life Insurance Company filed a lawsuit for
declaratory relief and interpleader in the United States District Court for the Northern District of
California, Case No. 14-cv-03713-WHO (the "Collins Action") to determine the entitlements of
the Collins Trust and Windsor in and to the death benefits due under the Collins Policy.
Complaint [D.E. #1] [attached to Millrood Declaration as Exhibit 8]; and Defendants' Answer,
Affirmative Defenses and Counterclaims [D.E. #19], at ¶¶121 [attached to Millrood Declaration
as Exhibit 9]; Pacific Life Interpleader Complaint in the Collins Action [attached to Millrood
Declaration as Exhibit 101].

127.    The Collins Trust/Trustee filed an Answer and a Cross Claim in the Collins
Action against Windsor and made the identical arguments of entitlement to the death benefits
that were made in the Acker Action.  Answer and Cross Claim of Collins Trustee in Collins
Action, Case No. 14-cv-03713-WHO [Doc. #16] [attached to Millrood Declaration as Exhibit
76];  Answer and Cross Claim of Acker Trustee in Acker Action, Case No. 14-cv-04651-WHO
[Doc. #9][attached to Millrood Declaration as Exhibit 74].

128.    On July 8, 2015, Windsor moved for Summary Judgment, or, in the alternative,
Partial Summary Judgment in the Collins Action making the identical arguments made in the

Acker Action. Complaint [D.E. #1] [attached to Millrood Declaration as Exhibit 8]; and

Defendants' Answer, Affirmative Defenses and Counterclaims [D.E. #19], at ¶¶123 [attached to

Millrood Declaration as Exhibit 9]; Windsor's Motion for Summary Judgment in the Collins

Action, Case No. 14-cv-03713-WHO [Doc. #31, and #31-1] (without attached Declarations and

Exhibits) [attached to Millrood Declaration as Exhibit 100]; Motion for Summary Judgment in

Acker Action, Case No. 14-cv-04651-WHO [Doc. #30] ] (without attached Declarations and

Exhibits) [attached to Millrood Declaration as Exhibit 99].

129.    On September 21, 2015 the Court in the Collins Action (the same judge presided

over the Summary Judgment Motions in the Acker and Collins Actions) entered an Order

denying Windsor's Motion for Summary Judgment, specifically finding that "the Assignment

does not constitute an exercise of the DSR, and the purported acceptance of the insurance

proceeds in full satisfaction of the Trust's debt does not comply with section 9620 [of the

California Commercial Code]". Collins Court's September 21, 2015 Order [ Doc. #50] [attached

to Millrood Declaration as Exhibit 77].

130.    The Collins Court further specifically held, as did the Arbitration Panel in the

Bitter Arbitration, that "Windsor is entitled to retain from the Death Benefit ***only*** a sum equal to

the amounts Windsor has loaned to the Trust, plus legal interest thereon, plus Windsor's

reasonable expenses, if any exist, incurred in collecting or enforcing the Policy collateral, and

that the Trust is entitled to the portion of the Death Benefit remaining after that sum has been

paid." Collins Court's September 21, 2015 Order [ Doc. #50] (emphasis added) [attached to

Millrood Declaration as Exhibit 77].

131.    Following the September 21, 2015 Order denying Windsor's Motion for Summary

Judgment, on December 22, 2015 the Court in the Collins Action granted the Collins Trust's

Motion for Summary Judgment. Collins Court's December 22, 2015 Order [ Doc. #70] [attached

to Millrood Declaration as Exhibit 78].

132.    Thus, the Collins Court determined -- as a matter of law -- that the legal advice

provided by Rousseau and Arent Fox to Windsor regarding ownership of and entitlement to the

death benefits under the Collins Policy by virtue of the execution of the COOs, and what was

required for Windsor to have executed by the Trustee so that Windsor would unquestionably

have unfettered ownership to the Policies and all entitlements thereunder was incorrect and the

Court stated that it "denied Windsor's motion for summary judgment, principally on the ground

that Windsor had not demonstrated compliance with California Commercial Code § 9620, a

California statute governing the disposition of collateral in secured transactions." Collins

Court's December 22, 2015 Order [ Doc. #70] [attached to Millrood Declaration as Exhibit 78].

