# EXHIBIT "1"

# ORIGINAL

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------x

WINDSOR SECURITIES, LLC,

                    Plaintiff,      Case No.

       -against-          16-cv-01533

ARENT FOX, LLP and JULIUS      (GBD)

ROUSSEAU, III,

                 Defendants.

-------------------------------------x

March 6, 2017

10:16 a.m.

Deposition of WINDSOR SECURITIES, LLC

by STEVEN PRUSKY, and STEVEN PRUSKY, individually,

held at the offices of Foley & Lardner LLP, 90

Park Avenue, New York, New York, pursuant to

Notice, before Mildred Cassese, a Registered

Professional Reporter and Notary Public of the

State of New York.

1                              *S. Prusky*

2           A.    Yes.

3           Q.    Oh, okay -- but now you're back with

4     your second wife?

5           A.    No.

6           Q.    No, you're not.  Are you separated?

7           A.    We are separated.

8           Q.    But not divorced?

9           A.    We are not divorced.

10          Q.    Okay.  When did you set up or your

11    attorneys set up Windsor Securities LLC?

12          A.    Again, I would have to guesstimate

13    that it was around 2005.

14          Q.    At the time that you set up Windsor,

15    were you working for MFI Associates?

16          A.    Are you asking at the time I set up

17    Windsor Securities LLC?

18          Q.    At 2005, yes.

19          A.    Yes.

20          Q.    Have you continued to be affiliated

21    with MFI Associates since 2005?

22          A.    Yes.

23          Q.    To date?

24          A.    Yes.

25          Q.    So that continues and has continued

1               *S. Prusky*

2          A.    Yes.

3          Q.    Now, in 2005 you set up Windsor

4     Securities LLC?

5          A.    Somewhere around that time frame, yes.

6          Q.    And does anyone else have an interest

7     in Windsor Securities LLC other than you --

8     withdrawn.

9               You set it up yourself, correct, or

10    the trust of the Windsor Irrevocable Trust,

11    correct?

12          **MR. FRANK:**  Objection.

13               You can answer.

14          A.    The entities comprising or affiliated

15    with Windsor Trust were set up, more or less,

16    contemporaneously -- more or less around 2005.

17          Q.    And is Windsor Securities LLC still in

18    operation?

19          A.    Yes, it is.

20          Q.    And from 2005 to date, what sorts of

21    investments has Windsor Securities LLC made?

22          A.    It's invested in life settlements, the

23    cases that we have discussed today.

24               And it has invested in index mutual

25    funds, using algorithms developed by MFI

1                    *S. Prusky*

2      Associates, and it has invested in index futures

3      using algorithms developed by MFI Associates

4      whereby the index futures basically mimic the

5      index mutual fund.

6                    We have a very narrow area of

7      expertise.  We like to think it's deep, but it's

8      very narrow.

9           Q.    And how would you describe that area

10     of expertise, index funds?

11          A.    It is macro market technical analyst

12     through trading indexes on a short term basis.

13          Q.    And outside of that narrow focus, you

14     went into life settlements, correct?

15          A.    Outside of that narrow focus I made

16     some investments in life settlements.

17          Q.    So let's talk about how that came to

18     be.

19                    First of all, when did you first

20     consider expanding your scope of investments

21     beyond index funds to alternative investments?

22          A.    I believe it was late 2007, perhaps a

23     little earlier, when it appeared on my radar -- in

24     fact I'm sure it was a little bit earlier than

25     that.

1          **S. Prusky**

2          Q.    Okay.  Well, it continued through the

3     time of your litigations; it went through --

4          A.    No.  If you're asking what I invested

5     in premium finance, it was in that narrow time

6     frame.

7          Q.    Okay.

8          A.    I haven't looked at or entertained new

9     cases of premium finance since that initial batch.

10         Q.    Is there some reason why you didn't?

11         A.    I was burned.

12         Q.    And when did you realize you were

13    burned?

14         A.    Well, for certain when I lost the

15    Bitter panel it became abundantly clear how burned

16    I was, and then, of course, things got worse from

17    interest.

