# EXHIBIT "3"

1

IN THE UNITED STATES DISTRICT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------

WINDSOR SECURITIES, LLC   : CIVIL ACTION

vs.           :

ARENT FOX, LLP, et al.,   : NO. 16-cv-01533 (GBD)

------

Tuesday, March 7, 2017

------

Videotape deposition of JULIUS ROUSSEAU,

III, ESQUIRE, held at the law offices of FOLEY &

LARDNER, LLP, 90 Park Avenue, New York, New York,

beginning at 9:06 a.m., on the above date, before

LANCE A. BRUSILOW, Registered Professional

Reporter and Approved Reporter for the United

States District Court.

------

brusilow + associates
1528 Walnut Street, Ste. 400
Philadelphia, PA 19102
215.772.1717
www.brusilow.com

------

2

1    A. Yes.

2    Q. Also, if you don't know something, that

3 may be equally important and perhaps more

4 important to me. And if you don't know something,

5 would you simply let me know that? That's assuming

6 that's a truthful answer. Okay?

7    A. Yes.

8    Q. Yesterday I know you were present during

9 the deposition of Steven Prusky, and Mr. Prusky

10 used the word guess, figuratively speaking, quite

11 a few times.

12      You're a lawyer. I think you understand

13 the difference between a guess, on the one hand,

14 and an estimate on the other. And so if you do

15 use the word "guess," is it acceptable for me to

16 assume that you really mean an estimate on your

17 part?

18    A. Well, I will tell you what I know.

19    Q. All right. If you're not sure of an

20 answer but you think you know the answer, would

21 you just let me know that, what the answer is,

22 along with the fact that you're not certain of the

23 answer? Is that acceptable to you?

24    A. Like I say, I'll tell you what I know.

8

1    Q. Okay. Should you have a question about

2 the clarity or meaning of one of my questions -- I

3 assure you in advance it's not your imagination

4 and probably my question could use some work

5 and/or edits -- would you let me know that the

6 question seems confusing to you or needs to be

7 clarified, and I will do my very best to change

8 the question? Is that acceptable?

9    A.  Yes.

10    Q.  Okay.  I understand today that you're

11 appearing here individually and as a corporate

12 designee for Arent Fox LLP.  Is that correct?

13    A.  Yes.

14    Q.  And what do you understand your role

15 today to be for Arent Fox?

16    A.  I'm the corporate designee under Rule

17 30(b)(6).

18    Q.  And have you participated in depositions

19 involving 30(b)(6) corporate designees before?

20         MR. WANG:  Participating as in

21    giving testimony or has he. . .

22         MR. FRANK:  Do you understand the

23    question?

24         MR. WANG:  I don't, so I object to

9

1    the form of the question.

6 in connection with this case?

7    A.  I told him that I had been sued when the

8 lawsuit came down.  I told him that I was giving a

9 deposition.

10    Q.  Did you tell him what the magnitude of

11 the amount of the claim is?

12    A.  I think I told him the client owed us

13 about half a million dollars.

14    Q.  Did you tell your father about how much

15 was being requested of you?

16    A.  No.

17    Q.  You said clients called you?

18    A.  Yes, a few people called, had seen -- I

19 think Law 360 picked this up.

20    Q.  I'm not asking you about their names, but

21 can you give me a general sense of the

22 conversations you had with the clients that called

23 you?

24        MR. WANG:  I object to the form of

18

1 the question.

2    Q.  You can answer.

3    A.  It was kind of, hey, I see you got sued.

4 Hate to see that.  This is Steve Prusky.  Most of

5 them knew Prusky, as he said yesterday, as he had

6 met and been introduced to a few of my clients.

7 And I said yes, that's how it goes and I can't say

8 anything about it.

9    Q.  Mr. Rousseau, what's your educational

10 background, please?

11    A.  Well, I have an undergraduate and law

12 degrees from the University of North Carolina.

13    Q.  Any other educational degree?

14    A.  No.

15    Q.  When did you graduate from law school?

16    A.  '83.

17    Q.  Can you trace your work history briefly

18 for me as lawyer? I'm not looking for any deep

19 dive here, just a background.

20    A.  I went to work fork Hunter & Williams in

21 Raleigh, North Carolina, in 1983, then moved to

22 and became a partner in a firm called Yates,

23 McLamb & Weyher, also in Raleigh, five or six

24 years after that, so like '88/'89; moved to New

19

1 York at the end of 1992, and worked in a series of

2 different law firms in New York and arrived at

3 Arent Fox.

4    Q.  How many firms do you think you worked at

5 in New York City before arriving at Arent Fox?

6    A.  Well, there was -- I joined a firm called

7 Kroll & Tract, which basically had a name change,

8 so it became a new firm but it was the same group

9 of lawyers. I went from there to a firm called

10 London Fischer, then to Herrick Feinstein, then to

11 Arent Fox.

12   Q.  And why do you make those moves from Firm

13 A to Firm B to Firm C to Firm D?

14   A.  A different reason each time.

15   Q.  Does that mean -- were you terminated

16 from employment at any of those locations?

17   A.  No.

18   Q.  Do you hold yourself out as a

19 life-settlement specialist?

20        MR. WANG:  Objection to the form

21 of the question.

22   Q.  You can answer.

23   A.  I don't think I used the term

24 "specialist."  I think I hold myself out as

20

1 someone who has a substantial amount of experience

2 in investments and life insurance policies.

3   Q.  And how do you go about holding yourself

4 out as someone that has a substantial amount of

5 experience in investments and life insurance

6 policies?

7   A.  I think --

9 during these appearances as a panel member ten to

10 thirty times in the last eight years?

