# EXHIBIT "8"

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| WINDSOR SECURITIES, LLC | : | |
| 25 E Athens Avenue | : | Civil Action No.   16-1533 |
| Ardmore, PA 19003 | : | |
|         Plaintiff | : | |
| v. | : | |
| | : | |
| ARENT FOX, LLP | : | |
| 1675 Broadway | : | |
| New York, NY 10019 | : | |
|         and | : | |
| JULIUS ROUSSEAU, III, ESQUIRE | : | |
| Arent Fox, LLP | : | |
| 1675 Broadway | : | |
| New York, NY 10019 | : | **JURY TRIAL DEMANDED** |
|         Defendants | : | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Windsor Securities, LLC ("Windsor"), by and through its undersigned counsel,

Alan L. Frank Law Associates, P.C., herein file its Complaint against Defendants Arent Fox,

LLP ("Arent Fox") and Julius Rousseau, III, Esquire ("Rousseau"), and in support thereof avers

as follows:

## INTRODUCTION

1.      This is a legal malpractice case. Through this Complaint, Windsor seeks to

recover the significant damages caused by Arent Fox and Rousseau's representation of Windsor

relating to certain premium financing Windsor provided for several different life insurance

policies, and litigation arising therefrom.  Arent Fox's and Rousseau's lawyering failures were

both pervasive and egregious. They materially contributed to an arbitration panel and several

Courts determining that Windsor was not entitled to the death benefits for significant life

1

insurance policies that it financed, under either default sale rights or section 9620 of the California Code, that Windsor's rights were thus limited to the rights of a secured creditor, and that Windsor was entitled only to collect the premiums paid plus 10% interest and expenses. As will be described more fully below, said arbitration panel decision prompted the trustees for several other insurance policies financed by Windsor to dispute that Windsor had rights in such policies other than as a secured creditor, to assert rights with respect to the death benefits under each policy, to pursue litigation to determine entitlement to the death benefit proceeds under said policies, and forced Windsor to file and answer various Complaints for declaratory relief as to death benefit proceeds. As also described in detail below, the Court handling two of these matters recently entered summary judgment in favor of the insureds and against Windsor. With its cases gutted and adverse rulings entered, to contain its financial losses, Windsor had no choice but to negotiate a settlement in the arbitration case, and, in the other cases, either negotiate a settlement, pay additional legal costs to overcome the breaches and omissions of Arent Fox and Rousseau, or in certain cases, continue to pay premiums while also pursuing one of the aforementioned remedies. Arent Fox and Rousseau must be held accountable for the massive damages that they caused.

## JURISDICTION AND VENUE

2.       This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exclusive of attorney's fees and costs exceeds Seventy Five Thousand Dollars.

3.       Venue for this action is properly laid in this district pursuant to 28 U.S.C. § 1391(b) in that the Arent Fox Engagement Letter dated April 7, 2011, which is signed by the

2

parties (the "Arent Fox Engagement Letter"), provides that venue is appropriate in this District. The Arent Fox Engagement Letter specifically states, in relevant part, "we and you agree that any litigation will be commenced only in the United States District Court for the Southern District of New York (or if that Court has no jurisdiction over the matter, in the Supreme Court for New York County) and you consent to the exclusive jurisdiction of that Court." A true and correct copy of the Arent Fox Engagement Letter is attached hereto as Exhibit "A".

4.      Accordingly, this Court has personal jurisdiction over the parties to the present action in that the parties have consented in writing to submit the dispute between them that is encompassed by this action to this Court. See Exhibit "A".

### PARTIES

5.      Plaintiff Windsor is a Nevada limited liability company with a principal place of business at 25 East Athens Avenue, Ardmore Pennsylvania. None of the members of Windsor are citizens of the States of New York or California.

6.      Upon information and belief, Defendant Arent Fox is a California limited liability partnership engaged in the practice of law in the State of New York and elsewhere, with its principal place of business in New York at 1675 Broadway, New York, New York 10019. Defendant Arent Fox also maintains offices in Los Angeles, California, San Francisco, California, and Washington DC.

7.      Defendant Rousseau is a resident of New York, is admitted to the New York Bar, is a licensed New York lawyer, and is a Partner with Defendant Arent Fox. As Arent Fox's website states, "Rousseau focuses his practice on insurance and reinsurance related matters and litigation. He advises clients in all areas of the business, including policy and treaty wording,

3

regulatory compliance and strategy. Jule [Rousseau]'s practice includes property and casualty, life, accident, health insurance, and insurance-linked products and he represents various participants in these markets. **Jule [Rousseau] has developed extensive knowledge in the life settlement business and with premium finance structures used in the purchase of life insurance. He represents clients in all facets of this business – policyholders, lenders, life settlement brokers, and providers and hedge funds providing capital to the industry"**. (emphasis added). A true and correct copy of the Arent Fox, LLP website and webpage for Julius A. Rousseau, III are attached hereto as Exhibit "B". (Arent Fox and Rousseau will be collectively referred to herein as "Defendants")

## FACTUAL BACKGROUND

### Windsor's Premium Financing

8.      In or around 2007 Windsor first became involved in life insurance premium financing.

9.      Stated simply, premium finance is a program where a client will borrow money to purchase or finance premiums for a large life insurance policy. This type of arrangement can allow the policyholder to secure a significant amount of life insurance with virtually no out-of-pocket expense for approximately two years.

10.      Windsor provided premium financing, whereby it would make a loan to a life insurance trust to finance the payment of premiums for the life insurance policy with only the policy as collateral for that loan.

11.      Most of the life insurance policies financed by Windsor were procured through an unrelated entity, E.E.H Consulting Inc. and/or its associated or affiliated entities, including but

4

not limited to Bonded Life Company, LLC, who acted as broker or servicing agent for the policies. Upon information and belief, Eugene E. Houchins III acted as President of E.E.H. Consulting, Inc., and Eugene E. Houchins, Jr. was the producer of the Policies. (E.E.H. Consulting, Inc., and/or its associated or affiliated entities, including but not limited to Bonded Life Company, LLC, and its employees/agents Eugene E. Houchins III and Eugene E. Houchins, Jr. will be collectively referred to herein as the "Broker Houchins").

12.     With each of the life insurance policies financed by Windsor and procured through Broker Houchins, Broker Houchins solicited the insured policy holders, assisted them in the purchase of the policy, assisted them in establishing a trust, obtaining financing through Windsor, and assisted them in choosing and appointing the trustee for the trust.

13.     With each of the life insurance policies financed by Windsor, an individual was the grantor of the trust and the named insured for the policy, and the trust was the original owner of the policy. The trust, and not the insured, was the borrower on the loan from Windsor, and the trust was the sole owner and beneficiary of the life insurance policy. Windsor believes, and therefore avers, that each Trust held no assets other than the Policy itself.

14.     During the loan term – 820 days or approximately twenty seven (27) months – neither the trust, nor the insured on any of the policies financed by Windsor made payments to Windsor on the borrowed funds. However, prior to the maturity date for each loan, Windsor gave the insured the options of either (1) keeping the policy by funding the trust and causing the trust to pay off the loan to Windsor, if sixty days prior written notice of full payoff was provided to Windsor; or (2) walking away from the policy by transferring ownership of the life insurance policy to Windsor in exchange for complete satisfaction and discharge of the loan (in which case

5

Windsor would then have to choose whether it would let the policy lapse for a 100% loss; or continue to pay the premiums, as owner, with the hope that the ultimate death benefit would exceed the costs put into the policy).

    15.    In or around late 2007 and early 2008, Windsor made loans for seven (7) policies procured through Broker Houchins, five (5) of which later became involved in separate lawsuits to determine whether Windsor or the trusts were entitled to the portion of the death benefits payable under each policy in excess of the monies Windsor had loaned the trusts and paid to the insurer to keep the policies in effect[1], including specifically:

- Joe E. Acker Family Trust
Insured Joe E. Acker
Policy issued by John Hancock Life Insurance Company
Policy #93783751 issued on March 6, 2008
Face Amount and Death Benefit Value $1,000,000
Trustee Ronald Mark Goss
Maturity Date of Loan- July 29, 2010
(the "Acker Policy")

---

[1]There were two (2) policies procured through Broker Houchins and financed by Windsor where the entitlement to death benefits were not contested: (1) The Stephen R. Pawlik Family Insurance Trust (the "Pawlik Trust"), insured Stephen R. Pawlik ("Pawlik"); and (2) The Warren E. Gilbert, Sr. Irrevocable Life Insurance Trust 2007-I, insured Warren E. Gilbert ("Gilbert"). In 2009, well prior to the time that the Pawlik Trust's loan came due, Pawlik, through Broker Houchins, to ask Windsor's opinion as to what to do with the Policy. Pawlik offered to Windsor to take the Policy over, but Windsor and Broker Houchins advised him that, considering his health, he should pay off the loan and assume ownership of the Policy. Ultimately, Windsor and Pawlik worked out a slightly discounted payoff, the Pawlik Trust paid off the loan, and thereafter, upon information and belief, Broker Houchins arranged for Pawlik to sell his policy in the life settlement market. Also in 2009, Gilbert caused the Gilbert Trust to relinquish the policy on his life to Windsor. Accordingly, neither is at issue in this action.

- Erwin A. Collins Family Life Insurance Trust
  Insured Erwin A. Collins
  Policy issued by Pacific Life Insurance Co.
  Policy #VF51701320 issued on March 4, 2008
  Face Amount and Death Benefit Value $2,000,000
  Trustee Maria Ana Gordillo
  Maturity Date of Loan- July 29, 2010
  (The "Collins Policy")

- John L. Bitter Irrevocable Life Insurance Trust
  Insured John L. Bitter
  Policy issued by Pacific Life Insurance Company
  Policy #VF51701770 issued on February 8, 2008
  Face Amount and Death Benefit Value $2,000,000
  Trustee Gregory Barnes
  Maturity Date of Loan- July 10, 2010
  (The "Bitter Policy")

- The Jane Ann Stamatov Family Insurance Trust
  Insured Jane Ann Stamatov
  Policy issued by PHL Variable Insurance Company
  Policy #97524494 issued on January 28, 2008
  Face Amount and Death Benefit Value $2,000,000
  Trustee Larry L. Davidson
  Maturity Date of Loan-June 29, 2010
  (The "Stamatov Policy")

- Robert S. Coppock Irrevocable Life Insurance Trust
  Insured Robert S. Coppock
  Policy issued by Pacific Life Insurance Company
  Policy #VF51701030 issued on December 2, 2007
  Death Benefit Value $2,000,000
  Trustee Eliza L. Coppock
  Maturity Date of Loan- July 8, 2010
  (The "Coppock Policy")

(The five (5) policies: "Acker", "Collins", "Bitter" Stamatov", and "Coppock", outlined above,

will be collectively referred to herein as the ("Premium Finance Policies"), the five (5) loans for

those Policies will be collectively referred to herein as the ("Premium Finance Loans"), and the

individual trustees for the Premium Finance Loans will be collectively referred to herein as the

7

("Trustees")).

