**EXHIBIT "10"**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WINDSOR SECURITIES, LLC<br>25 E Athens Avenue<br>Ardmore, PA 19003<br>     Plaintiff<br>v.<br><br>ARENT FOX, LLP<br>1675 Broadway<br>New York, NY 10019<br>  and<br>JULIUS ROUSSEAU, III, ESQUIRE<br>Arent Fox, LLP<br>1675 Broadway<br>New York, NY 10019<br>     Defendants | Civil Action No. 16-cv-01533(GBD)<br><br>JURY TRIAL DEMANDED |

## EUGENE HOUCHINS III AFFIDAVIT

1. I, Eugene Houchins III, was the president of Bonded Life Company, LLC ("Bonded Life") and E.E.H. Consulting, Inc. ("E.E.H."), neither of which presently remains active.

2. I, through my companies Bonded Life and E.E.H., beginning in 2007 assisted in the procurement of life insurance policies for Joe. E. Acker, Erwin A. Collins, John L. Bitter, Jane Ann Stamatov, and Robert S. Coppock (individually, an "Insured", and collectively, the "Insureds")

3. Specifically, I, in some instances along with my father, assisted each of the Insureds in the application process, in the purchase of the policy, and in the creation of a life insurance trust. I also recommended to those of the Insureds who did not have their own Trustees in place, namely, John L. Bitter and Erwin Collins, candidates whom I believed would be suitable to administer their respective Trusts (the "Trusts"). After the policy had been issued and delivered, I introduced to the Insureds the option of premium financing for the life insurance policy. If an Insured were

1

interested in receiving premium financing, I would put that Insured together with lending broker, Wood, Hat, & Silver, LLC. For the Insureds, each of whom chose to finance their policies, Wood, Hat & Silver, LLC procured Windsor Securities, LLC ("Windsor") as the lender. Once the Insureds and Trustees had received financing agreements from Windsor, I assisted the Insureds and Trustees in understanding and filling out those agreements.

4. Starting approximately one year after the Insureds had purchased the policies and received financing, I had direct communications with Windsor's attorney, Julius Rousseau ("Rousseau").

5. Each of the financing agreements between and among the Insureds, the Trusts, and Windsor consisted of nineteen separate documents, had a term of 820 days or approximately twenty-seven months, and included a default sale right provision.

6. As each of the loans approached the end of their terms, i.e., as the financing agreements reached their maturity date, Windsor and/or Rousseau as Windsor's counsel, on the one hand, and I, on the other, had communicated by email concerning how Windsor, the Insureds, and the Trustees wished to proceed.

7. I am informed and believe that as each of the loans began to approach the end of their terms, i.e., as the financing agreements reached their maturity date, Windsor informed the Trustees, and the Insureds, that Windsor did not have a duty to pay any upcoming premiums.

8. In 2010, shortly before the loans from Windsor to the Trusts were due to be repaid, the Trusts, except for the Bitter Trust, informed Windsor of the fact that they were not willing to take over premium payments on the Policy and would not repay the loan when due. That fact was communicated to Windsor by me, pursuant to the request of the Trustees.

2

9. None of the Trusts had any cash or other assets, other than the Insurance Policy in question for each Trust. The Trustees could not have made any premium payments, purchased the policy at a foreclosure sale, or made any other outlay unless the underlying Insured both put such funds in the Trust and requested the Trustee to take such an action.

10. The only Insured that I spoke with who expressed an interest in having the Trust pay off the loan was Mr. Bitter. The Bitter Trust, however, failed to pay Windsor when the loan became due. Windsor claimed that that failure had comprised a default under the financing agreements. Mr. Bitter contested that claim for a number of months, but eventually decided that he no longer had the emotional and physical strength to continue to do so.

11. Whenever a decision was to be made regarding the policy, I would communicate with, and advise, the Insureds; once the Insureds, in light of my advice, had decided how best to proceed, that decision would be communicated to the Trustee.

