Document #12 of 19

## THE POLICY

*TO BE PROVIDED BY INSURED*

<Please attach complete original policy and premium schedule, or, if a copy of each is
attached, please sign the verification below>

By affixing my signature below, I am hereby affirming that the attached copy of the insurance
policy being financed according to the terms *Life Insurance Premium Financing Agreement
Among Windsor Securities LLC, Joe E. Acker Family Insurance Trust, and Joe E. Acker.* is an
accurate and current copy of that insurance policy as of the date of this signing.

_____, Trustee       Date: __4/10/2008__
Joe E. Acker Family Insurance Trust

_____, Agent        Date: __4/10/2008__

JUDD 068200

*John Hancock.*

Life Insurance Company (U.S.A.)
A Stock Company

| | |
|---|---|
| **LIFE INSURED** | JOE E ACKER |
| **POLICY NUMBER** | 93 783 751 |
| **PLAN NAME** | Performance UL |

**FLEXIBLE PREMIUM ADJUSTABLE LIFE INSURANCE POLICY**
**ADJUSTABLE DEATH BENEFIT**
**BENEFIT PAYABLE ON LIFE INSURED'S DEATH**
**FLEXIBLE PREMIUMS PAYABLE TO AGE 121 DURING THE LIFE INSURED'S LIFETIME**
**NON-PARTICIPATING (NOT ELIGIBLE FOR DIVIDENDS)**

Subject to the conditions and provisions of this policy, if the Life Insured dies while the policy is in force, the John Hancock Life Insurance Company (U.S.A.) ("the Company") agrees to pay the Insurance Benefit to the beneficiary in a lump sum, and to provide the other benefits, rights, and privileges, if any, of the policy. The Insurance Benefit is described in Section 6. If the Company makes other plans of payment available other than a lump sum, then a Beneficiary may request written election of any such other plans in lieu of a lump sum.

**READ YOUR POLICY CAREFULLY.** It is a contract between you and us.

**RIGHT TO RETURN POLICY.** If for any reason you are not satisfied with your policy, you may return it for cancellation within TEN days after receiving it by delivering or mailing it to us or to the agent who sold it. We will refund in full the payment made. The policy will be void from the beginning.

Signed for the Company by:

President                    Secretary

JUDD  068201

## Policy Provisions

**Section**

1. Policy Specifications
2. Table of Rates
3. Definitions
4. Qualification as Life Insurance
5. Total Face Amount
6. Insurance Benefit
7. Interest On Proceeds
8. Premiums
9. No-Lapse Guarantee
10. Grace Period
11. Policy Termination
12. Reinstatement
13. Coverage at and after Age 121
14. Policy Value
15. Loan Account and Guaranteed Interest Account
16. Loans
17. Surrenders and Withdrawals
18. Owner and Beneficiary
19. Assignment
20. Misstatements
21. Suicide
22. Incontestability
23. The Contract
24. Right to Postpone Payment of Benefits
25. Claims Of Creditors
26. Reports To Owner
27. How Values Are Computed

2

JUDD 068202

PUL08

## 1. POLICY SPECIFICATIONS

| | | | |
|---|---|---|---|
| **Life Insured** | JOE E ACKER | **Plan Name** | Performance UL |
| **Age at Policy Date** | 81 | **Policy Number** | 93 783 751 |
| **Sex** | Male | **Issue Date** | March  6, 2008 |
| **Risk Classification** | Standard Plus Non Smoker | **Policy Date** | November 20, 2007 |

**Additional Ratings**   Not Applicable

**Owner, Beneficiary**   As designated in the application or subsequently changed

**Death Benefit Option at Issue**   Option 1

**Life Insurance Qualification Test Elected**   Cash Value Accumulation Test

|  |  |
|---|---|
| Base Face Amount at Issue | $1,000,000.00 |
| Supplemental Face Amount at Issue | $0.00 |
| Total Face Amount at Issue | $1,000,000.00 |

**Governing Law**   Georgia

### PREMIUMS AT ISSUE

**Premium Mode**   Annual

**Planned Premium**
1. $65,458.13 for year 1 - 1
2. $64,239.00 for years 2 - 19
3. $0.00 thereafter

**Minimum Initial Premium**   $5,203.42

**No-Lapse Guarantee Premium**   $62,441.06 per year

Notice:  This policy provides life insurance coverage for the lifetime of the Life Insured if sufficient premiums are paid.  Premium payments in addition to the planned premium shown may need to be made to keep this policy and coverage in force.  Keeping the policy and coverage in force will be affected by factors such as:  changes in the current cost of insurance rates; the amount, timing and frequency of premium payments; the interest rate being credited to the Guaranteed Interest Account; changes to the death benefit option; changes in the Total Face Amount; loan activity; withdrawals; and deductions for any applicable Supplementary Benefit riders that are attached to, and made a part of, this policy.  Also refer to the Grace Period and Policy Termination provisions in Sections 10 and 11.

3.0

JUDD  068203

PU0306A

THIS PAGE INTENTIONALLY LEFT BLANK

3.1

PU03106A

JUDD  068204

**1. POLICY SPECIFICATIONS** (continued) - Policy 93 783 751

## OTHER BENEFITS AND SPECIFICATIONS

Not Applicable

3.2

PU03206A

JUDD  068205

## 1. POLICY SPECIFICATIONS (continued) - Policy 93 783 751

### MAXIMUM EXPENSE CHARGES

**Deductions from Premium Payments**

**Premium Charge**   8% of each premium paid

**Monthly Deductions:** the following charges are deducted monthly from the Policy Value

**Administrative Charge**

| Policy Years | Dollar amount |
|---|---|
| 1 | $25.00 |
| 2+ | $10.00 |

**Face Amount Charge**   $0.6949 per $1,000 of Base Face Amount for the first 10 Policy Years.

**Cost of Insurance Charge**   Determined in accordance with Section 14.  Maximum monthly rates per $1,000 are shown in Section 2.

**Other Charges**

**Surrender Charge**   Charge deducted from the Policy Value during the Surrender Charge Period. See Sections 5 and 17 for details of when a Surrender Charge applies.

The Surrender Charge for the Base Face Amount at issue is $18,758.97.

The Surrender Charge will reduce monthly over the Surrender Charge Period until it becomes zero.  The table below shows the applicable grading percentage at the beginning of each Policy Year during the Surrender Charge Period (proportionate grading percentages apply for other Policy Months).  The amount to which the Surrender Charge is reduced at any time is determined by multiplying the initial amount of Surrender Charge by the percentage that is applicable at that interval during the Surrender Charge Period.

| Surrender Charge Period (Policy Year) | Maximum Percentage of Surrender Charge | Surrender Charge Period (Policy Year) | Maximum Percentage of Surrender Charge |
|---|---|---|---|
| 1 | 100.00% | 9 | 87.50% |
| 2 | 100.00% | 10 | 75.00% |
| 3 | 100.00% | 11 | 62.50% |
| 4 | 100.00% | 12 | 50.00% |
| 5 | 100.00% | 13 | 37.50% |
| 6 | 100.00% | 14 | 25.00% |
| 7 | 100.00% | 15 | 25.00% |
| 8 | 87.50% | 16 | 0.00% |

**Supplementary Benefit Rider Charges**   Charges for applicable riders are shown under Supplementary Benefits of this Section 1.

**Withdrawal Fee**   $25.00 per withdrawal

3A

PU03A06A

JUDD 068206

## 1. POLICY SPECIFICATIONS (continued) - Policy 93 783 751

### TABLE OF VALUES

Refer to your policy provisions for details on the terms and values shown in this table.

| | |
|---|---|
| Minimum Total Face Amount | $ 100,000 |
| Minimum Base Face Amount | $ 100,000 |
| Minimum Base Face Amount Decrease | $  10,000 |
| No-Lapse Guarantee Period | |
| *Base Face Amount | First 9 Policy Years from Policy Date |
| Supplemental Face Amount (if elected) | First 2 Policy Years from Policy Date |
| Guaranteed Interest Account Annual Rate | Not less than 3% |
| Loan Interest Rate | As defined in Section 16 |
| Maximum Loan Interest Credited Differential | |
| Policy Years 1-10 | 1.25% |
| Policy Years   11+ | .25% |
| Minimum Loan Amount | $500 |
| Minimum Withdrawal Amount | $500 |
| Death Benefit Discount Factor | 1.0024663 |
| Partial Surrender Charge Decrease Exemption | 10% |

*Electing to increase the Supplemental Face Amount after the Policy Date may reduce this period.  Refer to Section 5 for details.

3B

PU03B06A

JUDD  068207

## 2. TABLE OF RATES - Policy 93 783 751

### A. RATE TABLE

| Age | Maximum Monthly Rates per $1,000 of Net Amount at Risk | Minimum Death Benefit Factors | Age | Maximum Monthly Rates per $1,000 of Net Amount at Risk | Minimum Death Benefit Factors |
|-----|-----|-----|-----|-----|-----|
| 81 | 6.6509 | 1.3002 | | | |
| 82 | 7.2975 | 1.2788 | | | |
| 83 | 8.1096 | 1.2588 | | | |
| 84 | 9.0173 | 1.2400 | | | |
| 85 | 10.0423 | 1.2224 | | | |
| 86 | 11.1922 | 1.2060 | | | |
| 87 | 12.4650 | 1.1909 | | | |
| 88 | 13.8493 | 1.1769 | | | |
| 89 | 15.3334 | 1.1640 | | | |
| 90 | 16.9088 | 1.1522 | | | |
| 91 | 18.4163 | 1.1412 | | | |
| 92 | 20.0152 | 1.1307 | | | |
| 93 | 21.7336 | 1.1203 | | | |
| 94 | 23.5854 | 1.1100 | | | |
| 95 | 25.5730 | 1.0993 | | | |
| 96 | 27.4318 | 1.0876 | | | |
| 97 | 29.4678 | 1.0738 | | | |
| 98 | 31.6726 | 1.0565 | | | |
| 99 | 34.0995 | 1.0332 | | | |
| 100 | 36.7713 | 1.0000 | | | |
| 101 | 38.9513 | 1.0000 | | | |
| 102 | 41.3363 | 1.0000 | | | |
| 103 | 43.9462 | 1.0000 | | | |
| 104 | 46.8128 | 1.0000 | | | |
| 105 | 49.9263 | 1.0000 | | | |
| 106 | 53.3625 | 1.0000 | | | |
| 107 | 57.1734 | 1.0000 | | | |
| 108 | 61.4190 | 1.0000 | | | |
| 109 | 66.1732 | 1.0000 | | | |
| 110 | 71.5293 | 1.0000 | | | |
| 111 | 77.6167 | 1.0000 | | | |
| 112 | 83.3333 | 1.0000 | | | |
| 113 | 83.3333 | 1.0000 | | | |
| 114 | 83.3333 | 1.0000 | | | |
| 115 | 83.3333 | 1.0000 | | | |
| 116 | 83.3333 | 1.0000 | | | |
| 117 | 83.3333 | 1.0000 | | | |
| 118 | 83.3333 | 1.0000 | | | |
| 119 | 83.3333 | 1.0000 | | | |
| 120 | 83.3333 | 1.0000 | | | |
| 121 | 0.0000 | 1.0000 | | | |

For attained Age 122 and above, the Maximum Monthly Rate per $1,000 of Net Amount of Risk is 0 and the Minimum Death Benefit Factor is 1.0000.

Maximum Monthly Rates are the same for the Base Face Amount and the Supplemental Face Amount and have been adjusted for any applicable Additional Ratings that are applied to the Cost of Insurance rates as shown in Section 1.

4

JUDD 068208

PU0406A

## 3. DEFINITIONS

The term "**Additional Rating**" is an increase in the Cost of Insurance that is applied when a Life Insured does not meet, at a minimum, our underwriting requirements for the standard Risk Classification.

The term "**Age**" means, on any policy anniversary, the age of the person in question at his or her birthday nearest that date.

The term "**Annual Processing Date**" means every 12th Processing Date starting with the Processing Date next after the Policy Date.

The term "**Business Day**" means any day that we are open for business.

The term "**Cash Surrender Value**" equals the Policy Value less the Surrender Charge.

The term "**date**" means a calendar day ending at midnight local time at our Service Office.

The term "**Guaranteed Interest Account**" is that part of the Policy Value which reflects the value you have in our general account.

The term "**in force**" means that the policy has not terminated in accordance with Sections 9, 10, or 11, or surrendered in accordance with Section 17.

The term "**Issue Date**" is the date shown in the Policy Specifications of this policy from which the Suicide and Incontestability provisions are applied.

The term "**Loan Account**" is that part of the Policy Value which reflects amounts transferred from the Guaranteed Interest Account as collateral for a policy loan.

The term "**Minimum Initial Premium**" means the minimum premium needed to put the policy in force and is shown in Section 1.

The term "**Net Cash Surrender Value**" equals the Cash Surrender Value less the Policy Debt.

The term "**Net Premium**" is the gross premium paid less any Premium Charge.

The term "**Partial Surrender Charge Decrease Exemption**" is the percentage of the Base Face Amount at Issue as shown in Section 1 in the Table of Values. This percentage is set at issue of the policy. This exemption applies to cumulative decreases in the Base Face Amount of insurance. Once cumulative decreases exceed this exemption, applicable Surrender Charges will apply. The exemption is not applicable to a full surrender of the policy or Net Cash Surrender Value withdrawals.

The term "**Planned Premium**" means the premium that is selected in the application for the policy, which is intended to be paid on a regular modal basis.

The term "**Policy Date**" is the date from which charges for the first Monthly Deduction are calculated. The Policy Date is shown in Section 1. Policy Years, Policy Months, and Policy Anniversaries are determined from the Policy Date.

The term "**Policy Debt**" as of any date equals (a) plus (b) plus (c), minus (d), where:

(a)    is the total amount of loans borrowed as of such date;

(b)    is the total amount of any unpaid loan interest charges borrowed against the policy on a Policy Anniversary;

(c)    is any interest charges accrued from the last Policy Anniversary to the current date; and

(d)    is the total amount of loan repayments as of such date.

The term "**Policy Value**" is the sum of the values in the Loan Account and the Guaranteed Interest Account.

JUDD  068209

PU0506A

## 3. DEFINITIONS (continued)

The term "Policy Year" means (a) or (b) below whichever is applicable.

    (a)    The first Policy Year is the period beginning on the Policy Date and ending on the Business Day immediately preceding the first Annual Processing Date.

    (b)    Each subsequent Policy Year is the period beginning on an Annual Processing Date and ending on the Business Day immediately preceding the next Annual Processing Date.

The term **"Processing Date"** means the first day of a Policy Month. A Policy Month shall begin on the day in each calendar month that corresponds to the day of the calendar month on which the Policy Date occurred. The Policy Date is not a Processing Date.

The term **"Service Office"** is the office that we designate to service this policy as shown on the back cover of your policy.

The term **"Surrender Charge Period"** is the period during which we will assess surrender charges beginning on the Policy Date and ending when the surrender charge is equal to zero. Surrender charges will apply during this period if you surrender the policy, request a decrease in the Base Face Amount which exceeds the Partial Surrender Charge Decrease Exemption, make a withdrawal that reduces the Base Face Amount, or if the policy terminates due to default. The Surrender Charge Period is shown in Section 1.

The terms **"we"**, **"us"**, and **"our"** refer only to the Company.

The term **"written request"** is your request to us which must be in a form satisfactory to us, signed and dated by you, and filed at our Service Office or, if permitted by our administrative practices, an electronic mail message ("e-mail") received by us at the Internet address specified by us for receipt of such messages.

The terms **"you"** and **"your"** refer only to the Owner of this policy.

## 4. QUALIFICATION AS LIFE INSURANCE

It is the intent that this policy be considered as life insurance for federal income tax purposes, notwithstanding any other provisions of the policy to the contrary, in order to comply with Section 7702 of the Internal Revenue Code of 1986, or any other equivalent section of the Code. We reserve the right to make any reasonable adjustments to the terms or conditions of this policy if it becomes necessary to allow it to qualify as life insurance. This provision should not be construed to guarantee that this policy will receive tax treatment as life insurance or that the tax treatment of life insurance will never be changed by the future actions of any tax authority. In order for this policy to qualify as life insurance, one of the following tests will apply to the policy. The test you elected is shown in Section 1. Your election cannot be changed after issue.

**Guideline Premium Test**

Under this test, if at any time the premiums received under the policy exceed the amount allowable for such tax qualification, such excess amount shall be removed from the policy as of the date of its payment, together with interest thereon from such date, and any appropriate adjustment in the Death Benefit shall be made as of such date. This excess amount shall be refunded to you no later than 60 days after the end of the applicable Policy Year. If this excess amount is not refunded by then, the Total Face Amount under the policy shall be increased retroactively so that at no time is the Death Benefit ever less than the amount necessary to ensure or maintain such tax qualification. In no event, however, will we refuse to accept any premium necessary to prevent the policy from terminating but only if such premium payment would result in a zero Policy Value at the end of the policy year. In addition, the Minimum Death Benefit, as described in Section 6, must be maintained.

**Cash Value Accumulation Test**

Under this test, the Minimum Death Benefit, as described in section 6, must be maintained. We reserve the right to modify the Minimum Death Benefit Factors shown in Section 2, retroactively if necessary, to ensure or maintain qualification of this policy as a life insurance contract for federal income tax purposes, notwithstanding any other provisions of this policy to the contrary.

**Effect on Life Insurance Qualification Tests**

A change in Death Benefit Option or Total Face Amount, or certain other policy changes, will often change the policy's limits under the Life Insurance Qualification Test that you elected.

We reserve the right to refuse or limit any request for a change if the change would cause the policy to fail to qualify as life insurance for tax purposes.

## 5. TOTAL FACE AMOUNT

The Total Face Amount is made up of two components: (i) the Base Face Amount, and (ii) any Supplemental Face Amount. Minimum Base Face Amount and the minimum Total Face Amount limits are shown in Section 1. Scheduled increases in any Supplemental Face Amount are elected on the application and if approved, their amounts, when they are to become effective and the Maximum Increasing Supplemental Face Amount will be shown in Section 1. If you request to cancel a scheduled increase, or request a decrease in your Supplemental Face Amount, that request will be honored but all scheduled increases for subsequent policy years will cease. Future increases to Supplemental Face Amount will be subject to the Company's normal underwriting practices. After the first Policy Year, while the Life Insured is alive and the policy is in force, unscheduled changes to the Supplemental Face Amount may be requested in writing. We reserve the right to limit the number of such unscheduled changes to one per Policy Year. We also reserve the right to limit the maximum and minimum amounts of unscheduled changes. All requested changes will be subject to our approval. You may not increase your Base Face Amount of insurance under this policy.

### Increase in Supplemental Face Amount

As a condition of our approval of any unscheduled increase in Supplemental Face Amount, we may require evidence of insurability satisfactory to us. A minimum premium payment may also be required. When a requested change becomes effective, and if required by our then current rules, a change in future Planned Premiums will automatically be affected to comply with those rules. Any change will be effective on the next Annual Processing Date after our approval. If an increase in Supplemental Face Amount is elected and approved after the Policy Date, any remaining No Lapse Guarantee Period for the Base Face Amount will be reduced to zero.

### Reduction of Total Face Amount

You may request a reduction in Total Face Amount any time after the first Policy Year while this policy is in force. Any reduction in the Total Face Amount will be implemented by first reducing any Supplemental Face Amount. We reserve the right to allow a reduction in Base Face Amount first. If there is a reduction in Base Face Amount, a charge may be deducted from the Policy Value. This charge will be equal to a proportionate part of the Surrender Charge that would have applied if the policy had been surrendered on the date the reduction in Base Face Amount takes effect. The proportion will be equal to the amount of the reduction in Base Face Amount which exceeds the Partial Surrender Charge Decrease Exemption divided by the amount of Base Face Amount in effect immediately before the reduction, less any applicable Partial Surrender Charge Decrease Exemption. This charge will also apply if a withdrawal, as described in Section 17, results in a reduction in Base Face Amount. Without our prior approval, the Base Face Amount cannot be reduced below the minimum as shown in Section 1. Any reduction in Supplemental Face Amount or Base Face Amount will be effective on the next Processing Date after our approval.

## 6. INSURANCE BENEFIT

If the Life Insured dies while the policy is in force, we will pay the Insurance Benefit upon receipt of due proof of death of the Life Insured, subject to any applicable provisions of the policy. If the Life Insured dies on or after the date we receive a request from you to surrender the policy, no Insurance Benefit will be paid. We will pay the amount payable under the Surrenders and Withdrawals provision instead.

### Insurance Benefit

The Insurance Benefit payable is:

    (a)    the Death Benefit as described below; plus

    (b)    any amounts payable under any Supplementary Benefit riders as a result of the Life Insured's death that form part of the contract; less

    (c)    any outstanding Policy Debt at the date of death.

If the Life Insured dies during a grace period, the Insurance Benefit payable described above will be modified as follows:

    (a)    the Insurance Benefit will be reduced by any outstanding Monthly Deductions due; and

    (b)    the Policy Value used in the calculation of the Death Benefit will be the Policy Value as of the date of death of the Life Insured.

JUDD 068211

PU0706A

## 6. INSURANCE BENEFIT (continued)

**Death Benefit**

The Death Benefit will depend on whether Option 1 or Option 2 is in effect on the date of the Life Insured's death.

**Death Benefit Options**

Under Option 1, the Death Benefit is equal to the Total Face Amount at the date of death of the Life Insured. Under Option 2, the Death Benefit is equal to the Total Face Amount at the date of death of the Life Insured plus the Policy Value at the date of death of the Life Insured.

The Death Benefit after the Life Insured's Attained Age 121 will be as described in Section 13.

If any withdrawals are made, the Death Benefit, whether Option 1 or Option 2 is in effect, will be less than it would have been if no withdrawals were made. Withdrawals reduce the Death Benefit by reducing:

    (a)  the Total Face Amount if Option 1 is in effect, as specified in Section 17; or

    (b)  the Policy Value if Option 2 is in effect.

