# EXHIBIT "28"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WINDSOR SECURITIES, LLC,

    Plaintiff,

-against-

ARENT FOX, LLP and JULIUS
ROUSSEAU, III,

    Defendants.

Case No. 16-cv-01533 (GBD) (GWG)

### EXPERT TESTIMONY OF JAMES W. MAXSON PURSUANT TO FED. R. CIV. P. RULE 26(a)(2)(B)

#### A. Introduction

I have been retained as an expert in this case by counsel for Arent Fox, LLP ("Arent Fox") and Julius Rousseau, III, Esq. ("Rousseau" and, collectively, with Arent Fox, "Defendants"). I may testify at trial regarding the matters set forth in this report, if asked about these matters by the Court or the parties' attorneys.

#### B. Background and Qualifications

I received a B.A. in philosophy form Denison University in Granville, Ohio in 1990. I received a J.D. from The Ohio State University School of Law in 1993 (*cum laude*).

After law school, my legal experience was as follows:

- 1993-1994: Judicial Clerk – Honorable Alice M. Batchelder of the United States Court of Appeals for the Sixth Circuit.
- 1994-1996: Litigation Associate – Paul Hastings, LLP, Atlanta Office.
- 1996-1997: Corporate Associate – Takaishi Law Office, Tokyo, Japan.
- 1997-2000: Counsel – Delta Airlines, Inc., International Group.
- 2000-2004: Senior Associate – Paul Hastings, LLP, Atlanta Office. My practice included securities, mergers and acquisitions, and life settlements.
- 2004-2008: Executive Vice President, General Counsel, and Chief Operating Officer of Habersham Funding, LLC, a life settlement provider.
- 2008-2015: Of Counsel and Partner – Morris, Manning & Martin, LLP, Atlanta Office – Co-Chair Insurance-Linked Securities Practice, with a primary focus on life settlements.

- 2015-2017: Partner – Culhane Meadows, PLLC, Atlanta Office. My practice was approximately 90% life settlements-related.
- 2017-Present: Founding Partner – Edwards, Maxson, Mago & Macaulay, LLP, Atlanta Office. My practice is approximately 90% life settlements-related.

My primary practice area since 2000 has been life settlements and other insurance-linked securities, so the nature of my practice has resulted in my having extensive dealings with life insurance premium finance programs. While at Habersham Funding, I reviewed hundreds of policies originated out of non-recourse premium finance programs for possible purchase. While at Morris Manning, I assisted in structuring non-recourse premium finance programs, and advised clients about obtaining good title to foreclosed upon policies from such programs, and assisted in reviewing policies originated out of such programs for purchase.

In total, I have over twenty years of experience practicing in the areas of insurance-linked securities, mergers and acquisitions, private placements, general corporate matters, insurance regulatory issues, life settlements and premium finance.

### Board Memberships and Honors

- Chairman, Board of Directors, Life Insurance Settlement Association, the oldest and largest trade group representing the interests of participants in the life settlements and other longevity-related assets (2017-present)
- Member, Board of Directors, Life Insurance Settlement Association (2013-present)
- Deputy Chair, European Life Settlement Association (2015)
- Executive Committee, European Life Settlement Association (2012-2014)
- Selected, Georgia Trend Magazine's Legal Elite (2012)
- Selected, Most Influential People by the Life Settlement Review (2009)

### Selected Presentations

- Panelist, "Master Agreement for Tertiary Transactions," ELSA/BVZL International Life Settlement Investor Conference, September 12, 2017
- Panelist, "Model Agreement for Tertiary Transactions and Other Investor Issues," 23rd Annual LISA Fall Conference, October 15, 2017
- Panelist, "Life Settlement Taxation – Strategies for Addressing Life Settlement Tax Issues," 23rd Annual LISA Spring Life Settlement Conference, May 16, 2017
- Panelist, "Lead Generation: Rules of the Road," 22nd Annual LISA Conference, October 18, 2016
- Panelist, "The Policy Chase: Alternative Methods for Policy Generation," 21st Annual Spring LISA Life Settlement Conference, May 4, 2015
- Panelist, "The New Life Settlement Market: How Advisors and Their Clients Can Benefit," 2015 ADISA Spring Symposium, March 23, 2015
- Speaker, "How the Life Settlements Statutory Scheme Provides Investors Protection," Fifth Annual LISA Investor Conference, January 22, 2015
- Speaker, "Advisor Liability and Fiduciary Duty," 20th Annual Fall LISA Life Settlement Conference, October 7, 2014

- Speaker, "Originating, Executing and Completing Life Settlement Transactions in a Changing Environment," 19th Annual LISA Life Settlement Conference, October 9, 2013
- Panelist, "Originating, Execution and Completing Life Settlements Transactions in a Changing Environment," 19th Annual LISA Life Settlement Conference, May 30, 2013
- Panelist, "The Evolution Continues: New Applications for Life Settlements Benefits Consumers," Third Annual European Life Settlement Association Investor Summit, September 25, 2013
- Moderator, "The Evolving Regulatory Landscape," European Life Settlement Association, 2012 Investor Summit, September 26, 2012
- Panelist, "Life Settlements as an Asset Class," AALU Annual Conference, April 30, 2012
- Webinar, "Private Placements and Life Settlement-Related Securities," March 29, 2011
- Webinar, "Recent Topics in Life Settlements," November 17, 2010
- Webinar, "SEC Eyes the Life Settlements Market," September 22, 2009
- Webinar, "Life Settlements – After the Purchase," September 10, 2009
Webinar, "Demystifying the Application of Securities Law to Life Settlements," April 30, 2009

## Publications from the Past 10 Years

- Article, June 1, 2014 MMM Insurance Review – "The Life Settlement Option: A Duty to Inform?"
- Article, October 1, 2011 MMM Insurance Review – "Can IRAs Invest in Life Settlements?"
- Article, March 23, 2011 MMM Insurance Review – "Can You Trust the Trustee?"
- Article, September 12, 2010 Investment News – Point/Counterpoint – "Are Life Settlements Essentially Securities?"
- Article, June 1, 2009 MMM Insurance Review – "Can Investments In Life Settlements Be Shari'ah Compliant?"
- Article, December 1, 2008 MMM Insurance Review – "Is A VUL Policy Always A Security In A Life Settlement Transaction? Maybe Not"
- Article, September 1, 2008, MMM Insurance Review – "Synthetic Structures To Hedge Longevity Risk In Life Settlements"

### C. Succinct Statement of Opinions to be Presented at Trial

In the present litigation, I will be prepared to testify at trial that the decisions made and advice provided by Defendants, on behalf of Plaintiff Windsor Securities, LLC ("Windsor"), were, given the specific facts and circumstances of the transactions in which Windsor was involved, reasonable and within the applicable standard of care for attorneys practicing in the same or similar areas of the law, and did not constitute malpractice.

