# EXHIBIT "29"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WINDSOR SECURITIES, LLC,

Plaintiff,

-against-

ARENT FOX, LLP and JULIUS
ROUSSEAU, III,

Defendants.

Case No.  16-cv-01533 (GBD) (GWG)

---

## REBUTTAL EXPERT REPORT OF JAMES W. MAXSON

### A. Introduction

I have reviewed the Expert Report of James H. Sinnott ("Sinnott" and the "Report") and the Expert Witness Statement of Joseph Wood ("Wood" and the "Statement") submitted in support of Windsor Securities, LLC's ("Windsor") action against Arent Fox, LLP ("Arent Fox") and Julius Rousseau ("Rousseau" and, collectively, with Arent Fox, the "Defendants"). As set forth below, I disagree with several assertions and claims made in the Report and the Statement.

While covering many of the same issues, the Report and Statement both make assertions in support of Windsor's action that are distinct. Hence, I first address the basis for my disagreement with the claims made in the Report; I then set forth my analysis and conclusions as to why assertions made in the Statement are incorrect; and, finally, I address erroneous conclusions common to both the Report and the Statement.

### B. Inaccuracies and Inconsistences Contained in the Report

#### 1. Applicability of the U.C.C. to Transactions Involving Life Insurance

The fact that the State of California applies its version of the Uniform Commercial Code (the U.C.C.) to secured transactions involving life insurance is not in dispute in this matter. California is, however, only one of two states that does so (Louisiana is the other).[1] Thus, to the extent the Report's numerous references to the applicability of the U.C.C.[2] in any state outside of

---

[1] Andrew Verstein, *Bad Policy For Good Policies: Article 9's Insurance Exclusion*, 17 CONN. INS. L. J. 287, 289-90, n.7 (2011).

[2] For instance, the Report notes, "§ 9-620 of the Georgia version of the Uniform Commercial Code . . . is in all relevant particulars identical to California Commercial Code § 9620." Report at 7 n.1. And, that, in many states, life insurance premium finance agreements "are . . . interpreted and implemented in the context of the Uniform Commercial Code." Report at 10.  Given that the U.C.C. does not apply to life insurance policies in 48 of the 50

those two states are an attempt to persuade the Court that it is standard or common in this area of practice to interpret a "default sale right" provision in the context of the U.C.C., that assertion is simply wrong. Further, to the extent the Report is referring only to transactions governed by California law, the assertion that practitioners in the industry knew to interpret the "default sale right" provision under the U.C.C. is unsupported by any precedent or legal authority – inside or outside of California – prior to the Bitter arbitration decision, and the summary judgment decisions in Acker and Collins. The Report essentially creates an alternate version of history, in which, despite the absence of any precedent, and the fact that the U.C.C. applies to life insurance in only two states, there was a commonly accepted practice founded in the provisions of the U.C.C. that all practitioners in this space knew to follow. There is simply no support for this alternate history because there was no authority anywhere, at the time, that the actions taken by the Defendants did not comply with the U.C.C. (and, further, there was no authority that the only way to comply with the U.C.C. was to proceed as directed by the Bitter arbitration decision and Acker and Collins decisions).

    2.   There is No Sole Method to Acquire Unfettered Ownership of a Life Insurance Policy

        a.   The Report's Numerous Assertions of What is "Understood in the Industry" are Unsupported.

In the Report, the phrase "it is understood in the industry," is used repeatedly followed by inflexible and absolute declarations as to how practitioners in this area must approach certain situations, or else, the Report asserts, the practitioners are incontrovertibly failing to satisfy their obligations as attorneys. For example, the Report asserts the following:

> It is understood in the industry that in order to exercise the 'Default Sale Right' or similar provision . . . the lender and borrower, following a borrower's default on the loan and the lender's assumption of ownership and beneficiary status . . . must enter into an express agreement, either written or oral but authenticated in writing, under which the borrower, in return for the lender's express agreement to relieve the borrower from any continuing obligation on the loan, agrees to relieve the lender from its obligation[s] . . . . Report at 16 (emphasis in original).

> It is further understood in the industry that any such agreement must involve an express offer by one party and an express acceptance of that offer by the other. Report at 17 (emphasis in original).

---

states, the following statements in the Report are not only wrong but, as applicable to life insurance policies, are affirmatively misleading: "[p]rotection of this right of the borrower . . . is so important that the Uniform Commercial Code has not only clarified and supplemented the language of a typical 'Default Sale Right' provision by statute (see, e.g., California Commercial Code § 9-620; Ga. Code Ann. § 11-9-620), but has also rendered a nullity any attempt by the parties to waive, vary, or otherwise avoid the rights created by that statute through agreement." Report at 18 (emphasis in original).

> It is further understood in the industry that exercise of the 'Default Sale Right' . . .
> provides the sole mechanism whereby a lender can avoid its ongoing obligations,
> following a borrower's default on the loan and the lender's assumption of
> ownership and beneficiary status . . . . Report at 17 (emphasis in original).

