# EXHIBIT "31"

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

WINDSOR SECURITIES, LLC,                          Civil Action No. 1:16-cv-01533 (GBD)

    Plaintiff,

vs.

ARENT FOX, LLP; and
JULIUS ROUSSEAU, III,

    Defendants.

_____/

**REBUTTAL OF JOSEPH WOOD TO
EXPERT WITNESS STATEMENTS SUBMITTED BY DEFENDANTS**

Joseph Wood respectfully submits, pursuant to Federal Rules of Civil Procedure, Rule 26(a)(2)(B), the following rebuttal to the expert witness statements submitted by defendants in the above-named action.

## I.   THE WINDSOR LOANS WERE "RECOURSE" LOANS AS TO THE TRUST.

Defendants' experts take the position that Windsor's loans to the Trusts were "non-recourse," *i.e.*, that Windsor's sole remedy, in the event of default on the loans by the Trusts, was against the Policy collateral held by the Trusts. That position, as will be demonstrated below, is in direct contradiction to the terms of the operative Financing Agreements, the requirements of applicable law, and the relevant testimony in the record. Defendants' experts take that position in an apparent effort to avoid the effects of Mr. Rousseau's having entirely failed to meet one of the express requirements of California Commercial Code § 9620, *viz.*, the requirement that Windsor, in order to obtain unfettered ownership of the Policies, had to offer to relieve the Trusts of any continuing liability on the loans. That is, defendants' experts hope to sell the argument (a) that Windsor had no right to sue for monetary relief from the Trusts separate from the Policy collateral or (b) in the alternative, that because the Trusts had not been previously funded by the Insureds, an offer to relieve the Trusts of continuing liability on the loans would not have involved actual consideration to the Trusts, and that for one or both of those ostensible reasons the statutory requirements could simply be ignored. The argument is specious.

### A.   The Operative Financing Agreements Expressly Provide That Windsor Had The Right To Sue For Monetary Relief From The Trusts Separate From The Policy Collateral.

SECTION 1.01. Loan. (a) Except as otherwise provided below, the Lender shall make to the Trust, either directly or though payment to parties (such as the insurance company issuing the policy) on behalf of the trust, and the Trust shall so

borrow from the Lender, the loan amount for the sole purpose of funding the
payment of the Financed Premiums, Structuring Fee and Closing Fees.[1]

SECTION 1.03.  Payment of Loan at Maturity.  Early Maturity and Prepayment.

(a)      Payment of the Loan shall be as provided in the Note.[2]

SECTION 6.02.  Remedies.  If any Event of Default shall occur and be
continuing, then automatically in the case of an Event of Default described in
clause (5) of Section 6.10 or otherwise at the election of the Lender, the Financing
Balance shall become due and payable, without presentment, demand, protest or
any notice of any kind, all of which are expressly waived by the Insured and the
Trust (the "Default Maturity").  Upon the occurrence and during the continuance
of an Event of Default, in addition to any other rights under this Agreement and
any other Financing Documents or otherwise available at law or in equity, the
Lender and its assigns shall have all the rights and remedies of a secured party on
default under the laws of the State of California and other applicable law to
enforce the assignments and security interests contained in the Financing
Documents . . . .[3]

SECTION 7.12.  Governing Law and Consent to Jurisdiction.  This Agreement
shall be governed by and construed under the laws of the State of California
(without regard to conflict of laws principles that could or would cause the
application of other laws), all rights and remedies being governed by said laws. . .[4]

---

[1]   Declaration of Maria Ana Gordillo in Opposition To Motion For Summary Judgment, *Pacific
Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance
Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713, Document 40, p. 21 of 160, internal pagination
Document #1 of 19, p. 1.

[2]   Declaration of Maria Ana Gordillo in Opposition To Motion For Summary Judgment, *Pacific
Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance
Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713, Document 40, p. 22 of 160, internal pagination
Document #1 of 19, p. 2.

[3]   Declaration of Maria Ana Gordillo in Opposition To Motion For Summary Judgment, *Pacific
Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance
Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713, Document 40, p. 30 of 160, internal pagination
Document #1 of 19, p. 10.

[4]   Declaration of Maria Ana Gordillo in Opposition To Motion For Summary Judgment, *Pacific
Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance
Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713, Document 40, p. 33 of 160, internal pagination

2

FOR VALUE RECEIVED, the [name of trust] ("Borrower") hereby promises to pay to the order of Windsor Securities, LLC, a Nevada LLC ("Lender") . . . . the sum of [anticipated premium payments during term of loan], or greater amount should Lender, at its sole discretion, choose to make additional premium payments on the policy, or other amount as the Lender may disburse, together with interest accrued thereon . . . on the Maturity Date as provided in Section 3 hereof.[5]

(b)     **If an event of default occurs before the Maturity Date, the borrower shall immediately pay the Financing Balance** pursuant to Section 6 hereof.[6]

6.     Events of Default.  Upon the occurrence of an event of default before the Maturity Date, the Financing Balance (as defined in the Financing Agreement) shall be immediately due and payable, all without notice, presentment, protest, demand, notice of dishonor or any other demand or notice whatsoever, all of which are hereby waived by Borrower.[7]

(a)     Waiver of Presentment.  The Borrower hereby

    . . . .

(iii) agrees that **the Lender shall not be required first to institute any suit, or to exhaust his remedies against the undersigned or any other person or party to become liable hereunder, or against any collateral in order to enforce payment of this Note;**

---

Document #1 of 19, p. 13.

[5]   Declaration of Maria Ana Gordillo in Opposition To Motion For Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713, Document 40, p. 41 of 160, internal pagination Document #2 of 19, p. 1.

[6]   Declaration of Maria Ana Gordillo in Opposition To Motion For Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713, Document 40, p. 41 of 160, internal pagination Document #2 of 19, p. 1.  [Bold supplied.]

[7]   Declaration of Maria Ana Gordillo in Opposition To Motion For Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713, Document 40, p. 42 of 160, internal pagination Document #2 of 19, p. 2.

. . . .

(d)   <u>No Waiver; Remedies Cumulative</u>.  **None of the rights or remedies of the Lender are to be deemed waived or affected by failure or delay to exercise the same.  All remedies conferred upon the lender by this Note or any other instrument or agreement, including without limitation the Financing Agreement, shall be cumulative, and such remedies may be exercised concurrently or consecutively at the Lender's option.**[8]

(h)   <u>Governing Law and Consent to Jurisdiction</u>.  This Agreement shall be governed by and construed under the laws of the State of California (without regard to conflict of laws principles that could or would cause the application of any other laws), all rights and remedies being governed by said laws.[9]

9.   <u>Waiver</u>.  **No delay on Lender's part in exercising any power of sale, Lien, option, or other right hereunder . . . . shall . . . . prejudice Lender's rights against Beneficiary or Trustee in any respect.**[10]

18.   <u>Governing Law</u>.  This Security Agreement and all the rights, covenants, duties and obligations crated hereunder and **any remedy at law or in equity sought by either party hereto in connection with this Security Agreement shall be governed by, and construed, enforced and interpreted solely in accordance with, the laws of the State of California** without any application of its conflicts or choice of law principles or rules.[11]

---

[8]   Declaration of Maria Ana Gordillo in Opposition To Motion For Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713, Document 40, p. 43 of 160, internal pagination Document #2 of 19, pp. 2-3.  [Bold supplied.]

[9]   Declaration of Maria Ana Gordillo in Opposition To Motion For Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713, Document 40, p. 43 of 160, internal pagination Document #2 of 19, p. 3.

[10]   Declaration of Maria Ana Gordillo in Opposition To Motion For Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713, Document 40, p. 114 of 160, internal pagination Document #13 of 19, p. 5.  [Bold supplied.]

[11]   Declaration of Maria Ana Gordillo in Opposition To Motion For Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713, Document 40, p. 117 of 160, internal pagination

**B.**     **Applicable Law Expressly Provides That Windsor Had The Right To Sue**
**For Monetary Relief From The Trusts Separate From The Policy Collateral.**

"[A]ll applicable laws in existence when an agreement is made, which laws the
parties are presumed to know and to have had in mind, necessarily enter into the
contract and form a part of it, without any stipulation to that effect, as if they were
expressly referred to and incorporated." [Citation omitted.]

*Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 954 (2008).

(d)     If the security interest under which a disposition is made secures payment
or performance of an obligation, after making the payments and applications
required by subdivision (a) and permitted by subdivision (c), both of the following
apply:
. . . .
(2)     Subject to subdivision (b) of Section 9626, **the obligor is liable**
**for any deficiency.**

California Commercial Code § 9615(d)(2).  [Bold supplied.]

**C.**     **The Relevant Testimony In the Record Demonstrates Both That Windsor**
**Had The Right To Sue For Monetary Relief From The Trusts Separate From**
**The Policy And That The Trusts Might Have Been Able To Pay Any**
**Judgment Obtained Thereby.**

ARBITRATOR RICK BROWN:  What about the trust, is it nonrecourse as to the
trust?

MR. ROUSSEAU:  **There's nothing in the document that says there's**
**nonrecourse to the trust,** but it's an insurance trust that had no assets, and
nobody assumed it had assets. . . . . **Mr. Wood said, and I believe he's**
**technically correct, that yes, there would be liability in the trust,** but it's
meaningless.[12]

MR. WOOD:  The issue, Mr. Arbitrator, is this.  Mr. Prusky has taken the position
that even though this is a non-recourse loan as to the trust, as from the provisions

---

Document #13 of 19, p. 8.  [Bold supplied.]

[12]   Transcript of Proceedings of Hearing Day 1, January 13, 2014, *Gregory Barnes as Trustee of*
*John L. Bitter Irrevocable Life Insurance Trust v. Windsor Securities, LLC*, American Arbitration
Association Case No. 74-148-000296-13-S1M, 24:8-19.  [Bold supplied.]

5

that we looked at previously, it says non-recourse as to the insured, but it says you can go after the trust, and without going after the collateral, then his argument or **Windsor's argument has been, well, since the trust had no money anyway and trusts have no money, we should just treat it as a non-recourse loan even as to the trust.**

THE WITNESS [Mr. Prusky]:  **That's not correct.**

BY MR. WOOD:

Q.    That's what I thought you said.  If I'm not – so you agree – let me ask you this:  **You agree that a trust of this kind could have other assets besides the policy, right?**

A.    **It is conceivable a trust of this kind could have millions of dollars.**

Q.    **And therefore, the trust could be able to respond to a claim for payment of the loan without recourse to the policy as collateral.**

A.    **In theory, yes.**[13]

Q.    **[By Mr. Wood]  Now did you, in discussing with Mr. Bitter the pluses and minuses of premium financing, ever use the phrase "non-recourse loan"?**

A.    **[By Mr. Houchins]  We did.**

Q.    **And what did you understand that to mean?**

A.    **Non-recourse to him is most important.  If he was not willing to pay back the loan, or if he wanted to default, it was non-recourse to him personally, so they cannot go after him.**

Q.    **Did you either initially or subsequently explain to him that there was recourse as to the trust?**

A.    **Yes.**

Q.    **Did you say that up front or bring that up later?**

---

[13]   Transcript of Proceedings of Hearing Day 2, January 14, 2014, *Gregory Barnes as Trustee of John L. Bitter Irrevocable Life Insurance Trust v. Windsor Securities, LLC*, American Arbitration Association Case No. 74-148-000296-13-S1M, 319:8-320:5.  [Bold supplied.]

A.     We usually bring it up later.

Q.     Why is that?

A.     Typically in this premium financing arena back then, and most agents do this, and we aren't very proud of this in the industry. We basically sell them as non-recourse. And we want to get them interested in it, and if they are interested, then we give them the fine details. It's non-recourse to you, but the trust, I want you to know they can come after the trust. So just be aware of that. So we definitely explain all the details when it becomes time.

Q.     Now in your experience of these kinds of transactions, do the – does the borrowing trust sometimes have assets in it other than the policy that's being financed.

A.     Yes.[14]

Q.     [By Mr. Rousseau]  So did the trust ever have any assets other than the policy, to your knowledge?

A.     [By Mr. Barnes]  Not to my knowledge.[15]

9.     None of the Trusts had any cash or assets, other than the Insurance Policy in question for each Trust. **The Trustees could not have made** any premium payments, purchased the policy at a foreclosure sale, or made **any other outlay unless the underlying Insured both put such funds in the Trust and requested the Trustee to take such an action.**[16]

---

[14]  Transcript of Proceedings of Hearing Day 2, January 14, 2014, *Gregory Barnes as Trustee of John L. Bitter Irrevocable Life Insurance Trust v. Windsor Securities, LLC*, American Arbitration Association Case No. 74-148-000296-13-S1M, 465:9-466:15.  [Bold supplied.]

