**EXHIBIT "32"**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

WINDSOR SECURITIES, LLC,

Plaintiff,

vs.

ARENT FOX, LLP; and
JULIUS ROUSSEAU, III,

Defendants.

_____/

Civil Action No. 1:16-cv-01533 (GBD)

**REPLY OF JOSEPH WOOD TO
REBUTTAL EXPERT REPORT OF JAMES W. MAXSON**

Joseph Wood respectfully submits, pursuant to Federal Rules of Civil Procedure, Rule 26(a)(2)(B), the following reply to the Rebuttal Expert Witness Report Of James W. Maxson submitted by defendants in the above-named action. The purpose of this reply is to address, on a point by point basis, some of the more egregious misstatements of fact and law contained in that report.

**A.    The Claim That There Existed No Relevant Authority Upon Which Mr. Rousseau Could And Should Have Relied Is Entirely Specious.**

Mr. Maxson claims that there existed "no authority," prior to the arbitration decision in Bitter and the summary judgment decisions in Collins and Acker, that would have put a competent attorney on notice that the "default sale right" provision in the Financing Agreements would likely be understood by California courts to be controlled by California Commercial Code § 9620. This is a rather astonishing claim, for the following reasons:

(1)    Mr. Rousseau was called upon to take the appropriate steps to ensure Windsor's right to absolute ownership of the policy collateral in Bitter, Collins, and Acker in 2010, at or around the time the loans became due.

(2)    The California Supreme Court explicitly held, in 2008, that:

> "'[A]ll applicable laws in existence when an agreement is made, which laws the parties are presumed to know and to have had in mind, necessarily enter into the contract and form a part of it, without any stipulation to that effect, as if they were expressly referred to and incorporated.' [Citation omitted.]"

*Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 954 (2008).

(3)    The California Commercial Code at that time therefore became part of, and controlled, the Financing Agreements, not only because those agreements indisputably comprised secured transactions in which the collateral was personal property – *i.e.*, the subject matter of

1

Division 9 of the Code[1] – but also because the Default Sale Right provision of the Financing Agreements plainly tracked the language of California Commercial Code § 9620.

> DEFAULT SALE RIGHT. Upon the occurrence of an Event of Default (as defined in the Agreement) that has not been remedied within the time period required in the Agreement, Assignee shall have the right (the "Default Sale Right") but not the obligation to accept, that in consideration of the full and complete satisfaction of the Liabilities (the sufficiency of which consideration is hereby acknowledged) Owner may make a full transfer and assignment of the Insurance Policy to Assignee and thereby forever relinquish any and all rights Owner may have thereunder, including without limitation any rights to cash surrender value and/or death benefit provided thereunder. Upon the exercise of this Default Sale Right, Assignee shall notify Insurer in writing and Insurer shall thereafter recognize Assignee as the sole lawful owner of the Insurance Policy.[2]

(a) Except as otherwise provided in subdivision (g), a secured party may accept collateral in full or partial satisfaction of the obligation it ensures only if all the following conditions are satisfied:

    (1) The debtor consents to the acceptance under subdivision (c).

. . . .

(b) A purported or apparent acceptance of collateral under this section is ineffective unless both of the following conditions are satisfied:

    (1) The secured party consents to the acceptance in an authenticated record or sends a proposal to the debtor.

    (2) The conditions of subdivision (a) are met.

(c) For purposes of this section both of the following rules apply:

---

[1] California Commercial Code § 9101 ("This division may be cited as the Uniform Commercial Code–Secured Transactions.") and Official Comment 1 thereto ("**Source.** This Article supersedes former Uniform Commercial Code (UCC) Article 9. As did its predecessor, it provides a comprehensive scheme for the regulation of security interests in personal property and fixtures." [Bold in original.])

[2] Declaration of Maria Ana Gordillo in Opposition To Motion For Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713, Document 40, p. 134 of 160, internal pagination Document #15 of 19, p. 4.

2

. . . .

