# EXHIBIT "33"

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WINDSOR SECURITIES, LLC | : |
| | : Civil Action No. 16-cv-01533 (GBD) |
| Plaintiff | : |
| v. | : |
| | : |
| ARENT FOX, LLP | : |
| and | : |
| JULIUS ROUSSEAU, III, ESQUIRE | : |
| | : |
| Defendants | : |

## EXPERT REPORT OF SANDRA STERN, ESQUIRE

## 1. BACKGROUND AND QUALIFICATIONS.

1. I am an attorney in private practice in New York City. I have had extensive experience with secured transactions and their statutory underpinning, Article 9 of the Uniform Commercial Code ("UCC"), beginning in the 1980s as an in-house attorney at Republic National Bank of New York and continuing through the last 24 years in private practice. I have represented borrowers and lenders in various types of secured transactions, involving collateral pools as well as single items of collateral, and have advised clients from the inception of the structuring process through default.

2. I am the author of the treatise *Structuring and Drafting Commercial Loan Agreements*, which was first published in the early 1980s. I have updated my treatise every year, generally by adding a new chapter addressing what I consider to be matters of current interest. In addition, I was chair of the annual Practising Law Institute program on Article 9 of the UCC for approximately 10 years, and continued as a regular program speaker through this year (teaching the segment on default and remedies, among other topics). I was one of a small group of drafters of an Omnibus Bill, Senate #5901, that, brought New York into step with the other jurisdictions with respect to the 2010 amendments to Article 9, and enacted some unique provisions that made New York law more advantageous for Article 9 practitioners than the laws of other jurisdictions. Finally, as a member of the Uniform Law Commission's Drafting Committee to Revise Articles 1, 3, and 9, I am currently working on provisions to further revise these articles in contemplation of the establishment of a national repository for mortgage notes.

3. I represent New York State on the Uniform Law Commission ("ULC") (formerly the National Conference of Commissioners on Uniform State Laws). I was a member of the Drafting Committees for the 2001 and 2010 revisions of Article 9 (and was a member of the Drafting Committees for several other Articles of the UCC as well). I am currently a member of the UCC Committee, which is the group within ULC that considers what initiatives, if any, ULC should undertake to address current practice issues arising under the UCC.

4. With respect to the specific issues involved in this litigation, I was a member of the 3-person Consumer Issues Subcommittee formed during the drafting process for Revised Article 9. This group was appointed by the ULC from among the Drafting Committee members for the purpose of resolving differences between consumer and creditor representatives that were then threatening to derail the Article 9 enactment process, largely those centering upon the rights of the defaulting consumer.[1] We met separately with both groups, ultimately drafting a set of comprehensive provisions that covered all aspects of the default and foreclosure process. The package was presented to the full Drafting Committee, and was adopted wholesale.

5. My CV, setting forth my background, qualifications, a list of my publications, including those that I have authored in the last 10 years, and a list of all cases in which, during the last 4 years, I have testified as an expert at trial or by deposition, is attached hereto as Appendix A.

---

[1] The process, and the issues addressed, is described in Benfield, Marion W., Jr., "Consumer Provisions in Revised Article 9", 74 Chicago-Kent Law Review Issue 3 (1999).

## II. THE ASSIGNMENT.

I have been asked to review the advice provided to Windsor Securities, LLC by Julius Rousseau, III and Arent Fox, LLP to determine whether such attorneys' conduct fell below the ordinary and reasonable skill and knowledge commonly possessed by members of the procession, and, more particularly, exercised the skill and knowledge commensurate with their claimed expertise in the transactions at issue, and if not, whether Mr. Rousseau's advice and conduct rise to the level of malpractice.

## III. STATEMENT OF FACTS.

### (1) Overview

The Plaintiff, Windsor Securities, LLC ("Windsor") and its principal, Steven Prusky, entered the business of life insurance premium financing in 2007. Windsor made loans to finance the acquisition of a policy insuring the life of each designated individual. The loans were each scheduled to mature on a specified date 820 days from the date of disbursement of the funds by Windsor.

On the maturity date, the Trustee (directed, as a practical matter, by the insured) had two choices. He or she might make arrangements for the repayment of the loan. In that case, the Trustee would, subject to continuing premium payments, be entitled to designate the person who would ultimately receive the death benefits payable thereunder.

Or the Trust might fail to repay the loan, an occurrence that was described as an "Event of Default" under the relevant transaction documents. In that case, it was Windsor's expectation that Windsor would become the owner of the policy, and would have the option of (1) continuing to pay premiums, and thereby being entitled to receive the benefits payable thereunder upon the death of the insured (including the right to sell the policy and keep all proceeds or to eventually collect the death benefit); or (2) discontinuing such premium payments, in which event it would absorb as a loss the payments previously made during the term of the loan, as well as any made thereafter.

The focus of this Report is (a) to identify the specific requirements that Windsor had to meet in order to become the unfettered owner of each policy with all death benefits payable thereunder; and (b) to evaluate the advice given in this regard by Windsor's attorneys, Arent Fox, in light of prevailing standards for legal malpractice.

### (2) The Structure and Transaction Documents

The five premium finance loans at issue in this litigation were similarly structured. In each case, the insured became the grantor of a trust, which became the initial owner of the policy and the borrower of the funds advanced to purchase it. The trust then entered into a Life Insurance Premium Financing Agreement ("Premium Financing Agreement") among Windsor Securities LLC, the Trust, and the Insured, setting forth the terms and conditions of the loan, and a

2

Promissory Note. By a stand-alone instrument, Assignment of Life Insurance Policy as Collateral ("Assignment Agreement"), the Trust assigned its rights to the policy to Windsor as collateral security for the advances made under the Premium Financing Agreement. In addition, there was a separate Security Agreement in which the insured pledged its interest in the Trust and the Trust pledged its interest in the policy to Windsor. Of great importance, the documents were governed by California law.

These documents contained two provisions that related to an Event of Default. One is a "Default Sale Right," found on page 4 of the Assignment Agreement. This provision stated that upon an Event of Default, Windsor shall have the right (but not the duty) to accept the policy in satisfaction of the Trust's liabilities. The second is the right, set forth in section 6(a) of the Security Agreement, providing that upon an Event of Default, Windsor is authorized to register the policy in its name or the name of a designee. The relevance of these provisions to the secured creditor remedies set forth in Article 9 of the Commercial Code ("UCC") as adopted in California is discussed in Sections (V)(b)(v) and (vi) below.

(3) Julius Rousseau and Arent Fox's Representation of Windsor

Sometime in 2008, shortly after Windsor had made the premium finance loans at issue in this litigation,[2] Steve Prusky was introduced to Julius Rousseau by a business acquaintance. Rousseau was then with the firm Herrick Feinstein, LLP (the "Herrick Firm") and held himself out to the public as having specialized expertise in both the life settlement business and with premium finance structures used in the purchase of life insurance.

On or about June 5, 2009, Windsor engaged Rousseau and the Herrick Firm to "provide general advice and representation to Windsor in connection with a variety of corporate and lending transactions in which you and it [Windsor] are involved including premium finance of life insurance policies and various lending and investment opportunities."[3]

In or around June of 2010, Rousseau left the Herrick Firm and joined Defendant Arent Fox as a partner and head of the Firm's Insurance and Reinsurance Practice in New York City. Windsor engaged Arent Fox to represent Windsor "generally" in connection with its business ventures, and also to handle matters in litigation, "providing advice and guidance in connection with negotiations, settlements, and providing regulatory advice and assistance."[4] Rousseau's representation of Windsor continued uninterrupted during his transition from the Herrick Firm to Defendant Arent Fox. Rousseau continued to hold himself out as having specialized expertise in these areas of the law.

Rousseau advised and assisted Windsor with each of the policies at issue herein. Most significantly, he advised Windsor with respect to the issue of utmost importance to it: determining what steps were necessary to ensure that Windsor had unfettered title and ownership

---

[2] Prusky Deposition, at 177-78.
[3] Rousseau-Herrick Engagement Letter of June 5, 2009.
[4] Arent Fox Engagement Letter of April 7, 2011.

3

to each of the policies, and all rights and death benefits thereunder in the event that the loans were not repaid by the Trusts at maturity.

(4) The Five Contested Policies

Julius Rousseau provided legal advice to Windsor with respect to five policies funded by it. They were as follows:

- Joe E. Acker Family Trust, Insured Joe E. Acker
  Policy #93783751 issued 3-6-08 by John Hancock Life Insurance Company
  Face Amount and Death Benefit Value $1,000,000
  Trustee Ronald Mark Goss, Maturity Date of Loan- July 29, 2010
  (the "Acker Policy")

- Erwin A. Collins Family Life Insurance Trust, Insured Erwin A. Collins
  Policy #VF51701320 issued on 3- 4- 08 by Pacific Life Insurance Co.
  Face Amount and Death Benefit Value $2,000,000
  Trustee Maria Ana Gordillo, Maturity Date of Loan- July 29, 2010
  (The "Collins Policy")

- John L. Bitter Irrevocable Life Insurance Trust, Insured John L. Bitter
  Policy #VF51701770 issued 2- 8-08 by Pacific Life Insurance Company
  Face Amount and Death Benefit Value $2,000,000
  Trustee Gregory Barnes, Maturity Date of Loan- July 10, 2010
  (The "Bitter Policy")

- The Jane Ann Stamatov Family Insurance Trust, Insured Jane Ann Stamatov
  Policy #97524494 issued on 1-28-08 by PHL Variable Insurance Company
  Face Amount and Death Benefit Value $2,000,000
  Trustee Larry L. Davidson, Maturity Date of Loan-June 29, 2010
  (The "Stamatov Policy")

- Robert S. Coppock Irrevocable Life Insurance Trust, Insured Robert S. Coppock
  Policy #VF51701030 issued on 12- 2-07 by Pacific Life Insurance Company
  Death Benefit Value $2,000,000
  Trustee Eliza L. Coppock, Maturity Date of Loan- July 8, 2010
  (The "Coppock Policy")

4

The Bitter Policy was issued to John L. Bitter by Pacific Life Insurance Company on February 8, 2008 and had a face amount of two Million Dollars ($2,000,000). Windsor funded the Bitter Premium Finance Loan in the amount of Eight Four Thousand Five Hundred Dollars ($84,500) at fifteen percent (15%) interest to pay the initial premium (the "Bitter Loan"). The Bitter Trustee, John Bitter and Windsor executed the financing package of documents. The Bitter Loan was due 820 days after the initial funding, and the principal balance increased over time as Windsor continued to pay premiums. Neither Bitter nor the Bitter Trust ever paid any premiums for the Bitter Policy, all of such payments having been made by Windsor. The Bitter Loan became due to Windsor on or about July 10, 2010.

