# EXHIBIT "34"

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WINDSOR SECURITIES, LLC <br><br> Plaintiff <br><br> v. <br><br> ARENT FOX, LLP <br> and <br> JULIUS ROUSSEAU, III, ESQUIRE <br><br> Defendants | Civil Action No. 16-cv-01533 (GBD) |

## REBUTTAL EXPERT REPORT OF SANDRA STERN, ESQUIRE

Rebuttal Report in Response to Expert Reports of James W. Maxson and Edwin E. Smith

This Rebuttal Report addresses the arguments made in the expert Reports of James W. Maxson and Edwin E. Smith. Each Report will be addressed separately in the discussion that follows.

The Maxson Report.

(1) The "Prevailing Practice."

The Maxson Report contains many references to the "recognized and accepted" practices of lenders making premium finance loans. Among them are the following: (a) the COO as a means of transferring legal and record title to a policy, and (b) use of the "voluntary walk away" in pre-default situations. As Maxson observes, however, of the 52 United States jurisdictions in which the UCC has been enacted (including the District of Columbia and Puerto Rico), only two of these jurisdictions subject life insurance premium finance loans to the UCC, California and one unnamed jurisdiction. It follows that the overwhelming number of premium finance loans are subject to the laws of jurisdictions that do not include such loans within the scope of the UCC, and it follows from that observation that the practices in such jurisdictions are numerically the majority or "prevailing" practices.

These arguments are irrelevant to the issues in this litigation. No one is contesting whether the course of action pursued by Defendants Rousseau and Arent Fox would or would not have satisfied the requirements for a transfer of ownership for premium finance policies subject to the laws of the majority of U. S. jurisdictions. At issue here is whether it such actions were in conformity with the prevailing practices for premium finance loans subject to the laws of California, a jurisdiction which includes such loans within the scope of the UCC. The Maxson Report contains not a single sentence addressing this critical issue, and can only be read as offering no opinion on the subjects.

(2) The Bitter decision applied Article 9 in a "strict constructionist" manner, and therefore could not have been anticipated by a lawyer exercising the prudence and skill of a reasonable lawyer.

There are many instances in Article 9 where the statute is meant to be applied *exactly* as it is written, irrespective of the intention of the parties. Take section 9-204, which concerns after-acquired property. The parties may intend to finance commercial tort claims that arise after the execution of the security agreement and may include a grant of security interest in such after-acquired property. They may have specifically discussed an intention to finance such claims. Ordinarily, a grant of a security interest in specifically described after-acquired property is effective.

However, Section 9-204 states that:

1

> A security interest does not attach [become enforceable] under a term constituting an after-acquired property clause to...
>
> (2) a commercial tort claim.

In construing this clause, a court would not look into the minds and hearts of the parties and conclude that the statute can be disregarded because both parties intended to grant a present security interest in after-acquired commercial tort claims. The meeting of the minds doesn't matter; the statute (for valid policy reasons) states that it simply can't be done.

Or take a license that provides that the licensee is not to assign the license, and that to do so is an event of default. Section 9-408(a) renders such agreements ineffective for most purposes; it does not prevent the licensee from financing its interest in the license. Here, for valid policy reasons, the statute does not look to enforce the intention of the parties, but expressly sets aside those intentions. The statute says: it simply can't be done.

Likewise, in fulfilling Article 9 requirements, it is sometimes necessary to use "magic words" - i.e., precisely the words set forth in the statute. For example, in executing an agreement that will give the secured party a perfected security interest in the debtor's funds on deposit with a bank, 9-104(a)(2) states that the bank executing that agreement must agree to comply with instructions originated by the secured party

> directing disposition of the funds in the deposit account without further consent by the debtor.

Virtually every agreement of this kind that I have reviewed uses these "magic words", or language virtually identical to the foregoing. In reading cases under Article 9, it is not a surprise that it is read closely and interpreted literally. Overwhelmingly, practitioners dealing with security interests in personal property understand that it will be so interpreted and advise their clients accordingly. Indeed, it would be a surprise if a court were to do the opposite: to elevate the intention of the parties (if that could even be accurately ascertained) over the result intended by the persons who drafted the rules and the legislature that enacted them.

<u>(3) This was a case of first impression and therefore the result could not reasonably have been anticipated.</u>

This argument begs the question of *why* there is so little litigation concerning section 9-620.

The reason is that Section 9-620, which was based upon former 9-505, is a model of clarity. Reading it through as through for the first time, it is difficult to see what term or terms might be in any way ambiguous or might be contested in litigation.

