**EXHIBIT "35"**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WINDSOR SECURITIES, LLC | : |
| : Civil Action No. 16-cv-01533 (GBD) |
| Plaintiff : |
| v. : |
| : |
| ARENT FOX, LLP : |
| and : |
| JULIUS ROUSSEAU, III, ESQUIRE : |
| : |
| Defendants : |

## REPLY REPORT OF SANDRA STERN IN RESPONSE TO THE REBUTTAL REPORT OF EDWIN E. SMITH

Reply Report of Sandra Stern in Response to the Rebuttal Report of

Edwin E. Smith

This Reply answers the three arguments made in the Smith Rebuttal Report.

1. COO Executed and Delivered Before Default.

As an initial observation, the Stern Report did not concede that any of the COOs were executed prior to default. It merely stated that four of them were executed prior to a monetary default. In several cases, statements constituting anticipatory repudiation and/or changes in the identity of a trustee may or may not have constituted default under the terms of the transaction documents. No opinion was or is expressed herein on whether default occurred prior to the maturity date of the loans.

Did a pre-default discharge of the financing documents require an amendment to the transaction documents? A termination of a financing package is the most significant type of "amendment," in that it extinguishes all rights and obligations of both parties. The thrust of Section 14(d) of the Security Agreement, drafted by the financier and to be interpreted strictly against it, is that such an event would have required something in writing, executed by both parties, referring to the financing, and expressing the intent of each party to release the other from all duties and extinguish all rights thereunder. Of course, as noted in the Smith Report, this document would not, in practice, be titled an "Amendment." It would likely be called a "Release," "Termination," "Satisfaction," or words of similar import. It might have been minimal - perhaps only a single page - but it would have satisfied the requirement of the Security Agreement.

The illustration provided by the Smith Report – the exchange of a deed for the release of mortgage obligations – is inapposite. In the case of the mortgage, the homeowner would certainly be required to execute a deed, because the mortgagee would insist on receiving title. Even the most unsophisticated lay homeowner would recognize that, in giving the lender a deed, it was transferring complete and unfettered ownership of the property to the mortgagee.

Here, the lay borrowers were dealing with an esoteric type of financing. There is no evidence that any of them had ever engaged in such a transaction previously, or had any understanding of the function of a COO. Thus, one of the central issues in this litigation is what they thought they were doing by executing the COO. There is no evidence that any of them thought that they were transferring unfettered ownership and entitlement to the death benefit under the policy to the Lender, and, as noted in my initial Report, there was testimony to the contrary.

1

Even if the Blackacre illustration was comparable to the situation at issue here, however, it illustrates, rather than disproves, the point made in my initial Report. In such an event, the homeowner would want some evidence that it had no remaining liability under the mortgage (particularly since, in the given example, it would not have a cancelled check for the payoff amount to retain as evidence of discharge). This document would likely be called "Mortgage Satisfaction," "Mortgage Release," or words of equivalent import. No such document was given to the borrowers or trustees in exchange for execution of the COO.

Julius Rousseau and Arent Fox could easily have drafted a one-page "Termination and Release" document to accompany the execution of the COO, for execution by the Trustee and Windsor, that, when so executed, would have satisfied the Security Agreement requirement for a writing. It did not require specialized expertise in insurance premium finance to understand that such clarification was required by the transaction documents, and was, in any event, good practice when any ambiguity may exist in the legal significance of an act or event.

II. COO Executed and Delivered Following Default.

I agree with the observation in the Smith Report that an "agreement" satisfying 9-620 would have been an acceptable alternative to a proposal. But let's parse what 9-620 requires. It states:

> A debtor consents to an *acceptance of collateral* in *full satisfaction of the obligation* it secures only if the debtor agrees to the terms of the acceptance *in a record* authenticated after default....

The first requirement is that the terms (presumably, all the terms) be embodied in a single record. Thus, while in general the concept of an "agreement" may encompass an oral understanding, 9-620 requires that the understanding be set forth in a single written or electronic record. In order to satisfy 9-620, that record would have stated that (1) ownership of the collateral was being transferred to the secured party; and (2) that the obligations of the Trust (and, to the extent applicable, of the borrower) were being extinguished.

