# EXHIBIT "100"

1  Darin T. Judd (SBN 160475)
   Russell F. Rowen (SBN 058178)
2  THOMPSON, WELCH, SOROKO & GILBERT, LLP
   3950 Civic Center Drive, Suite 300
3  San Rafael, CA 94903
   Telephone:    (415) 448-5000
4  Facsimile:    (415) 448-5010
   Email:        darin@twsglaw.com
5                rrowen@twsglaw.com

6  Attorneys for Defendant/Cross-Claimant
   WINDSOR SECURITIES, LLC
7

8                      UNITED STATES DISTRICT COURT
9
         NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION
10

11

12 | PACIFIC LIFE INSURANCE COMPANY,           | Case No.  3:14-cv-03713-WHO

13 |              Plaintiff,                    | WINDSOR SECURITIES, LLC'S NOTICE OF
                                               | MOTION AND MOTION FOR SUMMARY
14 |      vs.                                   | JUDGMENT, OR, IN THE ALTERNATIVE,
                                               | PARTIAL SUMMARY JUDGMENT
15 | MARIA ANA GORDILLO, as Trustee of the      |
   | Erwin A. Collins Family Insurance Trust –  | Date: August 12, 2015
16 | 2008; and WINDSOR SECURITIES, LLC, a       | Time:  2:00 pm
   | Nevada limited liability company,          | Courtroom:  2, 17th Floor
17 |                                            | The Honorable William H. Orrick
   |              Defendants.                    |
18

19 | WINDSOR SECURITIES, LLC, a Nevada
   | limited liability company,
20
   |          Cross-Claimant/Cross-Defendant,
21
   |      vs,
22
   | MARIA ANA GORDILLO, as Trustee of the
   | Erwin A. Collins Family Insurance Trust-2008,
23
   |          Cross-Defendant/Cross-Claimant.
24

25

26     TO DEFENDANT/CROSS-DEFENDANT/CROSS-CLAIMANT MARIA ANA GORDILLO

   AND HER ATTORNEY OF RECORD:
27

28     NOTICE IS HEREBY GIVEN that on August 12, 2015 at 2:00 pm, or as soon thereafter as

-1-

JUDD  070003

1 | counsel may be heard by the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco,
2 | California, defendant/cross-defendant/cross-claimant WINDSOR SECURITIES, LLC ("Windsor") will
3 | and hereby does move the Court for summary judgment on the ground that there is no genuine dispute
4 | as to any material fact and that the moving party is entitled to judgment as a matter of law that it is
5 | entitled to the entire death benefit ("DB") interpleaded by Pacific Life Insurance Company. In the
6 | alternative, Windsor moves for partial summary judgment that it is entitled to recover
7 | from the DB a sum equal to the amounts Windsor has loaned to the Insurance Trust, plus legal interest
8 | thereon.

9 |      This motion is based upon this Notice of Motion and Motion, the accompanying Memorandum
10 | of Points and Authorities, the declarations of Steven Prusky and Karen H. Canoff, all pleadings and
11 | papers on file in this action, and upon such other matters as may be presented to the Court at the time of
12 | the hearing.

14 | Dated: July 8, 2015                    THOMPSON, WELCH, SOROKO & GILBERT, LLP

                                         By:      /s/ Darin T. Judd
16 |                                               Darin T. Judd
                                                 Attorneys for Defendant, Cross-Defendant, and
17 |                                              Cross-Claimant
                                                 WINDSOR SECURITIES, LLC

                                         -2-

1  Darin T. Judd (SBN 160475)
   Russell F. Rowen (SBN 058178)
2  THOMPSON, WELCH, SOROKO & GILBERT, LLP
   3950 Civic Center Drive, Suite 300
3  San Rafael, CA 94903
   Telephone:    (415) 448-5000
4  Facsimile:    (415) 448-5010
   Email:        darin@twsglaw.com
5               rrowen@twsglaw.com

6  Attorneys for Defendant/Cross-Claimant
   WINDSOR SECURITIES, LLC
7

8              UNITED STATES DISTRICT COURT

9    NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

10

11 | PACIFIC LIFE INSURANCE COMPANY,          | Case No. 3:14-cv-03713-WHO

12 |                Plaintiff,                 | **WINDSOR SECURITIES, LLC'S**
                                               | **MEMORANDUM OF POINTS AND**
13 |        vs.                                | **AUTHORITIES IN SUPPORT OF MOTION**
                                               | **FOR SUMMARY JUDGMENT, OR, IN THE**
14 | MARIA ANA GORDILLO, as Trustee of the     | **ALTERNATIVE, PARTIAL SUMMARY**
   | Erwin A. Collins Family Insurance Trust – | **JUDGMENT**
15 | 2008; and WINDSOR SECURITIES, LLC, a      |
   | Nevada limited liability company,         | Date:    August 12, 2015
16 |                                           | Time:    2:00 pm
   |                Defendants.                | Dept:    Courtroom 2, 17th Floor
17 |                                           | Judge:   The Honorable William H. Orrick

18 | WINDSOR SECURITIES, LLC, a Nevada
   | limited liability company,
19 |
   |        Cross-Claimant/Cross-Defendant,
20 |
   |        vs,
21 |
   | MARIA ANA GORDILLO, as Trustee of the
22 | Erwin A. Collins Family Insurance Trust-2008,
   |
23 |        Cross-Defendant/Cross-Claimant.

