# EXHIBIT "102"

HENNEFER FINLEY & WOOD, LLP
JOSEPH WOOD [Calif. SBN 103596]
275 Battery Street, Suite 200
San Francisco, California 94111
Telephone:     (415) 421-6100
Facsimile:     (415) 421-1815
E-Mail:        jwood@hennefer-wood.com; jhcwlaw@yahoo.com

Attorneys for Defendant, Cross-Claimant, and Cross-Defendant,
Mindy Goss as Trustee of the Joe E. Acker Family Insurance Trust

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

JOHN HANCOCK LIFE INSURANCE
COMPANY (U.S.A.),

Plaintiff,

vs.

MINDY GOSS AS TRUSTEE OF THE
JOE E. ACKER FAMILY INSURANCE
TRUST [incorrectly named herein as the
"Joe E. Acker Family Trust"]; and
WINDSOR SECURITIES, LLC,

Defendants.

AND RELATED CROSS-ACTIONS.

Civil Action No. 3:14-cv-04651-WHO

# MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Date:     August 12, 2015
Time:     2:00 p.m.
Courtroom 2, 17ᵗʰ Floor
Hon. William H. Orrick

UDD 068473

1

**TABLE OF CONTENTS**

2

Page

3    TABLE OF AUTHORITIES    ii

4

5    I.    INTRODUCTION    1

6

7    II.    WINDSOR'S ALTERNATIVE MOTION FOR PARTIAL SUMMARY JUDGMENT IS IMPROPER    2

8

9    III.    OBJECTIONS TO PURPORTED EVIDENCE SUBMITTED BY WINDSOR    3

10

11    IV.    THE TYPICAL LIFE INSURANCE PREMIUM FINANCING AGREEMENT    4

12    V.    THE FINANCING AGREEMENT    9

13

14    VI.    THE FINANCING AGREEMENT IS TYPICAL OF THE LIFE INSURANCE PREMIUM FINANCING AGREEMENTS USED IN THE INDUSTRY    15

15

16    VII.    MATERIAL FACTS BEFORE THE COURT    15

17

18    VIII.    THE OPINION OF WINDSOR'S EXPERT HAS NO BASIS IN FACT OR LOGIC    22

19

20    IX.    WINDSOR'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED BOTH ON STATUTORY

21    GROUNDS AND BECAUSE THERE REMAIN TRIABLE ISSUES OF MATERIAL FACT    25

22

23

24

25

26

27

28

MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
John Hancock Life Insurance Company (U.S.A.) v. Mindy Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al., and Related Cross-Actions
Civil Action No. 3:14-cv-04651-WHO

i

1

**TABLE OF AUTHORITIES**

Page

2

3   **Cases**

4   *Atel Financial Corporation v. Quaker Coal Company*
5        321 F.3d 924 (9th Cir. 2003)                                                    3

    *Crow Tribe of Indians v. Racicot*
6        87 F.3d 1039 (9th Cir. 1996)                                                   3

7   *Edwards v. Arthur Andersen LLP*
         44 Cal. 4th 937 (2008)                                                         8
8
    *McSherry v. City of Long Beach*
9        584 F.3d 1129 (9th Cir. 2009)                                                 25

10  *Norse v. City of Santa Cruz*
         629 F.3d 966 (9th Cir. 2010)                                                   3
11

    **Statutes**
12

    California Commercial Code § 1302(a)                                                8
13

    California Commercial Code § 9602                                            7-8, 15, 25
14

    California Commercial Code § 9620                                         7, 8, 15, 24, 25
15

    Federal Rules of Civil Procedure, Rule 56(a)                                    3, 25
16

    Georgia Code Annotated, § 11-1-102                                              8
17

    Georgia Code Annotated, § 11-9-602                                              8
18

    Georgia Code Annotated, § 11-9-620                                              7
19

20

21

22

23

24

25

26

27

28

MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*John Hancock Life Insurance Company (U.S.A.) v. Mindy Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al., and Related Cross-Actions*
Case Action No. 3:14-cv-04651-WHO                                                   ii

1    Defendant, Cross-Claimant, and Cross-defendant, Mindy Goss as Trustee of the Joe E.

2  Acker Family Insurance Trust ["Mindy Goss," the "current trustee," or "the Trust"], respectfully

3  submits the following memorandum in opposition to the motion for summary judgment, or, in the

4  alternative, summary adjudication, filed herein by defendant and cross-defendant, Windsor

5  Securities, LLC ["Windsor"].

6  **I.   INTRODUCTION.**

7    This case presents the Court with a relatively straightforward secured transaction - a "life

8  insurance premium finance agreement" - in which the lender, not satisfied with a return on its

9  investment in excess of ten percent plus reasonable expenses, wants to deprive the borrower -

10  whose willingness to enter into the transaction created and provided the collateral that made that

11  return possible - of the portion of the collateral that will remain after the lender has been paid

12  everything it is owed. Neither the language of the agreement between the parties, nor the

13  language of California statutes made a part of the agreement by operation of law, will allow that to

14  happen.

15    The prize in this case is a life insurance policy with a one million dollar death benefit. The

16  lender - Windsor - paid the premiums on the policy pursuant to a recourse loan agreement with the

17  borrower - the Trust - that was secured by the policy. The Trust defaulted on the loan and the

18  prior trustee dutifully signed the paperwork he was contractually required to sign so that Windsor

19  could do what all secured lenders do in that situation, namely, take title to the collateral and

20  either: (a) sell it, retain from the proceeds of sale what Windsor was owed, and provide any

21  excess to the Trust; or (b) hold onto it until the insured had passed away, collect the death benefit,

22  retain from the death benefit whatever Windsor was owed, and again provide any excess to the

23  Trust.

24    The reason we are here, despite the apparent simplicity of the transaction, is this:  under

25  the language of the agreement between the parties and controlling California statutes, the parties

26  had the right, post-default, to enter into an agreement - referred to as "exercising the Default Sale

27  Right" - by which the Trust could give up its right to any portion of the proceeds of sale or of the

28  death benefit in return for an express agreement by Windsor to relieve the Trust from any

MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*John Hancock Life Insurance Company (U.S.A.) v. Mindy Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al., and Related Cross-Actions*
Case Action No.3:14-cv-04651-WHO

1

1    continuing liability on the loan. It is undisputed that no such agreement was ever offered,

2    discussed, or consummated. Windsor nevertheless claims that the parties exercised the Default

3    Sale Right. That claim is based on the flimsiest of reeds, namely, the title of the insurance

4    company form document that the prior trustee had to sign so that Windsor could exercise its

5    options as a secured lender, described above. The document in question was called a "Change of

6    Ownership (Absolute Assignment)." Windsor essentially asks the Court to find that those words

7    are so plainly indicative of an intent by the Trust to abandon all its rights, and of an intent by

8    Windsor to relieve the Trust from any continuing obligation on the loan, that the statutory

9    requirement of an express agreement to that effect can safely be ignored. This cannot be the law,

10    and Windsor's motion should be denied.

## II. WINDSOR'S ALTERNATIVE MOTION FOR PARTIAL SUMMARY JUDGMENT IS IMPROPER.

13    As an alternative to its motion for summary judgment, Windsor has moved the Court for a

14    "partial summary judgment" that Windsor "is entitled to recover from the DB [death benefit] a

15    sum equal to the amounts Windsor has loaned to the insurance trust, plus legal interest thereon."

