UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WINDSOR SECURITIES, LLC,

　　　　　　　Plaintiff,

　-against-

ARENT FOX, LLP and JULIUS
ROUSSEAU, III,

　　　　　　　Defendants.

Case No.  16-cv-01533 (GBD) (GWG)

**ORAL ARGUMENT REQUESTED**

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Peter N. Wang
Douglas S. Heffer
Adam G. Pence
Foley & Lardner LLP
90 Park Avenue
New York, New York  10016-1314
Tel:  (212) 682-7474
Fax:  (212) 682-2329

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

SUMMARY OF FACTS IN SUPPORT
OF PARTIAL SUMMARY JUDGEMENT ...................................................................3

I.     Windsor Invests in Premium Financing..........................................................3

II.    Windsor Engages Rosseau ..............................................................................4

III.   Acker, Collins, Coppock, and Statmatov Chosen Not to Repay Loans...........5

IV.    The Bitter Trust Defaults ................................................................................5

V.     The Bitter Litigation and Subsequent Arbitration ...........................................6

VI.    Aftermath of Bitter Arbitration And
       Windsor's Attempts Through Defendants to Settle ..........................................7

VII.   The Acker And Collins Litigations..................................................................8

VIII.  The Coppock and Stamatove Litigations .......................................................11

IX.    Current Lawsuit ...........................................................................................12

ARGUMENT ........................................................................................................12

I.     Standard for Granting Summary Judgment ...................................................12

II.    Legal Malpractice Standard ..........................................................................13

III.   Windsor's Legal Malpractice
       Claim Has Multiple Causation Problems........................................................13

       A.     Successor Counsel's Representation of Windsor
              in the Acker, Collins, Coppock, and Stamatov Actions
              is Plainly and Intervening Cause of Windsor's Alleged Harm..............15

              1.     Acker and Collins .....................................................................16

              2.     Coppock and Stamatov ..............................................................18

IV.    Windor's Claims for Repayment of "Premium Finance"
Legal Fees and Bitter Legal Fees Fail Because It Cannot
Establish Those Fees Were the Result of Any Alleged Malpractice ................................. 21

V.    Windsor's Breach of Fiduciary Duty and Breach
of Contract Claims Should Be Dismissed as Impermissably Duplicative ......................... 23

VI.    Arent Fox is Entitled to Summary Judgment on Its Counterclaims ................................. 24

CONCLUSION ........................................................................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaimo v. Cohen*,
No. 07-cv-7625 (KMK), 2008 WL 4202267 (S.D.N.Y. Sept. 10, 2008) ...............................24

*Albin v. Pearson*,
289 A.D.2d 272 (2d Dep't 2001) .......................................................................15, 17, 19, 20

*Allianz Ins. Co. v. Lerner*,
416 F.3d 109 (2d Cir. 2005)............................................................................................14

*Becker v. Julien, Blitz & Schlesinger, P.C.*,
406 N.Y.S.2d 412 (Sup. Ct. N.Y. Cnty. 1977), *modified on other grounds*, 66
A.D.2d 674 (1st Dep't 1978) ...........................................................................................17

*Boye v. Rubin & Bailin, LLP*,
152 A.D.3d 1 (1st Dep't 2017) .........................................................................................18

*Brady v. Town of Colchester*,
863 F.2d 205 (2d Cir. 1988)............................................................................................13

*Brooks v. Lewin*,
21 A.D.3d 731 (1st Dep't. 2005) ......................................................................................18

*C & F Pollution Control, Inc. v. Fidelity & Cas. Co. of New York*,
222 A.D.2d 828 (3d Dep't 1995) ......................................................................................24

*Capogrosso v. Lecrichia*,
No. 07 Civ. 272 (BSJ), 2010 WL 2076962 (S.D.N.Y. May 24, 2010).............................15, 20

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).......................................................................................................13

*Cobalt Multifamily Inv'rs I, LLC v. Shapiro*,
857 F. Supp. 2d 419 (S.D.N.Y. 2012)...............................................................................13

*D'Jamoos v. Griffith*,
340 Fed. App'x 737 (2d Cir. 2009)....................................................................................14

*Destefano v. MVN Assocs., Inc.*,
No. 10-cv-05441, 2013 U.S. Dist. LEXIS 14428 (S.D.N.Y. Feb. 1, 2013)............................13

*Diamond v. Sokol*,
468 F. Supp. 2d 626 (S.D.N.Y. 2006)............................................................................15, 22

*Dombrowski v. Bulson*,
   19 N.Y.3d 347 (2012) ..................................................................................................14

*Flutie Bros. v. Hayes, LLC*,
   No. 04 Civ. 4187(DAB), 2006 WL 1379594 (S.D.N.Y. May 18, 2006)................................14

*Greenwich v. Markhoff*,
   234 A.D.2d 112 (1st Dep't 1996) ..................................................................................20

*Humbert v. Allen*,
   89 A.D.3d 804 (2d Dep't 2011) ....................................................................................18

*Katz v. Herzfeld & Rubin, P.C.*,
   48 A.D.3d 640 (2d Dep't 2008) ....................................................................... 16, 19-20

*Kerzer v. Kingly Mfg.*,
   156 F.3d 396 (2d Cir. 1998)..........................................................................................13

*Kirk v. Heppt*,
   532 F. Supp. 2d 586 (S.D.N.Y. 2008)...........................................................................24

*Kozmol v. Law Firm of Allen L. Rothenberg*,
   241 A.D.2d 484 (2d Dep't 1997) ......................................................15, 17, 19, 20

*McCoy v. Feinman*,
   99 N.Y.2d 295 (2002) ..................................................................................................15

*MIG, Inc. v. Paul, Weiss, Rifkind, Wharton & Garrison, L.L.P.*,
   701 F. Supp. 2d 518 (S.D.N.Y. 2010)...........................................................................24

*Minkow v. Sanders*,
   82 A.D.3d 597 (1st Dep't 2011) ..............................................................................17, 19

*O'Connell & Aronowitz v. Gullo*,
   229 A.D.2d 637 (3d Dep't 1996) ..................................................................................24

*Perks v. Lauto & Garabedian*,
   306 A.D.2d 261 (2d Dep't 2003) ......................................................15, 17, 20

*Pyne v. Block & Assocs.*,
   302 A.D.2d 213 (1st Dep't 2003) ..................................................................................18

*Rexnord Holdings, Inc. v. Bidermann*,
   21 F.3d 522 (2d Cir. 1994)............................................................................................24

*Rosenbaum v. Sheresky Aronson Mayefsky & Sloan, LLP*,
   100 A.D.3d 731 (2d Dep't 2012) ..................................................................................15

*Rosenblatt v. Christie, Manson & Woods Ltd.*,
   195 Fed. App'x. 11 (2d Cir. 2006) ................................................................24

*Rubens v. Mason (Rubens I)*,
   387 F.3d 183 (2d Cir. 2004) ........................................................................15

*Rudolf v. Shayne, Dachs, Stanisci, Corker & Sauer*,
   8 N.Y.3d 438 (2007) ....................................................................................22

*Schutz v. Kagan Lubic Lepper Finkelstein & Gold, LLP*,
   No. 12-CV-9459, 2013 U.S. Dist. LEXIS 93762 (S.D.N.Y. July 2, 2013) .....................13, 14

*Schwartz v. Olshan Grundman Frome & Rosenzweig*,
   302 A.D.2d 193 (1st Dep't 2003) ................................................................15

*Senise v. Mackasek*,
   227 A.D.2d 184 (1st Dep't 1996) ................................................................23

*Sicom S.P.A. v. TRS Inc.*,
   168 F. Supp. 3d 698 (S.D.N.Y. 2016) ..........................................................13

*Sloane v. Reich*,
   No. 90 Civ. 8187(SS), 1994 WL 88008 (S.D.N.Y. Mar. 11, 1994) ...............14

*Small Bus. Bodyguard Inc. v. House of Moxie, Inc.*,
   230 F. Supp. 3d 290 (S.D.N.Y. 2017) ..........................................................14

*Somma v. Dansker & Aspromonte Assocs.*,
   44 A.D.3d 376 (1st Dep't 2007) .......................................................15, 16, 19

