UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WINDSOR SECURITIES, LLC,

            Plaintiff,

   -against-

ARENT FOX, LLP and JULIUS
ROUSSEAU, III,

            Defendants.

---

Case No.  16-cv-01533 (GBD) (GWG)


**ORAL ARGUMENT REQUESTED**


# DEFENDANTS' STATEMENT OF UNCONTESTED MATERIAL FACTS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56 AND LOCAL CIVIL RULE 56.1 (A)

Peter N. Wang
Douglas S. Heffer
Adam G. Pence
Foley & Lardner LLP
90 Park Avenue
New York, New York 10016-1314
Tel:  (212) 682-7474
Fax:  (212) 682-2329

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1(a) of the United States District Court for the Southern District of New York, Defendants Arent Fox, LLP ("Arent Fox") and Julius Rousseau, III ("Rousseau," and, collectively, with Arent Fox, "Defendants") submit the following Statement of Uncontested Material Facts in support of their Motion for Partial Summary Judgment on all claims asserted in the complaint (the "Complaint") filed by Plaintiff Windsor Securities, LLC ("Windsor" or "Plaintiff") in this action.

## BACKGROUND

1.      In 2007, Windsor became involved in life insurance premium financing. Complaint, dated February 29, 2016 (ECF No. 1, hereinafter, the "Compl.") ¶ 8, attached as Exhibit 1 to the Declaration of Peter N. Wang, dated August 13, 2010 (the "Wang Decl.").

2.      Prusky decided to explore the premium financing business, even though he had little investing experience outside index mutual funds.  Transcript of the Depositions of Steven Prusky, March 6, 2017 and October 4, 2017 ("Prusky Tr.") 58:19-59:8, 71:20-25, 107:4-8, 125:25-126:5, 136:6-10, attached as Exhibit 13 to the Wang Decl.

3.      Based on what he had been told, Prusky was under the impression that Windsor could charge an above-market 15% interest rate on the loans.  Wang Decl. Ex. 13, Prusky Tr. 69:17-70:5, 91:7-92:5, 99:24-100:5, 107:18-23, 137:2-138:4, 239:4-9.

4.      Windsor's ultimate goal was always to get this 15% return, not to own the policies and collect the death benefits.  Wang Decl. Ex. 13, Prusky Tr. 91:7-92:5, 145:22-23, 155:21-156:7; 239:4-9.

5.      Windsor eventually provided premium financing for ten life insurance policies. Wang Decl. Ex. 1, Compl. ¶¶ 8-11, 15; Wang Decl. Ex. 13, Prusky Tr. 146:16-147:9.

6.     Seven of the policies were procured through Georgia brokers, Eugene Houchins III ("Houchins") and his father, Eugene Houchins II, including the five at issue in this litigation: these were insurance policies (hereinafter, the "Policies") for John L. Bitter, Joe E. Acker, Erwin A. Collins, Robert S. Coppock, and Jane Ann Stamatov (collectively, the "Insureds").  Wang Decl. Ex. 1, Compl. ¶¶ 8-11, 15.

7.     Windsor loaned around $1.5 million to finance the ten life insurance policies. Wang Decl. Ex. 13, Prusky Tr. 186:11-25.

## THE PREMIUM FINANCE PACKAGE: THE LOAN DOCUMENTS

8.     Rather than hiring an attorney to draft the loan documents, Prusky used a template to create sets of loan documents; as such the loan documents (hereinafter, the "Premium Finance Packages") for the five Policies operated in the same way and contained the same essential terms.  Wang Decl. Ex. 1, Compl. ¶¶ 16-20; Wang Decl. Ex. 13, Prusky Tr. 109:23-110:2, 151:16-152:11; *see, e.g.*, Wang Decl. Ex. 3 (Compl. Ex. C, ECF Nos. 1-3 & 1-4, hereinafter, the "Sample Premium Finance Package").

9.     Under the loan documents, the insureds for the Policies set up trusts (the "Trusts").  Wang Decl. Ex. 1, Compl. ¶¶ 12-13; *see, e.g.*, Wang Decl. Ex. 3, Sample Premium Finance Package (ECF No. 1-3, page 37-48 of 74).

10.     The Insureds appointed Trustees to manage the Trusts.  Wang Decl. Ex. 1, Compl. ¶¶ 15-16; *see, e.g.*, Wang Decl. Ex. 3, Sample Premium Finance Package (ECF No. 1-3, page 37-48 of 74).

11.     Each respective individual Trust was the owner of the Policy and was the actual borrower on the loan (not the Insured).  Wang Decl. Ex. 1, Compl. ¶ 13; *see, e.g.*, Wang Decl. Ex. 3, Sample Premium Finance Package (ECF No. 1-3, page 37 of 74).

12.     Included in the Premium Finance Package was the following: an agreement entitled Life Insurance Premium Financing Agreement among Windsor, the Trustee and the Insured (the "Financing Agreement"), a Security Agreement for the Beneficiary Interest in Trust by and among Windsor, the Trustee and the Insured (the "Security Agreement"), a Promissory Note (the "Promissory Note"), an Assignment of Life Insurance Policy as Collateral (the "Assignment"), and the Terms and Conditions for Life Insurance Premium Financing Agreement ("Terms and Conditions").  Wang Decl. Ex. 1, Compl. ¶¶ 16, 17, 20 n.3; *see generally* Wang Decl. Ex. 3, Sample Premium Finance Package.

13.     Pursuant to the terms of the loan documents, Windsor loaned the Trust funds for the initial premium payment and took the Policy as collateral.  Wang Decl. Ex. 1, Compl. ¶¶ 16-20; Wang Decl. Ex. 3, Sample Premium Finance Package, Promissory Note ¶ 5 (ECF No. 1-3, page 8-11 of 74).

14.     According to the Premium Finance Package, Windsor was entitled to 15% interest for the "principal amount" of each loan.  Wang Decl. Ex. 1, Compl. ¶¶ 16-20; Wang Decl. Ex. 3, Sample Premium Finance Package (ECF No. 1-3, page 4 of 74).

