# EXHIBIT 3

EXHIBIT "C"

# LIFE INSURANCE PREMIUM FINANCING AGREEMENT

## AMONG

## WINDSOR SECURITIES LLC

## THE ERWIN A. COLLINS TAMILY INSURANCE TRUST- 2008

## AND

## ERWIN A. COLLINS

1612628 v01

LIFE INSURANCE PREMIUM FINANCING AGREEMENT

Table Of Contents

TRUST CONTRACT

Incorporation of Terms and Conditions
Designation of Terms and Conditions
Execution Page
Exhibit 1. Description of Policy and Instructions for Payment of Premiums Exhibit
2. Instructions for Payment of Structuring and Closing Fees
Exhibit 3. Specimen copy of Promissory Note

TERMS AND CONDITIONS

Article I. Loan, Interest and Payment Terms ................................................................................... 1
Article II. Conditions Precedent .................................................................................................... 2
Article III. Representations and Warranties of Trust and Insured ................................................. 3
Article IV. Representations and Warranties of Lender .................................................................. 7
Article V. Covenants of Trust and Insured .................................................................................... 8
Article VI. Events of Default ....................................................................................................... 10
Article VII. General Provisions .................................................................................................... 11
Article VIII. Defined Terms ......................................................................................................... 14

APPENDIX

A. Closing Package
B. Representation Required by Treasury Regulations Section 1.7872-15(d)(2)

1612628 v01

## LIFE INSURANCE PREMIUM FINANCING AGREEMENT

**LIFE INSURANCE PREMIUM FINANCING AGREEMENT,** dated as of $4/15$ , 2008, among **Windsor Securities LLC,** a Nevada LLC with a principal address as shown on the signature page hereto (the **"Lender"**), the Georgia trust (the **"Trust"**), and the Insured designated below (the **"Insured"**). The term "Agreement" shall refer to this document and any attachments, exhibits and appendixes plus the document "*Terms and Conditions for Life Insurance Premium Financing Agreement Among Windsor Securities LLC, The Erwin A. Collins Family Insurance Trust-2008, and Erwin A. Collins*" and any attachments, exhibits and appendixes.

      The Lender, the Trust and the Insured agree to the Lender's providing a loan to the Trust subject to the Terms and Conditions attached hereto, which are incorporated herein and made a part of this Agreement in their entirety. All capitalized terms used herein have the respective meanings specified in the Terms and Conditions attached hereto. The Policy is described in Exhibit 1 hereto.

| | |
|---|---|
| **Insured:** | **Erwin A. Collins, Tennessee** |
| | (Name and state of residence) |
| **Trust:** | **The Erwin A. Collins Family Insurance Trust-2008** |
| | (Name of Georgia Trust) |

| | |
|---|---|
| Principal Loan Amounts for | |
|   Payment of Insurance Premiums | $99,750 |
|   Structuring Fee | $0 |
|   Closing Fees: | $13,000 |
| **TOTAL LOAN AMOUNT** (as of Financing date): | $112,750 |

| | | |
|---|---|---|
| **Annual Interest Rate:** | Annual Interest Rate | 15.0% |

| | |
|---|---|
| **Pre-Payment Fee:** | 3.0% of the Financing Balance reduced by 1/27 of 3.0% of the Financing Balance for each month this Agreement remains effective. |

**Notices:**

    Trust:           The Erwin A. Collins Family Insurance Trust-2008
                           c/o Maria A. Gordillo, as Trustee
                           346 Crestview Circle
                           Roswell, GA 30075

    Insured:       Erwin A. Collins
                           311 Suburban Road
                           Knoxville, TN 37923

    Lender:       Windsor Securities LLC
                           c/o MFIP
                           25 East Athens Avenue
                           Ardmore, PA 19003

1612628 v01

This Agreement shall not become effective until it is executed below by the Insured, executed by the Trust through its Trustee as evidenced by his signature below, and accepted and executed by the Lender as evidenced by its signature below.

          **IN WITNESS WHEREOF,** the parties have executed this Agreement on the respective dates specified below with the effect from the date specified on the first page of this Agreement.

**WINDSOR SECURITIES LLC** By MFIP (Delaware, Inc.)

By: _____

    **Steven Prusky, President/Director, MFIP (Delaware)**

**The Erwin A. Collins Family Insurance Trust-2008**

By: _Maria Ana Gordillo_____

    Trustee Name: **Maria A. Gordillo**

Date: _April 15, 2008_____

Place of execution: _Atlanta, GA_____

- 4 -

## EXHIBIT 1

### Description of the Policy

| Insurer | Policy Issue Date | Policy Number | Annual Premium | Death Benefit |
|---------|-------------------|---------------|----------------|---------------|
| Pacific Life | March 4, 2008 | VF51701320 | $101,667 3rd year on | $2,000,000.00 |

### Instructions for Payment of Premiums:

Bank:            Bank of America, N.A.
ABA#:            121000248
Account name:    Pacific Life- Life
Account #:       4121486161
Amount of:       $99,750.00
FBO:             Policy #: VF51701320
                 Name: The Erwin A. Collins Family Insurance Trust-2008

1612628 v01

Case 16-cv-04651-SBB-GPG   Document 130   Filed 09/09/13   Page 87 of 133
Case 3:14-cv-04651-WHO   Document 81   Filed 11/10/15   Page 23 of 90
Document #1 of 19

## EXHIBIT 2
Instructions for Payment of Structuring and Closing Fees

**Structuring Fee:**                                                    $0

**Closing Fees:**                                                  **$13,000**
                                        To be paid according to the Financing Documents

1612628 v01

## EXHIBIT 3
<u>PROMISSORY NOTE</u>

$112,750.00                           <u>April     15</u>, 2008

   FOR VALUE RECEIVED, **The Erwin A. Collins Family Insurance Trust**, a Georgia trust ("**Borrower**"), hereby promises to pay to the order of **Windsor Securities LLC**, a Nevada LLC ("**Lender**"; Lender and any other person who becomes a holder of this promissory note being referred to hereinafter sometimes as the "**Holder**"), the sum of ONE HUNDRED TWELVE THOUSAND SEVEN HUNDRED FIFTY Dollars ($112,750.00), or greater amount should Lender, at its sole discretion, choose to make additional premium payments on the Policy, or other amount as the Lender may disburse, together with interest accrued thereon (at Lender's address or at such other place as Lender may designate to Borrower in writing), on the "**Maturity Date**" as provided in Section 3 hereof. Additional Premium Payments are currently estimated at approximately $25,417 (twenty five thousand four hundred seventeen dollars) per calendar quarter after the first 24 (twenty-four) months. This promissory note and any promissory note issued in substitution for this promissory note in accordance with the provisions hereof are referred to herein and elsewhere in the Financing Documents as the "**Note**." The unpaid principal amount outstanding under this Note from time to time shall accrue and bear interest at the simple rate of fifteen percent (15.0%) per annum. All payments made under this Note shall be made in lawful tender of the United States and shall be credited first to accrued and unpaid interest and the remainder to outstanding principal. Interest owed under this Note shall be calculated on the basis of actual days elapsed over a 360-day year. The principal and interest hereunder shall be paid in one installment, to be paid on the Maturity Date or as provided in Section 3 hereof. This Note has been executed and delivered pursuant to, and is the Note referenced in, the Life Insurance Premium Financing Agreement dated as of the date hereof between the Lender and the Borrower (the "**Financing Agreement**").

   1. <u>Defined Terms.</u> Unless defined in this Note, all capitalized terms used, but not defined, in this Note have the meanings ascribed to such terms in the Financing Agreement.

   2. <u>Use of Proceeds of Note</u>. The Borrower shall use the proceeds of this Note solely for purposes of paying the Financed Premiums to the Insurer and the Closing Fees to the parties designated in the Financing Agreement.

   3. <u>Maturity Date</u>. The Maturity Date is 820 days (approximately 27 months) from the date Lender disburses funds pursuant to the Financing Documents. It is estimated that the <u>Maturity Date is July 15, 2010</u>, although the exact date shall be dictated by the date of disbursement. The entire principal amount of this Note and all accrued but unpaid interest owed hereunder shall be due and payable by the Borrower on the earlier of (a) the Death Date, or (b) the Maturity Date.

   4. <u>Prepayment.</u>

    (a) At any time prior to the Maturity Date, on sixty (60) calendar days prior written notice to the Lender, the Borrower may prepay the Financing Balance in full, but not in part.

    (b) If an Event of Default occurs before the Maturity Date, the Borrower shall

- 7 -

immediately pay the Financing Balance pursuant to Section 6 hereof.

      5.    Collateral. This Note is secured by (a) the **"Pledged Collateral"** as defined in the Security Agreement and (b) the collateral assignment of the Policy given by Borrower to Lender pursuant to the Assignment of Life Insurance Policy as Collateral dated the date hereof.

      6.    Events of Default. Upon the occurrence of an Event of Default before the Maturity Date, the Financing Balance (as defined in the Financing Agreement) shall be immediately due and payable, all without notice, presentment, protest, demand, notice of dishonor or any other demand or notice whatsoever, all of which are hereby expressly waived by Borrower.

      7.    Miscellaneous.

      (a)   Waiver of Presentment. The Borrower hereby

        (i) waives demand, presentment of payment, notice of nonpayment, protest, notice of protest and all other notice, filing of suit, and diligence in collecting this Note;

        (ii) agrees to any substitution, addition, or release of any party or person primarily or secondarily liable hereon;

        (iii) agrees that the Lender shall not be required first to institute any suit, or to exhaust his remedies against the undersigned or any other person or party to become liable hereunder, or against any collateral in order to enforce payment of this Note; and

        (iv) consents to any extension, rearrangement, renewal, or postponement of time of payment of this Note and to any other indulgence with respect hereto without notice, consent, or consideration to the undersigned. No failure to accelerate the debt evidenced hereby by reason of an Event of Default hereunder, and no indulgence that may be granted from time to time, shall be construed either as a novation of this Note, or as a reinstatement of the indebtedness evidenced hereby or as a waiver of such right of acceleration or of the right of the Lender thereafter to insist upon strict compliance with the terms of this Note, or to prevent the exercise of such right of acceleration or any other right granted hereunder or by the laws of the State of California. No extension of the time for the payment of this Note shall operate to release, discharge, modify, change or affect the original liability of Borrower under this Note, either in whole or in part, unless the Lender agrees otherwise in writing.

      (b)    Limitation on Interest. Regardless of any provisions contained herein, the Lender shall never be deemed to have contracted for or be entitled to receive, collect or apply as interest on the Note, any amount in excess of the highest lawful rate, and, in the event Lender ever receives, collects or applies as interest any such excess, such amount which would be excessive interest shall be applied to the reduction of the unpaid principal balance of this Note, and, if the principal balance of this Note is paid in full, any remaining excess shall forthwith be paid to Borrower. In determining whether or not the interest paid or payable under any specific contingency exceeds the highest lawful rate, Borrower and Lender shall, to the maximum extent permitted under applicable law, (i) characterize any non-principal payment (other than payments which are expressly designated as interest payments hereunder) as an expense, fee, or premium,

      1612628 v01

rather than as interest, (ii) exclude voluntary prepayments and the effect thereof, and (iii) spread the total amount of interest throughout the entire contemplated term of this Note so that the interest rate is uniform throughout such term.

     (c)    Amendment. Any provision of this Note may be amended, waived or modified upon the written consent of Borrower and Lender.

     (d)    No Waiver; Remedies Cumulative. None of the rights or remedies of the Lender are to be deemed waived or affected by failure to delay to exercise the same. All remedies conferred upon the Lender by this Note or any other instrument or agreement, including without limitation the Financing Agreement shall be cumulative, no such remedy is exclusive, and such remedies may be exercised concurrently or consecutively at the Lender's option.

     (e)    Time of the Essence. Time is of the essence with respect to the obligations of the Borrower under this Note.

     (f)    Assignment. This Note may be assigned by Lender at any time given written notice of such assignment to Borrower. Borrower may not assign this Note.

     (g)    Notices. Any notice, request or other communication required or permitted hereunder shall be in writing and shall be deemed to have been duly given if personally delivered or if telegraphed or mailed by registered or certified mail, postage prepaid, at the respective addresses of the parties as set forth herein. Any party hereto may by notice so given change its address for future notice hereunder. Notice shall conclusively be deemed to have been given when personally delivered or when deposited in the mail or telegraphed in the manner set forth above and shall be deemed to have been received when delivered. Notice shall be made in writing as follows:

If to Borrower:          The Erwin A. Collins Family Insurance Trust-2008
                                c/o Maria A. Gordillo, as Trustee
                                346 Crestview Circle
                                Roswell, GA 30075
                                Telephone: 770-375-9266
                                Facsimile: n/a

If to Lender:           Windsor Securities LLC
                                  25 East Athens Avenue
                                  Ardmore, PA 19003
                                Attention: Steven Prusky
                                Telephone: 610-642-3100
                                Facsimile: 610-642-9709

     (h)    Governing Law and Consent to Jurisdiction. This Agreement shall be governed by and construed under the laws of the State of California (without regard to conflict of laws principles that could or would cause the application of any other laws), all rights and remedies being governed by said laws. All parties hereto agree that any claim arising out of or relating to this Agreement shall be (i) brought in the Superior Court of Sonoma County, California, or (ii) brought in or removed to the United States District Court for the Northern District of California. Each of the parties consents to the personal jurisdiction of the courts

- 9 -

Case 3:16-cv-01058-GBG-CBC Document 1-30 Filed 02/09/16 Page 12 of 133
Case 3:14-cv-04651-WHO   Document 81   Filed 11/10/15   Page 27 of 90
Document #1 of 19

identified above and waives (i) any objection to jurisdiction or venue, or (ii) any defense claiming lack of jurisdiction or improper venue, in any action brought in such courts.

       (i)    <u>Binding Effect</u>. This Note shall be binding upon and inure to the benefit of the Borrower's and Lender's respective heirs administrators, successors and permitted assigns.

       (j)    <u>Severability.</u> The provisions of this promissory note shall be severable. If any provision hereof is held to be invalid, void or otherwise unenforceable, the remaining provisions shall remain in full force and effect to the fullest extent permitted by law.

       IN WITNESS WHEREOF, the Borrower has executed and delivered this Note as of the date set forth above.

**BORROWER:**

The Erwin A. Collins Family Insurance Trust-2008

By: _Maria Ana Gordillo_

Name: Maria A. Gordillo, Trustee

Date: _April 15, 2008_

Place of execution: _Atlanta, GA_

Tax Identification number Redacted

- 10 -

1612628 v01

## TERMS AND CONDITIONS FOR LIFE INSURANCE PREMIUM FINANCING AGREEMENT AMONG WINDSOR SECURITIES LLC, THE ERWIN A. COLLINS FAMILY INSURANCE TRUST-2008, AND ERWIN A. COLLINS

By entering into this Life Insurance Premium Financing Agreement, the Trust has requested that the Lender make a loan to the Trust in the principal amount designated as the Loan Amount in the Trust Contract (the "**Loan**") for the sole purpose of paying the Financed Premiums for the Policy and the other amounts shown in the calculation of the Loan Amount in the Trust Contract. To secure the obligations of the Trust for the Loan and otherwise under this Agreement, the Trust is granting the Lender a collateral assignment and pledge of the Policy and all the proceeds thereof, and the Trust, as beneficiary of the Policy, is pledging its beneficiary interest in the Policy. All capitalized terms used herein without definition shall have the respective meanings assigned to such terms in Article VIII.

This Agreement shall be effective on the date hereof except for Section 1.01 hereof. If the Lender, in its sole discretion, elects to advance the Financed Premiums, the date on which the Loan has occurred shall be the "Financing Date," and the entire Section 1.01 hereof shall become effective on the Financing Date.

## ARTICLE I.
## LOAN, INTEREST AND PAYMENT TERMS

SECTION 1.01. Loan. (a) Except as otherwise provided below, the Lender shall make to the Trust, either directly or through payment to parties (such as the insurance company issuing the policy) on behalf of the Trust, and the Trust shall so borrow from the Lender, the Loan Amount for the sole purpose of funding the payment of the Financed Premiums, Structuring Fee and Closing Fees.

(b) The Structuring Fee and Closing Fees are fully earned at Closing and no amount of such fees is refundable in the event of pre-payment.

(c) The Lender shall disburse the Loan, on behalf of the Trust, as follows: (i) the amount set forth as the Financed Premiums on the first page of the Trust Contract shall be disbursed directly to parties as set forth in Exhibit 1 of the Trust Contract, (ii) the Structuring Fee and Closing Fees shall be disbursed as set forth in Exhibit 2.

SECTION 1.02. Interest. Interest shall accrue on the Loan Amount outstanding hereunder from time to time as provided in the Note. On any date, the Loan Amount, plus the aggregate amount of accrued and unpaid interest owed thereon shall be defined as the "Financing Balance" as of such date.

Notwithstanding anything to the contrary herein or elsewhere, if at any time the rate of interest payable hereunder or under any Note or other Financing Document (the "**Stated Rate**") would exceed the highest rate of interest permitted under any applicable law to be charged (the "**Maximum Lawful Rate**"), then for so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable shall be equal to the Maximum Lawful Rate; provided, that if at any time thereafter the Stated Rate is less than the Maximum Lawful Rate, borrower shall, to the extent permitted by law, continue to pay interest at the Maximum Lawful Rate until such time as the total interest received is equal to the total interest which would have been received had the Stated Rate

1

been (but for the operation of this provision) the interest rate payable.

Thereafter, the interest rate payable shall be the Stated Rate unless and until the Stated Rate again would exceed the Maximum Lawful Rate, in which event this provision shall again apply.

SECTION 1.03. <u>Payment of Loan at Maturity, Early Maturity and Prepayment.</u>

(a) Payment of the Loan shall be as provided in the Note.

(b) In the event the Trust receives the Death Benefit for the Policy from the Insurer, no later than the next Business Day after the Trust receives the Death Benefit, the Trust shall pay to the Lender the Financing Balance.

(c) At any time prior to the Maturity Date, on sixty (60) calendar days prior written notice to the Lender, the Trust may prepay the Loan Amount only in full but not in part. The prepayment amount shall be the Financing Balance outstanding as of the day of receipt of such prepayment by Lender.

SECTION 1.04. <u>Note.</u> The Loan shall be evidenced by the Note executed and delivered by the Trust to the Lender as part of the Closing Package.

SECTION 1.05. <u>Certain Tax Matters.</u> For all United States federal tax purposes, it is the intent of the parties to this Agreement and all of their affiliates and beneficial owners, including the Insured, that (1) this Agreement be treated as a "split-dollar life insurance arrangement" under Treasury Regulations Section 1.61-22(b)(1), and (2) all payments made by or on behalf of the Lender to the Trust pursuant to this Agreement shall be treated as "split-dollar" loans pursuant to Treasury Regulations Section 1.7872-15(a)(2) in which the Lender is treated as the lender and the Trust is treated as the borrower. The parties to this Agreement and their affiliates and beneficial owners, including the Insured, agree not to take any position for United States federal tax purposes that is inconsistent with this intent unless required to do so by law. Pursuant to Treasury Regulations Section 1.7872-15(d)(2), the parties to this Agreement hereby represent that a reasonable person would expect that the Death Benefit will equal or exceed the Financing Balance, and the Lender, the Trust and the Insured shall make the representation in the manner required by Treasury Regulations Section 1.7872-15(d)(2)(ii) in the form attached hereto as <u>Appendix B</u> to this Agreement.

SECTION 1.06. <u>Pledge of Trust Beneficial Interests.</u> As a material inducement to the Lender to make the Loan to the Trust and enter into this Agreement, the trust beneficiary shall execute and deliver to the Lender the Security Agreement.

## ARTICLE II.
## CONDITIONS PRECEDENT

SECTION 2.01. <u>Financing Date Conditions.</u> The obligation of the Lender under Section 1.01 to make the Loan for the Loan Amount shall be contingent upon each of the following conditions having been satisfied or waived by the Lender:

a) As of the Financing Date, all the representations and warranties of the Trust and the

1612628 v01

Insured in this Agreement and the other Financing Documents shall be accurate and complete in all material respects as if made on such date; and

b) Execution and delivery by the Trust and/or the Insured, as applicable, of all the documents included in the Closing Package.

SECTION 2.02. Termination. If the Trust does not deliver a complete Closing Package to the Lender within thirty (30) calendar days after the date of this Agreement, then the Lender shall have the option, in its discretion, to terminate this Agreement, in which event it shall be of no further force or effect and the Lender shall not have any further obligations to the Trust or the Insured under this Agreement, and the Lender shall have no duty or obligation to cause the Financing Date to occur.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES OF TRUST AND INSURED

SECTION 3.01. Trust. The Trust represents and warrants to the Lender, as of the date hereof and the Financing Date, as follows:

(a) Organization. The Trust is duly organized and validly existing under the laws of the State of Georgia, is authorized to do business in the State of Georgia, and has all necessary right, title, power and authority to enter into this Agreement and the other Financing Documents to which the Trust is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by the Trust of this Agreement and the other Financing Documents to which the Trust is a party, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all required action, corporate or otherwise, on the part of the Trust.

A true and correct copy of the Trust Agreement, including all amendments, supplements and other modifications thereto, has been previously delivered by the Trust to the Lender, and the Trust Agreement is a legal, valid and binding agreement, enforceable in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law). There are no existing options, warrants, calls or commitments of any character whatsoever relating to the Trust or its assets; other than the Trust Agreement as such may be amended and this Agreement.

(b) Execution. This Agreement has been, and as of the Financing Date the other Financing Documents to which the Trust is a party have been, duly executed and delivered by the Trust, and this Agreement and such other Financing Documents constitute or as of the Financing Date will constitute legal, valid and binding obligations of the Trust, enforceable against the Trust in accordance with their terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and to equitable principles of general application, regardless of whether such principles are considered in a proceeding in equity or at law).

(c) No Conflict. The execution and performance by the Trust of this Agreement and the other Financing Documents to which it is a party do not and will not (1) violate, conflict with or result in the breach of any provision of its constitutive documents, (2) conflict with or cause a

- 3 -

1612628 v01

Case 3:16-cv-01558-JD Document 1-30 Filed 02/09/23 Page 16 of 133
Case 3:14-cv-04651-WHO   Document 81   Filed 11/10/15   Page 31 of 90

Document #1 of 19

violation by the Trust of any Law or Governmental Order applicable to it or to any of its assets, properties or business or (3) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment or acceleration pursuant to any Contract to which the Trust is a party.

(d) Consents. No authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority is required to be obtained by the Trust that has not been obtained or is not in full force and effect; and no registration, declaration, or filing with any Governmental Authority is required to be given or made by the Trust to or with any Governmental Authority that has not been given or made or the applicable waiting period for which has not expired or terminated, each in connection with the execution and delivery of this Agreement and the other Financing Documents and the consummation of the transactions contemplated hereby and thereby.

(e) No Event of Default; Compliance and Litigation. No Event of Default, or event which with notice or passage of time would become an Event of Default, has occurred and is continuing. The Trust is not in violation of any Law or Governmental Order applicable to it or any of its properties or assets. No judicial, administrative or arbitral proceeding is pending or, to the best knowledge of the Trust, threatened against the Trust.

(f) Policy.
(i) The Trust has full, complete and absolute title to and ownership of, and is the sole and duly designated beneficiary under, the Policy and all rights thereunder free and clear of any Encumbrances, options, purchase rights or commitments of any kind except as otherwise contemplated by the Financing Documents. Under the terms of the Policy, the Trust has the sole and absolute right to (1) change the beneficiary of the Policy, (2) elect settlement options available under the Policy, (3) assign, transfer, sell or surrender the Policy, (4) borrow against the Policy, (5) pledge or assign the Policy as collateral, (6) apply for and maintain waiver of premium or conversion of the Policy, (7) exercise any right regarding nonforfeiture, amendment or voting, (8) be notified about any and all matters relating to the Policy as to which the owner and beneficiary thereof should be notified, and (9) receive all proceeds and other amounts now or in the future due and payable under the Policy, including all death benefits, surrender value, dividends, options, benefits or advantages claimed from the Policy. On the Financing Date, no Person other than the Trust will have any interest in or claim to the Policy other than as expressly provided in this Agreement. On the date the Policy was issued, the Trust and each beneficiary of the Trust had an insurable interest in the life of the Insured under applicable law.

(ii) The Policy is in full force and effect and constitutes the legal, valid and binding obligation of the Insurer, enforceable in accordance with its terms, subject to the terms of the collateral assignment of the Policy given by the Trust to the Lender.

(iii) The copies of the Policy, financial information, policy information, premium schedules, in-force illustrations and the other documentation included in the Closing Package are true and correct copies of the Policy and such other documentation, and no amendments or other modifications have been made to any of the foregoing that are not included in the Closing Package, nor is the Trust aware of any material documentation in connection with the negotiation, purchase and administration of the Policy a copy of

1612628 v01

which is not included in the Closing Package.

(iv) All of the material information provided by the Trust or which the Trust caused to be provided by any Person to the Lender (or its agent(s)) or any insurer, reinsurer, insurance agent or medical underwriters in connection with the issuance of the Policy, this Agreement or any other Financing Document, is complete and accurate in all material respects as of the date when delivered, including the information contained in the Closing Package.

(v) Other than this Agreement, the Policy and the other agreements in the Closing Package to which it is a party, the Trust is not a party to any Contract, has not engaged in any business or activity and has no liabilities or obligations. The copies of the Trust Agreement included in the Closing Package are true and correct copies, and no amendments or other modifications have been made thereto that are not included in the Closing Package.

(g) Independent Decision. The Trust has consulted with and received advice from attorneys, accountants and tax or other financial advisors of his or her choosing, has considered other options for financing the Policy, and has satisfied himself or herself that entering into this Agreement and the other Financing Documents and consummating the transactions contemplated by this Agreement and the other Financing Documents is in the best interest of the Trust. The Trust acknowledges that it has had this Agreement and the other Financing Documents for an amount of time sufficient to thoroughly analyze, discuss and receive advice from any professionals or anyone else of its choosing.

(h) No Competency Proceedings. Neither the Insured nor the Trustee is now, nor has ever been, the subject of any mental health or mental competency proceedings or any other proceedings or hearings with respect to which that party's competency or capacity to contract is or was an issue, nor is any such proceeding, hearing, appointment or service pending, threatened or contemplated.

(i) No Illness. To the Trustee's knowledge, the Insured does not have a catastrophic, chronic, life-threatening or terminal illness or condition.

(j) Purpose of Loan. The purpose of this Loan is for estate planning purposes and is not entered into with the intent to effect a life settlement transaction.

(k) Net Worth. To the Trustee's knowledge, the application for insurance and all financial information relative to the Insured provided in, or with, such application is true, accurate and correct in all material respects as of the date of this Agreement and the Financing Date.

SECTION 3.02. Insured. The Insured hereby represents and warrants to the Lender, as of the date hereof and the Financing Date, as follows:

(a) Residence. The Insured is an individual residing in the state designated by the Insured in the Trust Contract.

(b) Execution. This Agreement and the other Financing Documents to which the Insured is a party have been duly executed and delivered by the Insured and the Trust, and this Agreement and such other Financing Documents constitute legal, valid and binding obligations of the Insured and the Trust, enforceable against the Insured and the Trust in accordance with the documents' terms (subject to Section 7.13 below and applicable bankruptcy, reorganization,

1612628 v01

insolvency, moratorium or similar laws affecting creditors' rights generally and to equitable principles of general application regardless of whether such principles are considered in a proceeding in equity or at law).

      (c) No Conflict. The execution, delivery and performance by the Insured of this Agreement and the other Financing Documents to which it is a party do not and will not (1) to the knowledge of the Insured, conflict with or cause a violation by the Insured of (A) any Law or Governmental Order of the Insured's state of residence applicable to the Insured or to any of the Insured's assets, properties or business or (B) to the knowledge of the Insured, any other Law or Governmental Order applicable to the Insured or to any of the Insured's assets, properties or business or (2) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment or acceleration pursuant to any Contract to which the Insured is a party.

      (d) Consents. No authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority is required to be obtained by the Insured that has not been obtained or is not in full force and effect, and no registration, declaration, or filing with any Governmental Authority is required to be given or made by the Insured to or with, any Governmental Authority that has not been given or made or the applicable waiting period for which has not expired or terminated, each in connection with the execution and delivery of this Agreement and the other Financing Documents and the consummation of the transactions contemplated hereby and thereby.

      (e) No Event of Default. No Event of Default described in Section 6.01 or event which with notice or passage of time would become such an Event of Default, has occurred and is continuing.

      (f) Policy. The Insured does not have any knowledge that any representation made by the Trust is false or misleading. The Trust does not have any knowledge that any representation made by the insured is false or misleading. All of the material information provided by the Insured or which the Insured caused to be provided by any Person to the Lender (or its agent(s)) or any insurer, reinsurer, insurance agent or medical underwriters in connection with the issuance of the Policy, this Agreement or any other Financing Document is complete and accurate in all material respects as of the date when delivered, including the information contained in the Closing Package.

      (g) Independent Decision. The Insured and Trustee each has read, understands, and has signed or caused to be signed by the appropriate Persons (other than the Lender) each document in the Closing Package. The Insured and Trustee each has sought and obtained his or her own tax, accounting, financial and legal advice with respect to this Agreement and any obligations that the Insured and/or trustee will incur or undertake thereunder, and is relying solely upon his or her own tax, accounting, financial, legal and other advisers in his or her decision to enter into this Agreement and any related transactions. The Insured and Trustee each has considered other alternatives for financing the Policy, and has satisfied himself or herself that entering into this Agreement and the other Financing Documents and consummating the transactions contemplated by this Agreement and the other Financing Documents is in his or her and the Trust's best interest. The Insured and Trustee each acknowledges that he or she has had this Agreement and the other Financing Documents for an amount of time sufficient to thoroughly analyze, discuss and receive advice from any professionals or anyone else of his or her choosing.

(h) <u>No Competency Proceedings.</u> Neither the Insured nor the Trustee is now, nor has ever been, the subject of any mental health or mental competency proceedings or any other proceedings or hearings with respect to which that party's competency or capacity to contract is or was an issue, nor is any such proceeding, hearing, appointment or service pending, threatened or contemplated.

(i) <u>No Illness.</u> To the Insured's knowledge, the Insured does not have a catastrophic or life-threatening illness or condition.

(j) <u>Purpose of Loan.</u> The purpose of this Loan is for estate planning purposes and is not entered into with the intent to effect a life settlement transaction.

(k) <u>Net Worth.</u> The application for insurance and all financial information provided in, or with, such application is true, accurate and correct in all material respects as of the date of this Agreement and the Financing Date.

(l) <u>Accredited Investor.</u> The Insured and the Trust each is an "accredited investor" pursuant to Rule 501(a) or Rule 144A promulgated under the Federal Securities Act of 1933 and by reason of his/her business and financial experience, has such knowledge, sophistication and experience in business and financial matters as to be capable of evaluating the merits and risks of the transactions contemplated by this Agreement and is able to bear any economic risk of such transactions. Furthermore, the Insured is a natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,500,000.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF LENDER

The Lender hereby represents and warrants to the Trust and the Insured, as of the date hereof and the Financing Date, as follows:

SECTION 4.01. <u>Lender.</u> The Lender is a Nevada LLC which is duly organized, validly existing and in good standing under the laws of the State of Nevada. It has all necessary power and authority to enter into this Agreement and any Financing Document to which it is a party, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by the Lender of this Agreement and any Financing Document to which it is a party, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all required action on the part of the Lender.

SECTION 4.02. <u>Execution.</u> This Agreement and any Financing Document to which the Lender is a party have been duly executed and delivered by the Lender, and (assuming due authorization, execution and delivery by the other parties thereto) this Agreement and such Financing Documents constitute legal, valid and binding obligations of the Lender, enforceable against the Lender in accordance with their terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application, regardless of whether enforcement is sought in a proceeding in equity or at law).

1612628 v01

SECTION 4.03. No Conflict. The execution, delivery and performance of this Agreement and any Financing Document to which it is a party by the Lender do not and will not (1) violate, conflict with or result in the breach of any provision of its constitutive documents, (2) conflict with or violate any Law or Governmental Order applicable to it or to any of its respective assets, properties or businesses or (3) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of any Contract to which the Lender is a party.

SECTION 4.04. Consents. No authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority is required to be obtained by the Lender that has not been obtained or is not in full force and effect, and no registration, declaration, or filing with any Governmental Authority, domestic or foreign, is required to be given or made by the Lender, or any of its affiliates to, or to be made by the Lender, or any of its affiliates with, any Governmental Authority that has not been given or made or the applicable waiting period for which has not expired or terminated, each in connection with the execution and delivery of this Agreement and the other Financing Documents and the consummation of the transactions contemplated hereby and thereby.

### ARTICLE V.
### COVENANTS OF TRUST AND INSURED

SECTION 5.01. Covenants of Trust. From and after the Financing Date and for so long as any amounts remain owing by the Trust to the Lender under this Agreement, the Trust hereby covenants and agrees as follows:

(a) The Trust shall take such further action and/or execute and deliver all further assurances, documents and/or instruments as may be reasonably requested by the Lender in order to (i) effect and protect the collateral assignment of the Policy to the Lender and its assigns, (ii) immediately notify the Lender upon having knowledge of the Insured's death, (iii) provide from time to time to the Lender assurance from the Insurer that the Policy remains in effect, that no collateral assignment or other impairment has been submitted to the Insurer with respect to the Policy, (other than an instrument reflecting the Lender's interest in the Policy which was submitted by or with the consent of the Lender) and that the Trust is the owner of the Policy, (iv) effect, administer or enforce the transactions contemplated by this Agreement and the other Financing Documents to which the Trust is a party, (v) execute any documents requested by the Lender to submit to the Insurer for payment of the Death Benefit, and (vi) authorize the provision and/or delivery of medical, financial, personal and other information and documentation about the Insured to the Lender, any affiliate of the Lender, any of their assigns, or any Insurer from any physician, hospital, medical provider, insurance company or other Person with respect to the Insured.

(b) The Trust agrees to notify the Lender in writing of any change of the Trust's address, telephone number or other contact information or the appointment of a new Trustee at least thirty (30) days prior to such change. The Trust acknowledges that the Lender will be verifying the Trust's and the Insured's current addresses, contact information and other relevant information by sending the Trust correspondence with a prepaid return response from time to time. The Trust covenants and agrees that it shall accurately complete and manually execute each such response and return the same to the Lender and/or its designees in a timely manner.

1612628 v01

(c) If the Trust receives proceeds derived or to be derived from the Policy other than from the Lender, the Trust shall (1) hold all such proceeds for the sole and exclusive benefit of the Lender and its assigns, (2) immediately notify the Lender of such receipt by the Trust, (3) immediately transfer, convey and pay over to the Lender such portion of the proceeds as is equal to the amount(s) then due and owing by the Trust to the Lender, and (4) take any and all actions reasonably requested by the Lender, in order to change the payment instructions with respect to the Policy such that proceeds therefrom are payable directly to the Lender or any person designated in writing by the Lender.

(d) The Trust shall remain duly organized, validly existing and in good standing under the law of the State of Georgia, and shall not change its form of organization, breach the terms of the Trust Agreement, remove, replace or otherwise change the Trustee or name an additional Trustee of the Trust, or permit an Encumbrance to the Policy or the other Trust Assets (except as contemplated by this Agreement) without the Trust's receipt of the prior written consent of the Lender. Should any material changes take place concerning the Trust or the trustee that could not be anticipated, Lender shall be immediately informed of such changes as soon as is practicable.

(e) The Trustee shall not take any of the actions set forth in Section VI of the Trust Agreement without the prior written consent of the Lender, which consent may be withheld by the Lender in its sole discretion.

