# EXHIBIT 13

# ORIGINAL

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

WINDSOR SECURITIES, LLC,

                        Plaintiff,      Case No.

          -against-          16-cv-01533

ARENT FOX, LLP and JULIUS        (GBD)

ROUSSEAU, III,

                    Defendants.

------------------------------------x


                March 6, 2017

                10:16 a.m.


           Deposition of WINDSOR SECURITIES, LLC

by STEVEN PRUSKY, and STEVEN PRUSKY, individually,

held at the offices of Foley & Lardner LLP, 90

Park Avenue, New York, New York, pursuant to

Notice, before Mildred Cassese, a Registered

Professional Reporter and Notary Public of the

State of New York.

**Computer Reporting NYC Inc.**

124 West 72nd Street |New York, NY 10023

(212) 986-1344 Fax (212) 983-9149 office@crinyc.com

A P P E A R A N C E S:


ALAN L. FRANK LAW ASSOCIATES, P.C.

Attorneys for Plaintiff

    135 Old York Road

    Jenkintown, Pennsylvania 19046

BY:   ALAN L. FRANK, ESQ.



FOLEY & LARDNER LLP

Attorneys for Defendants

    90 Park Avenue

    New York, New York 10016

BY:   PETER N. WANG, ESQ.

    ADAM G. PENCE, ESQ.



ALSO PRESENT:

    JULE ROUSSEAU, ARENT FOX

    HUNTER T. CARTER, ARENT FOX


    JIM SEPULVEDA, VIDEOGRAPHER

**IT IS HEREBY STIPULATED AND AGREED**, by and between the attorneys for the respective parties herein, that filing and sealing be and the same are hereby waived.

**IT IS FURTHER STIPULATED AND AGREED** that all objections, except as to the form of the question, shall be reserved to the time of the trial.

**IT IS FURTHER STIPULATED AND AGREED** that the within deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the officer before whom the within deposition was taken.

*S. Prusky*

Q.    No details about the case or what your
issue or problem was?

A.    Not that I recall.

Q.    Did you come to the conclusion in your
own mind as a non-lawyer that there was
malpractice before you sought out an attorney to
represent you?

MR. FRANK:  I'm going to direct the
witness not to respond.  Attorney-client
privilege.

MR. WANG:  I asked him whether he came
to a conclusion.  By definition, it's not
seeking advice given to him by an attorney.

MR. FRANK:  I understand.

Same instruction, sir.

MR. WANG:  I don't understand it.
Just enlighten me.

MR. FRANK:  I'm not going to argue
with you.  I'm directing him not to answer.
If you have another question, please
proceed.

(Discussion off the record.)

Q.    Mr. Rousseau and his law firm, first
Herrick Feinstein and then later Arent Fox, they

1                        *S. Prusky*

2    represented you for some period of time in

3    connection with your activities in the life

4    insurance business?

5         A.    In the life settlement business, yes.

6         Q.    Life settlement business.

7               And they would send you bills from

8    time to time?

9         A.    Yes.

10        Q.    And you would pay those bills from

11   time to time?

12        A.    Yes.

13        Q.    And did you keep a record of the bills

14   when you received them?

15        A.    When they were received?

16        Q.    Yes.

17        A.    I don't --

18        Q.    Let me rephrase the question.  That

19   was a poor question.

20              When you would receive a bill, did you

21   review the bill?

22        A.    With Mr. Rousseau, I tended not to

23   review them in great detail.  I took his word of

24   things.

25        Q.    Okay.

1                         *S. Prusky*

2          A.    But there was an occasional review,

3     sure.

4          Q.    You had a trusted relationship with

5     Mr. Rousseau; you trusted him?

6          A.    Yes, I did.

7          Q.    And when he would send you bills you

8     wouldn't review them that carefully because you

9     trusted him?

10         A.    Generally speaking, that's true.

11         Q.    And there were a number of different

12    matters on which Mr. Rousseau represented you, all

13    connected to the life settlement business,

14    correct?

15         A.    Yes.

16         Q.    And it involved a number of different

17    cases, as it's referred to, correct?

18         A.    Yes.

19         Q.    Hathaway case was one, correct?

20         A.    That is correct.

21         Q.    Garcia?

22         A.    Correct.

23         Q.    Ultimately the Bitter case?

24         A.    Yes.

25         Q.    And others as well?

1                          *S. Prusky*

2          A.      Yes.

3          Q.      As well as general advice regarding

4    the life settlement business?

5          A.      Yes.

6          Q.      Do you recall any other particular

7    cases that he represented you on?

8          A.      Yes.

9          Q.      Which one or ones?

10         A.      Did you mention Acker, Collins,

11   Stamatov, Cohen, Pawlick, P A W L I C K,

12   Gilbert -- forgive me if you've already mentioned

13   these.  I'm just trying to go through them in my

14   mind.

15              I think so far as specific life

16   settlement cases with named insureds, that

17   probably covers it.

18         Q.      And you're aware that there are

19   outstanding bills on many of those cases that you

20   haven't received -- that you haven't paid,

21   correct?

22         A.      I'm aware there are outstanding bills.

23         Q.      Totally approximately close to

24   $500,000?

25         A.      I don't recall how much it is.

*S. Prusky*

1
2    It was stale.

3            And I forget if that was 18 or

4    $20,000.

5        Q.    Do you recall whether or not either of

6    those allegations are contained in your Complaint?

7        A.    I don't believe they are.

8        Q.    Why not?

9        **MR. FRANK:**  Objection.

10       A.    That's a question for my attorney.

11       Q.    Okay.

12       **MR. FRANK:**  You can answer.

13       Q.    So you don't believe those allegations

14   are in your Complaint at all?

15       A.    I believe there is a comment in my

16   Complaint regarding damages from the Hathaway

17   case.  I'm not sure that the specifics for that

18   are laid out in the Complaint.  I think you

19   touched on that a moment ago.

20       Q.    Okay.  Well, I'm going to --

21       **MR. WANG:**  Can I have a copy of the

22   Complaint --

23       **MR. FRANK:**  Can I help you now, or --

24       **MR. WANG:**  I don't think I need it

25   right now.  I need help generally, Mr.

*COMPUTER REPORTING NYC INC.*
*(212) 986-1344*

1                           *S. Prusky*

2    is a copy of the Complaint, without exhibits.

3                 **(Prusky Exhibit 2,** Copy of the

4           Complaint, without exhibits, marked for

5           identification, as of this date.)

6           Q.    Now, you made a comment a few moments

7    ago, Mr. Prusky, that there was reference to the

8    Hathaway damages in the Complaint.

9                 Take a look at the Prayer For Relief,

10   just so I understand what it is you're talking

11   about.

12                The actual claims, the counts start at

13   page 48 and the Prayer for Relief is on page 53.

14                What -- where is the Hathaway case

15   included in that?

16                **MR. FRANK:**  Objection.

17                You can answer.

18                (Witness reviews document.)

