# EXHIBIT 26

*WINDSOR SECURITIES, LLC VS.*
*ARENT FOX, LLP and JULIUS ROUSSEAU, III, ESQUIRE*

*JOSEPH WOOD*
*June 28, 2018*



ELLEN GRAUER
COURT REPORTING CO. LLC

126 East 56th Street, Fifth Floor  New York, New York 10022
P:  212-750-6434   F:  212-750-1097
www.ellengrauer.com

*Original File 117662A.TXT*
*Min-U-Script® with Word Index*

1   UNITED STATES DISTRICT COURT

2   FOR THE SOUTHERN DISTRICT OF NEW YORK
    -------------------------------------------------X
3   WINDSOR SECURITIES, LLC,

4                         Plaintiff,

5       -against-

6   ARENT FOX, LLP and JULIUS ROUSSEAU, III,
    ESQUIRE,
7
                          Defendants.
8
    Civil Action No.: 16-1533
9   -------------------------------------------------X

10

11                        135 Old York Road
                          Jenkintown, Pennsylvania
12
                          June 28, 2018
13                        9:03 a.m.

14

15          VIDEOTAPED DEPOSITION of JOSEPH WOOD,

16   taken before Sadie L. Herbert, a RPR and Notary

17   Public of the States of New York and New Jersey.

18

19

20

21

22

23      ELLEN GRAUER COURT REPORTING CO. LLC
           126 East 56th Street, Fifth Floor
24              New York, New York 10022
                      212-750-6434
25                    REF: 117662A

```
 1   A P P E A R A N C E S:

 2

 3   ALAN L. FRANK LAW ASSOCIATES, P.C.

 4   ON BEHALF OF PLAINTIFF:

 5        135 Old York Road

 6        Jenkintown, Pennsylvania  19046

 7        Phone 215.935.1000

 8   BY:  ALAN L. FRANK, ESQ.

 9        SAMANTHA A. MILLROOD, ESQ.

10        Afrank@alflaw.net

11

12

13   FOLEY & LARDNER, LLP

14   ON BEHALF OF DEFENDANTS:

15        90 Park Avenue

16        New York, New York  10016

17        Phone 212.682.7474

18        ADAM PENCE, ESQ.

19   BY:  PETER WANG, ESQ.

20        Pwang@foley.com

21

22

23   ALSO PRESENT:

24        STEVEN PRUSKY, Windsor Securities

25        SABRINA FRANZ, Videographer
```

```
1    ------------------- I N D E X -------------------
2    WITNESS                   EXAMINATION BY        PAGE
3    JOSEPH WOOD               MR. WANG            8, 315
4                             MR. FRANK             309
5
6
7    DIRECTIONS:     PAGE   199, 217, 218, 219
8
9
10   ------------ REQUESTS FOR PRODUCTION ------------
11   PAGE:     139   Any documentation that reflects
12                   the dates of the agreement or the
13                   circumstances under which
14                   there are two dates
15             154   Written fee agreements in Acker
16                   and Collins
17             155   Written fee agreements in Coppock
18                   and Stamatov
19             234   Bill after May 2, 2018
20
21
22   --------------- E X H I B I T S ---------------
23   WOOD            DESCRIPTION            FOR I.D.
24   Exhibit 1    Curriculum Vitae             10
25   Exhibit 2    Email Chain, 11/3/17         44
```

```
 1    ----------- E X H I B I T S (Cont'd)------------

 2    WOOD              DESCRIPTION                  FOR I.D.

 3    Exhibit 3         Agreement and Mutual             60

 4                      Release, Bates Stamped

 5                      PLAINTIFF 081407

 6    Exhibit 4         First Amended Complaint          76

 7                      for Declaratory Relief,

 8                      Bitter

 9    Exhibit 5         Plaintiff's Opposition           93

10                      to Defendant's Motion to

11                      Dismiss, Bitter

12    Exhibit 6         Plaintiff's Opposition           96

13                      to Defendant's Motion

14                      for Judgment on the

15                      Pleadings, Bitter

16    Exhibit 7         Order Denying Motion to          97

17                      Dismiss First Amended

18                      Complaint and Motion for

19                      Judgment on the Pleadings

20                      on Cross-Complaint for

21                      Interpleader

22    Exhibit 8         Mutual Release of Claim,        126

23                      Bates Stamped

24                      PLAINTIFF 087010 - 14

25    Exhibit 9         Letter, 10/4/16                 130
```

```
 1  ----------- E X H I B I T S (Cont'd)------------
 2  WOOD              DESCRIPTION              FOR I.D.
 3  Exhibit 10        Memorandum Opinion, Sun      166
 4                    Life v. Conestoga
 5  Exhibit 11        Deposition Transcript,       166
 6                    Houchins, 8/4/16
 7  Exhibit 12        Email Chain, 1/4/13          168
 8  Exhibit 13        Email Chain, 9/17/14         170
 9  Exhibit 14        Email, 9/26/14               175
10  Exhibit 15        Email Chain, 10/8/14         183
11  Exhibit 16        Email Chain, 7/21/14         189
12  Exhibit 17        Email Chain, 8/12/16         225
13  Exhibit 18        Email with attachment,       232
14                    4/6/17
15  Exhibit 19        Invoice                      234
16  Exhibit 20        Eugene Houchins III          241
17                    Affidavit, Bates Stamped
18                    PLAINTIFF 072806 - 11
19  Exhibit 21        Expert Witness Statement     251
20                    of Joseph Wood
21  Exhibit 22        Rebuttal of Joseph Wood      288
22                    to Expert Witness
23                    Statements Submitted by
24                    Defendants
25
```

```
1    ------------ E X H I B I T S (Cont'd)------------
2    WOOD              DESCRIPTION              FOR I.D.
3    Exhibit 23    Reply of Joseph Wood to        288
4                  Rebuttal Expert Report
5                  of James W. Maxson
6    Exhibit 24    Email Chain, Bates            321
7                  Stamped PLAINTIFF 005139
8                  through 44
9    Exhibit 25    Email Chain, 8/6/14           323
10
11
12              (EXHIBITS TO BE PRODUCED)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

WOOD

1
2  the insurance company was refusing to pay, I
3  think it's Lincoln, it's coming to me now, I
4  think that was a Lincoln policy, a $10 million
5  Lincoln policy, any way, I knew from having
6  worked on that case that he had some involvement
7  with life insurance, yes.
8      Q    Okay.
9      A    And -- and my understanding was that
10 he -- this grew out of his activities as the
11 administrator of an investment fund, I think the
12 financing of the policies was done with monies
13 from his investment fund, if I recall correctly,
14 I might not be right, it's something like that.
15 That wasn't an issue for me, all I was
16 interested in that case was getting the
17 insurance company to pay off, which they did, by
18 the way.
19     Q    So -- and Mr. Houchins, so
20 Mr. Houchins, when he called you, what in
21 substance was -- what was he presenting to you
22 with respect to Mr. Bitter's situation?
23     A     I can't recall exactly, but it would
24 have -- it would have been something to the
25 effect of, we have a situation here where there

