# EXHIBIT 45

Darin T. Judd (CA SBN 160475)
Russell F. Rowen (CA SBN 058178)
THOMPSON WELCH SOROKO & GILBERT LLP
3950 Civic Center Drive, Suite 300
San Rafael, CA 94903
Telephone:     (415) 448-5000
Facsimile:      (415) 448-5010
Email:       djudd@twsglaw.com

Lauren S. Antonino (*Appearance Pro Hac Vice*)
THE ANTONINO FIRM LLC
Six Concourse Parkway, Suite 2920
Atlanta, Georgia 30328
Telephone:     (770) 408-1229
Facsimile:      (866) 372-5586
Email: lauren@antoninofirm.com

Attorneys for Defendant, Cross-Claimant and Cross-Defendant
WINDSOR SECURITIES, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A.), a Michigan corporation,<br><br>Plaintiff,<br><br>vs.<br><br>MINDY GOSS, as Trustee of the Joe E. Acker Family Insurance Trust [incorrectly named herein as the "Joe E. Acker Family Trust"], a Georgia resident; and<br>WINDSOR SECURITIES, LLC, a Nevada limited liability company [incorrectly named herein as a "Delaware company"],<br><br>Defendants.<br><br>AND RELATED CROSS-CLAIMS. | Case No.      3:14-cv-04651-WHO<br><br>**WINDSOR SECURITIES, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:         December 2, 2015<br>Time:        2:00 p.m.<br>Dept.:        Courtroom 2, 17th Floor<br>Judge:       Hon. William H. Orrick<br><br>Complaint Filed:      October 17, 2014 |

Case No. 3:14-cv-04651-WHO

WINDSOR SECURITIES, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................ ii

I.   Statement of the Issues ..................................................................................... 2

II.  Statement of Relevant Facts ............................................................................. 2

    A.   The Trust transferred ownership of the policy prior to the maturity date of their respective Loans .................................................................... 2

    B.   Evidence shows that the Trust transferred ownership of the policy before default, unlike in the Barnes/Bitter arbitration where ownership was transferred after the loan matured and after Windsor's counsel sent a notice of default and threatened to sue ...................................................................................................... 3

    C.   Post-COO conduct is also evidence that the Trustee and Houchins understood that the Trust was relinquishing all rights to any benefits under the policy ........................... 10

    D.   There is evidence that Houchins and the Acker Trustee, Goss, are biased and not credible ...................................................................................................... 11

    E.   The voluntary transfer before default is not new or unplead ............................ 12

III. Argument and Citation of Authority ............................................................. 13

    A.   A fact issue exists whether a pre-default walk-away agreement was reached ............... 13

    B.   The fact issue regarding whether a walk-away was agreed to is a material fact that precludes summary judgment because the agreement, if proven, is enforceable ........... 14

        1.   California Commercial Code §9620 does not apply to pre-default agreements .................................................................................. 14

        2.   The provision in the Premium Financing Agreement that it may be modified only be a written agreement signed by all parties does not render the walk-away unenforceable ......................................................... 15

        3.   The Trust's having informed Windsor, directly or through Houchins, that it did not intend to pay off the Loan or pay future premium payments does not negate that a voluntary walk-away agreement was reached or render the agreement to have been made post-default ............................... 18

        4.   The Trust is bound by the agreement it made, regardless of whether the Trust spoke directly with Windsor, or through Houchins, the servicing agent ............................................................................... 21

        5.   If 9620 applies, the June 2014 letter and the Trust's failure to respond within twenty days satisfies Section 9620 ......................................... 22

    C.   The voluntary transfer walk-away is not a new issue and should be allowed ............... 23

IV.  Conclusion ...................................................................................................... 26

Case No. 3:14-cv-04651-WHO       - i -

WINDSOR SECURITIES, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

**TABLE OF AUTHORITIES**

Cases

*Arlington LF, LLC v. Arlington Hospitality, Inc.* 637 F.3d 706, 713; (7th Cir. 2011)...................19

*Bardeen v. Commander Oil Co.*, 40 Cal.App.2d 341 (1940) ..........................................17

*Buck v. Kleiber Motor Co.*, 97 F.2d 557 (9th Cir. 1938)................................................19

*Carlton v. St. Paul Mercury Ins. Co.*, 30 Cal.App.4th 1450, 1457 (1994) ......................................22

*Central Valley General Hosp. v. Smith,* 162 Cal.App.4th 501, 518-519 (2008) ..........................19

*Certain Underwriters at Lloyd's of London v. American Safety Ins. Services, Inc.*, 702 F.Supp.2d 1169, 1172 (C.D. Cal. 2010) ...........................................................................22

*Conley v. Matthews*, 56 Cal. App. 4th 1453 (1997)......................................................16, 17

*Daigle v. Maine Medical Center, Inc.,* 14 F. 3d 684 (1st Cir. 1993).......................................7

*Davidson v. ConocoPhillips Company*, 2009 WL 2136536, *4 (N.D. Cal. July 10, 2009) ............16

*Diamond v. University of So. California*, 11 Cal.App.3d 49, 53 (1970) ........................20

*Eddy v. Sharp,* 199 Cal App 3d 858, 865 (1988)........................................................22

*Epresence, Inc. v. Evolve Software, Inc.* 190 F. Supp 159, 164 (D. Mass 2002) ..........................16

*Fanucchi & Limi Farms v. United Agri Products*, 414 F. 2d 1075, 1080-1081 (9th Cir. 2005) ................................................................................16

*Gherman v. Colburn,* 72 Cal.App.3d 544, 564 (1977) ..............................................19

*Gold Mining & Water Co. v. Swinerton* 23 Cal.2d 19, 28 (1943) ..................................19

*Isaac v. Waste Management Collection and Recycling, Inc.,* 134 Cal. App. 4th 1076, 1083 (2005) ...........................................................................................15

*Lacy Mfg. Co. v. Gold* Crown *Mining Co.*, 52 Cal.App.2d 568, 577-578 (1942) ..........................17

*Lockheed Missiles & Space Co. v. Gilmore Indus.,* 135 Cal.App.3d 556, 559 (Ct.App. 1982) ...........................................................................................16

*MacDonald v. General Motors Corp.*, 110 F.3d 337, 341 (6th Cir.)................................24

*MacIsaac and Menke. Co.*, 193 Cal App 2d 661, 670 (1961) ..................................16

*Marani v. Jackson*, 183 Cal. App.3d 695, 704 (1986)...........................................15, 17

*Oki America, Inc. v. Microtech Int'l, Inc.*, 872 F2d 312, 314 (9th Cir. 1989)..................................24

*Pacific Coast Engineering Co. v. Merritt-Chapman & Scott Corp.* 411 F.2d 889, 894 (9th Cir. 1969) ..................................................................................................................19

*Pearsall v. Henry,* 153 Cal. 314 (1908) ...................................................................................17

*Quinn v. Brown*, 561 F. 2d 795 (9th Cir. 1977) ....................................................................20

*Rojas v. Roman Catholic Dioces of Rochester*, 660 F3d 98, 105-106 (2d Cir. 2011) ...................24

*Taylor v. Johnston*,15 Cal.3d 130, 137 (1975) ...............................................................19, 21

*Treadwell v. Nickel*, 194 Cal. 243, 258-259 (1924) ................................................................17

*Triple A Management Co., Inc. v. Frisone* 69 Cal.App.4th 520 (1999) ........................................15

*United States Energy Corp. v. Nukem, Inc.*, 400 F.3d 822, 833, fn. 4 (10th Cir. 2005) .................24

*Wade v. Markwell & Co*., 118 Cal.App.2d 410, 420-421 (1953) ...................................................17

*Weeshoff Constr. Co. v. Los Angeles County Flood Control Dist*., 88 CalApp3d 579, 589 (Ct.App. 1979) .......................................................................................................17


Statutes

California Civil Code §1698..............................................................................................16, 17

California Commercial Code §2209 .........................................................................................16

California Commercial Code §9601 ....................................................................................14, 15

California Commercial Code §9620 .................................................................................passim

California Probate Code §16012...............................................................................................22

California Probate Code §16052...............................................................................................22

Probate Code §16401 ............................................................................................................22


Treatises

3 Couch on Insurance (2d. ed. 1984) § 25:112, p. 477 ................................................................22

Rutter Group Prac. Guide Fed. Civ. Trials & Ev. Ch. 8D-B, §8:1115 ..........................................24

WINDSOR SECURITIES, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

The original deadline for filing motions for summary judgment in this case was July 8, 2015. Tellingly, the Joe E. Acker Family Insurance Trust (the "Trust" or "Acker Trust"), acting through its trustee Mark Goss (the "Trustee"), elected not to move for summary judgment. The reason the Trust did not file a motion is evident from its admission that a fact issue exists regarding whether an agreement to transfer complete ownership in the policy to Windsor occurred.[1] The Trust's recently filed Motion for Summary Judgment ("Motion"), based largely on affidavits of witnesses[2] whose testimony is in dispute, demonstrates *exactly* that point.

