# EXHIBIT 50

HENNEFER FINLEY & WOOD, LLP
JOSEPH WOOD [Calif. SBN 103596]
275 Battery Street, Suite 200
San Francisco, California 94111
Telephone: (415) 421-6100
Facsimile: (415) 421-1815
E-Mail: jwood@hennefer-wood.com; jhcwlaw@yahoo.com

Attorneys for Defendant and Cross-Claimant, Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust - 2008

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

PACIFIC LIFE INSURANCE COMPANY,

Plaintiff,

vs.

MARIA ANA GORDILLO AS TRUSTEE OF THE ERWIN A. COLLINS FAMILY INSURANCE TRUST - 2008; and WINDSOR SECURITIES, LLC,

Defendants.
_______________________________________/

AND RELATED CROSS-ACTION.
_______________________________________/

Civil Action No. 3:14-cv-03713-WHO

**MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

Date: August 12, 2015
Time: 2:00 p.m.
Courtroom 2, 17th Floor
Hon. William H. Orrick

CaseCase 3:14-cv-03713-WHO Document 38 Filed 07/29/15 Page 2 of 29 of 30

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| TABLE OF AUTHORITIES | | ii |
| I. | INTRODUCTION | 1 |
| II. | WINDSOR'S ALTERNATIVE MOTION FOR PARTIAL SUMMARY JUDGMENT IS IMPROPER | 2 |
| III. | OBJECTIONS TO PURPORTED EVIDENCE SUBMITTED BY WINDSOR | 3 |
| IV. | THE TYPICAL LIFE INSURANCE PREMIUM FINANCING AGREEMENT | 4 |
| V. | THE FINANCING AGREEMENT | 10 |
| VI. | THE FINANCING AGREEMENT IS TYPICAL OF THE LIFE INSURANCE PREMIUM FINANCING AGREEMENTS USED IN THE INDUSTRY | 16 |
| VII. | MATERIAL FACTS BEFORE THE COURT | 16 |
| VIII. | THE OPINION OF WINDSOR'S EXPERT HAS NO BASIS IN FACT OR LOGIC | 22 |
| IX. | WINDSOR'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED BOTH ON STATUTORY GROUNDS AND BECAUSE THERE REMAIN TRIABLE ISSUES OF MATERIAL FACT | 25 |

**MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**
***Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust - 2008 et al., and Related Cross-Action***

**Civil Action No. 3:14-cv-03713-WHO** i

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Atel Financial Corporation v. Quaker Coal Company*
321 F.3d 924 (9th Cir. 2003) 3

*Crow Tribe of Indians v. Racicot*
87 F.3d 1039 (9th Cir. 1996) 3

*Edwards v. Arthur Andersen LLP*
44 Cal. 4th 937 (2008) 9

*McSherry v. City of Long Beach*
584 F.3d 1129 (9th Cir. 2009) 25

*Norse v. City of Santa Cruz*
629 F.3d 966 (9th Cir. 2010) 3

**Statutes**

California Commercial Code § 1302(a) 8

California Commercial Code § 9602 8, 15-16, 25

California Commercial Code § 9620 8, 14-15, 24, 25

Federal Rules of Civil Procedure, Rule 56(a) 3, 25

Georgia Code Annotated, § 11-1-102 8

Georgia Code Annotated, § 11-9-602 8

Georgia Code Annotated, § 11-9-620 8

**MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**
***Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust - 2008 et al., and Related Cross-Action***
**Civil Action No. 3:14-cv-03713-WHO** ii

Defendant and Cross-Claimant, Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust - 2008 ["Gordillo" or "the Trust"], respectfully submits the following memorandum in opposition to the motion for summary judgment, or, in the alternative, summary adjudication, filed herein by defendant and cross-defendant, Windsor Securities, LLC ["Windsor"].

## I. INTRODUCTION.

This case presents the Court with a relatively straightforward secured transaction - a "life insurance premium finance agreement" - in which the lender, not satisfied with a return on its investment in excess of ten percent plus reasonable expenses, wants to deprive the borrower - whose willingness to enter into the transaction created and provided the collateral that made that return possible - of the portion of the collateral that will remain after the lender has been paid everything it is owed. Neither the language of the agreement between the parties, nor the language of California statutes made a part of the agreement by operation of law, will allow that to happen.

The prize in this case is a life insurance policy with a two million dollar death benefit. The lender - Windsor - paid the premiums on the policy pursuant to a recourse loan agreement with the borrower - the Trust - that was secured by the policy. The Trust defaulted on the loan and Gordillo dutifully signed the paperwork she was contractually required to sign so that Windsor could do what all secured lenders do in that situation, namely, take title to the collateral and either: (a) sell it, retain from the proceeds of sale what Windsor was owed, and provide any excess to the Trust; or (b) hold onto it until the insured had passed away, collect the death benefit, retain from the death benefit whatever Windsor was owed, and again provide any excess to the Trust.

The reason we are here, despite the apparent simplicity of the transaction, is this: under the language of the agreement between the parties and controlling California statutes, the parties had the right, post-default, to enter into an agreement - referred to as "exercising the Default Sale Right" - by which the Trust could give up its right to any portion of the proceeds of sale or of the death benefit <u>in return for an express agreement by Windsor to relieve the Trust from any</u>

**MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**
***Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust - 2008 et al., and Related Cross-Action***
**Civil Action No. 3:14-cv-03713-WHO** 1

continuing liability on the loan.  It is undisputed that no such agreement was ever offered,
discussed, or consummated.  Windsor nevertheless claims that the parties exercised the Default
Sale Right.  That claim is based on the flimsiest of reeds, namely, the title of the insurance
company form document that Gordillo had to sign so that Windsor could exercise its options as a
secured lender, described above.  The document in question was called an "Ownership, Name, Or
Beneficiary Change Request."  Windsor essentially asks the Court to find that those words are so
plainly indicative of an intent by the Trust to abandon all its rights, and of an intent by Windsor to
relieve the Trust from any continuing obligation on the loan, that the statutory requirement of an
express agreement to that effect can safely be ignored.  This cannot be the law, and Windsor's
motion should be denied.

