# EXHIBIT 58

```
 1                                              Pages 1 - 22

 2                     UNITED STATES DISTRICT COURT

 3                   NORTHERN DISTRICT OF CALIFORNIA

 4     Before The Honorable William H. Orrick, Judge

 5     JOHN HANCOCK LIFE INSURANCE    ) Case No. 3:14-cv-04651-WHO
       COMPANY (U.S.A.),              )
 6                                    )
                                      )
 7          Plaintiff,                )
                                      )
 8       v.                           )
                                      )
 9     MINDY GOSS [now Ronald Mark    )
       Goss] AS TRUSTEE OF THE JOE E. )
10     ACKER FAMILY INSURANCE TRUST   )
       [Incorrectly named herein as   )
11     the "Joe E. Acker Family       )
       Trust"]; and WINDSOR           )
12     SECURITIES, LLC,               )
                                      )
13          Defendants.               )
       _____)
14                                    )
       PACIFIC LIFE INSURANCE COMPANY,) Case No.3:14-cv-03713-WHO
15                                    )
                                      )
16          Plaintiff,                )
                                      )
17       v.                           )
                                      )
18     MARIA ANA GORDILLO AS TRUSTEE  )
       OF THE ERWIN A. COLLINS FAMILY )
19     INSURANCE TRUST - 2008; and    )
       WINDOW SECURITIES, LLC,        )
20                                    )
            Defendants.               )
21     _____)
                                      )
22     AND RELATED CROSS-ACTION.      )
       _____)
23                                      San Francisco, California
                                        Wednesday, December 2, 2015
24        AMENDED (AS TO CASE NUMBER ONLY) TRANSCRIPT OF PROCEEDINGS OF
             THE OFFICIAL ELECTRONIC SOUND RECORDING - FTR 2:38-3:05
25
```

```
 1      UNDERLINE{APPEARANCES}:

 2

 3      For the Trusts:
                        Hennefer Finley & Wood, LLP
 4                      275 Battery Street, Suite 200
                        San Francisco, CA 94111
 5          BY:         JOSEPH H.C. WOOD, ESQ.

 6

 7

 8
        For Windsor Securities, LLC:
 9
                        Thompson, Welch, Soroko & Gilbert, LLP
10                      3950 Civic Center Drive, Suite 300
                        San Rafaeo, CA 94903
11          BY:         DARIN T. JUDD, ESQ.

12                      The Antonino Firm LLC
                        Six Concourse Parkway, Suite 2920
13                      Atlanta, GA 30328
            BY:         LAUREN ANTONINO, ESQ.
14

15

16      Transcribed by Kelly Polvi, Contract Transcriber, utilizing

17      court reporting and transcription hardware and software.

18

19

20

21

22

23

24

25
```

```
 1    WEDNESDAY, DECEMBER 2, 2015                    2:38 P.M.

 2                       P R O C E E D I N G S

 3                           ---oOo---

 4         THE CLERK:  Calling civil matter 14-3713, Pacific Life

 5    Insurance Company versus Maria Ana Gordillo, and civil matter

 6    14-4651, John Hancock Insurance Company versus Goss, et al.

 7         Counsel, please come forward and state your appearance.

 8         MR. JUDD:  Good afternoon, Your Honor.  Darin Judd

 9    appearing on behalf of Windsor Securities LLC and --

10         MS. ANTONINO:  Hi.  Lauren Antonino.  Nice to meet you.

11         MR. WOOD:  Good afternoon, Your Honor.  Pardon me.

12    Joseph Wood on behalf of the Trusts.

13         THE COURT:  Well, welcome back, everybody.

14         All right.  So I'm inclined to grant the motion for

15    summary judgment.

16         The oral walk-away agreement, I don't think, was pleaded.

17    It wasn't descri- -- not only was it not pleaded, in the case

18    management conference statement that was filed in January of

19    last year there is not even a whisper of this.

20         As I've described to Mr. Judd, it was quite surprising to

21    me that this was an issue at the time that the summary judgment

22    motion was argued.  And I know that he's pointed me to the

23    footnote in his opposition, but, even that, I still look at it

24    and I'm -- maybe I'm dense, but it did not sort of come out at

25    me.
```