133.    Had Rousseau and Arent Fox properly documented Windsor's intent and the

Trust's agreement for Windsor to accept the policy in full satisfaction of the Trust's obligations

under the Premium Finance Package, and included the language that Defendant Rousseau had

previously included and required the Gilbert and Garcia Trusts to execute in the Loan

Satisfaction and Policy Relinquishment Agreement signed by the Gilbert Trust and the 9620

Proposal signed by the Garcia Trust, and/or the draft Loan Satisfaction and Policy

Relinquishment Agreement that David Fox had forwarded to Rousseau on August 25, 2009, any

ambiguity of the parties' intent and/or intent to satisfy the Default Sales Right and/or Section

9620, to the extent applicable, would have been avoided and Windsor would have absolutely and

63

as a matter of law been entitled to *__all__* of the death benefits of the Collins Policy. Collins Court's

September 21, 2015 Order [ Doc. #50] [attached to Millrood Declaration as Exhibit 77];

American Arbitration Association April 8, 2014 Interim Award [attached to Millrood Declaration

as Exhibit 73]; August 25, 2009 Email from David Fox to Rousseau attaching draft Policy

Relinquishment and Loan Satisfaction Agreement [attached to Millrood Declaration as Exhibit

40 (CONFIDENTIAL)]; March 16, 2010 proposal, counter-executed by Garcia on March 31,

2010 [attached to Millrood Declaration as Exhibit 20].

134.    As a result of the adverse ruling in the Collins Action, Windsor incurred

substantial legal fees and was forced to settle the Collins Action for significantly less than the

full death benefits under the Acker Policy.  Collins Settlement Agreement [attached to Millrood

Declaration as Exhibit 115 (CONFIDENTIAL)].

**The Coppock Litigation**

135.    On January 7, 2015, Windsor filed a Complaint for Declaratory Relief with

respect to the Coppock Policy, in the case titled Windsor Securities, LLC v. The Robert S.

Coppock Irrevocable Life Insurance Trust, United States District Court for the Northern District

of California, Case3:15-cv-00075 (the Coppock Action"), wherein Windsor argued that it was

entitled to declaratory relief with respect to the Coppock Policy Death Benefit Proceeds on the

grounds that as between Windsor and the Trust, Windsor has the superior right, title, and interest

in and to the Death Benefit Proceeds and that therefore the Death Benefit Proceeds ought to be

preserved for and paid over to Windsor.  Complaint for Declaratory Relief in the Coppock

Action, Case3:15-cv-00075 [Doc. #1] (without attached Exhibits) [attached to Millrood

Declaration as Exhibit 97].

136.    On April 22, 2015, the Coppock Trust and Trustee Answered Windsor's Complaint for Declaratory Relief in the Coppock Action requesting "a judicial determination that the conditions required for issuance of a declaratory judgment by the Court do not presently exist, and that Windsor therefore take nothing by the Complaint" and "In the alternative, should the Court find that the conditions required for issuance of a declaratory judgment by the Court *do* presently exist, for a judicial determination that: (a) Windsor is not the absolute owner of the Policy, but is, rather, a secured lender holding nominal title to the Policy, pursuant to the Security Agreement and related documents contained in the Financing Agreement Package, for the limited purpose of selling the Policy at a public or private sale and retaining from the proceeds of any such sale the amounts it is owed by the Trust, plus legal interest thereon, plus recoverable costs, with any excess to be provided to the Trust. (b) *If* it should transpire that the Policy were never allowed to lapse; and *if* it should further transpire that Windsor were never to exercise its right to hold a public or private sale of the Policy pursuant to the terms of the Security Agreement and related documents contained in the Financing Agreement Package, *then*, upon the death of the Insured, the Trust would be entitled, pursuant to the terms of the Assignment Of Life Insurance Policy As Collateral and related documents contained in the Financing Agreement Package, to specific performance by Windsor of Windsor's duty to: (i) collect the death benefit from Pacific Life; (ii) retain only that portion of the death benefit necessary to compensate Windsor for the amounts loaned to the Trust by Windsor, plus legal interest thereon, plus recoverable costs; and (iii) provide the remainder of the death benefit to the Trust." Coppock Trust and Trustee Answer to Complaint for Declaratory Relief in the Coppock Action, Case3:15-cv-00075 [Doc. #16] [attached to Millrood Declaration as Exhibit 103].

137.    Windsor incurred substantial legal fees in the Coppock Action, which was

eventually settled for less than the full death benefits under the Coppock Policy, and the Coppock

Action was dismissed upon settlement on January 14, 2016.  Coppock Settlement Agreement

[attached to Millrood Declaration as Exhibit 116 (CONFIDENTIAL)]; Coppock Action January

14, 2016 Order of Dismissal, Case 3:15-cv-00075 [Doc. #38] [attached to Millrood Declaration

as Exhibit 106].