18         Q.    When you say "things got worse from

19    there," what do you mean?

20         A.    Well, it meant that I didn't collect

21    the death benefit on two other policies.

22              For some of the same reasons I didn't

23    collect the death benefit on the Bitter policy.

24         Q.    But that was in 2014 or '15 that you

25    learned that, correct?  Am I right?

1                          *S. Prusky*

2       specific way.

3              Q.    And why did you become more concerned?

4              A.    Because once I took over the policies,

5       I was essentially faced with two choices:  One was

6       an open-ended commitment to pay premiums for as

7       long as each of the insureds lived.

8                    And the other was, for all intents and

9       purposes, the only other option at the time was to

10      walk away from the policies and take a 100 percent

11      loss.

12                   I could always hold hope that the

13      market would come back and they would be more

14      saleable in the future, but, again, until that

15      time, if ever, I'd be paying premiums.

16             Q.    I see.  And when was it -- what's your

17      best recollection of when you first started

18      talking to Mr. Aaron?

19             A.    2007.

20             Q.    Some time in 2007?

21             A.    That's my best recollection.

22             Q.    And about six months after you start

23      to talk to him is when you made your investments?

24             A.    That's my best recollection.

25             Q.    And what did Mr. Aaron do for you,

```
 1                    S. Prusky
 2          A F T E R N O O N   S E S S I O N
 3                     (1:36 p.m.)
 4     S T E V E N    P R U S K Y,
 5          having been previously sworn, resumed the
 6          stand and testified further as follows:
 7               THE VIDEOGRAPHER:  The time is 1:36.
 8          This is the start of media No. 3.
 9               We're on the record.
10     EXAMINATION (Cont'd)
11     BY MR. WANG:
12          Q.   All right, good afternoon, Mr. Prusky.
13               Before we broke we were talking about
14     Mr. Aaron introducing you to brokers who had cases
15     that you might be interested in.
16               Let me ask you this, sir:  Did he --
17     did Mr. Aaron indicate to you that he had worked
18     with other premium finance lenders?
19          A.   I'm sorry, lenders.  I was thinking
20     about other brokers.
21               That was my inference, yes.
22          Q.   Okay.  So what did you understand his
23     job was; Mr. Aaron?
24          A.   His job was to find brokers and cases
25     and matching lenders, bring them together.
```

1                    *S. Prusky*

2          A.    I might have learned it from Jules.  I

3    might have learned it from Mr. Darracq.  I might

4    have learned it from Mr. Aaron.  I don't recall

5    sitting here.

6          Q.    And when did you learn that --

7          A.    I --

8          Q.    -- he had had some problem?

9          A.    I don't mean to talk over you.

10               I don't recall.

11         Q.    What -- did you learn that after you

12   had already made your investments?

13         A.    Yes.

14         Q.    So you think you did a Google search

15   of him and you think you spoke to Mr. Darracq

16   about him?

17         A.    Yeah.

18         Q.    And that's all before you decided to

19   go forward with the investments?

20         A.    Yes.

21         Q.    And, now, did Mr. Aaron first send

22   you, kind of, form documents, so you would

23   understand what the nature of the business was or

24   did he send -- did he do that before he sent you

25   particulars with respect to particular cases?

1                    **S. Prusky**

2         A.    I don't remember the sequence

3    vis-a-vis the financing agreement boilerplate and

4    the first case.  He might have sent them

5    contemporaneously -- uhm -- he might have sent the

6    case first and the financing agreements shortly

7    thereafter, or the reverse.  I don't recall.

8         Q.    Now, I think you said this morning

9    that at some point, as you were considering

10   whether or not to go forward with these

11   investments, you talked to Mr. Fineburg's firm?

12        A.    I said that was a possibility.  I did

13   not say I did.

14        Q.    Well, did you speak to anybody to seek

15   advice as to whether or not you should go into

16   these investments before you made the investments?

17        A.    I think you asked that question

18   already this morning, and I gave you my best

19   recollection at that time.