11          MR. WANG:  Objection to the form

12 of the question.

13    A.  There have been many, many topics, but if

14 they were -- if you're asking me about programs

15 involving life insurance, then they would be

16 related to investments in life insurance by

17 third-party investors as opposed to the individual

18 whose life is insured.

19    Q.  Have you ever appeared as a panel member

20 to discuss topics liken enforcement of investor

21 rights with respect to insurance policies?

22          MR. WANG:  I object to the form of

23 the question.

24    A.  I don't recall.  That may have been -- I

23

1 just don't recall.

2    Q.  Have you ever appeared to address

3 foreclosure proceedings with respect to life

4 insurance policies?

5    A.  I do not recall that specific topic.

6    Q.  Do you remember ever being in attendance

7 at any seminar at which you were a panel member

8 where foreclosure of collateral was discussed?

9    A.  I don't recall it.

10   Q.  Prior to meeting Mr. Prusky in 2008 -- is

11 that when you met him, by the way?

12   A.  Well, I don't think I met him

13 face-to-face until some number of months after I

14 began representing his different companies.

15       As far as when we first met by phone

16 through a referral, I cannot tell you if it was

17 2008 or 2009.

18   Q.  Well, there is an engagement letter

19 signed in November of 2008.  Isn't that right?

20   A.  If you make that representation to me,

21 I'll -- I'm assuming that would be the Horizon

22 Alpha matter.

23   Q.  And why are you making that assumption?

24   A.  Because that was the first client matter

24

1 that I recall undertaking for one of Steven's

2 companies.

3    Q.  And did you meet Mr. Prusky face-to-face

4 before you were engaged by Mr. Prusky in the alpha

5 matter?

6    A.  No.

7    Q.  Before becoming involved in the -- did

8 you use the name Alpha Horizon matter?

9    A.  Horizon Alpha.  That's my best

9    A.  I don't recall it.

10    Q.  Prior to meeting Mr. Prusky in 2008 -- is

11 that when you met him, by the way?

12    A.  Well, I don't think I met him

13 face-to-face until some number of months after I

14 began representing his different companies.

15        As far as when we first met by phone

16 through a referral, I cannot tell you if it was

17 2008 or 2009.

18    Q.  Well, there is an engagement letter

19 signed in November of 2008.  Isn't that right?

20    A.  If you make that representation to me,

21 I'll -- I'm assuming that would be the Horizon

22 Alpha matter.

23    Q.  And why are you making that assumption?

24    A.  Because that was the first client matter

                        24

1 that I recall undertaking for one of Steven's

2 companies.

3    Q.  And did you meet Mr. Prusky face-to-face

4 before you were engaged by Mr. Prusky in the alpha

5 matter?

6    A.  No.

7    Q.  Before becoming involved in the -- did

8 you use the name Alpha Horizon matter?

9    A.  Horizon Alpha.  That's my best

10 recollection.

11    Q.  Had you ever been involved in a

12 foreclosure proceeding involving life insurance as

13 collateral?

14    A.  Had I been before that point in time?

15    Q.  Yes, sir.

16    A.  I suppose it depends on what you mean by

17 "foreclosure proceeding."  We had clients who we

18 advised who had collateral and life insurance

19 policies who had exercised their rights of

20 collateral, but I don't believe that I was

21 involved in a legal proceeding in connection with

22 any of those.

23    Q.  When you say the word "we" in your last

24 answer, who do you mean?

25

1    A.  I think I mean the group of us at Herrick

2 Feinstein that were part of the insurance group,

3 most of whom are my colleagues at Arent Fox.

4    Q.  So, you personally had never been

5 involved prior to meeting Mr. Prusky in

6 foreclosing life insurance collateral.  Would that

7 be right?

8         MR. WANG:  Objection to the form

9 of the question.  You misstated -- mis-summarized

16 BY MR. FRANK:

17   Q. This is a copy -- exhibit forty is a copy

18 of your April 7, 2011 engagement letter that you

19 issued soon after you arrived at Arent Fox. Is

20 that fair to say?

21          MR. WANG: I object to the form

22     of the question. It's your definition of

23     "soon."

24          MR. FRANK: Okay.

                    38

1          THE WITNESS: We, our group, moved

2     June 1st, 2010 to Arent Fox, so I was a bit

3     slow getting a new engagement letter for an

4     existing client. We had been representing

5     Windsor at Arent Fox since June of 2010.

6 BY MR. FRANK:

7   Q. To the best of your recollection, was

8 there any change in the scope of the

9 representation as you migrated from the Herrick

10 firm to the Arent Fox firm?

11   A. There was no change in scope.

12   Q. And what I'm getting to here is, are we

13 in agreement that, so far as you can recall, you

14 don't remember limiting the scope of your

15 engagement with respect to Mr. Prusky or his

16 entities? Is that fair to say?

17    A.  Well, right, the deposition was the

18 entity Windsor Securities.  But yes, we did not

19 change or limit the scope.  It was whatever we

20 were asked to do by Mr. Prusky acting on behalf of

21 his entity.

22    Q.  And to the best of your recollection, was

23 there any request that Mr. Prusky made to you that

24 you said, you know, words to the effect that no,

39

1 I'm sorry, we're not able to do that or we're

2 unwilling to do that?

3    A.  I don't recall that.

4        MR. FRANK:  Can we show the

5    witness exhibit thirty-nine, please?

6        (Exhibit Rousseau-39 was marked

7    for identification)

8 BY MR. FRANK:

9    Q.  Mr. Rousseau, I'm showing you a document

10 that we've pre-marked as number thirty-nine.  This

11 appears to be a letter that you authored dated May

12 26, 2010, countersigned by Mr. Prusky.  Is that a

13 correct description, in your view?