16. All of the Premium Finance Loans by Windsor worked the same way. The Trustee for each individual trust, the insured, and Windsor executed nineteen documents, which, taken together, were expressly deemed by the parties thereto to comprise a single agreement (the "Financing Agreement Package" or "Premium Finance Package"). Each loan was made for a specific amount and, by its terms, would increase based on accrued interest and premium payments that Windsor thereafter elected in its sole discretion to make. A true and correct copy of the Financing Agreement Package for the loan made by Windsor to the Erwin A. Collins Family Insurance Trust and Erwin A. Collins is attached hereto, by way of example, as Exhibit "C". The Financing Agreement Packages for the other four Premium Financing Loans referenced in paragraph 14 were virtually identical (except for the amount and maturity dates of the loan).

17. Included in each Financing Agreement Package was an agreement titled Life Insurance Premium Financing Agreement among Windsor, the trustee and the insured (the "Financing Agreement"), a Security Agreement for the Beneficiary Interest in Trust by and among Windsor, the trustee and the insured (the "Security Agreement"), an Assignment of Life Insurance Policy As Collateral (the "Assignment"), which, among other things, collateralized the Premium Finance Loans with the proceeds of the policies, and Terms and Conditions for Life Insurance Premium Financing Agreement ("Terms and Conditions"), which provided, in relevant part, that all disputes were to be governed by California law[2]. See Exhibit "C".

---

[2] California law requires that interest on this type of loan be no more than 10%, a fact not conveyed by Rousseau, and of which Windsor was not aware of until the Bitter lawsuit, described more fully below.

8

18.     The Assignment in each Financing Agreement Package further provided that each Trust assigned a number of rights to Windsor, including "[t]he sole right to collect from Insurer the net proceeds of the Insurance Policy due to the death of the Insured or the maturity of the Insurance Policy," "[t]he sole right to sell the Policy," and power of attorney. See Ex. C, Doc. #15 of 19.

19.     The Assignment in each Premium Finance Package also included a Default Sale Right which provided:

> **DEFAULT SALE RIGHT. Upon an occurrence of an Event of Default (as defined in the Agreement) that has not been remedied within the time period required in the Agreement, Assignee shall have the right (the "Default Sale Right") but not the obligation to accept, that in consideration of the full and complete satisfaction of the Liabilities (the sufficiency of which consideration is hereby acknowledged) Owner may make a full transfer and assignment of the Insurance Policy to Assignee and thereby forever relinquish any and all rights Owner may have thereunder, including without limitation any rights to cash surrender value and/or death benefit provided thereunder. Upon the exercise of this Default Sale Right, Assignee shall notify Insurer in writing and Insurer shall thereafter recognize Assignee as the sole lawful owner of the Insurance Policy.**

See Exhibit "C", Doc. #15 of 19, at pg. 4 (emphasis omitted).

20.     For each of the Premium Finance Loans, Windsor provided the financing for the initial premiums and paid all of the premiums for the insurance policies thereafter. Windsor initially funded each Premium Finance Loan at 15% interest to pay the initial premium. Each Premium Finance Loan was due 820 days (approximately 27 months) after the initial funding (the "Maturity Date")[3] and the principal balance increased over time as Windsor continued to pay

---

[3]Each Financing Agreement provides that the date on which the Loan has occurred shall be the "Financing Date." See Exhibit C, at Page 10, Preamble. This defined term operates within each Financing Agreement to fix the "Maturity Date" of the loan. The Promissory Note signed by each Insurance Trust states in paragraph 3 that: "The Maturity Date is 820 days (approximately 27 months) from the date Lender [Windsor] disburses funds pursuant to the Financing

9

premiums to protect its interest in the policies as collateral.

21.   Windsor elected to make premium payments it was not required to make under the Premium Finance Policies, and in so doing, Windsor took the calculated risk that Windsor might someday make a profit. As an investor affiliated with an Investment Advisor, Windsor seeks a return of higher than 10-15% and was at risk for not recouping back its investment, much less a return of the 15% provided for in the Promissory Note.

22.   In early 2010, well prior to the Maturity Dates on each of the Premium Finance Loans, Windsor and Rousseau had discussed with Broker Houchins the various options that each of the Trustees could pursue with respect to the Premium Finance Loans, including: (1) possibly selling the policies; (2) having each Trustee retain its respective policy by paying off the loan; and (3) a mutual walk away, whereby each Trust would assign Windsor ownership of each Premium Finance Policy and all rights thereunder free and clear of any obligations to the Trusts, and in exchange therefor, each Trust would be released from and owe no further obligations to Windsor.

23.   Because the market for premium financed policies was very weak at that time, Windsor explained to Broker Houchins that its intention, if it continued to pay premiums on the policies was probably to keep the Policies in force until a death benefit was payable, but that Windsor was not interested in funding the Policies beyond what was required unless Windsor would have the sole right to the proceeds of the Policies.

---

Documents. Each Financing Agreement provides an estimated Maturity Date, although the exact Maturity Date is dictated by the date of disbursement. The entire principal amount of each Note and all accrued but unpaid interest owed thereunder [was] due and payable by the Borrower on the earlier of (a) the Death Date, or (b) the Maturity Date." See Exhibit C, pg. 29, ¶3.

24.     At or around the time of the Maturity Date on each of the Premium Finance Loans, there was no repayment or payoff by any of the Trustees, and Windsor was advised by Broker Houchins that the Trustees would not be making any premium payments nor were the Trustees planning to repay the Premium Finance Loans at their Maturity Dates.

25.     The only Trustee or Insured on the Premium Finance Policies that Broker Houchins said had even claimed to have expressed any interest in paying off the Premium Finance Loan, although no repayment of the Loan was ever actually made, was the Bitter Trustee and/or Bitter (it must be noted that Windsor never received any writing or communication directly from Bitter or the Bitter Trustee expressing said interest).

### Rousseau's Introduction To and Representation of Windsor

26.     In or around 2008, Windsor was first introduced to Rousseau by a business acquaintance that had a client in the life settlement industry that was being represented by Rousseau.

27.     At that time Rousseau was with the firm Herrick Feinstein, LLP (the "Herrick Firm") and held himself out to the public as having specialized expertise in both the life settlement business and with premium finance structures used in the purchase of life insurance.

28.     On or about June 5, 2009, Windsor engaged Rousseau and the Herrick Firm to "provide general advice and representation to Windsor in connection with a variety of corporate and lending transactions in which you and it [Windsor] are involved including premium finance of life insurance policies and various lending and investment opportunities." A true and correct copy of the Rousseau/Herrick Firm June 5, 2009 engagement letter is attached hereto as Exhibit "D".

11

29.     From June 5, 2009 through May 2010 Rousseau and the Herrick Firm provided advice and representation to Windsor regarding the Premium Finance Loans and Policies at issue herein.

30.     In or around June of 2010, Rousseau left the Herrick Firm and became a partner with Defendant Arent Fox, and became the head of Arent Fox's Insurance and Reinsurance Practice in New York City. See Pr. Newswire Article of June 17, 2010 attached as Exhibit "E".

31.     Rousseau's representation of Windsor continued uninterrupted during his transition from the Herrick Firm to Defendant Arent Fox.

32.     Rousseau, while at Defendant Arent Fox, advised and assisted Windsor with each of the Premium Finance Loans and Premium Finance Policies at issue herein, specifically including, but not limited to, Windsor's rights under the Finance Agreement Packages, notices and demands to the Premium Financing Trustees, and in determining whether and what, and preparing and obtaining the documentation necessary to ensure that Windsor had unfettered title and ownership to each of the Premium Finance Policies, and all rights thereunder.

33.     Despite the fact that Rousseau's representation of Windsor continued without interruption during his transition to Defendant Arent Fox, and the fact that Rousseau continued to provide legal advice to Windsor regarding the Premium Finance Loans and Policies and billed it for the same, Rousseau neglected to prepare or provide an official Arent Fox engagement letter to Windsor until April 7, 2011. See April 7, 2011 email from Rousseau to Windsor stating, in relevant part "I was recently reminded that I never got you to officially engage us, so here is our std ltr. I included you and Windsor both as clients, though so far we are only repping Windsor", attached as Exhibit "F". Rousseau's April 7, 2011 email enclosed the Arent Fox Engagement

12

Letter (which is attached as Exhibit "A"); See also, September 16, 2010 email exchange wherein Windsor's principal was requesting advice as to the Bitter Premium Finance Policy, attached as Exhibit "G"; and September 8, 2010 Arent Fox/Rousseau letter to the Bitter Trust, described more fully below and attached as Exhibit "H".

34.      Rousseau and Arent Fox were representing Windsor before and at the Maturity Dates for each of the Premium Finance Loans, and specifically provided advice and representation to Windsor regarding the title to, and ownership and assignment of, the Policies, actions required for transfer thereof and perfection of entitlement to the death benefits thereunder, compliance with the Finance Agreement Packages and California law, to the extent applicable, rights to benefits under the Policies, and/or notice(s) required.

35.      Rousseau and Arent Fox continued to represent Windsor in the litigation that ensued with respect to the Bitter Premium Finance Loan and Bitter Premium Finance Policy and entitlement to the death benefits thereunder.  Rousseau and Arent Fox also advised Windsor after the Bitter Ruling and throughout the summer of 2014 in connection with settlement negotiations concerning the Policies.

36.      Rousseau and Arent Fox represented Windsor regarding the Premium Finance Policies until Windsor terminated the representation by letter dated September 9, 2014.  A true and correct copy of the September 9, 2014 letter terminating Rousseau and Arent Fox's representation of Windsor is attached hereto as Exhibit "I"

**The Bitter Policy**

37.      As explained more fully above, the Bitter Policy was issued to John L. Bitter by Pacific Life Insurance Company on February 8, 2008 and had a face amount of two Million

13

Dollars ($2,000,000).

38.    The Trust for the Bitter Policy was created on January 3, 2008, and Gregory Barnes, an acquaintance of Broker Houchins, was appointed as Trustee based on Broker Houchins' recommendation ("Bitter Trustee")[4].

39.    Windsor funded the Bitter Premium Finance Loan in the amount of Eight Four Thousand Five Hundred Dollars ($84,500) at fifteen percent (15%) interest to pay the initial premium (the "Bitter Loan").

40.    The Bitter Trustee, John Bitter and Windsor executed nineteen documents, which, taken together, were expressly deemed by the parties thereto to comprise a single agreement (the "Bitter Financing Agreement Package").

41.    The Bitter Loan was due 820 days (approximately 27 months) after the initial funding, and the principal balance increased over time as Windsor continued to pay premiums to protect its interest in the Policy as collateral.

42.    Neither Bitter nor the Bitter Trust ever paid any premiums for the Bitter Policy. All premiums for the Bitter Policy were paid by Windsor.