12. To my knowledge, neither Windsor nor its attorney ever sent a letter offering to release the Bitter Trust, or any of the other Trusts, from the obligations in the financing agreements in exchange for unfettered title to the various policies. If Windsor or its counsel had sent such a letter to the Bitter Trust after Mr. Bitter no longer felt able to contest Windsor's claim that a default had occurred, I would have recommended to Mr. Bitter that he instruct Gregory Barnes - the Trustee for the Bitter Trust, to whom I conveyed Mr. Bitter's instructions about Trust-related matters - to accept a release from the obligations in the financing agreement in exchange for giving Windsor unfettered title and ownership of the policy and entitlement to all death benefits thereunder. It is my belief that Mr. Bitter, who was opposed to getting involved in any litigation with Windsor, and Mr. Barnes, who understood he was to follow Mr. Bitter's instructions so long

3

as they were consistent with his fiduciary obligations to the Trust beneficiary, Mr. Bitter's wife, would have agreed.

13. Further, had Windsor and/or its counsel offered to the Insureds and Trustees other than Mr. Bitter and Mr. Barnes (the "other Insureds" and "other Trustees") to forgive their respective loans in exchange for being made the owner of the respective policies and for the Trust's forfeiting all death benefits thereunder, I would have looked at each of the other Insured's health at the time and reached an opinion as to whether acceptance of such an offer would be warranted. Knowing the condition of the other Insureds in the time-period in and around the default, and at the time of the execution of the change of beneficiary and change of ownership documents, I would have recommended that each of the other Insureds and other Trustees accept the offer. Based on my experience in working with each of the other Insureds and other Trustees, and based on my experience and understanding of each specific case, I believe that each of the other Insureds and each of the other Trustees would have followed that recommendation.

14. To my knowledge, Windsor, after execution of the change of ownership forms, made no efforts to proceed with either a private or public sale of any of those policies. Pursuant to the financing agreements, each of the Trustees and Insureds would have expected that if a sale of the respective policy were to take place, he or she would be informed and given an opportunity to bid if they wanted to do so. When informed of the sale, the Trustee and Insured could have considered the health of the insured and determined whether it made financial sense to bid. Each Trustee and Insured would most likely have consulted with me on how to proceed if he or she had received notice that a sale of the policy would be held. Knowing the condition of the other Insureds in the time-period in and around the default, I would have recommended that each of the Insureds and other Trustees refrain from bidding for the policy at any such sale. Based on my experience

in working with each of the other Insureds and other Trustees, and based on my experience and understanding of each specific case, I believe that each of the other Insureds and other Trustees would have followed that recommendation.

15. At no time prior to defaulting, or any other time, did any of the Insureds or the Trustees acting on behalf of the respective Trusts that owned the policies on their lives enter into an agreement forfeiting all rights to the policy and all benefits payable thereunder.

16. I presented each Trustee with a change of ownership, and change of beneficiary, form that I thought the Trustees were obligated to sign once the Trust was in default, i.e., once the Trust had either declared its intention not to pay off the loan or, in the case of the Bitter Trust, had failed to pay off the loan when due. It was my understanding that after default, the Trustee had a duty, pursuant to the terms of the financing agreement, to do whatever it took to give Windsor indicia of title sufficient to allow Windsor to sell the policy at a foreclosure sale.

17. Neither Windsor nor its legal counsel ever communicated to me that Windsor Securities was offering to forgive the loan if the Trusts would waive, abandon, or assign: (a) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of a public or private sale of the Policy remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale); and/or (b) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of the death benefit remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit).

18. Windsor never communicated to me, and I therefore - by definition - never communicated to Trustees, that Windsor was offering to forgive the loan.

5

19. As noted above, based on my conversations and personal knowledge of the persons involved in these transactions, and in light of such factors as the existing health conditions of the Insureds, I believe that if asked to do so shortly after default (or, in the case of Mr. Bitter, shortly after his decision to no longer contest Windsor's claim that a default had occurred), each of the Insureds and Trustees would have agreed to make Windsor the unfettered owner of the policies, and would have forfeited all rights and/or entitlement to the death benefits under their respective loans, in return for forgiveness by Windsor of any obligation the Trust might otherwise have had to pay back the loan. Similarly, had Windsor's counsel provided a written agreement, stating that the transfer of ownership of the policy was in consideration of the full and complete satisfaction of the liabilities owed to Windsor by the Trust, I believe the Trustees would have signed it.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Eugene Houchins III

Sworn to and subscribed before me this 22 day of March, 2017.



_____
Notary Public