**Change of Death Benefit Options**

You may request in writing to change your Death Benefit Option at any time after the first Policy Year while the policy is in force, subject to the Minimum Base Face Amount shown in Section 1. For a change from Option 1 to Option 2, the change will be effective on the next Annual Processing Date following the date we approve the request, and the Total Face Amount after the change will be equal to the Total Face Amount immediately before the change minus the Policy Value as of the effective date of the change.

For a change in Option 2 to Option 1, the change will be effective on the next Processing Date following the date we approve the request, and the Total Face Amount after the change will be equal to the Total Face Amount immediately before the change plus the Policy Value as of the effective date of the change.

**Minimum Death Benefit**

The sum of the Death Benefit as described above and the Death Benefit payable under any Supplementary Benefit riders will never be less than the Minimum Death Benefit. The Minimum Death Benefit is equal to the Policy Value on the date of death multiplied by the Minimum Death Benefit Factor for the Age of the Life Insured. The Minimum Death Benefit Factors are shown in Section 2. To the extent that the Net Amount at Risk associated with the Minimum Death Benefit that results from this calculation exceeds our guidelines and limitations that may be in effect, we reserve the right to:

    (a)  distribute to you a portion of the Policy Value such that the Net Amount at Risk associated with the resulting Minimum Death Benefit does not exceed our guidelines and limitations in effect; or

    (b)  if we should decide to accept the additional death benefit, require evidence of insurability satisfactory to us.

## 7. INTEREST ON PROCEEDS

We will pay interest on proceeds paid in one sum including interest as stipulated by the state. If the state does not specify the interest rate, we will use the rate for insurance benefits left on deposit with us.

## 8. PREMIUMS

The Minimum Initial Premium is shown in Section 1. No insurance will take effect under this policy until our underwriters approve issuance of this policy and the conditions specified in the application form have been satisfied, including receipt of at least the Minimum Initial Premium at our Service Office.

Subsequent premiums can be paid at any time at our Service Office, and in any amount subject to the limits described below. We will give you a receipt signed by one of our officers.

If coverage under the policy takes effect in accordance with the provisions of the application, we will process any premium payment as of the end of the Business Day the payment is received at our Service Office, subject to the limitations of the life insurance qualification test elected by you and to our maximum limits then in effect, unless one of the following exceptions applies.

    (i)   We will process a payment received prior to the Policy Date as if received on the Policy Date.

    (ii)  We will process the portion of any premium payment for which we require evidence of the Life Insured's continued insurability on the first Business Day after we have received such evidence and found it satisfactory to us.

## 8. PREMIUMS (continued)

(iii)  If our receipt of any premium payment (or portion thereof) would cause a problem for the policy to qualify as a "life insurance contract" under the federal income tax laws, we will not process such payment or portion. However, in the case of certain other tax situations, we will process the payment (or portion thereof) on the first Business Day after we have received satisfactory written instructions from you.

You may pay premiums until the Life Insured reaches Age 121, at which time Monthly Deductions cease and no further premiums may then be paid as described in Section 13.

If any premium payment would result in an increase in the Minimum Death Benefit, we reserve the right to either refund the premium or to require evidence of insurability satisfactory to us for any increase in the Minimum Death Benefit.

### Continuation of Insurance Upon Discontinuance of Premium Payments

If you discontinue paying premiums, we will continue taking the Monthly Deductions from the Policy Value. Your insurance coverage will continue subject to the No-Lapse Guarantee, Grace Period, and Policy Termination provisions in Sections 9, 10 and 11.

## 9. NO-LAPSE GUARANTEE

Your policy includes a No-Lapse Guarantee. The guarantee periods applicable to the Base Face Amount and to any Supplemental Face Amount are shown in the Table of Values in Section 1. During your No-Lapse Guarantee Period, if the Net Cash Surrender Value falls to zero or below, your policy will not go into default provided it satisfies the cumulative premium test.

### Cumulative Premium Test

The test will be performed on any Processing Date that your policy would otherwise be in default in the absence of the No-Lapse Guarantee. Your policy will satisfy the test if the sum of the premiums received, less any Policy Debt, and less any withdrawals, taken on or before the date of the test, is equal to or greater than the sum of the monthly No-Lapse Guarantee Premiums due from the Policy Date to the date of the test. The test will exclude any period during which the Life Insured was totally disabled if the Total Disability Waiver Of Monthly Deductions Rider Supplementary Benefit is included in your policy. The No-Lapse Guarantee Premium is shown as an annualized amount in the Table of Values in Section 1.

The No-Lapse Guarantee Premium may change if any of the following changes occur under your policy:

(a)  you add, terminate or change a Supplementary Benefit rider;

(b)  you change the Death Benefit Option under your policy;

(c)  there is a change in the Base Face Amount or the Supplemental Face Amount; or

(d)  there is a change in the Life Insured's Risk Classification, or if applicable, Additional Rating.

We will inform you of any change to the No-Lapse Guarantee Premium resulting from any such change. The revised premium will be effective from the date of the change. For the purpose of performing the Cumulative Premium Test, we will use the No-Lapse Guarantee Premium in effect as of the Policy Date up to the date of the change, including any revised premium in effect as of the date of a prior change.

## 10. GRACE PERIOD

### Default

Subject to the No-Lapse Guarantee feature of the policy, the policy and any Supplementary Benefit riders will go into default if, at the beginning of any Policy Month, the Net Cash Surrender Value is less than or equal to zero after we take the Monthly Deduction that is due for that month.

### Grace Period Duration

We will allow 61 days from the date the policy goes into default, for you to pay the amount that is required to bring the policy out of default. At least 30 days prior to termination of coverage, we will send notice to your last known address, specifying the amount you must pay to bring the policy out of default. If we have notice of a policy assignment on file at our Service Office, we will also mail a copy of the notice of the amount due to the assignee on record.

9

PU0906A

## 10. GRACE PERIOD (continued)

### Default Payment

The amount required to bring the policy out of default, referred to as the Default Payment, is equal to (a) plus (b) plus (c) where:

(a) is the amount by which all unpaid monthly deductions exceeds the Net Cash Surrender Value at the date of default;

(b) is an amount equal to 3 times the Monthly Deduction due on the date of default;

(c) is the applicable Premium Charge.

When payment is received, any expense charges which are past due and unpaid will be immediately deducted from the Net Policy Value. If the Default Payment has not been paid by the end of the grace period, the policy will terminate. If the Life Insured dies while the policy is in default, then we will deduct from the proceeds all Monthly Deductions due and unpaid as of the date of the Life Insured's death. No Supplementary Benefit riders will be in effect after the policy terminates.

### No-Lapse Guarantee

If the policy is in the No-Lapse Guarantee Period, and the Cumulative Premium Test has been met, then one of the following will apply.

- During the first 2 Policy Years, the Base Face Amount, any Supplemental Face Amount, and any Supplementary Benefit riders will remain in effect.

- For the remainder of the No-Lapse Guarantee Period, if any, (see Section 1 for the duration of the No-Lapse Guarantee Period), the Base Face Amount will remain in effect, but any Supplemental Face Amount and any Supplementary Benefit riders (unless otherwise stated therein) will be subject to termination. The amount required to maintain any Supplemental Face Amount and any applicable Supplementary Benefit riders is equal to the Default Payment specified above. If a payment at least equal to the Default Payment is not received by the end of the grace period, then any Supplemental Face Amount, and any Supplementary Benefit riders (unless otherwise stated therein), will cease to be in effect and will be terminated from the policy.

### Failure to Meet Cumulative Premium Test

If the policy is in the No-Lapse Guarantee Period, and the Cumulative Premium Test has not been met, then the Base Face Amount, any Supplemental Face Amount, and any Supplementary Benefit riders will go into default, as described above. The Grace Period Duration and Default Payment provisions described above will apply. In lieu of the Default Payment, however, you may pay the shortfall needed to meet the Cumulative Premium Test, in which case one of the following will apply.

- During the first 2 Policy Years, the Base Face Amount, any Supplemental Face Amount, and any Supplementary Benefit riders will remain in effect.

- For the remainder of the No-Lapse Guarantee Period, if any, the Base Face Amount will remain in effect, but any Supplemental Face Amount and any Supplementary Benefit riders (unless otherwise stated therein) will terminate as of the end of the Grace Period.

The shortfall will be equal to the amount necessary to satisfy the Cumulative Premium Test as of the date of default, plus the No-Lapse Guarantee Premium for the next three Policy Months.

## 11. POLICY TERMINATION

This policy terminates on the earliest of the following events:

(a) the end of the grace period for which we have not received the amount necessary to bring the policy out of default;

(b) surrender of the policy for its Net Cash Surrender Value; or

(c) the death of the Life Insured.

JUDD 068214

## 12. REINSTATEMENT

If the policy terminates at the end of a grace period in which you did not make a required payment, the policy may be reinstated within 3 years from the date of default. The policy cannot be reinstated if it has been surrendered for its Net Cash Surrender Value.

The requirements for reinstatement are as follows:

(1)   we must receive written request for reinstatement;

(2)   we must receive evidence of insurability satisfactory to us for the Life Insured, and for any insureds covered under any Supplementary Benefit rider that you wish to reinstate;

(3)   we must receive a premium equal to the amount that was required to bring the policy out of default immediately prior to termination, plus the amount needed to keep the policy in force for the next 3 Policy Months.

Requirements (2) and (3) must be satisfied within 60 days after the date we receive written request for reinstatement.

If we approve your request,

(a)   the reinstatement date will be the date we receive the required payment at our Service Office;

(b)   any Surrender Charge will be reinstated to the amount it was at the date of default;

(c)   the remaining Surrender Charge Period, if any, will be the same as on the date of default;

(d)   the Policy Value on the date of reinstatement, prior to the crediting of any Net Premium paid on the reinstatement, will be equal to the Policy Value on the date the policy terminated.

## 13. COVERAGE AT AND AFTER AGE 121

Coverage under this policy at and after the Life Insured's Age 121 is subject to the stipulations stated below.

### Death Benefit
Any Supplemental Face Amount will be terminated, thereby reducing the Death Benefit by such amount. Apart from this change, the Death Benefit will be determined in the same respect as specified in Section 6.

### Premiums and Monthly Deductions
We will not accept any further premium payments. We will cease to take Monthly Deductions for charges listed in Section 1.

### Credited Interest
We will continue to credit interest monthly to your Policy Value.

### Policy Debt and Default
New Loans will not be allowed at and after the Life Insured's Age 121. Loan interest will continue to be charged if there is an outstanding loan when Monthly Deductions and premium payments cease at the Life Insured's Age 121. Loan repayments will be accepted at and after the Life Insured's Age 121. The policy will go into default at any time the Policy Debt exceeds the Policy Value, and Section 10, Grace Period, and Section 16, Loans, will apply.

### Withdrawals
Withdrawals will not be allowed at and after the Life Insured's Age 121.

## 14. POLICY VALUE

### Net Premiums Added
When we receive your premium payments at our Service Office, we deduct a Premium Charge which will not exceed the amount shown in Section 1 and add the balance remaining (the Net Premium) to the Policy Value. We will do this before we take any deductions due on that Business Day. However, we will add any Net Premiums received before the Policy Date to your Policy Value as of the Policy Date.

While a loan exists, we will treat the amounts you pay as premiums unless you request in writing that they be treated as loan repayments. If you instruct us to do so, we will first deduct from such payments the amount of accrued interest on loans and then deduct the amount specified as a loan repayment before applying any balance remaining as a premium payment.

## 14. POLICY VALUE (continued)

### Monthly Deductions

A deduction is due and will be taken from the Policy Value as of the Policy Date and as of each applicable Processing Date. Monthly Deductions are calculated from the Policy Date. If, at your request, we set the Policy Date to a date which precedes the date on which we receive the initial premium, Monthly Deductions due for the period prior to receipt of the initial premium will be taken on the later of the date we receive the initial premium and the date our underwriters approve issuance of this policy.

Monthly Deductions are due until the Policy Anniversary on which the Life Insured reaches Age 121 at which time we will cease to take any further Monthly Deductions as described in Section 13.

The Monthly Deduction for any Policy Month that will be deducted from the Policy Value consists of charges (a) through (e) listed below, where:

(a)   is the Administrative Charge;

(b)   is the Face Amount Charge, if any;

(c)   is the sum of the charges for riders which are part of the policy, if any, provided such charges are deducted from the Policy Value;

(d)   is the sum of all charges for ratings, if applicable; and

(e)   is the Cost of Insurance Charge, as described below.

### Cost of Insurance Charge

The rates for the Cost of Insurance Charge, as of the Policy Date and subsequently for each increase in Total Face Amount, are based on the Life Insured's sex, if applicable, Age, Risk Classification and duration that the coverage has been in force.

The Cost of Insurance Charge for a specific Policy Month is the charge for the Net Amount at Risk, including any Additional Ratings and any Supplementary Benefit riders which are part of the policy. The charge for the Net Amount at Risk is an amount equal to the per dollar cost of insurance rate for that month multiplied by the Net Amount at Risk, and will be based on our expectations of future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, and tax assumptions. The Maximum Monthly Rates at any age are shown in Section 2 as a rate per $1,000 of Net Amount at Risk. To get the maximum rate per dollar, the rate shown must be divided by 1,000. Each Cost of Insurance Charge is deducted in advance of the applicable insurance coverage for which we are at risk.

The Cost of Insurance calculation will reflect any adjustment for the Minimum Death Benefit.

We review our Cost of Insurance rates from time to time, and may re-determine Cost of Insurance rates at that time on a basis that does not discriminate unfairly within any class of lives insured.

### Net Amount at Risk

The Net Amount at Risk is the amount determined by subtracting (a) from the greater of (b) or (c) where:

(a)   is the Policy Value at the end of the immediately preceding Business Day less all charges due on the Policy Date or Processing Date;

(b)   (i) is the sum of the Total Face Amount and the Death Benefit payable under any Supplementary Benefit riders, divided by the Death Benefit Discount Factor shown in Section 1 for Death Benefit Option 1; or (ii) is the sum of the Total Face Amount and the Death Benefit payable under any Supplementary Benefit riders, divided by the Death Benefit Discount Factor shown in Section 1 plus the Policy Value for Death Benefit Option 2; and

(c)   is the amount defined in (a) multiplied by the applicable Minimum Death Benefit Factor for the Life Insured's Age as shown in Section 1.

### Other Deductions

We will deduct a Surrender Charge, as detailed in Section 17, if during the Surrender Charge Period:

(a)   you surrender this policy for its Net Cash Surrender Value;

(b)   the Base Face Amount decreases;

(c)   you do not pay an amount due at the end of the Grace Period as described in Section 10, and your policy terminates.

## 15. LOAN ACCOUNT AND GUARANTEED INTEREST ACCOUNT

The Policy Value at any time is equal to the sum of values you have in the Loan Account and the Guaranteed Interest Account.

### Loan Account Value

The amount you have in the Loan Account at any time equals:

- (a)   amounts transferred to it for loans or borrowed loan interest; plus
- (b)   interest credited to it; less
- (c)   amounts transferred from it for loan repayment.

For details regarding the Loan Account, see Section 16.

### Guaranteed Interest Account Value

The amount you have in the Guaranteed Interest Account at any time equals:

- (a)   Net Premiums allocated to it; plus
- (b)   amounts transferred to it; plus
- (c)   interest credited to it; less
- (d)   amounts deducted from it; less
- (e)   amounts transferred from it; less
- (f)   amounts withdrawn from it.

We will determine the rate or rates of interest to be credited to the Guaranteed Interest Account.  Any additional interest will be credited no less frequently than annually.  Additional interest is nonforfeitable after crediting.  The rate or rates of interest will be determined prospectively and will be based on our expectations for the Guaranteed Interest Account's future investment earnings, persistency, mortality, expense and reinsurance costs and future tax, reserve, and capital requirements, but in no event will the minimum credited interest be less than the Guaranteed Interest Account Annual Rate shown in Section 1.  The rate or rates of interest will be determined on a uniform basis for life insureds with the same timing and amount of premium, same amount of Policy Debt, and whose policies have been in force for the same length of time.  For all transactions, interest is calculated from the date of the transaction.

## 16. LOANS

At any time while this policy is in force and sufficient loan value is available, you can get a loan by written request.  Each loan must be for at least the Minimum Loan Amount shown in Section 1.  We may require a loan agreement from you as the policy is the only security for the loan.  We may defer loans as provided by law or as provided in Section 24.  Loans may not be made if the policy is in the Grace Period as described in Section 10.

### Available Loan Value

The available loan value on any date is the Net Cash Surrender Value, less estimated interest and the Monthly Deductions due to the next Policy Anniversary.  In no event, however, will the available loan value be less than 90% of the Net Cash Surrender Value.  Values will be determined, subject to Section 24, as of the end of the Business Day on which the loan application is received at our Service Office.

### Loan Account

When you take out a loan, or when loan charges are borrowed, we will transfer amounts from the Guaranteed Interest Account into the Loan Account

Interest is credited to the Loan Account and interest is also charged on the Policy Debt, as described in the Loan Interest Charged and Loan Interest Credited provisions.

13

JUDD  068217

PU1306A

## 16. LOANS (continued)

### Loan Interest Charged

The loan interest rate is variable. It will be set each year at your Policy Anniversary and it will not change during the year.

The loan interest rate charged will not exceed the greater of (a) and (b), where:

(a) is the Guaranteed Interest Account Rate shown in Section 1 plus 1% per annum; and

(b) is the Moody's Corporate Bond Yield Average-Monthly Average Corporates for the calendar month ending two months before the beginning of the month in which your Policy Anniversary falls. For example, if your Policy Anniversary is in April; we would use the Average for January.

If the Average is at least one-half of one percent smaller than the rate we have set for the previous Policy Year, we will reduce the rate to a rate no more than that Average. If the Average is at least one-half of one percent greater than the rate we have set for the previous Policy Year, we will increase the rate to a rate no more than that Average.

Moody's Corporate Bond Yield Average-Monthly Average Corporates referred to above is published in the United States by Moody's Investors Service, Inc. In the event it is no longer published, we will use a similar average published by another United States bond rating agency.

Interest will accrue daily on loans. Loan interest will be payable on each Annual Processing Date and on the date the loan is settled. In the event that you do not pay the loan interest charged in any Policy Year, it will be borrowed against the policy and added to the Policy Debt in arrears at the Policy Anniversary.

We will increase the Loan Interest Rate at any time it is determined that the rate being charged would cause a loan to be taxable under any applicable ruling, regulation, or court decision. In such case, we will increase the Loan Interest Rate to an amount that would result in the transaction being treated as a loan under federal tax law.

Loan interest will continue to be charged, as described in Section 13, when Monthly Deductions and premium payments cease at the Life Insured's Age 121.

### Loan Interest Credited

Loan interest will accrue daily to amounts in the Loan Account. The effective loan interest rate credited is the difference between the effective loan interest rate charged and the Loan Interest Credited Differential. The difference, in terms of dollars, is the cost of keeping a loan. The differential will not exceed the Maximum Loan Interest Credited Differential shown in Section 1.

### Loan Repayment

You may repay the Policy Debt in whole or in part at any time prior to the death of the Life Insured and while the policy is in force. When you make a loan payment or repay a loan, we will transfer an amount equal to the amount received, less the Loan Interest Credited Differential for such amount received, from the Loan Account to the Guaranteed Interest Account.

Subject to any rider, endorsement, or other provisions, while a loan exists, we will treat any amounts you pay as premiums, unless you request in writing that they be treated as loan repayments.

## 17. SURRENDERS AND WITHDRAWALS

### Surrender of the Policy

You may surrender this policy upon written request for its Net Cash Surrender Value at any date prior to the death of the Life Insured. We will determine the Net Cash Surrender Value as of the end of the Business Day on which we have received at our Service Office your written request for full surrender of the policy. We will process the request and pay the Net Cash Surrender Value only if we have not received due proof that the Life Insured died prior to the surrender date. After we receive your written request to surrender the policy, no insurance will be in force. If you surrender the policy during the Surrender Charge Period, we will deduct a Surrender Charge from your Policy Value in calculating the Net Cash Surrender Value. The Surrender Charge and Surrender Charge Period are shown in Section 1.

## 17. SURRENDERS AND WITHDRAWALS (continued)

### Withdrawals

Once per Policy Month after the first Policy Anniversary, you may request a withdrawal of part of the Net Cash Surrender Value if available. For each withdrawal we reserve the right to deduct a Withdrawal Fee as shown in Section 1. Withdrawals are subject to the following conditions:

(a)   without our approval, each withdrawal must be for at least the Minimum Withdrawal Amount shown in Section 1;

(b)   after the withdrawal, the remaining Net Cash Surrender must be at least equal to 3 times the Monthly Deductions at the time of the withdrawal;

(c)   we will process the withdrawal, thereby reducing the Policy Value, as of the end of the Business Day on which we receive your written request;

(d)   we will deduct a pro-rata Surrender Charge if the withdrawal occurs during the Surrender Charge Period, and the withdrawal results in a reduction in Base Face Amount;

(e)   we will reduce the amount of the withdrawal if the amount is not sufficient to pay the withdrawal plus the Withdrawal Fee and any pro-rata Surrender Charge; and

(f)   we will reduce the amount of the withdrawal if it would otherwise cause the Base Face Amount to fall below the Minimum Base Face Amount shown in Section 1.

If Death Benefit Option 1 is in effect at the time of the withdrawal, the Total Face Amount of the policy will be reduced:

(a)   by the amount of the withdrawal, if at the time of the withdrawal the Death Benefit equals the Total Face Amount; otherwise

(b)   by the amount, if any, by which the withdrawal (including any applicable pro-rata surrender charge and withdrawal fee) exceeds the difference between the Minimum Death Benefit and the Total Face Amount, divided by the applicable Minimum Death Benefit Factor for the Life Insured's Age as shown in the Table of Rates in Section 2.