### D. Opinions to be Expressed, Reasons and Basis Therefor

#### 1) Non-Recourse Premium Finance: A Brief Overview

To put appropriate context around Windsor's non-recourse premium finance ("NRPF") lending, and Defendant's representation of Windsor in connection therewith, it is important to have a basic understanding of: (i) what an NRPF life insurance loan program is; (ii) the documentation associated with these programs; (iii) why these programs became popular with

3

investors; and (iv) how life insurance carriers' legal challenges to the validity of policies financed by NRPF loans resulted in those policies having little value in the secondary market for life insurance.

### (a) *NRPF Loans*

An NRPF loan for a life insurance policy is a financial transaction in which an individual (usually the insured under the policy) establishes an irrevocable life insurance trust ("ILIT"), then directs the trustee of the ILIT to apply for a life insurance policy on the insured's life and to enter into a financing agreement with the lender to borrow the funds to pay premiums for a set term once the policy is issued.[1] In return, the lender is entitled to receive interest on the borrowed funds, and repayment of the loan at the end of its term. An ILIT is used because the obligation to repay the loan rests with the ILIT, not the insured. The "non-recourse" aspect of these programs means that the assets in the trust (the ILIT's sole asset is almost always the policy) are the only collateral for the loan, and the lender's sole recourse for the failure to repay the loan is to collect the assets in the ILIT because the lender normally has no right to seek satisfaction of the loan from the insured directly. If the insured chooses not to repay the loan, or the ILIT defaults on its obligation to repay, the lender is entitled to take ownership of the policy to satisfy the borrower's obligation as its sole means of recourse.

### (b) *NRPF Loan Documentation*

While there is some variation between the documents used in different NRPF programs, there are certain documents (such as a financing agreement, promissory note and security agreement) common in all such transactions. These documents set forth the terms pursuant to which the insured will borrow and repay the funds to pay premiums on the policy, and how the lender's interest in the policy used as collateral for the loan is secured.

### (c) *The Increase in Popularity of NRPF Programs*

The use of NRPF loans as a means to finance life insurance became increasingly popular in the early and middle 2000s, as the secondary market for life insurance, also called "life settlements," grew. A life settlement is a transaction in which a policy owner sells a life insurance policy to an investor for a lump sum cash purchase price, and thereafter the investor pays the premiums on that policy until the insured dies and the investor collects the death benefit.[2] Rather than repay the NRPF loans, it is common that the insured will direct the trustee to surrender ownership of the policy to the lender, which the lender will then frequently re-sell as a life settlement. Because the ability to sell a policy in a life settlement gives NRPF lenders a

---

[1] Susan Lorde Martin, *Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitizations*, 13 U. PA. J. BUS. L. 173, 188 (2010).

[2] Life settlement transactions (also referred to as viatical settlements) are regulated by the insurance departments in 45 of the 50 states. See Life Settlements Task Force, STAFF REPORT TO UNITED STATES SECURITIES EXCHANGE COMMISSION, July 22 2010 (hereinafter, the "SEC Staff Report"), at 35 n.166.

4

convenient and often lucrative exit strategy, the two transactions (the financing of the policy and its sale as a life settlement), while distinct, are complementary, and the number of transactions done in both markets spiked dramatically in the early and middle 2000s.[3] In fact, by the middle 2000s many lenders had changed their focus from making the loans in order to receive the agreed upon interest, to structuring the transactions in a manner that made it unlikely the trust would repay the loan, so the lender could take ownership of the policy in satisfaction of the loan, and then re-sell the policy in a life settlement transaction and reap additional profits, or, in some cases, keep the policy and collect the death benefit.[4]

### (d) *Carrier Legal Challenges to NRPF Policies*

As the number of NRPF programs increased, so did the number of policies coming out of these programs being sold to life settlements investors. Initially, participants in the life settlements market were pleased to have a new source of policies in which to invest, but by 2006-2007 it became evident there were problems associated with policies originated out of NRPF programs. Most significantly, carriers began bringing challenges on the basis that the trust that owned the policy lacked an "insurable interest" in the life of the insured when it applied for the policy.[5] "Insurable interest" is the legal term used to embody the public policy that wagering on human lives should be prohibited, and an insurable interest must exist between the owner of a policy and the insured when the policy is applied for and issued, or the carrier can void the policy as if it had never been issued.[6] The primary basis for the challenges brought by the life insurance carriers is that the true purpose of NRPF transactions is to benefit third-party investors, not someone with a continued interest in the life, health and safety of the insured; therefore, the carriers contend, these policies issued out of NRPF programs are void for lack of an insurable interest. Policies issued without the requisite insurable interest are sometimes called stranger-originated life insurance or "STOLI."[7]

By 2007-2008, the continuing legal challenges brought by life insurance carriers had the effect of making almost all policies issued in connection with NRPF programs appear too risky for most life settlement investors.[8] As a result, lenders who accepted policies in satisfaction of NRPF loans found it much more difficult to sell those policies for a quick profit, and they also

---

[3] SEC Staff Report at 4. Leslie Scism, *Regulators Reign in Murky Life Insurance Policies*, WALL ST. J., June 21, 2010, https://www.wsj.com/articles/SB10001424052748704324304575306440620747882.
[4] *See* Eryn Matthews, *STOLI on the Rocks: Why States Should Eliminate the Abusive Practice of Stranger-Owned Life Insurance*, 14 CONN. INS. L.J. 521, 527 (2008).
[5] SEC Staff Report at 13-14.
[6] "Insurable interest" is typically defined as an interest based upon a reasonable expectation of pecuniary advantage through the continued life, health and bodily safety of another person, and, consequently, loss by reason of their death or disability; or a substantial interest engendered by love and affection if closely related by blood or by law. Martin, *supra* note 1 at 177-78.
[7] Matthews, *supra* note 4 at 528.
[8] SEC Staff Report at 13-14.

5

faced the possibility that carriers would challenge the validity of the policies.[9] By 2010, when the Windsor Loans (described below) came due, the bottom had effectively fallen out of the life settlements market for NRPF policies. Many NRPF lenders were forced to abandon policies or take ownership of the policies and continue paying the premiums, with the hopes of collecting the death benefit.