> To put this another way, it is understood in the industry that unless the parties
> clearly exercise the 'Default Sale Right,' the borrower cannot be deemed,
> following default and transfer of ownership and beneficiary status to the lender, to
> have given up its right to collect from the lender . . . [its residual rights to the
> benefits of the policy]. Report at 18 (emphasis in original).

Sinnott claims his opinions in the Report, including the assertions above, are based on the
"hundreds of life insurance premium financing agreements and other secured transaction
agreements" that he has prepared, reviewed, and explained to clients (Report at 5) and that he has
been specifically hired in the past because of his expertise "in the proper and improper
methodologies used by premium finance company to secure ownership of the policies after
default under the non-recourse loans." Report at 3.[3]  By referencing his extensive experience in
this field, Sinnott implies that in every single situation involving non-recourse premium
financing he has always operated under the "industry understanding" that the turnover of the
collateral alone was insufficient to constitute full satisfaction of the loan and transfer of
ownership of the policy to the lender.

Accepting Sinnott's experience as represented, he was involved in the financing and/or
review of hundreds or even thousands of policies associated with non-recourse premium finance
programs. Despite this purported significant experience, it is telling that Sinnott provides no
support for his assertions, either from his own experience or from any case law or secondary
sources for what was apparently universally "understood in the industry" in this area, let alone
that he has always advised clients in a manner consistent with this understanding. That is,
nowhere in the Report does Sinnott reference even one specific situation in which he, or any
other attorney in the field, had ever advised a client to utilize this "sole mechanism" whereby a
lender can obtain full ownership of the life insurance policy following a borrower's default, as he
suggests in the above excerpts. Report at 17. The fact is that despite all of his claimed
experience, and the hundreds or thousands of transactions in which he was involved, Sinnott has
not alleged, much less demonstrated, that in every case he followed the practice he says must be
followed of expressly stating to the borrower, in taking back the collateral (whether pre-default
or post default), that it (the change of ownership and beneficiary) is in full satisfaction of the
loan. Sinnott also fails to explain what happens when a trustee wants to relinquish an insurance
policy prior to default under the financing agreement. He simply assumes, without any
explanation, that all of the relevant trusts were in default at the time, even though the trustees for
Acker, Collins, Coppock, and Stamatov executed change forms prior to the loans coming due.

---

[3] Sinnott also notes that he was a member of a practice, at what is now Locke Lord, LLP, which, by his estimate,
"represented approximately half of all such 'non-recourse' and 'limited recourse life insurance premium finance
programs during this period [approximately 2005]." Report at 2.

More practically, taken at face value, the positions advocated in the Report would make it more difficult, if not impossible, for non-recourse premium finance parties to walk away and voluntarily relinquish all rights in a policy (regardless of default), without a more formal process. That is, if the trustee of the trust that owns the policy is willing to sign a change of ownership and beneficiary form, but nothing else,[4] according to the argument set forth in the Report, this would be insufficient for the trust to surrender fully, and the lender to acquire fully, unfettered ownership rights in the policy, and the lender would be forced to engage in a more formal process. This is inconsistent with the reality of the practice in this space. In the heyday of non-recourse premium finance programs, there were thousands of outstanding loans with scores coming due each month. The argument made in the Report that the sole method available to lenders to obtain unfettered ownership of these policies is through an express agreement or strict foreclose process under the U.C.C. is illogical from both a practical and legal perspective, even under California law.

Reviewing case law and secondary sources, I could find no reference to an absolute and inflexible obligation that there must be an express agreement between lender and borrower to relinquish and accept the policy, lest the trust retain a residual interest in perpetuity to the policy or its proceeds. Logically, if this was the "sole mechanism" for a lender to take absolute ownership of a policy it would be enshrined as an immutable law, and references to it would appear in case law and secondary sources.

### b. "Walk Aways" and Other Forms of Informal Voluntary Surrender Were Common in the Industry

On the other hand, the concept of a "walk away" from non-recourse premium finance programs, or the "surrender" of policies by borrowers to lenders in full satisfaction of their debts, without the need for express agreements or more formal proceedings was well known and frequently utilized at the time the Windsor loans were made and came due.[5]

---

[4] This situation was not uncommon. As with the trustees selected by Eugene Houchins, III, many of the individuals selected as trustees of the trusts which entered into these finance agreements were completely unqualified to be a fiduciary, and had no idea what if meant to be one. *See, e.g., Dukes Bridge, LLC v. Beinhocker,* No. 10-10877-DPW, 2012 WL 4324919, at *8 (D. Mass. Sept. 19, 2012) ("[the trustee's] deposition is replete with examples of his willful ignorance of his duties as trustee of the [trust]"), *rev'd on other grounds,* 856 F.3d 186 (1st Cir. 2017). Trustees sometimes were unwilling to sign anything they believed might create the possibility of liability to the grantor or the beneficiary of the trust. Hence, it was sometimes possible to get the trustee to sign change of ownership and beneficiary forms, but nothing else.