[15]  Transcript of Proceedings of Hearing Day 3, January 15, 2014, *Gregory Barnes as Trustee of John L. Bitter Irrevocable Life Insurance Trust v. Windsor Securities, LLC*, American Arbitration Association Case No. 74-148-000296-13-S1M, 411:15-16.

[16]  Eugene Houchins III Affidavit, produced in discovery [but not filed with the Court] in *Windsor Securities, LLC v. Arent Fox LLP, et al.*, U.S.D.C., S.D.N.Y., Case No. 16-cv-01533 (GBD), p. 3.  [Bold added.]

### D.   Whether Or Not The Trusts Had Assets Other Than The Policy Is Irrelevant As A Matter of Law.

So far as I am aware, California law includes no rule to the effect that, as defendants' experts seem to believe, a debtor who is without funds receives no consideration from an agreement to forgive his debts.  Indeed, the law is to the contrary.

> Petitioner was relieved of his obligation to pay the remaining $325,000 due on his promissory note to Prudential and therefore realized income from the forgiveness of debt . . . .

*Corrigan v Commissioner*, 2005 Tax Ct. Memo, LEXIS 118, *17.

> That means that if the tax laws say you have income because of the forgiveness-of-debt, you have income . . .

*In re Marriage of Riddle*, 125 Cal. App. 4th 1075, 1080 (2005).

Nor, as Mr. Rousseau admitted, do the Financing Agreements contain any suggestion that Windsor's explicit right to sue for monetary relief from the Trusts separate from the Policy collateral would somehow evaporate if the Trusts received no money from the Insureds and were without funds.  The above-quoted provisions of the Financing Agreements are to the contrary, were never supplemented or altered by the parties, and must be given legal effect.

> SECTION 7.06.  Entire Agreement.  This Agreement and the other Financing Documents to which the Insured or Trust are parties constitute the entire agreement of the parties hereto with respect to the subject matter hereof and supersede all prior agreements and undertakings, both written and oral, among the Lender, the Trust and the Insured with respect to the subject matter hereof.[17]

---

[17]   Declaration of Maria Ana Gordillo in Opposition To Motion For Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713, Document 40, p. 32 of 160, internal pagination Document #1 of 19, p. 12.

> SECTION 7.10.  Amendments.  No amendment, waiver, modification, or supplement of any provision of this Agreement shall in any event be effective unless the same shall be in writing and signed by the Lender and the Trust . . . .[18]

> The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.

California Civil Code § 1641.

> "'An interpretation which gives effect to all provisions of the contract is preferred to one which renders part of the writing superfluous, useless, or inexplicable.'" [Citation omitted.]

R.W.L. Enterprises v. Oldcastle, Inc., 17 Cal. App. 5th 1019, 1026 (2017).

> "The Court has a duty to construe every provision of a written instrument as to give force and effect, not only to every clause but to every word in it, so that no clause or word may become redundant." [Citation omitted.]

Grayl CPB, LLC v. Kolokotronis, 202 Cal. App. 4th 480, 487 (2011).

In short, whether the Trusts possessed, or could have obtained from the Insureds, money or other assets beyond the Policies, is irrelevant to whether Windsor had a statutory duty, if it wished to obtain unfettered ownership of the Policies, to offer to relieve the Trusts of any continuing liability on the loans.

### E.    Custom And Practice In States Other Than California Is Irrelevant.

Defendants' experts make repeated reference to the supposed custom and practice, in their experience, of lenders and borrowers treating premium financing agreements as non-

---

[18]   Declaration of Maria Ana Gordillo in Opposition To Motion For Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713, Document 40, p. 32 of 160, internal pagination Document #1 of 19, p. 12.

recourse loans. (We are not told whether any of that experience included transactions governed by California law, and should therefore assume that it did not.) Whether or not those references are accurate, they are entirely irrelevant to the Windsor loans.

First, the above-quoted terms of the Financing Agreements, explicitly granting Windsor the right to sue for monetary relief from the Trusts separate from the Policy collateral, bar any evidence of custom or practice that might contradict those terms.

> It is clear that where a written contract states a term clearly and unambiguously, usage or custom that would vary or contradict the term is not admissible. [Citations omitted.] Similarly, where the parties contradict each other on whether a certain term was part of their precontract discussions, usage or custom is not admissible to prove that one party's version of the contract was more probable. [Citations omitted.]

*Varni Bros. Corporation v. Wine World, Inc.*, 35 Cal. App. 4th 880, 889-890 (1995).

Second, the applicable statute guarantees Windsor the right, following sale of the Policies, to collect any deficiency from the Trusts.

> (d)    If the security interest under which a disposition is made secures payment or performance of an obligation, after making the payments and applications required by subdivision (a) and permitted by subdivision (c), both of the following apply:
>
>     . . . .
>
>     (2)    Subject to subdivision (b) of Section 9626, **the obligor is liable for any deficiency**.

California Commercial Code § 9615(d)(2). [Bold supplied.]

Again, the Windsor loans were "recourse" as to the Trusts, and Windsor was required, if it wished to obtain unfettered ownership of the Policies, to offer to relieve the Trusts of any continuing liability on the loans.

II.     **THERE IS NO BASIS ON WHICH TO CONCLUDE THAT THE TRUSTEES AND INSUREDS WERE BEING UNTRUTHFUL WHEN THEY STATED, IN THEIR INSURANCE APPLICATIONS, THAT THEY DID NOT INTEND TO OBTAIN PREMIUM FINANCING.**

Defendants' experts darkly suggest that the Trustees and the Insureds lied when they

stated, in their insurance applications, that they did not intend to obtain premium financing. So

far as I am aware, all of the evidence in the record contradicts that suggestion.

> 2.      I, though my companies Bonded Life and E.E.H., beginning in 2007 assisted in the procurement of life insurance policies for Joe E. Acker, Erwin A. Collins, John L. Bitter, Jane Anne Stamatov, and Robert S. Coppock (individually, an "Insured", and collectively, the "Insureds").
>
> 3.      Specifically, I, in some instances along with my father, assisted each of the Insureds in the application process, in the purchase of the policy, and in the creation of a life insurance trust. I also recommended to those of the Insureds who did not have their own Trustees in place, namely, John L. Bitter and Erwin Collins, candidates whom I believed would be suitable to administer their respective Trusts (the "Trusts"). After the policy had been issued and delivered, I introduced to the Insureds the option of premium financing for the life insurance policy. If an Insured were interested in receiving premium financing, I would put that Insured together with lending broker, Wood, Hat, & Silver, LLC. For the Insureds, each of whom chose to finance their policies, Wood, Hat & Silver, LLC procured Windsor Securities, LLC ("Windsor") as the lender. Once the Insureds and Trustees had received financing agreements from Windsor, I assisted the insureds and trustees in understanding and filling out those agreements.[19]

> Q.      [By Mr. Rousseau]  So after the – approximately how long after the Pacific Life application did you do the Sun Life application?
>
> A.      [By Mr. Houchins]  About three months.
>
> Q.      Was there any discussion with Mr. Bitter that you were privy to around this time about how these policies, one or both of these policies, would be paid for?
>
> A.      There was no discussion about that until after the – there was no

---

[19]   Eugene Houchins III Affidavit, produced in discovery [but not filed with the Court] in *Windsor Securities, LLC v. Arent Fox LLP, et al.*, U.S.D.C., S.D.N.Y., Case No. 16-cv-01533 (GBD), pp. 1-2.

discussion until after the application for Pacific Life had been submitted.

Q.    And after that time, after the submission of the Pacific Life policy, was there any discussion about how the premiums would be paid?

A.    Yes.

Q.    What was that discussion?

A.    We introduced him to what premium financing was.

Q.    And what is premium financing?

A.    Premium financing is borrowing money to pay for life insurance premiums.

Q.    And is premium financing something that is done in a sort of casual ad hoc way or are there standard agreements that are used?

A.    Standard agreements were used.[20]

Q.    [By Mr. Wood]  So you're aware, are you not, that the loan documents in this particular case were signed on April 8th, 2008?

A.    [By Mr. Houchins]  Sounds about right.

Q.    So how much prior to that time did you first introduce to Mr. Bitter the possibility or the notion of premium financing?

A.    Probably a week or two.[21]

Q.    [By Mr. Wood]  Had the Pac Life policy already been issued to Mr. Bitter before he made a decision about premium financing?

A.    [By Mr. Houchins]  Yes.

---

[20]   Transcript of Proceedings of Hearing Day 3, January 15, 2014, *Gregory Barnes, Jr. as Trustee of John L. Bitter Irrevocable Life Insurance Trust v. Windsor Securities, LLC*, American Arbitration Association Case No. 74-148-000296-13-S1M, 460:1-25.

[21]   Transcript of Proceedings of Hearing Day 3, January 15, 2014, *Gregory Barnes as Trustee of John L. Bitter Irrevocable Life Insurance Trust v. Windsor Securities, LLC*, American Arbitration Association Case No. 74-148-000296-13-S1M, 464:4-11.

Q.      Approximately how long before April 8 did he really make a final decision on this?

A.      It was just a few days prior.  Yeah, it was a pretty quick process.[22]

Because the Trustees and the Insureds apparently did not even know abut the possibility

of premium financing until after they had submitted their applications, there is no reason to

suggest that they made any untrue statements to the insurers in that regard.

## III.    THE ARBITRATION PANEL WAS NOT CONFUSED ABOUT WHICH LAW TO APPLY.

One of defendants' experts argues that the Barnes/Bitter arbitration panel seems to have

been confused about whether to apply Georgia Life Settlements law or California secured

transactions law to that case.  The argument is based on the most slender of reeds, namely, the

panel's having noted that Eugene Houchins III was licensed in Georgia as a Life Settlements

broker and, as such, had a fiduciary duty to the Trust and to Mr. Bitter.

> Mr. Gene Houchins III ("Houchins"), a resident licensed Georgia "life settlement broker" [FN 1:  Under the Georgia Insurance Code, title 33, chapter 59, section 33-59-2(10), "A life settlement broker represents only the owner and owes a fiduciary duty to the owner to act according to the owner's instructions, and in the best interests of the owner, notwithstanding the manner in which the life settlement broker is compensated."] was the broker for sale of the policy to Mr. Bitter.[23]

---

[22]   Transcript of Proceedings of Hearing Day 3, January 15, 2014, *Gregory Barnes, Jr. as Trustee of John L. Bitter Irrevocable Life Insurance Trust v. Windsor Securities, LLC*, American Arbitration Association Case No. 74-148-000296-13-S1M, 466:18-25.

[23]   Interim Award, entered April 8, 2014, in *Gregory Barnes, Jr. as Trustee of John L. Bitter Irrevocable Life Insurance Trust v. Windsor Securities, LLC*, American Arbitration Association Case No. 74-148-000296-13-S1M, p. 3.

Crucially, the panel made no further reference to Georgia law, much less grounded any aspect of its decision thereon. Having been present at the arbitration hearing, I can attest that the panel's brief reference to Mr. Houchins' agency/fiduciary status was very likely intended to negate any suggestion, arguably raised by Mr. Houchins' testimony, that while making efforts to find buyers for the Policies during the 2009-2010 period, Mr. Houchins had been acting on behalf of Windsor as well as on behalf of the Policy owners.

> MR. ROUSSEAU: On that point, you do have a life settlement broker's license?
>
> THE WITNESS [Mr. Houchins]: Yes, I do.[24]

---

> Q.  [By Mr. Rousseau]  And, in fact, as a life settlement broker that's part of what you do is to help sellers find buyers and make sure everything is compliant.
>
> A.  [By Mr. Houchins]  The provider might be on the compliance side, yeah, but yeah.[25]
>
> Q.  [By Mr. Rousseau]  And, in fact, in 2009, when you were looking at potential buyers for some of your clients' policies who had loans with Windsor, you were exploring beneficial interest sales, were you not?
>
> A.  [By Mr. Houchins]  Yes.
>
> Q.  And in that beneficial interest sale rather than the insured and the trustee selling something in a regulated fashion, the beneficiary of the policy, in this case Mrs. Bitter, would actually sell her interest in the policy?

---

[24]   Transcript of Proceedings of Hearing Day 3, January 15, 2014, *Gregory Barnes, Jr. as Trustee of John L. Bitter Irrevocable Life Insurance Trust v. Windsor Securities, LLC*, American Arbitration Association Case No. 74-148-000296-13-S1M, 539:14-16.

[25]   Transcript of Proceedings of Hearing Day 3, January 15, 2014, *Gregory Barnes, Jr. as Trustee of John L. Bitter Irrevocable Life Insurance Trust v. Windsor Securities, LLC*, American Arbitration Association Case No. 74-148-000296-13-S1M, 562:21-25.

14

A.     In the trust.[26]

Q.     [By Mr. Rousseau]  Why did you not end up selling some or all of the policies that Windsor had financed in the year 2009?