> (2) A debtor consents to an acceptance of collateral in full satisfaction of the obligation it secures only if the debtor agrees to the terms of the acceptance in a record authenticated after default or the secured party does all of the following:
>
>> (A) Sends to the debtor after default a proposal that is unconditional or subject only to the condition that collateral not in possession of the secured party be preserved or maintained.
>>
>> (B) In the proposal, proposes to accept collateral in full satisfaction of the obligation it secures.
>>
>> (C) Does not receive a notification authenticated by the debtor within 20 days after the proposal is sent. . . . .

California Commercial Code § 9620.

(4)　There existed, in 2010, an abundance of authority, both under California law and under the laws of states whose respective versions of the relevant provisions of the UCC were essentially identical to that of California,[3] demonstrating that any attempt by Windsor to take absolute ownership of the collateral through what has been called "strict foreclosure" required strict compliance with the provisions of California Commercial Code § 9620.

> (a)　In this division:
>
> . . . .
>
> (66)　"Proposal" means a record authenticated by a secured party that includes the terms on which the secured party is willing to accept collateral in full or partial satisfaction of the obligation it secures pursuant to Sections 9620, 9621, and 9622.

---

[3] *See, in this regard, In re Alcom America Corporation*, 154 B.R. 97, 104 (D.C. 1993), where the court held: "As a preliminary matter, the court must decide which state's law controls. However, as a general rule, where the relevant UCC provisions are identical in all material respects, as they are here, the controlling law should be the same in each state. [FN and citations omitted.] When UCC provisions are the same, state law will vary only where courts have interpreted those provisions differently. . . . . [¶] Thus, New York law will control where it differs materially from District of Columbia law. Nonetheless, in light of the UCC's goal of uniformity, other state court decisions are highly relevant."

3

California Commercial Code § 9102(a)(66).

> Except as otherwise provided in Section 9624, to the extent they give rights to a debtor or obligor and impose duties on a secured party, the debtor or obligor may not waive or vary the rules stated in the following listed sections:
>
> . . . .
>
> (10) Section 9620, 9621, and 9622, which deal with acceptance of collateral in satisfaction of obligation.

California Commercial Code 9602(10).

> (a) Except as otherwise provided in subdivision (g), a secured party may accept collateral in full or partial satisfaction of the obligation it ensures only if all the following conditions are satisfied:
>
> > (1) The debtor consents to the acceptance under subdivision (c).
>
> . . . .
>
> (b) A purported or apparent acceptance of collateral under this section is ineffective unless both of the following conditions are satisfied:
>
> > (1) The secured party consents to the acceptance in an authenticated record or sends a proposal to the debtor.
> >
> > (2) The conditions of subdivision (a) are met.
>
> (c) For purposes of this section both of the following rules apply:
>
> . . . .
>
> > (2) A debtor consents to an acceptance of collateral in full satisfaction of the obligation it secures only if the debtor agrees to the terms of the acceptance in a record authenticated after default or the secured party does all of the following:
> >
> > > (A) Sends to the debtor after default a proposal that is unconditional or subject only to the condition that collateral not in possession of the secured party be preserved or maintained.
> > >
> > > (B) In the proposal, proposes to accept collateral in full satisfaction of the obligation it secures.
> > >
> > > (C) Does not receive a notification authenticated by the debtor

4

>  within 20 days after the proposal is sent. . . . .

California Commercial Code § 9620.

> **History**
>
> Added Stats 1999 ch 991 § 35 (SB 45), operative 2001.
>
> **Notes**
>
> **Historical Derivation:**
>
> Former UCC § 9505, as added Stats 1974 ch 997 § 46.
>
> **Commentary**
>
> **Official Comments on Uniform Commercial Code:**
>
>> 1. **Source.** Former Section 9-505.
>>
>> . . . .
>>
>> 3. **Conditions to Effective Acceptance.** Subsection (a) contains the conditions necessary to the effectiveness of an acceptance of collateral. Subsection (a)(1) requires the debtor's consent. Under subsections (c)(1) and (c)(2), the debtor may consent by agreeing to the acceptance in writing after default. . . . . [¶] The time when a debtor consents to strict foreclosure is significant in several circumstance under this section and the following one. See Sections 9-620(a)(1), (d)(2), 9-621(a)(1), (a)(2), (a)(3).
>>
>> . . . .
>>
>> 5. **Secured Party's Agreement; No "Constructive" Strict Foreclosure.**
>>
>> . . . .
>>
>> A debtor's voluntary surrender of collateral to a secured party and the secured party's acceptance of possession of the collateral does not, of itself, necessarily raise an implication that the secured party intends or is proposing to accept the collateral in satisfaction of the secured obligation under this section.