In or around July 10, 2010, the Bitter Trust failed to pay back the loan, an uncured event of default. After repeated communications on this matter, on February 14, 2011, the Bitter Trustee executed an Ownership, Name or Beneficiary Change Request (the "Bitter COO"). Rousseau and Arent Fox specifically advised Windsor that the executed Bitter COO and surrender of the Bitter Policy effectuated ownership and entitlement of the death benefits under the Bitter Policy to Windsor. Rousseau did not suggest or advise that any other document(s) be executed or any other action be taken by Windsor to perfect its ownership in and/or entitlement to the death benefits under the Bitter Policy. Based on this belief, that Windsor had unfettered ownership to the Bitter policy, Windsor continued to pay all required premiums with the expectation that eventually Windsor would collect the full death benefit. About 20 months later, on December 23, 2012, Bitter died.

Upon receiving notice of Windsor's attempts to collect the death benefits under the Bitter policy, on February 13, 2013, the Bitter Trustee filed a civil action in the California Superior Court against Windsor claiming that Windsor did not have ownership and/or rights to the death benefits under the Bitter policy. Because the Bitter transaction documents provided that all disputes were to be determined by a panel of three (3) arbitrators in San Francisco, California, the Bitter Action was referred to the American Arbitration Association (the "Bitter Arbitration").

In the Bitter Arbitration, the Bitter Trustee argued that the Bitter Trust was not in default at the time that Windsor sought to take ownership of the Bitter Policy, and even if it was, Windsor failed to satisfy the requirements of the "Default Sale Right" provision contained in the Bitter Assignment and also failed to comply with the "strict foreclosure" procedures under California Civil Code Section 9620, California's version of the Uniform Commercial Code ("UCC"),[5] and therefore Windsor's rights were that of a secured party entitled to recover only the monies it advanced for premiums, plus interest, closing costs, and expenses, and was not entitled the death benefits under the Bitter policy.

On April 8, 2014, the American Arbitration Association panel entered an Interim Award in the Bitter Arbitration in favor of the Bitter Trust, wherein it found and decided that the Bitter Trust at the time of Mr. Bitter's death retained ownership of the Bitter Policy. The Arbitration Panel specifically found that "Windsor failed to comply with the Default Sales provision in the [Bitter] Collateral Assignment Agreement and California Civil Code §9620."

---

[5] California's Civil Code Section 9620 is identical to the Uniform Version printed in West's Uniform Commercial Code, except for minor clarifying changes that do not affect the substance of these rules. For purposes of this Report, the sections will be treated as identical.

5

With respect to the other four (Collins, Acker, Coppock and Stamatov), the Trustees executed COO's prior to the Maturity Date of the Loans. Following the Arbitration Panel's Interim Order in the Bitter Arbitration, Windsor and Rousseau specifically discussed the documentation regarding Windsor's ownership of those premium finance policies, and Windsor's entitlement to the death benefits under each respective policy. Again, Rousseau and Arent Fox assured Windsor that Windsor's ownership of those policies was absolute, because the executed COOs effected a mutual "walkaway" before the maturity date of the loan, and that Windsor would therefore be, by virtue thereof, entitled to the death benefits for each policy. Rousseau specifically suggested that requiring and/or obtaining any further documentation with respect to each of these policies could "only cause more harm than good." [6]

The Acker and Collins litigations, which were heard by the same Judge, were both decided adversely to Windsor. In each case, the Court held that the executed COOs did not satisfy the requirement of 9620, and that the respective Trusts were entitled to the death benefit. The court reasoned that the COOs did not satisfy 9620 because:

> ...Section 9620 requires an *agreement* "to the terms of the acceptance in a record authenticated after default." An agreement is not simply a transfer. Section 9602 [sic] requires that the agreement include the terms of the acceptance "of collateral in full satisfaction of the obligation it secures." Because the Assignment does not reflect any agreement to transfer the collateral in exchange for a satisfaction of the Trust's obligations, the Trust cannot be considered to have consented under the terms of section 9620....In addition, section 9620 provides that a debtor's consent to acceptance of collateral must be made in an agreement *after default*. The statute repeatedly uses the language of a "record authenticated after default." This is made clear because an agreement to any terms before default would constitute an improper waiver of the rights in section 9620(b).

With respect to the Coppock and Stamatov policies, COOs were likewise obtained prior to the maturity date of the loan (and thus prior to a monetary default). In each instance, Windsor initiated litigation in order to seek a determination as to its right to the policies and entitlement to the death benefit. However, now faced with the adverse decisions in the Acker and Collins litigations, Windsor was compelled to settle with the Coppock and Stamatov Trustees.

Thus, in all five instances, all premium payments were made by Windsor. No insured or its trust ever paid any premium. Yet, because of the failure of Julius Rousseau and Arent Fox to satisfy

---

[6] Prusky Deposition, Transcript pages 207:23-209:5.

the 9620 requirements (or those of the other default remedies mandated by Article 9), Windsor was deprived of its reasonable expectation that it would receive the death benefits payable thereunder.

## IV. SUMMARY OF OPINIONS.

(1) Julius Rousseau failed to exercise the skill and knowledge commonly possessed by lawyers claiming specialized expertise in the financing of life insurance policies. (2) Further, he failed to exercise even the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession generally. (3) Because of the unique practices and expectations common to premium finance transactions (as distinguished from secured transactions entered into in reliance upon other collateral), it was reasonable to anticipate that such failings would cause significant and irreparable damage to Windsor. (4) Because of the unique nature of the premium finance business, such failings satisfy the "but for" requirement of the proximate cause test. (5) The statutory law involved - section 9620 of the Uniform Commercial Code ("UCC") as adopted in California (which is identical to the uniform version of this section) - is black letter statutory law that does not present unclear and unsettled issues or questions of first impression.

## V. DISCUSSION.

(1) What is the UCC roadmap for determining the secured party's rights after default?

(a) Choice of law. The governing law for the various transaction documents comprising the premium financing package is California. The overarching Article containing the choice of law rules for the UCC in California (as elsewhere) is Article 1 (General Provisions).[7] Pursuant to section 1301 thereof:

> (a) Except as otherwise provided in this section, when a transaction bears a reasonable relation to this state and also to another state or nation, the parties may agree that the law either of this state or of the other state or nation shall govern their rights and duties....

> (c) If one of the following provisions specifies the applicable law, that provision governs and a contrary agreement is effective only to the extent permitted by the law so specified: ...

[7] The citations in this Report may be to either the uniform version promulgated for enactment by the National Conference of Commissioners on Uniform State Laws and the American Law Institute ("Official Text") or to the California version of the UCC, as the context may require. Citations to the Official Text use its numbering system, which contains a hyphen: i.e., 1-201. Citations to the California UCC use its numbering system, which does not: i.e., 1201. However, any material deviations between the two will be noted.

(6) Sections 9301 to 9307 inclusive....

Section 9-301 and 9-307 of the UCC address the determination of applicable law in secured transactions. Under California's 9301:

> ... the following rules determine the law governing perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral:
>
> (1) Except as otherwise provided in this section, while a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral.

Thus, for example, in determining whether a filed financing statement was effective to perfect a security interest in the collateral described therein, if the debtor with respect to that collateral was, for example, located in Georgia, the laws of Georgia would determine whether a UCC financing statement filed in the State of Georgia was effective to perfect a security interest in the collateral described therein, and whether it was effective to confer a first priority security interest as against other persons claiming a security interest in the same collateral.

As to the rest of the security agreement – all provisions that do not determine perfection, the effect of perfection or nonperfection, and ...priority," the applicable law is that set forth in the governing documents. This point is addressed by an Comment (No. 2) to California's 9301:

> This subpart does not address choice of law for other purposes. For example, the law applicable to issues such as attachment, validity, characterization (e.g., true lease or security interest), *and enforcement* [italics supplied] is governed by the rules in Section 1-301; that governing law typically is specified in the same agreement that contains the security agreement.

Thus, enforcement of a security interest, which is governed by Part 6 of the Uniform Commercial Code (including section 620 thereof) is governed by the law chosen by the agreement of the parties - in this case, the law of the State of California.

Finally, and significant to this controversy, in most jurisdictions, Article 9 does not apply at all to the transfer of an interest in an insurance policy. The Uniform version of 9-109 provides that:

> (d) This Article does not apply to:
>
> (8) A transfer of an interest in or an assignment of a claim under a policy of insurance ....