> (c) For purposes of this section both of the following rules apply:
> (1) A debtor consents to an acceptance of collateral in partial satisfaction of the obligation it secures only if the debtor agrees to the terms of the acceptance in a record authenticated after default.
> (2) A debtor consents to an acceptance of collateral in full satisfaction of the obligation it secures only if the debtor agrees to the terms of the acceptance in a record authenticated after default or the secured party does all of the following:
> (A) Sends to the debtor after default a proposal that is unconditional or subject only to a condition that collateral not in the possession of the secured party be preserved or maintained.
> (B) In the proposal, proposes to accept collateral in full satisfaction of the obligation it secures.
> (C) Does not receive a notification of objection authenticated by the debtor within 20 days after the proposal is sent.

Note that the statute refers, in both (1) and (2), to incorporation of "the terms" in "a record." There is no reference to "a record," containing some terms, plus other circumstances and conditions from which the totality of "the terms" can perhaps be inferred.

The paucity of litigation regarding 9-620 is particularly striking because there is no scarcity of UCC litigation in general. Every year, at the American Bar Association's Business Law Section, two members present the year's most interesting UCC cases, focusing on those involving secured transactions. I generally attend this presentation, and review the cases when I am not able to attend it. Generally, there are approximately a hundred of them. The paucity of such litigation related to section 9-620 evidences the clear and unambiguous language of this section.

(4) Judge Orrick's decision prohibiting a pre-default transfer could not have been anticipated.

The Maxson Report notes that industry practice has sanctioned the pre-default "walk away." This argument will be addressed in more detail in the forthcoming sections addressing the Smith Report. However, one brief point must be made here.

A reasonable lawyer, let alone an expert, should not have relied on industry practice that was developed in jurisdictions in which the UCC did not apply to life insurance premium finance loans. Such a lawyer should instead have considered and applied the statute in the jurisdiction whose laws clearly applied to these transactions - i.e., California. Since the statute is clear, there was no reason to look to industry practice; it was merely necessary to take the steps dictated by 9620.

(5) The "amicable resolution" letter.

As late as the date of his deposition, Jules Rousseau maintained that the letter of January 14, 2011, addressing the resolution of the relationship among the parties in an "amicable fashion," satisfied the requirements of 9620, despite the fact that he was unable during that deposition to identify any language in that letter suggesting that the liabilities of the Trust and/or the insured would be satisfied by completion of the requested paperwork. [1]

Clearly, section 9620 does not sanction such a letter as a substitute for the express statutory requirements. Furthermore, the Maxson Report does not identify any industry practice relating to the use of such a letter, or any basis for the belief that such a letter would, in the industry, be understood as implying a release of all borrower obligations.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The Smith Report

(1) The Legal Standard

(a) The Doctrine of Judgmental Immunity

The *Bernstein* case, which is relied on by the Smith Report, stands for the doctrine of judgmental immunity, a rule that protects a lawyer's good faith exercise of professional judgment in areas in which the law is unsettled. That doctrine, however, has been limited to areas of the law that are debatable or uncertain. See *FDBII Associates, LP v. Moore & Van Allen, PLLC*, 2014 WL 6682624 (S.D. FL., 2014), citing *Bernstein* (at 4):

> By its current motion, the defendant argues for a more expansive application of the rule, one which would extend its reach to any attorney error based on an honest exercise of professional judgment ...In advancing this view, it relies on select cases from other jurisdictions embracing this broader formulation of the rule. *Hatfield v. Herz*, 109 F.Supp.2d 174 (S.D.N.Y.2000) (decision not to file dispositive pretrial motions is discretionary litigation decision which cannot support legal malpractice claim); *Bernstein v. Oppenheim & Co.*, 160 A.D.2d 428, 554 N.Y.S.2d 487 (N.Y.A.D. 1 Dept.1990) (attorney decision not to file motion for summary judgment insulated as litigation conduct); *Rosner v. Paley*, 65 N.Y.2d 736, 492 N.Y.S.2d 13, 481 N.E.2d 553 (N.Y.1985) (selection of one option among several reasonable courses of action found

---

[1] Rousseau deposition, 189-93.