As discussed above, the only "record" here is the COO. It did not state to the Trustees or the borrowers that they were transferring unfettered ownership of the policy and its death benefits to Windsor, or that there was a release of their obligations under the financing documents.

The Smith Rebuttal states that such express statement was unnecessary in view of the fact that there was no recourse, and in light of the Default Sale provision. The Smith Rebuttal points to my observation that the pursuit of any recourse remedies was not a practical alternative open to the secured party. This statement merely

2

meant that Windsor would likely have decided not to "throw good money after bad" by pursuing such remedies; it is not to say that they did not exist. In my Rebuttal Report, I have indicated several instances of recourse provisions in the transaction documents. I understand that another expert furnishing a report in connection with this litigation has concluded that such recourse existed.

Even if such documents can be read as "no recourse" – a conclusion that is disputed – this analysis would have been beyond the capabilities of lay persons. It was below the standard of care for a specialist in insurance premium finance to have concluded that a court would have accepted a fragmentary record plus other facts, circumstances, and analyses as a substitution for the "agreement" "in a record" as required by 9-620.

### III. Policies of the UCC.

In my Report, I stated that the policies of the UCC support the view that 9-620 is an important debtor protection provision. The Smith Rebuttal notes that because the execution of the COO required an affirmative act (rather than simple failure to object, as provided by 9-620(c)(2)), it was a preferable method of satisfying the statute from the standpoint of debtor protection.

However, there are only two possibilities here. Either the execution of the COO, together with accompanying facts, circumstances, and inferences to be drawn therefrom, satisfied the requirement of an "agreement" "in a record," as required by 9-620(c)(2), or it did not. If it did, the inquiry is at an end. If it did not, the fact that it was an affirmative act of the Trustee is irrelevant. Any other result would leave parties free to disregard the Article 9 rules in favor of acts that seem preferable to them at the time, leaving nothing left of the statute.

### IV. Standard of Care

The point of the foregoing observations is not to relitigate the cases that led to the present litigation. It is to determine whether the advice provided by Jules Rousseau and Arent Fox was below the applicable standard of care.

Let's look at what they knew at the time.

First, the COO (which was the insurance company's form document) was presented to the lay borrowers (who were unrepresented by counsel) for their signature by a large and sophisticated law firm. The record indicates that in some instances there was initial opposition to signing it, but that such signatures were ultimately obtained. Even without knowing that the governing law was that of a state known to be consumer-friendly, they could have assumed that this transaction would be scrutinized by a court if it was contested at a later point in time.

3

Furthermore, if a controversy as to ownership of the policy rights arose after the borrower's death, the moving party would be an executor or personal representative who was not party to the transaction or present at the time of the execution of the COO. Any testimony as to the borrower's stated intentions in signing the COO would be lost because of the dead man's statute.

Even a "lawyer in the community" (rather than an expert in premium finance) would have forseen that this situation presents a risk that, after the death of an insured, the Trustee would state that by executing the COO, (s)he intended only to enable the lender to further perfect its security interest, not to transfer unfettered ownership of the policy rights and the death benefits. Such a lawyer would have known that the only way to avert the risk was to document why the COO was being executed.

Finally, the same sort of simple document explaining the exchange - ownership of the policy rights in return for satisfaction/release of all obligations - would, if executed by both parties, have satisfied the requirement of Section 14(d) (if executed before default), and Section 9-620(c)(2) (if executed after default).

As stated in my Report, Julius Rousseau should be held to the higher standard of a lawyer who advertises himself as having specialized knowledge. He should have known that the financing package was subject to the laws of the State of California, which include insurance policies within the scope of the UCC, and should have known or discovered the provisions of UCC 9620. But, even if he is held to the lower standard of a "lawyer in the community," and even if he was ignorant of these requirements, the exercise of basic lawyering skills would have dictated a course of action that would have protected Windsor's interests.

*[signature]*

Sandra Stern

May 22, 2018

4