24

25

26

27

28

JUDD   070005

# TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................... 1

II.    STATEMENT OF FACTS ...................................................................................... 1

    A.    Windsor Engaged to Provide Premium Financing............................................ 1

    B.    Admittedly an Event of Default Occurred Triggering Windsor's Rights Under the DSR............................................................................................................... 4

    C.    Representations & Rights Granted under the Other Financing Documents. ..................... 6

III.   ARGUMENT........................................................................................................... 7

    A.    Windsor Had The Right, Agreed To In Advance In The Contract Documents, To Unilaterally Exercise The DSR..................................................................... 8

    B.    California Commercial Code §9620 May Be Varied By Agreement, And, In Any Event, There Has Been Compliance With §9620. ............................................. 11

IV.    CONCLUSION....................................................................................................... 12

WINDSOR SECURITIES, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

JUDD  070006

1

# TABLE OF AUTHORITIES

2

3

Cases

*Bank of the W. v. Superior Court* (1992) 2 Cal.4th 1254.........................................................................11

*Ferguson v. Neighborhood Housing Services.*, 780 F.2d 549, 551 (6th Cir.1986) ...................................7

*In re Fordson Engineering Corp.*, 25 B.R. 506, 509 (Bankr.E.D.Mich.1982).........................................8

*Jefferson v. California Dept. of Youth Authority* (2002) 28 Cal.4th 299................................................11

*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815 ...........................................................................6

*White v. Arco/Polymers, Inc.*, 720 F.2d 1391, 1396 (5th Cir.1983) ........................................................8

Statutes

California Civil Code §1636.................................................................................................10, 11

California Civil Code §1638.................................................................................................10, 11

California Civil Code §1639.................................................................................................10, 11

California Civil Code §1641..........................................................................................................11

California Civil Code §1643..........................................................................................................11

California Civil Code §1644..........................................................................................................11

California Civil Code §1647..........................................................................................................10

California Civil Code §1648..........................................................................................................11

California Civil Code §3289............................................................................................................5

California Commercial Code §1302...............................................................................................12

California Commercial Code §9620.........................................................................................11, 12

California Commercial Code §9102...............................................................................................12

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WINDSOR SECURITIES, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT
JUDD   070007

# I.

## INTRODUCTION

In this case, plaintiff Pacific Life Insurance Company (U.S.A.) ("**Pacific Life**") interpleaded the death benefits ("**DB**") of its policy number no. VF51701320 ( the "**Policy**") because of the partially conflicting claims asserted by Maria Ana Gordillo, Trustee of the Erwin A. Collins Family Insurance Trust - 2008 ("**the Insurance Trust**" or "**Trust**") and Windsor Securities LLC ("**Windsor**") to those death benefits.    The central issue in this case, and in related case *John Hancock Life Insurance Company USA) v. Mindy Goss, et al, U.S.D.C. N. D. case no. 3:14-cv-04651-WHO*, is whether Windsor, which provided financing for the initial premiums that has never been repaid, *and* paid all of the premiums thereafter for the Policy (including those premiums due after transfer of the ownership of the Policy to Windsor), or the Insurance Trust (the original owner of the policy), which refusedto pay Windsor back on the note it executed for the premiums financed and never paid a penny in premiums, is entitled to the death benefits that are payable now that Mr. Collins has passed away.

Windsor submits that there is no genuine dispute as to any material fact that Windsor is entitled to the entire DB and that it is entitled to such as a judgment.   (FRCP 56(a))  Certainly, there is no dispute of any sort that Windsor is at least entitled to retain from the DB a sum equal to the amounts Windsor has loaned to the Insurance Trust, plus legal interest thereon. (Judicially admitted at Paragraph 28(b) (page 9) of the Answer And Cross-Claim Of Maria Ana Gordillo As Trustee Of The Erwin A. Collins Family Insurance Trust - 2008 ("**Gordillo Answer And Cross-Claim**"))[1]

# II.

## STATEMENT OF FACTS

### A.    *Windsor Engaged to Provide Premium Financing.*

Premium financing is just what its name implies: the financing by the owner of a life insurance policy of premiums needed to initiate and keep a policy in force. (Declaration of Steven Prusky ¶ 2; Declaration of Karen H. Canoff ¶ ¶ 3-7)  A life insurance trust was created to own a life insurance

---

[1] Alternatively, Windsor is entitled to partial summary judgment of this part of its claim under Rule 56(a).

1 policy on the life of decedent Erwin A. Collins in connection with a premium financing transaction

2 between this trust and Windsor. (Declaration of Steven Prusky ¶3, Ex. A.) The premium financing

3 gave Mr. Collins, through his Trust, the opportunity to obtain a life insurance policy essentially for free

4 for a little over two years, after which he could make the practical decision whether to keep the policy

5 or walk away from it. (Declaration of Steven Prusky ¶3, Ex. A; Declaration of Karen H. Canoff ¶ 10.)

6       Mr. Collins' insurance broker, E.E.H. Consulting, Inc., arranged for a lender – here Windsor –

7 to loan the money necessary to keep the policy in force for approximately 27 months. (Declaration of

8 Steven Prusky ¶¶2-3, Ex. A.) Under the Terms of the Premium Financing Agreement attached as

9 Exhibit A to the Declaration of Steven Prusky, the insurance trust, and not the insured, would be the

10 borrower on the loan, thus making the loan non-recourse to the insured. (Declaration of Steven Prusky

11 ¶3, Ex. A (doc 2); Declaration of Karen H. Canoff ¶ 11.) Further, under the terms of the Premium

12 Financing Agreement, the only collateral on the loan was the life insurance policy itself. (Declaration

13 of Steven Prusky ¶3, Ex. A (doc 2); Declaration of Karen H. Canoff ¶ 12.) The Premium Financing

14 Documents establish that the Insurance Trust, and it alone, initially owned the policy and borrowed the

15 money to pay for the initial premiums and, at the end of the loan term, owed Windsor the premiums

16 that had been financed plus interest. (Declaration of Steven Prusky ¶3, Ex. A (doc 2); Declaration of

17 Karen H. Canoff ¶ 11.)

18       The Premium Financing Documents were presented by Eugene Houchins of EEH to the

19 Insurance Trust, the insured (Mr. Collins) (the "**Insured**"), and to the trustee of the Insurance Trust.

20 (Declaration of Steven Prusky ¶3.) As set forth in more detail below, the Premium Financing

21 Documents included representations and warranties by the Insurance Trust that it executed valid and

22 binding legal documents, that the Insurance Trust exercised its own independent decision to execute the

23 documents, and that the Insurance Trust granted Windsor, as the lender, express rights in the event of

24 default that could not, and were not, waived. (*See, infra,* C. Representations & Rights Granted under

25 the Other Financing Documents.)