16    (Windsor Securities, LLC's Notice Of Motion And Motion For Summary Judgment, Or, In the

17    Alternative, For Partial Summary Judgment, Court's File, Doc. 30, p. 2 of 2 [internal reference:

18    2:9-11].) The motion is specious, for two simple reasons: (a) Windsor has made no claim for

19    such relief in this action (Answers And Counterclaim Of Windsor Securities, LLC; Demand For

20    Jury Trial, Court's File, Doc. 18, pp. 11-12 [internal reference: generally, and 11:25-12:1; 12:6-

21    7]); and (b) the Trust has affirmatively alleged, in its cross-claim for declaratory relief herein, that

22    Windsor should recover from the death benefit the amounts Windsor has loaned to the insurance

23    trust, plus legal interest thereon (Answer And Cross-Claim Of Mindy Goss As Trustee Of The Joe

24    E. Acker Family Insurance Trust, Court's File, Doc. 9, pp. 9-10 of 11 [internal reference: 7:28-

25    8:12; 8:23-9:4]).

26    Windsor's entitlement to recover what it loaned, plus interest, is not the subject of a claim,

27    is not at issue in this action, and should not become the subject of a "summary judgment" - partial

28    or otherwise - on the basis of which, one can only surmise, Windsor will later seek to collect

MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
John Hancock Life Insurance Company (U.S.A.) v. Mindy Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al., and Related Cross-Actions
U.S.D.C. Action No.3:14-cv-04651-WHO

2

1   attorney's fees as the "prevailing party." The motion should be summarily denied. Federal Rules

2   Of Civil Procedure, Rule 56(a) (motion for summary judgment or partial summary judgment

3   pertains only to "claim" or "defense").

4   **III.     OBJECTIONS TO PURPORTED EVIDENCE SUBMITTED BY WINDSOR.**

5           Goss respectfully lodges the following objections to portions of the Declaration Of Karen

6   H. Canoff In Support Of Windsor Securities, LLC's Motion or Summary Judgment, Or, In The

7   Alternative Partial Summary Judgment ["Canoff Decl."] on file herein, and moves that all such

8   purported evidence be excluded and/or ignored by the Court in ruling on the motion. *Norse v.*

9   *City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010).

10  1.      Purported Evidence:

11              By its terms, the DSR provides for the satisfaction and thus the release of the

12              Insurance Trust's financial obligations automatically upon acceptance by Windsor

13              of the change of ownership tendered by the Insurance Trust.

14          (Canoff Decl., Court's File, Doc. 30-3, p. 10 of 91 [internal reference: 10:24-26].)

15      Objection:

16              Improper expert testimony. *Atel Financial Corporation v. Quaker Oil Company,*

17              321 F.3d 924, 925-926 (9th Cir. 2003) (interpretation of contract language is a

18              question of law); *Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir.

19              1996) (interpretation of a contract is an issue of law; expert testimony is not proper

20              for issues of law).

21  2.      Purported Evidence:

22              . . . consistent with the procedures contemplated under the DSR, on or about March

23              18, 2010, the Insurance Trust executed a John Hancock Change of Ownership

24              (Absolute Assignment) form and forwarded the same to Windsor.

25          (Canoff Decl., Court's File, Doc. 30-3, p. 11 of 91 [internal reference: 11:1-4].)

26      Objection:

27              Same.

28  3.      Purported Evidence:

MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*John Hancock Life Insurance Company (U.S.A.) v. Mindy Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al., and Related Cross-Actions*
Civil Action No. 3:14-cv-04651-WHO

3

1    Conversely, the Change of Ownership is used for the purpose of effecting an

2    "absolute" transfer of ownership, which, consistent with the provisions of the DSR,

3    the Insurance Trust did by executing the Change of Ownership.

4  (Canoff Decl., Court's File, Doc. 30-3, p. 11 of 91 [internal reference: 11:16-18.)

5    Objection:

6    Same.

7  **IV.    THE TYPICAL LIFE INSURANCE PREMIUM FINANCING AGREEMENT.**

8    While there may of course be some variation among particular life insurance premium

9  financing agreements, it is nevertheless possible accurately to identify a number of provisions that

10  are standard or typical in such agreements across the industry, as follows:

11    (A)    Life insurance premium financing agreements typically comprise a number of

12  documents, all of which are deemed to comprise a single agreement, and all of which are either

13  signed or approved not only by the borrower - typically, as noted above, a life insurance trust - but

14  also by the insured and by the beneficiary of the trust. (Expert Witness Declaration Of James H.

15  Sinnott Submitted In Opposition To Motion For Summary Judgment ["Sinnott Decl."], filed

16  herewith, 10:18-24.)

17    (B)    Life insurance premium financing agreements typically provide that all aspects of

18  the agreement are governed by the law of a particular jurisdiction. (Sinnott Decl., 10:25-26.)

19    (C)    Life insurance premium financing agreements typically provide that all notices

20  from the lender to the remaining parties to the agreement must be in writing addressed directly to

21  the parties. (Sinnott Decl., 10:27-11:2.)

22    (D)    Life insurance premium financing agreements typically provide that the lender is

23  obligated to loan to the trust an amount covering a loan initiation fee and approximately two years

24  of premiums on the life insurance policy purchased by the trust. (Sinnott Decl., 11:3-5.)

25    (E)    Life insurance premium financing agreements typically provide that the trust is

26  obligated to repay the amount financed/loaned, plus interest thereon, at the end of approximately

27  twenty-seven months. (Sinnott Decl., 11:6-8.)

28    (F)    Life insurance premium financing agreements typically provide that the life

MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*John Hancock Life Insurance Company (U.S.A.) v. Mindy Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al., and Related Cross-Actions*
JUDD Action No. 3:14-cv-04651-WHO

068479

4

1    insurance policy purchased by the trust is collateral for the loan. (Sinnott Decl., 11:9-10.)

2         (G)     Life insurance premium financing agreements typically provide that, in the event of

3    a default on the loan by the trust, the lender has the right to proceed directly against the trust for

4    repayment of the amounts owed to the lender whether or not the lender chooses to proceed against

5    the policy collateral, *i.e.*, that the loan is, in the language of the industry, a "recourse" loan as to

6    the trust.[1]    (Sinnott Decl., 11:11-15.)

7         (H)     Life insurance premium financing agreements typically provide that, in the event of

8    a default on the loan by the trust, the trust is required to execute certain insurance company form

9    documents - typically entitled "change of ownership," "absolute assignment," "assignment/change

10   of ownership," "change of beneficiary," or the like - that will allow the lender, subject to the

11   lender's continuing obligations to the trust under the life insurance premium financing agreement,

12   to take title to, and beneficiary status under, the policy. Those documents are needed by the

13   lender - again, subject to the lender's continuing obligations to the trust under the life insurance

14   premium financing agreement - in order for the lender either to sell the policy at a public or

15   private sale or to collect the death benefit from the insurer upon the death of the insured. (Sinnott

16   Decl., 11:16-24.)

17         (I)     Life insurance premium financing agreements typically provide that, following

18   default by the trust and execution by the trust of the above-mentioned documents transferring title

19   and beneficiary status under the policy, the lender, subject to the lender's continuing obligations to

20   the trust under the life insurance premium financing agreement, has the following options:

21         (i)     The lender can allow the policy to lapse, in which case neither the lender

22   nor the trust would obtain any financial benefit from the policy and the trust would remain liable

23   to the lender for the full amount of the loan plus interest thereon, plus reasonable expenses

24   incurred in connection with the loan.

25

26

27         [1]   By contrast, life insurance premium financing agreements typically provide that, in the event of default on the loan by the trust, the lender, in the absence of fraud, cannot directly seek repayment from the insured - *i.e.*, that the loan is "non-recourse" as to that party.

28

MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*John Hancock Life Insurance Company (U.S.A.) v. Mindy Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al., and Related Cross-Actions*
Case No. 3:14-cv-04651-WHO

5

1        (ii)     Assuming the policy had not been allowed to lapse, the lender, prior to the

2  death of the insured and pursuant to the lender's status as secured lender/title holder:

3             (a)     can sell the policy at a public or private sale, at which sale the trust

4  would be allowed to bid;[2]

5             (b)     can take from the proceeds of the sale the amount it had loaned to

6  the trust, plus interest thereon, plus its reasonable costs incurred in connection with the sale; and

7             (c)     is required to provide any excess proceeds to the trust; or

8             (d)     should the proceeds be insufficient to cover what the lender is

9  owed, can proceed directly against the trust to recover the deficiency.