*Stonewell Corp. v. Conestoga Title Ins. Co.*,
   678 F. Supp. 2d 203 (S.D.N.Y. 2010) ..........................................................14

*Terracciano v. McGarrity*,
   No. 16 Civ. 1324 (LAP), 2017 U.S. Dist. LEXIS 79722 (S.D.N.Y. May 24,
   2017) ...........................................................................................................18

*Tortura v. Sullivan Papain Block McGrath & Cannavo, P.C.*,
   21 A.D.3d 1082 (2d Dep't 2005) ..................................................................17

*Tydings v. Greenfield, Stein & Senior, LLP*,
   43 A.D.3d 680 (1st Dep't 2007) ...................................................................15

**Other Authorities**

FRCP 56 ...............................................................................................................13

Arent Fox, LLP ("Arent Fox") and Julius Rousseau, III ("Rousseau," and, collectively, with Arent Fox, "Defendants") submit this Memorandum of Law in support of their Motion for Partial Summary Judgment (the "Motion"). In its complaint ("Complaint"), Plaintiff Windsor Securities, LLC ("Windsor") has alleged that Defendants committed malpractice in providing Windsor legal advice on five premium finance agreements, relating to separate life insurance policies (the "Policies") for John Bitter, Joe Acker, Erwin Collins, Robert Coppock, and Jane Stamatov (the "Insureds"). Defendants now seek dismissal of all portions of Windsor's legal malpractice claim involving (1) four Policies whose outcome was decided long after Defendants no longer represented Windsor, namely, the Acker, Collins, Coppock, and Stamatov Policies; (2) so much of the damages claim that seeks the recovery of legal fees Windsor paid to Arent Fox for litigating to collect the Bitter Policy; and (3) so much of the damages claim that seeks the recovery of other legal fees Windsor paid to Arent Fox and Windsor's prior counsel for premium finance advice.[1] Defendants also seek dismissal of Windsor's duplicative claims for breach of contract and breach of fiduciary duty. Finally, Arent Fox seeks summary judgment in its favor on its counterclaims against Windsor for unpaid legal fees.

As we will demonstrate below, after extensive discovery, it is now clear these significant portions of Windsor's claim – as well as Arent Fox's counterclaim – are ripe for summary judgment. Granting judgment now on these major portions of the outstanding claims will leave only the portion of the malpractice claim relating to the Bitter Policy to be tried.

## PRELIMINARY STATEMENT

In 2007, Windsor's principal, Steven Prusky, a sophisticated securities trader, decided to invest millions of dollars in the life insurance premium finance business. In a nutshell, premium

---

[1] For the Court's convenience, Defendants have appended to this Memorandum a chart outlining Windsor's claims and asserted damages that demonstrates how partial summary judgment removes all issues to be tried but one.

finance involves lending money to individuals to purchase life insurance and taking the insurance policies as collateral.  Long after Windsor made its loans, Windsor engaged Rousseau to protect its interests in the Policies, which Rousseau did for many years with exceptional skill, prudence, and diligence.

In the end, Windsor recovered the full amount of its loans on three of the Policies, plus interest, and took complete ownership of the remaining two Policies, but Windsor was unable to prevail in a resulting arbitration involving entitlement to the Bitter Policy's death benefit. Despite the fact that Windsor had been assigned the Bitter Policy after the premium finance loan went into default, the Arbitration Panel awarded the death benefit to the Bitter Trust (effectively, Bitter's survivors) rather than Windsor.  Defendants could not have anticipated the result because – as the Arbitration Panel itself noted – it was the first known decision of its kind.  Unhappy with the result, Windsor terminated Defendants and hired new counsel to protect Windsor's interests in the other four Policies.  As a result of independent choices of litigation strategy, new counsel did not prevail in those subsequent actions – a result which Windsor now unfairly seeks to put at Arent Fox's door.  Ultimately, Windsor refused to pay its legal bills and commenced this meritless legal malpractice case against one of the most well-respected law firms in the country and one of its most accomplished partners.

This Motion seeks, *inter alia*, dismissal of all portions of Windsor's malpractice claims related to subsequent counsel's work.  Through discovery, it has become apparent that Windsor viewed this malpractice case as an insurance policy for its perceived losses, directing subsequent counsel to litigate the underlying cases aggressively, while Windsor looked to its malpractice claims as a backstop.  After extensive discovery, it is now clear from undisputed facts that a majority of Windsor's claims, relating to conduct after Defendants were replaced, are not

recoverable. Specifically, Windsor's legal theories seeking recovery of damages for all matters apart from the Bitter Policy fail as a matter of law. Accordingly, Defendants are entitled to dismissal of those claims. While the presence of what appears to be conflicting expert testimony precludes summary judgment now in connection with the Bitter Policy, we are confident this sole remaining claim, too, will be dismissed at trial. Finally, and in addition, Arent Fox seeks an order directing Windsor to pay its long-outstanding legal fees.

## SUMMARY OF FACTS IN SUPPORT OF PARTIAL SUMMARY JUDGMENT[2]

### I.      Windsor Invests in Premium Financing

In 2007, Windsor decided to enter the premium finance business. SOF ¶¶ 1-2. After performing little due diligence (and apparently without any legal advice), Windsor loaned $1.5 million for the payment of premiums on ten separate insurance policies and took the Policies as collateral. *Id.* ¶¶ 2, 5, 7-8, 13. Seven of these policies were procured through Georgia brokers Eugene Houchins III ("Houchins") and his father, Eugene Houchins Jr., including the five Policies at issue here. *Id.* ¶ 6.[3]

Under the loan documents (hereinafter, the "Premium Finance Package"), each of the five Insureds set up individual trusts (the "Trusts"), which owned the insurance policies and were the actual borrowers of the funds used to pay the premiums. *Id.* ¶¶ 8-13. Each Trust appointed a trustee (the "Trustee"). *Id.* ¶ 10. Under the Premium Finance Package, absent fraud, the loans were non-recourse against the Insureds, so Windsor's only recourse in the event of a default was to pursue the Trust, and the sole asset of the Trust was the Policies. *Id.* ¶¶ 11, 17-18. The

---

[2] A full recitation of uncontested material facts is set forth in the accompanying Local Civ. R. 56.1(a) Statement of Facts ("SOF"), and is incorporated herein by reference.

[3] Windsor was told, and assumed, that Windsor would receive an above-market interest rate return of 15% with little to no risk. *Id.* ¶¶ 3, 14. Windsor's ultimate goal was simply (and always) to get this above-market return on its loans; although not strictly relevant to this Motion, Prusky admitted that he never intended for Windsor to own the policies or collect death benefits on the underlying Insureds. *Id.* ¶ 4.

Insureds, therefore, had no risk of liability to repay the premium finance loans in the event of default; they just had to instruct the Trustees to turn over the Policies and let Windsor take the risk of continuing to pay the premiums to preserve the Policy death benefit, or allow the Policy to lapse and lose the money loaned. *Id.* Windsor's loans paid the insurance premiums during the roughly two-year term of the loans, and, at the maturity date of the loans, the Trusts could either repay the outstanding loan balance, with interest, or transfer ownership of the Policies to Windsor in full satisfaction of the loans. *Id.* ¶¶ 15-16.

Soon after the loan documents were finalized, Prusky realized that Windsor's investments were not as secure as he had anticipated. *Id.* ¶ 20. Among other things, the Insureds and Trustees had lied on the insurance application forms by stating they did not plan to use premium financing, meaning the Policies were potentially subject to rescission for fraud in the application process. *Id.* ¶¶ 21-23, 27, 29.

## II.   Windsor Engages Rousseau

In or around June 2009, Windsor engaged Rousseau, then with the law firm Herrick Feinstein, LLP ("Herrick"). *Id.* ¶ 24. Rousseau warned Prusky that Windsor's loans were anything but risk free and that these Policies could be considered invalid under state laws that prohibit "STOLI" (Stranger-Originated Life Insurance) policies. *Id.* ¶¶ 25-26. Rousseau advised Prusky that Windsor, to secure its interests, needed to file UCC statements and proffer collateral assignments to the insurers. *Id.* ¶¶ 27-28. Doing so, Rousseau explained, would allow Windsor to establish priority as a lender and deal with the potential application fraud head-on, with the hopes that the insurers would either rescind the Policies (and Windsor could seek the return of the premiums) or do nothing and, arguably, waive the right to rescind later. *Id.* ¶¶ 27, 29. Windsor agreed to proceed with this strategy. *Id.* ¶¶ 30-31. As a result, by the end of 2009, Windsor's interests were much more secure, and the insurers did not attempt to rescind the

Policies. *Id.* ¶ 32.