15.     The Promissory Note in the Premium Finance Package (the "Note"), signed by each Trust, provided that the "Maturity Date is 820 days (approximately 27 months) from the date Lender [Windsor] disburses funds pursuant to the Financing Documents."  Wang Decl. Ex. 1, Compl. ¶¶ 14, 20 n.3; *see, e.g.*, Wang Decl. Ex. 3, Sample Premium Finance Package, Promissory Note ¶ 3 (ECF No. 1-3, page 8 of 74).

16.     The Note further provided that the "entire principal amount of each Note and all accrued but unpaid interest owed thereunder [was] due and payable by the Borrower on the earlier of (a) the Death Date, or (b) the Maturity Date."  Wang Decl. Ex. 1, Compl. ¶ 20 n.3;

Wang Decl. Ex. 3, Sample Premium Finance Package, Promissory Note ¶ 3 (ECF No. 1-3, page

8 of 74).

17.     Under the Financing Agreement, absent fraud, the Insureds could not be liable for

repayment of the loans.  Wang Decl. Ex. 3, Sample Premium Finance Package, Financing

Agreement § 7.13 (ECF No. 1-3, page 24 of 74).

18.     Prior to the Maturity Dates, the relevant Trusts held no assets other than the

Policies.  Wang Decl. Ex. 1, Compl. ¶ 13.

19.     The Assignment included a "Default Sale Right" Provision (the "DSR") that

provided the following:

> **DEFAULT SALE RIGHT**: Upon an occurrence of an Event of
> Default (as defined in the Agreement) that has not been remedied
> within the time period required in the Agreement, Assignee shall
> have the right (the "**Default Sale Right**") but not the obligation to
> accept, that in consideration of the full and complete satisfaction of
> the Liabilities (the sufficiency of which consideration is hereby
> acknowledged) Owner may make a full transfer and assignment of
> the Insurance Policy to Assignee and thereby forever relinquish
> any and all rights Owner may have thereunder, including without
> limitation any rights to cash surrender value and/or death benefit
> provided thereunder.  Upon the exercise of this Default Sale Right,
> Assignee shall notify Insurer in writing and Insurer shall thereafter
> recognize Assignee as the sole lawful owner of the Insurance
> Policy.

Wang Decl. Ex. 1, Compl. ¶ 19; Wang Decl. Ex. 3, Sample Premium Finance Package (ECF No.

1-4, page 49 of 58).

## PROBLEMS WITH THE LOANS

20.     After the premium finance documents were finalized and executed, Prusky

realized his investments were riskier than he thought.  Wang Decl. Ex. 13, Prusky Tr. 113:6-

114:15.

21.     Around 2008, the life settlement market had dried up, and there was no way to sell the Policies on the secondary market. Wang Decl. Ex. 13, Prusky Tr. 113:6-114:15, 179:5-14.

22.     The Insureds and appointed Trustees had lied on the insurance application forms by checking a box that represented that they had not and did not plan to enter into a premium financing agreement. Wang Decl. Ex. 13, Prusky Tr. 179:15-20, 240:10-241:11; *see, e.g.*, Wang Decl. Ex. 3, Sample Premium Finance Package (ECF No. 1-4, page 18 of 58).

23.     Windsor's investments were in danger because the insurance companies could potentially rescind the Policies for fraud. Wang Decl. Ex. 13, Prusky Tr. 239:10-240:14; Exhibit 2 to the Declaration of Julius Rousseau, III, dated August 13, 2018 (the "Rousseau Decl.").

## WINDSOR ENGAGES ROUSSEAU

24.     On June 5, 2009, Prusky engaged Rousseau and Herrick Feinstein, LLP ("Herrick"). Wang Decl. Ex. 1, Compl. ¶¶ 28-29; Wang Decl. Ex. 13, Prusky Tr. 19:24-20:4, 21:11-22:14, 124:22-125:2, 176:25-178:4; Rousseau Decl. ¶ 3, Ex. 1.

25.     Rousseau warned Prusky that Windsor's loans were at risk. Rousseau Decl. ¶ 5.

26.     In particular, Rousseau warned Prusky that certain states considered these Policies to be STOLI ("Stranger-Originated Life Insurance") policies and invalid. Rousseau Decl. ¶ 5.

27.     Rousseau explained that Windsor should file Uniform Commercial Code ("UCC") statements to secure its interests and give Windsor priority on its loans. Rousseau Decl. Ex. 2 (HF WIN 007295).

28.     Rousseau also suggested contacting the insurers, disclosing the fact that Windsor was a secured premium finance lender on the Policies and proffering the collateral assignments for acceptance. Rousseau Decl. Ex. 2 (HF WIN 007295-007296); Wang Decl. Ex. 13, Prusky Tr. 239:10-241:11.

29.     As Rousseau explained, the insurers, after learning the Policies were premium financed, might rescind the Policies (but might not return the premium) or do nothing, which Windsor could later argue constitutes a waiver of the right to rescind.  Rousseau Decl. Ex. 2 (HF WIN 007296); Wang Decl. Ex. 13, Prusky Tr. 239:10-241:11.

30.     In July 2009, Herrick filed UCC statements for Windsor's secured loans. Rousseau Decl. ¶ 7.

31.     In early fall of 2009, Rousseau and Windsor started contacting the insurers by letter to disclose the fact that Windsor was a premium finance lender with a security interest in the Policies.  Wang Decl. Ex. 13, Prusky Tr. 239:10-240:14.

32.     None of the insurers rescinded the Policies.  Wang Decl. Ex. 13, Prusky Tr. 239:10-240:14.

## WINDSOR SECURES CHANGE OF OWNERSHIP FORMS THROUGH HOUCHINS

33.     In late 2009 or early 2010, Houchins told Prusky that some of the Trustees were saying the respective Insureds did not want to pay back the loans to Windsor and wanted nothing more to do with the policies.  Wang Decl. Ex. 13, Prusky Tr. 245:25-247:3; Wang Decl. Ex. 1, Compl. ¶¶ 22, 24.