SECTION 5.02. Covenants of Insured. For so long as any amounts remain owing by the Trust to the Lender under this Agreement, the Insured hereby covenants and agrees as follows:

(a) Subject to the Lender complying with its obligations under Section 7.01, the Insured shall take such further action and/or execute and deliver all further assurances, documents and/or instruments as may be reasonably requested by the Lender to effectuate the purpose of this Agreement and the other Financing Documents, including to authorize the provision and/or delivery of (i) medical information and documentation about the Insured and (ii) during the twenty-four (24) month contestability period for the Policy, financial, personal and other information and documentation with respect to the Insured, to the Lender, any affiliate of the Lender, any of their assigns, or any Insurer from any physician, hospital, medical provider, insurance company or other Person.

(b) The Insured and Trustee each agrees to notify the Lender in writing of any change of his or her and the Trust's address, telephone number or other contact information thirty (30) days prior to such change.

(c) The Insured and Trustee each understands that the Lender will be verifying his or her current address, contact information and other relevant information by sending the Insured correspondence with a prepaid return response from time to time. The Insured and Trustee each covenants and agrees that he or she shall accurately complete and manually execute each such response and return the same to the Lender and/or its designees in a timely manner.

### ARTICLE VI.
### EVENTS OF DEFAULT

SECTION 6.01. Events of Default. The occurrence at any time of any of the following events constitutes an "Event of Default":

1612628 v01

Case 3:16-cv-01058-RS-GPC Document 1-30 Filed 02/29/16 PageID.27 Page 22 of 133
Case 3:14-cv-04651-WHO Document 81 Filed 11/10/15 Page 37 of 90

Document #1 of 19

a) Failure by the Trust or the Insured to perform any of its obligations under this Agreement or any Financing Document to which either the Trust or the Insured is a party if, except with respect to defaults under Sections 6.01(2) and (3) below; provided that if such failure is susceptible to remedy, it shall not constitute an Event of Default unless such failure is not remedied on or prior to the thirtieth (30th) calendar day after written notice of such failure is given to the Trust and the Insured by the Lender;

b) Failure by the Trust to pay any amount within two (2) days when due under this Agreement or any Financing Document;

c) Failure by the Trust to comply with any of its covenants under Sections 5.01(d) or 5.01(e);

d) Any representation or warranty made by the Trust or the Insured under this Agreement or any Financing Document to which either is a party is incorrect or misleading in any material respect when made or deemed to be made;

e) The Trust is terminated, dissolved or liquidated, is unable to pay its debts as they mature, makes an assignment for the benefit of creditors, is adjudicated a bankrupt or insolvent, seeks appointment of, or is subject of an order appointing, a trustee, conservator, liquidator or receiver as to all or part of its assets, commences, approves or consents to, or is the debtor in, any case or proceeding under any bankruptcy, reorganization or similar law and, in the case of an involuntary case or proceeding, such case or proceeding is not dismissed thirty (30) days following its commencement, or is the subject of an order for relief in an involuntary case under federal bankruptcy law;

f) The Insured commits suicide, as determined by the Insurer, or the Insurer contests the Policy, exercises its contestability rights under the Policy or otherwise rescinds or attempts to rescind the issuance of the Policy, within the two (2) year period following the date of issuance of the Policy.

SECTION 6.02. Remedies. If any Event of Default shall occur and be continuing, then automatically in the case of an Event of Default described in clause (5) of Section 6.01 or otherwise at the election of the Lender, the Financing Balance shall become due and payable, without presentment, demand, protest or any notice of any kind, all of which are expressly waived by the Insured and the Trust (the "Default Maturity"). Upon the occurrence and during the continuance of an Event of Default, in addition to any other rights under this Agreement and any other Financing Documents or otherwise available at law or in equity, the Lender and its assigns shall have all the rights and remedies of a secured party on default under the law of the State of California and other applicable law to enforce the assignments and security interests contained in the Financing Documents, including the right, subject to compliance with any mandatory requirements under applicable law, to sell or apply any rights and other interests assigned or pledged in the Financing Documents at public or private sale. The rights and remedies of Lender with respect to the Insured are subject to the terms of `Section 7.13 below.

## ARTICLE VII.
## GENERAL PROVISIONS

SECTION 7.01. Expenses. Except as otherwise specified in this Agreement, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses unless, at any time after the Financing

1612628 v01

Date, the Lender elects in its sole discretion to pay the costs and expenses of any other party hereto, *provided, however,* that any party that is in default in the performance or observance of its duties and obligations hereunder shall indemnify the other party hereto for the reasonable costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred by such other party in enforcing this Agreement against such defaulting party. This Section 7.01 shall survive the payments of all other amounts due hereunder.

SECTION 7.02. Confidentiality. (a) The Lender agrees (i) not to use or disclose Consumer Information except as necessary, in the opinion of the Lender, to secure funding for its obligations under this Agreement or the other Financing Documents or to effect, administer or enforce the transactions contemplated by this Agreement, the other Financing Documents, and any other agreements entered into in connection therewith, including, without limitation, the sale or exercise of rights under the Policy, and (ii) to keep Consumer Information confidential and limit access to such information to those Persons who, in the Lender's reasonable discretion, require access to such information to effect, administer or enforce the transactions contemplated by this Agreement, the other Financing Documents and any other agreements entered into in connection therewith, including, without limitation, the sale or the exercise of rights under the Policy.

(b) Each of the Trust and the Insured agrees not to use or disclose any Financing Documents or any information or data related thereto except to its counsel, financial advisors, internal and external auditors and accountants advising the Trust or the Insured with respect to the transaction contemplated thereby or to the members of the Trust or family members of the Insured, in each case, provided that the third party agrees not to use or disclose such documents, information or data, except on the same terms and subject to the same limitations.

(c) Nothing in this Section 7.02 shall prohibit disclosure of information that is required by any Law or regulation, or in response to legal process or to the extent that it may otherwise have become publicly available without the fault of the person proposing to disclose. In addition, notwithstanding anything herein to the contrary, in accordance with section 1.60114(b)(3)(iii) of the United States Treasury Regulations, the parties (and each employee, representative, or other agent of any party) may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) that are provided to the parties relating to such tax treatment and tax structure.

SECTION 7.03. Survival of Representations and Warranties. The representations and warranties of the Trust, the Trustee and the Insured contained in Article III hereof, and the representations and warranties of the Lender contained in Article IV, shall survive the Financing Date.

SECTION 7.04. Notices. All notices, requests, claims, demands and other communications required or permitted to be given hereunder shall be in writing, shall be given to the Trust, Insured and the Lender and shall be delivered by hand or telecopied or sent by reputable overnight courier service and shall be deemed given when so delivered by hand or telecopied (with proof of transmission), or one (1) Business Day after being sent by reputable overnight domestic courier service and five (5) Business Days after being sent by reputable overnight international courier service. All such notices, requests, claims, demands and other communications shall be addressed as set forth in the Trust, or pursuant to such other instructions as may be designated in writing to the other party in accordance with this Section 7.04.

SECTION 7.05. Severability. The provisions of this Agreement shall be severable. If any

provision hereof is held to be invalid, void or otherwise unenforceable, the remaining provisions shall remain in full force and effect to the fullest extent permitted by law.

SECTION 7.06. <u>Entire Agreement.</u> This Agreement and the other Financing Documents to which the Insured or Trust are parties constitute the entire agreement of the parties hereto with respect to the subject matter hereof and supersede all prior agreements and undertakings, both written and oral, among the Lender, the Trust and the Insured with respect to the subject matter hereof.

SECTION 7.07. <u>Assignment.</u> The Trust and the Insured may not assign this Agreement, or any of their rights, duties or obligations hereunder, without their receipt of the prior written consent of the Lender. The Lender may assign or pledge its rights and obligations under this Agreement and the other Financing Documents to any Person from time to time in its sole discretion; provided that the Lender shall remain liable to the Insured and the Trust for all of its obligations under Sections 1.05, 7.01, 7.02 and 7.11 of the Terms and Conditions.

SECTION 7.08. <u>Third Party Beneficiaries.</u> Except as otherwise expressly provided herein to the contrary, this Agreement shall be binding upon and inure solely to the benefit of the parties hereto, and their permitted assigns, and nothing herein is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

SECTION 7.09. <u>Execution in Counterparts.</u> This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile shall be effective as delivery of an original executed counterpart of this Agreement.

SECTION 7.10. <u>Amendments.</u> No amendment, waiver, modification or supplement of any provision of this Agreement shall in any event be effective unless the same shall be in writing and signed by the Lender and the Trust, provided that no amendment, waiver, modification or supplement of any provision of this Agreement that affects the rights or obligations of the Insured hereunder shall in any event be effective until approved in writing by the Insured and then any such amendment, waiver, modification, supplement or consent shall be effective only in the specific instance and for the specific purpose for which given.

SECTION 7.11. <u>Dispute Resolution.</u>

(a) The Lender, the Trust and the Insured agree that all controversies or disputes arising out of or in connection with this Agreement ("**Disputes**") shall be resolved pursuant to this Section 7.11.

(b) All Disputes shall in the first instance be discussed amicably between the parties with a view to resolving such Dispute, commencing upon one party giving other parties written notice of such Dispute. In the event that such Dispute is not resolved within thirty (30) days after such notice (or such longer period as the parties may agree in writing with respect to any such Dispute), any party may submit such Dispute to be finally settled by arbitration administered under the Rules by a panel of three arbitrators sitting in San Francisco, California. One arbitrator shall be nominated by the party initiating arbitration at the time of the filing of its demand for arbitration, the second arbitrator shall be nominated by the opposing party(ies) at the time of the filing of its

1612628 v01

answering statement, and the third arbitrator (who shall act as chairman) shall be jointly nominated by party-nominated arbitrators if they are able to agree. If the first two party nominated arbitrators are unable to agree upon a third within thirty (30) days after the nomination of the second, or if either party fails to nominate an arbitrator as set forth herein, an arbitrator shall be appointed pursuant to the Rules. The award of the arbitrators shall be final and binding upon the parties, and shall not be subject to any appeal or review. The parties agree that such award may be recognized and enforced in any court of competent jurisdiction. The parties agree to submit to the personal jurisdiction of the federal and state courts sitting in Sonoma County, California, for the sole purpose of enforcing this Agreement (including, where appropriate, issuing injunctive relief), the agreement to arbitrate contained herein and any award resulting from arbitration pursuant to this Section 7.11 and, to the fullest extent permitted by law, waive any objection which they may have at any time to the laying of venue of any proceedings brought in such court and any claim that such proceedings have been brought in an inconvenient forum.

(c) In any arbitral proceeding arising under this Agreement, the parties agree that they will engage in cooperative discovery, to be supervised by the arbitral tribunal. In its discretion, the tribunal may order the exchange of documents in the custody or control of parties to this Agreement, and may order a limited number of party depositions of one (1) day's duration each if requested by the opposing party and if the tribunal finds that such depositions would contribute to the efficient development of evidence.

SECTION 7.12. Governing Law and Consent to Jurisdiction. This Agreement shall be governed by and construed under the laws of the State of California (without regard to conflict of laws principles that could or would cause the application of any other laws), all rights and remedies being governed by said laws. All parties hereto agree that any claim arising out of or relating to this Agreement shall be (i) brought in the Superior Court of Sonoma County, California, or (ii) brought in or removed to the United States District Court for the Northern District of California. Each of the parties consents to the personal jurisdiction of the courts identified above and waives (i) any objection to jurisdiction or venue, or (ii) any defense claiming lack of jurisdiction or improper venue, in any action brought in such courts.

SECTION 7.13. Limitation on Insured Liability. The Insured shall be liable for damages for any misrepresentation made by him or her in Section 3.02, and for any default by him or her in the performance of any of his or her obligations under Article V and Section 7.01 but, in the absence of fraud, otherwise shall have no liability hereunder, including, without limitation, no liability for the payment of the Financing Balance.

SECTION 7.14. Limitation on Liability of Manager. In no event shall any members or managers of the Lender be liable to any Person for the representations and obligations of the Lender under any Financing Document.

**ARTICLE VIII.**
**DEFINED TERMS**

SECTION 8.01. Definitions. Terms used in this Agreement and elsewhere in the Financing Documents shall be as defined in this Section 8.01. Whenever the word "Other" is inserted before a defined term, it refers to such term as used in other financing agreements which have terms and conditions substantially similar to the Terms and Conditions of this Agreement.

Document #1 of 19

**"Agreement"** means this Life Insurance Premium Financing Agreement, consisting of the Trust Contract and the Terms and Conditions, and including all the exhibits and appendices thereto.

**"Business Day"** means a day of the year other than a Saturday or Sunday on which commercial banks in New York City or San Francisco, California are not authorized or required to be closed.

**"Closing Fees"** has the meaning given to such term in the preamble to the Trust Contract.

**"Closing Package"** means, collectively, the agreements, instruments, certificates, reports and documents included in Appendix A to this Agreement.

**"Consumer Information"** means non-public medical, financial and personal information about the Trust and the Insured (including the identity of the Trust or the Insured, or the identity of a family member or friend thereof).

**"Contract"** means any contract, agreement, lease, sublease, license, note, bond, mortgage or indenture, permit, franchise, insurance policy or other instrument, whether written or oral.

**"Death Benefit"** means the amount paid by any Insurer upon the death of the Insured under the terms of the Policy.

**"Death Date"** means the date on which the Insured dies.

**"Default Maturity"** has the meaning specified in Section 6.02 hereof. **"Dispute"** has the meaning specified in Section 7.11 hereof.

**"Encumbrance"** means any security interest, pledge, mortgage, lien (including, without limitation, environmental and tax liens), charge, encumbrance, adverse claim, preferential arrangement or restriction of any kind, including, without limitation, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership.

**"Event of Default"** means any event specified as such in Section 6.01 hereof.

**"Financing Balance"** has the meaning set forth in Section 1.02 hereof.

**"Financing Date"** has the meaning given to such term in the preamble hereof.

**"Financed Premiums"** means the insurance premiums required to be paid for the Policy to keep the Policy in force for twenty-seven (27) months following the date of inception of the Policy.

**"Financing Documents"** means this Agreement, the Promissory Note, the Pledge Agreement, and all other agreements and instruments as referenced in the Closing Package, and any of the foregoing which may be amended from time to time.

1612628 v01

**"Governmental Authority"** means any nation or government, any state, province, city, municipal entity or other political subdivision thereof, and any governmental, executive, legislative, judicial, administrative or regulatory agency, department, authority, instrumentality, commission, board, bureau or similar body, whether federal, state, provincial, territorial, local or foreign.

**"Governmental Order"** means any order, writ, judgment, injunction, decree, stipulation, determination or administrative ruling or award entered by or with any Governmental Authority.

**"Holder"** has the meaning given to such term in the Promissory Note.

**"Insured"** means the individual who is designated as the insured in the Trust Contract.

**"Insurer"** means the life insurance company designated in the Trust Contract and which is the issuer of the Policy.

**"Law"** means any federal, national, supranational, state, provincial or local statute, law, ordinance, regulation, rule, code, order, requirement or rule of law (including, without limitation, common law).

**"Lender"** has the meaning given to such term in the preamble to the Trust Contract.

**"Loan"** has the meaning given to such term in the preamble to the Terms and Conditions.

**"Loan Amount"** means the aggregate principal amount of the loan and related fees designated in the Trust Contract.

**"Maturity Date"** means the date that is twenty-seven (27) months after the Financing Date.

**"Note"** means the promissory note evidencing the Loan in the form attached as <u>Exhibit 3</u> to the Trust Contract.

**"Pre-Payment Amount"** means an amount equal to the sum of (1) the Financing Balance as of the repayment date, plus (2) the Pre-Payment Fee.

**"Person"** means any individual, partnership (whether general or limited), corporation (including a business trust), joint stock company, limited liability company, trust, estate, association, custodian, nominee, joint venture or other entity, or a government or any political subdivision or agency thereof.

**"Pledge Agreement"** means the Security Agreement for Beneficiary Interest in Trust between the Lender and the Trust beneficiary(ies) pursuant to which the Beneficiary(ies) have pledged to the Lender any beneficial interest in the Trust.

**"Pledged Collateral"** shall have the meaning as denoted in the Security Agreement (for Beneficiary Interest in Trust).

1612628 v01

**"Policy"** means the life insurance policy designated in the Trust Contract, and any applications, riders, endorsements, supplements, amendments and other documents that modify or otherwise affect the terms and conditions of such policy, and any and all proceeds thereof.

**"Prepayment Date"** means the date of prepayment by Borrower pursuant to Section 1.03(c).

**"Promissory Note"** has the same meaning as "Note", defined above.

**"Pre-Payment Fee"** means an amount equal to the Pre-Payment Fee specified in the Trust Contract.

**"Rules"** means the Commercial Arbitration Rules of the American Arbitration Association.

**"Secured Obligations"** has the same meaning as "Pledged Collateral".

**"Security Agreement"** is the document **"The Security Agreement for Beneficiary Interest in Trust"** that is part of the Financing Documents

**"Structuring Fee"** is the amount set forth opposite such term in the Trust Contract.

**"Terms and Conditions"** means the Terms and Conditions incorporated into the Trust Contract.

**"Trust Assets"** means all the assets of the Trust including, without limitation, the Policy, cash, accounts, chattel paper, general intangibles, documents, instruments and other assets and property, and all replacements, proceeds and products of the foregoing, wherever located, whether now or hereafter acquired.

**"Trust Contract"** means the Life Insurance Premium Financing Agreement exclusive of the Terms and Conditions.

**"Trustee"** means the individual or entity identified as the Trustee in the Trust Contract.

[end of Terms and Conditions of Financing Agreement]

1612628 v01

## APPENDIX A

Closing Package Documents

The Trust shall have delivered to the Lender the documents which together comprise the **"Closing Package"**, and which includes, but may not be limited to, the following:

1) This **Financing Agreement,** including
   1a) Exhibit 1: Description of Policy;
   1b) Exhibit 2: Instructions for Payment of Structuring and Closing Fees;
   1c) Exhibit 3: Specimen copy of Promissory Note;
   1d) The Terms and Conditions,
   1d) Appendix A: This Closing Package;
   1e) Appendix B: Representation Required by Treasury Regulations;

2) **Promissory Note,** duly executed;

3) **Trustee's Certificate** Confirming the Trust, including:
   3a) Exhibit A: Copy of the Trust Document, TO BE PROVIDED BY TRUSTEE;
   3b) Exhibit B: Internal revenue Service letter certifying EIN of the Trust, TO BE PROVIDED BY TRUSTEE;

4) **Insured's Consent;**

5) **Authorization for Disclosure of Protected Health Information Form** executed by the Insured, TO BE NOTARIZED;

6) **Irrevocable and Durable Limited Power of Attorney** executed by the Insured permitting the Lender to review and receive copies of all records protected by the federal Health Insurance Portability and Accountability Act of 1996; permitting Lender sign for Insured for such documents; and permitting Lender to complete and blanks or omissions in any documents in the Closing Package, TO BE NOTARIZED;

7) **Authorization and Direction to Provide Death Certificate** Form executed by the Insured, TO BE NOTARIZED;

8) **Insured's Closing Certificate;**

9) **Acknowledgment and Agreement of Trust and Insured with Respect to Certain Financial Matters;**

10) A copy of the Insured's driver's license or other proof of the Insured's age and sex reasonably satisfactory to the Lender, in either case certified by the Insured, TO BE PROVIDED BY INSURED, preferably enlarged color copy;

11) **Special Power of Attorney** executed by the Trust permitting the Lender or its designee to submit documents to the Insurer for payment of the Death Benefit, TO BE NOTARIZED;

- 17 -

12) The **Policy** and related financial information, policy information and premium schedules (The original, or a copy signed by the Insured, the Owner (Trust) and the agent of record certifying such copy as accurate and current), TO BE PROVIDED BY TRUSTEE;

13) **The Security Agreement for Beneficiary Interest in Trust** between the Lender and the trust beneficiary executed by the Insured and beneficiary, including:
13a) Policy issue information (Schedule 1);
SEPARATE COPIES TO BE SIGNED BY EACH BENEFICIARY;

14) Sales illustration for the Policy, in form reasonably satisfactory to the Lender, generated by each applicable Insurer, TO BE PROVIDED BY TRUSTEE;

15) **Assignment of Life Insurance Policy as Collateral**, including:
15a) Schedule 1: addresses for Notice;

16) *Assignment of Life Insurance Policy as Collateral* (insurance company form)
16a) Individual Acknowledgement, TO BE NOTARIZED;

17) **Borrower's Closing Certificate**, certifying the representations and warranties made in the Financing Documents are accurate and complete in all material respects;

18) **Life Insurance Premium Finance Trust Questionnaire;**

19) **Receipt of Funds Confirmation**. To be signed and returned upon receipt of such funds.

- 18 -

1612628 v01

Document #1 of 19

## APPENDIX B

### Representation Required by Treasury Regulations Section 1.7872-15(d)(2)

**Windsor Securities LLC, The Erwin A. Collins Family Insurance Trust-2008,** and **Erwin A. Collins** hereby represent, pursuant to Treasury Regulations Section 1.7872-15(d)(2), that the Death Benefit provided under the Life Insurance Premium Financing Agreement dated 4 15, 2008 (the "**Agreement**") among **Windsor Securities LLC, The Erwin A. Collins Family Insurance Trust-2008** and **Erwin A. Collins** is equal to or exceeds the Financing Balance under that Agreement and that, accordingly, a reasonable person would expect that all payments under the split-dollar loan will be made. All capitalized terms not otherwise defined shall have the same meanings given to such terms in the Agreement. A copy of this representation shall be attached to the federal income tax return for each undersigned party filed for the tax year in which the loan is made to the borrower under the Agreement.

**WINDSOR SECURITIES LLC** By MFIP (Delaware, Inc.)

**By:**

Steven Prusky

**Title:**          **President/Director,** MFIP (Delaware)
**Address:**       25 East  Athens Avenue
               Ardmore, PA  19003
**Taxpayer I.D. Number:**      Redacted

**The Erwin A. Collins Family Insurance Trust-2008**

**By:**  *Maria Ana Gordillo*
Trustee Name: **Maria A. Gordillo**

**Date:**  April 15, 2008
**Taxpayer I.D. Number:** Redacted
**Place of execution:** Atlanta, GA

**Erwin A. Collins**

**Address:** 331 Suburban Road
         Knoxville, TN 37923
**Date:** 4-14-08
**Taxpayer I.D. Number:** Redacted

- 19 -

1612628 v01

## PROMISSORY NOTE

$112,750.00                                            _April_  _15_, 2008

FOR VALUE RECEIVED, **The Erwin A. Collins Family Insurance Trust-2008**, a Georgia trust ("**Borrower**"), hereby promises to pay to the order of **Windsor Securities LLC**, a Nevada LLC ("**Lender**"; Lender and any other person who becomes a holder of this promissory note being referred to hereinafter sometimes as the "**Holder**"), the sum of ONE HUNDRED TWELVE THOUSAND SEVEN HUNDRED FIFTY Dollars ($112,750.00), or greater amount should Lender, at its sole discretion, choose to make additional premium payments on the Policy, or other amount as the Lender may disburse, together with interest accrued thereon (at Lender's address or at such other place as Lender may designate to Borrower in writing), on the "**Maturity Date**" as provided in Section 3 hereof. Additional Premium Payments are currently estimated at approximately $25,417 (twenty five thousand four hundred seventeen dollars) per calendar quarter after the first 24 (twenty-four) months. This promissory note and any promissory note issued in substitution for this promissory note in accordance with the provisions hereof are referred to herein and elsewhere in the Financing Documents as the "**Note**." The unpaid principal amount outstanding under this Note from time to time shall accrue and bear interest at the simple rate of fifteen percent (15.0%) per annum. All payments made under this Note shall be made in lawful tender of the United States and shall be credited first to accrued and unpaid interest and the remainder to outstanding principal. Interest owed under this Note shall be calculated on the basis of actual days elapsed over a 360-day year. The principal and interest hereunder shall be paid in one installment, to be paid on the Maturity Date or as provided in Section 3 hereof. This Note has been executed and delivered pursuant to, and is the Note referenced in, the Life Insurance Premium Financing Agreement dated as of the date hereof between the Lender and the Borrower (the "**Financing Agreement**").

1.      Defined Terms. Unless defined in this Note, all capitalized terms used, but not defined, in this Note have the meanings ascribed to such terms in the Financing Agreement.

2.      Use of Proceeds of Note. The Borrower shall use the proceeds of this Note solely for purposes of paying the Financed Premiums to the Insurer and the Closing Fees to the parties designated in the Financing Agreement.

3.      Maturity Date. The Maturity Date is 820 days (approximately 27 months) from the date Lender disburses funds pursuant to the Financing Documents. It is estimated that the Maturity Date is July 15, 2010, although the exact date shall be dictated by the date of disbursement. The entire principal amount of this Note and all accrued but unpaid interest owed hereunder shall be due and payable by the Borrower on the earlier of (a) the Death Date, or (b) the Maturity Date.

4.      Prepayment.

(a)      At any time prior to the Maturity Date, on sixty (60) calendar days prior written notice to the Lender, the Borrower may prepay the Financing Balance in full, but not in part.

(b)      If an Event of Default occurs before the Maturity Date, the Borrower shall immediately pay the Financing Balance pursuant to Section 6 hereof.

-1-

1604856 v01

Case Case 3:14-cv-04651-WHO Document 81 Filed 11/10/15 Page 48 of 90
Case 3:14-cv-04651-WHO Document 81 Filed 11/10/15 Page 48 of 90
Document #2 of 19

5.     Collateral. This Note is secured by (a) the **"Pledged Collateral"** as defined in the Security Agreement and (b) the collateral assignment of the Policy given by Borrower to Lender pursuant to the Assignment of Life Insurance Policy as Collateral dated the date hereof.

6.     Events of Default. Upon the occurrence of an Event of Default before the Maturity Date, the Financing Balance (as defined in the Financing Agreement) shall be immediately due and payable, all without notice, presentment, protest, demand, notice of dishonour or any other demand or notice whatsoever, all of which are hereby expressly waived by Borrower.

7.     Miscellaneous.

(a)     Waiver of Presentment. The Borrower hereby

(i) waives demand, presentment of payment, notice of nonpayment, protest, notice of protest and all other notice, filing of suit, and diligence in collecting this Note;

(ii) agrees to any substitution, addition, or release of any party or person primarily or secondarily liable hereon;

(iii) agrees that the Lender shall not be required first to institute any suit, or to exhaust his remedies against the undersigned or any other person or party to become liable hereunder, or against any collateral in order to enforce payment of this Note; and

(iv) consents to any extension, rearrangement, renewal, or postponement of time of payment of this Note and to any other indulgence with respect hereto without notice, consent, or consideration to the undersigned. No failure to accelerate the debt evidenced hereby by reason of an Event of Default hereunder, and no indulgence that may be granted from time to time, shall be construed either as a novation of this Note, or as a reinstatement of the indebtedness evidenced hereby or as a waiver of such right of acceleration or of the right of the Lender thereafter to insist upon strict compliance with the terms of this Note, or to prevent the exercise of such right of acceleration or any other right granted hereunder or by the laws of the State of California. No extension of the time for the payment of this Note shall operate to release, discharge, modify, change or affect the original liability of Borrower under this Note, either in whole or in part, unless the Lender agrees otherwise in writing.

(b)     Limitation on Interest. Regardless of any provisions contained herein, the Lender shall never be deemed to have contracted for or be entitled to receive, collect or apply as interest on the Note, any amount in excess of the highest lawful rate, and, in the event Lender ever receives, collects or applies as interest any such excess, such amount which would be excessive interest shall be applied to the reduction of the unpaid principal balance of this Note, and, if the principal balance of this Note is paid in full, any remaining excess shall forthwith be paid to Borrower. In determining whether or not the interest paid or payable under any specific contingency exceeds the highest lawful rate, Borrower and Lender shall, to the maximum extent permitted under applicable law, (i) characterize any non-principal payment (other than payments which are expressly designated as interest payments hereunder) as an expense, fee, or premium, rather than as interest, (ii) exclude voluntary prepayments and the effect thereof, and (iii) spread

the total amount of interest throughout the entire contemplated term of this Note so that the interest rate is uniform throughout such term.

        (c)      <u>Amendment</u>.  Any provision of this Note may be amended, waived or modified upon the written consent of Borrower and Lender.

        (d)      <u>No Waiver; Remedies Cumulative</u>.  None of the rights or remedies of the Lender are to be deemed waived or affected by failure to delay to exercise the same.  All remedies conferred upon the Lender by this Note or any other instrument or agreement, including without limitation the Financing Agreement, shall be cumulative, no such remedy is exclusive, and such remedies may be exercised concurrently or consecutively at the Lender's option.

        (e)      <u>Time of the Essence</u>.  Time is of the essence with respect to the obligations of the Borrower under this Note.

        (f)      <u>Assignment</u>.  This Note may be assigned by Lender at any time given written notice of such assignment to Borrower.  Borrower may not assign this Note.

        (g)      <u>Notices</u>.  Any notice, request or other communication required or permitted hereunder shall be in writing and shall be deemed to have been duly given if personally delivered or if telegraphed or mailed by registered or certified mail, postage prepaid, at the respective addresses of the parties as set forth herein. Any party hereto may by notice so given change its address for future notice hereunder. Notice shall conclusively be deemed to have been given when personally delivered or when deposited in the mail or telegraphed in the manner set forth above and shall be deemed to have been received when delivered. Notice shall be made in writing as follows:

If to Borrower:                  The Erwin A. Collins Family Insurance Trust-2008
                                      c/o Maria A. Gordillo, as Trustee
                                        346 Crestview Circle
                                        Roswell, GA 30075
                                        Telephone:  770-375-9266
                                        Facsimile:  n/a

If to Lender:                    Windsor Securities LLC
                                          25 East Athens Avenue
                                        Ardmore, PA 19003
                                        Attention: Steven Prusky
                                        Telephone:  610-642-3100
                                        Facsimile:  610-642-9709

        (h)      <u>Governing Law and Consent to Jurisdiction</u>.  This Agreement shall be governed by and construed under the laws of the State of California (without regard to conflict of laws principles that could or would cause the application of any other laws), all rights and remedies being governed by said laws.  All parties hereto agree that any claim arising out of or relating to this Agreement shall be (i) brought in the Superior Court of Sonoma County, California, or (ii) brought in or removed to the United States District Court for the Northern District of California. Each of the parties consents to the personal jurisdiction of the courts

1604856 v01

Case Case 3:14-cv-04651-WHO Document 81 Filed 11/10/15 Page 50 of 90
Case 3:14-cv-04651-WHO Document 81 Filed 11/10/15 Page 50 of 90
Document #2 of 19

identified above and waives (i) any objection to jurisdiction or venue, or (ii) any defense claiming lack of jurisdiction or improper venue, in any action brought in such courts.

      (i)    <u>Binding Effect</u>. This Note shall be binding upon and inure to the benefit of the Borrower's and Lender's respective heirs administrators, successors and permitted assigns.

      (j)    <u>Severability</u>. The provisions of this promissory note shall be severable. If any provision hereof is held to be invalid, void or otherwise unenforceable, the remaining provisions shall remain in full force and effect to the fullest extent permitted by law.

      IN WITNESS WHEREOF, the Borrower has executed and delivered this Note as of the date set forth above.

      **BORROWER:**

      **The Erwin A. Collins Family Insurance Trust-2008**

By: *Maria Ana Gordillo*

Name: Maria A. Gordillo, Trustee

Date: April 15, 2008

Place of execution: Atlanta, GA

Tax Identification number Redacted

-4-

1604856 v01

## TRUSTEE'S CERTIFICATE

THE UNDERSIGNED, on behalf of **The Erwin A. Collins Family Insurance Trust-2008**, a Georgia situed irrevocable trust (the "**Trust**"), certifies that in connection with the Life Insurance Premium Financing Agreement dated as of _April     15_ ,     2008     (the "**Financing Agreement**"), by and between the Trust and **Windsor Securities LLC**, a Nevada LLC, (the "**Lender**"), and the transactions contemplated thereby (the "**Transaction**"), that he is the duly appointed and duly qualified Trustee of the Trust and that:

     1.     Attached as <u>Exhibit A</u> is a true and correct copy of the Irrevocable Trust Agreement as in effect on the date hereof. There exist no amendments or modifications to the Irrevocable trust Agreement, except as attached hereto.

     2.     The Insured has formed the Trust as its sole settlor by executing the attached Trust Agreement that permits the Trustee to enter into the Financing Agreement and apply for, purchase, own and pledge the Policy. The beneficiary of the Policy, and the party to whom the death benefit would be payable on the date hereof, is the Trust. The sole beneficiary of the Trust is or will be the Beneficiary. The Trust (1) is intended to be a non-business trust, ineligible for relief under the United States Bankruptcy Code, and (2) is irrevocable and may not be revoked by the Insured, the Insured's spouse, the Beneficiary or any creditors of the foregoing. The beneficiary of the Trust will be the Insured's spouse, the Insured's natural children, any other person having an insurable interest in the life of the Insured or an entity or trust, the owner or beneficiaries of which are either the Insured's spouse, the Insured's natural children or any other person having an insurable interest in the life of the Insured. The assets of the Trust (A) including the Policy and the proceeds thereof, are separate and apart from the assets of the Insured, the Insured's spouse and the Beneficiary, and (B) are not subject to the claims of any creditor of the Insured, the Insured's Spouse or the Beneficiary. The initial contribution of the Insured to the Trust constitutes the Insured's separate property and does not constitute the community property or quasi-community property of the Insured and the Insured's spouse.

     3.     The Beneficiary is the sole and duly designated beneficiary of the Borrower and possesses and owns all its beneficiary rights free and clear of any liens, options, purchase rights or commitments of any kind except as expressly contemplated by the Loan Documents. Under the terms of the Trust, the Beneficiary in its capacity as beneficiary of the Borrower has the absolute right to (A) assign, transfer, sell or surrender the Beneficiary's interest in the Trust (the "Beneficiary's Trust Interest") to the Lender, and (B) pledge or assign the Beneficiary's Trust Interest as collateral for the "Obligations" (as defined in the Security Agreement for Beneficiary Interest in Trust, dated as of 4/15 , 2008, between the Lender and the Beneficiary).

     IN WITNESS WHEREOF, the undersigned has duly executed this certificate on the 15 day of April , 2008.

The Erwin A. Collins Family Insurance Trust-2008

By: _Maria Ana Gordillo_ , **Trustee**
Name: **Maria A. Gordillo**
Date: _April 15, 2008_

Place of execution: _Atlanta, GA_

1604868 v01

# EXHIBIT A

## IRREVOCABLE TRUST AGREEMENT
<to be attached by Trustee>

1604868 v01

## THE ERWIN A. COLLINS FAMILY INSURANCE TRUST - 2008

### IRREVOCABLE TRUST AGGREEMENT

THIS TRUST AGREEMENT, dated this 1st day of February, 2008 is made between Erwin A. Collins of 331 Suburban Road Knoxville, TN 37923 as Settlor ("Settlor") and Maria A. Gordillo of 346 Crestview Circle Roswell, GA 30075 as Trustee ("Trustee").

I intend by this Trust Agreement to create an irrevocable trust of the sum of Ten Dollars ($10.00), and Trustee is willing to administer the same in accordance with the terms of this Trust Agreement. I therefore assign, transfer and deliver such property to Trustee, and Trustee hereby acknowledges the receipt of such property, IN TRUST, and agree to hold, manage, invest and reinvest the same (and all property later assigned, transferred and delivered to the Trustee by me or at my direction), and to collect the income therefrom and to distribute the net income and principle thereof in accordance with the terms of this Trust Agreement.

### I. STATEMENT OF IRREVOCABILITY AND BENEFICIARIES

A. Irrevocable Trust. Settlor acknowledges and states that the promises and covenants set forth in this agreement are not revocable. Settlor has relinquished all power to alter, amend or revoke this Trust Agreement in whole or in part.