19          A.    I do not see a specific paragraph in

20   here regarding Mr. Hathaway.

21          Q.    How about Mr. Garcia?

22          A.    Sorry, I was still talking.

23          Q.    Oh, I'm sorry, I apologize.

24          A.    I do see, however, under the Prayer

25   for Relief return of any and all fees paid for

*S. Prusky*

1    Associates, and it has invested in index futures

2    using algorithms developed by MFI Associates

3    whereby the index futures basically mimic the

4    index mutual fund.

5            We have a very narrow area of

6    expertise.  We like to think it's deep, but it's

7    very narrow.

8        Q.    And how would you describe that area

9    of expertise, index funds?

10       A.    It is macro market technical analyst

11   through trading indexes on a short term basis.

12       Q.    And outside of that narrow focus, you

13   went into life settlements, correct?

14       A.    Outside of that narrow focus I made

15   some investments in life settlements.

16       Q.    So let's talk about how that came to

17   be.

18           First of all, when did you first

19   consider expanding your scope of investments

20   beyond index funds to alternative investments?

21       A.    I believe it was late 2007, perhaps a

22   little earlier, when it appeared on my radar -- in

23   fact I'm sure it was a little bit earlier than

24   that.

1                          *S. Prusky*

2          Q.    How did it appear on your "radar," as

3     you put it?

4          A.    I have a business acquaintance or

5     colleague who had -- who mentioned the idea to me

6     probably for the first time in earlier 2007 as a

7     way of diversifying my assets and with very, very

8     little risk.

9          Q.    By the way, you did testify in the

10    Bitter arbitration, correct?

11         A.    I believe I did.

12         Q.    Both at the hearing as well as at a

13    deposition?

14         A.    I suspect so.  I don't recall sitting

15    here at this moment.

16         Q.    And you were under oath on both

17    occasions, correct?

18         A.    If I testified, I was under oath, yes.

19         Q.    And you -- you believe you told the

20    truth at those -- in those -- at that deposition

21    and hearing?

22         A.    Yes.

23         Q.    You had the opportunity to review your

24    testimony at deposition, did you not, meaning

25    after, you saw a copy of the transcript?

1                    *S. Prusky*

2    while.

3         Q.    Prior to this litigation being

4    started?

5         A.    Probably.

6         Q.    Now, you understood that Mr. Darracq

7    had been in the life settlement business?

8         A.    No.

9         Q.    What was his relationship, if any, to

10   the life settlement business?

11        A.    He was friendly with Mr. Aaron, who

12   was in the life settlement business.

13        Q.    But Mr. Darracq -- did you understand

14   that Mr. Darracq was involved, at all, in the life

15   settlement business?

16        A.    No.

17        Q.    So tell me, in substance -- I know

18   it's some time ago -- what did Mr. Darracq tell

19   you about the life settlement business that caused

20   you to look into it some more?

21        A.    He said -- you know, you maybe want to

22   consider diversifying your investments.  There are

23   these things call life settlements -- obviously

24   paraphrasing from him -- where the risk is very

25   low, the worse case scenario is you take over a

*S. Prusky*

1
2       policy, but that almost never happens.  You earn

3       15 percent interest, or something thereabouts.

4                   And it's for, roughly, a two-year

5       horizon.

6             Q.    Did you do some research to look into

7       it to learn more about it?

8             A.    Depends how you define "research."

9             Q.    Well, tell me what you did, and then

10      we'll determine if it's research.

11            A.    Well I ignored Mr. Darracq probably

12      two or three months.  He mentioned it a few times,

13      and I really was not comfortable investing outside

14      of my zone of expertise.

15                  But, ultimately, he suggested that I,

16      at least, speak with Mr. Aaron, and I did so.

17                  Mr. Aaron educated me more, and I

18      decided I would make an investment in them.

19            Q.    So he introduced you to Mr. Aaron?

20            A.    Yes.

21            Q.    And how did that come about?  Did

22      Mr. Darracq say, look, if you're interested in

23      this, there's a guy who knows this area?

24            A.    Yes.

25            Q.    You should talk to him?

1                          *S. Prusky*

2          A.     Yes.

3          Q.     And he gave you his name?

4          A.     He gave me his contact information.

5          Q.     Did you do any checking or diligence

6      to determine who Mr. Aaron was?

7          A.     Well, most of it was personal.

8      Mr. Darracq told me he was a former FBI agent.

9                 Mr. Aaron independently told me the

10     same thing.

11                I was more focused on the investment

12     itself than on Mr. Aaron, since I wasn't directly

13     paying Mr. Aaron anything.

14         Q.     Before you spoke to Mr. Aaron, did you

15     discuss, either with your father or anyone else

16     within MFI or Windsor, that you were thinking

17     about possibly going into this alternative

18     investment?

19         A.     Not that I recall.

20         Q.     And had you ever, prior to going into

21     the life settlement or premium finance lending

22     business, had you ever done any other alternative

23     investing, other than the index funds that you've

24     described earlier?

25         A.     Not that I recall sitting here today.

been involved in this for a while, and you might want to speak to him.

Q. And by "this" you understood that to mean what, sir?

A. Premium financing.

Q. And that was the business you wanted -- you were interested in exploring, premium financing?

A. That's -- uhm -- not quite how I would phrase it, and, in fact, I would rephrase earlier when you brought this up in terms of life settlement, I was interested far less in life settlement.

I was interested in lending money at a good rate.

Q. Had you ever done any lending before that?

A. No.

Q. And what caused you to think about going into the lending of money at a good rate?

**MR. FRANK:** Objection.

A. As I mentioned earlier, I was managing all of my own assets. And sometimes it was a struggle. And I thought it was prudent to

1                              *S. Prusky*

2    diversify my investments somewhat.

3                    So I was looking for potential

4    investments that would have a reasonably good rate

5    of return and very low risk.

6         Q.    When you say "sometimes it was a

7    struggle," what did you mean by that?

8         A.    In 2005, we had our first down year.

9    That was very -- uhm -- humbling.

10        Q.    You say -- you're talking about your

11   own assets, is that what you said, you were

12   managing your own assets?

13        A.    We -- Windsor Securities Inc. and MFI

14   Associates Limited -- maybe Inc. -- I don't

15   recall -- is what I'm referring to.

16        Q.    And, round numbers, what's the amount

17   of assets we're talking about that you had under

18   management?

19             **MR. FRANK:**  What year?

20             **MR. WANG:**  In 2007-ish.

21             **MR. FRANK:**  And I don't mean to

22        obstruct, you, inadvertently, were using a

23        lot of pronouns.  You're using "you" and he

24        is responding with "I" and "we" and we have

25        a very fuzzy record in the last couple of

*S. Prusky*

 1    will want to sell the policy.

 2                  And they're better able to sell it

 3    after two years, and he talked a little bit about

 4    what was going on in the insurance industry at the

 5    time.

 6         Q.    What did tell you about what was going

 7    on in the insurance industry at the time?