```
 1                          WOOD
 2    may have been some wrongdoing by this lender in
 3    terms of the insured's ability to buy the
 4    policy, and could you look into it and would --
 5    would you talk to the trustee about the
 6    possibility of being our lawyer here, their
 7    lawyer, I should say.
 8        Q    Okay.  And -- and did you -- what did
 9    you next do after you got the call from
10    Mr. Houchins?
11        A    I had -- I had some -- one or more
12    phone conversations with Mr. Barnes, and I can't
13    remember if he called me or I called him, but he
14    was the trustee for the Bitter trust.
15        Q    Okay.  Let me -- let me see if I can
16    help you, at least, perhaps, assist your memory
17    on some of these matters.
18        A    Thank you.
19             MR. WANG:  Let's have the reporter
20             mark as Wood Exhibit 2, it's a
21             multipage email from you to my
22             colleague, Adam Pence, from November of
23             1917 -- 2017.  It seems like 1917.
24             (Wood Exhibit 2, Email Chain,
25             11/3/17, was marked for
```

1                          WOOD

2    happened in the -- in the Bitter situation?

3         A     Yeah.

4         Q     You had spoken to Barnes to -- to get

5    his side?

6         A     Right.

7         Q     And you had -- but you certainly had

8    reviewed the documents carefully to make sure

9    you understood what they -- what they involved?

10        A     Yes, yes, that's -- that's correct.

11   Although, I -- I think that, prior to the time I

12   filed this complaint in May, my focus, as I said

13   earlier, in the beginning, the way this came to

14   me was not about default settle right and all

15   that stuff, it was about had Mr. Bitter --

16   because this was Mr. Houchins' view, and thus,

17   that was my initial orientation, the issue was

18   whether Mr. Bitter had somehow been properly

19   deprived of the ability to pay off the loan and

20   -- or had -- or whether Mr. Barnes had somehow

21   been improperly induced to sign these transfer

22   documents.  And it really wasn't until I started

23   gearing up for the actual arbitration and

24   thought more deeply about the case that I

25   realized that that was not the only issue in the