At issue in the Trust's Motion is whether a voluntary walk-away agreement was reached before default, as a result of which Windsor Securities, LLC ("Windsor") obtained clean title to the insurance policy at issue and all benefits there-under. If the Court agrees that a fact issue exists regarding whether a walk-away agreement was reached, summary judgment must be denied unless the agreement would be unenforceable as a matter of law, as the Trust contends, or the Trust succeeds in convincing the Court not to consider the voluntary transfer argument on the grounds that it is a "new" theory concocted by Windsor after the Court's recent Order which was previously un-pled and should not be allowed.

As shown below, there is substantial evidence from which a jury could find that a pre-default walk-away was agreed to and is enforceable. California Commercial Code Section 9620 does not apply to a pre-default agreement. Moreover, California law is clear that there are several circumstances, such as

---

[1] See Opposition Brief filed July 29, 2015 by the Trust at page 25: lines 16-17 ("there remain substantial disputed issues of material fact as to what those intentions were").

[2] The Trust's Motion is based on affidavits of the trustee, whose deposition has not been completed, and of Eugene Houchins III ("Houchins"), who is an important fact witness, whose deposition has not been taken in this case. Windsor noticed his deposition and depositions of other employees of his company for June of this year and served a subpoena for documents in May. Although Mr. Wood, the Trust Counsel, does not represent Houchins or his company, the Houchins group communicated to the Trust Counsel that they could not attend depositions when noticed and asked for them to be rescheduled. Due to Wood's own unavailability in June, counsel cooperated and rescheduled the depositions. The Houchins' group's depositions were in the process of being set for September, when discovery was stayed. Ms. Gordillo's deposition was started in July but Ms. Gordillo asked to resume later as she developed a migraine and preferred not to continue her deposition to the next day, but advised the next morning that her migraine persisted and she would not attend. [*See,* Declaration of Darin T. Judd ¶4(b).] The deposition of Mark Goss, trustee of the Acker trust, was postponed because he was reportedly in the process of being transferred from a Florida prison to an Atlanta prison. In connection with Goss' deposition, counsel had already bought tickets to travel, provided all documents to the prison, and had all arrangements for an approved court reporter. [*See, Id.*]

WINDSOR SECURITIES, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

1  those that apply here, whereby a subsequent agreement can be enforceable even if there is a provision in

2  the parties' original agreement that provides for amendment only by a writing signed by all parties. In

3  addition, Windsor shows that the Trust's having informed Windsor that it did not intend to pay off its

4  loan, months before the maturity date, did not result in the Loan being in default status. As the Trust's

5  primary witness has already sworn repeatedly, the Acker loan never went into default. Finally, the record

6  is replete with evidence that the Trust has known of the voluntary transfer issue for more than a year, the

7  issue was pled, and Windsor did not come up with the theory to counter the Court's order denying its own

8  motion.

9  For the reasons explained further below, the Trust's Motion for Summary Judgment or, in the

10  alternative, for Partial Summary Judgment should be denied and fact discovery should be allowed to

11  proceed. In the alternative, if the Court finds that a fact issue does not already exist, the Court should

12  allow discovery to be completed before ruling on the pending Motion.

13  ## I. Statement of the Issues

14  The Trust's Motion presents three primary issues for this Court to decide: (1) whether there is an

15  issue of fact concerning whether the Trust voluntarily transferred the policy before default in a mutual

16  walk-away; (2) whether the pre-default agreement, if proven, would be enforceable based on facts already

17  in the record or could be enforceable, based on facts that discovery could develop; and (3) whether the

18  Trust is correct that Windsor concocted the voluntary transfer issue after the Court's recent ruling and

19  should be precluded from arguing it now.

20  ## II. Statement of Relevant Facts

21  ### A. The Trust transferred ownership of the policy prior to the maturity date of their respective Loans

22  

23  The Promissory Note signed by the Trustee provides that the maturity date of the loan was 820

24  days after funding. [*See* Declaration of Steve G. Prusky filed concurrently herewith, ¶4, **Exh. A**, Page 10,

25  Preamble.] In this case, funding occurred on May 1, 2008. [Prusky Decl., ¶5.] The maturity date on the

26  loan therefore was July 30, 2010. [*Id.*] The Trustee signed the Change of Ownership (Absolute

27  Assignment) ("COO") on March 18, 2010, more than three months before the loan would have matured.

28  [Prusky Decl., **Exh. F**.] Windsor signed the Change of Ownership (Absolute Assignment) ("COO") on or

WINDSOR SECURITIES, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

1    about March 18, 2010; ownership was effectively changed by the insurer as of May 20, 2010; and John

2    Hancock Life Insurance Company ("JHUSA") confirmed the change of ownership to Windsor on or

3    about May 20, 2010. [Prusky Decl., ¶¶17&21, and **Exh.s A-J**.] These facts are undisputed. [*Id.*]

4        **B.**     **Evidence shows that the Trust transferred ownership of the policy before default,
     unlike in the Barnes/Bitter arbitration where ownership was transferred after the loan matured
5    and after Windsor's counsel sent a notice of default and threatened to sue**

6        As this Court is aware, counsel for the Trust ("Trust Counsel") served as counsel in an arbitration

7    matter involving a loan Windsor made to another Houchins' client, Bitter. He is also counsel to the

8    insurance trusts in *Pacific Life Insurance Company v. Maria Ana Gordillo, et al.,* U.S.D.C. N.D. Cal.

9    3:14-cv-03713-WHO ("**Collins**") and the *Coppock* and *Stamatov* cases that were recently transferred to

10   Your Honor. When discussing the *Collins*, *Acker*, *Coppock* and *Stamatov* cases, Trust Counsel explained

11   to the arbitration panel that, unlike in the *Barnes/Bitter* case before it, "***Windsor had not declared any of***

12   ***these [other] borrowers in default. California Commercial Code Section 9620 therefore did not apply,***

13   ***and the borrowers could waive or ignore whatever rights they wished.***" [Declaration of Darin Judd in

14   Support of Opposition, **Exh. #4,** 39:9-12.] As a result, counsel noted, "We are in a different situation

15   here." [Judd Decl., **Exh. #1**, 32:17-23.]

16       This position was not just argument; it was based on testimony of key witnesses.[3] [See Prusky

17   Decl., ¶6.] As Trust Counsel knows, Windsor's representative, Mr. Prusky, had testified that: "Windsor

18   had not declared any of these borrowers [referencing the Acker Trust] in default." [Judd Decl., **Exh. #1**, at

19   312:18-25.] By contrast, in the *Bitter* case, Mr. Prusky testified that a written notice of default was sent

20   out by Windsor or its counsel. [Judd Decl., **Exh. #1**. at 310:21-24.] In the non-*Bitter* cases, Prusky agreed

21   that the default issue "didn't arise with any of the other policyholders; it was all done amicably." As the

22   Trust Counsel summarized, 'Oh, we don't want this any more. Here's the COO, right?" [Judd Decl., **Exh.**

23   **#1**. at 311:1-5.]

24   ———————————————

25   [3] Whether Trust Counsel can now make a contrary argument is not the point. Counsel was synopsizing
     evidence. Counsel's position that argument for a different client cannot be used against clients in this
26   case is thus inapposite. The same evidence will exist in this case because the same witnesses are
     involved; thus the same differences between the instant case and *Barnes/Bitter* exist. The point is that
27   there is ample evidence that key witnesses will testify or have admitted that the loan in this case never
     went into default and that the trustee for the Acker Trust agreed to walk-away and relinquish the
28   insurance policies.

WINDSOR SECURITIES, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

1   In addition, the differences between the *Barnes/Bitter* matter and the *Acker*, *Collins*, *Coppock* and

2   *Stamatov* cases are emphasized in the arbitration testimony of Houchins, which testimony conflicts

3   materially with the affidavit Houchins submitted in support of the pending Motion before Your Honor.

4   Although Windsor had different counsel in the arbitration matter and has not had deposed Houchins or his

5   company's employees yet in the instant case, Houchins's admissions in the *Barnes/Bitter* arbitration are

6   probative of evidence that would be developed in this case. [*See*, *generally,* Judd Decl.]

7   Houchins and his company served as servicing agent on seven Windsor-financed policies,

8   including the ones that are subject of the four Windsor cases now pending before Your Honor. [Prusky

9   Decl., ¶2.] Houchins is thus in a good position to know what trustees were told and agreed to because he

10  was involved in the explanations to them and the insureds about how premium financing worked and what

11  their options were before loans came due. [Judd Decl., **Exh. #1**, Arbitration Excerpts, at 464:4-465:8;

12  577:6-20; 580:6-581:21; 582:1-21; 614:5-616:25; see also Judd Decl., **Exh. #2**, at 65:24-67:3 (Robert

13  Coppock's testimony at explaining that servicing agent communicates information from his client to third

14  parties).] In addition, as the Trustee and Houchins have sworn in their Affidavits here, Houchins

15  communicated information between the Trust and Windsor, at the Trust's request. [Prusky Decl., ¶7.]