## II.  WINDSOR'S ALTERNATIVE MOTION FOR PARTIAL SUMMARY JUDGMENT IS IMPROPER.

As an alternative to its motion for summary judgment, Windsor has moved the Court for a
"partial summary judgment" that Windsor "is entitled to recover from the DB [death benefit] a
sum equal to the amounts Windsor has loaned to the insurance trust, plus legal interest thereon."
(Windsor Securities, LLC's Notice Of Motion And Motion For Summary Judgment, Or, In the
Alternative, For Partial Summary Judgment, Court's File, Doc. 31, p. 2 of 2 [internal reference:
2:5-8].)  The motion is specious, for two simple reasons:  (a) Windsor has made no claim for such
relief in this action (Answer Of Windsor Securities, LLC To Crossclaim Of Maria Ana Gordillo
As Trustee Of The Erwin A. Collins Family Insurance Trust - 2008, Court's File, Doc. 21, pp. 4-5
of 7 [internal reference: generally, and 4:25-27, 5:7-9]; and (b) the Trust has affirmatively alleged,
in its cross-claim for declaratory relief herein, that Windsor should recover from the death benefit
the amounts Windsor has loaned to the insurance trust, plus legal interest thereon (Answer And
Cross-Claim Of Maria Ana Gordillo As Trustee Of The Erwin A. Collins Family Insurance Trust
- 2008, Court's File, Doc. 16, p. 10 of 12 [internal reference: 8:22-9:7; 9:18-27]).

Windsor's entitlement to recover what it loaned, plus interest, is not the subject of a claim,
is not at issue in this action, and should not become the subject of a "summary judgment" - partial
or otherwise - on the basis of which, one can only surmise, Windsor will later seek to collect

attorney's fees as the "prevailing party." The motion should be summarily denied. Federal Rules Of Civil Procedure, Rule 56(a) (motion for summary judgment or partial summary judgment pertains only to "claim" or "defense").

**III. OBJECTIONS TO PURPORTED EVIDENCE SUBMITTED BY WINDSOR.**

The Trust respectfully lodges the following objections to portions of the Declaration Of Karen H. Canoff In Support Of Windsor Securities, LLC's Motion or Summary Judgment, Or, In The Alternative Partial Summary Judgment ["Canoff Decl."] on file herein), and moves that all such purported evidence be excluded and/or ignored by the Court in ruling on the motion. *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010).

1. Purported Evidence:

> By its terms, the DSR provides for the satisfaction and thus release of the Insurance Trust's financial obligations automatically upon acceptance by Windsor of the change of ownership tendered by the Insurance Trust.
>
> (Canoff Decl., Court's File, pp. 10-11 of 55 [internal reference: 10:27-11:2].)

Objection:

> Improper expert testimony. *Atel Financial Corporation v. Quaker Oil Company*, 321 F.3d 924, 925-926 (9th Cir. 2003) (interpretation of contract language is a question of law); *Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996) (interpretation of a contract is an issue of law; expert testimony is not proper for issues of law).

2. Purported Evidence:

> . . . upon execution of the Pacific Life Ownership, Name, or Beneficiary Change Request form . . . the trustee initiated the DSR process by signing such change of ownership form for delivery to Windsor.
>
> (Canoff Decl., Court's File, p. 11 of 55 [internal reference: 11:4-7].)

Objection:

> Same.

3.  Purported Evidence:

By countersigning the Ownership, Name, or Beneficiary Change Request . . . and forwarding it to Pacific Life . . . Windsor effectively accepted the Insurance Trust's transfer of the policy pursuant the terms of the DSR clause.

(Canoff Decl., Court's File, Doc. 31-4, p. 11 of 55 [internal reference: 11:9-13].)

Objection:

Same.

4.  Purported Evidence:

Conversely, the Change of Ownership form set forth in Exhibit G is used to effect a complete transfer of title and all ownership rights and beneficial interests in the policy which, consistent with the provisions of the DSR, the Insurance Trust did by executing the Change of Ownership on May 11, 2010. Once Pacific Life processed the change and recorded Windsor as the new owner of the policy . . . the DSR process was completed. This satisfied and discharged all of the Insurance Trust's obligations under the loan, and also effected a full and complete transfer to Windsor of and [*sic*] all rights, title, and beneficial interests in the Policy. At that point in time, the Insurance Trust would have no further claim to, rights under, or obligations with respect to the Policy.

(Canoff Decl., Court's File, Doc. 31-4, p. 12 of 55 [internal reference: 12:7-17].)

Objection:

Same.

## IV. THE TYPICAL LIFE INSURANCE PREMIUM FINANCING AGREEMENT.

While there may of course be some variation among particular life insurance premium financing agreements, it is nevertheless possible accurately to identify a number of provisions that are standard or typical in such agreements across the industry, as follows:

(A)  Life insurance premium financing agreements typically comprise a number of documents, all of which are deemed to comprise a single agreement, and all of which are either signed or approved not only by the borrower - typically, as noted above, a life insurance trust - but

also by the insured and by the beneficiary of the trust. (Expert Witness Declaration Of James H. Sinnott Submitted In Opposition To Motion For Summary Judgment ["Sinnott Decl."], filed herewith, 10:13-19.)

(B) Life insurance premium financing agreements typically provide that all aspects of the agreement are governed by the law of a particular jurisdiction. (Sinnott Decl., 10:20-21.)

(C) Life insurance premium financing agreements typically provide that all notices from the lender to the remaining parties to the agreement must be in writing addressed directly to the parties. (Sinnott Decl., 10:22-24.)

(D) Life insurance premium financing agreements typically provide that the lender is obligated to loan to the trust an amount covering a loan initiation fee and approximately two years of premiums on the life insurance policy purchased by the trust. (Sinnott Decl., 10:25-27.)

(E) Life insurance premium financing agreements typically provide that the trust is obligated to repay the amount financed/loaned, plus interest thereon, at the end of approximately twenty-seven months. (Sinnott Decl., 11:1-3.)

(F) Life insurance premium financing agreements typically provide that the life insurance policy purchased by the trust is collateral for the loan. (Sinnott Decl., 11:4-5.)

(G) Life insurance premium financing agreements typically provide that, in the event of a default on the loan by the trust, the lender has the right to proceed directly against the trust for repayment of the amounts owed to the lender whether or not the lender chooses to proceed against the policy collateral, *i.e.*, that the loan is, in the language of the industry, a "recourse" loan as to the trust.[1] (Sinnott Decl., 11:6-10.)

(H) Life insurance premium financing agreements typically provide that, in the event of a default on the loan by the trust, the trust is required to execute certain insurance company form documents - typically entitled "change of ownership," "absolute assignment," "assignment/change

---

[1] By contrast, life insurance premium financing agreements typically provide that, in the event of default on the loan by the trust, the lender, in the absence of fraud, cannot directly seek repayment from the insured - *i.e.*, that the loan is "non-recourse" as to <u>that</u> party.

of ownership," "change of beneficiary," or the like - that will allow the lender, subject to the lender's continuing obligations to the trust under the life insurance premium financing agreement, to take title to, and beneficiary status under, the policy.  Those documents are needed by the lender - again, subject to the lender's continuing obligations to the trust under the life insurance premium financing agreement - in order for the lender either to sell the policy at a public or private sale or to collect the death benefit from the insurer upon the death of the insured.  (Sinnott Decl., 11:11-19.)