1    Every argument in this case and every fact scenario in
2    this case, up until the time that I made my initial ruling, was
3    inconsistent with a walk-away agreement.  And while it's true
4    that a party is entitled to rely on inconsistent theories, you
5    have to plead them.
6    So -- so.  That's the basis of my ruling.  I'll say on the
7    basis of the other evidence that was provided -- and I'm not
8    relying on this in my ruling, but -- it's very flimsy, it seems
9    to me, to even make a question of fact.
10   There's no allegation regarding the date of the walk-away
11   agreement; Mr. Houchins absolutely denies it in his
12   declaration.
13   And I know I read the statements about discovery not
14   being finished with respect to some of the parties, and I know
15   that the parties had stipulated to continue discovery.  I
16   hadn't signed it and I ended up denying it, pending the ruling
17   on the motion for summary judgment.  But I realize that you
18   might have expected to be able to do that.  And if I thought
19   that it was in the interests of justice to allow you to do it,
20   that it would change perspective, I would allow the additional
21   discovery.  But the fact that this wasn't pleaded, I think, is
22   dispositive.
23   So Mr. Judd, please go ahead
24   **MR. JUDD:**  Yes, Your Honor.  So we do want to point you
25   specifically to places in the pleadings where we believe it was

1    preserved, the right was preserved.

2        So initially, Your Honor, we point you to the footnote in

3    our motion for summary judgment, which --

4        **THE COURT:**  I'm sorry.  When I was referring to pleadings

5    I was talking about the cross-complaint or the answer.

6    (Indiscernible - simultaneous speaking) those things.

7        **MR. JUDD:**  We'll start at the footnote, but then we'll go

8    through those as well.

9        **THE COURT:**  Okay.  I know where the footnote is.

10       **MR. JUDD:**  Okay.  So the footnote says this motion does

11   not address whether the insurance trust voluntarily assigned

12   the death benefits to pre-Windor -- I mean, to Windor,

13   pre-default, but Windor does not waive that issue.

14       If you look at the complaint originally filed by the --

15   the interpleader complaint, paragraph No. 18, our answer,

16   answer to the trust's cross-complaint, we specifically respond

17   to that -- and let me give you the language.

18       So this is the Acker matter.  It was Docket No. 18.  And

19   in the Collins matter it's Docket No. 21.

20       You really have to look at the allegation that was being

21   asserted for us, and then -- in that context, to see how we

22   denied it.

23       So paragraph 10 of the original complaint -- interpleader

24   complaint and the cross-claim by the trustee says Windsor

25   admits that the insured under the John Hancock policy, life

1    insurance policy --

2         That's the first paragraph.

3         It says Windsor admits that the initial owner and

4    beneficiary of the policy was the Trust.

5         Windsor further admits that the predecessor Trustee of

6    the Trust, Ronald S. Goss, voluntarily executed a change of

7    ownership, absolute assignment for the policy, on March 18,

8    2010, that transferred ownership and the beneficiary

9    designation of the policy to Windsor.

10        Windsor further admits that the registered change of

11   ownership, absolute assignment for the policy on March 25th,

12   2010, and confirmed the change of ownership or the policy on

13   May 20th, 2010.

14        Windsor denies that the owner and the beneficiary of the

15   policy is the Trust.

16        So specifically in our answer we allege a voluntari --

17   that it was voluntarily executed -- importantly, pre-default.

18   We give the dates.

19        So one of the things that the Court was concerned about

20   is there was not facts pled to provide the dates.  We provide

21   the dates.  Specifically, that it was executed on March 25th,

22   and then that was recorded with the company.

23        All of this pre-default.

24        Paragraph 17 of our answer:  Windsor admits that the

25   Security Agreement, which document, in terms of the content and

```
1    legal --
2          THE COURT:  I'm sorry, which -- where are we now?
3          MR. JUDD:  It's paragraph 17.
4          THE COURT:  17 of Docket No. which?
5          MR. JUDD:  If you're -- Acker it is Docket No. 18 and
6    then Collins it is Docket No. 21.
7          THE COURT:  Collins is paragraph 20?
8          MR. JUDD:  21.
9          THE COURT:  You're saying dock- --
10         MR. JUDD:  I'm sorry.  Collins Docket No. 21.
11         THE COURT:  Okay.
12         MR. JUDD:  And it's paragraph No. 17 that I was directing
13   you to.
14         THE COURT:  Okay.  In the Answer.
15         MR. JUDD:  Right.
16         THE COURT:  Okay.
17         MR. JUDD:  "Windsor admits that the Security Agreement,
18   which document, in terms and content, legal effect, must speak
19   for itself."
20         And then, "Windsor denies the remaining allegations
21   contained in paragraph 17."
22         Looking at paragraph 17 is where there is specifically
23   alleged that there was an execution of the COO that was
24   required.  We denied that it was required because it wasn't a
25   default; it was, again a --
```

1    THE COURT:  Where do you allege the walk-away agreement?

2    MR. JUDD:  Voluntarily executed the change of ownership,

3    in paragraph 10.