### The Stamatov Litigation

138.    On January 7, 2015, Windsor also filed a Complaint for Declaratory Relief with

respect to the Stamatov Policy, in the case titled Windsor Securities, LLC v. The Jane Ann

Stamatov Family Insurance Trust, United States District Court for the Northern District of

California, Case 3:15-cv-00080 (the " Stamatov Action"), wherein Windsor argued that it was

entitled to declaratory relief with respect to the Stamatov Policy Death Benefit Proceeds on the

grounds that as between Windsor and the Trust, Windsor has the superior right, title, and interest

in and to the Death Benefit Proceeds and that therefore the Death Benefit Proceeds ought to be

preserved for and paid over to Windsor.  Complaint for Declaratory Relief in the Stamatov

Action, Case 3:15-cv-00080 [Doc. #1](without attached Exhibits) [attached to Millrood

Declaration as Exhibit 96].

139.    On April 22, 2015, the Stamatov Trust and Trustee Answered Windsor's

Complaint for Declaratory Relief in the Stamatov Action requesting "a judicial determination

that the conditions required for issuance of a declaratory judgment by the Court do not presently

exist, and that Windsor therefore take nothing by the Complaint" and  "In the alternative, should

the Court find that the conditions required for issuance of a declaratory judgment by the Court *do*

presently exist, for a judicial determination that: (a) Windsor is not the absolute owner of the

Policy, but is, rather, a secured lender holding nominal title to the Policy, pursuant to the Security

Agreement and related documents contained in the Financing Agreement Package, for the limited

purpose of selling the Policy at a public or private sale and retaining from the proceeds of any

such sale the amounts it is owed by the Trust, plus legal interest thereon, plus recoverable costs,

with any excess to be provided to the Trust. (b) *If* it should transpire that the Policy were never

allowed to lapse; and *if* it should further transpire that Windsor were never to exercise its right to

hold a public or private sale of the Policy pursuant to the terms of the Security Agreement and

related documents contained in the Financing Agreement Package, *then*, upon the death of the

Insured, the Trust would be entitled, pursuant to the terms of the Assignment Of Life Insurance

Policy As Collateral and related documents contained in the Financing Agreement Package, to

specific performance by Windsor of Windsor's duty to: (i) collect the death benefit from Pacific

Life; (ii) retain only that portion of the death benefit necessary to compensate Windsor for the

amounts loaned to the Trust by Windsor, plus legal interest thereon, plus recoverable costs; and

(iii) provide the remainder of the death benefit to the Trust." Stamatov Trust and Trustee

Answer to Complaint for Declaratory Relief in the Stamatov Action, Case 3:15-cv-00080 [Doc.

#16] [attached to Millrood Declaration as Exhibit 104 (CONFIDENTIAL)].

140.    Windsor incurred substantial legal fees in the Stamatov Action, which was

eventually settled for less than the full death benefits under the Stamatov Policy, and the

Stamatov Action was dismissed upon settlement on January 14, 2016. Stamatov Settlement

Agreement [attached to Millrood Declaration as Exhibit 117 (CONFIDENTIAL)]; Stamatov

Action January 14, 2016 Order of Dismissal, Case 3:15-cv-00080 [Doc. #35] [attached to

Millrood Declaration as Exhibit 105].

### Facts relating to the Institution of this Action Against Rousseau and Arent Fox

141.     On February 29, 2016 Plaintiff filed the within lawsuit against the Defendants, and asserted therein Counts for: Professional Negligence/Legal Malpractice (Count I); Breach of Fiduciary Duty (Count II); and Breach of Contract (Count III).  Complaint in this action [Doc. #1] [attached to Millrood Declaration as Exhibit 8].

142.     On May 6, 2016, Defendants filed their Answer, Affirmative Defenses and Counterclaims for Breach of Contract (Counterclaim Count I); Account Stated (Count II); Quantum Meruit (Count III); and Unjust Enrichment (Count IV).  Defendants Answer, Affirmative Defenses and Counterclaims in this action [Doc. # 19] [attached to Millrood Declaration as Exhibit 9].

BY: _____

Alan L. Frank, Esquire
Samantha A. Millrood, Esquire
Alan L. Frank Law Associates, P.C.
135 Old York Road
Jenkintown, PA 19046

1601 Gravesend Neck Rd
Suite 903, 2nd Fl.
Brooklyn, NY  11229

Tel: (215) 935-1000
 Fax: (215) 935-1110
afrank@alflaw.net
smillrood@alflaw.net

Dated: August 9, 2018                  Attorneys for Plaintiff Windsor Securities, LLC