20        Q.    Which was that you think you may have

21   spoken to Mr. Fineburg?

22        A.    That I spoke with Mr. Darracq, I spoke

23   with Mr. Aaron and I may have spoken to

24   Mr. Fineburg or someone at his firm; more likely

25   from Fineburg himself.

```
 1                          S. Prusky
 2           Q.    But you don't remember that for sure?
 3           A.    I do not.
 4           Q.    At some point, again, you received
 5     form documents that were being used for these
 6     sorts of investments?
 7           A.    I received -- uhm -- what later became
 8     known as the 19-piece financing agreement.
 9           Q.    Okay.  There were 19 separate
10     documents that all together were regarded as one
11     agreement?
12           A.    Yes.
13           Q.    And so he sent you copies of that?
14           A.    Yes.
15           Q.    And that, again, that wasn't in
16     connection with any particular individual case; is
17     that right?
18           A.    I think I just testified I don't
19     recall.  It may have been with the first case.  It
20     may have been shortly before, shortly after, but
21     it became a template for all of the cases.
22           Q.    Well, let me just jump to something.
23                 By the time you sought counsel from
24     Mr. Rousseau at Herrick, you had already made your
25     investments for these cases, correct?
```

1                          *S. Prusky*

2    name of the client, who escapes me at this moment.

3          Q.    And what makes you think that he would

4    know the name of Mr. Fineburg's client?

5          A.    Bus he was Jules's client as well.

6    That's the point.

7          Q.    Okay.  That's --

8          A.    That's why --

9          Q.    That's what I was coming to.

10         A.    Yes.

11         Q.    That's what I was coming to, Mr.

12   Prusky.

13               It was through that client that you

14   got Mr. Rousseau's name?

15         A.    It was -- that client, I believe, gave

16   Mr. Herb Fineburg Mr. Rousseau's name, and

17   Mr. Fineburg gave that that name to me.

18         Q.    I see.  Now, what was it that caused

19   you -- withdrawn.

20               So Mr. Aaron sends you the template

21   for these 19 documents?

22         A.    Yes.

23         Q.    And you look at them as best you can?

24         A.    Yes.

25         Q.    And perhaps you sought counsel about

*S. Prusky*

1

2      A.    Is there a reason?  I think I started

3  contemplating the math and looking at different

4  policies, and decided I like the math much more

5  the other way.

6      Q.    And, ultimately, you invested in

7  approximately ten policies, I think that --

8      A.    I think we've agreed that that's a

9  rough --

10     Q.    Whatever that number, it adds up

11  somewhere around ten --

12     A.    Somewhere around there, yes.

13     Q.    And you made all of those investments,

14  again, before you spoke to Mr. Rousseau, correct?

15     A.    That is correct, to the best of my

16  recollection, I believe so.

17     Q.    And of those ten, we'll use No. 10 --

18     A.    Okay.  As long as we understand that

19  it's --

20     Q.    Plus, minus.

21     A.    Yes.

22     Q.    -- what percentage were sourced by

23  Mr. Houchins?

24     A.    The majority.

25           If we're using the number 10, I would

1                        *S. Prusky*

2      Here's an interesting thing that I just came

3      across; would you be interested?

4              Q.    All of which you said no to?

5              A.    All of which I ultimately had said no

6      to, that's correct.

7              Q.    After examining them?

8              A.    That's correct.

9              Q.    Okay.  So when he would present

10     something to you --

11             A.    Depending what you mean by the term

12     "examine," yeah.

13             Q.    You'd look into it?

14             A.    I would look into it, or think about

15     it and -- you know, sometimes it got more of my

16     attention; sometimes it got less.

17             Q.    But none of them did you pull the

18     trigger on?

19             A.    That's correct.

20             Q.    And then, lo and behold, right around

21     the same time that you've done the premium

22     financing, he comes up with the idea to see if

23     you're still investing in purchasing policies,

24     being -- managing a fund that's going to purchase

25     policies?

1                    **S. Prusky**

2         A.    That's a very big difference, and the

3   answer is yes to the latter, no to the former.