14    A.  Yes.

15    Q.  Is this the authorization that Mr. Prusky

16 was requested by you to execute that would enable

17 you to transfer all of his files from the Herrick

18 firm over to the Arent Fox firm?

19    A.  Yes.

20    Q.  To the best of your recollection, were

21 all of the documents that had previously been with

22 the Herrick firm in fact transferred to the Arent

23 Fox firm?

24    A.  Yes.

                              40


1    Q.  Everything, by way of example, that

2 Steven Prusky had sent to you to review or that he

3 sent to one of your colleagues to review at the

4 Herrick firm, is it fair to say that those papers,

5 everything, so far as you can recall, were

6 transferred pursuant to this authorization letter

7 dated May 26, 2010 by the Herrick firm to the

8 Arent Fox firm?

9    A.  I think so, but the one proviso is, I'm

10 not sure if the Horizon Alpha matter was a closed

11 matter.  I'm not sure that that came over, if we

12 had a copy of that.

13    Q.  With the exception of that, everything

14 you think came over?

15    A.  Yes.

16    Q.  I want to basically put a line around the

17 Alpha Horizon matter.  Did that matter conclude?

18   A.  Yes.

19   Q.  Approximately what was the length of time

20 that that engagement was open, please?

21   A.  I believe it was pretty much over by the

22 end of May 2009, when Steven first asked me to

23 help him with his premium finance portfolio, in

24 that group of policies.

41

1   Q.  You think that's about when Steven asked

2 you to begin to help him with his premium finance

3 activities?

4   A.  Yes.  I know the Horizon matter was over

5 by then. I think it had been over by some period

6 of time, but I think the first email communication

7 we had was about paying the final bill on Horizon

8 and now looking at the life settlement cases.

9         MR. FRANK:  Can we show the

10       witness number ten, please? Thank you.

11 BY MR. FRANK:

12   Q.  Mr. Rousseau, I'm showing you a document

13 we've marked as number ten.  It appears to be

14 dated by you on April 29, 2009 and it's addressed,

15 I think, to Mr. Prusky.

16       Do you recall this email?

17   A.  I don't recall it.

18    Q.  Can you take a look at it and tell me if,

19 after briefly reviewing the first page, it

20 refreshes your recollection? And can you can

21 describe it to me?

22    A.  I have a general recollection of what the

23 memo is about and what we were doing for Steven

24 back then, but I don't recall this memo.

42

1    Q.  This is the first communication that I've

2 seen in the file that seems to deal with the

3 premium financing activities of Mr. Prusky.  Do

4 you recall anything previous to this?

5    A.  No.

6    Q.  And this particular email, even though

7 you don't remember the contents very well, do you

8 at least remember sending the email with the

9 attachment over to Mr. Prusky on or about April

10 29, 2009?

11    A.  Yes, I do.

12    Q.  Okay.  So, can you tell me what the

13 attachment is, please?

14    A.  The attachment is whatever it says, a

15 short memo about demands that Windsor might and

16 could and, I think, thereafter did make about

17 collateral assignments.

18    Q.  And why were the issues -- strike that.

24    A. Same answer.

53

1    Q. To the best of your recollection, do you

2 think you reviewed this paperwork before arriving

3 at Arent Fox or afterwards?

4    A. Don't know.

5    Q. I meant to ask a better question.  I'm

6 trying to --

7          MR. WANG:  That wasn't so bad.

8          THE WITNESS: He said nothing.

9          MR. WANG:  I know. I sat silently.

10      I thought that was a pretty good question.

11          MR. FRANK:  Okay.

12 BY MR. FRANK:

13    Q.  Can you tell me, if you know, if you

14 first saw this paperwork, meaning Stamatov,

15 Bitter, Acker, Collins and Coppock, if you first

16 saw it before arriving at Arent Fox or if you

17 first saw it after arriving at Arent Fox?

18          MR. WANG:  Objection, asked and

19 answered.

20    A.  I saw some of that material while at

21 Herrick.  I can't recall if I had seen all of

22 them.

23          David Fox had all of the loan documents

1 firm prepared correspondence. I think that was

2 all ten of the loans, but I don't specifically

3 recall if I looked at the loan documents for all

4 ten.

5        MR. WANG: The question was just

6     whether you looked at them.

7        THE WITNESS: At the time, I can't

8     recall.

9 BY MR. FRANK:

10    Q. So, if Mr. Fox had all of them and he

11 only worked with you while you were at Herrick, is

12 it fair to conclude, then, that you must have seen

13 or at least Mr. Fox must have seen all this

14 paperwork while you were at Herrick?

15        MR. WANG: I object to the form of

16 the question.

17    A. Yes.

18    Q. Do you have any reason to believe that

19 any of this paperwork involving the ten policies,

20 five of which I just called out by name, would

21 have been received after you left Herrick?

22    A. I can't say I'm one hundred percent

23 certain, but I'm relatively positive that we had

24 all of the loan documents on all ten cases while

56

1 one group to the next.  Would that be fair to say?

2    A.  The policy. . .

3    Q.  One was for one million; one was for two

4 million.  Some were the same; some were different.

5    A.  Yes.

6    Q.  You can put that to the side.  We can

7 also agree that the applicant and the trustees

8 were all different, again, from Policy A to Policy

9 B to Policy C, right?

10    A.  Yes.

11    Q.  Okay.  And the contents of each insured's

12 application would have disclosed differences

13 between from one insured to the next to the next:

14 One is age eighty, one is seventy-five; one is

15 male, one is female. Put all that aside, okay?