43.    The Bitter Loan became due to Windsor on or about July 8, 2010.

44.    No repayment of the Bitter Loan was made by Bitter or the Bitter Trust either before or subsequent to July 8, 2010.

45.    Throughout the term of the Bitter Loan, Windsor sought and Rousseau provided legal advice regarding Windsor's rights under the Bitter Finance Agreement Package, notices and

---

[4]Upon information and belief, the Bitter Trustee was a high school drop out, with no financial or insurance expertise, who had become acquainted with Broker Houchins when he installed Houchins' home audio equipment.

14

demands to Bitter/The Bitter Trust/the Bitter Trustee, preparing and obtaining the documents

necessary to transfer title and ownership of the Bitter Policy from the insured/Trust to Windsor,

and perfect Windsor's entitlement to the death benefits payable under the Bitter Policy.

46.     By way of example:

- On July 7, 2009 Rousseau sent a letter to the Bitter Trust (via Barnes the Trustee), Mr. Bitter, and Mrs. Bitter, claiming an event of default on the grounds that the trustee had been changed without the permission of Windsor.

- On July 23, 2009 Rousseau sent a letter to the Bitter Trust (via Barnes the Trustee) regarding the Trustee's inquiry about a collateral assignment and loan documents.

- On August 18, 2009 Rousseau sent a letter to the Bitter Trust (via Barnes the Trustee) and to Mr. Bitter regarding the obligations of the insured and the trustee, tax issues, and the transmission of loan documents.

- On November 30, 2009 Rousseau sent a letter to the Bitter Trust (via Barnes the Trustee) and to Mr. Bitter requesting a HIPAA release and threatening an event of default if the release was not provided.

47.     On September 8, 2010, Rousseau and Arent Fox, as counsel to Windsor, sent a

letter to Bitter and Bitter's Trustee asserting an event of default for non-payment of the loan and

explaining that, pursuant to Section 6(a) of the Security Agreement, Windsor is entitled to a

transfer of the collateral and registration of the collateral in Windsor's name. Specifically

Rousseau's September 8, 2010 letter stated in relevant part:

> **I represent the above-named Lender in connection with the loan made under the Financing Agreement. As you know, the maturity date of the loan was July 10, 2010, and payment in full has not been received by the Lender. Mr. Houchins has had several conversations with Mr. Prusky, at the Lender, but the Lender has not heard from the Trustee directly or been told that payment was attempted. Mr. Prusky has advised Mr. Houchins that, since payment was not made when due, title to the policy and its benefits has transferred, by law, directly to the Lender.**

> **Pursuant to the terms of the Security Agreement (attached), the collateral that was**

15

posted - the life insurance policy on the insured and all beneficial interests thereto - has become the property of the *Lender. Section 6(a) of the Security Agreement authorized and empowers the Lender to transfer the collateral and register its in the Lender's name by virtue of the Borrower's failure to pay the loan at the maturity date.* The Lender also has irrevocable **attorney-in-fact powers** to transact the change of ownership.

To expedite the transaction with the life insurance company, we request that the trustee execute on the third page at the "x" by "other required signature," which shows that Mr. Barnes is acting in his capacity as trustee. You are also required to forward the original of the policy to the Lender.

(emphasis added) A true and correct copy of Rousseau's September 8, 2010 correspondence is attached hereto as Exhibit "H".

48.     The Bitter Trustee and Bitter failed to respond to Rousseau's September 8, 2010 letter.

49.     After consulting with Rousseau and in accordance with Rousseau's advice, on January 14, 2011, Windsor sent a letter to Bitter and the Bitter Trustee reiterating the assertions in Rousseau's September 8, 2010 letter as to Windsor's ownership of the Bitter Policy as a matter of law by reason of default and requesting return of the paperwork that Rousseau had requested to conclude the relationship in an amicable fashion. A true and correct copy of Windsor's January 14, 2011 letter is attached hereto as Exhibit "J".

50.     On February 14, 2011, as demanded by Rousseau (Arent Fox) and thereafter requested by Windsor, the Bitter Trustee executed an Ownership, Name or Beneficiary Change Request (the "Bitter COO").

51.     Rousseau specifically advised Windsor that the executed Bitter COO and surrender of the Bitter Policy effectuated ownership and entitlement of the death benefits under the Bitter Policy to Windsor. Rousseau did not suggest or advise that any other document(s) be

16

executed or any other action be taken by Windsor to perfect its ownership in and/or entitlement to the death benefits under the Bitter Policy.

52.     Approximately 20 months later, on December 23, 2012 Bitter died.

53.     From the Maturity Date on the Bitter Loan to Bitter's death, Windsor continued to pay the premiums on the Bitter Policy.

54.     Following Bitter's death and pursuant to the executed Bitter COO, Windsor sought to collect the death benefit under the Bitter Policy from Pacific Life Insurance Company.

55.     Upon receiving notice of Windsor's attempts to collect the death benefits under the Bitter policy, on February 13, 2013, the Bitter Trustee filed a civil action in the California Superior Court for the County of Sonoma against Windsor claiming that Windsor did not have ownership and/or rights to the death benefits under the Bitter Policy and seeking declaratory relief as to Windsor's entitlement thereto (the "Bitter Action").

56.     Windsor was represented in the Bitter Action by Rousseau and Arent Fox.

57.     Rousseau, on Windsor's behalf, removed the Bitter Action to the United States District Court for the Northern District of California, San Francisco.

58.     Pacific Life Insurance Company then filed an Interpleader action in the Bitter Action and the Two Million Dollars ($2,000,000) of death benefits under the Bitter Policy, less Pacific Life's interpleader expenses, were deposited in the registry of the United States District Court for the Northern District of California.

59.     Because the Bitter Premium Finance Package provided that all disputes were to be determined by a panel of three (3) arbitrators in San Francisco, California, under the Commercial Arbitration Rules of the American Arbitration Association, the Bitter Action was referred to the

17

American Arbitration Association (the "Bitter Arbitration") and the United States District Court for the Northern District of California stayed the Bitter Action pending the Bitter Arbitration.

60.     Rousseau and Arent Fox chose two (2)- of the three (3)- arbitration panel members in the Bitter Arbitration, represented Windsor therein, and Windsor paid Rousseau and Arent Fox significant legal fees for said representation and paid significant arbitration fees to the American Arbitration Association.

61.     Throughout the Bitter Arbitration, Rousseau and Arent Fox assured Windsor that it had gained ownership to the Bitter Policy by reason of the Bitter Trust's default in failing to make payment of the loan when it became due in July of 2010, Rousseau's September 8, 2010 letter and Windsor's January 14, 2011 letter, and that such ownership became absolute when the Bitter Trustee executed the Bitter COO that formally transferred the Bitter Policy on February 14, 2011 and subsequently surrendered the original of the Policy to Windsor. In fact, Rousseau and Arent Fox repeatedly strongly counseled against Windsor's suggestion to settle the Bitter Arbitration and Action advising, in part, that Windsor had made the "offer" required under either the Default Sale Right in the Premium Finance Package and/or California law, if and to the extent that California Commercial Code Section 9620 applied.

62.     In the Bitter Arbitration, the Bitter Trustee argued that the Bitter Trust was not in default at the time that Windsor sought to take ownership of the Bitter Policy, and even if it was, Windsor failed to satisfy the requirements of the "Default Sale Right" provision contained in the Bitter Assignment and also failed to comply with the "strict foreclosure" procedures under California Civil Code Section 9620, California's version of the Uniform Commercial Code ("UCC"), and therefore Windsor's rights were that of a secured party entitled to recover only the

18

monies it advanced for premiums, plus interest, closing costs, and expenses, and was not entitled

the death benefits under the Bitter policy. See the American Arbitration Association April 8,

2014 Interim Award, attached as Exhibit "K".

      63.     On April 8, 2014, following three days of hearing testimony from multiple

witnesses (February 13-15, 2014), extensive briefing by Rousseau and Arent Fox on Windsor's

behalf, review of hundreds of exhibits, and hours of argument by Rousseau (on March 5, 2014),

the American Arbitration Association panel entered an Interim Award in the Bitter Arbitration in

favor of the Bitter Trust, wherein it found and decided that the Bitter Trust at the time of Mr.

Bitter's death retained ownership of the Bitter Policy. Specifically the Interim Award states, in

relevant part, as follows:

> **the Trust at the time of Mr. Bitter's death retained the ownership of the policy
> and is entitled to the death benefits of the policy subject to Windsor's rights as
> a secured creditor to collect all sums due it by reason of its payment of the
> insurance premiums including principal, interest, at the rate of 10% from the
> date of the initial payment to the present and expenses as defined in the loan
> documents.**

See Exhibit "K", at pg. 7.

      64.     The Arbitration Panel specifically found that "Windsor failed to comply with the

Default Sales provision in the [Bitter] Collateral Assignment Agreement and California Civil

Code §9620." See Exhibit "K" at pg. 4.

      65.     The Arbitration Panel specifically held that Windsor failed to comply with the

Default Sales Provision in the Bitter Collateral Assignment for the following reasons:

> **There is no direct evidence in this record that Windsor notified Barnes [the Bitter
> Trustee] that by reason of the non-payment of the loan it intended to exercise the
> Default Sale Right provision in the Assignment Agreement. _Although the letter from
> Windsor's counsel of September 8, 2010 in its heading referenced the Assignment
> Agreement among other documents, the body of the letter makes reference to Section_**

19

*6(a) of the Security Agreement as the basis for the demand that Barnes execute the COO transferring all ownership rights to Windsor as a matter of law.*

*The rights granted to Windsor under the terms of Section 6(a) are solely to protect its secured interests and do not purport to give Windsor unfettered ownership of the policy or a right to keep any death benefits in excess of its secured interests.* Windsor argues that even though there may be no direct evidence, the conduct of the parties reflect that Barnes believed that the COO ended any interest the Trust might have in the policy and that Barnes never took any action that would reflect that he believed the Trust retained any right to the benefits once he delivered the COO. It also argues that Windsor took no steps against the Trust once it obtained the COO.

Because Section 6(a) contemplated the execution of a COO under circumstances wherein Barnes was not giving up all rights in the policy, its execution is at best ambiguous. Absent express notification to Barnes that Windsor was invoking its Default Sale Right, the record does not support a finding that Barnes' execution of the COO and surrender of the policy conveyed to Windsor unfettered title to the policy and the death benefit.

(emphasis added) See Exhibit "K" at pg. 5.

66.     The Arbitration Panel specifically held that Windsor failed to comply with

California Civil Code §9620 for the following reasons:

Under Cal. Civ. Code § 9620, Windsor had two options to obtain unfettered ownership of the Bitter policy and its death benefit. One option for Windsor was to enter into a written agreement, post-default, with Barnes whereby Windsor released Barnes and the Trust from all obligations in exchange for Barnes conveying outright ownership of the policy.

Windsor acknowledged that it did not do so.