Withdrawals will reduce the Supplemental Face Amount first, and then the Base Face Amount. We reserve the right to allow a reduction in Base Face Amount prior to fully reducing the Supplemental Face Amount. If the Death Benefit on any given day is equal to the Policy Value times the applicable Minimum Death Benefit Factor, withdrawals on such day will reduce the Death Benefit by the amount withdrawn times the applicable Minimum Death Benefit Factor until the Death Benefit is equal to the Total Face Amount. Your Death Benefit will continue to be determined in accordance with Sections 6 and 13, subject to these provisions.

If Death Benefit Option 2 is in effect, an amount equal to any withdrawal and Withdrawal Fee will be deducted from the Policy Value. Withdrawals will not affect the Total Face Amount. Your Death Benefit will continue to be determined in accordance with Sections 6 and 13.

## 18. OWNER AND BENEFICIARY

Until the Life Insured's death, without the consent of any revocable beneficiaries, you can receive any amount payable under the policy and exercise all rights and privileges granted by the policy.

### Change of Owner

Until the Life Insured's death, the owner can change the ownership of the policy by written request. The change will take effect as of the date you signed the written request. It will not apply to any payments we made or any action we may have taken before we received your written request.

### Trustee Owner

Should the owner be a trustee, payment to the trustee(s) of any amount to which the trustee(s) is (are) entitled under the policy, either by death or otherwise, will fully discharge us from all liability under the policy to the extent of the amount so paid.

### Joint Ownership

Two or more owners will own the policy as joint tenants with right of survivorship, unless otherwise requested on the application or in any subsequent assignment of the policy. On death of any of the owners, the deceased owner's interest in the policy passes to the surviving owner(s).

## 18. OWNER AND BENEFICIARY (continued)

**Successor Owner**

Upon the owner's death during the Life Insured's lifetime, a named successor owner will, if then living, have all the owner's rights and interest in the policy. Until the Life Insured's death, the owner, without the consent of any beneficiary or any successor owner, can cancel or change the designation of successor owner. This may be done from time to time by agreement in writing with us.

The following four provisions will apply unless there is a beneficiary appointment in force that provides otherwise.

**Beneficiary Classification**

You can appoint beneficiaries for the Insurance Benefit in three classes: primary, secondary, and final. Beneficiaries in the same class will share equally in the Insurance Benefit payable to them.

**Payment To Beneficiaries**

We will pay the Insurance Benefit:

(a)   to any primary beneficiaries who are alive when the life insured dies; or

(b)   if no primary beneficiary is then alive, to any secondary beneficiaries who are then alive; or

(c)   if no primary or secondary beneficiary is then alive, to any final beneficiaries who are then alive.

**Change Of Beneficiary**

Until the Life Insured's death, you can change the beneficiary by written request unless you make an irrevocable designation. We are not responsible if the change does not achieve your purpose. The change will take effect as of the date you signed such request. It will not apply to any payments we made or any action we may have taken before we received your written request.

**Death Of Beneficiary**

If no beneficiary is alive when the Life Insured dies, the Insurance Benefit will be payable to you; or if you are the Life Insured, to your estate. Unless otherwise provided, if a beneficiary dies before the seventh day after the death of the Life Insured, we will pay the Insurance Benefit as if the beneficiary had died before the Life Insured.

## 19. ASSIGNMENT

Your interest in this policy may be assigned without the consent of any revocable Beneficiary. Your interest, any interest of the Life Insured and of any revocable Beneficiary shall be subject to the terms of the assignment.

We will not be on notice of any assignment unless it is in writing, nor will we be on notice until a duplicate of the original assignment has been filed at our Service Office. We assume no responsibility for the validity or sufficiency of any assignment.

## 20. MISSTATEMENTS

If the age or sex of the Life Insured was misstated in the application, we will, if necessary, change the Base Face Amount, any Supplemental Face Amount, and every other benefit to that which would have been purchased at the correct age or sex by the most recent Cost of Insurance Charge.

## 21. SUICIDE

If the Life Insured commits suicide, while sane or insane, within 2 years from the Issue Date, the policy will terminate on the date of such suicide and we will pay (in place of all other benefits, if any) an amount equal to the premiums paid less the amount of any Policy Debt on the date of death and less any withdrawals.

If the Life Insured commits suicide, while sane or insane, after 2 years from the Issue Date and within 2 years from

(a)   the date we approve a schedule of increasing Supplemental Face Amount;

(b)   the effective date of any unscheduled increase in Supplemental Face Amount; or

## 21. SUICIDE (continued)

(c)  the date of an increase in Death Benefit resulting from any payment of premium we are authorized to refuse under Section 4;

the benefits payable under the policy will not include the amount of such Death Benefit increase but will include the amount of premium that pertains to the increase.

We reserve the right under this provision to obtain evidence of the manner and cause of death of the Life Insured.

## 22. INCONTESTABILITY

This policy shall be incontestable after it has been in force during the lifetime of the Life Insured for two Policy Years from the Issue Date, except for policy termination, or any provision for reinstatement or policy change requiring evidence of insurability.

In the case of reinstatement or any policy change requiring evidence of insurability, the incontestable period shall be two years from the effective date of such reinstatement or policy change. However, for a policy change involving the approval of a schedule of increasing Supplemental Face Amount, the incontestable period shall be two years from the date we approve such schedule.

Any premium payment which we accept subject to insurability, and any increase in the Death Benefit resulting from such payment, shall be considered a policy change for purposes of this Section.

## 23. THE CONTRACT

The written application for the policy is attached at issue.  The entire contract between the applicant and us consists of the policy, such application, and any riders and endorsements.  However, additional written requests or applications for policy changes or acceptance of excess payment may be submitted to us after issue and such additional requests may become part of the policy. All statements made in any application shall, in the absence of fraud, be deemed representations and not warranties. We will use no statement made by or on behalf of the Life Insured to defend a claim under the policy unless it is in a written application.

An exchange of this policy for a new policy on a different plan may be made by agreement between you and us in accordance with our published rules in effect at that time.

We reserve the right to make any changes necessary in order to keep this policy in compliance with any changes in federal or state tax laws. Other changes in this policy may be made by agreement between you and us.  Only the President, Vice President, the Secretary, or an Assistant Secretary of the Company has authority to waive or agree to change in any respect any of the conditions or provisions of the policy, or to extend credit or to make an agreement for us.

## 24. RIGHT TO POSTPONE PAYMENT OF BENEFITS

We reserve the right to postpone the payment of Net Cash Surrender Value, withdrawals, and policy loans, for up to six months after we receive such written request, except when required to make a premium payment.

## 25. CLAIMS OF CREDITORS

The proceeds and any income payments under the policy will be exempt from the claims of creditors to the extent permitted by law.  These proceeds and payments may not be assigned or withdrawn before becoming payable without our agreement.

17

PU176AGA

JUDD  068221

## 26. REPORTS TO OWNER

Within 30 days after each Policy Anniversary, we will send you a report at no charge showing:

    (a)    the Death Benefit;

    (b)    the Policy Value;

    (c)    any Policy Debt;

    (d)    any Loan Account balance and loan interest charged since the last report;

    (e)    the premiums paid for the year; and

    (f)    any further information required by law.

Upon request, we will provide you with a report of projected future values. We will provide one report annually without charge. For additional reports you request, we reserve the right to charge a reasonable fee, not to exceed $50.

## 27. HOW VALUES ARE COMPUTED

We provide Cash Surrender Values that are at least equal to those required by law. We base minimum Cash Surrender Values on the Commissioners 2001 Standard Ordinary Sex and Smoker Distinct ANB Ultimate Mortality Tables, with substandard ratings as applicable. However, if this policy is issued on a unisex basis, we base minimum Net Cash Surrender Values on the Commissioners 2001 Standard Ordinary Male Mortality Table, with substandard ratings as applicable. We also use these tables in determining Guaranteed Maximum Cost of Insurance Charges. Reserves will be at least as great as the minimum required by law.

A detailed statement of the method of computing the values of this policy has been filed with the insurance department of the state shown in Section 1.

JUD 068222

93 783 751

NS   N

APPLICATION SUPPLEMENT

RETURN ONE COPY OF THIS FORM TO
JOHN HANCOCK LIFE INSURANCE COMPANY
HEAD OFFICE: 200 BLOOR STREET EAST
TORONTO, CANADA M4W 1E5

TWO COPIES OF THIS FORM MUST BE SIGNED BEFORE THIS POLICY IS DELIVERED

POLICY NUMBER:   93 783 751

REGISTER:   20920

ON THE LIFE OF:   JOE E ACKER

JOHN  HANCOCK  LIFE  INSURANCE  COMPANY   IS  REQUESTED  TO  MAKE  THE  FOLLOWING
ADDITIONS,  CORRECTIONS  AND  AMENDMENTS  IN  THE  APPLICATION  DATED  DEC  28,  2007.   IT
IS  AGREED  THAT  THEY  ARE  TO  BE  OF  THE  SAME  EFFECT  AS  IF  CONTAINED  IN  THE
APPLICATION.

THE POLICY IS ISSUED WITH CASH VALUE ACCUMULATION TEST

DATED AT.........................THIS.......DAY OF.............YEAR........
                    (city/state)

------------------------------
SIGNATURE OF PROPOSED
LIFE INSURED (ANNUITANT)
JOE E ACKER

------------------------------------------
SIGNATURE OF APPLICANT IF OTHER THAN
PROPOSED LIFE INSURED (ANNUITANT)
RONALD M GOSS, TRUSTEE

FORM 856

JUDD  068223

*John Hancock*

Service Office:
200 BLOOR STREET EAST
TORONTO, ONTARIO
CANADA M4W 1E5

Policy No. (for Internal Use Only)

**Application for Life Insurance**

☒ John Hancock Life Insurance Company (U.S.A.)
☐ John Hancock Variable Life Insurance Company
☐ John Hancock Life Insurance Company
(hereinafter referred to as The Company)

· Print and use black ink. Any changes must be initialed by the Proposed Life Insured(s) and/or Owner(s).

| Proposed Life Insured (Life One) | Proposed Life Insured (Life Two) |
|---|---|
| **1. a) Name** First Joe Middle F Last Acker | **2. a) Name** First Middle Last |
| **b) Date of Birth** mm 05 dd 21 yyyy 1936   **c) Sex** ☒ M ☐ F | **b) Date of Birth** mm dd yyyy   **c) Sex** ☐ M ☐ F |
| **d) Place of Birth** State GA Country USA | **d) Place of Birth** State Country |
| **e) Citizenship** ☒ U.S. ☐ Other _____ | **e) Citizenship** ☐ U.S. ☐ Other _____ |
| **f) Social Security/ Tax ID Number** 2 6 0 8 6 4 6 5 5 | **f) Social Security/ Tax ID Number** |
| **g) Driver's License No.** 004305764   State GA | **g) Driver's License No.**   State |
| **h) Home Address** Street No. & Name, Apt No. 2140 Dixide Branches Rd.   City Elberton   State GA   Zip code 30635 | **h) Home Address** Street No. & Name, Apt No.   City   State   Zip code |
| **i) Years at this Address** 40 | **i) Years at this Address** |
| **j) Tel Nos.** Home (706) 283-2374   Business ( ) | **j) Tel Nos.** Home ( )   Business ( ) |
| **k) Name of Employer** Retired   **Address of Employer** Street No. & Name, Apt No. N/A   City   State   Zip code | **k) Name of Employer**   **Address of Employer** Street No. & Name, Apt No.   City   State   Zip code |
| **l) Occupation** N/A | **l) Occupation** |

**Owner - Complete information only if Owner is other than Proposed Life Insured.**

If Trust Owner, complete questions 3, a), d) and e) and Trust Certification PS5101.   Date of Trust mm 12 dd 14 yyyy 2007

**3. a) Name** Joe F. Acker Family Insurance Trust

**b) Date of Birth** mm dd yyyy   **c) Relationship to Proposed Life Insured(s)** Trust   **d) Social Security/ Tax ID Number** 2 6 6 1 6 4 7 8 3
(if individually owned)

**e) Address** Street No. & Name, Apt No. 725 Esco Rd.   City Comer   State GA   Zip code 30629

**4. Multiple Owners -** *Provide details as above for other owner(s) on a separate page.*   Type of ownership ☐ Joint with right of survivorship   ☐ Tenants in Common

JUDD 068224

| Other information - MUST BE COMPLETED |
|---|

5. Is there, or will there be, an understanding or agreement providing for a party, other than the Owner designated in question 3, a), to obtain any right, title or other legal or beneficial interest in any policy issued on the life of the Proposed Life Insured(s) as a result of this application?

☒ No   ☐ Yes - give details

6. a) What is the source of the funding for the policy(ies) currently applied for?   *Insured*

b) Will the Owner, now or in the future, be paying premiums funded by an individual and/or an entity other than the Proposed Life Insured(s), or the Proposed Life Insured's employer?   ☐ Yes - If Yes, answer question 7.   ☒ No - If No, proceed to question 8.

7. Will the premiums be financed through a loan?

☐ No - If No, describe the funding arrangement.
☐ Yes - If Yes, answer the following questions.

   a) What is the interest rate per annum?      %

   b) In addition to repayment of principal and interest, are there other fees, charges or other consideration to be paid on maturity?
     ☐ No   ☐ Yes - give details

   c) What is the duration of the loan?        d) Who is the lender?

   e) What amount and type of collateral  Amount      Type of Collateral
     is required to secure the loan?  $

| Beneficiary Information - Subject to change by Owner |
|---|

8. a) Name of Primary Beneficiary   First      Middle      Last   *Joe E Acker Family Insurance Trust*

   b) Relationship to Proposed Life Insured(s)  *Trust*

   c) Name of Secondary Beneficiary   First      Middle      Last

   d) Relationship to Proposed Life Insured(s)

| Coverage Applied For |
|---|

9. Complete the applicable Policy Details Form NB5097 (Universal Life), NB5098 (Variable Life) or NB5013 (Term & Traditional Life) for details of the policy being applied for, including Supplementary Benefits and other benefit options.

| Juvenile Insurance - Do not complete for Children's Insurance Rider. |
|---|

10. a) Are all siblings equally insured?   ☐ Yes ☐ No

   b) Amount of life insurance currently in force or pending on parent(s)/guardian(s)  $

   If none, give details.

| Existing and Pending Insurance - Proposed Life Insured(s) |
|---|

11. a) Total insurance in force on the Proposed Life Insured(s), including any policy that has been sold, assigned or settled to or with a settlement or viatical company or any other person or entity.

b) Including this application, total insurance currently pending with all companies.

c) Of the above pending amount in 11. b), how much do you intend to accept?

| | Life One | Life Two |
|---|---|---|
| a) | $ 30,000 | $ |
| b) | $ 3,000,000 | $ |
| c) | $ 1,000,000 | $ |

d) Have you ever had an application for life or health insurance declined, postponed, rated or offered with a reduced face amount?

  Life One: ☒ No   ☐ Yes - give details
  Life Two: ☐ No   ☐ Yes - give details

e) Provide information for each policy in force on the Proposed Life Insured(s), including any policy that has been sold, assigned or settled to or with a settlement or viatical company or any other person or entity. (Attach additional page if necessary.)

| Proposed Life Insured | Company | Insurance Group | Insurance Personal | Insurance Business | Insurance Amt | Issue Date d) | To Remain in Force? Yes | To Remain in Force? No | Face Amount |
|---|---|---|---|---|---|---|---|---|---|
| ☒ One ☐ Two | American Air Force | ☐ | ☒ | ☐ | | 1978 | ☒ | ☐ | $ 30,000 |
| ☐ One ☐ Two | | ☐ | ☐ | ☐ | | | ☐ | ☐ | $ |
| ☐ One ☐ Two | | ☐ | ☐ | ☐ | | | ☐ | ☐ | $ |
| ☐ One ☐ Two | | ☐ | ☐ | ☐ | | | ☐ | ☐ | $ |

JUDD 068225

| Existing and Pending Insurance - Proposed Life Insured(s) (continued) | | | | | | | |

11. i) Is Disability Insurance (DI) with Provident or Long Term Care (LTC) Insurance with the Company currently being applied for?

**Life One**  ☐ Yes ☒ No
**Life Two**  ☐ Yes ☐ No

If Yes, provide ☐ DI date of application

| | mm | dd | yyy | | mm | dd | yyy |
| ☐ LTC date of application | mm | dd | yyy | | mm | dd | yyy |

| Existing Insurance - Owner(s) Replacement(s) - MUST BE COMPLETED |

12. Will this insurance replace existing policies or are you considering using funds from existing policies to pay premiums due on the new policy or contract?
☐ Yes  ☒ No   If Yes, please complete the IMPORTANT NOTICE: Replacement of Life Insurance or Annuities (Standard Form), NB5017.

| Financial Questions |

*Complete when applying for Face Amount of $250,000 or more, or any amount of Business Insurance, or when a Proposed Life Insured is over age 70.  (Please submit copies of financial statements, estate analysis, contractual agreements, etc.)*

13. a) What is the purpose of this insurance?  Estate Conservation
(e.g. estate conservation, buy-sell, keyperson)

b) How was the need for the Face Amount determined?  Estate Tax Planning

| | | Life One | Life Two |
|---|---|---|---|
| c) Gross annual earned income (salary, commissions, bonuses, etc.) | | $ 0 | $ |
| d) Gross annual unearned income (dividends, interest, net real estate income, etc.) | | $332,000 | $ |
| e) Household net worth (combined) | | $4,190,000 | |

f) In the last 5 years, has/have either of the Proposed Life Insured(s), or the business had any major financial problems (bankruptcy, etc.)?  ☒ No  ☐ Yes - give details

| Business Insurance - Complete for ALL Business Insurance |

| 14. | | Current Year | Previous Year |
|---|---|---|---|
| a) Assets | $ | | $ |
| b) Liabilities | $ | | $ |
| c) Gross Sales | $ | | $ |
| d) Net Income after taxes | $ | | $ |
| e) Fair Market Value of the business | $ | | $ |

f) What percentage of the business is owned by the Proposed Life Insured(s)? _____ %

g) Are other partners/owners/executives being insured?  ☐ Yes  ☐ No
If Yes, give details.

| Smoking Questions |

15. Have you ever used tobacco or nicotine products in any form (including cigarettes, cigars, cigarillos, a pipe, chewing tobacco, nicotine patches or gum)?
Proposed Life Insured (Life One) ☒ No  ☐ Yes - give details below      Proposed Life Insured (Life Two) ☐ No  ☐ Yes - give details below

| Product | Frequency | Current | Past | Date last used | | | Product | Frequency | Current | Past | Date last used | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | mm | dd | yyy | | | | | mm | dd | yyy |
| Cigarettes | pack(s) / day | ☐ | ☐ | | | | Cigarettes | pack(s) / day | ☐ | ☐ | | | |
| Cigars | x / day | ☐ | ☐ | | | | Cigars | x / day | ☐ | ☐ | | | |
| Other: | x / day | ☐ | ☐ | | | | Other: | x / day | ☐ | ☐ | | | |

| Lifestyle Questions - Please provide details in No. 21 for Yes answers. (Page 4) |

16. Do you engage in regular exercise?
Proposed Life Insured (Life One) ☐ No  ☒ Yes - give details below      Proposed Life Insured (Life Two) ☐ No  ☐ Yes - give details below
a) What type of exercise?  Walking                                         a) What type of exercise?
b) How many times a week?  3    c) How long? (Hours or minutes per occasion)  30      b) How many times a week? _____   c) How long? (Hours or minutes per occasion) _____

| | | Life One | Life Two |
|---|---|---|---|
| 17. Do you expect to travel outside the U.S. or Canada, or change your country of residence in the next 2 years? | | ☐ Yes ☒ No | ☐ Yes ☐ No |
| 18. a) Have you flown as a student pilot, licensed pilot, or crew member in any aircraft, including ultralight planes, in the last 2 years? If Yes, please complete Aviation Questionnaire NB5009. | | ☐ Yes ☒ No | ☐ Yes ☐ No |
| b) Have you engaged in any form of motor vehicle or power boat racing, sky diving/parachuting, skin or scuba diving, hang-gliding, mountain climbing, or any other hazardous activities in the last 2 years? If Yes, please complete Avocation Questionnaire NB5010. | | ☐ Yes ☒ No | ☐ Yes ☐ No |

JUDD  068226

JUDD  068227

Document #13 of 19

### SECURITY AGREEMENT FOR BENEFICIARY INTEREST IN TRUST

This SECURITY AGREEMENT FOR BENEFICIARY INTEREST IN TRUST (the "**Security Agreement**") is entered into by **Nadine Acker**, a Georgia resident (the "**Beneficiary**"), in favor of **Windsor Securities LLC**, a Nevada LLC with its principal place of business located at 101 Convention Center Boulevard, Suite P-109, Las Vegas, NV 89109 (the "**Lender**"). It is further understood that the term "Trustee" used herein shall refer to the trustee of the Trust/Borrower in his or her capacity as Trustee.

#### WITNESSETH:

WHEREAS, pursuant to the Life Insurance Premium Financing Agreement, dated the date hereof, entered into among the Lender, the **Joe E. Acker Family Insurance Trust** (the "**Trust**" and "**Borrower**"), and **Joe E. Acker**, a Georgia resident (the "**Insured**") (including all annexes, exhibits and schedules thereto, and as from time to time amended, restated, supplemented or otherwise modified, (the "**Financing Agreement**"), Lender has agreed to make a loan to the Borrower for the amount specified in the Financing Agreement (the "Loan") as evidenced by that certain Promissory Note dated the date hereof by and between the Borrower and Lender (the "**Note**"), the proceeds of which shall be used by the Borrower to pay the Financed Insurance Premiums and Closing Fees on the Policy listed in Schedule 1 hereto;

WHEREAS, the Trust is the sole owner of the Policy;

WHEREAS, the Beneficiary is a beneficiary of the Trust; and,

WHEREAS, in order to induce the Lender to make the loan and extend credit to the Borrower as provided for in the Financing Agreement, the Beneficiary has agreed to grant a security interest in her entire beneficiary interest in the Trust to Lender in accordance with the terms and conditions of this Security Agreement.

NOW, THEREFORE, in consideration of the premises, promises, and the covenants hereinafter contained and to induce Lender to make loan and extend credit to Borrower as provided for in the Financing Agreement, Beneficiary and Trustee and Lender each agree as follows:

1.  Definitions.  Unless otherwise defined herein, all capitalized terms used in this Security Agreement have the meanings ascribed to such terms in the Financing Agreement.