### 2) Relevant Factual Background Information

#### (a) *Windsor's Investment in Non-Recourse Premium Finance Loans*

Around 2008, Windsor, through its principal Steven Prusky, decided to make ten loans to borrowers in connection with a NRPF loan program. Transcript of the Deposition of Steven Prusky ("Prusky Tr.") 147:7-9, 177:18-23. Rousseau was engaged to represent Windsor in connection with those loans, beginning in 2009, approximately two years after the loans were made. Prusky Tr. 199:7. Rousseau continued to represent Windsor in connection with these loans after he transitioned his practice from his prior law firm to Arent Fox. Prusky Tr. 231:14-232:9. Each of the loans was secured by a life insurance policy. Of the ten loans Windsor made, only five are at issue in this litigation: the loans associated with the life insurance policies of Joe E. Acker (the "Acker Policy"), Erwin A. Collins (the "Collins Policy"), John L. Bitter (the "Bitter Policy"), Jane Ann Stamatov (the "Stamatov Policy"), and Robert S. Coppock (the "Coppock Policy") (collectively, the loans are referred to herein as the "Windsor Loans" and the policies as the "Windsor Policies").

#### (b) *The Windsor Loans*

In the case of the Windsor Loans, the financing documents comprised nineteen separate documents, most of which are typical in NRPF loan transactions. While the record reflects that Windsor had some involvement in preparing the financing package, it remains unclear whether the financing documents were prepared or reviewed by any attorney prior to Windsor making the Loans. Prusky Tr. 129:20-130:3. Nevertheless, the documents comprising those financing packages are, largely, within the norms for the NRPF industry.

As discussed above, by the time Rousseau began his representation of Windsor, the NRPF and life settlements markets had both suffered precipitous declines[10] (Prusky Tr. 113:14-19), and STOLI policies were being challenged at higher rates.[11] Looked at objectively, the circumstances surrounding the issuance of the Windsor Policies makes it likely they would be STOLI policies.[12] The trusts were formed solely for the purposes of applying for the policies and

---

[9] Not only did carriers challenge the validity of STOLI policies, they also took the position that because the policies were often procured as a result of fraud the carrier should be permitted to keep all the premiums paid, resulting in the possibility of a complete loss by the lender.

[10] *See* Arthur Postal, *Life Settlements: A Long Road to Redemption*, THINK ADVISOR (Jan. 2, 2014), https://www.thinkadvisor.com/2014/01/02/life-settlements-a-long-road-to-redemption/?slreturn=20180303155028.

[11] SEC Staff Report at 14.

[12] Matthews, *supra* note 4 at 528

6

taking out the loans; the insureds never paid any of the premiums to keep the policies in force; and, perhaps, most problematic of all, the applicants for the Windsor Policies indicated, falsely, on the policy applications that the policies would not be premium financed. In addition to the possible STOLI concerns, the insureds under the Windsor Policies had made unauthorized changes in trustees of one or more of the trusts, and failed to provide Windsor certain necessary paperwork and certain health updates, as required by the loan documents. Prusky Tr. 179:5-24. In fact, it is my understanding that Rousseau was engaged, in part, to help Windsor enforce its rights under the loan documents and to protect Windsor's investment. Prusky Tr. 179:5-24. Rousseau, first at his previous law firm, and later at Arent Fox, did just that, and assisted Windsor in maintaining any value in the Windsor Policies at a time when many policies were being challenged by the insurance carriers. Ironically, the record reflects Windsor was seeking a "relatively riskless investment." Prusky Tr. 136:24-137:4. Instead, it invested in an asset class that was rife with fraud.[13] The record reflects that Rousseau, to preserve Windsor's investment in the Windsor Loans, advised Windsor to send letters to the issuing carriers disclosing that the Windsor Policies were premium financed, despite the applications for those policies indicating they were not. Prusky Tr. 240:3-16. But for this advice, the Windsor Policies might have been challenged and declared void. This was prudent advice for dealing with policies of questionable provenance, a view which Windsor shares, and which was undoubtedly part the basis for Prusky's "tremendous respect" for Rousseau. Prusky Tr. 241:3-20, 254:13-18.

### (c) *Relevant Standards of Practice in the Life Settlements/Premium Financing Space*

As explained above, life settlements and NRPF loans are separate but complementary, and both are still esoteric compared to transactions involving traditional assets. It has only been in the last 15-20 years that these transactions have transitioned from being virtually unheard of to a specialty practice, and there are still only a small handful of legal practitioners across the country who have had substantial exposure to these transactions and their vagaries. As Prusky testified, when he inquired about attorneys with knowledge of these practices areas, he was only able to find two names, Rousseau and one other. Prusky Tr. 172:4-9.

Because of the overlap between insurance law, premium finance/secured lending law, and life settlement law, it is easy for attorneys who do not frequently practice in this area to blur where one discipline begins and the other ends. That is, the law that governs the issuance of a life insurance policy is distinct from the law that governs NRPF loans, both of which are distinct from the laws that govern the sale of a life insurance policy in a life settlement. Knowing when the laws of one area apply versus another is something only experienced practitioners will understand and be able to address effectively.

An example of how the convergence of these different areas of practice can cause confusion is found in the April 8, 2014 Interim Award (the "Arbitration Decision") at issue in this litigation. On page 3 of the Arbitration Decision, the following statement is made: "Mr.

---

[13] Matthews, *supra* note 4 at 537.

7

Gene Houchins III ('Houchins'), a resident licensed Georgia 'life settlement broker' was the broker for sale of the policy to Mr. Bitter." This statement is footnoted with the following: "Under the Georgia Insurance Code . . . section 33-59-2(10), 'A life settlement broker represents only the owner and owes a fiduciary duty to the owner to act according to the owner's instructions, and in the best interest of the owner . . . .'" Arbitration Decision at 3 n.1. This reference and citation evidence a fundamental misunderstanding on the part of the Arbitration Panel regarding the nature of the underlying transaction in the dispute it was arbitrating. With respect to the Bitter trust, Houchins acted as an insurance agent selling a life insurance policy on behalf of the issuing carrier, not as a life settlement broker in the sale of a policy to an investor. The Arbitration Panel's reference to Georgia's life settlement laws in this context is not only irrelevant, but shows that the panel was unclear as to the basic nature of the transaction at issue.

This example also serves to illustrate that these are complicated transactions, which often involve novel or unusual circumstances, and, as with any new area of practice, the law continues to develop, sometimes in unforeseen ways. Hence, any assertion that there are standardized norms definitively agreed to and established for these areas of practice is inaccurate. Instead, it is more accurate to say that there are certain practices that many or most practitioners in this area agree are prudent, but there is no sole way to handle a given situation, and it will always depend on the terms of the financing agreements and other transaction-specific circumstances, such as the conduct of the individuals and entities involved.