[5] Windsor's own expert witness, retained in connection with the Acker litigation, also opined as to the well-known practice of the "walk away," stating "[t]he exercise of provisions of the type set forth in the DSR is often referred to in the premium finance industry as a relinquishment or mutual 'walk away.' A 'walk away' is an arrangement under which a lender and the borrower agree that the borrower will transfer 100% of all interests in the collateral to the lender in lieu of making any further payments on the loan, and the lender agrees to accept the collateral in full satisfaction of the borrower's financial obligations." Declaration of Karen H. Canoff in Support of Windsor Securities, LLC's Motion for Summary Judgment, *John Hancock Life Insurance. Co. v. Goss,* No. 3:14-cv-04651, ECF No. 30-3 ("Canoff Declaration") at 10, ¶ 21.

4

As the name suggests, a "walk away" is just that – borrowers decide they no longer want the policy "and they can simply 'walk away' at the end of the loan term with the lender accepting the policy as full payment of the outstanding principal, interest, fees and all other charges." Leimberg, et al., LIFE SETTLEMENT PLANNING, at 231 (1st ed. 2008);[6] *see also* Stephan R. Leimberg, *Stranger Originated Life Insurance (STOLI): What Counsel (And What Every Advisor) Must Absolutely Positively Know!*, SP037 ALI-ABA 573, 577-78 (Feb. 19-21, 2009) ("The owner can 'walk away' from the arrangement and the lender will accept the policy as the only payment for the loan — no matter how much the total of the premium loans plus interest and other charges exceed the cash value of the policy."); R. Marshall Jones, Stephan R. Leimberg, Lawrence J. Rybka, *"Free" Life Insurance: Risks and Costs of Non-Recourse Premium Financing*, SMO22 ALI-ABA 727, 730 (Sept. 2006) ("If, as expected, the insured chooses not to retain the coverage after two years, he or she can purportedly 'walk away from the loan at no cost' and perhaps enjoy a profit."); Robert S. Blonik, *Premium Financed Surprises: Cancellation of Indebtedness Income and Financed Life Insurance*, 63 TAX LAW 283, 284 (Spring 2010) ("If for any reason the insured decided to walk away from the policy, the insured could not be held liable by the lender for the loan balance."); J. Allen Jensen, Stephan R. Leimberg, *Stranger-Owned Life Insurance: A Point/Counterpoint Discussion*, 33 ACTEC J. 110, 116 (Fall 2007) ("If the insured or the insured's trust decides to turn over the policy to the lender and 'walk away from the non-recourse loan . . . .'").

Instead of the term "walk away," courts and secondary sources have also discussed this option in terms of a "surrender" or similar language. *See, e.g.*, Maria Fleischer, *Stranger Originated Life Insurance: Finding a Modern Cure for an Age-Old Problem*, 41 CUMB. L. REV. 569, 586 (2010-2011) ("The policyholder's final option is simply to turn over his policy to the lender in satisfaction of his debt. This will relieve him of his obligations to the lender, and the lender will either sell the policy into the secondary market or hold it until the insured dies."); *Dukes Bridge LLC*, 2012 WL 4324919 at *1 ("If the insured survives [the two-year contestability period on the policy], the owner (the life insurance trustee) typically has two options, in addition to the sale of the policies to investors: (1) have the insured pay the outstanding debt with accrued interest and retain the policy; or (2) transfer the policy to the lender in lieu of foreclosure."), *rev'd on other grounds*, 856 F.3d 186 (1st Cir. 2017); *Lincoln Nat'l Life Ins. Co. v. Fishman Irrevocable Life Tr.*, 638 F. Supp. 2d 1170, 1172 (C.D. Cal. 2009) ("borrowers also had the option to sell the policies in question upon the loan's maturity, or surrender their policies to [lender] in full satisfaction of their debts."); Robert S. Blonik, *Catalysts for Clarification: Modern Twists on the Insurable Interest Requirement for Life Insurance*, 17 CONN. INS. L.J. 55, 81 (2010) ("The insured can surrender the policy to the lender in satisfaction of the loan."); *Ellias v. Phoenix Life Ins. Co.*, 501 F. App'x. 478, 481 (6th Cir. 2012) ("if [lender] forecloses on

[6] Brian Casey, who Sinnott notes recruited him to join the Atlanta office of what is now Locke Lord, LLP, was one of the authors of this book, and almost certainly the author of this particular section which deals with the tax consequences of borrowers surrendering policies to lenders in exchange for an extinguishment of the indebtedness. As Sinnott correctly states, Casey was well known as being deeply involved in the non-recourse life insurance premium financing industry.

5

the policy or if [the trust] decides to relinquish the policy in satisfaction of the Note and Security Agreement . . . .").