A.     I think we communicated some of the offers to Windsor and he thought it wasn't enough.  So he declined some of the offers that we were getting, and these were temporary offers, they weren't firm or anything, but we were trying to get a ballpark number what he could expect.[27]

Q.     [By Mr. Rousseau]  And there's a middleman, a life settlement broker, who puts the deal together, and that person is going to get paid too?

A.     [By Mr. Houchins]  Could, yeah.  That's one way to do it.[28]

Q.     [By Mr. Rousseau]  **And so in 2009, you thought you were going to be doing Windsor a favor by selling your clients' policies for Windsor to help cut losses?**

A.     [By Mr. Houchins]  **Yes.**[29]

Q.     [By Mr. Rousseau]  And did any of your clients try to sell their policies on the market and pay off the loans?

A.     [By Mr. Houchins]  Yes.

---

[26]  Transcript of Proceedings of Hearing Day 3, January 15, 2014, *Gregory Barnes, Jr. as Trustee of John L. Bitter Irrevocable Life Insurance Trust v. Windsor Securities, LLC*, American Arbitration Association Case No. 74-148-000296-13-S1M, 565:5-15.

[27]  Transcript of Proceedings of Hearing Day 3, January 15, 2014, *Gregory Barnes, Jr. as Trustee of John L. Bitter Irrevocable Life Insurance Trust v. Windsor Securities, LLC*, American Arbitration Association Case No. 74-148-000296-13-S1M, 566:18-567:1.

[28]  Transcript of Proceedings of Hearing Day 3, January 15, 2014, *Gregory Barnes, Jr. as Trustee of John L. Bitter Irrevocable Life Insurance Trust v. Windsor Securities, LLC*, American Arbitration Association Case No. 74-148-000296-13-S1M, 568:1-4.

[29]  Transcript of Proceedings of Hearing Day 3, January 15, 2014, *Gregory Barnes, Jr. as Trustee of John L. Bitter Irrevocable Life Insurance Trust v. Windsor Securities, LLC*, American Arbitration Association Case No. 74-148-000296-13-S1M, 603:10-13.  [Bold supplied.]

Q.     Who?

A.     Pawlik.[30]

There is nothing to suggest that the panel was confused about which law to apply.

## IV.     GEORGIA LIFE SETTLEMENT LAW IS IRRELEVANT TO THIS CASE.

For reasons that are somewhat obscure, one of defendants' experts spends a lot of time discussing how the premium financing transactions at issue in this case should perhaps have been governed, despite the parties' choice of California law, by Georgia Life Settlement law, *viz.*, O.C.G.A. §§ 33-59-1, *et seq.*  That discussion suffers from two major problems.  First, the expert repeatedly quotes the version of the Life Settlement law enacted in 2009 – a year after the events in question and therefore not applicable here – rather than the 2005 version that actually applies. Second, the 2005 statute – particularly when read in light of clarifying language added in 2009 – appears to exclude from its purview premium financing arrangements like those entered into by Windsor and the Trusts.  I will let the statutes, the relevant portions of the Financing Agreements, and the relevant testimony speak for themselves.

§ 33-59-1.  Short title.

This chapter shall be known and may be cited as the "Life Settlements Act."

History.

Code 1981, *§ 33-59-1*, enacted by *Ga. L. 2005, p. 998, § 1/SB 217*; *Ga. L. 2009, p. 370, § 1/SB 61*.

O.C.G.A. § 33-59-1.  [Bold supplied.  Italics in original.]

---

[30]  Transcript of Proceedings of Hearing Day 3, January 15, 2014, *Gregory Barnes, Jr. as Trustee of John L. Bitter Irrevocable Life Insurance Trust v. Windsor Securities, LLC*, American Arbitration Association Case No. 74-148-000296-13-S1M, 605:10-14.

16

§ 33-59-2.  Definitions.

. . . .

History.

Code 1981, *§ 33-59-2*, enacted by ***Ga. L. 2005, p. 998, § 1/SB 217***; ***Ga. L. 2009, p. 370, § 1/SB 61***; *Ga. L. 2010, p. 878, § 33/HB 1387.*

O.C.G.A. § 33-59-2.  [Bold supplied.  Italics in original.]

> (7)      . . . .  A life settlement contract also includes **a contract for a loan** or other financing transaction **with a seller** secured primarily by an individual or group life insurance policy, other than a loan by a life insurance company pursuant to the terms of the policy or a loan secured by the cash value of the policy.

2005 Ga. SB 217, § 3359-2(7).

> (13)    "Seller" means the owner of a policy who enters or seeks to enter into a life settlement contract. . . . .  **Seller does not include**:
>
> > . . . .
> >
> > (B) **An accredited investor** or qualified institutional buyer as defined, respectively, in Regulation D, Rule 501, or Rule 144A of the Federal Securities Act of 1933, as amended;
> >
> > . . . .
> >
> > (E)      A related provider trust.

2005 Ga. SB 217, § 3359-2(13).  [Bold supplied]

> (12)    "Related provider trust" means a tilting trust or other trust established by a licensed life settlement provider or a financing entity for the sole purpose of holding the ownership or beneficial interest in purchased policies in connection with a financing transaction. . . . .

2005 Ga. SB 217, § 3359-2(12).

> (4)      (A) "Financing entity" means a[] . . . . lender . . . ., but:

17

(i)  Whose principal activity related to the transaction is providing funds to effect the life settlement or purchase of one or more of the purchased policies; and

(ii)  Who has an agreement in writing with one or more life licensed life settlement providers to finance the acquisition of life settlement contracts or to provide stop-loss insurance.[31]

2005 Ga. SB 217, § 3359-2(4).

(j)  <u>Purpose of Loan.</u>  The purpose of this Loan is for estate planning purposes and is not entered into with the intent to effect a life settlement transaction.[32]

(j)  <u>Purpose of Loan.</u>  The purpose of this Loan is for estate planning purposes and is not entered into with the intent to effect a life settlement transaction.

. . . .

(l)  **Accredited Investor.**  The Insured and the Trust each is an "accredited investor" pursuant to Rule 501(a) or Rule 144A promulgated under the Federal Securities Act of 1933 and by reason of his/her business and financial experience, has such knowledge, sophistication and experience in business and financial matters as to be capable of evaluating the merits and risks of the transactions contemplated by this Agreement and is able to bear any economic risk of such transactions.  Furthermore, the Insured is a natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,500,000.[33]

Q.  [By Mr. Rousseau]  Now, let's go back to the beginning of this whole transaction.  What did you understand – strike that.  Based on the documents that you were provided by Wood, Hat and Silver for premium

---

[31]  I do not know whether or not Windsor had any such agreements, hence am not certain whether this provision is applicable.

[32]  Declaration of Maria Ana Gordillo in Opposition To Motion For Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713, Document 40, p. 25 of 160, internal pagination Document #1 of 19, p. 5.

[33]  Declaration of Maria Ana Gordillo in Opposition To Motion For Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713, Document 40, p. 27 of 160, internal pagination Document #1 of 19, p. 7.  [Bold supplied.]

18

financing, did you have a understanding as to whether a life insurance trust had to be created for the purposes of this transaction?

A.  [By Mr. Houchins]  Yes.

Q.  And did it have to be created or not?

A.  Yes, it had to be created.

Q.  And did Wood, Hat and Silver provide you with documents to be used for the trust?

A.  Yes, they provided a generic trust agreement for us to use.

Q.  And was that the one used in the Pac Life transaction?

A.  Yes.[34]

[Later statutes clarifying 2005 version.]

(C)  **Life settlement contract does not include:**

. . . .

(ii)  **A premium finance loan**, as defined in paragraph 18 [*sic*][35] of this Code section . . . .;

(iii)  A collateral assignment of a life insurance policy by an owner.

O.C.G.A. § 33-59-2(11)(C).  [Bold supplied]

**"Premium finance loan"** is a loan made primarily for the purposes of making premium payments on a life insurance policy, which loan is secured by an interest in such life insurance policy.

O.C.G.A. § 33-59-2(17).  [Bold supplied.]

---

[34]  Transcript of Proceedings of Hearing Day 3, January 15, 2014, *Gregory Barnes as Trustee of John L. Bitter Irrevocable Life Insurance Trust v. Windsor Securities, LLC*, American Arbitration Association Case No. 74-148-000296-13-S1M, 476:24-477:16.

[35]  Actually, paragraph 17.

19

### V.   THE COLLINS, ACKER, COPPOCK, AND STAMATOV TRUSTS ALL DEFAULTED ON THEIR LOANS.

In a further effort to render California Commercial Code § 9620 inapplicable to

Mr. Rousseau's conduct, defendants' experts claim that neither the Collins Trust, the Acker

Trust, the Coppock Trust, nor the Stamatov Trust ever defaulted on their loans.  That claim rests

on the fact that those Trusts communicated to Windsor their decision not to pay off their loans

before the loans were due.  The claim fails on both legal and factual grounds.

First, the abovementioned decisions of the Trusts, and their communication of those

decisions to Windsor, comprised a straightforward repudiation of the loan agreements and thus a

breach thereof.

> We have established that: "There can be no actual breach of a contract until the time specified for performance has arrived." [Citation omitted.]  Nonetheless, if a party to a contract expressly or by implication repudiates the contract before the time for his or her performance has arrived, an anticipatory breach is said to have occurred. [Citations omitted.] . . . . [¶]  In the event the promisor repudiates the contract before the time for his or her performance has arrived, the plaintiff has an election of remedies – he or she may "treat the repudiation as an anticipatory breach and immediately seek damages for breach of contract, thereby terminating the contractual relation between the parties, or he [or she] can treat the repudiation as an empty threat, wait until the time for performance arrives and exercise his [or her] remedies for actual breach if a breach does in fact occur at such a time." [Citation omitted.]

*Romano v. Rockwell International, Inc.*, 14 Cal. 4th 479, 488-489 (1996).

Second, the existence of the breach – *i.e.*, of a default – was confirmed by Windsor's

actions in response.

> Windsor admits that subsequent to Windsor's having loaned to the Trust all of the monies for premium payments that Windsor was required to provide under the

Financing Agreement, the Trust informed Windsor that the Trust would not repay the loan when due.[36]

Windsor admits that subsequent to Windsor's having loaned to the Trust all of the monies for premium payments that Windsor was required to provide under the Financing Agreement, the Trust informed Windsor that the Trust would not repay the loan when due.[37]

Following the Trust's default under the terms of the transaction agreements, the Trust made a full transfer of the Policy to Windsor . . . .[38]

When the loan became due, the broker informed me that the Insurance Trust would not repay the loan.[39] [40]

---

[36]  Answer Of Windsor Securities, LLC To Crossclaim Of Maria Ana Gordillo As Trustee Of The Erwin A. Collins Family Insurance Trust, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713, Document No. 21, p. 3 of 7, internal pagination 3:14-16.

[37]  Answer And Crossclaim Of Windsor Securities, LLC; Demand For Jury Trial, *John Hancock Life Insurance Company (U.S.A.) v. Ronald Mark Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al.*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-04651-WHO, Document No. 18, p. 6 of 12, internal pagination. 6:7-9.

[38]  Answer And Crossclaim Of Windsor Securities, LLC; Demand For Jury Trial, *John Hancock Life Insurance Company (U.S.A.) v. Ronald Mark Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al.*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-04651-WHO, Document. No. 18, p. 10 of 12, internal pagination 10:7-8.

[39]  Declaration Of Steven Prusky In Support Of Windsor Securities, LLC's Motion For Summary Judgment, Or, In The Alternative, Partial Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713, Document No. 31-2, p. 2 of 75, internal pagination 2:18-19.

[40]  I am informed and believe that the Declaration Of Steven Prusky In Support Of Windsor Securities, LLC's Motion For Summary Judgment Or, In The Alternative, For Partial Summary Judgment, *John Hancock Life Insurance Company (U.S.A.) v. Ronald Mark Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al.*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-04651-WHO, Document No. 30-2, was intended to contain, at internal page 2 thereof, an assertion with reference to the *Goss* matter identical to the assertion made by Mr. Prusky here with reference to the *Gordillo* matter. That internal page 2, however, appears to have been inadvertently omitted from the document filed with the Court. Thus, Document No. 30-2, p. 1 of 146 bears internal pagination 1, while Document 30-2, p. 2 of 146 bears internal pagination 3.