California Commercial Code § 9620. [Bold in original.]

5

> Therefore, the provisions of Art. 9 control a creditor's manner of foreclosure on a security consisting of personal property. 12A Pa.Stat.Ann. § 9-102(1)(a); 68 Am.Jur.2d Secured Transactions § 14.

*Fletcher v. Cobuzzi*, 499 F. Supp. 694, 698 (W.D. Pa. 1980).

> The relationship between the parties is, by agreement, governed by the laws of California. The applicable California law is its version of the Uniform Commercial Code as a patent falls within the Uniform Commercial Code definition of a "general intangible."

*Braunstein v. Gateway Management Services (In re Coldwave Systems, LLC)*, 368 B.R. 91, 94 (U.S.B.C., D. Mass., 2007).

> [T]he patent is beyond the reach of the Trustee *under the California Commercial Code*. [FN omitted.] It thus becomes necessary to examine the sufficiency of the foreclosure.

*Braunstein, supra*, 368 B.R. at 95. [Italics in original.]

> The applicable portion of the Commercial Code provides that a secured party may accept collateral in full or partial satisfaction of the obligation it secures only if the conditions of the statute are satisfied. The triggering condition is that "the debtor consents to the acceptance under subdivision (c)." Subdivision (c)(1) provides that "a debtor consents to the acceptance of collateral in partial satisfaction of the obligation it secures only if the debtor agrees to the terms of the acceptance in a record authenticated after default." [¶] It appears that the Debtor did not respond. Silence is not consent in the case of an acceptance in partial satisfaction of a debt. [FN omitted.] As a result, the attempted strict foreclosure fails. [FN omitted.]

*Ibid.*

> Defendant contends that transfer of the collateral to his name through a Dallas bank on May 23, 1973, was a valid foreclosure under the statute. We must determine whether such a transfer of stock to the creditor's name is permitted by the Code as a means of foreclosure. . . . . Defendant's transfer was merely a means of eliminating plaintiff's legal title to the collateral and vesting such title in himself. A parallel may be seen in the repossession of tangible property, vesting ownership in the creditor prior to disposition. Thus, such a transfer of title by the creditor to himself will not operate as a foreclosure under the Code. [¶] In some situations the parties may benefit best without a disposition of the collateral and 12A Pa.Stat.Ann. § 9-505[4] provides an alternative. The creditor may, upon

---

[4] Now 13 Pa.Cons.Stat. § 9620.

6

> default, elect to retain the collateral as full satisfaction of the debtor's obligations. .... For an effective strict foreclosure, defendant must demonstrate compliance with the terms of § 9-505. [¶] Subsection (2) of § 9-505 requires notice to the debtor of creditor's proposal to retain the collateral as full satisfaction of the debt. The notice must be of strict foreclosure in particular, and not simply of an intent to foreclose.

*Fletcher, supra,* 499 F. Supp. at 698-699.

> Under § 9.620, Canfina may accept collateral in satisfaction of the debt "only if" the debtor consents to the acceptance under the statutory process. § 9.620(a). To consent, the debtor must either agree to the terms of the acceptance in a record authenticated "after default" or the secured creditor must send to the debtor "after default" a proposal describing its intention to accept the collateral in satisfaction of the obligation it secures.

*In re Cadiz Properties,* 278 B.R. 744, 748-749 (Bankr. N.D. Tex. 2002).