8

However, and most significantly, California's law departs from the uniform version, and specifically provides that insurance policies are specifically brought within the scope of Article 9, and are subject to its rules.[8] In explaining its deviation from the uniform version, the California Assembly, in Comment 13 states that:

> **Insurance.** The uniform version of Section 9109(d)(8) carries forward the exclusion from coverage of security interests in insurance policies, except for receivables under health insurance policies. The drafters of revised Article 9 believe that other law adequately addresses the creation of security interests in insurance policies. Because California has permitted the creation and perfection of security interests in insurance policies under the former version of Division 9 for some 30 years now, coopting the development of other law governing such matters, satisfactory industry practice should not be disturbed and California's former rule has been carried forward into revised Division 9. Given that the effect of the uniform version of Article 9 is to let the laws of individual states govern the issue, it should not disturb the structure of the uniform statute if California chooses to retain its version of the Uniform Commercial Code as the applicable governing law for this issue. This variation, therefore, is not incompatible with commercial law uniformity.

(b) The Secured Party's Rights Upon Default.

In any secured loan, it is of paramount importance for the lawyer advising the secured party to determine how the secured party can obtain ownership of the collateral. Although this is critical to the client's recovery on its loan, Arent Fox and Julius Rousseau consistently either ignored this issue, or, having considered it, provided the wrong advice.

Often a client will fail to ask the attorney about this issue. Frequently, it will assume that it somehow automatically owns the collateral after default, and must be told of the Part 6 default rules that it must follow to become the owner. One would not, however, expect an attorney - particularly one who holds himself out as possessing expertise in insurance premium financing, as Arent Fox and Julius Rousseau claimed to be - to make this mistake.

---

[8] The text of California's 9109(d)(8) excludes from the scope of Article 9 only "a loan made by an insurance company pursuant to the provisions of a policy or contract issued by it and upon the sole security of the policy or contract." This exclusion would not apply to Windsor, which is not an insurance company.

9

California follows the uniform version generally in offering four options to a secured party that wishes to obtain ownership of the collateral after default (not all of which are useful to or practical for a secured party in Windsor's position). As set forth in both 9-602 and California's version 9602, these rules are black letter and, for the most part, cannot be waived or varied by agreement. As shall be discussed below, Julius Rousseau's advice to Windsor reflected a lack of knowledge of the differences between California law and the uniform version.

(i) Partial Strict Foreclosure

The first option is partial strict foreclosure - acceptance of the collateral in partial satisfaction of the obligation it secures. Section 9620(g) provides that this remedy is not available in a "consumer transaction."

> In a consumer transaction, a secured party may not accept collateral in partial satisfaction of the obligation it secures.

Note 12 adds the following commentary:

> If a secured party attempts an acceptance in partial satisfaction in a consumer transaction, the attempted acceptance is void.

Are the premium finance transactions at issue here "consumer transactions"? The definition of "consumer transaction" is found in 9102(a)(26)(as well as California's version):

> "Consumer transaction" means a transaction in which (i) an individual incurs an obligation primarily for personal, family, or household purposes, (ii) a security interest secures the obligation, and (iii) the collateral is held or acquired primarily for personal, family, or household purposes. The term includes consumer-goods transactions.

If one reads the exclusion broadly as applying to the Windsor financings, which were undertaken primarily for "personal, family, or household purposes" (9102(a)(26)), this option was not available to Windsor. If one reads it literally, because it was the trust rather than the individual insured that acquired the policy, the 9620 exclusion does not apply, but the remedy is useless because the trusts were established as single purpose entities with no assets other than the policy. Therefore, if the collateral was accepted in partial satisfaction of the obligation, there can be, as a practical matter, no successful claim against the trust. The result is that the remedy of partial strict foreclosure would have been, under either interpretation, unavailable to Windsor.

(ii) Strict foreclosure.

10

This is, of course, the remedy at issue in this case. The secured party may, under either the uniform version of 9-620 or California's 9620, retain the collateral in full satisfaction of the obligation if it receives either (1) actual consent to a proposal made by the secured party; or (2) acquiescence in such proposal by the debtor's failure to object thereto, in the precise form prescribed by the UCC. Under both the uniform and the California version of 9620:

> (2) A debtor consents to an acceptance of collateral in full satisfaction of the obligation it secures only if the debtor agrees to the terms of the acceptance in a record authenticated[9] after default or the secured party does all of the following:
>
> (A) Sends to the debtor after default a proposal that is unconditional or subject only to a condition that collateral not in the possession of the secured party be preserved or maintained.
>
> (B) In the proposal, proposes to accept collateral in full satisfaction of the obligation it secures.
>
> (C) Does not receive a notification of objection authenticated by the debtor within 20 days after the proposal is sent. [10]

Under both the uniform and the California version of 9602(10), the protections of this section cannot be waived by the debtor.

If one did not know anything about the nature and purpose of the default provisions in Article 9, it might appear that the foregoing provisions reflect mere procedural formalities that need not be strictly observed, or whose requirements may be satisfied by patching together disparate communications to the debtor. However, that view would not reflect the significant role of 9-620 (in both the uniform and California versions) in Article 9's default provisions.

Of the remedies in Part 6 of Article 9 (Default and Enforcement of Security Interests), one remedy that is considered to be fair to the defaulting debtor in most circumstances is disposition

---

[9] "Authenticate" is a term defined in 9 102(a)(7). It means: to do either of the following:

> (A) To sign.
> (B) To, with present intent to adopt or accept a record, attach to or logically associate with the record an electronic sound, symbol, or process.

The definition is boilerplate that appears in many sections of the UCC. It is intended to permit parties to indicate assent to an electronic message by replying thereto, obviating any need to manually sign a hard copy and return it to the sender.

[10] In certain instances, notices to third parties may be required. The circumstances requiring such third party notices do not appear to have been present in the Windsor transactions.

11

(the commercially reasonable sale), discussed in greater detail below. That is not because a commercially reasonable sale will necessarily generate a winning bid that will exceed the debt and return some surplus to the debtor. Indeed, the drafters of Article 9 were aware that a low price was often a realistic outcome of a commercially reasonable sale. I recall that this issue was discussed extensively during the Drafting Committee meetings that took place prior to the 2001 revision of Article 9. The issue was resolved by an agreement to insert Comment 10 to section 9-610:

> While not itself sufficient to establish a violation of this Part, a low price suggests that a court should scrutinize carefully all aspects of a disposition to ensure that each aspect was commercially reasonable.

Instead, a commercially reasonable sale is thought to be fair to the debtor because the disposition must comply with the Part 6 requirements for notice to the debtor and advertisement to third parties. Therefore, it is thought to create the circumstances under which the highest possible price can be realized under the circumstances of a foreclosure sale. It aims for procedural regularity, in the expectation that economic fairness will follow.

Additionally, section 615(f) permits the courts to take a second look at a disposition which, although procedurally regular, generates a "pennies on the dollar" credit bid by the secured party.

> The surplus or deficiency following a disposition is calculated based on the amount of proceeds that would have been realized in a disposition complying with this chapter to a transferee other than the secured party, a person related to the secured party, or a secondary obligor if both of the following apply:
> (1) The transferee in the disposition is the secured party, a person related to the secured party, or a secondary obligor.
> (2) The amount of proceeds of the disposition is significantly below the range of proceeds that a complying disposition to a person other than the secured party, a person related to the secured party, or a secondary obligor would have brought.

Finally, the commercially reasonable sale has at least the potential of returning a surplus to the debtor. Under 9615(d)(1), the secured party shall apply the amount received for the collateral to the expenses of sale and the satisfaction of the obligations secured by the collateral. Following such application, the surplus, if any, is to be returned to the debtor.

Comparing the remedy of strict foreclosure to the commercially reasonable disposition, it is evident that strict foreclosure does not always provide the same debtor protections as the

12

commercially reasonable sale. First, the consideration to be paid is the amount outstanding on the obligation, not an amount that is determined by objective market forces. Depending on the nature of the collateral, and the terms of the loan, a default could potentially result in the transfer of ownership of a valuable asset in return for a relatively small obligation.

Second, there is no "second look," as discussed above, even though the remedy of strict foreclosure, by definition, results in a transfer of the collateral to the secured party. There is, instead, a comment in 9620(11) that relates to the general duty of good faith.

> **Role of Good Faith.** Section 1-304 imposes an obligation of good faith on a secured party's enforcement under this Article. This obligation may not be disclaimed by agreement. See Section 1-302. Thus, a proposal and acceptance made under this section in bad faith would not be effective. For example, a secured party's proposal to accept marketable securities worth $1,000 in full satisfaction of indebtedness in the amount of $100, made in the hopes that the debtor might inadvertently fail to object, would be made in bad faith. On the other hand, in the normal case proposals and acceptances should be not second-guessed on the basis of the "value" of the collateral involved. Disputes about valuation or even a clear excess of collateral value over the amount of obligations satisfied do not necessarily demonstrate the absence of good faith. [11]

The foregoing is a relatively weak comment, merely calling a practitioner's attention to the possibility that, in appropriate circumstances, a claim of bad faith may be made. It does not direct the courts to undertake such inquiries.

Third, as discussed above, the remedy of strict foreclosure (unlike the commercially reasonable sale) does not give the debtor even the possibility of a surplus. It is an exact exchange.

In light of these differences, the *only* significant debtor protection to be found in 9620 (in the uniform and California version) is the requirement of notice to the debtor after default. At the time such requirement was discussed during the Drafting Committee meetings leading to the 2001 revision, it was assumed that a post default notice would call the debtor's attention to the fact that it was required to make a decision, and, would give the debtor opportunity to seek legal assistance if it wished to do so.

---

[11] For a case holding that: "That ... strict foreclosure may result in a windfall does not, by itself, amount to bad faith or otherwise render the foreclosure improper...." See, *McDonald v. Yarchenko*, 2013 WL 3809512 (D. Oregon, July, 2013).

A properly drafted proposal, therefore, is not a mere technical requirement, or a trap for the unwary. It is the critical key to procedural fairness to the debtor when collateral is to be accepted and valued at the amount then outstanding on the loan. It is for this reason that each of the tribunals that considered this issue below correctly refused to permit Windsor to construct such a notice out of implication and inference, or to patch together the terms of a proposal from contract terms and conditions agreed to prior to default.