4

> insulated); *Mosera v. Davis,* 306 Ga.App. 226, 701 S.E.2d 864 (Ga.App.2010) (no liability for acts and omission of attorney in conduct of litigation ion which are based on honest exercise of professional judgment)....
>
> However, Florida courts have never interpreted the doctrine this broadly, instead confining its application to decisions and judgments made in unsettled areas of the law, leaving questions regarding the standard of care and breach of that standard for determination by the finder of fact. *Greene v. Leasing Associates, Inc.,* 935 So.2d 21 (Fla. 4th DCA 2006) (rejecting application of the doctrine as an immunity shield for an attorney litigation decision which did not involve legal principles that were either fairly debatable or unsettled); *Haisfield v. Fleming, Haile & Shaw, P.A.,* 819 So.2d 182 (Fla. 4th DCA 2002) ("judgmental immunity applies only where attorney shows that legal authority supporting the decision was "fairly debatable" or "unsettled" *and* that he or she acted in good faith and made a diligent inquiry into the unsettled area of law); *Hanson v. Fowler, White, Burnett, P.A.,* 117 So.3d 1127 (Fla. 3d DCA 2012) (doctrine applies where attorney makes good faith tactical decision based on a fairly debatable point of law).

See also *Roberts v. Chimileski,* 175 Vt. 480 (S. Ct., 2003), at 485:

> Judgmental immunity shields attorneys only from liability arising out of advice based on reasonable research into an unsettled area of the law. 3 R. Mallen & J. Smith, Legal Malpractice § 18.1, at 2-5 (5th ed.2000)...Furthermore, judgmental immunity does not extend to a failure to advise a client of the risks associated with an action of questionable legality. "The attorney's responsibilities to the client may not be satisfied concerning a material issue simply by determining that a proposition is doubtful or by unilaterally deciding the issue. When there are reasonable alternatives, the attorney should inform the client that the issue is uncertain, unsettled or debatable and allow the client to make the decision."

5

> *Wood v. McGrath, North, Mullin & Kratz, P.C.*, 256 Neb. 109, 589 N.W.2d 103, 106 (1999) (citing 2 R. Mallen & J. Smith, Legal Malpractice § 17.15, at 531-32 (4th ed.1996) (emphasis added).

See also *Schonfeldt V. Knapp, Petersen & Clarke*, 2003 WL 170417 (Ct. App., 2nd Dist., Ca., 2003):

> The judgmental immunity doctrine does not shield every "judgment call" made by a lawyer regarding investigation of a case, discovery, pretrial preparation or trial tactics, but rather applies only to the exercise of informed judgment *with respect to an unsettled state of the law that was the subject of professional advice:* "In order to establish judgmental immunity, a defendant must prove (1) the law was unsettled at the time professional advice was rendered and (2) the advice was based upon the exercise of informed judgment."

There is nothing debatable or unsettled about any of the following: (a) California law applied generally to enforcement of the loans in question; (b) they were within the scope of California's UCC; (c) Section 9620 thereof applied after default; (d) default occurred, at the latest, two days after the due date on the loan; and (e) a simple statement, which could be signed by the Trustee or to which it would have been bound by failure to respond - one that could easily be found in a form book - would have satisfied the statute.

Even assuming that the *Bernstein* doctrine applies to cases governed by black letter law as well as those that are unsettled, the question posed by the Smith Report is whether it can be a reasonable strategic decision to ignore the black letter law and try to construct an "agreement" from execution of the COO, together with other facts, circumstances, and inferences.

It may have been Jules Rousseau's hope, and expectation, that the immediate parties (the insured and its Trustee) would sleep on their rights, so that it was not necessary, in the near term, to comply with the statute. Perhaps this was what Jules Rousseau means when he said that to require any further documentation would only "cause more harm than good."[2] However, it is reasonably to be anticipated that, upon the death of an insured, his or her heirs, who were not part of the original premium finance transaction, would seek to assert rights to the policy and would take a close look at the basis underlying any claim that ownership of the policy had been transferred to Windsor. Indeed, the Trustees had a fiduciary obligation to their respective Trusts,

---

[2] Prusky Deposition, Transcript pages 207:23-209:5.

6

and each in fact sought the Death Benefits that they correctly believed was due to his or her respective Trust. Any executor of such insured's estate would also be duty bound to do so. Thus, future litigation was reasonably foreseeable.

This case therefore poses the question: is it ever a reasonable strategic choice to invite future litigation when it can easily be averted?

### (b) The Standard of Care

On multiple occasions the Smith Report states that Jules Rousseau is to be held to the standard of "a lawyer in the professional community." However, as set forth on pages 31-2 of my Report, many courts have held that a lawyer claiming to be a specialist or to have expertise in a particular area of the law is to be held to a higher standard of care. Jules Rousseau's *curriculum vitae* as published on the Arent Fox web site claimed such specialized expertise.