26       Under the terms of the Premium Financing Documents, the Insurance Trust retained ownership,

27 as long as it did not default under the terms of the Premium Financing Documents. (Declaration of

28 Steven Prusky ¶3, Ex. A (doc 15; Declaration of Karen H. Canoff ¶ 11.) These same Premium

JUDD 070009

1 Financing Documents also, however, granted Windsor *express rights* related to ownership of the Policy

2 in the event of default. (Declaration of Steven Prusky ¶3, Ex. A (doc 15); Declaration of Karen H.

3 Canoff ¶¶13-21.) The express right, ultimately exercised by Windsor in this case, is the Default Sale

4 Right contained in the Assignment of Life Insurance Policy as Collateral signed by the original trustee

5 on behalf of the Insurance Trust on April 10, 2008. (Declaration of Steven Prusky ¶3, Ex. A (doc 15)

6 C.)

7     The Default Sale Right included in the Assignment of Life Insurance Policy as Collateral states:

8                 **DEFAULT SALE RIGHT.** Upon an occurrence of an Event of Default
(as defined in the Agreement) that has not been remedied within the time
9                 period required in the Agreement, Assignee *shall have the right* (the
**"Default Sale Right"**) but not the obligation to accept, that in
10                 consideration of the *full and complete satisfaction of the Liabilities* (the
sufficiency of which consideration is hereby acknowledged) *Owner may*
11                 *make a full transfer and assignment of the Insurance Policy to Assignee*
and thereby forever relinquish any and all rights Owner may have
12                 thereunder, including without limitation any rights to cash surrender value
and/or death benefit provided thereunder. Upon the exercise of this
13                 Default Sale Right, Assignee shall notify Insurer in writing and Insurer
shall thereafter recognize Assignee as the sole lawful owner of the
14                 Insurance Policy. [Emphasis added.]

15     Thus, under the express terms of the Premium Financing Agreement, the insured would never be

16 personally responsible to repay any portion of the monies lent by Windsor to repay the premium

17 financing provided in April 2008. (Declaration of Steven Prusky ¶3, Ex. A; Declaration of Karen H.

18 Canoff ¶ 11.) Further, upon exercise of the Default Sale Right the Premium Financing Documents

19 expressly provide for a "full and complete satisfaction" of all liabilities existing between Windsor and

20 the Insurance Trust. (Declaration of Steven Prusky ¶3, Ex. A (doc 15); Declaration of Karen H. Canoff

21 ¶¶19-21.) The exercise of the Default Sale Right, or similarly phrased rights, is known in the industry as

22 a mutual "walk away." (Declaration of Karen H. Canoff ¶ 21.) The "walk away," the Default Sale

23 Right ( or the **"DSR"**), is discussed more fully below, but initially Windsor highlights that the DSR

24 provided Windsor with the right to accept the Insurance Trust's transfer of title of the insurance policy

25 in full satisfaction of the trust's financial obligations, thus allowing the Insurance Trust to walk away

26 from the loan without recourse. (Declaration of Steven Prusky ¶3, Ex. A (doc 15); Declaration of Karen

27 H. Canoff ¶ 19-21.) By its terms, the DSR provides for the satisfaction and thus release of the Insurance

28 Trust's financial obligations automatically upon acceptance by Windsor of the change of ownership

JUDD 070010

1  tendered by the Insurance Trust. (Declaration of Steven Prusky ¶3, Ex. A (doc 15); Declaration of

2  Karen H. Canoff ¶ 19-21.) No written release is required for the full satisfaction of the Insurance Trust's

3  liabilities to occur as it is already provided for in the DSR.

4  **B.      *Admittedly an Event of Default Occurred Triggering Windsor's Rights Under the DSR.***

5  After being introduced to premium financing and the insurance agents Eugene Houchins II and

6  III/EEH group, Windsor made loans, including the subject loan, to seven Houchins clients in 2008.

7  (Declaration of Steven Prusky ¶2.) All of the loans worked the same way and were based on the same

8  operative documents, which consisted of a series of 19 documents ("the Premium Financing

9  Agreement"). (Declaration of Steven Prusky ¶3, Ex. A) The Insurance Trust admits that it executed

10  the Premium Financing Agreement and that the nineteen documents of the Premium Financing

11  Agreement were deemed by the parties to comprise a single agreement. (Paragraph 14 (page 5) of the

12  Gordillo Answer And Cross-Claim).[2]  The loans were made to the respective insurance trusts for

13  approximately 27 months. (Declaration of Steven Prusky ¶7.)

14  Windsor made all payments of premium required under the Premium Financing Agreement.

15  (Declaration of Steven Prusky ¶4; and Paragraph 18 (page 6) of the Gordillo Answer And Cross-

16  Claim.) When the loan by Windsor to the Insurance Trust to finance the initial premium payments

17  became due, however, the Insurance Trust through the servicing agent informed Windsor that the

18  Insurance Trust would not repay the loan when due. (Declaration of Steven Prusky ¶4; and Paragraph

19  18 (page 6) of Gordillo Answer And Cross-Claim). It is indisputable that the Insurance Trust breached

20  and defaulted on its obligation to repay Windsor, triggering Windsor's rights under the DSR.[3]

21  Following the Insurance Trust's default, Windsor then exercised the DSR and, as admitted by

22  the Insurance Trust, the Insurance Trust then executed Ownership, Name, or Beneficiary Change

23  Requests ("**CR**"). (Paragraph 10 (page 1) and paragraph 19 (page 6) of Gordillo Answer And Cross-

24

25  [2] In the Premium Financing Agreement, the Insurance Trust stated it had consulted with and received advice from attorneys, accountants, or other financial advisors of his or her choosing and had decided

26  that entering into the subject agreements was in the best interest of the trust (Section 3.01 of Financing Agreement, which is document #1 of the Premium Financing Agreement)

27  [3] This motion does not address whether the Insurance Trust voluntarily assigned the death benefits to Windsor pre-default, but Windsor does not waive that issue.