10       (iii)    Again assuming the policy had not been allowed to lapse, and that no sale

11  had been held, the lender, following the death of the insured and pursuant to the lender's status as

12  beneficiary:

13             (a)     can collect the death benefit from the insurance company;

14             (b)     can take from the death benefit the amount it had loaned to the trust,

15  plus interest thereon, plus its reasonable costs incurred in connection with collecting the death

16  benefit; and

17             (c)     unless the parties had exercised what is typically called the

18  "Default Sale Right" - discussed further below - the lender is required to provide the remaining

19  portion of the death benefit to the trust; or

20             (d)     if the parties had exercised the "Default Sale Right," the trust would

21  have no continuing obligation on the loan and the lender could retain the entirety of the death

22  benefit. (Sinnott Decl., 12:1-13:6.)

23       (J)     It is understood in the industry that in order to exercise the "Default Sale Right" or

24  similar provision typically included in life insurance premium financing agreements, the lender

25  and the trust, following a trust's default on the loan and the lender's assumption of ownership and

26

27      [2] Life insurance premium financing agreements typically provide that the lender is not required to
hold any such sale.

28

MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*John Hancock Life Insurance Company (U.S.A.) v. Mindy Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al., and Related Cross-Actions*
No. 068481
3:14-cv-04651-WHO

6

1  beneficiary status pursuant to that default, must enter into an express agreement, either written or

2  oral but in any case authenticated by a writing, under which the trust, in return for the lender's

3  express agreement to relieve the trust from any continuing obligation on the loan, agrees to relieve

4  the lender from its obligation to provide the trust with either: (i) the portion of the proceeds of a

5  public or private sale of the policy remaining after the lender has been paid what it is owed (*viz.*,

6  the amount of the loan, plus interest, plus reasonable costs of sale); or (ii) the portion of the

7  proceeds of the death benefit remaining after the lender has been paid what it is owed (*viz.*, the

8  amount of the loan, plus interest, plus reasonable costs of collecting the death benefit from the

9  insurer). It is further understood in the industry that any such agreement must involve an express

10  offer by one party and an express acceptance of that offer by the other. (Sinnott Decl., 13:7-19.)

11  (K)  It is further understood in the industry that exercise of the "Default Sale Right"

12  provides the sole mechanism whereby a lender can avoid its ongoing obligations, following a

13  trust's default on the loan and the lender's assumption of ownership and beneficiary status

14  pursuant to that default, to provide the trust with either: (i) the portion of the proceeds of a public

15  or private sale of the policy remaining after the lender has been paid what it is owed (*viz.*, the

16  amount of the loan, plus interest, plus reasonable costs of sale); or (ii) the portion of the proceeds

17  of the death benefit remaining after the lender has been paid what it is owed (*viz.*, the amount of

18  the loan, plus interest, plus reasonable costs of collecting the death benefit from the insurer). To

19  put this another way, it is understood in the industry that unless the parties clearly exercise the

20  "Default Sale Right," the trust cannot be deemed, following default and transfer of ownership and

21  beneficiary status to the lender, to have given up its right to collect from the lender either: (i) the

22  portion of the proceeds of a public or private sale of the policy remaining after the lender has been

23  paid what it is owed; or (ii) the portion of the proceeds of the death benefit remaining after the

24  lender has been paid what it is owed. Protection of this right of the trust - and of borrowers in

25  secured transactions generally - is so important that the Uniform Commercial Code has not only

26  clarified and supplemented the language of a typical "Default Sale Right" provision by statute

27  (*see, e.g.*, California Commercial Code § 9620; Ga. Code Ann., § 11-9-620), but has also rendered

28  a nullity any attempt by the parties to waive, vary, or otherwise avoid the rights created by that

1    statute through agreement. Thus, California Commercial Code § 9602 provides, in relevant part:

2       Except as otherwise provided in Section 9624, to the extent that they give rights to

3       a debtor or obligor and impose duties on a secured party, the debtor or obligor may

4       not waive or vary the rules stated in the following listed sections: . . . .

5       (5) Subdivision (a) of Section 9608 and subdivision (d) of Section 9615 to the

6       extent that they require accounting for or payment of surplus proceeds of collateral.

7       . . . . (10) Section 9620, 9621, and 9622, which deal with acceptance of collateral

8       in acceptance of obligation. [Emphasis added.]

9    *See also* Ga. Code Ann., § 11-9-602 (same).[3]

10    (Sinnott Decl., 13:20-14:19.)

11    In California, the language of these statutes is deemed, as a matter of law, to be

12    incorporated into any contracts to which they apply, *viz.*, secured transactions like the one at issue

13    here. As the California Supreme Court has held:

14       "'[A]ll applicable laws in existence when an agreement is made, which laws the

15       parties are presumed to know and to have had in mind, necessarily enter into the

16       contract and form a part of it, without any stipulation to that effect, as if they were

17       expressly referred to and incorporated.' [Citation omitted.]"

18    *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 954 (2008).

19    (Sinnott Decl., 8:3-26.)

20    (L)    Finally, it is understood in the industry that the rigorous statutory criteria for

21    exercise of the "Default Sale Right," described above, are made necessary in part by the potential

22    ambiguities created by the titles of the documents the trust is required to execute upon default,

23    *viz.*, "change of ownership," "absolute assignment," "assignment/change of ownership," "change

24

25    [3]   For additional clarification of the fact that California Commercial Code § 9602 and comparable statutes in other states render a nullity any attempt by the parties to avoid the rights created by California

26    Commercial Code § 9620 and comparable statutes through agreement, *see* California Commercial Code § 1302 (a) ("Except as otherwise provided in subdivision (b) or elsewhere in this code, the effect of the

27    provisions of this code may be varied by agreement. . . . .") [emphasis added]; Ga. Code Ann., §11-1-102, first line (same).

28

MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*John Hancock Life Insurance Company (U.S.A.) v. Mindy Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al., and Related Cross-Actions*
Case No. 3:14-cv-04651-WHO

8

Case 1:16-cv-01533-GBD-GWG Document 125-105 Filed 08/23/18 Page 13 of 30
Case3:14-cv-04651-WHO Document37 Filed07/29/15 Page12 of 29

1 of beneficiary," and the like. As noted above, those documents: (i) are understood in the industry
2 simply to allow the lender, subject to the lender's continuing obligations to the trust under the life
3 insurance premium financing agreement, to take title to, and beneficiary status under, the policy;
4 and (ii) are understood in the industry simply to be needed by the lender - again, subject to the
5 lender's continuing obligations to the trust under the life insurance premium financing agreement
6 - in order for the lender either to sell the policy at a public or private sale or to collect the death
7 benefit from the insurer upon the death of the insured. Predictably, however, some lenders have
8 sought (incorrectly) to argue that the titles of those document necessarily suggest an intention by
9 the trust, in executing the documents, to waive the trust's continuing rights to any portion of the
10 proceeds of sale or proceeds of the death benefit remaining after the lender has been paid what it
11 is owed. In the understanding of the industry, inclusion of the "Default Sale Right" provision in
12 life insurance premium financing agreements, taken together with the rigorous statutory criteria
13 for exercise of the "Default Sale Right," is intended to negate, and effectively does negate, any
14 such argument by a lender. In short, in the understanding of the industry, the titles of the
15 documents the trust is forced to execute following default imply nothing about whether the
16 "Default Sale Right" has or has not been exercised. (Sinnott Decl., 14:20-15:17.)