### III.   Acker, Collins, Coppock, and Stamatov Choose Not to Repay Loans

Houchins eventually informed Prusky that the Insureds did not intend to repay the loans and had no interest in keeping the Policies. *Id.* ¶ 33.  Prusky consulted Rousseau, who told Prusky that if an Insured really did want to walk away from the Policy, a signed Change of Ownership Form (a "Change of Ownership Form"), if it was accepted by the insurer, should be sufficient to give Windsor ownership of the Policy. *Id.* ¶ 35.  In early 2010, Houchins secured Change of Ownership Forms from four of the five Trustees – for Acker, Collins, Coppock, and Stamatov – prior to the loans becoming due. *Id.* ¶¶ 34, 36.  The Forms were sent to the respective insurers, which all accepted them. *Id.* ¶ 37.

While the surrender of the Policies, which each time was accepted by Windsor, was sufficient to release the Trusts from any financial liability, some of the Insureds and Trustees requested additional releases. *Id.* ¶ 38.  On March 23, 2010, five days after the Acker Trustee signed the operative Change of Ownership Form, Windsor mailed Acker and the Acker Trustee each a written release documenting the fact that Windsor was taking ownership of the Policy in exchange for releasing the Acker Trust from any financial obligation under the loan documents. *Id.* ¶¶ 39-41.[4]  On May 18, 2010, five days after the Collins Trustee signed the operative Change of Ownership Form, Windsor mailed similar releases to Collins and the Collins Trustee. *Id.* ¶¶ 42-43.

### IV.   The Bitter Trust Defaults

The Bitter loan became past due on or around July 8, 2010, but Houchins indicated that

---

[4] The release to the Trustee provided that "we are releasing the Trust and the insured ... from any future financial obligations of our financial agreement. ... We want to confirm that it is our understanding  that you have signed the [Change of Ownership Form] because you would rather irrevocably surrender ownership and be freed of financial obligations, than pay off your loan to Windsor. ... With its processing there will be no more financial obligations between Windsor and the Trust, nor between Windsor and the insured ..." Id. ¶ 41 (emphasis added).

Bitter might want to pay off the loan. *Id.* ¶¶ 44-45. Rousseau (who by that time had moved from Herrick to Arent Fox) and Windsor both sent letters demanding that Gregory Barnes, the Trustee, sign the Change of Ownership Form because the Trust was in default on the loan; and, on February 14, 2011, Barnes signed the Form. *Id.* ¶¶ 46-49. Houchins told Prusky that he had forwarded the Change of Ownership Form to the insurer, but the insurer never processed it (and may have never received it). *Id.* ¶¶ 49-50.

## V.     The Bitter Litigation and Subsequent Arbitration

On December 23, 2012, Bitter died. *Id.* ¶ 51. Windsor attempted to collect the death benefit from the Pacific Life Insurance Company ("Pacific Life"), the insurer, but the Bitter Trust was still the record owner of the Policy. *Id.* ¶¶ 52-53. On February 13, 2013, the Bitter Trust's attorney, Joseph Wood – who had been hired at the behest of Houchins – filed suit in California state court, asserting the Bitter Trust was entitled to the Policy death benefit because (i) the Bitter Trust was not in default under the loan documents and (ii) the Change of Ownership Form had been procured by fraud. *Id.* ¶¶ 54-56. Windsor removed the action to federal court and, represented by Arent Fox, filed motions to dismiss the complaint and for judgment on the pleadings. *Id.* ¶ 58. After full briefing, the Court denied both motions, on the ground that the Bitter Trust's allegation that the initial transaction was infected by fraud presented an issue of fact. *Id.* ¶¶ 58-59.

The two sides eventually arbitrated the dispute before the AAA. *Id.* ¶ 60. In its Opening Arbitration Brief, the Bitter Trust raised – for the first time – issues related to the effectiveness of the Change of Ownership Form, an issue that had not been raised in the underlying litigation. *Id.* ¶¶ 54-57, 61. Specifically, the Bitter Trust argued, for the first time, that the Change of Ownership Form did not meet the requirements of California Uniform Commercial Code ("UCC") § 9-620, which set forth requirements for transfers of collateral after default, and that

the Form did not satisfy a contractual provision in the Collateral Assignment Agreement called the Default Sale Right ("DSR"). *Id.* ¶¶ 19, 54-57, 62.

On April 8, 2014, the Arbitration Panel entered its decision (the "Bitter Arbitration Award"). *Id.* ¶¶ 63-67. The Panel reached a split result that gave something to both sides. *Id.* ¶¶ 63, 68. Holding that Windsor had not literally followed the provisions of § 9-620,[5] the Panel awarded the death benefit to the Bitter Trust but awarded Windsor its rights as a secured creditor on the loan: the right to collect any outstanding amounts on the loan, including repayment of the full amount of the insurance premiums, interest at the maximum lawful rate,[6] and certain expenses. *Id.* ¶¶ 63, 68. This was an unprecedented decision, as the Panel recognized. *Id.* ¶ 70. Since Windsor had lost on its claim for the death benefit but prevailed on its claim for loan repayment and interest, the Panel left open the question of whether, and in what amount, the Bitter Trust might also be responsible for fees, costs, and expenses. *Id.* ¶ 68.

## VI.   Aftermath of Bitter Arbitration And Windsor's Attempts Through Defendants to Settle

On April 15, 2014, Acker died. *Id.* ¶ 73. Two months later, on June 19, 2014, Collins died. *Id.* ¶ 74. In July 2014, the Acker Trustee sent a letter to the John Hancock Life Insurance Company ("John Hancock"), the insurer on the Acker Policy, asserting a claim to the death benefit. *Id.* ¶ 75. Around the same time, the Collins Trustee sent a similar letter to Pacific Life, the insurer on the Collins Policy. *Id.* ¶ 76.

Following the Bitter decision, Defendants began negotiating with Wood to settle the Bitter Litigation and, potentially, the Acker and Collins disputes. *Id.* ¶¶ 79, 82-83. At one point, Wood, who purported to represent Acker and Collins as well, offered to settle the Bitter dispute

---

[5] Defendants will demonstrate at trial – among other things, through the testimony of a pre-eminent UCC law expert – that Arent Fox did not fail to comply with the UCC in this context.

[6] The Panel awarded 10%, not 15%, interest because California law allowed for a maximum of 10%. *Id.* ¶ 69.

by paying Windsor $650,000 and keeping the remainder of the $2 million Policy (the $650,000 represented the repayment of Windsor's premium payments, full interest on those payments, and an additional sum as an incentive to settle). *Id.* ¶¶ 82-83, 92. Wood also offered to settle Acker and Collins, and let Windsor keep the death benefits, if Windsor paid the Acker estate $50,000 and the Collins estate $100,000 (with Windsor keeping the remainder of the $1 million and $2 million Policies, respectively). *Id.* ¶ 83. Rousseau implored Windsor to settle these two cases as soon as possible. *Id.* ¶¶ 71, 80, 84. Prusky, however, resisted, believing the Acker and Collins Trusts could be persuaded to settle for even less. *Id.* ¶ 84. Instead of accepting Rousseau's advice to settle favorably, Windsor stopped paying Arent Fox's invoices, refused to settle quickly, and replaced Arent Fox and Rousseau as counsel. *Id.* ¶¶ 84, 85-90, 92.