34.     The Trusts were not in default at that time.  Wang Decl. Ex. 13, Prusky Tr. 245:25-247:3; see also Wang Decl. Ex. 1, Compl. ¶¶ 15, 82, 112, 139, 162.

35.     Prusky consulted with Rousseau about what Windsor should do; Rousseau told Prusky that if the Insureds really did just want to walk away and abandon the Policies, a signed Change of Ownership form ("Change of Ownership Form"), if it was accepted by each insurer, would suffice to pass title to Windsor.  Wang Decl. Ex. 1, Compl. ¶¶ 82-86, 112-113, 139-140, 162; Wang Decl. Ex. 13, Prusky Tr. 245:25-247:3.

36.     In early 2010, Houchins collected Change of Ownership Forms from four Trustees – for the Acker, Collins, Coppock, and Stamatov Policies – prior to the loans becoming due.  Wang Decl. Ex. 1, Compl. ¶¶ 15, 82-86, 112-113, 139-140, 162.

37.     The Change of Ownership Forms were sent to the respective insurers, and the insurers all accepted the Forms. Wang Decl. Ex. 1, Compl. ¶¶ 88, 114-115, 145, 164.

38.     Some of the Insureds and Trustees requested releases after signing the Change of Ownership Forms.  *See, e.g.*, Wang Decl. Ex. 1, Compl. ¶ 142.

39.     The Acker Trustee had signed the Change of Ownership Form on March 18, 2010.  Wang Decl. Ex. 1, Compl. ¶ 86.

40.     In March 2010, Windsor mailed releases, dated March 23, 2010, for the Acker Trustee and Acker.  Wang Decl. Ex. 46.

41.     Specifically, in the letter to the Acker Trustee, Windsor stated the following:

> we are releasing [the Trust and the insured] from any future financial obligations of our financial agreement. ... We want to confirm that it is our understanding that you have signed the [Change of Ownership Form] because you would rather irrevocably surrender ownership and be freed of financial obligations past and future, than pay off your loan to Windsor. We also want to confirm that this assignment is effective immediately upon its processing by the Insurance Company and is irrevocable. With its processing there will be no more financial obligations between Windsor and the Trust, nor between Windsor and the insured ...

Wang Decl. Ex. 46.

42.     In May 2010, Windsor mailed releases, dated May 18, 2010, for the Collins Trustee and Collins.  This release was identical in form to the Acker release.  Wang Decl. Ex. 56.

43.     The Collins Trustee had executed the Change of Ownership Form on May 11, 2010.  Wang Decl. Ex. 1, Compl. ¶ 113.

## BITTER WANTS TO REPURCHASE POLICY

44.     The Bitter loan became due around July 8, 2010.  Wang Decl. Ex. 1, Compl. ¶ 43.

45.     After the Maturity Date on the Bitter loan, Houchins indicated that Bitter might want to pay off the loan.  Wang Decl. Ex. 1, Compl. ¶ 25; Wang Decl. Ex. 13, Prusky Tr. 247:2-248:4.

46.     Around June 2010, Rousseau left the Herrick Firm to become a partner at Arent Fox.  Wang Decl. Ex. 1, Compl. ¶ 30.

47.     On September 8, 2010, Rousseau mailed Bitter and Gregory Barnes, the Bitter Trustee, a letter noticing the default and demanding the trustee sign a Change of Ownership Form.  Wang Decl. Ex. 1, Compl. ¶ 47.

48.     On January 14, 2011, Prusky sent Bitter and Barnes a second letter himself, again demanding that the trustee sign the Change of Ownership Form.  Wang Decl. Ex. 1, Compl. ¶ 49; Wang Decl. Ex. 4.

49.     On February 14, 2011, Houchins claimed that he secured the signed Change of Ownership Form from Barnes, and that he had sent it to the insurer.  Wang Decl. Ex. 1, Compl. ¶ 50; Transcript of the Deposition of Eugene Houchins, III, February 16, 2018 ("Houchins Tr.") 59:18-60:10, 105:9-24, attached as Exhibit 33 to the Wang Decl.; *see also* Transcript of the Deposition of Julius Rousseau, III, March 7, 2017 ("Rousseau Tr.") 214:4-13, attached as Exhibit 12 to the Wang Decl.

50.     Pacific Life Insurance Company ("Pacific Life"), the insurer, never recorded the Change of Ownership Form.  Wang Decl. Ex. 12, Rousseau Tr. 214:4-13; Wang Decl. Ex. 31.

## THE BITTER LITIGATION

51.     On December 23, 2012, Bitter died.  Wang Decl. Ex. 1, Compl. ¶ 52.

52.     The Bitter Trust was still the recorded owner with Pacific Life.  Wang Decl. Ex. 31.

53.     Windsor attempted to collect the death benefit from Pacific Life.  Wang Decl. Ex. 1, Compl. ¶ 54.

54.     On February 13, 2013, through counsel recommended by Houchins, the Bitter Trustee filed suit in California state court, seeking the death benefit for Bitter's widow.  Wang Decl. Ex. 1, Compl. ¶ 55; Transcript of the Deposition of Joseph Wood, June 28, 2018 ("Wood Tr.") 43:19-44:14, attached as Exhibit 26 to the Wang Decl.

55.     Neither the complaint nor amended complaint in the above-referenced action made reference to any UCC issues or any issues with the effectiveness of the Change of Ownership Form under the loan documents, including the DSR.  Wang Decl. Ex. 27; Wang Decl. Ex. 26, Wood Tr. 43:19-44:7, 78:7-79:7, 80:18-84:19, 85:7-20.

56.     Joseph Wood, the Bitter Trust's counsel, asserted two primary theories in the original complaint: that Windsor had engaged in some wrongdoing with regard to procuring the Change of Ownership Form and preventing the Trust from repaying the loan.  Wang Decl. Ex. 27; Wang Decl. Ex. 26, Wood Tr. 43:19-44:7, 78:7-79:7, 80:18-84:19; *see also* Wood Tr. 85:7-20.