B. Named Beneficiary. The Named Beneficiary of this Trust is Ann H. Collins. For the convenience of reference, the Named Beneficiary herein may also be referred to as "Named Beneficiaries" and it shall be sufficient that they be referred to as such in any instrument of transfer, deed, assignment, bequest or devise pertaining to this Trust Agreement.

### II. NAME AND SITUS OF TRUST

A. Name. This Trust shall, for the convenience of reference, be known as "The Erwin A. Collins Family Insurance Trust - 2008" and it shall be sufficient that it be referred to as such in any instrument of transfer, deed, assignment, bequest or devise.

B. Situs; Choice of Law and Venue. Unless and until changed by an affirmative specific election and act of the Trustee, the situs of this Trust is the State of Georgia. No Named Beneficiary shall compel a change if situs except as in accordance with the Changing of Situs provision herein. The laws and courts of Georgia shall have exclusive jurisdiction over the subject matter of this Trust Agreement and disputes arising hereunder, unless otherwise agreed in a separate writing executed by the Trustee and each Named Beneficiary that specifies that the laws of some other jurisdiction will apply to specific subject matter hereunder or that the courts of another jurisdiction will have non-exclusive jurisdiction over such subject matter and disputes arising in connection therewith under this Trust Agreement.

C. <u>Changing of Situs.</u> The Trustee may change the legal situs by a written instrument signed and acknowledged before a witness and a public notary to which state the situs is being changed. The Trustee shall do so if the Named Beneficiaries hereof unanimously instruct the Trustee to do so in writing, in which event the Trustee shall change the situs of the Trust to the jurisdiction specified by the Named Beneficiaries in such writing; provided that the Trustee shall not be obligated to do so if the Trustee is not qualified or legally capable of acting as trustee with respect to this Trust in the indicated jurisdiction.

## III. DURING MY LIFETIME

A. <u>Payment of Income.</u> Until my death, Trustee shall pay any net income from the trust to my Named Beneficiaries as, and only as, specified in this Trust Agreement.

B. <u>Payment of Principal.</u> Subject to the express limitations set forth herein with respect to distributions in kind or in respect of specific assets of property comprising the trust estate, until my death, Trustee is authorized to pay to my Named Beneficiaries such sums from the Principal of the trust as seem advisable in Trustee's discretion for their health, education, or support in reasonable comfort. In exercising such discretion, Trustee may, but shall not be obliged to, take into consideration the income of other resources of the Named Beneficiaries. Trustee shall be the sole judge of whether the occasion exists for the payment of principal, the amount, if any, to be paid and its use.

## IV. AFTER MY DEATH.
Upon my death, Trustee shall distribute the balance of the trust evenly to Ann H. Collins. The successors in interest to the Named Beneficiary, should they predeceases Settlor are his/her descendants, per stirpes, subject to any more specific provisions or the proper exercise of a power of appointment stated in the Trust Agreement.

## V. DISTRIBUTION TO PERSONAL REPRESENTATIVE.
Notwithstanding the foregoing provisions of this Trust Agreement for distribution of the trust after my death, if it shall be determined that any portion of the trust is included in my gross estate for federal estate tax purposes, Trustee shall distribute such portion to the personal representative of my estate.

## VI. PROVISIONS CONCERNING LIFE INSURANCE.

A. <u>Authorization to Purchase.</u> I authorize Trustee to purchase or to receive by transfer from me one or more life insurance policies on my life or on the life of a

person in which I and each Named Beneficiary have an insurable interest and to hold the same as an investment of the trust (herein sometimes collectively referred to, along with any policies that may be issued in exchange therefore, and any policies assigned to Trustee, as the "Policy").

B. <u>Rights and Powers of Trustee</u>. Without limiting the generality of the foregoing, all right, title and interest in to and under such Policy shall vest solely in Trustee each and all of the following rights and powers if applicable with respect to the Policy:

   1. To exercise all options, rights and elections (including, without limitation, the right to elect methods of settlement and to exercise any conversion privilege) exercisable under the Policy or allowed by the company or companies issuing said policies;

   2. To designate beneficiaries under the Policy provided that myself, my estate, my creditors or my estate's creditors shall not be designated as such beneficiary and subject to any more specific provisions herein;

   3. To demand and collect from the company or companies issuing said policies all such proceeds of the Policy as shall become a claim. Upon the death of an insured or earlier maturity of any insurance policy or policies composing part of the trust estate, the Trustee shall collect the proceeds and the benefits thereof. The Trustee shall furnish the necessary proofs of death to the insurance companies. The Trustee is authorized to take any and all other steps reasonably necessary for the collection of such proceeds and benefits, including the institution of proceedings at law or in equity in order to enforce the payment thereof;

   4. Subject to the other provisions of this Trust Agreement, to cancel any interest in the Policy and to surrender the converted Policy;

   5. To pay any premium due in respect of such Policy from income or principal of the trust estate, to apply any dividends or cash surrender value of such Policy to fund premiums due in respect of such Policy, or to borrow funds to apply premiums due in respect of such Policy and to pledge such policies to secure such borrowings; and

   6. To receive any increases in the amount of insurance under the Policy.

   7. The insurance companies which have issued such policies are hereby authorized and directed to recognize the Trustee as absolute owner of such policies of insurance and that all options, rights, privileges and interests under such policies, and any receipts, releases and other instruments executed by the Trustee in connection with such policies shall be binding and conclusive upon the insurance companies and upon all persons interested in this trust.

C. <u>Limitations on Powers</u>. Trustee shall not incur any indebtedness on behalf of or secured by any assets or property of the Trust or comprising the trust estate,

whether secured by assets of the Trust or otherwise, except as expressly contemplated by this Trust Agreement. Trustee shall not purport to create or permit to exist any interest in any asset of the Trust (including the Policy) in favor of any person other than (i) in favor of a Named Beneficiary to the extent expressly set forth in this Trust Agreement or (ii) a lien or collateral security interest therein in favor of a lender in connection with the incurrence of debt expressly permitted herein. Trustee shall not purport to amend or modify the Policy in any way, including by making any transfer thereof, change of ownership or change of beneficiary thereunder with out the prior written consent of every Named Beneficiary.

D. <u>Limitations on Duties</u>. The Trustee shall be under no obligation (i) to pay the premiums which may become due and payable under the provisions of any policies of insurance added to the trust estate from Trustee's own funds or assets, (ii) to make certain that such premiums are paid by the Settlor or others, or (iii) to notify any persons of the nonpayment of such premiums, except that if the Trustee receives notice from the issuer of any such life insurance policy that any premium has not been paid, Trustee will forward a copy of such notice to each Named Beneficiary and to the Settlor. The Trustee shall not be held responsible or liable in the event such premiums are not paid, except that Trustee will apply any funds delivered to it by Settlor or any other person for the purpose of funding such premiums to fund such premiums.

## VII. TRUSTEE'S COMPENSATION.

A. <u>Reasonable Compensation</u>. Trustee shall be entitled to receive reasonable compensation for its services hereunder (which may be taken without judicial authorization at the time or times permitted under the laws of the State of Georgia.

B. <u>Reimbursement of Expenses</u>. Trustee shall be entitled to be reimbursed for all expenses reasonably incurred by it in the administration of the trust, including legal fees, the fees of investment advisors and other similar expenses.

## VIII. TRUSTEE SUCCESSION.

A. <u>Trustee's Inability to Act</u>. Trustee hereby represents that it is qualified under the laws of the State of Georgia to act as Trustee with respect to the Trust. I acknowledge that it may become impractical, because of mental or physical incapacity or otherwise, for an individual to serve as trustee throughout the trust term. For purposes of this Trust Agreement, an individual shall be considered to be unable to serve as trustee if such individual is not able to promptly and

intelligently manage his or her affairs or the affairs of the Trust due to a legal, physical or mental instability. The determination as to whether an individual has any such physical or mental disability shall be made in writing by two duly licensed physicians, and the determination as to whether such individual is legally unable to serve as trustee hereunder shall be made by legal counsel to such individual. Upon any determination that an individual currently serving as Trustee hereunder is unable to serve as trustee, Trustee shall cease to serve as such.

B.  Resignation of Trustee. Trustee shall have the right to resign at any time by delivering or mailing written notice of such resignation to the Settlor and Named Beneficiaries hereunder. Such resignation shall take effect upon the date specified in such notice, but not less than thirty (30) days after such mailing or delivery.

C.  Appointment of Successor Trustee. If the Trustee resigns or otherwise ceases to act as Trustee, the Named Beneficiaries will have the right to appoint as successor Trustee any person that is qualified to act as trustee hereunder under the laws of the State of Georgia and is physically and mentally capable of acting as trustee hereunder. Such appointment will become effective upon the later of acceptance by such successor of such appointment and the date specified as the effective date of such appointment in written notice of such appointment delivered by the Named Beneficiaries to the Trustee being replaced.

## IV. GENERAL PROVISIONS AND FIDUCIARY POWERS.

A.  Transfer Documents. I hereby agree to execute and deliver at any time upon request of Trustee, such other and further instruments of transfer and conveyance as are or may be deemed necessary with respect to any part of the trust assets or the assignment or transfer thereof to Trustee.

B.  Fiduciary Bonds. No Trustee, Successor Trustee or Donee of a Power to manage property during minority or incompetency, or other such fiduciary however styled, shall be required to post a bond or other security in such capacity in any jurisdiction unless posting a bond or security is then required by law.

C.  References to Fiduciaries. For convenience I refer to my fiduciaries herein in the singular neuter gender. This reference shall, throughout, include the masculine and feminine and plural where ever necessary to appropriate.

D.  Power to Apply Income or Principal. Whenever Trustee is directed or authorized hereunder to pay income or principal to any Named Beneficiary, Trustee may so apply such income or principal for the benefit of such beneficiary.

E.  Trustee's Discretion. The decision of Trustee with respect to the exercise or nonexercise by it of any discretionary power hereunder, or the time or manner of

the exercise thereof, made in good faith, shall be conclusive and binding upon all persons interested in the trust.

F. Release. Absent bad faith, I hereby release the Trustee from any claim or cause of action I may now or herein after have arising from or pertaining to their respective discretionary decisions and actions (or lack of actions) in the discharge of their duties and the exercise of their powers hereunder that are taken in good faith and without fraud, willful misconduct or gross negligence.

G. Discretionary Trust Termination. Whenever, in the sole discretion of Trustee, a trust hereunder is too small to administer economically, or the purposes for which the trust was established can no longer be effectively carried out because of a change in the law affecting the trust and its Named Beneficiaries or any other changes in circumstances which make continuation of the trust unwarranted, Trustee may terminate such trust. In such event Trustee shall distribute the then remaining assets of the trust to the Named Beneficiaries in accordance with the provisions hereof outright and without any obligation to account to anyone other than the Named Beneficiaries.

H. Accounts. Trustee may from time to time (or, upon the resonable request of a Named Beneficiary, at any time), render an account of the acts and transactions of Trustee with respect to the income and principal of the trust from the date of the creation of the trust or from the date of the last previous account of Trustee, as the case may be, to the Named Beneficiaries as shall be of full age and competent at the time when such account is rendered. Such Named Beneficiaries shall have full power and authority on behalf of all persons interested in the trust to settle and adjust such account. Upon such account being settled and adjusted to the satisfactions of such Named Beneficiaries, it shall be final and conclusive upon each and every person (whether then living or then ascertainable or not) who will then or therafter be or become interested in either the income or the principal of the trust fund, with like effect as a judgement of a court having jurisdiction, judically settling such account in an action in which Trustee and all persons having or claiming any interest in the trust fund were parties. The approval of such account by such Named Beneficiaries shall constitute a full and complete discharge and release of Trustee from all further liability, responsibility and accountability for or with respect to the acts and transactions of Trustee as set forth in said account, both as to the income and as to the principal of the trust. If at any time the trust shall be divided into shares, the provisions of this paragraph shall apply to each share with the like effect as if such share constituted the entire trust. The foregoing provision, however, shall not preclude Trustee from having its account judicially settled if it so desires.

I. Payment of Minor's Interest. Whenever pursuant to any provision of this Trust Agreement, Trustee is required or permitted to pay to or apply for the benefit of a

minor any gift or any income or principal of the trust, Trustee may make such payment or application by paying the same directly to such minor, or to a bank for deposit to such minor's account, or to the parent or guardian of such minor or to a custodian for such minor under a Uniform Gifts to Minors Act or a Uniform Transfers to Minors Act to the extent permitted by law, and the receipt of such bank, parent, guardian or custodian shall be a full and complete discharge and acquittance to Trustee to the extent of any such payment. I authorize Trustee to designate that any payment or application to a custodian hereunder shall be held by such custodian until the minor attains the age of twenty-one years.

J. <u>Power to Manage Property Vested in a Minor or Incompetent During Minority or Incompetency</u>. Not withstanding any contrary provisions of this Trust Agreement, if any portion of the trust shall at any time be or become payable or distributable to a minor or an incompetent, such interest shall vest in absolute ownership in such minor or incompetent, and Trustee is authorized in its discretion, and without authorization by any court, to defer payment or distribution of the whole or any part of such interest during such minority or incompetency and, in the meantime, to hold, manage, invest and reinvest the same, to collect the income therefrom and to pay to, or apply for the benefit of, such minor or incompetent so much of the net income and principal thereof as such Trustee, in its discretion, deems advisable for the health, education or support of such minor or incompetent, accumulating any income not so paid or applied. The principal thereof any accumulated income shall be paid or distributed to such minor when such minor reaches his or her majority, or earlier pursuant to the provisions of the preceding paragraph, or to such incompetent or his or her committee, conservator or other legal representative at any time. The Trustee holding property under this power is authorized to permit the minor or incompetent, or his or her legal guardian, committee, conservator or other legal representative at any time to have the use of possession of any real or tangible personal property so held. Trustee shall be entitled to receive compensation with respect to any property held under this power at the same rate and payable in the same manner as provided earlier in this Trust Agreement. For purposes of this paragraph a minor shall be deemed to be a person who has not attained the age of twenty-one years.

K. <u>Pension Plans and Insurance Proceeds Payable to Trusts</u>. With regard to all policies of life insurance and all pension, stock bonus, profit sharing, individual retirement and like plans which designate the Trust hereunder as beneficiary, Trustee is specifically authorized and empowered:

   1. to execute and deliver receipts and other instruments and to take such actions as may be appropriate to obtain possession and control of such policies or of documents necessary to collect proceeds of such plans;

2. to execute and file proofs of claim required to collect the proceeds thereof (the receipt of Trustee shall constitute full acquittance to insurance companies, employers, trustees or other payors for proceeds so paid), provided however, that Trustee shall be under no obligation to institute legal proceedings for the collection of any such proceeds until and unless it has been indemnified to its satisfaction for all costs and expenses, including attorney's fees;

3. to elect, in its discretion, but consistent with the provisions hereof or any other agreement entered into by the Trustee hereunder pledging or collaterally assigning such policy, any optional modes of settlement available to it under such policies or plans;

4. to receive such proceeds and to administer and distribute them in accordance with the dispositive provisions of this Trust Agreement;

5. to use such proceeds in the purchase from my estate of such assets as Trustee deems advisable without being limited to assets authorized by law for the investment of trust funds;

6. to the extent that proceeds of such policies or plans represent ordinary income taxable to the recipient, other than for a trust qualifying for the marital deduction Trustee may, in its discretion, allocate such taxable proceeds in any manner between principal and income, paying out any part or all of it as current income of the trust, or accumulating and adding it to the principal of the trust; and Trustee's determination in this regard, and its exercise of any election available to them affecting the manner of taxation of such proceeds, shall be final and shall not be subject to judicial review, and any person adversely affected by such determination or election shall not be entitled to any reimbursement or adjustment by reason thereof.

L. <u>Dividends Paid in Stock</u>. Dividends and other distributions by a corporation or association, whether ordinary or extraordinary, received by Trustee in the stock of the corporation or association making the distribution shall be principal.

M. <u>Exercise of powers by multiple trustees</u>. Whenever more than one trustee is serving as fiduciary, the co-trustees may designate one trustee to exercise the administrative and/or ministerial powers granted by law or under this instrument. As evidence of such designation, persons dealing with the trust may rely on a notarized, written statement signed by all trustees then in office which specifies powers that may be exercised by one of the multiple trustees, acting alone.

N. <u>Captions</u>. The use of captions or headings in articles and paragraphs of this Trust Agreement is for convenience only. They are not intended to embody any substantive content and shall be wholly disregarded in the construing of this Trust Agreement.

O. <u>General Powers</u>. I grant to Trustee the following powers in addition to those elsewhere herein granted or conferred by law, and to the exclusion of contrary

provisions of law where I have power to vary such provisions, with respect to all property, real and personal, at any time forming part of any trust hereunder, including accumulated income and property held under a power to manage property vested in a minor or incompetent during minority or incompetency, until the final distribution therof.

P. Retention and Diversification. To retain any such property, including shares of stock of a Trustee hereunder or shares of stock of a corporation having voting control of such Trustee, as an investment without regard to the proportion which it and other property of a similar character held hereunder may bear to the trust in which such property is held and whether or not such property is of the class in which trustees are authorized by law or rule of court to invest trust funds.

Q. Sale or Other Disposition. To sell, exchange or otherwise dispose of any such property at public or private sale, without authorization by any court, wholly or partly on credit or for cash or for any other consideration including stocks, bonds, other obligations, real estate or other property and to grant options for the purchase, exchange or other disposition thereof.

R. Investments. To invest and reinvest in property of any character, real or personal, located in or outside the state of my domicile, including, but not limited to, bonds, notes, debentures, mortgates, leases, common and preferred stocks, general or limited partnership interests, legal and discretionary common trust funds and mutual funds, without being limited to investments authorized by law or rule of court for trust funds, and without regard to the proportion which all such property and other property of a similar character held hereunder may bear to the trust in which such property is held, or other property in which I hold interest.

S. Options, Proxies. To exercise or sell any options and any conversion, subscription, voting and other rights pertaining to any such property and to grant proxies, discretionary or otherwise, in respect thereof.

T. Corporate Matters Affecting Investments. To consent to and participate in any plan of reorganization, consolidation, merger, combination, recapitalization, reclassification, liquidation or other plan and to consent to any contract, lease, mortgage, purchase, sale or other action by any corporation.

U. Creditors' Rights Affecting Investments. To deposit any such property with any protective, reorganization or similar committee, to delegate discretionary power thereto, to pay part of such committee's expenses and compensation and any assessments levied with respect to such property.

V. Adjustment of Claims. To extend the time of payment of any obligation held hereunder and to compromise, settle, arbitrate or abandon any claim in favor of or against any trust hereunder.

W. <u>Title to Assets</u>. To hold property unregistered or in such other form that title shall pass by delivery, and to cause any Policy or securities or other property held hereunder to be registered in the name of a nominee or in its own name.

X. <u>Distribution In Kind</u>. To make any division or distribution required hereunder (including the satisfaction of any pecuniary gift) in cash or in other property, real or personal, or undivided interests therein, or partly in cash and partly in such other property, in accordance with this Trust Agreement as to any particular asset, and to do so without regard to the income tax basis of specific property allocated to any beneficiary (including any trust).

Y. <u>Worthless Assets</u>. To abandon property which it determines not to be worth protecting or collecting.

Z. <u>Trust Additions</u>. To receive additional property acceptable to Trustee from any source and add it to and mingle it with the trust or trusts created hereunder; provided that no such property shall be so added or mingled if subject to any interest, lien, pledge, mortgage or other claim by any person.

AA.     <u>Plenary Powers</u>. To do all such acts, take all such proceedings and exercise all such rights and privileges, although not specifically mentioned, with relation to any such property, as though the absolute owner thereof, and in connection therewith to make, execute and deliver any instruments and to enter into any covenants or agreements binding any trust hereunder.


**The remainder of this page is intentionally left blank.**

**ACCEPTANCE.** Trustee accepts the trust and agrees to perform its duties hereunder.

IN WITNESS WHEREOF, we have signed this Trust Agreement.

Acknowledged and Agreed to this 27 day of September, 2007.

By: _Erwin A. Collins_

Erwin A. Collins, as Settlor

STATE OF TENNESSEE

COUNTY OF Knox

Subscribed and sworn to (or affirmed) before me on this 27th day of September, 2007, by Erwin A. Collins, personally know to me (or proved to me on the basis of satisfactory evidence) to be the person who appeared before me.

WITNESS my hand and official seal

Signature _Cerissa Yates_
7-24-2011

(Seal)

*Maria A. Gordillo*
Maria A. Gordillo
Trustee

STATE OF _Dekalb, GA_  } ss. )

COUNTY OF _____  )

On this __1st__ day of __Feburary__ , 2008, before me, a Notary Public within and for said County, personally appeared Maria A. Gordillo, to me known to be the person described in and who executed the foregoing instrument as trustee, and acknowledged that she executed the same as her free act and deed.

*Jamie Pennington*
Notary Public

My Commission Expires __4/30/2011__

## **EXHIBIT B**

INTERNAL REVENUE SERVICE LETTER CERTIFYING EIN OF TRUST

\<to be provided by trustee\>

1604868 v01

X

 IRS DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
CINCINNATI  OH   45999-0023

Date of this notice:  02-14-2008

Employer Identification Number:
Redacted

002139.417786.0008.001 1 MB 0.360 532
|.ll.ll..ll..l..l..l..bb.ll..ll.ll..l..l.ll.l..l.l.ll.l..ll.l.l

Form:  SS-4

Number of this notice:  CP 575 D



002139

ERWIN A COLLINS FAMILY INS TR -
2008
MARIA A GORDILLO TTEE
346 CRESTVIEW CIR
ROSWELL  GA   30075

For assistance you may call us at:
1-800-829-4933

IF YOU WRITE, ATTACH THE
STUB OF THIS NOTICE.

### WE ASSIGNED YOU AN EMPLOYER IDENTIFICATION NUMBER

Thank you for applying for an Employer Identification Number (EIN).  We assigned
you EIN Redacted      This EIN will identify your business account, tax returns, and
documents, even if you have no employees.  Please keep this notice in your permanent
records.

When filing tax documents, please use the label we provided.  If this isn't
possible, it is very important that you use your EIN and complete name and address
exactly as shown above on all federal tax forms, payments and related correspondence.
Any variation may cause a delay in processing, result in incorrect information in your
account or even cause you to be assigned more than one EIN.  If the information
isn't correct as shown above, please correct it using tear off stub from this notice
and return it to us so we can correct your account.

Based on the information from you or your representative, you must file the
following form(s) by the date(s) shown.

        Form 1041                        04/15/2009

If you have questions about the form(s) or the due dates(s) shown, you can call
or write to us at the phone number or address at the top of the first page of this
letter.  If you need help in determining what your tax year is, see Publication 536,
Accounting Periods and Methods, available at your local IRS office or you can download
this Publication from our Web site at www.irs.gov.

We assigned you a tax classification based on information obained from you or
your representative.  It is not a legal determination of your tax classification,
and is not binding on the IRS.  If you want a legal determination on your tax
classification, you may request a private letter ruling from the IRS under the
guidelines in Revenue Procedure 2004-1,2004-1 I.R.B. 1 (or superseding Revenue
Procedure for the year at issue.)

(IRS USE ONLY)     575D                    02-14-2008  ERWI  B  0509905261  SS-4

IMPORTANT REMINDERS:

    *  Keep a copy of this notice in your permanent records.

    *  Use this EIN and your name exactly as they appear above on all your federal
       tax forms.

    *  Refer to this EIN on your tax related correspondence and documents.

    If you have questions, you can call or write to us at the phone number or address
at the top of the first page of this notice.  If you write, please tear off the stub
at the end of this notice and send it along with your letter.  Thank you for your
cooperation.

## INSURED'S CONSENT

Reference is made to the **Life Insurance Premium Financing Agreement** dated as of ___April___ ___15___, 2008 (the "***Agreement***"), including its Terms and Conditions, among **Windsor Securities LLC**, a Nevada LLC with a mailing address of 25 East Athens Avenue, Ardmore, PA 19003, as Lender (the "***Lender***"), **Erwin A. Collins**, as Insured (the "***Insured***") and **The Erwin A. Collins Family Insurance Trust-2008**, as Borrower (the "***Borrower***"). All terms defined in the Agreement shall have their defined meanings when used herein.

The undersigned is the Insured under the Policy attached to the Agreement as <u>Exhibit 1</u>. The Insured Life understands and is aware that the Policy is owned by the Borrower and that the Borrower is financing its payment of the Policy premiums by entering into the Agreement with the Lender. The Insured wishes to assist the Borrower in financing the payment of the Policy premiums and consummating the transactions contemplated by the Agreement. To that end the Insured hereby agrees, represents and warrants to the Lender as follows:

1.  The Insured consents to the issuance of the Policy to the Borrower based on his/her life.

2.  The Insured has a net worth in excess of US $1,500,000.

3.  The Insured has consulted with and received advice from attorneys, accountants and/or financial advisors of the Insured's, choosing to the extent the Insured has deemed such advice necessary or desirable in order to satisfy himself/herself that assisting the Borrower in financing the Policy premiums and consummating the transactions contemplated by the Agreement is in the Insured's best interest. The Insured has determined that the Borrower's entering into the Agreement and consummating the transactions contemplated thereby is in the Insured's best interest, and the Insured acknowledges that he/she has had the Agreement and all Exhibits or other documents in connection with or relating to the Agreement (the "***Related Documents***") for an amount of time sufficient thoroughly to analyze, discuss and make informed decisions with respect to the Agreement and the Related Documents and to receive advice from any professionals or anyone of the Insured's choosing.

4.  The Insured expressly acknowledges, understands, consents and agrees to waive, and hereby waives, any and all rights, claims, interests, powers and privileges that the Insured now possesses, or in the future will possess, under or with respect to the Policy.

5.  The Insured is of sound mind and not subject to any constraint or undue influence or duress.

6.  This "Insured's Consent" has been executed and delivered by the Insured and is in full force and effect.

7.  The Insured has consented to the release and disclosure of all medical and health information about the Insured that has been or will be provided to the

Document #4 of 19

Lender in connection with the Agreement, and the Authorization for Disclosure of Protected Health Information, is in full force and effect, and shall remain in full force and effect for the longest term permitted under any applicable statute or regulation.

       8.    The Insured has executed and delivered an Irrevocable and Durable Limited Power of Attorney ("**Power of Attorney**") naming the Lender as the Insured's attorney-in-fact and personal representative. The Power of Attorney empowers the Lender to obtain any medical and health information about the Insured that the Lender may need to effect the intent and purpose of the Agreement and Related Documents at any time now or in the future without obtaining further specific authorization or consent from the Insured or the Insured's other personal representatives.

       9.    The Insured will, at any time and from time to time, subsequent to the execution of the Agreement and Related Documents, at no net cost or net expense to the Insured, take all further actions and/or execute and deliver all further assurances, authorizations, documents and/or instruments as may be requested by the Lender in order for the Lender or its designee or assigns to effectuate the intent and purpose of the Agreement and Related Documents, including to authorize the provision and/or delivery of information and documentation to the Lender or its designees or assigns from any physician, hospital, medical or healthcare provider, insurance company or other person or entity with regard to the Insured, the Policy and/or any other matter related thereto as may be reasonably requested by the Lender or its assigns.


Name of Insured:  **Erwin A. Collins**

STATE OF  Florida  )

COUNTY OF  St. Lucie )

On  14   April , 2008, before me, the undersigned, personally appeared **Erwin A. Collins**, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same, and that by his/her signature on the instrument the person executed the instrument.

WITNESS my hand and official seal.


Notary Public

My Commission Expires: Apr 25 2011

LISA M. CAUDULLO
Notary Public - State of Florida
My Commission Expires Sep 25, 2011
Commission # DD 719273
Bonded Through National Notary Assn.

- 2 -

# AUTHORIZATION FOR DISCLOSURE OF PROTECTED HEALTH INFORMATION

I, the undersigned individual, authorize the disclosure of my protected health information ("PHI") as defined under the privacy regulations promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996 as follows:

1.    Classes of Persons Authorized to Disclose My Protected Health Information:  I authorize each doctor, hospital, nurse, pharmacy, physician, physician practice group, and any other type of health care provider (each, an "Authorized HCP") having any PHI about me to disclose any and all of my PHI, except psychotherapy notes, as provided under this authorization.  I acknowledge that all of my PHI in the possession of any Authorized HCP, except psychotherapy notes, is necessary for the purpose for which this authorization is given as described below.  I authorize each Authorized HCP to rely upon a photostatic or facsimile copy or other reproduction of this authorization.

2.    Classes of Persons Authorized to Receive My Protected Health Information:  I authorize each Authorized HCP to disclose my PHI under this authorization to **Windsor Securities LLC**, a Nevada LLC with a mailing address of 25 East Athens Avenue, Ardmore, PA 19003, and of its affiliates, and any of their directors, officers, employees, agents, independent contractors, service providers or other representatives (each, an "Authorized Recipient").

3.    Description of Protected Health Information Authorized for Disclosure and Purpose of Disclosure:  This authorization shall apply to any and all of my health and medical data, information and records, except psychotherapy notes, whether or not personally or individually identifiable or protected under any federal or state confidentiality or privacy laws or regulations.  This authorization and all disclosures of my PHI made under this authorization are for purposes of allowing the Authorized Recipient (1) to analyze, assess, evaluate or underwrite my health or medical condition, or life expectancy, in connection with the sale and issuance of any life insurance policy under which my life is insured, or any resale, assignment or other transfer of such life insurance policy after its issuance, (2) to monitor, track or verify my health or medical status and condition in connection with any life insurance policy under which my life is insured and (3) to assess the value of a life insurance policy on my life.

4.    Expiration of Authorization:  This authorization shall remain valid until, and shall expire on, the date that is one (1) year after the date of my death.

5.    Right to Revoke Authorization:  I acknowledge and understand that I may revoke this authorization any time with respect to any Authorized HCP by notifying such Authorized HCP in writing of my revocation of this authorization and delivering my revocation by mail or personal delivery at such address designated to me by such Authorized HCP; provided, that, any revocation of this authorization shall not apply to the extent that the Authorized HCP has taken action in reliance upon this authorization prior to receiving written notice of my revocation.

6.    Inability to Condition Treatment, Payment, Enrollment or Eligibility for Benefits on Provision of Authorization.  I acknowledge and understand that no HCP or other covered entity may condition my treatment, payment, enrollment or eligibility for benefits on whether I sign this authorization.

- 1 -

1604833 v01

I understand that this authorization is not a consent or an authorization requested by a health care provider, health care clearinghouse or health plan covered by the privacy regulations promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996 (the "HIPAA Privacy Regulations"). I further understand that, as a result of this authorization, there is the potential for my PHI that is disclosed by any Authorized HCP to an Authorized Recipient to be subject to redisclosure by such Authorized Recipient and my PHI that is disclosed to such Authorized Recipient may no longer be protected by the HIPAA Privacy Regulations.

I certify that I am executing and delivering this authorization freely and unilaterally as of the date written below. I acknowledge that I have received and retained a copy of this signed authorization for my future reference.

_____
Signature of Individual

Erwin A. Collins
Print or Type Name of Individual


Date: 4 - 14 - 08


**If this Authorization is signed by the Individual's Personal Representative, you must provide a description of the Personal Representative's legal authority to act for the Individual:**

Document #6 of 19

## IRREVOCABLE AND DURABLE LIMITED POWER OF ATTORNEY

The State of ___Georgia___ )
                            ) KNOW ALL MEN BY THESE PRESENTS
County of ___DeKalb___ )

      This Irrevocable and Durable Limited Power of Attorney (this "*Power of Attorney*") is executed and delivered by Erwin A. Collins (the "*Grantor*") to Windsor Securities LLC, a Nevada LLC with a mailing address of 25 East Athens Avenue, Ardmore, PA 19003 (the "*Attorney*"), in connection with the Life Insurance Premium Financing Agreement dated ___April 15___, 2008, among the Grantor, Attorney and The Erwin A. Collins Family Insurance Trust-2008 settled by the Grantor. No person to whom this Power of Attorney is presented, as authority for Attorney to take any action or actions contemplated hereby, shall be required to inquire into or seek confirmation from Grantor as to the authority of Attorney to take any action described below, or as to the existence of or fulfillment of any condition to this Power of Attorney, which is intended to grant to Attorney unconditionally the authority to take and perform the actions contemplated herein, and Grantor irrevocably waives any right to commence any suit or action, in law or equity, against any person or entity which acts in reliance upon or acknowledges the authority granted under this Power of Attorney.

      Grantor hereby irrevocably authorizes, empowers and appoints Attorney (and all officers, employees, agents and representatives designated by Attorney), as Grantor's true and lawful attorney-in-fact with full irrevocable and durable power and authority in the place and stead of Grantor and in the name of Grantor or in its own name, with sole and absolute discretion to:

1. review and receive copies of all records, including, but not limited to, private, privileged, protected or personal health information defined as "Protected Health Information" in the federal Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), relating to Grantor's medical history, health-care insurance, and life insurance, and to release or authorize the release of such information to others, as Attorney shall deem appropriate;

2. sign documents and instruments on Grantor's behalf in order to carry out the powers granted herein, including HIPAA-compliant authorizations as described at 45 CFR § 164.508, waivers, or releases of liability required by any Covered Entity, health care provider or any custodian of records; and

3. complete any blanks in the Life Insurance Premium Financing Agreement or related documents, including making any required mechanical or clerical changes to the documents on Grantor's behalf.

      This Power of Attorney shall be construed and interpreted as a special power of attorney limited in scope to the authority to act on Grantor's behalf for the above-stated purposes. This Power of Attorney is intended to designate Attorney as a "personal representative" of Grantor, and any Covered Entity shall treat Attorney as the personal representative of Grantor, as provided in 45 CFR § 164.502 (g)(1) for all purposes of HIPAA.

      The above powers and authorizations are irrevocably granted and appointed to Attorney and its successors and assignees, and Grantor specifically gives up all rights to revoke this

1604852 v01

Irrevocable and Durable Limited Power of Attorney. Except as otherwise provided by applicable law, the power of attorney granted hereby is coupled with an interest, and may only be revoked or canceled by the Grantor with Attorney's prior written consent. Notwithstanding the foregoing, this Irrevocable and Durable Limited Power of Attorney shall expire on the date that is one (1) year after the date of my death.

Grantor acknowledges that information disclosed by a healthcare provider or other "Covered Entity" (as defined under HIPAA) pursuant to this Power of Attorney may be redisclosed and may no longer be subject to the privacy rules provided by law including, but not limited to, HIPAA.

The power of attorney granted by this instrument shall be durable and will not be affected by Grantor's subsequent death, disability, incapacity or incompetence. At Grantor's option, Grantor has had the opportunity to consult with an attorney prior to signing this Power of Attorney, and Grantor affirms that Grantor understands and agrees to all the terms of this Power of Attorney.

IN WITNESS WHEREOF, this Power of Attorney is executed by Grantor on this _14_ day of _April_____, 2008.

**GRANTOR**

By: _Erwin A. Collins_ (signature)

Name: **Erwin A. Collins**

STATE OF _Florida_

COUNTY OF _St. Lucie_

I, _Lisa M. Caudullo_____, a Notary Public in and for said County in the State aforesaid, DO HEREBY CERTIFY that Erwin A. Collins, personally known to me to be the same person whose name is subscribed to the foregoing instrument as "Grantor", appeared and delivered the said instrument as his/her free and voluntary act, for the uses and purposes therein set forth.

GIVEN under my hand and Notarial Seal this _14_ day of _April_ 2008.

_Lisa M. Caudullo_ (signature)

Notary Public

My commission expires: _Sept 25 2011_

(Official Seal)



## AUTHORIZATION AND DIRECTION TO PROVIDE DEATH CERTIFICATE

I hereby authorize, direct and instruct my personal representative, family members, funeral service providers, or any other person with responsibility for my affairs at the time of and after my death to provide to **Windsor Securities LLC**, a Nevada LLC with a mailing address of 25 East Athens Avenue, Ardmore, PA 19003, its agents, representatives, designees, successors or assigns one or more original death certificates evidencing my death and any other documents necessary to process a claim for payment of any and all benefits under a life insurance policy under which I am the insured and under which **Windsor Securities LLC,** has a direct or indirect economic interest.