 8         A.    He said there was this new class, and

 9    he explained to me that the insurance companies

10    count on, and price in, that a lot of people allow

11    their policies to lapse.

12                  And with the advent of premium

13    financing, far fewer were lapsing and the

14    insurance companies were not particularly happy

15    about it.

16         Q.    Okay.  Did he tell you that he's done

17    this before with other people, other premium

18    finance lenders?

19         A.    I believe he told me he had done this

20    quite a bit, yes.

21         Q.    Quite a bit?

22         A.    I think that's what he told me.

23         Q.    Did you do any independent research,

24    that is other than talking to him, to determine

*S. Prusky*

1   what kind of a business this was?

2        A.     I probably, knowing me, did some

3   reading about it, but I don't recall specifically

4   sitting here today.

5        Q.     And when you say "knowing" you,

6   because you're a careful guy?

7        A.     Knowing me because -- I read a lot,

8   and if I hear about an idea sometimes -- and

9   often, sounds intriguing, I'll read about it.

10       Q.     Have there been, over the course of

11  time in your business career, at times when you've

12  considered in investing in other things besides

13  the index funds or Exchange traded funds and

14  you've looked into it and decided not to do it?

15       A.     No, not that I recall.

16       Q.     So this is the only alternative

17  investment, if I can call it an alternative

18  investment, alternative to what you normally do,

19  that you've ever considered; do I have that right?

20       A.     No.

21       Q.     So you have considered other

22  alternative investments?

23       A.     Yes.

24       Q.     Which one or ones?

*S. Prusky*

whether or not it was one that you should invest
in?

    A.    Aah -- there were a few things.  First
of all, I was being given guidance by Mr. Aaron,
since I, as I said before, I was new to life
expectancies and relatively new to how they are
determined and how they are related.

    So he gave me some guidance on
policies saying some were better, some were not;
some deals were better, some were not.

    I believe I kept an eye towards
diversifying among different insurance companies,
as we did when we made our estate plan, not to put
all of our eggs in too few baskets.

    Uhm -- as I sit here now, that's what
I recall.

    Q.    Did you speak to any other premium
finance lenders to ask them what their experience
had been?

    A.    Before I took these policies out?

    Q.    Yes.

    A.    Not that I recall.

    Q.    Did you speak to any afterwards?

    A.    Yes.

*S. Prusky*

1

2     A.    I may have spoken to -- to -- I may

3  have spoken to attorney Eizen Fineburg and

4  McCarthy.  I don't recall.  I'd have to check and

5  see if I have any reference to it.

6     Q.    And were they attorneys that you had

7  worked with before?

8     A.    Yes.  Herb Fineburg I had been working

9  with -- probably for 10 years at that point on

10  smaller matters, different matters.

11     Q.    Okay.  So you think you may have

12  spoken to your attorney about going into this

13  business?

14     A.    I may have, yes.

15     Q.    Did you seek legal advice or is it

16  investment advice?

17     A.    I don't recall.  No, I don't think it

18  would be -- uhm -- well -- I don't recall.

19     Q.    And you believe you may have spoken to

20  him before you went into -- before you made your

21  first investments?

22     A.    I believe I might have, yes.

23     Q.    Did anyone -- ultimately, Mr. Aaron

24  sent you drafts of templates, if you will, of

25  documentation?

*S. Prusky*

1

2      A.    That's correct.

3      Q.    Did you have anyone review that before

4  you went to see Mr. Rousseau, before you met Mr.

5  Rousseau?

6      A.    Not that I recall sitting here today.

7      Q.    By the time you -- withdrawn.

8            So how long a time was it between the

9  time you were first introduced to Mr. Aaron and

10  the time that you agreed to make investments, on a

11  case-by-case basis?

12      A.    Again, I'm going to have to give you

13  my best guess.  If you don't want me to guess --

14      Q.    No, no, that's helpful.

15      A.    Okay.  My best guess is six months.

16      Q.    So it took about six months of talking

17  to Mr. Aaron to decide whether or not to go to

18  this brings?

19      **MR. FRANK:**  Objection.

20      A.    Again, I don't think I would use your

21  characterization.

22            I would say from the time I spoke to

23  Mr. Aaron to the time I made my first investment

24  in premium financing, my best guess is about six

25  months.

*S. Prusky*

1    you tell Mr. Aaron what your business was

2    otherwise?

3         A.    I apologize.  I will answer that

4    question.  I want to go back.

5         You asked me when I realized things

6    turned south.  Not that I had been burned, and

7    that was clearly when it became -- when it became

8    much more apparent that I was likely to take

9    ownership of the policies, rather than -- and

10   continue to finance them -- rather than just get

11   my 15 percent after two years and go -- two years

12   and three months.

13        So that was when I began -- when the

14   market imploded in 2008 it became -- and I think I

15   was speaking with Mr. Rousseau at the time -- it

16   became more likely that I would not -- that these

17   policies would not be -- in other words, would not

18   be repaid.

19        So that was my first area of concern.

20        A little bit later, when it was

21   clearer that, in fact, they would not be -- my

22   financing would not be paid back and I would take

23   over the policies, I became more concerned.

24        But I use the term "burned" in a very

1                          *S. Prusky*

2    specific way.

3          Q.     And why did you become more concerned?

4          A.     Because once I took over the policies,

5    I was essentially faced with two choices:  One was

6    an open-ended commitment to pay premiums for as

7    long as each of the insureds lived.

8                 And the other was, for all intents and

9    purposes, the only other option at the time was to

10   walk away from the policies and take a 100 percent

11   loss.

12                I could always hold hope that the

13   market would come back and they would be more

14   saleable in the future, but, again, until that

15   time, if ever, I'd be paying premiums.

16         Q.     I see.  And when was it -- what's your

17   best recollection of when you first started

18   talking to Mr. Aaron?

19         A.     2007.

20         Q.     Some time in 2007?

21         A.     That's my best recollection.

22         Q.     And about six months after you start

23   to talk to him is when you made your investments?

24         A.     That's my best recollection.

25         Q.     And what did Mr. Aaron do for you,

1                          *S. Prusky*

2          Q.    But you don't remember that for sure?

3          A.    I do not.

4          Q.    At some point, again, you received

5    form documents that were being used for these

6    sorts of investments?

7          A.    I received -- uhm -- what later became

8    known as the 19-piece financing agreement.

9          Q.    Okay.   There were 19 separate

10   documents that all together were regarded as one

11   agreement?

12         A.    Yes.

13         Q.    And so he sent you copies of that?

14         A.    Yes.

15         Q.    And that, again, that wasn't in

16   connection with any particular individual case; is

17   that right?

18         A.    I think I just testified I don't

19   recall.   It may have been with the first case.   It

20   may have been shortly before, shortly after, but

21   it became a template for all of the cases.

22         Q.    Well, let me just jump to something.

23               By the time you sought counsel from

24   Mr. Rousseau at Herrick, you had already made your

25   investments for these cases, correct?