```
 1                        WOOD
 2   case, that there was this whole UCC issue too.
 3        Q    Okay.  So, in fact, actually, and, you
 4   know, there's nothing in this complaint that
 5   touches UCC at all?
 6        A    No, that's right, because that -- that
 7   was not my orientation in the beginning.
 8        Q    Despite having reviewed the documents
 9   and speaking to Mr. Bitter -- Mr. --
10        A    Well, I --
11        Q    Just -- just let me finish the
12   question, Mr. Wood.
13        A    Yeah.
14        Q    Despite the fact that you had spoken to
15   Mr. Barnes, heard from Mr. Houchins and reviewed
16   the documents thoroughly, you didn't include any
17   claim under the UCC in your complaint, did you,
18   just yes or no, if you can, Mr. Wood, if you
19   can't answer yes or no, just tell me?
20        A    Well, I -- I'm -- I'm going to -- I'm
21   going to have to clarify, when you say I
22   reviewed the documents thoroughly, I reviewed
23   the documents, but I -- what I was looking for
24   was issues having to do with notice and
25   communications between the parties and so on.
```

```
                              WOOD
 1
 2    So I wasn't focused on anything but the points
 3    that I mentioned.  So I -- you know, when you
 4    review documents, you do so with an eye towards
 5    finding certain information and my focus was not
 6    on anything except the question of whether
 7    Mr. Bitter/Mr. Barnes had been improperly
 8    induced to sign documents or to give up the
 9    loan.
10        Q    What you were hired to do was to see if
11    there was any way that the Barnes, that the
12    trust and the trustee, could have claim to the
13    death benefit, despite the fact that they had
14    executed a change of ownership; isn't that
15    right?
16              MR. FRANK:  Objection, leading.
17        Q    That -- that was your -- your task?
18        A    My task was, initially -- I mean, in a
19    general sense, sure, what we wanted to do was
20    get the death benefit.  And initially, my focus,
21    as I said, was on whether or not Windsor had
22    behaved improperly in inducing Mr. Barnes to
23    sign those documents and/or whether he had
24    deprived Mr. Bitter of the right to pay off the
25    loan.
```

WOOD

Then when this case actually got into litigation mode and we had an arbitration scheduled and so on, then I did a much more thorough review of the law and all the possibilities, and that's why the claim changed as time went forward.

Q    Mr. -- Mr. -- Mr. Wood, the client comes to you and says, here are the documents I've signed; right?

A    Yes.

Q    And they give you all those documents?

A    (Nonverbal response.)

Q    Correct?

A    Right.

Q    He tells you, here are the circumstances under which those documents came about; correct?

A    Mm-hmm.

Q    Mr. Houchins does the same; correct? To -- to the extent that he's been involved with these materials?

A    In the beginning, that's right.

Q    And -- and his request to you as the lawyer is, I want to get my -- I think I'm