16  Despite Houchins's affidavit, claiming that he never discussed a walk-away option with Windsor or the

17  Trustee, his testimony in the arbitration provides ample evidence from which a jury could clearly find

18  otherwise. For example:

19      (1)     Houchins agreed at the hearing, initially, that four of his clients in 2010 chose not to pay

20  off their policies, signed change of ownership documents, and walked away from their policies (Judd

21  Decl. **Exh. #1**, 581:8-14; 582:1-4):

22          Q:      *So we have got five clients left, including Mr. Bitter. As we get to 2010.*
                    *One by one each of them signs a COO over to Mr. Prusky and*
23                  *surrenders the policy, right?*
            A.      *Not exactly, Mr. Pawlik's policy lasted until about March or April 2010.*
24                  *So we had six [not five, as the question asked] going into 2010…..*
            Q:      *Seven cases, four in the year 2010, change the ownership from trust to*
25                  *Windsor, walk-away and they are done, right?*
            A:      *(Witness nods head up and down.)[4]*

26

27  [4] Houchins gave similar testimony at his deposition when he said that some of his clients "turned over"
    their policies. Some preferred, he said, to tender their policies and have the note canceled. [Judd Decl.,
28  (footnote continued)

WINDSOR SECURITIES, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

(2)     After further questioning, apparently trying to distance himself from this admission, Houchins noted that no written release was signed in these four cases, which he identified as *Acker*, *Collins*, *Coppock* and *Stamatov*, and thus that a "surrender" did not occur, depending on what surrender means. [Judd Decl. **Exh. #1**, at 582:1-10 (a jury should answer the question of what definition of surrender).] In yet another attempt to evade, ***Houchins explained "I think you might have an issue here because you did not get any of those four insureds or policy owners to sign mutual releases, so you might have to go back and do that."*** [Judd Decl. **Exh. #1**, at 582:11-21.][5]

(3)     Houchins admitted he had talked about a walk-away option with Bitter, stating he explained: (a) "You can choose to pay back the loan and keep the policy, option one. Option two, God forbid you die, your family gets the death benefit. Knock on wood, that didn't happen. Option three was the loan goes into default. You don't want to pay back the loan. In that case, the ownership of the policy is transferred as per the security agreement[6]… And the fourth option is that you can walk-away from it and say, "Hey, lender, I'm out of this game. Let's do a mutual release and the policy is all yours, and don't go after my trust for any assets." [Judd Decl. **Exh. #1**, at 464:12-465:8.]

(4)     Houchins admitted that he had explained options also to the trustee for the Bitter Insurance Trust, Barnes. Houchins told the Arbitrator he had informed Barnes that the Trust could: (a) transfer the policy to the lender per the security agreement so the lender could sell the policy if it wanted to; or (b) do what Houchins described as the "mutual release" option, which the Arbitrator followed up by asking if that was to "sign the ownership on the basis that there'll be a mutual release and no liability from either side." [Judd Decl. **Exh. #1**, at 543:20-544:16.] Houchins, clarifying that the "third option" was "an option outside of the security agreement, that both parties can walk-away." [Judd Decl. **Exh. #1**,

---

**Exhibit #3** 123:5-12.]
[5] Notably, Houchins did not say that the walk-away he explained back in 2010 contemplated a further writing to memorialize the forgiveness of the loan that his clients understood they were getting. His testimony shows instead that he learned in 2014 that there may be an argument that can be made since a formal release was not signed based on Trust Counsel's analysis. That is why Houchins says Windsor may need to go back and get them now. ***This is the crux of the issue*** – not whether a pre-default mutual walk-away agreement was reached and fully executed, but whether the Trust can avoid their agreement years later, despite never having paid a penny for the policies by challenging the agreement's enforceability on the grounds that a further writing not discussed or contemplated then is now needed.
[6] The Premium Financing Agreement included a Power of Attorney already executed in favor of Windsor, as well as a Collateral Assignment. [Prusky Decl. ¶3, **Exhibit A,** at 52-53, 60; pages 107-115.]

at 544:17-25.]

(5)     Houchins testified that he and Barnes discussed the option of signing the COO before Barnes signed it in 2011 and the choice of whether to sign the COO *was the trustee's decision* (see Judd Decl. **Exh. #1**, at 577:6-14).[7] He also admitted that he did not recall discussing with Barnes, however, that a release document was needed: "I don't recall advising him about the mutual release." [Judd Decl. **Exh. #1**, at 542:13-22.]

(6)     Indicative of the fact that Houchins and the *Bitter* trustee never expected to hear more about the policy after the COO was signed due to giving up all rights to the policy, Houchins admitted that he was relieved that he would no longer be hearing from Windsor or Windsor's attorney thereafter about the Bitter policy. [Judd Decl. **Exh. #1**, at 580:1-5.].

(7)     Houchins admitted that the Acker, Coppock, Collins and Stamatov policies were "relinquished." [Judd Decl. **Exh. #1**, at 615:9-18.] Houchins explained: "they had a choice to make: pay back loan, which they did not want to do, or give policy back and do a mutual release as there is a default sale agreement or they were going to let it go in default and none of these policies went into default. There was no default notice sent or anything, so." [*Id.*]

That Houchins explained the walk-away to his clients is also evident from the testimony of another witness in this case, Mr. Coppock, who is a former insurance agent in the State of Tennessee specializing in "personal lines" that included life insurance from 1966-2000, and who was also one of Houchins's clients whose life insurance policy Windsor financed. [Judd Decl. **Exh. #2**, at 20:14 – 22:6.][8]

---

[7] *Barnes/Bitter* was a post-default case. Bitter claimed that he had wanted to pay off the loan but that Windsor would not let him do so because the loan had already matured. Windsor had sent a notice of default following maturity. [Prusky Decl. ¶35, **Exhibit O**] However, none of the trusts in the four cases now pending indicated they wanted to pay off the loan or keep their respective policies. [*Id.*]
[8] Mr. Coppock's deposition was taken in July of this year in the *Collins* and *Acker* cases, but was continued because Mr. Coppock informed counsel after his deposition started that he could only stay for 1 ½ hours and then had to leave to care for his sick wife. After his deposition, Trust Counsel raised the issue of whether Windsor intended to use the Coppock deposition in support of Windsor's then pending Motion for Summary Judgment before the full thirty-day correction period was up. Windsor's counsel agreed that Mr. Coppock could have the full thirty-day period. Counsel's agreement that the Coppock transcript would not be used in support of Windsor's then pending Motion should have no bearing on its use here. Windsor's motion was based on an alternative theory of recovery that was not dependent on oral testimony, but was a matter of law argument. That Mr. Coppock's deposition was continued at the witness's and Trust Counsel's request also does not render the deposition not usable now as evidence (footnote continued)

WINDSOR SECURITIES, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

Evidence related to the Coppock policy shows that:

     (1)    Mr. Coppock testified that Houchins explained that an option was to "***walk-away and get nothing, except during the two-year financing period if I died my beneficiary would get the proceeds of the death benefit minus the loan***." [Judd Decl., **Exh. #2**, at 43:4-9.]

     (2)    Houchins had explained to Coppock the walk-away option as follows:

> **Q:**    *And what did [Houchins] explain to you in terms of what a walk-away meant?*
> **A:**    *I don't know that that's the terminology he used, but at the end of two years I could relinquish all rights. …*
> **Q:**    *And they could also keep it, Windsor Securities, and hold the policy as the absolute owner or the outright owner of the policy, with the responsibility to make the ongoing payments. Did Mr. Houchins explain that to you, as well?*
> **A:**    *Yes.*
> **Q:**    *So it's different than they could simply sell the policy. You recall Mr. Houchins also explaining that Windsor, if you decided not to repay the loan, could receive documentation where they would be the owner of the policy and they would – in exchange for becoming the owner they would relinquish any claim, any recourse for the underlying loan, but they would then own the policy and have the right to designate the beneficiary, right?*
> **A:**    *Right.*[9]

     (3)    Mr. Coppock also explained that the agreement to walk-away was why he did not respond or have his wife, the trustee of his insurance trust, respond to the letter Windsor had sent in June 2014, until five months later after he had been referred to Trust Counsel.[10] The testimony on this point is revealing [Judd Decl., **Exh. #2**, at 74:4-19]:

> **Q:**    *So you agreed? So if you agreed, there would be no reason to write a response to that letter, correct?*
> **A:**    *The way I read this letter, all he was telling me that I have no responsibility except to keep them informed if I have any health issue.*
> **Q:**    *And not just you, but the trust also –*
> **A.**    *Well –*
> **Q.**    *– has no obligations or responsibilities or rights. Isn't that what Mr –*

---

taken in this case or as evidence of what continued fact discovery will show. *See, Daigle v. Maine Medical Center, Inc.,* 14 F. 3d 684 (1st Cir. 1993)(rejecting objection to using deposition argued to be incomplete, noting court's discretion, fairness, and opposing counsel's choice not to actively pursue completion of deposition).