(I)      Life insurance premium financing agreements typically provide that, following default by the trust and execution by the trust of the above-mentioned documents transferring title and beneficiary status under the policy, the lender, subject to the lender's continuing obligations to the trust under the life insurance premium financing agreement, has the following options:

(i)      The lender can allow the policy to lapse, in which case neither the lender nor the trust would obtain any financial benefit from the policy and the trust would remain liable to the lender for the full amount of the loan plus interest thereon, plus reasonable expenses incurred in connection with the loan.

(ii)      Assuming the policy had not been allowed to lapse, the lender, prior to the death of the insured and pursuant to the lender's status as secured lender/title holder:

(a)      can sell the policy at a public or private sale, at which sale the trust would be allowed to bid;[2]

(b)      can take from the proceeds of the sale the amount it had loaned to the trust, plus interest thereon, plus its reasonable costs incurred in connection with the sale; and

(c)      is required to provide any excess proceeds to the trust; or

(d)      should the proceeds be insufficient to cover what the lender is owed, can proceed directly against the trust to recover the deficiency.

(iii)      Again assuming the policy had not been allowed to lapse, and that no sale

---

[2]  Life insurance premium financing agreements typically provide that the lender is not required to hold any such sale.

had been held, the lender, following the death of the insured and pursuant to the lender's status as beneficiary:

(a) can collect the death benefit from the insurance company;

(b) can take from the death benefit the amount it had loaned to the trust, plus interest thereon, plus its reasonable costs incurred in connection with collecting the death benefit; and

(c) unless the parties had exercised what is typically called the "Default Sale Right" - discussed further below - the lender is required to provide the remaining portion of the death benefit to the trust; or

(d) if the parties had exercised the "Default Sale Right," the trust would have no continuing obligation on the loan and the lender could retain the entirety of the death benefit. (Sinnott Decl., 11:20-13:1.)

(J) It is understood in the industry that in order to exercise the "Default Sale Right" or similar provision typically included in life insurance premium financing agreements, the lender and the trust, following a trust's default on the loan and the lender's assumption of ownership and beneficiary status pursuant to that default, must enter into an express agreement, either written or oral but in any case authenticated by a writing, under which the trust, in return for the lender's express agreement to relieve the trust from any continuing obligation on the loan, agrees to relieve the lender from its obligation to provide the trust with either: (i) the portion of the proceeds of a public or private sale of the policy remaining after the lender has been paid what it is owed (*viz.*, the amount of the loan, plus interest, plus reasonable costs of sale); or (ii) the portion of the proceeds of the death benefit remaining after the lender has been paid what it is owed (*viz.*, the amount of the loan, plus interest, plus reasonable costs of collecting the death benefit from the insurer). It is further understood in the industry that any such agreement must involve an express offer by one party and an express acceptance of that offer by the other. (Sinnott Decl., 13:2-14.)

(K) It is further understood in the industry that exercise of the "Default Sale Right" provides the sole mechanism whereby a lender can avoid its ongoing obligations, following a trust's default on the loan and the lender's assumption of ownership and beneficiary status

pursuant to that default, to provide the trust with either: (i) the portion of the proceeds of a public or private sale of the policy remaining after the lender has been paid what it is owed (*viz.*, the amount of the loan, plus interest, plus reasonable costs of sale); or (ii) the portion of the proceeds of the death benefit remaining after the lender has been paid what it is owed (*viz.*, the amount of the loan, plus interest, plus reasonable costs of collecting the death benefit from the insurer). To put this another way, it is understood in the industry that unless the parties clearly exercise the "Default Sale Right," the trust cannot be deemed, following default and transfer of ownership and beneficiary status to the lender, to have given up its right to collect from the lender either: (i) the portion of the proceeds of a public or private sale of the policy remaining after the lender has been paid what it is owed; or (ii) the portion of the proceeds of the death benefit remaining after the lender has been paid what it is owed. Protection of this right of the trust - and of borrowers in secured transactions generally - is so important that the Uniform Commercial Code has not only clarified and supplemented the language of a typical "Default Sale Right" provision by statute (*see*, *e.g.*, California Commercial Code § 9620; Ga. Code Ann., § 11-9-620), but has also rendered a nullity any attempt by the parties to waive, vary, or otherwise avoid the rights created by that statute through agreement. Thus, California Commercial Code § 9602 provides, in relevant part:

> Except as otherwise provided in Section 9624, to the extent that they give rights to a debtor or obligor and impose duties on a secured party, the debtor or obligor may not waive or vary the rules stated in the following listed sections: . . . .
>
> (5) Subdivision (a) of Section 9608 and subdivision (d) of Section 9615 to the extent that they require accounting for or payment of surplus proceeds of collateral. . . . . (10) Section 9620, 9621, and 9622, which deal with acceptance of collateral in acceptance of obligation. [Emphasis added.]

*See also* Ga. Code Ann., § 11-9-602 (same).[3]

---

[3] For additional clarification of the fact that California Commercial Code § 9602 and comparable statutes in other states render a nullity any attempt by the parties to avoid the rights created by California Commercial Code § 9620 and comparable statutes through agreement, *see* California Commercial Code § 1302 (a) ("Except as otherwise provided in subdivision (b) or elsewhere in this code, the effect of the provisions of this code may be varied by agreement. . . . .") [emphasis added]; Ga. Code Ann., §11-1-102,

(Sinnott Decl., 13:15-14:14.)

In California, the language of these statutes is deemed, as a matter of law, to be incorporated into any contracts to which they apply, *viz.*, secured transactions like the one at issue here. As the California Supreme Court has held:

> "'[A]ll applicable laws in existence when an agreement is made, which laws the parties are presumed to know and to have had in mind, necessarily enter into the contract and form a part of it, without any stipulation to that effect, as if they were expressly referred to and incorporated.' [Citation omitted.]"

*Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 954 (2008).

(Sinnott Decl., 8:3-26.)