4    THE COURT:  Okay.  But those were all the documents that

5    we were dealing with on the motion for summary judgment; right?

6    What I understood your argument to be was that there was

7    an oral walk-away agreement that was brokered by Mr. Houchins,

8    and -- am I wrong about that?

9    MR. JUDD:  What we are saying, Your Honor, is we have the

10   financing agreement that is a written agreement.

11   THE COURT:  Yes.  And that's the one that I've dealt

12   with.  But you're raising a different issue, which is that

13   there was an oral walk-away agreement.

14   MR. JUDD:  There is an agreement that was ultimately

15   affirmed and confirmed factually by the walk-away.  Or what

16   we're saying is, is there's no default.

17   This is the alternative pleading that we're telling --

18   that I indicated to the Court at the time of our oral

19   argument -- and you asked the question last week -- what's

20   different in the Coppock and Stamatov cases that are now before

21   Your Honor --

22   THE COURT:  No, I understand what your position is.  But

23   what I don't understand is how that -- where you think that

24   issue got into the case and, if you thought it was there all

25   along, why was it never raised?

1       **MR. JUDD:**  It is raised.  Here, specifically --

2       **THE COURT:**  Why didn't you raise it?  Why wasn't there

3  some explanation in the motion for summary judgment that said,

4  "Hey, Judge, you know, there is this walk-away -- we think

5  there's this walk-away agreement but it's going to be disputed

6  between the parties, so we want to do it some -- we want to

7  deal with just this legal question.  Pretend there's no

8  walk-away agreement; look at the documents."

9       **MR. JUDD:**  Well, Your Honor, that's what we attempted to

10  do in the footnote.

11       **THE COURT:**  Oh, my.

12       **MR. JUDD:**  Well, if there's an error or a misstep, it's

13  my fault.  Because what we're trying to say, "What does it

14  say?"  The motion does not address whether the insurance Trust

15  voluntarily assigned the death benefits to Windsor pre-default.

16       That's exactly what we're saying that has occurred here.

17  That's exactly what we said in the answer.

18       And again, I'm happy to fall on the sword.  I thought

19  that it was clear because what we were saying is there are all

20  these issues -- which is highlighted by the opposition that was

21  filed by the --

22       **THE COURT:**  When we first had -- I'm sorry to interrupt

23  you, but the -- when we first had the case management

24  conference and you laid out in some detail what your case was,

25  why wasn't there a suggestion that there was a walk-away

1   agreement that had been executed by the parties?

2       MR. JUDD:  Well, Your Honor, in terms of the walk-away

3   agreement, the voluntary transfer, I believe, is there.  I'd

4   have to go back and look at it.

5       It's kind of -- we've done probably five different joint

6   case management conferences in now four different cases and I

7   know for certain that this is not a concocted argument, this is

8   not something that just came up.

9       And why I specifically referenced the Stamatov and

10  Coppock cases that are before the Court now is go through and

11  look at our declaratory relief claim, which I indicated to the

12  Court last week.  We are responding to an interpleader

13  complaint.  We're responding to a cross-claim where we are

14  asserting -- you know, denying and admitting, but we're not

15  laying out the facts as we would have drafted them ourselves.

16      So in responding to those things, we specifically do

17  say it's not new, it's there specifically that there was a

18  voluntary -- we didn't call it a "walk-away" because candidly

19  the concept of a walk-away is something that was presented by

20  Mr. Houchins.  He's the one -- and that's what we have with the

21  discovery that we're saying that we started but we're not able

22  to complete.  He's the one that described to Mr. Coppock about

23  a walk-away.  He's the one in the arbitration and his

24  deposition testimony that talks about a walk-away.

25      We understood it -- not as a term of art, but we're

1    agreeing.  "You're not going to pay us back; your time to

2    perform has not yet arrived."

3        And so what is it that you see in Mr. Prusky's -- in his

4    declaration and the email that we presented to the Court in

5    January before there's any default?  He's saying, "I'll work

6    with you.  I'll -- you know, if you want to do it now or you

7    want to do it later, I will work with you."

8        There's no compulsory or demand.  It's saying, "We will

9    voluntarily agree; but you agree, if I pay these additional

10    premiums that I'm not obligated to pay under the documents,

11    that you will sign and transfer the policy over to me."