4         Q.    And why do you emphasize that's a

5   really big difference?

6               I understand it's a difference, but

7   why are you saying it's a really big difference?

8         A.    Because managing a fund of other

9   people's investments in policies is very different

10  from me investing my own money in owning those

11  policies.

12        Q.    Had you ever managed a fund that

13  invested other people's money?

14        A.    I had looked into and formed two or

15  three different partnerships with the intent that

16  they would take investors and I would manage their

17  money, in the same kind of form.

18              Maybe that's why he brought it to me,

19  because I had formed these kind of partnerships, a

20  general kind of fund or partnership, before.

21        Q.    Had you ever raised money in

22  connection with either of those ventures?

23        A.    No.

24        Q.    So you formed the funds, but you

25  didn't go forward to raise any money?

1      *S. Prusky*

2           it repeats a question that perhaps I didn't

3      understand the answer to --

4           Q.     What clients have you ever had?

5           A.     I think we discussed earlier that in

6      the context of Windsor Securities Inc. they had

7      outside clients from as early as the late '70s to

8      as late as into the 2000s.

9                  MFI Associates had outside investors

10     in its first 15 or 20 years of existence, before

11     it became strictly a family vehicle.

12                 So I have extensive experience with

13     outside clients.

14          Q.     But at the time that Mr. Acq --

15          A.     Acquadro.

16          Q.     -- Acquadro made this proposal to you,

17     at that point you didn't have clients; is that

18     right?

19          A.     At that point I had few or no paying

20     clients in Windsor Securities or in MFI

21     Associates, and that's one of the reasons I was

22     considering looking at managing a different kind

23     of fund as a way of bringing revenue into the

24     office.

25          Q.     From outside sources?

1                              *S. Prusky*

2              A.      From outside sources.

3              Q.      And so --

4              A.      This would attract a different kind of

5     clientele than the clientele we had had

6     historically?

7              Q.      By the way, was there something that

8     caused either MFI or Windsor to stop having

9     outside clients?

10             A.      I don't think there's any one thing.

11    It was a combination of things.

12             Q.      Okay.

13                     In any event, you believe that what

14    brought you to Mr. Rousseau's door was this

15    proposal or this proposition that was made to you

16    by Mr. Acquadro about this fund?

17             A.      I'm going to interrupt you for just a

18    moment and say I believe I remember the name of

19    the gentleman, and it was Steve Lockwood, that was

20    a common client of Jules and Mr. Fineburg.

21             Q.      Okay.  But --

22             A.      So I digress, but I am trying to keep

23    your answers in my mind if they come to me --

24             Q.      No, no.  And I appreciate that.

25    That's exactly -- that's very much what I want you

1                    *S. Prusky*

2    first.  Reached out to him by phone, and then we

3    spoke, and probably followed up by e-mail.

4           Q.    And was the purpose of that -- well,

5    withdrawn.

6                 What's your best recollection of what

7    you were asking Mr. Rousseau to do when you called

8    him?

9           A.    Well, it started off primarily asking

10   him about forming these kind of funds, getting

11   more information about the industry, uhm -- I

12   cannot recall the specifics.

13                But the initial thrust, certainly, was

14   about the potential to take on this kind of a

15   fund.

16          Q.    Do you recall whether that was called

17   Alpha Horizon?  Was that going to be the name of

18   the fund that you were looking into?

19          A.    I don't recall.

20          Q.    Does that name ring a bell to you?

21          A.    I'm not sure.

22          Q.    Okay.  In any event, that's the reason

23   you called him originally, was to examine or look

24   into the wisdom of going into this fund business,

25   managing this fund?

1                    *S. Prusky*

2          A.    It was in the context of the fund, so

3    yes.

4          Q.    When you say "in the context of the

5    fund," what do you mean by that?

6          A.    Well, I don't recall exactly what we

7    discussed.  Was it the logistics of how to set it

8    up?  Was it the risks involved?  Was it what kind

9    of structure it needs to be?  Was it is Larry

10   Simons a sleaze bag?

11               I don't recall.

12         Q.    And --

13         A.    But it was in the context -- I

14   contacted him because I was looking for someone to

15   help me while I considered taking on this role.