16    A.  Okay.

17    Q.  Can you think of any other differences

18 that existed in terms of the paperwork?

19    A.  Well, the policies or the policy

20 applications were different for each person.  You

21 didn't say -- call out that aspect of it.

22       The files that I recall had loan

23 documents and they had the individual person and

24 trust policy information.  Policy information is

57

1 different.  Loan documents were identical or

2 virtually identical.

3    Q.  Did all ten investments call for the

4 application of California law?

5    A.  I am reasonably certain all the ones that

6 I remember doing any substantive work on called

7 for California law, yes.

8    Q.  Can you think of any policy among the ten

9 which called for the application of some state law

10 other than those found in the State of California?

11    A.  No.

12    Q.  Do you think you acquainted yourself with

13 applicable California law in order to provide Mr.

14 Prusky with adequate and/or correct advice?

15    A.  Yes.

16    Q.  How did you do that exactly? How did you

17 acquaint yourself with California law?

18    A.  We as a firm at Herrick conducted

19 research on all of the applicable law that we --

20 or the law that we analyzed might be applicable.

21    Q.  Did you personally investigate California

22 law to see what might be required and what might

23 not be required in order to provide Mr. Prusky

24 with adequate and/or correct advice?

58

1 point, or you don't remember? I'm sorry, you

2 reviewed exhibit five at some point, or you don't

3 remember?

4        MR. WANG:  You asked that before.

5 I object.

6    A.  I reviewed Windsor's loan documents in

7 2009.

8    Q.  See those papers in front of you that are

9 marked exhibit five?

10    A.  Yes.

11    Q.  Okay.  Do you remember reviewing those

12 documents?

13    A.  No.

14    Q.  Do you think someone in your office did?

15    A.  Yes.

16    Q.  If I showed you similar paperwork -- I'm

17 happy to do it if you want -- for Bitter, Acker,

18 Collins, Coppock, would your answer be the same:

19 You don't remember reviewing the paperwork?

20        MR. WANG:  We've gone over this

21     already.  Let's do it again:  I object to

22     the form of the question.  I don't think

23     you're focusing on his answer, Mr. Frank.

24        MR. FRANK:  One of my favorite

62

1     things --

6 of Georgia applied to foreclosure proceedings for

7 this particular promissory note and associated

8 security agreement?

9    A.  I don't know.

10   Q.  Did you ever tell Mr. Prusky that the law

11 of the State of Georgia applied to any foreclosure

12 proceedings involving this promissory note and the

13 associated security agreement?

14   A.  I do not recall what we told him, if

15 anything, about foreclosing on the Stamatov

16 policy.

17   Q.  Do you see -- I'm going to estimate it's

18 about eleven or twelve typed lines from the top --

19 that at that point the sentence begins which says

20 "The unpaid principal and the outstanding under

21 this note from time to time shall accrue and bear

22 interest at the simple rate of fifteen percent per

23 annum"?

24       Did I read that correctly?

71

1    A.  I'm sure you did.

2    Q.  Okay.  Was there ever a point where you

3 investigated whether the fifteen percent would or

4 would not be lawful?

5        MR. WANG:  I'm sorry, for the

7       MR. FRANK: Yes.

8       THE WITNESS: I have no

9    recollection of that.

10 BY MR. FRANK:

11    Q. Do you have any recollection of

12 investigating the fifteen percent per annum

13 interest rate threading through the remaining nine

14 document packages?

15    A. I have no recollection of discussing

16 interest rate. I feel certain that we did at

17 different points.

18       The only time it became a relevant issue

19 was in the Bitter arbitration. We had discussions

20 with Steven then and showed him what our research

21 showed, and obviously the panel agreed.

22    Q. So, the Bitter arbitration, unless I'm

23 off on my time line, occurred in the fall of 2013.

24 Is that right?

72

1    A. I believe the hearing was in the January

2 of 2014.

3    Q. Do you remember it being after the end of

4 the year?

5    A. The hearing was in January of 2014.

6    Q. Do you remember the pleadings being made

7 before the end of the calendar year?

8    A. The arbitration obviously begun well

9 before the hearing, so I don't know what your

10 point of reference is.

11    Q. Do you remember when the arbitration

12 itself began? That is to say, the pleadings.

13    A. No.

14    Q. Do you know if it was in the second half

15 of 2013?

16    A. No, I don't -- I think there was

17 litigation first. I think the litigation was

18 around March of 2013. It followed that all the

19 documents tell us the dates. I have not memorized

20 the dates.

21    Q. Do you remember talking to Mr. Prusky

22 about the fifteen percent interest rate prior to

23 March of 2013, when the Bitter litigation

24 commenced?

73

1    A. I recall talking to Steven probably in

2 2009 about the loan documents, about the problems

3 with the loan documents. And I'm reasonably

4 certain that I told him that the interest rate was

5 probably -- you know, if California law were to

6 apply, he probably wasn't going to get it. But

7 when and where that discussion took place, I have

8 no idea.  It was an irrelevant part of our

9 discussion.

10   Q.  I think you had that discussion with Mr.

11 Prusky in 2009?

12   A.  I'm reasonably certain that was one of

13 the issues we talked about in the loan documents.

14   Q.  And you told him that the interest rate

15 was too high?

16   A.  Well, that if California law were

17 applicable.  As I said to you, we were looking at

18 foreclosure, in which case the interest rate was

19 basically irrelevant.

20   Q.  Take a look at exhibit ten again, please.

21 Can you tell me if the interest-rate issue is

22 addressed in exhibit ten, please?

23   A.  I'll take your representation for what's

24 in ten.  I have no idea.  I haven't read the whole

74

1 document.