Windsor's other option was "strict foreclosure," whereby Windsor agreed to accept the policy as full satisfaction of the Bitter loan pursuant to a "record authenticated" after default.

***

Windsor contends that in the context of the September 8, 2010 and January 14, 2011 letters from Windsor and its Counsel, and execution of the COO by Barnes constitutes an authenticated record evidencing that Windsor accepted the COO and surrender of the Policy in full satisfaction of the Trust's obligations under the financing documents. The record does not support this contention.

> There is nothing in either the September 8, 2010 letter or the January 14, 2001 letter that expresses an acceptance by Windsor of the collateral in full satisfaction of the obligation. Both are silent on this point.
>
> Windsor therefore did not satisfy the "strict foreclosure" requirement under § 9620(c)(2).
>
> Just as was discussed above in connection with the Default Sale Right, nothing in the demand letters sent by counsel for Windsor or by Windsor itself contained a proposal stating that Windsor was prepared to accept the policy in full satisfaction of the liability owed to it; thus, the execution of the COO by Barnes also does not satisfy the proposal requirements of §9620(c)(2)(A)-©.

See Exhibit "K", at pgs. 6-7.

67.    As outlined above, the decision in the Bitter Arbitration was directly based on Rousseau and Arent Fox's failures and incorrect advice, including, but not limited to, the failure to obtain a formal written release from the Trust/Trustee, the failure to document that Windsor accepted and the Trust transferred the Bitter Policy in full satisfaction of the Trust's liabilities to Windsor, and the fact that the September 8, 2010 letter Rousseau and Arent Fox did send quoted and relied on Section 6(a) of the Security Agreement, which was the wrong section of the Financing Agreement to rely upon for Windsor to have unfettered ownership and clean title in the Premium Finance Policy and all rights thereunder, including entitlement to the death benefit.

68.    As a result of the adverse ruling by the Bitter Arbitration Panel, Windsor incurred substantial legal fees and was forced to settle the Bitter Action for significantly less than the full death benefits under the Bitter Policy[5].

---

[5]Per the terms of the executed Settlement Agreement in the Bitter Action, the Parties thereto, including Windsor, agreed "not to disclose, discuss, or reveal the amounts paid or received under this AGREEMENT to any person or entity, other than its employees, officers, directors, attorneys, accountants, tax advisors, consultants, insurers, reinsurers, prospective purchasers, and state and federal regulatory authorities, or to the extent disclosure is required by law."

69.     Bitter was the only Premium Finance Policy where Rousseau/Arent Fox and/or Windsor sent a default letter following a Trust's failure to repay a loan and the passing of a maturity date. As will be discussed more fully below, with the other four (4) Premium Finance Policies (Collins, Acker, Coppock and Stamatov), the Trustees executed COO's prior to the Maturity Date of the Loans.

70.     Following the Arbitration Panel's Interim Order in the Bitter Arbitration, Windsor and Rousseau specifically discussed the documentation regarding the other four (4) Premium Financed Policies (Collins, Acker, Coppock and Stamatov), Windsor's ownership of those Premium Finance Policies, and Windsor's entitlement to the death benefits under each respective Policy.

71.     Again, Rousseau and Arent Fox assured Windsor that Windsor's ownership of those Policies was absolute and that Windsor would be, by virtue of the executed COO's (discussed more fully below), and by operation of law, entitled to the death benefits for each Policy. Rousseau specifically suggested that requiring and/or obtaining any further documentation with respect to each of these Policies could "only cause more trouble."

72.     After going back and forth on the issue with Rousseau for two (2) months, Windsor in June of 2014 sent to each Trustee (the Collins Trustee, the Acker Trustee, the Coppock Trustee, and the Stamatov Trustee) a letter reiterating what Rousseau and Arent Fox had repeatedly advised Windsor, which was that Windsor had received full ownership of the Policy in 2010 in exchange for a full release of any financial obligations under the Loan. However, and as will be discussed more fully below, in that two (2) month period, Acker died. Collins died within a day or days after the Collins Trustee received Windsor's letter.

22

**The Acker Policy**

73.     As explained more fully above, the Acker Policy was issued to the Joe E. Acker Family Insurance Trust by John Hancock Life Insurance Company on March 6, 2008 and had a face Amount and Death Benefit Value of One Million Dollars ($1,000,000).

74.     The Trust for the Acker Policy was created on December 5, 2007, shortly before Ronald Mark Goss (who unbeknownst to Windsor was a subagent of Broker Houchins) was originally appointed Trustee, based on Broker Houchins' recommendation. Also unbeknownst to Windsor, Ronald Mrk Goss was sent to prison in 2012, and his responsibilities as the Trustee for the Acker Trust were thereafter handled by his wife Mindy Goss (Ronald Mark Goss and Mindy Goss will be independently and/or collectively referred to herein as the "Acker Trustee").

75.     Windsor funded the Acker Premium Finance Loan on May 1, 2008 in the amount of One Hundred Thirty Thousand Nine Hundred and Fifty Eight Dollars ($130,958.00) at fifteen percent (15%) interest to pay the initial premium (the "Acker Loan").

76.     The Acker Trustee, Joe Acker and Windsor executed nineteen documents, which, taken together, were expressly deemed by the parties thereto to comprise a single agreement (the "Acker Financing Agreement Package").

77.     Under the Acker Financing Package, the Acker Loan was due on July 30, 2010/August 1, 2010, which is 820 days/27 months after the initial funding, and the principal balance increased over time as Windsor continued to pay premiums to protect its interest in the Policy as collateral.

78.     As with the Bitter Policy, the Acker Note was secured by "the collateral assignment of the Policy given by Borrower to Lender pursuant to the Assignment of Life

23

Insurance Policy as Collateral."

79.    Neither Acker nor the Acker Trust ever paid any premium for the Acker Policy. All premiums for the Acker Policy were paid by Windsor. By 2014, Windsor had paid over $230,000 in premiums for the Acker Policy. As of the filing of this Complaint, the principal and interest due under the Acker Policy, according to the Court ruling in the Acker case, is over $600,000.

80.    No repayment of the Acker Loan was made by Acker or the Acker Trust either before or subsequent to August 1, 2010 and neither objected to Windsor continuing to pay premiums after August 1, 2010.

81.    Throughout the term of the Acker Loan, Windsor sought and Rousseau provided legal advice regarding Windsor's rights under the Acker Finance Agreement Package, notices and demands to Acker/The Acker Trust/the Acker Trustee, preparing and obtaining the documents necessary to transfer title and ownership, including all rights thereunder, of the Acker Policy from the insured/Trust to Windsor, and perfecting Windsor's entitlement to the death benefits under the Policy.

82.    After hearing from Broker Houchins that the Acker Trust did not want to pay off the Loan or pay the upcoming premium to keep the Policy and wanted instead to transfer ownership of the Policy to Windsor, and pursuant to legal advice provided by and recommendation of Rousseau, Windsor and The Acker Trust entered into an agreement, in which the Acker Trustee, signed an "Absolute/Gift Assignment – Life Insurance" form (the "Assignment") that was intended to transfer ownership, and all rights attendant therewith, of the Policy to Windsor in exchange for the Acker Trust being relieved of its financial obligations to

24

Windsor.

83.     More specifically, on February 19, 2010 the Acker Trustee initially signed and returned a change of ownership form on behalf of the Acker Trust transferring ownership of the policy to Windsor, on which the Acker Trustee checked the box providing an "absolute assignment," which states, "[f]or value received, the undersigned hereby transfers and assigns absolutely all rights and interest in the above policy(ies) to the assignee".

84.     However, that COO form signed by the Acker Trustee was not the updated form required by the insurance company and was not witnessed properly, which prompted Windsor to send a letter to the Acker Trustee on the same day, February 19, 2010, wherein Windsor directed the Acker Trustee to sign an updated form entitled "Change of Ownership (Absolute Assignment)." Windsor's letter also stated that Windsor understood the Acker Trustee was "taking this action because the premiums required to keep the policy in force are now beyond the amount Windsor is responsible for according to financing documents, and [The Acker Trustee] would therefore rather assign the policy than pay those monies."

85.     The second "Change of Ownership (Absolute Assignment)" form (the "Second COO") stated that "the undersigned hereby transfers and assigns absolutely, all rights, title and interest in the above policy(ies) to the Assignee(s) indicated below and HEREBY REVOKES ANY BENEFICIARY DESIGNATION or direction of payment previously made in respect to the proceeds payable on the death of the Life Insured under the above policy(ies) and directs that such proceeds be paid to the Assignee(s) . . . The Assignor(s) WARRANT the validity of this assignment."

86.     On March 18, 2010, the Acker Trustee signed the Second COO, with proper

25

witness attestation, and returned it to Windsor. The executed Second COO named Windsor as the owner of the Acker Policy. A true and correct copy of the executed March 18, 2010 Second COO is attached hereto as Exhibit "L".

87. Rousseau specifically advised Windsor that it did not need a new "assignment" of the Acker Policy or any other documentation to protect its ownership thereof and absolute entitlement to the death benefits thereunder because Windsor had already received an assignment of the Acker Policy at the inception of the Loan when the Acker Trustee signed the "ASSIGNMENT OF LIFE INSURANCE POLICY AS COLLATERAL" on April 10, 2008, and Windsor had been timely making the premium payments on the Acker Policy.

88. On May 20, 2010 John Hancock Life Insurance Company received the Second COO signed by the Acker Trustee and confirmed the change of ownership to Windsor.

89. Thereafter, Rousseau and Arent Fox repeatedly assured Windsor that no other documentation was necessary from the Acker Trust for Windsor's unfettered ownership of the Acker Policy and Windsor's absolute entitlement to the death benefits thereunder.

90. As explained above, following the Bitter Arbitration award and after back and forth with Rousseau and Arent Fox, in June of 2014 Windsor sent a letter to the Acker Trustee confirming the change of ownership and the release previously provided.

91. Unbeknownst to Windsor, Acker had died on April 15, 2014.

92. Also following the Arbitration Panel Award in the Bitter Arbitration, on or about July 22, 2014, the Acker Trustee sent a letter to John Hancock Life Insurance Company wherein she asserted, for the first time, a claim to the death benefits under the Acker Policy.

26

93.    As both Windsor and the Acker Trust were claiming the death benefits under the Acker Policy, on October 17, 2014, the John Hancock Insurance Company filed a lawsuit for declaratory relief and interpleader in the United States District Court for the Northern District of California, Case No. 14-cv-04651-WHO (the "Acker Action") to determine the entitlements of the Acker Trust and Windsor in and to the death benefits due under the Acker Policy.