2.  Grant of Security Interest  Beneficiary and Trustee each hereby grants, gives, conveys and pledges to Lender a first priority security interest in all of the Beneficiary's and Borrower's right, title and interest whether now owned or hereafter acquired and wherever located, in and to all of the following (collectively, the "**Pledged Collateral**"):

   (a)   the Beneficiary and Borrower's entire beneficiary interest in the Trust, all instruments, certificates or other securities or investment property evidencing such beneficial interest and all proceeds thereof; and

   (b)   the Beneficiary and Borrower's interest, if any, in and of and to the Policy and any related documents and security and the death benefit payable under the Policy and all proceeds thereof.

3.  Security for Obligations.  This Security Agreement secures, and the Pledged Collateral is security for, the timely and full performance of all of the covenants, obligations and duties of Borrower, as borrower under the Financing Agreement and the Note, and the prompt payment and in

- 1 -

JUDD  068228

Document #13 of 19

full when due, whether at stated maturity, by acceleration or otherwise, of all monetary obligations of any kind under or in connection with, the Financing Agreement and the Note (in each case, an "**Obligation**") and all Obligations of Borrower and Beneficiary to Lender, any affiliate of Lender and any successor or assign thereof, now or hereafter existing under this Security Agreement or any other agreement, understanding, commitment, or contract to which Borrower is a party with Lender, including, without limitation, all fees, costs and expenses whether in connection with collection actions hereunder (collectively, the "**Secured Obligations**"). *Time is of the Essence with respect to the performance of all and each of the Secured Obligations.*

4.      Perfection.  This Security Agreement may be perfected by the Lender, in Lender's sole discretion, filing one or more UCC-1 Financing Statements in accordance with the laws of the jurisdictions applicable to the Beneficiary and Borrower and the Pledged Collateral, and Lender taking any other action that may be necessary and/or reasonably requested by the Lender to perfect such Security Interest under all applicable law.  The Beneficiary and Trustee each hereby authorizes and acknowledges such filings or other action.  After all amounts due by the Borrower under the Financing Agreement have been repaid in accordance with the terms of the Financing Agreement, the Lender shall release the Pledged Collateral, and shall terminate the UCC-1 Financing Statement(s) in accordance with the applicable laws.

5.      Representations and Warranties of Beneficiary and Borrower.  Beneficiary and Trustee each represents and warrants to Lender that:

(a)     Beneficiary is, as of the date hereof, the sole beneficiary of the Trust and owner of the Pledged Collateral free and clear of all liens, claims, security interests, pledges, rights of first refusal, charges, or encumbrances (a "**Lien**") thereon or affecting the title thereto, except for any Lien created by this Security Agreement;

(b)     Beneficiary has the right and requisite authority to grant a security interest, assignment and pledge of the Pledged Collateral to Lender as provided herein, and this Security Agreement and the security interest created by Beneficiary hereunder does not violate or breach the Irrevocable Trust Agreement dated December 15th, 2007 for the Trust (the "**Trust Agreement**") or any other document, instrument, mortgage or agreement to which the Beneficiary or Borrower is party or to which its assets are bound;

(c)     A true and correct copy of the Trust Agreement, including all amendments, supplements and other modifications thereto, has been previously delivered by Beneficiary or Borrower to Lender;

(d)     The Trust Agreement is a legal, valid and binding agreement, enforceable by Beneficiary and Trustee and Borrower, each, in accordance with its terms;

(e)     No consent, approval, authorization or other order or other action by, and no notice to or filing with, the trustee of the Trust any other person is required (i) for the grant of the security interest by Beneficiary or Borrower in the Pledged Collateral pursuant to this Security Agreement or for the execution, delivery or performance of this Security Agreement by Beneficiary and Trustee each, or (ii) for the exercise by Lender of any of its rights provided for in this Security Agreement or the remedies in respect of the Pledged Collateral pursuant to this Security Agreement;

(f)     The security interest created hereunder will create a valid first priority Lien in favor of Lender in the Pledged Collateral and all the proceeds thereof, securing the payment of the Secured Obligations, subject to no other Lien;

-2-

JUDD  068229

(g)     This Security Agreement has been duly authorized, executed and delivered by Beneficiary and Trustee each and constitutes a legal, valid and binding obligation of Beneficiary and Trustee enforceable by Lender against Beneficiary and Trustee in accordance with its terms;

(h)     Without Beneficiary and Trustee's receipt of the prior written consent of Lender, neither Beneficiary nor Trustee will not sell, assign, transfer, pledge, or otherwise encumber any of its rights in or to the Pledged Collateral, or any distributions or payments with respect to the Pledged Collateral or grant a Lien in the Pledged Collateral; and

(i)     Beneficiary and Trustee each will, at its sole expense, promptly execute, acknowledge and deliver all such instruments and take all such actions as Lender from time to time may request in order to ensure to Lender the benefits of its Lien in and to the Pledged Collateral intended to be created by this Security Agreement, including the filing of any necessary financing statements or continuation statements, which may be filed by Lender with or (to the extent permitted by law) without the signature of Beneficiary and Trustee, and will cooperate with Lender, at Beneficiary's and Trustee's expense, in obtaining all necessary approvals and making all necessary filings under federal, state, local or foreign law in connection with such Lien or any sale or transfer of the Pledged Collateral.

(j)     Beneficiary and Trustee each hereby consents, acknowledges and agrees that Lender may transfer, sell or assign its interest hereunder and under the Financing Agreement to one or more third party finance providers to the Lender.

(k)     Beneficiary and Trustee each represent that until Loan and all obligations to Lender are satisfied in full, Trustee to ensure that the Policy will remain in full control of the Trust to satisfy the collateral Loan purpose. The Policy will not be sold, gifted, distributed, or in any other way have its role as collateral for Loan compromised. Any such action shall be considered a breach of Agreement and Event of Default.

(l)     Insured and Trustee agree that the Agent (registered representative) of the policy will not be changed or removed without prior notice and concurrence of Lender, such concurrence not unreasonably withheld. Should the Agent (registered representative) be changed without the knowledge or consent of Trustee or due to facts beyond control of Trustee or Insured, Trustee and Insured shall immediately be notified. Violation of either preceding sentence shall be a breach of Agreement and an Event of Default.

The representations and warranties of Beneficiary and Trustee each set forth in this Section 5 shall survive the execution, delivery and performance of this Security Agreement.

6.     Defaults and Remedies.

(a)     An "Event of Default" is defined under this Security Agreement to include any of (i) the failure of Beneficiary or Trustee to timely and fully comply with its obligations hereunder, (ii) the breach of any representation, warranty, covenant or other agreement or statement made by the Beneficiary or Trustee each hereunder or by the Borrower within the Financing Agreement or any document executed in connection therewith, (iii) the occurrence of any "Events of Default" under the Financing Agreement or any document entered into between the Borrower and the Lender in connection therewith, and (iv) the failure of Beneficiary or Trustee to be in timely and full compliance with each and all of its respective Secured Obligations. Upon the occurrence of an Event of Default,

- 3 -

JUDD  068230

Document #13 of 19

Lender (personally or through an agent or assigns) is hereby authorized and empowered to take the following actions without a meeting: (i) transfer the Pledged Collateral and register it in Lender's name or in the name of its nominee; (ii) collect and receive all cash and other distributions made on or with respect to the Pledged Collateral; (iii) sell the Pledged Collateral in one or more sales after ten (10) days' notice of the time and place of any public sale or of the time at which a private sale is to take place (which notice Beneficiary and Trustee each agrees is commercially reasonable); and (iv) otherwise act with respect to the Pledged Collateral as though Lender was the outright owner thereof.

(b)     Beneficiary and Trustee each hereby irrevocably constitutes and appoints Lender and its assigns as the proxy and attorney-in-fact of Beneficiary and Trustee each, with full power of substitution to do so, and which appointment is coupled with an interest and shall remain in effect until there are no longer any Secured Obligations of Borrower under the Financing Agreement or other agreement with Lender entered into after the date hereof; provided, however, Lender shall not have any duty to exercise any such right or to preserve the same and shall not be liable for any failure to do so or for any delay in doing so. Any sale shall be made at a public or private sale at Lender's place of business, or at any place to be named in the notice of sale, either for cash or upon credit or for future delivery at such price as Lender may deem fair, and Lender may be the purchaser of the whole or any part of the Pledged Collateral so sold and hold the same thereafter in its own right free from any claim of Beneficiary or Trustee or any right of redemption (any such right being hereby waived or released). The Lender reserves the right to reject any and all bids at such sale which, in its discretion, it shall deem inadequate or unlikely to settle in a prompt and efficient manner. Demands of performance, except as otherwise herein specifically provided for, notices of sale, advertisements and the presence of property at sale are hereby waived by Beneficiary and Trustee each and any sale hereunder may be conducted by an auctioneer or any officer or agent of the Lender or its assigns.

(c)     If, at the original time or times appointed for the sale of the whole or any part of the Pledged Collateral, the highest bid, if there be but one sale, shall be inadequate to discharge in full all the Secured Obligations, or if the Pledged Collateral be offered for sale in fractions, if at any of such sales, the highest bid for a fraction offered for sale would indicate to Lender, in its discretion, that the proceeds of the sales of the whole of the Pledged Collateral would be unlikely to be sufficient to discharge all the Secured Obligations, Lender may, on one or more occasions and in its discretion, postpone any of said sales by public announcement at the time of sale or the time of previous postponement of sale, and no other notice of such postponement or postponements of sale need be given, any other notice being hereby waived; provided, however, that any sale or sales made after such postponement shall be after ten (10) days' notice to Beneficiary and Trustee.

(d)     Beneficiary and Trustee each recognizes that Lender may be unable to effect a public sale of any or all the Pledged Collateral and may be compelled to resort to one or more private sales thereof. Beneficiary and Trustee each also acknowledges that any such private sale may result in prices and other terms less favorable to Lender than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of such sale being private.

(e)     Beneficiary and Trustee each agrees to the maximum extent permitted by applicable law that following the occurrence of an Event of Default it will not at any time plead, claim or take the benefit of any appraisal, valuation, stay, extension, moratorium or redemption law now or hereafter in force in order to prevent or delay the enforcement of this Security Agreement, or the absolute sale of the whole or any part of the Pledged Collateral or the possession thereof by any purchaser at any sale here-under, and Beneficiary and Trustee each waives the benefit of all such laws to the extent he lawfully may do so. Beneficiary and Trustee each agrees that it will not interfere with any right, power and remedy of Lender provided for in this Security Agreement or now or hereafter existing at law or in equity or by statute or otherwise, or the exercise or beginning of the exercise by Lender of any one or more of such rights, powers or remedies. No failure or delay on the part of Lender to

- 4 -

JUDD 068231

Document #13 of 19

exercise any such right, power or remedy and no notice or demand which may be given to or made upon Beneficiary or Trustee/by Lender with respect to any such remedies shall operate as a waiver thereof, or limit or impair Lender's right to take any action or to exercise any power or remedy hereunder, without notice or demand, or prejudice its rights as against Beneficiary or Trustee each in any respect.

(f)     Beneficiary and Trustee each further agrees that a breach of any of its covenants contained in this Section 6 will cause irreparable injury to Lender, that Lender shall have no adequate remedy at law in respect of such breach and, as a consequence, agrees that each and every covenant contained in this Section 6 shall be specifically enforceable by Lender against Beneficiary or Trustee each, and Beneficiary and Trustee each hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred under the Financing Agreement.

(g)   .  Application of Proceeds.  The proceeds of all sales and collections, and any other monies, the application of which is not otherwise provided for, shall be applied as follows:

FIRST, to the payment of the costs and expenses of such sale or sales and collections, and the compensation of Lender, and its counsel;

SECOND, to the payment of the obligations secured hereby in such order and manner as Lender, in its sole discretion, may determine, until such obligations are paid in full; and

THIRD, any surplus remaining shall be paid to Beneficiary or Trust.

(h)     Certain Additional Waivers.  Beneficiary and Trustee each waives any defense based on the discharge of the Borrower by operation of law notwithstanding any intervention or omission by Lender and notwithstanding the provisions of Section 2825 of the California Civil Code.  Until all indebtedness and obligations secured hereunder have been fully satisfied: (i) Neither Beneficiary nor Trustee shall not have any right of subrogation, and Beneficiary and Trustee each waives, to the fullest extent permitted by law, all rights and benefits under Section 2848 of the California Civil Code and any right to enforce any remedy which Lender now has or may hereafter have against Beneficiary or Trustee in respect of the obligations and indebtedness secured hereunder; and (ii) Beneficiary and Trustee each waives (a) any benefit of, and any right to participate in, any security, whether real or personal property, now or hereafter held by Lender for the Secured Obligations, and (b) to the fullest extent permitted by law, all rights and benefits under Sections 2849 and 2850 of the California Civil Code.

7.     [Intentionally Omitted.]

8.     Termination Date.  This Security Agreement shall automatically terminate upon the Loan having been fully paid and performed and the Note extinguished.

9.     Waiver.  No delay on Lender's part in exercising any power of sale, Lien, option or other right hereunder, and no notice or demand which may be given to or made upon Beneficiary or Trustee each by Lender with respect to any power of sale, Lien, option or other right hereunder, shall constitute a waiver thereof, or limit or impair Lender's right to take any action or to exercise any power of sale, Lien, option, or any other right hereunder, without notice or demand, or prejudice Lender's rights as against Beneficiary or Trustee in any respect.

10.     Assignment.  Lender may assign, endorse or transfer any instrument evidencing all or any part of the Secured Obligations and such assignee shall be entitled to the benefits of this Security Agreement.

- 5 -

JUDD  068232

Document #13 of 19

11.    Lien Absolute.    All rights of Lender hereunder, and all duties, rights, covenants and obligations of Beneficiary or Trustee each hereunder, shall be absolute and unconditional irrespective of:

    (a)    any lack of validity or enforceability of the Financing Agreement, any other related document or any other agreement or instrument governing or evidencing any Secured Obligations;

    (b)    any change in the time, manner or place of payment of, or in any other term of, all or any part of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from the Financing Agreement, any other related document or any other agreement or instrument governing or evidencing any Secured Obligations;

    (c)    any exchange, release or non-perfection of any other Pledged Collateral, or any release or amendment or waiver of or consent to departure from any guaranty, for all or any part of the Secured Obligations;

    (d)    the insolvency of Beneficiary or Trustee each; or

    (e)    any other circumstance which might otherwise constitute a defense available to, or a discharge of, Borrower, the Beneficiary or Trustee or any affiliate of the Borrower or the Beneficiary or Trustee.

12.    Modifications.    Beneficiary and Trustee each consents and agrees that Lender may at any time, or from time to time, in its discretion:

    (a)    renew, extend or change the time of payment, and/or the manner, place or terms of payment of all or any part of the Secured Obligations; and

    (b)    exchange, release and/or surrender all or any of the Pledged Collateral (including the Pledged Collateral), or any part thereof, by whomsoever deposited, which is now or may hereafter be held by or on behalf of Lender in connection with all or any of the Secured Obligations, all in such manner and upon such terms as Lender may deem proper, and without notice to or further assent from Beneficiary or Trustee, it being hereby agreed that Beneficiary and Trustee each shall be and remain bound upon this Security Agreement, irrespective of the value or condition of any of the Pledged Collateral, and notwithstanding any such change, exchange, settlement, compromise, surrender, release, renewal or extension, and notwithstanding also that the Secured Obligations may, at any time, exceed the aggregate principal amount thereof set forth in the Financing Agreement, or any other agreement governing any Secured Obligations. Beneficiary and Trustee each hereby waives notice of acceptance of this Security Agreement, and also presentment, demand, protest and notice of dishonor of any and all of the Secured Obligations, and promptness in commencing suit against any party hereto or liable hereon, and in giving any notice to or of making any claim or demand hereunder upon Beneficiary or Trustee. No act or omission of any kind on Lender's part shall in any event affect or impair this Security Agreement.

13.    Reinstatement.    This Security Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against Beneficiary or Borrower for liquidation or reorganization, should Beneficiary or Borrower become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of Beneficiary or Borrower's assets, and shall continue to be effective or be reinstated, as the case may

- 6 -

JUDD  068233

Document #13 of 19

be, if at any time payment and performance of the Secured Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Secured Obligations, whether as a "voidable preference", "fraudulent conveyance", or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Secured Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

14.    Miscellaneous.

    (a)    Lender may execute any of its duties hereunder by or through agents or employees and shall be entitled to advice of counsel concerning all matters pertaining to its duties hereunder.

    (b)    Beneficiary and Trustee each agrees promptly to reimburse Lender and its assigns for actual out-of-pocket expenses, including, without limitation, reasonable counsel fees, incurred by Lender in connection with the administration and enforcement of this Security Agreement.

    (c)    Neither Lender, nor any of its respective officers, directors, employees, agents, counsel or assigns shall be liable for any action lawfully taken or omitted to be taken by it or them hereunder or in connection herewith, except for its or their own gross negligence or willful misconduct as finally determined by a court of competent jurisdiction.

    (d)    This Security Agreement shall be binding upon Beneficiary and Trustee each of their successors and permitted assigns (including a debtor-in-possession on behalf of Beneficiary or Borrower each), and shall inure to the benefit of, and be enforceable by, Lender and its successors and assigns and none of the terms or provisions of this Security Agreement may be waived, altered, modified or amended except in writing duly signed for and on behalf of Lender and Beneficiary or Borrower, with an express statement in such writing that it is intended as an amendment, waiver or modification of the provisions of this Security Agreement.

15.    Severability.  If for any reason any provision or provisions hereof are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or effect those portions of this Security Agreement which are valid.

16.    Notices.  All notices and other communications required or permitted hereunder shall be given in writing and shall be deemed effectively given (a) upon delivery, when delivered personally against receipt therefore, (b) upon delivery when sent by certified mail, postage prepaid and return receipt requested, (c) upon transmission, when transmitted by telecopier, facsimile, telex or other electronic transmission method, provided that receipt is confirmed and notice is sent by certified mail, postage prepaid and return receipt requested, or (d) upon delivery, when sent by Federal Express or other nationally recognized overnight delivery service:

    (a)    If to Lender, at:        Windsor Securities LLC
                                     c/o Steven Prusky
                                     25 East Athens Avenue
                                     Ardmore, PA 19003
                                     Telephone: 610-642-3100
                                     Facsimile: 610-642-9709

- 7 -

JUDD 068234

Document #13 of 19

(b)     If to Beneficiary, at:     Nadine Acker
2140 Double Branches Road
Elberton, GA 30635
Telephone: 706-283-2374
Facsimile: n/a

(c)     If to Trustee, at:     Ronald M. Goss
725 Esco Road
Comer, GA 30629
Telephone: 706-795-2597
Facsimile: n/a

17.    <u>Entire Agreement</u>. This Security Agreement, the Financing Agreement and those documents executed in connection therewith constitute the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes all prior written and oral agreements, arrangements and discussions with respect thereto. No course of conduct, course of dealing, course of performance or trade usage, shall be used to supplement or modify any terms or conditions of this Security Agreement.

18.    <u>Governing Law</u>. This Security Agreement and all the rights, covenants, duties and obligations created hereunder and any remedy at law or in equity sought by either party hereto in connection with this Security Agreement shall be governed by, and construed, enforced and interpreted solely in accordance with, the laws of the State of California without any application of its conflicts or choice of laws principles or rules. The Beneficiary and Lender acknowledge and agree that this Security Agreement is being executed and delivered in the State of California and the loan being made by Lender to Borrower is being contemplated and performed in the State of California.

19.    <u>Binding Effect</u>. This Security Agreement shall be binding upon, enforceable against, and inure to the benefit of each of the parties hereto and their respective permitted successors and assigns.

20.    <u>Dispute Resolution.</u> EACH PARTY HERETO AGREES THAT ANY AND ALL DISPUTES ARISING IN CONNECTION WITH THIS SECURITY AGREEMENT SHALL BE RESOLVED AS AGREED IN SECTION 7.11 OF THE FINANCING AGREEMENT.

21.    <u>Headings</u>. The section headings used in this Security Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

22.    <u>Counterparts</u>. This Security Agreement may be executed in any number of separate counterparts by one or more of the parties hereto and all of said counterparts taken together shall constitute one and the same instrument.

23.    <u>Limitation on Liability of Managers</u>. In no event shall the Managing Member of the Lender's General Partner be liable to any Person for the representations and obligations of the Lender under this Security Agreement.

24.    <u>Effective Date</u>. This instrument shall be deemed effective as of the Financing Date, as such term is defined in the Financing Agreement.

- 8 -

JUDD 068235

Document #13 of 19

IN WITNESS WHEREOF, the parties hereto have caused this Security Agreement to be duly executed under seal as of this 10 day of April, 2008

**BENEFICIARY:**
Nadine Acker

By: _Nadine Acker_

Name: Nadine Acker

Title: Spouse

Place of execution:

*Acknowledged by:*

**TRUST:**
**The Joe E. Acker Family Insurance Trust**

By: _____,

Name: Ronald M. Goss, Trustee

Place of execution: Atlanta, GA

**LENDER:**
Windsor Securities LLC

By: _____

Name: Steven Prusky

Title: **Director/President MFIP (Delaware)**

- 9 -

JUDD 068236

Document #13 of 19

## SCHEDULE I

### POLICY

| Insurer | Policy Issue Date | Policy Number | Annual Premium | Death Benefit |
|---|---|---|---|---|
| John Hancock | March 6, 2008 | 93783751 | $65,750.00 3rd year on | $1,000,000.00 |

JUDD   068237

1604873 v01

Document #14 of 19

## SALES ILLUSTRATION FOR THE POLICY

*TO BE PROVIDED BY THE TRUSTEE AND ATTACHED HERETO*

By signing below, I do hereby affirm that the attached illustration corresponds to the policy being premium financed pursuant to *Life Insurance Premium Financing Agreement Among Windsor Securities LLC, Joe E. Acker Family Insurance Trust, and Joe E. Acker,* and that it was recently provided the insurance company issuing such Policy.