### 3) How Legal and Record Ownership of Life Insurance Policies are Transferred

At the core of this malpractice case is an important dynamic involving the transfer of ownership of the policies that secured the Windsor Loans. An unusual characteristic of life insurance policies is that, similar to real estate, they involve two distinct bundles of rights: legal ownership and record ownership. Legal ownership of a life insurance policy is typically conveyed in an agreement in writing signed by both parties setting out the terms and conditions of the policy transfer. Whereas, record title is transferred by filing the carrier-specific forms to record the new "owner of record" with the carrier. It is standard practice in the life settlements and NRPF industries that legal and record ownership transfer at the same time, but it is not mandatory that they do so.

In the case of life settlements, where a policy is sold by the owner of that policy to a third-party investor, it is standard that there be some form of purchase and sale agreement to transfer legal title; however, as codified in the life settlements laws of the 45 states that regulate these transactions, a transaction for the sale of a life insurance policy is not consummated until the carrier has provided an acknowledgement that the policy purchaser has been recorded as the policy's new owner. Thus, regardless of who purports to hold legal title to a life insurance policy, a carrier will only pay the death benefit to the record beneficiary for that policy.

In NRPF transactions, it is not customary to require a separate writing to transfer legal ownership of the policy collateral to the lender because the purpose of the underlying financing documents is intended to accomplish this purpose. The financing packages for the Windsor

8

Loans are comprised of nineteen separate agreements, which set out what happens if the loan is not repaid and what happens if the lender's assumption of ownership of the policy is either uncontested or contested by the trustee or insured. If the relinquishment of the policy to the lender is voluntary, there is no need for separate documents or a legal process to transfer legal title to the lender, any more than the need to have a formal legal process at the end of a car lease – the lessee either surrenders the vehicle or chooses to purchase it. The transfer of legal title is a function of the loan documents themselves, with record ownership transferred by filing the change of ownership and beneficiary forms ("Change Forms") with the issuing carrier. A formal foreclosure and sale of a policy is more time consuming and expensive an option many lenders prefer to avoid, unless the trustee or the insured refuse to voluntarily surrender the policy or are completely non-responsive. Looking at the record in this case, it is difficult to reach a conclusion other than that the execution of the Change Forms by the Bitter trustee was clear evidence of the parties' intent that legal title <u>and</u> record title transfer pursuant to the financing documents.

### 4) The Defendants' Advice for each of the Windsor Policies was Reasonable and Appropriate under the Circumstances

Windsor essentially alleges that after it was informed the borrower-trusts were not going to repay the Windsor Loans, the Defendants failed to advise Windsor properly how to take unencumbered title to the policies under the Default Sale Right and Cal. Com. Code § 9620.[14] Windsor appears to be using the Bitter Arbitration Decision and adverse summary judgment decisions involving the Acker and Collins Policies as "proof" that Defendants failed to exercise the appropriate level of skill, prudence and diligence commonly used by attorneys specializing in life settlements and premium financing. As discussed below, read objectively and contextualized with the standards and practices of the NRPF and life settlements industries, these decisions simply do not support this conclusion.

### 5) The Bitter Policy and Arbitration Decision

At the time Defendants advised Windsor regarding how to obtain ownership of the Bitter Policy, no practitioner in the life settlements/premium financing field reasonably could have anticipated the Arbitration Panel would reach the conclusion it did.

#### (a) *The Default Sale Right*

The Arbitration Panel concluded that Windsor failed to exercise the Default Sale Right because it provided no express notification to the Bitter trustee that it was accepting the Bitter Policy in full satisfaction of the Bitter trust's obligations to Windsor. Arbitration Decision at 7.

---

[14] Windsor also alleges that Defendants failed to take the necessary steps after the adverse Bitter Arbitration Decision to secure Windsor's unfettered ownership rights to the remaining Policies. Complaint ¶¶ 173-174.

9

This conclusion is inconsistent with the reality of how NRPF loans are satisfied, and rights to policies are transferred in actual NRPF transactions.

There is, in the language of the Default Sale Right itself, no requirement that "express notification" be provided to the borrower in order for the lender to take ownership of the policy. The Default Sale Right, the language of which is fairly typical for NRPF programs, allows the lender to accept the policy in full and complete acceptance of the borrower's liabilities. It is understood in the NRPF industry that a Default Sale Right is not one exercised by the lender per se, it is the borrower that offers the policy to the lender (something the Arbitration Panel apparently did not understand) and, as set forth in the language of the Default Sale Right, the lender "shall have the right . . . but not the obligation to accept, that in consideration of the full and complete satisfaction of the [loan] . . . [borrower] may make a full transfer . . . and thereby forever relinquish any and all rights . . ." to the policy. Arbitration Decision at 4-5. In the event the lender is willing to accept the policy in complete satisfaction of the borrower's obligation, then the lender "shall notify Insurer in writing and Insurer shall thereafter recognize Assignee as the sole lawful owner . . ." of the policy. This is precisely the process that was followed with respect to the Bitter Policy. While Defendants, and then Windsor, requested that the Bitter trustee sign the Change Forms to transfer ownership and beneficiary of the Bitter Policy to Windsor, the fact that they requested the Bitter trustee exercise the Default Sale Right does not change the fact that this is a recognized and accepted means of taking full and unfettered ownership of a policy pledged as collateral for a NRPF loan (and the trustee's return of the signed Change Forms is still an exercise of the Default Sale Right, assuming Windsor accepts the form).

The Arbitration Panel also based its ruling on the fact that Defendants' September 8, 2010 letter to the Bitter trustee demanding the trustee sign the Change Forms referenced Section 6(a) of the Security Agreement, which the Panel believed only gave Windsor the right to protect its secured interests, not obtain unfettered ownership of the Policy. The reference to Section 6(a), however, should not negate the presumption that Windsor accepted the Bitter Policy in full satisfaction of the Bitter trust's obligations to Windsor. Looking at the relevant record evidence, it is, frankly, absurd to believe the Bitter trustee had any expectation whatsoever that the trust was entitled to any residual proceeds from the Bitter Policy. It is apparent that the Bitter trustee was an unsophisticated and, frankly, unqualified associate of the insurance broker, Houchins.[15] The citation to Section 6(a) would have meant nothing to him, and the signing of a "change of ownership" form would have meant just that: an absolute change of ownership without the reservation of any rights by the ILIT. As I understand it, there is also no evidence in the record that, after the execution of the COO, the insured or the trustee ever inquired about the status of the policy or whether Windsor continued to make the premium payments (and, at this point, Windsor was within its rights to stop making payments and let the policy lapse). That is, the Bitter trustee knew he had surrendered, absolutely, all ownership rights in the Bitter Policy, and

---

[15] As stated in the Complaint, "[u]pon information and belief, the Bitter Trustee was a high school drop out, with no financial or insurance expertise, who had become acquainted with Broker Houchins when he installed Houchins' home audio equipment." Complaint ¶ 38 n.4.