From my own experience practicing in this space, I have, on many occasions, reviewed for possible purchase policies originated out of non-recourse premium finance programs. In some instances, these packages contained documents with some form of express acknowledgement on the part of the trustee of the trust that owned the policy that the relinquishment of the policy was in full satisfaction of the trust's debt to the lender, but in many instances there was no such documentation, only the financing agreement and an absolute change of ownership and beneficiary (or similar change form) signed by the trustee of the trust as owner of the policy. The fact that there were no separate documents containing an express offer from the lender to forgive the debt in return for the policy, or from the trustee accepting the lender's offer, was not a red flag regardless of whether the governing law was California or another state (and even today, absent the Bitter arbitration decision and the Acker and Collins summary judgment orders, it would not be a red flag). I am also aware of other attorneys with whom I have practiced adhering to the same or similar practices.

Absent the existence of the underlying disputes and summary judgment orders, if a client engaged me to review the Acker, Collins, Stamatov, and Coppock policies today for possible purchase, and assuming all facts were the same as they were at the time the Defendants represented Windsor, these policies would not, based on my years of experience reviewing such policies and knowing what is generally acceptable to investors in the industry, raise any red flags with respect to whether ownership of the policies transferred to the lender with no reservation of rights by the borrower-trusts. Because there was a declared default with respect to the Bitter policy, I would want additional information, but the record presented in this case would satisfy me that either the Bitter trustee had validly walked away from the policy, or that Windsor had properly accepted the trust's exercise of the default sale right.[7]

Despite the Report's claims to the contrary, there is no overarching regulatory regime which governs how absolute ownership of a life insurance policy can be obtained – there is simply not a sole, unvarying mechanism that must be followed to undertake a "walk away," any more than that there is such a "sole mechanism" to exercise a default sale right. Each situation has to be addressed in relation to its specific facts and the underlying financing agreement. Hence, the Report's claims with respect to there being a "sole mechanism" for a lender to avoid ongoing obligations to a borrower trust, absent a formal foreclosure process, simply do not stand up to scrutiny. The implication of the terms "walk away," "surrender" and relinquishment are self-explanatory — the borrower can give up the policy to the lender, without any formal process or express offer and acceptance.[8] Practically, this means the borrower no longer has any

---

[7] While I would now be obligated to call the client's attention to the existence of the underlying decisions in this matter, I would not insist that the client proceed according to those decisions for any case not governed by California law because I believe these decisions are such outliers.

[8] The typical premium financing agreement contains multiple provisions addressing what happens in the event of a default, hence, the reason to include specific default sale rights. Because parties to a contract are normally free to waive or surrender their rights thereunder, and because prior to the Bitter arbitration decision and the summary judgment orders in the Acker and Collins cases there was no reason to question whether a willing borrower-trust

Case 1:16-cv-01533-GBD-GWG   Document 125-32   Filed 08/23/18   Page 8 of 16

obligation to pay the lender the debt, and the lender has no obligation to pay the borrower any portion of the sale proceeds or benefits from the policy. Leimberg, et al., LIFE SETTLEMENT PLANNING at 231; Blonik, *Premium Financed Surprises* at 284. While lenders can, and certainly in some cases did, depending upon the circumstances of the specific situation, obtain additional documentation from borrowers in connection with the surrender of policies in exchange for releasing the borrower from the debt, there was no precedent supporting the position this was mandatory under the laws of any state prior to the decision in the Bitter arbitration and the Collins and Acker summary judgment orders, and there is still little to no support for this argument in secondary sources.

### 3. It is Counsel's Obligation to Make it Easier for Lenders to Obtain Ownership of Policies, Not More Difficult

In the Report, Sinnott states that he represented at least a dozen lenders in the premium finance space, and that he "personally designed, drafted, revised and/or administered numerous such programs during [his] tenure at Lord Bissell . . . ." Report at 2. This is consistent with my own practice in which I represented almost exclusively lenders or investors considering the purchase of policies that had been premium financed. As part of my practice, however, it was my job to remove impediments to my clients obtaining unfettered ownership to the policies they financed, not to make it more difficult. In the Report, Sinnott appears to take a different position stating that,

> [p]redictably . . . lenders have sought (incorrectly) to argue that the titles of [documents used to change life insurance policy ownership and beneficiary rights] necessarily suggest an intention by the borrower, in executing the documents, to waive the borrower's continuing rights to any portion of the proceeds of sale or proceeds of the death benefit remaining after the lender has been paid what it is owed. In the understanding of the industry, inclusion of the 'Default Sale Right' provision in life insurance premium financing agreements, taken together with the rigorous statutory criteria[9] for exercise of the 'Default Sale Right' is intended to

could simply walk away from an agreement and surrender the policy in full satisfaction of the debt, the typical premium finance agreement does not contain a provision entitled "walk away" setting out a specific procedure therefor. Even in light of the Bitter decision and the Acker and Collins summary judgment orders, however, it is unlikely that premium finance agreements will be amended to specifically contemplate a right that is inherent in the freedom to contract.