21

After Windsor was informed the Insurance Trust would not pay the loan when due, it elected to exercise the Default Sale provision in the Premium Financing Agreement.[41]

After Windsor was informed the Insurance Trust would not pay the loan when due, it elected to exercise the Default Sale provision in the Premium Financing Agreement.[42]

It is indisputable that the Insurance Trust breached and defaulted on its obligation to repay Windsor, triggering Windsor's rights under the DSR.[43]

It is indisputable that the Insurance Trust breached and defaulted on its obligation to repay Windsor, triggering Windsor's rights under the DSR.[44]

3.     As I have previously testified, in 2010, shortly before the loan from Windsor Securities, LLC [Windsor"] to the Trust was due to be repaid, the Trust informed Windsor that it was not willing to take over premium payments on the Policy and would not repay the loan when due.  That fact was communicated to Windsor, pursuant to my request and, I believe, that of the insured, Erwin A. Collins [the "Insured"], by Eugene Houchins III ["Houchins"], who had helped

---

[41]   Declaration Of Steven Prusky In Support Of Windsor Securities, LLC's Motion For Summary Judgment, Or, In The Alternative, Partial Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713, Document No. 31-2, p. 3 of 75, internal pagination 3:3-4.

[42]   Declaration Of Steven Prusky In Support Of Windsor Securities, LLC's Motion For Summary Judgment Or, In The Alternative, For Partial Summary Judgment, *John Hancock Life Insurance Company (U.S.A.) v. Ronald Mark Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al.*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-04651-WHO, Document No. 30-2, p. 2 of 146, internal pagination 3:4-5.

[43]   Windsor Securities, LLC's Memorandum Of Points And Authorities In Support Of Motion For Summary Judgment, Or, In The Alternative, Partial Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713, Document No. 31-1, p. 7 of 21, internal pagination 4:19-20.

[44]   Windsor Securities, LLC's Memorandum Of Points And Authorities In Support Of Motion For Summary Judgment, Or, In The Alternative, Partial Summary Judgment, *John Hancock Life Insurance Company (U.S.A.) v. Ronald Mark Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al.*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-04651-WHO, Document No. 30-1, p. 8 of 21, internal pagination 5:2-3.

with managing and documenting the loan. Houchins was asked to convey that fact as a matter of convenience, in that Houchins, since the initiation of the loan, had been acting as a kind of middle-man or facilitator between Windsor and the Trust. Thus, for example, Houchins had kept track of whether – and, I believe, had reminded Windsor whenever – premium payments were at risk of becoming overdue, and had assisted Windsor in obtaining documents that it wanted from the Trust and/or the Insured.

4.      After – and only after – the fact that the Trust was not willing to take over premium payments on the Policy and would not repay the loan when due had been communicated to Windsor by Houchins, Windsor began demanding that I execute, on behalf of the Trust, the assignment documents that would, in my lay understanding, allow Windsor, subject to its continuing obligations to the Trust under the Financing Agreement, to take title to, and beneficiary status under, the Policy. Houchins assisted Windsor in obtaining those documents from me.[45]

2.      I helped to manage the loan and to document the premium financing agreement [the "Financing Agreement"] here at issue between Windsor Securities, LLC ["Windsor"] and the Erwin A. Collins Family Insurance Trust – 2008 [the "Trust"]. As such, I acted, on an ongoing basis following initiation of the loan, as a kind of middle-man or facilitator between Windsor and the Trust. Thus, for example, I kept track of whether – and reminded Windsor whenever I became aware that – premium payments were at risk of becoming overdue, and assisted Windsor in obtaining documents that it wanted from the Trust and/or the Insured.

3.      In 2010, shortly before the loan from Windsor to the Trust was due to be repaid, the Trust informed Windsor of the fact that it was not willing to take over premium payments on the Policy and would not repay the loan when due. That fact was communicated to Windsor by me, pursuant to the request of the trustee of the Trust, Maria Ana Gordillo ["Gordillo"], and the insured, Erwin A. Collins [the "Insured"]. I was asked to convey that fact as a matter of convenience, in that I had the kind of ongoing relationship with Windsor described above.

---

[45]   Declaration of Maria Ana Gordillo In Support Of Motion For Summary Judgment Or, In The Alternative, For Partial Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713-WHO, Document No. 55, p. 2 of 6, internal pagination 2:9-26; Declaration of Ronald Mark Goss In Support Of Motion For Summary Judgment Or, In The Alternative, For Partial Summary Judgment, *John Hancock Life Insurance Company (U.S.A.) v. Ronald Mark Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al.*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-04651-WHO, Document No. 80, p. 2 of 6, internal pagination 2:10-27.

4.      After – and only after – the fact that the Trust was not willing to take over premium payments on the Policy and would not repay the loan when due had been communicated to Windsor, Windsor began demanding that Gordillo execute, on behalf of the Trust and pursuant to the terms of the Financing Agreement, the assignment documents that, in my lay understanding, would allow Windsor, subject to its continuing obligations to the Trust under the Financing Agreement, to take title to, and beneficiary status under, the Policy.  I assisted Windsor in obtaining those documents from Gordillo.[46]

2.   .   I helped to manage the loan and to document the premium financing agreement [the "Financing Agreement"] here at issue between Windsor Securities, LLC ["Windsor"] and the Joe E. Acker Family Insurance Trust [the "Trust"].  As such, I acted, on an ongoing basis following initiation of the loan, as a kind of middle-man or facilitator between Windsor and the Trust.  Thus, for example, I kept track of whether – and reminded Windsor whenever I became aware that – premium payments were at risk of becoming overdue, and assisted Windsor in obtaining documents that it wanted from the Trust and/or the Insured.

3.      In 2010, shortly before the loan from Windsor to the Trust was due to be repaid, the Trust informed Windsor of the fact that it was not willing to take over premium payments on the Policy and would not repay the loan when due. That fact was communicated to Windsor by me, pursuant to the request of the trustee of the Trust, Ronald Mark Goss ["Goss"], and the insured, Joe E. Acker [the "Insured"].  I was asked to convey that fact as a matter of convenience, in that I had the kind of ongoing relationship with Windsor described above.

4.      After – and only after – the fact that the Trust was not willing to take over premium payments on the Policy and would not repay the loan when due had been communicated to Windsor, Windsor began demanding that Goss execute, on behalf of the Trust and pursuant to the terms of the Financing Agreement, the assignment documents that, in my lay understanding, would allow Windsor, subject to its continuing obligations to the Trust under the Financing Agreement, to take title to, and beneficiary status under, the Policy.  I assisted Windsor in obtaining those documents from Goss.[47]

---

[46]   Declaration Of Eugene Houchins III Submitted In Support Of Motion For Summary Judgment Or, In The Alternative, For Partial Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713-WHO, Document No. 57, p. 2 of 9, internal pagination 1:5-24.

[47]   Declaration Of Eugene Houchins III Submitted In Support Of Motion For Summary Judgment Or, In The Alternative, For Partial Summary Judgment, *John Hancock Life Insurance Company (U.S.A.) v. Ronald Mark Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al.*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-04651-WHO, Document No. 77, p. 2 of 9, internal pagination

The Trust defaulted under the terms of the PFA . . . . It subsequently entered into an agreement with Windsor in which the Trustee, Maria Ana Gordillo, signed an "Ownership Name or Beneficiary Change Request" form (the "Assignment") that transferred ownership of the Policy to Windsor.[48]

The Trust defaulted under the terms of the PFA . . . . It subsequently entered into an agreement with Windsor in which the Trustee, Ronald Mark Goss, signed an "Absolute Gift Assignment – Life Insurance form (the "Assignment") that transferred ownership of the Policy to Windsor.[49]

19.     In late January 2010, the Servicing Agent contacted Windsor to talk about the upcoming premium payment that was due on the policy and the status of the Loan.  Windsor asked the Servicing Agent to find out whether the Trust intended to pay off the Loan that would be coming due soon . . . .

20.     The Servicing Agent reported back, after inquiry having been made, that the Trust did not want to pay off the loan . . . .[50]

17.     In late January 2010, the Servicing Agent contacted Windsor to talk about the upcoming premium payment that was due on the policy and the status of the Loan.  Windsor asked the Servicing Agent to find out whether the Trust intended to pay off the Loan that would be coming due soon . . . .

18.     The Servicing Agent reported back, after inquiry having been made, that

---

1:5-24.

[48]   Order Granting In Part And Denying In Part Motion For Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713, Document No. 50, p. 3 of 11, internal pagination 3:5-9.

[49]   Order Granting In Part And Denying In Part Motion For Summary Judgment, *John Hancock Life Insurance Company (U.S.A.) v. Ronald Mark Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al.*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-04651-WHO, Document No. 68, p. 3 of 11, internal pagination 3:5-9.

[50]   Complaint For Declaratory Relief Of Windsor Securities, LLC, *Windsor Securities, LLC v. The Robert S. Coppock Irrevocable Life Insurance Trust, et al.*, U.S.D.C., N.D. Cal., Case No. 3:15-cv-00075-WHO, Document No. 1, p. 5 of 11, internal pagination 5:2-8.

the Trust did not want to pay off the loan . . . .[51]

I am personally aware, having represented the Coppock and Stamatov trusts in Windsor's actions for declaratory relief against them, that Windsor, following the Trusts' having communicated to Windsor that they were not going to pay off their loans, responded, under the advice of Mr. Rousseau, exactly as it had done in response to identical communications from the Collins and Acker Trusts.

It is beyond reasonable dispute that the Collins, Acker, Coppock, and Stamatov Trusts all defaulted on their loans.

## VI.   BECAUSE RIGHTS CREATED BY CALIFORNIA COMMERCIAL CODE § 9620 CANNOT BE WAIVED BY AN AGREEMENT ENTERED INTO BY THE PARTIES PRIOR TO DEFAULT, ANY PRE-DEFAULT AGREEMENT PURPORTING TO WAIVE SUCH RIGHTS WOULD BE A NULLITY.

Defendants' experts argue that under California law, parties to a secured transaction can agree, prior to default, to waive the rights created by California Commercial Code § 9620. The experts are mistaken.

(a)  Except as otherwise provided in subdivision (g), a secured party may accept collateral in full or partial satisfaction of the obligation it ensures only if all the following conditions are satisfied:

(1)  The debtor consents to the acceptance under subdivision (c).

. . . .

(b)  A purported or apparent acceptance of collateral under this section is ineffective unless both of the following conditions are satisfied:

(1)  The secured party consents to the acceptance in an authenticated record or sends a proposal to the debtor.

---

[51]  Complaint For Declaratory Relief Of Windsor Securities, LLC, *Windsor Securities, LLC v. The Jane Ann Stamatov Family Insurance Trust, et al.*, U.S.D.C., N.D. Cal., Case No. 3:15-cv-00080-WHO, Document No. 1, p. 4 of 9, internal pagination 4:21-27.

(2)  The conditions of subdivision (a) are met.

(c)  For purposes of this section both of the following rules apply:

. . . .

(2)  A debtor consents to an acceptance of collateral in full satisfaction of the obligation it secures only if the debtor agrees to the terms of the acceptance in a record authenticated **after default** or the secured party does all of the following:

(A)  **Sends to the debtor after default** a proposal that is unconditional or subject only to the condition that collateral not in possession of the secured party be preserved or maintained.

(B)  In the proposal, proposes to accept collateral in full satisfaction of the obligation it secures.

(C)  Does not receive a notification authenticated by the debtor within 20 days after the proposal is sent. . . . .

California Commercial Code § 9620.  [Bold supplied.]

Except as otherwise provided in Section 9624, to the extent they give rights to a debtor or obligor and impose duties on a secured party, **the debtor or obligor may not waive or vary the rules stated in the following listed sections:**

. . . .

(10)  **Section 9620**, 9621, and 9622, which deal with acceptance of collateral in satisfaction of obligation.

California Commercial Code 9602(10).  [Bold supplied.]

**History**

Added Stats 1999 ch 991 § 35 (SB 45), operative 2001.

**Notes**

**Historical Derivation:**

Former UCC § 9505, as added Stats 1974 ch 997 § 46.

**Commentary**

**Official Comments on Uniform Commercial Code:**

1. **Source.** Former Section 9-505.

. . . .

3. **Conditions to Effective Acceptance.** Subsection (a) contains the conditions necessary to the effectiveness of an acceptance of collateral. Subsection (a)(1) requires the debtor's consent. Under subsections (c)(1) and (c)(2), **the debtor may consent by agreeing to the acceptance in writing after default.** . . . . [¶] **The time when a debtor consents to strict foreclosure is significant in several circumstances under this section** and the following one. See Sections 9-620(a)(1), (d)(2), 9-621(a)(1), (a)(2), (a)(3).

. . . .

5. **Secured Party's Agreement; No "Constructive" Strict Foreclosure.**

. . . .

A debtor's voluntary surrender of collateral to a secured party and the secured party's acceptance of possession of the collateral does not, of itself, necessarily raise an implication that the secured party intends or is proposing to accept the collateral in satisfaction of the secured obligation under this section.

California Commercial Code § 9620. [Bold headings in original; remaining bold supplied.]

The relationship between the parties is, by agreement, governed by the laws of California. The applicable California law is its version of the Uniform Commercial Code as a patent falls within the Uniform Commercial Code definition of a "general intangible."