> Section 9-620 of the Uniform Commercial Code governs strict foreclosure – a procedure through which a secured creditor may retain its collateral in full or partial satisfaction of its claim. [Citations.] The remedy is only available if the debtor consents to strict foreclosure *after* it has defaulted. Thus, for example, the debtor cannot consent to strict foreclosure in anticipation of a future default at the time it enters into the transaction that creates the debt and the security interest.

*In re CBGB Holdings, LLC,* 439 B.R. 551, 554-555 (Bankr., S.D.N.Y. 2010). [Emphasis in original.]

> [T]he condition in the "ADDENDUM" providing for full and complete assignment and transfer of the collateral upon default by Chen amounted to nothing more than an unenforceable attempt at predefault waiver of the debtor's rights under Article 9 of Georgia's Uniform Commercial Code.

*Chen v. Profit Sharing Plan of Dr. Donald H. Bohne, D.D.S., P.A.,* 216 Ga. App. 878, 456 S.E.2d 237, 240 (1995).

> Section 29:9-505(2) states that "a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Under this section, a secured creditor (1) must take possession of the collateral after default; (2) must send written notice to the debtor of its intention to retain the collateral in satisfaction of the obligation, unless the debtor has "signed after default a statement renouncing or modifying his rights under this subsection." [Citation omitted.]

*Leroy Adventures, Inc. v. Cafritz Harbour Group, Inc.,* 660 A.2d 908, 912 (D.C. App. 1995).

7

> As previously noted, in contrast to the dispositional remedies provided for in section 9-504, the UCC also entitles creditors to retain and protect collateral for a debt until the debt is set aside. [FN omitted.] Importantly, under section 9-505 and applicable case law, such retention cannot be equated under the statute with an election to satisfy debt, absent the statutorily required written notice from the creditor that it has made such an election.

*IFG Leasing Company v. Gordon*, 776 P.2d 607, 613 (Utah 1989).

> This section requires notice to the debtor of the creditor's proposal to retain the collateral as full satisfaction of the debt. "The notice must be of strict foreclosure in particular, and not simply of an intent to foreclose." [Citation omitted.]

*Emmons v. LeMaster, Inc.*, 27 Kan. App. 2d 940, 942 (2000).

> Section 505(2) contains specific requirements for a strict foreclosure and should not be liberally construed so that a forfeiture can occur. If, upon default, the creditor elects to retain the collateral as full satisfaction of the debtor's obligations, he must comply with the terms of section 9-505(2) [citation omitted], which requires that the creditor notify the debtor of the creditor's proposal to retain the collateral as full satisfaction of the debt. [Citations omitted.] The written notice must clearly and explicitly inform the debtor the creditor is retaining the collateral in satisfaction of the indebtedness.

*Patrick v. Wix Auto Company, Inc.*, 288 Ill. App. 3d 846, 849-850 (1997).

> The strict foreclosure failed to satisfy the debt or to transfer the stock. Section 9-505(2) of the Illinois Commercial Code contains specific requirements for a strict foreclosure, as we have discussed. The creditor, who must be in possession of the collateral, begins the procedure by making a written "proposal" "to retain the collateral in satisfaction of the obligation." . . . . [S]tatutes such as this should not be liberally construed for the sake of working a forfeiture.

*In re McNair*, 90 B.R. 912, 917 (Bankr., N.D. Ill. 1988).

> To fulfill the requirements of 9-505(2), the secured party must explicitly inform the debtor that it is retaining the collateral in satisfaction of the indebtedness.

*In re Alcom, supra*, 154 B.R. at 113.

    (5)    As I have previously noted, with all of the above-quoted authorities at his disposal, Mr. Rousseau should have found it very easy to determine what an arbitration panel or a federal court might be likely to do in regard to the matters he was handling for Windsor. His

8

failure in that regard compels the conclusion that he did not conduct even minimal research of readily available sources, much less the "reasonable research in an effort to ascertain relevant legal principles and to make an informed decision as to a course of conduct based upon an intelligent assessment of the problem" that is required to meet the standard of care. *Blanks v. Seyfarth Shaw, LLP*, 171 Cal. App. 4th 336, 378-379 (2009).