Yet, notwithstanding this requirement, Julius Rousseau persisted in his assertion - which he reiterated as late as the time of his deposition - that the words "conclude our relationship in an amicable fashion," which appeared in demand letters sent to insureds, were the equivalent of a complying proposal.[12]

<u>(iii) The Private Sale.</u>

Article 9 permits a sale of collateral to be made at a private (as opposed to public) sale. Although there is no definition of either term in Article 9, there are some indications as to what was meant by each. Pursuant to 9610, Comment 7:

> Although the term is not defined, as used in this Division, a "public disposition" is one at which the price is determined after the public has had a meaningful opportunity for competitive bidding. "Meaningful opportunity" is meant to imply that some form of advertisement or public notice must precede the sale (or other disposition) and that the public must have access to the sale (disposition).

The private sale has been disregarded for purposes of this Report, as it would never have been an attractive option for Windsor. That is because 9610(c) prohibits a secured party from buying in at a private sale, and thus acquiring ownership of the policy, except in specific circumstances not present in this case.

> (c) A secured party may purchase collateral at either of the following:
> (1) At a public disposition.
> (2) At a private disposition only if the collateral is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations.

<u>(iv) The Public Sale.</u>

Jules Rousseau and Arent Fox never advised Windsor to conduct a public sale or described the requirements for such a sale, as they believed that the trusts and insured's execution of the change of ownership forms provided Windsor ownership of the policies and entitlement to the

---

[12] Rousseau deposition 191-2.

14

death benefits therender. This remedy would have achieved Windsor's objective: outright ownership of a policy after an event of default.

Pursuant to 9610(a),

> (a) After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing.
>
> (b) Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable. If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, and at any time and place and on any terms.

The requirements for such a sale are set forth in 9611-9614. The procedural steps for conducting the sale are threefold. (1) The secured party must determine, by conducting a search of the central filing records, the identity of any other secured party of record. Ordinarily, that search would be conducted by the secured party's service company. (2) The secured party must send a notice of the sale to the debtor and other persons specified by 9611(c) within specified time periods.

The rules governing steps (1) and (2) are mechanical, and are easily to follow. Part 6 includes a "safe harbor" form of notice which, when the blanks are completed, will be deemed in compliance with the statutory notice requirement. (Under Comment 2 to 9-613, a notification that fails to meet the statute's requirements may nevertheless be deemed compliant.)

Finally, (3) the secured party must advertise the sale. There are no specific requirements set forth in Article 9 that would enable the secured party to determine where, to whom, and how often the same must be advertised, so compliance with this requirement requires the secured party to exercise some judgment, and perhaps to investigate the existence of industry-specific publications.

The 2010 amendments to Article 9 added language to Comment 2 to 9613 specifically approving dispositions via the internet. However, the addition was regarded as "catch-up" in that, by the time that it was added, internet dispositions had become commonplace.

The UCC remedies are provided by law, not by contract, and may be exercised sequentially. Had Jules Rousseau and Arent Fox properly drafted and ensured that Windsor sent a notice in conformity with 9620, and had its proposal been rejected by the debtor, it could then have proceeded with a sale. At a sale, it could have bid in and acquired ownership of the policy.

15

In his email of December 9, 2013 (Rousseau Ex. 92), Julius Rousseau advised that execution of the COO was the equivalent of a commercially reasonable sale because the net effect on the secured creditor was the same: the secured party's acquisition of an ownership interest in the policy. This conclusion ignores the very reason why the UCC requires a notice in compliance with 9620 in the first place, which is to safeguard the interests of the *debtor* in evaluating the proposal to receive the collateral in return for full satisfaction of the debt.

While the foregoing describes the requirements for a sale that meets the Article 9 requirements, Jules Rousseau and Steven Prusky at one point discussed the possibility of a sale which (as no Article 9 requirements were mentioned) would have been a noncompliant sale.

> From: Rousseau, Jule [mailto:Jule.Rousseau@arentfox.com]
> Sent: Wednesday, June 04, 2014 7:32 PM
> To: 'mfiwsi@comcast.net'
> Subject: Re: Quickie
>
> Fair market sale no problem. Internal not so clean.
>
> From: MFIWSI [mailto:mfiwsi@comcast.net]
> Sent: Wednesday, June 04, 2014 06:46 PM
> To: Rousseau, Jule
> Subject: Quickie
>
> Jule,
> I'm sure we both believe that as soon as Acker (I pick on him because he's 88) gets the letter via his Trustee, Houchins will tell him to squeeze us. Before I send this letter (tomorrow), can't we just do sales to avoid this whole problem?
> -sgp

Such a sale might have been possible once Windsor was in possession of executed COOs. What would have happened had such a sale been conducted?

California's 9625, which is identical to the uniform version, provides damages for violation of Article 9.

> (b) ... a person is liable for damages in the amount of any loss caused by a failure to comply with this division. Loss caused by a failure to comply may include loss resulting from the debtor's inability to obtain, or increased costs of, alternative financing.

The California comment to this section (which likewise is identical to the uniform version) states:

16

> Damages for violation of the requirements of this
> Division, including Section 9609, are those
> reasonably calculated to put an eligible claimant in
> the position that it would have occupied had no
> violation occurred. See Section 1106. Subdivision
> (b) supports the recovery of actual damages for
> committing a breach of the peace in violation of
> Section 9609, and principles of tort law supplement
> this subdivision. See Section 1103. However, to the
> extent that damages in tort compensate the debtor
> for the same loss dealt with by this Division, the
> debtor should be entitled to only one recovery.

Had such a sale occurred, it is likely that once it was discovered Windsor would have been sued for damages for its failure to comply with the requirements of Part 6. Furthermore, as the comment points toward recovery under tort law, it is likely that Windsor would also have been sued for conversion of the policy that was sold (although, as the comment notes, only one recovery should have been asserted in such a suit.

The result is that Windsor would have sold a policy for some portion of the death benefit, but would have been exposed to damages greatly in excess of the amount received. In addition, it would have faced litigation costs. Thus, Windsor could not have avoided the harm caused by Rousseau and Arent Fox's failure to properly advise it by conducting such a noncomplying sale.

(v) How Does the Default Sale Right Relate to the UCC-Mandated Remedies Described Above?

The general rule is that the provisions of the Uniform Commercial Code may be varied by agreement. See California 1302 (which is identical to the uniform version):

> (a) Except as otherwise provided in subdivision (b)
> *or elsewhere in this code*,[italics supplied] the
> effect of provisions of this code may be varied by
> agreement.

Comment 1 to this section calls out for special attention the rules in 9602, which outline the requirements for enforcement of secured creditor remedies after default. It states that "Section 9602 ... is a quite explicit limitation on freedom of contract." In other words, the sections listed in 9602 cannot be waived or varied, notwithstanding the general rule in 1302.

California's section 9602 (identical to the uniform version) provides that:

17

> Except as otherwise provided in Section 9624,[13] to the extent that they give rights to a debtor or obligor and impose duties on a secured party, the debtor or obligor may not waive or vary the rules stated in the following listed sections: ....
>
> (10)   Sections 9620, 9621, and 9622, which deal with acceptance of collateral in satisfaction of obligation.

The Default Sale Right is set forth on page 4 of the Assignment Agreement. It states:

> Upon an occurrence of an Event of Default (as defined in the [Premium Financing] Agreement) that has not been remedied within the time period required in the Agreement, Assignee shall have the right (the "Default Sale Right") but not the obligation to accept, that in consideration of the full and complete satisfaction of the Liabilities (the sufficiency of which consideration is hereby acknowledged) Owner may make a full transfer and assignment of the Insurance Policy to Assignee and thereby forever relinquish any and all rights Owner may have thereunder, including without limitation any rights to cash surrender value and/or death benefit provided thereunder. Upon exercise of this Default Sale Right, Assignee shall notify Insurer in writing and Insurer shall thereafter recognize Assignee as the sole lawful owner of the Insurance Policy.

As stated in its introductory phrase, the Default Sale Right applies only to the rights of the parties *after default*. However, as set forth above, after default the rights of the parties are governed *solely* by the rules of Part 6 of Article 9, the overwhelming majority of which - including the right of strict foreclosure and the required notice that are central to this litigation - cannot be varied by agreement. Therefore, after default, the rights of the parties are solely as set forth in Article 9, and the contractual Default Sale Right is inapplicable.

Could the Default Sale Right (or a substantially similar agreement or understanding) have been used as the basis of a pre-default "mutual walk away" -- as Rousseau maintained -- in which the Borrower relinquished all rights to the Policy and, in return, its obligations were deemed to have

---

[13] Section 9624 permits waiver of the rule of 9620(e), which relates to mandatory disposition of consumer goods. It is not, therefore, applicable to any of the Windsor transactions, which do not relate to consumer goods.

been satisfied by transfer of the Policy to Windsor? This could not, and did not, occur for several reasons.

First, while the term "default" is not defined in Article 9 (in California or in the Uniform version), it is defined by the transaction documents. Section 6(a) of the Security Agreement defines "default" to include, *inter alia*, "(ii) the occurrence of any Events of Default under the Financing Agreement or any document entered into between the Borrower and the Lender in connection therewith...." Section 6.01 of the Financing Agreement provides that it is an Event of Default if the Trust fails "to pay any amount within two (2) days when due under this Agreement or any Financing Document." Section 6.01 does not require notice to the Trust or the passage of time (other than the aforesaid two days) and it does not provide for a cure thereafter. Therefore, with respect to all of the policies at issue in this litigation, the Borrowers were in default under any interpretation of the transaction at or immediately after the maturity date of their loans.