Without citing any authority for adoption of the lesser "lawyer in the professional community" standard, the Smith Report simply assumes that Jules Rousseau's conduct is to be judged against the far lesser standard of a lawyer whose only qualification is admission to practice in a given state. Given that life insurance premium financing is a relatively new development, and that there are relatively few lawyers claiming expertise in the broader category of "secured transactions," a random "lawyer in the professional community" would likely know little or nothing about the subject matter at issue.

Windsor did not hire that lawyer. Windsor hired an expert - Julius Rousseau.

### (2) Can an "Agreement" be Constructed from the Actions of the Parties?

The Smith Report states that:

> As a matter of contract interpretation the Defendants were entitled to consider what appeared to be the intention of the parties based on the circumstances surrounding the transfer.

In order for there to be an "agreement," there must be a meeting of the minds. Therefore, it is important to consider not only what Windsor might have meant or intended by taking a specific action, but what the insured (and the Trustee, directed by the insured) might have intended by the action it took. Only when these two coincide - and are objectively manifested - can it be said that there was a meeting of the minds.

### (a) Execution of the COO

The Smith Report notes, on page 7, that, after execution of the COO, it was Windsor's intention to own the Policy Rights outright. But what of the insureds' intention? And that of the Trustees? It

7

is equally reasonable to believe that the insureds instructed their Trustees to sign the COO it because they were told that the documents they executed required them to do so.

Pursuant to Section 5.02(a) of the Premium Financing Agreement:

> ...the Insured shall take such further action and/or execute and deliver all further assurances, documents, and/or instruments as may be reasonably requested by the Lender to effectuate the purpose of this Agreement and the other Financing Documents....

Had the insured taken a further look at the Premium Financing Agreement, he or she would have been reinforced in the view that there was no real alternative but to execute the COO when such action was demanded. Section 7.01 thereof provides for the recapture of expenses from any party to the Agreement (which in this case included the insureds, as well as their Trustees).

> ...any party that is in default in the performance or observance of its duties and obligations hereunder shall indemnify the other party hereto for the reasonable costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors, and accountants, incurred by such other party in enforcing this Agreement against such defaulting party. This Section 7.01 shall survive the payments of all other mounts due hereunder.

Confronted with the possibility that Windsor might have been advised to sue the insured and its Trustee to compel execution of the COO, and that Windsor's litigation expenses (as well as those of its own counsel) might have been collected from the insured, and that the insured's reimbursement obligation would survive termination of the Agreement, it would have been reasonable for each of the insureds to conclude that they had no real option but to execute the COO.

And it is equally, and more likely, that the insureds believed they were signing over the policies only as collateral for their loan. Otherwise, they would not have taken the position, in the lawsuits arising out of these loans, that they believed they still would have rights to any death benefits beyond the loan and interest.

(b) Acceptance of Policy in Full Satisfaction of Obligations

The Smith Report also notes, on page 7, that (a) after acceptance of the collateral, Windsor had no intention of pursuing the Trust for a deficiency, and (b) as a practical matter, could not do so, as

8

the Trust had no other assets. Therefore, acceptance of the collateral must have been interpreted as an even exchange: the policy is transferred and the Trust's liabilities are extinguished. This construction of an agreement, based on the facts and circumstances surrounding the transfer of the collateral, proceeds solely from Windsor's understanding of the significance of these events, and relies heavily on the assertion that this was a nonrecourse loan.

The Smith Report states, on page 8, that

> ...there is no policy reason for the acceptance to state the secured party's acceptance of the collateral was in full satisfaction of the secured obligations when the practical effect of the acceptance was that the debtor had no further liability for the secured obligations.

But was there no recourse? First, it was not established as a fact whether or not the Trusts had other assets. A trust is an estate planning tool. The Trustee had the power to receive additional property acceptable to the Trustee (Plaintiff 003448, clause Z), provided only that it be unencumbered.

Second, the Note states that:[3]

> ...the Holder shall not be required first to institute any suit or to exhaust his remedies against ...any collateral in order to enforce payment of this Note.

Therefore, Windsor could have decided that the policies could not be sold for an amount that exceeded or approached the amounts lent to the Trusts, and could have proceeded directly against the Trusts instead.

Third, the insured could have become liable for attorneys' fees expended by Windsor, or for loss caused by a misrepresentation, as is discussed below in section (3). These potential liabilities must be taken into account in concluding that there was no recourse after the collateral was transferred.