28

CASE NO. 3:14-cv-03713-WHO                -4-
WINDSOR SECURITIES, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT
JUDD  070011

1  Claim; and see Declaration of Steven Prusky ¶8, Ex. B1 and B2.)  Pacific Life confirmed the change of

2  0wnership from the Insurance Trust to Windsor.  (Declaration of Steven Prusky ¶9, Ex. C1 and C2.)

3  The forms used and recorded by Pacific Life are typical of the forms used in the industry to confirm a

4  transfer of title or full ownership.  (Declaration of Karen H. Canoff ¶ 23.)  The form transfers

5  ownership and is much different from a secured creditor perfecting its rights in collateral.  (Declaration

6  of Karen H. Canoff ¶ 23.)

7      At no time did the Insured, the Insurance Trust, the original trustee, successor trustee, or anyone

8  else connected to this action object to this transfer and assignment.  (Declaration of Steven Prusky ¶8)

9  Neither the Insurance Trust nor anyone else connected to this action other than Windsor has ever paid

10  the Policy premiums or repaid the loan under the Premium Financing Agreement.  (Declaration of

11  Steven Prusky ¶4)  Further, at no point did the Insured, the Insurance Trust, the original trustee or

12  successor trustee, or anyone else connected to this action object to or otherwise attempt to rescind the

13  form appointing Windsor as the owner and beneficiary of the Policy.  (Declaration of Steven Prusky ¶8)

14  Accordingly, Windsor paid all premiums on the Policy and Windsor alone kept the Policy in force as

15  the outright owner and beneficiary of the Policy from March 25, 2010, through the date of Mr. Erwin's

16  death.  (Declaration of Steven Prusky ¶¶4, 8, 9)

17      On or about July 18, 2014, Windsor notified Pacific that Windsor intended to submitted a claim

18  on the Policy death benefits.  Pursuant to Windsor's designation as owner and beneficiary of the Policy,

19  the Death Benefit Proceeds should have been immediately paid to Windsor.

20      The Insurance Trust has also admitted that Windsor is entitled to retain from the DB a sum equal

21  to the amounts Windsor has loaned to the Insurance Trust, plus legal interest thereon[4], plus Windsor's

22  reasonable expenses incurred in collecting or enforcing the Policy collateral. (Paragraph 28(b) (page 9)

23  of Gordillo Answer and Cross-Claim)  Windsor , however, has thus far not been able to collect even the

24  admittedly due loan plus interest, not to mention the reasonable costs of collection admitted by the

25  Insurance Trust to be due to Windsor.  **However, as described below, as a consequence of the**

26

27  [4] The Insurance Trust admits the proper interest rate is 10%/annum. (Paragraphs 16 (page 5) and 19

28  (page 6) of Gordillo Answer And Cross-Claim).  See also California Civil Code §3289).

WINDSOR SECURITIES, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT
JUDD  070012

1 | admitted conduct of Windsor and the Insurance Trust, Windsor is entitled to the entire amount of
2 | the DB.[5]

3         *C.*     *Representations & Rights Granted under the Other Financing Documents.*

4 |     The separate and enforceable Default Sale Right granted Windsor in the Assignment of Life

5 | Insurance Policy as Collateral is discussed above. It is anticipated that the Trustee will argue that the

6 | Financing Documents must be construed as a whole, and that the Security Agreement included in the

7 | Financing Documents is primary, and should control over the Default Sale Right granted Windsor.

8 | However, a review of the Financing Documents establishes the specious nature of this argument and that

9 | it should be disregarded. The initial document in the Financing Documents provides:

10         (b) Execution. This Agreement has been, and as of the Financing Date the
11         other Financing Documents to which the Trust is a party have been, duly
        executed and delivered by the Trust, and this Agreement and such other
12         Financing Documents constitute or as of the Financing Date *will
        constitute legal, valid and binding obligations of the Trust, enforceable
13         against the Trust in accordance with their terms* (subject to applicable
        bankruptcy, reorganization, insolvency, moratorium or similar laws
14         affecting creditors' rights generally and to equitable principles of general
        application (regardless of whether such principles are considered in a
15         proceeding in equity or at law)). [Emphasis added.]

16 | (Declaration of Steven Prusky ¶3, Ex. A (doc 1), "TERMS AND CONDITIONS FOR LIFE

17 | INSURANCE PREMIUM FINANCING AGREEMENT AMONG WINDSOR SECURITIES LLC,

18 | ERWIN A. COLLINS FAMILY INSURANCE TRUST – 2008, AND ERWIN A. COLLINS, page 3,

19 | ¶3.01(b).) This same document further provides:

20         (g) Independent Decision. The Trust has consulted with and received
        advice from attorneys, accountants and tax or other financial advisors of
21         his or her choosing, has considered other options for financing the Policy,
        and has satisfied himself or herself that entering into this Agreement and
22         the other Financing Documents and consummating the transactions

23 | [5] The Insurance Trust may attempt to raise issues from an unconfirmed arbitration award in a different
24 | premium financing case (known as Barnes/Bitter). That arbitration is inapposite due to the different
facts that exist in this case. The ruling in Barnes/Bitter also is inadmissible in the present proceeding.
25 | Under controlling California authority, any reference to the Barnes/Bitter arbitration decision in the
Collins trial would be improper as an award or judgment stemming from an arbitration has no
26 | collateral estoppel or res judicata effect on a non-party. (*Vandenberg v. Superior Court* (1999) 21
Cal.4[th] 815, 828-833.) *Vandenberg* is a California Supreme Court case, that holds that collateral
27 | estoppel is not available to a non-party to the arbitration proceeding, even if the arbitration award is
later confirmed as a judgment. (*Id.* at 836-837).