## V. THE FINANCING AGREEMENT.

18 The operative agreement in this action is the Life Insurance Premium Financing
19 Agreement among Windsor Securities LLC Joe E. Acker Family Insurance Trust and Joe E. Acker
20 [the "Financing Agreement" or "F.A."]. A true copy of the Financing Agreement, authenticated
21 and filed herewith as Exhibit A to the Declaration Of Ronald Mark Goss In Opposition To Motion
22 For Summary Judgment ["Mark Goss Decl."] and bearing Bates Nos. GOSS 0001 - GOSS 0134,
23 is also attached, for the convenience of the Court, as Exhibit A to the Sinnott Decl. (Mark Goss
24 Decl., 1:5-9; and Ex. A thereto; Sinnott Decl., 6:13-18, and Ex. A thereto.) The relevant
25 provisions of the Financing Agreement are as follows:

26 (A) The Financing Agreement recites that it includes nineteen documents and that
27 those documents were intended by the parties to comprise a single agreement. (F.A., Doc. 1 of 19
28 [internal reference: first part, p. 3], Bates No. GOSS 0003; F.A., Doc. 1 of 19 [internal reference:

MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*John Hancock Life Insurance Company (U.S.A.) v. Mindy Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al., and Related Cross-Actions*
USDC Action No. 3:14-cv-04651-WHO

9

1    second part, section 8.01, p. 14, definition of "Agreement"], Bates No. GOSS 0025); F.A., Doc. 1

2    of 19 [internal reference: second part, section 8.01, p. 15, definition of "Financing Documents"],

3    Bates No. GOSS 0026.) The Financing Agreement is signed or approved not only by the

4    borrower - a life insurance trust - but also by the insured and by the beneficiary of the trust. (F.A.,

5    Doc. 1 of 19 [internal reference: first part, p. 4] Bates No. GOSS 0005], and *passim*.)

6         (B)    The Financing Agreement recites that all aspects of the Financing Agreement are

7    governed by California law. (F.A., Document 1 of 19 [internal reference: second part, section

8    7.12, p. 13], Bates No. GOSS 0024; F.A., Doc. 2 of 19 [internal reference: section 7.(h), p. 4],

9    Bates No. GOSS 0035; F.A., Doc. 13 of 19 [internal reference: paragraph 18, p. 8], Bates No.

10   GOSS 0098; F.A., Doc. 15 of 19 [internal reference: p. 4, "Choice of Law"], Bates No. GOSS

11   0114.)

12        (C)    The Financing Agreement recites that all notices from Windsor to the remaining

13   parties to the Financing Agreement were required to be in writing addressed directly to the parties.

14   (F.A., Doc. 13 of 19 [internal reference: paragraph 16, pp. 7-8], Bates Nos. GOSS 0097 - GOSS

15   0098; F.A., Doc. 1 of 19 [internal reference: first part, p. 3], Bates No. GOSS 0003; F.A., Doc. 1

16   of 19 [internal reference: second part, section 7.04, p. 11], Bates No. GOSS 0022; F.A., Doc. 2 of

17   19 [internal reference: paragraph 7.(g), p. 3], Bates No. GOSS 0034]; F.A., Doc. 15 of 19 [internal

18   reference: p. 4], Bates No. GOSS 0114.)

19        (D)    The Financing Agreement recites that Windsor was obligated to loan to the Trust

20   at least $130,958, covering a loan initiation fee and two years of premiums on John Hancock Life

21   Insurance Company (U.S.A) policy number 8279375 [the "Policy"]. (F.A., Doc. 1 of 19 [internal

22   reference: first part, pp. 3-4], Bates Nos. GOSS 0003 - GOSS 0005; F.A., Doc. 1 of 19 [internal

23   reference: second part, sections 1.01, 1.02, pp. 1-2], Bates Nos. GOSS 0012 - GOSS 0013; F.A.,

24   Doc. 2 of 19 [internal reference: opening paragraph, p. 1], Bates No. GOSS 0032.)

25        (E)    The Financing Agreement recites that the Trust was obligated to repay the amount

26   financed/loaned, plus interest thereon, at the end of approximately twenty-seven months. (F.A.,

27   Doc. 2 of 19 [internal reference: paragraph 3, p. 1], Bates No. GOSS 0032.)

28        (F)    The Financing Agreement recites that the Policy was collateral for the loan. (F.A.,

MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*John Hancock Life Insurance Company (U.S.A.) v. Mindy Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al., and Related Cross-Actions*
JUDNAcdlip NRtS:34-cv-04651-WHO                                                                    10

Doc. 2 of 19 [internal reference: paragraph 5, p. 2], Bates No. GOSS 0033; F.A., Doc. 13 of 19 [internal reference: paragraph 3, pp. 1-2], Bates Nos. GOSS 0091 - GOSS 0092.)

(G)     The Financing Agreement recites that Windsor, in the event of a default by the Trust, had the right to proceed directly against the Trust for repayment of the amounts loaned to the Trust whether or not Windsor chose to proceed against the policy collateral, *i.e.*, that the loan was, in the language of the industry, a "recourse" loan as to the Trust. (F.A., Doc. 2 of 19 [internal reference: paragraph 7.(a)(i), p. 2], Bates Nos. GOSS 0033; F.A., Doc. 2 of 19 [internal reference: paragraph 7.(d), p. 3], Bates Nos. GOSS 0034.)[4]

(H)     The Financing Agreement recites that in the event of a default on the loan by the Trust, the Trust was required to execute certain documents that would allow Windsor, subject to the Windsor's continuing obligations to the Trust under the Financing Agreement, to take title to, and beneficiary status under, the Policy. (F.A., Doc. 1 of 19 [internal reference: second part, section 5.01(a), p. 8], Bates No. GOSS 0019; F.A., Doc. 13 of 19 [internal reference: paragraph 6.(a), pp. 3-4], Bates Nos. GOSS 0093 - GOSS 0094.)

(I)     The Financing Agreement recites that, following default by the Trust and execution by the Trust of the above-mentioned documents transferring title and beneficiary status under the Policy, Windsor, subject to the Windsor's continuing obligations to the Trust under the Financing Agreement, had the following options:

(i)     Windsor could allow the Policy to lapse, in which case neither Windsor nor the Trust would obtain any financial benefit from the Policy and the Trust would remain liable to Windsor for the full amount of the loan plus interest thereon, plus reasonable expenses incurred in connection with the loan. (F.A., Doc. 2 of 19 [internal reference: paragraph 7.(a)(i), p. 2], Bates Nos. GOSS 0033; F.A., Doc. 2 of 19 [internal reference: paragraph 7.(d), p. 3], Bates Nos. GOSS 0034.)

---

[4]     By contrast, the Financing Agreement provides that, in the event of default on the loan by the Trust, Windsor, in the absence of fraud, cannot directly seek repayment from the insured - *i.e.*, that the loan is "non-recourse" as to that party. (F.A., Doc. 1 of 19 [internal reference: second part, Section 7.13, p. 13], Bates No. GOSS 0024.)

1          (ii)     Assuming the Policy had not been allowed to lapse, Windsor, prior to the

2    death of the insured and pursuant to Windsor's status as secured lender/title holder:

3                   (a)     could sell the Policy at a public or private sale, at which sale the

4    Trust would be allowed to bid (F.A., Doc. 13 of 19 [internal reference: paragraph 6.(a), 6.(b), pp.

5    3-4], Bates Nos. GOSS 0093 - GOSS 0094);[5]

6                   (b)     could take from the proceeds of the sale the amount it had loaned to

7    the Trust, plus interest thereon, plus its reasonable costs incurred in connection with the sale

8    (F.A., Doc. 13 of 19 [internal reference: paragraph 6.(g), p. 5], Bates No. GOSS 0095); and

9                   (c)     would be required to provide any excess proceeds to the Trust (F.A.,

10   Doc. 13 of 19 [internal reference: paragraph 6.(g), p. 5], Bates No. GOSS 0095); or

11                  (d)     should the proceeds be insufficient to cover what Windsor was

12   owed, could proceed directly against the Trust to recover the deficiency (F.A., Doc. 2 of 19

13   [internal reference: paragraph 7.(a)(i), p. 2], Bates Nos. GOSS 0033; F.A., Doc. 2 of 19 [internal

14   reference: paragraph 7.(d), p. 3], Bates Nos. GOSS 0034).