By September 9, 2014, when Windsor officially terminated Defendants, Windsor had failed to pay numerous outstanding Arent Fox monthly invoices (ultimately, there were 25 outstanding invoices worth a total of $480,095.25 in unpaid costs and fees). *Id.* ¶¶ 92, 154, 157. Now represented by subsequent counsel, Windsor backed out of the settlement for Bitter, which had been described as "imminent" (and which Rousseau had negotiated), and proposed instead a new global settlement ($1.5 million to settle all disputes), which Wood promptly rejected. *Id.* ¶¶ 93-95. Ultimately, the Bitter matter was not settled until January 2015, when the Bitter Trust paid Windsor $650,000 – the same amount that Rousseau had negotiated nearly five months earlier. *Id.* ¶¶ 91, 96-97.[7]

## VII.   The Acker and Collins Litigations

After terminating Defendants, Windsor engaged in aggressive litigation over the Acker,

---

[7] In this lawsuit, Windsor claims the following direct damages associated with the Bitter Policy: $1,350,000 (the difference between the full $2 million death benefit and $650,000 settlement) and $434,115 in legal costs and fees, including $60,300.95 in Successor Counsel fees. Exhibit A to Damages Report of Charles Lunden (the "Lunden Report"), attached as Exhibit 36 to the Declaration of Peter N. Wang (the "Wang Decl."); *see also* Appendix A.

Collins, Coppock, and Stamatov Policies.[8] On August 15, 2014, Pacific Life commenced an interpleader action in the Northern District of California to determine entitlement to the Collins death benefit (the "Collins Litigation"). *Id.* ¶ 77. On August 19, 2014, Windsor retained Darin Judd ("Judd") to replace Arent Fox and represent Windsor in the Collins Litigation and in any disputes over the Acker Policy. *Id.* ¶ 85. On August 20, 2014, Windsor retained an additional attorney, Lauren Antonino ("Antonino" and, collectively with Judd, "Successor Counsel"), to review potential claims that Windsor might have under Georgia law against Houchins or his father related to their role in the underlying events. *Id.* ¶ 87.[9] On October 17, 2014, John Hancock commenced an interpleader action in the Northern District of California to determine entitlement to the Acker death benefit. *Id.* ¶ 78.

During these related litigations, Windsor, through Successor Counsel (not Defendants), failed to advance key factual and legal arguments that distinguished Acker and Collins from Bitter in crucial ways that could have led to a different result. *Id.* ¶¶ 98-99, 101-143. First and foremost, in various pleadings and papers, Windsor focused all of its arguments on the theory that the Acker and Collins Trusts were in default under the loan documents, despite the fact that the loans were not yet due and Windsor had not declared either Trust in default – and thus largely ignored theories that pre-default walkaway agreements were enforceable and did not suffer from what the Bitter Award considered (for the first time) defects in how ownership of the

---

[8] The strategy behind these litigations remains cloaked by the attorney-client privilege, such as how and why the subsequent cases were extensively litigated rather than settled as advised by Rousseau repeatedly. *Id.* ¶¶ 80, 84, 100, 146, 150, 152. Defendants have been denied the crucial discovery of the communications demonstrating why these aggressive and unsuccessful strategies were employed (ECF Nos. 66, 99); Defendants preserve and do not waive their right to renew access to such crucial evidence or have an adverse inference drawn based upon Windsor's cloaking this evidence under privilege.

[9] For years, Houchins had been improperly procuring various STOLI insurance policies, using the same insureds and trustees associated with the Policies in this case. For example, in *Sun Life Assurance Co. of Canada v. Conestoga Trust Servs., LLC*, 14-CV-00539 (E.D. Tenn.), the Court found that Houchins, using Coppock and the same Collins Trustee (Gordillo), had acted improperly by procuring another life insurance policy for Collins. The court there ruled that the other Collins policy was an invalid STOLI policy and that the trust created to hold the policy lacked an insurable interest in Collins' life. *See* July 12, 2017 Summary Judgment Memorandum Opinion (ECF No. 111).

Policies was changed under UCC rules that only apply post-default. *Id.* ¶¶ 103, 106-108, 112-123.[10]

Second, on July 8, 2015, Windsor moved for summary judgment on the post-default theory alone – arguing that it was entitled to the full death benefit for both Acker and Collins – despite the fact that discovery was not complete and Successor Counsel had not deposed Houchins. *Id.* ¶¶ 112, 114-117.[11] Windsor also did not proffer the additional releases that it had sent both the Insureds and Trustees for the Acker and Collins Policies. *Id.* ¶ 123.

On September 21, 2015, the Court issued its summary judgment decisions, finding that Windsor was not entitled to the death benefits, largely relying on the same reasoning relating to post-default requirements for taking the Policies upon which the Bitter Arbitration Panel relied. *Id.* ¶ 126. The Court subsequently rejected any requests for additional discovery and directed the Acker and Collins Trustees to move for summary judgment, asserting that the Trusts were entitled to the death benefit. *Id.* ¶¶ 127-128.

In opposition to the Trusts' summary judgment motions, Windsor's Successor Counsel tried to backtrack and raise for the first time the anterior question of whether the Trusts were even in default, and relied on the fact that both Insureds and both Trustees had been provided pre-default written releases – facts that could have led the Court not to follow the Bitter Panel's post default reasoning because of these valid pre-default "walk away" arrangements. *Id.* ¶¶ 130-134. Windsor also, finally, pointed out that Wood and Houchins previously had represented that these Trusts were not in default of their loan obligations. *Id.* ¶¶ 104-105, 130-134. But it was too late: on December 22, 2015, the Court granted the Trusts' motions for summary judgment

---

[10] This appeared to be a change in overall strategy. At a joint mediation on May 21, 2015, Windsor had argued that the two Trusts were not in default, that the Bitter Arbitration Panel was wrong, and that the circumstances involving Acker and Collins were significantly distinguishable from Bitter. *Id.* ¶¶ 109-111.

[11] Windsor also moved for summary judgment, in the alternative, that it was entitled to repayment of all premiums, plus interest, if it were determined that it was not entitled to the death benefits. *Id.* ¶ 113.

and held, as a matter of law, that the "dispositive problem" with Windsor's pre-default arguments was that <u>Windsor's Successor Counsel had *waived* these arguments by not preserving them in the initial pleadings</u>. *Id.* ¶¶ 135-138 (emphasis added).  As the Court explained, "Windsor's complete failure to plead the oral walk-away agreement it now rests its case on is <u>fatal</u>." *Id.* ¶ 138 (emphasis added).  Prusky would later complain to his Successor Counsel, Judd, that he viewed the waiver of this issue as hugely significant because Prusky believed the pre-default status of the loans should have been Windsor's "main argument." *Id.* ¶¶ 124-125.  He was right, but it was too late, and that failure was not Arent Fox's doing.

After these setbacks, Windsor settled with the Acker and Collins Trusts in March and April 2016, respectively. *Id.* ¶¶ 140, 142.  In the Acker dispute, Windsor received $720,648 on a $1 million Policy, and, in the Collins dispute, Windsor received $788,835 on a $2 million Policy (these sums represented repayment of Windsor's premium payments, interest on those payments, and additional sums as an incentive to settle the cases). *Id.* ¶¶ 141, 143.[12]

## VIII.   The Coppock and Stamatov Litigations

In response to the Bitter decision, in June 2014, Rousseau had recommended that Windsor send letters to the other four Trustees, documenting that Windsor had taken ownership of the Policies in exchange for a full release of any financial obligations by the Trusts (hereinafter, the "June 2014 Letters"), responding to the logic of the Bitter Award. *Id.* ¶ 72. Robert Coppock would later reply to Windsor's letter on November 4, 2014, explaining he disagreed with Windsor's characterization of the Change of Ownership Form exchange and had contacted an attorney (who turned out to be Wood). *Id.* ¶ 144.  On November 12, 2014, the

---

[12] Windsor, here, claims as damages the difference between the settlement amounts and full death benefits on both Policies, and $219,316 in legal fees associated with the Acker Litigation and $200,438 in legal fees associated with the Collins Litigation. Wang Decl. Ex. 36 (Lunden Report Exs. C-D); *see also* Wang Decl. Ex. 11 (Rog Responses). In all, Windsor is seeking a total of $1,910,271 in direct damages related to the Acker and Collins outcomes. *Id.*

Stamatov Trustee unsurprisingly replied with a similar letter. *Id.* ¶ 145.