57.     At this time, Wood was not aware of any potential UCC or DSR issues.  Wang Decl. Ex. 26, Wood Tr. 78:7-79:7, 84:16-19, 281:20-23; *see also* Wood Tr. 98:6-100:2.

58.     Windsor removed the action to federal court and, on June 7, 2013, filed two unsuccessful motions: for dismissal under FRCP 12(b)(6) and for judgment on the pleadings. Wang Decl. Ex. 1, Compl. ¶ 57; Wang Decl. Ex. 26, Wood Tr. 93:2-95:17; *see also* Wang Decl. Exs. 28-30.

59.     Both motions were denied on the basis that the Trust's allegations presented an issue of fact.  Wang Decl. Ex. 30 at 8.

60.     The Bitter Trust, through Barnes, and Windsor then arbitrated their dispute before the AAA.  Wang Decl. Ex. 1, Compl. ¶ 59; Wang Decl. Ex. 26, Wood Tr. 98:15-19.

61.     In its Opening Arbitration Brief, the Bitter Trust raised for the first time issues related to the effectiveness of the Change of Ownership Form.  Wang Decl. Ex. 26, Wood Tr. 84:16-19, 279:21-280:14.

62.     The Trust argued that the Change of Ownership Form was not enough to convey full title to Windsor because this form did not comply with the California UCC, particularly § 9-620 (involving transfer of collateral upon default), and did not comply with the requirements outlined in the DSR.  Wang Decl. Ex. 5 at 2.

63.     On April 8, 2014, after three days of testimony and a fourth day of closing arguments, the AAA Panel (the "Panel") entered an interim award holding that the Bitter Trust was entitled to the death benefit.  Wang Decl. Ex. 1, Compl. ¶ 63; Wang Decl. Ex. 5.

64.     In the award, the Panel ruled that Windsor failed to comply with certain terms of the loan documents – i.e., the DSR provision in the Collateral Assignment Agreement – and UCC § 9-620.  Wang Decl. Ex. 1, Compl. ¶ 64; Wang Decl. Ex. 5 at 5-7.

65.     The Panel held that there was no direct evidence that Windsor notified the trustee that Windsor intended to exercise its default rights because of the non-payment of the loan, explaining that Windsor's earlier correspondence with Barnes only referenced Section 6(a) of the Security Agreement (not the Collateral Assignment Agreement) as the basis for Windsor's demands.  Wang Decl. Ex. 1, Compl. ¶ 65; Wang Decl. Ex. 5 at 5.

66.     The Panel also ruled that § 9-620 applied and that Windsor did not comply with the specific provisions for "strict foreclosure" of the Policy.  Wang Decl. Ex. 1, Compl. ¶ 66; Wang Decl. Ex. 5 at 5-7.

67.     The Panel held that nothing in Windsor's earlier correspondence with Barnes contained a "proposal" stating that Windsor was prepared to accept the Policy in full satisfaction of the debt.  Wang Decl. Ex. 1, Compl. ¶ 66; Wang Decl. Ex. 5 at 5-7.

68.     The Panel awarded Windsor its rights as a secured creditor on the loan – i.e., the right to collect any outstanding amounts on the loan, including repayment of the insurance premiums, interest, and certain related expenses; the panel further agreed to entertain motions for attorneys' fees, but the parties then began negotiations and requested the panel not rule on any submissions.  Wang Decl. Ex. 1, Compl. ¶ 63; Wang Decl. Ex. 5 at 7; Wang Decl. Ex. 20; *see* Rousseau Decl. Ex. 3 (PLAINTIFF 005139).

69.     The Panel awarded Windsor only 10% interest, not 15% interest because California law does not allow more than 10% interest on this type of loan.  Wang Decl. Ex. 1, Compl. ¶¶ 17 n.2, 63; Wang Decl. Ex. 5 at 7.

70.     In the Award, the Arbitration Panel cited no case law and noted that there appeared to be no decisional authority on some of the key issues in the matter.  Wang Decl. Ex. 5 at 6.

## AFTERMATH OF BITTER ARBITRATION

71.     After the Bitter Arbitration, Rousseau advised Prusky to reach a settlement with Bitter as soon as possible.  Wang Decl. Ex. 13, Prusky Tr. 366:21-24, 367:21-25.

72.     In June 2014, Windsor sent letters to the Trustees for the Acker, Collins, Coppock, and Stamatov Policies, documenting the fact that, for each Policy, Windsor accepted

the Change of Ownership Form as a voluntary assignment of the Policy in exchange for a complete satisfaction and discharge of the loan (hereinafter, the "June 2014 Letters"). Wang Decl. Ex. 1, Compl. ¶ 72.

73. Acker, however, had died on April 15, 2014. Wang Decl. Ex. 1, Compl. ¶ 91.

74. On June 19, 2014, Collins died. Wang Decl. Ex. 1, Compl. ¶ 119.

75. Around July 2014, the Acker Trustee sent a letter to John Hancock Life Insurance Company asserting a claim to the death benefit under the Acker Policy. Wang Decl. Ex. 1, Compl. ¶ 92.

76. Around the same time, the Collins Trustee sent a letter to Pacific Life asserting a claim to the death benefit under the Collins Policy. Wang Decl. Ex. 1, Compl. ¶ 120.

77. On August 15, 2014, Pacific Life filed an interpleader action in the Northern District of California to determine whether Windsor or the Collins Trust was entitled to the death benefit. Wang Decl. Ex. 1, Compl. ¶ 121.

78. On October 17, 2014, John Hancock filed an interpleader action in the Northern District of California to determine whether Windsor or the Acker Trust was entitled to the death benefit. Wang Decl. Ex. 1, Compl. ¶ 93.

79. The Acker and Collins Trusts were eventually represented by Joseph Wood, counsel for the Bitter Estate and Barnes in the Bitter Litigations. Wang Decl. Ex. 1, Compl. ¶¶ 94, 122.

80. Rousseau advised Prusky to settle these two disputes quickly to avoid the inherent risks in litigation, particularly involving premium financed life insurance policies. Wang Decl. Ex. 12, Rousseau Tr. 244:12-17, 252:13-24.