If any of the above referenced individuals fails or refuses to provide original death certificates or any other documents necessary to process a claim for payment of any benefits under a life insurance policy under which I am the insured and under which **Windsor Securities LLC,** has a direct or indirect economic interest, then I authorize and consent that this authorization may be used to obtain one or more certified copies of my death certificate directly from the appropriate governmental agency and/or funeral service provider, notwithstanding that such certificate may contain confidential or nonpublic personal information otherwise protected from disclosure or dissemination under any state or Federal law.

_Erwin A. Collins_

Name of Insured:  Erwin A. Collins

STATE OF Florida )

COUNTY OF St Lucie )

On ___14___ ___April___, 2008, before me, the undersigned, personally appeared **Erwin A. Collins**, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same, and that by his/her signature on the instrument the person executed the instrument.

WITNESS my hand and official seal.

_Lisa M Caudullo_

Notary Public

My Commission Expires: ___Sept 25 2011___



LISA M. CAUDULLO
Notary Public - State of Florida
My Commission Expires Sep 25, 2011
Commission # DD 719273
Bonded Through National Notary Assn.

### INSURED'S CLOSING CERTIFICATE

Dated as of __April__   __14__, 2008

    Reference is made to the **Life Insurance Premium Financing Agreement** dated as of __April__   __15__, 2008 (the *"Financing Agreement"*) among **Windsor Securities LLC,** a Nevada LLC, as Lender (the *"Lender"*), **Erwin A. Collins**, as Insured (the *"Insured"*) and **The Erwin A. Collins Family Insurance Trust-2008**, as Borrower *(the "Borrower")*.

    Pursuant to Section 2.01 of the Financing Agreement, the Insured hereby certifies that all the representations and warranties of and made by the Insured set forth in the Financing Agreement and each Financing Document to which the Insured is a party are true and correct in all respects on and as of the date first above written.

    IN WITNESS WHEREOF, the undersigned Insured has hereunto set his/her name as of the date set forth below.

**Erwin A. Collins**

Date: 4-14-08

## ACKNOWLEDGMENT AND AGREEMENT OF TRUST AND INSURED
## WITH RESPECT TO CERTAIN FINANCIAL MATTERS

In connection with the Life Insurance Premium Financing Agreement (the "**Financing Agreement**"), dated as of ___April 15___, 2008, among **Windsor Securities LLC**, a Nevada LLC with a mailing address of 25 East Athens Avenue, Ardmore, PA 19003 (the "**Lender**"), the Trust designated below (the "**Trust**") and the Insured designated below (the "**Insured**"), this Acknowledgment and Agreement has been signed by the Insured and behalf of the Trust. All capitalized terms used, but not defined herein, shall have the respective meanings assigned to such terms in the Financing Agreement.

The Trust and the Insured acknowledge and agree as follows:

1.   The Trust, the beneficiaries of the Trust, and the Insured have consulted experts, including the undersigned advisor(s), regarding the Financing Documents and the transactions contemplated thereby and are not relying on Lender, or any of its respective officers, directors, employees, agents or attorneys for any tax, estate planning, accounting, financial planning, legal, or other advice. The Trust, the beneficiaries of the Trust, the Insured, and their representatives, attorneys, accountants and tax or other financial advisors or experts have reviewed the Financing Documents and the formulas and procedures for determining the Financing Balance. The Insured acknowledges that neither the Lender nor Trust solicited the Insured with respect to the Loan and that the contact was initiated by agents acting on behalf of the Insured.

2.   The Lender has undertaken substantial obligations to the Trust under the Financing Agreement, as well as the substantial risk associated with such obligations. The Lender's affiliates have incurred substantial costs associated with the organization of the Life Insurance Premium Financing Program. The Trust and the Insured have enjoyed substantial benefit from the obligations and risks assumed by the Lender and its affiliates, including, without limitation, the potential Net Death Benefit payable to the Insured's beneficiaries. The intention and expectation of the Trust, the Insured and the Lender is that prior to the Maturity Date (as defined in the document "Life Insurance Premium Financing Agreement Among Windsor Securities LLC, the Erwin A. Collins Family Insurance Trust-2008 and Erwin A. Collins", **which includes, but is**

- 1 -

Case 3:16-cv-04658-JD-GWG Document 130 Filed 02/08/16 Page 62 of 133
Case 3:14-cv-04651-WHO Document 81 Filed 11/10/15 Page 77 of 90

Document #9 of 19

**not limited to,** Term and Conditions and specimen copy of Promissory Note), the Lender and its affiliates will make the Loan to the Trust under the Financing Agreement in the principal amount designated as the Loan Amount in the Financing Agreement for the sole purpose of paying the Financed Premiums for the Policy, Structuring Fee and Closing Fees (as defined in the preamble to the Trust Contract).

     3. The statements of the Trust in this Acknowledgement are solely those of the Trust and are not the statements of the Trustee nor have they been verified by the Trustee.

                        **Insured:**

                        Print Name: Erwin A. Collins

                        **Trust:**

                        ***The Erwin A. Collins Family Insurance Trust-2008*** a Georgia Irrevocable Trust

                        By Maria A. Gordillo,
                        as Trustee, and not in his individual capacity

                        By: Maria Ana Gordillo
                        Print Name: Maria A. Gordillo
                        Title: Trustee

I acknowledge that I have advised the Insured with respect to the Financing Documents and the transactions contemplated thereby.

By:_____     By:_____

Print                          Print
Name:_____    Name:_____
Title:_____     Title:_____

1604830 v01

Document #10 of 19

## Copy of Insured's drivers license (or other proof of insured's age and sex)

*TO BE PROVDED BY INSURED*



Document #11 of 19

## SPECIAL POWER OF ATTORNEY

Through this Special Power of Attorney, which Special Power of Attorney is coupled
with an interest, the undersigned hereby irrevocably makes and appoints **Windsor
Securities LLC**, a Nevada LLC, as the undersigned's true and lawful attorney-in-fact for
it and in its name, place and stead, an on its behalf, to execute, deliver, endorse and
acknowledge any document or instrument concerning or pertaining to all claims, benefits,
privileges and rights available upon the death of the insured under the following life
insurance policy:

| Insurance Company | Policy Number |
|---|---|
| Pacific Life Insurance Company | VF51701320 |

*The Erwin A. Collins Family Insurance
Trust-2008*

By: *Maria Ana Gordillo*, **Trustee**
Name: **Maria A. Gordillo**
Date:

STATE OF ___Georgia___

COUNTY OF ___DeKalb___

On ___April___  ___15___, **2008**, before me, the undersigned, personally appeared
**Maria A. Gordillo**, personally known to me or proved to me on the basis of satisfactory
evidence to be the individual whose name is subscribed to the within instrument, and he
acknowledged to me that he is the Trustee of The Erwin A. Collins Family Insurance
Trust-2008, described in and which executed the foregoing instrument as Trustee of The
Erwin A. Collins Family Insurance Trust-2008; that he was authorized by the Irrevocable
Trust Agreement to execute documents such as this instrument.

*Jamie Pennington*
Notary Public

(Official Seal)



1604863 v01

Document #12 of 19

## THE POLICY

*TO BE PROVIDED BY INSURED*

**<Please attach complete original policy and premium schedule, or, if a copy of each is attached, please sign the verification below>**

By affixing my signature below, I am hereby affirming that the attached copy of the insurance policy being financed according to the terms *Life Insurance Premium Financing Agreement Among Windsor Securities LLC, The Erwin A. Collins Family Insurance Trust-2008, and Erwin A. Collins* is an accurate and current copy of that insurance policy as of the date of this signing.

_Maria Ana Gordillo_ , Trustee       Date: _April 15, 2008_
The Erwin A. Collins Family Insurance Trust-2008

_____ , Agent       Date: _4/15/08_



# PACIFIC LIFE

Pacific Life Insurance Company • 700 Newport Center Drive • Newport Beach, CA 92660

**READ YOUR POLICY CAREFULLY.** This is a legal contract between you, the Owner, and us, Pacific Life Insurance Company, a stock insurance company. We agree to pay the benefits of this policy according to its provisions. The consideration for this policy is the application for it, a copy of which is attached, and payment of the premiums.

THE METHOD FOR DETERMINING THE DEATH BENEFIT IS DESCRIBED IN THE DEATH BENEFIT SECTION OF THIS POLICY. THE AMOUNT OF THE DEATH BENEFIT MAY BE FIXED OR VARIABLE ACCORDING TO THE DEATH BENEFIT OPTION SELECTED AND MAY INCREASE OR DECREASE. POLICY LOAN VALUE IS LESS THAN ONE HUNDRED PERCENT (100%) OF THE POLICY'S CASH SURRENDER VALUE.

**Free Look Right** – You may return this policy within 20 days after you receive it. To do so, deliver or mail it to us or to our agent. This policy will then be deemed void from the beginning and we will refund the premiums paid.

Signed for Pacific Life Insurance Company,

President and Chief Executive Officer                    Secretary

# FLEXIBLE PREMIUM ADJUSTABLE LIFE INSURANCE POLICY

- Death Benefit Payable On The Death Of The Insured While The Policy Is In Force
- Net Cash Surrender Value Payable Upon Surrender While The Policy Is In Force
- Flexible Premiums
- Adjustable Face Amount
- Non-Participating

VF6

## POLICY SPECIFICATIONS

BASIC POLICY:  FLEXIBLE PREMIUM ADJUSTABLE LIFE INSURANCE

PREMIUMS:  PLANNED ANNUAL PREMIUM PAYMENT      = $      85,000.00
           7-PAY PREMIUM                  = $      220,649.63

DEATH BENEFIT QUALIFICATION TEST:     CASH VALUE ACCUMULATION TEST

           (THIS ELECTION IS IRREVOCABLE FOR THE LIFE OF THE CONTRACT)

| | |
|---|---|
| DEATH BENEFIT OPTION: | A. |
| PREMIUM LOAD RATE: | 6.35% |
| ADMINISTRATIVE CHARGE: | $ 7.50 PER MONTH TO AGE 100; $0 THEREAFTER. |
| INITIAL SURRENDER CHARGE: | $ 94,800.00 |
| FACE AMOUNT CHARGE: | $ 2,768.00 PER MONTH FOR POLICY YEARS 1 TO 10; $0 THEREAFTER.  REFER TO THE FACE AMOUNT CHARGE SECTION FOR DETAILS. |
| MINIMUM GUARANTEED ANNUAL INTEREST RATE: | 3%.  ANY EXCESS INTEREST DECLARED BY US AT POLICY ISSUE WILL BE GUARANTEED FOR THE FIRST POLICY YEAR. |
| DAILY EQUIVALENT: | 0.0080986% |
| DIVISOR FOR CALCULATING THE NET AMOUNT AT RISK: | 1.00246627 |

POLICY NUMBER:  VF51701320           OWNER (S): ERWIN A COLLINS FAM INS TRST
POLICY DATE:      MAR 04, 2008
AGE ON POLICY DATE: 74            INSURED:   ERWIN A COLLINS
                                       RISK CLASS: MALE PREFERRED NONSMOKER
INITIAL FACE AMOUNT:  $ 2,000,000.00

NOTE:  EVEN IF PLANNED PREMIUMS ARE PAID, IT IS POSSIBLE THAT THE POLICY MAY NOT CONTINUE IN FORCE (THAT IS, IT MAY LAPSE BEFORE THE DEATH OF THE INSURED) DUE TO CHANGES IN INTEREST CREDITED, EXPENSE LOADS, AND COST OF INSURANCE RATES.  ADDITIONALLY, LOANS, WITHDRAWALS, AND DEATH BENEFIT OPTION CHANGES WILL AFFECT THE LENGTH OF TIME THE POLICY STAYS IN FORCE.

POLICY NUMBER: VF51701320

## POLICY SPECIFICATIONS

## SUMMARY OF COVERAGES EFFECTIVE ON THE POLICY DATE

P04VF5        **BASIC COVERAGE**

FACE AMOUNT:      $2,000,000.00
AGE ON POLICY DATE:      74
RISK CLASS:      MALE PREFERRED NONSMOKER

INSURED:      ERWIN A COLLINS

R02NL5        NO LAPSE GUARANTEE RIDER

GUARANTEE PERIOD = 10 POLICY YEARS

INITIAL ANNUAL NO LAPSE PREMIUM = $ 103,482.84

MONTHLY INTEREST RATE FOR ACCUMULATION OF THE NO LAPSE CREDIT IF
THE NO LAPSE CREDIT IS POSITIVE: 0.327374%

R06CON        CONVERSION RIDER

ELIGIBLE COVERAGE:
BASIC POLICY

PAGE 3.1

POLICY NUMBER:  VF51701320

POLICY SPECIFICATIONS

TABLE OF COST OF INSURANCE RATES - BASIC POLICY

THE RATES BELOW ARE GUARANTEED MAXIMUM MONTHLY COST OF INSURANCE RATES PER
$1,000.00 OF COVERAGE APPLICABLE TO THE BASIC POLICY COVERING ERWIN A COLLINS.
THESE INCLUDE A 5 YEAR GUARANTEE OF OUR CURRENT RATES AS OF THE POLICY DATE.

| AGE | MONTHLY RATE | AGE | MONTHLY RATE | AGE | MONTHLY RATE |
|------|--------------|-----|--------------|-----|--------------|
| 74   | 0000.65554   |     |              |     |              |
| 75   | 0000.93285   |     |              |     |              |
| 76   | 0001.24747   |     |              |     |              |
| 77   | 0001.59191   |     |              |     |              |
| 78   | 0001.94088   |     |              |     |              |
| 79   | 0007.92387   |     |              |     |              |
| 80   | 0008.63521   |     |              |     |              |
| 81   | 0009.43078   |     |              |     |              |
| 82   | 0010.33895   |     |              |     |              |
| 83   | 0011.37350   |     |              |     |              |
| 84   | 0012.51384   |     |              |     |              |
| 85   | 0013.73773   |     |              |     |              |
| 86   | 0015.02185   |     |              |     |              |
| 87   | 0016.35661   |     |              |     |              |
| 88   | 0017.73798   |     |              |     |              |
| 89   | 0019.17199   |     |              |     |              |
| 90   | 0020.67765   |     |              |     |              |
| 91   | 0022.28714   |     |              |     |              |
| 92   | 0024.06347   |     |              |     |              |
| 93   | 0026.11993   |     |              |     |              |
| 94   | 0028.81300   |     |              |     |              |
| 95   | 0032.81758   |     |              |     |              |
| 96   | 0039.64294   |     |              |     |              |
| 97   | 0053.06605   |     |              |     |              |
| 98   | 0083.33333   |     |              |     |              |
| 99   | 0083.33333   |     |              |     |              |
| 100+ | 0000.00000   |     |              |     |              |

## DEFINITIONS

In this section, we define certain terms used throughout this policy. Other terms may be defined in other parts of the policy. Defined terms are usually capitalized to show emphasis.

**Accumulated Value** - is the sum of Net Premiums and credited interest less Withdrawals and deductions. See the Accumulated Value section for details.

**Administrative Office** - at the time of the delivery of this notice our Administration Office address is: Pacific Life Insurance Company (Life Division), PO BOX 2030, OMAHA, NE 68103-2030. We will notify you of any change in the address of our Administrative Office.

**Age** - means the age as of the Insured's birthday nearest to the Policy Date, increased by the number of complete policy years elapsed.

**Code** - is the U.S. Internal Revenue Code, and the resulting rules and regulations.

**Coverage Segment** - is a layer of insurance coverage with an associated Face Amount. The Face Amount shown in the Policy Specifications is that of the initial Coverage Segment. Any increase in the Face Amount, as shown in a Supplemental Schedule of Coverage, will result in a new Coverage Segment.

**Evidence of Insurability** - is information, including medical information, satisfactory to us that is used to determine insurability and the Insured's risk class.

**Face Amount** - is the sum of Face Amounts of each Coverage Segment and is used in determining the Death Benefit under this policy. The Face Amount as of the Policy Date is shown in the Policy Specifications. The Face Amount may be changed, as provided for in the Death Benefit section.

**Insured** - is the person insured under this policy, as shown in the Policy Specifications section.

**Monthly Payment Date** - is the day each month on which certain policy charges are deducted from the Accumulated Value. This first Monthly Payment Date is the Policy Date. Later Monthly Payment Dates as the same each month thereafter.

**Net Accumulated Value** - is the Accumulated Value, less Policy Debt.

**Net Premium** - is the premium we receive reduced by any Premium Load.

**PL, we, our, ours, us** and **the Company** - refer to Pacific Life Insurance Company.

**Policy Date** - is shown on page 3.0. Policy months, years and anniversaries are measured from this date.

**Policy Debt** - is the sum of all outstanding policy loans plus accrued loan interest.

**Policy Specifications** - is a section of the policy which shows information specific to your policy.

**Risk Class** - is shown in the Policy Specifications and is used in determining the Insured's Cost of Insurance Charges.

**Written Request** - is a request in writing, signed by you, containing the information we need to act on the request, and received by us at our Administrative Office.

**You, your** or **Owner** - refer to the Owner of this policy.

## DEATH BENEFIT

**Death Benefit -** This policy provides a Death Benefit on the death of the Insured while this policy is in force. This section describes how the Death Benefit is calculated. On the date of death, the Death Benefit is the larger of:

- The Death Benefit as calculated under the Death Benefit Option in effect; or
- The Minimum Death Benefit calculated under the Death Benefit Qualification Test elected.

**Death Benefit Options -** You have elected the Death Benefit Option in the application. The initial Death Benefit Option for this policy appears in the Policy Specifications. The Death Benefit Options are explained below.

- Option A - The Death Benefit equals the Face Amount.
- Option B - The Death Benefit equals the Face Amount plus the Accumulated Value at death.
- Option C - The Death Benefit equals the Face Amount plus the sum of the premiums paid minus the sum of any Withdrawals taken and any other distribution that reduces the Accumulated Value. If the sum of the Withdrawals is greater than the sum of the premiums paid, then the Death Benefit may be less than the Face Amount.

**Change of Death Benefit Option -** The Death Benefit Option may be changed to Option A or B upon Written Request at a maximum of once per policy year. Changes to Option C are not permitted. After any such change, the Face Amount will be that amount which results in the Death Benefit after the change being equal to the Death Benefit before the change. For this purpose, the Death Benefit is the amount calculated under the Death Benefit Options, disregarding the Minimum Death Benefit. The change will be effective on the Monthly Payment Date on or next following the day we receive your Written Request at our Administrative Office. We reserve the right to disallow any Death Benefit Option Change from Option A to B that would result in the Face Amount remaining after the change to be less than $50,000.

Unless you specify otherwise by Written Request, any request for a Death Benefit Option changes will not take effect if the requested change would cause the policy to be classified as a Modified Endowment Contract under the Code.

**Death Benefit Qualification Test -** In order for your policy to be classified as life insurance under the Code, it must satisfy one of two Death Benefit Qualification Tests. Unless you have elected otherwise, the Death Benefit Qualification Test for this policy is the Guideline Premium Test. The Death Benefit Qualification Test for this policy appears in the Policy Specifications section. The two Death Benefit Qualification tests are explained in this subsection.

1. **Cash Value Accumulation Test -** The Minimum Death Benefit will be the greater of the amount required for this policy to be deemed "life insurance" according to the Code or 101% of the Accumulated Value.

2. **Guideline Premium Test -** The Minimum Death Benefit at any time is the Accumulated Value multiplied by the Death Benefit percentage for the Age of the Insured as shown in the following table

| Age | Death Benefit Percentage | Age | Death Benefit Percentage | Age | Death Benefit Percentage | Age | Death Benefit Percentage |
|---|---|---|---|---|---|---|---|
| 0-40 | 250% | 50 | 185% | 60 | 130% | 70 | 115% |
| 41 | 243 | 51 | 178 | 61 | 128 | 71 | 113 |
| 42 | 236 | 52 | 171 | 62 | 126 | 72 | 111 |
| 43 | 229 | 53 | 164 | 63 | 124 | 73 | 109 |
| 44 | 222 | 54 | 157 | 64 | 122 | 74 | 107 |
| 45 | 215 | 55 | 150 | 65 | 120 | 75-90 | 105 |
| 46 | 209 | 56 | 146 | 66 | 119 | 91 | 104 |
| 47 | 203 | 57 | 142 | 67 | 118 | 92 | 103 |
| 48 | 197 | 58 | 138 | 68 | 117 | 93 | 102 |
| 49 | 191 | 59 | 134 | 69 | 116 | Over 93 | 101 |

P04VF5                                  Page 6

We reserve the right to reduce the Minimum Death Benefit by requiring Withdrawals be made in order to maintain the Net Amount at Risk at a level that will not exceed three times the Death Benefit on the Policy Date.

**Death Benefit Proceeds -** The Death Benefit Proceeds are the actual amount payable if the Insured dies while this policy is in force. The Death Benefit Proceeds are equal to the Death Benefit, as of the date of the Insured's death, less any Policy Debt and less any due and unpaid monthly deductions occurring during a grace period.

We will pay the Death Benefit Proceeds to the beneficiary within one month after we receive, at our Administrative Office, due proof of the Insured's death and proof of interest of the claimant. The Death Benefit Proceeds paid are subject to the conditions and adjustments defined in other policy provisions, such as General Provisions, Withdrawals, Policy Loans, and Timing of Payments and Transfers. We will pay interest on Death Benefit Proceeds as required by applicable law.

**Face Amount Change -** Subject to our approval, the Owner may change the Face Amount if such request is made:

- during the lifetime of the Insured;
- no more often than once in any policy year; and
- on your Written Request while this policy is in force.

**Face Amount Increase -** You may submit an application to increase the Face Amount by an amount not less than $25,000. The Insured must be Age 90 or less and the application must include Evidence of Insurability satisfactory to us. The effective date of the increased Face Amount will be the first Monthly Payment Date on or following the date all required conditions are met. We reserve the right to limit increases to one per policy year and to charge a fee to evaluate insurability, which will be deducted from the Accumulated Value. As of the time this policy is delivered, the fee will not exceed $100, but is subject to upward adjustments for inflation.

Upon approval of any unscheduled increase, we will send you a Supplemental Schedule of Coverage, which will include the following information:

- the increased Face Amount and the effective date of the increase;
- the Risk Class for the increase;
- the Monthly Cost of Insurance Rates applicable to the increase;
- the Face Amount Charge for the increase;
- the Surrender Charge for the increase; and
- if the Guideline Premium Test is used, the new Guideline Premiums.

**Face Amount Decrease -** The effective date of the decreased Face Amount will be the first Monthly Payment Date on or following the date we receive the Written Request and have approved it. We recommend you consult your tax advisor before requesting a decrease in policy Face Amount. Upon approval of any unscheduled decrease, we will send you a Supplements Schedule of Coverage, which will include the decreased Face Amount and the effective date of the decrease. If there have been prior increases in Face Amount, they will be decreased or eliminated in the following order:

- first, the most recent increase;
- next, other increases in Face Amount, in the reverse order in which they arose; and
- finally, the original Face Amount.

The request for a decrease in the Face Amount will be subject to the Guideline Premium Limit (if applicable to your policy) as defined in the Code. This may result in a refund of premiums and/or the distribution of Accumulated Value in order to maintain compliance with such limit. Such request will not be allowed if the resulting Guideline Premium limit could cause and amount in excess of the Net Cash Surrender Value to be distributed from the policy.

No request for a Face Amount decrease will be approved if the decrease would cause the policy to be classified as a Modified Endowment Contract under the Code, unless you authorize such a change in classification by Written Request.

**Change in Benefits** - Under the Guideline Premium Test, any change in policy or rider benefits will require an adjustment to the Guideline Premium Limit. See the Tax Qualification as Life Insurance subsection of the General Provisions Section for details.

## PREMIUMS

**Premiums** - This policy will not be in force until the initial premium is paid. The initial premium is payable either at our Administrative Office or to our agent. Additional premiums, if any, are payable in advance at our Administrative Office. At your request, a premium receipt signed by one of our officers will be given to you. We reserve the right to require each premium to be at least $50. Premiums may be paid at any time before the Insured attains Age 100, subject to the premium limits below, except that you may always make a premium payment which is required to keep this policy in force.

**Planned Premium** - Is the amount of premium you plan to pay and is shown in the Policy Specifications. We will send you premium reminder notices for the Planned Premium. You may change the Planned Premium by Written Request, in which case we will send you premium reminder notices for the new Planned Premium. Payment of the Planned Premium does not guarantee that the policy will continue in force.

**Premium Limitation** - We will not accept premiums after the Insured's Age 100, although you may make a loan repayment at any time. We reserve the right to require Evidence of Insurability, satisfactory to us, for any unscheduled premium payment that would result in an immediate increase in the difference between the Death Benefit and the Accumulated Value.

**Guideline Premium Limit** - This subsection applies only if you have elected the Guideline Premium Test as the Death Benefit Qualification Test. In order for this policy to be classified as life insurance under section 7702 of the Code, the sum of the premiums paid less a portion of any Withdrawals, as defined in the Code, may not exceed the greater of:

•   The Guideline Single Premium; or
•   The sum of the annual Guideline Level Premiums to the date of payment.

The Guideline Premiums are shown in the Policy Specifications section. The Guideline Premiums may change whenever there is a change in the Face Amount of insurance or in other policy benefits. Any such Guideline Premium change will be shown in a supplemental schedule that we will send to you at the time of the change. The Guideline Premiums are used solely to determine the premium limits, beyond which this policy would fail to be classified as life insurance under the Code. Payment of the Guideline Premiums does not guarantee that the policy will never lapse and additional premiums may be necessary to prevent the policy from lapsing in the future.

The Guideline Premiums are determined by the rules that apply to this policy as set forth in the Code. The Guideline Premiums will be revised to conform to any changes in the Code. In the event that a premium payment would cause such revised limits to be exceeded, we reserve the right to refund the excess payment to you, provided that we may not refuse any premium payment necessary to keep this policy in force. Further, we reserve the right to make distributions from the policy to the extent we deem it necessary to continue to qualify this policy as life insurance under the Code.

**Modified Endowment Contract Premium Limit** - In order that this policy not be classified as a Modified Endowment Contract under Section 7702A of the Code, the sum of premiums paid less a portion of any Withdrawals may not exceed the 7-Pay limit as defined in the Code. The 7-Pay limit is the cumulative sum of the 7-Pay Premiums to the date of payment. In the event that a premium payment would cause the 7-Pay limit to be exceeded, we reserve the right to refund the excess payment to your, unless you have provided a Written Request that we may accept any such payments and apply them to the policy.

The 7-Pay premium may change whenever there is a change in the Face Amount of Insurance or in other policy benefits. The 7-pay premiums are determined according to the rules applicable to this policy set forth in the Code. The 7-Pay premium will be revised to conform to any changes in the Code. In the event that a premium payment would cause such revised limits to be exceeded, we reserve the right to refund the excess payment to you. Further, we reserve the right to increase the Death Benefit or make distributions from the policy to the extent we deem it necessary to continue to classify this policy as a non-Modified Endowment Contract under the Code.

## ACCUMULATED VALUE

**Accumulated Value** - on each Policy Date, the Accumulated Value equals the Net Premium received less the first Monthly Deduction. On each other day, the Accumulated Value equals:

- the Accumulated Value as of the prior day;
- plus interest earned on such amount since the prior day;
- plus the amount of any Net Premiums received since the prior day;
- less the amount of any Withdrawal and Withdrawal fee as of the current day; and
- less, on a Monthly Payment Date, the Monthly Deduction and any fee for a Face Amount Increase or
- a Substitution of the Insured.

We credit interest on a daily basis using a 365-day year at a rate not less than the Guaranteed Minimum Annual Interest Rate shown in the Policy Specifications. The daily equivalent is also shown in the Policy Specifications. At our discretion, we may credit additional interest. Any such additional interest may be adjusted to reflect expenses, taxes, profit or sources of earning other than from investment earnings.

## POLICY CHARGES

**Monthly Deduction -** A Monthly Deduction for a policy month is due on each Monthly Payment Date prior to the Insured's age 100 and is equal to the sum of the following items:

- the Face Amount Charge;
- the Administrative Charge;
- rider or benefit charges, if any; and
- the Cost of Insurance Charge.

The guaranteed maximum of each such charge is described below or in the rider forms. We may charge less than these guaranteed maximum charge. Any lesser charge will apply uniformly to all members of the same Class. Class is determined by a number of factors, including (but not limited to) the Death Benefit, Accumulated Value, Policy Date, policy duration, and the Insured's Age and Risk Class.

**Face Amount Charge -** The Face Amount Charge will not exceed the Face Amount Charge shown in the Policy Specifications. This charge is based on the Face Amount on the Policy Date. If there have been increases in the Face Amount, each increase will have a Face Amount Charge corresponding to the amount of the increase and will be shown in the Supplemental Schedule of Coverage sent to you at the time of the increase.

**Administrative Charge -** The Administrative Charge is shown in the Policy Specifications.

**Rider Charges -** Any rider charges are described in the rider forms.

**Cost of Insurance Charge -** The Cost of Insurance Charge is the sum of the Cost of Insurance Charges on all Coverage Segments. For each Coverage Segment, the Monthly Cost of Insurance Charge is equal to (1) multiplied by (2), where:

(1) is the Guaranteed Maximum Monthly Cost of Insurance Rate for the Coverage Segment; and
(2) is the Net Amount at Risk for the Coverage Segment.

P04VF5                                    Page 9

**Cost of Insurance Rates -** The Guaranteed Maximum Monthly Cost of Insurance Rates for the initial Coverage Segment are shown in the Policy Specifications. The Guaranteed Maximum Monthly Cost or Insurance Rates for any subsequent Coverage Segment will be shown in a Supplemental Schedule of Coverage sent to you at the time of the increase.

**Net Amount at Risk -** is equal to the Death Benefit as of the most recent Monthly Payment Date divided by the Divisor for Calculating the Net Amount at Risk shown in the Policy Specifications, then reduced by the Accumulated Value at the beginning of the policy month before the Monthly Deduction is due. The Accumulated Value section describes how the Net Amount at Risk is used to calculate the Cost of Insurance Charge. If there are multiple Coverage Segments, then the Net Amount at Risk will be allocated proportionately to each Coverage Segment according to Face Amount.

**Premium Load -** The Premium Load will equal the premium paid multiplied by the Premium Load Rate shown in the Policy Specifications.

**Grace Period and Lapse -** If the Accumulated Value less Policy Debt on a Monthly Payment Date is not sufficient to cover the current monthly deduction, a grace period of 61 days will be allowed for the payment of sufficient premium to keep your policy in force.

The grace period begins on the Monthly Payment Date on which the insufficiency occurred and ends 61 days thereafter. At the start of the grace period, we will notify you and any assignee of record at the last known address. The notice will state the due date and the amount of premium required for your policy to remain in force. A minimum of three times the monthly deduction due when the insufficiency occurred, plus Premium Load, must be paid. There is no penalty for paying a premium during the grace period. Your policy will remain in force during the grace period. If sufficient premium is not paid by the end of the grace period, a lapse will occur. Thirty-one days prior to lapse, we will send you and any assignee of record a notice containing the lapse date and the required premium to keep your policy in force. If the Insured dies during the grace period, the Death Benefit Proceeds will be reduced by any overdue charges. Upon lapse, the policy will terminate with no value.

**Reinstatement -** If it has not been surrendered, this policy may be reinstated not more than five years after the end of the grace period. To reinstate this policy you must provide us with the following:

- a written application;
- Evidence of Insurability satisfactory to us;
- sufficient premium to cover all monthly deductions due and unpaid during the grace period; plus
- sufficient premium to keep the policy in force for three months after the date of reinstatement.

The effective date of the reinstated policy will be the first Monthly Payment Date on or following the date we approve your application. At reinstatement, the Net Accumulated Value will equal the Net Accumulated Value on the date of lapse and the surrender charge will be that in effect at the beginning of the grace period. The surrender charge will then decrease each Policy Month by 0.9259% of the Initial Surrender Charge until it becomes zero. Further, at reinstatement, the Face Amount Charge will be that in effect at the beginning of the grace period and will continue as if lapse had not occurred. If there was a policy loan at lapse, you may, by Written Request, reinstate or repay the loan at the time of reinstatement. In the absence of such Written Request, if the reinstatement occurs on the first Monthly Payment Date after lapse, the loan will also be reinstated; otherwise it will be repaid.

## SURRENDER AND WITHDRAWAL OF VALUES

**Surrender -** Upon Written Request and return to us of this policy while the Insured is living you may surrender this policy for its Net Cash Surrender Value. The policy will terminate on the date the request is received.

**Cash Surrender Value -** The Cash Surrender Value is the Accumulated Value less any Surrender Charge.

**Surrender Charge -** If you surrender your policy, a Surrender Charge will be deducted from the

P04VF5                              Page 10

Accumulated Value. The Surrender Charge is needed to help pay for costs such as underwriting, policy issue and sales and distribution costs. Each Coverage Segment has an associated Initial Surrender Charge, which is shown in the Policy Specifications for the Initial Coverage Segment or in a Supplemental Schedule of Coverage for subsequent Coverage Segments. For each Coverage Segment, the Surrender Charge will remain level for the first 12 Policy Months and then will decrease each Policy Month by 0.9259% of the Initial Surrender Charge for the Coverage Segment until it becomes zero at the 120th Policy Month following the effective date of the Coverage Segment. If there have been decreases in the Face Amount, including decreases in Face Amount due to Withdrawals, the Surrender Charge will not change as a result of the decrease.

The Surrender Charge as described above is the Guaranteed Maximum Surrender Charge. We may charge less than these guaranteed maximum charges. Any lesser charge will apply uniformly to all members of the same Class. Class is determined by a number of factors, including (but not limited to) the Death Benefit, Accumulated Value, Policy Date, policy duration, and the Insured's Age and Risk Class.

**Net Cash Surrender Value** - The Net Cash Surrender Value is the Cash Surrender Value less any Policy Debt.

**Withdrawals** - Upon Written Request on or after the first policy anniversary while the Insured is living, you may withdraw a portion of the Net Cash Surrender Value of this policy. We may deduct a Withdrawal fee of no more than $25 from the Accumulated Value for each Withdrawal. There is no Surrender Charge imposed for a Withdrawal, even if the Face Amount is reduced as a result of the Withdrawal.

Withdrawals will be subject to the following conditions:

- the amount of each Withdrawal must be at least $200; and
- the Net Cash Surrender Value remaining after a Withdrawal must be at least $500.

The amount of each Withdrawal and its associated Withdrawal fee will be deducted from the Accumulated Value. If the Insured dies after the request for a Withdrawal is sent to us and prior to the Withdrawal being effected, the amount of the Withdrawal will be deducted from the Death Benefit Proceeds, which will be determined without taking the Withdrawal into account.

A Withdrawal will affect the Death Benefit, depending on the Death Benefit Option you have chosen. If your policy's Death Benefit is greater than the Minimum Death Benefit, then the withdrawal may reduce the Death Benefit by the amount of the Withdrawal depending on the Death Benefit Option in effect. However, if your policy's Death Benefit is equal to the Minimum Death Benefit, the Withdrawal may cause the Death Benefit to decrease by an amount greater than the amount of the Withdrawal. For Death Benefit Option C, if the sum of the Withdrawals and other distributions from the policy is greater than the premiums paid, the Death Benefit will be less than the Face Amount.

**Withdrawals May Change the Face Amount** - Immediately following a Withdrawal, but only if Death Benefit Option A is in effect, the Face Amount of the policy will be re-determined as the lesser of (a) the Face Amount immediately before the Withdrawal and (b) the Death Benefit immediately before the Withdrawal less the amount of the Withdrawal or, if the Withdrawal is the first in any one of the first 15 policy years, less the amount of the Withdrawal in excess of 10% of the cumulative premiums paid to date. If the Face Amount has changed as a result of a Withdrawal as described above, the Death Benefit will also have changed since the Death Benefit depends on the Face Amount. See the Death Benefit section.