*S. Prusky*

1

2     A.    I believe that's correct, yes.

3     Q.    Okay.  So my question is:  Before you

4  went forward --

5     A.    Yes.

6     Q.    -- with your investments, did you seek

7  any advice as to whether or not those documents

8  were the sufficient documents to use?

9     A.    I think that's the same question,

10  essentially, you asked me before.

11    Q.    Meaning that you spoke to -- well, you

12  didn't speak to -- excuse me.

13          Did you speak to Mr. Darracq about

14  that, about those documents?

15    A.    About specific documents, probably

16  not.

17    Q.    Okay.

18    A.    It's possible I did, you know -- more

19  likely, he's not a very detailed guy, and this was

20  not his area of expertise.

21    Q.    Exactly.

22    A.    Yes.

23    Q.    And you understood that?

24    A.    Yes.

25    Q.    And, by the way, it certainly wasn't

1                          *S. Prusky*

2     your area of expertise?

3          A.     It certainly was not, that's correct.

4          Q.     You had never done this before?

5          A.     That is correct.

6          Q.     And is that what leads you to think

7     that you might have sought advice from

8     Mr. Fineburg about this?

9          A.     Yes.

10         Q.     The fact that you were not otherwise

11    experienced in this area?

12         A.     Yes.

13         Q.     And you wanted to be sure that what

14    you were doing was all according to Hoyle?

15         A.     I'm not familiar with that term, but

16    okay.

17         Q.     You've never heard that term

18    "according to Hoyle"?

19         A.     No.

20         Q.     Oh goodness, well --

21         A.     I do remember the book, though.

22         Q.     Okay.

23         A.     So I get the reference.

24         Q.     Okay.  In any event, you wanted to

25    make sure -- I was going to say kosher, but that's

*S. Prusky*

So, generally your characterization is correct, but two years was a substantially higher time frame than I had virtually all my investment experience in, which was literally day to day.

Q.    So even investing for a two-year period would be a long term investment for you?

A.    Yes.  It was very far outside my prior -- certainly far outside by expertise and very far outside my experience.

Q.    Did you tell that to Mr. Aaron?

A.    Yeah -- I'm sorry, I'd be surprised if I didn't.  I don't recall.

Q.    I mean, you told Mr. Aaron what your business was, generally?

A.    I don't recall.  I -- I honestly -- it's been 10 years so.

Q.    Well, did you tell Mr. Aaron that you had no experience in this business?

A.    Yes.  I'm sure I told him that I had not invested in premium finance before.  I'm not sure I went into any details as to what my business.

Q.    Did you tell him why you were interested in premium financing?

*S. Prusky*

1
2        A.    I don't recall.  I'm sure -- I'm sure

3    I told him I was looking for a relatively riskless

4    investment.

5        Q.    Relatively riskless?

6        A.    Yes.

7        Q.    At 15 percent?

8        A.    Yes.

9        Q.    By the way, you subsequently learned

10    that 15 percent was not available?

11        A.    Yes, I did.

12        Q.    And how did you learn that?

13        A.    I learned that, I believe, during the

14    course of the Bitter litigation.

15        Q.    And that came as a surprise to you?

16        A.    Yes, it did.

17        Q.    Did you ever consider suing Mr. Aaron

18    for misrepresenting -- well, did you ever consider

19    suing Mr. Aaron, period?

20        A.    No.

21        Q.    No?  Well, Mr. Aaron told you this was

22    going to be a 15 percent investment, correct?

23        A.    Mr. Aaron provided me docs that

24    provided for 15 percent investment.

25        Q.    And he told you that that was what the

1                           *S. Prusky*

2    return was going to be, correct?

3        A.    The docs spoke for themselves.   He

4    probably verbalized it as well.

5        Q.    But you learned that, in fact, you

6    couldn't achieve 15 percent because of the

7    California interest rate statutes, correct?

8        A.    That's correct.

9        Q.    So did you -- and you never discussed

10   with anybody whether or not you had any recourse

11   about that?

12       A.    Not that I recall.

13       Q.    And how about Mr. Houchins, did you

14   ever discuss suing Mr. Houchins for anything?

15            **MR. FRANK:**  You're not asking him to

16            -- I don't want to get in your way, but --

17            **MR. WANG:**  Let me rephrase the

18            question.

19            **MR. FRANK:**  Okay.

20       Q.    Did you ever consider suing

21   Mr. Houchins?

22            **MR. FRANK:**  I'm going to direct that

23            you not respond to that, if --

24            **MR. WANG:**  What he considered?

25            **MR. FRANK:**  Just a minute, sir.

1                          *S. Prusky*

2          A.     It's possible that I asked Mr. Darracq

3     for some advice regarding either the kind of

4     insurance policy it was or -- uhm -- facets that

5     he might be able to offer some experience with,

6     because life settlements was not his area, but he

7     was very well-qualified in the insurance arena

8     when it came to specific instances.

9          Q.     And what portion of this involved life

10    settlements, the fact that it would be sold after

11    two years; is that -- when you refer to "life

12    settlements," what are you referring to?

13         A.     Well, I view this strictly as a

14    premium financing.  It came to be known to me,

15    later on, as life settlements, because it came to

16    be clear that at least some of the insureds,

17    notwithstanding that they might keep the policy,

18    also expected that there was a decent chance they

19    would sell the policy.

20                So that's the context in which I'm

21    using that term, and I -- I keep slipping, you

22    know, this is really -- my investment objective

23    was premium finance, not owning life insurance.

24         Q.     And your understanding was that you

25    would get repaid from the sale of those policies

1                              *S. Prusky*

2      in the life settlement market to pay off the loan?

3           A.    My understanding was that I get repaid

4      after two and a quarter years, and that, at least

5      in some cases, that was likely to come from resale

6      of the policy.

7           Q.    And other cases would simply be

8      because the insured wanted to keep the policy?

9           A.    Correct.

10          Q.    And is that what Mr. Aaron told you,

11     that those were the two most likely scenarios?

12          A.    Probably.

13          Q.    And you discussed that with

14     Mr. Darracq as well?

15          A.    Probably.

16          Q.    Now, when you made your economic

17     determination, which of those 20 policies to

18     invest in -- did you, in your mind, have a limit

19     as to how much you were prepared to invest?

20          A.    In terms of total number of dollars?

21          Q.    Yes.

22          A.    No.  Uhm -- I mean, perhaps generally.

23     I don't think I would have put all of my money

24     into it, but I -- Darracq represented it would be

25     a piece.

1                           *S. Prusky*

2           Q.    I'm sorry?

3           A.    It would be a piece of what I had to

4     invest.

5           Q.    How much of a piece?

6           A.    I don't know that I went that far.

7           Q.    Well, you didn't invest in all 20.

8     You invested in only about half of them.

9           A.    That's correct.

10          Q.    So what was the standard you used to

11    determine which ones you were going to and which

12    ones you weren't going to?