```
1                        WOOD
2    entitled to the death benefit or can you come up
3    with some way for me to get the death benefit;
4    correct?
5         A    That wasn't exactly the way the request
6    was framed.  The request was framed -- the
7    request was framed, can you help us to show that
8    we were improperly induced to sign these
9    documents?
10        Q    But you understood that their ambition
11   was to -- to get out from under a change of
12   ownership form that had been signed?
13        A    No, that's correct.
14        Q    Oh, that is, yes, that's correct?
15        A    To -- to get out from under it, yeah,
16   my -- my initial understanding was that I wanted
17   to show that in signing those things, something
18   improper had happened and when this case,
19   then -- also, there was some -- there were time
20   constraints because, you know, Windsor had made
21   a claim for the death benefit, we made a claim,
22   the insurance company then did what it was going
23   to do.  I had to get things rolling.  So I filed
24   an initial claim, which was based on this issue.
25   And then when the case actually moved forward
```

WOOD

and was going to be litigated, then I thought,

maybe there's other stuff here and I'm going to

look into it more deeply, and I did.

Q    Okay.  Made a fraud claim, that's what

it was; correct?

A    Initially, there was a question of

whether they had been improperly induced by

false statements to --

Q    Okay.

A    -- sign these documents, that's right.

Q    The -- the complaint you filed, it will

speak for itself.

By the way, in that complaint, you also

took the position that, as far as you were -- as

far as your client was concerned, they weren't

in default under the documents; isn't that

right?

A    That is correct, right, because my

understanding was that there were negotiations

going on as to whether Mr. Bitter was going to

pay off this loan and, according to what

Mr. Houchins and -- and I don't want to say what

Mr. Barnes told me -- what my understanding was,

that Windsor never provided the exact amount

```
1                          WOOD
2    that was due and thus effectively caused the
3    trust not to make an offer to pay timely.
4         Q    Whatever --
5         A    So that was -- that was the issue.
6         Q    Whatever reason was, you were taking
7    the position and that you filed that a default
8    had not occurred --
9         A    Because --
10        Q    I didn't ask you the "because," that
11   was your position; correct, Mr. Wood?
12        A    That's right.
13        Q    Okay.  That there was no default;
14   correct?
15        A    Right.
16        Q    And as you -- and you didn't look at
17   9620, UCC 9620 at all, at that time, because you
18   said that --
19        A    It wasn't on my radar at that time.
20        Q    It wasn't on your radar.
21             As you subsequently came to understand,
22   9620 only kicks in post-default; correct?  I
23   think we got that -- I think we can agree on
24   that, am I -- am I right?
25        A    When you say 9620 only kicks in
```

1              WOOD

2    post-default, the obligations of the parties, if

3    they wish to transfer ownership of the policy,

4    kick in after default, that's right.

5         Q    After default?

6         A    Yes.

7         Q    Okay.  So -- so taking the position

8    that there hadn't been a default would undermine

9    a 9620 argument, would it not?

10              MR. FRANK:  Objection.

11        A    No, not really, because the -- the way

12   the argument eventually played out at the

13   arbitration, which is now what I think you're

14   addressing, is we don't think there was ever a

15   default, and so Windsor has no claim to

16   ownership of the policy in the first place, but

17   if you disagree with us, and you agree with

18   Windsor's statement that there was a default,

19   then we win, any way, because the default sale

20   right was not properly exercised.

21        Q    Okay.  So now let's -- so you -- you

22   file this in May of 2013, and -- and -- and are

23   you saying that you -- is it your testimony that

24   you had not met with Mr. Barnes by the time that

25   you filed that?

```
                              WOOD
1
2            Mr. -- do you recall that Arent Fox and
3    Mr. Rousseau made a motion to dismiss your
4    complaint?
5        A    Yes, I do.
6        Q    And you filed -- and -- and they took
7    the position, in substance, that they were
8    entitled to the death benefit?
9        A    I don't recall the details of that
10   motion.
11       Q    And you submitted an opposition to
12   their motion to dismiss?
13       A    I'm sure I did, yes.
14            MR. WANG:  Let's mark that as -- as
15            Wood Exhibit 5.
16            (Wood Exhibit 5, Plaintiff's
17            Opposition to Defendant's Motion to
18            Dismiss, Bitter, was marked for
19            identification.)
20            THE WITNESS:  Thank you.
21       Q    So without reviewing -- without taking
22   the time to review what -- what you wrote,
23   you -- you did understand that Arent Fox made a
24   motion to dismiss; correct?
25       A    Yes.
```

```
1                              WOOD

2        Q     If the motion to dismiss had been

3   granted, you would have been out of court and

4   Windsor would have been able to collect the

5   death benefit; correct?

6                    MR. FRANK:  Objection.

7        Q     That's what you understood?

8                    MR. FRANK:  Objection.

9                    You can answer.

10       A     Well, I wouldn't -- I wouldn't go quite

11  that far, a motion to dismiss would have been

12  what it was.  I mean, I -- it depends on what

13  the terms were, whether there was a right to

14  be -- for me to amend and other things.