[9] Following a restroom break, Mr. Coppock said that after speaking to Mr. Wood, he wanted to change his prior testimony to say that his understanding was that his beneficiary would still receive a part of the death benefit after Windsor took ownership of the policy, that Windsor would not in fact own everything. [Judd Decl., **Exhibit #2**, at 47:8-20.] Windsor encourages the Court to review the transcript.
[10] [Prusky Decl.,¶36, **Exhibit P.**]

WINDSOR SECURITIES, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

*because they have been relinquished, they have been release. Did you disagree with that?*
*A:* *They've been released of any financial liability?*
*Q:* *You agreed with that, correct?*
*A:* *Yeah.*

In addition to oral testimony, there is documentary evidence from which a jury could find that a walk-away agreement was reached without the loans ever going into default. For example:

(1) On November 24, 2014, then counsel for Windsor sent an email to Houchins to follow up a conversation he had had with Houchins' father at a life settlement insurance industry conference. Houchins's father, by this email shows, was also involved in explanations of options to Houchins' clients. [Prusky Decl., ¶6, **Exh. B.**] Counsel's email noted options that had been discussed, including that some of Houchins' clients may prefer to sell their policies prior to maturity and "*[s]ome may prefer to tender the policies prior to maturity of the loan and have the note cancelled….*" [*Id.*] The email concluded, "***Pls let me and Steven know how each client decides to proceed….*" [*Id.*]

(2) On January 29, 2010, Windsor's Mr. Prusky replied to an email from Houchins that talked about a variety of topics, including whether an insured was considering paying off the loan or whether it wanted to wait closer to the maturity date, like Stamatov, before signing over ownership. Reflective of the voluntary nature of the pre-default COO, Mr. Prusky noted that "***Stamatov, Bitter and Collins: If they want to wait, that's fine. I don't want to send in more premiums than I'm obligated for, however. Let me know.*" He also wrote "***I'm willing to work with any of these guys, and welcome your comments.*" [Prusky Decl., ¶12, **Exh. C.**]

(3) In this case, on February 19, 2010, Windsor sent a letter to Mark Goss, the Acker trustee, to send Mr. Goss a new change of ownership form because the first one Mr. Goss had signed was defective since it had not been witnessed and the insurance company had implemented a new form (the "2010 Letter to Goss"). [Declaration of Steven Prusky in Support of Opposition to Motion of Acker Trust ("Prusky-Acker Decl."), ¶16, **Exh. E.**] In the 2010 Letter to Goss, Mr. Prusky confirms that the Acker Trust is transferring ownership *voluntarily*. Mr. Prusky wrote: "We hereby confirm that it is our understanding that we may file this form immediately, and that you are taking this action because the premiums required to keep the policy in force are now beyond the amount Windsor is responsible for

WINDSOR SECURITIES, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

1  according to financing documents, and **you would therefore rather** assign the policy than pay those

2  monies." [*Id.*][11]

3      (4)    In the *Bitter* case, Houchins emailed Windsor in July of 2010 about helping Windsor get a

4  COO form signed by Bitter if Bitter did not pay off the loan. In that email, Houchins noted that, if needed,

5  he would help Windsor "**complete the COO so you can have clean title.**" [Prusky Decl., ¶37, **Exh. P.**]

6      (5)    he COO, signed by Goss almost three full months *before* the Acker loan would have

7  matured, reads "***the undersigned hereby transfers and assigns absolutely, all rights, title and interest in***

8  ***the agove policy(ies) to the Assignee(s) indicated below and HEREBY REVOKES ANY***

9  ***BENEFICIARY or direction of payment previously made in respect to the proceeds payable on the***

10  ***death of the Life Insured....***" [Prusky Decl.,¶18, **Exhibit C**.].

11      (6)    In the *Coppock* case, Houchins sent Mr. Prusky an email on March 30, 2010,

12  approximately six weeks after the Coppock trustee signed the COO, to let him know that Mr. Coppock

13  asked Houchins to ask Windsor to send a release to "complete his file." When Mr. Prusky returned from

14  vacation, he sent a letter stating "***Please accept this letter as formal notification that pending our***

15  ***ownership of #VF51701030, we are releasing you from any future obligations of our financial***

16  ***agreement***." [Prusky Decl., ¶36, **Exh. O**.][12]

17      (7)    On March 18, 2010, Houchins's father ("Houchins, Sr.") who worked with Houchins

18  called Mr. Prusky to discuss conversations he and Mr. Prusky had had with another Houchins' client,

19  Steve Pawlik, who was thinking of paying off the loan to keep his policy. Mr. Prusky told Houchins Sr.

20  that he thought Mr. Pawlik's acquiring the policy might be a good idea for him if he could afford it but

21  that if Pawlik decided to give the policy to Windsor in lieu of the loan, Windsor would have to make the

22  same decision concerning whether Windsor could afford the policy in light of the risks. [Prusky Decl.,

23  ¶29, **Exh. K**, pg. 2.] Mr. Prusky told Houchins Sr.: "And I said, based on what little … I said I'll be faced

24  with the same choice you are, you know, **if you give the policy to me in lieu of the loan**, I'll make the

25  _____

26  [11] As the Promissory Notes expressly stated, Windsor has the option but not the obligation to loan the Trust additional monies for premium payments after the initial funding occurred. [Prusky Decl., ¶23,

27  **Exhibit A, page 29.**]
[12] Mr. Coppock testified that he also wanted to be released individually. [Judd Decl., **Exhibit #2**, at

28  64:7-65:6; 69:6-71:23.]

WINDSOR SECURITIES, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

1  same decision…" (Judd Decl., **Exh. #1**, at Exh. 260 page 2 of 6. Houchins Sr. gave no indication that the

2  transfer of ownership of the policy to Windsor involved forgiveness of the loan was a surprise to him or

3  something that had not been previously understood.[13]

4  **C.    Post-COO conduct is also evidence that the Trustee and Houchins understood that**

5  **the Trust was relinquishing all rights to any benefits under the policy**

6      Actions speak a thousand words. The post-COO conduct in this case speaks loudly that a walk-

7  away agreement was reached and that the Trustee and Houchins in fact understood that the Trust would

8  have no further right to any policy benefits. For example,

9      (1) In this case, Mindy Goss, who initially filed the case as acting trustee, testified that she learned

10  that Mr. Acker had passed away in April 2014, because Ms. Goss's insurance agency had other policies

11  that were impacted by Mr. Acker's death. [Prusky Decl.,¶21; Judd Decl., **Exhibit #6**, 78:21-79:16; 80:2-

12  11; and 73:3-12.] Ms. Goss told her husband, the Trustee who is in prison, that Mr. Acker had passed

13  away as well. Trustee, the actual trustee of the Acker Trust, is serving a 144-month sentence in prison

14  following his plea of guilty of using the mail to distribute false information to victims of his fraudulent

15  investment scheme. [Judd Decl. **Exhibit #6**, 80:2-8.] At no time in the three months between Mr. Acker's

16  death and Ms. Goss's receipt of the June 19, 2014 letter from Windsor did the Trust assert any claim to the

17  Acker insurance policy. [Judd Decl. **Exhibit #6**, 79:1-24; 103:16-22.] During these three months, Ms.

18  Goss did not, and the Trustee did not tell Ms. Goss to, contact anyone, including the insurance company,

19  to claim that the Acker Trust was entitled to any portion of the death benefit payable on the Acker policy.

20  [Judd Decl. **Exhibit #6**, 79:4-24.] It was not until after Ms. Goss received the June 2014 letter and the

21  Trustee advised her to ask Houchins what to do in light of the letter that Ms. Goss was referred to and

22  contacted current Trust Counsel, who then claims to have mailed a letter responding to Windsor's letter in

23  July, over a month later. It was also at that time that Ms. Goss filed a claim, contending the Acker Trust

24  was entitled to recovery.[14]

25

26  [13] Mr. Prusky produced in the Barnes/Bitter matter transcripts he had of recorded calls. Although a
recording on his office line tells callers that all calls are recorded, they are not. [Prusky Decl., ¶19.]

27  [14] Similarly, in the *Collins* case, the Collins trustee testified that she learned that Mr. Collins had passed

28  away when Houchins told her. [Judd Decl., **Exh. #5**, 109:1-25.] From when Houchins told her that Mr.
(footnote continued)

WINDSOR SECURITIES, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

1  (2)  For that matter, not one insured or trustee ever contacted Windsor during the four-year

2  period after their respective COOs were signed. [Prusky Decl., ¶22.]

3  (3)  Although Houchins testified at the arbitration that he paid attention to whether the

4  premiums on the policies were being paid after COOs were signed so he could let the Trustees know if a

5  policy was about to lapse, there is no evidence whatsoever that Houchins ever reached out to Windsor to

6  find out if a payment had been sent in or was going to be sent in, as he had done before COOs were

7  signed, even though Windsor had a history of paying the premiums very close to the due date. [Prusky

8  Decl., ¶22.]

9  (4)  After Barnes learned that Bitter had died, Barnes threatened to sue Houchins for the $2

10  million in policy benefits that Barnes thought the Bitter Trust would not get due to Houchins' having

11  given Barnes bad advice to sign over ownership in the policy. [Judd Decl., **Exh. #1**, at 534:23-535:5.]

12  Barnes, Houchins explained, said "this never should have happened. It's such a shame. Such a shame this

13  happened." [Judd Decl., **Exh. #1**, at 533:11-23.] As to whether Barnes felt he "had been duped by

14  [Houchins] or he had been duped about whether he was turning over rights to the death benefits",

15  Houchins admitted that "he was laying a little blame on me for telling him to sign that document." …

16  **D.  There is evidence that Houchins and the Trustee are biased and not credible**

17  A jury could reasonably find that Houchins is biased because he is concerned he may have

18  liability to a trust if the trust does not receive any of the death benefit as his admissions in the

19  *Barnes/Bitter* case show:

20  **Q:  "So you said Mr. Barnes was laying some blame on you. Did you have
      any conversations about how to deal with that problem?**

21  **A:  I did.**
     **Q:  What was it?**

22  **A:  I sought my legal counsel and he said, yeah, you might have a little
      liability here, and so I discussed it with [Barnes] and we came to an**

23  **agreement.** [Prusky Decl., ¶18.]