(L) Finally, it is understood in the industry that the rigorous statutory criteria for exercise of the "Default Sale Right," described above, are made necessary in part by the potential ambiguities created by the titles of the documents the trust is required to execute upon default, *viz.*, "change of ownership," "absolute assignment," "assignment/change of ownership," "change of beneficiary," and the like. As noted above, those documents: (i) are understood in the industry simply to allow the lender, subject to the lender's continuing obligations to the trust under the life insurance premium financing agreement, to take title to, and beneficiary status under, the policy; and (ii) are understood in the industry simply to be needed by the lender - again, subject to the lender's continuing obligations to the trust under the life insurance premium financing agreement - in order for the lender either to sell the policy at a public or private sale or to collect the death benefit from the insurer upon the death of the insured. Predictably, however, some lenders have sought (incorrectly) to argue that the titles of those document necessarily suggest an intention by the trust, in executing the documents, to waive the trust's continuing rights to any portion of the proceeds of sale or proceeds of the death benefit remaining after the lender has been paid what it is owed. In the understanding of the industry, inclusion of the "Default Sale Right" provision in

---

first line (same).

life insurance premium financing agreements, taken together with the rigorous statutory criteria for exercise of the "Default Sale Right," is intended to negate, and effectively does negate, any such argument by a lender. In short, in the understanding of the industry, the titles of the documents the trust is forced to execute following default imply nothing about whether the "Default Sale Right" has or has not been exercised. (Sinnott Decl., 14:15-15:12.)

**V. THE FINANCING AGREEMENT.**

The operative agreement in this action is the Life Insurance Premium Financing Agreement among Windsor Securities LLC The Erwin A. Collins Family Insurance Trust - 2008 And Erwin A. Collins [the "Financing Agreement" or "F.A."]. A true copy of the Financing Agreement, authenticated and filed herewith as Exhibit A to the Declaration Of Maria Ana Gordillo In Opposition To Motion For Summary Judgment ["Gordillo Decl."] and bearing Bates Nos. GORDILLO 0001 - GORDILLO 0134, is also attached, for the convenience of the Court, as Exhibit A to the Sinnott Decl. (Gordillo Decl., 1:5-9; and Ex. A thereto; Sinnott Decl., 6:13-19, and Ex. A thereto.) The relevant provisions of the Financing Agreement are as follows:

(A) The Financing Agreement recites that it includes nineteen documents and that those documents were intended by the parties to comprise a single agreement. (F.A., Doc. 1 of 19 [internal reference: first part, p. 3], Bates No. GORDILLO 0003; F.A., Doc. 1 of 19 [internal reference: second part, section 8.01, p. 14, definition of "Agreement"], Bates No. GORDILLO 0025); F.A., Doc. 1 of 19 [internal reference: second part, section 8.01, p. 14, definition of "Financing Documents"], Bates No. GORDILLO 0025.) The Financing Agreement is signed or approved not only by the borrower - a life insurance trust - but also by the insured and by the beneficiary of the trust. (F.A., Doc. 1 of 19 [internal reference: first part, p. 4] Bates No. GORDILLO 0005, and *passim*.)

(B) The Financing Agreement recites that all aspects of the Financing Agreement are governed by California law. (F.A., Document 1 of 19 [internal reference: second part, section 7.12, p. 13], Bates No. GORDILLO 0024; F.A., Doc. 2 of 19 [internal reference: section 7.(h), pp. 34], Bates No. GORDILLO 0034 - GORDILLO 0035; F.A., Doc. 13 of 19 [internal reference: paragraph 18, p. 8], Bates No. GORDILLO 0108; F.A., Doc. 15 of 19 [internal reference: p. 4,

"Choice of Law"], Bates No. GORDILLO 0125.)

(C)     The Financing Agreement recites that all notices from Windsor to the remaining parties to the Financing Agreement were required to be in writing addressed directly to the parties. (F.A., Doc. 13 of 19 [internal reference: paragraph 16, pp. 7-8], Bates Nos. GORDILLO 0107 - GORDILLO 0108; F.A., Doc. 1 of 19 [internal reference: first part, p. 3], Bates No. GORDILLO 0003; F.A., Doc. 1 of 19 [internal reference: second part, section 7.04, p. 11], Bates No. GORDILLO 0022; F.A., Doc. 2 of 19 [internal reference: paragraph 7.(g), p. 3], Bates No. GORDILLO 0034]; F.A., Doc. 15 of 19 [internal reference: p. 4], Bates No. GORDILLO 0125.)

(D)     The Financing Agreement recites that Windsor was obligated to loan to the Trust at least $112,750, covering a loan initiation fee and two years of premiums on Pacific Life Insurance Company policy number VF51701320 [the "Policy"].  (F.A., Doc. 1 of 19 [internal reference: first part, pp. 3-4], Bates Nos. GORDILLO 0003 - GORDILLO 0005; F.A., Doc. 1 of 19 [internal reference: second part, sections 1.01, 1.02, pp. 1-2], Bates Nos. GORDILLO 0012 - GORDILLO 0013; F.A., Doc. 2 of 19 [internal reference: opening paragraph, p. 1], Bates No. GORDILLO 0032.)

(E)     The Financing Agreement recites that the Trust was obligated to repay the amount financed/loaned, plus interest thereon, at the end of approximately twenty-seven months.  (F.A., Doc. 2 of 19 [internal reference: paragraph 3, p. 1], Bates No. GORDILLO 0032.)

(F)     The Financing Agreement recites that the Policy was collateral for the loan.  (F.A., Doc. 2 of 19 [internal reference: paragraph 5, p. 2], Bates No. GORDILLO 0032; F.A., Doc. 13 of 19 [internal reference: paragraph 3, pp. 1-2], Bates Nos. GORDILLO 0101 - GORDILLO 0102.)

(G)     The Financing Agreement recites that Windsor, in the event of a default by the Trust, had the right to proceed directly against the Trust for repayment of the amounts loaned to the Trust whether or not Windsor chose to proceed against the policy collateral, *i.e.*, that the loan was, in the language of the industry, a "recourse" loan as to the Trust.  (F.A., Doc. 2 of 19 [internal reference: paragraph 7.(a)(i), p. 2], Bates Nos. GORDILLO 0033; F.A., Doc. 2 of 19

[internal reference: paragraph 7.(d), p. 3], Bates Nos. GORDILLO 0034.)[4]

(H) The Financing Agreement recites that in the event of a default on the loan by the Trust, the Trust was required to execute certain documents that would allow Windsor, subject to Windsor's continuing obligations to the Trust under the Financing Agreement, to take title to, and beneficiary status under, the Policy. (F.A., Doc. 1 of 19 [internal reference: second part, section 5.01(a), p. 8], Bates No. GORDILLO 0019; F.A., Doc. 13 of 19 [internal reference: paragraph 6.(a), pp. 3-4], Bates Nos. GORDILLO 0103 - GORDILLO 0104.)