12        And this is, again, pre-default.

13        They couldn't have, by law, an anticipatory repudiation

14    because at that point in time the contract had become

15    unilateral.  They couldn't declare a default and we weren't

16    operating in terms of mandatory or compulsory provisions

17    because we couldn't impose them at that point in time.

18        So really the issue before this Court is can we do it.

19    Did we do it.  We will direct the Court to these paragraphs and

20    others.

21        Paragraph 17, that I just referenced you, you have to

22    really see what else was there.  Because what we said is we

23    admit that there are certain aspects but we denied the balance.

24        So what's concluded in the balance of the paragraph that

25    was being denied?  That there was an anticipatory repudiation.

1  That it wasn't a voluntarily agreement.  We deny that.  We

2  state it and then we reemphasize it, that we are denying those

3  allegations.

4      The same thing in paragraph 18.  Again, you have to look

5  at what their paragraph 18 talks about.  But under their --

6  again, they're -- they're saying that there was a default,

7  there was an anticipatory repudiation.  And what we say is

8  Windsor denies the remaining allegations of paragraph 18.

9      In paragraph 28 it says Windsor admits that it is the

10  owner of the policy due to the Trust by and through its

11  predecessor Trustee, voluntarily execution -- and I'm sorry for

12  my -- that's my bad -- voluntarily execution of a change of

13  ownership form for the policy on March 18.

14      So consistently throughout we are talking about a

15  voluntary transfer.

16      **THE COURT:**  Right.  And that's the argument that you've

17  made all along.  That's not different.

18      What's different -- I don't know why you wouldn't have

19  asserted this as an affirmative defense or just in some way

20  laid it out, Mr. Judd.

21      **MR. JUDD:**  Well, Your Honor, again --

22      **THE COURT:**  You think it's there.

23      **MR. JUDD:**  What is it -- we -- again, the most important

24  person in the room now, whether it's clear or not, is you.

25      **THE COURT:**  I usually think that.

1    MR. JUDD:  And I recognize that.  But here, what's -- the

2    point is, where is the prejudice?  It's there.

3    THE COURT:  Well, I'll tell you where the prejudice is.

4    The prejudice is that we went through this entire case and we

5    had a motion for summary judgment, the discovery period was

6    coming to an end, we were a month and a half away from trial,

7    and then you say, "Well, no, there are actually still more

8    issues."

9    Now I don't know why Mr. Wood didn't cross-move for

10   summary judgment, and I hear your point there.

11   MR. JUDD:  Well, it's very clear why Mr. Wood didn't

12   cross-move for summary judgment.  Read his opposition.  What

13   does he say?  And we put it right in our introduction.

14   "There are substantial factual issues associated with the

15   transfer of ownership by way of the voluntary transfer."

16   That's why he didn't move.  And that's why we, when we

17   focused our motion for summary judgment -- in an effort to

18   focus the Court and expedite the resolution, we said, "We're

19   not even going to get into anything, other than we believe the

20   documents include the default sell right that can be triggered

21   by a default."

22   They, on their own, make a judicial admission that there

23   was a default.  We don't necessarily agree, but assuming that

24   that's the case if there is a default they get full relief,

25   it's documented by a subsequent document, we meet the

1    parameters of 9620.  That's all.

2         We were trying to make it very limited and -- again, my

3    mistake.  In a footnote I thought I was reserving the right and

4    demonstrating to the Court -- not now, not -- not -- I mean,

5    before the motion was filed at the inception we're saying

6    there's another argument out there.  Which we then presented to

7    the Court at the time of oral argument.

8         And we've consistently, you know, pointed --

9         THE COURT:  (Indiscernible - simultaneous speaking) you

10   have (indiscernible - simultaneous speaking.)

11        MR. JUDD:  -- to the Court.

12        And at this point in time, what can we do?  We can

13   certainly amend.  We don't have a judgment.  We can -- our

14   amendment would be very consistent with what you see in Coppock

15   and Stamatov because the facts are very similar.  And it does

16   lay out a voluntarily transfer, which can occur under the law.

17   9620, the Commercial Code, does not preclude a voluntarily

18   transfer.

19        THE COURT:  That may well be right, but --

20        Is there anything else that you wanted to add on this?

21        MR. JUDD:  Your Honor, I thought there was one other

22   issue that you raised.

23        THE COURT:  Okay.

24        MR. JUDD:  In terms of flimsiness of the evidence.  I

25   think when you go back and you look at Mr. Houchins and you

1    look at his declaration, and under the standard of a sham

2    declaration -- this is a great example of what constitutes a

3    sham declaration.