16         Q.    And did Mr. Rousseau tell you about

17   what his expertise was in this line of work?

18         A.    Mr. Rousseau -- again, I cannot give

19   you specifics -- spec -- very certain specifics.

20   We certainly discussed that he was considered one

21   of the top lawyers in the country in this area, in

22   terms of certain types of life insurance law,

23   particularly life settlements.

24         Q.    I'm sorry, does he tell you that or

25   you came to understand that?

1                          **S. Prusky**

2          A.    I came -- I think he told me that and

3    I think I came to that understanding elsewhere.

4                There are two names that always

5    resurfaced -- always surfaced when it came to

6    important lawyers in this field, and one of them

7    was Jules Rousseau.

8          Q.    Who is the other?

9          A.    Brian Casey.

10         Q.    Have you ever spoken to --

11         A.    I have.   Mr. Rousseau introduced me to

12   him.   I think we had lunch together once, and I

13   think he represented the Houchins at one point.

14         Q.    Brian Casey did?

15         A.    I think so.

16         Q.    So --

17         A.    I'm getting the name right, and I

18   think he's out of Locke Lord in Atlanta.

19         Q.    So you came to understand, not just

20   from what Mr. Rousseau said, but Mr. Rousseau's

21   reputation was as one of the two leading lawyers

22   in this life settlement business?

23         A.    Yes.

24         Q.    Is that right?

25         A.    Yes.

1                      *S. Prusky*

2    started talking to Mr. Rousseau about the premium

3    finance business, had some problems arisen with

4    respect to that business, or any of the loans that

5    you had invested in?

6         A.    I'm not sure of the sequence of

7    events, whether I was already speaking to Mr.

8    Rousseau about them or whether problems occurred

9    first and I went to him for guidance.

10        Q.    Well, when was it that you first went

11   to Mr. Rousseau for advice?

12        A.    Regarding premium finance policy?

13        Q.    Regarding anything.

14        A.    Probably 2008.

15        Q.    Some time in 2008?

16        A.    That's my best guess, but it's a

17   guess.

18        Q.    And when you made your investments,

19   your loans, your premium finance loans, when was

20   that, in 2007?

21        A.    I think some at the end of 2007 and

22   most in 2008, but again, I'm not -- I believe it

23   was the beginning -- end of '07, beginning of '08.

24        Q.    But it is the fact that by the time

25   you first spoke to Mr. Rousseau, you had already

*S. Prusky*

1

2     made all your loans?

3          A.     That's correct, I believe that's

4     correct.

5          Q.     All right.  So you say that at some

6     point you start talking to Mr. Rousseau about the

7     loans you made.

8               Did you send him copies of the loan

9     documents?

10         A.     Yes.

11         Q.     When did you do that?

12         A.     Very early on.

13         Q.     "Early on" while you were talking

14    about the fund?

15         A.     No.  As soon as we started talking

16    about the premium finance policies, I sent him

17    financing agreements.

18         Q.     Well, for what purpose?

19         A.     So that he could be as familiar as

20    possible and give me the advice that I needed in

21    terms of dealing with them.

22         Q.     And what advice did you need?

23         A.     You've asked me that question, and I'm

24    trying to remember what was the first thing that

25    came up, and sitting here at the moment I can only

1                    **S. Prusky**

2          Q.    And what issues were those, sir, that

3     could have and should have been prevented by Mr.

4     Rousseau?

5                    **MR. FRANK:**  Objection to the extent it

6              calls for a legal conclusion.

7                    You can otherwise answer.  Go ahead.

8          A.    Well, I'll first preface my comments

9     by saying that I'm not sure I can remember them

10    all today, but hopefully they are all laid out in

11    the various Complaint and ancillary documents.