2   Q.  You can do it now.

3         MR. WANG:  Are you talking about

4     the document that says correspondence with

5     life insurers?

6         MR. FRANK:  Yes.  It's a two-page

7     document.

4 that.

5    A.  We told Steven that.  We later wrote to

6 each of the insureds and advised them of the same

7 thing.

8    Q.  You knew and understood that the offer, a

9 proposal, had to contain change that said, if you

10 accept, you don't owe us any more money.  It's a

11 full and final arrangement.  Is that a fair

12 statement?

13         MR. WANG:  I object to the way you

14 characterized that.

15    A.  What we said to Steven at the time was

16 our view of the law.

17         MR. FRANK:  I what to show the

18     witness fourteen, fifteen, sixteen,

19     seventeen and eighteen.  Sorry to do that to

20     you, Sean.  We're going to give you another

21     set.

22         (Exhibits Rousseau-14 through

23     Rousseau-18, inclusive, were marked for

24     identification)

121

1 BY MR. FRANK:

2    Q.  I'm showing you, Mr. Rousseau, exhibits

3 fourteen, fifteen, sixteen, seventeen, eighteen

4 and nineteen -- sorry, and eighteen.  It's

5 fourteen through eighteen, inclusive.  There

6 should be five of them there. Are those letters

7 authored by you?

8    A.  I signed them, so if that's your

9 definition of authored -- I don't know if I

10 prepared the meat of the documents or not.

11    Q.  Can we agree that by July 7, 2009, while

12 you were at Herrick, the Herrick law firm, you

13 accepted responsibility to prosecute, civilly

14 speaking, any defaults or at least the known

15 defaults of the trustees under these five

16 policies?

17        MR. WANG: I object to the form of

18    the question. What was the beginning of that

19    question?

20        (The record was read by the court.

21    reporter as requested)

22    A.  I don't know that I can agree or disagree

23 with what you've said.  The trusts had, in our

24 view, defaulted by taking the action that we

122

1 recite here.

2    I think this is when they had changed

3 trustees, so we sent default letters.  I don't

4 know that we discussed, Steven and myself,

5 prosecuting all other defaults because I don't

6 think we were thinking about other defaults.

7    Q. As I understand it -- and this is really

8 not meant as a trick question.  I just want to

9 understand the time line here.

10     It seems to me that by July 7, 2009,

11 Steve Prusky is asking you to get involved now

12 with declaring defaults with respect to the

13 following trusts: Collins, Coppock, Acker,

14 Stamatov and Bitter.  Is that correct?

15    A. Again, I don't think I can agree with the

16 way you put it.  Steven had a problem with the

17 loans, with getting his collateral assignments

18 recorded, is my recollection.  And part of the

19 problem was, insurance companies told him you've

20 got a collateral assignment signed by trustee one.

21 The policy is now owned by trustee two.

22     I think the goal -- and again, this is

23 all difficult to recall specifically, but the

24 primary problem here was making sure we had a

123


1 trustee to sign a collateral assignment so Windsor

2 could have on record a collateral assignment.

3     It was a foregone conclusion that the

4 policies were going to be worthless, the policies

5 themselves. I say worthless in the sense of

6 marketable on the secondary market.

7    Q.  In these letters of July 7, 2009, did you

8 intend to trigger the UCC 6920 provisions in

9 California or in any other state?

10        MR. WANG:  I think you got the

11    numbers wrong.

12        MR. FRANK:  Sorry, 9620.  I had a

13    transpositional error.  It's a mental block.

14        THE WITNESS:  I don't recall.  I

15    think the letters were there to state the

16    rights, remedies and responsibilities of the

17    parties, whatever we decided was governing.

18 BY MR. FRANK:

19    Q.  Were these letters written by Mr. Fox?

20    A.  My recollection is, David prepared the

21 letters.  I also recall that some of the

22 correspondence with trustees was signed by David.

23        I didn't remember that I was the one who

24 signed all these documents and I don't recall why

124

1 that was, but it could well be that for some

2 reason I had my secretary type this up from a

3 dictation I did.  I don't know.

4    Q.  Do you think you dictated this

5 personally?

19 of Windsor, the relinquishment of all of its

20 then-remaining claims against the trustee in

21 exchange for a transfer to Windsor of ownership of

22 the policy?

23      Can you tell me why that's not in this

24 letter of November 30, 2009?

152

1    A.  I can't tell you why anything is not in

2 it.  I can tell you that we put in the letter what

3 we thought needed to go in the letter for the

4 purpose it was sent for.

5    Q.  Although you're polite, that's not really

6 an answer.  Can you tell me why it's not in there,

7 if you have any recollection at all?

8    A.  Anything that's not in the letter wasn't

9 necessary to the letter, the purpose that the

10 letter was sent.

11   Q.  Why was the language I just read in Mr.

12 Fox' March 16, 2010 letter not necessary to be

13 included in the November 30, 2009 letter?

14   A.  Because our client wasn't negotiating

15 with Bitter and Barnes to surrender the policy in

16 exchange for a release.

17   Q.  Did that ever change?

18   A.  No, no the with Bitter and Barnes.

19   Q.  They never did that.

20      MR. FRANK:  Forty-four, please.

21         (Exhibit Rousseu-44 was marked for

22      identification)

23 BY MR. FRANK:

24   Q.  Mr. Rousseau, here is a letter -- again,

153

1 this is signed by you, but it's from the Arent Fox

2 firm.  It's dated September 8, 2010. It's also

3 addressed to Mr. Barnes and Mr. Bitter.