94.    In the Acker Action, the Acker Trustee (represented by the same counsel that represented the Bitter Trustee in the Bitter Action/Bitter Arbitration) filed a cross-claim against Windsor alleging, in part, that neither the terms of the Security Agreement, nor any other portion of the Financing Agreement, provided that execution of the Assignment and COO by the Trustee would make Windsor the outright owner of the Acker Policy, would entitle Windsor either to the entirety of the Death Benefit under the Policy or to any other amount in excess of the sum due to Windsor in its capacity as a secured lender, viz., the total of the amounts loaned by Windsor to the Trust, plus legal interest (10% per annum) thereon, plus Windsor's reasonable expenses, if any existed, incurred in enforcing and/or protecting its security interest. A true and correct copy of the Acker Trustee's Answer and Cross-Claim in the Acker Action is attached hereto as Exhibit "M".

95.    The Acker Trustee further argued in its Cross Claim that "subsequent to Windsor's having loaned to the Trust all of the monies for premium payments that Windsor was required to provide under the Financing Agreement, the Trust informed Windsor that the Trust would not repay the loan when due. The Trust thereby committed an anticipatory breach of, and default under, the Financing Agreement, entitling Windsor, pursuant to the Security Agreement and to California law governing secured transactions like the one here at issue, to [only] the

27

[following] relief";

   "(a)   to sell the Policy collateral at a noticed public or private sale, at which sale Windsor, the Trust, the Insured, or any other person or entity could bid in an effort to purchase the Policy;

   (b)   to take from the proceeds of that sale a sum equal to the total of the amounts loaned by Windsor to the Trust, plus legal interest (10% per annum) thereon, plus Windsor's reasonable expenses, if any existed, incurred in enforcing and/or protecting its security interest;

   ©   to recover from the Trust, with no requirement of first having recourse to the Policy collateral, all monies owed by the Trust by Windsor; and

   (d)   should sale of the Policy collateral not generate proceeds sufficient to pay what was owed by the Trust to Windsor, to recover from the Trust the amount of any such deficiency.

Also pursuant to the terms of the Security Agreement and to California law governing secured transactions like the one here at issue, any proceeds of sale in excess of what was owed by the Trust to Windsor were required to be paid to the Trust by Windsor."

See Exhibit "M", at ¶16-18.

96.     On July 8, 2015, Windsor moved for Summary Judgment, or, in the alternative, Partial Summary Judgment in the Acker Action claiming that the Acker Assignment demonstrated that there had been an exercise of the Default Sales Right contained in the Acker Premium Finance Package and that it was entitled to the full amount of death benefits under the Acker Policy.

97.     In its response thereto, the Acker Trust did not dispute that it executed the Assignment, or that it defaulted under the terms of the Acker Premium Finance Agreement, instead, the Trust asserted that the Assignment it entered into after its anticipatory breach was not an exercise of, or evidence of, an exercise of the Default Sales Right and did not comply with California UCC law.

98.    On September 21, 2015 the Court in the Acker Action entered an Order denying

Windsor's Motion for Summary Judgment, specifically finding that "the Assignment does not

constitute an exercise of the DSR, and the purported acceptance of the insurance proceeds in full

satisfaction of the Trust's debt does not comply with section 9620 [of the California Commercial

Code]". A true and correct copy of the Acker Court's September 21, 2015 Order is attached as

Exhibit "N".

99.    The Court further granted Windsor's alternative motion for partial summary

judgment and specifically held, as did the Arbitration Panel in the Bitter Arbitration, that

"Windsor is entitled to retain from the Death Benefit *only* a sum equal to the amounts Windsor

has loaned to the Trust, plus legal interest thereon, plus Windsor's reasonable expenses, if any

exist, incurred in collecting or enforcing the Policy collateral, and that the Trust is entitled to the

portion of the Death Benefit remaining after that sum has been paid." See Exhibit "N" (emphasis

added).

100.   In so holding the Court stated, in relevant part:

**At issue is whether the Assignment satisfies the provisions of California Commercial Code section 9620(c)(2). This statute contemplates two ways in which a debtor may consent to relinquish its claim to collateral. Windsor argues that it has satisfied the first form of satisfaction and that the Trust "agree[d] to the terms of the acceptance in a record authenticated after default." CAL. COM. CODE § 9620(c)(2). It is undisputed that the Assignment itself does not contain any language that the transfer of ownership satisfied the Trust's liabilities under the PFA**

\*\*\*

**Windsor's argument is unpersuasive for several reasons, starting with its understanding of the statute. Section 9620 requires an *agreement* "to the terms of the acceptance in a record authenticated after default." An agreement is not simply a transfer. Section 9602 requires that the agreement include the terms of the acceptance "of collateral in full satisfaction of the obligation it secures." Because the Assignment does not reflect any agreement to transfer the collateral in exchange for a satisfaction of the Trust's obligations, the Trust cannot be considered to have**

29

consented under the terms of section 9620.

\*\*\*

In addition, section 9620 provides that a debtor's consent to acceptance of collateral must be made in an agreement *after default.* The statute repeatedly uses the language of a "record authenticated after default." This is made clear because an agreement to any terms before default would constitute an improper waiver of the rights in section 9620(b). Thus, any construction of the DSR as requiring the Trust to transfer the policy to Windsor in full satisfaction of its obligations pre-default would violate section 9602 . By its plain terms, the Assignment does not satisfy section 9620.

\*\*\*

Windsor is also incorrect in asserting that the Assignment was simply an execution of the DSR. The DSR allows Windsor to request, *"in consideration of the full and complete satisfaction of the Liabilities* . . . [that the Trust] make a full transfer and assignment of the Insurance Policy to Assignee and thereby forever relinquish any and all rights Owner may have thereunder, including without limitation any rights to cash surrender value and/or death benefit provided thereunder." PFA, Doc. No. 15 at 4 (emphasis added). Again, although the Assignment makes a full assignment of the policy to Windsor, it does not provide that the transfer of title or change in beneficiary was in "consideration of the full and complete satisfaction of the Liabilities." Just as the lack of such language fails to satisfy the requirements of section 9620, it also fails to satisfy the requirements of the DSR as defined in the PSA. Without such language or any reference to the DSR, it is not clear that the document the Trust signed was the DSR.

\*\*\*

...even assuming the PFA did not require the Assignment in order for Windsor to foreclose after default, Windsor would not be relieved of its obligation to comply with California law. That Windsor did not need to execute the Assignment does not change the fundamental fact that the Assignment does not discharge the obligations of the Trust under the PFA

\*\*\*

Windsor's argument that there was a separate offer and acceptance that satisfies section 9620... fails because section 9620 requires a writing that contains the terms of acceptance.

See Exhibit "N".

101.    Following the September 21, 2015 Order denying Windsor's Motion for Summary

Judgment, on December 22, 2015 the Court in the Acker Action granted the Acker Trust's

Motion for Summary Judgment. Thus, the Acker Court determined as a matter of law, that the

30

legal advice provided by Rousseau and Arent Fox to Windsor regarding ownership of and entitlement to the death benefits under the Acker Policy by virtue of the execution of the COOs, and what was required for Windsor to have executed by the Trustee so that Windsor would unquestionably have unfettered ownership to the Policies and all entitlements thereunder was incorrect.

102.    Stated plainly, the Court in the Acker Action and the Arbitration Panel in the Bitter Action both concluded that there was language that should have been added to the documents executed by the Trust to demonstrate unambiguously that the change in ownership of the insurance policy was "in consideration of the full and complete satisfaction of the liabilities". Had Rousseau and Arent Fox properly documented the mutual walkaway between Windsor and the Trust, and included the language required to avoid ambiguity of the parties' intent and/or to satisfy the Default Sales Right and/or Section 9620, to the extent applicable, Windsor would have absolutely and as a matter of law been entitled to **all** of the death benefits of the Acker Policy.

### The Collins Policy

103.    As explained more fully above, the Collins Policy was issued to Erwin A. Collins by Pacific Life Insurance Company on or about March 4, 2008 and had a face Amount and Death Benefit Value of Two Million Dollars ($2,000,000).

104.    The Trust for the Collins Policy was created shortly before and Maria Ana Gordillo was appointed Trustee (the "Collins Trustee"), based on Broker Houchins' recommendation.

31

105. Windsor funded the Collins Premium Finance Loan on April 30, 2008 in the amount of One Hundred Twelve Thousand Seven Hundred and Fifty Dollars ($112,750) at Fifteen percent (15%) interest to pay the initial premium and closing costs (the "Collins Loan").

106. The Collins Trustee, Erwin Collins and Windsor executed nineteen documents, which, taken together, were expressly deemed by the parties thereto to comprise a single agreement (the "Collins Financing Agreement Package").

107. Under the Collins Financing Package, the Collins Loan was due on or about July 30, 2010, which is 820 days/27 months after the initial funding, and the principal balance increased over time as Windsor continued to pay premiums to protect its interest in the Policy as collateral.

108. As with the other Premium Finance Policies discussed above, the Collins Note was secured by "the collateral assignment of the Policy given by Borrower to Lender pursuant to the Assignment of Life Insurance Policy as Collateral."

109. Neither Collins nor the Collins Trust ever paid any premium for the Collins Policy. All premiums for the Collins Policy were paid by Windsor.

110. No repayment of the Collins Loan was made by Collins or the Collins Trust either before or subsequent to July 30, 2010 and neither objected to Windsor continuing to pay premiums after July 30, 2010.

111. Throughout the term of the Collins Loan, Windsor sought and Rousseau provided legal advice regarding Windsor's rights under the Collins Finance Agreement Package, notices and demands to Collins/The Collins Trust/the Collins Trustee, preparing and obtaining the documents necessary to transfer title and ownership, including all rights thereunder, of the

32

Collins Policy from the insured/Trust to Windsor, and to perfect Windsor's entitlement to the death benefits under the Policy.

112.    After hearing from Broker Houchins that the Collins Trust did not want to pay off the Loan or pay the upcoming premium to keep the Policy and wanted instead to transfer ownership of the Policy to Windsor, and pursuant to legal advice provided by and recommendation of Rousseau, before the Maturity Date of the Collins Loan, Windsor entered into an agreement with the Collins Trust  in which the Collins Trustee, signed an "Ownership Name or Beneficiary Change Request" form (the "Assignment") that transferred ownership of the Collins Policy to Windsor.

113.    On or about May 11, 2010 The Collins Trustee executed a document that changed the ownership and payor of the Collins policy.

114.    On May 25, 2010, Pacific Life Insurance Company provided a Title Change Confirmation to Windsor of the Change of Ownership and Change in Payor requested and filed on May 11, 2010.  The new owner and payor on the Collins Policy was Windsor.

115.    On September 1, 2010, Pacific Life provided a Title Change Confirmation to Windsor of the Change of Beneficiary requested and filed on August 26, 2010.

116.    Thereafter, Rousseau and Arent Fox repeatedly assured Windsor that no other documentation (or additional language) was necessary from the Collins Trust for Windsor's unfettered ownership of the Collins Policy and/or Windsor's absolute entitlement to the death benefits thereunder.