_____, Trustee     Date: __April 10, 2008__
The Joe E. Acker Family Insurance Trust

JUDD  068238

# John Hancock Life Insurance Company (U.S.A.)

## A LIFE INSURANCE POLICY ILLUSTRATION
A Flexible Premium Adjustable Life Insurance Policy
### Valuable Information About Your Life Insurance Illustration

Performance UL  Form: 06PERFUL

Presented By: Eugene Houchins

### Illustration Assumptions

Joe Acker
Male - Standard Plus NonSmoker
Age: 81

Initial Death Benefit $1,000,000
Base Face Amount $1,000,000
Initial Planned Premium: $65,458.13 / Billing Mode: Annual
Death Benefit Option 1; Cash Value Accumulation Test
State: Georgia
Based on Current Charges and an Initial Current Rate of 4.80%

### Universal Life Insurance

The Universal Life Insurance policy which you are considering provides flexible death benefit protection and premium payment flexibility. The values in the insurance contract grow based on the amount of each premium payment and the interest rate credited to the policy less insurance and other charges.

Certain aspects of the policy cannot be predicted with absolute certainty. For example, the interest rate credited may exceed the guaranteed rate and monthly charges may be less than the maximum guaranteed charges. These nonguaranteed elements are described on the following pages. This is an illustration only and is not intended to predict actual performance.

### No-Lapse Guarantee

The No-Lapse Guarantee illustrated ensures the Base Face Amount will stay in force for 9 years provided the No-Lapse Guarantee Cumulative Premium Test is met. During the No-Lapse Guarantee period, if the net cash surrender value falls to zero or below, coverage will continue if the cumulative premiums paid since the policy was issued, net of withdrawals, net of policy debt, are greater than or equal to $62,441.07 multiplied by the number of years coverage has been in effect. There is no additional charge for the No-Lapse Guarantee included in your policy.

Rider termination or change and or face amount increases or decreases may cause this premium to be recalculated. If a policy loan is outstanding and the Net Policy Value falls to zero, the illustration will stop. However, if the No-Lapse Guarantee requirements are satisfied, the contract will remain in effect.

In the first two policy years, the Supplemental Face Amount plus the Return of Premium Death Benefit Rider, if elected, will remain in force provided the No-Lapse Guarantee cumulative premium test is satisfied. In policy year three and after, if the net cash surrender value falls to zero or below, you must pay additional premiums. If you do not pay additional premiums, the Supplemental Face Amount plus the Return of Premium Death Benefit Rider, if elected, may

lapse even if your Base Face Amount does not lapse. Once this benefit is terminated, it cannot be reinstated.

### Net Death Benefit

The life insurance provided in this illustration reflects a Total Initial Death Benefit of $1,000,000. The Death Benefit is comprised of $1,000,000 in Base Face Amount (Option 1). The net death benefit reflects total loan plus any loan interest due.

### Planned Premium Outlay

One of the advantages of Universal Life Insurance is premium payment flexibility, allowing you to vary the amount of your payments. This illustration assumes an Initial Planned Premium Outlay of $65,458.13 and that premium payments are made at the beginning of each modal period. Reduced or discontinued premiums in future years are only possible if the premiums paid and interest credited are sufficient to cover the cost of insurance and administrative expenses. These factors, as well as any outstanding policy loans, or partial surrenders could require additional premiums to maintain your insurance coverage. Payments in excess of the planned premium are subject to underwriting approval.

### Interest Rate

Interest is credited to the Policy Value at a guaranteed effective annual rate of 3.00% or the current interest rate, whichever is higher. An assumed rate may also be shown for illustrative purposes. The assumed rate will always be lower than the current rate. Current and assumed rates are not guarantees or estimates but merely illustrate resultant values for that assumption. Current interest is illustrated at an effective annual rate of 4.80%.

There is a non-guaranteed persistency bonus that will be applied to the then current credited interest rate for contracts still inforce at the beginning of policy year 11. The bonus is currently 0.15% beginning in policy year 11. The persistency bonus is only applied to unborrowed policy value. Midpoint values assume interest and insurance charges which are halfway between the guaranteed and assumed.

This is your Basic Illustration and is valid only if all illustration pages are included.
Version: 4.0S[0-24576-3584-8192]                    Page 1 of 8                    3/4/2008 7:22:13 AM

JUDD  068239

# John Hancock Life Insurance Company (U.S.A.)

## A LIFE INSURANCE POLICY ILLUSTRATION
A Flexible Premium Adjustable Life Insurance Policy
Valuable Information About Your Life Insurance Illustration (cont'd)

Performance UL  Form: 08PERFUL

Presented By: Eugene Houchins

### Illustration Assumptions

Joe Acker
Male - Standard Plus NonSmoker
Age: 81

Initial Death Benefit $1,000,000
Base Face Amount $1,000,000
Initial Planned Premium: $65,458.13 / Billing Mode: Annual
Death Benefit Option 1; Cash Value Accumulation Test
State: Georgia
Based on Current Charges and an Initial Current Rate of 4.80%

### Accessing Policy Value

After your policy has been in force for one year, you can make partial cash withdrawals. You can surrender your policy for cash at any time. We will pay you the policy value less a surrender charge and any policy debts you may have. You can also borrow the available cash value at any time.

### Interest Credited

This is the interest earned on the Policy Value including the amount of interest credited on the Loan Account.

### Policy Loans

Policy loans may be taken against the Policy Value at anytime and if illustrated, are assumed to be taken at the beginning of each month during the year. The maximum loan amount available is the Surrender Value less any indebtedness, one year of policy charges, and one year's loan spread. The portion of Policy Value securing any loan is credited interest at the net loan rate. The net loan rate equals the loan rate less 1.25% in policy years 1-10 and, currently, 0.00% (guaranteed not to exceed 0.25%) thereafter. Loan interest is payable in arrears. This illustration assumes policy loan interest rates are as shown in the Policy Summary. The loan interest rate is variable and subject to change annually on the policy anniversary.

### Annual Loan Interest

This is the interest charged on the outstanding Policy Debt. In the event that you do not pay the loan interest charged in any Policy Year, it will be borrowed against the policy and added to the Policy Debt in arrears at the Policy Anniversary.

### Withdrawals

Withdrawals reduce the Policy Value and the Death Benefit. Withdrawals, if illustrated, are assumed taken at the beginning of each month during the year. Currently no fee is charged for withdrawals; a guaranteed fee of $25 for each withdrawal can be deducted from the Policy Value.

### Policy Continuation at Age 121

This offers protection from the possibility of outliving coverage. Provided your coverage is in effect on the policy anniversary nearest the date on which the life insured reaches attained age 121, coverage will continue after age 121 and interest will be credited. No additional charges, other than those for any outstanding policy loans, will be deducted.

It should be pointed out that the tax implications with respect to policies that do continue beyond age 100 are not clear at the present time. We urge you to consult your tax advisor regarding this issue if there are questions about what happens after age 100.

### Taxation of Life Insurance

The information contained in this illustration is based on certain tax and legal assumptions. We suggest that you seek professional counsel regarding the interpretation of current tax laws and accounting practices as they relate to your actual situation. The Technical and Miscellaneous Revenue Act (TAMRA) of 1988 classifies some policies as Modified Endowment Contracts (MECs). Distributions from these policies (excluding death benefits but including policy loans and withdrawals) are taxed differently and may be subject to an IRS 10% penalty tax. TAMRA testing has been performed on the current scale only.

- The initial annual 7-pay premium for this policy is $158,110.00.
- Based on our interpretation of TAMRA, this policy as illustrated would not be considered a Modified Endowment Contract (MEC).
- Employer-owned Life Insurance.
  Where the owner of the policy is the employer of the insured, Section 101(j) of the Internal Revenue Code specifies a number of requirements in order for life insurance death benefits to be excluded from income taxation. Potential insureds must be limited to the employer's directors and "highly compensated" employees (as defined by the law). Also, *before the issuance of the policy*, the potential insured must (1) be notified in writing that the employer/policyowner intends to insure the employee's life and the maximum face amount for which the employee could be insured;

JUDD 068240

# John Hancock Life Insurance Company (U.S.A.)

## A LIFE INSURANCE POLICY ILLUSTRATION
### A Flexible Premium Adjustable Life Insurance Policy
### Valuable Information About Your Life Insurance Illustration (cont'd)

Performance UL  Form: 06PERFUL

Presented By: Eugene Houchins

### Illustration Assumptions

Joe Acker
Male - Standard Plus NonSmoker
Age: 81

Initial Death Benefit $1,000,000
Base Face Amount $1,000,000
Initial Planned Premium: $65,458.13 / Billing Mode: Annual
Death Benefit Option 1; Cash Value Accumulation Test
State: Georgia
Based on Current Charges and an Initial Current Rate of 4.80%

(2) give his or her written consent to being a life insured under the policy, and agree that such coverage may continue after the life insured terminates employment; and (3) be informed in writing that the employer/policyowner will be a beneficiary of any proceeds payable upon the death of the employee. Finally, the policyowner is required to keep records and make an annual report concerning its employer-owned life insurance policies. Taxpayers should seek the counsel of qualified tax advisors to determine the applicability of IRC §101(j) or other provisions of federal tax law and/or compliance with the requirements of any such law or regulation.

### Other Considerations

This is an illustration only. An illustration is not intended to predict actual performance. Interest rates and values set forth in the illustration are not guaranteed.

This illustration assumes that the currently illustrated nonguaranteed elements will continue unchanged for all years shown. This is not likely to occur, and the actual results may be more or less favorable. Future credits for interest and deductions for mortality and expenses can vary at the company's discretion depending upon factors such as death claims, investment earnings and expenses.

Performance UL is issued by John Hancock Life Insurance Company (U.S.A.) of Boston, MA. John Hancock Life Insurance Company (U.S.A.) consistently receives high financial strength ratings from independent rating agencies such as Fitch Ratings, A.M. Best, Standard & Poors, and Moody's. These ratings do not apply to the safety and performance of separate accounts. For more information, please visit our website at www.JohnHancock.com.

For more than a century, John Hancock has offered security and high quality products to its customers. The company's experience and resources allow it to provide first class financial solutions to customers in every market in which it operates.

JUDD  068241

# John Hancock Life Insurance Company (U.S.A.)

## A LIFE INSURANCE POLICY ILLUSTRATION
A Flexible Premium Adjustable Life Insurance Policy

**Basic Illustration Summary**

Performance UL  Form: 06PERFUL

Presented By: Eugene Houchins

**Illustration Assumptions**

Joe Acker
Male - Standard Plus NonSmoker
Age: 81

Initial Death Benefit $1,000,000
Base Face Amount $1,000,000
Initial Planned Premium: $65,458.13 / Billing Mode: Annual
Death Benefit Option 1; Cash Value Accumulation Test
State: Georgia
Based on Current Charges and an Initial Current Rate of 4.80%

### Coverage Summary

| Coverage Description | Initial Amount | Initial Premium |
|---|---|---|
| Base Face Amount - Level for all years | $1,000,000 | $65,458.13 |

### Policy Summary

| | | |
|---|---|---|
| State | Georgia | |
| Death Benefit Option | 1 | From 1 Thru 40 |
| Definition of Life Insurance | CVAT | |
| Payment Mode | Annual | |
| Charges | Current | |
| Assumed Interest Rate | 4.80% | From 1 Thru 10 |
| (includes non-guaranteed persistency bonus) | 4.95% | From 11 Thru 40 |
| Loan Interest Rate | 5.75% | From 1 Thru 40 |
| Owner Tax Bracket | 35.00% | From 1 Thru 40 |
| Requested Policy Date | 11/20/2007 | ** |
| Estimated Policy Issue Date | 3/4/2008 | *** |
| Initial 7-Pay Premium | $158,110.00 | |
| Target Premium | $65,458.13 | |
| Minimum Initial Premium | $5,206.02 | |
| 9 Year No-Lapse Guarantee Premium | $62,441.07 | |

** A Policy Date prior to the application date of your life insurance policy has been used in this illustration. The Policy Date used is November 20, 2007. Monthly deductions will be made for the period the Policy Date is backdated and we do not credit interest during this period. If the policy does not take effect on the date selected, it may not perform as illustrated and an illustration reflecting the revised Policy Date should be reviewed. For further information please contact your agent or broker.

*** An Estimated Policy Issue Date of March 4, 2008 has been used in this illustration. This reflects the date when all initial premiums have been received, the policy is issued and the investment returns begin. If all premiums are not received by the date selected, the policy may not perform as illustrated and an illustration reflecting the revised Estimated Policy Issue Date should be reviewed. For further information please contact your agent or broker.

---

This is your Basic Illustration and is valid only if all illustration pages are included.
PUL08 Version: 4.0S[0-24576-3584-8192]

3/4/2008 7:22:13 AM

JUDD 068242

# John Hancock Life Insurance Company (U.S.A.)

## A LIFE INSURANCE POLICY ILLUSTRATION
A Flexible Premium Adjustable Life Insurance Policy

## Basic Illustration Summary (cont'd)

Performance UL   Form: 06PERFUL

Presented By: Eugene Houchins

**Illustration Assumptions**

Joe Acker
Male – Standard Plus NonSmoker
Age: 81

Initial Death Benefit $1,000,000
Base Face Amount $1,000,000
Initial Planned Premium: $66,458.13 / Billing Mode: Annual
Death Benefit Option 1; Cash Value Accumulation Test
State: Georgia
Based on Current Charges and an Initial Current Rate of 4.80%

### Interest Adjusted Indexes on Insured at 5%

| | -------Payment------- | | -------Cost------- | |
|---|---|---|---|---|
| | 10 Year | 20 Year | 10 Year | 20 Year |
| Guaranteed | 64.39 | N/A | 64.39 | N/A |
| Current | 64.39 | 62.39 | 61.89 | 62.39 |
| Non-guaranteed Element | 0.00 | 62.39 | 2.50 | 62.39 |

**Interest Adjusted Indexes**

These indexes provide a means for evaluating the comparative cost of the policy under stated assumptions.  They can be useful in comparing similar plans of insurance, a lower index being better than a higher one.  These indexes reflect the time value of money.  Indexes are approximate because they involve assumptions, including the rate of interest used.

JUDD  068243

# John Hancock Life Insurance Company (U.S.A.)

93 783 75

## A LIFE INSURANCE POLICY ILLUSTRATION
A Flexible Premium Adjustable Life Insurance Policy
### Numeric Summary

Performance UL  Form: 06PERFUL

Presented By: Eugene Houchins

**Illustration Assumptions**
Joe Acker
Male - Standard Plus NonSmoker
Age: 81

Initial Death Benefit $1,000,000
Base Face Amount $1,000,000
Initial Planned Premium: $65,458.13 / Billing Mode: Annual
Death Benefit Option 1; Cash Value Accumulation Test
State: Georgia

**GUARANTEED ASSUMPTIONS**
These policy benefits and values are based on the guaranteed interest of 3.00% and guaranteed charges. Based on your Planned Premium Outlay, the policy would remain in force until policy year 10, month 3*.

**NON-GUARANTEED ASSUMPTIONS**
These policy benefits and values are based on non-guaranteed elements that are subject to change by the insurer. Actual results may be more or less favorable.

**ASSUMED SCALE:**
Policy benefits and values are based on the initial current interest rate of 4.80% and current charges. Based on your Planned Premium Outlay, the policy would remain in force until policy year 20, month 1*.

**MIDPOINT SCALE:**
Assumes the midpoint interest rate and charges which are halfway between current and guaranteed. Based on your Planned Premium Outlay, the policy would remain in force until policy year 10, month 5*.

Premiums are assumed to be paid at the beginning of each modal period. Policy values, including surrender values and death benefits, are illustrated as of the end of the year, unless otherwise noted.

* See Policy Continuation at Age 121 on "Valuable Information" page.

Representative's Address:
Eugene Houchins
4243 Dunwoody Club Drive Suite 215
Atlanta, GA 30350
678-336-5250

| SUMMARY YEARS | GUARANTEED ASSUMPTIONS | NON-GUARANTEED ASSUMPTIONS | |
|---|---|---|---|
| | | Midpoint Scale | Assumed Scale |
| Years Premium Paid in Cash | 10 | 10 | 19 |
| Summary Year 5 | | | |
| Net Surrender Value | 0 | 0 | 31,009 |
| Net Death Benefit | 1,000,000 | 1,000,000 | 1,000,000 |
| Summary Year 10 | | | |
| Net Surrender Value | 0 | 0 | 32,985 |
| Net Death Benefit | 0 | 0 | 1,000,000 |
| Summary Year 20 | | | |
| Net Surrender Value | n/a | n/a | n/a |
| Net Death Benefit | n/a | n/a | n/a |
| Summary Age 100 | | | |
| Net Surrender Value | 0 | 0 | 37 |
| Net Death Benefit | 0 | 0 | 1,000,000 |

I have received a copy of this illustration and understand that any non-guaranteed elements illustrated are subject to change and could be either higher or lower. The representative has told me they are not guaranteed.

Applicant: _____  Date: 3/26/08
                    (Signature)                        (mm/dd/yyyy)

I certify that this illustration has been presented to the applicant and that I have explained that any non-guaranteed elements illustrated are subject to change. I have made no statements that are inconsistent with the illustration.

Representative: _____  Date: 3/26/08
                        (Signature)                        (mm/dd/yyyy)

JUDD  068244

# John Hancock Life Insurance Company (U.S.A.)

## A LIFE INSURANCE POLICY ILLUSTRATION
A Flexible Premium Adjustable Life Insurance Policy
### Guaranteed and Nonguaranteed Values

Performance UL  Form: 08PERFUL

Presented By: Eugene Houchins

**Illustration Assumptions**

Joe Acker
Male - Standard Plus NonSmoker
Age: 81

Initial Death Benefit $1,000,000
Base Face Amount $1,000,000
Initial Planned Premium: $65,458.13 / Billing Mode: Annual
Death Benefit Option 1; Cash Value Accumulation Test
State: Georgia

| Policy Year | EOY Age | Planned Premium | End of Year Guaranteed Assumptions 3.00% Minimum Rate, Maximum Charges | | | End of Year Non-Guaranteed Assumptions 4.80% Initial Current Rate, Current Charges | | |
|---|---|---|---|---|---|---|---|---|
| | | | Policy Value | Net Surrender Value | Net Death Benefit | Policy Value | Net Surrender Value | Net Death Benefit |
| 1 | 82 | 65,458 | 0 | 0 | 1,000,000 | 17,214 | 0 | 1,000,000 |
| 2 | 83 | 64,239 | 0 | 0 | 1,000,000 | 30,205 | 11,446 | 1,000,000 |
| 3 | 84 | 64,239 | 0 | 0 | 1,000,000 | 39,105 | 20,346 | 1,000,000 |
| 4 | 85 | 64,239 | 0 | 0 | 1,000,000 | 45,628 | 26,869 | 1,000,000 |
| 5 | 86 | 64,239 | 0 | 0 | 1,000,000 | 49,768 | 31,009 | 1,000,000 |
| 6 | 87 | 64,239 | 0 | 0 | 1,000,000 | 52,438 | 33,679 | 1,000,000 |
| 7 | 88 | 64,239 | 0 | 0 | 1,000,000 | 52,939 | 36,525 | 1,000,000 |
| 8 | 89 | 64,239 | 0 | 0 | 1,000,000 | 52,001 | 35,587 | 1,000,000 |
| 9 | 90 | 64,239 | 0 | 0 | 1,000,000 | 49,103 | 35,034 | 1,000,000 |
| 10 | 91 | 64,239 | ## | ## | ## | 44,710 | 32,985 | 1,000,000 |
| Totals: | | 643,609 | | | | | | |
| 11 | 92 | 64,239 | | | | 45,348 | 35,969 | 1,000,000 |
| 12 | 93 | 64,239 | | | | 44,853 | 37,818 | 1,000,000 |
| 13 | 94 | 64,239 | | | | 43,233 | 38,544 | 1,000,000 |
| 14 | 95 | 64,239 | | | | 40,521 | 35,832 | 1,000,000 |
| 15 | 96 | 64,239 | | | | 36,065 | 35,832 | 1,000,000 |
| 16 | 97 | 64,239 | | | | 29,791 | 29,791 | 1,000,000 |
| 17 | 98 | 64,239 | | | | 21,760 | 21,760 | 1,000,000 |
| 18 | 99 | 64,239 | | | | 11,977 | 11,977 | 1,000,000 |
| 19 | 100 | 64,239 | | | | 37 | 37 | 1,000,000 |
| 20 | 101 | ## | | | | ## | ## | ## |
| Totals: | | 1,221,760 | | | | | | |

## Indicates that the policy has lapsed under the illustrated assumption. Additional premium would be required to maintain policy benefits.

This is your Basic Illustration and is valid only if all illustration pages are included.
Version: 4.08[0-24576-3584-8192]                    Page 7 of 8                                3/4/2008 7:22:13 AM

JUDD  068245

# John Hancock Life Insurance Company (U.S.A.)

## A LIFE INSURANCE POLICY ILLUSTRATION
A Flexible Premium Adjustable Life Insurance Policy
Glossary of Terms

Performance UL  Form: 08PERFUL

Presented By: Eugene Houchins

**Illustration Assumptions**
Joe Acker
Male - Standard Plus NonSmoker
Age: 81

Initial Death Benefit $1,000,000
Base Face Amount $1,000,000
Initial Planned Premium: $65,458.13 / Billing Mode: Annual
Death Benefit Option 1; Cash Value Accumulation Test
State: Georgia
Based on Current Charges and an Initial Current Rate of 4.80%

### Base Face Amount
The Base Face Amount is the coverage provided by the base policy. Any decreases to the Base Face Amount after the first policy year must fall within policy minimums.

### Cost Of Insurance
Current insurance charges are based on Company experience. The current rates may change, but are guaranteed never to exceed the maximum rates. Maximum rates reflect the 2001 CSO Sex and Smoker Distinct Age Nearest Birthday Ultimate Mortality Table.