10

it was not until he was contacted by an attorney that he suddenly "remembered" he'd been waiting for Windsor to contact him about disposition of the Bitter Policy.

### (b) *Application of Cal. Com. Code § 9620*

The Arbitration Panel also ruled that under Cal. Com. Code § 9620, Windsor failed to enter into a written agreement, post-default, with the Bitter trustee whereby Windsor explicitly released the trustee and the trust from all obligations in exchange for outright ownership of the policy, and failed to achieve a "strict foreclosure" whereby Windsor agreed to accept the policy as full satisfaction of the Bitter loan pursuant to a "record authenticated" after default. Arbitration Decision at 6-7.

As someone who practices regularly in the life settlement and premium financing areas, the Arbitration Panel's application of Cal. Com. Code § 9620 is difficult to reconcile with how transactions were actually undertaken, and the general understanding of how existing law was interpreted and applied at the time.

Defendants took various steps, undisputed by the parties, to secure Windsor's unfettered ownership of the Bitter Policy. These steps included sending the September 8, 2010 letter demanding the execution of the Change Forms; the letter was, essentially, requesting that the Bitter trust exercise its Default Sale Right, which Windsor was obviously prepared to accept. When the Bitter trustee executed the Change Forms on February 14, 2011 (in response to a second demand letter sent by Windsor not Defendants) the trustee, in effect, proffered the policy to Windsor, and Windsor accepted this proffer by having those changes recorded with the carrier.[16] In the ordinary course of practice in connection with NRPF programs, this act would have been deemed sufficient to satisfy the Default Sale Right, to transfer legal and record ownership to Windsor, and to accomplish the absolute relinquishment of all the Bitter trust's rights to the Bitter Policy. While this is not the only way this relinquishment could have been accomplished, it was consistent with the terms of the financing agreement, and a reasonable course of action given the circumstances of the situation and the fact that the Bitter trustee, at first, appeared uncooperative. Beyond obtaining the Trustee's signature on the COO, a lawyer in the Defendants' position must carefully consider whether any additional actions are necessary and would be potentially harmful to a client in the position of Windsor. A reasonable lawyer in the position of the Defendants should have had concerns, as I understand they did, that the argument could be made the Bitter loan transaction itself (aside from any STOLI concerns associated with the Bitter Policy) was void or voidable if classified as a violation of the Georgia Life Settlement Act (as discussed below). Under the circumstances, getting the Bitter trustee to sign the Change Forms transferring ownership to Windsor was a reasonable and generally accepted way to transfer legal and record ownership to the Bitter Policy.

---

[16] Apparently some issue occurred which prevented the proper recording and acknowledgment of these Change Forms, but that is irrelevant for purposes of the borrower's relinquishment of its rights to the Policy.

11

The UCC applies to life insurance policies in only two states,[17] and prior to the decisions in the Acker case and the Collins case, there was no clear authority to give a practitioner guidance as to how § 9620 should apply to life insurance policies. The verbiage of the statute alone is not sufficient to make clear that § 9620 required these very specific and particular actions. If I were to have a client come to me today with a situation identical to Windsor's, the only reason I would know that there was any reason to take steps beyond those taken by the Defendants, are the opinions in the Acker and Collins cases, which, effectively, adopted the Arbitration Panel's decision. Thus, the Arbitration Panel's strict application of § 9620 in this case and the conclusion it reached was not only unexpected, but unforeseeable. As the Arbitration Panel itself acknowledged, "[n]either the parties nor independent research by the Panel has revealed any California decisional authority explaining what is mean by a 'record authenticated after default.'" Arbitration Decision at 6.

Windsor's attempt to use the Arbitration Decision as proof that Defendants' advice with respect to the Bitter Policy fell below the level of skill, prudence and diligence commonly used by attorneys practicing in this area is a tautology: the Arbitration Panel ruled against Windsor; therefore, Defendants committed malpractice because the Arbitration Panel ruled against Windsor. To conclude that Defendants committed legal malpractice requires the assumption that Defendants should have anticipated a court or arbitrator would: 1) apply § 9620 in an strict constructionist manner such that only certain "magic words" could be sufficient to satisfy its requirements; 2) admitting it had no decisional authority upon which to base its opinion,[18] yet nevertheless reject all of the efforts made by Defendants to secure Windsor's unfettered rights in the Bitter Policy because Windsor supposedly failed to use those magic words; and 3) arrive at a decision that effectively negates the practices developed over the course of the last 15-20 years with respect to how unfettered title to policies can be obtained in connection with NRPF programs. In short, Windsor's malpractice allegations rely on the flawed assumption that the failure to foresee these unanticipated outcomes is a failure to possess the skill, prudence and diligence commonly used by attorneys practicing in this area of the law. This is simply not the case.

(c) *The Probable Illegality of the Bitter Policy*

As discussed earlier in this opinion, by citing the Georgia life settlement law, it is apparent the Arbitration Panel was confused about the nature of the transaction. In fact, had the Arbitration Panel applied Georgia's life settlement law to this transaction, the panel could easily have concluded that the Bitter Policy was issued illegally, and that Windsor violated the law,

---

[17] Andrew Verstein, *Bad Policy For Good Policies: Article 9's Insurance Exclusion* 17 CONN. INS. L. J. 287, 289-90 (2011).

[18] Not only is there no decisional authority in California with respect to the application of the UCC to NRPF programs and acquiring unfettered title to a life insurance policy, it appears there was no such precedent, at that time, anywhere.