[9] The only statutory scheme cited by Sinnott is the U.C.C. Touting his expertise, Sinnott makes a point of noting that "Georgia became the jurisdiction of choice to domicile [premium finance] programs and our practice, by my estimate, represented approximately half of all such 'non-recourse' and 'limited recourse' life insurance premium finance programs . . . ." Report at 2. Half of these programs were not domiciled in California or Louisiana, so the Report's claim it was "in the understanding of the industry" that "rigorous statutory criteria" restricted exercise of default sale provisions is confounding. In fact, if the statements in the Report were accurate, and it was well known that in the two states that apply the U.C.C. to life insurance policies strict requirements for exercising a default sale right had to be met, it is unlikely any lawyer would ever permit a client to have premium financing documents governed by California law. However, the answer to this seeming conundrum is simple – as explained above – it was not well known in the industry that strict statutory requirements apply to exercise of a default sale right, because outside of California and Louisiana there are no requirements under the U.C.C. that apply to the exercise of a default sale right as related to a life insurance policy. And, even in California and Louisiana, there was no precedent that

negate, and effectively does negate, any such argument by a lender. In short, in the understanding of the industry the titles of the documents the trust is forced to execute following default imply nothing about whether the 'Default Sale Right' has or has not been exercised.

Report at 19 (emphasis in original).

The documents used to change ownership and beneficiary of a life insurance policy, generically referred to in the industry as "change forms," frequently have titles such as "Absolute Assignment of Ownership," "Transfer of Ownership," "Authorization to Change Ownership," and similar indications of an absolute and irrevocable transfer of all ownership rights in the policy. In fact, contrary to the argument in the Report, that is exactly what counsel for lenders intend and expect: for borrowers to understand that the words used in the titles of these documents mean what those words always mean – i.e., an absolute transfer of all ownership rights in the policies, with no reservation of rights by the borrower.[10]

Similarly, the Report also makes the assertion that the U.C.C. has "rendered a nullity any attempt by the parties to waive, vary, or otherwise avoid the rights created by that statute through agreement." Report at 18 (emphasis in original). This contention is, however, difficult to square with the reality of practice in this area. A significant amount of time, energy and resources are put into drafting the financing agreements used in these transactions, and almost universally those documents are drafted by counsel for the lender. As counsel for lenders, it is our obligation to ensure our clients can secure their rights in the collateral in as easy and efficient a manner as possible. In the Report, Sinnott acknowledges that the 19 separate documents comprising the financing package used by Windsor are fairly standard for this type of transaction. Hence, to the extent the Report takes the position that counsel for lenders are (now or at the pertinent times involved with the Windsor loans) more concerned about the rights of borrowers than lenders – and therefore drafted financing agreements to advantage borrowers by making it harder for lenders to obtain unfettered ownership of policies by requiring extra steps to take ownership of a policy[11] – it is not only an absurd argument, but one that appears to be adverse to the best interests of the very clients Sinnott and I are engaged to represent.

---

would have revealed to counsel, regardless of how diligent or how much research that counsel undertook, that California law would be construed as it was by the panel in the Bitter arbitration, and subsequently by Judge Orrick when he essentially adopted the decision from the Bitter arbitration when deciding the summary judgment motions in the Acker and Collins cases.

[10] As Windsor's expert in the Acker Litigation correctly opined, change forms are "not the form that would be used by a secured creditor to notify the insurer of the creditor's rights in collateral. John Hancock, like all life insurance companies, uses a different form of collateral assignment for purposes of enabling a lender to record its security interest in a policy that is subject of a loan. Conversely, the Change of Ownership is used for the purpose of effecting an 'absolute' transfer of ownership . . . ." Canoff Declaration at 11, ¶ 23.

[11] Or take similar steps, such as failing to include the most favorable provisions possible for lenders because they would be rendered a "nullity" or choosing to incorporate stricter requirements than required by law to exercise a default sale right.

8

4. The Report Ignores Key Deposition Testimony from David Fox

The only actual support offered in the Report for the multiple references to what was "understood in the industry" to be the "sole mechanism" for a lender to avoid ongoing obligations to a borrower trust is a letter sent by a former colleague of Rousseau's, David Fox.[12] The Report states that the "standard practices" set forth therein are "exemplified in the letter sent by attorney David Fox (an associate of Mr. Rousseau) . . . . In the letter, Mr. Fox proposes to the trust that Windsor as the lender 'retain the collateral in full satisfaction of the debt' stating that if the trust accepts, the lender would no longer have claims against it." Report at 19. Sinnott then concludes that "Mr. Fox's letter conforms to industry standards relating to foreclosure of collateral insurance policies in the premium finance industry." Report at 20.