*Braunstein v. Gateway Management Services (In re Coldwave Systems, LLC)*, 368 B.R. 91, 94 (U.S.B.C., D. Mass., 2007).

[T]he patent is beyond the reach of the Trustee *under the California Commercial Code.* [FN omitted.] It thus becomes necessary to examine the sufficiency of the foreclosure.

28

*Braunstein v. Gateway Management Services (In re Coldwave Systems, LLC)*, 368 B.R. 91, 95 (U.S.B.C., D. Mass., 2007). [Italics in original.]

> The applicable portion of the Commercial Code provides that a secured party may accept collateral in full or partial satisfaction of the obligation it secures only if the conditions of the statute are satisfied. The triggering condition is that "the debtor consents to the acceptance under subdivision (c)." Subdivision (c)(1) provides that "a debtor consents to the acceptance of collateral in partial satisfaction of the obligation it secures **only if the debtor agrees to the terms of the acceptance in a record authenticated after default.**" [¶] It appears that the Debtor did not respond. Silence is not consent in the case of an acceptance in partial satisfaction of a debt. [FN omitted.] As a result, the attempted strict foreclosure fails. [FN omitted.]

*Braunstein v. Gateway Management Services (In re Coldwave Systems, LLC)*, 368 B.R. 91, 95 ~~(U.S.B.C., D. Mass., 2007). [Bold supplied.]~~

> **Defendant contends that transfer of the collateral to his name through a Dallas bank on May 23, 1973, was a valid foreclosure under the statute.** We must determine whether such a transfer of stock to the creditor's name is permitted by the Code as a means of foreclosure. . . . . **Defendant's transfer was merely a means of eliminating plaintiff's legal title to the collateral and vesting such title in himself.** A parallel may be seen in the repossession of tangible property, vesting ownership in the creditor prior to disposition. Thus, **such a transfer of title by the creditor to himself will not operate as a foreclosure under the Code.** [¶] In some situations the parties may benefit best without a disposition of the collateral and 12A Pa.Stat.Ann. § 9-505[52] provides an alternative. The creditor may, upon default, elect to retain the collateral as full satisfaction of the debtor's obligations. . . . . For an effective strict foreclosure, defendant must demonstrate compliance with the terms of § 9-505. [¶] Subsection (2) of § 9-505 requires notice to the debtor of creditor's proposal to retain the collateral as full satisfaction of the debt. **The notice must be of strict foreclosure in particular, and not simply of an intent to foreclose.**

*Fletcher v. Cobuzzi*, 499 F. Supp. 694, 698-699 (W.D. Pa. 1980). [Bold supplied.]

> Under § 9.620, Canfina may accept collateral in satisfaction of the debt "only if" the debtor consents to the acceptance under the statutory process. § 9.620(a). To consent, **the debtor must either agree to the terms of the acceptance in a record authenticated "after default" or the secured creditor must send to the**

---

[52]   Now 13 Pa.Cons.Stat. § 9620.

> debtor **"after default"** a proposal describing its intention to accept the collateral in satisfaction of the obligation it secures.

*In re Cadiz Properties*, 278 B.R. 744, 748-749 (Bankr. N.D. Tex. 2002).  [Bold supplied.]

> Section 9-620 of the Uniform Commercial Code governs strict foreclosure – a procedure through which a secured creditor may retain its collateral in full or partial satisfaction of its claim.  [Citations.]  **The remedy is only available if the debtor consents to strict foreclosure <u>after</u> it has defaulted.  Thus, for example, the debtor cannot consent to strict foreclosure in anticipation of a future default at the time it enters into the transaction that creates the debt and the security interest.** [Emphasis in original.]

*In re CBGB Holdings, LLC*, 439 B.R. 551, 554-555 (Bankr., S.D.N.Y. 2010).  [Bold supplied]

> **[T]he condition in the "ADDENDUM" providing for full and complete assignment and transfer of the collateral upon default by Chen amounted to nothing more than an unenforceable attempt at predefault waiver of the debtor's rights under Article 9 of Georgia's Uniform Commercial Code.**

*Chen v. Profit Sharing Plan of Dr. Donald H. Bohne, D.D.S., P.A.*, 216 Ga. App. 878, 456 S.E.2d 237, 240 (1995)  [Bold supplied.]

> In addition, section 9620 provides that a debtor's consent to acceptance of collateral must be made in an agreement *after default*.  The statute repeatedly uses the language of a "record authenticated after default."  This is made clear because an agreement to any terms before default would constitute an improper waiver of the rights in section 9620(b).[53]

One of defendants' experts makes the argument that a common form of secured

transaction – *viz.*, the trading in of a used car on which money is still owed, where the old loan is

---

[53]   Order Granting In Part And Denying In Part Motion For Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713, Document No. 50, pp. 7-8 of 11, internal pagination 7:23-8:2; Order Granting In Part And Denying In Part Motion For Summary Judgment, *John Hancock Life Insurance Company (U.S.A.) v. Ronald Mark Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al.*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-04651-WHO, Document No. 68, p. 8 of 11, internal pagination 8:2-5.  [Italics in original.]

cancelled, a new loan is provided, and the value of the used car is applied to reduce the total amount of the new loan – shows that pre-default agreements which deprive the owner of his collateral are permissible under § 9.620 of the UCC. This argument – which strikes me as somewhat disingenuous – ignores a fundamental fact:  <u>the owner of the car, in asking for a trade-in, is effectively telling the dealer that he does not want to pay off the loan when due</u>. The dealer can and does treat this as an anticipatory breach/default, enabling the parties to make the above-mentioned agreement – transfer of the collateral and forgiveness of the original loan – <u>after default</u> and thus consistent with the demands of § 9.620.

Finally, defendants' experts make the observation that, in their experience in various parts of the United States (again we aren't told exactly where, and should assume that California is not included), exercise of the default sale right in life insurance premium financing transactions does not follow the strict requirements of § 9.620. That observation is completely irrelevant, for two reasons. First, <u>life insurance premium financing transactions in all states other than California and Louisiana are not governed by the UCC</u>; no surprise, then, that custom and practice in those states may depart from § 9.620, and no relevance if it does. Second – as noted with reference to the alleged "no recourse" status of the Windsor loans – where, as here, a written contract and/or a controlling statute states a term clearly and unambiguously, custom or practice that would vary or contradict that term is not admissible. *Varni Bros. Corporation v. Wine World, Inc.*, 35 Cal. App. 4th 880, 889-890 (1995).

## VII.  EVEN IF ANY PRE-DEFAULT AGREEMENT PURPORTING TO WAIVE THE PARTIES' RIGHTS UNDER CALIFORNIA COMMERCIAL CODE § 9620 WERE NOT A LEGAL NULLITY, THERE IS NO FACTUAL SUPPORT FOR THE ARGUMENT THAT ANY SUCH AGREEMENT WAS REACHED.

Ignoring the law set forth in the preceding section of this response, defendants' experts advance the theory that Windsor entered with the Trusts into <u>new</u> agreements, prior to default,

31

under which the Trusts, in return for a "walkaway," voluntarily waived whatever rights they

might have had in and to the death benefit under the Financing Agreements.  This theory fails on

factual grounds as well as on the legal ones already adduced.

### A.      The Alleged Agreement, Were It To Exist, Would Necessarily Be Oral.

There does not appear to be a single document even arguably comprising a written

agreement executed by the Trustees of the Collins Trust, the Acker Trust, the Coppock Trust, or

the Stamatov Trust, respectively, <u>either before or after default</u>, under which the Trusts waived all

rights in and to the death benefit in return for a forgiveness of their respective loans by Windsor.

> The Trusts served on Windsor a comprehensive request for documents—
> including, but not limited to, requests for all documents comprising or referring to
> any communications and/or any agreements between Windsor, on the one hand,
> and either the Trustees, the Trusts, the Insureds, the beneficiaries of the Trusts,
> Eugene Houchins III, or any agents of any of those persons or entities, on the
> other.[54]

> In response to those requests, Windsor produced:

>> (a)      no document in which Windsor at any time offered to forgive
>> Windsor's loan to the Trust in return for the Trust's agreement to waive,
>> abandon, or assign:  (i) the right of the Trust, pursuant to the Financing
>> Agreement, to receive any proceeds of a public or private sale of the
>> Policy remaining after Windsor had been paid what it was owed on the
>> loan (*viz.*, premium payments, interest, and reasonable expenses connected
>> with the sale); and/or (ii) the right of the Trust, pursuant to the Financing
>> Agreement, to receive any proceeds of the death benefit remaining after
>> Windsor had been paid what it was owed on the loan (*viz.*, premium
>> payments, interest, and reasonable expenses connected with collecting the
>> death benefit);

---

[54]   Declaration Of Joseph Wood In Support Of Motion For Summary Judgment Or, in The
Alternative, For Partial Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as
Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713,
Document No. 56, pp. 2-3 of 28, internal pagination 1:6-2:4; Declaration Of Joseph Wood In Support Of
Motion For Summary Judgment Or, In The Alternative, For Partial Summary Judgment, *John Hancock
Life Insurance Company (U.S.A.) v. Ronald Mark Goss as Trustee of the Joe E. Acker Family Insurance
Trust, et al.*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-04651-WHO, Document 78, pp. 2-3 of 29, internal
pagination 1:6-2:9.

(b)     no document in which the Trust, at any time, offered to waive, abandon, or assign: (i) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of a public or private sale of the Policy remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale); and/or (ii) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of the death benefit remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit), in return for an agreement by Windsor to forgive the loan.

(c)     no document comprising an agreement under which the Trust would waive, abandon, or assign: (i) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of a public or private sale of the Policy remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale); and/or (ii) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of the death benefit remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit), in return for Windsor's forgiveness of the loan.[55]

The Windsor Document Production did contain letters sent by Windsor to the Trusts in June, 2014 – four years after the Trusts' defaults on the loans and following Windsor's receipt of an unfavorable ruling from the arbitrators in the *Barnes* case – claiming that the Trusts' execution of assignment documents in 2010 "was in exchange for Windsor's agreement that the assignment of the policy would constitute a complete satisfaction and discharge of the loan that Windsor had made to enable you to purchase the policy." The Trusts each responded with a letter denying that claim.[56]

---

[55]   Declaration Of Joseph Wood In Support Of Motion For Summary Judgment Or, in The Alternative, For Partial Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713, Document No. 56, pp. 3-4 of 28, internal pagination 2:5-3:13; Declaration Of Joseph Wood In Support Of Motion For Summary Judgment Or, in The Alternative, For Partial Summary Judgment, *John Hancock Life Insurance Company (U.S.A.) v. Ronald Mark Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al.*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-04651-WHO, Document 78, pp. 3-4 of 29, internal pagination 2:10-3:18.

[56]   Declaration Of Joseph Wood In Opposition To Motion For Summary Judgment Or, In The Alternative, for Partial Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713, Document No. 56, p. 4 of 28, internal pagination 3:14-24; Declaration Of Joseph Wood In Support Of Motion For Summary Judgment Or, In The Alternative, For Partial Summary Judgment, *John Hancock*

The Windsor Document Production also contained an e-mail sent by Windsor to Eugene Houchins III in July, 2014 – again, four years after the Trusts' defaults on their loans and following Windsor's receipt of an unfavorable ruling from the arbitrators in the *Barnes* case – claiming that "when the trusts of Acker, Collins, Coppock and Stamatov surrendered the life insurance policies in satisfaction of the premium finance loans made by Windsor, Windsor agreed to release the trusts from the loans with no further financial obligation among the parties . . ." Houchins responded with an e-mail denying that claim, as follows:

> One thing about your e-mail – I don't think it's correct that "Acker, Collins, Coppock, and Stamatov surrendered the life insurance policies in satisfaction of the premium finance loans made by Windsor" or that "Windsor agreed to release the trusts from the loans with no further financial obligations among the parties." My recollection is that the trusts communicated that they weren't willing to pay back the loans, that Windsor took that as a default and demanded signed COO's, and that the trusts complied with that demand. I advised them to comply, just like I did with Barnes, because I thought it was required under the security agreement. I don't remember any discussion about "surrender" or "release." I've reviewed the correspondence and it seems to confirm my recollection. Maybe I'm missing something.[57]

Finally, Windsor sent a letter to Mr. Barnes and Mr. Bitter, copied to Mr. Houchins'

father, on January 14, 2011, requesting that Mr. Barnes and Mr. Bitter provide "the paperwork

---

*Life Insurance Company (U.S.A.) v. Ronald Mark Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al.*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-04651-WHO, Document No. 78, p. 5 of 29, internal pagination 4:3-12.