**B.    The Fact That Borrowers May Choose To "Walk Away" From Secured Transactions Does Not Alter The Requirement, Under California Law, That In Doing So The Parties Must Comply With The Provisions Of California Commercial Code § 9620.**

Mr. Maxson argues that it is common practice for borrowers to "walk away" from a secured transaction in which the collateral is a life insurance policy, and that under this practice the secured lender supposedly has no duty to comply with the strict requirements of the UCC. This argument is specious, for two reasons:

(1)    With the exception of such transactions governed by the laws of California or Louisiana (which are, conveniently, not mentioned in any of Mr. Maxson's "authorities"), <u>a secured transaction in which the collateral is a life insurance policy is not controlled by the UCC</u>, making any ostensible failure to comply with the UCC in those instances completely irrelevant to the present action.

(2)    Even Mr. Maxson's "authorities" note that borrowers "can simply 'walk away' at the end of the loan term <u>with the lender accepting the policy as full payment of the outstanding principal, interest, fees, and all other charges</u>" [emphasis supplied], and that "[t]he policyholder's final option is simply to <u>turn over his policy to the lender in satisfaction of his debt</u>" [emphasis supplied]. Under California Commercial Code § 9620, the <u>procedures by which</u> the lender may accept the policy as full payment of the outstanding principal, interest, fees, and all other charges, and by which the debtor may turn over his policy to the lender in satisfaction of his debt, are

9

strictly and explicitly prescribed. Mr. Rousseau failed to advise Windsor about, or to implement, those procedures, and thereby fell below the standard of care. Recharacterizing the transaction as a "walk away" cannot change that fact.

## C. The So-Called "Reality Of Practice" Is Irrelevant.

Mr. Maxson suggests that my assertion that "the UCC has 'rendered a nullity any attempt by the parties to waive, vary, or otherwise avoid the rights created by that statute[5] through agreement' .... is .... difficult to square with the reality of practice in this area." Again, because the "practice" to which Mr. Maxson refers – secured transactions in which the collateral is a life insurance policy – seems to have occurred solely in states not governed by California or Louisiana law, the transactions in question were not subject to the UCC and are completely irrelevant to this action. More important, it is well established under California law that custom and practice cannot vary or contradict the plain terms of a contract or incorporated statute.

> It is clear that where a written contract states a term clearly and unambiguously, usage or custom that would vary or contradict the term is not admissible. [Citations omitted.] Similarly, where the parties contradict each other on whether a certain term was part of their precontract discussions, usage or custom is not admissible to prove that one party's version of the contract was more probable. [Citations omitted.]

*Varni Bros. Corporation v. Wine World, Inc.*, 35 Cal. App. 4th 880, 889-890 (1995).

> That said, after considering all the extrinsic evidence offered, I find that the PFA and the Assignment are unambiguous and not reasonably susceptible to multiple interpretations. . . . . Therefore, any extrinsic evidence that contradicts the clear terms of the contracts is irrelevant and will not be considered.[6]

---

[5] *Viz.*, California Commercial Code § 9620.

[6] Order Granting In Part and Denying in Part Motion for Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo, et al.*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713-WHO, Document No. 50, p. 5 of 11, internal pagination 5:24-28; Order Granting In Part And Denying In Part Motion For Summary Judgment, *John Hancock Life Insurance Company (U.S.A.) v. Ronald Mark Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al.*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-04651-WHO, Document No. 68, p. 6 of 11, internal pagination 6:3-7.

10

Finally, the incorporated statutory language which, pursuant to the authorities cited above, cannot be varied or contradicted by custom or practice, includes language which – as I have previously noted – renders a nullity any attempt by the parties, prior to default, to waive, vary, or otherwise avoid the rights created by California Commercial Code § 9620:

> Except as otherwise provided in Section 9624, to the extent they give rights to a debtor or obligor and impose duties on a secured party, the debtor or obligor may not waive or vary the rules stated in the following listed sections:
>
> . . . .
>
> (10) Section 9620, 9621, and 9622, which deal with acceptance of collateral in satisfaction of obligation.