Once a default occurs, a secured party cannot simply state, in effect, to the Borrower: (1) you are no longer in default (because we choose to ignore the event of default); (2) therefore, this is a "pre-default" situation; and (3) we may agree among ourselves as to our rights and obligations. If this could be done, it would vitiate the debtor rights provided for in Part 6 of Article 9, because in each case the secured party could avoid its duties to the debtor simply by choosing to "ignore" an evident event of default. Article 9 does not permit the parties to vary the rules identified in 9602 (in both the California and the uniform version). The foregoing is simply a specific example of this rule.

Of course, in all types of secured financings, there are instances in which, prior to the occurrence of an Event of Default (as defined in the transaction documents), the parties come to an agreement to modify the terms of their transaction or to terminate it. Nothing in Article 9 prohibits such an agreement. However, there is no indication that this did, in fact, occur. In fact, the Security Agreement expressly provides that such an agreement, had it existed, would have to contain an explicit statement that it was intended as a modification of the Security Agreement.

Pursuant to Section 14(d) of the Security Agreement:

> This Security Agreement shall be binding upon Beneficiary and Trustee each of their successors and permitted assigns ...and shall inure to the benefit of, and be enforceable by, Lender and its successors and assigns and none of the terms and provisions of this Security Agreement may be waived, altered, modified or amended except in writing duly signed for and on behalf of Lender and Beneficiary or Borrower, *with an express statement in such writing that it was intended as an amendment, waiver or modification of the provisions of this Security Agreement* [emphasis supplied].

19

There is no evidence that any such explicit agreement, as required by this provision, ever existed.

(vi) How Does the Lender's Right to Obtain a Change of Ownership of the Policy Relate to the UCC-Mandated Remedies Described Above?

Section 6(a) of the Security Agreement states that:

> Upon the occurrence of an Event of Default, Lender (personally or through an agent or assigns) is hereby authorized and empowered to take the following actions without a meeting: (i) transfer the Pledged Collateral [the Policy] and register it in Lender's name or the name of its nominee....

Relying on this section, Arent Fox was able to obtain Change of Ownership forms ("COOs") for each of the policies involved in this litigation. [14]

Section 6(a), however, is not a substitute for the UCC-mandated remedies described above. Instead, it merely puts the secured party into a position from which it can exercise the remedies provided by Part 6 of Article 9. It is comparable to 9609(c), which provides (in the California and uniform version) that:

> If so agreed, and in any event after default, a secured party may require the debtor to assemble the collateral and make it available to the secured party at a place to be designated by the secured party which is reasonably convenient to both parties.

Just as 9609(c) does not substitute for the secured party's obligation to thereafter dispose of the assembled collateral in a public or private sale, or to accept the collateral under the strict or partial strict foreclosure procedures described in Article 9, the 6(a) provision does not enable the secured party to simply bypass the Article 9 requirements with respect to the Policy. It facilitates the exercise of the Article 9 remedies, because it would be easier, for example, to hold a public or private sale of the policies with an executed COO than without it. It does not replace the Article 9 remedies. This is consistent with Comment 5 to California's 9620, which states that:

> A debtor's voluntary surrender of collateral to a secured party and the secured party's acceptance of possession of the collateral does not, of itself, necessarily raise an implication that the secured party intends or is proposing to accept the collateral in satisfaction of the secured obligation under this section.

---

[14] The term "COO" will be used to refer to refer generally to a form effecting a change of ownership of the Policy, although, in some instances, the insurance companies used slightly different names for such forms. .

20

Thus, the arbitration panel and the California courts ruled that, notwithstanding execution of COOs, Windsor was not entitled to the death benefits payable under the policies, and was limited to collection of the debt owed to it.

(2)  The Windsor secured loans were fundamentally different from the typical secured loan.  The differences made it imperative for any lawyer advising Windsor to properly advise Windsor concerning its default remedies.

The Windsor premium finance loans were similar in legal structure to any other secured loan, in that they created a security interest in specified collateral. However, they were fundamentally different in their economic effect.

(a) Because of the nature of its business, Windsor could anticipate a higher level of default than most secured lenders.

The typical lender making a secured personal loan to an individual borrower can count upon a relatively stable and predictable rate of default, which is somewhat related to prevailing economic conditions. Whether the collateral is an automobile, an art collection, or a securities account, the borrower will generally seek to repay the loan, if at all possible, in order to retain the collateral.

In Windsor's business, it was to be expected that there would be a higher rate of default than would be true for personal secured loans generally. That is because the borrower's decision as the due date approached would be influenced both by general economic conditions as well as the borrower's own evaluation of his or her personal situation. It was generally to be anticipated that some borrowers would not seek to repay the loan even if they were able to do so. In the years after 2008, of course, it was predictable that the number of defaulting borrowers would increase because of the decline in the value of other assets that might under normal circumstances be available to repay the loan.

(b) Most secured creditors are not easily able to realize value from the collateral.  Because of the unique nature of Windsor's collateral, Windsor should have been easily able to do so.

In the typical secured loan, the general assumption of the secured creditor is that no one can extract value from the collateral better than the debtor. The lender does not typically wish to obtain and operate the collateral, although it will, of course, do so as a last recourse after a default in order to minimize its losses.

Windsor was financing life insurance policies. The collateral was a bundle of rights relating to a life insurance policy. These rights were described in the Security Agreement as follows: [15]

> (a)   the   Beneficiary   and   Borrower's   entire
> beneficiary interest in the Trust, all instruments,

---

[15] Extracted from the Collins Security Agreement, but substantially similar in all of the Windsor financings.

21

certificates or other securities or investment
property evidencing such beneficial interest and all
proceeds thereof; and

(b) the Beneficiary and Borrower's interest, if any,
in and of and to the Policy and any related
documents and security and the death benefit
payable under the Policy and all proceeds thereof.

For convenience, this bundle of rights will be referred to collectively as "the Policy Rights,"
unless otherwise noted.

To realize value from the collateral, the death benefit need only be collected from the insurance
company after the death of the insured (assuming that all insurance premiums are paid at that
time). Upon default, Windsor anticipated and was entitled to expect, as it had been told by Julius
Rousseau, that it would be entitled to receive outright ownership of its collateral and the right to
receive the death benefit. Unfortunately, as Arent Fox and Rousseau did not comply with the
Article 9 requirements, and properly advise Windsor, this did not occur.

(3) Because the some heightened possibility of default was inherent in the premium finance
business, and because the owner of the policy need take no further steps to realize upon it other
than notifying the insurer of the insured's death, the Defendants' failure to properly advise
Windsor as to its right to obtain unfettered ownership of its collateral did, and could be
anticipated to have, a significant damaging effect upon Windsor's business and profits.

When a lawyer renders advice to a secured party concerning its remedies after default, and its
advice is incorrect, the effect of such errors (even those as serious as those of the Defendants)
might ordinarily be minimal. If that lawyer was lucky, all of the loans might be repaid on time,
so that there would be no adverse impact on the secured lender. Even if a loan went into default,
the correct advice might not have resulted in a greater economic recovery for the secured party
than the advice that was given.

In the case of Windsor's loans, however, the nature of the business made it probable or likely that
a number of them would not be repaid upon maturity of the loan. If Windsor could not then
obtain the Policy Rights, it was predictable that it would suffer serious and irreparable harm.

Finally, California usury law limited the amount that could be collected to 10 per cent. This
limitation, which Julius Rousseau also did not discover until it was too late to address, made it all
the more imperative to provide for Windsor's right to obtain the Policy Rights after default by the
Trust.

(4) The Defendants repeatedly failed to take the steps that a reasonable attorney would have
taken to enforce Windsor's post-default rights.

(a) The Defendants failed to recognize that there was an applicable body of statutory law, i.e., the
Uniform Commercial Code.

22

When advising a client, it is axiomatic that a lawyer should begin by determining whether there is a body of state or federal statutory law that applies to the client's business. If not, the client's rights *vis-a-vis* its counterparties are to be determined solely by common law principles and contractual provisions. If so, that statutory law must be consulted in order to determine the client's rights and duties.

In advising a client that as to the premium finance business, one would need to recognize that: (i) the premium finance business is a form of secured transaction; and (ii) the applicable body of statutory law for secured transactions is the Uniform Commercial Code. As a matter of basic minimum competence, a reasonable lawyer would be expected to determine the correct legal characterization of the Windsor transactions and the governing body of statutory law.

(b) The Defendants failed to recognize that California's Article 9 (unlike the uniform version of Article 9) applies to loans secured by insurance policies.

The uniform version of 9-109(d)(8) excludes most loans secured by insurance policies. It does not apply to:

> A transfer of an interest in or an assignment of a claim under a policy of insurance, other than an assignment by or to a health care provider of a health-care-insurance receivable and any subsequent assignment of the right to payment ....

The carve-out for health-care-insurance has no relevance to life insurance.

In the overwhelming majority of jurisdictions, this section was enacted in uniform form. However, *of vital importance,* this is not the case in California. In California, Article 9 applies to the Windsor transactions.

California's nonuniform enactment of 9109(d)(8) provides that the sole exclusion from the coverage of Article 9 is premium financing provided by the insurer:

> (d) This division does not apply to any of the following:
>
> (8) A loan made by an insurance company pursuant to the provisions of a policy or contract issued by it and upon the sole security of the policy or contract.

As discussed above, the California comments to this subsection indicates that the inclusion of insurance policy loans within the scope of Article 9 was conscious and deliberate.

> 13. **Insurance.** The uniform version of Section 9109(d)(8) carries forward the exclusion from

23

coverage of security interests in insurance policies, except for receivables under health insurance policies. The drafters of revised Article 9 believe that other law adequately addresses the creation of security interests in insurance policies. Because California has permitted the creation and perfection of security interests in insurance policies under the former version of Division 9 for some 30 years now, coopting the development of other law governing such matters, satisfactory industry practice should not be disturbed and California's former rule has been carried forward into revised Division 9. Given that the effect of the uniform version of Article 9 is to let the laws of individual states govern the issue, it should not disturb the structure of the uniform statute if California chooses to retain its version of the Uniform Commercial Code as the applicable governing law for this issue. This variation, therefore, is not incompatible with commercial law uniformity.