The passage from the Smith Report quoted above concludes that the transfer of collateral must have been in full satisfaction of the obligations because there was no practical method of collecting them. There is no support for this conclusion, and, as stated above, several bases for asserting such liability against the Trust or the insured.

The position of the Smith Report that the "meaning" of the transfer of the collateral can be inferred from Windsor's intentions and the absence of other assets in the Trusts does not address what might have been in the mind of the insured. Windsor's intentions concerning the pursuit of any deficiency were not clearly communicated to the insured, and in any event were based upon Jules Rousseau's

---

[3] Taken from the Stamatov note, Plaintiff 003437, 7(a)(c).

9

advice that Windsor was entitled to the death benefits if it continued making premium payments. Further, if indeed it was true that the Trusts has no assets other than the policy, it likely that each insured thought of its Trust as its alter ego and did not know whether, or to what extent, the trust barrier might be disregarded and recovery might be had against the insured.

It is equally likely that the insureds, not being familiar with the industry practices outlined in the Maxson Report, believed that they were merely transferring record title to Windsor, but still retaining beneficial ownership. They may have understood that after execution of the COO Windsor could decide to cease paying premiums, causing the policy to lapse. But they may well have assumed that if Windsor continued paying premiums, their estates would receive, after collection of the death benefits, the face amount of the policy, less certain amounts owed to Windsor under the terms of the financing package. This would be a prudent proposition for the trusts: nothing to pay out and a partial death benefit to potentially collect. There is no objective manifestation from which it is possible to conclude that they intended the transfer as an extinguishment of all rights and duties on both sides of the transaction, and every indication, from the position taken in the underlying litigation, that they did not.

(c) The Lack of an Immediate Outcry

The Smith Report correctly notes that there was no immediate protest after execution of the COOs. That observation, however, leads to just the opposite conclusion than was drawn in the Smith Report.

If, for example, an adroit thief lifts my wallet while I am away from my house, I am not likely to make an outcry when the event occurs. I will make the outcry when I next seek to make a purchase and realize that it is not there.

Likewise, the fact that there was no immediate outcry supports the conclusion that the insureds (and their Trustees) did not believe that the effect of execution of the COOs, was to extinguish any right of the Trusts to the policy benefits. Their silence at the time, compounded by the actions they took when they did not receive the difference between the loan(s) and the death benefit(s), objectively demonstrates that by executing the COOs they were merely doing what they were told was required by the transaction documents.

(3) The Pre-Default Walk Away

I do not disagree with the Smith Report's conclusion that the parties could have agreed to a pre-default walk away (although, as stated in my Report, not under the aegis of the Default Sale Right, which expressly applied to a post-default situation). I do disagree, however, with his conclusion that they did so.

10

As discussed in my Report, pursuant to Section 14(d) of the Security Agreement:

> This Security Agreement shall be binding upon Beneficiary and Trustee each of their successors and permitted assigns ...and shall inure to the benefit of, and be enforceable by, Lender and its successors and assigns and none of the terms and provisions of this Security Agreement may be waived, altered, modified or amended except in writing duly signed for and on behalf of Lender and Beneficiary or Borrower, *with an express statement in such writing that it was intended as an amendment, waiver or modification of the provisions of this Security Agreement* [emphasis supplied].

No attempt was made to comply with these mechanics, which were inserted to protect the Lender against a claim that someone speaking for it had waived or modified a contract term. As the foregoing provision required the express assent in writing of the Borrower, the Lender was incapable of unilaterally waiving it. Therefore, any asserted "modification" not complying with the foregoing mechanics was legally ineffective.

Furthermore, looking again at what might have been in the mind of the insured, the "pre-default walk away" was not a trivial or inconsequential action. These policies were significant assets. The asserted "walk away," in legal terms, was a termination of the basic financial rights and obligations of the parties under an elaborate financing package. Even apart from the requirements of Article 9, or those of section 14(d), a lay person would ordinarily expect some sort of formalistic document from the lender or its attorney at the time of such agreement, or shortly thereafter, evidencing such a significant event. But, absent receipt of such documentation, it is unlikely that the insured believed that such a "walk away" had been effected.

Finally, there was no communication to the insured or the Trustee that acceptance of the collateral was in full satisfaction of all potential or unasserted liabilities of the insured to Windsor. As mentioned previously, the insured could have been liable for attorneys' fees incurred by Windsor. Additionally, section 7.13 of the Premium Financing Agreement provides that the insured may be liable for damages for any misrepresentation made in Section 3.02 thereof (including misrepresentations as to the existence of a catastrophic or life-threatening condition, and as to the net worth of the insured). There was no statement that these potential liabilities were to be extinguished.