28

1   contemplated by this Agreement and the other Financing Documents is in
    the best interest of the Trust. The Trust acknowledges that it has had this
2   Agreement and the other Financing Documents for an amount of time
    sufficient to thoroughly analyze, discuss and receive advice from any
3   professionals or anyone else of its choosing.

4   (*Id.*, page 5, ¶3.01(g).)  The insured and Trustee made the same representation and warranty.  (*Id.*, page

5   6, ¶3.02(g).)  Finally, this document enumerates all of the rights available to Windsor, as the Lender, in

6   the event of default, that admittedly here occurred:

7       SECTION 6.02. Remedies. If any Event of Default shall occur and be
        continuing, then automatically in the case of an Event of Default described
8       in clause (5) of Section 6.0 I or otherwise at the election of the Lender, *the*
        *Financing Balance shall become due and payable*, without presentment,
9       demand, protest *or any notice of any kind, all of which are expressly*
        *waived* by the Insured and the Trust (the "Default Maturity"). Upon the
10      occurrence and during the continuance of an Event of Default, *in addition*
        *to any other rights under this Agreement and any other Financing*
11      *Documents* or otherwise available at law or in equity, the Lender and its
        assigns shall have all the rights and remedies of a secured party on default
12      under the law of the State of California and other applicable law to enforce
        the assignments and security interests   contained in the Financing
13      Documents, including the right, subject to compliance with any mandatory
        requirements under applicable law, to sell or apply any rights and other
14      interests assigned or pledged in the Financing Documents at public or
        private sale. The rights and remedies of Lender with respect to the Insured
15      are subject to the terms of Section 7.13 below. [Emphasis added.]

16  (*Id.*, page 10, ¶6.02.)  This provision confirms that in the Event of Default Windsor retained all rights

17  granted under" *any other Financing Documents"* including the Default Sale Right granted in the

18  Assignment of Life Insurance Policy as Collateral.  Additionally, this provision clarifies that Windsor

19  could elect to enforce any of its remedies, and that included remedies outside of those granted under the

20  Security Agreement and the California Commercial Code.

21                                      **III.**

22                                  **ARGUMENT**

23      All of the facts material to the motion have been admitted by the Insurance Trust.  "[U]nder

24  federal law, stipulations and admissions in the pleadings are generally binding on the parties and the

25  Court.  Not only are such admissions and stipulations binding before the trial court, but they are binding

26  on appeal as well." *Ferguson v. Neighborhood Housing Services.,* 780 F.2d 549, 551 (6th Cir.1986)

27  (citations omitted).  "Judicial admissions are formal admissions in the pleadings which have the effect of

28  withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *In re Fordson*

1   *Engineering Corp.*, 25 B.R. 506, 509 (Bankr.E.D.Mich.1982).  Factual assertions in pleadings and

2   pretrial orders, unless amended, are considered judicial admissions conclusively binding on the party

3   who made them. *See White v. Arco/Polymers, Inc.,* 720 F.2d 1391, 1396 (5th Cir.1983); *Fordson,* 25

4   B.R. at 509.  See also Rule 801(d)(2), Federal Rules of Evidence.  It is therefore submitted that Windsor

5   will demonstrate that there is no genuine issue as to any material fact and that Windsor is entitled to

6   judgment as a matter of law to the entire DB.

7       *A.*    *Windsor Had The Right, Agreed To In Advance In The Contract Documents, To*

8   *Unilaterally Exercise The DSR.*

9       The Assignment of Life Insurance Policy as Collateral agreement (Document #15 of the

10   Premium Financing Agreement) gives Windsor the right to exercise the Default Sale Right in that

11   document *without notice or further consent,* as consent was already given in advance in the contract

12   documents admitted to have been executed by the Insurance Trust. The DSR provides:

13         **DEFAULT SALE RIGHT**. Upon an occurrence of an Event of Default
(as defined in the Agreement) that has not been remedied within the time
14         period required in the Agreement, *Assignee [Windsor] shall have the
right* (the "**Default Sale Right**") but not the obligation to accept, that in
15         consideration of the full and complete satisfaction of the Liabilities (the
sufficiency of which consideration is hereby acknowledged) Owner may
16         make a full transfer and assignment of the Insurance Policy to Assignee
and thereby forever relinquish any and all rights Owner may have
17         thereunder, including without limitation any rights to cash surrender value
and/or death benefit provided thereunder. Upon the exercise of this
18         Default Sale Right, Assignee shall notify Insurer in writing and Insurer
shall thereafter recognize Assignee as the sole lawful owner of the
19         Insurance Policy. (Emphasis added.)

20   This same document also includes an express covenant detailing who and how the Default Sale Right is

21   effectuated.  Covenant 6 states:

22         6. The exercise of any right, option, privilege or power given to Assignee under this
Assignment *shall be at the sole option of Assignee,* and Assignee may exercise any such right,
23         option, privilege or power *without notice to, or assent by,* or affecting the liability of, or
releasing any interest hereby assigned by Owner [the Insurance Trust]. (Emphasis added.)
24

25       The impact of these two provisions, agreed to in advance of a default, is that upon the

26   occurrence of a triggering event, a default **[or in this case, a judicially admitted anticipatory**

27

28

**default],**[6] the Trustees each granted and vested in Windsor the ability to claim all rights vested in the Default Sale Right.