15          (iii)    Again assuming the Policy had not been allowed to lapse, and that no sale

16   had been held, Windsor, following the death of the insured, and pursuant to Windsor's status as

17   beneficiary:

18                  (a)     could collect the death benefit from the insurance company (F.A.,

19   Doc. 15 of 19 [internal reference: "Assignment," paragraph 1, p. 1], Bates No. GOSS 0111);

20                  (b)     could take from the death benefit the amount it had loaned, plus

21   interest thereon, plus its reasonable costs incurred in connection with collecting the death benefit

22   (F.A., Doc. 15 of 19 [internal reference: "Obligations Secured," p. 2], Bates No. GOSS 0112;

23   F.A., Doc. 15 of 19 [internal reference: "Benefits Payment Directive," p. 2] Bates No. GOSS

24   0112); and

25                  (c)     unless the parties had exercised the "Default Sale Right," Windsor

26

27          [5]   The Financing Agreement also recites that Windsor was not required to hold any such sale.
     (F.A., Doc. 13 of 19 [internal reference: paragraph 6.(b), p. 4], Bates No. GOSS 0094.)

28

MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
John Hancock Life Insurance Company (U.S.A.) v. Mindy Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al., and Related Cross-Actions
Case Action No. 3:14-cv-04651-WHO                                                                    12

JUDP 068487

1  would be required to provide the remaining portion of the death benefit to the Trust (F.A., Doc. 15

2  of 19 [internal reference: "Covenants," paragraph 1, p. 3], Bates No. GOSS 0113; F.A., Doc. 15

3  of 19 [internal reference: "Default Sale Right," p. 4], Bates No. GOSS 0114); or

4             (d)     if the parties had exercised the "Default Sale Right," the Trust

5  would have no continuing obligation on the loan and Windsor could retain the entirety of the

6  death benefit (F.A., Doc. 15 of 19 [internal reference: "Covenants," paragraph 1, p. 3], Bates No.

7  GOSS 0113; F.A., Doc. 15 of 19 [internal reference: "Default Sale Right," p. 4], Bates No. GOSS

8  0114).

9         (J)     The Financing Agreement recites that exercise of the Default Sale Right requires

10  the following:

11             Upon an occurrence of an Event of Default (as defined in the Agreement)

12             that has not been remedied within the time period required in the

13             Agreement, Assignee shall have the right (the "Default Sale Right") but not

14             the obligation to accept, that in consideration of the full and complete

15             satisfaction of the Liabilities (the sufficiency of which consideration is

16             hereby acknowledged) Owner may make a full transfer and assignment of

17             the Insurance Policy to Assignee and thereby forever relinquish any and all

18             rights Owner may have thereunder, including without limitation any rights

19             to cash surrender value and/or death benefit provided thereunder. Upon the

20             exercise of this Default Sale Right, Assignee shall notify Insurer in writing

21             and Insurer shall thereafter recognize Assignee as the sole lawful owner of

22             the Insurance Policy.

23  F.A., Doc. 15 of 19 [internal reference: "Default Sale Right," p. 4], Bates No. GOSS 0114.)

24  [Emphasis added.]

25       As noted with reference to the typical life insurance premium financing agreements

26  discussed above, this provision, pursuant to the practice of the industry and of controlling statutes,

27  contemplates an express offer by the Trust, which Windsor may or may not accept, to relinquish

28  any and all rights the Trust may have in or to the proceeds of sale or the death benefit in return for

1 Windsor's express agreement, authenticated by a writing, to relieve the Trust of any continuing

2 obligation on the loan. As noted with reference to the typical life insurance premium financing

3 agreements discussed above, this provision, pursuant to the practice of the industry and of

4 controlling statutes, contemplates an express offer by the Trust, which Windsor may or may not

5 accept, to relinquish any and all rights the Trust may have in or to the death benefit in return for

6 Windsor's express agreement, authenticated by a writing, to relieve the Trust of any continuing

7 obligation on the loan. *See*, in this connection, California Commercial Code § 9620 - the terms of

8 which are made part of the Financing Agreement by operation of law, as noted above[6] - which

9 provides, in relevant part:

10           (a) Except as otherwise provided in subdivision (g), a secured party may accept

11           collateral in full or partial satisfaction of the obligation it ensures only if all the

12           following conditions are satisfied:

13                (1) The debtor consents to the acceptance under subdivision (c). . . . .

14           (b) A purported or apparent acceptance of collateral under this section is

15           ineffective unless both of the following conditions are satisfied:

16                (1) The secured party consents to the acceptance in an authenticated record

17                or sends a proposal to the debtor.

18                (2) The conditions of subdivision (a) are met.

19           (c) For purposes of this section both of the following rules apply: . . . .

20                (2) A debtor consents to an acceptance of collateral in full satisfaction of

21                the obligation it secures only if the debtor agrees to the terms of the

22                acceptance in a record authenticated after default or the secured party does

23                all of the following:

24                     (A) Sends to the debtor after default a proposal that is

25                     unconditional or subject only to the condition that collateral not in

26

27       [6] *Edwards, supra*, 44 Cal. 4th at 954.

28

MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*John Hancock Life Insurance Company (U.S.A.) v. Mindy Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al., and Related Cross-Actions*
USDC No. 3:14-cv-04651-WHO             14

| | |
|---|---|
| 1 | possession of the secured party be preserved or maintained. |
| 2 | (B) In the proposal, proposes to accept collateral in full satisfaction |
| 3 | of the obligation it secures. |
| 4 | (C) Does not receive a notification authenticated by the debtor |
| 5 | within 20 days after the proposal is sent. . . . . |

6  *See also* California Commercial Code § 9602, again made part of the Financing Agreement by

7  operation of law, which renders a nullity any attempt the parties to the Financing Agreement

8  might have made to vary, waive, or otherwise avoid by agreement the protections given to the

9  Trust by § 9620.

10  Except as otherwise provided in Section 9624, to the extent that they give rights to

11  a debtor or obligor and impose duties on a secured party, the debtor or obligor may

12  not waive or vary the rules stated in the following listed sections: . . . .

13  (5) Subdivision (a) of Section 9608 and subdivision (d) of Section 9615 to the

14  extent that they require accounting for or payment of surplus proceeds of collateral.

15  . . . . (10) Section 9620, 9621, and 9622, which deal with acceptance of collateral

16  in acceptance of obligation. [Emphasis added.]

17  **VI.   THE FINANCING AGREEMENT IS TYPICAL OF THE LIFE INSURANCE
       PREMIUM FINANCING AGREEMENTS USED IN THE INDUSTRY.**

18

19  The Trust's expert witness, having thoroughly reviewed the Financing Agreement and

20  compared its provisions with those found in standard or typical premium financing agreements

21  (Sinnott Decl., 10:18-15:17; 15:20-21:10) has opined: "In summary, it is my expert opinion that

22  the Financing Agreement is typical of the life insurance premium financing agreements used

23  throughout the life insurance premium financing industry and should be understood and

24  interpreted in a manner consistent with the norms and practices of that industry." (Sinnott Decl.,

25  21:11-14.)