On January 7, 2015, in response to these replies, Windsor (now represented by Successor Counsel) preemptively filed two actions in the Northern District of California, asserting its absolute right to ownership in the Coppock and Stamatov Policies. *Id.* ¶ 146. Over a year later, after extensive discovery, in March 2016, Windsor settled with the Stamatov Trust and, in July 2016, Windsor settled with the Coppock Trust. *Id.* ¶¶ 150, 152. Pursuant to the settlement agreements, Windsor paid the Trusts $12,000 each in exchange for Policies (because Coppock and Stamatov were still living, there were no death benefits yet). *Id.* ¶¶ 151, 153. Windsor now includes in its claims against Defendants both the $12,000 payments as well as $151,416 in legal fees associated with Coppock and $48,919 in legal fees associated with Stamatov. Wang Decl. Ex. 36 (Lunden Report Exs. E-F).

## IX.    Current Lawsuit

This lawsuit includes not just a claim for the lost Bitter death benefit, which Arent Fox will dispute at trial through expert testimony, but also seeks damages for the allegedly lost Acker and Collins death benefits (and the settlement payments paid to Coppock and Stamatov), as well as, incredibly, all legal fees paid to Successor Counsel in the Acker, Collins, Coppock, and Stamatov Litigations. It is those portions of Windsor's claim that are the subject of this Motion.

In addition, Arent Fox has asserted counterclaims related to Windsor's unpaid legal fees, which total $480,095.25, together with interest. Wang Decl., Ex. 6 (Answer and Counterclaims). As shown below, this claim, too, is ripe for summary judgment in Arent Fox's favor.

## ARGUMENT

## I.    Standard for Granting Summary Judgment

Summary judgment is proper where "admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of

material fact, and one party's entitlement to judgment as a matter of law." *Destefano v. MVN Assocs., Inc.*, No. 10-cv-05441, 2013 U.S. Dist. LEXIS 14428, at *3 (S.D.N.Y. Feb. 1, 2013); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[C]onclusory allegations, conjecture, and speculation … are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). Moreover, a court must enter summary judgment in a defendant's favor if the plaintiff fails to make a showing sufficient to establish an essential element of a claim. *Celotex*, 477 U.S. 317, 323-24; *see also Destefano*, 2013 U.S. Dist. LEXIS 14428, at *4 (citing *Brady v. Town of Colchester*, 863 F.2d 205, 210-11 (2d Cir. 1988)).

As demonstrated below, based on undisputed facts, Windsor has not met and cannot meet its burden of proof with regard to those portions of Windsor's claims, which relate to post-Bitter events, and cannot establish with admissible evidence a genuine issue of material fact for trial to avoid summary judgment on Arent Fox's claims for fees. *See* FRCP 56(a); *Sicom S.P.A. v. TRS Inc.*, 168 F. Supp. 3d 698, 705 (S.D.N.Y. 2016) (partial summary judgment functions as "a pretrial adjudication that certain issues shall be deemed established for the trial of the case," which "serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact") (citing FRCP 56, Advis. Comm. Note to 1946 Amendment).

## II.   Legal Malpractice Standard

To prevail on a claim of legal malpractice, a plaintiff must establish the following elements under New York law:[13] (1) the duty of the professional to use such skill, prudence, and diligence as other members of the profession commonly exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury (i.e., the

---

[13] New York law clearly applies to this action. Both Herrick's and Arent Fox's engagement letters provide that New York law applies to issues related to the law firms' legal representation, and most of the allegations in the Complaint center around Defendants' legal representation of Windsor in the state of New York, where Rousseau and both law firms are domiciled. *See Cobalt Multifamily Inv'rs I, LLC v. Shapiro*, 857 F. Supp. 2d 419, 431 (S.D.N.Y. 2012).

outcome would have been different "but for" the attorney's negligence); and (4) actual and ascertainable damage resulting from the professional's negligence. *Schutz v. Kagan Lubic Lepper Finkelstein & Gold, LLP*, No. 12-CV-9459, 2013 U.S. Dist. LEXIS 93762, at *13-21 (S.D.N.Y. July 2, 2013); *Dombrowski v. Bulson*, 19 N.Y.3d 347, 350 (2012). Where, as here, the defendant can demonstrate that the plaintiff is unable to prove at least one of the essential elements of the legal malpractice cause of action, summary judgment is appropriate. *Small Bus. Bodyguard Inc. v. House of Moxie, Inc.*, 230 F. Supp. 3d 290, 322 (S.D.N.Y. 2017); *Stonewell Corp. v. Conestoga Title Ins. Co.*, 678 F. Supp. 2d 203, 208-09 (S.D.N.Y. 2010).

### III.   Windsor's Legal Malpractice Claim Has Multiple Causation Problems

Windsor's claims relating to the Acker, Collins, Coppock, and Stamatov Policies must all be dismissed because those alleged "losses" all occurred long after Arent Fox was replaced and are the result of subsequent, independent decisions by Successor Counsel and Windsor, superseding any effect of the Defendants' representation.

The causation requirement is "a high bar to attorney malpractice liability" and "seeks to insure a tight causal relationship exists between the claimed injuries and the alleged malpractice, and demands a nexus between loss and injury." *Flutie Bros. v. Hayes, LLC*, No. 04 Civ. 4187(DAB), 2006 WL 1379594, at *5 (S.D.N.Y. May 18, 2006) (internal quotations omitted) (quoting *Sloane v. Reich*, No. 90 Civ. 8187(SS), 1994 WL 88008, at *3 (S.D.N.Y. Mar. 11, 1994)). To establish the elements of proximate cause and actual damages, a plaintiff "must show that but for the defendant's negligence, ... he [or she] would have prevailed in the underlying action or would not have sustained any damages." *D'Jamoos v. Griffith,* 340 Fed. App'x 737, 739 (2d Cir. 2009) (internal citations omitted) (quoting *Allianz Ins. Co. v. Lerner,* 416 F.3d 109, 118 (2d Cir. 2005)). Additionally, an identifiable loss must have stemmed from the attorney's alleged negligence – i.e., a plaintiff must establish "actual and ascertainable" damages, not

14

damages "too speculative and incapable of being proven with any reasonable certainty." *Diamond v. Sokol*, 468 F. Supp. 2d 626, 633–34 (S.D.N.Y. 2006); *Rubens v. Mason (Rubens I)*, 387 F.3d 183, 189 (2d Cir. 2004) (citing *McCoy v. Feinman*, 99 N.Y.2d 295, 301-02 (2002)).

The failure to demonstrate proximate cause "mandates the dismissal of a legal malpractice action regardless of whether the attorney was negligent." *Capogrosso v. Lecrichia*, No. 07 Civ. 272 (BSJ), 2010 WL 2076962, at *5 (S.D.N.Y. May 24, 2010) (quoting *Tydings v. Greenfield, Stein & Senior, LLP*, 43 A.D.3d 680, 682 (1st Dep't 2007)); *Schwartz v. Olshan Grundman Frome & Rosenzweig*, 302 A.D.2d 193, 198, (1st Dep't 2003) (holding same).

### A.   Successor Counsel's Representation of Windsor in the Acker, Collins, Coppock, and Stamatov Actions is Plainly an Intervening Cause of Windsor's Alleged Harm

Under New York law, "it is well-settled that the introduction of new counsel serves as an intervening cause in a legal malpractice claim, severing the chain of causation between the negligent actions of an attorney and a plaintiff's injuries, so long as new counsel has 'sufficient opportunity to protect the plaintiffs' rights.'" *Schutz*, 2013 WL 3357921, at *21 (citing *Perks v. Lauto & Garabedian*, 306 A.D.2d 261, 262 (2d Dep't 2003)); *Albin v. Pearson*, 289 A.D.2d 272, 272-73 (2d Dep't 2001); *Kozmol v. Law Firm of Allen L. Rothenberg*, 241 A.D.2d 484, 485-86 (2d Dep't 1997).

Courts consistently have held that when successor counsel has sufficient time and opportunity to protect the client's rights, predecessor counsel cannot be held liable for any alleged earlier failure to protect those same rights. *See, e.g., Rosenbaum v. Sheresky Aronson Mayefsky & Sloan, LLP*, 100 A.D.3d 731, 732 (2d Dep't 2012) (dismissing malpractice claim involving alleged unfavorable separation agreement in underlying property rights case because successor counsel negotiated agreement and had 19 months to protect the client's interests);

15

*Somma v. Dansker & Aspromonte Assocs.*, 44 A.D.3d 376, 377 (1st Dep't 2007) (same result in case in which plaintiff alleged defendants' mistake compelled unfavorable settlement because defendants "no longer represented plaintiff at the time he agreed to settle" and "plaintiff's successor counsel had sufficient time and opportunity to adequately protect plaintiff's rights").