81.     Rousseau also advised Prusky to pay Coppock and Stamatov, who were still living, small sums to instruct their Trustees to sign new releases and resolve any potential future disputes over these Policies before they began.  Wang Decl. Ex. 12, Rousseau Tr. 244:12-17, 251:15-252:24.

## WINDSOR TERMINATES DEFENDANTS AND RESISTS SETTLING

82.     Around August 2014, Wood offered to settle the Bitter dispute by paying Windsor $650,000 (on the $2 million policy).  Rousseau Decl. Ex. 3.

83.     At one point, Wood, who purported to represent the Acker and Collins estates as well, offered to settle with Windsor, without a lawsuit, if Windsor paid the Acker estate $50,000 and the Collins estate $100,000 (or 5% of the $1 million and $2 million death benefits, respectively).  Rousseau Decl. Ex. 3.

84.     Rousseau repeatedly implored Prusky to settle all three disputes, but Prusky did not take Rousseau's advice, saying he thought Acker and Collins would settle for less.  Rousseau Decl. ¶ 9.

85.     A few days after Pacific Life commenced its interpleader action with regard to the Collins Policy, around August 19, 2014, Windsor retained Darin Judd ("Judd") to represent Windsor in the Collins Litigation and in any disputes over the Acker Policy.  Declaration of Darin Judd (the "Judd Decl."), dated June 6, 2017, ¶ 7, attached as Exhibit 9 to the Wang Decl.

86.     Judd had never been involved in a litigation involving the premium finance or life settlement industries.  Transcript of the Deposition of Darin Judd, October 4, 2017 ("Judd Tr.") 38:15-25, 40:19-41:5, attached as Exhibit 18 to the Wang Decl.

87.     On or around August 20, 2014, Windsor retained Lauren Antonino ("Antonino" and, collectively with Judd, "Successor Counsel") to review potential claims that Windsor might

14

have under Georgia law against Houchins or his father for their role in the financing and handling of the Policies, particularly Bitter and Collins.  Affidavit of Lauren Antonino (the "Antonino Aff."), dated June 8, 2017, ¶ 2, attached as Exhibit 10 to the Wang Decl.; *see also* Wang Decl. Ex. 16 (ANTONINO 006528); Transcript of the Deposition of Lauren Antonino, February 15, 2018 ("Antonino Tr.") 26:13-22, attached as Exhibit 14 to the Wang Decl.

88.    Judd and Antonino advised Windsor with regard to the growing disputes over the Acker and Collins Policies, and Antonino eventually amended her engagement to include specific work on the Acker and Collins litigations.  Declaration of Julius Rousseau, III, in Support of Windsor's Motion to Compel, dated June 6, 2017, ¶ 4, attached as Exhibit 8 to the Wang Decl.; Wang Decl. Exs. 16-17.

89.    Antonino had no experience in premium financing for life insurance or in litigation involving premium finance for life insurance.  Wang Decl. Ex. 14, Antonino Tr. 16:12-19, 18:21-24.

90.    Antonino also had no experience in the life settlement industry.  Wang Decl. Ex. 14, Antonino Tr. 18:14-20.

91.    By September 2014, Defendants had negotiated a potential settlement of the Bitter Litigation – with the Bitter Trustee and the Bitter Estate – whereby Windsor would receive $650,000 (which represented the premium payments, interest, and an additional sum to settle). Rousseau Decl. ¶ 11; *see also* Wang Decl. Exs. 19-20.

92.    Windsor terminated its relationship with Defendants by letter, dated September 9, 2014.  Wang Decl. Ex. 1, Compl. ¶ 36.

93.    On September 16, 2014, Windsor, through Successor Counsel, backed out of what Joseph Wood believed was an "imminent settlement" of the Bitter dispute.  Wang Decl. Ex. 20.

94.     Later, on September 26, 2014, Windsor provided Wood a global settlement offer of $1.5 million to resolve the Bitter Litigation, as well as the Acker and Collins disputes.  Wang Decl. Ex. 21; Wang Decl. Ex. 18, Judd Tr. 100:15-101:6, 109:2-10.

95.     Wood refused this global offer, citing ethical concerns.  Wang Decl. Ex. 18, Judd Tr. 109:11-16.

96.     With Successor Counsel, Windsor did not settle the Bitter Litigations until January 29, 2015.  Wang Decl. Ex. 37.

97.     Pursuant to the Bitter settlement agreement, Windsor received $650,000.  Plaintiff's Response to Defendants' First Set of Interrogatories (the "Rog Responses") at 3, attached as Exhibit 11 to the Wang Decl.

## THE ACKER AND COLLINS LITIGATIONS

98.     Defendants never appeared on behalf of Windsor in the Acker or Collins cases.  Wang Decl. Ex. 1, Compl. ¶¶ 36, 93-100, 121-125.

99.     Defendants never performed any legal work for Windsor in the Acker or Collins Litigations.  Wang Decl. Ex. 1, Compl. ¶¶ 36, 93-100, 121-125.

100.    Windsor engaged in extensive litigation in both the Acker and Collins cases.  *See, e.g.*, Wang Decl. Exs. 38-58.

101.    The parties in the Acker and Collins cases litigated the matters concurrently.  *See, e.g.*, Wang Decl. Ex. 24 (ANTONINO 083440); *see also* Wang Decl. Exs. 38-58.

102.    The two litigations were assigned to the same judge.  *See, e.g.*, Wang Decl. Ex. 1, Compl. ¶¶ 93-101, 121-125; Wang Decl. Ex. 24 (ANTONINO 083440); *see also* Wang Decl. Exs. 38-58.

103.    In both cases, the respective Trustees asserted cross claims against Windsor, alleging that Windsor was not the outright owner of the Policies because the signing of the Change of Ownership Forms was not enough under the DSR Provision in the Financing Agreement or under § 9-620.  Wang Decl. Ex. 1, Compl., ¶¶ 94, 122-23.