## INCOME BENEFITS

**Income Benefits** - Surrender or Withdrawal benefits may be used to buy a lifetime monthly income for the Insured as long as the monthly income is at least $100. Death benefits may be used to buy a monthly income for the lifetime of the beneficiary. The monthly income will automatically be guaranteed to continue for at least ten years, unless another form of payment is requested. Under the automatic form of payment, if the income recipient dies before the end of the ten-year period, payments will continue to the end of the

ten-year period to a person named by the income recipient in a Written Request.

The purchase rates for the monthly income will be set by the Company. However, under the automatic form of payment, the monthly income bought by each $1,000 of benefit amount will always be at least as large as that shown below.

| Age | Monthly Income | Age | Monthly Income | Age | Monthly Income | Age | Monthly Income | Age | Monthly Income |
|------|------|------|------|------|------|------|------|------|------|
| 0-30 | 2.38 | 40 | 2.63 | 50 | 3.00 | 60 | 3.60 | 70 | 4.63 |
| 32 | 2.42 | 42 | 2.69 | 52 | 3.10 | 62 | 3.76 | 72 | 4.92 |
| 34 | 2.47 | 44 | 2.76 | 54 | 3.20 | 64 | 3.94 | 74 | 5.26 |
| 36 | 2.52 | 46 | 2.83 | 56 | 3.32 | 66 | 4.14 | 75+ | 5.45 |
| 38 | 2.57 | 48 | 2.91 | 58 | 3.45 | 68 | 4.37 | | |

Monthly income amount for ages not shown are halfway between the two amounts for the nearest two ages that are shown. Amounts shown are based on an annual interest rate of 2% and the Annuity 2000 mortality table with the age setback 5 years. This benefit is not available if the income would be less than $100 a month. We may require evidence of survival for incomes that last more than ten years.

**Other Income Options -** Surrender, Withdrawal or Death Benefits may be used under any other payment plans that we make available at that time.

## POLICY LOANS

**Policy Loans -** You may obtain loans by Written Request after the Free Look Period, on the sole security of the Accumulated Value of this policy. We recommend you consult your tax advisor before requesting a policy loan.

**Loan Amount Available -** The amount of the loan must be at least $200. The amount available for a loan is equal to 90% of Accumulated Value, less any Policy Debt and also less any Surrender Charge that would be imposed if the policy were surrendered on the date the loan is taken or, if greater, the result of  (a x b/c)-d, where:

a = the Accumulated Value less 12 times the most recent monthly deduction less any Surrender Charge on the date of the loan;
b = 1 + the Guaranteed Minimum Annual Interest Rate shown in the Policy Specifications;
c = 1 + the loan interest rate described below; and
d = any existing Policy Debt.

**Loan Interest -** Interest will accrue daily at a rate no greater than the Guaranteed Minimum Annual Interest Rate shown in the Policy Specifications plus 0.25% and is due at the end of each policy year. Interest not paid when due will be added to the loan principal and bear interest at the same rate.

**Loan Repayment -** Loans may be repaid at any time prior to lapse of this policy. Any payment we receive from you while you have a loan will be first considered a loan repayment, unless you tell us by Written Request it is a premium payment.

## SUBSTITUTION OF INSURED

**Benefit -** Subject to our approval, after the first policy year, you may request a substitution of the Insured under this policy for a new Insured. We will require the following before we substitute the Insured:

• The new Insured must submit Evidence of Insurability satisfactory to us.
• You must submit a written application for the substitution.

We may adjust the Face Amount, Accumulated Value, Surrender Charge, and any policy fees and charges to reflect the new Insured. A revised schedule of benefits will be sent to you outlining the  benefits of the

new Insured. Riders on the new Insured will be added only with our consent and subject to our requirements for those riders. If approved, the substitution will be effective on the next Monthly Payment Date on or following our approval.

With respect to the substituted Insured, the incontestability and suicide exclusion periods will begin on the substitution date, or any later reinstatement date. If the substituted Insured commits suicide, while sane or insane, within 2 years of the effective date of the substitution, no Death Benefit Proceeds will be paid. Instead, we will return the Net Cash Surrender Value as of the substitution date, plus any premiums paid and less any loans and Withdrawals taken all since the substitution date.

## OWNER AND BENEFICIARY

**Owner** - The Owner of this policy is as shown in the Policy Specifications or in a later Written Request. If you change the Owner, the change is effective on the date the Written Request is signed, subject to our receipt of it. If there are two or more Owners, they will own this contract as joint tenants with right of survivorship.

**Assignment** - You may assign this policy by Written Request. An assignment will take place only when recorded at our Administrative Office. When received, the assignment will take effect as of the date the Written Request was signed. Any rights created by the assignment will be subject to any payments made or actions taken by us before the change is recorded. We will not be responsible for the validity of any assignment.

**Beneficiary** - The beneficiary is named by you in the application to receive the Death Benefit Proceeds. The beneficiary may be one or more persons. If the beneficiary is more than one person, they will share the Death Benefit Proceeds equally or as you may otherwise specify by Written Request. The interest of any beneficiary will be subject to any assignment. If you have named a contingent beneficiary, that person becomes the beneficiary if the beneficiary dies before the Insured. A beneficiary may not, at or after the Insured's death, assign, transfer or encumber any benefit payable. To the extent allowed by law, policy benefits will not be subject to the claims of any creditor of any beneficiary.

You may make a change of beneficiary by Written Request on a form provided by us while the Insured is living. The change will take place as of the date the request is signed. Any rights created by the change will be subject to any payments made or actions taken by us before the Written Request is received. You may designate a permanent beneficiary whose rights under the policy cannot be changed without his or her written consent.

The interest of a beneficiary who does not survive the Insured will pass to the surviving beneficiaries in proportion to their share in the portion of proceeds that pass to the surviving beneficiaries, unless otherwise provided. For example, if three beneficiaries were named with unequal portions, the first two named to receive 20% each, and the last to named to receive 60%, and if one of the 20% beneficiaries were to fail to survive the Insured, then such 20% share would be split between the two surviving beneficiaries, the first receiving 20/80 of the 20% share (5% of the total), and the other receiving 60/80 of the 20% share (15% of the total). If no beneficiaries survive to receive payment, the death proceeds will pass to the Owner, or the Owner's estate if the owner does not survive to receive payment.

## GENERAL PROVISIONS

**Entire Contract** - This policy is a contract between you and us. This policy, any attached endorsements, benefits and riders and the attached copy of the initial application are the entire contract, except as follows. Any written application for a change in policy terms allowed by the policy after issue or written notice of exercise of policy options made after the policy has been issued will also become part of the contract upon our acceptance of such application or notice and our mailing of same to your address last known to us. Only our president, chief executive office or secretary is authorized to change this contract or extend the time for paying premiums. Any such change must be in writing.

All statements in the application shall, in the absence of fraud, be deemed representations and not

warranties. We will not use any statement to contest this policy or defend a claim on grounds of misrepresentation unless the statement is in an application.

**Incontestability -** We will not contest this policy unless there was a material misrepresentation in an application, including any reinstatement application. The policy will terminate upon successful contest and we will return to you the premiums paid less any policy loans and Withdrawals. Except for failure to pay premiums, this policy cannot be contested after the expiration of the following time periods:

- If this policy has not been reinstated, we cannot contest the Death Benefit of any Coverage Segment after it has been in force during the Insured's lifetime for two years from its effective date; and
- Following a reinstatement, we cannot contest this policy after it has been in force during the Insured's lifetime for two years from the reinstatement date.

**Non-Participating -** This policy will not share in any of our surplus earnings.

**Suicide Exclusion -** If the Insured dies by suicide, while sane or insane, within two years after the Policy Date, the Death Benefit Proceeds will be limited to an amount equal to the sum of the premiums paid, less the sum of any Policy Debt and Withdrawals.

If the Insured dies by suicide, while sane or insane, within two years of the effective date of any increase in the Face Amount, the Death Benefit Proceeds with respect to such increase will be limited to the portion of the Monthly Deductions associated with that increase.

**Misstatement -** If the Insured's Age is misstated in the application, the amount of the Death Benefit shall be the Minimum Death Benefit for the correct age, or if greater, the Death Benefit Proceeds otherwise payable multiplied by a) divided by b), where a) = the Cost of Insurance rate for the misstated age use d in the most recent Monthly Deduction and b) = the Cost of Insurance rate for the correct age for such Monthly Deduction, unless such rate is zero, in which case b) = the last non-zero Cost of Insurance rate used in calculating a Monthly Deduction.

**Evidence of Insurability -** We reserve the right to require Evidence of Insurability for any policy change or any premium payment, which would result in an increase in Net Amount at Risk.

**Maturity -** This policy does not mature, but will continue in force so long as the Insured is alive and there is sufficient Accumulated Value to provide for the Monthly Deduction due. Starting at age 100 of the Insured there is no Monthly Deduction whatsoever.

**Timing of Payments -** We may defer payments of any Net Cash Surrender Value, Withdrawal or loan (except for loans to pay a premium on any policy issued by us) for up to six months after we receive your request. If we defer any such payment for more than 30 days after we receive your request, we will pay interest at the rate required by the state in which this policy is delivered, but not less the Guaranteed Minimum Annual Interest Rate shown in the Policy Specifications.

**Reports -** A report will be mailed to you at the end of each policy year to your last known address. This report will show the following information as of the policy anniversary:

- the Accumulated Value;
- any Cash Surrender Value;
- the Death Benefit;
- premiums paid and charges made during the policy year;
- interest earned during the policy year;
- any existing Policy Debt;
- any change in the Guideline Premiums, and
- any other information required by law.

**Policy Illustrations -** Upon request we will give you an illustration of the future benefits under this policy based upon both guaranteed and current cost factor assumptions. However, if you ask us to do this more

P04VF5                                        Page 14

than once in any policy year, we reserve the right to charge you a fee not to exceed $25 per request for this service. Illustrated benefits that are not guaranteed, such as benefits based on the current cost factor assumptions, will vary depending upon a number of factors, including but not limited to, changes in future interest.

**Juvenile Insured -** If an Insured's Age on the Policy Date is less than 20, the Insured may apply for Nonsmoker risk status on attaining Age 20. This option must be requested by Written Request and accompanied by satisfactory evidence of nonsmoking.

**Basis of Values -** All values provided by this policy will be at least equal to the nonforfeiture minimums required by the state in which this policy was delivered. A detailed statement showing how values are determined has been filed with the insurance department in states that require such filing. Required minimum values include the policy cash value.

To calculate the required minimum values, we use the Minimum Guaranteed Interest rate shown in the Policy Specifications, and the 1980 Commissioners Standard Ordinary Unismoke Ultimate Age nearest birthday, Sex-distinct Mortality Table. However, if the policy is issued as unisex (gender-neutral), we use a corresponding unisex mortality table, the 1980 Commissioners Standard Ordinary Table B (80% male, 20% female). The Risk Class in the Policy Specifications shows whether this policy was issued as sex-distinct or unisex.

**Tax Qualification as Life Insurance -** This policy is intended to qualify as a life insurance contract for federal tax purpose, and the death benefit under this policy is intended to qualify for federal income tax exclusion. This policy, including any rider, benefit or endorsement, shall be interpreted to ensure and maintain such tax qualification, despite any other provision to the contrary.

If at any time the premiums paid under the policy exceed the amount allowable for such tax qualification, the excess amount shall be removed from the policy as of the date of its payment in accordance with federal tax law. Any appropriate adjustments will be made to the death benefit and/or Accumulated Value of the policy. We will refund to you this excess amount, including interest, no later than 60 days after the end of the contract year in which this excess amount occurs, as determined under federal tax law.

If this excess amount is not refunded by the end of such 60-day period, the death benefit shall be increased retroactively to the minimum extent necessary so that at no time is the death benefit ever less than the amount necessary to ensure or maintain such tax qualification. In addition, the Accumulated Value will be reduced to reflect the increased Monthly Deductions that result from such death benefit increase, starting on the date that the increase is effective.

If you request a decrease in policy or rider benefits, it may cause a reduction in any applicable limits on premiums or cash values for the policy to qualify as life insurance under federal tax law. Such a reduction in these limits may require us to make a distribution from the policy equal to the greatest amount by which the premiums paid or cash values for the policy, as determined under federal tax law, exceed any such reduced limits, in order to maintain the policy's tax qualification. If such distribution is made, the distribution will be paid to you and the Accumulated Value will be reduced by the amount of the distribution. However, no request for a decrease in policy or rider benefits will be allowed to the extent that the resulting reduction in such tax limits would require us to distribute more than the Net Cash Surrender Value for the policy.

**Modified Endowment Contract Classification -** This policy is intended not to be classified as a Modified Endowment Contract for federal tax purposes, unless you have provided a Written request to accept a Modified Endowment Contract classification for this policy. Prior to such a Written Request, the provisions of this policy, including any rider, benefit or endorsement shall be interpreted to prevent the policy from being classified as a Modified Endowment Contract, despite any other provisions to the contrary.

In that case, if at any time the premium or other amounts paid under the policy exceed the limit for avoiding Modified Endowment Contract classification, the excess amount shall be removed from the policy as of the date of its payment in accordance with federal tax law. Any appropriate adjustments will be made to the death benefit and/or Accumulated Value of the policy. We will refund to you this excess amount, including

interest, no later than 60 days after the end of the contract year in which this excess amount occurs, as determined under federal tax law.

If this excess amount is not refunded by the end of such 60-day period, the death benefit shall be increased retroactively to the minimum extent necessary so that at no time is the death benefit ever less than the amount required to avoid Modified Endowment Contract classification. In addition, the Accumulated Value will be reduced to reflect the increased Monthly Deductions resulting from such death benefit increase, starting on the date that the increase is effective.

Any request that would change the death benefit or any other benefit under the policy or any rider will not be processed if the change would cause the policy to be classified as a Modified Endowment Contract, unless you have provided us with a Written Request to accept Modified Endowment Contract classification. Requested changes that could cause the policy to be classified as a Modified Endowment Contract include, but are not limited to, an elective reduction in the Face Amount, a Death Benefit Option change that would cause a reduction in the Face Amount, and a Withdrawal that would cause a reduction in the Face Amount.

**Compliance** - We reserve the right to make any change to the provisions of this policy to comply with, or give you the benefit of, any federal or state statute, rule, or regulation, including but not limited to requirements for life insurance contracts under the Code or of any state.

We will provide you with a copy of any such change, and file such a change with the insurance supervisory official of the state in which this policy is delivered. You have the right to refuse any such change.

**Termination** - This policy terminates on the earliest of:

- the death of the Insured;
- lapse of the policy; or
- surrender of the policy.

## INDEX

| | Page | | Page |
|---|---|---|---|
| Accumulated Value | 5 | Loan Interest | 12 |
| Administrative Charge | 9 | Loan Repayment | 12 |
| Administrative Office | 5 | Maturity | 14 |
| Age | 5 | MEC Classification | 15 |
| Assignment | 13 | Misstatement | 14 |
| Basis of Values | 15 | Modified Endowment Contract | 8 |
| Beneficiary | 13 | Monthly Deduction | 9 |
| Cash Surrender Value | 10 | Monthly Payment Date | 5 |
| Cash Value Accumulation Test | 6 | Net Accumulated Value | 5 |
| Change of Death Benefit Option | 6 | Net Amount at Risk | 10 |
| Code | 5 | Net Cash Surrender Value | 11 |
| Compliance | 16 | Net Premium | 5 |
| Cost of Insurance Charge | 9 | Non-Participating | 14 |
| Coverage Segments | 5 | Owner | 13 |
| Death Benefit | 6 | Planned Premium | 8 |
| Death Benefit Options | 6 | Policy Date | 5 |
| Death Benefit Proceeds | 7 | Policy Debt | 5 |
| Death Benefit Qualification Test | 6 | Policy Illustrations | 14 |
| Entire Contract | 13 | Policy Loans | 12 |
| Evidence of Insurability | 5, 14 | Policy Specifications | 5 |
| Face Amount | 5 | Premium Limitation | 8 |
| Face Amount Change | 7 | Premium Load | 10 |
| Face Amount Charge | 9 | Premiums | 8 |
| Face Amount Decrease | 7 | Reinstatement | 10 |
| Face Amount Increase | 7 | Reports | 14 |
| Grace Period | 10 | Risk Class | 5 |
| Guideline Premium Limit | 8 | Suicide Exclusion | 14 |
| Guideline Premium Test | 6 | Surrender | 10 |
| Income Benefits | 11 | Surrender Charge | 10 |
| Incontestability | 14 | Tax Qualification as Life Insurance | 15 |
| Insured | 5 | Termination | 16 |
| Juvenile Insured | 15 | Timing of Payments | 14 |
| Lapse | 10 | Withdrawals | 11 |
| Loan Amount Available | 12 | Written Request | 5 |

# NO LAPSE GUARANTEE RIDER

## SOME DEFINITIONS USED IN THIS RIDER

**Guarantee Period** - is the time during which we guarantee the death benefit will remain in force if the condition for the No Lapse Guarantee to be in effect (see below) is satisfied. The Guarantee Period is shown in the Policy Specifications. The Guarantee Period begins on the Policy Date and does not re-start if coverage is added or increased.

**No Lapse Guarantee Required Premium ("No Lapse Premium")** - is an amount used during the Guarantee Period to determine the No Lapse Credit (see next section), which in turn is used to determine if the No Lapse Guarantee is in effect. The Initial Annual No Lapse Premium is shown in the Policy Specifications. The No Lapse Premium may change as described in the "Changes in the No Lapse Premium" section below.

**No Lapse Credit** - is a value used to determine if the No Lapse Guarantee is in effect. It is calculated at the beginning of each policy month during the Guarantee Period. The No Lapse Credit as of the Policy Date, which is also the first Monthly Payment Date, is equal to the premium paid less one-twelfth of the Initial Annual No Lapse Premium. On any other Monthly Payment Date, the No Lapse Credit is equal to:

- the No Lapse Credit as of the prior Monthly Payment Date multiplied by (1+ i), where i = 0.327374% if the No Lapse Credit is negative, otherwise i = the rate shown in the Policy Specifications;
- plus premiums received since the prior Monthly Payment Date;
- less withdrawals taken since the prior Monthly Payment Date; and
- less one-twelfth of the then current No Lapse Premium.

**Net AV** - is the policy Accumulated Value less policy debt.

## PROVISIONS OF THIS RIDER

**Changes In No Lapse Premium** - Any increase in face amount, scheduled or not, or addition or increase in coverage will cause an increase in the No Lapse Premium. A decrease in Face Amount or in other coverage will not cause a decrease in the No Lapse Premium. If the No Lapse Premium changes as a result of a coverage change, we will provide you with the changed No Lapse Premium.

**Condition For The No Lapse Guarantee To Be In Effect** - The condition for the No Lapse Guarantee to be in effect is that the No Lapse Credit less policy debt is equal to or greater than zero. As an example, if you pay a premium at the beginning of each policy year at least equal to the then current No Lapse Premium, and if you have taken no policy loans or withdrawals, then the No Lapse Guarantee will be in effect throughout the Guarantee Period. You may also satisfy the condition for the No Lapse Guarantee to be in effect by other premium payment patterns so long as the No Lapse Credit less policy debt is greater than or equal to zero.

**Catch-Up Amount** - If the No Lapse Guarantee has become ineffective because you have not satisfied the above condition, you may bring the No Lapse Guarantee back into effect by paying the Catch-Up Amount. The Catch-Up Amount is equal to the No Lapse Credit less policy debt, if such amount is less than zero.

**No Lapse Guarantee Benefit** - If the No Lapse Guarantee is in effect, and if your policy would lapse in the absence of this rider due to insufficient Net AV to cover the Monthly Deductions due, the policy will not enter the grace period and will not lapse. Instead, the policy will continue under the No Lapse Guarantee and it will stay in force as long as you continue to meet the condition for the No Lapse Guarantee to be in effect.

**AV Pay-Off Account** - If the policy is continued under the No Lapse Guarantee, then the policy has no Net AV from which Monthly Deductions can be collected. Any such uncollected amounts are accumulated with interest at the monthly rate of 0.327374%, which is equivalent to 4% annually, and the result is stored in an account we call the AV Pay-Off Account. Any payment you make to us when the policy is continued under the No Lapse Guarantee will first be used to reduce the AV Pay-Off Account. After the AV Pay-Off Account is reduced to zero, any excess will be applied to the Accumulated Value, as described in your policy. If you want to keep your policy active at the end of the Guarantee Period, you must make a payment sufficient to reduce the AV Pay-Off Account to zero. In such case, any excess will then be applied to the Accumulated Value, as described in your policy. Any payment used to reduce the AV Pay-Off Account will be subject to the Premium Loads shown in your policy.

**Other Riders Attached To Policy At Issue** - If the policy is continued under the No Lapse Guarantee, any attached riders will continue or end according to their terms.

**Effective Date** - This rider is effective on the policy date unless otherwise stated. It will end on the earliest of:

- your Written Request;
- when the policy ends;
- if you change the Death Benefit Option from A to B;
- if you add any rider that has charges; or
- at the end of the Guarantee Period.

**General Conditions** - This rider is part of the policy to which it is attached. All terms of the policy that do not conflict with this rider's terms apply to this rider.

Signed for Pacific Life Insurance Company

James T. Morris

Audrey L. Milfs

President and Chief Executive Officer

Secretary

## CONVERSION RIDER

**Conversion Right -** At any time during the 8th policy year, you may convert any Eligible Coverage, as defined below, to any other policy of permanent life insurance that we make available at that time for such conversions. The new policy will be issued at the same Risk Class as this policy, provided that if this policy has one or more increases in Face Amount with one or more Risk Classes that are different from the Risk Class for the original Face Amount, the new policy will be issued at the Risk Class of the most recent Coverage Segment of this policy. If the Risk Class of this policy is not available on the policy to which you choose to convert, the new policy will be issued at the risk class for which the insured would have qualified based on the application for the original policy, or for the latest increase in Face Amount, if any. The Face Amount of the new policy will be equal to the current amount of Eligible Coverage for this policy, subject to any minimum requirement for the new policy. There will be no Surrender Charge imposed on this policy, and no Evidence of Insurability will be required for the conversion. Upon exercise of the conversion right of this rider, this policy will end.

**Eligible Coverage -** is coverage of the policy that will qualify for conversion under this rider. Eligible Coverage is listed in the Policy Specifications under the title of this rider.

**Eligible Coverage does not include:**

- any insurance provided under the policy on the life of someone other than the insured; and
- any other rider, term policy, or term coverage on the primary insured other than explicitly listed under Eligible Coverage above.

**Effective Date -** This rider is effective on the Policy Date unless otherwise stated.

**When This Rider Ends -** This rider will end when the policy lapses or ends.

**General Conditions -** This rider is part of the policy to which it is attached. All provisions of the policy that do not conflict with this rider's provisions apply to this rider.

**Consult Your Tax Advisor -** It is possible that converting your policy under this rider could cause the policy to become a Modified Endowment Contract, as defined in the Internal Revenue Code section 7702A. Such a result could have potential adverse tax consequences. You should consult your tax advisor before any such conversion to make sure you understand how it may affect the tax you owe.

Signed for Pacific Life Insurance Company

President and Chief Executive Officer                     Secretary

R06CON

ENDOR

**PACIFIC LIFE INSURANCE COMPANY**
Life Insurance Operations Center
P.O. Box 2030 • Omaha, NE 68103-2030
(800) 347-7787

 **PACIFIC LIFE**

## HOME OFFICE ENDORSEMENTS

| INSURED NAME:          | POLICY NUMBER: |
|------------------------|----------------|
| COLLINS, ERWIN A       | VF51701320     |

Pacific Life has endorsed the Application, referenced by the above policy number, as indicated below.

**ENDORSEMENTS**

```
APPLICATION PAGE 7, QUESTION #5A: NOT APPLICABLE
APPLICATION PAGE 7, QUESTION #5B: CVAT
APPLICATION PAGE 7, QUESTION #11A: NOT APPLICABLE
```

\Postrisk\HOendor.doc                                                    10/2007

APPLC

**PACIFIC LIFE INSURANCE COMPANY**
Life Insurance Operations Center
P.O. Box 2030 · Omaha, NE 68103-2030
(800) 347-7787 · Fax (949) 462-3098
www.PacificLife.com



# APPLICATION FOR LIFE INSURANCE

## CLIENT INFORMATION

| PROPOSED INSURED Complete for all Life Insurance Policies. | 1A. Name: First Erwin | MI A | Last Collins | | | B. Gender ☑ Male ☐ Female |
|---|---|---|---|---|---|---|
| | C. Residence Address: Street 331 Suburban Rd | City Knoxville | | State TN | Zip Code 37923 | D. How Long 15 yr mo |
| | E. Date of Birth (mm/dd/yyyy) 09/15/1933 | F. Place of Birth (State/Country) TN / USA | | G. Soc. Sec. # Redacted | | |
| | H. Driver's License # & State (Redacted FL | I. Telephone # (include area code) (865) 691-3328 | J. Occupation Property Owner / Manager | | | |
| Employer's address should be location where Proposed Insured physically works. | K. Proposed Insured is a: ☑ U.S. Citizen ☐ U.S. Permanent Resident ☐ Foreign National If Foreign National, provide Country | | | and Visa Type | | |
| | 2A. Employer's Name Self Employed | | | | | B. How Long 15 yr mo |
| | C. Employer's Address: Street P.O. Box 31668 | City Knoxville | | State TN | Zip Code 37930 | D. Type of Business Property Management |

| PROPOSED ADDITIONAL INSURED Complete for either: 1) Second-to-Die Life Insurance Policy; or 2) Term Rider on Another Covered Person (e.g., Spouse) for an Individual Life Insurance Policy. | 3A. Name: First | MI | Last | | | B. Gender ☐ Male ☐ Female |
|---|---|---|---|---|---|---|
| | C. Residence Address: Street | City | | State | Zip Code | D. How Long yr mo |
| | E. Date of Birth (mm/dd/yyyy) | F. Place of Birth (State/Country) | G. Soc. Sec. # | | H. Relationship to Insured | |
| | I. Driver's License # & State | J. Telephone # (include area code) | K. Occupation | | | |
| | L. Proposed Insured is a: ☐ U.S. Citizen ☐ U.S. Permanent Resident ☐ Foreign National If Foreign National, provide Country | | | and Visa Type | | |
| | 4A. Employer's Name | | | | | B. How Long yr mo |
| | C. Employer's Address: Street | City | | State | Zip Code | D. Type of Business |

| OWNER Complete only if owner is different than the insured(s). If more than one owner, add in #6A. If owner is a trust, complete #'s 5 & 7-10 with applicable information. Use Remarks if necessary. | 5A. Name Erwin A. Collins Family Insurance Trust - 2008 | | | | State GA | Zip Code 30075 |
|---|---|---|---|---|---|---|
| | B. Address: Street 346 Crestview Circle | City Roswell | | | | |
| | C. Date of Birth (mm/dd/yyyy) N/A | | D. Relationship to Insured(s) Trust | | | |
| | E. Soc. Sec #/Tax ID # Redacted | F. Driver's License # & State (if applicable) N/A | G. Telephone # (include area code) | | | |
| | 6A. Additional Name (if applicable) | | | | | |
| | B. Address: Street | City | | | State | Zip Code |
| | C. Relationship to Insured(s) | | D. Soc. Sec. #/Tax ID # | | | |
| If owner is a corporation or business entity, indicate name and title of authorized representative in #11. Use Remarks if more than one. | 7A. Trustee's Name: First Maria | MI A | Last Gordillo | | | B. Date of Trust (mm/dd/yyyy) 02/01/2008 |
| | 8. Additional Trustee's Name: First | MI | Last | | | 9. Total Number of Trustees 1 |
| | 10. Does your trust agreement require all trustees to sign? ☑ Yes ☐ No (If No, indicate in Remarks who is required to sign) | | | | | |
| | 11A. Authorized Representative's Name: First MI | | Last | | B. Title | |

A061UW   Page 1   15-27446-06 01/2008

PLXAPPLCXPLN

**CLIENT INFORMATION (Continued)**

| CERTIFICATION OF OWNER'S TAXPAYER IDENTIFICATION# | Under penalty of perjury, I certify that: |
|---|---|

Under penalty of perjury, I certify that:
  1. The number shown in this application as my Social Security number or Taxpayer Identification number is correct; and
  2. I am not subject to backup withholding under Section 3406(a)(1)(c) of the Internal Revenue Code; and
  3. I am a U.S. person (including a U.S. resident alien).
Note: If statement 2 or 3 is false, strike out and initial.
I understand that 1) federal law requires all financial institutions to obtain the name, residential address, date of birth and Social Security or Taxpayer Identification number and any other information necessary to verify the identity of each customer, and 2) failure to provide this information could result in denial of this application or in delayed or unprocessed transactions.

| PRIMARY BENEFICIARY(IES) | 12A. Name | | | | | B. % Share |
|---|---|---|---|---|---|---|
| | Erwin A. Collins Family Insurance Trust – 2009 | | | | | 100 |
| If there are more than two, use the Remarks section. If beneficiary is a trust, complete #12, 14 and 15 with applicable information. Use Remarks if necessary. | C. Relationship to Insured(s) | | | D. Soc. Sec. # / Tax ID # | E. Date of Birth (mm/dd/yyyy) | |
| | Trust | | | Redacted | | |
| | 13A. Additional Name (if applicable) | | | | | B. % Share |
| | | | | | | |
| | C. Relationship to Insured(s) | | | D. Soc. Sec. # / Tax ID # | E. Date of Birth (mm/dd/yyyy) | |
| If percentage shares are left blank, the shares will be equal. | 14A. Trustee's Name: First | MI | Last | | B. Date of Trust (mm/dd/yyyy) | |
| | Maria | A | Gordillo | | 02/01/2008 | |
| | 15. Additional Trustee's Name: First | MI | Last | | | |
| | | | | | | |
| CONTINGENT BENEFICIARY (Optional) | 16A. Name | | | | | |
| | | | | | | |
| | B. Relationship to Insured(s) | | C. Soc. Sec. # / Tax ID # | | D. Date of Birth (mm/dd/yyyy) | |

**REMARKS – IDENTIFY QUESTION AND GIVE DETAILS**

## EXISTING / PENDING INSURANCE INFORMATION

**LIFE INSURANCE / ANNUITY IN FORCE AND REPLACEMENT INFORMATION**

1. Is there any existing or pending life insurance or annuities on any Proposed Insured(s)?
   ☒ Yes (Complete and submit with the application any applicable state replacement notice, see IMPORTANT note)
   ☐ No

2. Will the policy applied for replace, cause a change in, or involve a cash withdrawal or loan from or lapse of any life insurance policy or annuity contract on any Proposed Insured's life?
   ☐ Yes (Complete and submit with the application the applicable state replacement forms)
   ☒ No

3. Complete the chart below:

**IMPORTANT**
Certain states require replacement forms for any inforce policies even if a replacement is not intended. Refer to Producer instructions for a list of states.

Add additional policies under Remarks.

### PROPOSED INSURED'S INFORMATION

| Policy/Contract # | Company | Face Amount | Year Issued/ Applied For | Policy Type Life | Policy Type Ann | Ind/Grp Ind | Ind/Grp Grp | Purpose Bus | Purpose Pers | Pending Yes | Pending No | Replace Yes | Replace No | 1035 Exch Yes | 1035 Exch No |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Unknown | Phoenix Life | $2,000,000 | 2007 | ☒ | ☐ | ☒ | ☐ | ☐ | ☒ | ☒ | ☐ | ☐ | ☒ | ☐ | ☒ |
|  |  |  |  | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
|  |  |  |  | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

### PROPOSED ADDITIONAL INSURED'S INFORMATION

| Policy/Contract # | Company | Face Amount | Year Issued/ Applied For | Policy Type Life | Policy Type Ann | Ind/Grp Ind | Ind/Grp Grp | Purpose Bus | Purpose Pers | Pending Yes | Pending No | Replace Yes | Replace No | 1035 Exch Yes | 1035 Exch No |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
|  |  |  |  | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
|  |  |  |  | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

4. For all 1035 Exchanges, complete the following chart:

| Policy/Contract # | Qualified Plan Yes | Qualified Plan No | Loan Carryover Yes (If yes, indicate amount) | Loan Carryover No | Modified Endowment Contract Yes | Modified Endowment Contract No | Modified Endowment Contract Unknown |
|---|---|---|---|---|---|---|---|
|  | ☐ | ☐ | ☐ $ | ☐ | ☐ | ☐ | ☐ |
|  | ☐ | ☐ | ☐ $ | ☐ | ☐ | ☐ | ☐ |

**MODIFIED ENDOWMENT CONTRACT (MEC) DISCLOSURE**

Under federal tax rules, if a policy is received in exchange for an old policy that had become a MEC, the new policy will also be a MEC. This rule applies whether or not the two policies are issued by the same insurance company. A MEC Acceptance Form must be signed and submitted with the application, or must be signed upon policy delivery.

## REMARKS – IDENTIFY QUESTION AND GIVE DETAILS

## PERSONAL INFORMATION

### FINANCIAL INFORMATION

| | | Proposed Insured | Additional Insured |
|---|---|---|---|
| 1. | Annual earned income from occupation (After deduction of business expenses) | $ 125,352 | $ |
| 2. | Annual unearned income (State source in Remarks below) | $ 80,000 | $ |
| 3. | Net worth: ☑ Individual ☐ Joint | $ 3,096,402 | $ |
| 4A. | Is the Proposed Insured married? | ☑ Yes ☐ No | |
| B. | If married and applying for individual life insurance, list amount of life insurance in force on the spouse $ 0 (for business or survivor insurance write N/A) | | |

### GENERAL INFORMATION

Complete each question for the Proposed Insured and Proposed Additional Insured.

Explain all "Yes" answers in Remarks unless instructed otherwise.

| | | YES | NO | YES | NO |
|---|---|---|---|---|---|
| 5. | Within the next 2 years do you plan to fly, or within the last 2 years have you flown, as a pilot, student pilot, or crewmember? (If yes, complete the Aviation Questionnaire) | ☐ | ☑ | ☐ | ☐ |
| 6. | Within the next 2 years do you plan to participate in, or within the last 2 years have you participated in, parachute jumping, scuba diving, auto/motorboat/motorcycle racing, hang gliding, or mountain climbing? (If yes, complete the Avocation Questionnaire) | ☐ | ☑ | ☐ | ☐ |
| 7. | Do you plan or expect to travel or reside outside the USA? (If yes, complete the appropriate Travel Questionnaire) | ☐ | ☑ | ☐ | ☐ |
| 8. | Have you applied for any other life insurance within the last 3 months? | ☑ | ☐ | ☐ | ☐ |
| 9. | Have you ever had life insurance declined, rated, modified, cancelled, or not renewed? | ☐ | ☑ | ☐ | ☐ |
| 10. | Have you been convicted of a felony within the past 5 years? | ☐ | ☑ | ☐ | ☐ |
| 11. | Have you had a driver's license restricted or revoked or been convicted of 3 or more moving violations within the past 5 years? | ☐ | ☑ | ☐ | ☐ |

### TOBACCO USE INFORMATION

Complete if Proposed Insured and/or Proposed Additional Insured is age 20 and above.

| | | YES | NO | YES | NO |
|---|---|---|---|---|---|
| 12. | Have you used within the last 5 years tobacco or any other product that contains nicotine? | ☐ | ☑ | ☐ | ☐ |

| Type of Product | Proposed Insured | Additional Insured |
|---|---|---|
| Cigarettes | ☐ | ☐ |
| Cigars | ☐ | ☐ |
| Pipe | ☐ | ☐ |
| Chewing | ☐ | ☐ |
| Patch | ☐ | ☐ |
| Gum | ☐ | ☐ |
| Other | | |
| Date last used (mm/yy) | | |

(If yes, check all that apply and indicate date when last product was used)

## MEDICAL CERTIFICATION

### MEDICAL CERTIFICATION

Complete when submitting a medical examination from another insurance company.