13          A.    Aah -- that's difficult to say with

14    specificity, other than I learned very quickly I

15    was better off with smaller policies, several

16    smaller policies rather than one larger policy.

17          Q.    You "came" to learn that?

18          A.    I came to decide that and believe that

19    that was the case.

20          Q.    Based on what?

21          A.    Based on the risk involved; based on

22    the percentage return that I would get.

23                And based on the whole notion of

24    diversity.

25          Q.    Well, let me unpack that for a bit.

1                          *S. Prusky*

2          A.     That sounds about right.  I was

3     focused less on the face amount than on the amount

4     of money that needed to be invested, and as I

5     recall that was a very large initial premium.

6          Q.     So that was the first one you decide

7     to do?

8          A.     Right.

9          Q.     And, again, maybe you sought advice,

10    maybe you didn't, you're not sure?

11         A.     About that particular policy?

12         Q.     Before you actually signed and said

13    yes, I'm going to do this.

14         A.     Whatever advice I sought, I've already

15    discussed as best I could.

16         Q.     Okay.  Now, you did understand that

17    these documents that were being prepared by Mr.

18    Aaron -- withdrawn.

19                Who -- Mr. Aaron prepared the

20    templates of documents?

21         A.     I don't know who prepared the template

22    of documents.  Mr. Aaron provided them to me.

23         Q.     For Mr. Gilbert, who was the broker?

24    Was that a Houchins policy?

25         A.     That was a Houchins policy.

1                          *S. Prusky*

2          Q.     Did you speak it Mr. Houchins, before

3    you invested in the Gilbert policy?

4          A.     I don't recall.

5          Q.     And you understood that these

6    documents that were all being signed had some

7    legal significance?

8          A.     Of course.

9          Q.     And you don't remember whether or not

10   you sought the advice of a lawyer to determine

11   whether or not they were all in good order?

12         A.     No, I don't recall.

13         Q.     Did you read the documents themselves?

14         A.     I'm sure I did.

15         Q.     Okay.  In any event, you went forward

16   with the Gilbert policy?

17         A.     I believe that's correct.

18         Q.     And this is all before you spoke --

19   even heard of Mr. Rousseau?

20         A.     I think that's true, yes.

21         Q.     And some time after you got the

22   Gilbert policy, there were other policies that you

23   were considering?

24         A.     Yes.

25         Q.     And I think you said that you then

1                        *S. Prusky*

2    approximate that 70 percent were placed by

3    Mr. Houchins.

4         Q.    Now, again, we're focusing on the time

5    before you first spoke to Mr. Rousseau.

6               Did there come a time when you

7    considered buying policies?

8         A.    Uhm -- sort of yes; sort of no.

9               I was approached by a gentleman named

10   Larry Simon, who ran a company called Life

11   Settlement Solutions.

12              And he was looking for someone to set

13   up a fund that purchased tranches of life

14   insurance policies.

15              And it was, in looking into -- he

16   wanted me to be that person -- and it was in

17   looking into that, I believe, that I first was

18   connected with Mr. Rousseau.

19        Q.    Okay.  So let's talk about that for a

20   second.

21              You said earlier you were in the

22   premium finance business; that's what you wanted

23   to consider and ultimately went into, premium

24   finance business?

25        A.    I said I wanted to diversify with, in

*S. Prusky*

terms of -- I'm sorry.  Let me rephrase.

I said that in the context of funding the policies I did, it was with the -- with the understanding that I was premium -- financing premiums, not with the expectation I would be taking over the policies.

Q.   Okay.  And so we have it that you also at least considered for a time either forming a funds or going into investments to purchase policies or tranches of policies; is that right?

A.   I was approached with the concept of managing a fund that did that.

Q.   Managing a fund?

A.   Managing a fund.

Q.   Although you would have no prior experience at life settlement business at all, correct?

A.   No. I had -- that's correct.  I had no experience -- no, I shouldn't say that.

I had some experience in the premium finance loan business shortly after I -- if my time frame is correct, it was either during or shortly thereafter the time that I started making premium finance notes.

*S. Prusky*

1    too much time, energy away from my primary

2    business, and would take me too long to -- to feel

3    sufficiently comfortable to take on that role.

4        Q.    Was there anything that Mr. Rousseau

5    or his firm told you to cause you to reach that

6    conclusion?

7        A.    I suspect so, but I don't recall

8    sitting here now.

9        Q.    You don't recall any advice they gave

10   you that dissuaded you from going to that fund?

11       A.    No.

12       Q.    In any event, would you characterize

13   your experience with -- that was when he was at

14   Herrick, correct?

15       A.    That's correct.

16       Q.    Was your experience satisfactory, that

17   is, you were content with the advice you were

18   being given?

19       A.    Yeah, I believe it was.

20       Q.    Okay.  And you say at some point along

21   the line the discussions start to turn to your

22   premium finance business?

23       A.    Yes.

24       Q.    Now, by that time, that is when you

*S. Prusky*

started talking to Mr. Rousseau about the premium

finance business, had some problems arisen with

respect to that business, or any of the loans that

you had invested in?

    A.    I'm not sure of the sequence of

events, whether I was already speaking to Mr.

Rousseau about them or whether problems occurred

first and I went to him for guidance.

    Q.    Well, when was it that you first went

to Mr. Rousseau for advice?

    A.    Regarding premium finance policy?

    Q.    Regarding anything.

    A.    Probably 2008.

    Q.    Some time in 2008?

    A.    That's my best guess, but it's a

guess.

    Q.    And when you made your investments,

your loans, your premium finance loans, when was

that, in 2007?

    A.    I think some at the end of 2007 and

most in 2008, but again, I'm not -- I believe it

was the beginning -- end of '07, beginning of '08.

    Q.    But it is the fact that by the time

you first spoke to Mr. Rousseau, you had already

1                            *S. Prusky*

2    made all your loans?

3         A.    That's correct, I believe that's

4    correct.

5         Q.    All right.  So you say that at some

6    point you start talking to Mr. Rousseau about the

7    loans you made.

8                Did you send him copies of the loan

9    documents?

10        A.    Yes.

11        Q.    When did you do that?

12        A.    Very early on.

13        Q.    "Early on" while you were talking

14   about the fund?

15        A.    No.  As soon as we started talking

16   about the premium finance policies, I sent him

17   financing agreements.

18        Q.    Well, for what purpose?

19        A.    So that he could be as familiar as

20   possible and give me the advice that I needed in

21   terms of dealing with them.

22        Q.    And what advice did you need?

23        A.    You've asked me that question, and I'm

24   trying to remember what was the first thing that

25   came up, and sitting here at the moment I can only

*S. Prusky*

1   make an educated guess' as to what the first thing

2   was that came up.

3   

4        Q.    Which is what?

5        A.    That it looked like there was

6   increasing possibly -- and this is again, this is

7   an educated guess -- that the liquidity problems

8   occurring in the market in 2008 made it seem --

9   actually, there were two things.