15       Q     Okay.  In any event, you certainly were

16  trying to do everything you could to avoid the

17  motion to dismiss from being granted, certainly?

18       A     Yes.

19       Q     And -- and after considering the motion

20  to dismiss -- withdrawn.

21             And did you send a copy of the motion

22  to dismiss to your client?

23       A     I don't recall, but I assume so, maybe,

24  maybe not.

25       Q     Spoke to your client about it?
```

1                        WOOD

2        A    I don't recall.

3        Q    But you would assume so, wouldn't you?

4        A    I -- I would assume that I sent him a

5    copy.  I -- I don't know whether I spoke to him

6    or not.  You know, Mr. Barnes is not a very

7    sophisticated person, I might have just let him

8    know this was going on, but it might have been

9    hard to explain to him what it was.

10       Q    And -- and -- and do you recall in

11   addition that Arent Fox, on behalf of Windsor,

12   also filed a motion for judgment in the

13   pleadings, not just a motion to dismiss, but

14   a --

15       A    Yes, I remember, I remember that.  I

16   can't remember the particular grounds on which

17   that was brought.

18       Q    But certainly, at the time, you

19   reviewed that motion?

20       A    Sure.

21       Q    And you opposed that motion as well?

22       A    Yes.

23       Q    And, again, you -- it was a serious

24   motion, you had to do whatever you could to

25   stave off; correct?

```
 1                        WOOD
 2                THE WITNESS:  Thank you.
 3        Q    Does that appear to be the order,
 4   Mr. Wood?
 5        A    Yes, it does.
 6        Q    Okay.  And ultimately, as a result of
 7   the order, the case was then sent to
 8   arbitration.
 9             Do you remember that?
10        A    I don't recall whether the order to
11   arbitration was part of this order denying the
12   motions to dismiss and for judgment of the
13   pleadings or whether it was a subsequent order
14   based on the agreement of the parties.
15        Q    Well, that's -- I think that's why I
16   used the word ultimately, the -- the next thing
17   that happened in the litigation of substance was
18   that it went to arbitration?
19        A    That's right.
20        Q    Correct?
21        A    That's right.
22        Q    And -- and then the matter went through
23   the arbitration hearing; correct?
24        A    Yes, it did.
25        Q    Now, I think you testified that at --
```

```
 1                    WOOD
 2   somewhere along the line, you -- you -- you
 3   shifted focus or you -- you focused on the -- on
 4   UCC?
 5              MR. FRANK:  Objection.
 6              You can answer.
 7      A    When -- once this was teed up for
 8   arbitration, then I got really serious about
 9   exploring all theories and all law that would be
10   controlling in the case.
11      Q    Okay.  So do I understand from that,
12   that until that happened, you were not serious
13   about exploring the theories that applied to the
14   case?
15      A    Not as serious.
16      Q    Not as serious?
17      A    No, you know, as I'm sure you know,
18   being an experienced trial lawyer, the level of
19   intensity that you bring to research and
20   analysis and so on when you're actually teed up
21   for trial tends to be much more intense than in
22   the early sort of skirmish portions of the case.
23      Q    And you regarded a motion for judgment
24   on the pleadings and a motion to dismiss as
25   early skirmishes?
```