24  _____

25  Collins passed away until Houchins directed her to retain the Collins Trust's current attorney which was
    after the Collins trustee received a letter Windsor had mailed in mid June to the Collins Trust, the

26  Collins Trustee did not do anything to make a claim on the Collins policy. [*Id.*] The first time the Collins
    trustee through her attorney attempted to assert a claim on the Policy was on approximately July 15,

27  2014 when she purportedly signed a letter directed to the Insurance Company asserting a claim. [*Id.*] At
    no time in the months between Mr. Collins' death and the Collins' trustee's receipt of the June, 2014

28  letter from Windsor did the Collins Trust assert any claim to the Collins insurance policy.

WINDSOR SECURITIES, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

The agreement Houchins reached with the Bitter Trust was for Houchins to pay for litigation against Windsor in exchange for a release from the Trust. [Prusky Decl., ¶20, **Exh. G.**] There is also evidence that Houchins has a personal vendetta against Windsor, because Houchins' company lost its right to sell Pacific Life policies after Windsor informed insurance carriers that policies Houchins had procured were in fact premium financed, despite the representation on the application for insurance that Houchins or his father had submitted that said they were not. [Prusky Decl., ¶20.].

Similarly, there is evidence from which a jury could infer that the Trustee is not credible or is biased. In addition to having pled guilty to a crime of moral turpitude that involved fraud on elders, it appears that the Trustee was not only serving as the Acker Trustee, but was also a subagent who helped Houchins procure the Acker policy and thus may have received a financial benefit. [Prusky Decl., ¶3.][15] He has a conflict of interest and may himself be concerned about personal liability, for the same reasons Houchins is.

**E.     The voluntary transfer before default is not new or unplead**

Windsor referenced the Voluntary Transfer issue in several places in its Answer [Dkt #18] to the Crossclaim [Dkt #9] filed by the Trust. For example, Windsor pled that the Trust voluntarily executed the COO (para 10), denied that the Trust was required to sign the COO on default (para 17); denied anticipatory breach (para 18); and admitted that it owned the policy due to voluntary transfer on March

---

[15] There is evidence from which a jury could infer that the Collins trustee, who had experience only as an assistant, bookkeeper, and office manager and had *never* acted as a trustee or had any special training, educationally or by experience, that would reasonably qualify her for the responsibilities of a trustee of a life insurance trust *before Houchins, a tenant on property she managed,* nominated her as trustee of the Collins Trust. Trustee never directly contacted the insured, the beneficiary, the insurance company, or Windsor except through Houchins and merely made the decisions and signed the documents that Houchins directed her to make and sign [Judd Decl., **Exhibit #5**, at 16:8-12, 21:20-23:4, 24:20-26:3, 28:25-31:10.] For example, she does not have any understanding as to the purpose of an insurance trust other than from Houchins' explanation that she does not remember. [*Id.* at 43:5-44:17.] She never signed any returns or checks for the trust, "don't know" and "honestly not sure" if she has ever asked someone to prepare tax returns for the trust, "not sure" if returns have ever been filed, had no idea how much money the trust had in the bank account. [*Id.* at 50:17-51:13, 62:1-63:10.] Further, all the documents she received from Houchins' office were prepared for her signature without any input from her in her capacity as trustee, even to the point that she signed documents without any explanation from Houchins as to why they were prepared or why an address not associated with her was used. [*Id.* at 87:6-92:5; 113:1-114:12; 125:22-129:21.] She recalls the Collins Trust received funds from Windsor to pay for the policy but does not recall how funds were received or sent to the insurance company for payment of the policy. [*Id.* at 81:6-82:3.]

18, 2010 (para 28). In its summary judgment briefing, Windsor noted up front in footnote 3 that "This motion does not address whether the Insurance Trust voluntarily assigned the death benefit to Windsor pre-default, but Windsor does not waive…" Similarly, in its reply brief, Windsor noted that its motion was premised on the argument that a default occurred for purposes of the motion, since Windsor believed it could prevail as a matter of law even if the Trust's default argument were accepted.[16]

## III.   Argument and Citation of Authority

### A.   A fact issue exists whether a pre-default walk-away agreement was reached

The facts speak for themselves. As the admissions by Houchins, Coppock, Barnes, Mindy Goss and Maria Gordillo already show, evidence already obtained in this case and that would be developed further if discovery is allowed to continue manifestly shows that a pre-default voluntary walk-away occurred or, at a minimum, that a fact question regarding whether a mutual walk-away as agreed to exists.

Despite Affidavits from Houchins and the Trustee stating that they never discussed the concept of a walk-away with each other or with Mr. Prusky, a reasonable jury could certainly conclude that credible evidence shows otherwise. According to admissions in the arbitration, Houchins discussed the option to walk-away with Messrs. Barnes and Bitter. Mr. Coppock's deposition in this case shows that he discussed the walk-away option with Houchins. Indeed, before the bathroom break with Trust Counsel, Mr. Coppock explained that he understood his Trust would relinquish all rights and Windsor would relinquish all rights to go after the Trust for any liabilities. There is recorded evidence that Mr. Prusky told Houchins Sr. that Prusky had discussed the option to walk away in lieu of paying the loan with another insured, when the insured was trying to decide whether to keep the policy and that Houchins Sr. gave no indication that this was news to him. As to the voluntary nature of trustees executing COOs, Mr. Prusky's response to Mr. Houchins in January 2010 about various matters noted that Windsor was

---

[16] Windsor also refers the Court to the declaratory judgment complaints in *Coppock* and *Stamatov* that were pending prior to the Answers being filed in this case and the *Acker* case. The three alternative theories of voluntary transfer, right to policy if a default occurred, and 9620 compliance if applicable were expressly pled. Trust Counsel represents the trustees in *Coppock* and *Stamatov* and was familiar with all of the facts and issues plead in those cases; the voluntary transfer issue was manifestly not concocted by Windsor after the Court's denial of its motion for summary judgment.

willing to work with any of the insureds and that they could wait to sign the COO until the loans matured if they wanted to. Mr. Prusky's letter to Mark Goss in February 2010 also references that the choice to sign over the policy was voluntarily made by Mr. Goss and Windsor's counsel's email in November 2009 following up his discussion with Houchins Sr. asks Houchins to talk to the trustees and let him and Windsor know what the trustees wanted to do.[17]

The Affidavit of Mr. Houchins, who is biased and likely afraid of liability from ever trust if it does not receive any portion of the death benefits now payable, cannot eliminate the existence of a fact issue even though he swears he did not have these conversations. The same is true of Mr. Goss' testimony. Mr. Goss, who has already pled guilty of a crime of moral turpitude, is biased and is likely operating under a conflict of interest. In contrast to their statements, their past conduct speaks volumes. At a minimum, fact issues exist.

**B.    The fact issue regarding whether a walk-away was agreed to is a material fact that precludes summary judgment because the agreement, if proven, is enforceable**

The existence of this genuine issue of a material fact precludes summary judgment. If the jury agrees that the parties agreed to a mutual walk-away, the agreement is enforceable.

**1.    California Commercial Code §9620 does not apply to pre-default agreements**

The Trust suggests that the Court already decided in its Order denying Windsor's Motion for Summary Judgment that Section 9620 applies to a pre-default agreement and requires a writing signed after default. [See Trust's Motion at 10-11.] This is neither accurate nor logical. Commercial Code section 9601 provides that <u>after default</u> the secured party has the rights "in this chapter" (which includes section 9620). Consequently, it is clear that section 9620 does not apply to conduct during the pre-default period.

While the Court did determine that a debtor could not be required to give its consent in advance of a default to relinquish its collateral completely if a default occurs, the Court did not hold that Section 9620's requirements apply to agreements reached by debtors voluntarily, before default, in order to avoid

---

[17] It is reasonable that a jury could conclude that Houchins had similar conversations with all of his clients. Moreover, if Barnes did not believe that he had agreed on behalf of the Bitter Trust to walk away and relinquish all rights under the policy, why would he have been angry and threatened to sue Houchins?

1    defaults in the first place. [*Id.*] Nor would it be logical to impose a post-default requirement to a situation

2    in which a default never occurs. Pre-default, a debtor is making a voluntary decision to walk-away. Up

3    until the time of default, the debtor can pay off its loan, sell the policy for a profit, if obtainable, and pay

4    off the loan or sell the policy at a loss, much like a short-sale, if the lender consents. Once a debtor has

5    defaulted, however, choices are limited because, absent a post-default agreement as allowed by Section

6    9620, the debtor's collateral will be involuntarily taken away. The instant case involves a mutual walk-

7    away pre-default, to which 9620 does not apply.[18]

8            **2.      The provision in the Premium Financing Agreement that it may be modified
9            only be a written agreement signed by all parties does not render the walk-away unenforceable**

10           Citing *Marani v. Jackson*, 183 Cal. App.3d 695, 704 (1986), the Trust next contends it is "black-

11   letter law that where, as here, a contract expressly requires any waiver or modification of rights thereunder

12   to be in writing, attempts to effect such waiver or modification orally will be deemed a nullity." [Trust's

13   Motion at 12.] The Trust is wrong, as the two other cases the Trust cited demonstrate. Indeed, the issue

14   was squarely addressed in *Davidson v. ConocoPhillips Company*, 2009 WL 2136536, *4 (N.D. Cal. July

15   10, 2009) and *Conley v. Matthews*, 56 Cal. App. 4th 1453 (1997), which both show that there are

16   circumstances (such as those in the instant case) in which a contract containing a written modification

17   only provision can be modified orally.