(I) The Financing Agreement recites that, following default by the Trust and execution by the Trust of the above-mentioned documents transferring title and beneficiary status under the Policy, Windsor, subject to Windsor's continuing obligations to the Trust under the Financing Agreement, had the following options:

(i) Windsor could allow the Policy to lapse, in which case neither Windsor nor the Trust would obtain any financial benefit from the Policy and the Trust would remain liable to Windsor for the full amount of the loan plus interest thereon, plus reasonable expenses incurred in connection with the loan. (F.A., Doc. 2 of 19 [internal reference: paragraph 7.(a)(i), p. 2], Bates Nos. GORDILLO 0033; F.A., Doc. 2 of 19 [internal reference: paragraph 7.(d), p. 3], Bates Nos. GORDILLO 0034.)

(ii) Assuming the Policy had not been allowed to lapse, Windsor, prior to the death of the insured and pursuant to Windsor's status as secured lender/title holder:

(a) could sell the Policy at a public or private sale, at which sale the Trust would be allowed to bid (F.A., Doc. 13 of 19 [internal reference: paragraph 6.(a), 6.(b), pp. 3-4], Bates Nos. GORDILLO 0103 - GORDILLO 0104);[5]

---

[4] By contrast, the Financing Agreement provides that, in the event of default on the loan by the Trust, Windsor, in the absence of fraud, cannot directly seek repayment from the insured - *i.e.*, that the loan is "non-recourse" as to <u>that</u> party. (F.A., Doc. 1 of 19 [internal reference: second part, Section 7.13, p. 13], Bates No. GORDILLO 0024.)

[5] The Financing Agreement also recites that Windsor was not required to hold any such sale. (F.A., Doc. 13 of 19 [internal reference: paragraph 6.(b), p. 4], Bates No. GORDILLO 0104.)

(b)      could take from the proceeds of the sale the amount it had loaned to the Trust, plus interest thereon, plus its reasonable costs incurred in connection with the sale (F.A., Doc. 13 of 19 [internal reference: paragraph 6.(g), p. 5], Bates No. GORDILLO 0105); and

(c)      would be required to provide any excess proceeds to the Trust (F.A., Doc. 13 of 19 [internal reference: paragraph 6.(g), p. 5], Bates No. GORDILLO 0105); or

(d)      should the proceeds be insufficient to cover what Windsor was owed, could proceed directly against the Trust to recover the deficiency (F.A., Doc. 2 of 19 [internal reference: paragraph 7.(a)(i), p. 2], Bates Nos. GORDILLO 0033; F.A., Doc. 2 of 19 [internal reference: paragraph 7.(d), p. 3], Bates Nos. GORDILLO 0034).

(iii)      Again assuming the Policy had not been allowed to lapse, and that no sale had been held, Windsor, following the death of the insured, and pursuant to Windsor's status as beneficiary:

(a)      could collect the death benefit from the insurance company (F.A., Doc. 15 of 19 [internal reference: "Assignment," paragraph 1, p. 1], Bates No. GORDILLO 0122);

(b)      could take from the death benefit the amount it had loaned, plus interest thereon, plus its reasonable costs incurred in connection with collecting the death benefit (F.A., Doc. 15 of 19 [internal reference: "Obligations Secured," p. 2], Bates No. GORDILLO 0123; F.A., Doc. 15 of 19 [internal reference: "Benefits Payment Directive," p. 2] Bates No. GORDILLO 0123); and

(c)      unless the parties had exercised the "Default Sale Right," Windsor would be required to provide the remaining portion of the death benefit to the Trust (F.A., Doc. 15 of 19 [internal reference: "Covenants," paragraph 1, p. 3], Bates No. GORDILLO 0124; F.A., Doc. 15 of 19 [internal reference: "Default Sale Right," p. 4], Bates No. GORDILLO 0125); or

(d)      if the parties had exercised the "Default Sale Right," the Trust would have no continuing obligation on the loan and Windsor could retain the entirety of the

death benefit (F.A., Doc. 15 of 19 [internal reference: "Covenants," paragraph 1, p. 3], Bates No. GORDILLO 0124; F.A., Doc. 15 of 19 [internal reference: "Default Sale Right," p. 4], Bates No. GORDILLO 0125).

(J) The Financing Agreement recites that exercise of the Default Sale Right requires the following:

> Upon an occurrence of an Event of Default (as defined in the Agreement) that has not been remedied within the time period required in the Agreement, Assignee shall have the right (the "Default Sale Right") but not the obligation to accept, that in consideration of the full and complete satisfaction of the Liabilities (the sufficiency of which consideration is hereby acknowledged) Owner may make a full transfer and assignment of the Insurance Policy to Assignee and thereby forever relinquish any and all rights Owner may have thereunder, including without limitation any rights to cash surrender value and/or death benefit provided thereunder. Upon the exercise of this Default Sale Right, Assignee shall notify Insurer in writing and Insurer shall thereafter recognize Assignee as the sole lawful owner of the Insurance Policy.

F.A., Doc. 15 of 19 [internal reference: "Default Sale Right," p. 4], Bates No. GORDILLO 0125.) [Emphasis added.]

As noted with reference to the typical life insurance premium financing agreements discussed above, this provision, pursuant to the practice of the industry and of controlling statutes, contemplates an express offer by the Trust, which Windsor may or may not accept, to relinquish any and all rights the Trust may have in or to the proceeds of sale or the death benefit in return for Windsor's express agreement, authenticated by a writing, to relieve the Trust of any continuing obligation on the loan. *See*, in this connection, California Commercial Code § 9620 - the terms of which are made part of the Financing Agreement by operation of law, as noted above[6] - which

---

[6] *Edwards*, *supra*, 44 Cal. 4th at 954.

provides, in relevant part:

> (a) Except as otherwise provided in subdivision (g), a secured party may accept collateral in full or partial satisfaction of the obligation it ensures only if all the following conditions are satisfied:
>
> (1) The debtor consents to the acceptance under subdivision (c). . . . .
>
> (b) A purported or apparent acceptance of collateral under this section is ineffective unless both of the following conditions are satisfied:
>
> (1) The secured party consents to the acceptance in an authenticated record or sends a proposal to the debtor.
>
> (2) The conditions of subdivision (a) are met.
>
> (c) For purposes of this section both of the following rules apply: . . . .
>
> (2) A debtor consents to an acceptance of collateral in full satisfaction of the obligation it secures only if the debtor agrees to the terms of the acceptance in a record authenticated after default or the secured party does all of the following:
>
> (A) Sends to the debtor after default a proposal that is unconditional or subject only to the condition that collateral not in possession of the secured party be preserved or maintained.
>
> (B) In the proposal, proposes to accept collateral in full satisfaction of the obligation it secures.
>
> (c) Does not receive a notification authenticated by the debtor within 20 days after the proposal is sent. . . . .

*See also* California Commercial Code § 9602, again made part of the Financing Agreement by operation of law, which renders a nullity any attempt the parties to the Financing Agreement might have made to vary, waive, or otherwise avoid by agreement the protections given to the Trust by § 9620.