4        We have provided the Court his trial, his arbitration,

5    and his deposition testimony where he clearly describes these

6    were not in default.  Talking specifically about Collins and

7    Acker.  That this was a voluntary.  It was a surrender.  This

8    occurred in order to pass clear or clean title.

9        That's not flimsy.  That definitely and completely

10   supports a voluntary agreement, pre-default, with the intent to

11   transfer full ownership.

12       You look at the other evidence that would support it.

13   Mr. Acker, (indiscernible) for months.  The Trustees did

14   nothing.  Collins, they barely responded, only after contacted

15   by their current counsel.  They didn't respond to --

16       So there is clear evidence to show, number one, that it

17   was considered, number two, that it was executed and completed.

18   Because the document that was ultimately signed, the COO, that

19   language is clear.  They're not transferring it for security

20   purposes; that document had already been signed.  These are

21   documents that say absolute ownership with the ability to

22   change the beneficiary that was completely and totally

23   confirmed to Mr. Houchins, admittedly their agent, admittedly

24   their agent, that had -- ownership had been transferred,

25   beneficiary rights had been transferred, and they did nothing

1   for four years other than allow us to continue to make the

2   payments.

3       **THE COURT:**  Okay.

4       Mr. Wood.

5       **MR. WOOD:**  Thank you, Your Honor.  Couple of things.

6   First, Mr. Judd is doubling down on his misstatement in his

7   brief saying that I admitted that there was substantial issues

8   of material fact here, as the Court knows.

9       What I said was, the Court should rule as a matter of law

10  that we win, but, if you buy his argument, then there will be

11  issues of fact.

12      So you didn't buy his argument and it's irrelevant.

13      Now, a couple of things.  Of course we agree that this

14  wasn't properly pled in any way, but I'd like to point out to

15  the Court -- and I didn't develop this as fully in my reply

16  brief as I would have liked to because there's not enough

17  space, they don't give us 25 pages there, but --

18      **THE COURT:**  Seemed like enough.

19      **MR. WOOD:**  Okay, well, some of the cases that I men- --

20  just a couple of points that I would like to make.

21      First of all, as I think the Court has ruled, there was a

22  default.  They admitted it repeatedly and the Court ruled that

23  there was.  And they pursued the default sell right remedy

24  thereafter.  So for them now to say there was no default is a

25  bit much.

1    But more importantly, the issue here of what kinds of

2    contractual agreements you can make to undo the finance

3    agreement, either by modifying it or by innovation, necessarily

4    operates, as the Court has found previously, in the context of

5    the statute.

6    This is not an ordinary contract.  It has statutory

7    provisions which expressly preclude giving away the rights

8    created by the statute absent a post-default document affirming

9    that.

10    So whether they characterize this alleged oral agreement

11    between the parties -- of which there's no evidence that I know

12    of -- as a novation or a modification, it should fail under

13    9620.  And even if you don't think it fails under 9620, it

14    fails for two other reasons.  If we characterize it, first of

15    all, as a modification of the finance agreement, I recommend

16    the Court to the *Fanucchi* case, which we cited in our paper --

17    papers, where Judge Fletcher points out that where you have a

18    provision that says you can't modify an agreement except in

19    writing, that will be operative so long as -- that will not be

20    operative if the agreement, the oral agreement, is fully

21    executed.

22    But he also held this agreement in this case was not

23    fully executed because the party claiming that it was is, at

24    the same time, asserting a breach of part of that agreement by

25    the other party.

1    That's what we have here.  They alleged in their

2    pleadings "You have breached your duty under this supposedly

3    modified agreement to turn over all papers to us, to let the

4    insurer pay all the death benefits to us."

5    They have, in other words, said that this agreement was

6    not fully executed.  That's what *Fanucchi* stands for.

7    That's as to the modification issue.

8    Pardon me, as I take a drink here.

9    If, on the other hand, they want to characterize it as a

10   novation, then they have to say, "Well, the whole financing

11   agreement is dead and gone and what we have now is this new

12   agreement, completely replaces it, which is 'We forgive the

13   loan and you give us the policy.'"

14   That's their second argument.

15   Well, that doesn't work because in 2014 they send a letter

16   out to both Trusts saying you have continuing obligations under

17   the financing agreements to do thus and so.

18   And there's another point, which is that the obligations

19   that they list are referred to in the financing agreement --

20   and I can read the language to Your Honor; it's very

21   instructive.  You know, the obligations are, turn over the

22   HIPAA documents, help us get the money from the insurance

23   company, and so on.