12                   Having said that, there were a number

13    of errors committed by Mr. Rousseau that basically

14    boil down to the fact that he believed, and made

15    me believe, that I had secure claims on the full

16    death benefit of every one of these policies, when

17    I did not.

18                   There are different parts to that.

19                   He encouraged me not to settle the

20    Bitter action.

21                   He neglected to ask Mr. Barnes whether

22    he was on any drugs, so Mr. Barnes later invoked

23    the Prozac defense.

24                   But it really comes down to papering

25    the proper transfer as to whether 9620 was

1                          *S. Prusky*

2    them --

3         Q.    Let's try to enumerate them.  I'll

4    write them down as you enumerate them, sir.

5         A.    Okay.

6               When the policies -- either went to

7    default or went into what we called -- I think Mr.

8    Rousseau called them volunteer walkaway, they've

9    already been referred to as predefault, and the

10   policies were transferred to me, Mr. Rousseau said

11   everything had been done to insure that I have the

12   full death benefit when the insureds die.

13              Among the mistakes he made, was

14   writing a letter to the insureds and the trustees,

15   making that claim and citing a portion of the

16   financing agreement having to do with the

17   collateral assignment that the court and the

18   panels found was absolutely the wrong thing to

19   cite.

20              They cited that letter as one of the

21   reasons why my case failed.

22              There were issues with getting the

23   collateral assignments effected in a way where

24   there was a joint agreement.

25        Q.    I'm sorry, are we finished with the

1            **S. Prusky**

2      first action, had to do with --

3            A.    Yeah -- if you're going to try to pin

4      me down on very specific had legal issues, I'm

5      going to go and simply say that the courts and the

6      panel said repeatedly that what was done to

7      perfect my full death benefit interest was not

8      done; neither the DSR was properly effected nor

9      was 9620 further complied with.

10           The fact that they weren't done, I lay

11     at the hands and lay at the feet of Mr. Rousseau,

12     and I go further to say, not only weren't they

13     done, but he assured me that everything was done,

14     needed to be done.

15           He strongly encouraged me not to

16     settle the Bitter action, and after the Bitter

17     action and the disastrous result, did nothing to

18     try to fix those errors when it comes to

19     subsequent cases.

20           And I went through multiple requests

21     with him to see what we could do to avoid what

22     ultimately happened with the other cases.

23           Q.    Okay.  So let's talk about those

24     items.

25           A.    Okay.

1                        *S. Prusky*

2          Q.    He assured you that everything that

3     could have been done was done --

4          A.    Yes.

5          Q.    -- to secure the policies?

6          A.    That's -- he assured me that the

7     policies were secure, and he had taken, and we

8     together had taken the steps required necessary

9     and sufficient that I would have the full death

10    benefit when it was paid.

11         Q.    Did you and -- and did he do that

12    orally or in writing or both?

13         A.    I think both.  Certainly orally and I

14    think there's -- there's writing to that effect as

15    well.

16         Q.    And have you -- had he been hired to

17    give you that advice; that is, to make sure that

18    the policies were securely in your hands as owner?

19         A.    He had been hired on a general -- if

20    I'm using use the term correctly -- plenary basis,

21    to assist me with all aspects of premium finance,

22    my premium finance policies.

23                And he did provide me a lot of

24    guidance in several areas on every one of the

25    policies at issue.

1                    *S. Prusky*

2      whether it can be inferred from other documents, I

3      will leave to you and the court and Mr. Frank to

4      handle.

5           Q.    Okay.  So you said now "there's no

6      doubt" he gave that advice orally?

7           A.    There's no doubt he gave it to me

8      orally, but the question is did he also give it to

9      in writing.

10          Q.    I see.  So when was it, approximately,

11     when was it that he gave you that advice?

12          A.    Oh, multiple times.

13                At the time that the policies were

14     transferred to me.

15                After the Bitter case, and I said:

16     What can we do to lock down these others?

17                You don't have to do anything.  You're

18     locked down.  You got 'em.

19                There certainly was a paper trail when

20     Acker and Collins, Stamatov and Coppock policies

21     were transferred to me, and Jules was intimately

22     involved in that process.