4         Toward the bottom of the first page you

5 say, "Pursuant to the terms of the security

6 agreement attached, the collateral that was

7 posted, the life insurance policy on the insured,

8 and all beneficial interests thereto has become

9 the property of the lender.  Section 6A of the

10 security agreement authorizes and empowers the

11 lender to transfer the collateral and register it

12 in the lender's name by virtue of the borrower's

13 failure to pay the loan at the maturity date.  The

14 lender also has irrevocable attorney powers to

15 transact the change of ownership."

16      Did I read that correctly, sir?

17   A.  Yes.

18   Q.  Did that language, in your view, parallel

19 the language of Mr. Fox in his March 16, 2010

21    Q. It says at the top of page two, "To

22 expedite the transaction with the life insurance

23 company, we request that the trustee execute on

24 the third page at the X by 'other required

155

1 signature,' which shows that Mr. Barnes is acting

2 in his capacity as trustee.  You're required to

3 forward the original policy to the lender."

4       What exactly were you doing here? Weren't

5 you trying to effectuate the paperwork associated

6 with what you believe to be at that time a valid

7 transfer of the ownership of this policy to

8 Windsor?

9    A.  At the time we were trying to get Bitter

10 and Barnes to either do what they said they were

11 going to do, which was to pay off the loan, or

12 agree to a default sell right, give us the policy.

13    Q. Ownership of the policy?

14    A.  Absolutely.

15    Q. Okay.  In retrospect, you now agree that

16 you didn't do that right.  Isn't that fair to say?

17    A.  Didn't do what right?

18    Q. Communicate in writing to the trustee

19 that will, for and in exchange for ownership,

20 Windsor was relinquishing all of its rights and

21 claims against the trustee. You didn't do that in

22 your letter of September 8, 2010. Isn't that

23 correct?

24    A.  Again, the letter stated what needed to

156

1 be stated to respond to what we were dealing with

2 at the time. You can argue what could and should

3 have been there. The letter was complete and was

4 ignored.

5    Q.  Can you tell me where in the September 8,

6 2010 letter you are communicating payoff

7 information?

8       I mean, option one, as I understand your

9 testimony, is to have the trustee pay off the

10 obligation, right?

11    A.  The agent had told me and Steven in a

12 phone call that Bitter was thinking about paying

13 off the loan; they were arguing over whether he

14 had a right to.

15      We took the position under the loan

16 agreement that it's too late: That it was too late

17 to cure failure to pay. Questions about was there

18 presentment. Was there ever a statement of what

19 was owed and what was required. There was a

20 dispute brewing.

21    Q.  When you say "we" who do you mean?

23    not in the letter.  The letter is right

24    here.

159

1        MR. WANG:  I'm letting this going

2    on, but what you're doing is making your

3    argument.  That's pretty apparent.  I think

4    we -- I don't think that's appropriate

5    questioning.

6 BY MR. FRANK:

7    Q.  Were you involved in circulating change

8 of ownership forms to the remaining trustees?

9    A.  I don't recall.

10    Q.  Do you have any recollection of Steven

11 Prusky individually doing that?

12    A.  My recollection is, in the early part of

13 2010 Steven got some change of ownership forms in.

14 Whether he sent them to me to look at or not, I

15 don't recall.  If there are some emails that talk

16 about it, I don't remember.

17    Q.  Did you ever evaluate, professionally

18 speaking, the manner in which the certificate of

19 ownership change forms were obtained?

20    A.  I don't believe there was any evaluation

21 when -- well, I should step back.  Policies were

22 different.  If you're talking Acker, Collins,

23 Coppock, I think those were simply done.  Houchins

24 took care of it, sent it to Steven. Whether Steven

160

1 sent it to me for my file at the time, I don't

2 recall.

3      Garcia obviously was difficult.  Some of

4 the others were different.

5    Q.  Were you involved in a -- strike that.

6 At the time of the collection of the certificate

7 of ownership forms, were you even aware that that

8 was going on?

9    A.  I'm pretty sure -- I'm not certain, but I

10 think some time entry in February 2010 bear out

11 that Steven and I talked about his getting COOs on

12 Acker, Collins, Coppock.  Like I say, I don't

13 recall seeing them.

14      I think he probably just said, hey,

15 Houchins sent these in to me because we were

16 expecting that to happen.

17    Q.  And at the time did you tell Steven that

18 he nevertheless had to comply with California code

19 Section 9620, and either directly by name or

20 substantively by telling Steven that he, in

21 writing, or that you on his behalf in writing, had

22 to offer a complete extinguishment of Windsor's

23 claims against the trustees in exchange for the

24 COOs?

161

1    A. I can say for certain that, in connection

2 with the change of ownership forms that Houchins

3 got and sent to him in 2010, I did not advise

4 Steven about the Uniform Commercial Code of the

5 State of California.

6    Q. How about the notion generally --

7 irrespective of California Code Section 9620,

8 irrespective of that did you ever advise Steven

9 that, for and in exchange for the COOs, he had to

10 offer the opportunity in writing to each trustee

11 to accept a complete extinguishment of Windsor's

12 claims against the trustee? Did you ever tell him

13 that?

14    A. Probably so. I mean, we talk about

15 releases. We actually prepared the releases. I

16 think Coppock asked for a release and he sent him

17 a release. So, there were discussions about that,

18 sure.

19    Q. Do you have anything in writing that

20 supports your belief?

21    A. We prepared release documents. Mr.

22 Coppock signed a release document.

23    Q. A release is a consensual -- strike that.

1 mutual-party release that I'm speaking of.

2    Q. And were you aware of the manner in which

3 the COOs -- strike that. Were the COOs in Bitter,

4 Acker and Collins obtained contemporaneously with

5 general releases, so far as you can recall?