117.    As explained above, following the Bitter Arbitration award and after back and forth with Rousseau and Arent Fox, in June, 2014 Windsor sent a letter to the Collins Trustee

33

confirming the voluntary assignment of the Policy to Windsor, in exchange for a complete satisfaction and discharge of the loan evidenced by the Promissory Note.

     118.    The Collins Trustee responded, stating that the Collins Trust was entitled to the excess of the death benefits once Windsor had been repaid the premium and interest.

     119.    Collins died on June 19, 2014.

     120.    Also following the Arbitration Panel Award in the Bitter Arbitration, on or about July 15, 2014, the Collins Trustee sent a letter to Pacific Life Insurance Company wherein she asserted, for the first time, a claim to the death benefits under the Collins Policy.

     121.    As both Windsor and the Collins Trust were claiming the death benefits under the Collins Policy, on October 17, 2014, the Pacific Life Insurance Company filed a lawsuit for declaratory relief and interpleader in the United States District Court for the Northern District of California, Case No. 14-cv-03713-WHO (the "Collins Action") to determine the entitlements of the Acker Trust and Windsor in and to the death benefits due under the Acker Policy.

     122.    The Collins Trust/Trustee (who were represented by the same counsel that represented both the Bitter Trustee and the Ackers Trustee in the Bitter and Acker Actions) filed a Cross Claim in the Collins Action against Windsor and made the identical arguments of entitlement to the death benefits that were made in the Acker Action.

     123.    On July 8, 2015, Windsor moved for Summary Judgment, or, in the alternative, Partial Summary Judgment in the Collins Action making the identical arguments made in the Acker Action.

     124.    On September 21, 2015 the Court in the Collins Action (the same judge presided over the Summary Judgment Motions in the Acker and Collins Actions) entered an Order

34

denying Windsor's Motion for Summary Judgment, specifically finding that "the Assignment does not constitute an exercise of the DSR, and the purported acceptance of the insurance proceeds in full satisfaction of the Trust's debt does not comply with section 9620 [of the California Commercial Code]". A true and correct Copy of the Collins Court's September 21, 2015 Order is attached as Exhibit "O".

125. The Court further granted Windsor's alternative motion for partial summary judgment and specifically held, as did the Arbitration Panel in the Bitter Arbitration, that "Windsor is entitled to retain from the Death Benefit *only* a sum equal to the amounts Windsor has loaned to the Trust, plus legal interest thereon, plus Windsor's reasonable expenses, if any exist, incurred in collecting or enforcing the Policy collateral, and that the Trust is entitled to the portion of the Death Benefit remaining after that sum has been paid." See Exhibit "O" (emphasis added).

126. Following the September 21, 2015 Order denying Windsor's Motion for Summary Judgment, on December 22, 2015 the Court in the Collins Action granted the Collins Trust's Motion for Summary Judgment. Thus, the Collins Court determined as a matter of law, that the legal advice provided by Rousseau and Arent Fox to Windsor regarding ownership of and entitlement to the death benefits under the Collins Policy by virtue of execution of the COO, and what was required for Windsor to have executed by the Trustee so that Windsor would unquestionably have unfettered ownership to the Policy, and entitlements thereunder, were incorrect. Stated plainly, the Court in the Collins Action, the Acker Action and the Arbitration Panel in the Bitter Action all concluded that there was language that should have been added to the documents executed by the Trust to demonstrate unambiguously that the change in ownership

35

of the insurance policy was "in consideration of the full and complete satisfaction of the liabilities". Had Rousseau and Arent Fox advised Windsor regarding proper documentation of the mutual walkaway between Windsor and the Trust, that included the language required to avoid ambiguity of the parties' intent and/or to satisfy the Default Sales Right and/or Section 9620, to the extent applicable, Windsor would have absolutely and as a matter of law been entitled to **_all_** of the death benefits of the Acker Policy.

### The Coppock Policy

127.    As explained more fully above, the Coppock Policy was issued to Robert Coppock by Pacific Life Insurance Company on or about December 2, 2007 and had a face Amount and Death Benefit Value of Two Million Dollars ($2,000,000).

128.    Upon information and belief, the Trust for the Coppock Policy was created in or around January 2008, and Robert Coppock, II, was appointed the Trustee. At some point prior to July of 2009, Eliza L. Coppock was named the successor trustee for the Coppock Trust. (Robert Coppock, II and Eliza L. Coppock will be collectively referred to as the "Coppock Trustee").

129.    Windsor funded the Coppock Premium Finance Loan on April 14, 2008 in the amount of Eighty Three Thousand Seven Hundred and Seventy Dollars ($83,770) at Fifteen percent (15%) interest to pay the initial premium (the "Collins Loan").

130.    The Coppock Trustee, Robert Coppock and Windsor executed nineteen documents, which, taken together, were expressly deemed by the parties thereto to comprise a single agreement (the "Coppock Financing Agreement Package").

131.    Under the Coppock Financing Package, the Coppock Loan was due on or about July 8, 2010, which is 820 days/27 months after the initial funding, and the principal balance

36

increased over time as Windsor continued to pay premiums to protect its interest in the Policy as collateral.

132.    As with the other Premium Finance Policies discussed above, the Coppock Note was secured by "the collateral assignment of the Policy given by Borrower to Lender pursuant to the Assignment of Life Insurance Policy as Collateral."

133.    Also, in May of 2008, the original Coppock Trustee signed and returned a document provided by the insurance company, Pacific Life, entitled "Collateral Assignment." The Collateral Assignment expressly reserved to the Owner of the Policy, the Trust, the right to change the beneficiary of the Policy as long as there had been no surrender of the Policy.

134.    On or about July 15, 2009, Defendant Eliza L. Coppock and the insured Robert S. Coppock notified Rousseau, in his capacity as counsel for Windsor, that Robert Coppock, II, the original trustee, was no longer the Trustee, and that the successor trustee was Defendant Eliza L. Coppock. Pacific Life was notified of this change of trustee and provided its Collateral Assignment form to be executed by the new trustee., which she did execute in August 2009.

135.    On or about September 23, 2009, Pacific Life provided The Coppock successor Trustee with a written confirmation of the Collateral Assignment in favor of Windsor.

136.    Neither Coppock nor the Coppock Trust ever paid any premium for the Coppock Policy. All premiums for the Coppock  Policy were paid by Windsor, without which the Coppock Policy would have lapsed.

137.    No repayment of the Coppock Loan was made by Coppock or the Coppock Trust before the Maturity Date on the Loan, and neither objected to Windsor continuing to pay premiums after July 14, 2010.

37

138.    Throughout the term of the Coppock Loan, Windsor sought and Rousseau provided legal advice regarding Windsor's rights under the Coppock Finance Agreement Package, notices and demands to Coppock/The Coppock Trust/the Coppock Trustee, preparing and obtaining the documents necessary to transfer title and ownership of the Coppock Policy from the insured/Trust to Windsor, and to perfect and ensure Windsor's absolute and unfettered entitlement to the death benefits thereunder.

139.    After hearing from Broker Houchins that the Coppock Trust did not want to pay off the Loan or pay the upcoming premium to keep the Policy and wanted instead to surrender the Policy to Windsor and transfer ownership of the Policy to Windsor, and pursuant to legal advice provided by and recommendation of Rousseau, before the Maturity Date of the Coppock Loan, on or about February 15, 2010 Windsor entered into an agreement with the Coppock Trust in which the Coppock Trustee, as the Owner of the Policy, surrendered the Policy and signed and mailed the requisite Request of Ownership Change that expressly transferred ownership of the Policy to Windsor.

140.    On February 15, 2010, the Coppock Trustee executed the Request of Ownership Change form.

141.    On February 19, 2010, Windsor sent the signed Request of Ownership Change for the Coppock Policy by facsimile to Pacific Life Insurance Company, and on February 25, 2010, Windsor sent the original signed documents to Pacific Life by Federal Express.

142.    On or about March 30, 2010, Broker Houchins communicated to Windsor that the insured, Mr. Coppock, requested that Windsor, as owner of the Policy, provide a release to complete his file.

38

143. After consulting with Rousseau and per Rousseau's advice, on April 23, 2010, Windsor mailed Mr. Coppock a signed release that states; "Please accept this letter as formal notification that pending our ownership of policy #VF5170 1030, *we are releasing you from any future obligations of our financial agreement*." (emphasis added). A true and correct copy of the request for a release and the release are attached collectively hereto as Exhibit "P".

144. Neither Mr. Coppock nor the Coppock Trust or Coppock Trustee responded to that letter, and neither the Trust nor Trustee has had any contact, direct or indirect, verbal or written with Windsor for more than 4 years since the April 23rd letter was sent, a period during which Windsor, as owner, continued to make premium payments.

145. On or about September 2, 2010, Pacific Life Insurance Company provided a written confirmation to the Coppock Trust and Trustee, Broker Houchins, and Windsor that the written Request of Ownership Change signed by the Trust and Trustee had been received and processed.

146. Rousseau and Arent Fox repeatedly assured Windsor that no other documentation (or additional language) was necessary from the Coppock Trust for Windsor's ownership of the Coppock Policy and/or Windsor's entitlement to the death benefits thereunder.

147. Windsor has made all required premium payments for the Coppock Policy, without which the Policy would have lapsed. Windsor alone has borne the entire financial burden for the required premiums payments for the Coppock Policy paying in excess of $373,000 in premiums.

148. The insured Mr. Coppock is still living and Windsor continues to make the premium payments for the Coppock Policy. Neither the Coppock Trust nor the Trustee has ever

39

attempted to make any ongoing premium payments.

149.     As explained above, following the Bitter Arbitration award and after back and

forth with Rousseau and Arent Fox, in June, 2014 Windsor sent a letter to the Coppock

explaining that it was doing some spring cleaning of its files and was writing to find out if the

Trust was still extant and the Insured was still alive. Windsor reminded the Coppock Trustee that

the Trust had no financial obligations due to the Trust's voluntary assignment of the Policy in

2010 in exchange for Windsor's agreement that the assignment would constitute a complete

satisfaction and discharge of the Loan and the consequent discharge of the Loan.

150.     Neither the Coppock Trust nor the Coppock Trustee ever responded to the June 1,

2014 letter nor took issue with any of the statements in the letter.

151.     Instead, Robert Coppock, five (5) months after Windsor's June 2014 letter, sent a

letter dated November 4, 2014 advising that he had contacted an unnamed attorney and that he

disagreed that the Trust had no rights to the Policy or any portion of it, though he did not dispute

that the Trust had informed Windsor that it was not willing to repay the Loan (the "Late

Objection Letter"). A true and correct copy of the Coppock Late Objection letter is attached

hereto as Exhibit "Q".

152.     Based upon the Insured's Late Objection Letter, on or about January 7, 2015,

Windsor filed an action and Complaint for declaratory relief on the Coppock Policy in the United

States District Court for the Northern District of California, San Francisco Division, Case No.

15-cv-00075-WHO, wherein Windsor is asserting that Windsor has an absolute right of

ownership of the Coppock Policy which includes all death benefit proceeds. (the "Coppock

Action").