### Death Benefit Option
Death Benefit Option 1 provides a level amount of coverage. It will increase only when necessary to maintain the definition of life insurance. Death Benefit Option 2 provides coverage equal to the Face Amount plus the Policy Value plus any amount necessary to maintain the definition of life insurance.

### Net Death Benefit
The Death Benefit illustrated is the Base Face Amount plus any Required Additional Death Benefit. This is the value that is payable upon the death of the insured as stated on the front page of the policy. The actual amount payable may be decreased by loans or increased by additional insurance benefits. Death Benefits are illustrated as of the end of the year. Net Death Benefit reflects the total loan plus any loan interest due.

### Net Income
Net Income reflects any illustrated withdrawal, policy loan and/or loan interest due.

### Net Surrender Value
The Net Surrender Value is the Policy Value less surrender charge(s), and is illustrated as of end of the year. This amount is shown net of withdrawals and total loans plus interest due. During the surrender charge period, there is a surrender charge assessed if all or part of the Base Face Amount is reduced. If the policy terminates for any reason, the amount of any

outstanding loan (that was not previously considered income) could result in a considerable tax. Under certain situations involving large amounts of outstanding loans, you might find yourself having to choose between high premium requirements to keep your policy from lapsing and a significant tax burden if you allow the lapse to occur. Please consult your tax advisor for further information.

### Planned Premium Outlay
The Planned Premium Outlay is the amount which the policyholder plans to pay. This illustration assumes that planned premiums are paid at the beginning of each modal period indicated. Additional premiums may be paid while the policy is in force, subject to our minimum and maximum limits.

### Policy Value
When premiums are paid, the balance, after premium charges are deducted, goes into the Policy Value. The Policy Value is credited daily with a guaranteed interest rate of 3.00 % or the current rate, whichever is greater. Also, once each month, administrative and insurance charges are deducted.

### Required Additional Death Benefit
The death benefit will automatically be increased if necessary to maintain the minimum amount of insurance needed to comply with current federal tax law (Section 7702 of the Internal Revenue Code). This will ensure that your policy maintains the favorable tax treatment associated with being a life insurance policy.

### Risk Class
Classifications represent groups of people with similar risk characteristics and help to determine the cost of insurance. Final risk classification for a proposed insured is determined upon completion of the underwriting process, and may vary from what is shown on this illustration. If so, you will receive a Revised Basic Illustration prior to or upon delivery of your insurance contract.

JUDD   068246

## ASSIGNMENT OF LIFE INSURANCE POLICY AS COLLATERAL

**ASSIGNMENT.** For Value Received, *Joe E. Acker Family Insurance Trust*, a Georgia Irrevocable Trust, its successors and assigns ("**Owner**"), hereby assigns, transfers, pledges, and grants all of Owner's claims, options, privileges, rights, titles and interests in, to and under the insurance policy or policies described below to *Windsor Securities LLC*, a Nevada LLC, its successors and assigns (herein called "**Assignee**"):

**Policy No.:** 93783751          **Issued by:** John Hancock ("**Insurer**")

**Insured:**   Joe E. Acker ("**Insured**")

and any and all additions, renewals and supplementary contracts issued in connection therewith and any and all proceeds thereof (said policies and contracts and proceeds are hereinafter collectively referred to as the "**Insurance Policy**"), subject to all the terms and conditions of this Assignment of Life Insurance Policy as Collateral (this "**Assignment**").

This Assignment includes, without limitation, assignment of the following rights of Owner:

1.   The sole right to collect from Insurer the net proceeds of the Insurance Policy due to the death of the Insured or maturity of the Insurance Policy;

2.   The sole right to withdraw from or surrender the Insurance Policy and receive the surrender value thereof at any time provided by the terms of the Insurance Policy and at such other times as Insurer may allow;

3.   The sole right to obtain one or more loans or advances on the Insurance Policy at any time, either from Insurer or from other persons, and to pledge or assign the Insurance Policy as security for such loans or advances;

4.   The sole right to collect and receive all distributions or shares of surplus, dividend deposits or additions to the Insurance Policy now or hereafter made or apportioned thereto, and to exercise any and all options contained in the Insurance Policy with respect thereto; provided, that unless and until Assignee shall notify Insurer in writing to the contrary, the distributions or shares of surplus, dividend deposits and additions shall continue on the plan in force at the time of this Assignment;

5.   The sole right to exercise all nonforfeiture rights permitted by the terms of the Insurance Policy or allowed by Insurer and to receive all benefits and advantages derived therefrom;

6.   The sole right to amend the Insurance Policy; and

7.   The right to exercise any and all voting rights or privileges to the extent created or endowed by the Insurance Policy.

8.   The sole right to sell the Policy, but only upon the failure of the Owner to fulfill obligations to the Lender as specified in any agreements or contracts to which Lender and Owner are parties.

9.   Any other Policy rights the Owner might enjoy not otherwise excluded below.

- 1 -

1604840 v01

Document #15 of 19

**RIGHTS RETAINED.** The following rights, so long as the Insurance Policy has not been surrendered or canceled, are reserved and excluded from this Assignment and do not pass by virtue hereof:

1.  The right to collect from Insurer any disability benefit payable in cash under the terms of the Insurance Policy that does not reduce the amount of insurance provided under the Insurance Policy;

2.  The right to designate and change the beneficiary of the Insurance Policy, provided that Assignee shall continue to be the primary assignee of the Insurance Policy; and

3.  The right to elect any optional mode of settlement permitted by the Insurance Policy or allowed by Insurer;

provided, however, that Owner shall not exercise any of these rights without the Owner's receipt of the prior written consent of Assignee and that the reservation of these rights shall in no way impair the right of Assignee to surrender the Insurance Policy completely with all its incidents or impair any other right of Assignee hereunder, and any permitted designation or change of beneficiary or election of a mode of settlement shall expressly be made subject to this Assignment and to the rights of Assignee hereunder.

**OBLIGATIONS SECURED.** This Assignment is made, and the Insurance Policy is to be held, as collateral security for any and all liabilities of Owner to Assignee, either now existing or that may hereafter arise, under the Life Insurance Premium Financing Agreement dated as of **April 10**, 2008, among Assignee, Owner and Insured, as amended, supplemented, and otherwise modified from time to time (the "**Agreement**") and all liabilities, obligations, covenants, duties, indebtedness, fees, expenses and other amounts owing by Owner to Assignee under this Assignment (all of which liabilities of Owner, secured or to become secured, are herein called "**Liabilities**"). Subject to the terms of this Assignment, Assignee may apply any and all money received under the Insurance Policy to pay Liabilities when due in any order Assignee may choose it its sole discretion.

**BENEFITS PAYMENT DIRECTIVE.** Owner hereby authorizes and directs Insurer to pay Assignee any and all death benefits and other amounts due under or on account of the Insurance Policy, and Owner shall be considered the Insurance Policy's primary beneficiary, provided, however, that nothing in this paragraph entitles Assignee to retain more than the amount of the Liabilities.

**REPRESENTATIONS.** Owner hereby represents and warrants to Insurer and Assignee that: (a) Owner is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization; (b) the execution, delivery and performance of this Assignment by Owner (i) are within Owner's power, (ii) have been duly authorized by all necessary limited liability company or other action and (iii) do not contravene any provision of Owner's articles of organization, operating agreement or other comparable organizational documents, any law or regulation applicable to Owner or its members or conflict with, violate, create a lien or default under or require a consent under any document or agreement to which Owner is a party or by which it is bound; (c) the Insurance Policy is in full force and effect and has never lasped; (d) Owner is the sole owner of the Insurance Policy and has full authority to assign the Insurance Policy to Assignee; (e) Owner has neither assigned, nor granted or suffered any lien, pledge or security interest against, the Insurance Policy to any other person or entity, except for liens securing the Liabilities; (f) this Assignment constitutes a legal, valid and binding obligation of Owner, enforceable by Assignee against Owner in accordance with its terms (subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally); and (g) none of the proceeds of the Agreement will be used for personal, family or household purposes. Owner further represents and warrants to Insurer and Assignee that no proceedings in bankruptcy are pending or to its knowledge threatened against Owner (and that no grounds exist for such proceedings) and that Owner's property is not subject to any assignment for the benefit of creditors.

JUDD  068248

- 2 -

1604840 v01

COVENANTS. Owner and Assignee covenant and agree as follows:

1.   That, unless Owner and Assignee have elected to exercise the Default Sale Right (as defined below), any balance of sums received hereunder from Insurer remaining after payment of the then existing Liabilities, matured or unmatured, shall be paid in full by Assignee to the persons entitled thereto under the terms of the Insurance Policy had this Assignment not been executed;

2.   That Assignee shall not exercise either the right to surrender the Insurance Policy or the right to obtain policy loans from Insurer, until there has been a default on any of the Liabilities or any other Event of Default under the Agreement that shall not have been cured within the time period, if any, provided in the Agreement;

3.   That upon Owner's request, and subject to the terms of "RIGHTS RETAINED" above, Assignee shall forward, without unreasonable delay, to Insurer, the Insurance Policy for endorsement of any designation or change of beneficiary or any election of an optional mode of settlement;

4.   Owner hereby authorizes Insurer to recognize Assignee's claims to rights hereunder (including the exercise of the Default Sale Right) without investigating the reason for any action taken by Assignee, or the validity or the amount of the Liabilities or the existence of any default therein, or the giving of any notice hereunder, under applicable law or otherwise, or the application to be made by Assignee of any amounts to be paid to Assignee. The sole signature of Assignee shall be sufficient for the exercise of any rights under the Insurance Policy assigned hereby and the sole receipt by Assignee of any sums shall be a full discharge and release therefor to Insurer. Checks or drafts for all or any part of the sums payable under the Insurance Policy and assigned herein shall be paid to the exclusive order of Assignee if, when, and in such amounts as may be requested by Assignee;

5.   Owner shall at no time change the mode of premium payment or otherwise modify the timing of any such premium payments from the signed policy illustration provided by Owner to Assignee. Assignee shall be under no obligation to pay any premium, or the principal of or interest on any loans or advances on the Insurance Policy, whether or not obtained by Assignee, or any other charges on the Insurance Policy, but such amounts so paid by Assignee from its own funds, shall become a part of the Liabilities hereby secured, shall be due immediately, and shall accrue interest at the highest rate allowed by applicable law; and

6.   The exercise of any right, option, privilege or power given to Assignee under this Assignment shall be at the sole option of Assignee, and Assignee may exercise any such right, option, privilege or power without notice to, or assent by, or affecting the liability of, or releasing any interest hereby assigned by Owner.

TERMINATION. At such time as the Liabilities have been paid and performed in full, Assignee will promptly terminate this Assignment and the security interests granted hereunder, and will promptly terminate any UCC financing statements filed in connection with this Assignment.

LIMITED POWER OF ATTORNEY. Owner irrevocably appoints Assignee and any officer or agent thereof, with full power of substitution, as Owner's true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of Owner and in the name of Owner or in its own name, from time to time in Assignee's discretion, for the limited purpose of carrying out the terms of this Assignment, to take any and all appropriate action and to execute and deliver any and all documents and instruments that Assignee may deem necessary or desirable to accomplish the purposes of this Assignment, provided, however, that nothing in this Assignment shall obligate Assignee to

protect the interests of Owner or anyone else in or under the Insurance Policy.  For avoidance of doubt, such power of attorney shall be considered to be coupled with an interest.

**DEFAULT SALE RIGHT.**  Upon an occurrence of an Event of Default (as defined in the Agreement) that has not been remedied within the time period required in the Agreement, Assignee shall have the right (the "**Default Sale Right**") but not the obligation to accept, that in consideration of the full and complete satisfaction of the Liabilities (the sufficiency of which consideration is hereby acknowledged) Owner may make a full transfer and assignment of the Insurance Policy to Assignee and thereby forever relinquish any and all rights Owner may have thereunder, including without limitation any rights to cash surrender value and/or death benefit provided thereunder.  Upon the exercise of this Default Sale Right, Assignee shall notify Insurer in writing and Insurer shall thereafter recognize Assignee as the sole lawful owner of the Insurance Policy.

**NO WAIVER.**  Any forbearance or failure or delay by Assignee in exercising any right, power or remedy hereunder shall not be deemed to be a waiver of such right, power or remedy, and any single or partial exercise of any right, power or remedy shall not preclude the further exercise thereof. Assignee may take or release other security, may release any party primarily or secondarily liable for any of the Liabilities, may grant extensions, renewals or indulgences with respect to the Liabilities, or may apply to the Liabilities in such order as Assignee shall determine, the proceeds of the Insurance Policy hereby assigned or any amount received on account of the Insurance Policy by the exercise of any right permitted under this Assignment, without resorting or regard to other security or any guaranty.  No waiver of any provision hereof shall be effective unless it shall be in writing and signed by Assignee.

**JOINT AND SEVERAL LIABILITY.**  If more than one entity signs this Assignment as an owner, the obligations, agreements, covenants, representations and warranties of all such persons or entities signing this Assignment as owners shall be joint and several.

**SUCCESSORS AND ASSIGNS.**  All of the terms and provisions of this Assignment shall be binding upon, and inure to the benefit of, and be enforceable by, the respective successors, executors, administrators and assigns of the parties hereto.

**NOTICES.**  Unless notice is required by law to be given in another manner, all notices or other communications required or permitted to be given pursuant to this Assignment shall be given in writing and may be personally served or may be deposited in the United States mail, by first-class mail, postage prepaid, addressed as set forth in Schedule 1 hereto, or to such other address as such party shall have specified by written notice given as provided herein.  All notices mailed as provided herein shall be deemed given on the third (3rd) business day following the date so mailed.

**CHOICE OF LAW.**  This Assignment shall be governed by, and construed, interpreted and enforced in accordance with, the laws of the state of California.

**TITLES AND HEADINGS.**  Titles and headings of sections of this Assignment are for convenience of reference only and shall not affect the construction of any provision of this Assignment.  The unenforceability of any provision of this Assignment shall not affect the enforceability or validity of any other provision hereof.

1604840 v01

Document #15 of 19

**COUNTERPARTS**. This Assignment may be executed in any number of counterparts, each of which shall constitute an original and together shall constitute one and the same instrument.

Signed this 10 day of ~~April~~, 2008.

**OWNER:**

**Joe E. Acker Family Insurance Trust**

By: _____, **Trustee**
Name: **Ronald M. Goss**
Date: 4/10/2008

**ASSIGNEE:**

*Windsor Securities LLC*
By MFIP (Delaware Inc.)

By: _____
Name: **Steven Prusky**
Title: *President / Director*
Date: *15-Apr-08*

Schedule 1

Addresses for notice:

Owner:

The Joe E. Acker Family Insurance Trust
c/o Ronald M. Goss, as Trustee
725 Esco Road
Comer, GA 30629
Telephone: 706-795-2597
Facsimile: n/a

Assignee:

Windsor Securities LLC
c/o Steven Prusky
25 East Athens Avenue
Ardmore, PA 19003
Telephone: (610) 642-3100
Facsimile: 6/0 642-970 9

JUDD 068252

1604840 v01

Document #16 of 19

Assignment of Life Insurance Policy as Collateral
and
Individual Acknowledgement to be signed and notarized.

*This is an insurance company form to be provided to the Insured and Trustee and attached hereto.*

JUDD  068253



**Assignment of Life Insurance Policy as Collateral/
Release of Collateral Assignment**

John Hancock Life Insurance Company (U.S.A.)
John Hancock Variable Life Insurance Company
John Hancock Life Insurance Company
*(hereinafter referred to as The Company)*
*Please return completed form to address on cover page*

NOTICE  If any person using this form has a question as to the legal effect of any of its provisions, such person should consult their own lawyer for advice.

| Assignment of Life Insurance Policy as Collateral |

For value received, the undersigned(s) hereby assign, transfer and set over to:

Name of Assignee    *Joe E. Acker Family Insurance Trust*

Contact Person    *Ronald M. Goss, Trustee*      Telephone no.
                                                    of Contact Person  *706. 338.3454*
                  Street no. & Name. Apt no., City, State, Zip code

Address of Assignee  *725 Esco Road, Comer, GA, 30629*

its successors or assigns (herein called the "Assignee") policy number | *937 837 51* | (the "Policy") issued by The Company,
except as provided in paragraph 1. and 2. hereof, subject to all the terms and conditions of the Policy and to all superior liens, if any, which The Company
may have against the Policy. The undersigned(s) agree and the Assignee by execution of this assignment agrees to the conditions and provisions herein
set forth. The Assignor(s) hereby WARRANT the validity of this assignment.

1.  It is expressly agreed that, by virtue of this assignment ALL rights, title and interest pass to the Assignee, except the following rights, which are
    reserved and excluded from this assignment and do not pass by virtue hereof:

    a)  With respect to variable life policies, the right to change the election of the Investment Option;
    b)  With respect to variable life policies, the right to elect an Account Transfer option;
    c)  The right to designate and change the beneficiary; and
    d)  The right to elect any optional mode of settlement permitted by the Policy or allowed by the Company, but the reservations of these rights shall in
        no way impair the right of the Assignee to surrender the Policy completely with all its incidents or impair any other right of the Assignee hereunder,
        and any designation or change of beneficiary or election of a mode of settlement shall be made subject to this assignment and to the rights of the
        Assignee hereunder.

2.  It is expressly agreed that the following specific rights may not be exercised while this assignment is in effect, except with the consent of the Assignor
    and Assignee:

    a)  The right to change the Death Benefit Option;
    b)  The right to change the Face Amount; or
    c)  The right to add or delete any riders or other policy benefits, which are permitted by the terms of the Policy.

3.  Unless The Company is notified in writing to the contrary, the shares of surplus, dividends and dividend options in force shall continue to be paid out to
    the Assignor or allocated on the Policy in force at the time of this assignment.

4.  The Company is hereby authorized to recognize the Assignee's claims to rights hereunder without investigating the reason for any action taken by the
    Assignee, or the validity or the amount of the liabilities or the existence of any default therein, or the application to be made by the Assignee of any
    amount to be paid to the Assignee. The sole signature of the Assignee shall be sufficient for the exercise of any rights under the Policy assigned
    hereby and the sole receipt of the Assignee for any sums received shall be a full discharge and release therefore to The Company. Checks for all or
    any part of the sums payable under the Policy assigned herein, shall be drawn to the exclusive order of the Assignee if, when and in such amounts as
    may be, requested by the Assignee.

5. The laws of the Commonwealth of Massachusetts will govern any dispute regarding this collateral assignment.

## Signatures

| Signed at   City | State | This | Day Of | Year |
|---|---|---|---|---|
| *Comer* | *GA* | *10* | *April* | *2008* |

Name of Assignor(s) (Owner) (Please print)

*Ronald M. Goss, Trustee*

Name of Assignor(s) (Owner) (Please print)

_____

Signature of Assignor(s) (Owner)
X *Ronald M. Goss*

Signature of Assignor(s) (Owner)
X

Signature of Assignee (Lender)
X

X

X

The Company is not a party to this assignment, nor does it assume responsibility for the validity or the sufficiency of the foregoing assignment.

## Release of Collateral Assignment

. or value received,
the Assignee named below, hereby releases, ALL rights, title and interest in policy [_____] on the Life/lives of

| Life Insured (Life One) | | | | Life Insured (Life Two) | | | |
|---|---|---|---|---|---|---|---|
| Name   First | Middle | Last | | Name   First | Middle | Last | |

Name of Assignee

_____ ("Assignee")

| Signed at   City | State | This | Day Of | Year |
|---|---|---|---|---|

Witness
X

Witness
X

Signature of Assignee (if corporation indicate name/title)
X

Signature of Assignee (if corporation indicate name/title)
X

JUDD  068255

Document #17 of 19

## BORROWER'S CLOSING CERTIFICATE

Dated as of 4/10, 2008

Reference is made to the **Life Insurance Premium Financing Agreement** dated as of April 10, 2008 (the *"Financing Agreement"*) among **Windsor Securities LLC**, a Nevada LLC with a mailing address of 25 East Athens Avenue, Ardmore, PA 19003, as Lender (the *"Lender"*), **Joe E. Acker** as Insured (the *"Insured"*) and **The Joe E. Acker Family Insurance Trust**, as Borrower (the *"Borrower"*).

Pursuant to Section 2.01 of the Financing Agreement, the Borrower hereby certifies that all the representations and warranties of and made by the Borrower set forth in the Financing Agreement and each Financing Document to which the Borrower is a party are true and correct in all respects on and as of the date first above written.

IN WITNESS WHEREOF, the undersigned Borrower has hereunto set its name as of the date set forth below.