12

with possible criminal repercussions, in making the Bitter Loan.[19]

In the Georgia's Life Settlements Act, § O.C.G.A. § 33-59-1 *et seq.* (the "Georgia Act"), the definition of "Life settlement contract" includes: "A written agreement for a loan or other lending transaction, secured primarily by an individual or group life insurance policy[.]"[20] Under Georgia law, only a licensed "life settlement provider" may enter into life settlement contracts.[21] Windsor had neither a license nor an acknowledgement of registration from the Georgia Commissioner when it made the Bitter Loan, which, on its face, appears to meet the definition of a "life settlement contract" under Georgia law. Accordingly, it was prudent to foresee that, as I understand Defendants did here, Windsor's loan to the Bitter trust could have been deemed to have been made illegally under the Georgia Act, and such a finding might allow the insured or his estate to have the NRPF transaction voided for violating that Act. If that were to have occurred, there would be no guarantee that the lender would even get back the premiums paid to keep the policy in force, resulting in a complete loss of the investment.

While the Arbitration Panel's application of the Default Sale Right and § 9620 was unprecedented and unforeseeable, the risk to Windsor under Georgia law was the opposite and something, as I understand it, Defendants and Windsor discussed. This known risk was due to the circumstances surrounding Windsor's original lending transaction. Defendants were not representing Windsor at that time, and there was nothing else they could have done subsequently (beyond what they did) to reduce or eliminate this specific risk.

Finally, Mr. Prusky himself might have been in legal peril under Georgia law.[22] The Georgia Act states: "It shall be unlawful for any person to: . . . Enter into a premium finance agreement with any person or agency . . . pursuant to which such person shall receive any proceeds, fees, or other consideration, directly or indirectly, from the policy or owner of the policy or any other person with respect to the premium finance agreement . . . ."[23] While the

---

[19] While there are a few exceptions, not relevant here, the general rule is that the sale of a policy in a life settlement is governed by the laws of the state where the owner resides. The Bitter trust, the Bitter trustee and Mr. Bitter himself, were all residents of Georgia, and the Bitter Policy was issued under Georgia law, so the Georgia life settlements act would be applicable. The NRPF documents were finalized long before the Defendants became involved with this matter, but the fact that California law governs the loan documents, while the laws governing the trusts and any sale of the policies are either Georgia, or the state where the other insureds resided, complicates this matter, and was a poor decision by whoever drafted those documents.

[20] O.C.G.A. § 33-59-2(11)(B)(i). There are several exemptions from this definition, none of which appear applicable to the Windsor Loans. The Bitter Loan was secured not primarily, but solely, by the Bitter Policy.

[21] O.C.G.A. § 33-59-3(a) states: "No person, wherever located, shall act as a provider or life settlement broker with an owner or multiple owners who are residents of this state without first having obtained a license or acknowledgment of registration from the Commissioner."

[22] While prosecuted under federal, rather than state, law, potential liability for STOLI-related activities is more than theoretical. *See, e.g.*, United States v. Binday, 804 F.3d 558 (2d Cir. 2015) (confirming convictions for wire and mail fraud for participation in STOLI scheme); United States v. Carpenter, 190 F. Supp. 3d 260 (D. Conn. 2016) (confirming convictions for wire and mail fraud for participation in a STOLI scheme).

[23] O.C.G.A. § 33-59-13(a)(5).

13

exact circumstances are unclear in the record, Mr. Prusky apparently accepted from Houchins, the insurance agent who sold the Bitter Policy to the Bitter trust, a payment of a portion of Houchins' commission from the issuing carrier for selling the Bitter Policy. Prusky Tr. 248:18-249:6. In addition to possibly violating Georgia insurance law,[24] the penalties for violating the Georgia Act include possible criminal liability.[25]

### 6) The Acker Policy and The Collins Policy

The disposition of the Acker Policy and the Collins Policy differs from that of the Bitter Policy inasmuch as the dispute over the Bitter Policy was arbitrated before a panel of three arbitrators by Defendants, whereas the Acker Policy and the Collins Policy were the subject of two summary judgment decisions issued by the U. S. District Court for the Northern District of California by the Honorable William H. Orrick. Windsor was, by that time, represented by counsel chosen to replace Defendants.

In his Orders Granting in Part and Denying in Part Motion for Summary Judgment, Judge Orrick effectively adopted the reasoning of the Arbitration Panel with respect to the Bitter Policy.[26] That is, he determined that a default occurred with respect to the Policies, that after default Windsor failed to exercise properly the Default Sale Right, and that Windsor similarly failed to document properly an agreement to surrender the Policies in full satisfaction of the loan obligations under Cal. Com. Code. § 9620.

Relying on Judge Orrick's decision, Windsor makes what is, in essence, another tautological assertion: specifically, it is Windsor's position that the Acker/Collins court "determined as a matter of law, that the legal advice provided by [Defendants] to Windsor regarding ownership of and entitlement to the death benefit under the [Acker/Collins Policies] by virtue of execution of the [Change Forms], and what was required for Windsor to have executed by the Trustee so that Windsor would unquestionably have unfettered ownership to the Policy . . ." was incorrect. Complaint ¶¶ 101, 126. This conclusion, however, ignores the underlying facts with respect to the Acker Policy and Collins Policy (specifically those facts that differ from those of the Bitter Policy), and that Defendants did not represent Windsor in front of Judge Orrick in these matters. Further, this argument is a classic example of a fallacy in formal logic known as the *post hoc* fallacy. The *post hoc* fallacy assumes that "since event Y followed event X, event Y must have been caused by event X." In this instance, Windsor's position is that because the

---

[24] O.C.G.A. § 33-9-36(b) states: "[n]o insurer or employee of such insurer and no broker or agent shall pay, allow, or give, or offer to pay, allow, or give, directly or indirectly as an inducement to insurance or after insurance has been effected, any rebate, discount, abatement, credit, or reduction of the premium named in a policy of insurance . . ."

[25] O.C.G.A § 33-59-16 states: "For criminal liability purposes, a person that commits a fraudulent life settlement act shall be guilty of committing insurance fraud and shall be guilty of a felony and, upon conviction, shall be punished by imprisonment for not less than two nor more than ten years, or by a fine of not more than $10,000.00, or both."

[26] Pac. Life Ins. Co. v. Gordillo, 2015 WL 5569432, (N.D. Cal. Sept. 21, 2015); John Hancock Ins. Co. (U.S.A.) v. Goss, 2015 WL 5569150 (N.D. Cal. Sept. 21, 2015).

Defendants did not obtain certain releases or invoke heretofore unknown "magic words," Windsor lost the Acker and Collins summary judgment motions. The record in this matter does not support this conclusion.