At his deposition, however, Fox's testimony directly contradicts the assertions in the Report that there is a "sole mechanism" for a lender to gain unfettered ownership to a life insurance policy used as collateral for a loan. Specifically, Fox testified:

> Q. Was there ever a time, after August of '09 where you believe that Windsor could have obtained ownership to the collateralized life insurance policies without relinquishing, overtly relinquishing, any and all claims that Windsor had against the borrower and/or trustee with respect to each such policy?
>
> A. Sure.
>
> Q. When was that, please?
>
> A. I mean, at any time somebody could have said 'Here, I'll sell you my policy' and, you know, it's like selling a house: You don't have to have anything other than a deed to convey the house.
>
> Q. And who would have had to have sold the policy under these conditions? Would it have been the trustee?
>
> A. Either the borrower or a trustee or the beneficiaries, or all of them, could have said 'Here, I don't want this any more, take it back.'"

Fox Tr. 89:22–90:17.

Fox's testimony regarding how to advise a lender to obtain ownership of a policy in connection with a non-recourse premium finance loan establishes that an attorney must proceed

---

[12] In connection with forming my opinions as expressed herein, I reviewed one additional document from the materials listed on Appendix A to my initial report, which was the above-referenced letter to the Marcia G. Garcia Family Trust. Rousseau Deposition Exhibit 35 (PLAINTIFF 028708-028713). In addition, one document was erroneously left off of Appendix A: Produced Document JUDD 090975-090980.

on a case-by-case basis after looking at the totality of the circumstances. There is simply nothing in Fox's testimony that supports the Report's erroneous assertion that there is one, and only one, way to obtain unfettered ownership of a life insurance policy other than to initiate a formal foreclosure on the policy.

### 5. The Report's Conclusions are Ultimately Unsupported by any Objective Legal Authority or Facts.

The proclamations made in the Report as to what was "understood in the industry" with respect to obtaining ownership of a life insurance policy pledged as collateral for a loan lack any basis or support other than Sinnott's own purported expertise.[13] The only statutory support cited in the Report is inapplicable in 48 of the 50 states, and, thus, is a highly questionable basis for asserting that it creates an industry standard, even within California (where there was no legal precedent upon which to base any legal analysis for how to proceed under the U.C.C. at the time the Defendants represented Windsor). The Report cites no case law or secondary support for the proposition that there is a "sole mechanism" permitting lenders to exercise their right to obtain absolute ownership of a life insurance policy. And, finally, the only evidence cited in the Report – the Garcia letter – is severely undercut by the deposition testimony of David Fox, the author of the letter.

### C. Issues with the Statement

#### 1. It is Unclear that Wood's Experience Qualifies him as an Expert in Non-Recourse Premium Finance Programs

In the Statement, Wood sets forth a section on his "Relevant Experience." In sum, that experience appears to consist of having been an active commercial litigator for 35 years. Other than the transactions that form the basis for Windsor's action in this matter, Wood cites no other experience with life settlements, life insurance, secured lending or non-recourse premium finance programs. Statement at 52-53, ¶ 4. Hence, while Wood may be a competent litigator, any credence given to his assertions in the Statement with respect to practices associated with non-recourse premium finance programs must acknowledge his lack of experience in this area of practice.

#### 2. The Statement Includes Numerous Speculative and Inaccurate Assertions

Wood has styled his submission in this matter as an "Expert Witness Statement," rather than as a "Report" or "Opinion," and this is an accurate characterization of his submission. Pages 2-19 of the Statement are no more than a recitation of the documents comprising the financing packages and selective provisions therein, as well as the pertinent provisions of the

---

[13] As noted above, notwithstanding his stated experience in the non-recourse premium financing space, Sinnott fails to cite a single instance in which he, or any other attorney, actually gave advice with respect to the fact that there was a "sole mechanism" for obtaining unfettered ownership of a policy.

California Commercial Code. Pages 20-30 provide a speculative[14] and inaccurate[15] recounting of the underlying facts. Practically speaking, the one element of which the Statement is devoid is any actual analysis of the underlying facts and the applicable law. The only "analysis" in the Statement is a series of tendentious assertions to the effect that Rousseau "appears to have incorrectly believed," Georgia law applied, or "entirely failed" to perfect Windsor's interests in the subject life insurance policies. Statement at 30-31, ¶¶ 53-55.

Notwithstanding the inaccurate facts and lack of meaningful analysis, the issue of greatest concern with respect to the Statement is that Wood fails to acknowledge the Defendants' representation of Windsor was terminated before most of the events discussed in the Statement, for which Wood faults the Defendants.[16] For example, Wood cites the following in support of his belief the Defendants committed malpractice with respect to the Acker and Collins matters: "The court also rejected Windsor's attempt to avoid summary judgment by having claimed, on the basis of what the court called 'a hodgepodge of highly attenuated evidence of . . . [an] alleged oral walk-away agreement . . . .'" Statement at 28, ¶ 45. And, that the "dispositive problem with Windsor's reliance on this alleged oral walk away agreement is that Windsor did not plead it." *Id.* While these are accurate recitations of the court's holdings, Wood wholly fails to address the fact that the Defendants did not represent Windsor in these matters and cannot be held responsible for the actions of subsequent counsel. Blame is similarly laid at the feet of Defendants for the outcomes with respect to the Coppock and Stamatov settlements, which, again took place through counsel other than Defendants.