[57]   Declaration Of Eugene Houchins III Submitted In Support Of Motion For Summary Judgment Or, In The Alternative, For Partial Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713, Document No. 57, pp. 4-5 of 9, internal pagination 3:16-4:14, and Exhibit A thereto; Declaration Of Eugene Houchins III Submitted In Support Of Motion For Summary Judgment Or, In The Alternative, For Partial Summary Judgment, *John Hancock Life Insurance Company (U.S.A.) v. Ronald Mark Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al.*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-04651-WHO, Document No. 77, pp. 4-5 of 9, internal pagination 3:16-4:14, and Exhibit A thereto.

we requested so that we can conclude our relationship in an amicable fashion."[58] Mr. Prusky

described the purpose of the letter as follows:

> Q. [By Mr. Wood] And finally, Exhibit GG.
>
> A. [By Mr. Prusky] A letter from me dated January 14.
>
> Q. That's correct. This is a letter from you seeking to obtain some – have some documents signed by Mr. Barnes, correct?
>
> A. It's asking for the insurance policy and Mr. Bitter's signature.[59]

Mr. Houchins understood the meaning of the letter as follows:

> Q. [By Mr. Rousseau] I want to move to the time frame in I guess it's 2011, when the COO was executed. And in the book in front of you, Exhibit GG, could you put GG up? January 14 letter. You see at the bottom I think that you're CC'd on this letter?
>
> A. [By Mr. Houchins] Yes, my father, that's my father's name, but I tend to his mail sometimes.
>
> Q. But you said in your testimony you thought there was some threatening language in this letter, and I just wanted you to call to my attention what you perceived to be the threatening language there.
>
> A. Okay, I think the last paragraph is what I was alluding to. Both sentences.
>
> Q. Okay. Mr. Prusky wants to conclude the relationship in an amicable fashion. You saw that as threatening?
>
> A. Yes.
>
> Q. How so?
>
> A. Well, if you add that second sentence there, it's pretty clear that he might

---

[58] Transcript of Proceedings of Hearing Day 1, January 13, 2014, *Gregory Barnes, Jr. as Trustee of John L. Bitter Irrevocable Life Insurance Trust v. Windsor Securities, LLC*, American Arbitration Association Case No. 74-148-000296-13-S1M, 56:1-8, and Arbitration Exhibit GG.

[59] Transcript of Proceedings of Hearing Day 1, January 13, 2014, *Gregory Barnes, Jr. as Trustee of John L. Bitter Irrevocable Life Insurance Trust v. Windsor Securities, LLC*, American Arbitration Association Case No. 74-148-000296-13-S1M, 56:1-8, and Arbitration Exhibit GG.

35

go after some people legally if he doesn't get what he wants.

. . . .

Q.   What did you think when you got this in January 2011? I don't care what you think today.

A.   "I would be more kindly disposed to the trust should we have your cooperation."

Q.   Sure.

A.   The cooperation he's asking for is the change of ownership that he attached to the letter.

Q.   Sure.[60]

Mr. Rousseau now claims that the January 14, 2011 letter met the requirements of California Commercial Code § 9620.

Q.   [By Mr. Frank] Can you pull the letters dated September 11, 2010 and January 14, 2011 close to you so you can see them and read them to me out loud the words that you believe stand for the proposition that, in exchange for ownership, Windsor is absolving the trustee of any further obligations?

A.   [By Mr. Rousseau] The trustee has no obligation, It's the trust.

Q.   Can you read me the words from the letter?

A.   There is no absolving the trustee. It's the trust. So there are no words that deal with the trustee, if that's what you're looking for. There are no words.

Q.   Is there anything in either of those two letters that expresses an acceptance by Windsor of the collateral in full satisfaction of the obligation? If there is, can you kindly read out loud for me now those words?

---

[60]   Transcript of Proceedings of Hearing Day 3, January 15, 2014, *Gregory Barnes, Jr. as Trustee of John L. Bitter Irrevocable Life Insurance Trust v. Windsor Securities, LLC*, American Arbitration Association Case No. 74-148-000296-13-S1M, 572:15-19, 573:4-18, 574:2-9, and Arbitration Exhibit GG.

36

A.    I'll read to you, and it's the same thing that's in our brief.  "We ask one more time for your cooperation in sending us the paperwork, that being the change of ownership form we requested, so we can conclude our relationship in an amicable fashion."

Q.    And you think that is synonymous with an acceptance – an expression of acceptance by Windsor of the collateral in full satisfaction of the obligation?  Is that your belief?

A.    It is – yes, correct.

Q.    From what letter did you just read?

A.    Exhibit 45.

Q.    What's the date of that, please?

A.    January 14, 2011.[61]

Mr. Rousseau made the identical claim in the Barnes/Bitter arbitration.  I pointed out to the arbitration panel that the January 14, 2011 letter not only failed to meet the plain requirements of § 9620, but also that if the roles of the parties were reversed – *i.e.*, if the Trust were to argue, in a suit by Windsor on the promissory note, that the letter proved that a loan in excess of $100,000 had been entirely forgiven – no court in the world would take that argument seriously.  The panel agreed.

> There is nothing in either the September 8, 2010 letter or the January 14, 2011 letter that expresses an acceptance by Windsor of the collateral in full satisfaction of the obligation.[62]

---

[61]   Transcript of Deposition of Julius Rousseau III, Esq., March 7, 2017, in *Windsor Securities, LLC v. Arent Fox LLP, et al.*, U.S.D.C., S.D.N.Y., Case No. 16-cv-01533 (GBD), 189:18-191:3, and Exhibit 45 thereto.

[62]   Interim Award, entered April 8, 2014, in *Gregory Barnes, Jr. as Trustee of John L. Bitter Irrevocable Life Insurance Trust v. Windsor Securities, LLC*, American Arbitration Association Case No. 74-148-000296-13-S1M, p. 7.

37

**B.      Windsor Had No Oral Communications With Any Of The Trustees, Much Less Entered Into An Oral Agreement With Any Of Them.**

Nor did Windsor or Mr. Rousseau have any relevant oral communications with any of the

Trustees.

5.      At <u>no</u> time did I ever discuss with Windsor, much less enter into with Windsor, <u>any</u> agreement, whether oral or written, other than that contained in the written Financing Agreement itself. In particular, I never discussed or agreed, whether on behalf of the Trust or in any other capacity, to waive, abandon, or assign, either: (a) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of a public or private sale of the Policy remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale); and/or (b) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of the death benefit remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit).

6.      I am informed and believe that Windsor is now claiming that, at some point prior to or after the Trust's having informed Windsor that it was not willing to take over premium payments on the Policy and would not repay the loan when due, Houchins – purportedly acting as the agent of the Trust – entered into an oral agreement with Windsor under which the Trust, in return for Windsor's agreement to forgive the loan, would waive, abandon, or assign: (a) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of a public or private sale of the Policy remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale); and/or (b) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of the death benefit remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit). Any such claim is false.

7.      As noted above, Houchins at all relevant times acted as a kind of middle-man or facilitator between Windsor and the Trust. I never said or did anything to suggest, either to Windsor or to Houchins, that Houchins had been authorized to act as an agent of the Trust capable of committing the Trust to an agreement of any kind and, in particular, never said or did anything to suggest, either to Windsor or to Houchins, that Houchins had been authorized to act as an agent of the Trust capable of committing the Trust to an agreement that would waive, abandon, or assign the rights of the Trust that had been created by the Financing Agreement. Windsor never inquired of me whether Houchins had been authorized to act as an agent of the Trust capable of committing the Trust to an agreement of any kind, and, in particular, never inquired of me whether Houchins

had been authorized to act as an agent of the Trust capable of committing the Trust to an agreement that would waive, abandon, or assign the rights of the Trust that had been created by the Financing Agreement.

8.      Houchins never communicated to me that Windsor was offering to forgive the loan if the Trust would waive, abandon, or assign: (a) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of a public or private sale of the Policy remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale); and/or (b) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of the death benefit remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit).

9.      I never asked Houchins to communicate to Windsor that, if Windsor would forgive the loan, the Trust would waive, abandon, or assign: (a) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of a public or private sale of the Policy remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale); and/or (b) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of the death benefit remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit).

10.     Houchins never communicated to me that he had purported to commit the Trust to an agreement under which the Trust, in return for Windsor's agreement to forgive the loan, would waive, abandon, or assign: (a) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of a public or private sale of the Policy remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale); and/or (b) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of the death benefit remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit).

11.     Windsor never communicated to me that Houchins had purported to commit the Trust to an agreement under which the Trust, in return for Windsor's agreement to forgive the loan, would waive, abandon, or assign: (a) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of a public or private sale of the Policy remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale); and/or (b) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of the death benefit remaining after Windsor had been paid what it was owed on the loan (*viz.*,

39

premium payments, interest, and reasonable expenses connected with collecting the death benefit).[63]

6.      As each of the loans began to approach the end of their terms, i.e., as the financing agreements reached their maturity date, Windsor and/or Rousseau as Windsor's counsel, on the one hand, and I, on the other, had sporadic discussions and communicated by email concerning how Windsor, the Insureds, and the Trustees wished to proceed.

7.      I am informed and believe that as each of the loans began to approach the end of their terms, i.e., as the financing agreements reached their maturity date, Windsor informed the Trustees, and the Insureds, that Windsor did not have a duty to pay any upcoming premiums.

8.      In 2010, shortly before the loans from Windsor to the Trusts were due to be repaid, the Trusts, except for the Bitter Trust, informed Windsor of the fact that they were not willing to take over premium payments on the Policy and would not repay the loan when due. That fact was communicated to Windsor by me, pursuant to the request of the Trustees.

. . . .

12.      To my knowledge, neither Windsor nor its attorney ever sent a letter offering to release the Bitter Trust, or any of the other Trusts, from the obligations in the financing agreements in exchange for unfettered title to the various policies.

. . . .

15.      At no time prior to defaulting, or any other time, did any of the Insureds or the Trustees acting on behalf of the respective Trusts that owned the policies on their lives enter into an agreement forfeiting all rights to the policy and all benefits payable thereunder.

16.      I presented each Trustee with a change of ownership, and change

---

[63] Declaration of Maria Ana Gordillo In Support Of Motion For Summary Judgment Or, In The Alternative, For Partial Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713-WHO, Document No. 55, pp. 3-5 of 6, internal pagination 3:1-5:14; Declaration of Ronald Mark Goss In Support Of Motion For Summary Judgment Or, In The Alternative, For Partial Summary Judgment, *John Hancock Life Insurance Company (U.S.A.) v. Ronald Mark Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al.*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-04651-WHO, Document No. 80, pp. 3-5 of 6, internal pagination 2:1-4:14.

of beneficiary, form that I thought the Trustees were obligated to sign once the Trust was in default, i.e., once the Trust had either declared its intention not to pay off the loan or, in the case of the Bitter Trust, had failed to pay off the loan when due. It was my understanding that after default, the Trustee had a duty, pursuant to the terms of the financing agreement, to do whatever it took to give Windsor indicia of title sufficient to allow Windsor to sell the policy at a foreclosure sale.

17.    Neither Windsor nor its legal counsel ever communicated to me that Windsor Securities was offering to forgive the loan if the Trusts would waive, abandon, or assign: (a) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of a public or private sale of the Policy remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale); and/or (b) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of the death benefit remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit).

18.    Windsor never communicated to me, and I therefore – by definition – never communicated to Trustees, that Windsor was offering to forgive the loan.[64]

5.    I am informed and believe that Windsor is now claiming that at some point, either prior to or after the Trust's having informed Windsor that it was not willing to take over premium payments on the Policy and would not repay the loan when due, I – purportedly acting as the agent of the Trust – entered into an oral agreement with Windsor under which the Trust, in return for Windsor's agreement to forgive the loan, would waive, abandon, or assign: (a) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of a public or private sale of the Policy remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale); and/or (b) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of the death benefit remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit). Any such claim is false.

6.    As noted above, I at all relevant times acted as a kind of middle-man or facilitator between Windsor and the Trust.  Gordillo never said or did

---

[64]  Eugene Houchins III Affidavit, produced in discovery [but not filed with the Court] in *Windsor Securities, LLC v. Arent Fox LLP, et al.*, U.S.D.C., S.D.N.Y., Case No. 16-cv-01533 (GBD), pp. 2-5.

41

anything to suggest to me – and, so far as I am aware, never said or did anything to suggest to Windsor – that I had been authorized to act as an agent of the Trust capable of committing the Trust to an agreement of any kind, much less to one that would waive, abandon, or assign the rights of the Trust that had been created by the Financing Agreement. Nor, so far as I am aware, did I ever say or do anything to suggest to Windsor that I possessed such authority.

7.    Windsor never communicated to me, and I therefore – by definition – never communicated to Gordillo, that Windsor was offering to forgive the loan if the Trust would waive, abandon, or assign: (a) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of a public or private sale of the Policy remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale); and/or (b) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of the death benefit remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit).