California Commercial Code § 9602(10).

### D. Mr. Maxson's Attempt To Discredit My Qualifications Fails.

Mr. Maxson purports to show that I am not qualified to provide expert testimony herein by claiming that I have cited "no other experience with life settlements, life insurance, secured lending, or non-recourse premium finance programs."

Two parts of that four-part claim – *viz.*, those regarding the areas of "secured transactions" and "non-recourse premium finance programs" – are false. I have described my relevant experience as follows:

> I have more than thirty-five years of continuous trial and appellate experience, in both state and federal courts, with emphases on: (a) complex business litigation, representing both plaintiffs and defendants, in such matters as misappropriation of trade secrets, trademark, business fraud, breach of commercial contracts, **secured transactions**, and breach of fiduciary duty; (b) employment and employment discrimination, representing both plaintiffs and defendants; (c) attorney malpractice, representing both plaintiffs and defendants; (d) class actions, representing plaintiffs; and (e) in several recent instances, **disputes arising out of life insurance premium financing agreements controlled by the UCC.**[7]

---

[7] Expert Witness Statement Of Joseph Wood, dated April 2, 2018, p. 52. [Bold supplied.]

11

Perhaps Mr. Maxson did not read that description carefully and thus failed to notice the bold portions thereof. I might add that – as I have previously shown by way of extensive reference to the Financing Agreements and to applicable statutes – the premium financing agreements in these cases were simply <u>not</u> "non-recourse," no matter how many times Mr. Maxson may assert that they were.

As for the remaining two parts of the claim – *viz.*, those regarding the areas of "life settlements" and "life insurance" – any experience I may or may not have in those areas would in any case be irrelevant, for the following reason: Under California law, the matters that Mr. Rousseau was charged with handling for Windsor were <u>purely about the requirements that had to be met in order for a lender to obtain absolute ownership of the collateral in a secured loan transaction governed by the UCC</u> . Whether or not the collateral was a life insurance policy, and whether or not either Windsor or the borrowers might have wished to sell the collateral on a secondary market (*i.e.*, to become involved in the life settlement industry), had no effect whatsoever on those requirements.

**E.     Statements By Counsel During The Bitter Arbitration About Whether Or Not There Had Been Defaults By The Collins, Acker, Coppock, And Stamatov Trusts Were Made On The Basis Of Incomplete Information, Cannot Alter The Fact That Such Defaults Occurred As A Matter Of Fact And Of Law, And Cannot Relieve Mr. Rousseau Of Liability For His Failure To Have Met The Requirements Of California Commercial Code § 9620 With Regard To The Collins, Acker, Coppock, And Stamatov Trusts.**

Mr. Maxson attempts to show, on the basis of statements I made during the Bitter arbitration, that (1) there were no defaults by the Collins, Acker, Coppock, and Stamatov trusts, and (2) that the attorneys who replaced Mr. Rousseau broke the chain of causation flowing from Mr. Rousseau's failure to have met the requirements of California Commercial Code § 9620 with

12

regard to the Collins and Acker trusts by not arguing to the Court in Collins and Acker that no defaults had occurred. That attempt fails, for the following reasons:

(1)    I stated, during arguments in the Bitter arbitration, that while the Bitter trust had defaulted on its loan from Windsor, the Collins, Acker, Coppock, and Stamatov trusts had not done so. I later discovered, upon undertaking representation of the Collins and Acker trusts, and still later, upon undertaking representation of the Coppock and Stamatov trusts, that my statements in that regard had been mistaken. Prior to and during the Bitter arbitration, I had had no reason to investigate, and had not investigated, anything having to do with either the Collins, Acker, Coppock, or Stamatov trusts. Moreover, Eugene Houchins III had in the Bitter case communicated to me, and testified to, his belief that those trusts had not defaulted, and I had at that time no reason to think otherwise. Mr. Houchins later testified that he had originally believed and testified – mistakenly, as it turned out – that there could be no default absent a written notice of default from Windsor (something which had occurred with regard to the Bitter trust but not with regard to the Collins, Acker, Coppock, or Stamatov trusts), and changed his testimony about whether defaults had occurred when he learned of the mistake.[8]