Inclusion of third-party loans secured by insurance policies had the effect of subjecting these transactions to the rules found in Part 6 (Default and Enforcement), most of which are intended to protect the defaulting debtor. Indeed, it is possible or likely that California, a state that is known to protective of its consumer debtors, included such transactions within Article 9 for the express purpose of giving consumers these protections.

That Article 9 in California applies to loans secured by insurance policies is not hidden or recondite knowledge. One way to learn of state nonuniform enactments of the Uniform Commercial Code is to consult a reference work such as UCC State Variation Service. This work highlights each state's deviation (if any) from the uniform text. There is no indication that Defendants took this step.

Alternatively, one can simply search an electronic version of a state's consolidated laws (such as that found on Lexis or Westlaw) and read UCC 9-109(d) as enacted in California. Or one can go to a law library and read the text of California's 9109(d) in print. Defendants' record indicates they did no such thing.

Finally, a lawyer can take a CLE course on secured financing. For approximately twenty-five years, I participated as a panelist (and in some years, chaired) Practicing Law Institute's one-day course entitled "Secured Transactions [year]: What Lawyers Need to Know About UCC Article 9". One segment of this course, presented by my colleague Kenneth Chin, contains a discussion on perfecting a security interest in a policy of insurance. It highlights the different requirements in California. (Indeed, Julius Rousseau would have learned of the nonuniform California requirement had he merely purchased and read the course handbook.)

24

Thus, Julius Rousseau could easily have learned of the critical nonuniform California enactment by simply looking at a book (or its electronic equivalent). However, it does not appear that he practiced law in California, or was admitted to the Bar there. How was the duty to ascertain California law affected by the fact that he practiced law in New York?

The fact that a lawyer does not practice in the foreign jurisdiction whose law governs a transaction should put a reasonable lawyer on notice that it likely will not (without further investigation) know the law of that foreign jurisdiction. For example, if I practice in New York I might serendipitously learn of newly-enacted law affecting my area of practice by reading about it in a legal journal, by hearing of it at a meeting of a bar association committee dealing with such transactions, by chatting with colleagues who have similar practices, by taking a CLE course in my area of specialization, or the like. This information is unlikely to reach me if I do not practice law in the foreign jurisdiction.

Indeed, even some lawyers who might be confident of their knowledge of the foreign law would consult a lawyer practicing in the foreign jurisdiction. It appears from the time entry on July 20, 2009 (Rousseau Exh. 91) that a Georgia lawyer was consulted as to the possibility of litigation in Georgia, but there is no evidence that a California lawyer familiar with secured transactions was asked for advice concerning Windsor's default rights.

Alternatively, Julius Rousseau might have investigated the resources available to him as a member of a large law firm. The Firm's web site lists offices in California. It may have been that one or more members of the Firm had the requisite expertise to advise him as to the California UCC. Furthermore, some large law firms employ one or more persons who are expected to service the firm generally by providing assistance on UCC matters. Some firms conduct internal CLE sessions on topics such as the UCC. It does not appear, however, that Julius Rousseau ever made an attempt to determine which, of any, of the foregoing resources were available to him. The bottom line remains: Rousseau and Arent Fox acted in a manner indicating that they were ill-informed about the relevant distinction of California law; that lack of knowledge cost Windsor millions of dollars, and rises to the level of malpractice.

(c) Even after an adverse decision, which clearly pointed to the correct conclusions of law, the Defendants refused to acknowledge that the Article 9 default provisions, and, in particular, 9620, applied to the Windsor loans.

The Bitter arbitrators correctly ruled that Windsor was not entitled to claim ownership of the Bitter policy because it had failed to comply with the 9620 requirement that the secured party send a proposal stating that Windsor would accept ownership of the policy in return for full satisfaction of the obligations owed to it.

Even after their decision, Julius Rousseau repeatedly refused to accept the arbitral award as the correct statement of the law. He claimed that Windsor had been "screwed," a phrase indicating that he thought the decision was a miscarriage of justice (email to Peter G. Mancuso, April 13, 2014, Rousseau Exh. 60). He continued to assert that the "amicable" letter was, by itself, satisfaction of 9620. [16]He specifically refused to send the 9620 notice to any of the Trustees of

---

[16] Rousseau deposition 191-2.

25

the Collins, Coppock, Acker and Stamatov policies because of his concern that to do so could only cause "more harm than good".[17] In several instances, he wrote letters attempting to recharacterize the Trust's assignment of the respective policies as an agreement meeting the requirements of 9620 (the "spring cleaning" letters, Rousseau Exhs. 63-66). Thus, having initially been put on notice as to the black letter law requirement of a 9620 notice, he proceeded to repeatedly ignore it, to Windsor's detriment.

What would a reasonable lawyer have done? The term "proposal" in the text of Article 9 is not defined in such a manner as to indicate its contents (except that it must contain language stating that the debtor will be released from its obligation). Under 9102(a)(66) (identical in California):

> "Proposal" means a record authenticated by a secured party that includes the terms on which the secured party is willing to accept collateral in full or partial satisfaction of the obligation it secures....

Comment 4 to 9620 (identical in the California and uniform versions) adds the following explanation:

> A proposal need not take any particular form as long as it sets forth the terms under which the secured party is willing to accept collateral in satisfaction. A proposal to accept collateral should specify the amount (or a means of calculating the amount, such as by including a per diem accrual figure) of the secured obligations to be satisfied, state the conditions (if any) under which the proposal may be revoked, and describe any other applicable conditions.

What would a complying proposal look like? One source is the American Bar Association's publication "Forms Under Article 9 of the UCC", which was authored by the UCC Committee of the Association. The persons listed as contributors participated significantly in the revision of Article 9 that became effective in 2001. The forms are generally regarded as authoritative by attorneys whose practice focused on secured transactions.

Form 5.1.1 provides a sample notice:[18] [19]

---

[17] Prusky Deposition, Transcript pages 207:23-209:5.

[18] Forms Under Article 9 of the UCC, Second Edition, UCC Committee (ABA Publishing, 2009), at 345. This work is available from the Chicago office of the ABA.

[19] For substantially similar "bare bones" notices , see 2 Ill. Prac., UCC Forms Annotated § 9-620 Form 2, and 27B Mass. Prac., UCC Forms Annotated § 9-620 Form 2 (3d ed.)

Notice of Proposal to Accept Collateral in Full Strict Foreclosure
Debtor [Debtor, address] (the "Debtor")
Secured Party: [Secured Party, address] (the "Secured Party")
Collateral [collateral description] (the "Collateral")

Dear [name of person receiving notice]:

The Debtor is in default under a security agreement dated [date]
entered into between the Debtor and the Secured Party granting a
security interest in the Collateral. The outstanding balance due
from the Debtor to the Secured Party as of [date] is [$ amount] (the
"Balance").

The Secured Party shall accept the Collateral in full satisfaction of
the Balance, and the obligations shall be deemed fully discharged
as a result.

[Secured Party]

By:_____

Name:

Title:

For a California-specific version of this form, see West's California Code forms:[20]

9620 Form 1. Notice of intention to retain collateral in satisfaction
of obligation—Notice to debtor

*[Date]*

To *[name of debtor]*:

You are hereby notified that because of your default under the
security agreement executed by us on *[date of security agreement]*,
I propose to retain the following collateral in satisfaction of your
obligation under the agreement: *[description or identification of
collateral to be retained]*.

*[Name of secured party].*

---

[20] West's Cal. Code Forms, Com. § 9620 Form 1 (3rd ed.)

27

The California definition of "Proposal" in 9102 (which is identical to the uniform version) states only that a proposal, to be legally sufficient, must comprise the following:

> (66) "Proposal" means a record authenticated by a secured party that includes the terms on which the secured party is willing to accept collateral in full or partial satisfaction of the obligation it secures pursuant to Sections 9620, 9621, and 9622.

Thus, there is no statutory requirement that the amount of the debt be specified. The Official Comments suggest, in Comment 4 (identical in the uniform and California version), that the debt (or the method by which it may be calculated) be included in the notice.

Julius Rousseau and Arent Fox could have complied with the 9-620 requirement simply by completing the blanks in a simple form readily available in a form book, sending it to the debtor, and waiting twenty days. If, at the end of this period, they did not receive notice of objection, the statutory requirements would have been satisfied.

Note that the letter sent to the Garcia family Trust on March 16, 2010 by Rousseau, on Windsor's behalf, as drafted by David Fox, went significantly beyond the simple notice described above and complied with the 9620 (and 9-620) requirements. That letter read, in part:

> Under the Finance and Security Agreements above described (the "Agreements") and the California Uniform Commercial Code, ("UCC") Lender has the right to foreclose on the collateral and sell the same to the highest bidder. Alternatively, it is permitted under those Agreements and §9620 et. seq. of the UCC to retain the collateral in full satisfaction of the debt of the debtor. Because you have indicated that you have no interest in the collateral, Lender hereby proposes under §9621 of the UCC to retain the collateral in full satisfaction of the debt you owe. If you should consent, then, and, in such event, Lender will no longer have claims against you. To document your consent, the Lender asks you to sign and return the original of this letter where indicated below which by its terms consents to the Lender's proposal and transfers to the Lender all of your right, title and interest in the collateral. In doing so Lender asks that you consent to Lender's retention of the collateral pursuant to the agreements and § 9621. In addition, we enclose an Appointment of Trustee form for Emily M. Garcia to sign and return. In this form we ask Ms. Garcia to agree that Mr. Stephen Prusky of the Lender, Windsor Securities, LLC, be appointed trustee in place of Mr. Imbimbo. Your signing and returning the letter and this form will permit Windsor to effectuate the transfer of the polices and name new beneficiaries in accordance with the Agreement.