Looking, therefore, at the totality of the facts and circumstances, there is no objective manifestation of any meeting of the minds, or the timing thereof, or what the content of any such agreement might have been. Perhaps for such reason Comment 5 to Section 9620 (California and uniform version) states:

11

> A debtor's voluntary surrender of collateral to a secured party and the secured party's acceptance of possession of the collateral does not, of itself, necessarily raise an implication that the secured party intends or is proposing to accept the collateral in satisfaction of the secured obligation under this section.

(4) The Effect of Multiple Errors

The Smith Report, like the Maxson Report, compresses the time periods involved here, and thus ignores the effect of multiple errors. Even if it was reasonable for an expert lawyer to rely initially on the COO as a substitute for satisfaction of the 9620 requirements - which it was not - the fallacy of this reasoning must have been apparent by the time that Jules Rousseau first became aware of the basis for the Trustee's assertions in the Bitter arbitration. At that point it should have been evident that the situation in California was different from that which prevails elsewhere, and that the California statute commands compliance. The Smith Report does not discuss whether, in light of this new information, it was still reasonable for a lawyer (let alone an expert) to rely on an scheme of his own invention, not sanctioned by 9620, by the case law, or by any other authority.

CONCLUSION:

Neither the Maxson Report nor the Smith Report addresses the reasons and motivations for Jules Rousseau's advice to Windsor. In the first instance, he was ignorant of the California law as it applied to the financing of life insurance policies. Surely neither Report is intended to support the proposition that ignorance of the law can ever be a reasonable professional strategy.

In the second instance, he chose to ignore the black letter law because it was inconvenient. Had he drafted an agreement or proposal extinguishing the Trusts' obligations in return for surrender of its rights to the policy, or had he conducted a commercially reasonable sale, Windsor would have had an unfettered right to the policies it had financed. But he chose not to do so because, as noted in my Report, that would cause "more harm than good." Neither Report has satisfactorily explained why it might be a reasonable professional strategy to ignore the dictates of a clearly-written statute in favor of an untested scheme for which there was no precedent in that state, simply because following the statute is inconvenient. Nor has either Report explained Rousseau's failure to take action on the other policies after a clear decision from the AAA Panel.

The result of the advice rendered to Windsor was to vest the death benefits in the legatees of insureds who never paid any premiums for the policies during their lifetimes. But this was not the result of an unfair decision by any tribunal. It was the result of legal advice that was below the standard of care for an expert practicing life insurance finance.

12

The materials I reviewed in preparing my initial Report and this Rebuttal Report are attached hereto as Appendix A.

*[signature]*

SANDRA STERN

**Appendix A: Materials**

1.  Complaint with all exhibits;

    **Exhibits**

    A.  Arent Fox Engagement Letter.

    B.  Arent Fox, LLP website and webpage for Julius A. Rousseau, III

    C.  Financing Agreement Package for the loan made by Windsor to the Erwin A. Collins Family Insurance Trust and Erwin A. Collins

    D.  Rousseau/Herrick Firm June 5, 2009 engagement letter.

    E.  Pr. Newswire Article of June 17, 2010.

    F.  April 7, 2011 email from Rousseau to Windsor.

    G.  September 16, 2010 email exchange wherein Windsor's principal was requesting advice as to the Bitter Premium Finance Policy.

    H.  September 8, 2010 Arent Fox/Rousseau letter to the Bitter Trust.

    I.  September 9, 2014 letter terminating Rousseau and Arent Fox's representation of Windsor.

    J.  A true and correct copy of Windsor's January 14, 2011 letter.

    K.  American Arbitration Association April 8, 2014 Interim Award.

    L.  March 18, 2010 Second COO

    M.  Acker Trustee's Answer and Cross-Claim in the Acker Action.

    N.  Acker Court's September 21, 2015 Order.

    O.  Collins Court's September 21, 2015 Order.

    P.  Request for a release and the release, collectively.

    Q.  Coppock Late Objection letter.

    R.  Stamatov Late Objection letter.

2. Deposition Transcript of Julius Rousseau, III dated March 7, 2017 (with exhibits)

**Exhibits**

1. Complaint (w/o Exhibits) - 2/29/16

2. Defendants' Answer, Affirmative Defenses & Counterclaims - 5/6/16

5. Life Insurance Premium Financing Agreement Among Windsor Securities, LLC - The Jane Ann Stamatov Family Insurance Trust and Jane Ann Stamatov (CONFIDENTIAL PLAINTIFF 003408-003527) - 2/26/08