Importantly, these rights included:

- The right to make a full transfer and assignment of the Insurance Policy to Assignee [Windsor]

- The right to transfer and end any and all rights of the Owner, in consideration of the full and complete satisfaction of all Owner Liabilities [the individual Trusts]; and

- Upon the exercise of this Default Sale Right, Assignee shall notify Insurer in writing and Insurer shall thereafter recognize Assignee as the sole lawful owner of the Insurance Policy **[which happened in this case].**

The Insurance Trust may incorrectly argue that Windsor's rights are limited to those set forth in the Security Agreement. However, nowhere in the Premium Financing Agreement did a trustee or Windsor agree that following an event of default (or in anticipation thereof), only the rights granted in the Security Agreement were exercisable. To the contrary, the Assignment of Life Insurance Policy as Collateral agreement expressly provides:

> **NO WAIVER.** Any forbearance or failure or delay by Assignee in exercising any right, power or remedy hereunder shall not be deemed to be a waiver of such right, power or remedy, and any single or partial exercise of any right, power or remedy shall not preclude the further exercise thereof. Assignee may take or release other security, may release any party primarily or secondarily liable for any of the Liabilities, may grant extensions, renewals or indulgences with respect to the Liabilities, or may apply to the Liabilities in such order as Assignee shall determine, the proceeds of the Insurance Policy hereby assigned or any amount received on account of the Insurance Policy by the exercise of any right permitted under this Assignment, without resorting or regard to other security or any guaranty. No waiver of any provision hereof shall be effective unless it shall be in writing and signed by Assignee.

In construing paragraphs in the Assignment of Life Insurance Policy as Collateral, the Court

_____

[6] In her pleadings, the Trustee judicially admitted:

"18. Subsequent to Windsor's having loaned to the Trust all of the monies for premium payments that Windsor was required to provide under the Financing Agreement, the Trust informed Windsor that the Trust would not repay the loan when due. *The Trust thereby committed an anticipatory breach of, and default under, the Financing Agreement, . . .*" (gORDILLO Answer and Cross-Claim of, ¶18 , at 6 (emphasis added)).

JUDD  070016

1  should interpret the language so as to give effect to the intent *expressed at the time of the making of*
2  *the writing*. [California Civil Code §1636.] This statutory provision directs that the Court should not
3  look to the intent allegedly expressed in some later writings, such as emails or pleadings that attempt to
4  revise history filed in this case. What is more, the actual language of the Assignment of Life Insurance
5  Policy as Collateral governs its interpretation because the language is clear and explicit. [California
6  Civil Code §1638; *and see* California Civil Code §1639 (intention should be ascertained from the
7  writing *alone* if possible).] It would be improper to ignore the specific language of the Assignment of
8  Life Insurance Policy as Collateral, and infer some other intention – *i.e., to disregard the express*
9  *language* of the document that includes the express provision granting the **DEFAULT SALE RIGHT**
10  (page 4), the express covenant that the exercise of this right "shall be at the sole option of the Assignee"
11  (page 3, ¶6.0), the provision that any right could be exercised "**without notice to, or assent** by" the
12  Insured Trust (page 3) and the **NO WAIVER** provision (page 4).

13      Furthermore, the language of the Assignment of Life Insurance Policy as Collateral should be
14  interpreted in light of the surrounding circumstances. [California Civil Code §1647.] The reality is that
15  the Insurance Trust made no attempt to repay or negotiate an extension of the loan, the Insurance Trust
16  made no efforts or attempts to pay premiums coming due to avoid the lapse of the policy in 2010.
17  Instead, the trust through its trustee voluntarily signed all of the necessary documents to change the
18  absolute ownership of the policy to Windsor in 2010, in exchange for the full and complete release as
19  stated in the Assignment of Life Insurance Policy as Collateral.

20      There is nothing inconsistent or ambiguous about the Assignment of Life Insurance Policy as
21  Collateral and the specific rights therein enumerated. And, the rights granted in the separate Security
22  Agreement do not eliminate or supersede the separate right granted—the Default Sale Right. One does
23  not preclude the other, and both should be given effect as a matter of law. This is consistent with the
24  interpretation tenet that the Assignment of Life Insurance Policy as Collateral should be construed in a
25  manner that *gives effect to every part* of the writing. [California Civil Code §1641.]

26      Ultimately, the words used in the Assignment of Life Insurance Policy as Collateral should be
27  understood in their ordinary and popular sense and interpreted in a way that makes them operative,
28  reasonable, definite, and capable of being carried into effect. [California Civil Code §§1643 & 1644.]

JUDD  070017

1   That is: (1) The Insurance Trust through its Trustee <u>signed the Assignment of Life Insurance Policy as</u>
2   <u>Collateral</u> that expressly granted to Windsor the Default Sale right, and (2) the Insurance Trust, as
3   judicially admitted in the answer filed in the present case, defaulted by committing an "anticipatory
4   breach," communicated to Windsor that the Insurance Trust would not repay the Liability voluntarily
5   assumed, nor did it pay any further premiums to protect the collateral for Windsor. [California Civil
6   Code §1648 (intention may never be extended beyond those things which appear to be intended by the
7   writing).]

8       Moreover, a contract must be interpreted to give effect to the parties' mutual intent at the time
9   of the contract, which intent may be inferred from the language of the release provided the language is
10  not ambiguous or uncertain. [*See,* California Civil Code §§1636, 1638, 1639; *Bank of the W. v.*
11  *Superior Court* (1992) 2 Cal.4th 1254, 1264.] Further, the language of the Assignment of Life
12  Insurance Policy as Collateral is broad and expressly provides the right exercised by Windsor in this
13  case; as such, "the law imputes to [the Insurance Trust through its Trustee] an intention corresponding
14  to the reasonable meaning of [their] words and acts." [*Jefferson v. California Dept. of Youth Authority*
15  (2002) 28 Cal.4th 299, 305.] A plain construction of the Default Sale Right provision necessarily
16  includes the full transfer of ownership of the Policy to Windsor in 2010.