26  **VII.   MATERIAL FACTS BEFORE THE COURT.**

27  In addition to the contents of the Financing Agreement set forth above, the evidence

28  submitted by the parties either establishes, or at the very least creates a triable issue concerning,

1   the following material facts:

2         (A)     The Trust defaulted on the loan. (Windsor Securities, LLC's Memorandum In

3   Support Of Motion For Summary Judgment, Or, In The Alternative, Partial Summary Judgment

4   ["Windsor Mem."], Court's File, Doc. 30-1, p. 8 of 21 [internal reference: 5:2-4]; Mark Goss

5   Decl., 1:15-18.)

6         (B)     Thereafter, on or about February 19, 2010, the prior trustee of the Trust executed a

7   John Hancock Life Insurance Company ["Hancock"] form document entitled "Absolute/Gift

8   Assignment - Life Insurance" and provided it to Windsor. (Mark Goss Decl., 3:1-3, and Ex. B

9   thereto [Bates No. GOSS 0134].)[7]

10        (C)     On or about February 19, 2010, Windsor sent the prior trustee of the Trust a letter

11   with a different form, entitled "Change of Ownership (Absolute Assignment)." In that letter,

12   Windsor stated that the new form had replaced the prior one, and asked that the prior trustee sign

13   the new form before a witness. He did so, and returned the new, signed and witnessed form to

14   Windsor. (Mark Goss Decl., 3:4-9, and Exs. C and D thereto [Bates Nos. GOSS 0135, GOSS

15   0136 - GOSS 0137].[8]

16        (D)     The prior trustee of the Trust executed the abovementioned Absolute/Gift

17   Assignment - Life Insurance form and the abovementioned Change of Ownership (Absolute

18   Assignment) form because he believed the Trust was required to do so, following default, in order

19   to provide Windsor, subject to Windsor's continuing obligations to the Trust under the Financing

20   Agreement, with title to the Policy and with beneficiary status under the Policy. (Mark Goss

21   Decl., 3:154-19.) At no time did the prior trustee of the Trust believe that by his executing those

22   documents the Trust was giving up either: (i) the right of the Trust, pursuant to the Financing

23   Agreement, to receive any portion of the proceeds of a public or private sale of the Policy

24

25        [7]   The prior trustee, Ronald Mark Goss, continued in that role until February 6, 2012, after which
26   the current trustee, Mindy Goss, performed that function. (Ron Goss Decl., 1:2-3; Mindy Goss Decl., 1:2-
     4.)

27        [8]   Windsor in its letter appears to reverse the titles of the two forms. (Mark Goss Decl., 3:27-28,
28   ans Ex. C thereto, first paragraph [Bates No. GOSS 0135].)

remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale); or (ii) the right of the Trust, pursuant to the Financing Agreement, to receive any portion of the death benefit remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit). (Mark Goss Decl., 3:19-4:1.)

(E)     In its letter dated February 19, 2010, Windsor appears to have explicitly confirmed its understanding that the prior trustee of the Trust was executing the abovementioned Change of Ownership (Absolute Assignment) because the Trust - in addition to having defaulted on its loan obligation to Windsor - was not willing to make any future premium payments on the Policy. (Mark Goss Decl., 3:10-14, and Ex. C thereto, second paragraph [Bates No. GOSS 0135].)

(F)     Windsor did not suggest in the February 19, 2010 letter - or in any other communication in the record prior to a June, 2014 letter discussed below - that the prior trustee of the Trust was executing the abovementioned Change of Ownership (Absolute Assignment) form - or, for that matter, the Absolute/Gift Assignment Life Insurance form - in return for an agreement by Windsor to relieve the Trust from any continuing obligation to repay the loan. Nor did Windsor suggest in that letter - or in any other communication in the record prior to a June, 2014 letter discussed below - that by the prior trustee's executing those documents the Trust was giving up either: (i) the right of the Trust, pursuant the Financing Agreement, to receive any proceeds of a public or private sale of the Policy remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale); or (ii) the right of the Trust to receive any proceeds of the death benefit remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit). (Mark Goss Decl., 4:2-14, and Ex. C thereto [Bates No. GOSS 0135]; Mindy Goss Decl., 1:5-16, and Ex. A thereto [Bates No. GOSS 0267]); Windsor Mem, generally; Prusky Decl., generally;[9] Canoff Decl., generally; Windsor Req.

---

[9]     Mr. Prusky makes only the conclusory statement that Windsor "elected to exercise the Default Sale provision in the Premium Financing Agreement" (Prusky Decl., 3:4-5), begging the question of whether Windsor engaged in any of the actions required - *e.g.*, an express agreement by Windsor to forgive

MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*John Hancock Life Insurance Company (U.S.A.) v. Mindy Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al., and Related Cross-Actions*
Case No. 3:14-cv-04651-WHO

17

1  Jud. Not., generally.)

2      (G)    The prior trustee of the Trust subsequently received a document from Hancock
3  indicating that Windsor had provided the abovementioned Change of Ownership (Absolute
4  Assignment) form to Hancock and that Hancock had amended its internal records accordingly,
5  thereafter showing Windsor as the owner and beneficiary of the Policy. (Mark Goss Decl., 4:15-
6  19, and Ex. E thereto [Bates No. GOSS 0138].) The prior trustee of the Trust lodged no objection
7  to the amendments referred to in that document because, as noted above, he believed the Trust had
8  been required, following default, to provide Windsor, subject to Windsor's continuing obligations
9  to the Trust under the Financing Agreement, with title to the Policy and with beneficiary status
10 under the Policy. (Mark Goss Decl., 4:19-22.) At no time did the prior trustee of the Trust
11 believe that those amendments had any effect upon either: (i) the right of the Trust, pursuant to
12 the Financing Agreement, to receive any proceeds of a public or private sale of the Policy
13 remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments,
14 interest, and reasonable expenses connected with the sale); or (ii) the right of the Trust to receive
15 any portion of the death benefit remaining after Windsor had been paid what it was owed on the
16 loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the
17 death benefit). (Mark Goss Decl., 4:22-5:1.)

18     (H)    From at or around the time of the default by the Trust in 2010 until the prior trustee
19 of the Trust ceased to act as trustee in February, 2012, the prior trustee had no direct
20 communication with Windsor other than the abovementioned letter dated February 19, 2010.
21 (Mark Goss Decl., 5:2-4, and Ex. C thereto [Bates No. GOSS 0135].) In particular, Windsor
22 never communicated to the prior trustee of the Trust, and the prior trustee thus by definition never
23 accepted, either:

24     (i)    an offer to relieve the Trust from any continuing obligation to repay the
25 loan if the Trust would agree to give Windsor a form of ownership of the Policy unfettered by the

27 the loan - in order for such exercise to occur.

1    obligation, set forth in the Financing Agreement, to provide to the Trust any amounts remaining

2    from the proceeds of a public or private sale of the Policy after Windsor had been paid what it was

3    owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the

4    sale); or

5        (ii)    an offer to relieve the Trust from any obligation to repay the loan if the

6    Trust would agree to give Windsor a form of beneficiary status under the Policy unfettered by the

7    obligation, set forth in the Financing Agreement, to provide to the Trust any amounts remaining

8    from the death benefit after Windsor had been paid what it was owed on the loan (*viz.*, premium

9    payments, interest, and reasonable expenses connected with collecting the death benefit). (Mark

10   Goss Decl., 5:4-16.)

11       (I)    Again, from at or around the time of the default by the Trust in 2010 until the prior

12   trustee of the Trust ceased to act as trustee in February, 2012, the prior trustee had no direct

13   communication with Windsor other than the abovementioned letter dated February 19, 2010.