 These specific principles have been applied to claims of malpractice arising from allegedly inadequate settlements caused by purported errors of counsel who no longer represented the clients at the time of settlement. *See supra.* As the courts repeatedly have explained, the alleged legal malpractice of the predecessor attorney cannot be a proximate cause of damages because the representation by a successor counsel, who has sufficient time and opportunity to protect the client's rights, is an <u>intervening and superseding cause of harm</u>, where, as here, the successor attorney failed to protect those same rights. *See supra.*

  1. *Acker and Collins*

 Defendants were terminated on September 9, 2014, and Windsor litigated for the next 18 months, represented by Successor Counsel, until finally settling these cases in March and April 2016. *Supra* at 8-11. Attorneys Judd and Antonino, who had no experience in this field, made independent strategic litigation decisions that sever the chain of causation between Defendants' alleged malpractice and Windsor's purported damages. *See Somma*, 44 A.D.3d at 377; *Katz v. Herzfeld & Rubin, P.C.*, 48 A.D.3d 640, 641 (2d Dep't 2008). Those decisions include:

- Ignoring the pre-default walkaway in the pleadings despite having raised this argument during the Georgia mediation. SOF ¶¶ 103-111.
- Moving for summary judgment, prior to the close of discovery (and before deposing Houchins). *Id.* ¶¶ 112-117.
- Moving for summary judgment on only one legal theory, ignoring key factual and legal arguments – e.g., the fact that the Acker and Collins Trusts were arguably not in default and, instead, entered into pre-default walkaway agreements with Windsor – that would have circumvented any potential UCC § 9-620 and DSR issues because the statute and contractual provision only apply <u>after default</u>. *Id.* ¶¶ 112-123.

- Failing to proffer the additional releases of the Insureds and Trustees until it was too late in opposing the Trusts' summary judgment motion. *Id.* ¶ 123.

These independent strategic decisions significantly impacted Windsor's pre-default and post-default arguments (e.g., Windsor's own UCC expert testified that a contemporaneous release would have been "highly significant" to § 9-620 issues). Transcript of the Deposition of Sandra Stern ("Stern Tr.") 178:7-180:8, 162:17-23, attached as Exhibit 35 to the Wang Decl.

Successor Counsel's actions, therefore, intervene and supersede any alleged malpractice by Defendants, regardless of whether earlier actions amounted to negligence. *Perks*, 306 A.D.2d at 262; *Albin*, 289 A.D.2d at 272-73; *Kozmol*, 241 A.D.2d at 485-86. Further, these decisions were the actual cause of Windsor's supposedly unfavorable settlements because Joseph Wood became more aggressive in settlement negotiations "[i]n light of the Court's summary judgment orders." SOF ¶ 139.[14]

As a matter of law, Windsor cannot demonstrate causation because of the superseding representation of Successor Counsel in the Acker and Collins Litigations. Windsor has not, and cannot, offer any theory as to why Defendants' alleged malpractice compelled Successor Counsel to pursue questionable litigation strategies. Successor Counsel and Windsor, not Defendants, had the means and opportunity to protect Windsor's interests after September 9, 2014 through the Acker and Collins Litigations. *Minkow v. Sanders*, 82 A.D.3d 597, 598 (1st Dep't 2011) (affirming dismissal of legal malpractice case because defendants' "alleged failures

---

[14] Windsor's causation burden here, and really for all the settlements, is even higher in terms of establishing that Defendants were the proximate cause of the alleged harm. When a client attacks an underlying settlement, complaining that he or she settled due to some underlying mistake by the attorney, "malpractice by the attorney is more difficult to establish" because the client must demonstrate that assent "to the settlement was compelled because prior misfeasance or nonfeasance by the attorneys left no other recourse." *Becker v. Julien, Blitz & Schlesinger, P.C.*, 406 N.Y.S.2d 412, 413-15 (Sup. Ct. N.Y. Cnty. 1977) (noting "[w]hile it is understandable that a plaintiff with hopes for a recovery of millions who settles for thousands would be disappointed, that does not mean that the appropriate target for his disappointment must be the attorneys who handled his case"), *modified on other grounds*, 66 A.D.2d 674 (1st Dep't 1978); *see also Katz*, 48 A.D.3d at 641; *Tortura v. Sullivan Papain Block McGrath & Cannavo, P.C.*, 21 A.D.3d 1082, 1083 (2d Dep't 2005).

... could have been remedied by successor counsel"); *Boye v. Rubin & Bailin, LLP*, 152 A.D.3d 1, 10 (1st Dep't 2017) ("It is clear that the proximate cause of any damages sustained by plaintiff was not the alleged malpractice of defendants, but rather the intervening and superseding failure of plaintiff's successor attorney ... .") (citing *Pyne v. Block & Assocs.*, 302 A.D.2d 213, 213 (1st Dep't 2003)); *Brooks v. Lewin*, 21 A.D.3d 731, 734 (1st Dep't 2005).

Separately, even setting aside the role of Successor Counsel, Windsor's own decisions also sever the causal link. Windsor refused to settle these Litigations early, when it had the chance. *Supra* at 7-8. Windsor engaged Successor Counsel with little to no relevant experience and sought to pursue potential fraud claims against Houchins in Georgia. SOF ¶¶ 85-90. *See Humbert v. Allen*, 89 A.D.3d 804, 807 (2d Dep't 2011) (dismissing legal malpractice action, alleging defendant firm failed to cancel contract of sale for condominium and lost the client's down payment, because client independently breached sale contract and would have forfeited the down payment anyway); *Terracciano v. McGarrity*, No. 16 Civ. 1324 (LAP), 2017 U.S. Dist. LEXIS 79722, at *22-23 (S.D.N.Y. May 24, 2017) (defendant law firm's failure to file cross-petition not proximate cause of plaintiff's alleged injury because the underlying court would not have considered petition given the allegations of negligence against Plaintiff).

2.    *Coppock and Stamatov*

Windsor further alleges that Defendants were negligent in failing to take steps necessary to secure Windsor's unfettered ownership of the Coppock and Stamatov Policies. *See generally* Wang Decl. Ex. 1 (Compl.). These allegations also have no merit. Coppock and Stamatov were alive at the time Windsor voluntarily commenced litigations against their Trusts. According to Windsor's own proffered experts, if Windsor had any concern (following the Bitter decision) about the effectiveness of the Change of Ownership Forms or the ownership of the Policies, Windsor could have conducted a public sale to secure incontrovertible ownership of the Policies.

18

Sandra Stern (Windsor's UCC expert) and Wood, the Trusts' counsel in the underlying litigations, both testified that Windsor could have submitted a credit bid at a public sale, based on all previously paid premiums, and purchased the Policies outright with little to no additional expense. Wang Decl. Ex. 35, Stern Tr. 127:10-130:16, 162:17-23; Wang Decl. Ex. 34 at 14-15, 29; Wang Decl. Ex. 32, ¶¶ 48-50. As they explain, Windsor would not have been outbid because, to purchase the Policies, another bidder would have had to be willing to pay more money than the premiums Windsor already had paid. Wood estimated that the costs associated with such sale would only have been around $12,000 each, the same amount that Windsor ended up paying the Insureds to settle these disputes. Wang Decl. Ex. 32, ¶¶ 48-50.