104.    Both the Acker and Collins Trustees argued that they committed an anticipatory breach of the Premium Finance Package, particularly the Financing Agreement portion, by supposedly informing Houchins that they did not intend to repay the loans to Windsor.  Wang Decl. Ex. 1, Compl., ¶¶ 95, 122-23; Wang Decl. Ex. 39 at 9; Wang Decl. Ex. 49 at 9; *see generally* Wang Decl. Exs. 38, 48.

105.    Wood and Houchins had both previously represented to the Bitter Arbitration Panel that these two Trusts were not in default of their loan obligations.  Rousseau Decl. Ex. 11, (Bitter Arbitration Hearing) 32:17-24, 581:8-14, 582:1-6, 614:5-615:5; *see also* Wang Decl. Ex. 24 (ANTONINO 083450, 083452); Wang Decl. Ex. 45 at 4-5; Wang Decl. Ex. 55 at 4-5.

106.    Windsor asserted separate cross claims against Acker and Collins, specifically referring to "the Trust's default" under the Financing Agreements and alleging that "[f]ollowing the Trust's default under the terms of the transaction agreements, the Trust made a full transfer and assignment of the Policy to Windsor and forever relinquished any and all rights it may have had to the policy in consideration of the full and complete satisfaction of its liabilities to Windsor."  Wang Decl. Ex. 38 (Acker Crossclaim) ¶ 7; Wang Decl. Ex. 48 (Collins Crossclaim) ¶ 6; *see also* Wang Decl. Ex. 47 at 7; Wang Decl. Ex. 57 at 7.

107.    Nowhere in either crossclaim did Windsor explain that the Acker and Collins Trustees signed the Change of Ownership Forms prior to the Maturity Date of the respective

Loans.  *See generally* Wang Decl. Exs. 38, 48; *see also* Wang Decl. Ex. 47 at 7; Wang Decl. Ex. 57 at 7.

108.    In both cases, Windsor maintained that the Trusts were in default when the Trustees signed the Change of Ownership Forms.  Wang Decl. Ex. 47 at 9 n.6 (noting that even in a January 13, 2015 Joint Case Management Statement, Windsor stated that the Trustees' relevant actions were "following default"); Wang Decl. Ex. 57 at 9 n.6 (same); *see also* Wang Decl. Ex. 58.

109.    On May 21, 2015, the parties all attended a joint mediation in Georgia.  Wang Decl. Ex. 24 (ANTONINO 083440).

110.    In Windsor's mediation statement, Successor Counsel on behalf of Windsor acknowledged that the two Trusts were not in default.  Wang Decl. Ex. 24 (ANTONINO 083450).

111.    Successor Counsel also argued in the statement that the circumstances involving Acker and Collins were significantly distinguishable from Bitter, even though Bitter should have come out differently.  Wang Decl. Ex. 24 (ANTONINO 083450-083453).

112.    On July 8, 2015, Windsor moved for summary judgment in both cases, arguing that it was entitled to the death benefits.  Wang Decl. Ex. 39 at 1; Wang Decl. Ex. 49 at 1; Wang Decl. Ex. 1, Compl., ¶¶ 96, 123.

113.    Windsor also moved for summary judgment, in the alternative, that it was entitled to repayment of all premiums, plus interest, if it were determined that it was not entitled to the death benefits.  Wang Decl. Ex. 39 at 1; Wang Decl. Ex. 49 at 1.

114.     Prior to moving for summary judgment in the two cases, Successor Counsel did not depose Houchins.  Wang Decl. Ex. 45 at 1 n.2; Wang Decl. Ex. 55 at 1 n.2; Wang Decl. Ex. 14, Antonino Tr. 180:10-24.

115.     Successor Counsel deposed Robert Coppock in connection with the Coppock matter, but the deposition was continued because Mr. Coppock had to leave to care for a sick spouse.  Wang Decl. Ex. 45 at 6 n.8; Wang Decl. Ex. 55 at 6 n.8.

116.     Windsor agreed not to use anything from Coppock's deposition in its summary judgment motion – even though Coppock's testimony established that Houchins had explained the walkaway agreement with his clients – because Wood did not have an opportunity to cross-exam Coppock.  Wang Decl. Ex. 45 at 6 n.8; Wang Decl. Ex. 55 at 6 n.8.

117.     Because Windsor moved for summary judgment in the middle of discovery, the Court stayed discovery.  Wang Decl. Exs. 41, 51.

118.     In its summary judgment motions, Windsor argued the Acker and Collins Trusts' "anticipatory breach" arguments were admissions that the Trusts were in default under the loan documents.  Wang Decl. Ex. 39 at 9; Wang Decl. Ex. 49 at 9.

119.     Windsor argued that the exchanged Change of Ownership Forms, coupled with the terms in the loan documents and communications between Houchins and the Trustees, were enough for Windsor to take full ownership of the Policies.  *See generally* Wang Decl. Exs. 39, 49.

120.     Windsor also argued that it had complied with the DSR and § 9-620.  *See generally* Wang Decl. Exs. 39, 49.

121.     In the motions, Successor Counsel did not assert the argument that the Trusts were not in default because the loans were not due.  *See generally* Wang Decl. Exs. 39, 49.

122.    In the motions, Successor Counsel did not assert the argument that the Trusts and Windsor entered an "oral walkaway" agreement whereby the Trusts transferred ownership of the Policies in exchange for a full release of any financial obligations under the loan documents. *See generally* Wang Decl. Exs. 39, 49.

123.    In the motions, Successor Counsel did not submit to the Court evidence of the fact that the Acker and Collins Insureds and Acker and Collins Trustees were mailed releases from Windsor shortly after the Trustees signed the Change of Ownership Forms. *See generally* Wang Decl. Exs. 39, 49.

124.    Prusky would later complain to Judd that he viewed the waiver of this issue as significant because Prusky believed the pre-default status of the loans should have been Windsor's "main argument." Wang Decl. Ex. 15 (PLAINTIFF 084552).

125.    In opposing Windsor's summary judgment motion, Joseph Wood, counsel for Acker and Collins, proffered the Bitter Arbitration Award, arguing that the Court should deny Windsor's arguments on the same basis as the Arbitration Panel. Wang Decl. Ex. 40 at 21-22; Wang Decl. Ex. 50 at 21-22.