Another insurance company's exam may be accepted if the proposed/additional insured was examined within the past six months.

1. The attached examination is on the life of (Use check boxes):

| Proposed Insured | Additional Insured | Name of Insurance Company | Date of Examination |
|---|---|---|---|
| ☑ | ☐ | Phoenix Life | 11/14/2007 |
| ☐ | ☐ | | |

2. To the best of your knowledge and belief, are the statements in the examination true as of today? (If no, explain in Remarks)

Proposed Insured ☑ Yes ☐ No
Additional Insured ☐ Yes ☐ No

3. Has the person who was examined consulted a doctor or other medical practitioner, or received medical or surgical advice since the date of the examination? (If yes, explain in Remarks)

Proposed Insured ☐ Yes ☑ No
Additional Insured ☐ Yes ☐ No

## REMARKS – IDENTIFY QUESTION AND GIVE DETAILS

#2: Source of unearned income: pension, stocks, bonds and mutual funds.

#8: Application for Phoenix Life has been submitted, but will not be accepted if the Pacific Life preferred rating stands.

| PHYSICIAN / MEDICAL FACILITY INFORMATION | | | | |
|---|---|---|---|---|
| **PHYSICIAN / MEDICAL FACILITY INFORMATION** (Optional) | Complete information on the Proposed Insured and the Proposed Additional Insured regarding the last visits to a physician(s) or medical facility(ies): | | | |

**PROPOSED INSURED'S INFORMATION**

| 1A. Name: First<br>Erwin | MI<br>A | Last<br>Cullins | | B. Height<br>6'1 | C. Weigh:<br>247 |
|---|---|---|---|---|---|
| 2A. Physician and/or Medical Facility Name<br>Dr. Charles Robinson | | | B. Telephone Number (include area code)<br>(865) 584-2146 | | |
| C. Address: Street<br>1300 Old Weisgarber Rd. | | City<br>Knoxville | | State<br>TN | Zip Code<br>37909 |
| D. Date of Last Visit (mm/yyyy)<br>09/2007 | E. Reason for Visit<br>Regular Check up | | F. Results of Visit<br>Normal | | |
| 3A. Additional Physician and/or Medical Facility Name<br>Dr. Eric Nicely | | | B. Telephone Number (include area code)<br>(865) 691-3061 | | |
| C. Address: Street<br>9330 Park West Blvd., Ste 308 | | City<br>Knoxville | | State<br>TN | Zip Code<br>37932 |
| D. Date of Last Visit (mm/yyyy)<br>06/2007 | E. Reason for Visit<br>Urological Physical | | F. Results of Visit<br>Normal | | |

**PROPOSED ADDITIONAL INSURED'S INFORMATION**

| 4A. Name: First | MI | Last | | B. Height | C. Weight |
|---|---|---|---|---|---|
| 5A. Physician and/or Medical Facility Name | | | B. Telephone Number (include area code) | | |
| C. Address: Street | | City | | State | Zip Code |
| D. Date of Last Visit (mm/yyyy) | E. Reason for Visit | | F. Results of Visit | | |
| 6A. Additional Physician and/or Medical Facility Name | | | B. Telephone Number (include area code) | | |
| C. Address: Street | | City | | State | Zip Code |
| D. Date of Last Visit (mm/yyyy) | E. Reason for Visit | | F. Results of Visit | | |

**REMARKS – IDENTIFY QUESTION AND GIVE DETAILS**

Obtaining this information will assist in the early ordering of attending physician statements.

## PREMIUM AND BILLING INFORMATION

| | |
|---|---|
| **AMOUNT PAID WITH THIS APPLICATION**<br>The application, TIA, and check should all have the same date. | **1A.** Is an initial premium submitted with this application?  ☐ Yes  ☑ No<br>(Do not submit money unless the Temporary Insurance Agreement (TIA) is completed)<br>**B.** If yes, show amount of initial premium and complete the next question. Amount $_____<br>**C.** Do you understand, accept, and agree to the terms of the TIA?  ☐ Yes  ☐ No |
| **PREMIUM FINANCING**<br>All questions must be answered. | **2.** Premium financing, or borrowing life insurance premiums from a lender or other third party, can be a legitimate method of obtaining life insurance premiums. However, not all premium financing arrangements may be appropriate and otherwise in compliance with the applicable laws and regulations. In fact, Pacific Life does not allow its products to be used in certain premium financing arrangements and will decline applications for life insurance made in connection with a premium financing arrangement that is not approved for use with Pacific Life products.<br><br>**A.** Have you entered into or do you have an expectation that you may enter into an agreement to borrow current or future premiums, or both, in connection with this Application for Life Insurance?<br>☐ Yes (A signed Premium Financing Disclosure Statement must be returned to Pacific Life before the underwriting process can begin)<br>☑ No<br><br>**B.** Do you have an expectation that you may transfer the policy to a third party as repayment of any premium financing debt?  ☐ Yes (Give details in the Remarks section)    ☑ No |
| **PREMIUMS** | **3.** Billing Method (Check one):<br>A.  ☑ Direct<br>B.  ☐ Monthly Bank Draft (Attach voided check and complete Authorization for Electronic Funds Transfer (EFT) section)<br>C.  ☐ Single Premium<br>D.  ☐ List Bill – I agree that inclusion of the premium for this policy in an itemized list to be furnished as stated below by Pacific Life to the Employer named in the Client Information section shall constitute notice of premium due, and I waive any future premium notices or other notices relating to premiums. (Check one)<br>        ☐ New List Bill        ☐ Add to Existing List Bill #:_____ |
| | **4.** Frequency of Payment for Direct and List Bill (Check one):<br>A.  ☑ Annually          C.  ☐ Quarterly<br>B.  ☐ Semi-Annually      D.  ☐ Monthly (Available with List Bill only) |
| | **5A.** Send Premium Notices to:  ☐ Insured  ☑ Owner  ☐ Payor  ☐ Other<br>Indicate name, relationship, and address below if different from Client Information section. |
| | **B.** Name _____ | **C.** Relationship to Insured(s) _____ |
| | **D.** Care of (if applicable) |
| | **E.** Address: Street _____ City _____   State ____ Zip Code ____ |
| **NOTIFICATIONS (Optional)**<br><br>*Notifications include, but are not limited to, Policy Annual Statements, Last Premium Offers/Lapse Notices, and Confirmation Statements. | **6A.** For non-employer sponsored cases, original notifications* are sent to the policyowner. To send additional notifications, indicate where notifications should be sent:  ☐ Insured  ☐ Payor  ☐ Other<br>**B.** For employer-sponsored cases, indicate where notifications* should be sent:  ☐ Employer  ☐ Other |
| | **7.** Indicate name, relationship, and address below if information for above entity(ies) is different from Client Information section.<br>**A.** Name _____   **B.** Relationship to Insured(s) _____<br>**C.** Address: Street _____ City _____   State ____ Zip Code ____ |

## REMARKS – IDENTIFY QUESTION AND GIVE DETAILS

## LIFE INSURANCE COVERAGE INFORMATION

| PRODUCT/PREMIUM | 1. Product Name<br>Versa Flex VI | | 2. Planned Annual Premium<br>$ 85,000.00 | |

**FACE AMOUNT/ DEATH BENEFIT**
Select the appropriate basic and rider/other coverage face amount(s) as shown on the illustration.

Not all rider/other coverages are available on all products.

Rider/Other Coverage (Total of face amounts below)
$ _____
- ☐ Accounting Benefit Rider $ _____
- ☐ Annual Renewable Term $ _____
- ☐ Cash Value Enhancement Rider $ _____
- ☐ ECV Coverage $ _____
- ☐ Group Term Carve Out $ _____
- ☐ Last Survivor Accounting Benefit Rider $ _____
- ☐ Last Survivor Annual Renewable Term $ _____
- ☐ Other _____ $ _____

3. Basic Coverage Amount $ 2,000,000

Total Initial Coverage $ 2,000,000

**DEATH BENEFIT OPTION** Not available on all products.
4. Check one: ☒ Option A (Level) ☐ Option B (Increasing) ☐ Option C (Face amount plus premiums less distributions) ☐ Option D (Face amount multiplied by a death benefit factor)

**LIFE INSURANCE QUALIFICATION TEST** Both tests not available on all products.
5. Check one: (Qualification test cannot be changed after the policy is inforce)
A. ☒ Guideline Premium Test (GPT)
B. ☐ Cash Value Accumulation Test (CVAT)

**GUARANTEED COST OF INSURANCE (COI) PERIOD** Not all years available on all products.
6. Indicate number of years:
☐ 0 ☐ 1 ☐ 2 ☐ 3 ☒ 5 ☐ 10 ☐ Other _____

**OPTIONAL BENEFITS** Select the appropriate riders as indicated in the illustration and indicate face amount(s) where applicable.
7. Individual Life Insurance Products Only
A. ☐ Accelerated Living Benefit Rider (Complete disclosure form)
B. ☐ Accidental Death $ _____
C. ☐ Children's Term $ _____ (Complete non-Medical form)
D. ☐ Disability Benefit $ _____
E. ☐ Flexible Duration No Lapse Guarantee Rider
F. ☐ Guaranteed Insurability $ _____
G. ☐ Guaranteed Minimum Distribution Rider
H. ☐ Long-Term Performance Rider _____ % (Indicate a percentage of Base plus Annual Renewable Term Coverages to which this rider applies)
I. ☐ Minimum Earnings Benefit Rider _____ years (Indicate a Maturity Period)
J. ☐ Maturity Extension Rider

K. ☐ Owner Waiver of Charges (Complete Non-Medical form)
L. ☐ Payor Waiver of Charges (Complete Non-Medical form)
M. ☐ Premium Waiver
N. ☐ Qualified Retirement Plan Rider
O. ☐ Short Term No Lapse Guarantee Rider
P. ☐ Termination Credit Rider I
Q. ☐ Termination Credit Rider II
R. ☐ Term Rider on Other Covered Person $ _____
S. ☐ Waiver of Charges (On Insured)
T. ☐ IRC §412(i) Life Insurance Rider
U. ☐ Other _____
V. ☐ Other _____
W. ☐ Other _____

8. Second-to-Die Life Insurance Products Only
A. ☐ Accelerated Living Benefit Rider (Complete disclosure form)
B. ☐ Flexible Duration No Lapse Guarantee Rider
C. ☐ Individual Term Rider on the Proposed Insured $ _____

D. ☐ Individual Term Rider on the Additional Insured $ _____
E. ☐ Other _____
F. ☐ Other _____

9. If any optional benefit applied for cannot be approved, should the policy be issued without it? ☒ Yes ☐ No

**NON-FORFEITURE/ PREMIUM CESSATION OPTIONS** (if applicable)
10. ☐ Automatic Premium Loan ☐ Extended Insurance ☐ Reduced Paid-Up

**SPECIAL POLICY DATING** Backdating is subject to Pacific Life and state guidelines
11A. I understand that insurance charges and expenses begin on the policy date. ☒ Yes ☐ No
B. A current policy date will be used unless you select one of the following.
☐ Save Age ☐ Specific Date _____ (mm/dd/yyyy) (Indicate a date, excluding 29th, 30th, and 31st)

**MODIFIED ENDOWMENT CONTRACT (MEC) ACCEPTANCE** (if applicable)
12. I understand that the policy as applied for is expected to become a Modified Endowment Contract (MEC) prior to its first policy anniversary.
☐ Yes (I have signed and submitted, or will sign upon policy delivery, a MEC Acceptance Form)

A061UW  Page 7  15-27446-06 01/2008

**NON-VARIABLE LIFE INSURANCE INFORMATION**

| | |
|---|---|
| **ILLUSTRATION ACKNOWLEDGMENT** | 1 An illustration is defined as a presentation or depiction that includes non-guaranteed elements of a policy over a period of years. This includes supplemental illustrations and/or sales material, which can be classified as a supplemental illustration. As applicant, I acknowledge that: (Check one) |
| **IMPORTANT** Must complete when applying for a non-variable product. | A. ☑  An illustration that matches this application was presented, signed, and is being submitted with this application. |
| | B. ☐  An illustration was not presented to me. (Not applicable in Michigan) |
| | C. ☐  An illustration was presented to me; however, the policy applied for is different than as illustrated. |
| | D. ☐  An illustration was displayed to me on a computer screen. The displayed illustration matches the policy applied for; however, no printed copy of the illustration was given to me. The illustration on the screen included personal and policy information as listed in this application. |
| | If B, C, or D is checked, I acknowledge, as applicant, that I did not receive and sign an illustration that matches this application for the reason indicated above. I also understand that an illustration matching the policy as issued will be provided for my signature no later than at the time the policy is delivered. |

**RETURN FOR ALL NON-VARIABLE PRODUCTS**
Page 8

15-27446-06  01/2008

## APPLICANT/OWNER'S REPRESENTATION OF INSURABLE INTEREST

| | |
|---|---|
| **REPRESENTATION OF INSURABLE INTEREST**<br><br>Applicable except where the Proposed Insured is both Applicant and Owner. | As the Applicant and/or Owner, I represent that the Owner and Beneficiary have an insurable interest in the life of the Proposed Insured(s). |

## PROPOSED INSURED'S CONSENT FOR EMPLOYER OWNED INSURANCE

| | |
|---|---|
| **PROPOSED INSURED'S CONSENT**<br><br>Applicable only if the employer or an employer-controlled trust is to be the owner of this policy. | As the proposed insured, I acknowledge and understand that (i) my employer (the "Employer"), or a trust established by my employer (the "Trust"), is involved in this Application for life insurance insuring my life ("Life Insurance Coverage"), (ii) the Employer or the Trust will have an interest as owner and/or beneficiary of the Life Insurance Coverage as reflected in this Application, and (iii) both I and my heirs may have no right or interest in or to the Life Insurance Coverage and its proceeds.<br><br>I (i) consent to the issuance of the Life Insurance Coverage as requested in this Application; (ii) acknowledge that the Life Insurance Coverage may continue after the termination of my employment with the Employer; (iii) acknowledge that my Employer has notified me in writing of the maximum life insurance face amount for which my Employer may seek Life Insurance Coverage insuring my life; and (iv) acknowledge that Pacific Life will not necessarily issue a policy at this maximum life insurance face amount.<br><br>My consent to this insurance has not been obtained by coercion of my Employer or its representatives or agents, whether express or implied. By my signature in the Signature section, I am consenting to the Employer's and/or Trust's future purchase of additional Life Insurance Coverage up to the maximum amount described above, for which no additional notice to, or consent from me will be necessary. |

## EMPLOYER ACKNOWLEDGMENT

| | |
|---|---|
| **EMPLOYER ACKNOWLEDGMENT REGARDING THE POTENTIAL TAXATION OF DEATH BENEFITS** | I acknowledge and understand: (i) the potential significance of IRC section 101(j); and (ii) that, if IRC section 101(j) applies, the policy(s) death benefit may be income taxable unless I, as employer, have satisfied the conditions of IRC Section 101(j); and (iii) that Pacific Life and its producers are not authorized to provide tax or legal advice and that I must look to my independent tax and legal advisors for current information regarding this and other laws that may impact me and my life insurance policies.<br><br>I understand that it remains the employer's responsibility to ensure both current and ongoing compliance with the requirements of IRC sections 101(j) and 6039I.<br><br>By signing in the Signature section, I acknowledge my understanding of this information, and that I have obtained or will obtain from my independent tax and legal advisors whatever advice I deem necessary or appropriate concerning the taxation of my life insurance policies. |

## APPLICATION PACKAGE

| | |
|---|---|
| **PAGES OMITTED** | 1.   Indicate below each page omitted from this application (Check all that apply):<br><br>A.   ☐ Page 5 – Physician/Medical Facility Information<br><br>B.   ☐ Page 6 – Non-Variable Life Insurance Information<br><br>C.   ☑ Page 9-10 – Equity Indexed Universal Life Insurance Information<br><br>D.   ☑ Page 11-15 – Variable Life Insurance Information<br><br>E.   ☑ Page 16 – Additional/Alternate Life Insurance Coverage Information<br><br>Note that only the above-referenced pages may be omitted when submitting this application. The omission of any other pages may result in rejection of the application. |

## NEW BUSINESS DATE STAMP (For Internal Use Only)

... SERVICES
FEB 13  PM 12: 01

## DECLARATIONS

The answers provided in this application are true and complete to the best of my knowledge and belief. I understand and agree that:

1.   (NOT APPLICABLE IN WEST VIRGINIA) Acceptance of a life insurance policy will be ratification of any administrative change with respect to such policy made by Pacific Life as indicated under the title "Endorsement," where permitted by state law. All other changes made to the application or policy by Pacific Life will be indicated on an "Application Amendment Form" that must be signed by all applicable parties, prior to or at the time of delivery of this policy.

A08IUW                 15-27446-06  01/2008

04/19/2008  07:31   5516274928                                        PAGE  04
Feb 08 08 01:04p                                                      p.2

## DECLARATIONS (Continued)

2. Except as provided in the terms or conditions of any Temporary Insurance Agreement (TIA) that I may have received in connection with this application, coverage will take effect when the policy is delivered and the entire first premium is paid only if at that time the Proposed Insured(s) is alive, and all answers in this application that are material to the risk are still true and complete.

3. If I have given money with the application and received a TIA and if the coverage amount of the application exceeds the TIA coverage limit, I understand that if the Proposed Insured(s) die(s) before a policy is delivered, the death benefit will be limited to the TIA coverage limit.

4. I must inform the Producer or Pacific Life Insurance Company (PL) in writing of any changes in the health of any Proposed Insured(s) or if any of the statements or answers on this application change prior to delivery of the policy.

5. My statements and answers in this application must continue to be true as of the date I receive the policy.

6. No Producer is authorized to make or modify contracts or insurance policies on Pacific Life's behalf.

7. No Producer may alter the terms of this application, the TIA, or the policy, nor can the Producer waive any of Pacific Life's rights or requirements.

8. No representation is made that, based on information provided in this application, a particular premium rate, risk category or class will be offered to me. I will review my policy and ask the producer or the Company about the specific premium and risk class referenced in my policy.

9. The policy(ies) as applied for in this Application will meet my insurance needs and financial objectives based in part upon my age, income, net worth, tax and family status, and any existing insurance policies I own.

10. (APPLICABLE ONLY IF THE EMPLOYER OR AN EMPLOYER-CONTROLLED TRUST IS TO BE THE OWNER OF THIS POLICY) If insurance is being applied for on the life of any non-exempt employee, then such insurance is not prohibited by applicable state law.

## SIGNATURES

Any person who knowingly and with intent to defraud any insurance company or other person, files an application for insurance containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties. (Not applicable in Oregon)

If you are signing on behalf of an entity, you represent that you are authorized to execute this document and to make the representations herein. If the entity is a corporation, you further represent that all requirements under applicable law and under the corporation's governing documents have been satisfied concerning the execution of this document, including the use of the corporate seal and number of signing officers.

If insured or owner is under age 16, a signature of parent/guardian is required in place of the minor's signature.

Signed and Dated by the Applicant in:   Atlanta        GA        09/11/2008
                                          City           State    Date (mm/dd/yyyy)

The applicant is the party that initiates and applies for the policy.

THE INTERNAL REVENUE SERVICE DOES NOT REQUIRE YOUR CONSENT TO ANY PROVISION OF THIS DOCUMENT OTHER THAN THE CERTIFICATIONS REQUIRED TO AVOID BACKUP WITHHOLDING.

X  Maria A. Gordillo  TRUSTEE
*Applicant's Signature, always required & Title, if corporation, trust or business entity

Applicant's Name: First   MI   Last   (print)          Relationship To Proposed Insured
MARIA  A.  GORDILLO                                     TRUSTEE

X                                                       X
*Proposed Insured's Signature, if other than applicant  Proposed Additional Insured's Signature, if applicable

X                                                       X
*Owner's Signature, if other than applicant or insured; & Title, if corporation,   *Additional Owner's Signature & Title, if applicable
trust, or business entity

If a corporation or business entity, indicate name below. The signature and title of any authorized representative other than the Proposed Insured(s) is required. If a trust, all required trustees must sign according to the trust agreement.

Corporation or Business Entity's Name, if applicable

## PRODUCER'S CERTIFICATION

I certify that I have truly and accurately recorded the information supplied in the application.

X                                                       Soliciting Producer's Name: First   MI   Last   (print)
Soliciting Producer's Signature                         Eugene  E.  Houchins

ADGIUW                          Page 15                      15-27448-06 01/2006

04/19/2008   07:31   5516274928                                          PAGE   03

Feb 05 08 01:00p

NE MAIL SERVICES

**PACIFIC LIFE INSURANCE COMPANY** 2008 FEB 13 PH 12:02
Life Insurance Operations Center
P.O. Box 2030 • Omaha, NE 68103-2030
(800) 347-7787 • fax (949) 462-3086
www.PacificLife.com

PQD

PCHG NONMD

**PACIFIC LIFE**

## APPLICATION, PART II – NON-MEDICAL

| SECTION A    COMPLETE ON PROPOSED INSURED (AGE 16 OR OVER) | | | |
|---|---|---|---|
| 1. Name: First   MI   Last | 2a. Date of Birth (MM/DD/YY) | 2b. Height | 2c. Weight |
| Erwin     A.   Collins | 09/15/1933 | 6 ft 1 in | 247 lbs |

3. a. Name and address of physician or practitioner last visited: Dr. Charles Robinson 1300 Old Weisgarber Rd. Knoxville, TN 37909
(PHONE NUMBER)

b. Date: 09/2007   c. Reason consulted: Regular Check Up

| | Yes No | Details of "Yes" answers. (Identify question, and include diagnosis, dates, duration, and names and addresses of all attending physicians and medical facilities.) Use an additional sheet if necessary |
|---|---|---|
| d. Did any symptoms prompt consultation? | ☐ ☒ | 4.a) High blood pressure, diagnosed by Dr. Robinson, controlled w/ Verapamil |
| e. Was any treatment given or medication prescribed? | ☐ ☒ | |
| 4. To the best of your knowledge and belief, during the past 10 years, have you had, or been told that you had, or been treated by a member of the medical profession for: (CIRC. & APPLICABLE ITEMS AND GIVE DETAILS) | | 4.f) Diagnosed w/ BPH (Benign prostatic hypertrophy) in 2001 by Dr. Eric Nicely 9330 Park West Blvd., Ste 308 Knoxville, TN 37932. Treated by microwave turp. |
| a. Disorder of the eyes, ears, nose, or throat? | ☐ ☒ | |
| b. Dizziness, fainting, convulsions, headaches, speech defect, paralysis or stroke, or mental or nervous disorder? | ☐ ☒ | |
| c. Hoarseness or cough, blood spitting, asthma, pneumonia, emphysema, tuberculosis, or other respiratory system disorder? | ☐ ☒ | |
| d. Chest pain, high blood pressure, rheumatic fever, murmur, heart attack, or other disorder of the heart or blood vessels? | ☒ ☐ | 5.b) See 4.d above. |
| e. Jaundice, intestinal bleeding, ulcer, colitis, diverticulitis, hepatitis, or other disorder of the liver, gallbladder, stomach, or intestines? | ☐ ☒ | 7.a) Has regular check ups w/ Dr. Robinson and Dr. Nicely |
| f. Sugar, albumin, or blood in urine, venereal disease, stone or other disorder of kidney, bladder, prostate, breasts or reproductive organs? | ☒ ☐ | |
| g. Diabetes, thyroid, or other endocrine disorders? | ☐ ☒ | 7.b) Normal bloodwork, labs and EKGs w/ regular check ups |
| h. Neuritis, sciatica, arthritis, gout, or disorder of the muscles or bones, including the spine, back, or joints? | ☐ ☒ | |
| i. Cancer, cyst, tumor, or disorder of skin, blood, or lymph glands? | ☐ ☒ | |
| j. Any disorder(s) of the immune system, including AIDS (Acquired Immune Deficiency Syndrome) and ARC (AIDS-Related Complex)? | ☐ ☒ | |
| 5. a. Have you within the past 5 years been a patient in a hospital, clinic, sanitarium, or other medical facility? | ☐ ☒ | |
| b. Are you now under regular medical observation or taking treatment? | ☒ ☐ | |
| 6. a. Except as prescribed by a physician, have you used heroin, morphine, or other narcotic drugs in the last 10 years? | ☐ ☒ | |
| b. Except as prescribed by a physician, have you used cocaine, LSD, marijuana, or other hallucinogenic agents, or barbiturates, sedatives, tranquilizers, or any amphetamines in the last 5 years? | ☐ ☒ | |
| c. In the last 5 years have you received treatment for or joined an organization because of alcoholism or drug addiction? | ☐ ☒ | |
| 7. Other than as stated in answers above, have you within the past 5 years: | | |
| a. Had a check up, consultation, illness, injury, or operation? | ☒ ☐ | |
| b. Had an electrocardiogram, blood test, other test or X-ray? | ☒ ☐ | |
| c. Been advised to have any diagnostic test, hospitalization, or surgery that was not completed? | ☐ ☒ | |
| 8. Have you had any change in weight in the past year? | ☐ ☒ | |
| 9. Have either of your parents, brothers, or sisters had diabetes, cancer, high blood pressure, heart disease or mental illness? | ☒ ☐ | |
| IF "YES", STATE CONDITION, AGE, RELATIONSHIP AND AGE AT ONSET) | | |

10. Parents' Record (COMPLETE BELOW)

| | LIVING | | DECEASED | |
|---|---|---|---|---|
| | AGE | STATE OF HEALTH | AGE AT DEATH | CAUSE OF DEATH |
| Father | | | 48 | Accident |
| Mother | | | 91 | colon cancer |

The above statements are true and complete to the best of my knowledge and belief. I agree that such statements and answers shall be a part of this application. Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

Dated at Atlanta   GA on 02/11/2008   X Erwin A. Collins
          (CITY)       (STATE)   (MO DAY YR)   (SIGNATURE OF PROPOSED INSURED)

WITNESS

AP9500-P2                    Page 1                    16-19536-08 10/2007

**NOTICE**

The laws of the State of Georgia prohibit insurers from unfairly discriminating against any person based upon his or her status as a victim of family violence.

NFVIOL-GA                                                      Required by Directive 00-EX-5



# PACIFIC LIFE

Pacific Life Insurance Company • 700 Newport Center Drive • Newport Beach, CA 92660

# FLEXIBLE PREMIUM ADJUSTABLE LIFE INSURANCE POLICY

- Death Benefit Payable On The Death Of The Insured While The Policy Is In Force
- Net Cash Surrender Value Payable Upon Surrender While The Policy Is In Force
- Flexible Premiums
- Adjustable Face Amount
- Non-Participating

15-26374-01

## SECURITY AGREEMENT FOR BENEFICIARY INTEREST IN TRUST

      This SECURITY AGREEMENT FOR BENEFICIARY INTEREST IN TRUST (the **"Security Agreement"**) is entered into by **Ann H. Collins**, a **Tennessee** resident (the **"Beneficiary"**), in favor of **Windsor Securities LLC**, a Nevada LLC with its principal place of business located at 101 Convention Center Boulevard, Suite P-109, Las Vegas, NV  89109 (the **"Lender"**).  It is further understood that the term "Trustee" used herein shall refer to the trustee of the Trust/Borrower in his or her capacity as Trustee.

<p align="center">WITNESSETH:</p>

      WHEREAS, pursuant to the Life Insurance Premium Financing Agreement, dated the date hereof, entered into among the Lender, **The Erwin A. Collins Family Insurance Trust-2008** (the **"Trust"** and **"Borrower"**), and **Erwin A. Collins**, a **Tennessee** resident (the **"Insured"**) (including all annexes, exhibits and schedules thereto, and as from time to time amended, restated, supplemented or otherwise modified, (the **"Financing Agreement"**), Lender has agreed to make a loan to the Borrower for the amount specified in the Financing Agreement (the "Loan") as evidenced by that certain Promissory Note dated the date hereof by and between the Borrower and Lender (the **"Note"**), the proceeds of which shall be used by the Borrower to pay the Financed Insurance Premiums and Closing Fees on the Policy listed in <u>Schedule 1</u> hereto;

      WHEREAS, the Trust is the sole owner of the Policy;

      WHEREAS, the Beneficiary is a beneficiary of the Trust; and,

      WHEREAS, in order to induce the Lender to make the loan and extend credit to the Borrower as provided for in the Financing Agreement, the Beneficiary has agreed to grant a security interest in her entire beneficiary interest in the Trust to Lender in accordance with the terms and conditions of this Security Agreement.

      NOW, THEREFORE, in consideration of the premises, promises, and the covenants hereinafter contained and to induce Lender to make loan and extend credit to Borrower as provided for in the Financing Agreement, Beneficiary and Trustee and Lender each agree as follows:

1.    <u>Definitions</u>.  Unless otherwise defined herein, all capitalized terms used in this Security Agreement have the meanings ascribed to such terms in the Financing Agreement.

2.    <u>Grant of Security Interest</u>  Beneficiary and Trustee each hereby grants, gives, conveys and pledges to Lender a first priority security interest in all of the Beneficiary's and Borrower's right, title and interest whether now owned or hereafter acquired and wherever located, in and to all of the following (collectively, the **"Pledged Collateral"**):

    (a)    the Beneficiary and Borrower's entire beneficiary interest in the Trust, all instruments, certificates or other securities or investment property evidencing such beneficial interest and all proceeds thereof; and

    (b)    the Beneficiary and Borrower's interest, if any, in and of and to the Policy and any related documents and security and the death benefit payable under the Policy and all proceeds thereof.

3.    <u>Security for Obligations</u>.  This Security Agreement secures, and the Pledged Collateral is security for, the timely and full performance of all of the covenants, obligations and duties of Borrower, as borrower under the Financing Agreement and the Note, and the prompt payment and in

<p align="center">- 1 -</p>

Case Case4:t6-dv-643303GBLG DDocumeentt11-30-1Bile6ile02/08/26/1BagPa2ge7 a102800f 133
Case 3:14-cv-04651-WHO   Document 81-1   Filed 11/10/15   Page 27 of 90

Document #13 of 19

full when due, whether at stated maturity, by acceleration or otherwise, of all monetary obligations of any kind under or in connection with, the Financing Agreement and the Note (in each case, an **"Obligation"**) and all Obligations of Borrower and Beneficiary to Lender, any affiliate of Lender and any successor or assign thereof, now or hereafter existing under this Security Agreement or any other agreement, understanding, commitment, or contract to which Borrower is a party with Lender, including, without limitation, all fees, costs and expenses whether in connection with collection actions hereunder (collectively, the **"Secured Obligations"**). *Time is of the Essence with respect to the performance of all and each of the Secured Obligations.*

4.   Perfection.  This Security Agreement may be perfected by the Lender, in Lender's sole discretion, filing one or more UCC-1 Financing Statements in accordance with the laws of the jurisdictions applicable to the Beneficiary and Borrower and the Pledged Collateral, and Lender taking any other action that may be necessary and/or reasonably requested by the Lender to perfect such Security Interest under all applicable law.  The Beneficiary and Trustee each hereby authorizes and acknowledges such filings or other action.  After all amounts due by the Borrower under the Financing Agreement have been repaid in accordance with the terms of the Financing Agreement, the Lender shall release the Pledged Collateral, and shall terminate the UCC-1 Financing Statement(s) in accordance with the applicable laws.

5.   Representations and Warranties of Beneficiary and Borrower.  Beneficiary and Trustee each represents and warrants to Lender that:

      (a)   Beneficiary is, as of the date hereof, the sole beneficiary of the Trust and owner of the Pledged Collateral free and clear of all liens, claims, security interests, pledges, rights of first refusal, charges, or encumbrances (a **"Lien"**) thereon or affecting the title thereto, except for any Lien created by this Security Agreement;

      (b)   Beneficiary has the right and requisite authority to grant a security interest, assignment and pledge of the Pledged Collateral to Lender as provided herein, and this Security Agreement and the security interest created by Beneficiary hereunder does not violate or breach the Irrevocable Trust Agreement dated February 1st, 2008 for the Trust (the **"Trust Agreement"**) or any other document, instrument, mortgage or agreement to which the Beneficiary or Borrower is party or to which its assets are bound;

      (c)   A true and correct copy of the Trust Agreement, including all amendments, supplements and other modifications thereto, has been previously delivered by Beneficiary or Borrower to Lender;

      (d)   The Trust Agreement is a legal, valid and binding agreement, enforceable by Beneficiary and Trustee and Borrower, each, in accordance with its terms;

      (e)   No consent, approval, authorization or other order or other action by, and no notice to or filing with, the trustee of the Trust any other person is required (i) for the grant of the security interest by Beneficiary or Borrower in the Pledged Collateral pursuant to this Security Agreement or for the execution, delivery or performance of this Security Agreement by Beneficiary and Trustee each, or (ii) for the exercise by Lender of any of its rights provided for in this Security Agreement or the remedies in respect of the Pledged Collateral pursuant to this Security Agreement;

      (f)   The security interest created hereunder will create a valid first priority Lien in favor of Lender in the Pledged Collateral and all the proceeds thereof, securing the payment of the Secured Obligations, subject to no other Lien;

Case Case:1-61-59-30-6833-GBDG Document 11-30 Bile Filed 02/08/26/18 Page 28 d053 of 133
Case 3:14-cv-04651-WHO Document 81-1 Filed 11/10/15 Page 28 of 90

Document #13 of 19

(g) This Security Agreement has been duly authorized, executed and delivered by Beneficiary and Trustee each and constitutes a legal, valid and binding obligation of Beneficiary and Trustee enforceable by Lender against Beneficiary and Trustee in accordance with its terms;

(h) Without Beneficiary and Trustee's receipt of the prior written consent of Lender, neither Beneficiary nor Trustee will not sell, assign, transfer, pledge, or otherwise encumber any of its rights in or to the Pledged Collateral, or any distributions or payments with respect to the Pledged Collateral or grant a Lien in the Pledged Collateral; and

(i) Beneficiary and Trustee each will, at its sole expense, promptly execute, acknowledge and deliver all such instruments and take all such actions as Lender from time to time may request in order to ensure to Lender the benefits of its Lien in and to the Pledged Collateral intended to be created by this Security Agreement, including the filing of any necessary financing statements or continuation statements, which may be filed by Lender with or (to the extent permitted by law) without the signature of Beneficiary and Trustee, and will cooperate with Lender, at Beneficiary's and Trustee's expense, in obtaining all necessary approvals and making all necessary filings under federal, state, local or foreign law in connection with such Lien or any sale or transfer of the Pledged Collateral.

(j) Beneficiary and Trustee each hereby consents, acknowledges and agrees that Lender may transfer, sell or assign its interest hereunder and under the Financing Agreement to one or more third party finance providers to the Lender.

(k) Beneficiary and Trustee each represent that until Loan and all obligations to Lender are satisfied in full, Trustee to ensure that the Policy will remain in full control of the Trust to satisfy the collateral Loan purpose. The Policy will not be sold, gifted, distributed, or in any other way have its role as collateral for Loan compromised. Any such action shall be considered a breach of Agreement and Event of Default.

(l) Insured and Trustee agree that the Agent (registered representative) of the policy will not be changed or removed without prior notice and concurrence of Lender, such concurrence not unreasonably withheld. Should the Agent (registered representative) be changed without the knowledge or consent of Trustee or due to facts beyond control of Trustee or Insured, Trustee and Insured shall immediately be notified. Violation of either preceding sentence shall be a breach of Agreement and an Event of Default.

The representations and warranties of Beneficiary and Trustee each set forth in this Section 5 shall survive the execution, delivery and performance of this Security Agreement.