10             One, the liquidity problems in the

11  market made it began to make it think that if they

12  didn't cure, there was increasing chance that I

13  would not have my loans repaid in a timely

14  fashion.

15             Uhm -- there was -- uhm -- a secondary

16  issue, which just occurred to me, that was

17  occurring at the same time -- oh -- uhm -- I think

18  it was at that time that I became aware that there

19  were possible misrepresentations in some of the

20  applications, and he and I discussed that.

21             I think it was a little bit later

22  that -- either Jules discovered or I discovered

23  and brought to Jules, I think the former, that

24  some of the trusts had changed the trustees.

25        Q.    Okay.  At the beginning part of your

*S. Prusky*

1
2          **THE VIDEOGRAPHER:**  The time is 2:46.
3     This ends media No. 3.  We're off the
4     record.
5              (Recess taken from 2:46 p.m. until
6     3:07 p.m.)
7          **THE VIDEOGRAPHER:**  The time is 3:07.
8     This starts media No. 4.  We're on the
9     record.
10   **BY MR. WANG:**
11        Q.   Mr. Prusky, how much did you
12   ultimately invest in the premium finance business,
13   putting aside legal fees that you paid?
14        **MR. FRANK:**  Objection.
15        Q.   How much did you lend the trusts?
16        A.   That's a different question.
17        Q.   That's my question.
18             Approximately?
19        A.   I really don't know.  I can give you a
20   very rough ballpark of one and a half million.
21        Q.   Okay, about a million and a half
22   dollars --
23        A.   Maybe larger.
24        Q.   Whose money was that?
25        A.   I think it was Windsor, LLC's money.

1                          *S. Prusky*

2      it as a lender?

3           A.     That is correct.

4           Q.     And you certainly weren't looking for

5      technical default so you could grab the policy;

6      that wasn't your interest?

7           A.     That is correct.

8           Q.     You just wanted to get repaid?

9           A.     That is correct.

10          Q.     So at some time when you spoke to Mr.

11     Rousseau, and when you went -- by the time you

12     went to Mr. Rousseau initially, that was still

13     your view; that is, that you were in this as a

14     lender, or had that changed?

15          A.     I think -- relatively early in my

16     discussions with Jule, we talked about possible

17     ways of just getting out of it; that is, getting

18     out of the lending, getting out of the, you know,

19     ownership whatsoever, by having the insurance

20     companies rescind the policies and return the

21     premiums.

22          Q.     And that involved discussions, among

23     other things, that there were perhaps problems

24     with the applications, that that would lead to a

25     rescission of the policies?

1                     *S. Prusky*

2          A.    That was discussed, yes.

3          Q.    And did Mr. Rousseau tell you, in

4    substance, that the insurance companies would

5    resist paying premiums to you?

6          A.    Uhm -- he said that, among other

7    things, but he also advised ultimately that I

8    write the letter.  I did write the letter.

9          Q.    Which letter are you talking about?

10         A.    I wrote a letter to each of the

11   insurance companies, saying I want to inform you

12   that these policies are being premium financed and

13   that I'm the lender -- this is the substance of

14   it, you probably have a copy of the letter.

15              And it did not -- it did not lead to

16   any rescissions directly, that I know of.

17         Q.    Had you and Mr. Rousseau talked about

18   whether or not that would lead to rescissions?

19         A.    We thought it might.  He advised it

20   might.  He sent a letter, initially, saying it

21   could cause you problems, and then later he said,

22   you know, probably couldn't hurt, might help, get

23   it rescinded.

24              And in the long run it was probably

25   good that I sent the letter.  Uhm --

*S. Prusky*

1

2      Q.    How so?

3      A.    Because should the insurance companies

4  have played Humphrey Bogart -- I'm sorry -- Claude

5  Rains to Humphrey Bogart and later on said:  I'm

6  shocked, shocked that there's premium financing

7  going on here and you didn't tell us the truth, we

8  had a letter -- a letter, at least in the record,

9  saying yes, this was premium financed, you were

10  put on notice, you had an opportunity to do

11  something; you didn't.

12          And I think that Jules and I agreed in

13  the long run that it was a net positive that the

14  letter was written.

15      Q.    So no complaints about that piece of

16  advice that Mr. Rousseau gave you?

17      A.    No.

18      Q.    That is, to write the letter?

19      A.    That's -- I've not -- that's not part

20  of my Complaint.

21      Q.    Okay.  So you write the letters; that

22  didn't result in any rescissions?

23      A.    Didn't result in any policy

24  rescissions.  Apparently, it did result in

25  Mr. Houchins losing his producer's license with

1                     *S. Prusky*

2    Rousseau about his advice in connection with that

3    activity?

4         A.    No.

5         Q.    Okay.

6               So that didn't result in rescissions.

7               What was the next thing you asked Mr.

8    Rousseau to do?

9         A.    Again, it was a common context and

10   theme that in any way I could be protected, he was

11   going to help me protect myself or help protect

12   me.

13              So that included investigating

14   rescission.  It included talking to insurance

15   companies.  It included making sure that if I was

16   going to be on the hook for this much money, that

17   I was going to benefit from the full death

18   benefit.

19              So it included making sure the

20   policies were properly transferred to me, and that

21   everything was, to use your term, "kosher," and I

22   would have unfettered access to the death

23   benefits, so long as I continued to maintain

24   paying premiums on the policies.

25        Q.    So did there come a time when you said

*S. Prusky*

1  to Mr. Rousseau:  Hey, Mr. Rousseau -- in
2  substance -- I want you to protect me and make
3  sure that I have full ownership of these policies?
4           Did that time come in 2009?
5       A.    I can't tell you whether it was
6  proactive, reactive or joint, but we had that
7  discussion together many times.
8       Q.    Many times?
9       A.    Many times.
10      Q.    When for the first time?
11      A.    Probably as we were approaching
12 payment default, and -- uhm -- we discussed --
13 well, we had discussions about Mr. Pawlick, who
14 was offering to either give me the policy outright
15 or pay off the loan.
16           Aah -- then we discussed that, through
17 Mr. Houchins, most of the insureds were already
18 telling us they were not going to pay off the loan
19 -- most of the insureds were telling us the trust
20 was not going to pay off the loan, and that I
21 could assume ownership.
22           So we discussed about, talked about
23 the transfers then, making sure they were done in
24 proper order.

*S. Prusky*

1
2          So I would guess that would be in the
3    late 2009 or spring of 2010.
4          Then there was a discussion, after the
5    default, that Mr. Bitter, through Mr. Houchins,
6    said he might want to pay off the policy, and Mr.
7    Rousseau and I had a number of discussions about
8    whether I could or should -- whether I was
9    compelled to go along with that if I felt I didn't
10   want to, and, if so, locking down the death
11   benefit to me.
12         Uhm --
13    Q.    And how -- was there some -- just to
14   talk about that for a second.
15    A.    Yes, sir.
16    Q.    So you understand that there came a
17   time when Mr. Bitter suggested he wanted to pay
18   off the loan?
19    A.    After we informed -- the answer to
20   your question is ye -- the answer to your question
21   is probably.
22    Q.    But you're saying you weren't
23   interested in that?
24    A.    There came a point, after Mr. Bitter
25   defaulted, and Jules and I made arrangements to

*S. Prusky*

take over, that Mr. Houchins conveyed:  Hey, maybe
Mr. Bitter wants to keep this policy.  Maybe he
wants to pay off your loan.