```
 1                     WOOD
 2      A    Absolutely.
 3      Q    Okay.  And now, do you -- withdrawn.
 4           Do you recall when the arbitration
 5   occurred?
 6      A    As I recall, it was sometime in January
 7   of 2014.
 8      Q    Okay.  So --
 9      A    Three days in a row.
10      Q    So it was in January of 2014?
11      A    Yes.
12      Q    The Barnes/Houchins agreement was in
13   November of 2013, just about a month and a half
14   before that?
15      A    If that's correct, yes.
16      Q    Certainly during that period of
17   intense, more focused work that you were doing;
18   is that right?
19      A    Yes.
20      Q    And when did you start representing
21   Mr. Houchins?
22      A    Well, as I said in my email, it was --
23   it was -- what I -- what I -- the thing I'm
24   having trouble with is my recollection is that I
25   started representing Mr. Houchins early on, and
```

1                       WOOD

2  Mr. Houchins' testimony?

3     A   That's correct.

4     Q   So what you did was you read

5  Mr. Houchins' testimony and you -- and you

6  reached your conclusion based on that?

7     A   As an expert is entitled and indeed

8  compelled to do, you have to take the -- the

9  evidence and base an opinion on it.

10     Q   Well, I'm not going to argue with you

11  about what an expert does or doesn't do, but

12  that's what you did, that's all I'm interested

13  in?

14           MR. FRANK:  Objection.

15     A   That's correct.

16     Q   Take that look at Paragraph 37.

17     A   Okay.

18           MR. FRANK:  Sorry, did you say 37?

19           MR. WANG:  I did say 37.

20     A   Okay.  I have it, thank you.

21     Q   And it -- it makes reference to events

22  in mid June of 2014 after Windsor sent

23  letters -- and you can take a look at the

24  paragraph, Windsor sent letters to the trustees

25  of the Collins trust, Acker trust, Coppock trust

```
 1                        WOOD
 2   and Stamatov trust.
 3            Do you see that?
 4       A    Uh-huh.
 5       Q    And it makes reference to what those
 6   letters said.
 7            Do you see that?
 8       A    Yup.
 9       Q    And then it says, quote, "The trusts
10   responded with letters denying that claim."
11            Do you see that?
12       A    Yes, I do.
13       Q    Did you advise the trusts in connection
14   with those responses?
15       A    Absolutely.
16       Q    You did?
17       A    Yes, sure.
18       Q    So you were the lawyers -- by that
19   time, which was June of 2014, you were the
20   lawyers for the Collins, Acker, Coppock and
21   Stamatov trusts; right?
22       A    I had not yet signed any retainer
23   agreement or decided whether or not I would
24   represent them in a lawsuit.  But I did
25   represent them to the extent of protecting their
```

```
1                         WOOD
2   interests against that spurious letter, yes.
3       Q    And when did you have the agreement
4   with them to do that?
5       A    It was -- it was just basically
6   Houchins asked me whether I would help them by
7   doing that to protect their interests to -- to
8   reserve any rights.
9       Q    By that, that is, mid June of 2014,
10  when you -- as you said you absolutely, I think
11  that was your word, you absolutely were the one
12  who -- who drafted that response --
13      A    No, I -- I did, I drafted the response.
14      Q    Wait, let me finish the question,
15  absolutely, that's what you said?
16      A    Yeah, sure.
17      Q    You hadn't even spoken to the trustees
18  by mid June of 2014?
19      A    I don't recall whether I had spoken to
20  the trustees about this.  I think I -- I think I
21  probably spoke to the trustees about responding
22  to this letter, that's my recollection.
23      Q    You think you did?
24      A    I'm not positive, but I think so, yeah.
25      Q    You know you spoke to Houchins?
```

1                          WOOD

2    unjustified denial about it, sir, or was that a

3    conclusion that you reached?

4        A    I think that's a -- since he didn't

5    mention it ever, either he didn't know about it

6    or he was denying its applicability, in

7    denial which -- so this -- this statement is

8    kind of a mix -- mixture of fact and opinion.

9             He didn't -- he didn't address it, his

10   opening brief in arbitration said nothing about

11   9620, so either he didn't know that it applied

12   or he was ignoring the fact that it -- or

13   deciding it didn't apply, which I would regard

14   as an unjustifiable denial.

15       Q    Well, when you say his opening brief

16   said nothing about 9620, I think as -- do you

17   remember whether the opening briefs were

18   exchanged simultaneously?

19       A    Yes, they were.

20       Q    They were.

21            And prior to the time of that opening

22   brief, you hadn't raised anything about 9620?

23       A    Where would I have raised it, the

24   arbitration briefs hadn't been submitted yet.

25       Q    Exactly, you hadn't raised anything

1                         WOOD

2    about 9620, had you?

3        A    So what?

4        Q    Well, wait a moment, you hadn't raised

5    anything about 9620 in the underlying

6    litigation?

7        A    The underlying --

8        Q    Mr. Wood, you hadn't raised anything

9    about 9620 in the underlying litigation?

10       A    My pleadings say what they say, and I

11   explained to you in some detail previously how

12   that played out and how I didn't really delve

13   deeply into the merits of the case until we got

14   teed up for arbitration.

15       Q    But Mr. -- Mr. -- Mr. Wood, you're

16   taking Mr. Rousseau to task for not including

17   his opening brief anything having to do with

18   9620 and my -- my question to you was, that

19   hadn't even been at issue prior to that time,

20   you hadn't raised it, there would be no reason

21   for him to raise it at all?

22       A    There is a big reason for him to have

23   raised it, if he had carefully read the

24   financing documents and seen that California law

25   applied and if he had looked at that, he would