18           In *Davidson*, Magistrate Judge Zimmerman's explained, "I begin with the issue whether an oral

19   _____

20   [18] *Isaac v. Waste Management Collection and Recycling, Inc.,* 134 Cal. App. 4th 1076, 1083 (2005), is
     inapposite. It deals with the concept of eliminating part of the requirements of Section 9620, when
21   Section 9620 applies. It does not stand for the proposition that Section 9620 applies to a mutual walk-
     away entered into before default, as a result of which, the loan at issue never went into default. Further,
22   *Triple A Management Co., Inc. v. Frisone* 69 Cal.App.4th 520 (1999) is not directly on point but may be
     instructive in showing that UCC sections 9601 sections 9601 et seq. applies only to the disposition of
23   collateral after default. *Triple A* analyzed the history of the UCC as applied to the right of a secured
     party to sell, compromise, or otherwise discharge the a pledged debt, or the security therefor, and
24   recognized that adoption of the "UCC affirmatively changed the law regarding postdefault sale or
     disposition of pledged instruments…" but recognized that it did not address the relationship between the
25   pledgor and pledgee prior to any default by the pledgor. [*Id.* at 540-542.] The Court concluded that "the
     common law restriction on predefault sale [citation] of a pledged debt instrument continues to govern
26   California security transactions [and] held, in the absence of an agreement between [the secured party]
     and [the debtor] to the contrary, [the secured party] did not have the right unilaterally to sell, release or
27   subordinate the [pledged instrument]." [*Id.* at 542.] This is supported by the Commercial Code itself,
     where Section 9620 falls under Chapter 6 of Division 9 of the Commercial Code, dealing with
28   "Default."

WINDSOR SECURITIES, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

modification of a written agreement is allowable in the face of a provision requiring that any modification be in writing and signed by both parties." *Davidson v. ConocoPhillips Co.,* 2009 WL 2136535 at*2.  The issue, the Court noted, is governed by Sections 1698 of the California Civil Code, which provide that oral amendments can be effective, even in the face of a requirement that all changes be in writing. [*Id.*] The Court then went on to discuss Subsections (b) and (d) as authority for why an oral amendment can be effective.

Subsection (b), the Court said, "allows modification of a written contract by an oral agreement to the extent the oral agreement is executed. ***This is true regardless of whether the written agreement contains a clause expressly prohibiting oral modification***." [*Id.* at *3,citing *Miller v. Brown*, 136 Cal. App. 2d. 763, 775 (1995)(emphasis added).] Although subsection (c) of this Code section may prevent enforcement of an executory oral modification by providing that modifications must be in writing, "[s]uch a provision would not apply to an oral modification valid under subsection (b)."[19] [*Id.*]

In addition, "[u]nder the plain language of subdivision (d) of section 1698, a modification of a written contract may result when a party to that contract has waived one or more of the contract provisions." [*Id.* at *4.] The Court also recognized that other doctrines referenced in subsection (d) would provide authority for an oral modification agreement to be enforceable, even in the face of an express written amendment only provision in the parties' contract. Subsection (d) lists no less than five additional methods by which an agreement can be effectively modified orally: "[n]othing in this section precludes in an appropriate case the application of rules of law concerning estoppel, oral novation and substitution of a new agreement, rescission of a written contract by an oral agreement, waiver of a provision of a written

---

[19] Law Revision Code Comments state: "The introductory clause of subdivision (c) recognizes that the parties may prevent enforcement of executory oral modifications by providing in the written contract that it may only be modified in writing. [See Com. Code § 2209(2) for a comparable requirement.] Such a provision would not apply to an oral modification valid under subdivision (b). Many cases follow the code comment interpretation of subsection (b). [*See,e.g*, *Fanucchi & Limi Farms v. United Agri Products*, 414 F. 2d 1075, 1080-1081 (9th Cir. 2005); *Epresence, Inc. v. Evolve Software, Inc*. 190 F. Supp 159, 164 (D. Mass 2002)(discussing California law); *MacIsaac and Menke. Co.*, 193 Cal App 2d 661, 670 (1961).] An executory agreement is one that is yet to be performed. By contrast, an executed, enforceable oral agreement within the meaning of subdivision (b) is one that has been fully performed. [*Fanucchi*, 414 F. 2d at1080-1081; *Lockheed Missiles & Space Co. v. Gilmore Indus.,* 135Cal.App.3d 556, 559 (Ct.App. 1982).]

contract, or oral independent collateral contracts."[20]

In *Conley*, the California appellate court similarly relied on subsections (b) and on the estoppel doctrine referenced in subsection (d) to find that an oral agreement modifying a written contract was enforceable, despite a written amendment only provision. After citing *Marani*, the court explained that proof of an oral agreement is not barred by the parol evidence rule because the oral agreement had been executed. For the same reason, the Court noted, "the provision in the escrow instructions precluding second trust deeds is deemed stricken from those agreements." [*Conley v. Matthews*, 56 Cal. App. 4th 1453, 1466 (1997).] The Court went on to state that, "[w]hether or not the escrow instructions contains a clause precluding modifications except by a writing, by accepting the benefits of the modification, [the plaintiff] is estopped from arguing it is barred by the parol evidence rule. [*Id*.]

The mutual walk-away agreement in the case at bar is similarly enforceable, despite a writing-only amendment provision. The walk-away agreement was entered into, fully performed, and detrimentally relied upon by Windsor, thus making it admissible under both subsections (b) and (d) of Section 1698. The walk-away involved the Trust transferring ownership of the policy before default to Windsor, which the undisputed evidence shows was done, and the Trust forgiving the Trust of any of its liabilities. The evidence shows, or a jury could certainly find, that this is exactly what happened. Everyone walked away and the Trust never looked back. Even if Houchins claims he paid attention to whether the premiums were still being paid in case the Trust needed to pay a premium if Windsor chose not to in order to keep the policy in effect, a fact issue would exist on the walk-away agreement. And Remember this is the same Houchins who declared in the present motions that he had no legal standing/agency for the trust.

Windsor never sent a notice of default related to the trust failing to pay at maturity, as it had done in the Barnes/Bitter case, and Windsor never sued the Trust for non-payment. And neither the Trustee nor Houchins called Windsor in the four years since the COO was executed to talk about the policy status. In

---

[20] *See also Wade v. Markwell & Co.*, 118 Cal.App.2d 410, 420-421 (1953) (estoppel); *Pearsall v. Henry*, 153 Cal. 314 (1908) (oral novation and substitution of a new agreement); *Treadwell v. Nickel*, 194 Cal. 243, 258-259 (1924) (rescission of a written contract by an oral agreement); *Bardeen v. Commander Oil Co.*, 40 Cal.App.2d 341 (1940); *Weeshoff Constr. Co. v. Los Angeles County Flood Control Dist.*, 88 CalApp3d 579, 589 (Ct.App. 1979) (waiver of a provision of a written contract); *Lacy Mfg. Co. v. Gold Crown Mining Co.*, 52 Cal.App.2d 568, 577-578 (1942) (oral independent collateral contract).

the *Acker* case, the Trustee even knew for three months that Mr. Acker had died but yet never inquired about the death benefit or made a claim until after Windsor sent a letter that led Mr. Goss to tell Mrs. Goss to talk to Mr Houchins who referred them to Mr. Wood. This is true even though Mr. and Mrs. Goss were themselves in the insurance business.

The Trust should also be estopped from denying the walk-away. As Mr. Prusky's declaration shows, Windsor elected to continue to pay premiums beyond when it was required to, on the understanding that it was the sole beneficiary of the policy and that if it chose to keep the policy in effect, only Windsor would receive the benefit of such investment decision. Windsor is in the investment business and strives to produce a return far in excess of the interest that the Promissory Note would have allowed it. Had Windsor expected that, despite laying out hundreds of thousands of dollars, it would only produce a 15% return at best, while accepting the risk that the significant premiums could exceed the death benefit if the insured lived longer than expected, Windsor would have strongly considered selling the policy on the secondary market. [Prusky Decl. ¶¶ 12-14.]

Whether as a fully executed oral agreement under subsection (b) or on the basis of estoppel or another available doctrine under subsection (d), the mutual walk-away agreement is enforceable and is not precluded by the written amendment provision only, as the Trust contends.

**3.    The Trust's having informed Windsor, directly or through Houchins, that it did not intend to pay off the Loan or pay future premium payments does not negate that a voluntary walk-away agreement was reached or render the agreement to have been made post-default**

The Trust's argument that the COO was signed post-default, despite the COO's having being signed months before the maturity date, is wrong. Even if the Trustee, through Houchins, told Windsor the Trust would not be paying off the loan, the Loan was not in default status and was not put in default. As the evidence shows, Windsor did not send a notice of default or otherwise prevent the Trust from changing its mind prior to the maturity date it it wanted to. If the Trust argues otherwise, at a minimum, there is a fact question on this issue.