> Except as otherwise provided in Section 9624, <u>to the extent that they give rights to a debtor or obligor and impose duties on a secured party, the debtor or obligor may</u>

not waive or vary the rules stated in the following listed sections: . . . . (5) Subdivision (a) of Section 9608 and subdivision (d) of Section 9615 to the extent that they require accounting for or payment of surplus proceeds of collateral. . . . . (10) Section 9620, 9621, and 9622, which deal with acceptance of collateral in acceptance of obligation. [Emphasis added.]

## VI. THE FINANCING AGREEMENT IS TYPICAL OF THE LIFE INSURANCE PREMIUM FINANCING AGREEMENTS USED IN THE INDUSTRY.

The Trust's expert witness, having thoroughly reviewed the Financing Agreement and compared its provisions with those found in standard or typical premium financing agreements (Sinnott Decl., 10:13-15:12; 15:15-21:10) has opined: "In summary, it is my expert opinion that the Financing Agreement is typical of the life insurance premium financing agreements used throughout the life insurance premium financing industry and should be understood and interpreted in a manner consistent with the norms and practices of that industry." (Sinnott Decl., 21:11-14.)

## VII. MATERIAL FACTS BEFORE THE COURT.

In addition to the contents of the Financing Agreement set forth above, the evidence submitted by the parties either establishes, or at the very least creates a triable issue concerning, the following material facts:

(A) The Trust defaulted on the loan. (Windsor Mem., Court's File, Doc. 31-1, p. 8 of 21 [internal reference: 4:19-20]; Gordillo Decl., 1:15-21.)

(B) Thereafter, on or about May 11, 2010, the trustee of the Trust executed a Pacific Life Insurance Company ["Pacific Life"] form document entitled "Ownership, Name, Or Beneficiary Change Request" and provided it to Windsor. (Gordillo Decl., 2:21-3:3, and Ex. B thereto [Bates No. GORDILLO 0136 - GORDILLO 0138].)

(C) The trustee of the Trust executed the abovementioned Ownership, Name, Or Beneficiary Change Request form because she believed the Trust was required to do so, following default, in order to provide Windsor, subject to Windsor's continuing obligations to the Trust under the Financing Agreement, with title to the Policy and with beneficiary status under the

Policy. (Gordillo Decl., 3:4-7.) At no time did the trustee of the Trust believe that by her executing those documents the Trust was giving up either: (i) the right of the Trust, pursuant to the Financing Agreement, to receive any portion of the proceeds of a public or private sale of the Policy remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale); or (ii) the right of the Trust, pursuant to the Financing Agreement, to receive any portion of the death benefit remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit). (Gordillo Decl., 3:7-14.)

(D) Windsor never suggested to the trustee of the Trust, in any communication at or around the time she was executing the abovementioned Ownership, Name, Or Beneficiary Change Request, that she was executing the abovementioned Ownership, Name, Or Beneficiary Change Request in return for an agreement by Windsor to relieve the Trust from any continuing obligation to repay the loan. Nor did Windsor suggest to the trustee of the Trust, in any communication prior to June 2014, that by her executing those documents the Trust was giving up either: (i) the right of the Trust, pursuant the Financing Agreement, to receive any proceeds of a public or private sale of the Policy remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale); or (ii) the right of the Trust to receive any proceeds of the death benefit remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit). (Gordillo Decl., 3:15-26; Windsor Mem, generally; Prusky Decl., generally;[7] Canoff Decl., generally; Windsor Req. Jud. Not., generally.)

(E) Following her execution of the abovementioned Ownership, Name, Or Beneficiary Change Request, the trustee of the Trust received documents from Pacific Life indicating that Windsor had provided the abovementioned Ownership, Name, Or Beneficiary Change Request

---

[7] Mr. Prusky makes only the conclusory statement that Windsor "elected to exercise the Default Sale provision in the Premium Financing Agreement" (Prusky Decl., 3:3-4), begging the question of whether Windsor engaged in any of the actions required - *e.g.*, an express agreement by Windsor to forgive the loan - in order for such exercise to occur.

form to Pacific Life and that Pacific Life had amended its internal records accordingly, thereafter showing Windsor as the owner and beneficiary of the Policy. (Gordillo Decl., 3:27-4:4, and Exs. C and D thereto [Bates Nos. GORDILLO 0141, GORDILLO 0142].) The trustee of the Trust lodged no objection to the amendments referred to in those documents because, as noted above, she believed the Trust had been required, following default, to provide Windsor, subject to Windsor's continuing obligations to the Trust under the Financing Agreement, with title to the Policy and with beneficiary status under the Policy. (Gordillo Decl., 4:4-8.) At no time did the trustee of the Trust believe that those amendments had any effect upon either: (i) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of a public or private sale of the Policy remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale); or (ii) the right of the Trust to receive any portion of the death benefit remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit). (Gordillo Decl., 4:8-15.)

(F) Windsor never communicated to the trustee of the Trust, and the trustee thus by definition never accepted, either:

(i) an offer to relieve the Trust from any continuing obligation to repay the loan if the Trust would agree to give Windsor a form of ownership of the Policy unfettered by the obligation, set forth in the Financing Agreement, to provide to the Trust any amounts remaining from the proceeds of a public or private sale of the Policy after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale); or

(ii) an offer to relieve the Trust from any obligation to repay the loan if the Trust would agree to give Windsor a form of beneficiary status under the Policy unfettered by the obligation, set forth in the Financing Agreement, to provide to the Trust any amounts remaining from the death benefit after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit).

(Gordillo Decl., 4:16-4:28.)

**MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**
***Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust - 2008 et al., and Related Cross-Action***
**Civil Action No. 3:14-cv-03713-WHO**

18

(G)     The trustee of the Trust never communicated to Windsor, and Windsor thus by definition never accepted, either:

(i)     an offer to give Windsor a form of ownership of the Policy unfettered by the obligation, set forth in the Financing Agreement, to provide to the Trust any amounts remaining from the proceeds of a public or private sale of the Policy after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale), if Windsor would agree to relieve the Trust from any continuing obligation to repay the loan; or

(ii)     an offer to give Windsor a form of beneficiary status under the Policy unfettered by the obligation, set forth in the Financing Agreement, to provide to the Trust any amounts remaining from the death benefit after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit), if Windsor would agree to relieve the Trust from any continuing obligation to repay the loan.  (Gordillo Decl., 5:1-14.)