24   Well, if we look at the language in the financing

25   agreements calling for them to do that -- this is Section 5.01,

1    which in the Goss agreement is Docket No. 38, page 28 of 143,

2    and in the Gordillo case is Docket No. 40, page 28 at 160 -- it

3    says, "Covenants of Trust from and after the financing date and

4    for so long as any amounts remain owing by the Trust to the

5    lender, the Trust shall have the following duties."

6        And these are the duties that they say they had.

7        Well, that -- those letters are a flat-out admission that

8    as far as Windsor is concerned the financing agreement is still

9    operative and it's not been novated by some magical oral

10   agreement.

11       So even if you decide that they pled this, which they

12   didn't, it fails anyway.

13       Thank you.

14       **THE COURT:**  Mr. Judd, last word?

15       **MR. JUDD:**  Thank you, Your Honor.

16       First, I think that there has to be the recognition which

17   we provided in the court that there cannot be a waiver unless

18   it's knowing and deliberate on the part of the attorneys.

19       There is nothing that shows that we knowingly and

20   deliberately waived this voluntary argument.

21       And so --

22       **THE COURT:**  Unless you didn't plead it.

23       **MR. JUDD:**  Unless we didn't plead it artfully and we

24   didn't plead it clearly.

25       But certainly, the language is there that we could

1    refine, we could be more specific, and we could be even more

2    articulate and --

3        **THE COURT:**  Okay.  I get that argument.

4        **MR. JUDD:**  I'm not doubling down.

5        **THE COURT:**  Don't go back to that one.  I've read through

6    that one.  It's not a good ar- -- it's not a persuasive

7    argument one way or another, so go to the next one.

8        **MR. JUDD:**  I appreciate that, Your Honor.

9        The last one that he raised is -- and again, what you just

10   heard was these -- our arguments fail and we lose because

11   Section 19 -- 9620 of the Commercial Code is operative and

12   can't be altered.

13       What it doesn't do, and what it completely ignores -- and

14   it's a diversion, is we're not to 9620 under a voluntary

15   transfer.  9601 very specifically says -- if I don't do it

16   upside down -- well, it's -- copy of the wrong page.  Here it

17   is.

18       9601 of the Commercial Code says this.  Rights of the

19   secured party after default.  After default, a secured party

20   has the rights provided in this chapter.

21       We don't have a default here; we have a voluntary

22   agreement.  And the things that he identified in terms of their

23   continuing obligations, notice what Windsor asked them to do.

24   Not pay anything, but to provide updated help for the insured.

25       The Trust had the obligation to provide the updated help

1    information; not make payments, not repay anything, but provide

2    the updated information.  Which they didn't do.

3         But, in any event, that's not something that now vitiates

4    the enforceable agreement that was voluntarily entered into,

5    documented.  It's not just simply that there is an oral

6    agreement, there is a verified document signed that

7    specifically transferred ownership.

8         So it's not an oral agreement.  There's an oral

9    modification, there's an oral amendment, but it's not a

10   (indiscernible) or a new agreement, it's an amendment that was

11   fully executed and completely complied with.

12        There are substantial issues of fact, Your Honor.  The

13   discovery, I believe, that our -- my declaration that I

14   submitted shows that there is an abundance of discovery that

15   could further flesh out and show that there are issues of fact.

16        The motion that we'd have to -- that was admitted that

17   we'd have to show by clear and convincing evidence actually

18   proves our point.  There are facts -- whether we have to show

19   it by a preponderance of the evidence or clear and convincing

20   evidence, there are facts that support the denial of this

21   motion and warrant discovery to be completed and a trial on

22   these issues.

23        **THE COURT:**  All right.  Thank you all very much.

24        You've had -- your lawyer has done an excellent job

25   and -- lining it out, Ms. Antonino, so I'm not going to hear

1    anything further.

2         All right.  Thanks very much.

3         **MR. JUDD:**  Thank you, Your Honor.

4         (Proceedings adjourned at 3:05 P.M.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF CONTRACT TRANSCRIBER

I, Kelly Polvi, CSR, RMR, FCRR, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further, that I am not financially nor otherwise interested in the outcome of the action.

Dated December 30, 2015.

_____
Kelly Polvi, CSR #6389, RMR, FCRR
Contract Transcriber

*Kelly Polvi, CSR, RMR, FCRR*
*P.O. Box 1427*
*Alameda, CA 94501*
*(503) 779-7406; kpolvi@comcast.net*