23          Q.    And after the Bitter case -- focusing

24     on after the Bitter case -- I know we're jumping

25     around, Mr. Prusky, and I apologize for that --

*S. Prusky*

2  did he say, in substance, there's really nothing

3  more you can do now?

4      A.  In substance, he said that I did not

5  have a problem with the Collins and Acker case

6  cease and the Coppock and Stamatov cases.

7      In fact, right after the Bitter

8  ruling -- actually, before the Bitter ruling, but

9  I'll focus after the Bitter ruling -- he was, by

10  all appearances, upset at the ruling.  I certainly

11  was upset by the ruling, and I said:  What can we

12  do to protect the others?

13      They are claiming, "they" the panel,

14  that we didn't properly do whatever the statute is

15  and whatever this DSR thing is:  What can we do?

16      And I pushed him, for at least a month

17  or two, to try to paper and address the

18  deficiencies that the panel raised in the Bitter

19  case, and he was very resistant.

20      And I said:  I want to write a letter.

21  And I flew it by him at least once, if not more,

22  and ultimately said:  Do whatever you want.

23      Q.  Ultimately you said to him:  Do

24  whatever you want?

25      A.  No.  Ultimately I said:  I'm going to

1        **S. Prusky**

2        do it.

3                He said: I think you're going to

4        cause more harm than good, but if you want to do

5        it, it's your call.

6                And at that point, obviously, my faith

7        in his advice had been diminished somewhat, so,

8        therefore, I went ahead and did it.

9        Q.    Did you seek advice from anyone else?

10       A.    No.

11       Q.    Why not?  You said your faith in his

12       advice was diminished.

13               Why didn't you seek someone else's

14       advice?

15       A.    Because I had flown by him the letter

16       that that had what I thought was the best on point

17       to the panel, and I had nowhere else to go.  I had

18       nobody else with experience.

19               I knew two attorneys in this field:

20       One was Mr. Rousseau and one was Mr. Casey.  And I

21       was very concerned the time was ticking by and,

22       you know, my faith in Mr. Rousseau was just slowly

23       diminishing as more reality set in post Bitter.

24       Q.    The decision, the Bitter decision was

25       when, April -- let's just take a look, just so we

1                          *S. Prusky*

2          A.    I believe that's true, yes.

3          Q.    Do you remember seeing such letters in

4     connection with your preparation for the

5     deposition today?

6          A.    I believe so.

7          Q.    And what is it that you asked him to

8     do?

9                In other words, what was Mr.

10    Rousseau's assignment, whether it was at Herrick

11    or Rousseau, with respect to the change of

12    ownership and collateral assignments?

13         A.    We discussed that because I was not

14    being paid back, that I was going to be entitled,

15    if I continued to pay the premiums, which I did on

16    most but not all policies, that I would be given

17    unfettered right to the full death benefit, and

18    that's what he was helping me do, to make sure

19    that happened.

20         Q.    And so you discussed that with him?

21         A.    Yes.

22         Q.    And when was that, sir?

23         A.    In 2009, in 2010 -- subsequently,

24    after Mr. Bitter died.

25                I mean, it was a process that went on

1                          S. Prusky

2          A.    Yes.

3          Q.    And why was that?  Why did you change
4    your mind?

5          A.    There was something in the tone and
6    tenor of Mr. Houchins' communications that led me
7    to believe that -- uhm -- this one was worth
8    taking the risk on.

9          Q.    Meaning what, that Mr. Bitter was
10   sicker than you thought?

11         A.    Sicker than Mr., perhaps, Mr. Houchins
12   was letting on, yes.

13         Q.    So you wanted to take advantage of
14   that?

15         A.    Do I want to take advantage of that?
16               I, at that point, had paid all the
17   premiums, taken all the risk --

18         Q.    But --

19         A.    Did not -- he had already been in
20   default for a substantial period of time; didn't
21   want to continue my machinations with
22   Mr. Houchins, and yes, was willing to take a risk
23   that, at this point, especially since I had just
24   lost $800,000 on the Gilbert policy, that this was
25   a risk worth taking with a $2 million death