6          MR. WANG: I object to the form of

7 the question.

8    A. You have to put Bitter aside. Bitter was

9 never obtained correctly. Acker, Collins,

10 Coppock: As I said, my recollection is that

11 Houchins sent Steven signed forms and said these

12 guys are giving up their policy. That's the

13 default sell right provision under the loan

14 agreement.

15       That's what they were doing. You can call

16 it a walk-away. Call it what you will, and those

17 were done. As far as I know, Steven got ownership

18 process into the name of Windsor on those

19 policies.

20    Q. Didn't Mr. Barnes execute a COO in

21 February of 2011?

22    A. We talked about that before: Somewhere

23 in that time frame he did.

24    Q. He did.

8   A. No.

9       MR. WANG: Objection.

10   A. No.

11   Q. You didn't believe that at any time?

12   A. A change of owner form is an insurance

13 company document. It's used to satisfy the

14 insurance company that the ownership has been

15 changed.

16       The form is either accepted by the

17 insurance company or it's not. The form either

18 does -- and since it's a form that you download

19 from the insurance company website, it's their

20 form. If it's filled out and signed in the

21 appropriate places, typically it's accepted by the

22 company. That's all it is.

23   Q. And you told Mr. Prusky that exactly, did

24 you not?

182

1       MR. WANG: Told him what exactly?

2       MR. FRANK: The words he just used

3   with me.

4       MR. WANG: I object to the form of

5   the question.

6       THE WITNESS: I suspect we would

7   have a discussion along those lines.

8 BY MR. FRANK:

9    Q.  When you told him that the change of

10 ownership form reflects a change by the carrier

11 once accepted on its books, that he need not worry

12 any further about who owned the policy, because at

13 that point you believed, once the COO was accepted

14 by the carrier, that actual ownership resided with

15 Windsor.  Isn't that correct?

16    A.  Well, yes, that's correct.

17    Q.  And ultimately that's not what the

18 arbitration panel concluded.  Would that be right?

19         MR. WANG:  Objection.

20         MR. FRANK:  Mr. Wang, honestly --

21         MR. WANG:  I just said was

22    "objection."  That's all I said.

23         MR. FRANK:  You said a lot more

24    than that.

183

1         MR. WANG:  No, I said "objection."

2    I'm just reading the thing.  I said

3    "objection."

4         MR. FRANK:  The good news is, we

5    have an actual audio record.

6         MR. WANG:  That's right.

7         MR. FRANK:  Okay, good.

11 as full satisfaction of the Bitter loan pursuant

12 to a 'record authenticated' after default."

13      Do you agree or disagreed with that

14 statement by the panel?

15    A.  Again, I can't -- I don't know that I

16 would agree or disagree with that.  It's a summary

17 of what the provision says.  Since they got it

18 wrong, it doesn't really matter to me.

19    Q.  Do you have the September 8, 2010 letter

20 and the January 14, 2011 letter near you?

21    A.  You've handed them to me, yes.

22    Q.  Can you put them both in front of you,

23 please, just for a minute?  Are they there?

24    A.  They are there.

189

1    Q.  Turn to page seven of the opinion,

2 please.  Now, this is the second -- I want to read

3 from the second full paragraph:  "There is nothing

4 in either the September 8, 2010 letter or the

5 January 14, 2010 letter" --

6        MR. WANG:  2011.

7        MR. FRANK:  Let me start again.

8 BY MR. FRANK:

9    Q.  "There is nothing in either the September

10 8, 2010 letter or the January 14, 2011 letter that

11 expresses an acceptance by Windsor of the

12 collateral in full satisfaction of the obligation.

13 Both were silent on the point."

14        Can you tell me if you agree or disagree

15 with that assessment?

16    A.  I disagree, and we argued that point very

17 strongly in our motion to reconsider.

18    Q.  Can you pull the letters dated September

19 8, 2010 and January 14, 2011 close to you so you

20 can see them and read to me out loud the words

21 that you believe stand for the proposition that,

22 in exchange for ownership, Windsor is absolving

23 the trustee of any further obligations?

24    A.  The trustee has no obligation.  It's the

190

1 trust.

2    Q.  Can you read me the words from the

3 letter?

4    A.  There is no absolving the trustee.  It's

5 the trust.  So, there are no words that deal with

6 the trustee, if that's what you're looking for.

7 There are no words.

8    Q.  Is there anything in either of those two

9 letters that expresses an acceptance by Windsor of

10 the collateral in full satisfaction of the

11 obligation?  If there is, can you kindly read out

12 loud for me now those words?

13    A.  I'll read to you, and it's the same thing

14 that's in our brief.  "We ask one more time for

15 your cooperation in sending us the paperwork, that

16 being the change of ownership form we requested,

17 so we can conclude our relationship in an amicable

18 fashion."

19    Q.  And you think that that is synonymous

20 with an acceptance -- an expression of acceptance

21 by Windsor of the collateral in full satisfaction

22 of the obligation?  Is that your belief?

23    A.  It is -- yes, correct.

24    Q.  From what letter did you just read?

                        191


1    A.  Exhibit forty-five.

2    Q.  What's the date of that, please?

3    A.  January 14, 2011.

4    Q.  Are there any other words in either that

5 letter or the September 8, 2010 letter that

6 expresses, at least in your view, an acceptance by

7 Windsor of the collateral in full satisfaction of

8 the obligation?  If there is, kindly read those

9 words out loud.

10    A.  I've read you the words.

11    Q.  That's it.  There is nothing else.

16 come in and get our attorney's fees.