40

153. To date, the Court in the Coppock Action has not entered an Order or made a decision regarding entitlement to the death benefits under the Coppock Policy.

**The Stamatov Policy**

154. As explained more fully above, the Stamatov Policy was issued to Jane Ann Stamatov Family by PHL Variable Insurance Company on January 28, 2008 and had a face Amount and Death Benefit Value of Two Million Dollars ($2,000,000).

155. The Trust for the Stamatov Policy was created and Larry L. Davidson was appointed Trustee (the "Stamatov Trustee")[6].

156. Windsor funded the Stamatov Premium Finance Loan on March 21, 2008 in the amount of Ninety Four Thousand Six Hundred and Six Dollars ( $94,606) at Fifteen percent (15%) interest (the "Stamatov Loan").

157. The Stamatov Trustee, Jane Stamatov and Windsor executed nineteen documents, which, taken together, were expressly deemed by the parties thereto to comprise a single agreement (the "Stamatov Financing Agreement Package").

158. Under the Stamatov Financing Package, the Stamatov Loan was due on or about June 26, 2010, which is 820 days/27 months after the initial funding, and the principal balance increased over time as Windsor continued to pay premiums to protect its interest in the Policy as collateral.

159. Neither Stamatov nor the Stamatov Trust ever paid any premium for the Stamatov Policy. All premiums for the Stamatov Policy were paid and are being paid by Windsor.

---

[6]Upon information and belief, Mr. Davidson did not know Jane Stamatov and was appointed as the Stamatov Trustee based on his personal acquaintance with Broker Houchins.

41

Windsor has paid in excess of $210,527 in premiums, without which the Stamatov Policy would have lapsed.

160. No repayment of the Stamatov Loan was made by Stamatov or the Stamatov Trust before the Maturity Date on the Loan, and neither objected to Windsor continuing to pay premiums after May, 2010.

161. Throughout the term of the Stamatov Loan and thereafter, Windsor sought and Rousseau provided legal advice regarding Windsor's rights under the Stamatov Finance Agreement Package, notices and demands to Stamatov/The Stamatov Trust/the Stamatov Trustee, preparing and obtaining the documents necessary to transfer title and unfettered ownership of the Stamatov Policy from the insured/Trust to Windsor (including all rights thereunder), and to perfect Windsor's absolute right and entitlement to the death benefits under the Policy.

162. After hearing from Broker Houchins that the Stamatov Trust did not want to pay off the Loan or pay the upcoming premium to keep the Policy and wanted instead to surrender the Policy to Windsor and transfer ownership of the Policy to Windsor, and pursuant to legal advice provided by and recommendation of Rousseau, before the Maturity Date of the Stamatov Loan, in or around February, 2010 Windsor entered into an agreement with the Stamatov Trust in which the Stamatov Trustee, as the Owner of the Policy, agreed to sign and mail the requisite Request of Ownership Change to transferred ownership of the Policy to Windsor.

163. In February, 2010 the Stamatow Trustee executed and returned the Request of Ownership Change.

164. Windsor sent the signed Request of Ownership Change for the Stamatov Policy to

42

PHL Variable Insurance Company, and on or about July 28, 2011, PHL provided a Statement of Values as written confirmation of the Collateral Assignment in favor of Windsor as Owner/Payor of the Policy, and as primary beneficiary of the Policy.

165.    At all times relevant hereto, Rousseau and Arent Fox repeatedly assured Windsor that no other documentation (or additional language) was necessary from the Stamatov Trust for Windsor's absolute and unfettered ownership of the Stamatov Policy and/or Windsor's absolute entitlement to the death benefits thereunder.

166.    Windsor has made all required premium payments for the Stamatov Policy, without which the Policy would have lapsed. Windsor alone has borne the entire financial burden for the required premiums payments for the Stamatov Policy paying in excess of $210,527 in premiums.

167.    The insured Ms. Stamatov is still living and Windsor continues to make the required premium payments for the Stamatov Policy. Neither the Stamatov Trust nor the Trustee has ever attempted to make any ongoing premium payments.

168.    As explained above, following the Bitter Arbitration award and after back and forth with Rousseau and Arent Fox, on or about June 1, 2014 Windsor sent a letter to the Stamatov Trustee explaining that it was doing some spring cleaning of its files and was writing to find out if the Trust was still extant and the Insured was still alive. Windsor reminded the Stamatov Trustee that the Trust had no financial obligations due to the Trust's voluntary assignment of the Policy in 2010 in exchange for Windsor's agreement that the assignment would constitute a complete satisfaction and discharge of the Loan and the consequent discharge of the Loan.

43

169.     On November 12, 2014, five (5) months after Windsor's June 2014 letter, the Stamatov Trustee responded to Windsor's letter advising that he had contacted an unnamed attorney and that he disagreed that the Trust had no rights to the Policy or any portion of it, though he did not dispute that the Trust had informed Windsor that it was not willing to repay the Loan (the "Late Objection Letter"). A true and correct copy of the Stamatov Late Objection letter is attached hereto as Exhibit "R".

170.     Based upon the Insured's Late Objection Letter, on or about January 7, 2015, Windsor filed an action and Complaint for declaratory relief on the Stamatov Policy in the United States District Court for the Northern District of California, San Francisco Division, Case No. 15-cv-00080-WHO, wherein Windsor is asserting that Windsor has an absolute right of ownership of the Stamatov Policy which includes all death benefit proceeds. (the "Stamatov Action").

171.     To date, the Court in the Stamatov Action has not entered an Order or made a decision regarding entitlement to the death benefits under the Stamatov Policy.

**Rousseau and Arent Fox's Continuous Representation, Errors, Breaches and Omissions**

172.     Defendant Rousseau was continuously engaged by Windsor from 2008 through September 9, 2014, and Defendant Arent Fox was continuously engaged by Windsor from June of 2010 when Rousseau moved to the Arent Fox firm from the Herrick Firm and became a partner of Arent Fox, through September 9, 2014, to assist and advise Windsor on the Premium Finance Policies, including specifically providing Windsor advice related to Windsor's rights and obligations under the Finance Agreement Packages, notices and communication with the Premium Financing Trustees, preparing and obtaining the documents, and language contained

44

therein, necessary to transfer title and ownership of each of the Premium Finance Policies from the Insureds/Trusts to Windsor, so that Windsor would have unfettered rights to the Policies and all benefits thereunder, and Windsor's legal position and likelihood of success in the Bitter Action, and in disputes with the other Trustees that led to the Actions that followed. At all relevant times, Windsor relied on the guidance and advice of Defendants Rousseau and Arent Fox, and depended upon them to appropriately advise it on the Premium Finance Policies, ownership and entitlement to the death benefits thereunder, and litigation strategy with respect thereto.

173. As outlined more fully above, and as determined now by more than one tribunal, Defendants Rousseau and Arent Fox committed the following errors omissions, and breaches during its representation of Windsor related to the Premium Finance Polices and Windsor's Premium Financing:

A. Failed to obtain a sufficient understanding of the Premium Finance Packages and Default Sales Rights under California Law in order to properly advise Windsor on its ownership rights and entitlement to death benefits under each of the Premium Finance Policies;

B. Failed to sufficiently determine the requirements for absolute transfer of ownership and to obtain absolute entitlement to death benefits under the terms of the Premium Finance Packages, and California Law and/or ensure that the record was unambiguous concerning such transfers;

C. Failed to Sufficiently advise Windsor of the requirements for absolute and unambiguous transfer of ownership to obtain, without dispute, absolute entitlement to death benefits under the Premium Finance Policies per the Premium Finance Packages, and/or California Law, as applicable;

D. Failed to take appropriate measures and draft appropriate documentation with specific required language to assure that Windsor would obtain absolute ownership of the Premium Finance Policies and absolute entitlement to the death Benefits thereunder, without dispute;

45

E.  Failed to cite the appropriate provision of the Finance Agreement Package, cited instead an incorrect provision thereof, in the default letter it sent to the Bitter Trustee on September 8, 2010;

F.  Failed to address any shortcomings in documentation obtained from the Premium Finance Trustees to transfer ownership of the Premium Finance Policies and entitlement to the death benefits under each;

G.  Failed to correctly recognize and evaluate the risks presented by the issues raised by the Bitter Trustee in the Bitter Action, and raised thereafter by the Trustees in the Acker, Collins, Coppock and Stamatov Actions regarding default sale rights and/or entitlement to the death benefits under each of the Premium Finance Policies;

H.  Failed sufficiently to advise Windsor as to how to protect its ownership and entitlement to the Premium Finance Policy death benefits under the Acker and Collins Premium Finance Policies subsequent to the Interim Panel Award in the Bitter Arbitration, but before the deaths of Acker and Collins; and

I.  Failed to document the agreements of the respective parties involved appropriately to ensure both that: (1) the record showed clearly and unambiguously that the respective Trusts and Windsor had agreed to mutual walkaways, whereby the Trusts were agreeing to transfer ownership in the policies at issue and give up all rights whatsoever to any benefits paying under or from such policies in exchange for Windsor's giving up rights to pursue the Trusts for any liabilities; and (2) such agreements were enforceable.

J.  Failed to take immediate action following the Bitter Arbitration Panel Award – indeed ignored Windsor's pleas to take such action – that would have secured Windsor's absolute unfettered entitlement to the death benefits under the remaining Policies.

174.  Moreover, and as outlined more fully above, the Defendants drafted and sent the September 8, 2010 letter in the Bitter Action and instructed Windsor thereafter that the change in Ownership and/or Beneficiary forms signed by the Acker, Collins, Coppock and Stamatov Trustees were sufficient to ensure that Windsor had unfettered ownership to those Policies and the death benefits thereunder, despite the fact that there had not been any execution of a specific

46

release with specific language, as a result of which the Trustees have contested Windsor's absolute ownership of the Premium Finance Policies and entitlement to death benefits thereunder in the Bitter, Acker, Collins, Coppock and Stamatov Actions.

175.    In addition, Rousseau and Arent Fox generally mishandled and mismanaged the Bitter Action to such an extent that Windsor incurred excessive and unconscionable legal fees and expenses and was ultimately forced to settle the Bitter Action because Windsor's position had become so compromised by the negligence and breaches of the Defendants.

176.    The errors and omissions committed by Defendants Rousseau and Arent Fox, in failing to properly prepare, preserve and present the necessary documentation, with the appropriate and required language, needed under California Law and the Premium Finance Packages to absolutely and without dispute transfer ownership of the Premium Finance Policies to Windsor, and for Windsor to indisputably have absolute entitlement to the death Benefits thereunder, directly resulted in significant damages and harm to Windsor, which include but are not limited to the loss of significant death benefits under the Bitter, Policy, and the potential loss of the death benefits under the Acker, Collins, Coppock and Stamatov Policies, and the significant legal fees and expenses incurred in the Bitter, Acker, Collins, Coppock and Stamatov Actions instituted to determine the entitlement to the death benefits under the Premium Finance Policies.