The Joe E. Acker Family Insurance Trust

By: _____, Trustee
Name: Ronald M. Goss
Date: 4/10/2008

JUDD 068256

Document #18 of 19

# *Life Insurance Premium Finance*
# *Trust Questionnaire*

**Insured's Name:**  Joe E. Acker

**Insured's Address:**  2140  Double Branches Road. Elberton, GA 30635

    **Second Home:**  NA

**Insured's Phone Number:**  706-283-2374

**Insured's Facsimile Number:**  NA

**Insured's Social Security Number:**  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

**Insured's E-mail:**  NA

**Insured's Spouse (if any):**  NA

---

**Trust Name and State of Organization:**  The Joe E. Acker Family Insurance Trust
**Trust Tax ID #:** 26-6164783

---

**Name of Trust Beneficiary:** Nadine Acker

**Beneficiary's Address:**  2140 Double Branches Road. Elberton, GA 30635
**Relationship of Beneficiary to Insured:**

**Beneficiary's Phone Number:** 706-283-2374

**Beneficiary's Facsimile Number:**  NA

---

**Name of Trustee:** Ronald M. Goss

**Trustee's Address:**  725 Esco Road. Comer, GA 30629

**Trustee's Phone Number:** 706-795-2597

**Trustee's Facsimile Number:**  NA

---

**Agency Name and State of Organization:** E.E.H. Consulting, Inc.

**Agent Name and Title with Agency:**  Eugene E. Houghins, CEO

**Agency's Address:**  4243 Dunwoody Club Drive, Suite 215 Atlanta, GA 30350

**Agency's Phone Number:**  678-336-5250

**Agency's Facsimile Number**  866-501-1888

JUDD  068257

Document #18 of 19

Attach the following documents to this questionnaire:

1) Complete executed copy of trust formation documents

2) Complete executed copy of illustration, application and policy (if issued)

3) Copy of insured's and trustee's drivers license

Description of Policy:

| Insurer | Policy Issue Date | Policy Number | Annual Premium | Death Benefit |
|---|---|---|---|---|
| John Hancock | March 6, 2008 | 93783751 | $65,750 3rd year on | $1,000,000 |

**Instructions for Premium Reimbursement:**
Bank:
Address:
ABA#:
SWIFT Code:
For Further Credit to
Account number:
Amount of $:

**Instructions for Payment of Premiums ( Trust Account):**
Bank:
Address:
|ABA#:
Account name:
Account #:
Amount of $:
Policy #:

**Instructions for Payment of Premiums:**
Bank:  CitiBank NA
Address: 399 Park Avenue New York, NY 10043
ABA#: 021000089
Account name:  John Hancock USA
Account #: 40678502
Amount of $: 1st: $65,458;  2nd: $52,500
Policy #: 93783751
Ref: Joe E. Acker

- 2 -

JUDD  068258

Document #18 of 19

[To be completed by Lender]

Lender: Windsor Securities, LLC
Lender address:
Tax ID#:
Agent Guaranty:

## Loan Information:

| Loan: | | | |
|---|---|---|---|
| | $ | 65,458 | First Year Premium |
| | $ | 52,500 | Second Year Premium |
| | $ | | Structuring Fee |
| | $ | 13,000 | Closing Fees |
| Total Loan Amount: | $ | 130,958 | |

- 3 -

JUDD 068259

Document #19 of 19

## Receipt of Funds Confirmation

THE UNDERSIGNED, on behalf of the Joe E. Acker Family Insurance Trust, EIN #26-6164783, hereby confirms receipt of SIXTY FIVE THOUSAND FOUR HUNDRED FIFTY EIGHT dollars ($65,458.00), from Windsor Securities LLC, pursuant to the premium financing documents (including, but not limited to *"Life Insurance Premium Financing Agreement Among Windsor Securities LLC, The Joe E. Acker Family Insurance Trust, and Joe E. Acker"*, "The Promissory Note", and *"The Security Agreement(s) for Beneficiary Interest in Trust"*).


_____ , Trustee      Date: _05/01/2008_

The Joe E. Acker Family Insurance Trust

JUDD  068260

**EXHIBIT B**

JUDD  068261



May 20, 2010

WINDSOR SECURITIES, LLC.
C/O STEVEN PRUSKY
25 EAST ATHENS AVENUE
ARDMORE PA 19003

Dear Windsor Securities, LLC. :

RE:     Policy No. 93 783 751  Insured(s): Joe E Acker
        John Hancock Life Insurance Company (U.S.A.)

We enclose your registered copy of the **Change of Ownership (Absolute Assignment)** form. This change was registered **March 25, 2010.** Please attach this form to your policy contract for future reference.

If you require additional information, please contact our Customer Service Center at 1-800-387-2747. Thank you for selecting John Hancock for your financial needs.

Sincerely,

*Shainaaz Gulamani*
Sr. Titles Associate
Customer Service Center
encl.

Customer Service Center R-02
1 John Hancock Way Suite 1350, Boston, MA 02217-1099
Toll Free: (800) 387-2747  Fax: (416) 926-5656

www.jhlifeinsurance.com

JUDD  068262



**John Hancock**
LIFE INSURANCE

**Change of Ownership (Absolute Assignment)**

**Mail your request to:**

For Individual Life Products,
Customer Service Center R-02
John Hancock
1 John Hancock Way Suite 1350
Boston MA 02217-1089

For Majestic Series Products,
Specialty Products & Distribution C-6
John Hancock
PO Box 192
Boston MA 02117-0192

---

**Section A - Current Policy Information**

1. a) Name of Owner(s)  JOE E. ACKER FAMILY INSURANCE TRUST
   b) Policy Number  9378375 1

   c) Life Insured(s)  JOE E. ACKER

   d) Address  725 ESCO ROAD    COMER, GA   30629
   e) Daytime Phone No.

---

**Section B - Change of Ownership (Absolute Assignment)**

For ☒ Value received; or ☐ as a Gift for Love and Affection,

the undersigned hereby transfers and assigns absolutely, all rights, title and interest in the above policy(ies) to the Assignee(s) indicated below and **HEREBY REVOKES ANY BENEFICIARY DESIGNATION** or direction of payment previously made in respect to the proceeds payable on the death of the Life Insured under the above policy(ies) and directs that such proceeds be paid to the Assignee(s) and, if more than one, in the same proportion as their ownership rights bear to one another. The Assignor(s) WARRANT the validity of this assignment.

Name of New Owner (Assignee)

WINDSOR SECURITIES, LLC

Relationship to Life Insured

Mailing and Billing Address of New Owner (Assignee) - Street, City, State, Zip Code
If no address is indicated, the Mailing and Billing
Address will remain the same.

c/o STEVEN PRUSKY
25 EAST ATHENS AVENUE
ARDMORE, PA  19003

---

**Section C - Signature(s) of Current Owner - Person/entity making this transfer**

Signed at City/State   COMER, GA

Date   MARCH 18, 2010

Signature of Witness

X _____
Signature of Owner (if corporation, officer(s) Name/Title must be indicated)   TRUSTEE

Signature of Witness

X _____
Signature of Owner (if corporation, officer(s) Name/Title must be indicated)

---

Registered By The Company

On   **MAR 25 2010**

---

P65115U8 (01/2010)

Insurance products are issued by: John Hancock Life Insurance Company (U.S.A.) (not licensed in New York), Boston, MA 02116; John Hancock Life Insurance Company of New York, Valhalla, NY 10595 and John Hancock Life & Health Insurance Company, herein collectively referred to as John Hancock.

Page 1 of 2

JUDD 068263

| Section D - Request for Taxpayer Identification Number and Certification - MUST be completed by the NEW Owner |
|---|

In order to comply with IRS regulations regarding Tax Identification Numbers and Backup Withholding, individuals and sole proprietors MUST give their Social Security Number. Other entities MUST give their Employer Identification Number.

**Social Security Number**

If you have no number or you have applied for a number and are waiting for one to be issued, write "APPLIED FOR" in the boxes. You then have 60 days to supply your TIN number to us. After 60 days The Company must begin Backup Withholding.

**Tax ID Number**

2 0 3 . 3 . 6 . 0 8 0 6

**CERTIFICATION - UNDER PENALTIES OF PERJURY, I CERTIFY THAT:**

☒ The number shown on this form is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me).

☐ For Minnesota residents only. I have received a copy of IRS Form W9.

☐ Check box ONLY if you are not a United States citizen (complete IRS Form W-8BEN).

☐ I am no longer subject to Backup Tax Withholding.

☐ I am subject to Backup Tax Withholding.

☐ I am exempt from Backup Tax Withholding.

Signed at City/State

ARDMORE, PA

Date

MARCH 23, 2010.

Signature of NEW Owner/Taxpayer (if corporation, officer(s) Name/Title must be indicated)

x _____ member LUNDER LLC

Registered By The Company

on.... MAR 2 5 2010 ........

JUDD  068264

EXHIBIT C

JUDD 068265



John Hancock Life Insurance Company (U.S.A.)

# Agent Summary Report

EUGENE E HOUCHINS JR

May 21, 2010
Page 1 of 1

This is to inform you of changes to your clients' policies so
that appropriate action may be taken. If you have any
questions, please call us at 1-800-505-9427.

| Policy Plan | Owner Insured | Total Death Benefit | Comment |
|---|---|---|---|
| 93 783 751 Performance UL 2008 | WINDSOR SECURITIES, LLC. JOE E ACKER | $1,000,000.00 | This policy will lapse effective June 20, 2010 if a minimum payment of $14,711.47 is not received. The first lapse warning notice was sent to the client approximately 30 days ago. A client notice will not be sent at this time. |

The Total Death Benefit is not adjusted for loans or premium refunds.