With respect to both the Acker Policy and the Collins Policy, the trustee of the respective trusts signed the Change Forms, granting unfettered ownership to Windsor before the loans were due. That is, there was no default, so the trustees could not have proffered the policies to Windsor to accept in full satisfaction of the loans under the Default Sales Right. In the NRPF area, this is characterized as a "voluntary walk away." As the name suggests, both parties to the transaction decide that they are willing to relinquish voluntarily their rights: the trust, its ownership in the policy, and the lender, repayment of the loan. The use of this mutual relinquishment of rights without the need for any formal proceedings or "magic words" has been utilized hundreds if not thousands of times in the NRPF area of practice. Prior to the Bitter arbitration, and the Acker and Collins cases, there was no reason to believe that two willing parties could not simply step away from these transactions.

In his September 2015 orders, discussed above, Judge Orrick briefly touches on the possibility of the trust surrendering the policy prior to a default, but appears to dismiss this as a viable option. Specifically, Orrick held that "any construction of the [Default Sale Right] as requiring the Trust to transfer the policy to Windsor in full satisfaction of its obligations pre-default would violate Section 9602."[27] The Default Sale Right and Section 9620, however, only apply after a default occurs (§ 9602 prohibits any waivers of a debtor's rights under the code, but this section of the UCC requires a default before the section applies to any transfer). As such, Judge Orrick's decision essentially requires a default before any transfer can take place, which would prohibit the use of the voluntary, pre-default walk away in order for a borrower to relinquish a policy to a lender. This decision runs contrary to more than 20 years of custom and practice in the NRPF industry, as well as common sense. And, of course, if this were Judge Orrick's conclusion, it would apply not only to life insurance policies, but to all assets subject to the UCC, a conclusion that would undoubtedly shock many secured lenders across the spectrum of such transactions. However, this outcome may not have been Judge Orrick's intent because he appeared to reject Windsor's pre-default argument primarily because he found that Windsor, represented by subsequent counsel, waived the argument.[28]

To the extent that Judge Orrick's Decision prohibits pre-default transfers of the Policies, Defendants could not have foreseen this result. To the extent, that Windsor waived its pre-

---

[27] Pac. Life Ins. Co., 2015 WL 5569432 at *5; John Hancock Ins. Co. (U.S.A.), 2015 WL 5569150, at *5.

[28] In his December 22, 2015 Order on the Trust's Motion for Summary Judgment, he stated "[t]he dispositive problem with Windsor's reliance on this alleged oral walk-away agreement is that Windsor did not plead it." Pac. Life Ins. Co. v. Gordillo, 2015 WL 9303986 at *5 (N.D. Cal. Dec. 22, 2015); John Hancock Ins. Co. (U.S.A.) v. Windsor Sec., LLC, 2015 WL 9303987 at *5 (N.D. Cal. Dec. 22, 2015). As Orrick explained, Windsor's crossclaim included repeated references to the "the Trust's default." Pac. Life Ins. Co., 2015 WL 9303986 at *5; John Hancock Ins. Co. (U.S.A.), 2015 WL 9303987 at *5.

15

default arguments, Defendants are in no way responsible for Windsor's legal representation in these cases. It is entirely possible, had the issue properly been pleaded before the Court, Judge Orrick would have accepted a voluntary, pre-default walkaway as means for a borrower to relinquish absolute ownership of a policy in full satisfaction of its obligations to the lender.

Reviewed through this lens, any reasonable argument that Defendants' advice fell below the requisite standard of care is rendered moot. There is no evidence in the record that either of the Acker or Collins trusts were in breach of their respective loan agreements at the time the trustee of the respective trusts voluntarily agreed to relinquish their rights to the policies. The loans were coming due; they did not want to repay the loans or have the burden of paying premiums to keep the policies in force going forward, so they simply handed the policies over in full satisfaction of their obligations, as was an established custom in the NRPF industry.

Finally, even if the default status of the Acker and Collins Policies were not relevant, my analysis above regarding the Bitter Policy would still apply to these policies (N.B. Defendants also did not send a demand letter to any of the trustees other than Bitter).

### 7) The Coppock Policy and the Stamatov Policy

As with the Acker and Collins Policies, the record shows that neither the Coppock trust nor the Stamatov trust were in default under the terms of their respective loan agreements at the time those policies were voluntarily surrendered. The trustees for these policies each signed forms necessary to surrender the policies to Windsor, with no declaration of breach (nor does there appear to be any evidence in the record to support such a declaration) by Windsor with respect to repayment of the loans for those policies.

After the decision by the Arbitration Panel in the Bitter litigation, in June of 2014, Windsor sent the so-called "spring cleaning" letters, in which Windsor sought confirmation that it had several years before obtained full and unfettered ownership as a result of the trustee's "voluntary assignment" of the policy in exchange for a full release from Windsor. Unfortunately, the Stamatov trustee and Mr. Coppock rejected these letters, apparently after they consulted with the same attorney representing the Bitter, Acker, and Collins estates. Regardless of the responses to the "spring cleaning" letters, it is entirely unclear, what, if anything, Defendants could have done, in light of the heretofore unknown requirements to use certain "magic words" under § 9620 in order to obtain unfettered ownership of the policies surrendered to satisfy the trusts' loan obligations. The unforeseeable decisions by both the Arbitration Panel and Judge Orrick created a situation in which it was, practically, impossible (short of possessing a time machine) for Windsor to "fix" the alleged deficiencies in its efforts to obtain unfettered title to the policies. It is, in fact, this impossibility of "curing" these deficiencies that makes it clear that the Defendants could not have anticipated that either the Arbitration Panel or Judge Orrick would impose these new, and unworkable constraints on taking possession of Policies used as collateral in NRPF loan transactions. Windsor's only recourse at this point would have been to foreclose on the policies, something, for whatever reason, it chose not to do.

16

Finally, as with the Acker and Collins Policies, if the default status of the Stamatov and Coppock Policies were not relevant, my analysis above regarding the Bitter Policy would still apply to these policies (as noted above, no demand letter was sent to any of the trustees other than Bitter).

### 8) Conclusion

Defendants' representation of Windsor in no way departed from the standards of skill, prudence and diligence expected of an attorney practicing in these areas at that time. To the contrary, Defendants' actions were consistent with the standard of care and consistent with how hundreds of similar cases had been handled, and would have resulted in Windsor securing ownership of the Policies, but for the above-referenced unprecedented and unforeseeable decisions.

### E. Witness Compensation

I am being compensated for my study and testimony at the hourly billing rate of $525.00 per hour.

### F. Cases in Which Expert Testimony was Given Within the Last Four Years

In the last four years I have been engaged as an expert witness in the following matter:

RPH Holdings Group, et al v. Kirkland and Ellis, LLP, District Court, Denver County, Colorado, Case No. 2014-CV-31937, on behalf of the defendant.