## D. Both the Report and the Statement Make Incorrect Assumptions as to Whether there were Defaults Under the Acker, Collins, Stamatov, or Coppock Financing Agreements

Both the Report and the Statement appear to be working under the assumption that the trustees for the Acker, Collins, Stamatov, and Coppock trusts anticipatorily breached their obligations by supposedly informing the broker Houchins that they did not intend to repay the loans. However, there is nothing in the record I have seen that establishes such incontrovertible (and incurable) anticipatory breaches. Instead, it is my understanding that the parties in each of

---

[14] For instance, the Statement, with no factual basis, gives insight into the thoughts of the trustees when they took certain actions, Statement at 20, ¶ 21 ("In each case, the trustee of the Trust took that action in the belief that he or she was required to do so . . . "); *id.* at 23, ¶ 26 ("Had Windsor offered . . . to relieve each Trust of any further liability on its loan . . . each Trust would almost certainly have accepted that offer").

[15] For instance, as discussed in detail below, Wood asserts the "Collins Trust, the Acker Trust, the Coppock Trust, and the Stamatov Trust each fell in default by committing an anticipatory breach . . . .") Statement at 20, ¶ 20. While this may have eventually been Wood's view, it is my understanding that this view was never advocated by the Defendants. Further, certain statements such as "[r]elying on Mr. Rousseau's advice, or the lack thereof: (a) Windsor did not seek to obtain settlements in regard to either the Collins Policy the Acker Policy . . . " are demonstrably false. Statement at 33, ¶ 60. Wood was the attorney representing all of the trusts in the underlying disputes, and it is my understanding that he was personally involved in the Defendants' efforts to negotiate settlements of these matters.

[16] The Statement nevertheless concedes that "[f]rom June 5, 2009 through approximately August 2014, Mr. Rousseau acted as Windsor's attorney . . . ." Statement at 30, ¶ 51.

11

these underlying litigations (where Windsor was represented by subsequent counsel) initially both argued that such a breach had occurred without establishing that one had actually happened, and Windsor then reversed its position in the Acker and Collins cases stating that breaches had not occurred.

### 1. The Report Does Not Address Whether there was a Default Under the Acker, Collins, Stamatov, or Coppock Financing Agreements

The Report takes the position there is a single, correct method to exercise a default sale right under a premium financing agreement, and that this sole method is governed by Section 9-620 of the California Commercial Code. What the Report ignores is that subsequent counsel, not Defendants, argued during the Acker and Collins litigations that there was a default under the financing agreements, even though these loans had not yet come due (just as the loans related to the Coppock and Stamatov policies had not yet come due). In terms of the underlying litigations, Defendants only represented Windsor during the Bitter litigation, where there was a clear default under the agreements.   Section 9 of the California Commercial Code governs secured transactions, and Chapter 6 thereunder is entitled "Default." It is, therefore, undeniable that without the existence of a default, Section 9-620 of the California Commercial Code is not applicable (or, even if a court deemed it somehow to apply, no practitioner at the time could have foreseen the application of a "default" U.C.C. provision to a pre-default circumstance). The Report simply elides this critical fact, and goes on to analyze all of the policies at issue as if there had been a default under each financing agreement.[17] This omission renders all of the arguments in the Report, except as applied to the Bitter policy,[18] irrelevant.

### 2. The Statement Misrepresents the Underlying Record With Respect to Defaults Under the Acker, Collins, Stamatov, and Coppock Financing Agreements

The Statement, unlike the Report, acknowledges there must be a default before it can be argued that Section 9-620 of the California Commercial Code applies to the financing agreements entered into between the trusts and Windsor. The Statement argues that there was, somehow, an "anticipatory breach" that constituted a default under the terms of the pertinent financing agreements. Statement at 20, ¶ 20. Wood fails to acknowledge it was subsequent counsel, not Defendants, who argued the existence of an anticipatory breach; hence, Wood's arguments, all of which are premised on the existence of a default with respect to the Collins, Acker, Stamatov, and Coppock financing agreements, are meretricious at best.

. In fact, Wood, the author of the Statement, as counsel for all five trusts in the underlying transactions and disputes, himself repeatedly argued during the Bitter arbitration that none of the trusts, other than the Bitter trust, were in default at the time Windsor obtained ownership and

---

[17] How to square intellectually the exercise of a "default sale right" without first establishing that a default occurred, is not something addressed in the Report.

[18] Which analysis, as set forth in my initial Opinion submitted to this Court on April 4, 2017, is flawed. As conceded by the panel in the Bitter arbitration, this was an issue of first impression under California law and there was no "California decisional authority explaining what is meant by a 'record authenticated after default.'" Arbitration Decision at 6.