8.    Gordillo never asked me to communicate to Windsor that, if Windsor would forgive the loan, the Trust would waive, abandon, or assign: (a) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of a public or private sale of the Policy remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale); and/or (b) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of the death benefit remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit).

9.    Finally, I <u>never communicated to Windsor</u> that the Trust, in return for Windsor's agreement to forgive the loan, would waive, abandon, or assign: (a) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of a public or private sale of the Policy remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale); and/or (b) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of the death benefit remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit), and <u>never purported to enter into an agreement to that effect on behalf of the Trust</u>.[65]

---

[65]    Declaration Of Eugene Houchins III Submitted In Support Of Motion For Summary Judgment Or, In The Alternative, For Partial Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713-WHO, Document No. 57, pp. 2-4 of 9, internal pagination 1:25-3:15. [Emphasis

5.      I am informed and believe that Windsor is now claiming that at some point, either prior to or after the Trust's having informed Windsor that it was not willing to take over premium payments on the Policy and would not repay the loan when due, I – purportedly acting as the agent of the Trust – entered into an oral agreement with Windsor under which the Trust, in return for Windsor's agreement to forgive the loan, would waive, abandon, or assign: (a) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of a public or private sale of the Policy remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale); and/or (b) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of the death benefit remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit). Any such claim is false.

6.      As noted above, I at all relevant times acted as a kind of middle-man or facilitator between Windsor and the Trust. Goss never said or did anything to suggest to me – and, so far as I am aware – never said or did anything to suggest to Windsor – that I had been authorized to act as an agent of the Trust capable of committing the Trust to an agreement of any kind, much less to one that would waive, abandon, or assign the rights of the Trust that had been created by the Financing Agreement. Nor, so far as I am aware, did I ever say or do anything to suggest to Windsor that I possessed such authority.

7.      Windsor never communicated to me, and I therefore – by definition – never communicated to Goss, that Windsor was offering to forgive the loan if the Trust would waive, abandon, or assign: (a) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of a public or private sale of the Policy remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale); and/or (b) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of the death benefit remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit).

8.      Goss never asked me to communicate to Windsor that, if Windsor would forgive the loan, the Trust would waive, abandon, or assign: (a) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of a public or private sale of the Policy remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses

———————————

in original.]

connected with the sale); and/or (b) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of the death benefit remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit).

9.     Finally, I <u>never communicated to Windsor</u> that the Trust, in return for Windsor's agreement to forgive the loan, would waive, abandon, or assign: (a) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of a public or private sale of the Policy remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale); and/or (b) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of the death benefit remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit), and <u>never purported to enter into an agreement to that effect on behalf of the Trust</u>.[66]

C.     **Mr. Houchins Could Not Legally Have Entered, And In Fact Did Not Purport To Enter, Into Agreements With Windsor, On Behalf Of The Trusts, Pursuant To Which The Trusts, In Return For A "Walkaway," Voluntarily Waived Whatever Rights They Might Have Had In And To The Death Benefit Under The Financing Agreements.**

Since the record reveals no written agreements and no oral communications between Windsor or Mr. Rousseau, on the one hand, and any of the Trustees, on the other, defendants' experts will be forced to ground their "walkaway" argument on the theory that Mr. Houchins – who <u>did</u> communicate with both Windsor and Mr. Rousseau – acted as the agent for the Trusts and, in that capacity, caused them to enter into binding walkaway agreements. This argument, too, fails on both legal and factual grounds.

First, a Trustee cannot legally delegate powers like those at issue here; thus Mr. Houchins, as a matter of law, could not have bound the Trusts to any such agreements.

---

[66]   Declaration Of Eugene Houchins III Submitted In Support Of Motion For Summary Judgment Or, In The Alternative, For Partial Summary Judgment, *John Hancock Life Insurance Company (U.S.A.) v. Ronald Mark Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al.*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-04651-WHO, Document No. 77, pp. 2-4 of 9, internal pagination 1:25-3:15. [Emphasis in original.]

> The trustee cannot assign his trusteeship or delegate the performance of his duties
> . . . .

*Gonsalves v. Hodgson*, 38 Cal. 2d 91, 99 (1951).

> Except as permitted by the terms of a trust, a trustee cannot delegate to others those duties which if "done by the average man of business with regard to his own property, but with motives similar to trust motives in mind, that businessman would consider . . . . so important and so much within his capacity that he must do [them] personally." [Citation omitted.]

*Powers v. Ashton*, 45 Cal. App. 3d 783, 789 (1975).

> When a power of sale is given to trustees of executors, they cannot sell by attorney . . . .

*Neal v. Patten*, 47 Ga. 73, 79 (1872).

> It is one thing to act pursuant to a power of attorney, and another to act as a trustee.[67]

Second, even if the Trustees legally could have delegated to Mr. Houchins the power to bind the Trusts to such agreements, nothing of the sort ever occurred.

> Q. [By Mr. Wood] Did you ever receive any authorization from Mr. Bitter, either written or oral, saying words to the effect of "You are my agent for all purposes in this transaction and the lender should communicate only with you, not with me."?
>
> A. [By Mr. Houchins] No, I didn't.
>
> Q. Did Mr. Bitter ask you to be in the loop in his communcation with Windsor?
>
> A. Yes.

---

[67] Order Regarding Real Party In Interest, *John Hancock Life Insurance Company (U.S.A.) v. Ronald Mark Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al.*, U.S.D.C, N.D. Cal., Case No. 3:14-cv-04651-WHO, Document No. 58, p. 3 of 4, internal pagination 3:7.

Q.    And what did you understand that to mean?

A.    Well, to help him through any need the lender had, whether they send him a letter asking for a new HIPAA be signed.  There were a couple of other letters that were pretty much demands, and this might be in default, and he needed help understanding that stuff.  So we were very happy to immediately attend to what was needed at that time.  Any time you get a letter from the lender.

Q.    Did you ever send any written communication to Windsor saying "You are no longer to send notices, official notices of any kind or transaction-related notices of any kind to Mr. Bitter, you need only send them to me"?

A.    No, no.

Q.    Did you ever ask Windsor in any form to kind of keep you in the loop, and make sure you were involved in any communications with Mr. Bitter, or with the trust, for that matter?

A.    Yes.

Q.    Can you remember what you said in that regard?  I mean, we have e-mails, but –

A.    I said "If you want assistance getting anything done, please keep us in the loop, or let us help you do that.  If you need something signed, you're going to get it in a day or two if you help us do it."[68]

7.    As noted above, Houchins at all relevant times acted as a kind of middle-man or facilitator between Windsor and the Trust.  I never said or did anything to suggest, either to Windsor or to Houchins, that Houchins had been authorized to act as an agent of the Trust capable of committing the Trust to an agreement of any kind and, in particular, never said or did anything to suggest, either to Windsor or to Houchins, that Houchins had been authorized to act as an agent of the Trust capable of committing the Trust to an agreement that would waive, abandon, or assign the rights of the Trust that had been created by the Financing Agreement.  Windsor never inquired of me whether Houchins had been authorized to act as an agent of the Trust capable of committing the Trust to an

---

[68]    Transcript of Proceedings of Hearing Day 3, January 15, 2014, *Gregory Barnes, Jr. as Trustee of John L. Bitter Irrevocable Life Insurance Trust v. Windsor Securities, LLC*, American Arbitration Association Case No. 74-148-000296-13-S1M, 475:9-476:20.

46

agreement of any kind, and, in particular, never inquired of me whether Houchins had been authorized to act as an agent of the Trust capable of committing the Trust to an agreement that would waive, abandon, or assign the rights of the Trust that had been created by the Financing Agreement.[69]

6.      As noted above, I at all relevant times acted as a kind of middle-man or facilitator between Windsor and the Trust. Gordillo never said or did anything to suggest to me – and, so far as I am aware, never said or did anything to suggest to Windsor – that I had been authorized to act as an agent of the Trust capable of committing the Trust to an agreement of any kind, much less to one that would waive, abandon, or assign the rights of the Trust that had been created by the Financing Agreement. Nor, so far as I am aware, did I ever say or do anything to suggest to Windsor that I possessed such authority.[70]

6.      As noted above, I at all relevant times acted as a kind of middle-man or facilitator between Windsor and the Trust. Goss never said or did anything to suggest to me – and, so far as I am aware – never said or did anything to suggest to Windsor – that I had been authorized to act as an agent of the Trust capable of committing the Trust to an agreement of any kind, much less to one that would waive, abandon, or assign the rights of the Trust that had been created by the Financing Agreement. Nor, so far as I am aware, did I ever say or do anything to suggest to Windsor that I possessed such authority.[71]

---

[69]   Declaration of Maria Ana Gordillo In Support Of Motion For Summary Judgment Or, In The Alternative, For Partial Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713-WHO, Document No. 55, p. 3 of 6, internal pagination 3:23-4:7; Declaration of Ronald Mark Goss In Support Of Motion For Summary Judgment Or, In The Alternative, For Partial Summary Judgment, *John Hancock Life Insurance Company (U.S.A.) v. Ronald Mark Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al.*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-04651-WHO, Document No. 80, p. 3 of 6, internal pagination 2:23-3:7.

[70]   Declaration Of Eugene Houchins III Submitted In Support Of Motion For Summary Judgment Or, In The Alternative, For Partial Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713-WHO, Document No. 57, p. 3 of 9, internal pagination 2:10-16.

[71]   Declaration Of Eugene Houchins III Submitted In Support Of Motion For Summary Judgment Or, In The Alternative, For Partial Summary Judgment, *John Hancock Life Insurance Company (U.S.A.) v. Ronald Mark Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al.*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-04651-WHO, Document No. 77, p. 3 of 9, internal pagination 2:10-16.

The "walkaway" argument is unsupportable.

## VIII.   MR. ROUSSEAU COULD AND SHOULD HAVE ANTICIPATED WHAT THE ARBITRATORS AND THE COURT MIGHT BE LIKELY TO DO, BECAUSE THE LAW WAS CLEAR.

Defendants' experts contend that Mr. Rousseau could not reasonably have figured out what an arbitration panel or a federal court might be likely to do in these cases because there was ostensibly no relevant authority to guide him as to what law applied and how it would be construed.  That contention suffers from the embarrassing fact that there was an abundance of such authority, both statutory and decisional (including one case construing § 9620 under California law).[72]

First, concerning the clarity, or alleged lack thereof, of Article 9 of the UCC, a scholarly work cited by one of defendants' experts is on point:

> Revised Article 9 of the Uniform Commercial Code is governing law for almost all security interest transactions in all states. [FN omitted.] **The product of extensive scholarly drafting and professional insights, the UCC is lauded for its clarity, coherence, and logic**. [FN omitted.] Despite its potential benefits, Article 9 excludes from its scope transfers of interests in insurance policies. [FN 6: U.C.C. § 9-109(d)(8) (2000) . . .)]. Forty-eight of the fifty states follow the UCC in excluding insurance policies from the scope of their state's version of Article 9. [FN 7: . . . . *But see* CAL. COM. CODE § 9109 (West 2002); LA. REV. STAT. § 10:9-109(d)(8) (West 2002).]

Verstein, Andrew, *Bad Policy for Good Policies: Article 9's Insurance Exclusion*, 17 CONN. INS. L.J. 287, 289-290 (2011). [Bold supplied.]

The operative documents are equally clear.

---

[72]  Introducing what might reasonably be called a textbook example of a red herring, one of defendants' experts bemoans the lack of any decisions that specify how section § 9620 would operate where the collateral is a life insurance policy. But Article 9 of the UCC, having defined the several kinds of personal property that may be used as collateral thereunder (*see, e.g.*, California Commercial Code § 9102(a)(12)), does not provide for one kind of such collateral (with the exception of consumer goods) to be treated differently from another following default. In short, any case construing section § 9620 would be as instructive as any other. Defendants' expert surely knows this.

48

That said, after considering all the extrinsic evidence offered, I find that the PFA and the Assignment are unambiguous and not reasonably susceptible to multiple interpretations. . . . . Therefore, any extrinsic evidence that contradicts the clear terms of the contracts is irrelevant and will not be considered.[73]

Likewise the statutes.

This article does not apply to:

. . . .

(8)     a transfer of an interest in or assignment of a claim under a policy of insurance . . .

Uniform Commercial Code § 9-109(d)(8).

This division does not apply to any of the following:

. . . .

(8)     A loan made by an insurance company pursuant to the provisions of a policy or contract issued by it and upon the sole security of the policy or contract.

California Commercial Code § 9109(d)(8)

(a)     In this division:

. . . .

(12)     "Collateral" means the property subject to a security interest or agricultural lien.  The term includes all of the following:

(A)     Proceeds to which a security interest attaches.