(2)    Upon undertaking representation of the Collins and Acker trusts, and still later, upon undertaking representation of the Coppock and Stamatov trusts, I investigated the underlying facts of those cases, researched California law on breach of contract, and determined that in each case the trusts had committed an anticipatory breach/default.

---

[8] Supplemental Declaration Of Eugene Houchins III Submitted In Support Of Motion For Summary Judgment Or, In The Alternative, For Partial Summary Adjudication, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust – 2008, et al., and Related Cross-Action*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713-WHO, Document No. 67, p. 2 of 4, internal pagination 1:5-2:1.

13

(3)     I was able to demonstrate to the Court in the Collins and Acker cases that the Collins and Acker trusts' communications to Windsor of their intention not to repay their loans had comprised an anticipatory breach/default. That demonstration turned mainly on the conduct of Windsor – carried out under the guidance of Mr. Rousseau – following those communications. Specifically, Windsor treated those communications as a default, demanding that the trustees sign change of ownership and change of beneficiary forms and turn over the policies to Windsor. (The same thing occurred with regard to the Coppock and Stamatov trusts.) Mr. Prusky testified truthfully about those events with regard to the Collins and Acker Trusts, leaving the attorneys who replaced Mr. Rousseau with no reasonable basis upon which to argue otherwise.

### F.     The Testimony Of David Fox Misstates Applicable Law.

David Fox, a former colleague of Mr. Rousseau who has not been designated as an expert herein, claimed in his deposition that any of the trusts could have transferred ownership of the policy collateral to Windsor at any time, regardless of the requirements of California Commercial Code § 9620, simply by saying "Here, I'll sell you my policy." Mr. Fox went on: "[I]t's like selling a house. You don't have to have anything other than a deed to convey a house."

Putting aside the fact that Mr. Fox, not being the judge in this case and having not been designated as an expert herein, cannot be heard to tell us what the law is, his statements are squarely negated by California Commercial Code §§ 9602, 9620, and such decisions as *Chen*, supra, 216 Ga. App. 878, 456 S.E.2d 237, 240 (1995) ("[T]he condition in the "ADDENDUM" providing for full and complete assignment and transfer of the collateral upon default by Chen amounted to nothing more than an unenforceable attempt at predefault waiver of the debtor's rights under Article 9 of Georgia's Uniform Commercial Code."). Under the code, as we have repeatedly seen, the debtor cannot waive by agreement, other than a writing following

default, his or her rights in the collateral created by § 9620. One wonders, first of all, whether Mr. Fox, in providing such an example, was unaware that the laws governing real estate transactions are often not the same as those governing secured transactions under Article 9 of the UCC. More important, if he was claiming that the same sort of transaction could occur where the collateral was personal property and thus covered by the UCC, he was making the same argument later put forward by one of Defendants' experts, *viz.*, "people trade in used cars all the time without going into default, so a pre-default agreement to give up the collateral to the lender can't be a violation of the UCC." That argument, as I have previously pointed out, ignores the fact that <u>the owner of the car, in asking for a trade-in, is effectively telling the dealer that he does not want to pay off the loan when due</u>. The dealer can and does treat this as an anticipatory breach/default, enabling the parties to make the above-mentioned agreement – transfer of the collateral and forgiveness of the original loan – <u>after default</u> and thus consistent with the demands of UCC § 9.620.

**G.     Conclusion.**

My previously expressed opinions – *viz.*, that Mr. Rousseau fell below the standard of care and thereby caused damages to Windsor – remain unchanged.

DATED:     May 22, 2018

_____
Joseph Wood

15