All Julius Rousseau and Arent Fox had to do was to replicate the Garcia letter, with the appropriate policy-specific changes, but they did not do so.

What "harm" would sending the notice cause? It is possible that some recipients would have objected to the proposal. If so, it would have been reasonable for the Defendants to advise Windsor to offer additional amounts to them as an incentive.

28

Had such offers been refused (or had Windsor declined to make them), the Defendants would have been put to the trouble- of determining the mechanics of a commercially reasonable sale. They would have had to decide where to advertise, and how often, whether to conduct an in-person sale or an internet sale, who to invite, what information to provide about the health status of the insured (if any could legally be provided), and how to satisfy the formal requisites: conducting a search for other secured parties, providing the statutory notice, and distributing the proceeds received. In every instance of default involving collateral other than funds or readily marketable securities, however, the attorneys advising the secured party face the same challenges. The attorney would only have to go through this exercise once, since it can be repeated for each defaulting debtor. Had the Defendants disposed of the collateral by holding such a sale, they would have enabled Windsor to achieve its objective -acquiring ownership of the policies - and would have limited Windsor's losses to those incurred as a result of the Bitter arbitration.

(d) Julius Rousseau failed to recognize or act upon the possibility that the advice given to the client might be incorrect.

After the issue of 9620 was first raised in the Bitter arbitration, Julius Rousseau and Arent Fox were on notice that California law applied, that California law is different than the law of many other states, and that such law might require satisfaction of section 9620. By the time the arbitration was concluded, Rousseau and Arent Fox knew for a fact that this was so, although Rousseau refused to accept the arbitral decision as a correct interpretation of the law.

Notwithstanding the result in the Bitter controversy, in the case of the four remaining policies in which Windsor's rights were at stake - Acker, Collins, Coppock, and Stamatov - Julius Rousseau advised Windsor that the COOs, which were executed prior to a monetary default, were sufficient by themselves to effect a pre-default "walkaway," and therefore that Windsor need not satisfy 9620 or any other statutory requirement. As a matter of law, and as confirmed by multiple rulings, Rousseau's advice to Windsor was incorrect.

Julius Rousseau was placed in a situation that is frequently encountered by lawyers in private practice: the lawyer firmly believes that the analysis given to the client is correct. However, there is some chance that the analysis may be wrong, and, if so, the consequences to the client will likely be catastrophic. What would a reasonable lawyer in this situation do?

A reasonable lawyer might have advised the client that it was advisable to comply with 9620, stating something like: "It may not be necessary - I believe that I am correct - but out of an excess of caution, I believe that we should..." Lawyers practicing in the area of secured finance are so habituated to taking additional actions to bolster their position (even when they are convinced that the additional steps are probably unnecessary) that the strategy has evolved into a term of art: "belt and suspenders."

Or, the lawyer might have outlined the pros and cons of satisfying 9620: the greater likelihood of recovery of the death benefits versus the possibility that the trust would object to strict foreclosure, compelling Windsor to incur the expenses of conducting a commercially reasonable sale. In such a case, the lawyer would leave the decision to the client. But, in any case, it was not

29

a reasonable choice to simply ignore potential application of the section 9620 requirements once the attorney had been made aware of them.

Finally, a reasonable lawyer would have recognized that, once the Bitter controversy was decided, it was probable that any other controversy concerning the four remaining policies would be resolved in the same manner. Therefore, it was imperative to take steps that would unquestionably satisfy the 9620 requirements, notwithstanding the lawyer's view that the arbitration panel was wrong. A reasonable lawyer would have taken such action immediately, as once an insured passed away, there would be no further opportunity to do so. However, no such steps were taken, and Acker and Collins passed away in 2014.

(5) In order to make the mistakes that he did, Defendant Julius Rousseau had to (a) fail to analyze the transaction initially and thereby to recognize that the California UCC might apply, and thereafter (b) fail to note many indications, in the transaction documents and elsewhere, that the UCC did indeed apply; and, finally, (3) disregard what he was expressly told on that subject by David Fox, an attorney whom he held in high regard.

As discussed above, Julius Rousseau failed in the first instance to investigate whether or not the California UCC applies to the premium finance transactions, apparently believing that it did not, or to recognize that the California version of the UCC was nonuniform. However, he was given many successive chances to rectify this error. The record contains numerous references to his knowledge that UCC financing statements were filed (Rousseau Exh. 91). Financing statements are a creature of Article 9 and have no application to perfection of a security interest in collateral that is excluded from Article 9. These references should have led an ordinary reasonable lawyer to wonder why, if the California UCC did not apply, financing statements were of any concern.

Furthermore, the Security Agreement provided a that the default rights were those provided under the laws of the State of California. Note that the further reference to a sale thereunder would not have been required if the California UCC did not apply and the parties' rights were governed simply by the common law. Thus, it was evident that the original drafter of these agreements understood that California's Article 9 applied to them.

> SECTION 6.02. Remedies. If any Event of Default shall occur and be continuing, then automatically in the case of an Event of Default described in clause (5) of Section 6.01 or otherwise at the election of the Lender, the Financing Balance shall become due and payable, without presentment, demand, protest or any notice of any kind, all of which are expressly waived by the Insured and the Trust (the "Default Maturity"). Upon the occurrence and during the continuance of an Event of Default, in addition to any other rights under this Agreement and any other Financing Documents or otherwise available at law or in equity, the Lender and its assigns shall have all the rights and remedies of a secured party on default under the law of the State of California and other applicable law to enforce the assignments and security interests contained in the Financing Documents, including the right, subject to compliance with any mandatory requirements under applicable law, to sell or apply any rights and other interests assigned or pledged in the Financing Documents at public or private sale. The rights and remedies of Lender with respect to the Insured are subject to the terms of Section 7.13 below.

These "red flags" should have alerted Julius Rousseau to the possibility that California's UCC did apply to the policies. It should have caused him to check to see whether this was true.

30

Finally, David Fox, a Herrick Feinstein colleague who Julius Rousseau viewed with respect ("David has 40+ years experience in this stuff") (Rousseau Exh. 91, email of September 14) did realize that 9620 applied. In an email dated July 16, 2009, (Rousseau Ehx. 12) David Fox sent an email to Windsor, copying Julius Rousseau, in which the correctly summarized the 9620 requirements. On March 16, 2010 David Fox sent a complying notice in connection with the Garcia transaction (Rousseau 35). He followed up by a sending Julius Rousseau the following email on March 18, 2010 (Rousseau Exh. 35), summarizing the contents of the notice.

> Jule
> We gave notice yesterday to the Garcias about Prusky's proposal to retain the collateral in satisfaction of the debt.
> Under the notices, the Garcias have 20 days from their reciept of the proposal to object to object. As you will recall we gave them the opportunity to consent to the transfer. However if they do not sign the forms we sent, Prusky will be able to take title, provided the Garcia's do not object.
> The notices were sent certified mail return receipt requested so you will be able to be precise about the dates. In short, some time around April 5, 2010, if not sooner, and if there is no objection, Prusky should be able to treat the policies as belonging to Windsor from then.
> David

Following this email, the time records (Rousseau Exh. 91) contain multiple notes of discussions among Julius Rousseau and David Fox concerning Windsor's rights after a default. Although the time records do not reveal the contents of those discussions, it is likely that David Fox, who clearly understood the 9620 requirement, would have conveyed his understanding to Julius Rousseau. Thus, in order for Julius Rousseau to conclude that the 9620 notice did not have to be sent required him to turn a blind eye to what he was being told by a trusted colleague.

(6) Julius Rousseau failed to meet the standard of care which an ordinary reasonable lawyer possessing no special expertise in premium finance would have exercised. He fell far below the standard of a lawyer claiming specialized expertise in premium finance.

Julius Rousseau's web site stated:

> Jule has developed extensive knowledge in the life settlement business and with premium finance structures used in the purchase of life insurance (Complaint, Exhibit B).

The Southern District of New York and multiple other state and federal courts have held that a lawyer who holds himself out as having expertise in a particular area of law, or claims to be a specialist or to have special skills or ability in a certain area, may be held to a higher standard of care than other lawyers. See, e.g., *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 336 (S.D. N.Y. 2005) ("An attorney is held to the standard of care of a practitioner in his or her field"); *Transcraft, Inc. v. Galvin, Stalmack, Kirschner & Clark*, 39 F.3d 812, 815 (7th Cir. 1994)("The plaintiff in a case of malpractice, legal as well as medical, must prove that the defendant failed to come up to minimum standards of professional competence, or to higher standards if he represented himself to be a specialist or to have unusual qualities"); *Rodriguez v. Horton*, 622 P.2d 261, 264 (N.M. Ct. App. 1980) ("A lawyer holding himself out to the public as specializing

31

in an area of the law must exercise the same skill as other specialists of ordinary ability specializing in the same field."); *Rhodes v. Batilla,* 848 S.W.2d 833, 842-843 (Tex. Ct. App. 1993) (applying heightened standard of care in legal malpractice action to "one who holds himself out as an expert or specialist"); Bent v. Green, 466 A.2d. 322, 325 (Conn. App. Ct. 1983) (An attorney has duty to exercise "the same degree of care, skill and diligence which other attorneys ... in the same line of practice would have exercised in similar circumstances."); *Duffey Law Office, S.C. v. Tank Transport, Inc.* 194 Wis.2d 674, 535 N.W.2d 91 (Wis.App., 1995) ("to the extent that a lawyer holds himself out as having expertise in a particular area of law, he may be held to a higher standard of care than other lawyers").