10. Email from Jule Rousseau to Steve Prusky re: Premium Finance Cases (PLAINTIFF 027304-027307) - 4/29/09

11. Email string between David Fox/Steve Prusky/ Jule Rousseau re: Phoenix (CONFIDENTIAL AF0032254-0032256) - 7/7/09-7/8/09

12. Email from David Fox to Steve Prusky re: Windsor Securities LLC Obtaining Possession and Title to Insurance Policies financed by Windsor (CONFIDENTIAL AF0031707) - 7/16/09

14. Letter from Julius Rousseau to Maria Gordillo/Ann Collins & Erwin Collins re: Life Insurance Premium Financing Agreement Among Windsor... (CONFIDENTIAL AF0006993-0006998) - 7/7/09

15. Letter from Julius Rousseau to Robert Coppock, II, Eliza Coppock and Robert Coppock re: Life Insurance Premium Financing Agreement Among Windsor... (CONFIDENTIAL AF0006976-0006981) - 7/7/09

16. Letter from Julius Rousseau to Ronald Goss, Nadine Acker and Joe Acker re: Life Insurance Premium Financing Agreement Among Windsor.... (CONFIDENTIAL   AV0007027-0007032 - 7/7/09

17. Letter from Julius Rousseau to Larry Davidson, The Jane Ann Stamatov Family Insurance Trust & Jane Ann Stamatov re: Life Insurance Premium Financing Agreement Among Windsor.... (CONFIDENTIAL AF0007052-0007055) - 7/7/09

18. Letter from Julius Rousseau to Gregory Barnes, Carol Bitter and John Bitter, Jr., re: Life Insurance Premium Financing Agreement Among Windsor... (CONFIDENTIAL   AF0007073-0007078)-7/7/09

20. Letter from Julius Rousseau to Gregory Barnes and John Bitter, Jr. Re: Life Insurance Premium Financing Agreement Among Windsor....(CONFIDENTIAL   AF 0002974 &0002976 - 8/18/09

21. Letter from Julius Rousseau to Eliza Coppock & Robert Coppock re: Life Insurance Premium Financing Agreement Among Windsor... (CONFIDENTIAL AF0006960-0006961) - 8/26/09

22. Letter from Julius Rousseau to Ronald Goss & Joe Aker re Life Insurance Premium Financing Agreement Among Windsor... (CONFIDENTIAL Plaintiff 000127-000128) - 8/27/19

23. Letter from Julius Rousseau to Larry Davidson & Jan Ann stamatov re: Life Insurance Premium Financing Agreement Among Windsor.... - 8/27/09

27. Letter from Julius Rousseau to Gregory Barnes & John Bitter, Jr. re: Life Insurance Premium Financing Agreement Among Windsor..... (Plaintiff 023366-023367) - 11/30/09

35. CONFIDENTIAL Email from Jule Rousseau to Steve Prusky re: Garcia with attachment (Plaintiff028708-028713) with attachment: Letter from David Fox to The Marcia Garcia Family Trust; Marcia Garcia; Emily Garcia; Martha Garcia & Anthony Imbimbo re: Life Insurance Premium Financing Agreement Among Windsor......(dated 3/16/10) - 4/5/10

39. Letter from Jule Rousseau to Steve Prusky re: Authorization to Transfer Files Belonging to Mr. Steven Prusky (CONFIDENTIAL Plaintiff......),5/26/10

40. Letter from Jule Rousseau to Windsor Securities, LLC re: Engagement Letter (CONFIDENTIAL Plaintiff 003914-003918),4/7/11

44. Letter from Jule Rousseau to Gregory Barnes & John Bitter, Jr. Re: Life Insurance Premium Financing Agreement Among Windsor....(Plaintiff 023368-023369) - 9/8/10

45. Letter from Steve Prusky to Gregory Barnes & John Bitter, Jr. Re: Pacific Life #VF51701770 (CONFIDENTIAL AF0003336),1/14/11

50. Pacific Life Title Change Confirmation addressed to Robert Coppock ILIT /Eliza Coppock TTEE/ Eugene Houchins (CONFIDENTIAL Plaintiff 001443-001418) & Pacific Life Ownership, Name or Beneficiary Change Request (CONFIDENTIAL Plaintiff 001268-001270) - 9/23/09