17      *B.*    *California Commercial Code §9620 May Be Varied By Agreement, And, In Any Event,*
18  *There Has Been Compliance With §9620.*

19      Windsor anticipates that the trust may argue that the California Commercial Code (specifically
20  section 9620[7]) supersedes the above-referenced, express rights granted in the Assignment of Life
21  Insurance Policy as Collateral agreement, but such an argument is incorrect. Indeed, the Commercial
22  Code itself provides that its provisions may be varied by agreement, so long as the obligations of good
23  faith, diligence, reasonableness and care may not be disclaimed. (California Commercial Code
24  §1302(a)-(b)[8]). Subject only to this provision, not applicable here, California law is clear that an
25  agreement that varies the effect of provisions of the Uniform Commercial Code may do so by stating

26

27  [7] For text, see attachment A
28  [8] For text, see attachment A

WINDSOR SECURITIES, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT
JUDD  070018

1   the rules that will govern in lieu of the provisions varied." (California Commercial Code §1302,

2   Comment 2.) Because the Default Sale Right does not purport to disclaim any obligations of good faith,

3   diligence, reasonableness, and care, the DSR is therefore enforceable as a valid contractual provision

4   and controls here. Rather, the policy owner, which had paid nothing and anticipatorily breached by

5   stating it would not repay the premiums provided by Windsor and did not make any premium payment

6   itself, was released from its liability to Windsor and on the policy. Windsor had the right to exercise

7   the DSR and did so here.

8           The DSR, by its terms, already provided for the satisfaction of the Insurance Trust's financial

9   responsibilities upon acceptance by Windsor of the executed Change of Ownership. There was simply

10  no need for an additional document to be drawn up.

11          For similar reasons, *even if* Section 9620 applies to this case, then Section 9620 was satisfied.

12          The COO is the authenticated record that was entered into post-default. (See definitions of

13  "authenticated" and "record" as defined by California Commercial Code Sections 9102(7) and

14  9102(70)[9], and the DSR itself contains the release required by section 9620. The execution of the COO

15  and acceptance of it by Windsor, by the very terms of the DSR, effected the full and final satisfaction of

16  the Insurance Trust's financial obligations to Windsor. That is all that was required. Unfettered title

17  thus passed under Section 9620, if it applies here at all.

18

19                                          **IV.**

20                                    **CONCLUSION**

21          The Insurance Trust and Insured obtained a $2,000,000 life insurance policy for free. It refused

22  (not just failed) to pay Windsor back for the premiums Windsor had financed and failed to pay any

23  other premiums which were needed to keep the policy in force. Windsor paid all of those premiums.

24          Windsor had the absolute right, at its sole option, to exercise its right to obtain all rights under

25  the policy, including the DB, in return for a full satisfaction of the Insurance Trust's obligations to

26  Windsor. Windsor exercised its rights to the DB and the DSR provided the satisfaction of the

27

28  [9] For text see attachment A

CASE NO.  3:14-cv-03713-WHO                    -12-
WINDSOR SECURITIES, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT
JUDD  070019

1   obligations.  The Insured Trust transferred all rights to the policy to Windsor in the COO and this was

2   acknowledged by Pacific Life.

3       Consequently, Windsor submits that there is no genuine dispute as to any material fact that

4   Windsor is entitled to the entire DB and that it is entitled to such as a judgment.[10]

5

6                           Respectfully submitted,

7   Dated: July 8, 2015            THOMPSON, WELCH, SOROKO & GILBERT, LLP

8

                            By:     /s/ Darin T. Judd
9                                   Darin T. Judd
                                    Attorneys for Defendant, Cross-Defendant, and
10                                  Cross-Claimant
                                    WINDSOR SECURITIES, LLC
11

12

13

14

15  ,

16

17

18

19

20

21

22

23

24

25

26  [10] Should the Court not determine that Windsor is entitled to the full DB on summary judgement, it is
    admitted by the Insurance Trust in this case that Windsor is entitled to at least a sum from the DB equal
27  to the amounts Windsor has loaned to the Insurance Trust , plus legal interest thereon, not to mention
    reasonable costs of collection which the Insurance Trust admits to be due to Windsor .( See ¶¶ 5, 6, and
28  7 of Declaration of Steven Prusky).

## Attachment A

### Commercial Code Section 1302

(a) Except as otherwise provided in subdivision (b) or elsewhere in this code, the effect of provisions of this code may be varied by agreement.

(b) The obligations of good faith, diligence, reasonableness, and care prescribed by this code may not be disclaimed by agreement. The parties, by agreement, may determine the standards by which the performance of those obligations is to be measured if those standards are not manifestly unreasonable. Whenever this code requires an action to be taken within a reasonable time, a time that is not manifestly unreasonable may be fixed by agreement.

(c) The presence of certain provisions of this code of the phrase "unless otherwise agreed," or words of similar import, does not imply that the effect of other provisions may not be varied by agreement under this section.

### Comments

1.  Subsection (a) states affirmatively at the outset that freedom of contract is a principle of the Uniform Commercial Code: "the effect" of its provisions may be varied by "agreement." The meaning of the statute itself must be found in its text, including its definitions, and in appropriate extrinsic aids; it cannot be varied by agreement. But the Uniform Commercial Code seeks to avoid the type of interference with evolutionary growth found in pre-Code cases such as *Manhattan Co. v. Morgan,* 242 N.Y. 38, 150 N.E. 594 (1926). Thus, private parties cannot make an instrument negotiable within the meaning of Article 3 except as provided in Section 3-104; nor can they change the meaning of such terms as "bona fide purchaser," "holder in due course," or "due negotiation," as used in the Uniform Commercial Code. But an agreement can change the legal consequences that would otherwise flow from the provisions of the Uniform Commercial Code. "Agreement" here includes the effect given to course of dealing, usage of trade and course of performance by Sections 1-201 and 1-303; the effect of an agreement on the rights of third parties is left to specific provisions of the Uniform Commercial Code and to supplementary principles applicable under Section 1-103. The rights of third parties under Section 9-317 when a security interest is unperfected, for

1

example, cannot be destroyed by a clause in the security agreement.