14   (Mark Goss Decl., 5:17-19, and Ex. C thereto [Bates No. GOSS 0135].) In particular, the prior

15   trustee of the Trust never communicated to Windsor, and Windsor thus by definition never

16   accepted, either:

17       (i)    an offer to give Windsor a form of ownership of the Policy unfettered by

18   the obligation, set forth in the Financing Agreement, to provide to the Trust any amounts

19   remaining from the proceeds of a public or private sale of the Policy after Windsor had been paid

20   what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses

21   connected with the sale), if Windsor would agree to relieve the Trust from any continuing

22   obligation to repay the loan; or

23       (ii)   an offer to give Windsor a form of beneficiary status under the Policy

24   unfettered by the obligation, set forth in the Financing Agreement, to provide to the Trust any

25   amounts remaining from the death benefit after Windsor had been paid what it was owed on the

26   loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the

27   death benefit), if Windsor would agree to relieve the Trust from any continuing obligation to

28   repay the loan. (Mark Goss Decl., 5:19-6:5.)

MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*John Hancock Life Insurance Company (U.S.A.) v. Mindy Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al., and Related Cross-Actions*
Case No. 3:14-cv-04651-WHO

19

1    (J)    In short, the prior trustee of the Trust never heard of, never intended to enter into,

2    and never did enter into, any agreement with Windsor either:

3        (i)    to give Windsor a form of ownership of the Policy unfettered by the

4    obligation, set forth in the Financing Agreement, to provide to the Trust any amounts remaining

5    from the proceeds of a public or private sale of the Policy after Windsor had been paid what it was

6    owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the

7    sale) in return for Windsor's relieving the Trust from any continuing obligation to repay the loan;

8    or

9        (ii)    to give Windsor a form of beneficiary status under the Policy unfettered by

10   the obligation, set forth in the Financing Agreement, to provide to the Trust any amounts

11   remaining from the death benefit after Windsor had been paid what it was owed on the loan (*viz.*,

12   premium payments, interest, and reasonable expenses connected with collecting the death benefit)

13   in return for Windsor's relieving the Trust from any continuing obligation to repay the loan.

14   (Mark Goss Decl., 6:6-19.)

15   (K)    Following the Trust's default on the loan, and the prior trustee's execution of the

16   abovementioned Absolute/Gift Assignment - Life Insurance and the abovementioned Change of

17   Ownership (Absolute Assignment), the prior trustee commissioned the originating insurance agent

18   on the Policy, Eugene Houchins III, to monitor the status of the Policy and, in particular, to let the

19   prior trustee know immediately if Windsor at any time failed timely to pay the premiums on the

20   Policy and thus created the possibility that the Policy might lapse. His purpose in doing so was to

21   preserve for the Trust the possibility of taking over those premium payments and thus preventing

22   the Policy from lapsing. (Mark Goss Decl., 6:20-27.)

23   (L)    In or about mid-June, 2014, Windsor sent a letter (ostensibly dated June 1, 2014) to

24   the Trust in which Windsor asserted, for the first time, that:

25              Pursuant to the Financing Agreement ("FA") signed by you and according to our

26              records, on May 11, 2010, you assigned the policy listed above to Windsor. You

27              may recall that this voluntary assignment of the policy was in exchange for

28              Windsor's agreement that the assignment of the policy would constitute a complete

MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*John Hancock Life Insurance Company (U.S.A.) v. Mindy Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al., and Related Cross-Actions*

20

1    satisfaction and discharge of the loan Windsor had made to enable you to purchase

2    the policy. Accordingly, you no longer have any financial liability under that loan.

3    (Mindy Goss Decl., 1:5-16, and Ex. A thereto, Bates No. GOSS 0267.)

4    (M)    The abovementioned mid-June 2014 letter was sent by Windsor following an April

5    8, 2014 arbitration award in *Gregory Barnes, Jr., Trustee of the John L. Bitter Irrevocable Life*

6    *Insurance Trust v. Windsor Securities, LLC*, U.S.D.C., N.D. Cal. No. 3:13-cv-01878-WHO,

7    American Arbitration Association Case No. 74-148-00296-13-S1M [the "Barnes/Windsor

8    Action"], a case deemed related to the present action. (Court's File, Doc. 11.) The

9    Barnes/Windsor Action was based on financing documents virtually identical to those at issue in

10   the present action. The arbitration panel therein denied Windsor's claim of entitlement to the

11   entirety of the death benefit on the following grounds:

12        Because Section $6(a)^{10}$ contemplated the execution of a $COO^{11}$ under

13        circumstances wherein Barnes was not giving up all rights in the policy, its

14        execution is at best ambiguous. Absent express notification to Barnes that

15        Windsor was invoking its Default Sale Right, the record does not support a finding

16        that Barnes' execution of the COO conveyed to Windsor unfettered title to the

17        policy and the death benefit.

18   (Wood Decl., 1:6-2:10, and Ex. A thereto, p. 5.)

19        There is nothing in either the September 8, 2010 letter or the January 14, 2011

20        letter that expresses an acceptance by Windsor of the collateral in full satisfaction

21        of the obligation. Both are silent on this point. [¶] Windsor therefore did not

22        satisfy the "strict foreclosure" requirement under § 9620.

23   (Wood Decl., 1:6-2:10, and Ex. A thereto, p. $7.)^{12}$

24

25        [10]   *I.e.*, of the security agreement contained in the financing documents.

26        [11]   *I.e.*, Change of Ownership.

27        [12]   The *Barnes* arbitration award was vacated, at or around the end of 2014, pursuant to a
     settlement agreement between the parties. (Wood Decl. 2:24-25.)

28

MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*John Hancock Life Insurance Company (U.S.A.) v. Mindy Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al., and Related Cross-Actions*
3:14-cv-04651-WHO
21

(N)   While the Court will draw its own inferences from these events, it appears that Windsor sent the June, 2014 letter in an attempt retroactively to create "facts" that might allow it to escape, in the present action, an outcome equivalent to that which had befallen Windsor in the Barnes/Windsor Action.

(O)   In response to the June, 2014 letter, the current trustee of the Trust obtained counsel and on July 18, 2014 responded with a letter prepared by counsel and denying the above-quoted statement by Windsor. (Mindy Goss Decl., 1:17-19, and Ex. B thereto, Bates Nos. GOSS 0128 - GOSS 0129.)

(P)   On July 22, 2014, the current trustee of the Trust sent a letter to Hancock, prepared by counsel and informing Hancock of the apparent dispute between Windsor and the Trust over the parties' respective rights in and to the death benefit pursuant to the Financing Agreement between the parties. (Mindy Goss Decl., 1:20-24, and Ex. C thereto, Bates Nos. GOSS 0130 - GOSS 0131.)

## VII.   THE OPINION OF WINDSOR'S EXPERT HAS NO BASIS IN FACT OR LOGIC.

Windsor's expert, Karen H. Canoff, repeatedly opines that the parties exercised the Default Sale Right. The Trust's expert, James H. Sinnott, has demonstrated why that opinion should be rejected out of hand.

> In my expert opinion, based on my understanding of (a) practices and terms of art in the premium finance industry and (b) the effect of incorporation, as a matter of law, of California Commercial Code Section 9620 into the Financing Agreement, Windsor's expert, Karen H. Canoff, has expressed a crucially inaccurate opinion which, if not corrected, might well mislead the Court or other trier of fact. After stating - correctly - that Windsor would have been entitled to retain the entirety of the death benefit had the parties elected to exercise the Default Sale Right (Canoff Decl., Court's File, Doc. 30-3, pp. 8-9 of 91 [internal reference: 8:20-9:2]), Ms. Canoff - seeking to support her opinion that the parties did exercise that right - incorrectly states the following:
>
> By its terms, the DSR provides for the satisfaction and thus the release of the Insurance Trust's financial obligations automatically upon acceptance by Windsor

MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*John Hancock Life Insurance Company (U.S.A.) v. Mindy Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al., and Related Cross-Actions*
USDC Action 3:14-cv-04651-WHO

22

1    of the change of ownership tendered by the Insurance Trust.