Giving credence to this expert testimony for the purposes of this Motion only, Windsor's claims related to the Coppock and Stamatov Policies fail because, since the Insureds were still alive after the Bitter Arbitration and at the time of settlement, such public sales could have taken place and given Windsor full ownership of the Policies. SOF ¶¶ 144-148; Wang Decl. Ex. 11 (Rog Responses). Although Defendants were not negligent in their handling of the Coppock and Stamatov Policies at all, in no event can Windsor complain of a result that occurred after Defendants' termination; Successor Counsel's failure to hold a public sale – which would have given Windsor ownership of the policies through a credit bid – acts as an intervening and superseding cause of any alleged harm. *See Albin*, 289 A.D.2d at 272-73; *Kozmol*, 241 A.D.2d at 485-86; *Minkow*, 82 A.D.3d at 598; *Somma*, 44 A.D.3d at 377; *Katz*, 48 A.D.3d at 641.[15]

As explained above, under New York law, even if an attorney makes a mistake – and there was no mistake here – if subsequent counsel has the opportunity but fails to correct that mistake, the original attorney is not the proximate cause of the alleged harm. *See, e.g., Katz*, 48

---

[15] Alternatively, Successor Counsel and Windsor could have, from the beginning, negotiated the same nominal settlements with Coppock and Stamatov, as Arent Fox had recommended. *Id.* ¶ 81.

A.D.3d at 641 (2d Dep't 2008) (dismissing malpractice action because five-month period before alleged unfavorable settlement was more than sufficient for successor counsel to protect the client's rights by pursuing the remedies that former counsel allegedly did not pursue).

Courts have reached this same conclusion for numerous types of legal work for which the new attorneys could have rectified an earlier problem, including the following: the purported failure to conduct a proper title search; the alleged failure to effect proper service of process, leading to dismissal for lack of personal jurisdiction; the supposed failure to investigate assets and insurance coverage of a defendant before settlement; and even the failure to commence an action before the expiration of the statute of limitations. *Albin*, 289 A.D.2d at 272-273 (subsequent counsel had three years to rectify the title search issue in mortgage foreclosure action); *Kozmol*, 241 A.D.2d at 485-86 (after dismissal for improper service, replacement had 120 days under rules to recommence dismissed action); *Perks*, 306 A.D.2d at 261-262 (successor counsel had two months to rectify supposed failure to investigate assets and insurance coverage of defendant driver in underlying action before unfavorable settlement); *Greenwich v. Markhoff*, 234 A.D.2d 112, 114 (1st Dep't 1996) (malpractice action against two successive counsel for failing to commence action prior to statute of limitations properly dismissed against first law firm because that firm did not have "any responsibility for allowing the Statute of Limitations to expire some two years" after termination); *C & F Pollution Control, Inc. v. Fidelity & Cas. Co. of New York*, 222 A.D.2d 828, 830 (3d Dep't 1995) (same).

Successor Counsel represented Windsor with regard to these Policies since at least November 2014, after Coppock and the Stamatov Trustee rejected the June 2014 Letters (and after Rousseau recommended settlements more favorable than the eventual outcomes). SOF ¶¶ 81, 144-146. Yet, instead of pursuing a public sale, on January 7, 2015, Windsor voluntarily

commenced actions against the Coppock and Stamatov Trusts, and then proceeded to litigate these cases for over a year before settling with Stamatov in March 2016 and with Coppock in July 2016. *Id.* Windsor now seeks $24,000 for the settlement payments, as well as $151,416 in legal fees associated with the Coppock dispute and $48,919 in legal fees associated with the Stamatov dispute. Wang Decl. Ex. 36 (Lunden Report Exs. E-F). After all this litigation, Windsor settled and agreed to pay each Trust, in exchange for the Policies, $12,000 – the same amount Windsor's expert estimates a public sale would have cost. *Id.* ¶¶ 150, 152; Wang Decl. Ex. 32, ¶¶ 48-50. At his deposition, Darin Judd claimed that Windsor did not originally proceed with a public sale because of concerns that Houchins or his company would outbid Windsor for the two Policies but later admitted that the Trusts accepted such low settlement offers after Windsor threatened to hold a public sale. *Id.* ¶¶ 147-149.

As a matter of law, therefore, Defendants are not the proximate cause of Windsor's alleged harm for these Policies – i.e., the unnecessary legal fees incurred in procuring settlements that ensured Windsor had unfettered ownership of the Policies, nor the $12,000 paid in "settlement" on each Policy.

**IV.  Windsor's Claims for Repayment of "Premium Finance" Legal Fees and Bitter Legal Fees Fail Because It Cannot Establish Those Fees Were the Result of Any Alleged Malpractice**

Inexplicably, Windsor seeks the return of legal fees paid to Arent Fox and Herrick relating to premium financing advice, totaling $103,269. Wang Decl. Ex. 36.[16] Windsor's alleged damages claim defies all common sense. First, Arent Fox cannot be responsible for the return of legal fees paid to Herrick, not only because Windsor has commenced a separate legal

---

[16] In response to Defendants' Interrogatories regarding damages, Windsor claimed these premium finance fees totaled $256,944.96 ($112,776.85 to Arent Fox and $144,168.11). Wang Decl. Ex. 11 (Rog Responses). Windsor never amended or supplemented its Interrogatory Responses but, during expert discovery, Windsor proffered Charles Lunden's expert report, which calculated this portion of Windsor's damages (for both Arent Fox and Herrick) to be only $103,269. Wang Decl. Ex. 36.

malpractice action against Herrick based on the same alleged misconduct and seeking the return

of the same fees (Wang Decl. Ex. 67), but because there is nothing in the record that would allow

Windsor to establish that these earlier fees would not have been incurred "but for" the later

alleged malpractice.  Windsor has refused to provide any more detail regarding the nature of the

legal work associated with these fees.  Wang Decl. Ex. 11 (Rog Responses); Wang Decl. Ex. 36

(Lunden Report).  Therefore, as a matter of law, Windsor is not entitled to the return of these

fees. *See Diamond*, 468 F. Supp. 2d at 633-34; *Rudolf v. Shayne, Dachs, Stanisci, Corker &*

*Sauer*, 8 N.Y.3d 438, 443 (2007) (damages in malpractice action are not to provide windfall but

to make "the injured client whole," including only those litigation expenses expended to

"correct" defendant's error) (citations omitted).

Windsor also appears to assert that Defendants should have to repay any costs and legal

fees related to the Bitter Litigation under the theory that these litigations would never have

occurred "but for" Defendants' alleged malpractice.  In Windsor's Interrogatory Responses,

Windsor claims that Arent Fox was paid $266,013 for this representation.  Wang Decl. Ex. 11

(Rog Responses).  But the record demonstrates clearly that litigation was inevitable, even if the

Bitter Trustee, Barnes, had signed a complete release in the first place.  Pacific Life never

recorded the Change of Ownership Form from Houchins, so the Bitter Trust was still the owner

of record, meaning Windsor could not have collected the death benefit without litigation.  *Supra*

at 5-6.

More importantly, the record is clear that Barnes would have sued – for fraud unrelated to

Arent Fox's conduct – regardless of the release he signed.  SOF ¶¶ 55-56.  When the Bitter Trust

filed its original complaint against Windsor, the Trust's counsel was not even aware there was a

potential issue with UCC § 9-620 or the DSR.  *Id.* ¶ 57.  Instead, Wood focused solely on the

theories that Barnes had been improperly tricked into signing the Change of Ownership Form

and that the Bitter Trust was not actually in default under the Premium Finance Package.  *Id.* ¶

56.   Those theories had nothing to do with UCC § 9-620, the alleged linchpin of Windsor's

malpractice claims. Simply put, Windsor would have incurred Bitter-related legal fees regardless

of the alleged malpractice.

## V.   Windsor's Breach of Fiduciary Duty and Breach of Contract Claims Should Be Dismissed as Impermissibly Duplicative

Windsor has asserted claims under theories for breach of fiduciary duty (Compl. ¶¶ 186-

191) and breach of contract (*id.* ¶¶ 192-194) that duplicate the malpractice theories and should be

dismissed.  The allegations with respect to these additional causes of action arise from the same

operative facts: the breach of fiduciary duty claim simply recasts the malpractice allegations

(specifically, those regarding Defendants' purported failure to correct earlier mistakes) as a

breach of "undivided loyalty," and the breach of contract claim simply recasts the alleged

breaches of the attorney's duty of care as breaches of Defendants' "express and implied

contractual obligations."  *Compare* Compl. ¶¶ 179-185 (and, generally, ¶¶ 1-178) *with* Compl. ¶¶

186-194.  With regard to Windsor's breach of contract claim, it "[does] not rest upon a promise

of a particular or assured result and only claim[s] a breach of general professional standards," so

it is properly "viewed as a redundant pleading of a malpractice claim."  *Senise v. Mackasek*, 227

A.D.2d 184, 185 (1st Dep't 1996) (internal citations and quotations omitted).  Windsor has not

sufficiently alleged, let alone produced any evidence supporting, the existence of any

independent promises or assurances by Defendants regarding the underlying matters, nor is there

any evidence of such in either Retainer Agreement.  Wang Decl. Ex. 2; Declaration of Julius

Rousseau, III, dated August 10, 2018 (the "Rousseau Decl.") Ex. 1.  In fact, Defendants

repeatedly warned Windsor that there were risks with any litigation involving the Policies. SOF ¶¶ 80-81.