126.    On September 21, 2015, the Court denied the portions of Windsor's summary judgment motions seeking the entire death benefit and granted the portion of the motions seeking repayment of the premiums, along with interest and reasonable expenses. Wang Decl. Exs. 42, 52; Wang Decl. Ex. 1, Compl., ¶¶ 98-100, 124-125.

127.    After ruling on Windsor's summary judgment motion, on September 29, 2015, the Court directed the Trusts to file for summary judgment. Wang Decl. Exs. 43, 53.

128.    The Court also denied requests to reopen discovery. Wang Decl. Exs. 43, 53.

129.    Following the Court's orders, the Acker and Collins Trustees moved for summary judgment, seeking an order declaring the Trusts the rightful owners of the relevant death benefits.  Wang Decl. Exs. 44, 54; Wang Decl. Ex. 1, Compl., ¶¶ 101, 126.

130.    When opposing the Trusts' summary judgment motions, Windsor asserted, for the first time, arguments related to the fact that the Acker and Collins Trustees signed the Change of Ownership Forms prior to the Maturity Date of the respective Loans.  Wang Decl. Ex. 45 at 2-9; Wang Decl. Ex. 55 at 2-9; Wang Decl. Ex. 47 at 9; Wang Decl. Ex. 57 at 9; *see infra* ¶¶ 135-138.

131.    Specifically, Windsor argued, for the first time, that the DSR and § 9-620 did not apply because the Trusts had not defaulted on the loans at the time the Change of Ownership Forms were signed.  Wang Decl. Ex. 45 at 13-20; Wang Decl. Ex. 55 at 13-20; Wang Decl. Ex. 47 at 10; Wang Decl. Ex. 57 at 10; *see infra* ¶¶ 135-138.

132.    Windsor argued, for the first time in a written submission, that there was a pre-default oral agreement preceding the signature of the Change of Ownership Forms.  Wang Decl. Ex. 45 at 2-20; Wang Decl. Ex. 55 at 2-20; Wang Decl. Ex. 47 at 9-10; Wang Decl. Ex. 57 at 9-10; *see infra* ¶¶ 135-138.

133.    Windsor submitted, for the first time, various testimony from Coppock that Windsor said would establish the fact that Windsor and the non-Bitter Trustees entered into an oral walkaway agreement.  Wang Decl. Ex. 45 at 6-8; Wang Decl. Ex. 55 at 6-8; Wang Decl. Ex. 47 at 9; Wang Decl. Ex. 57 at 9; *see infra* ¶¶ 135-138.

134.    Windsor submitted, for the first time, the releases Windsor mailed to the Acker and Collins Insureds and Trustees shortly after receiving the signed Change of Ownership Forms.  Wang Decl. Exs. 46, 56.

135.   At oral argument on the Trusts' summary judgment motions, the Court explained that Windsor did not appear to plead the pre-default oral walkaway theory, or even raise it prior to the second round of summary judgment briefing.  Wang Decl. Ex. 58 at 3-4.

136.   The Court noted during the oral argument that "[e]very argument in this case and every fact scenario in this case, up until the time that I made my initial ruling, was inconsistent with a walk-away agreement."  Wang Decl. Ex. 58 at 4:1-3.

137.   In ruling in favor of the Trusts, the Court held in its December 22, 2015 written order that the "dispositive problem with Windsor's reliance on this alleged oral walk-away agreement is that Windsor did not plead it."  Wang Decl. Ex. 47 at 7; Wang Decl. Ex. 57 at 7.

138.   The Court held that "Windsor's complete failure to plead the oral walk-away agreement it now rests its case on is fatal."  Wang Decl. Ex. 47 at 9; Wang Decl. Ex. 57 at 9.

139.   On December 23, 2015, Wood e-mailed Judd and Antonino with new settlement offers for the Acker and Collins matters "[i]n light of the Court's summary judgment orders…" Wang Decl. Ex. 23.

140.   Windsor settled the Acker Litigation on March 28, 2016.  Wang Decl. Ex. 37.

141.   Pursuant to the terms of the settlement, Windsor received $720,648.34 on the $1 million policy.  Wang Decl. Ex. 11, Rog Responses at 4.

142.   Windsor settled the Collins Litigation on April 15, 2016.  Wang Decl. Ex. 37.

143.   Pursuant to the terms of the settlement, Windsor received $788,835 on the $2 million policy.  Wang Decl. Ex. 36 (Exhibit D); *but see* Wang Decl. Ex. 11, Rog Responses at 4 (stating Collins settled for $816,334.54).

## THE COPPOCK AND STAMATOV LITIGATIONS

144.     Robert Coppock responded to Windsor's June 2014 letter on November 4, 2014, explaining he disagreed with Windsor's characterization of the Change of Ownership Form exchange and had contacted an attorney (who turned out to be Joseph Wood).  Wang Decl. Ex. 1, Compl., ¶ 151; Wang Decl. Ex. 26, Wood Tr. 267:21:18-269:22.

145.     Around this same time, on November 12, 2014, Larry Davidson, the Stamatov Trustee, rejected Windsor's June 2014 letter, explaining he had also consulted an attorney (also Joseph Wood).  Wang Decl. Ex. 1, Compl., ¶ 169; Wang Decl. Ex. 26, Wood Tr. 267:21:18-269:22.

146.     Through Successor Counsel, Windsor commenced two actions on January 7, 2015, against the Coppock and Stamatov Trusts and Trustees, seeking declaratory judgment that Windsor had an absolute right to ownership in the respective Policies (hereinafter, the "Coppock and Stamatov Litigations").  Wang Decl. Ex. 1, Compl., ¶¶ 152, 170.

147.     At some point in late 2015 or early 2016, Windsor notified Wood that Windsor would conduct a public sale of the Policies.  Wang Decl. Ex. 18, Judd Tr. 135:24-136:7, 175:24-178:6.