6. Defaults and Remedies.

 (a) An "Event of Default" is defined under this Security Agreement to include any of (i) the failure of Beneficiary or Trustee to timely and fully comply with its obligations hereunder, (ii) the breach of any representation, warranty, covenant or other agreement or statement made by the Beneficiary or Trustee each hereunder or by the Borrower within the Financing Agreement or any document executed in connection therewith, (iii) the occurrence of any "Events of Default" under the Financing Agreement or any document entered into between the Borrower and the Lender in connection therewith, and (iv) the failure of Beneficiary or Trustee to be in timely and full compliance with each and all of its respective Secured Obligations. Upon the occurrence of an Event of Default,

- 3 -

Lender (personally or through an agent or assigns) is hereby authorized and empowered to take the following actions without a meeting: (i) transfer the Pledged Collateral and register it in Lender's name or in the name of its nominee; (ii) collect and receive all cash and other distributions made on or with respect to the Pledged Collateral; (iii) sell the Pledged Collateral in one or more sales after ten (10) days' notice of the time and place of any public sale or of the time at which a private sale is to take place (which notice Beneficiary and Trustee each agrees is commercially reasonable); and (iv) otherwise act with respect to the Pledged Collateral as though Lender was the outright owner thereof.

(b)     Beneficiary and Trustee each hereby irrevocably constitutes and appoints Lender and its assigns as the proxy and attorney-in-fact of Beneficiary and Trustee each, with full power of substitution to do so, and which appointment is coupled with an interest and shall remain in effect until there are no longer any Secured Obligations of Borrower under the Financing Agreement or other agreement with Lender entered into after the date hereof; provided, however, Lender shall not have any duty to exercise any such right or to preserve the same and shall not be liable for any failure to do so or for any delay in doing so. Any sale shall be made at a public or private sale at Lender's place of business, or at any place to be named in the notice of sale, either for cash or upon credit or for future delivery at such price as Lender may deem fair, and Lender may be the purchaser of the whole or any part of the Pledged Collateral so sold and hold the same thereafter in its own right free from any claim of Beneficiary or Trustee or any right of redemption (any such right being hereby waived or released). The Lender reserves the right to reject any and all bids at such sale which, in its discretion, it shall deem inadequate or unlikely to settle in a prompt and efficient manner. Demands of performance, except as otherwise herein specifically provided for, notices of sale, advertisements and the presence of property at sale are hereby waived by Beneficiary and Trustee each and any sale hereunder may be conducted by an auctioneer or any officer or agent of the Lender or its assigns.

(c)     If, at the original time or times appointed for the sale of the whole or any part of the Pledged Collateral, the highest bid, if there be but one sale, shall be inadequate to discharge in full all the Secured Obligations, or if the Pledged Collateral be offered for sale in fractions, if at any of such sales, the highest bid for a fraction offered for sale would indicate to Lender, in its discretion, that the proceeds of the sales of the whole of the Pledged Collateral would be unlikely to be sufficient to discharge all the Secured Obligations, Lender may, on one or more occasions and in its discretion, postpone any of said sales by public announcement at the time of sale or the time of previous postponement of sale, and no other notice of such postponement or postponements of sale need be given, any other notice being hereby waived; provided, however, that any sale or sales made after such postponement shall be after ten (10) days' notice to Beneficiary and Trustee.

(d)     Beneficiary and Trustee each recognizes that Lender may be unable to effect a public sale of any or all the Pledged Collateral and may be compelled to resort to one or more private sales thereof. Beneficiary and Trustee each also acknowledges that any such private sale may result in prices and other terms less favorable to Lender than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of such sale being private.

(e)     Beneficiary and Trustee each agrees to the maximum extent permitted by applicable law that following the occurrence of an Event of Default it will not at any time plead, claim or take the benefit of any appraisal, valuation, stay, extension, moratorium or redemption law now or hereafter in force in order to prevent or delay the enforcement of this Security Agreement, or the absolute sale of the whole or any part of the Pledged Collateral or the possession thereof by any purchaser at any sale here-under, and Beneficiary and Trustee each waives the benefit of all such laws to the extent he lawfully may do so. Beneficiary and Trustee each agrees that it will not interfere with any right, power and remedy of Lender provided for in this Security Agreement or now or hereafter existing at law or in equity or by statute or otherwise, or the exercise or beginning of the exercise by Lender of any one or more of such rights, powers or remedies. No failure or delay on the part of Lender to

- 4 -

Case Case:14-cv-04651-GBO3-GBOG Document11-30-Bilefiled02/08/26/18PageAge 0058of 133
Case 3:14-cv-04651-WHO   Document 81-1   Filed 11/10/15   Page 30 of 90

Document #13 of 19

exercise any such right, power or remedy and no notice or demand which may be given to or made upon Beneficiary or Trustee by Lender with respect to any such remedies shall operate as a waiver thereof, or limit or impair Lender's right to take any action or to exercise any power or remedy hereunder, without notice or demand, or prejudice its rights as against Beneficiary or Trustee each in any respect.

(f)     Beneficiary and Trustee each further agrees that a breach of any of its covenants contained in this Section 6 will cause irreparable injury to Lender, that Lender shall have no adequate remedy at law in respect of such breach and, as a consequence, agrees that each and every covenant contained in this Section 6 shall be specifically enforceable by Lender against Beneficiary or Trustee each, and Beneficiary and Trustee each hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred under the Financing Agreement.

(g)     <u>Application of Proceeds</u>.  The proceeds of all sales and collections, and any other monies, the application of which is not otherwise provided for, shall be applied as follows:

FIRST, to the payment of the costs and expenses of such sale or sales and collections, and the compensation of Lender, and its counsel;

SECOND, to the payment of the obligations secured hereby in such order and manner as Lender, in its sole discretion, may determine, until such obligations are paid in full; and

THIRD, any surplus remaining shall be paid to Beneficiary or Trust.

(h)     <u>Certain Additional Waivers.</u>  Beneficiary and Trustee each waives any defense based on the discharge of the Borrower by operation of law notwithstanding any intervention or omission by Lender and notwithstanding the provisions of Section 2825 of the California Civil Code.  Until all indebtedness and obligations secured hereunder have been fully satisfied: (i) Neither Beneficiary nor Trustee shall not have any right of subrogation, and Beneficiary and Trustee each waives, to the fullest extent permitted by law, all rights and benefits under Section 2848 of the California Civil Code and any right to enforce any remedy which Lender now has or may hereafter have against Beneficiary or Trustee in respect of the obligations and indebtedness secured hereunder; and (ii) Beneficiary and Trustee each waives (a) any benefit of, and any right to participate in, any security, whether real or personal property, now or hereafter held by Lender for the Secured Obligations, and (b) to the fullest extent permitted by law, all rights and benefits under Sections 2849 and 2850 of the California Civil Code.

7.     [Intentionally Omitted.]

8.     <u>Termination Date</u>.  This Security Agreement shall automatically terminate upon the Loan having been fully paid and performed and the Note extinguished.

9.     <u>Waiver</u>.  No delay on Lender's part in exercising any power of sale, Lien, option or other right hereunder, and no notice or demand which may be given to or made upon Beneficiary or Trustee each by Lender with respect to any power of sale, Lien, option or other right hereunder, shall constitute a waiver thereof, or limit or impair Lender's right to take any action or to exercise any power of sale, Lien, option, or any other right hereunder, without notice or demand, or prejudice Lender's rights as against Beneficiary or Trustee in any respect.

10.     <u>Assignment</u>.  Lender may assign, endorse or transfer any instrument evidencing all or any part of the Secured Obligations and such assignee shall be entitled to the benefits of this Security Agreement.

- 5 -

Case Case3:1-4-592-0433-GWOS Documeent11-40-Bilefdile0d2/08/26/1Pagpagt 10568f 133
Case 3:14-cv-04651-WHO   Document 81-1   Filed 11/10/15   Page 31 of 90

Document #13 of 19

11.   Lien Absolute.  All rights of Lender hereunder, and all duties, rights, covenants and obligations of Beneficiary or Trustee each hereunder, shall be absolute and unconditional irrespective of:

(a)   any lack of validity or enforceability of the Financing Agreement, any other related document or any other agreement or instrument governing or evidencing any Secured Obligations;

(b)   any change in the time, manner or place of payment of, or in any other term of, all or any part of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from the Financing Agreement, any other related document or any other agreement or instrument governing or evidencing any Secured Obligations;

(c)   any exchange, release or non-perfection of any other Pledged Collateral, or any release or amendment or waiver of or consent to departure from any guaranty, for all or any part of the Secured Obligations;

(d)   the insolvency of Beneficiary or Trustee each; or

(e)   any other circumstance which might otherwise constitute a defense available to, or a discharge of, Borrower, the Beneficiary or Trustee or any affiliate of the Borrower or the Beneficiary or Trustee.

12.   Modifications.  Beneficiary and Trustee each consents and agrees that Lender may at any time, or from time to time, in its discretion:

(a)   renew, extend or change the time of payment, and/or the manner, place or terms of payment of all or any part of the Secured Obligations; and

(b)   exchange, release and/or surrender all or any of the Pledged Collateral (including the Pledged Collateral), or any part thereof, by whomsoever deposited, which is now or may hereafter be held by or on behalf of Lender in connection with all or any of the Secured Obligations, all in such manner and upon such terms as Lender may deem proper, and without notice to or further assent from Beneficiary or Trustee, it being hereby agreed that Beneficiary and Trustee each shall be and remain bound upon this Security Agreement, irrespective of the value or condition of any of the Pledged Collateral, and notwithstanding any such change, exchange, settlement, compromise, surrender, release, renewal or extension, and notwithstanding also that the Secured Obligations may, at any time, exceed the aggregate principal amount thereof set forth in the Financing Agreement, or any other agreement governing any Secured Obligations.  Beneficiary and Trustee each hereby waives notice of acceptance of this Security Agreement, and also presentment, demand, protest and notice of dishonor of any and all of the Secured Obligations, and promptness in commencing suit against any party hereto or liable hereon, and in giving any notice to or of making any claim or demand hereunder upon Beneficiary or Trustee.  No act or omission of any kind on Lender's part shall in any event affect or impair this Security Agreement.

13.   Reinstatement.  This Security Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against Beneficiary or Borrower for liquidation or reorganization, should Beneficiary or Borrower become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of Beneficiary or Borrower's assets, and shall continue to be effective or be reinstated, as the case may

Case Case3:16-53:303EG33-GBAG Document11-30-BileEiled02/09/26/18Page32of50f 133
Case 3:14-cv-04651-WHO   Document 81-1   Filed 11/10/15   Page 32 of 90

Document #13 of 19

be, if at any time payment and performance of the Secured Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Secured Obligations, whether as a "voidable preference", "fraudulent conveyance", or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Secured Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

14.    Miscellaneous.

(a)    Lender may execute any of its duties hereunder by or through agents or employees and shall be entitled to advice of counsel concerning all matters pertaining to its duties hereunder.

(b)    Beneficiary and Trustee each agrees promptly to reimburse Lender and its assigns for actual out-of-pocket expenses, including, without limitation, reasonable counsel fees, incurred by Lender in connection with the administration and enforcement of this Security Agreement.

(c)    Neither Lender, nor any of its respective officers, directors, employees, agents, counsel or assigns shall be liable for any action lawfully taken or omitted to be taken by it or them hereunder or in connection herewith, except for its or their own gross negligence or willful misconduct as finally determined by a court of competent jurisdiction.

(d)    This Security Agreement shall be binding upon Beneficiary and Trustee each of their successors and permitted assigns (including a debtor-in-possession on behalf of Beneficiary or Borrower each), and shall inure to the benefit of, and be enforceable by, Lender and its successors and assigns and none of the terms or provisions of this Security Agreement may be waived, altered, modified or amended except in writing duly signed for and on behalf of Lender and Beneficiary or Borrower, with an express statement in such writing that it is intended as an amendment, waiver or modification of the provisions of this Security Agreement.

15.    Severability. If for any reason any provision or provisions hereof are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or effect those portions of this Security Agreement which are valid.

16.    Notices. All notices and other communications required or permitted hereunder shall be given in writing and shall be deemed effectively given (a) upon delivery, when delivered personally against receipt therefore, (b) upon delivery when sent by certified mail, postage prepaid and return receipt requested, (c) upon transmission, when transmitted by telecopier, facsimile, telex or other electronic transmission method, provided that receipt is confirmed and notice is sent by certified mail, postage prepaid and return receipt requested, or (d) upon delivery, when sent by Federal Express or other nationally recognized overnight delivery service:

(a)    If to Lender, at:    Windsor Securities LLC
c/o Steven Prusky
25 East Athens Avenue
Ardmore, PA 19003
Telephone: 610-642-3100
Facsimile:  610-642-9709

- 7 -

Case Case:14-5x3-04653-GEWOG Documeentt11-40-Billefiled102/08/26/18agFagge a1058f 133
Case 3:14-cv-04651-WHO    Document 81-1    Filed 11/10/15    Page 33 of 90

Document #13 of 19

(b)     If to Beneficiary, at:     Ann H. Collins
                                   331 Suburban Road
                                   Knoxville, TN 37923
                                   Telephone: 865-691-3329
                                   Facsimile: n/a

(c)     If to Trustee, at:         Maria A. Gordillo
                                   346 Crestview Circle
                                   Roswell, GA 30075
                                   Telephone: 770-375-9266
                                   Facsimile: n/a


17.    Entire Agreement. This Security Agreement, the Financing Agreement and those documents executed in connection therewith constitute the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes all prior written and oral agreements, arrangements and discussions with respect thereto. No course of conduct, course of dealing, course of performance or trade usage, shall be used to supplement or modify any terms or conditions of this Security Agreement.

18.    Governing Law. This Security Agreement and all the rights, covenants, duties and obligations created hereunder and any remedy at law or in equity sought by either party hereto in connection with this Security Agreement shall be governed by, and construed, enforced and interpreted solely in accordance with, the laws of the State of California without any application of its conflicts or choice of laws principles or rules. The Beneficiary and Lender acknowledge and agree that this Security Agreement is being executed and delivered in the State of California and the loan being made by Lender to Borrower is being contemplated and performed in the State of California.

19.    Binding Effect. This Security Agreement shall be binding upon, enforceable against, and inure to the benefit of each of the parties hereto and their respective permitted successors and assigns.

20.    Dispute Resolution. EACH PARTY HERETO AGREES THAT ANY AND ALL DISPUTES ARISING IN CONNECTION WITH THIS SECURITY AGREEMENT SHALL BE RESOLVED AS AGREED IN SECTION 7.11 OF THE FINANCING AGREEMENT.

21.    Headings. The section headings used in this Security Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

22.    Counterparts. This Security Agreement may be executed in any number of separate counterparts by one or more of the parties hereto and all of said counterparts taken together shall constitute one and the same instrument.

23.    Limitation on Liability of Managers. In no event shall the Managing Member of the Lender's General Partner be liable to any Person for the representations and obligations of the Lender under this Security Agreement.

24.    Effective Date. This instrument shall be deemed effective as of the Financing Date, as such term is defined in the Financing Agreement.

- 8 -

Document #13 of 19

IN WITNESS WHEREOF, the parties hereto have caused this Security Agreement to be duly executed under seal as of this 15 day of April , 2008

**BENEFICIARY:**
Ann H. Collins

By: _Ann H. Collins_

Name: Ann H. Collins

Title: Spouse

Place of execution:

*Acknowledged by:*

**TRUST:**
**The Erwin A. Collins Family Insurance Trust-2008**

By: _Maria Ana Gordillo_ ,
Name: **Maria A. Gordillo, Trustee**

Place of execution: Atlanta, GA

**LENDER:**
Windsor Securities LLC

By: _Steven Prusky_

Name: **Steven Prusky**

Title: **Director/President MFIP (Delaware)**

- 9 -

**SCHEDULE I**

**POLICY**

| Insurer | Policy Issue Date | Policy Number | Annual Premium | Death Benefit |
|---|---|---|---|---|
| Pacific Life | March 4, 2008 | VF51701320 | $101,667 3rd year on | $2,000,000.00 |

Document #14 of 19

## SALES ILLUSTRATION FOR THE POLICY

*TO BE PROVIDED BY THE TRUSTEE AND ATTACHED HERETO*

By signing below, I do hereby affirm that the attached illustration corresponds to the policy being premium financed pursuant to *Life Insurance Premium Financing Agreement Among Windsor Securities LLC, The Erwin A. Collins Family Insurance Trust-2008, and Erwin A. Collins*, and that it was recently provided the insurance company issuing such Policy.


Maria Ana Gardillo_____, Trustee          Date: _April 15, 2008_
The Erwin A. Collins Family Insurance Trust-2008



Producer:
Eugene Houchins
4243 Dunwoody Club Dr Suite 215
Atlanta, GA 30350

## Basic Illustration Narrative Summary

| Proposed Insured | Proposed Insured: | Erwin Collins |
| --- | --- | --- |
| | Age: | 74 |
| | Gender: | Male |
| | Risk Classification: | Preferred Nonsmoker |

The assumed risk classification has a material impact on any illustration. Your actual risk classification will ultimately depend on the outcome of processing the submitted life insurance application and may vary from what is shown on this illustration. If so, you will receive a revised illustration with your life insurance policy.

| Summary of Proposed Initial Coverage | Initial Total Face Amount: | $2,000,000 |
| --- | --- | --- |
| | Death Benefit Option: | Level |
| | Premium Frequency: | Annual |
| | | Accelerated Living Benefit Rider, Short Term No-Lapse Guarantee Rider, Overloan Protection Rider, Conversion Rider |

Above is a brief summary of the proposed coverage shown in this illustration. Additional information about the assumptions, coverage and product information is in the following sections. Any illustrated policy changes that require a request from you are detailed in the Future Action Required of Policyowner section.

**About Us**

For more than 135 years, Pacific Life Insurance Company has been serving the needs of individuals through our life insurance products, and our commitment to our policyholders has always been our top priority. From offering cutting-edge life insurance products to innovative services, our goal is to provide our policyowners with the best we can offer. For information about Pacific Life, including its current financial strength ratings from A.M. Best, Fitch Ratings, Standard & Poor's, and Moody's, visit the company Web site at www.PacificLife.com. Our principal office is located at 700 Newport Center Drive, Newport Beach, CA, 92660.

Pacific Life Insurance Company is licensed to issue individual life insurance and annuity products in all states except New York. Product availability and features may vary by state.

**About This Illustration**

This is an illustration only. An illustration is not intended to predict actual performance. Interest rates, dividends and values set forth in the illustration are not guaranteed, except for those items clearly labeled as guaranteed.

The sale or liquidation of any stock, bond, individual retirement account (IRA), certificate of deposit (CD), mutual fund, annuity, or other asset to fund the purchase of this product may have tax consequences, early *Withdrawal* penalties, or other costs or penalties as a result of the sale or liquidation. You may wish to consult independent legal or financial advice before selling or liquidating any assets, prior to the purchase of the life insurance product being solicited.

This is a life insurance illustration and not a contract. The illustration is intended to demonstrate the impact of policy charges on the policy cash value and *Death Benefit* under a set of assumptions. This illustration is not intended to predict actual performance. Please review the illustration and its assumptions. You may request illustrations with different assumptions to better understand how the policy charges affect the policy cash value and *Death Benefit*. You should consider a periodic review of your coverage with your producer.

This illustration assumes you, the applicant, will also will be the owner.

"Guaranteed" columns reflect maximum policy charges and a 3.00% minimum credited interest rate.

Key terms are italicized throughout this illustration. Please see the Key Terms section for definitions.

**How The Policy Works**

Versa Flex VI is a universal life insurance policy that provides a *Death Benefit* which will be paid to the beneficiaries in the event of the proposed insured's death. Your policy may also provide additional benefits through policy riders.

The policy and any riders attached to it have eligibility criteria that must be met. These criteria consist of various factors including, but not limited to, *Age*, risk classification and form of ownership. Policy and rider features and availability may



**PACIFIC LIFE**

vary by state.

You have the flexibility to choose the amount and frequency of your premium payments, within limits. Once a premium payment is made, a premium load is deducted and the net premium payment is added to your policy's *Accumulated Value*. Fees and charges are deducted and interest credits are added to your policy's *Accumulated Value* each month. In the event of surrender, your policy's *Accumulated Value* may be reduced by a surrender charge. You may take distributions of the *Cash Surrender Value* in the form of *Policy Loans* or *Withdrawals* subject to certain limitations described in the policy. A policy issued and maintained as described in this illustration may cause tax implications. Please see the **Tax Information** section for more detail.

**Assumptions About Non-Guaranteed Elements**

The policy includes elements that may be changed at Pacific Life's discretion but cannot be less favorable to you than the policy's guarantees. These are referred to as the policy's "non-guaranteed elements" and include the cost of insurance charges, coverage charges, premium load and interest rates. This illustration's non guaranteed values are calculated using current cost of insurance charges, current coverage charges, current premium load and a non-guaranteed interest rate. This illustration assumes that the illustrated non-guaranteed elements will never be changed; however, change is likely to occur and actual results may be more or less favorable than those shown.

This illustration reflects certain assumptions about how you will use the policy's options. Over time, the policy's actual non-guaranteed elements, and perhaps your actual use of the policy's options are likely to vary from the assumptions used in this illustration. For these reasons, actual policy performance will either be more or less favorable than shown in this illustration.

All non-guaranteed elements are subject to change at Pacific Life's discretion. The illustration assumptions reflected here are not estimates of future values of these elements. Actual results could be more or less favorable.

**Death Benefit**

The amount that will be paid upon the proposed insured's death will be based on the then current *Total Face Amount*, and the death benefit option you have elected, less the amount of any outstanding *Policy Debt*. The *Total Face Amount* is provided through the policy's basic coverage and may also be provided through Annual Renewable Term rider (ART), Accounting Benefit Rider (ABR) and Cash Value Enhancement Rider (CVER) depending on availability. Obtaining *Death Benefits* through a combination of basic, ART, ABR or CVER coverage may be more economical than obtaining the same *Death Benefits* through basic coverage alone, because ART, ABR and CVER coverage have different current and guaranteed charges than basic coverage.

When deciding whether or not to add ART, ABR or CVER coverage to your policy, there are several factors to consider. These factors include, but are not limited to the following:

- The current cost of ART coverage is generally less than the current cost of basic, ABR and CVER coverage.
- The guaranteed maximum cost of ART coverage is generally greater than the guaranteed maximum cost of basic, ABR and CVER coverage.
- Basic, ABR and CVER coverage have the option to guarantee the current cost of insurance rates for an initial period.
- For the same amount of coverage, combining basic coverage with ART coverage may improve the *Accumulated Value*.
- Using a combination of basic coverage with ABR or CVER will result in higher early year *Cash Surrender Value* when basic coverage is used alone or in combination with ART coverage.
- When combining basic coverage with ABR or CVER coverage long term *Cash Surrender Value* will be lower than that provided with basic coverage only.
- Unlike basic , ABR and CVER coverage, ART coverage is not eligible for the benefits provided by the Conversion Rider and the Accelerated Living Benefits Rider. See the **Illustrated Riders** section for more information on these riders.
- Using a combination of basic coverage with ABR or CVER may result in higher producer compensation than when basic coverage is used alone or in combination with ART coverage.

Your producer can provide you with additional illustrations showing the effects of different proportions of basic, ART, ABR and CVER coverage to help you make your decision. This illustration does not include ART, ABR, or CVER coverage. The following amounts of basic coverage are illustrated:

| Basic Coverage Face Amount | Basic Coverage Face Amount | | |
|---|---|---|---|
| | Start Year | End Year | Amount |
| | 1 | 26 | 2,000,000 |

IONVL-1A

Producer: Eugene Houchins

For: Erwin Collins

Pacific Life Insurance Company, 700 Newport Center Drive, Newport Beach, CA 92660

10.1.2943.24397D Run: 4/15/2008 4:32 PM

VF6 - CVAT SG - NonGI

Page: 2 of 9



**PACIFIC LIFE**

<div align="right">Versa Flex VI - Life Insurance Illustration<br>Flexible Premium Adjustable Life Insurance Policy<br>Form # P04VF5 - For Presentation in GA</div>

| Initial Total Face Amount | Coverage Type | Face Amount |
|---|---|---|
| | Initial Basic Coverage | $2,000,000 |
| | Initial Total Face Amount | $2,000,000 |

**Death Benefit Option**  You may select one of the following death benefit options under your policy:
(A) a level benefit equal to the face amount ,
(B) a benefit equal to the sum of the face amount and the *Accumulated Value*,
(C) a benefit equal to the sum of the face amount and the total amount of premiums paid (less any *Withdrawals*).

### Death Benefit Option

| Start Year | End Year | Option |
|---|---|---|
| 1 | 26 | Level (A) |

The *Death Benefit* column reflects 1) any future changes described in the previous tables; 2) the death benefit option and 3) any additional amounts necessary for the illustrated policy to qualify as life insurance.

**Premium**

Illustrated periodic premium payment frequencies and amounts are indicated in the following table. This illustration assumes premium payments will be made at the beginning of each premium payment interval.

### Illustrated Premiums

| Start Year | End Year | Amount | Frequency | Annualized Amount |
|---|---|---|---|---|
| 1 | 26 | 99,750.00 | Annual | 99,750.00 |

The actual premium amounts and number of years of premium payments needed to maintain the illustrated policy benefits will depend on the policy's non-guaranteed elements and on your actual use of the policy's options. As with any other deviations from the assumptions of this illustration, if your actual premium payments occur in different amounts or different times than illustrated, the illustrated policy values and benefits may not be achieved and may increase the likelihood that the policy may lapse.

We reserve the right to require evidence of insurability, acceptable to us, for any premium payments that would result in an immediate increase in the *Death Benefit* that is greater than the increase in *Accumulated Value*.

A premium of $181,132.60 paid at the beginning of each policy year until the insured's *Age* 100 will guarantee the initial Total Face Amount if there are no distributions or coverage changes made.

**Charges**

We will deduct charges from the *Accumulated Value* monthly to cover expenses and the cost of providing the policy benefits. If the *Accumulated Value* less any *Policy Debt* is not sufficient to cover these monthly charges, you will need to pay additional premium at that time to keep the policy in force.

The current cost of insurance rates that are used to calculate non-guaranteed policy charges for the basic coverage and for any Accounting Benefit Rider are guaranteed for a period of 5 years after issue. They are not guaranteed after the guaranteed period and are subject to change at Pacific Life's discretion. The current cost of insurance rates will never exceed the maximum cost of insurance rates, which are reflected in the guaranteed columns.

**Surrender Charge**  At any time, you may surrender your policy and receive an amount equal to the *Accumulated Value* less a surrender charge and any *Policy Debt*.

The surrender charge on the initial basic coverage face amount (and on any later increase in face amount) will be level for the first 12 months after issue (or after an increase), and then grade down 0.9259% of the original amount each month to zero in 10 years.

**Interest Rate**

At the time this illustration was prepared, the current declared interest rate applicable to this product was 5.60%. The declared interest rate in effect when the policy is issued is guaranteed for the first policy year. After the first policy year, non-guaranteed interest credits are based on a declared interest rate. The current declared interest rate is set at Pacific Life's discretion and is likely to change but will never be less than the guaranteed rate of 3.00%. At the end of each policy month, we will credit interest to the *Accumulated Value*. The table below shows the hypothetical declared interest rates used in this illustration for calculating non-guaranteed interest credits on the unloaned *Accumulated Value*.

IONVL-1A

Producer: Eugene Houchins

For: Erwin Collins

Pacific Life Insurance Company, 700 Newport Center Drive, Newport Beach, CA 92660

10.1.2943.24397D  Run: 4/15/2008 4:32 PM

VF6 - CVAT SG - NonGI

Page: 3 of 9



**PACIFIC LIFE**

Illustrated Interest Rate

| Start Year | End Year | Rate |
|---|---|---|
| 1 | 26 | 5.60% |

Starting in policy year 21 we currently credit additional non-guaranteed interest at a rate of 0.20% per year. This additional interest is reflected in this illustration, but is not guaranteed.

**Available Riders**

The following riders may be available with your policy provided the eligibility criteria are met. Rider features and availability may vary by state.

Rider Name (Form Series)

| | |
|---|---|
| Accelerated Living Benefits Rider (R06ALB) | Guaranteed Insurability Rider (R93-GI) |
| Accidental Death Benefit (R84-AD) | Immediate Family Member Term Rider (R98-SPT) |
| Accounting Benefit Rider (R04ABG) | Overloan Protection Rider (R05OL2) |
| Annual Renewable Term Rider (R06ARV) | Owner Waiver of Charges Rider (R84-OWC) |
| Cash Value Enhancement Rider (R05CVV) | Payor Waiver of Charges (R84-PWC) |
| Children's Term Rider (R84-CT) | Short Term No-Lapse Guarantee Rider (R02NL5) |
| Conversion Rider (R06CON) | Waiver of Charges Rider (R84-WC) |
| Disability Benefit Rider (R84-DB) | |
| Flexible Duration No-Lapse Guarantee Rider (R03FNL) | |

**Illustrated Riders**

The benefits and costs of the riders listed below are reflected in this illustration. A brief description of the riders requested follows. You should discuss with your producer the benefits and costs of each rider, and whether other riders might be appropriate for you. Unless otherwise noted, costs are deducted monthly from the *Accumulated Value*. Also, see the Tax Information section of this illustration for more information relating to this policy, including any riders.

**Accelerated Living Benefit Rider** Gives you access to a portion of the policy's basic coverage face amount if the person insured by the policy has been diagnosed with a terminal illness resulting in a life expectancy of twelve months or less. In some states, the rider's benefit will be available even if the proposed insured's life expectancy is longer than twelve months. Benefits are subject to state requirements, may be subject to taxation and may impact eligibility for Medicaid or other government benefits. Please refer to the Accelerated Living Benefit Rider Disclosure Statement and consult your legal and tax advisor for more information. This rider is provided at no additional cost. (Form Series R06ALB.)

**Conversion Rider** Anytime during the 8th policy year, while your policy is in-force, you may convert your Versa Flex VI policy for a Pacific Life permanent life insurance policy that we make available for such conversions at that time. The face amount of the new policy equals the current basic coverage plus any Accounting Benefit Rider or Cash Value Enhancement Rider for your Versa Flex VI policy. No evidence of insurability is required for the conversion. This conversion right is subject to state availability. This rider is provided at no additional cost. (Form Series R03CON.)

**Short-Term No-Lapse Guarantee (STNLG)** Provides that, while the STNLG is in effect (up to the end of the STNLG guarantee period), your policy will not lapse or enter the grace period even if the policy's *Net Accumulated Value* is zero. The STNLG is in effect if the minimum requirements are met, which includes the ongoing payment of the STNLG premium during the guarantee period. If the policy is being maintained solely by the STNLG premium you will be foregoing the advantage of building *Accumulated Value*.

Initial STNLG Premium

| Annually | Semi-Annually | Quarterly | Monthly |
|---|---|---|---|
| 101,646.69 | 51,321.66 | 25,786.63 | 8,623.65 |

Guarantee Period     10 years from issue

Your STNLG premium requirements will be higher to reflect distributions or face amount increases. Any benefit changes illustrated after the first policy year may result in a corresponding change in the STNLG premium. Any benefit changes illustrated after the first policy year are not reflected in the previous table.

If the STNLG has become ineffective, it may be reinstated by paying the catch-up amount. The catch-up amount will be quoted upon request.

If the *Net Accumulated Value* becomes less than or equal to zero and if the STNLG is in effect, the uncollected monthly deductions are accumulated with interest at an annual rate of 4%. To keep your policy active at the end of the STNLG period, you will need to make a net premium payment at least equal to the uncollected monthly deductions plus accrued interest and you will need to continue to make future premiums that will be significantly higher than the STNLG premium you were paying.

 **PACIFIC LIFE**

Versa Flex VI - Life Insurance Illustration
Flexible Premium Adjustable Life Insurance Policy
Form # P04VF5 - For Presentation in GA

This rider is provided at no additional cost. (Form Series R02NL5.)

**Tax Information**

This material is not intended or written by Pacific Life to be used, and it cannot be used by any taxpayer, for the purpose of avoiding penalties that may be imposed on the taxpayer. This material is written to support the promotion or marketing of the transaction(s) or matter(s) addressed by this material. Any taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

Although the information contained in this illustration is based on our understanding of the Internal Revenue Code (IRC) and on certain tax and legal assumptions, it is not intended to be tax or legal advice. Such advice should be obtained from your own counsel or other tax advisor.

**Tax Rate** The following tax rates have been used to estimate your taxes, if any, due to a *Policy Loan* or *Withdrawal*.

| Assumed Income Tax Rate | | |
|---|---|---|
| Start | End | Rate |
| 1 | 26 | 31.00% |

**Death Proceeds** For federal income tax purposes, life insurance death benefits generally pay income tax-free to beneficiaries pursuant to IRC Sec. 101(a)(1). In certain situations, however, life insurance death benefits may be partially or wholly taxable. Situations include, but are not limited to: the transfer of a life insurance policy for valuable consideration unless the transfer qualifies for an exception under IRC Sec. 101(a)(2)( i.e. the "transfer- for- value rule"); arrangements that lack an insurable interest based on state law; and an employer-owned policy unless the policy qualifies for an exception under IRC Sec. 101 (j).

**Cash Value Accumulation Test** A life insurance policy will qualify as life insurance under IRC Section 7702 if it meets one of two alternative tests. This illustration uses the Cash Value Accumulation Test which requires that the *Accumulated Value* of the policy must not at any time exceed the net single premium which would be necessary to fund future benefits under the policy. Failure to qualify as life insurance will have adverse tax consequences.

**Modified Endowment Contract** As defined in IRC Section 7702A, a life insurance policy becomes a Modified Endowment Contract (MEC) if the cumulative premium payments (less nontaxable *Withdrawals* and nontaxable cash dividends) exceed, at any time during a Seven-Pay-Test Period, the cumulative total of the Seven-Pay Premiums in that Period. The Seven-Pay-Test Period starts when a policy is issued and runs for seven years, but it will start over and run for seven more years any time there is a "*Material Change*" in the terms or benefits of the policy. Any time the Seven-Pay-Test Period starts over, a new Seven-Pay Premium is determined and cumulative premiums are measured from that point forward against the new cumulative limit.

Generally, once a policy is a MEC, it is always a MEC. However, if premiums in excess of the Seven-Pay Premium limit are paid, the MEC status can be avoided if such premium payments, plus interest (which is taxable), are returned to you within 60 days after the end of the 'measuring year' in which the premium payment was made.

Note that if the benefits of a policy are reduced the policy may be subject to "re-testing" with lower Seven Pay Premium limits based on the reduced benefits. Such "re-testing" of prior premiums can cause a policy to become a MEC. Before you reduce your policy benefits, you should confirm with us whether your policy would become a MEC.

**Taxable Income** Assuming the life insurance policy is not a "Modified Endowment Contract" ("MEC") as described above:
1. *Withdrawals* (and other distributions) are taxed under the "cost recovery rule" and are generally taxable only to the extent the *Withdrawal* exceeds the cost basis of the policy. Policy cost basis generally equals the gross premiums paid less prior untaxed *Withdrawals*.
2. However, *Withdrawals* in the first 15 policy years may be taxable in part or in full under IRC 7702(f)(7)(B) if they occur in connection with a reduction in benefits.
3. Further, when such a reduction in benefits has occurred during the first 15 policy years, it is possible that earlier *Withdrawals* (within the two years prior to the reduction in benefits) may be similarly taxable. This illustration does not reflect this "two years prior" taxation.
4. After 15 policy years, *Withdrawals* up to policy cost basis are not taxable.

If the life insurance policy is a MEC:
1. Distributions from a MEC, including *Withdrawals*, *Policy Loans*, and certain assignments, are taxed to the extent there is a gain in the policy and may be subject to additional penalties.
2. Further, distributions taken from a policy during the two years prior to the policy becoming a MEC will be subject to MEC rules in the year the policy became a MEC and may become taxable at that time. This illustration does not reflect this "two years prior" taxation.