Then there was some discussion as to
whether he was going to get a discount or not.

And ultimately in that case my antenna
began to quiver, and I said:  You know what --
Jules tell me, and we did discuss it, you know, if
you want to keep this policy and you're willing to
take the risk, you're going to get the full
$2 million.

I said:  You know what, I'm going to
keep it.

And so I made that decision, and Jules
help me perfect the -- or so I thought -- perfect
the receipt of the death benefit.

Q.    Well, just to stay with that for a
moment.

So you went into the deal as a lender?

A.    That is correct.

Q.    Happy to get your interest?

A.    That's correct.

Q.    As well -- by the way, in addition to
the interest, you also got a piece of the

*S. Prusky*

1
2    itself, that's correct.

3              MR. WANG:  Okay.  I've gone past 5:00,
4         so that's shame on me.  That will be that
5         much shorter tomorrow when we conclude.

6              We'll conclude at this time.

7              MR. FRANK:  Do this tomorrow, then.

8              MR. WANG:  And we will pick up at
9         9 o'clock with Mr. Rousseau.

10             MR. FRANK:  Thank you.

11             THE VIDEOGRAPHER:  The time is 5:22.
12        This ends media No. 5, in the deposition of
13        Mr. Rousseau.

14

15             (Time Noted:  5:22 p.m.)

16

17        _____

18             STEVEN PRUSKY

19

20   Subscribed and sworn to before me

21   this _____ day of _____, 2017.

22

23   _____    _____

24   (Notary Public)       My Commission Expires:

25

*COMPUTER REPORTING NYC INC.*
*(212) 986-1344*

C E R T I F I C A T E

STATE OF NEW YORK        )

                        : ss.

COUNTY OF NEW YORK       )

      I, MILDRED CASSESE, a Registered
Professional Reporter and a Notary Public within
and for the State of New York, do hereby certify
that the foregoing deposition of STEVEN PRUSKY was
taken before me on the 6th day of March 2017;

      That the said witness was duly sworn
before the commencement of his testimony; that the
said testimony was taken stenographically by me
and then transcribed.

      I further certify that I am not
related by blood or marriage to any of the parties
to this action or interested directly or
indirectly in the matter in controversy; nor am I
in the employ of any of the counsel in this action.

      IN WITNESS WHEREOF, I have hereunto
set my hand this 24th day of March 2017.

MILDRED CASSESE, RPR

March 6, 2017

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---------|----------------|------|
| STEVEN PRUSKY | MR. WANG | 5 |

---------------INFORMATION REQUESTS--------------

DIRECTIONS (DI):       19, 87, 263, 263.

INSERT:                None.

RULINGS (RL):          None.

REQUESTS (RQ):         79, 130.

CERTIFIED (CE):        None.

MOTIONS (MO):          None.

E X H I B I T S

PRUSKY EXHIBITS                FOR IDENTIFICATION

1, Notice of Rule 30(b)(6) Deposition............6

2, Copy of the Complaint, without exhibits......33

COMPUTER REPORTING NYC INC.
124 West 72nd Street
New York, NY 10023
(212) 986-1344

NAME OF CASE: Windsor Securities, LLC v. Arent Fox, LLP
DATE OF DEPOSITION: October 4, 2017
WITNESS: Steven Prusky

If there are any corrections to your deposition, indicate them on this sheet of paper, give the change, page number, and line number.

PAGE _____ LINE _____

CHANGE _____ TO _____

PAGE _____ LINE _____

CHANGE _____ TO _____

PAGE _____ LINE _____

CHANGE _____ TO _____

PAGE _____ LINE _____

CHANGE _____ TO _____

PAGE _____ LINE _____

CHANGE _____ TO _____

PAGE _____ LINE _____

CHANGE _____ TO _____

PAGE _____ LINE _____

CHANGE _____ TO _____

PAGE _____ LINE _____

CHANGE _____ TO _____

PAGE _____ LINE _____

CHANGE _____ TO _____


_____
**Steven Prusky**


Subscribed and sworn to before me

this _____ day of _____, 2017.


_____        _____
(Notary Public)                  My Commission Expires:

**COMPUTER REPORTING NYC INC.**
124 West 72nd Street
New York, NY 10023
(212) 986-1344

NAME OF CASE: Windsor Securities, LLC v. Arent Fox, LLP
DATE OF DEPOSITION: October 4, 2017
WITNESS: Steven Prusky

If there are any corrections to your deposition, indicate them on this sheet of paper, give the change, page number, and line number.

PAGE _____ LINE _____

CHANGE _____ TO _____

PAGE _____ LINE _____

CHANGE _____ TO _____

PAGE _____ LINE _____

CHANGE _____ TO _____

PAGE _____ LINE _____

CHANGE _____ TO _____

PAGE _____ LINE _____

CHANGE _____ TO _____

PAGE _____ LINE _____

CHANGE _____ TO _____

PAGE _____ LINE _____

CHANGE _____ TO _____

PAGE _____ LINE _____

CHANGE _____ TO _____

_____
**Steven Prusky**

Subscribed and sworn to before me

this _____ day of _____, 2017.

_____     _____
(Notary Public)                 My Commission Expires:

ORIGINAL

278



UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

WINDSOR SECURITIES, LLC

                        Plaintiff,       Case No.

        -against-          16-cv-01533

ARENT FOX, LLP and JULIUS       (GBD)

ROUSSEAU, III,

                     Defendants.

------------------------------------x

                    October 4, 2017

                    2:40 p.m.

        Continued deposition of WINDSOR

SECURITIES, LLC by STEVEN PRUSKY, and STEVEN

PRUSKY, individually, held at the offices of Foley

& Lardner LLP, 90 Park Avenue, New York, New York,

pursuant to Adjournment, before Mildred Cassese, a

Registered Professional Reporter and Notary Public

of the State of New York.

**Computer Reporting NYC Inc.**
124 West 72nd Street |New York, NY 10023
(212) 986-1344 Fax (212) 983-9149 office@crinyc.com

A P P E A R A N C E S:


ALAN L. FRANK LAW ASSOCIATES, P.C.

Attorneys for Plaintiff

135 Old York Road

Jenkintown, Pennsylvania 19046

BY:    ALAN L. FRANK, ESQ.



FOLEY & LARDNER LLP

Attorneys for Defendants

90 Park Avenue

New York, New York 10016

BY:    PETER N. WANG, ESQ.