```
1                          WOOD
2    have realized that he had a problem.
3        Q    You had carefully read those documents
4    before you filed your lawsuit, hadn't you?
5        A    Not really.  I -- I -- I --
6        Q    You filed your lawsuit without --
7                 MR. FRANK:  Please, sir, let him
8             answer his question, come on.
9        Q    You can finish, Mr. Wood.
10       A    Yeah, and, you know, I -- I should also
11   point out to you that you're not on camera, so
12   all your phony outrage is not going to be
13   registered, but I'll --
14       Q    There's nothing phony about it.
15       A    -- I'll carry on.
16       Q    And I'm not showing outrage, I'm
17   showing incredulity.
18       A    Whatever, whatever, it's -- it's --
19   it's -- it's not helping you, any way.
20            So look, as I said, when I started this
21   case, what I was told was, Mr. Bitter was
22   prevented from buying the policy and I filed a
23   lawsuit on that basis.  And then as the case
24   progressed, as it got beyond the preliminary
25   stage and got teed up for actual litigation by
```

1                A C K N O W L E D G M E N T

2

3   STATE OF              )

4                         :ss

5   COUNTY OF             )

6

7                I, JOSEPH WOOD, hereby certify that

8   I have read the transcript of my testimony taken

9   under oath in my deposition of June 28, 2018;

10  that the transcript is a true, complete and

11  correct record of my testimony, and that the

12  answers on the record as given by me are true

13  and correct.

14

15

16                     _____

17                          JOSEPH WOOD

18

19

20  Signed and subscribed to before me

21  this _____ day of _____, 20__.

22

23

24  _____

25  Notary Public

```
 1              C E R T I F I C A T E

 2

 3   STATE OF NEW YORK      )

 4                          ) ss:

 5   COUNTY OF NEW YORK     )

 6

 7             I, SADIE L. HERBERT, a Registered

 8   Professional Reporter and Notary Public, do

 9   hereby certify:

10             That JOSEPH WOOD the witness whose

11   deposition is hereinbefore set forth, was duly

12   sworn by me and that such deposition is a true

13   record of the testimony given by such witness.

14             I further certify that I am not

15   related to any of the parties to this action by

16   blood or marriage; and that I am in no way

17   interested in the outcome of this matter.

18             IN WITNESS WHEREOF, I have hereunto

19   set my hand this 11th day of July 2018.

20

21

22

23

24   _____

25   SADIE HERBERT, RPR, CLR
```

```
1              *** ERRATA SHEET ***

2       ELLEN GRAUER COURT REPORTING CO. LLC
           126 East 56th Street, Fifth Floor
3              New York, New York 10022
                    212-750-6434
4

5    NAME OF CASE:  WINDSOR SECURITIES vs. ARENT FOX
     DATE OF DEPOSITION:  June 28, 2018
6    NAME OF WITNESS:  JOSEPH WOOD

7    PAGE   LINE  FROM       TO         REASON

8    _____|_____|_____|_____|_____

9    _____|_____|_____|_____|_____

10   _____|_____|_____|_____|_____

11   _____|_____|_____|_____|_____

12   _____|_____|_____|_____|_____

13   _____|_____|_____|_____|_____

14   _____|_____|_____|_____|_____

15   _____|_____|_____|_____|_____

16   _____|_____|_____|_____|_____

17   _____|_____|_____|_____|_____

18   _____|_____|_____|_____|_____

19   _____|_____|_____|_____|_____

20   _____|_____|_____|_____|_____

21                        _____

22   Subscribed and sworn before me

23   this_____day of_____, 20_____.

24   _____   _____

25   (Notary Public)          My Commission Expires:
```