Under California law, a breach of contract cannot occur until the time specified for performance has arrived. [*Taylor v. Johnston*, 15 Cal.3d 130, 137 (1975).] While it is true that a party's unequivocal refusal to perform prior to the time of performance, as opposed to making a threat to not perform, can

constitute a repudiation, an anticipatory breach does not put the party automatically in default status. Instead, an anticipatory breach simply gives the non-breaching party an election of remedies, one of which is to terminate the contract and immediately sue for damages. [*Buck v. Kleiber Motor Co., 97 F.2d 557* (9th Cir. 1938)(suit for anticipatory breach is at option of other party); *see also Taylor* at 37; *Thornton v. Victor Meat Co.* 260 Cal.App.2d 452, 476 (1968); *Gherman v. Colburn,* 72 Cal.App.3d 544, 564 (1977)(repudiation means the "rejection; disclaimer; renunciation" of a contractual duty or obligation to be performed).] The non-breaching party also has the option to wait until the time for performance arrives and exercise his remedies for actual breach then, if and when it does occur. In addition, the non-breaching party has the option to "attempt to resolve the issues surrounding the repudiation." [*See Central Valley General Hosp. v. Smith,*162 Cal.App.4th 501, 518-519 (2008).]

Whether an anticipatory breach occurred is typically a fact question for the jury to decide. [*Pacific Coast Engineering Co. v. Merritt-Chapman & Scott Corp.* 411 F.2d 889, 894 (9th Cir. 1969); *Arlington LF, LLC v. Arlington Hospitality, Inc.* 637 F.3d 706, 713;  (7th Cir. 2011); *Gold Mining & Water Co. v. Swinerton* 23 Cal.2d 19, 28 (1943).] Here, Windsor believes the evidence will show that Houchins discussed the options available to the trustee, one of which was letting the loan go into default, and another of which was to do a walk-away, whereby the Trust would be relieved of liabilities and Windsor would have all rights to the insurance policy. The trustees voluntarily chose the walk-away option. The loans did no go into default.

Even if there had been an unequivocal and anticipatory breach, the evidence is clear that Windsor did not send a notice of default, as it did in the *Barnes/Bitter* case. The evidence shows that Houchins discussed the option to transfer ownership with several clients. Windsor's counsel had even asked Houchins to talk to the trustees about their options and to please let them know what they wanted to do. A jury can infer that Houchins and the Trustee had these conversations too as Houchins did let Windsor know that the Acker and Collins trustees wanted to sign over the policies prior to the loans going into default. As Houchins himself testified, none of the four policies - Acker, Collins, Coppock and Stamatov - went into default. Further evidence that Windsor did not put the loans in default status or preclude the Trustees from timely paying the loan, despite hearing they planned not to, is Windsor's Mr. Prusky email to Houchins that trustees (including the Collins trustee), who apparently had indicated a desire to wait

1  longer before relinquishing the policies, could hold on to the policies as long as they liked until maturity
2  if they wanted to and that he was willing to work with any of them. The evidence shows that Windsor did
3  not cut off the Trust's ability to pay off the loan. Instead, Windor and the trustees voluntarily signed
4  official documents that transferred ownership, and Windsor paid money, again, to prevent the loan from
5  going into default prior to any default. The reality is that the Trust could have retained full ownership by
6  simply paying the premiums and loan when due. [*See Quinn v. Brown*, 561 F. 2d 795 (9th Cir.
7  1977)(party can correct after statement of anticipatory breach).]

8  Another reason the anticipatory breach argument fails is that, in California, there can be no
9  anticipatory repudiation of a unilateral contract:

> It is the general rule, recognized in [California], that the doctrine of breach by
> anticipatory repudiation does not apply to contracts which are unilateral in their
> inception or have become so by complete performance by one party. [Citations.]
> The theory underlying this rule is that since the plaintiff has no future obligations
> to perform, he is not prejudiced by having to wait for the arrival of the
> defendant's time for performance in order to sue for breach. [Citations.]

14  [*Diamond v. University of So. California*, 11 Cal.App.3d 49, 53 (1970).] In other words, if Windsor was
15  not obligated to make premium payments or take other actions at the time that the Trust signed over the
16  policy, the Trust's statement that it had no intention to pay off the loan would have no legal bearing and
17  would not have entitled Windsor to put the loan in default status, even if it had wanted to. According to
18  the Promissory Note, Windsor had the discretion but not the obligation to make additional premium
19  payments. By the time the COOs were signed, the contract was thus unilateral.[21]

20  Finally, regardless of whether the PFA was bilateral or unilateral and regardless of whether the
21  Trust conveyed that it did not intend to pay the loan when due, the evidence shows that Windsor did not
22  put the Loan into default. To the contrary, the evidence shows that the parties attempted to work things
23  out, as California allow gives the non-breaching party the option to do. Here, there is ample evidence that

---

[21] In *Diamond,* defendant-ticket seller's agreement to give each buyer of an economy season ticket the
option to purchase a Rose Bowl Ticket if the football team was selected to play there had become
unilateral after the plaintiff-buyers had paid the price for the season tickets; thus, the doctrine of breach
by anticipatory repudiation was not applicable, so an action by plaintiff-buyers instituted before
expiration of the defendant-ticket seller's time for performance, resulting from defendant-ticket seller's
refusal to perform on its promise, was premature and did not furnish a basis for a claim that defendant-
ticket seller's power to retract repudiation had terminated. [*Id.* at 53-54.]

WINDSOR SECURITIES, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

1    the parties agreed to a mutual walk-away rather than letting the loan go into default, or that there exists a

2    multitude facts that no default of anticipatory breach occurred. [*Taylor,* 15 Cal.3d at 137-38.]

3    **4.    The Trust is bound by the agreement it made, regardless of whether the Trust**

4    **spoke directly with Windsor, or through Houchins, the servicing agent**

5    **a.    Houchins was authorized to communicate information**

6    As Houchins and the Trustee's Affidavits show, Houchins was asked by the Trustee to convey

7    information to and from Windsor.[22] Thus, the Court need not reach the issue of whether Houchins was an

8    agent of the Trust or could bind the Trust due to actual or ostensible authority. If Houchins discussed the

9    walk-away option with the insured and/or trustee, and the Trust chose to sign over the policy per the COO

10   in conjunction with a walk-away, the fact that the agreement was communicated to or from Houchins on

11   behalf of the Trust does not render the agreement a nullity. The evidence shows, or at least a fact issue

12   exists, that the walk-away agreement was authorized by the Trustee, even if the Trustee did not speak

13   directly with Windsor. Just as evidence shows the Trustee relied on Houchins to communicate information

14   about how the policy worked and what the insured's wishes were, the record shows, by direct or

15   circumstantial evidence, that Houchins and the Trustee discussed the walk-away option and that the

16   Trustee agreed to it, knowing the Trust was giving up all rights to the policy and Windsor was giving up

17   all rights under the Loan. [Judd Decl. **Exh. 1**, at 577:6-14.][23]

18   **b.    The Trust was entitled to rely on communication from Houchins**

19   Relying on the Order Regarding Real Party in Interest in this case, the Trust contends that

20   Windsor could not rely on anything Houchins said because a trustee cannot delegate his power. This

21   argument is incorrect. While a trustee has a duty not to delegate to others the performance of acts that the

22   trustee can reasonably be required to perform personally. [Prob. Code, § 16012, subd. (a)], the duty not to

23   delegate administration of the trust does not, however, preclude employment of an agent in a proper case.

24   [Law Revision Commission Comments to California Prob. Code, § 16012] Certainly obtaining financing

25

26   ---
     [22] The Trustee and Houchins affidavits downplay Houchins role when they describe him as a middleman

27   and faciltator. Houchins was the servicing agent who represented the Trust and the insured. *See infra.*
     [23] Houchins testified he told the Bitter trustee about the walk-away option and the choice was the

28   trustee's to make.

and interaction with a lender is something a layperson (the trustee) could reasonably delegate to an expert agent such as Houchins. Further, California Probate Code section 16052 provides that a trustee may delegate investment and management functions as prudent under the circumstances. Consequently, Windsor's interaction with and reliance on Houchins regarding financing is not a non-delegable duty of the trustee. In any event, even if the trustee had improperly delegated, it does not obviate ostensible agency. Rather, the consequence is that the trustee is personally liable if he or she improperly delegates an act and that act would have been a breach of fiduciary duty if handled by the trustee. [Prob. Code, § 16401, subd. (b)(2)] Further, the Trust's incorrect no-delegation argument is also beside the point. Windsor does not contend that the Trustee here abdicated her role as was the issue in the Acker case when Mark Goss tried to unilaterally appoint Mindy Goss as trustee while he was in jail.

Windsor was entitled to rely on Houchins when he conveyed information on behalf of the Trust because the Trustee authorized the communication, as shown above, and because Houchins was in fact an agent of the Trust. Although the Trustee describes Houchins as a middleman and facilitator for the purpose of the single communication she admits she asked him to convey, the law is clear in California that an insurance broker who secures a policy for a client acts as its agent. [*Eddy v. Sharp,* 199 Cal App 3d 858, 865 (1988)(citing 3 Couch on Insurance (2d. ed. 1984) § 25:112, p. 477); *see also Carlton v. St. Paul Mercury Ins. Co.*, 30 Cal.App.4th 1450, 1457 (1994); *Certain Underwriters at Lloyd's of London v. American Safety Ins. Services, Inc.*, 702 F.Supp.2d 1169, 1172 (C.D. Cal. 2010).]