(H)     In short, the trustee of the Trust never heard of, never intended to enter into, and never did enter into, any agreement with Windsor either:

(i)     to give Windsor a form of ownership of the Policy unfettered by the obligation, set forth in the Financing Agreement, to provide to the Trust any amounts remaining from the proceeds of a public or private sale of the Policy after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale) in return for Windsor's relieving the Trust from any continuing obligation to repay the loan; or

(ii)     to give Windsor a form of beneficiary status under the Policy unfettered by the obligation, set forth in the Financing Agreement, to provide to the Trust any amounts remaining from the death benefit after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit) in return for Windsor's relieving the Trust from any continuing obligation to repay the loan.

(Gordillo Decl., 5:15-28.)

(I)     Following the Trust's default on the loan, and the trustee's execution of the abovementioned Ownership, Name, Or Beneficiary Change Request, the trustee of the Trust commissioned the originating insurance agent on the Policy, Eugene Houchins III, to monitor the status of the Policy and, in particular, to let the trustee know immediately if Windsor at any time failed timely to pay the premiums on the Policy and thus created the possibility that the Policy might lapse.  Her purpose in doing so was to preserve for the Trust the possibility of taking over those premium payments and thus preventing the Policy from lapsing.  (Gordillo Decl., 6:1-6.)

(J)     In or about mid-June, 2014, Windsor sent a letter (ostensibly dated June 1, 2014) to the Trust in which Windsor asserted that:

> Pursuant to the Financing Agreement ("FA") signed by you and according to our records, on May 11, 2010, you assigned the policy listed above to Windsor.  You may recall that this voluntary assignment of the policy was in exchange for Windsor's agreement that the assignment of the policy would constitute a complete satisfaction and discharge of the loan Windsor had made to enable you to purchase the policy.  Accordingly, you no longer have any financial liability under that loan.

(Gordillo Decl., 6:7-16 and Ex. E thereto [Bates No. GORDILLO 0275].)

(K)     That letter marked the first time that Windsor had ever suggested to the trustee of the Trust that her execution of the abovementioned Ownership, Name, Or Beneficiary Change Request was "in exchange for Windsor's agreement that the assignment of the policy would constitute a complete satisfaction and discharge of the loan" or that "you [*i.e.*, the Trust] no longer have any financial liability under that loan."  (Gordillo Decl., 6:17-21.)

(L)     In response to that letter, the trustee of the Trust obtained counsel and on July 18, 2014 responded with a letter, prepared by her counsel, denying the abovementioned statement by Windsor and stating the facts as the trustee understood them.  (Gordillo Decl., 6:22-25. and Ex. F thereto [Bates Nos. GORDILLO 0276 - GORDILLO 0277.)

(M)     In further response to that letter, the trustee of the Trust on July15, 2014 sent a letter to Pacific Life, again prepared by her counsel and informing Pacific Life of the apparent dispute between Windsor and the Trust over the parties' respective rights in and to the death

benefit pursuant to the Financing Agreement between the parties. (Gordillo Decl., 6:26-7:2, and Ex. G thereto [Bates Nos. GORDILLO 0151- GORDILLO 0152].)

(N) The abovementioned mid-June 2014 letter was sent by Windsor following an April 8, 2014 arbitration award in *Gregory Barnes, Jr., Trustee of the John L. Bitter Irrevocable Life Insurance Trust v. Windsor Securities, LLC*, U.S.D.C., N.D. Cal. No. 3:13-cv-01878-WHO, American Arbitration Association Case No. 74-148-00296-13-S1M [the "Barnes/Windsor Action"], a case deemed related to the present action. (Court's File, Doc. 18.) The Barnes/Windsor action was based on financing documents virtually identical to those at issue in the present action. The arbitration panel therein denied Windsor's claim of entitlement to the entirety of the death benefit on the following grounds:

> Because Section 6(a)[8] contemplated the execution of a COO[9] under circumstances wherein Barnes was not giving up all rights in the policy, its execution is at best ambiguous. Absent express notification to Barnes that Windsor was invoking its Default Sale Right, the record does not support a finding that Barnes' execution of the COO conveyed to Windsor unfettered title to the policy and the death benefit.

(Wood Decl., 1:6-2:10, and Ex. A thereto, p. 5.)

> There is nothing in either the September 8, 2010 letter or the January 14, 2011 letter that expresses an acceptance by Windsor of the collateral in full satisfaction of the obligation. Both are silent on this point. [¶] Windsor therefore did not satisfy the "strict foreclosure" requirement under § 9620.

(Wood Decl., 1:6-2:10, and Ex. A thereto, p. 7.)[10]

(O) While the Court will draw its own inferences from these events, it appears that Windsor sent the June, 2014 letter in an attempt retroactively to create "facts" that might allow it

---

[8] *I.e.*, of the security agreement contained in the financing documents.

[9] *I.e.*, Change of Ownership.

[10] The *Barnes* arbitration award was vacated, at or around the end of 2014, pursuant to a settlement agreement between the parties. (Wood Decl. 2:24-25.)

**MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**
***Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust - 2008 et al., and Related Cross-Action***
**Civil Action No. 3:14-cv-03713-WHO** 21

to escape, in the present action, an outcome equivalent to that which had befallen Windsor in the Barnes/Windsor Action.

**VIII. THE OPINION OF WINDSOR'S EXPERT HAS NO BASIS IN FACT OR LOGIC.**

Windsor's expert, Karen H. Conoff, repeatedly opines that the parties exercised the Default Sale Right. The Trust's expert, James H. Sinnott, has demonstrated why that opinion should be rejected out of hand.

> In my expert opinion, based on the above-stated facts and my understanding of (a) practices and terms of art in the premium finance industry and (b) the effect of incorporation, as a matter of law, of California Commercial Code Section 9620 into the Financing Agreement, Windsor's expert, Karen H. Canoff, has expressed a crucially inaccurate opinion which, if not corrected, might well mislead the Court or other trier of fact. After stating - correctly - that Windsor would have been entitled to retain the entirety of the death benefit had the parties elected to exercise the Default Sale Right (Canoff Decl., Court's File, Doc. 31-4, pp. 8-9 of 55 [internal reference: 8:26-9:6]), Ms. Canoff - seeking to support her opinion that the parties did exercise that right - <u>incorrectly</u> states the following:
>
> > By its terms, the DSR provides for the satisfaction and thus release of the Insurance Trust's financial obligations automatically upon acceptance by Windsor of the change of ownership tendered by the Insurance Trust.
>
> (Canoff Decl., Court's File, pp. 10-11 of 55 [internal reference: 10:27-11:2].)
>
> > . . . upon execution of the Pacific Life Ownership, Name, or Beneficiary Change Request form . . . the trustee initiated the DSR process by signing such change of ownership form for delivery to Windsor.
>
> (Canoff Decl., Court's File, p. 11 of 55 [internal reference: 11:4-7].)
>
> > By countersigning the Ownership, Name, or Beneficiary Change Request . . . and forwarding it to Pacific Life . . . Windsor effectively accepted the Insurance Trust's transfer of the policy pursuant the terms of the DSR clause.
>
> (Canoff Decl., Court's File, Doc. 31-4, p. 11 of 55 [internal reference: 11:9-13].)