17    Q. Do you think this panel basically

18 disregarded the law in order to make sure the

19 widow got some money? Is that what you're saying?

20    A. Did they disregard the law? They cite the

21 law, so they didn't disregard it.  I think they

22 misused the law to give the result to the widow.

23    Q. Do you think it was mistaken or it was

24 part of a conscious effort on their part to

199

1 knowledge the law, but trample right over it in

2 order to get the widow some money?

3         MR. WANG:  Object to the form of

4 the question.

5    Q. You can answer.

6    A. I have no opinion on that.

7    Q. Isn't it true that your side picked two

8 of the three arbitrators?

9    A. We did.

10    Q. Did those arbitrators let you down, do

11 you think?

12         MR. WANG:  Objection to the form

13 of the question.  I think that -- I object to form

14 of the question.

15    A. I was let down by the panel, regardless

16 of who picked them. I do enough arbitrations to

17 know, when I pick an arbitrator, I don't control

18 that arbitrator.

19      That arbitrator has to act arbitrarily,

20 as he or she sees it, and that's the way it works.

21 I don't expect the person I appoint to do me a

22 favor.

23   Q.  I mean this very respectfully and

24 sincerely:  I'm not trying to put words in your

200

1 mouth, but it's been reported to me that when you

2 made a phone call to Mr. Prusky about the

3 decision, you were deeply -- it sounded to him

4 like you were deeply disappointed. Is that a fair

5 statement?

6   A.  Yes, I was disappointed.

7   Q.  He used the word "shocked."

8        MR. WANG:  I'm sorry, he used it.

9 to you or --

10   Q.  Mr. Prusky used the word "shocked," that

11 you had actually used the word "shocked" in

12 describing the outcome to him.  Is that correct?

13 Do you ever remember using the word "shocked"?

14   A.  I have no recollection.

15   Q.  Do you remember ever saying that "we were

16 screwed"?

17        MR. WANG: Objection to the form.

18   Q. The law, the facts, or both?

19   A. Both.

20   Q. How did you win anything? The death

21 benefits were given to the widow. Isn't that

22 true?

23        MR. WANG: I think you're

24      misunderstanding what he said. I object.

                        202

1        MR. FRANK: I appreciate that.

2 BY MR. FRANK:

3    Q. Can you explain to me, please, how you

4 think you won the arbitration?

5    A. I never said we won the arbitration.

6    Q. Okay.

7    A. We're talking about the time running up

8 until the decision came down. That's what you

9 asked me about, what did I think when the decision

10 came down.

11      I told you and I told him -- and Steven

12 agreed with me -- that we presented all the facts

13 we wanted, got in everything we wanted. We didn't

14 lose on any real issue of importance at the

15 hearing. Their evidence from the other side was,

16 to me and Steve, both dishonest and disjointed.

17      In many respects it was completely

18 contradicted by other testimony from the same

19 witnesses on the law as for the reasons I

20 explained, and particularly on the loan documents.

21 We had everything we needed.

22      So, I say we won in the presentation of

23 the case.  We expected to win -- not an award, but

24 we had an arbitration panel which -- we know

203

1 arbitrators can be arbitrary.  Steve and I talked

2 about that at great length, how to get that out of

3 panels. They can do anything they want, and so --

4 look, I've been in enough arbitrations to know you

5 never know.

6    Q.  As have I.  Your comments are very much

7 appreciated, but let me ask you something:  If you

8 really thought this was riverboat gambling, so to

9 speak, with this arbitration panel that might be

10 arbitrary -- your word, not mine -- then why not

11 urge Steve to settle the Bitter case before the

12 arbitration award came down?

13    A.  I don't need to urge Steve to settle

14 anything in this case.

15    Q.  You didn't recommend that he try to

16 settle.  Is that right?

17    A.  You know, I don't recall ever talking

18 about settlement. I don't think there was ever --

19 I think early on we offered them we'll give you

20 something. Their response, I think: No, we'll

21 get you your money and interest.

22       We were too far apart. I don't think

23 Steven and I ever thought that there was a

24 settlement because Steven's view, at least in my

204

1 mind, was he needed to get close to the two

2 million and that was never on the table.

3    Q. Did Joe ever try to settle this case

4 during the hearing itself?

5    A. I don't recall what I would consider a

6 substantive settlement discussion before the

7 award.

8    Q. Did you during the hearing urge Steve

9 Prusky not to settle, despite the understanding

10 that Joe wood had initiated a settlement dialogue?

11   A. I'm certain I never urged him either to

12 settle or not to settle.

13   Q. Okay. Do you think you did a good job

14 with that arbitration?

15   A. That I did?

16   Q. Yes.

17   A. Yes.

18   Q. I want to you ask about your views of Joe

19 Wood. Do you think he did a good job?

20   A. Joe was a good adversary.

21   Q. Was he a competent lawyer?

22   A. Yes.

23   Q. Did he make any mistakes during the

24 arbitration that you can recall?

205

1   A. No, I don't recall mistakes by Joe.

2   Q. I'm trying to choose my words carefully

3 here: I think you either hinted at or suggested

4 one or more of the other side's witnesses were

5 less than credible. My words, but is that your

6 recollection?

7   A. My words, Steven's words.

8   Q. How many such witnesses do you think were

9 less than credible on the other side?

10   A. Really, the two principal witnesses were

11 Houchins and Barnes.

12   Q. And you thought Mr. Houchins lied?

13   A. I did.

14   Q. And you thought Mr. Barnes lied?

15   A. I wasn't sure -- I was never really sure

16 about Barnes. In some respects he seemed like a

17 kid out of his league and in other respects seemed

18 like a cagy operator working with Houchins to try