177.    Had Windsor been properly advised of the requirements necessary to properly transfer absolute ownership of the Premium Finance Policies without ambiguity and to indisputably perfect absolute entitlement to the death benefits of each of the Premium Finance Policies under the Finance Package Agreements and/or California Law, it would have included

47

the necessary language cited by the Arbitration panel in the Bitter Arbitration and the Courts in

the Aker and Collins Actions in the documents it had the Trustees execute, and it would have

been successful in refuting the Trustees' claims to entitlement of the death benefits.

178.    Plaintiff had to incur and continues to incur significant additional legal costs to

defend the claims of entitlement to the death benefits and to rectify the erroneous advice of and

malpractice by Defendants.

COUNT I
PROFESSIONAL NEGLIGENCE/LEGAL MALPRACTICE
**Plaintiff v. All Defendants**

179.    The Plaintiff incorporates the foregoing paragraphs as if set forth at length herein.

180.    As Windsor's attorneys, the Defendants owed Windsor a duty of care requiring

them to act with a certain level of skill, prudence and diligence, and an elevated duty to exercise

exceptional care to employ their experience and skill in "insurance and reinsurance related matters

and litigation" and "extensive knowledge in the life settlement business and with premium finance

structures used in the purchase of life insurance" as touted to the public on Arent Fox's website.

See Exhibit "B".

181.    The duties that Rousseau and Arent Fox owed to Windsor include, but are not

limited to:

A.    Accurately and effectively analyzing the Premium Finance Packages and California
      Law, applicable per the terms of the Premium Finance Packages, to effectuate
      Windsor's transfer of Ownership of the Premium Finance Policies from the Bitter,
      Acker, Collins, Coppock and Stamatov Trusts to Windsor, and to effectuate
      Windsor's absolute entitlement to the death benefits under each of the Bitter,
      Acker Collins, Coppock and Stamatov Policies upon default and/or voluntary
      transfer;

B.    Promptly and fully advising Windsor of its rights to and obligations for transfer of

48

ownership of the Premium Finance Policies and absolute entitlement to the death benefits thereunder under the premium Finance Packages and California law upon default and/or voluntary transfer;

C. Assuring that the documents that it advised Windsor to have the Premium Finance Trustees and Insureds execute and return to Windsor properly and unambiguously effectuated transfer of ownership of the Premium Finance Policies to Windsor and absolute entitlement to Windsor of the death benefits under the Premium Insurance Policies, whether a result of default and/or voluntary transfer;

D. Properly and accurately citing the correct provisions of the Finance Package Agreement in notices sent to the Trustees; and

E. Accurately and effectively analyzing, and properly and fully advising Windsor as to the Trustees/Trusts' entitlement to the death benefits under the Premium Finance Policies and the Trust's claims in the Bitter, Acker, Collins, Coppock and Stamatov Actions.

182. The Defendants breached their duty of care and elevated duty of care in the

following ways, among others:

A. Failing to obtain a sufficient understanding of the Premium Finance Packages and Default Sales Rights under California Law in order to properly advise Windsor on its ownership rights and entitlement to death benefits under each of the Premium Finance Policies and the risks inherent in litigation regarding the same;

B. Failing to sufficiently determine the requirements for absolute transfer of ownership and to obtain absolute entitlement to death benefits under the terms of the Premium Finance Packages, and California Law;

C. Failing to sufficiently advise Windsor of the requirements for absolute transfer of ownership and to obtain absolute entitlement to death benefits under the Premium Finance Policies per the Premium Finance Packages, and California Law;

D. Failing to take appropriate measures and draft appropriate documentation with specific required language to assure that Windsor would obtain absolute ownership of the Premium Finance Policies and absolute entitlement to the death Benefits thereunder, without dispute;

E. Failing to cite the appropriate provision of the Finance Agreement Package, and in fact citing an incorrect provision thereof, in the notice of default it sent to the Bitter Trustee on September 8, 2010;

49

F.   Failing to address any shortcomings in the documentation it advised Windsor to require and obtain from the Premium Finance Trustees to transfer ownership of the Premium Finance Policies and entitlement to the death benefits under each;

G.   Failing to correctly recognize and evaluate the issues and claims raised by the Bitter Trustee in the Bitter Action, and the same issues and claims raised thereafter by the Trustees in the Acker, Collins, Coppock and Stamatov Actions regarding default sale rights, voluntary transfer requirements and entitlement to the death benefits under each of the Premium Finance Policies and California law; and

H.   Failing sufficiently to advise Windsor as to how to protect its ownership and entitlement to the Premium Finance Policy death benefits under the Acker, Collins, Coppock and Stamatov Premium Finance Policies subsequent to the Interim Panel Award in the Bitter Arbitration, but before the deaths of Acker and Collins.

183.   Each of these acts and omissions on the part of the Defendants constitutes a failure to exercise the appropriate level of skill, prudence, and diligence commonly used by attorneys, and especially those specializing "in the life settlement business and with premium finance structures used in the purchase of life insurance", and thus is a breach of the standard of care owed to Windsor. The Defendants' conduct is a clear departure from a reasonable standard of care and constitutes professional negligence.

184.   Had the Defendants acted in conformity with the reasonable standard of care, and included simple additional language in the Notice of Default it sent to the Bitter Trustee, and advised Windsor to include simple additional language in connection with the documentation signed to effectuate the change of ownership by the Acker, Collins, Coppock and Stamatov Trustees, Windsor would have avoided the onslaught of litigation and been unequivocally and absolutely entitled to the entire death benefits under each of the Premium Finance Policies and thus would have avoided the Bitter, Acker, Collins, Coppock and Stamatov Actions and the legal fees and costs associated therewith.

50

185.     Through the conduct alleged in this Complaint, Defendants breached their duty of both ordinary and exceptional care and diligence to Windsor, as a proximate result of which Windsor has suffered significant injury and damages in excess of Five (5) Million Dollars, plus interest, attorney fees and costs.

### COUNT II
### BREACH OF FIDUCIARY DUTY
### Plaintiff v. All Defendants

186.     The Plaintiff incorporates the foregoing paragraphs as if set forth at length herein.

187.     As Windsor's attorneys, the Defendants owed Windsor the duty to deal fairly and honestly and with undivided loyalty. This duty required, at a minimum, that they (a) take all action legally necessary and appropriate to protect Windsor's interests in the Premium Finance Policies and in the Bitter Action, (b) refrain from conduct that could expose Windsor to unnecessary or unreasonable financial harm, and (c) act solely in Windsor's best interests.

188.     The Defendants breached that duty by the following acts, among others:

A.     Protecting their own interests over Windsor's;

B.     Failing to acknowledge and admit to the Defendants' previous failures to properly review and analyze the Premium Finance Packages and California law and to take the steps necessary to indisputably effectuate absolute ownership to the Premium Finance Policies and absolute entitlement to the death benefits thereunder in the case of a default and/or voluntary transfer before default;

C.     Failing to admit to their own missed opportunities to identify and correct the documentation provided to and executed by the Premium Finance Trustees to perfect absolute entitlement to the death benefits under the Premium Finance Policies, and instead putting the Defendants' interests above Windsor's by advising Windsor to continue on in the same course;

D.     formulating an elaborate, yet faulty, explanation of Windsor's entitlement to the death benefits as a result of default and/or voluntary transfer before default rather than acknowledging the potential liability and success of the Trustee's claims of entitlement in the Bitter Action and advising Windsor as to appropriate options,

51

including resolution, at that time the Bitter Arbitration Panel entered its Interim Award; and

E.  Failing to disclose that their earlier malpractice in connection with the September 8, 2010 letter it issued with respect to the Bitter Policy and its advice to Windsor as to Windsor's absolute entitlement to the death benefits under all the Premium Finance Policies, created a conflict of interest such that Defendants could not offer Windsor independent and unbiased advice and representation in the Bitter Action.

189.   Each of the above acts constitutes a breach of the Defendants' fiduciary duty to its client Windsor.

190.   Had the Defendants put Windsor's interest above their own, they would have acknowledged, after the Panel's Interim Award in the Bitter Action, the faulty advice previously given in 2010 with regard to transfer of ownership and entitlement to the death benefits under the Bitter Policy and, it may be determined, under the other Premium Finance Policies as well. Instead of creating various arguments in an attempt to convince Windsor they had previously given competent advice, the Defendants should have admitted to earlier mistakes and advised Windsor as to the best course of action to prevent further damage with respect to the Collins, Acker, Coppock and Stamatov Policies.

191.   As a direct and proximate result of the Defendants' breaches of fiduciary duty, Windsor incurred and continues to incur additional damages of an amount to be proven at trial.

## COUNT III
## BREACH OF CONTRACT
### Plaintiff v. All Defendants

192.   The Plaintiff incorporates the foregoing paragraphs as if set forth at length herein.

193.   Through the conduct alleged in this Complaint, Defendants materially breached their express and implied contractual obligations to Windsor that they would take all action legally necessary and appropriate to protect Windsor's ownership interests in the Premium

Finance Policies and entitlement to the death benefits thereunder; that they would perform all legal services with due care and diligence; and that they would provide Windsor with professionally competent, skilled and careful lawyers.

194. As a proximate result of Defendants' material breaches of their express and implied contractual obligations, Windsor has suffered significant injury and damages including the loss of death benefits under the Bitter Policy, and potential loss of the death benefits under the Acker, Collins, Coppock and Stamatov Policies, plus significant attorney fees and costs incurred in determining entitlement in the Bitter, Acker, Collins, Coppock and Stamatov Actions.

## PRAYER FOR RELIEF

WHEREFORE, Windsor requests that the Court award it judgment against the Defendants on each of its Counts above for:

A.      actual damages in an amount to be proven at trial, including, without limitation, any death benefits lost under the Bitter, Acker, Collins, Coppock and Stamatov Policies;

B.      consequential damages in an amount to be proven at trial, including without limitation the expenses and losses Windsor has suffered, and will continue to suffer, in connection with the litigation of the entitlement to the death benefits under each of the Premium Finance Policies in the Bitter, Ackers, Collins, Coppock and Stamatov Actions;

C.      prejudgment and post judgment interest as allowed by law;

D.      return of any and all fees paid by Windsor to Rousseau and Arent Fox for the negligent services and a determination that no additional amounts are due to Arent Fox for the negligent services;

E.      reasonable attorneys' fees and cost of court, and

F.      any other relief allowed by law and deemed appropriate by the Court.

## DEMAND FOR JURY TRIAL

In accordance with Rule 38 of the Federal Rules of Civil Procedure, Windsor respectfully demands a jury trial of all issues triable to a jury in this action.

Respectfully submitted,
ALAN L. FRANK LAW ASSOCIATES, P.C.

Alan L. Frank, Esquire
Attorneys for Plaintiff Windsor Securities, LLC

Dated: February 29, 2016