JUDD 068266

◄Crump 11:19:1306/02/2010▼

EUGENE E HOUCHINS JR
4250 CRUMS MILL RD
HARRISBURG PA 17112

JUDD 068267

**EXHIBIT D**

JUDD  068268

Case3:14-cv-04651   Document1-3   Filed10/17/14   Page2 of 14

*John Hancock*

PRIORITY KNIGHT
RML
~~~~

**Statement of Claim for Death Benefit**
John Hancock Life Insurance Company (U.S.A.)
(hereinafter referred to as the Company)

**Mailing Address:**
John Hancock
Attn: Life Claims Services R-03
1 John Hancock Way Suite 1105
Boston MA  02217-1105

**Courier Address:**
John Hancock
Life Claims Services R-03
27 Drydock Ave Suite 3
Boston MA 02210-2382

Telephone Inquiries
Customers before 1/1/2005
1-800-732-5543

Originally a Manulife Customer or Customer after 12/31/2004
1-800-397-2747

Complete, sign and return the form together with the insurance policy and a certified death certificate, which indicates the cause and manner of death of the insured person. Additional requirements may also be requested depending on the circumstances.

You, your and yourself refer to the person(s), Trustee(s) or Entity claiming the death benefit, whichever is applicable to the policy(ies).

### A - LIST ALL POLICY NUMBERS IF YOU ARE CLAIMING THE DEATH BENEFIT FOR MORE THAN ONE POLICY

Policy Number(s)
a) 9 3 7 8 3 7 5 1    b) _____    c) _____

### B - TELL US ABOUT THE PERSON INSURED BY THE POLICY(IES)

a) Name  JOE  (First)   E (Middle)   ACKER (Last)    b) Date of Birth  05 (month) 21 (day) 1926 (year)

c) Also known as Name  (First) (Middle) (Last)

d) Place of Birth  ELBERTON (City)  GA (County)  USA

e) Address  2140 DOUBLE BRANCHES ROAD (Street Address)  ELBERTON (City)  GA (State)  30635 (Zip Code)

f) Date of Death  04 (month) 15 (day) 2014 (year)   g) State of Residence Prior to Death  GA   h) Place of Death  ELBERTON, GA   i) Cause of Death  BRAIN TUMOR

j) Employer's Name  RETIRED

k) Employer's Address  N/A (Street Address)   (City)   (State)   (Zip Code)

### C - READ THIS SECTION CAREFULLY IF THE NAMED BENEFICIARY(IES) IS NOT ALIVE

If the last known beneficiary(ies) of the policy(ies) has died, please send us a copy of the beneficiary's death certificate.

### D - TELL US ABOUT THE CLAIMANT OF THE DEATH BENEFIT PROCEEDS
i.e., individual, company, executor or trustee, whichever is applicable for this policy(ies).

a) Name  WINDSOR (First) SECURITIES, (Middle) LLC (Last)   b) Gender N/A ☐ Male  ☐ Female

c) Address  25 EAST ATHENS AVENUE (Street Address)   (Apt. No.)   ARDMORE (City)  PA (State)  19003 (Zip Code)

d) Mailing Address (if different than Street Address)  (Street Address)   (City)   (State)   (Zip Code)

e) Date of Birth  N/A (month) (day) (year)   f) Relationship to Insured  COLLATERAL ASSIGNEE TO TRUST   g) Telephone No.  Business 610-642-3100  Home 610-642-3100

h) E-mail Address  sprusky@windsorsecurities.com   i) Fax No.  610-642-9709

j) In what capacity are you claiming the death benefit?
☒ Named Beneficiary - Please complete one form for each named beneficiary and if a beneficiary is former spouse, include copy of divorce settlement.
☐ Executor or Administrator - Please send a court certificate of appointment.   ☐ Trustee
☐ Legal Guardian - Please send a court certificate of appointment.   ☐ Other -

PS5116US (08/2013)

Page 3 of 7

Insurance products are issued by: John Hancock Life Insurance Company (U.S.A.) (not licensed in New York), Boston, MA 02116; and John Hancock Life & Health Insurance Company, herein collectively referred to as John Hancock.

JUDD  068269

## E - STATEMENT OF LOST OR DESTROYED POLICY

Check this box if the policy is lost or destroyed:
☒ The undersigned hereby represents that the above numbered policy was lost or destroyed. This policy is not now assigned, nor has it been otherwise transferred or encumbered in any manner. No person, firm or corporation has or, claims the right to possession of this policy.

## F - FORM 712 (LIFE INSURANCE STATEMENT)

If you require an IRS Form 712 (Life Insurance Statement) for estate tax purposes, please check this box. ☐

## G - READ THIS SECTION CAREFULLY AND COMPLETE IT ONLY IF YOU ARE A TRUSTEE OF THE TRUST THAT IS CLAIMING THE PROCEEDS OF THIS POLICY(IES).

| a) Name of Trust | | b) Date of Trust | | | |
|---|---|---|---|---|---|
| | | | month | day | year |

c) Name of Trustees _____
If more than one trustee, all trustees must complete and sign this form

**Certification**
If you have completed this section, you are making the following commitments when you sign this form:
- You certify that you are the trustee(s) of the trust named above.
- You certify that you have the right under the trust to act as the claimant for the policies named in this form.
- You agree that John Hancock doesn't have to determine the original terms of the trust or any revisions to them. You also agree that John Hancock shall not be charged with the knowledge of the trust's provisions. You confirm that neither John Hancock nor its representatives are responsible for inquiring into or shall be charged with the knowledge of the terms of the trust.
- You agree that John Hancock may discharge its obligations under the policies named in this form by relying solely on the signature of the trustee(s) or successor trustee(s) on this form.
- You agree that proof of payment to the trustee(s) of the death claim proceeds will be final and conclusive evidence that payment was made and that all claims and demands of the trustee(s) against John Hancock will have been satisfied.

## H - GENERATION-SKIPPING TRANSFER TAX

Are the death benefit proceeds subject to the Generation-Skipping Transfer Tax?   ☐ Yes   ☒ No
If you answered 'Yes' above, and the proceeds are greater than $250,000, please submit a Schedule R-1 of IRS Form 706.

## I - ADDITIONAL INFORMATION

Complete if any family members are covered under the insurance being claimed.
Please list the names and birth dates of all children born of the marriage of the insured and the insured's Spouse, or of children acquired by the insured as stepchildren or legally adopted children. Please list only living children who have not reached their 25th birthday.

| Full Name of Child/Spouse | Relationship to Insurer | Social Security Number | Birthdate | | | Gender | |
|---|---|---|---|---|---|---|---|
| | | | month | day | year | M | F |
| | | | | | | ☐ | ☐ |
| | | | | | | ☐ | ☐ |
| | | | | | | ☐ | ☐ |
| | | | | | | ☐ | ☐ |

Is there any possibility of a posthumous child (a child born after the death of the father)?   ☐ Yes   ☐ No

Insurance products are issued by: John Hancock Life Insurance Company (U.S.A.) (not licensed in New York), Boston, MA 02116; and John Hancock Life & Health Insurance Company, herein collectively referred to as John Hancock.

JUDD   068270

**J - ALL INDIVIDUAL CLAIMANTS OR TRUSTEES OR EXECUTORS MUST SIGN HERE AND HAVE THEIR SIGNATURE WITNESSED BY A DISINTERESTED THIRD PARTY.**

Any person who knowingly and with intent to defraud any insurance company or other persons, files a statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, is subject to criminal prosecution and/or civil penalties. By signing below, you agree under penalties of perjury that the information in this statement is complete and true to the best of your knowledge (please sign as you would sign a check). Refer to "Fraud Warning Notices" Insert for your state.

To the extent proceeds are settled by lump sum into a John Hancock Safe Access Account, you further agree to the terms and conditions set forth in the John Hancock Safe Access Account Supplemental Contract, which together with this Statement of Claim forms the entire agreement between you and John Hancock.

| Signed at | City | State | This | Day of | | Year |
|---|---|---|---|---|---|---|

Signature of Claimant, Trustee(s), Executor or Signing Officer

X

Signature of Witness

X

**K - SIGNATURES - ALL CORPORATE CLAIMANTS MUST SIGN HERE AND HAVE THEIR SIGNATURE WITNESSED BY A DISINTERESTED THIRD PARTY**

Any person who knowingly and with intent to defraud any insurance company or other persons, files a statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, is subject to criminal prosecution and/or civil penalties. By signing below, you agree under penalties of perjury that the information in this statement is complete and true to the best of your knowledge (please sign as you would sign a check). Refer to "Fraud Warning Notices" Insert for your state.

Corporations making a claim must provide either:
• The title and signature of one signing officer along with the corporate seal, or
• Signatures of two signing officers with their titles and the Corporation Name.

| Signed at | City | State | This | Day of | | Year |
|---|---|---|---|---|---|---|
| | Ardmore | PA | 18TH | July | | 2014 |

Signature of the First Signing Officer

X _____

Name and Title of the First Signing Officer and the Name of Corporation

Signature of Witness

X _____

Steven G. Paisley, President Mero, Montauns Mero Winsor Stevens, LLC

| Signed at | City | State | This | Day of | | Year |
|---|---|---|---|---|---|---|
| | Ardmore | PA | 18TH | July | | 2014 |

Signature of the Second Signing Officer

X _____

Signature of Witness

X _____

By providing this form or other claim forms for the convenience of the claimant, John Hancock does not admit any liability or waive any of its rights.

Insurance products are issued by: John Hancock Life Insurance Company (U.S.A.) (not licensed in New York), Boston, MA 02116; and John Hancock Life & Health Insurance Company, herein collectively referred to as John Hancock.

JUDD  068271

Case3:14-cv-04651   Document1-3   Filed10/17/14   Page5 of 14

## FRAUD WARNING NOTICES - PLEASE READ THE FRAUD WARNING NOTICE FOR YOUR STATE

**ALASKA:** A person who knowingly and with intent to injure, defraud, or deceive an insurance company files a claim containing false, incomplete, or misleading information may be prosecuted under state law.

**ARIZONA:** For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

**ARKANSAS:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**CALIFORNIA:** For your protection California law requires the following to appear on this form; Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**COLORADO:** It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**DELAWARE:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

**DISTRICT OF COLUMBIA: WARNING:** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits, if false information materially related to a claim was provided by the applicant.

**FLORIDA:** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

**IDAHO:** Any person who knowingly, and with intent to defraud or deceive any insurance company, files a statement of claim containing any false, incomplete, or misleading information is guilty of a felony.

**INDIANA:** A person who knowingly and with the intent to defraud an insurer files a statement of claim containing any false, incomplete, or misleading information commits a felony.

**KENTUCKY:** Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**MAINE:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the Company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**MINNESOTA:** A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

**NEW HAMPSHIRE:** Any person who, with a purpose to injure, defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638:20.

**NEW JERSEY:** Any person who knowingly files a statement of claim containing any false or misleading information is subject to criminal and civil penalties.

**NEW MEXICO:** ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES.

**NEW YORK:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**OHIO:** Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**OKLAHOMA: WARNING:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**OREGON:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false or deceptive information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**PENNSYLVANIA:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**RHODE ISLAND:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison

**TENNESSEE:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

**TEXAS:** Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**VIRGINIA:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

**WASHINGTON:** It is a crime to knowingly provide false, incomplete, or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines, and denial of insurance benefits.

**WEST VIRGINIA:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**ALL OTHER STATES:** Any person who knowingly and with intent to defraud any insurance company or other persons, files a statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, subject to criminal prosecution and/or civil penalties.

Page 6 of 7
Insurance products are issued by: John Hancock Life Insurance Company (U.S.A.) (not licensed in New York), Boston, MA 02116; and John Hancock Life & Health Insurance Company, herein collectively referred to as John Hancock.

JUDD  068272

| Form **W-9**<br>(Rev. August 2013)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer<br>Identification Number and Certification** | Give Form to the<br>requester. Do not<br>send to the IRS. |
|---|---|---|

**Name (as shown on your income tax return)**

Winsor Securities, LLC

**Business name/disregarded entity name, if different from above**

**Check appropriate box for federal tax classification:**

☐ Individual/sole proprietor  ☐ C Corporation  ☐ S Corporation  ☐ Partnership  ☐ Trust/estate

☒ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ►  P

☐ Other (see instructions) ►

**Exemptions (see instructions):**

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

**Address (number, street, and apt. or suite no.)**

101 Convention Center Blvd, Suite P105

**City, state, and ZIP code**

Las Vegas NV 85105

**Requester's name and address (optional)**

**List account number(s) here (optional)**

**Print or type**

**See Specific Instructions on page 2.**

---

**Part I    Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN on page 3.

**Note.** If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

**Social security number**

☐☐☐ - ☐☐ - ☐☐☐☐

**Employer identification number**

2 0 - 3 6 0 8 6

---

**Part II    Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below), and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

| Sign<br>Here | **Signature of<br>U.S. person ►** | Date ► 16-Jul-14 |
|---|---|---|

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** The IRS has created a page on IRS.gov for information about Form W-9, at www.irs.gov/w9. Information about any future developments affecting Form W-9 (such as legislation enacted after we release it) will be posted on that page.

### Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, payments made to you in settlement of payment card and third party network transactions, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the

withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct.

**Note.** If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien,

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,

• An estate (other than a foreign estate), or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax under section 1446 on any foreign partners' share of effectively connected taxable income from such business. Further, in certain cases where a Form W-9 has not been received, the rules under section 1446 require a partnership to presume that a partner is a foreign person, and pay the section 1446 withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid section 1446 withholding on your share of partnership income.

Cat. No. 10231X                          Form **W-9** (Rev. 8-2013)

JUDD  068273

Case 1:16-cv-01533-GBD-GWG   Document 125-12   Filed 08/23/18   Page 75 of 82
Case3:14-cv-04651-WHO   Document30-2   Filed07/08/15   Page139 of 146

Case3:14-cv-04651   Document1-3   Filed10/17/14   Page7 of 14

Form W-9 (Rev. 8-2013)

Page 2

In the cases below, the following person must give Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States:

• In the case of a disregarded entity with a U.S. owner, the U.S. owner of the disregarded entity and not the entity;

• In the case of a grantor trust with a U.S. grantor or other U.S. owner, generally, the U.S. grantor or other U.S. owner of the grantor trust and not the trust; and

• In the case of a U.S. trust (other than a grantor trust), the U.S. trust (other than a grantor trust) and not the beneficiaries of the trust.

Foreign person. If you are a foreign person or the U.S. branch of a foreign bank that has elected to be treated as a U.S. person, do not use Form W-9. Instead, use the appropriate Form W-8 or Form 8233 (see Publication 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

Nonresident alien who becomes a resident alien. Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the payee has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

Example. Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity, give the requester the appropriate completed Form W-8 or Form 8233.

What is backup withholding? Persons making certain payments to you must under certain conditions withhold and pay to the IRS 28% of such payments. This is called "backup withholding." Payments that may be subject to backup withholding include interest, tax-exempt interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, payments made in settlement of payment card and third party network transactions, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester,

2. You do not certify your TIN when required (see the Part II instructions on page 3 for details),

3. The IRS tells the requester that you furnished an incorrect TIN,

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See Exempt payee code on page 3 and the separate Instructions for the Requester of Form W-9 for more information.

Also see Special rules for partnerships on page 1.

What is FATCA reporting? The Foreign Account Tax Compliance Act (FATCA) requires a participating foreign financial institution to report all United States account holders that are specified United States persons. Certain payees are exempt from FATCA reporting. See Exemption from FATCA reporting on page 3 and the Instructions for the Requester of Form W-9 for more information.

## Updating Your Information

You must provide updated information to any person to whom you claimed to be an exempt payee if you are no longer an exempt payee and anticipate receiving reportable payments in the future from this person. For example, you may need to provide updated information if you are a C corporation that elects to be an S corporation, or if you no longer are tax exempt. In addition, you must furnish a new Form W-9 if the name or TIN changes for the account, for example, if the grantor of a grantor trust dies.

## Penalties

Failure to furnish TIN. If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

Civil penalty for false information with respect to withholding. If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

Criminal penalty for falsifying information. Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

Misuse of TINs. If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

## Specific Instructions

### Name

If you are an individual, you must generally enter the name shown on your income tax return. However, if you have changed your last name, for instance, due to marriage without informing the Social Security Administration of the name change, enter your first name, the last name shown on your social security card, and your new last name.

If the account is in joint names, list first, and then circle, the name of the person or entity whose number you entered in Part I of the form.

Sole proprietor. Enter your individual name as shown on your income tax return on the "Name" line. You may enter your business, trade, or "doing business as (DBA)" name on the "Business name/disregarded entity name" line.

Partnership, C Corporation, or S Corporation. Enter the entity's name on the "Name" line and any business, trade, or "doing business as (DBA) name" on the "Business name/disregarded entity name" line.

Disregarded entity. For U.S. federal tax purposes, an entity that is disregarded as an entity separate from its owner is treated as a "disregarded entity." See Regulation section 301.7701-2(c)(2)(iii). Enter the owner's name on the "Name" line. The name of the entity entered on the "Name" line should never be a disregarded entity. The name on the "Name" line must be the name shown on the income tax return on which the income should be reported. For example, if a foreign LLC that is treated as a disregarded entity for U.S. federal tax purposes has a single owner that is a U.S. person, the U.S. owner's name is required to be provided on the "Name" line. If the direct owner of the entity is also a disregarded entity, enter the first owner that is not disregarded for federal tax purposes. Enter the disregarded entity's name on the "Business name/disregarded entity name" line. If the owner of the disregarded entity is a foreign person, the owner must complete an appropriate Form W-8 instead of a Form W-9. This is the case even if the foreign person has a U.S. TIN.

Note. Check the appropriate box for the U.S. federal tax classification of the person whose name is entered on the "Name" line (Individual/sole proprietor, Partnership, C Corporation, S Corporation, Trust/estate).

Limited Liability Company (LLC). If the person identified on the "Name" line is an LLC, check the "Limited liability company" box only and enter the appropriate code for the U.S. federal tax classification in the space provided. If you are an LLC that is treated as a partnership for U.S. federal tax purposes, enter "P" for partnership. If you are an LLC that has filed a Form 8832 or a Form 2553 to be taxed as a corporation, enter "C" for C corporation or "S" for S corporation, as appropriate. If you are an LLC that is disregarded as an entity separate from its owner under Regulation section 301.7701-3 (except for employment and excise tax), do not check the LLC box unless the owner of the LLC (required to be identified on the "Name" line) is another LLC that is not disregarded for U.S. federal tax purposes. If the LLC is disregarded as an entity separate from its owner, enter the appropriate tax classification of the owner identified on the "Name" line.

Other entities. Enter your business name as shown on required U.S. federal tax documents on the "Name" line. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on the "Business name/disregarded entity name" line.

## Exemptions

If you are exempt from backup withholding and/or FATCA reporting, enter in the Exemptions box, any code(s) that may apply to you. See Exempt payee code and Exemption from FATCA reporting code on page 3.

JUDD   068274

JUDD  068275

Case3:14-cv-04651   Document1-3   Filed10/17/14   Page9 of 14

Form W-9 (Rev. 8-2013)

Page 3

Exempt payee code. Generally, individuals (including sole proprietors) are not exempt from backup withholding. Corporations are exempt from backup withholding for certain payments, such as interest and dividends. Corporations are not exempt from backup withholding for payments made in settlement of payment card or third party network transactions.

Note. If you are exempt from backup withholding, you should still complete this form to avoid possible erroneous backup withholding.

The following codes identify payees that are exempt from backup withholding:

1—An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2)

2—The United States or any of its agencies or instrumentalities

3—A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities

4—A foreign government or any of its political subdivisions, agencies, or instrumentalities

5—A corporation

6—A dealer in securities or commodities required to register in the United States, the District of Columbia, or a possession of the United States

7—A futures commission merchant registered with the Commodity Futures Trading Commission

8—A real estate investment trust

9—An entity registered at all times during the tax year under the Investment Company Act of 1940

10—A common trust fund operated by a bank under section 584(a)

11—A financial institution

12—A middleman known in the investment community as a nominee or custodian

13—A trust exempt from tax under section 664 or described in section 4947

The following chart shows types of payments that may be exempt from backup withholding. The chart applies to the exempt payees listed above, 1 through 13.

| IF the payment is for . . . | THEN the payment is exempt for . . . |
|---|---|
| Interest and dividend payments | All exempt payees except for 7 |
| Broker transactions | Exempt payees 1 through 4 and 6 through 11 and all C corporations. S corporations must not enter an exempt payee code because they are exempt only for sales of noncovered securities acquired prior to 2012. |
| Barter exchange transactions and patronage dividends | Exempt payees 1 through 4 |
| Payments over $600 required to be reported and direct sales over $5,000 [1] | Generally, exempt payees 1 through 5 [2] |
| Payments made in settlement of payment card or third party network transactions | Exempt payees 1 through 4 |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees, gross proceeds paid to an attorney, and payments for services paid by a federal executive agency.

Exemption from FATCA reporting code. The following codes identify payees that are exempt from reporting under FATCA. These codes apply to persons submitting this form for accounts maintained outside of the United States by certain foreign financial institutions. Therefore, if you are only submitting this form for an account you hold in the United States, you may leave this field blank. Consult with the person requesting this form if you are uncertain if the financial institution is subject to these requirements.

A—An organization exempt from tax under section 501(a) or any individual retirement plan as defined in section 7701(a)(37)

B—The United States or any of its agencies or instrumentalities

C—A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities

D—A corporation the stock of which is regularly traded on one or more established securities markets, as described in Reg. section 1.1472-1(c)(1)(i)

E—A corporation that is a member of the same expanded affiliated group as a corporation described in Reg. section 1.1472-1(c)(1)(i)

F—A dealer in securities, commodities, or derivative financial instruments (including notional principal contracts, futures, forwards, and options) that is registered as such under the laws of the United States or any state

G—A real estate investment trust

H—A regulated investment company as defined in section 851 or an entity registered at all times during the tax year under the Investment Company Act of 1940

I—A common trust fund as defined in section 584(a)

J—A bank as defined in section 581

K—A broker

L—A trust exempt from tax under section 664 or described in section 4947(a)(1)

M—A tax exempt trust under a section 403(b) plan or section 457(g) plan

## Part I. Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see How to get a TIN below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN. However, the IRS prefers that you use your SSN.

If you are a single-member LLC that is disregarded as an entity separate from its owner (see Limited Liability Company (LLC) on page 2), enter the owner's SSN (or EIN, if the owner has one). Do not enter the disregarded entity's EIN. If the LLC is classified as a corporation or partnership, enter the entity's EIN.

Note. See the chart on page 4 for further clarification of name and TIN combinations.

How to get a TIN. If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local Social Security Administration office or get this form online at www.ssa.gov. You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at www.irs.gov/businesses and clicking on Employer Identification Number (EIN) under Starting a Business. You can get Forms W-7 and SS-4 from the IRS by visiting IRS.gov or by calling 1-800-TAX-FORM (1-800-829-3676).

If you are asked to complete Form W-9 but do not have a TIN, apply for a TIN and write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

Note. Entering "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

Caution: A disregarded U.S. entity that has a foreign owner must use the appropriate Form W-8.

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if items 1, 4, or 5 below indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). In the case of a disregarded entity, the person identified on the "Name" line must sign. Exempt payees, see Exempt payees code earlier.

Signature requirements. Complete the certification as indicated in items 1 through 5 below.

1. Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983. You must give your correct TIN, but you do not have to sign the certification.

2. Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983. You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

3. Real estate transactions. You must sign the certification. You may cross out item 2 of the certification.

4. Other payments. You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments made in settlement of payment card and third party network transactions, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

5. Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions. You must give your correct TIN, but you do not have to sign the certification.

JUDD  068276

JUDD  068277

Case 1:16-cv-01533-GBD-GWG   Document 125-12   Filed 08/23/18   Page 79 of 82
Case3:14-cv-04651-WHO   Document30-2   Filed07/08/15   Page143 of 146

Case3:14-cv-04651   Document1-3   Filed10/17/14   Page11 of 14

Form W-9 (Rev. 8-2013)                                                                                        Page 4

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) | The actual owner of the account; or, if combined funds, the first individual on the account [1] |
| 3. Custodian account of a minor (Uniform Gift to Minors Act) | The minor [2] |
| 4. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee [1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner [1] |
| 5. Sole proprietorship or disregarded entity owned by an individual | The owner [3] |
| 6. Grantor trust filing under Optional Form 1099 Filing Method 1 (see Regulation section 1.671-4(b)(2)(i)(A)) | The grantor |

| For this type of account: | Give name and EIN of: |
|---|---|
| 7. Disregarded entity not owned by an individual | The owner |
| 8. A valid trust, estate, or pension trust | Legal entity [4] |
| 9. Corporation or LLC electing corporate status on Form 8832 or Form 2553 | The corporation |
| 10. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 11. Partnership or multi-member LLC | The partnership |
| 12. A broker or registered nominee | The broker or nominee |
| 13. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |
| 14. Grantor trust filing under the Form 1041 Filing Method or the Optional Form 1099 Filing Method 2 (see Regulation section 1.671-4(b)(2)(i)(B)) | The trust |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or "DBA" name on the "Business name/disregarded entity" name line. You may use either your SSN or EIN (if you have one), but the IRS encourages you to use your SSN.

[4] List first and circle the name of the trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.) Also see Special rules for partnerships on page 1.

*Note. Grantor also must provide a Form W-9 to trustee of trust.

Note. If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Secure Your Tax Records from Identity Theft

Identity theft occurs when someone uses your personal information such as your name, social security number (SSN), or other identifying information, without your permission, to commit fraud or other crimes. An identity thief may use your SSN to get a job or may file a tax return using your SSN to receive a refund.

To reduce your risk:

• Protect your SSN,

• Ensure your employer is protecting your SSN, and

• Be careful when choosing a tax preparer.

If your tax records are affected by identity theft and you receive a notice from the IRS, respond right away to the name and phone number printed on the IRS notice or letter.

If your tax records are not currently affected by identity theft but you think you are at risk due to a lost or stolen purse or wallet, questionable credit card activity or credit report, contact the IRS Identity Theft Hotline at 1-800-908-4490 or submit Form 14039.

For more information, see Publication 4535, Identity Theft Prevention and Victim Assistance.

Victims of identity theft who are experiencing economic harm or a system problem, or are seeking help in resolving tax problems that have not been resolved through normal channels, may be eligible for Taxpayer Advocate Service (TAS) assistance. You can reach TAS by calling the TAS toll-free case intake line at 1-877-777-4778 or TTY/TDD 1-800-829-4059.

Protect yourself from suspicious emails or phishing schemes. Phishing is the creation and use of email and websites designed to mimic legitimate business emails and websites. The most common act is sending an email to a user falsely claiming to be an established legitimate enterprise in an attempt to scam the user into surrendering private information that will be used for identity theft.

The IRS does not initiate contacts with taxpayers via emails. Also, the IRS does not request personal detailed information through email or ask taxpayers for the PIN numbers, passwords, or similar secret access information for their credit card, bank, or other financial accounts.

If you receive an unsolicited email claiming to be from the IRS, forward this message to phishing@irs.gov. You may also report misuse of the IRS name, logo, or other IRS property to the Treasury Inspector General for Tax Administration at 1-800-366-4484. You can forward suspicious emails to the Federal Trade Commission at: spam@uce.gov or contact them at www.ftc.gov/idtheft or 1-877-IDTHEFT (1-877-438-4338).

Visit IRS.gov to learn more about identity theft and how to reduce your risk.

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons (including federal agencies) who are required to file information returns with the IRS to report interest, dividends, or certain other income paid to you; mortgage interest you paid; the acquisition or abandonment of secured property; the cancellation of debt; or contributions you made to an IRA, Archer MSA, or HSA. The person collecting this form uses the information on the form to file information returns with the IRS, reporting the above information. Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation and to cities, states, the District of Columbia, and U.S. commonwealths and possessions for use in administering their laws. The information also may be disclosed to other countries under a treaty, to federal and state agencies to enforce civil and criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism. You must provide your TIN whether or not you are required to file a tax return. Under section 3406, payers must generally withhold a percentage of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to the payer. Certain penalties may also apply for providing false or fraudulent information.

JUDD  068278

JUDD  068279

Case3:14-cv-0465 [REDACTED] nt1-3 Filed10/17/14 Page13 of 14

## GEORGIA DEATH CERTIFICATE

State File Number  2014GA000019635

| 1. DECEDENT'S LEGAL FULL NAME (First, Middle, Last) JOE EDWIN ACKER | | 1a. IF FEMALE, ENTER LAST NAME AT BIRTH | 2. SEX MALE | 2a. DATE OF DEATH (Mo., Day, Year) ACTUAL DATE OF DEATH 04/15/2014 |
|---|---|---|---|---|
| 3. SOCIAL SECURITY NUMBER ▓▓▓▓▓ | 4a. AGE (Years) 87 | 4b. UNDER 1 YEAR / Days / 4c. UNDER 1 DAY Hours / Mins. | 5. DATE OF BIRTH (Mo., Day, Year) 05/21/1926 | |
| 6. BIRTHPLACE GEORGIA | 7a. RESIDENCE - STATE GEORGIA | 7b. COUNTY ELBERT | 7c. CITY, TOWN ELBERTON | |

| 7d. STREET AND NUMBER 1043 LONGSTREET ROAD | | 7e. ZIP CODE 30635 | 7f. INSIDE CITY LIMITS? NO | 8. ARMED FORCES? YES |
|---|---|---|---|---|
| 8a. USUAL OCCUPATION FARMING | | 8b. KIND OF INDUSTRY OR BUSINESS AGRICULTURE | | |
| 9. MARITAL STATUS MARRIED | 10. SPOUSE NAME NADINE HAWKS | | 11. FATHER'S FULL NAME (First, Middle, Last) NEWTON H ACKER | |
| 12. MOTHER'S MAIDEN NAME (First, Middle, Last) GRACE TAYLOR | 13a. INFORMANT'S NAME (First, Middle, Last) JANE CRENSHAW | | 13b. RELATIONSHIP TO DECEDENT DAUGHTER | |
| 13c. MAILING ADDRESS 2142 DOUBLE BRANCHES ROAD ELBERTON GEORGIA 30635 | | | 14. DECEDENT'S EDUCATION HIGH SCHOOL GRADUATE OR GED COMPLETED | |
| 15. ORIGIN OF DECEDENT (Italian, Mex., French, English, etc.) NO, NOT SPANISH/HISPANIC/LATINO | 16. DECEDENT'S RACE (White, Black, American Indian, etc.) (Specify) WHITE | | | |
| 17a. IF DEATH OCCURRED IN HOSPITAL | 17b. IF DEATH OCCURRED OTHER THAN HOSPITAL (Specify) NURSING HOME-LONG TERM CARE FACILITY | | | |
| 18. HOSPITAL OR OTHER INSTITUTION NAME (If not in either give street and no.) HEARDMONT NURSING HOME | 19. CITY, TOWN or LOCATION OF DEATH ELBERTON | | 20. COUNTY OF DEATH ELBERT | |
| 21. METHOD OF DISPOSITION (Specify) BURIAL | 22. PLACE OF DISPOSITION FOREST HILLS MEMORIAL PARK, INC 1342 WASHINGTON HWY ELBERTON GEORGIA 30635 | | 23. DISPOSITION DATE (Mo., Day, Year) 04/19/2014 | |
| 24a. EMBALMER'S NAME BILLY GILFORD WATSON JR | 24b. EMBALMER LICENSE NO. 4868 | 25. FUNERAL HOME NAME HICKS FUNERAL HOME AND CREMATION SERVICES | | |
| 25a. FUNERAL HOME ADDRESS 231 HEARD STREET ELBERTON GEORGIA 30635 | | | | |
| 26a. SIGNATURE OF FUNERAL DIRECTOR BILLY GILFORD WATSON | | 26b. FUN. DIR. LICENSE NO 6274 | AMENDMENTS | |
| 27. DATE PRONOUNCED DEAD (Mo., Day, Year) 04/15/2014 | 28. HOUR PRONOUNCED DEAD 06:45 PM | | | |
| 29a. PRONOUNCER'S NAME Katrina Joy Fountain | | 29b. LICENSE NUMBER RN216792 | 29c. DATE SIGNED 04/15/2014 | |
| 30. TIME OF DEATH 06:45 PM | 31. WAS CASE REFERRED TO MEDICAL EXAMINER NO | | | |

| 32. Part I. Enter the chain of events-diseases, injuries, or complications that directly caused the death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest, or ventricular fibrillation without showing the etiology. DO NOT ABBREVIATE. | | Approximate interval between onset and death |
|---|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) | A. BRAIN TUMOR | 2 MONTHS |
| | Due to, or as a consequence of | |
| | B. | |
| | Due to, or as a consequence of | |
| | C. | |
| | Due to, or as a consequence of | |
| | D. | |
| Part II. Enter significant conditions contributing to death but not related to cause given in Part 1A. If female, indicate if pregnant or birth occurred within 90 days of death. | 33. WAS AUTOPSY PERFORMED? NO | 34. WERE AUTOPSY FINDINGS AVAILABLE TO COMPLETE THE CAUSE OF DEATH? |

| 35. TOBACCO USE CONTRIBUTED TO DEATH NO | 36. IF FEMALE (range 10-54) PREGNANT NOT APPLICABLE | 37. ACCIDENT, SUICIDE, HOMICIDE, UNDETERMINED (Specify) NATURAL |
|---|---|---|
| 38. DATE OF INJURY (Mo., Day, Year) | 39. TIME OF INJURY | 40. PLACE OF INJURY (Home, Farm, Street, Factory, Office, Etc.) (Specify) | 41. INJURY AT WORK? (Yes or No) |

| 42. LOCATION OF INJURY (Street, Apartment Number, City or Town, State, Zip, County) | |
|---|---|
| 43. DESCRIBE HOW INJURY OCCURRED | 44. IF TRANSPORTATION INJURY |
| 45. To the best of my knowledge death occurred at the time, date and place and due to the cause(s) stated. Medical Certifier (Name, Title, License No.) J DANIEL MCAVOY, 5, 18996 | 46. On the basis of examination and/or investigation, in my opinion death occurred at the time, date and place and due to the cause(s) stated. Medical Examiner/Coroner (Name, Title, License No.) |
| 45a. DATE SIGNED (Mo., Day, Year) 04/18/2014 | 45b. HOUR OF DEATH 06:45 PM | 46a. DATE SIGNED (Mo., Day, Year) | 46b. HOUR OF DEATH |
| 47. NAME, ADDRESS, AND ZIP CODE OF PERSON COMPLETING CAUSE OF DEATH J DANIEL MCAVOY 100 COLLEGE AVE ELBERTON GA 30635 ELBERTON GEORGIA | |
| 48. REGISTRAR (Signature)  /S/ DEBORAH C. ADERHOLD | 49. DATE FILED - REGISTRAR (Mo., Day, Year) 05/07/2014 |

Form 3903 (Rev. 04/2012), GEORGIA DEPARTMENT OF HUMAN RESOURCES                    DO NOT FOLD THIS CERTIFICATE

JUDD 068280

Case3:14-cv-04651   Document1-3   Filed10/17/14   Page147 of 41

THIS IS TO CERTIFY THAT THIS IS A TRUE AND CORRECT COPY OF THE CERTIFICATE FILED
WITH THE STATE OFFICE OF VITAL RECORDS, GEORGIA DEPARTMENT OF PUBLIC HEALTH.
THIS CERTIFIED COPY IS ISSUED UNDER THE AUTHORITY OF CHAPTER 31-10, CODE OF
GEORGIA AND 290-1-3 DPH RULES AND REGULATIONS.

STATE REGISTRAR AND CUSTODIAN
GEORGIA STATE OFFICE OF VITAL RECORDS

DATE   JUL 16 2014

(VOID WITHOUT IMPRESSED SEAL OR IF ALTERED OR COPIED)

JUDD  068281