### G. Documents Reviewed in Connection with Opinion

In connection with forming my opinions as expressed herein, I reviewed the documents listed on Appendix A, attached hereto.

*James W. Maxson*
James W. Maxson, Esq.
Date: 4-4-18

17

## APPENDIX A

1. The Complaint and exhibits in this action
2. Defendants' Answer and Counterclaims in this action
3. Affidavit of Eugene Houchins III, dated March 22, 2017 in this action
4. Joseph Wood Expert Statement for Mediation in this action (April 6, 2017)
5. Transcript of April 5, 2017 David Fox deposition in this action
6. Transcript of October 4, 2017 Darin Judd deposition and errata sheet in this action
7. Transcript of March 7, 2017 Jule Rousseau deposition and errata sheet in this action
8. Transcript of March 6, 2017 Steven Prusky deposition and errata sheet in this action
9. Transcript of October 4, 2017 Steven Prusky deposition and errata sheet in this action
10. Windsor's Responses to Defendants' First Set of Interrogatories in this action, dated July 11, 2016
11. Pacer docket sheets for Bitter litigations in N.D. Cal (13-cv-05022; 13-cv-1878)
12. Produced documents AF0008861-AF0008868, PLAINTIFF 002907-002922, PLAINTIFF 002730-31, PLAINTIFF 002727, PLAINTIFF 003065, PLAINTIFF 002965-69, JUDD 165175-16576
13. Demand for Arbitration, dated May 7, 2013, in Bitter AAA Arbitration (Case No. 74-148-000296-13-S1M, hereinafter, the "Bitter Arbitration")
14. Plaintiff's Opening Brief in Bitter Arbitration, dated December 20, 2013
15. Windsor's Trial Brief in Bitter Arbitration, dated December 20, 2013
16. Windsor's Answering Statement to Demand for Arbitration in Bitter Arbitration, dated June 13, 2013
17. Transcript of January 13, 2014 Hearing Proceedings in Bitter Arbitration
18. Transcript of January 14, 2014 Hearing Proceedings in Bitter Arbitration
19. Transcript of January 15, 2014 Hearing Proceedings in Bitter Arbitration
20. Windsor's Post-Trial Brief in Bitter Arbitration, dated February 18, 2014
21. Plaintiff's Post-Arbitration Brief in Bitter Arbitration, dated February 18, 2014
22. Windsor Reply to Post-Arbitration Brief in Bitter Arbitration, dated February 25, 2014
23. Plaintiff's Post-Arbitration Reply Brief in Bitter Arbitration, dated February 25, 2014
24. Windsor's Motion for Reconsideration of Interim Award in Bitter Arbitration, dated May 19, 2014
25. Plaintiff's Opposition to Motion for Reconsideration in Bitter Arbitration, dated June 2, 2014
26. Arbitration Order Denying Windsor's Motion for Reconsideration, dated June 3, 2014
27. Order Denying Motion to Dismiss and Motion for Judgment on the Pleadings, dated August 15, 2013, in the Bitter litigation in N.D. Cal. (13-cv-01878) (D.I. 53)
28. Pacer docket sheet for Acker litigation in N.D. Cal. (14-cv-4651)
29. Mindy Goss's Answer and Cross Claim in Acker litigation, dated November 7, 2014 (D.I. 9)
30. Windsor's Answer and Cross Claim in Acker litigation, dated January 23, 2015 (D.I. 18)
31. Windsor's Summary Judgment Papers in Acker litigation, dated July 8, 2015 (D.I. 30)
32. Memorandum in Opposition to Windsor's Summary Judgment motion in Acker litigation, dated July 29, 2015 (D.I. 37)
33. Declaration of Ronald Mark Goss in Acker litigation, dated July 27, 2015 (D.I. 38)
34. Declaration of Mindy Goss in Acker litigation, dated July 27, 2015 (D.I. 39)
35. Declaration of James H. Sinnott in Acker litigation, dated July 29, 2015 (D.I. 40)

36. Declaration of Joseph Wood in Acker litigation in Acker litigation, dated July 27, 2015 (D.I. 41)
37. Reply in Support of Windsor's Motion for Summary Judgment in Acker litigation, dated August 5, 2015 (D.I. 45)
38. Declaration of Ronald Mark Goss in Acker litigation, dated August 24, 2015 (D.I. 51)
39. Declaration of Mindy Goss in Acker litigation, dated August 24, 2015 (D.I. 52)
40. Windsor's Surreply Memorandum of Points and Authorities in Acker litigation, dated August 25, 2015 (D.I. 55)
41. Surreply Memorandum of the Acker Trust in Opposition to Summary Judgment Motion in Acker litigation, dated September 16, 2015 (D.I. 66)
42. Summary Judgment Order in Acker litigation, dated September 21, 2015 (D.I. 68)
43. Motion for Summary Judgment in Acker litigation, dated October 27, 2015 (D.I. 75)
44. Declaration of Eugene Houchins in Acker litigation, dated October 27, 2015 (D.I. 77)
45. Declaration of Joseph Wood in Acker litigation, dated October 27, 2015 (D.I. 78)
46. Decl. of Ronald Mark Goss in Acker litigation, dated October 27, 2015 (D.I. 80)
47. Declaration of Steven Prusky in Opposition to Motion for Summary Judgment in Acker litigation, dated November 10, 2015 (D.I. 81)
48. Declaration of Darin Judd in Opposition to Motion for Summary Judgment in Acker litigation, dated November 10, 2015 (D.I. 82)
49. Windsor's Memorandum of Points and Authorities in Opposition to Motion for Summary Judgment in Acker litigation, dated November 12, 2015 (D.I. 85)
50. Supplemental Declaration of Eugene Houchins in Support of Motion for Summary Judgment in Acker litigation, dated November 17, 2015 (D.I. 91)
51. Reply Memorandum in Support of Motion for Summary Judgment in Acker litigation, dated November 17, 2015 (D.I. 93)
52. Summary Judgment Order in Acker litigation, dated December 22, 2015 (D.I. 95)
53. Windsor's JAMS Mediation Statement (ANTONINO 083440-083460)
54. Pacer docket sheets for Collins litigation in N.D. Cal (14-cv-03713)
55. Summary Judgment Order in Collins (14-cv-03713), dated September 21, 2015 (D.I. 50)
56. Summary Judgment Decision in Collins (14-cv-03713), dated December 22, 2015 (D.I. 70)
57. Pacer docket sheet for Coppock litigation in N.D. Cal. (15-cv-00075)
58. Pacer docket sheet for Stamatov litigation in N.D. Cal. (15-cv-00080)