12

beneficiary rights to the policies owned by those trusts. For example, in his opening statement during the Bitter arbitration, Wood made the following statements about the Collins, Acker, Coppock, and Stamatov policies:

> [T]he signing of the documents in these other cases [Collins, Acker, Coppock, Stamatov] that [Rousseau] talked about did not involve defaults. We are in a different situation here from the other policies because the default had occurred and it was after that and in response to Windsor's demands after that the documents were signed.

> Transcript of Bitter Arbitration (Bitter Arb. Tr.) at 32:17-23.

Additionally, when Wood questioned Steven Prusky, Windsor's principal, the following exchange occurred:

> Q. It's true, is it not, Mr. Prusky, that all of the change of ownership forms that were signed by the other policyholders whose policies you financed, in all of those cases, there was no notice of default sent out by Windsor?

> A: That's correct ...

>          *       *       *

> Q: But this issue of whether or not there had been a default, whether or not any rights had been cut off, didn't arise with any of the other policyholders; it was all done amicably. "Oh, we don't want this anymore. Here's the COO," right?

> A: Effectively, through Mr. Houchins, yes.

> Q: Just so I have this clear. So the Bitter policy is the only one which from Windsor's point of view, there was an event of default, and now we move -- an event of default, and now the Bitters, according to Windsor, had lost the right to the policy as a result?

> ARBITRATOR BROWN: Just a question about your question. Do you mean an event of default by failing to pay at maturity? Do you mean some other kind of event of default?

> MR. WOOD: I meant an event of default that was deemed and declared by Windsor to be a default, as opposed to just, "We are negotiating turning this over now."

> ARBITRATOR LYNCH: The question, I take it, at a certain period of time, did

13

Windsor declare a default? Did they? First of all, did they?

THE WITNESS: I think Windsor sent a couple of notices of default. One was about the change of trustee, and then one was the September 10.

MR. WOOD: No, no, not to the Bitters. I'm talking about the policyholders that signed COOs. That's what I'm asking about. Perhaps I wasn't clear.

*    *    *

Q: My question: It's correct, isn't that, for all of the other policies except Mr. Bitter's, there was at the signing of the COOs, not in the context of a letter sent out like the [Bitter letter], saying "You defaulted and it's over." It was just done amicably?

A: That's correct.

Bitter Arb. Tr. 310:14-19, 311:6-19, 312:1-4. 19-25.

Undoubtedly because of the reasoning and decision of the panel in the Bitter arbitration, Wood appears to have reversed his position on the issue of whether the financing agreements for the policies other than Bitter were in default. Whether or not there were facts to support his position, asserting that the other four policies were in default gave Wood the ability to argue that the court in Acker and Collins should follow the Bitter panel's decision. Wood was given significant help in his ability to make this argument by counsel who replaced the Defendants. While Defendants never argued in the underlying litigations that the Collins, Acker, Coppock, or Stamatov trusts were in default under their respective financing agreements, the record is replete with evidence that counsel who replaced the Defendants took several different (and contrary) positions with respect to whether the trusts were in default.[19] This allowed Wood to argue in cross-summary judgment motions in front of Judge Orrick that Windsor had made multiple admissions that the trusts were in default when ownership and beneficiary of the respective policies were changed to Windsor.[20]

---

[19] See, e.g., Memorandum of Law in Support of Motion for Summary Judgment, *John Hancock Life Ins. Co. v. Goss*, No. 3:14-cv-04651, ECF No. 30-1 at 9-11 (arguing anticipatory breach); *see also* Windsor Securities, LLC's Reply Memorandum of Law in Support of Motion for Summary Judgment, *John Hancock Life Ins. Co. v. Goss*, No. 3:14-cv-04651, ECF No. 45 at 1-2 (same); Windsor Securities, LLC's Memorandum of Points and Authorities in Opposition to Motion for Summary Judgment, *John Hancock Life Ins. Co. v. Goss*, No. 3:14-cv-04651, ECF No. 85 at 2-10 (arguing the change form was executed prior to default).

[20] See, e.g., Reply Memorandum in Support of Motion for Summary Judgment or, in the Alternative, for Partial Summary Judgment, *Pacific Life Ins. Co. v. Gordillo*, No. 14-cv-03713-WHO, 2015 WL 10392649, at *9 (N.D. Cal. Nov. 17, 2015).

14

### E. **Conclusion**

Both the Report and the Statement fail to present accurately the underlying facts, the state of the law, and what standard practices in the non-recourse premium financing industry actually were at the time Windsor made its loans and at the time the Defendants advised Windsor with respect to taking ownership of those policies. Both also fail to present accurately whether four of the five trusts were in default. As a result, neither the Report nor the Statement provide meaningful guidance for making a determination as to whether the Defendants made a decision or gave advice to Windsor that was outside the parameters of that which would have been given by other attorneys with similar experience and expertise at that time. As set forth herein, the actual state of the law and standard practices were far more fluid than presented in the Report and Statement, and the Defendants' advice to Windsor was well within the standards exercised by competent counsel at that time.

James W. Maxson, Esq.
Date: May 3, 2018

15