(B)     Accounts, chattel paper, payment intangibles, and promissory notes

---

[73]   Order Granting In Part and Denying in Part Motion for Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo, et al.*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713-WHO, Document No. 50, p. 5 of 11, internal pagination 5:24-28; Order Granting In Part And Denying In Part Motion For Summary Judgment, *John Hancock Life Insurance Company (U.S.A.) v. Ronald Mark Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al.*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-04651-WHO, Document No. 68, p. 6 of 11, internal pagination 6:3-7.

that have been sold.

      (C)      Goods that are the subject of a consignment.

California Commercial Code § 9102(a)(12).

      (a)      In this division:

      . . . .

      (66)      "Proposal" means a record authenticated by a secured party that includes the terms on which the secured party is willing to accept collateral in full or partial satisfaction of the obligation it secures pursuant to Sections 9620, 9621, and 9622.

California Commercial Code § 9102(a)(66).  [Bold supplied]

Except as otherwise provided in Section 9624, to the extent they give rights to a debtor or obligor and impose duties on a secured party, the debtor or obligor may not waive or vary the rules stated in the following listed sections:

      . . . .

      (10)  Section 9620, 9621, and 9622, which deal with acceptance of collateral in satisfaction of obligation.

California Commercial Code 9602(10).

      (a)  Except as otherwise provided in subdivision (g), a secured party may accept collateral in full or partial satisfaction of the obligation it ensures only if all the following conditions are satisfied:

          (1)  The debtor consents to the acceptance under subdivision (c).

      . . . .

      (b)  A purported or apparent acceptance of collateral under this section is ineffective unless both of the following conditions are satisfied:

          (1)  The secured party consents to the acceptance in an authenticated record or sends a proposal to the debtor.

          (2)  The conditions of subdivision (a) are met.

(c)  For purposes of this section both of the following rules apply:

. . . .

(2)  A debtor consents to an acceptance of collateral in full satisfaction of the obligation it secures only if the debtor agrees to the terms of the acceptance in a record authenticated after default or the secured party does all of the following:

(A)  Sends to the debtor after default a proposal that is unconditional or subject only to the condition that collateral not in possession of the secured party be preserved or maintained.

(B)  In the proposal, proposes to accept collateral in full satisfaction of the obligation it secures.

(C)  Does not receive a notification authenticated by the debtor within 20 days after the proposal is sent.  . . . .

California Commercial Code § 9620.

**History**

Added Stats 1999 ch 991 § 35 (SB 45), operative 2001.

**Notes**

**Historical Derivation:**

Former UCC § 9505, as added Stats 1974 ch 997 § 46.

**Commentary**

**Official Comments on Uniform Commercial Code:**

1. **Source.**  Former Section 9-505.

. . . .

3. **Conditions to Effective Acceptance**.  Subsection (a) contains the conditions necessary to the effectiveness of an acceptance of collateral. Subsection (a)(1) requires the debtor's consent.  Under subsections (c)(1) and (c)(2), the debtor may consent by agreeing to the acceptance in writing

after default. . . . . [¶] The time when a debtor consents to strict foreclosure is significant in several circumstance under this section and the following one. See Sections 9-620(a)(1), (d)(2), 9-621(a)(1), (a)(2), (a)(3).

. . . .

**5. Secured Party's Agreement; No "Constructive" Strict Foreclosure.**

. . . .

A debtor's voluntary surrender of collateral to a secured party and the secured party's acceptance of possession of the collateral does not, of itself, necessarily raise an implication that the secured party intends or is proposing to accept the collateral in satisfaction of the secured obligation under this section.

California Commercial Code § 9620.  [Bold in original.]

And finally, the case law.

"'[A]ll applicable laws in existence when an agreement is made, which laws the parties are presumed to know and to have had in mind, necessarily enter into the contract and form a part of it, without any stipulation to that effect, as if they were expressly referred to and incorporated.' [Citation omitted.]"

*Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 954 (2008).

Therefore, the provisions of Art. 9 control a creditor's manner of foreclosure on a security consisting of personal property. 12A Pa.Stat.Ann. § 9-102(1)(a); 68 Am.Jur.2d Secured Transactions § 14.

*Fletcher v. Cobuzzi*, 499 F. Supp. 694, 698 (W.D. Pa. 1980).

The relationship between the parties is, by agreement, governed by the laws of California.  The applicable California law is its version of the Uniform Commercial Code as a patent falls within the Uniform Commercial Code definition of a "general intangible."

*Braunstein v. Gateway Management Services (In re Coldwave Systems, LLC)*, 368 B.R. 91, 94 (U.S.B.C., D. Mass., 2007).

> [T]he patent is beyond the reach of the Trustee *under the California Commercial Code*. [FN omitted.] It thus becomes necessary to examine the sufficiency of the foreclosure.

*Braunstein v. Gateway Management Services (In re Coldwave Systems, LLC)*, 368 B.R. 91, 95 (U.S.B.C., D. Mass., 2007). [Italics in original.]

> The applicable portion of the Commercial Code provides that a secured party may accept collateral in full or partial satisfaction of the obligation it secures only if the conditions of the statute are satisfied. The triggering condition is that "the debtor consents to the acceptance under subdivision (c)." Subdivision (c)(1) provides that "a debtor consents to the acceptance of collateral in partial satisfaction of the obligation it secures only if the debtor agrees to the terms of the acceptance in a record authenticated after default." [¶] It appears that the Debtor did not respond. Silence is not consent in the case of an acceptance in partial satisfaction of a debt. [FN omitted.] As a result, the attempted strict foreclosure fails. [FN omitted.]

*Braunstein v. Gateway Management Services (In re Coldwave Systems, LLC)*, 368 B.R. 91, 95 (U.S.B.C., D. Mass., 2007).

> Defendant contends that transfer of the collateral to his name through a Dallas bank on May 23, 1973, was a valid foreclosure under the statute. We must determine whether such a transfer of stock to the creditor's name is permitted by the Code as a means of foreclosure. . . . . Defendant's transfer was merely a means of eliminating plaintiff's legal title to the collateral and vesting such title in himself. A parallel may be seen in the repossession of tangible property, vesting ownership in the creditor prior to disposition. Thus, such a transfer of title by the creditor to himself will not operate as a foreclosure under the Code. [¶] In some situations the parties may benefit best without a disposition of the collateral and 12A Pa.Stat.Ann. § 9-505[74] provides an alternative. The creditor may, upon default, elect to retain the collateral as full satisfaction of the debtor's obligations. . . . . For an effective strict foreclosure, defendant must demonstrate compliance with the terms of § 9-505. [¶] Subsection (2) of § 9-505 requires notice to the debtor of creditor's proposal to retain the collateral as full satisfaction of the debt. The notice must be of strict foreclosure in particular, and not simply of an intent to foreclose.

*Fletcher v. Cobuzzi*, 499 F. Supp. 694, 698-699 (W.D. Pa. 1980).

---

[74]   Now 13 Pa.Cons.Stat. § 9620.

> Under § 9.620, Canfina may accept collateral in satisfaction of the debt "only if" the debtor consents to the acceptance under the statutory process. § 9.620(a). To consent, the debtor must either agree to the terms of the acceptance in a record authenticated "after default" or the secured creditor must send to the debtor "after default" a proposal describing its intention to accept the collateral in satisfaction of the obligation it secures.

*In re Cadiz Properties*, 278 B.R. 744, 748-749 (Bankr. N.D. Tex. 2002).

> Section 9-620 of the Uniform Commercial Code governs strict foreclosure – a procedure through which a secured creditor may retain its collateral in full or partial satisfaction of its claim. [Citations.] The remedy is only available if the debtor consents to strict foreclosure <u>after</u> it has defaulted. Thus, for example, the debtor cannot consent to strict foreclosure in anticipation of a future default at the time it enters into the transaction that creates the debt and the security interest.

*In re CBGB Holdings, LLC*, 439 B.R. 551, 554-555 (Bankr., S.D.N.Y. 2010). [Emphasis in original.]

> [T]he condition in the "ADDENDUM" providing for full and complete assignment and transfer of the collateral upon default by Chen amounted to nothing more than an unenforceable attempt at predefault waiver of the debtor's rights under Article 9 of Georgia's Uniform Commercial Code.

*Chen v. Profit Sharing Plan of Dr. Donald H. Bohne, D.D.S., P.A.*, 216 Ga. App. 878, 456 S.E.2d 237, 240 (1995).

With all of the above-quoted authorities at his disposal, Mr. Rousseau should have had no problem whatsoever in figuring out what an arbitration panel or a federal court might be likely to do in regard to the matters he was handling for Windsor.

## VIII.   EVEN IF THE APPLICABLE LAW WERE AS "MURKY" AS DEFENDANTS' EXPERTS CLAIM, IT WOULD NOT EXCUSE MR. ROUSSEAU'S CONDUCT.

Despite the clarity of the applicable authorities, defendants' experts claim that the law was "murky." This claim – which is essentially an assertion of the "judgmental immunity" defense available in malpractice cases – would not help Mr. Rousseau even if it were true.

54

The judgmental immunity doctrine relieves an attorney from a finding of liability even where there was an unfavorable result if there was an "honest error of judgment concerning a doubtful point of law ... ." [Citations omitted.] This doctrine recognizes that a attorney does not "ordinarily guarantee the soundness of his [or her] opinions and, accordingly, is not liable for every mistake he [or she] may make in his [or her] practice." [Citation omitted.] [¶] In order to prevail on this theory and escape a negligence finding, an attorney must show that there were unsettled or debatable areas of the law that were the subject of the legal advice rendered and this advice was based upon "reasonable research in an effort to ascertain relevant legal principles and to make an informed decision as to a course of conduct based upon an intelligent assessment of the problem." [Citations omitted.] Because attorneys must "possess knowledge of those plain and elementary principles of law which are commonly known by well informed attorneys" [citations omitted], as part of the analysis, the attorney must demonstrate that he or she has taken steps to "discover those additional rules of law which, although not commonly known, may readily be found by standard research techniques. [Citations.]" [Citation omitted.] It is not sufficient that the attorney exercise his or her best judgment; rather, that judgment must be consistent with the standard of practice.

*Blanks v. Seyfarth Shaw, LLP*, 171 Cal. App. 4th 336, 378-379 (2009).

"[A]n attorney's obligation is not satisfied by simply determining that the law on a particular subject is doubtful or debatable . . . ." [Citations omitted.] Even if the law is unsettled, an attorney's decision must be informed, based upon an intelligent evaluation of the case. "In other words, an attorney has a duty to *avoid* involving his [or her] client in murky areas of the law if research reveals alternative courses of conduct. At least he [or she] should inform his [or her] client of uncertainties and let the client make the decision." [Citation omitted.]

*Blanks v. Seyfarth Shaw, LLP*, 171 Cal. App. 4th 336, 379 (2009). [Italics in original.]

As I have previously noted, Mr. Rousseau had only to review the Financing Agreements in order to learn that the parties had chosen to have their secured transactions governed by California law. He had only to consult such cases as *Convergys Corporation v. Keener*, 276 Ga. 808, 810 (2003), in order to learn that the parties' choice of law – which violated no public policy of the state in which the Trusts were located – would be enforced. He had only to consult Division 9 of the California Commercial Code in order to learn that that code contained specific

language governing the rights and obligations of debtors and secured lenders following default, and that those rights and obligations could not be abrogated by agreement of the parties. He had only to read the decision of the California Supreme Court in *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 954 (2008), in order to learn that the specific language of the code would be deemed have been incorporated, verbatim, into the provisions of the Financing Agreements. He had only to read the authorities quoted above in order to clarify his understanding of the code and to learn that the code would be strictly enforced. Had he made those minimal and modest efforts, he would have known that Windsor, in order to assure its entitlement to the death benefits of the Policies, needed to enter into a post-default agreement with each of the Trusts under which Windsor would relieve each Trust of any further liability on its loan in return for Windsor's being granted a form of ownership of the Policy that was (a) unfettered by any obligation to provide to the Trust any amounts remaining from the proceeds of a public or private sale of the Policy and (b) unfettered by any obligation to provide to the Trust any amounts remaining from the death benefit after Windsor had been paid what it was owed on the loan. And if for some reason he had been unable to figure out exactly what the applicable codes and case law meant – *i.e.*, if it had all been too "murky" for him – he had a duty to avoid involving Windsor in such murkiness by seeking the advice of someone with greater expertise and by advising Windsor of the uncertainties in the situation so Windsor could decide how it wished to proceed. So far as I am aware, Mr. Rousseau did none of those things. Worse, he failed either to take, or recommend, appropriate action in regard to the Collins, Acker, Coppock and Stamatov Trusts even after the arbitration panel in Barnes/Bitter – led by a retired federal judge – had made it crystal clear what was required. My previous conclusion that Mr. Rousseau fell below the standard of care remains unchanged.

DATED:       May 2, 2018

_____
Joseph Wood