Similarly, when a lawyer claims to be a specialist or to have special skills or ability in a certain area, many courts will use a higher standard of care to evaluate the lawyer's legal services".); *Wright v. Williams* 47 Cal. App. 3d 802, 810 (1975) ("We thus conclude that a lawyer holding himself out to the public and the profession as specializing in an area of the law must exercise the skill, prudence, and diligence exercised by other specialists of ordinary skill and capacity specializing in the same field."); *Dave v. Cavanaugh,* 1992 Conn. Super, LEXIS 717, 1992 WL 54592 (Mar. 12, 1992,) ("The duty of the plaintiff in his capacity as an attorney specializing in taxation and financial planning was to exercise reasonable care, skill and diligence in the performance and execution of the legal services being furnished to the defendant. The level of that duty was to exercise the same degree of care, skill and diligence which other attorneys in the same or similar locality and in the same line of practice would have exercised in similar circumstances.")

Julius Rousseau held himself out to be a specialist in the area of premium finance. Notwithstanding the foregoing, Julius Rousseau failed to observe even the duty of care expected of a reasonable attorney with no special expertise in premium finance. Indeed, it is possible that such an inexperienced lawyer, with awareness of his or her limitations, would have taken greater care to search out the answers when confronted with similar issues, and would have considered the need to advise his client of the possibility that his conclusions might be incorrect.

Finally, the principles of law involved in this case are not unclear, unsettled, or matters of first impression. While Article 9 does contain some sections that are ambiguous, and some sections that appear to be in conflict with other sections, the sections at issue here - 9102 (scope of Article 9), 9620 (addressing acceptance of collateral in satisfaction of obligation), and 9602 (addressing waiver) - are clearly written. They are black letter law. They govern fundamental debtor rights that are not subject to interpretation or dispute.

(6). This case meets the "but for" standard required by tort law. There were at least two risks in the premium finance transactions that Windsor entered into. The most obvious was the longevity of the insured. A second was that the issuer might become insolvent and that the laws of its jurisdiction did not create a fund for the repayment of claims against the insurer. But from Windsor's standpoint, each of these risks could be evaluated in the context of whether it should keep policies and pay premiums. The record is clear that Windsor made that evaluation – believing that it owned the policies – and opted to keep the policies and pay the premiums.

32

The risks that Windsor could not anticipate were those created by its own attorneys - that they did not recognize and advise as to (1) the limitations on the interest rate in California or (2) the steps necessary to acquire ownership of the policies after default. Jules Rousseau and Arent Fox compounded their initial errors by ignoring the Bitter panel's rulings and failing to take prompt corrective action to secure Windsor's entitlement to the remaining policies. Thus, but for the negligence of the Defendants, Windsor would have achieved the objectives it sought, and would not have sustained loss after loss on the five policies at issue in this litigation.

SANDRA STERN

April 2, 2018

33

# Sandra Stern

**Admitted:**

- Massachusetts; Minnesota; New York;
- U.S. District Court, District of Minnesota;
- U.S. Court of Appeals, Eighth Circuit

**Law School:**

- Harvard Law School, LL.B.

**College:**

- Goucher College, B.A., highest honors .

**Member:**

- The Association of the Bar of the City of New York (Member, Committee on Uniform State Laws, 1999 to date);
- New York State Bar Association (Chair, Business Law Section, 1998-1999);( Chair, Banking Law Committee of Business Law Section, 1990-1994);
- New York County Lawyers' Association (Chair, Banking Law Committee, 1986-1989);
- New York State Bankers Association (Member, Lawyers Advisory Committee on Legislation and Regulation, 1990-1993).

**Biography:**

In private practice (Nordquist & Stern PLLC) since 1994, concentrating in commercial finance, including secured transactions and letters of credit, loan participations, and electronic commerce issues. Ms. Stern counsels commercial banks and nonbank lenders as well as corporate borrowers. As outside counsel for one of the largest Federal Home Loan Banks, have provided advice concerning the rights and obligations of parties to various types of negotiable and nonnegotiable instruments.

Previously: Senior Vice President and General Counsel, Banco Santander, 1993-1994. First Vice President and Deputy General Counsel, Republic National Bank of New York, 1980-1993. Previously, inside counsel for Bradford Trust Company, Depository Trust Company, and New York State Banking Department.

**Author of treatises:**

- Author: "Structuring and Drafting Commercial Loan Agreements", LexisNexis (updated annually)
- "Structuring Loan Participations," (currently out of print)

**Appointments:**

- Commissioner from New York to the Uniform Law Commission, 1992 to present (life member);
- Drafting Committee to Revise Uniform Commercial Code Article 5, Letters of Credit
- Drafting Committee to Revise Uniform Commercial Code Article 7, Documents of Title,
- Drafting Committee to Revise Uniform Commercial Code Article 9, Secured Transactions, (2001 and 2010 revisions);
- Drafting Committee to Revise Uniform Commercial Code Articles 1, 3, and 9 (current)
- Drafting Committee on Uniform Money Services Act,
- Chair, Study Committee on Payment Systems, and
- Uniform Commercial Code Committee

As Legislative Liaison for the New York State Delegation, have testified before the New York State legislature on issues relating to current Articles 3 and 4 of the UCC.

**Expert Witness testimony in:**

Subaru Distributors Corp. v. Subaru of America, Inc., United States District Court, Southern District of New York, 98 Civ. 5566, 2002 Westlaw 413808, March 18, 2002;  In re CRIIMI MAE INC., et. al., United States Bankruptcy Court, District of Maryland, Bankruptcy Case No. 98-2-3115-DK;  *BNP Paribas Mortgage Corp. v. Bank of America, N.A.*, and *Deutsche Bank AG v. Bank of America, N.A.*, United States District Court, Southern District of New York, 09 Civ. 9783, 09 Civ. 9784, and related case, Natixis Financial Products LLC v. Bank of America, N.A., Civ. Act. No.10-CV-3656-RWS; Motors Liquidation Company Avoidance Action Trust v. JP Morgan Chase Bank, N. A. et. al.,  Case No.: 09-00504 (MG), S.D.N.Y.

**Fellow:**

- American College of Commercial Finance Lawyers, 1995 to date.

**Presentations:**

What Lawyers Need to Know About UCC Article 9: Secured Transactions, PLI, Chair 2000-2010, Panelist 2000-2016.

**Publications:**

1. UCC Article 9: Secured Transactions, Bloomberg BNA (2014);
2. Unique Provisions in New York's Omnibus UCC Bill, New York Law Journal (February 28, 2015);
3. Paper Terrorism-Remedies for Victims of Abusive UCC Filings, New York Law Journal (March 21, 2014);
4. Modernizing New York's Commercial Code, New York Law Journal, March 31, 2013;
5. Amendments to Article 9 of the Uniform Commercial Code, The Goldbook,  Lexis Nexis (2010);

6. Mezzanine Finance: The Lender's Exit Strategy, New York Law Journal, November 20, 2008;

7. The Lender's Exit Strategy In Mezzanine Financing, New York Law Journal; February 13, 2009;

8. The Uniform Commercial Code Evolves, But More Slowly in New York, New York Law Journal, January 14, 2011;

9. Practice Guide, Chapter 16 (Letters of Credit), Matthew Bender (1997) (update only);

10. Varying Article 5 of the UCC by Agreement, The Banking Law Journal (June, 1997);

11. Revised Article 5 Brings Uniformity, Predictability to Letters of Credit, New Jersey Law Journal, February 26, 1996;

12. Recent Revisions to Letter of Credit Law, The Bankers Magazine, November/December, 1996, 8-9;

13. Cash as Collateral: Perfecting a Security Interest in a Deposit Account, The Bankers Magazine, July-August, 1996, 6-8.

14. New Code Rewrites U.S.Letter-of-Credit Rules, Corporate Finance, February, 1997.

15. FASB Complicates Participation Accounting, American Banker, August 13, 1996; and

16. New Liability Questions for Lenders; American Banker, December 13, 1996.

17. New York Enacts Revised Article 5 for UCC, N.Y.L.J., Oct.4, 2000 (at 1).

18. Current E-Signature Laws Lacking in Crucial Rules, Am. Banker, Nov.10, 2000 at 13.

19. The Future is Here: The Electronic Closing in 2000, Banking Law Journal May/June 2000.

20. An Analysis of the Secured Lender's UCC Article 9 Insurance Policy, New York Law Journal, June 28, 2002.

21. Using UCITA for Electronic Contracting, New York Law Journal, January 25,2001.

22. Making Loan Portfolios Comply With Revised Article 9, New York Law Journal, January 11, 2001.

23. How Revisions to UCC Article 9 Will Change Secured Financing, New York Law Journal, December 8, 1998.

24. Overview of Current UCC Article 9, What Lawyers Need to Know About UCC Article 9, PLI, 2002, 2003, 2004.

25. Insuring the Article 9 Transaction - The Lender's UCC Policy, What Lawyers Need to Know About UCC Article 9, PLI, 2003, 2004.

26. Secured Lending Issues in Revised Article 7, What Lawyers Need to Know About UCC Article 9, PLI, 2004.

27. New York State's Cooperative Apartment Provisions, What Lawyers Need to Know About UCC Article 9, PLI, 2002, 2003.

28. The Impact of UCC Article 5, What Lawyers Need to Know About UCC Article 5, PLI, 2002, 2003

29. Electronic Commerce and Revised Article 5, What Lawyers Need to Know About UCC Article 5, PLI, 2000, 2001, 2002, 2003.

30. New Types of Collateral in Article 9, What Lawyers Need to Know About UCC Article 9, PLI, 2000, 2001.

31. Transactions That Are Partly In Or Not At All: Financial Services Transactions Under UCITA, The UCITA Revolution, PLI, 2000.