59. AAA Interim Award re: Gregory Barnes, Jr., et al. V. Windsor Securities, LLC, Case No. 74-148-000296-13-S1M (CONFIDENTIAL AF0007679-0007687) - 4/8/14

60. Email string betwen Jule Rousseau/Desireee Morris/ Peter Mancusco/ Steve Prusky re: Gregory Barnes as Trustee of V. Windsor Securities - Case 74-20-1300-0296 (JUDD 140437-140439) - 4/11/14 to 4/13/14

61. CONFIDENTIAL email from Steve Prusky to Jule Rousseau re: other COO with attachments (Plaintiff 026781-026806) - 4/15/14

62. Email string between Jule Rousseau/Michael Cryan/Steve Prusky re: Motion for Reconsideration (JUDD 140172-140174) - 4/16/14

63. Letter from Steve Prusky to Maria Gordillo re: Pacific Life Insurance Policy #VF51701320 (CONFIDENTIAL AF0019919) - 6/1/14

64. Letter from Steve Prusky to Ronald Goss re: John Hancock Life Insurance Policy #93783751 (CONFIDENTIAL Plaintiff 000003) - 6/1/14

65. Letter from Steve Prusky to Robert Coppock re: Pacific Life Insurance Policy #VF51701030 (CONFIDENTIAL Plaintiff 001295) - 6/1/14

66. Letter from Steve Prusky to Larry Davidson re: Phoenix Life Insurance Policy #97524494 (CONFIDENTIAL Plaintiff 003551) - 6/1/14

76. Order Granting in Part & Denying in Part Motion for Summary Judgment in *Pacific Life Insurance Co. V. Maria Ana Gordillo, et al.*, USDC, Northern District of CA, No. 14-cv-03713-WHO - 9/21/15

77. Order Granting in Part & Denying in Part Motion for Summary Judgment in *John Hancock Insurance Co. V. Mindy Goss, et al.*, USDC, Northern District of CA No. 14-cv-04651-WHO (JUDD 069000-069010) - 9/21/15

78. Order on the Trust's Motion for summary Judgment in *John Hancock Insurance Co. V. Windsor Securities, LLC, et al.*, USDC, Northern District of CA, No. 14-cv-04651-WHO (JUDD 069819-069829)- 12/22/15

79. Order on the Trust's Motion for Summary Judgment in *Pacific Life Insurance Company v. Maria Ana Gordillo*, USDC, Northern District of CA, No. 14-cv-03713-WHO - 12/22/15

89. Email string between Alan Dubin/Jule Rousseau re: Bitter (CONFIDENTIAL AF0007662-0007664) - 4/17/14-4/18/14

90. Plaintiff's Notice of Videotaped Deposition Directed to Corporate Designee at Arent Fox - 1/24/17

91. Legal bills from Herrick to Steve Prusky (CONFIDENTIAL Plaintiff 002124-002257)

92. Email from Jule Rousseau to Steve Prusky re: Joe Aaron ,12/19/13

   93. Email string between Jule Rousseau/ Steve Prusky/Michael Cryan/Alan Dubin re: Gregory Barnes as Trustee of John L. Bitter Irrevocable Life Insurance Trust v. Windsor Securities, LLC AAA- Ref #1100074960 (JUDD 127464-127465),7/14/14

   94. Plaintiff's Response to Defendant's First Set of Interrogatories

       *Windsor Securities v Arent Fox et al.,* USDC, Southern District of NY No. 16-cv-01533 - 7/11/16

3. Deposition Transcript of David Fox dated April 5, 2017 (with Exhibits).

   1. **Exhibits**

      101. Letter from J. Rousseau, III to Steven Prusky re: General Corporate Representation dated June 3, 2009.

      102. Invoice from Herrick to Steven Prusky dated July 31, 2009.

      103. Condensed March 7, 2017 transcript of J. Rousseau.

      104. Invoice from Herrick to Steven Prusky dated August 31, 2009.

      106. Invoice from Herrick to Steven Prusky dated December 8, 2009.

4. Deposition Transcript of Steven Prusky dated March 6, 2017 (with Exhibits)

   **Exhibits**

   1. Notice of Rule 30(b)(6) Deposition Notice

   2. Complaint (w/o Exhibits)

5. Motion for Summary Judgment in the Collins Litigation dated October 27, 2017.

6. Opposition to Motion for Summary Judgment, or, in the alternative Partial Summary Judgment in the Collins Litigation dated November 10, 2015.