This principle of freedom of contract is subject to specific exceptions found elsewhere in the Uniform Commercial Code and to the general exception stated here. The specific exceptions vary in explicitness: the statute of frauds found in Section 2-201, for example, does not explicitly preclude oral waiver of the requirement of a writing, but a fair reading denies enforcement to such a waiver as part of the "contract" made unenforceable; Section 9-602, on the other hand, is a quite explicit limitation on freedom of contract. Under the exception for "the obligations of good faith, diligence, reasonableness and care prescribed by [the Uniform Commercial Code]," provisions of the Uniform Commercial Code prescribing such obligations are not to be disclaimed. However, the section also recognizes the prevailing practice of having agreements set forth standards by which due diligence is measured and explicitly provides that, in the absence of a showing that the standards manifestly are unreasonable, the agreement controls. In this connection, Section 1-303 incorporating into the agreement prior course of dealing and usages of trade is of particular importance.

Subsection (b) also recognizes that nothing is stronger evidence of a reasonable time than the fixing of such time by a fair agreement between the parties. However, provision is made for disregarding a clause which whether by inadvertence or overreaching fixes a time so unreasonable that it amounts to eliminating all remedy under the contract. The parties are not required to fix the most reasonable time but may fix any time which is not obviously unfair as judged by the time of contracting.

    2.    An agreement that varies the effect of provisions of the Uniform Commercial Code may do so by stating the rules that will govern in lieu of the provisions varied. Alternatively, the parties may vary the effect of such provisions by stating that their relationship will be governed by recognized bodies of rules or principles applicable to commercial transactions. Such bodies of rules or principles may include, for example, those that are promulgated by intergovernmental authorities such as UNCITRAL or Unidroit (see, e.g., Unidroit Principles of International Commercial Contracts), or non-legal codes such as trade codes.

    3.    Subsection (c) is intended to make it clear that, as a matter of drafting, phrases such as "unless otherwise agreed" have been used to avoid controversy as to whether the subject matter of a particular section does or does not fall within the exceptions to

2

subsection (b), but absence of such words contains no negative implication since under subsection (b) the general and residual rule is that the effect of all provisions of the Uniform Commercial Code may be varied by agreement.

## Commercial Code Section 9102

(a) In this division:

(7) "Authenticate" means to do either of the following:

(A) To sign.

(B) To, with present intent to adopt or accept a record, attach to or logically associate with the record an electronic sound, symbol, or process.

(70) "Record," except as used in "for record," "of record," "record or legal title," and "record owner," means information that is inscribed on a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form.

## Commercial Code Section 9620

(a) Except as otherwise provided in subdivision (g), a secured party may accept collateral in full or partial satisfaction of the obligation it secures only if all of the following conditions
are satisfied:

(1) The debtor consents to the acceptance under subdivision (c).

(2) The secured party does not receive, within the time set forth
in subdivision (d), a notification of objection to the proposal authenticated by either of the following:

(A) A person to which the secured party was required to send a proposal under Section 9621.

(B) Any other person, other than the debtor, holding an interest in the collateral subordinate to the security interest that is the subject of the proposal.

(3) If the collateral is consumer goods, the collateral is not in the possession of the debtor when the debtor consents to the acceptance.

(4) Subdivision (e) does not require the secured party to dispose of the collateral or the debtor waives the requirement pursuant to Section 9624.

3

(b) A purported or apparent acceptance of collateral under this section is ineffective unless both of the following conditions are satisfied:

(1) The secured party consents to the acceptance in an authenticated record or sends a proposal to the debtor.

(2) The conditions of subdivision (a) are met.

(c) For purposes of this section both of the following rules apply:

(1) A debtor consents to an acceptance of collateral in partial satisfaction of the obligation it secures only if the debtor agrees to the terms of the acceptance in a record authenticated after default.

(2) A debtor consents to an acceptance of collateral in full satisfaction of the obligation it secures only if the debtor agrees to the terms of the acceptance in a record authenticated after default or the secured party does all of the following:

(A) Sends to the debtor after default a proposal that is unconditional or subject only to a condition that collateral not in the possession of the secured party be preserved or maintained.

(B) In the proposal, proposes to accept collateral in full satisfaction of the obligation it secures.

(C) Does not receive a notification of objection authenticated by the debtor within 20 days after the proposal is sent.

(d) To be effective under paragraph (2) of subdivision (a), a notification of objection must be received by the secured party as follows:

(1) In the case of a person to which the proposal was sent pursuant to Section 9621, within 20 days after notification was sent to that person.

(2) In other cases, in accordance with either of the following:

(A) Within 20 days after the last notification was sent pursuant to Section 9621.

(B) If a notification was not sent, before the debtor consents to the acceptance under subdivision (c).

(e) A secured party that has taken possession of collateral shall dispose of the collateral pursuant to Section 9610 within the time specified in subdivision (f) if either of the following conditions has been satisfied:

(1) Sixty percent of the cash price has been paid in the case of a purchase money security interest in consumer goods.

4

(2) Sixty percent of the principal amount of the obligation secured has been paid in the case of a nonpurchase money security interest in consumer goods.

(f) To comply with subdivision (e), the secured party shall dispose of the collateral within either of the following time periods:

(1) Within 90 days after taking possession.

(2) Within any longer period to which the debtor and all secondary obligors have agreed in an agreement to that effect entered into and authenticated after default.

(g) In a consumer transaction, a secured party may not accept collateral in partial satisfaction of the obligation it secures.

5

JUDD 070025