2    (Canoff Decl., Court's File, Doc. 30-3, p. 10 of 91 [internal reference: 10:24-26].)

3    . . . consistent with the procedures contemplated under the DSR, on or about March

4    18, 2010, the Insurance Trust executed a John Hancock Change of Ownership

5    (Absolute Assignment) form and forwarded the same to Windsor.

6    (Canoff Decl., Court's File, Doc. 30-3, p. 11 of 91 [internal reference: 11:1-4].)

7    Conversely, the Change of Ownership is used for the purpose of effecting an

8    "absolute" transfer of ownership, which, consistent with the provisions of the DSR,

9    the Insurance Trust did by executing the Change of Ownership.

10   (Canoff Decl., Court's File, Doc. 30-3, p. 11 of 91 [internal reference: 11:16-18].)

11   (Sinnott Decl, 28:11-29:10.)

12   In making those incorrect statements, Ms. Canoff neglects to mention or consider a crucial

13   fact, namely, that the prior trustee of the Trust was (as discussed extensively above)

14   contractually obligated to execute the John Hancock Change of Ownership (Absolute

15   Assignment) form following default so that Windsor (a) could take title to, and beneficiary

16   status under, the Policy and thus (b) sell the Policy or collect the death benefit while

17   remaining subject to its obligations under the Financing Agreement to provide to the Trust

18   any proceeds of sale or the death benefit in excess of what Windsor was owed.  [Citations

19   in Sinnott Decl, 29:17-30:2.]   This means - as the industry well understands - that

20   execution and transfer of such a form by an insurance trust does not affect the contractual

21   rights of the parties and implies nothing about whether the trust has "initiated the DSR

22   process."

23   (Sinnott Decl., 29:11-30:4.)

24   Ms. Canoff also neglects to mention or consider a second crucial fact, namely, that

25   exercise of the Default Sale Right requires (again as discussed extensively above) an

26   express agreement by the parties - whether pursuant to an offer by the borrower and

27   acceptance by the lender or to an offer by the lender and acceptance by the borrower - that

28   in return for transferring all rights under the Policy the borrower shall be relieved from any

JUDD 068498

1      <u>further obligation on the loan</u>. (California Commercial Code § 9620; Ex. A, Doc. 15 of

2      19 [internal reference: "Default Sale Right," p. 4], Bates No. GOSS 0114.) There is of

3      course no mention of any such agreement in the John Hancock Change of Ownership

4      (Absolute Assignment) form. (Mark Goss Decl., 3:4-9, and Ex. D thereto [Bates Nos.

5      GOSS 0136 - GOSS 0137].) More important: (a) there is <u>nothing in the record</u> to suggest

6      that any such agreement was ever made (Windsor Mem, generally; Prusky Decl.,

7      generally; Canoff Decl., generally; Windsor Req. Jud. Not., generally); and (b) the prior

8      trustee of the Trust <u>explicitly denies</u> that any such agreement was ever discussed, intended,

9      or made (Goss Decl., 3:19-4:14; 4:22-6:19).

10     (Sinnott Decl., 30:5-17.)

11     For the reasons set forth above, it is my expert opinion that Ms. Canoff has <u>no basis, in</u>

12     <u>either fact or logic</u>, for her expressed opinion that the parties in this case exercised the

13     Default Sale Right. I can say, moreover - based on having reviewed and/or administered

14     hundreds of defaults and foreclosures in premium finance loans from numerous programs,

15     that: (a) it was not industry practice for lenders to seek to use only insurance company

16     change of ownership forms as a purported means to exercise the Default Sale Right; and

17     (b) it was understood in the industry that doing so would not give the lender an unfettered

18     right to the benefits of the policy. Typically, upon default, lenders wishing to exercise the

19     Default Sale Right would execute, with the trust, an agreement - variously known by such

20     names as "Relinquishment Agreement," "Transfer Agreement," or "Loan Satisfaction

21     Agreement" - specifying that the trust was giving up all rights in and to the policy in return

22     for a full satisfaction of the loan. Even where no such written agreement was entered into,

23     industry practice dictated that there should be an express written communication clearly

24     referencing the Default Sale Right and informing the trust that it was giving up all rights in

25     and to the policy in return for full satisfaction of the loan. Neither of those things occurred

26     here. Again, it is my expert opinion that Ms. Canoff has no basis for her expressed

27     opinion that the parties in this case exercised the Default Sale Right, and that in fact no

28     such exercise can be deemed to have occurred.

MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*John Hancock Life Insurance Company (U.S.A.) v. Mindy Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al., and Related Cross-Actions*
Case No. 3:14-cv-04651-WHO

24

1  (Sinnott Decl., 30:18-31:7.)

2  **IX.  WINDSOR'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED
       BOTH ON STATUTORY GROUNDS AND BECAUSE THERE REMAIN
3      TRIABLE ISSUES OF MATERIAL FACT.**

4          Windsor repeatedly admits that, unless the parties exercised the default sale right, Windsor

5  is not entitled to the entirety of the death benefit. It is undisputed that: (a) Windsor never

6  communicated to the Trust that it would be willing relieve the Trust of its obligation on the loan

7  in return for the Trust's giving up all its rights under the Policy; and that (b) no agreement to that

8  effect was ever reached. Because California Commercial Code § 9620, made part of the Default

9  Sale Right provision of the Financing Agreement by operation of law, requires that such an

10  agreement be reached in order for exercise of the Default Sale Right to occur, and because the

11  effect of that section cannot be waived or altered by the parties (California Commercial Code §

12  9602), Windsor's claim that the right was exercised fails as a matter of law.

13          Moreover, even if the Court were to entertain Windsor's suggestion that the Trust's

14  execution and Windsor's acceptance of change of ownership documents might have evidenced an

15  intention by the parties to enter into the kind of agreement required by California Commercial

16  Code § 9620, there remain substantial disputed issues of material fact as to what those intentions

17  were. Windsor's motion for summary judgment should be denied. Federal Rules of Civil

18  Procedure, Rule 56(a); *McSherry v. City of Long Beach*, 584 F.3d 1129, 1135 (9th Cir. 2009) (at

19  the summary judgment stage, all reasonable inferences must be drawn in the opposing party's

20  favor and the non-movant's version of any disputed fact must be presumed correct).

21          Respectfully submitted.

22  DATED:      July 29, 2015                    HENNEFER FINLEY & WOOD, LLP

23

24                                              /s/  Joseph Wood
                                                Joseph Wood

25                                              Attorneys for Defendant, Cross-Claimant,
                                                and Cross-Defendant, Mindy Goss as Trustee
26                                              of the Joe E. Acker Family Insurance Trust

27

28

MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*John Hancock Life Insurance Company (U.S.A.) v. Mindy Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al., and Related Cross-Actions*
EMP Action No. 3:14-cv-04651-WHO

JUDE 068500

25

1

PROOF OF SERVICE

2

Joseph Wood declares:

3

1.    I am over twenty-one years of age and am not a party to the above-named action.

4

My business address is 275 Battery Street, Suite 200, San Francisco, CA 94111.

5

2.    On July 29, 2015, in San Francisco, California, I served the attached

6

MEMORANDUM IN OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT

7

8

on the parties to this action.

9

3.    Service was made by electronically filing that document with the Court to be

10

served by operation of the Court's electronic filing and notice system.

11

I declare under penalty of perjury under the laws of the State of California that the

12

foregoing is true.

13

DATED:    July 29, 2015

14

15

/s/  Joseph Wood
Joseph Wood

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*John Hancock Life Insurance Company (U.S.A.) v. Mindy Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al., and Related Cross-Actions*
U.S.D.C. Civil Action No. 3:14-cv-04651-WHO

068501