These additional claims are duplicative and should be dismissed. *Alaimo v. Cohen*, No. 07-cv-7625 (KMK), 2008 WL 4202267, at *3 (S.D.N.Y. Sept. 10, 2008) ("New York law holds that, where a breach of contract or breach of fiduciary duty claim is premised on the same facts and seeks relief identical to that sought in a legal malpractice cause of action, such claims are redundant and should be dismissed."); *see also MIG, Inc. v. Paul, Weiss, Rifkind, Wharton & Garrison. L.L.P.*, 701 F. Supp. 2d 518, 532 (S.D.N.Y. 2010) (holding same).

## VI.    Arent Fox is Entitled to Summary Judgment on Its Counterclaims

Defendants have submitted substantial evidence to support Arent Fox's counterclaims for unpaid fees and disbursements resulting from Windsor's breach of its obligations to pay costs and legal fees under the Retainer Agreement, under both contract and account stated theories. *See, e.g.*, SOF ¶¶ 154-162; Rousseau Decl. Exs. 5-10.   It is undisputed that Windsor and Defendants entered into a contract whereby Windsor was to pay the costs and legal fees associated with Defendants' legal representation of Windsor in five matters, which were identified in invoices.   Wang Decl. Ex. 2; SOF ¶ 154-155; Rousseau Decl. Exs. 5-10.   As they had always done before, Defendants submitted to Windsor regular invoices for the legal services provided.   SOF ¶¶ 156-157.   Windsor neither objected to the fees billed nor rejected the invoices.   *Id.* ¶¶ 159-160.   As such, Defendants are entitled to payment of their legal fees.   *See, e.g.*, *Rosenblatt v. Christie, Manson & Woods Ltd.*, 195 Fed. App'x. 11, 12 (2d Cir. 2006) (under New York law, an action for breach of contract requires proof of "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages") (citing *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994)); *Kirk v. Heppt*, 532 F. Supp. 2d 586, 594 (S.D.N.Y. 2008) (attorney can recover under account stated cause of

24

action "with proof that a bill was issued to a client and held by the client without objection for an unreasonable period of time") (citing *O'Connell & Aronowitz v. Gullo*, 229 A.D.2d 637, 638-39 (3d Dep't 1996)).

For two of the matters covered by the invoices, the Hathaway and Lincoln matters, the Complaint contains no allegations of legal malpractice at all. *See generally* Wang Decl. Ex. 1, Compl.; SOF ¶ 161. For the Bitter Litigation (billed as "Bitter" and "Barnes Litigation"), as demonstrated above, Windsor would have incurred these legal fees regardless of whether the Bitter Trustee, Barnes, had signed a different release. *See supra* at 22-23. Because the issue of alleged malpractice is irrelevant with regard to the outstanding fees for all these matters, Defendants unquestionably fulfilled their obligations to Windsor while, at the same time, Windsor did not fulfill its obligations to Defendants, namely to pay the invoiced amounts within 30 days. Wang Decl. Ex. 2 at 2.[17]

As outlined above, Defendants have demonstrated they are entitled to their fees, and Windsor has produced nothing to dispute that showing, thereby entitling Defendants to summary judgment on Arent Fox's counterclaims. Arent Fox, therefore, is entitled to judgment in the amount of $474,005.25, together with interest.

## CONCLUSION

For all the foregoing reasons, the Court should grant Defendants' Motion for Partial

---

[17] The only theoretically possible outstanding legal fees implicated by Windsor's malpractice allegations involve $6,090 billed under a "General" Matter, related to advice about the Acker and Collins disputes. While Defendants are confident they will prevail at trial, they do not move for summary judgment with regard to these fees and seek $474,005.25 with this motion ($480,095.25 - $6,090). SOF ¶ 162; Rousseau Decl. Ex. 5.

Summary Judgment.

Dated: New York, New York
      August 13, 2018

Respectfully submitted,

FOLEY & LARDNER LLP

By: _____
    Peter N. Wang (PW 9216)
    Douglas S. Heffer (DH 6082)
    Adam G. Pence (AP 8621)
    90 Park Avenue
    New York, New York 10016
    Tel: (212) 682-7474
    Fax: (212) 687-2329
    pwang@foley.com
    dheffer@foley.com
    apence@foley.com

    *Attorneys for Defendants*
    *Arent Fox, LLP and Julius Rousseau, III*

APPENDIX A TO THE MOTION FOR PARTIAL SUMMARY JUDGMENT
FILED BY DEFENDANTS ARENT FOX, LLP AND JULIUS ROUSSEAU, III

### ELEMENTS OF WINDSOR'S LEGAL MALPRACTICE CLAIM

| Element | Alleged Damages | Remaining Damages After Granting Partial Summary Judgment |
|---|---|---|
| Bitter | Lost Death Benefit: $1,350,000 [$2 million DB – $650,000 settlement paid to Windsor]<br><br>Arent Fox & Successor Counsel Fees: $434,115<br><br>**Total**: $1,784,115[*] | Lost Death Benefit: $1,350,000<br><br>Successor Counsel Fees: $60,300.95<br><br>**Total**: $1,410,300.95 |
| Acker | Lost Death Benefit: $279,352 [$1 million DB – $720,648 settlement paid to Windsor]<br><br>Successor Counsel Costs/Fees: $219,316<br><br>**Total**: $498,668 | No Liability |
| Collins | Lost Death Benefit: $1,211,165 [$2 million DB – $788,835 settlement paid to Windsor]<br><br>Successor Counsel Costs/Fees: $200,438<br><br>**Total**: $1,411,603 | No Liability |
| Coppock | Settlement Paid to Insured: $12,000<br><br>Successor Counsel Costs/Fees: $151,416<br><br>**Total**: $163,416 | No Liability |
| Stamatov | Settlement Paid to Insured: $12,000<br><br>Successor Counsel Costs/Fees: $48,919<br><br>**Total**: $60,919 | No Liability |
| Premium Financing Fees | $103,269 (paid to Arent Fox and Herrick Feinstein, LLP | No Liability |
| **Total** | $4,021,990 | $1,410,300.95 |

---

[*] For the above calculations, Defendants rely on the damages report prepared by Windsor's proffered expert, Charles Lunden (the "Lunden Report"). Wang Decl. Ex. 36. In its earlier Interrogatory Responses, Windsor reached different damages calculations for many of these matters. For example, Windsor stated that the Collins matter settled for $816,334.54 (Wang Dec. Ex. 11, Interrogatory Responses at 4) when the actual settlement was $788,835. Lunden Report, Exhibit D. Also, with regard to the alleged Bitter damages, Windsor previously asserted $2,030,904.11 (the purported death benefit + interest) and $457,928.08 in fees. Wang Dec. Ex. 11, Interrogatory Responses at 3. Finally, Windsor claimed it was entitled to 1) interpleader costs in the underlying litigations; 2) legal fees for two other matters (Hathaway and Cohen) that have nothing to do with this case and were never mentioned in the Complaint; and 3) fees for its current counsel in this action. *Id.* at 3-5. These claims appear to have been abandoned based on Windsor's subsequent discovery responses, including the Lunden Report, which does not include them. Defendants, therefore, rely solely on the Lunden Report, unless the relevant information is only available elsewhere (e.g., the Lunden Report has no specific breakdown of Successor Counsel's alleged fees and Arent Fox's alleged fees for the Bitter matter; these amounts are only available in the Interrogatory Responses, even though this fee total does not match Lunden's final calculation of Bitter legal fees).