148.     In response, Wood agreed to settle if the Coppock and Stamatov Insureds each received $12,000 (despite the fact that Wood rejected a $40,000 offer to settle Stamatov in September 2015).  Wang Decl. Ex. 18, Judd Tr. 135:24-136:7, 175:24-178:6.

149.     At his deposition, Judd claimed that Windsor could not have conducted a public sale prior to that point in December 2015 because Houchins had threatened to purchase the Policies at the sale.  Wang Decl. Ex. 18, Judd Tr. 178:7-14.

150.     Windsor settled the Coppock Litigation on July 11, 2016. Wang Decl. Ex. 37.

151.    Pursuant to the terms of the settlement, Windsor paid Coppock $12,000 in exchange for the Coppock Trust relinquishing all claims to ownership of the Policy.  Wang Decl. Ex. 11, Rog Responses at 4.

152.    Windsor settled the Stamatov Litigation on March 29, 2016. Wang Decl. Ex. 37.

153.    Pursuant to the terms of the settlement, Windsor paid Stamatov $12,000 in exchange for the Stamatov Trust relinquishing all claims to ownership of the Policy.  Wang Decl. Ex. 11, Rog Responses at 5.

## WINDSOR FAILS TO PAY ARENT FOX'S LEGAL FEES

154.    Windsor has not paid Arent Fox for legal services on certain matters.  Rousseau Decl. ¶ 13; Wang Decl. Ex. 6 (Defendants' Counterclaims) at 26-31 (¶¶ 1-32); Wang Decl. Ex. 7 (Windsor's Answer to Counterclaims) ¶¶ 1-32.

155.    These matters included the following client-matter designations: General (032625.00000), Sheldon Hathaway Rescission (032625.00004), Windsor v. Lincoln (032625.00005), Barnes Litigation (032625.00006), and Bitter (032625.00007).  Rousseau Decl. ¶ 14, Exs. 5-10.

156.    For each matter, Arent Fox regularly submitted to Windsor invoices documenting the legal services.  Rousseau Decl. ¶ 15.

157.   The following is a chart of invoices (hereinafter, the "Outstanding Invoices") that

Arent Fox submitted to Windsor for payment:

| Invoice No. | Invoice Date | Amount | Matter |
|---|---|---|---|
| #1397256 | July 25, 2012 | $1,979.74 | General (032625.00000) |
| #1525667 | May 13, 2014 | $4,741.00 | General (032625.00000) |
| #1543030 | August 14, 2014 | $11,044.00 | General (032625.00000) |
| #1549683 | September 30, 2014 | $6,626.22 | General (032625.00000) |
| #1514192 | March 19, 2014 | $3,918.00 | Hathaway Rescission (032625.00004) |
| #1518932 | April 9, 2014 | $2,032.00 | Hathaway Rescission (032625.00004) |
| #1525668 | May 13, 2014 | $350.00 | Hathaway Rescission (032625.00004) |
| #1514193 | March 19, 2014 | $1,622.50 | Windsor v. Lincoln (032625.00005) |
| #1518933 | April 9, 2014 | $1,470.16 | Windsor v. Lincoln (032625.00005) |
| #1525669 | May 13, 2014 | $648.45 | Windsor v. Lincoln (032625.00005) |
| #1502746 | January 16, 2014 | $22,423.09 | Barnes Litigation (032625.00006) |
| #1507311 | February 10, 2014 | $137,684.30 | Barnes Litigation (032625.00006) |
| #1514194 | March 19, 2014 | $75,348.73 | Barnes Litigation (032625.00006) |
| #1518934 | April 9, 2014 | $24,704.61 | Barnes Litigation (032625.00006) |
| #1525670 | May 13, 2014 | $23,903.40 | Barnes Litigation (032625.00006) |
| #1534758 | June 26, 2014 | $23,437.84 | Barnes Litigation (032625.00006) |
| #1536684 | July 9, 2014 | $25,284.43 | Barnes Litigation (032625.00006) |
| #1543031 | August 12, 2014 | $5,706.34 | Barnes Litigation (032625.00006) |
| #1549684 | September 30, 2014 | $20,530.00 | Barnes Litigation (032625.00006) |
| #1514195 | March 19, 2014 | $13,567.84 | Bitter (032625.00007) |
| #1525671 | May 13, 2014 | $24,109.12 | Bitter (032625.00007) |
| #1534759 | June 26, 2014 | $5,795.31 | Bitter (032625.00007) |
| #1536685 | July 9, 2014 | $13,326.56 | Bitter (032625.00007) |
| #1543032 | August 19, 2014 | $20,751.55 | Bitter (032625.00007) |
| #1549685 | September 30, 2014 | $9,090.06 | Bitter (032625.00007) |

Rousseau Decl. ¶¶ 16-21; Rousseau Decl. Exs. 5-10.

158.   Windsor has not paid any of the Outstanding Invoices.  Rousseau Decl. ¶ 22.

159.   Windsor never objected to any of the work associated with the Outstanding

Invoices.  Rousseau Decl. ¶ 23.

160.   Windsor never rejected any of the Outstanding Invoices.  Rousseau Decl. ¶ 24.

161.    The matters Sheldon Hathaway Rescission (032625.00004) and Windsor v.

Lincoln (032625.00005) do not involve this current dispute.  Wang Decl. ¶ 13, Prusky Tr. 27:5-

7, 33:6-20; *see generally* Wang Decl. ¶ 1, Compl.

162.    The Outstanding Invoices total $480,095.25.  Rousseau Decl. ¶ 21, Ex. 10.

Dated: New York, New York                    Respectfully submitted,
      August 13, 2018

FOLEY & LARDNER LLP

By: _____
    Peter N. Wang (PW 9216)
    Douglas S. Heffer (DH 6082)
    Adam G. Pence (AP 8621)
    90 Park Avenue
    New York, New York 10016
    Tel: (212) 682-7474
    Fax: (212) 687-2329
    pwang@foley.com
    dheffer@foley.com
    apence@foley.com

    *Attorneys for Defendants*
    *Arent Fox, LLP and Julius Rousseau, III*