Whether or not the life insurance policy is a MEC:
If a life insurance *Policy Loan* is still outstanding when a policy is surrendered or lapses, the *Policy Loan* is automatically repaid from policy values. This will result in taxable income to the extent the *Net Cash Surrender*

IONVL-1A

Producer: Eugene Houchins

For: Erwin Collins

Pacific Life Insurance Company, 700 Newport Center Drive, Newport Beach, CA 92660

10.1.2943.24397D Run: 4/15/2008 4:32 PM

VF6 - CVAT SG - NonGI

Page: 5 of 9


**PACIFIC LIFE**

*Value* plus the amount of the repaid loan exceeds the cost basis of the policy. This potential tax is not reflected in any tax calculation(s) included in this illustration.

Premium Limits Summary  Initial Seven Pay Premium:      $220,648.56

When the *Death Benefit* is greater than the face amount due to *Accumulated Value* growth, payment of additional premium will be subject to approval.

Based on our understanding of the Internal Revenue Code a *policy issued and maintained consistent with the assumptions in this illustration would not be a MEC at issue or become one there after.*

Whether your policy might actually become a MEC depends on the timing and amounts of premium payments and *Withdrawals,* the policy's non-guaranteed elements, your actual use of the policy's options, and any policy changes made pursuant to your request.

Future Actions Required of Policyowner  This illustration does not reflect any future changes that require a written request. However, if you want to make changes to your policy, you must request the change in writing.

### Key Terms

Accumulated Value  The sum of premiums paid less all loads and expense charges, monthly deductions, and *Withdrawals* plus credited or accrued interest since the *Policy Effective Date.*

Age  The proposed insured's age on the birthday nearest the beginning of the policy year shown.

BOY  Beginning of the illustrated policy year.

Cash Surrender Value  The *Accumulated Value* minus any applicable surrender charge.

Death Benefit  The amount payable upon the proposed insured's death. The *Death Benefit* is always reduced by any outstanding *Policy Debt* and increased by any applicable rider benefits.

EOY  End of the illustrated policy year.

"Guaranteed" Columns  Reflect maximum policy charges and minimum credited interest.

"Illustrated" Columns  Reflect the assumptions about non-guaranteed elements.

"Intermediate" Columns  Reflect non-guaranteed elements, including charges and credits at rates that are halfway between the rates used in the "guaranteed" and "illustrated" columns.

Material Change  IRC 7702A describes the 7-Pay Test and also provides that a *Material Change* will cause the 7-Pay Test period to start over. A *Material Change* may occur when there is an increase in benefits, depending upon the amount of cumulative premiums paid into the policy at that time. In addition, a *Material Change* will occur if certain policy guarantees change (e.g. a change in rating class.)

Net Accumulated Value  *Accumulated Value* less *Policy Debt.*

Net Cash Surrender Value  *Cash Surrender Value* less *Policy Debt.*

Policy Debt  The sum of all outstanding *Policy Loans* plus accrued loan interest.

Premium Outlay  The sum of the premium payments you plan to make each year.

Total Face Amount  The basic coverage face amount plus the face amount of any Annual Renewable Term Rider, Accounting Benefit Rider or Cash Value Enhancement Rider covering the proposed insured.



## Basic Illustration Numeric Summary

| Yr | Age | Cumulative Premium Outlay | Guaranteed (EOY) 3.00% | | Non-Guaranteed (EOY) | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Intermediate | | Illustrated 5.60% | |
| | | | Cash Surrender Value | Death Benefit | Cash Surrender Value | Death Benefit | Cash Surrender Value | Death Benefit |
| 5 | 78 | 498,750 | 132,252 | 2,000,000 | 158,731 | 2,000,000 | 186,318 | 2,000,000 |
| 10 | 83 | 997,500 | ## | ## | ## | ## | 420,003 | 2,000,000 |
| 20 | 93 | 1,995,000 | | | | | 973,645 | 2,000,000 |

Insurance coverage will cease in year 7 based on guaranteed assumptions. Insurance coverage will cease in year 9 based on intermediate assumptions. Insurance coverage will cease in year 26 based on illustrated assumptions.

I have received and read a copy of this illustration and understand that any non-guaranteed elements illustrated are subject to change and could be higher or lower. The producer has told me that they are not guaranteed. I understand this is an illustration and not a contract. For full policy details, I will refer to the contract.

*Maria Ana Gordillo.*    4/15/08
APPLICANT'S SIGNATURE    DATE

I certify that this illustration has been presented to the applicant and that I have explained that any non-guaranteed elements are subject to change. I have made no statements that are inconsistent with this illustration.

[signature]    4/15/08
PRODUCER'S SIGNATURE    DATE
PL PRODUCER#

**PACIFIC LIFE**

Versa Flex VI - Life Insurance Illustration
Flexible Premium Adjustable Life Insurance Policy
Form # P04VF5 - For Presentation in GA

**Proposed Insured:** Erwin Collins
Male, Age 74
Preferred Nonsmoker

Death Benefit Option = Level
Total Face Amount = $2,000,000
Premium Frequency = Annual

**Producer:**
Eugene Houchins
4243 Dunwoody Club Dr Suite 215
Atlanta, GA 30350

## Basic Illustration Tabular Detail and Statement of Policy Cost and Benefit Information

| | | | Guaranteed Values (EOY) @ 3.00% | | | Non-Guaranteed Values (EOY) @ 5.60% | | |
|---|---|---|---|---|---|---|---|---|
| Yr | Age | Premium Outlay (1) | Accumulated Value (2) | Cash Surrender Value (3) | Death Benefit (4) | Accumulated Value (5) | Cash Surrender Value (6) | Death Benefit (7) |
| 1 | 74 | 99,750 | 48,768 | 0 | 2,000,000 | 53,271 | 0 | 2,000,000 |
| 2 | 75 | 99,750 | 91,265 | 6,998 | 2,000,000 | 104,269 | 20,002 | 2,000,000 |
| 3 | 76 | 99,750 | 128,450 | 54,717 | 2,000,000 | 152,430 | 78,697 | 2,000,000 |
| 4 | 77 | 99,750 | 159,710 | 96,510 | 2,000,000 | 197,329 | 134,129 | 2,000,000 |
| 5 | 78 | 99,750 | 184,919 | 132,252 | 2,000,000 | 238,984 | 186,318 | 2,000,000 |
| 6 | 79 | 99,750 | 78,350 | 36,216 | 2,000,000 | 279,724 | 237,591 | 2,000,000 |
| 7 | 80 | 99,750 | 0 | 0 | 0 | 317,741 | 286,141 | 2,000,000 |
| 8 | 81 | 99,750 | 0 | 0 | 0 | 353,660 | 332,593 | 2,000,000 |
| 9 | 82 | 99,750 | 0 | 0 | 0 | 388,051 | 377,518 | 2,000,000 |
| 10 | 83 | 99,750 | 0 | 0 | 0 | 420,003 | 420,003 | 2,000,000 |
| **Total** | | **997,500** | | | | | | |
| 11 | 84 | 99,750 | 0 | 0 | 0 | 482,649 | 482,649 | 2,000,000 |
| 12 | 85 | 99,750 | 0 | 0 | 0 | 544,550 | 544,550 | 2,000,000 |
| 13 | 86 | 99,750 | 0 | 0 | 0 | 605,482 | 605,482 | 2,000,000 |
| 14 | 87 | 99,750 | 0 | 0 | 0 | 663,745 | 663,745 | 2,000,000 |
| 15 | 88 | 99,750 | 0 | 0 | 0 | 719,375 | 719,375 | 2,000,000 |
| 16 | 89 | 99,750 | 0 | 0 | 0 | 774,749 | 774,749 | 2,000,000 |
| 17 | 90 | 99,750 | 0 | 0 | 0 | 828,293 | 828,293 | 2,000,000 |
| 18 | 91 | 99,750 | 0 | 0 | 0 | 879,617 | 879,617 | 2,000,000 |
| 19 | 92 | 99,750 | 0 | 0 | 0 | 928,259 | 928,259 | 2,000,000 |
| 20 | 93 | 99,750 | 0 | 0 | 0 | 973,645 | 973,645 | 2,000,000 |
| **Total** | | **1,995,000** | | | | | | |
| 21 | 94 | 99,750 | 0 | 0 | 0 | 1,017,169 | 1,017,169 | 2,000,000 |
| 22 | 95 | 99,750 | 0 | 0 | 0 | 1,056,523 | 1,056,523 | 2,000,000 |
| 23 | 96 | 99,750 | 0 | 0 | 0 | 1,091,018 | 1,091,018 | 2,000,000 |
| 24 | 97 | 99,750 | 0 | 0 | 0 | 960,698 | 960,698 | 2,000,000 |
| 25 | 98 | 99,750 | 0 | 0 | 0 | 528,504 | 528,504 | 2,000,000 |
| 26 | 99 | 99,750 | ## | ## | ## | ## | ## | ## |
| **Total** | | **2,593,500** | | | | | | |

Insurance coverage will cease in year 7 based on guaranteed assumptions. Insurance coverage will cease in year 26 based on illustrated assumptions.

A zero in the *Premium Outlay* column does not mean the policy is paid up. Charges will continue to be deducted from the *Accumulated Value* as long as the policy remains in-force. The actual premium amounts and number of years of premium payments that are needed to maintain the illustrated non-guaranteed policy benefits will depend on the policy's non-guaranteed elements and on your actual use of the policy's options.

**PACIFIC LIFE**

## Statement of Policy Cost and Benefit Information
## Summary of Coverage

Life Insurance Cost Information

| | Guaranteed | | Current | |
|---|---|---|---|---|
| Cost Index | 10 Year | 20 Year | 10 Year | 20 Year |
| Surrender @ 5% | 0.00 | 0.00 | 33.97 | 35.85 |
| Net Payment @ 5% | 0.00 | 0.00 | 49.88 | 49.88 |

An explanation of the intended use of these indices is provided in the life insurance buyer's guide.

**Important Notice**
Actual results will differ from the projections shown on the previous page if there is a change in the interest rates, cost of insurance rates or the timing and amount of your premium payments.  The non-guaranteed amounts shown on the previous page are based on our current unloaned interest rate of 5.60%.  We may change the current interest rate at any time but may not credit less than the guaranteed annual rate of 3.00%. We may change the current cost of insurance rates at any time but may not charge more than the guaranteed cost of insurance rates.

The tax status of this contract should be reviewed each year.  For further information, contact the insurance company or your producer shown at the top of page one.

The projected values in this Statement of Policy Cost and Benefit Information include the costs and benefits of the basic coverage and any additional riders or benefits.  In addition, all values are based on the plan of insurance as illustrated, including any face amount changes, option changes, withdrawals and policy loans.  A Statement of Policy Cost and Benefit Information based on the policy as issued, without any policy changes, is available on request.

| Type of Coverage | Benefit Amount |
|---|---|
| Basic Coverage: | |
| Universal Life Insurance Rider | $2,000,000.00 |
| Riders: | |
| No-Lapse Guarantee | |

Case Case 16:15-cv-04651-CBS-GWS Document 81-30-Filed 02/08/26/18 Page 46 of 258 of 133
Case 3:14-cv-04651-WHO   Document 81-1   Filed 11/10/15   Page 46 of 90
Document #15 of 19

## ASSIGNMENT OF LIFE INSURANCE POLICY AS COLLATERAL

**ASSIGNMENT.** For Value Received, *The Erwin A. Collins Family Insurance Trust-2008*, a Georgia Irrevocable Trust, its successors and assigns ("**Owner**"), hereby assigns, transfers, pledges, and grants all of Owner's claims, options, privileges, rights, titles and interests in, to and under the insurance policy or policies described below to *Windsor Securities LLC*, a Nevada LLC, its successors and assigns (herein called "**Assignee**"):

**Policy No.:** VF51071320          **Issued by:** Pacific Life ("**Insurer**")

**Insured:**    Erwin A. Collins ("**Insured**")

and any and all additions, renewals and supplementary contracts issued in connection therewith and any and all proceeds thereof (said policies and contracts and proceeds are hereinafter collectively referred to as the "**Insurance Policy**"), subject to all the terms and conditions of this Assignment of Life Insurance Policy as Collateral (this "**Assignment**").

This Assignment includes, without limitation, assignment of the following rights of Owner:

1.     The sole right to collect from Insurer the net proceeds of the Insurance Policy due to the death of the Insured or maturity of the Insurance Policy;

2.     The sole right to withdraw from or surrender the Insurance Policy and receive the surrender value thereof at any time provided by the terms of the Insurance Policy and at such other times as Insurer may allow;

3.     The sole right to obtain one or more loans or advances on the Insurance Policy at any time, either from Insurer or from other persons, and to pledge or assign the Insurance Policy as security for such loans or advances;

4.     The sole right to collect and receive all distributions or shares of surplus, dividend deposits or additions to the Insurance Policy now or hereafter made or apportioned thereto, and to exercise any and all options contained in the Insurance Policy with respect thereto; provided, that unless and until Assignee shall notify Insurer in writing to the contrary, the distributions or shares of surplus, dividend deposits and additions shall continue on the plan in force at the time of this Assignment;

5.     The sole right to exercise all nonforfeiture rights permitted by the terms of the Insurance Policy or allowed by Insurer and to receive all benefits and advantages derived therefrom;

6.     The sole right to amend the Insurance Policy; and

7.     The right to exercise any and all voting rights or privileges to the extent created or endowed by the Insurance Policy.

8.     The sole right to sell the Policy, but only upon the failure of the Owner to fulfill obligations to the Lender as specified in any agreements or contracts to which Lender and Owner are parties.

9.     Any other Policy rights the Owner might enjoy not otherwise excluded below.

1604840 v01

Case Case3:14-cv-04651-GHO Documernt11-40-Bileedil0d/08/26/1PageAg7 d228of 133
Case 3:14-cv-04651-WHO   Document 81-1   Filed 11/10/15   Page 47 of 90
Document #15 of 19

**RIGHTS RETAINED**.  The following rights, so long as the Insurance Policy has not been surrendered or canceled, are reserved and excluded from this Assignment and do not pass by virtue hereof:

      1.      The right to collect from Insurer any disability benefit payable in cash under the terms of the Insurance Policy that does not reduce the amount of insurance provided under the Insurance Policy;

      2.      The right to designate and change the beneficiary of the Insurance Policy, provided that Assignee shall continue to be the primary assignee of the Insurance Policy; and

      3.      The right to elect any optional mode of settlement permitted by the Insurance Policy or allowed by Insurer;

provided, however, that Owner shall not exercise any of these rights without the Owner's receipt of the prior written consent of Assignee and that the reservation of these rights shall in no way impair the right of Assignee to surrender the Insurance Policy completely with all its incidents or impair any other right of Assignee hereunder, and any permitted designation or change of beneficiary or election of a mode of settlement shall expressly be made subject to this Assignment and to the rights of Assignee hereunder.

**OBLIGATIONS SECURED**.  This Assignment is made, and the Insurance Policy is to be held, as collateral security for any and all liabilities of Owner to Assignee, either now existing or that may hereafter arise, under the Life Insurance Premium Financing Agreement dated as of 4/15, 2008, among Assignee, Owner and Insured, as amended, supplemented, and otherwise modified from time to time (the "**Agreement**") and all liabilities, obligations, covenants, duties, indebtedness, fees, expenses and other amounts owing by Owner to Assignee under this Assignment (all of which liabilities of Owner, secured or to become secured, are herein called "**Liabilities**").  Subject to the terms of this Assignment, Assignee may apply any and all money received under the Insurance Policy to pay Liabilities when due in any order Assignee may choose it its sole discretion.

**BENEFITS PAYMENT DIRECTIVE**.  Owner hereby authorizes and directs Insurer to pay Assignee any and all death benefits and other amounts due under or on account of the Insurance Policy, and Owner shall be considered the Insurance Policy's primary beneficiary, provided, however, that nothing in this paragraph entitles Assignee to retain more than the amount of the Liabilities.

**REPRESENTATIONS**.  Owner hereby represents and warrants to Insurer and Assignee that: (a) Owner is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization; (b) the execution, delivery and performance of this Assignment by Owner (i) are within Owner's power, (ii) have been duly authorized by all necessary limited liability company or other action and (iii) do not contravene any provision of Owner's articles of organization, operating agreement or other comparable organizational documents, any law or regulation applicable to Owner or its members or conflict with, violate, create a lien or default under or require a consent under any document or agreement to which Owner is a party or by which it is bound; (c) the Insurance Policy is in full force and effect and has never lasped; (d) Owner is the sole owner of the Insurance Policy and has full authority to assign the Insurance Policy to Assignee; (e) Owner has neither assigned, nor granted or suffered any lien, pledge or security interest against, the Insurance Policy to any other person or entity, except for liens securing the Liabilities; (f) this Assignment constitutes a legal, valid and binding obligation of Owner, enforceable by Assignee against Owner in accordance with its terms (subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally); and (g) none of the proceeds of the Agreement will be used for personal, family or household purposes.  Owner further represents and warrants to Insurer and Assignee that no proceedings in bankruptcy are pending or to its knowledge threatened against Owner (and that no grounds exist for such proceedings) and that Owner's property is not subject to any assignment for the benefit of creditors.

1604840 v01

**COVENANTS**. Owner and Assignee covenant and agree as follows:

1. That, unless Owner and Assignee have elected to exercise the Default Sale Right (as defined below), any balance of sums received hereunder from Insurer remaining after payment of the then existing Liabilities, matured or unmatured, shall be paid in full by Assignee to the persons entitled thereto under the terms of the Insurance Policy had this Assignment not been executed;

2. That Assignee shall not exercise either the right to surrender the Insurance Policy or the right to obtain policy loans from Insurer, until there has been a default on any of the Liabilities or any other Event of Default under the Agreement that shall not have been cured within the time period, if any, provided in the Agreement;

3. That upon Owner's request, and subject to the terms of "RIGHTS RETAINED" above, Assignee shall forward, without unreasonable delay, to Insurer, the Insurance Policy for endorsement of any designation or change of beneficiary or any election of an optional mode of settlement;

4. Owner hereby authorizes Insurer to recognize Assignee's claims to rights hereunder (including the exercise of the Default Sale Right) without investigating the reason for any action taken by Assignee, or the validity or the amount of the Liabilities or the existence of any default therein, or the giving of any notice hereunder, under applicable law or otherwise, or the application to be made by Assignee of any amounts to be paid to Assignee. The sole signature of Assignee shall be sufficient for the exercise of any rights under the Insurance Policy assigned hereby and the sole receipt by Assignee of any sums shall be a full discharge and release therefor to Insurer. Checks or drafts for all or any part of the sums payable under the Insurance Policy and assigned herein shall be paid to the exclusive order of Assignee if, when, and in such amounts as may be requested by Assignee;

5. Owner shall at no time change the mode of premium payment or otherwise modify the timing of any such premium payments from the signed policy illustration provided by Owner to Assignee. Assignee shall be under no obligation to pay any premium, or the principal of or interest on any loans or advances on the Insurance Policy, whether or not obtained by Assignee, or any other charges on the Insurance Policy, but such amounts so paid by Assignee from its own funds, shall become a part of the Liabilities hereby secured, shall be due immediately, and shall accrue interest at the highest rate allowed by applicable law; and

6. The exercise of any right, option, privilege or power given to Assignee under this Assignment shall be at the sole option of Assignee, and Assignee may exercise any such right, option, privilege or power without notice to, or assent by, or affecting the liability of, or releasing any interest hereby assigned by Owner.

**TERMINATION**. At such time as the Liabilities have been paid and performed in full, Assignee will promptly terminate this Assignment and the security interests granted hereunder, and will promptly terminate any UCC financing statements filed in connection with this Assignment.

**LIMITED POWER OF ATTORNEY**. Owner irrevocably appoints Assignee and any officer or agent thereof, with full power of substitution, as Owner's true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of Owner and in the name of Owner or in its own name, from time to time in Assignee's discretion, for the limited purpose of carrying out the terms of this Assignment, to take any and all appropriate action and to execute and deliver any and all documents and instruments that Assignee may deem necessary or desirable to accomplish the purposes of this Assignment, provided, however, that nothing in this Assignment shall obligate Assignee to

1604840 v01

Case Case cv-04-5930CBB3-GPBOC Document 11-30 Filed 02/09/26/18 Page 49 12588 of 133
Case 3:14-cv-04651-WHO Document 81-1 Filed 11/10/15 Page 49 of 90
Document #15 of 19

protect the interests of Owner or anyone else in or under the Insurance Policy. For avoidance of doubt, such power of attorney shall be considered to be coupled with an interest.

**DEFAULT SALE RIGHT.** Upon an occurrence of an Event of Default (as defined in the Agreement) that has not been remedied within the time period required in the Agreement, Assignee shall have the right (the "**Default Sale Right**") but not the obligation to accept, that in consideration of the full and complete satisfaction of the Liabilities (the sufficiency of which consideration is hereby acknowledged) Owner may make a full transfer and assignment of the Insurance Policy to Assignee and thereby forever relinquish any and all rights Owner may have thereunder, including without limitation any rights to cash surrender value and/or death benefit provided thereunder. Upon the exercise of this Default Sale Right, Assignee shall notify Insurer in writing and Insurer shall thereafter recognize Assignee as the sole lawful owner of the Insurance Policy.

**NO WAIVER.** Any forbearance or failure or delay by Assignee in exercising any right, power or remedy hereunder shall not be deemed to be a waiver of such right, power or remedy, and any single or partial exercise of any right, power or remedy shall not preclude the further exercise thereof. Assignee may take or release other security, may release any party primarily or secondarily liable for any of the Liabilities, may grant extensions, renewals or indulgences with respect to the Liabilities, or may apply to the Liabilities in such order as Assignee shall determine, the proceeds of the Insurance Policy hereby assigned or any amount received on account of the Insurance Policy by the exercise of any right permitted under this Assignment, without resorting or regard to other security or any guaranty. No waiver of any provision hereof shall be effective unless it shall be in writing and signed by Assignee.

**JOINT AND SEVERAL LIABILITY.** If more than one entity signs this Assignment as an owner, the obligations, agreements, covenants, representations and warranties of all such persons or entities signing this Assignment as owners shall be joint and several.

**SUCCESSORS AND ASSIGNS.** All of the terms and provisions of this Assignment shall be binding upon, and inure to the benefit of, and be enforceable by, the respective successors, executors, administrators and assigns of the parties hereto.

**NOTICES.** Unless notice is required by law to be given in another manner, all notices or other communications required or permitted to be given pursuant to this Assignment shall be given in writing and may be personally served or may be deposited in the United States mail, by first-class mail, postage prepaid, addressed as set forth in Schedule 1 hereto, or to such other address as such party shall have specified by written notice given as provided herein. All notices mailed as provided herein shall be deemed given on the third (3rd) business day following the date so mailed.

**CHOICE OF LAW.** This Assignment shall be governed by, and construed, interpreted and enforced in accordance with, the laws of the state of California.

**TITLES AND HEADINGS.** Titles and headings of sections of this Assignment are for convenience of reference only and shall not affect the construction of any provision of this Assignment. The unenforceability of any provision of this Assignment shall not affect the enforceability or validity of any other provision hereof.

**COUNTERPARTS**. This Assignment may be executed in any number of counterparts, each of which shall constitute an original and together shall constitute one and the same instrument.

Signed this 15 day of ___April___, 2008.

**OWNER:**

**The Erwin A. Collins Family Insurance Trust-2008**

By: *Maria Ana Gordillo*, **Trustee**
Name: **Maria A. Gordillo**
Date: 4/15/2008

**ASSIGNEE:**

*Windsor Securities LLC*
By **MFIP (Delaware Inc.)**

By: _____
Name: **Steven Prusky**
Title: *President/Director*
Date: *16-Apr-08*

- 5 -

## Schedule 1

Addresses for notice:

### Owner:

> The Erwin A. Collins Family Insurance Trust-2008
> c/o Maria A. Gordillo, as Trustee
> 346 Crestview Circle
> Roswell, GA 30075
> Telephone: 770-375-9266
> Facsimile: n/a

### Assignee:

> Windsor Securities LLC
> c/o Steven Prusky
> 25 East Athens Avenue
> Ardmore, PA 19003
> Telephone: (610) 642-3100
> Facsimile: 610 - 642-9709

Document #16 of 19

## Assignment of Life Insurance Policy as Collateral
### and
### Individual Acknowledgement to be signed and notarized.

*This is an insurance company form to be provided to the Insured and Trustee and attached hereto.*

**TITLE ASNMT**

**PACIFIC LIFE INSURANCE COMPANY**
Life Insurance Operations Center
P.O. Box 2030 • Omaha, NE 68103-2030
(800) 347-7787 • fax (949) 462-3066
www.PacificLife.com



# COLLATERAL ASSIGNMENT

## INSTRUCTIONS TO POLICYOWNER

1. Print full name and address of the Collateral Assignee.

2. The policyowner must sign and date this form.

3. Return the completed form to your Pacific Life Insurance Company (PL) Associate or local office. The form may also be mailed directly to Pacific Life Insurance Company, Attn: Life Insurance Operations Center, P.O. Box 2030, Omaha, Nebraska 68103-2030. Our toll free number is (800) 347-7787.

4. You will receive written confirmation from PL that will signify that this assignment is acceptable to PL and has been recorded. Upon receipt of confirmation, you should send a copy to Collateral Assignee.

## SIGNATURES REQUIRED

**ONE INDIVIDUAL OWNER** - No other signatures are required. However, in community property states it is recommended that the individual owner's spouse also sign the form when the policy is not considered separate property.

**SEVERAL INDIVIDUAL JOINT OWNERS** - All individuals must sign.

**PARTNERSHIP AS OWNER** - Signature of authorized signing partner.

**CORPORATION AS OWNER** - An authorized officer must sign the form with his/her signature and title. The signature must be notarized or the corporate seal affixed.

**BENEFICIARY** - PL suggests that the beneficiary consent to the assignment by signing this form in the "vested interest" states of Colorado, Massachusetts, Louisiana, New York and New Jersey.

| Insured's Name: First   MI   Last | Policy/Application Number |
|---|---|
| *Erwin  A.  Collins* | VF51701320 |

For value received, I transfer and assign this policy, subject to the conditions outlined below and on page two, to:

| Collateral Assignee's Name |
|---|
| |

| Address: Street | City | State | Zip Code |
|---|---|---|---|
| | | | |

**BENEFICIARY** - This assignment will not change the beneficiary of the policy. The beneficiary designation will remain in effect unless changed by the owner.

**SUPPLEMENTARY POLICY** - This assignment will apply to any Life policy, including any supplementary riders, having the above policy number.

**PRIOR ASSIGNMENT** - If this policy has been previously assigned, the existing assignment(s) will take precedence in case of a claim.

**ASSIGNMENT EFFECTIVE DATE** - Written confirmation by PL to the policyowner will signify that this is acceptable to PL and has been recorded. However, PL will have no liability for any action taken before this assignment is recorded at its home office.

**DEFINITIONS** - PL means Pacific Life Insurance Company. Words in the singular will include the plural, and words in the masculine gender will include the feminine gender, if applicable.

| Policyowner's Signature | Date | Applicant's Signature (Only required at time of application, if other than policyowner) | Date |
|---|---|---|---|
| *Maria Ana Gordillo* | | | |

| Proposed Insured's Signature (Only required at time of application, if other than applicant/policyowner) | Date | Assignee's Signature | Date |
|---|---|---|---|
| | | | |

| Beneficiary's Signature (if applicable) | Date |
|---|---|
| | |

NOTARY PUBLIC STAMP OR CORPORATE SEAL

| Corporation's Signature (if applicable) | Date |
|---|---|
| | |

*[Notary seal: Jamie ... Washington ... Notary Public ... DeKalb County, Georgia]*

## HOME OFFICE USE

Pacific Life Insurance Company has retained the original Assignment, dated _____ and is returning a copy of this document. The Home Office assumes no responsibility for the validity of this document.

SECRETARY, NEWPORT BEACH, CALIFORNIA

## PRODUCER: PROVIDE A PHOTOCOPY OF THIS SIGNED FORM TO ALL SIGNING PARTIES.

Page 1 of 2

PL%ASNMT%PLs

15-04027-42  10/2007

# COLLATERAL ASSIGNMENT

 **PACIFIC LIFE**

## GENERAL CONDITIONS

*This assignment is made as collateral security for an obligation owed the assignee, which may include, but is not limited to, any amounts hereafter advanced by the assignee for the purpose of paying premiums on the policy.*

*This assignment is subject to all the conditions of the policy, any prior lien in favor of PL and rules and regulations of PL. This assignment is also subject to all prior assignments.*

*The assignee, by the acceptance of this assignment, agrees to the conditions and provisions herein set forth.*

## ASSIGNEE'S RIGHTS

It is agreed that the following specific rights are included in this assignment and pass to the assignee.

1. The sole right to collect from PL the net policy proceeds when it becomes a claim by death or maturity.
2. The sole right to surrender the policy and receive the surrender value:

    (i)     at any time provided by the policy terms, and
    (ii)    at such other times as the insurer may allow.

3. The sole right to obtain one or more loans on the policy, either from PL or from other persons. The sole right to pledge or assign the policy as security for such loans.
4. The sole right to collect and receive all distributions or shares of surplus, dividend deposits or additions to the policy now or later made. The sole right to exercise any and all options in the policy with respect to such distributions or surplus dividend deposits or additions. However, the plan in effect for such distributions of surplus, dividend deposits or additions at this assignment date will remain, unless PL receives a written request from the assignee to change it.
5. The sole right to exercise all non-forfeiture rights permitted by the terms of the policy or allowed by PL. The sole right to receive all benefits and advantages derived from the exercise of such non-forfeiture rights.

## POLICYOWNER'S RIGHTS

It is agreed that the following specific rights, so long as the policy has not been surrendered, are reserved and excluded from the assignment and do not pass to the assignee.

1. The right to collect from PL any disability benefit payable in cash that does not reduce the amount of insurance.
2. The right to designate and change the beneficiary.
3. The right to elect any settlement option available in the policy or allowed by PL.
4. The right to transfer amounts between the subaccounts of the Separate Account and to and from the Fixed Account as allowed per the Prospectus for a Variable Universal Life Policy.

The reservation of these rights will in no way impair the right of the assignee to surrender the policy. Neither will such reservation impair any other right of the assignee resulting from this assignment. Any designation or change of beneficiary or election of a settlement option will be subject to this assignment and the rights of the assignee under this assignment.

## AGREEMENT BETWEEN POLICYOWNER AND ASSIGNEE

A.  The assignee agrees with the policyowner as follows:

1. That any balance of money received under this assignment remaining after payment of the obligation, which this assignment secured, will be paid to the persons entitled thereto under the terms of the policy, had this assignment not been made.
2. That the assignee will not exercise the right to obtain policy loans from PL, except for the purpose of paying premiums and except as an alternative, at the option of the assignee, to the surrender of this policy.
3. That the assignee will not exercise the right to surrender this policy or the right to obtain a policy loan from PL (other than to pay premiums) until:

    (i)     there has been default in performance of the obligation secured by this assignment, or
    (ii)    there has been failure to pay any policy premium when due, and in either case
    (iii)   20 days have elapsed since the assignee mailed by first class mail, to the policyowner at his last known address, notice of intention to surrender or obtain a policy loan.

B.  The policyowner and assignee agree as follows:

1. That PL will not be responsible for the sufficiency or validity of this assignment.
2. That PL is authorized to, and will be protected in, accepting the sole signature or request of the assignee as to rights granted the assignee by this assignment, and the sole signature or request of the policyowner as to rights reserved to the policyowner.
3. That PL will have no duty or responsibility to determine the existence of any default in the obligation secured hereby, the amount of the obligation, the giving of any notice by the assignee, the purpose of any policy loan or surrender of the policy, or otherwise question the right of the assignee to exercise any of the rights granted by this assignment.
4. That PL is authorized to make payment to the sole order of the assignee of any amounts becoming payable to the assignee under this assignment, and PL will have no duty to see to the application of the funds so received and will be discharged to the extent of such payment.

15-04027-42  10/2007

## BORROWER'S CLOSING CERTIFICATE

Dated as of ⁴⁄₁₅ , 2008

Reference is made to the **Life Insurance Premium Financing Agreement** dated as of April 15 , 2008 (the *"Financing Agreement"*) among **Windsor Securities LLC**, a Nevada LLC with a mailing address of 25 East Athens Avenue, Ardmore, PA 19003, as Lender (the *"Lender"*), **Erwin A. Collins** as Insured (the *"Insured"*) and **The Erwin A. Collins Family Insurance Trust-2008**, as Borrower (the *"Borrower"*).

Pursuant to Section 2.01 of the Financing Agreement, the Borrower hereby certifies that all the representations and warranties of and made by the Borrower set forth in the Financing Agreement and each Financing Document to which the Borrower is a party are true and correct in all respects on and as of the date first above written.

IN WITNESS WHEREOF, the undersigned Borrower has hereunto set its name as of the date set forth below.

> **The Erwin A. Collins Family Insurance Trust-2008**
>
> By: *Maria Ana Gordillo* Trustee
> Name: Maria A. Gordillo
> Date: 4/15/2008

# *Life Insurance Premium Finance*
# *Trust Questionnaire*

**Insured's Name:**  Erwin A. Collins

**Insured's Address:**  311 Suburban Road, Knoxville, TN 37923

   **Second Home:**  NA

**Insured's Phone Number:**  865-691-3329

**Insured's Facsimile Number:**  NA

**Insured's Social Security Number:**  Redacted

**Insured's E-mail:**  NA

**Insured's Spouse (if any):**  NA

---

**Trust Name and State of Organization:**  Erwin A. Collins Family Insurance Trust- 2008

**Trust Tax ID #:** Redacted

---

**Name of Trust Beneficiary:**  Ann H. Collins

**Beneficiary's Address:**  331 Suburban Road, Knoxville, TN 37923
**Relationship of Beneficiary to Insured:**  NA

**Beneficiary's Phone Number:**  865-691-3329

**Beneficiary's Facsimile Number:**  NA

---

**Name of Trustee:**  Maria A. Gordillo

**Trustee's Address:**  346 Crestview Circle, Roswell, GA 30075

**Trustee's Phone Number:**  770-375-9266

**Trustee's Facsimile Number:**  NA

---

**Agency Name and State of Organization:** E.E.H. Consulting, Inc.

**Agent Name and Title with Agency:**  Eugene E. Houchins, President

**Agency's Address:**  4243 Dunwoody Club Drive, Suite 215, Atlanta GA 30350

**Agency's Phone Number:**  678-336-5250

**Agency's Facsimile Number**  866-501-1888

- 1 -

Document #18 of 19

Attach the following documents to this questionnaire:

1) Complete executed copy of trust formation documents

2) Complete executed copy of illustration, application and policy (if issued)

3) Copy of insured's and trustee's drivers license

Description of Policy:

| Insurer | Policy Issue Date | Policy Number | Annual Premium | Death Benefit |
|---|---|---|---|---|
| Pacific Life | March 4, 2008 | VF51701320 | $101,667 3rd year on | $2,000,000 |

**Instructions for Premium Reimbursement:**
Bank:
Address:
ABA#:
SWIFT Code:

Account number:
Amount of $:

**Instructions for Payment of Premiums ( Trust Account):**
Bank:
Address:
|ABA#:
Account name:
Account #:
Amount of $: $
Policy #:

**Instructions for Payment of Premiums:** ____
Bank:  Wells Fargo Bank, N.A.
Address:
ABA#: 121000248
Account name:  Pacific Life- Life
Account #: Redacted
Amount of $: $99,750
Policy #: VF51701320
Ref: The Erwin A. Collins Family Insurance Trust- 2008

- 2 -

[To be completed by Lender]
Lender: Windsor Securities, LLC
Lender address:
Tax ID#:
Agent Guaranty:

**Loan Information:**

Loan:                  $_____99,750_____ First Year Premium

                       $_____0_____ Second Year Premium

                       $_____ Structuring Fee

                       $_____13,000_____ Closing Fees

Total Loan Amount:     $____112,750_____