ADAM G. PENCE, ESQ.



ALSO PRESENT:

JULE ROUSSEAU, ARENT FOX

HUNTER T. CARTER, ARENT FOX


DMITRY ZVONKOV, VIDEOGRAPHER

**IT IS HEREBY STIPULATED AND AGREED**, by and between the attorneys for the respective parties herein, that filing and sealing be and the same are hereby waived.

**IT IS FURTHER STIPULATED AND AGREED** that all objections, except as to the form of the question, shall be reserved to the time of the trial.

**IT IS FURTHER STIPULATED AND AGREED** that the within deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the officer before whom the within deposition was taken.

*Prusky*

1
2          I think you testified earlier, but I
3  want to make sure, Mr. Prusky, that Mr. Rousseau
4  did not want to settle Acker and Collins?
5          A.    That is not what I testified.
6          Q.    Okay.  Then, I misunderstood.  I
7  thought you had testified that he had said
8  don't -- you don't need to settle Acker and
9  Collins; let's settle Bitter.
10         A.    Okay.  I'm not sure I ever used the
11 word "don't need" and --
12         Q.    He didn't recommend settling?
13         A.    Let's separate not recommending from
14 recommending I don't settle.
15               It was raised.  It was discussed.  He
16 made offers on my behalf.
17               He agreed to offers that they made on
18 my behalf, but they then changed those offers.
19               And, therefore, it was not settled.
20               However, although it was sticking in
21 my craw, he was guiding me saying:  Look, most
22 important thing is to get Bitter settled, because
23 once Bitter is settled and we make sure that the
24 judgment is not on the record, admissible -- I
25 don't remember how he phrased it -- you'll be in a

1                          *Prusky*

2     much better stead, particularly because the Acker

3     and Collins cases are very, very weak and, on top

4     of that, there's not a lot to fight for in the

5     Acker case.

6           Q.    Right.   Okay, I understand that.

7                 And, therefore, did you understand

8     from that he was recommending don't chase Acker

9     Collins settlements, because it's not worth it?

10                Did he never turn in to anything?

11          A.    Uhm -- I wouldn't use that language,

12    but I would say we're in the same general

13    territory, you and I, in the sense that he said:

14    If you can settle it, at a reasonable price, you

15    know, you're not going to lose the cases, but

16    you'll avoid hassles.

17                So we tried that.   He made the offers.

18    They rejected them.   I think he made them more

19    than once.   I know they upped their offer at least

20    twice or their ask, twice.

21                And he stressed:   Even if you don't

22    settle them, settle Bitter.   It's really important

23    to settle Bitter.   You'll be very well served by

24    settling Bitter, and it's going to weaken what are

25    already weak cases in Acker and Collins.

October 4, 2017

# I N D E X

WITNESS                    EXAMINATION BY              PAGE

STEVEN PRUSKY              MR. WANG                    282



----------------INFORMATION REQUESTS--------------

DIRECTIONS (DI):      289, 293, 301, 302, 303,

                      303, 304, 368.

INSERT:               None.

RULINGS (RL):         None.

REQUESTS (RQ):        284, 383, 393.

CERTIFIED (CE):       None.

MOTIONS (MO):         None.



# E X H I B I T S

PRUSKY EXHIBITS                    FOR IDENTIFICATION

3, Document, Bates Judd 165175 through 176.....284

4, Document, Bates Judd 165179.................285

5, Judge Orrick's order on the Trust's Motion For

Summary Judgment.............................290

6, E-mail dated April 22, 2014 from Mr. Prusky

to Mr. Rousseau..............................300

E X H I B I T S

PRUSKY EXHIBITS                    FOR IDENTIFICATION

7, Document, Bates AF 0000488

through 492....................................339

8, Series of e-mails from October 14, 2014,

no Bates.......................................370

9, E-mail dated May 21, 2014,

Bates Antonino 082172 through 174..............383

COMPUTER REPORTING NYC INC.

124 West 72nd Street

New York, NY 10023

(212) 986-1344


NAME OF CASE:        Windsor Securities, LLC v. Arent Fox, LLP & Rousseau

DATE OF DEPOSITION:   MARCH 6, 2017

WITNESS:     Steven Prusky


P8, L10: Change "Am I here testifying" to "I am here testifying."

P15, L24: Change "Darren" to "Darin"

P17, L12: Change "him" to "whom"

P24, L20: Change "Duel" to "Dual"

P35,L22: Change "more" to "poor"

P41, L23: Change "tend to" to "tended to."

P43,L08: Change "write" to "quite"

P65,L2: Change "rely a star" to "Reliastar"

P100,L16: Change "no..." to "yes"

P107,L17: Change "interest" to "there"

P158,L13: Change "bought" to "brought"

P161,L23: Change "or" to "and"

P169,L25: remove "if I followed the NRI"

P195,L11: Change "insure" to "ensure"

P195,L16:  after financing agreement add, Section 6(a),

P198,L22: Change "I" to "I'm"

P201,L15: Change "rate" to "right"

P207,L8-L9: insert "me" between to and in.

P208,L06: remove "cease and" and insert "or"

P208,L22: Change "said" to "he said"

P263,L05: Change "Preston" to "Prusky"?

P268,L03: Change "him" to "me"

_____

STEVEN PRUSKY

Subscribed and sworn to before me
this ___19TH___ day of ___APRIL_____, 2017.

_____    SEPTEMBER 26, 2020

(Notary Public)            My Commission Expires:

ERIC S HARKINS
Commission # 2336026
Notary Public, State of New Jersey
My Commission Expires
September 26, 2020

COMPUTER REPORTING NYC INC.
124 West 72nd Street
New York, NY 10023
(212) 986-1344

NAME OF CASE: Windsor Securities, LLC v. Arent Fox, LLP
DATE OF DEPOSITION: October 4, 2017
WITNESS: Steven Prusky

If there are any corrections to your deposition, indicate them on
this sheet of paper, give the change, page number, and line
number.

PAGE __283__ LINE __6__

CHANGE __internal wars__ TO __award.__

PAGE 318 LINE 15

CHANGE  it was not a question & should read: I want to amend my last answer.

PAGE 326 LINE 8

CHANGE  there should be a comma between "was" and "short" TO

PAGE 374 LINE 13

CHANGE __be__ TO __can__

(I hope we can)

PAGE _____ LINE _____

CHANGE _____ TO _____

PAGE _____ LINE _____

CHANGE _____ TO _____

PAGE _____ LINE _____

CHANGE _____ TO _____

PAGE _____ LINE _____

CHANGE _____ TO _____

PAGE _____ LINE _____

CHANGE _____ TO _____

_____
Steven Prusky

Subscribed and sworn to before me

this __11th__ day of __DECEMBER__, 2017.

_____
(Notary Public)    My Commission Expires: __September 26, 2020__

ERIC S HARKINS
Commission # 2335026
Notary Public, State of New Jersey
My Commission Expires
September 26, 2020