Houchins therefore had actual and/or ostensible authority to bind the Trust, even if the jury were to believe that the Trustee did not in fact ask Houchins to communicate specifically the Trustee's agreement to the walk-away, although the evidence (either directly in the case of Acker or by circumstantial evidence at least in the case of Collins) shows that the walk-away option was explained by Houchins and/or Houchins Sr. to their clients as part of Houchins's role as servicing agent and that the Trustee knew and wanted Houchins to serve as a conduit to communication information between the Trust and Windsor. On this record, Windsor was entitled under the law to rely on what Houchins communicated to Windsor on behalf of the Trust.

**5.    If 9620 applies, the June 2014 letter and the Trust's failure to respond within twenty days satisfies Section 9620**

After the *Barnes/Bitter* arbitration ruling in 2014, Windsor sent letters to trustees of four Trusts who had agreed to a mutual walk-away in 2010 to confirm what had transpired years earlier in an attempt to head off at the pass exactly what is happening now. As Mr. Coppock admitted, he did not bother to respond until Trust Counsel was engaged five months later because he thought the letter was accurate and had understood the Trust had been relieved of financial obligations in exchange for the Trust's having walked away from the policy. None of the other trustees responded either, until Trust Counsel was retained. Because Mr. Goss told Mrs. Goss to ask Houchins what to do with the 2014 letter, Trust Counsel was ultimately retained and Trust Counsel belatedly drafted a letter in July purporting to create a record of disagreement with the Windsor June 2014 letter. Regardless, it is undisputed that the response came more than twenty days after the letters were received. As a result, even if the facts as they existed in 2010 did not result in a mutual walk-away, as Windsor believes they do, the June 2014 letter and lack of timely response constitute a proposal and acceptance within the meaning of Section 9620(a)(2), thus mooting the issue. The is no dispute that the Trustee failed to respond to the proposal to accept the collateral as full satisfaction of the outstanding debt within the requisite 20 days of the June 2014 letter sent by Windsor.

### C. The voluntary transfer walk-away is not a new issue and should be allowed

Paragraph 18 of the Cross-Claim Of the Trust alleges that, after Windsor had loaned all premiums amounts it was required to under the Financing Agreement, the Trust informed Windsor that the Trust would not repay the loan when due and that the Trust thereby committed an anticipatory breach of and default under the Financing Agreement. In Windsor's answer to that paragraph, Windsor alleges:

> "Windsor admits that subsequent to Windsor's having loaned to the Trust all of the monies for premium payments that Windsor was required to provide under the Financing Agreement, the Trust informed Windsor that the Trust would not repay the loan when due. Windsor denies the remaining allegations contained in paragraph 18."

In other words, Windsor denied that the Trust committed an anticipatory breach of and default under the Financing Agreement.

The point being that pleading rules permit litigants to allege factually (or legally) inconsistent theories. [(FRCP 8(d)(3); *Molsbergen v. United States* (9th Cir. 1985) 757 F2d 1016, 1018.] To protect the right to plead inconsistently, inconsistent facts alleged cannot be used as an admission. [*Oki America, Inc. v. Microtech Int'l, Inc.*, 872 F2d 312, 314 (9th Cir. 1989).] Similarly, any inconsistent statements

1  made in the alternative in Windsor's motion for summary judgment are also not "formal, deliberate

2  declarations... that could reasonably be construed as judicial admissions." [Rutter Group Prac. Guide Fed.

3  Civ. Trials & Ev. Ch. 8D-B, §8:1115, citing *United States Energy Corp. v. Nukem, Inc.*, 400 F.3d 822,

4  833, fn. 4 (10th Cir. 2005).]

5        Further, the statement in Steven Prusky's declaration in support of Windsor's motion for

6  summary judgment that Windsor exercised the Default Sale provision in the Premium Financing

7  Agreement (which is really a legal conclusion)[24] presumes that there had in fact been an 'Event of

8  Default" under that provision. The Default Sale provision begins: Upon an occurrence of an Event of

9  Default (as defined in the Agreement) that has not been remedied within the time period required in the

10  Agreement, Assignee shall have the right (the 'Default Sale Right') . . ." The term "Event of Default" is

11  defined at paragraph 6.(a) of the Security Agreement of the Premium Financing Agreement. The Trust's

12  representation that it would not pay the amounts owed to Windsor when they became due (its self-

13  denominated anticipatory breach) is not an "Event of Default" under the Default Sale provision.

14  Therefore, despite the Trust's representation to the contrary, there was no default under the Default Sale

15  and the conduct which took place between Windsor and the Trust was pre-default.[25]

16        Windsor did not move for summary judgment or present evidence with its own Motion for

17  Summary Judgment on the theory of a voluntary transfer, or walk-away, because Windsor knew that the

18  Trusts would dispute that a walk-away agreement was reached and that a fact issue would preclude

19  summary judgment. Windsor believed, however, that Windsor was entitled to judgment as a matter of

20  law even if the loan had gone in default on the theory that the PFA gave Windsor the option to accept the

21  policy in exchange for forgiveness of the loan and that the release language found in the DSR, coupled

22  with the COO/Absolute Assignment satisfied Section 9620 even if it applied. The Court disagreed, ruling

23  that Section 9620 does not allow a defaulting debtor to waive the requirement that it indicate its consent

---

24

25  [24] Legal conclusions are not binding as judicial admissions. [*MacDonald v. General Motors Corp.*, 110 F.3d 337, 341 (6th Cir.).]
26  [25] Facts in Mr. Prusky's declaration may not contradict the allegation of his pleading. [*Rojas v. Roman Catholic Dioce*se *of Rochester*, 660 F3d 98, 105-106 (2d Cir. 2011).] Footnote 4 of Windsor's points
27  and authorities in support of its motion for summary judgment states: "This motion does not address whether the Insurance Trust voluntarily assigned the death benefits to Windsor pre-default, but Windsor
28  does not waive that issue."

WINDSOR SECURITIES, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION
FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

after default to the exchange in a writing signed by both parties that sets out both the transfer of the collateral and the forgiveness of the loan, without relying on the language in the DSR itself.

In presenting its Motion, Windsor stated, as it does here, that the Trusts told Windsor, through their servicing agent, Mr. Houchins, that they would not be paying back the Loan "when due." Windsor also argued that Windsor thus "elected to exercise the DSR." In doing so, however, Windsor noted expressly "This motion does not address whether the Insurance Trust voluntarily assigned the death benefits to Windsor pre-default, but Windsor does not waive that issue." [See Windsor's MSJ at 4, n3.] Similar reference to the voluntary transfer argument being preserved was made in the reply brief as well.

The Trusts now contend that Windsor has made up the voluntary transfer argument in response to the Court's Order denying its motion, as an afterthought in an attempt to try to get something else to resonate with the Court. This is not true. The fact of a walk-away, which included the intention for the Trust to be forgiven of its obligation to pay back the loan, was always part of the case. Windsor's point as that a mutual walk-away occurred and whether pre-default or post-default, Windsor indicated that it was willing to work with the Trust and allow it to tender the policy in exchange for loan forgiveness. Those are the facts. The legal argument on the original motion was that even if default had occurred, Windsor would win because the release that the Trust was arguing was needed in a post-default context was already provided for in the documents. The Court disagreed with Windsor that the release in the DSR, given in the PFA, could satisfy Section 9620's post-default writing requirement.

Windsor respectfully submits that the same facts underlie its opposition here to the Trust's motion. Windsor consented to the walk-away and a mutual walk-away occurred. The objective facts show that the walk-away was, in fact, pre-default, that Windsor never sent a notice of default and that Windsor and its counsel had both asked Houchins to relay information to the Trust about their options and that Windsor was willing to work with them and to report back what the Trust wanted to do.

Having argued that Windsor "elected to exercise the DSR" is akin to saying that Windsor consented to and allowed the mutual walk-away. Under Windsor's matter of law argument, the Trust's verbal consent was not needed or was already shown in any event by the giving of the COO (Collins) and Absolute Assignment (Acker), so that a fact issue if intent was disputed, as Windsor knew it would be, would not be a barrier to judgment. "Electing to exercise the DSR" is a legal conclusion; the underlying

1  facts showed that Windsor accepted the transfer of the collateral in lieu of the loan. The facts, developed

2  and briefed in response to a motion on the issue that was not previously pending, demonstrate that the

3  walk-away occurred prior to default, is an alternative arguments for why Windsor should win the case.

4  **IV.    Conclusion**

5        A fact issue exists as to whether a voluntary walk-away agreement occurred. The agreement, if

6  proven, would be enforceable, and Windsor should be allowed to present it to the jury. The Trusts'

7  Motions in both cases should be denied.

8                                          Respectfully submitted,

9  Dated: November 10, 2015              THOMPSON, WELCH, SOROKO & GILBERT, LLP

10                                         By:    /s/ Darin T. Judd
                                                 _____
11                                                Darin T. Judd
                                                 WINDSOR SECURITIES, LLC