Conversely, the Change of Ownership form set forth in Exhibit G is used to effect a complete transfer of title and all ownership rights and beneficial interests in the policy which, consistent with the provisions of the DSR, the Insurance Trust did by executing the Change of Ownership on May 11, 2010.  Once Pacific Life processed the change and recorded Windsor as the new owner of the policy . . . the DSR process was completed.  This satisfied and discharged all of the Insurance Trust's obligations under the loan, and also effected a full and complete transfer to Windsor of and [*sic*] all rights, title, and beneficial interests in the Policy.  At that point in time, the Insurance Trust would have no further claim to, rights under, or obligations with respect to the Policy.

(Canoff Decl., Court's File, Doc. 31-4, p. 12 of 55 [internal reference: 12:7-17].)

(Sinnott Decl., 27:14-28:25.)

In making those incorrect statements, Ms. Canoff neglects to mention or consider a crucial fact, namely, that the trustee of the Trust was (as discussed extensively above) <u>contractually obligated</u> to execute the Pacific Life Ownership, Name, or Beneficiary Change Request form following default so that Windsor (a) could take title to and beneficiary status under the Policy and thus (b) sell the Policy or collect the death benefit <u>while remaining subject to its obligations under the Financing Agreement to provide to the Trust any proceeds of sale or the death benefit in excess of what Windsor was owed</u>. [Citations at Sinnott Decl., 29:5-20.]  This means - as the industry well understands - that execution and transfer of such a form by an insurance trust implies <u>nothing</u> about whether the trust has "initiated the DSR process."

(Sinnott Decl., 28:26-29:22.)

Ms. Canoff also neglects to mention or consider a second crucial fact, namely, that exercise of the Default Sale Right requires (again as discussed extensively above) an <u>express agreement by the parties</u> - whether pursuant to an offer by the borrower and acceptance by the lender or to an offer by the lender and acceptance by the borrower - <u>that in return for transferring all rights under the Policy the borrower shall be relieved from any</u>

further obligation on the loan. (California Commercial Code § 9620; Ex. A, Doc. 15 of 19 [internal reference: "Default Sale Right," p. 4], Bates No. GORDILLO 0125.) There is of course no mention of any such agreement in the Pacific Life Ownership, Name, or Beneficiary Change Request form. (Gordillo Decl., 2:21-3:3, and Ex. B thereto [Bates Nos. GORDILLO 136 - GORDILLO 138].) More important: (a) there is nothing in the record to suggest that any such agreement was ever made (Windsor Mem, generally; Prusky Decl., generally; Canoff Decl., generally; Windsor Req. Jud. Not., generally.); and (b) the trustee of the Trust explicitly denies that any such agreement was ever discussed, intended, or made (Gordillo Decl., 3:4-26; 4:16-5:28).

(Sinnott Decl., 29:23-30:8.)

For the reasons set forth above, it is my expert opinion that Ms. Canoff has no basis, in either fact or logic, for her expressed opinion that the parties in this case exercised the Default Sale Right. I can say, moreover - based on having reviewed and/or administered hundreds of defaults and foreclosures in premium finance loans from numerous programs, that: (a) it was not industry practice for lenders to seek to use only insurance company change of ownership forms as a purported means to exercise the Default Sale Right; and (b) it was understood in the industry that doing so would not give the lender an unfettered right to the benefits of the policy. Typically, upon default, lenders wishing to exercise the Default Sale Right would execute, with the trust, an agreement - variously known by such names as "Relinquishment Agreement," "Transfer Agreement," or "Loan Satisfaction Agreement" - specifying that the trust was giving up all rights in and to the policy in return for a full satisfaction of the loan. Even where no such written agreement was entered into, industry practice dictated that there should be an express written communication clearly referencing the Default Sale Right and informing the trust that it was giving up all rights in and to the policy in return for full satisfaction of the loan. Neither of those things occurred here. Again, it is my expert opinion that Ms. Canoff has no basis for her expressed opinion that the parties in this case exercised the Default Sale Right, and that in fact no such exercise can be deemed to have occurred.

(Sinnott Decl., 30:9-25.)

**IX. WINDSOR'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED BOTH ON STATUTORY GROUNDS AND BECAUSE THERE REMAIN TRIABLE ISSUES OF MATERIAL FACT.**

Windsor repeatedly admits that, unless the parties exercised the default sale right, Windsor is not entitled to the entirety of the death benefit. It is undisputed that: (a) Windsor never communicated to the Trust that it would be willing relieve the Trust of its obligation on the loan in return for the Trust's giving up all its rights under the Policy; and that (b) no agreement to that effect was ever reached. Because California Commercial Code § 9620, made part of the Default Sale Right provision of the Financing Agreement by operation of law, requires that such an agreement be reached in order for exercise of the Default Sale Right to occur, and because the effect of that section cannot be waived or altered by the parties (California Commercial Code § 9602), Windsor's claim that the right was exercised fails as a matter of law.

Moreover, even if the Court were to entertain Windsor's suggestion that the Trust's execution and Windsor's acceptance of change of ownership documents might have evidenced an intention by the parties to enter into the kind of agreement required by California Commercial Code § 9620, there remain substantial disputed issues of material fact as to what those intentions were. Windsor's motion for summary judgment should be denied. Federal Rules of Civil Procedure, Rule 56(a); *McSherry v. City of Long Beach*, 584 F.3d 1129, 1135 (9th Cir. 2009) (at the summary judgment stage, all reasonable inferences must be drawn in the opposing party's favor and the non-movant's version of any disputed fact must be presumed correct).

Respectfully submitted.

DATED: July 29, 2015

HENNEFER FINLEY & WOOD, LLP

/s/ Joseph Wood
Joseph Wood

Attorneys for Defendant and Cross-Claimant, Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust - 2008

PROOF OF SERVICE

Joseph Wood declares:

1. I am over twenty-one years of age and am not a party to the above-named action. My business address is 275 Battery Street, Suite 200, San Francisco, CA 94111.

2. On July 29, 2015, in San Francisco, California, I served the attached

MEMORANDUM IN OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT

on the parties to this action.

3. Service was made by electronically filing that document with the Court to be served by operation of the Court's electronic filing and notice system.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true.

DATED: July 29, 2015

/s/ Joseph Wood
Joseph Wood