UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| WINDSOR SECURITIES, LLC | : | |
| | : | Civil Action No. 16-cv-01533 (GBD) |
| **Plaintiff** | : | |
| v. | : | |
| | : | |
| ARENT FOX, LLP | : | |
| **and** | : | |
| JULIUS ROUSSEAU, III, ESQUIRE | : | |
| | : | |
| **Defendants** | : | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS STATEMENT OF UNCONTESTED
MATERIAL FACTS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56
AND LOCAL CIVIL RULE 56.1(A)**

Alan L. Frank, Esquire
Samantha A. Millrood, Esquire
Alan L. Frank Law Associates, P.C.
135 Old York Road
Jenkintown, PA 19046

1601 Gravesend Neck Rd
Suite 903, 2nd Fl.
Brooklyn, NY 11229

Tel: (215) 935-1000
Fax: (215) 935-1110
afrank@alflaw.net
smillrood@alflaw.net
Attorneys for Plaintiff Windsor Securities, LLC

Dated: September 17, 2018

**PLAINTIFF'S RESPONSE TO DEFENDANTS STATEMENT OF UNCONTESTED
MATERIAL FACTS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56
AND LOCAL CIVIL RULE 56.1(A)**

Pursuant to Rule 56.1(b) of the Local Rules of the United States Courts for the Eastern

and Southern Districts of New York, Plaintiff Windsor Securities, LLC ("Plaintiff" or

"Windsor"), responds as follows to each statement in Defendants Arent Fox, LLP ("Arent Fox")

and Julius Rousseau, III (" Rousseau") (Arent Fox and Rousseau will b collectively referred to

herein as "Defendants") Statement of Uncontested Material Facts Pursuant to Federal Rule of

Civil Procedure 56 and Local Civil Rule 56.1(a) submitted in support of their Motion for Partial

Summary Judgment as to all claims asserted in Plaintiff's Complaint:

## BACKGROUND

1.    Undisputed.

2.    Disputed.  While it is undisputed that Plaintiff had no previous experience with

life insurance premium financing, the remaining allegations are disputed.  Steven Prusky testified

that Plaintiff has experience with investing in mutual index funds and index futures and

described Plaintiff's are of expertise as "macro market technical analyst through trading indexes

on a short term basis".  Dep Tr. Steven Prusky March 6, 2017, pgs. 57: 20- 58:12. [attached to

Millrood Declaration submitted herewith as Exhibit "1"].

3.    Disputed.  Steven Prusky testified that he was told, prior to making any of the

premium financed loans at issue in this case, that he could earn "15% interest, or somewhere

thereabouts" on the loans.  Dep Tr. Steven Prusky March 6, 2017, pgs. 69:17-70:2 [attached to

Millrood Declaration submitted herewith as Exhibit "1"].

1

4.     Disputed.  When Plaintiff initiated the premium financing at issue in this action, Plaintiff's goal was a short-term near riskless investment with returns comprising the amounts loaned plus interest.  However, when it became clear that the Coppock, Collins, Stamatov and Acker Trusts had no intention of repaying the amounts they owed under the Premium Financing Package, Plaintiff was forced to choose between a 100% loss (lapsing the policies when Trusts would not repay) or funding an unknown amount (increasing premiums, and potentially far greater than loans called for in the Premium Financing package) for an unknown period of time (until the Insureds died), the calculus changed dramatically.  Plaintiff was now taking a much greater risk.  Plaintiff realized that to recover its investment, it would need to keep the policies, fund them for years, and collect the **full** Death Benefits.  Dep Tr. Steven Prusky March 6, 2017, pgs.69:17- 70:5, 248:20-251:3 ; Dep Tr. Steven Prusky October 4, 2017, pgs. 323:12-18, 348:14-23 [attached to Millrood Declaration submitted herewith as Exhibit "1"]; Declaration of Steven Prusky filed in support of Motion for Summary Judgment in the Collins Action, United States District Court for the Northern District of California, Case No. 3:14-cv-03713-WHO [Doc. #31-2], at ¶8, [attached to [D.E. #125] as Exhibit 12 (without Exhibits thereto as all Exhibits to the Declarations are separately referenced and identified herein)]; Declaration of Steven Prusky filed in support of Motion for Summary Judgment in the Acker Action, Case No. 14-cv-04651-WHO [Doc. #30-2], at ¶8 [attached to [D.E. #125] as Exhibit 11]; Dep. Tr. Julius Rousseau, III, individually and as Corporate Designee for Arent Fox, March 7, 2017, pg. 245:2-7 [attached to [D.E. #125] as Exhibit 3] ("A.  My recollection was, each of those policies had been surrendered by the insureds voluntarily exercising their -- and I'm saying insureds; trustees, trustees -- exercising their default sale right")

2

5.      Undisputed.  However, for clarification, only five (5) of those policies, the Bitter,
Collins, Aker, Coppock and Stamatov policies, are at issue in this action.

6.      Undisputed.

7.      Disputed.  As Steven Prusky stated in the testimony cited for the facts alleged in
this paragraph "How much did you lend to the Trusts?  A: I really don't know.  I can give you a
very rough ballpark of One and a half Million."  The Promissory Notes, Included in each
Premium Finance Package provides the starting amounts loaned to each Trust, and each
subsequent premium payment added to that initial amount.

8.      Disputed in part.  It is undisputed that Plaintiff did not hire an attorney to draft the
loan documents (referred to hereinafter as the Premium Finance Packages"), and that the
Premium Finance Packages for the five (5) policies operated in the same way and contained
virtually identical terms, except for except for the amounts and maturity dates of the loans and
insured, trustee and trust particulars.  The remaining allegations are disputed.  Specifically, the
Premium Financing documents, comprising 19 individual documents, were presented to Windsor
by Joseph Aaron, of Wood Hat & Silver, LLC, a California based company.  Mr. Joseph Darracq
presented the "idea" to Plaintiff, and connected Plaintiff to Aaron and Wood Hat, who connected
insurance brokers, insureds, and premium finance lenders, and the Premium Financing Packages
between Windsor and each of the Trust/Owners of the respective insurance policies.  Dep. Tr.
Steven Prusky, March 6, 2017, pgs.  116:12-25, 122:21- 123:7, 124:4–21, 129:20-22 [attached to
[D.E. #125 as Exhibit 1].

9.      Disputed.  The loan documents did not provide for, or set up the trusts for the
policies.  To the contrary, before the Premium Financing Packages were executed and before

3

Plaintiff was ever introduced to the insureds, the insureds had created their respective life insurance trusts with the assistance of Eugene Houchins, III, through his companies Bonded Life and E.E.H. Consulting, Inc. (collectively "Houchins"). Affidavit of Eugene Houchins, III, dated March 22, 2017, at ¶3 [attached to [D.E. #125] as Exhibit 10].

      10.    Undisputed.

      11.    Undisputed.

      12.    Disputed in part. While it is undisputed that Premium Finance Packages included the five (5) documents listed in this paragraph, to the extent this paragraph implies that there were only five (5) documents included in the Premium Finance Packages that implication is disputed. The Premium Finance Packages actually comprised of nineteen (19) documents, including specifically: (1) Life Insurance Premium Financing Agreement, and Terms and Conditions for Life Insurance Premium Financing Agreement (Doc.#1 of 19); (2) Promissory Note (Doc.#2 of 19); (3) Trustee's Certificate , with Exhibit A Irrevocable Trust Agreement and Exhibit B Internal Revenue Service Letter Certifying EIN of Trust (Doc.#3 of 19); (4) Insured's Consent (Doc.#4 of 19); (5) Authorization for Disclosure of Protected Health Information (Doc.#5 of 19); (6) Irrevocable and Durable Limited Power of Attorney (Doc.#6 of 19); (7) Authorization and Direction to Provide Death Certificate (Doc.#7 of 19); (8) Insured's Closing Certificate (Doc.#8 of 19); (9) Acknowledgment and Agreement of Trust and Insured with Respect to Certain Financial Matters (Doc.#9 of 19); (10) Copy of Driver's License (or Other Proof of Insured's Age and Sex) (Doc.#10 of 19); (11) Special Power of Attorney (Doc.#11 of 19); (12) The Insurance Policy (Doc.#12 of 19); (13) Security Agreement for Beneficiary Interest in Trust (Doc.#13 of 19); (14) Sales Illustration for the Policy (Doc.#14 of 19); (15) Assignment

4

of Life Insurance Policy as Collateral (Doc.#15 of 19); (16) Assignment of Life Insurance Policy as Collateral and Individual Acknowledgment to be Signed and Notarized (Doc.#16 of 19); (17) Borrower's Closing Certificate (Doc.#17 of 19); (18) Life Insurance Premium Finance Program Trust Questionnaire (Doc.#18 of 19); and (19) Receipt of Funds Confirmation (Doc.#19 of 19). Acker, Collins, Bitter, Stamatov, and Coppock Premium Financing Agreement Packages [attached to [D.E. #125] as Exhibits 23-27 (CONFIDENTIAL)].

13.     Disputed. Under the Premium Financing Packages, Windsor was obligated to loan each Trust a particular amount, covering a loan initiation fee and two years of premiums on the subject life insurance policy, and each Premium Financing Package provided that the Policy was collateral for the loan. Acker, Collins, Bitter, Stamatov, and Coppock Premium Financing Agreement Packages [attached to [D.E. #125] as Exhibits 23-27 (CONFIDENTIAL)], at Life Insurance Premium Financing Agreement, Doc.#1 of 19 and Promissory Note, Doc #2 of 19, and Assignment of Life Insurance Policy as Collateral, Doc.#15 of 19.

14.     Disputed in part. While it is undisputed that the Premium Finance Packages provided that Windsor was entitled to 15% interest on the "principal amount" of each loan, it is disputed that Windsor was actually entitled to interest at a annual rate of 15%. By way of further answer, although the Premium Finance Packages provide that interest shall accrue at the rate of 15% per annum, California law, applicable to the Premium Finance Packages, caps annual interest at a rate of 10% per annum. Steven Prusky, Dep. Tr. October 4, 2017, pg. 323:12-18 [attached to [D.E. #125] as Exhibit 2]; Dep. Tr. Julius Rousseau, III, individually and as Corporate Designee for Arent Fox, March 7, 2017, pgs. 72:21-73: 6, 109:17-20 [attached to [D.E. #125] as Exhibit 3].

5

15.    Undisputed.

16.    Undisputed.

17.    Disputed.  Section 7.13 titled "Limitation of Insured Liability" provides:

**The Insured shall be liable for damages for any misrepresentation made by him or her in Section 3.02, and for any default by him or her in the performance of his or her obligations under Article V and Section 7.01, but, in the absence of fraud, *otherwise* shall have no liability hereunder, including without limitation, no liability for the payment of the Financing Balance.**

See Premium Financing Packages, at Doc #1 of 19 [Exhibit 3 to [D.E. #130], at pg. 24 of 74].

18.    Disputed.  Windsor is without knowledge or information to know whether the

Trusts held any other assets besides the Policies, and therefore disputes the same.

19.    Undisputed.

## PROBLEMS WITH THE LOANS

20.    Disputed.  The cited testimony does not support the facts asserted and in no way

references realization of risks associated with the premium financing.  Rather, in the cited

testimony Mr. Prusky is discussing "when it became much more apparent that [Windsor] was

likely to take ownership of the policies rather than – and continue to finance them – rather than

just get 15% after two years..." Dep. Tr. Steven Prusky, March 6, 2017, pgs.  113:6-114:15

[attached to Millrood Declaration submitted herewith as Exhibit "1"].

21.    Disputed in part.  While it is undisputed that in 2008 the life settlement market

had taken a significant downturn and policies such as those at issue herein became more difficult

to sell on the open market, there is no testimony in the record that supports the allegation in this

paragraph that "there was no way to sell the policies on the secondary market" and that statement

is therefore disputed.

6

22.     Disputed.  There is no record evidence whatsoever that the Insureds and/or

Trustees lied on their insurance application forms by checking the box that represented that they

had not and did not plan to enter into a premium financing agreement.  The evidence of record

actually contradicts the Defendants' suggestion.  In fact the Affidavit of Eugene Houchins, III

confirms that it was only "after the policy had been issued and delivered", that he "introduced to

the Insureds the option of premium financing for the life insurance policy. If an Insured were

interested in receiving premium financing, [he] would put that Insured together with lending

broker, Wood, Hat, & Silver, LLC. For the Insureds, each of whom chose to finance their

policies, Wood, Hat & Silver, LLC procured Windsor Securities, LLC as the lender." Affidavit

of Eugene Houchins, III, dated March 22, 2017,  at pgs. 1-2 [attached to [D.E. #125] as Exhibit

10].  Mr. Houchins further testified consistently with respect to the Bitter policy at the Bitter

Arbitration Hearing as follows:

> Q.     [By Mr. Rousseau] So after the – approximately how long after the
>        Pacific Life application did you do the Sun Life application?
> A.     [By Mr. Houchins] About three months.
> Q.     Was there any discussion with Mr. Bitter that you were privy to around
>        this time about how these policies, one or both of these policies, would be
>        paid for?
> A.     There was no discussion about that until after the – there was no discussion until
>        after the application for Pacific Life had been submitted.
> Q.     And after that time, after the submission of the Pacific Life policy, was
>        there any discussion about how the premiums would be paid?
> A.     Yes.
> Q.     What was that discussion?
> A.     We introduced him to what premium financing was.
>
> ....
>
> Q.     [By Mr. Wood] So you're aware, are you not, that the loan documents in
>        this particular case were signed on April 8th, 2008?
> A.     [By Mr. Houchins] Sounds about right.
> Q.     So how much prior to that time did you first introduce to Mr. Bitter the
>        possibility or the notion of premium financing?

A.     Probably a week or two.

...

Q.     [By Mr. Wood] Had the Pac Life policy already been issued to Mr. Bitter
       before he made a decision about premium financing?

A.     [By Mr. Houchins] Yes.

Q.     Approximately how long before April 8 did he really make a final decision
       on this?

A.     It was just a few days prior. Yeah, it was a pretty quick process.

Transcript of Proceedings of Hearing Day 3, January 15, 2014, *Gregory Barnes, Jr. as*

*Trustee of John L. Bitter Irrevocable Life Insurance Trust v. Windsor Securities, LLC*, American

Arbitration Association Case No. 74-148-000296-13-S1M, 460:1-25, pgs. 464:4-11, 466:18-25

[attached hereto as Exhibit "2"].

       23.    Disputed.  There is no record evidence that Windsor's investments in the life

insurance policies at issue in this litigation were ever in danger because of recision of the policies

for fraud, and in fact the insurer paid the death benefits for all four (4) policies where the

insureds died.  See, John Hancock Interpleader Complaint in the Acker Action, Case No. 14-cv-

04651-WHO, [attached to [D.E. #125] as Exhibit 98]; Pacific Life Interpleader Complaint in the

Collins Action [attached to [D.E. #125] as Exhibit 101]; Complaint [D.E. #1] [attached to [D.E.

#125] as Exhibit 8]; and Defendants' Answer, Affirmative Defenses and Counterclaim [D.E.

#19], at ¶¶58 [attached to [D.E. #125] as Exhibit 9].

       Contrary to the allegations in this paragraph, the undisputed evidence of record

establishes that upon providing the premium financing and executing the Premium Financing

Packages, Windsor disclosed in writing to each Insurer for each policy that it was in fact being

premium financed, and, "within the contestability period", further sought the insurer's

acknowledgment that:

8

> **[it] was not aware of any facts or circumstances that would render any of the policies void or contestable for any reason" and further explained that it "was aware of a number of legal actions that ha[d] been taken around the country by insurance companies claiming that, by virtue of premium financing arrangements or other types of financial arrangements, various insurance policies are subject to rescission**

and stated:

> **Please be advised that as part of the premium financing agreements, Windsor was advised that all policies had been lawfully and validly issued, that no misrepresentations were made on any policy applications, and that there was no reason that the policies would not be honored.**

Windsor's September 15, 2009 letter to Pacific Life relating to the Collins, Bitter and Coppock Policies [Bates Stamped AF 0032796-0032797 CONFIDENTIAL].

## WINDSOR ENGAGES ROUSSEAU

24.     Disputed in part.  In or around 2008, Windsor was first introduced to Defendant Rousseau, and by April 2009, Windsor and Rousseau were discussing the insurance policies at issue in this litigation and Rousseau was providing Windsor legal advice with respect thereto, however, Windsor formally engaged Rousseau and the Herrick Firm on June 5, 2009.   Dep. Tr. Steven Prusky, March 6, 2017, pgs.154:13-16, 171:16- 172:7, 177:10-178:4 [attached to [D.E. #125] as Exhibit 1]; Dep. Tr. Julius Rousseau, III, individually and as Corporate Designee for Arent Fox, March 7, 2017, pgs. 19:18-20:14, 23:10- 24:6 [attached to [D.E. #125] as Exhibit 3]; Herrick Firm Engagement Letter dated October 20, 2008 [attached to [D.E. #125] as Exhibit 36 (CONFIDENTIAL)]; April 29, 2009 Email from Rousseau to Prusky [attached to [D.E. #125] as Exhibit 43 (CONFIDENTIAL)]; Rousseau/Herrick Firm June 5, 2009 Engagement Letter [attached to [D.E. #125] as Exhibit 37 (CONFIDENTIAL)].

9

25.     Disputed.  This is a mis-characterization of Rousseau's Declaration, wherein

Rousseau states "I warned Steven Prusky, Windsor's principal, that there were risks associated

with Windsor's loans and that some states considered the underlying insurance policies to be

STOLI ("Stranger Originated Life Insurance") policies and Invalid".  Rousseau Declaration, at ¶

5. It is unclear from Mr. Rousseau's Declaration when he purportedly made this comment to Mr.

Prusky, and the record contains no contemporaneous written or testimonial evidence that

Rousseau advised Plaintiff of this significant risk, or that he advised such risk was great enough

that Plaintiff should dispose of these policies rather than continue paying premiums.  Further, as

explained more fully above, the undisputed evidence of record establishes that upon providing

the premium financing and executing the Premium Financing Packages, Windsor disclosed in

writing to each Insurer for each policy that it was in fact being premium financed within the

contestability period for each, and not one of the Insurers contested any of the policies at issue,

and for each of the four (4) insureds that have died (Coppock is still living), the insurers duly

paid the death benefits under the policies.

26.     Undisputed.  However, none of those states governed the policies at issue.

Further, as explained more fully above, the evidence of record establishes that upon providing the

premium financing and executing the Premium Financing Packages, Windsor disclosed in

writing to each Insurer, within the contestability period for each for each policy, that each policy

was in fact being premium financed, and not one of the Insurers, or governing states, contested

any of the policies at issue, and for each of the four (4) insureds that have died (Coppock is still

living), the insurers paid the death benefits under the policies.  Additionally, Rousseau did not

10

suggest that Plaintiff take any other steps to protect these policies, and none of the risks Rousseau expressed concern about became a problem.

27.     Undisputed.

28.     Undisputed.

29.     Disputed as unclear.  As explained more fully above, the evidence of record establishes that upon providing the premium financing and executing the Premium Financing Packages, Windsor disclosed in writing to each Insurer for each policy that it was in fact being premium financed within the contestability period for each, and not one of the Insurers contested any of the policies at issue, and for each of the four (4) insureds that have died (Coppock is still living), the insurers paid the death benefits under the policies.

30.     Undisputed.

31.     Undisputed.

32.     Undisputed.

**WINDSOR SECURES CHANGE OF OWNERSHIP FORMS THROUGH HOUCHINS**

33.     Disputed in part.  It is undisputed that in or around January 2010, shortly before the Premium Financed Loans from Windsor to each of the Trusts were due to be repaid, Houchins informed Windsor that the Acker, Coppock, Collins and Stamatov Trusts were not willing to take over premium payments on the Policies and would not repay the loans when due. All remaining allegations in this paragraph are disputed. Affidavit of Eugene Houchins, III, dated March 22, 2017, at ¶8 [attached to [D.E. #125] as Exhibit 10]; Declaration of Steven Prusky filed in support of Motion for Summary Judgment in the Acker Action, Case No. 14-cv-04651-WHO [Doc. #30-2], at ¶4 [attached to [D.E. #125] as Exhibit 11]; Declaration of Steven Prusky filed in

11

support of Motion for Summary Judgment in the Collins Action, United States District Court for the Northern District of California, Case No. 3:14-cv-03713-WHO [Doc. #31-2], at ¶4 [attached to [D.E. #125] as Exhibit 12 (without Exhibits thereto as all Exhibits to the Declarations are separately referenced and identified herein)].

34.    Undisputed.  However, by way of clarification, Houchins informed Windsor that the Acker, Coppock, Collins and Stamatov Trusts were not willing to take over premium payments on the Policies and would not repay the loans before each of the respective loans became due.

35.    Disputed in part.  It is undisputed that upon learning from Houchins that the Acker, Coppock, Collins and Stamatov Trusts were not willing to take over premium payments on the Policies and would not repay the loans when due Prusky consulted with Rousseau, who advised in part, that a signed Change of Ownership form would suffice to pass absolute ownership and entitlement to the Acker, Coppock, Collins and Stamatov policies, and all death benefits thereunder.

The remaining allegations in this paragraph are disputed. By way of further response, Rousseau specifically advised Windsor to treat Houchins' communication regarding the Trustees for the Coppock, Collins, Acker and Stamatov Policies intention to not re-pay the loans at the maturity dates *as an exercise of the Premium Finance Packages' Default Sales Right*[1], which

---

[1]As outlined above the Premium Finance Packages' Assignment of Life Insurance Policy as Collateral, contains the following Default Sales Right:

**DEFAULT SALE RIGHT. Upon an occurrence of an Event of Default (as defined in the Agreement) that has not been remedied within the time period required in the Agreement, Assignee shall have the right (the "Default Sale Right") but not the obligation to accept, that in consideration of the full and complete**

provided Windsor with the right to accept the Insurance Trust's transfer of title of the insurance

policy in full satisfaction of the trust's financial obligations, thus allowing the Insurance Trust to

walk away from the loan without recourse. Declaration of Steven Prusky filed in support of

Motion for Summary Judgment in the Collins Action, United States District Court for the

Northern District of California, Case No. 3:14-cv-03713-WHO [Doc. #31-2], at ¶8, [attached to

[D.E. #125] as Exhibit 12 (without Exhibits thereto as all Exhibits to the Declarations are

separately referenced and identified herein)]; Declaration of Steven Prusky filed in support of

Motion for Summary Judgment in the Acker Action, Case No. 14-cv-04651-WHO [Doc. #30-2],

at ¶8 [attached to [D.E. #125] as Exhibit 11]; Dep. Tr. Julius Rousseau, III, individually and as

Corporate Designee for Arent Fox, March 7, 2017, pg. 245:2-7 [attached to [D.E. #125] as

Exhibit 3] ("A. My recollection was, each of those policies had been surrendered by the insureds

voluntarily exercising their -- and I'm saying insureds; trustees, trustees -- exercising their default

sale right"). Rousseau further specifically advised Windsor to demand that the Trustees sign the

respective Insurance companies' change of ownership and change of beneficiary forms and turn

over the policies to Windsor. Declaration of Steven Prusky filed in support of Motion for

Summary Judgment in the Acker Action, Case No. 14-cv-04651-WHO, at ¶8 [Doc. #30-2],

---

**satisfaction of the Liabilities (the sufficiency of which consideration is hereby acknowledged) Owner may make a full transfer and assignment of the Insurance Policy to Assignee and thereby forever relinquish any and all rights Owner may have thereunder, including without limitation any rights to cash surrender value and/or death benefit provided thereunder. Upon the exercise of this Default Sale Right, Assignee shall notify Insurer in writing and Insurer shall thereafter recognize Assignee as the sole lawful owner of the Insurance Policy.**

Acker, Collins, Bitter, Stamatov, and Coppock Premium Financing Agreement Packages [attached to [D.E. #125] as Exhibits 23-27 (CONFIDENTIAL)], at Assignment of Life Insurance Policy as Collateral, Doc. #16 of 19, at pg. 4.

[attached to [D.E. #125] as Exhibit 11]; Declaration of Steven Prusky filed in support of Motion for Summary Judgment in the Collins Action, United States District Court for the Northern District of California, Case No. 3:14-cv-03713-WHO [Doc. #31-2], at ¶8 [attached to [D.E. #125] as Exhibit 12 (without Exhibits thereto as all Exhibits to the Declarations are separately referenced and identified herein)]. Rousseau and Arent Fox specifically further assured Windsor that no other documentation, beside the respective Insurance Company's Assignment and Change of Ownership and Beneficiary forms executed by each of the Trustees, was necessary from the Stamatov, Acker, Coppock and Collins Trusts, Insureds, and/or Beneficiaries for Windsor's unfettered ownership of the Policies and Windsor's absolute entitlement to the death benefits thereunder, and did not advise Windsor about application of the California Commercial Code and/or the default sales provisions contained therein, and did not counsel Windsor to obtain writings such as the Policy Relinquishment and Loan Satisfaction Agreements and Mutual Releases that had been previously drafted and provided to Rousseau. Dep Tr. Julius Rousseau, individually and as Corporate Designee for Arent Fox, March 7, 2017, pgs. 160:17 to 161:22, 182:9-16, 245: 2-19 [attached to [D.E. #125] as Exhibit 3]. Rousseau did not advise, and therefore Windsor never communicated to any of the Stamatov, Acker, Coppock and/or Collins Trustees and/or Insureds and/or Beneficiaries that: (1) the above outlined Ownership Name or Beneficiary Change Request forms that the Trustees had executed were in return for any agreement by Windsor to relieve the Trusts from any continuing obligation to repay the Loans; and (2) that by executing the above outlined Ownership Name or Beneficiary Change Request forms the Trusts were giving up either (a) the right of the Trusts, pursuant to the Financing Agreements, to receive any proceeds from a public or private sale of the Policies remaining after

14

Windsor was paid what is was owed under the Loans; or (b) the right of the Trusts, pursuant to the Financing Agreements, to receive any proceeds of the death benefit remaining after Windsor was paid what is was owed under the Loans. Declaration of Mary Ann Gordillo filed in support of Motion for Summary Judgment in Pacific Life Insurance Co. v. Mary Ann Gordillo, as Trustee of the Erwin A. Collins Family Insurance Trust and Windsor Securities, United States District Court for the Northern District of California, Case No. 3:14-cv-03713-WHO (the "Collins Action")[Doc. 40], at ¶8 [attached to [D.E. #125] as Exhibit 13]; Declaration of Ronald Mark Goss filed in opposition of Motion for Summary Judgment in Acker Action, United States District Court for the Northern District of California, Case No. 14-cv-04651-WHO [Doc. #38], at ¶¶9-10 [attached to [D.E. #125] as Exhibit 14]; Complaint for Declaratory Relief, Windsor Securities, LLC v. The Jane Ann Stamatov Family Trust, United States District Court for the Northern District of California, Case No. 3:15-cv-00080-JST, Complaint (without Exhibits) [Doc. #1], at ¶22 [attached to [D.E. #125] as Exhibit 96].

36. Undisputed. By way of further clarification Houchins assisted in the collection of Change of Ownership forms from the Acker, Collins, Coppock and Stamatov Trustees.

37. Undisputed.

38. Disputed. Not one of the Trustees requested a release after signing the Change of Ownership form and the *only* insured that requested a release after providing the Change of Ownership form was Robert Coppock, whose request was made through Houchins to Windsor, and the record citation for this allegations so states. March 30, 2010 Houchins' letter [attached to [D.E. #125] as Exhibit 80].

39. Undisputed.

15

40.     Disputed in part.  It is undisputed that Windsor drafted on March 23, 2010 a letter

to the Acker Trustee which stated, in relevant part:

> **Pursuant to my February letter to you and my letter to Mr. Acker, please consider**
> **this formal notification that we are releasing the Trust and the insured, Joseph**
> **Acker, from any financial obligations stemming from our Financial Agreement.**
>
> **We want to confirm that it is our understanding that you have signed the Change of**
> **Ownership because you would rather irrevocably surrender ownership and be freed**
> **of financial obligations past and future, than pay off your loan to Windsor. We also**
> **want to confirm that this assignment is effective immediately upon its processing by**
> **the Insurance Company and is irrevocable. With its processing there will be no**
> **more financial obligations between Windsor and the Trust, nor between Windsor**
> **and the insured, excluding financial obligations contemplated by a breach of**
> **contract.**

[See Exhibit 46 to [D.E. #130]].

However, there is no evidence of record that proves receipt of the March 23, 2010 Letter,

and the Acker Trustee, Ronald Mark Goss submitted a declaration dated July 27, 2015 wherein

he specifically denied receiving the March 23, 2010 Letter from Windsor, stating in relevant part:

> **10.     _Windsor did not suggest in its February 19, 2010 letter - or in any other_**
> **_communication to me - that I was executing the abovementioned Change of Ownership_**
> **_(Absolute Assignment) form - or, for that matter, the abovementioned Absolute/Gift_**
> **_Assignment - Life Insurance form - in return for an agreement by Windsor to relieve_**
> **_the Trust from any continuing obligation to repay the loan._  Nor did Windsor suggest**
> **in that letter - or in any other communication to me - that by my executing those**
> **documents the Trust was giving up either: (a) the right of the Trust, pursuant to the**
> **Financing Agreement, to receive any proceeds of a public or private sale of the**
> **Policy remaining after Windsor had been paid what it was owed on the loan (_viz.,_**
> **premium payments, interest, and reasonable expenses connected with the sale); or**
> **(b) the right of the Trust, pursuant to the Financing Agreement, to receive any**
> **proceeds of the death benefit remaining after Windsor had been paid what it was**
> **owed on the loan (_viz.,_ premium payments, interest, and reasonable expenses**
> **connected with collecting the death benefit.) (Exhibit C hereto [Bates No. GOSS**
> **0135]).**
>
> **12.     _From at or around the time of the default by the Trust in 2010 until I ceased_**

16

*to act as trustee on February 16, 2012, I had no direct communication with Windsor other than the abovementioned letter dated February 19, 2010.* (Ex. C hereto [Bates No. GOSS 0135].*) In particular, Windsor never communicated to me, and thus by definition I never accepted, either*:

(a)   an offer to relieve the Trust from any continuing obligation to repay the loan if the Trust would agree to give Windsor a form of ownership of the Policy unfettered by the obligation, set forth in the Financing Agreement, to provide to the Trust any amount remaining from the proceeds of the public or private sale of the Policy after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale); or

(b)   an offer to relieve the Trust from any obligation to repay the loan if the Trust would agree to give Windsor a form of beneficiary status under the Policy unfettered by the obligation, set forth in the Financing Agreement, to provide the Trust any amounts remaining from the death benefit after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit).

13.   *Again, from at or around the time of the default by the Trust in 2010 until I ceased to act as trustee in February, 2012, I had no direct communication with Windsor other than the abovementioned letter dated February 19, 2010.* (Ex. C hereto [Bates No. GOSS 0135].)   In, particular, I never communicated to Windsor, and Windsor thus by definition never accepted, either:

(a)   an offer to give Windsor a form of ownership of the Policy unfettered by the obligation, set forth in the Financing Agreement, to provide to the Trust any amounts remaining from the proceeds of a public or private sale of the Policy after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale) if Windsor would agree to relieve the Trust from any continuing obligation to repay the loan; or

(b)   an offer to give Windsor a form of beneficiary status under the Policy unfettered by the obligation, set forth in the Financing Agreement, to provide to the Trust any amounts remaining from the proceeds of the death benefit after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit) if Windsor would agree to relieve the Trust from any continuing obligation to repay the loan.

14.   In short, I never heard of, never intended to enter into, and never did enter

into, any agreement with Windsor either:

(a) **to give Windsor a form of ownership of the Policy unfettered by the obligation, set forth in the Financing Agreement, to provide to the Trust any amounts remaining from the proceeds of the public or private sale of the Policy after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale) in return for Windsor's relieving the Trust from any continuing obligation to repay the loan; or**

(b) **to give Windsor a form of beneficiary status under the Policy unfettered by the obligation, set forth in the Financing Agreement, to provide to the Trust any amounts remaining from the proceeds of the death benefit after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit) in return for Windsor's relieving the Trust from any continuing obligation to repay the loan.**

Declaration of Ronald Mark Goss filed in opposition of Motion for Summary Judgment in Acker

Action, Case No. 14-cv-04651-WHO [Doc. #38](emphasis added) [attached to [D.E. #125] as

Exhibit 14].

Moreover, Windsor's March 23, 2010 letter was not counter signed by Acker, the Acker

Trustee and/or the Acker Beneficiary, and it did not provide that Acker and/or the Acker Trustee

and/or the Acker Beneficiary agreed that they were providing and Windsor was accepting

Acker's Policy **in full satisfaction of all liabilities and obligations under the Premium**

**Finance Package, thereby forever relinquishing any and all rights they may have**

**thereunder, including without limitation any rights to cash surrender value and/or death**

**benefit under the Policy, and/or that they were mutually releasing the other from all**

**liabilities and obligations under the Premium Finance Package.** Dep Tr. Julius Rousseau,

individually and as Corporate Designee for Arent Fox, March 7, 2017, pgs 161:14-18 [attached

to [D.E. #125] as Exhibit 3]; Declaration of Ronald Mark Goss filed in opposition of Motion for

Summary Judgment in Acker Action, Case No. 14-cv-04651-WHO [Doc. #38](emphasis added)

[attached to [D.E. #125] as Exhibit 14]; March 23, 2010 letter [attached as Exhibit 46 to [D.E.

#130]].  Further, there is no evidence of record that Defendants saw these letters, nor even opined

as to whether any letter should be sent, or considered this letters when advising Windsor of its

claims.

  41. Disputed in part.  See response to paragraph 40 above.

  42. Disputed in part.  It is undisputed that it is believed that on May 18, 2010 Windsor

drafted a letter to the Collins Trustee which stated, in relevant part:

> **Please accept this letter as formal notification that pending our ownership of policy #VF51701320 we are releasing the Trust and the insured, Edwin Collins, from any future financial obligations of our Financial Agreement.**
>
> **We want to confirm that it is our understanding that you have signed the Change of Ownership because you would rather irrevocably surrender ownership and be freed of financial obligations, than pay off your loan to Windsor. We also want to confirm that this assignment is effective immediately upon its processing by the Insurance Company and is irrevocable. With its processing there will be no more financial obligations between Windsor and the Trust, nor between Windsor and the insured, excluding financial obligations contemplated by a breach of contract.**

[See Exhibit 56 to [D.E. #130]].

  However, there is no evidence of record that proves receipt of the May 18, 2010 Letter,

and the Collins Trustee, Maria Ana Gordillo, submitted a declaration dated August 12, 2015

wherein she specifically denied receiving the May 18, 2010 Letter from Windsor, stating in

relevant part:

> **8. Windsor never suggested to me, in any communication at or around the time that I executed the abovementioned Ownership, Name, or Beneficiary Change Request, or at any time thereafter until June 2014, that I was executing the abovementioned Ownership, Name, or Beneficiary Change Request in return for an agreement by Windsor to relieve the Trust from any continuing obligation to repay**

19

the loan. Nor did Windsor ever suggest to me, in any communication prior to June, 2014, that by my executing those documents the Trust was giving up either: (a) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of a public or private sale of the Policy remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale); or (b) the right of the Trust, pursuant to the Financing Agreement, to receive any proceeds of the death benefit remaining after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit.)

10. *Windsor has never communicated to me*, and I have thus by definition never accepted, either:

    (a)    an offer to relieve the Trust from any continuing obligation to repay the loan if the Trust would agree to give Windsor a form of ownership of the Policy unfettered by the obligation, set forth in the Financing Agreement, to provide to the Trust any amount remaining from the proceeds of the public or private sale of the Policy after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale); or

    (b)    an offer to relieve the Trust from any obligation to repay the loan if the Trust would agree to give Windsor a form of beneficiary status under the Policy unfettered by the obligation, set forth in the Financing Agreement, to provide the Trust any amounts remaining from the death benefit after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit).

11. I have never communicated to Windsor, and Windsor thus by definition never accepted, either:

    (a)    an offer to give Windsor a form of ownership of the Policy unfettered by the obligation, set forth in the Financing Agreement, to provide to the Trust any amounts remaining from the proceeds of a public or private sale of the Policy after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale) if Windsor would agree to relieve the Trust from any continuing obligation to repay the loan; or

    (b)    an offer to give Windsor a form of beneficiary status under the Policy unfettered by the obligation, set forth in the Financing Agreement, to provide to the Trust any amounts remaining from the proceeds of the death benefit after Windsor had been paid what it was owed on the

loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit) if Windsor would agree to relieve the Trust from any continuing obligation to repay the loan.

12.     In short, I never heard of, never intended to enter into, and never did enter into, any agreement with Windsor either:

(a)     to give Windsor a form of ownership of the Policy unfettered by the obligation, set forth in the Financing Agreement, to provide to the Trust any amounts remaining from the proceeds of the public or private sale of the Policy after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with the sale) in return for Windsor's relieving the Trust from any continuing obligation to repay the loan; or

(b)     to give Windsor a form of beneficiary status under the Policy unfettered by the obligation, set forth in the Financing Agreement, to provide to the Trust any amounts remaining from the proceeds of the death benefit after Windsor had been paid what it was owed on the loan (*viz.*, premium payments, interest, and reasonable expenses connected with collecting the death benefit) in return for Windsor's relieving the Trust from any continuing obligation to repay the loan.

Declaration of Mary Ann Gordillo filed in support of Motion for Summary Judgment in the Collins Action, Case No. 3:14-cv-03713-WHO [Doc. 40](emphasis added) [attached to [D.E. #125] as Exhibit 13].

Moreover, Windsor's May 18, 2010 letter to Collins and the Collins Trustee was not counter signed by Collins, the Collins Trustee and/or the Collins Beneficiary, and it did not provide that Collins and/or the Collins Trustee and/or the Collins Beneficiary agreed that they were providing and Windsor was accepting Collins' Policy **in full satisfaction of all liabilities and obligations under the Premium Finance Package, thereby forever relinquishing any and all rights they may have thereunder, including without limitation any rights to cash surrender value and/or death benefit under the Policy, and/or that they were mutually**

21

releasing the other from all liabilities and obligations under the Premium Finance Package.

Dep Tr. Julius Rousseau, individually and as Corporate Designee for Arent Fox, March 7, 2017,

pgs 161:14-18 [attached to [D.E. #125] as Exhibit 3]; Declaration of Mary Ann Gordillo filed in

support of Motion for Summary Judgment in the Collins Action, Case No. 3:14-cv-03713-WHO

[Doc. 40](emphasis added) [attached to [D.E. #125] as Exhibit 13]. May 18, 2010 letter [attached

as Exhibit 56 to [D.E. #130]]. Finally, there is no evidence of record that the Defendants saw

this letter, advised Windsor to send this letter, or considered this letters when advising Windsor

of its claims.

43.     Undisputed.

### BITTER WANTS TO REPURCHASE POLICY

44.     Undisputed.

45.     Undisputed.

46.     Undisputed.

47.     Undisputed.

48.     Undisputed.  However and by way of further clarification, On September 8, 2010,

Rousseau and Arent Fox, as counsel to Windsor, sent a letter to Bitter and Bitter's Trustee

asserting an event of default for non-payment of the loan and explaining that, pursuant to Section

6(a) of the Security Agreement, Windsor is entitled to a transfer of the collateral and registration

of the collateral in Windsor's name. Specifically Rousseau's September 8, 2010 letter stated in

relevant part:

> I represent the above-named Lender in connection with the loan made under the
> Financing Agreement. As you know, the maturity date of the loan was July 10, 2010,
> and payment in full has not been received by the Lender.  Mr. Houchins has had

22

> several conversations with Mr. Prusky, at the Lender, but the Lender has not heard from the Trustee directly or been told that payment was attempted.  Mr. Prusky has advised Mr. Houchins that, since payment was not made when due, **title to the policy and its benefits has transferred, by law, directly to the Lender.**
>
> Pursuant to the terms of the Security Agreement (attached), the collateral that was posted - the life insurance policy on the insured and all beneficial interests thereto - has become the property of the *Lender. Section 6(a) of the Security Agreement authorized and empowers the Lender to transfer the collateral and register it in the Lender's name by virtue of the Borrower's failure to pay the loan at the maturity date.* **The Lender also has irrevocable attorney-in-fact powers to transact the change of ownership.**
>
> To expedite the transaction with the life insurance company, we request that the trustee execute on the third page at the "x" by "other required signature," which shows that Mr. Barnes is acting in his capacity as trustee.  You are also required to forward the original of the policy to the Lender.

Rousseau's September 8, 2010 correspondence [attached to [D.E. #125] as Exhibit 70

(CONFIDENTIAL)].  It should be further noted that Rousseau did not counsel Windsor to have

Bitter pay off the loan rather than risk future premium payments and loss of the Death Benefit.

48.  Undisputed.

49.  Undisputed.

50.  Disputed.  On November 11, 2010, Pacific Life Insurance Company provided a

Confirmation of Title Change for the Bitter Policy acknowledging the change of Windsor as

irrevocable Beneficiary.  Pacific Life Insurance Confirmation of Title Change [attached to [D.E.

#125] as Exhibit 92 (CONFIDENTIAL)].

## THE BITTER LITIGATION

51.  Undisputed.

52.  Disputed in part.  On February 14, 2011, as demanded by Rousseau and Arent Fox

and thereafter requested by Windsor, the Bitter Trustee executed Pacific Life's Ownership,
Name or Beneficiary Change Request form (the "Bitter COO"), naming Windsor as the new
Owner and Beneficiary of the Policy. Pacific Life's Ownership, Name or Beneficiary Change
Request form [attached to [D.E. #125] as Exhibit 88 (CONFIDENTIAL)]. On November 11,
2010, Pacific Life Insurance Company provided a Confirmation of Title Change for the Bitter
Policy acknowledging the change of Windsor as irrevocable Beneficiary, but did not provide a
confirmation of the change of Windsor as record owner of the Bitter Policy, and The Bitter trust
was still identified by Pacific Life as the record owner. Pacific Life Insurance Confirmation of
Title Change [attached to [D.E. #125] as Exhibit 92 (CONFIDENTIAL)].

53.    Undisputed. By way of further clarification, Windsor sought to collect the death
benefit under the Bitter Policy based on the advice and instruction of the Defendants that the
executed Bitter COO and surrender of the Bitter Policy effectuated complete ownership of, and
entitlement to the death benefits under the Bitter Policy to Windsor.

54.    Disputed as stated. The suit was for the Trust to receive the death benefit, and
the widow Bitter was the sole beneficiary of the Trust.

55.    Disputed. The First Amended Complaint specifically took issue with the
effectiveness of the "written assignment of rights under the Policy". See, First Amended
Complaint filed in the Bitter Federal Court action, at ¶11 (g) and (h) [[D.E. #130] Exhibit 27].

56.    Undisputed. However, and by way of clarification, while Bitter Trust's counsel
originally asserted the two primary theories identified in this paragraph, it is undisputed that by
the time the action was referred to the American Arbitration Association, the Bitter Trust was
arguing that the Bitter Trust was not in default at the time that Windsor sought to take ownership

24

of the Bitter Policy and, even if it was, Windsor failed to satisfy the requirements of the "Default

Sale Right" provision contained in the Bitter Assignment and also failed to comply with the

"strict foreclosure" procedures under California Civil Code Section 9620, California's version of

the Uniform Commercial Code ("UCC"), and therefore Windsor's rights rather were that of a

secured party entitled to recover only the monies it advanced for premiums, plus interest, closing

costs, and expenses, and was not entitled the death benefits under the Bitter policy. Wood Dep.

Tr., pgs. 78:10-79:2 [[D.E. #130] Exhibit 26]; American Arbitration Association April 8, 2014

Interim Award [attached to [D.E. #125] as Exhibit 73]; Complaint [D.E. #1] [attached to [D.E.

#125] as Exhibit 8]; and Defendants' Answer, Affirmative Defenses and Counterclaim [D.E.

#19],at ¶¶62 [attached to [D.E. #125] as Exhibit 9].

57.     Disputed. The record does not evidence what issues "Wood was aware of" at the

time the State Court Complaint and Amended Complaint were filed, however, Mr. Wood

testified when he "started gearing up for the actual arbitration and thought more deeply about the

case that [he] realized that that was not the only issue in the case, that there was this whole UCC

issue too." Wood Dep. Tr., pgs. 78:22-79:2 [[D.E. #130] Exhibit 26].

58.     Undisputed. By way of further clarification, Defendants were representing

Windsor.

59.     Disputed in part. As outlined in the Federal Court's August 15, 2013 Order:

**Because Barnes adequately states a claim for relief in the FAC. the motion to
dismiss is DENIED. And because there are disputed issues of material fact in the
Cross- Complaint and Windsor is not entitled to judgment as a matter of law. the
Motion for Judgment on the Pleadings is also DENIED.**

See, August 15, 2013 Order and Opinion of United States District Judge William H. Orrick
[[D.E. #130] Exhibit 30].

60.     Undisputed.  By way of further clarification, On April 8, 2014, following three

days of hearing testimony from multiple witnesses (February 13-15, 2014), extensive briefing by

Rousseau and Arent Fox on Windsor's behalf, review of hundreds of exhibits, and hours of

argument by Rousseau (on March 5, 2014), the American Arbitration Association panel entered

an Interim Award in the Bitter Arbitration in favor of the Bitter Trust, wherein it found and

decided that the Bitter Trust at the time of Mr. Bitter's death retained ownership of the Bitter

Policy.  Specifically the Interim Award states, in relevant part, as follows:

> **the Trust at the time of Mr. Bitter's death retained the ownership of the policy**
> **and is entitled to the death benefits of the policy subject to Windsor's rights as**
> **a secured creditor to collect all sums due it by reason of its payment of the**
> **insurance premiums including principal, interest, at the rate of 10% from the**
> **date of the initial payment to the present and expenses as defined in the loan**
> **documents.**

American Arbitration Association April 8, 2014 Interim Award, at pg. 7 [attached to [D.E. #125]

as Exhibit 73].

The Arbitration Panel specifically found that "Windsor failed to comply with the Default

Sales provision in the [Bitter] Collateral Assignment Agreement and California Civil Code

§9620." American Arbitration Association April 8, 2014 Interim Award, at pg. 4 [attached to

[D.E. #125] as Exhibit 73].

The Arbitration Panel specifically held that Windsor failed to comply with the Default

Sales Provision in the Bitter Collateral Assignment for the following reasons:

> **There is no direct evidence in this record that Windsor notified Barnes [the Bitter**
> **Trustee] that by reason of the non-payment of the loan it intended to exercise the**

26

Default Sale Right provision in the Assignment Agreement. *Although the letter from Windsor's counsel of September 8, 2010 in its heading referenced the Assignment Agreement among other documents, the body of the letter makes reference to Section 6(a) of the Security Agreement as the basis for the demand that Barnes execute the COO transferring all ownership rights to Windsor as a matter of law.*

*The rights granted to Windsor under the terms of Section 6(a) are solely to protect its secured interests and do not purport to give Windsor unfettered ownership of the policy or a right to keep any death benefits in excess of its secured interests.* Windsor argues that even though there may be no direct evidence, the conduct of the parties reflect that Barnes believed that the COO ended any interest the Trust might have in the policy and that Barnes never took any action that would reflect that he believed the Trust retained any right to the benefits once he delivered the COO. It also argues that Windsor took no steps against the Trust once it obtained the COO.

*Because Section 6(a) contemplated the execution of a COO under circumstances wherein Barnes was not giving up all rights in the policy, its execution is at best ambiguous. Absent express notification to Barnes that Windsor was invoking its Default Sale Right, the record does not support a finding that Barnes' execution of the COO and surrender of the policy conveyed to Windsor unfettered title to the policy and the death benefit.*

American Arbitration Association April 8, 2014 Interim Award, at pg. 5 (emphasis added)

[attached to [D.E. #125] as Exhibit 73]

The Arbitration Panel specifically held that Windsor failed to comply with California

Civil Code §9620 for the following reasons:

Under Cal. Civ. Code § 9620, Windsor had two options to obtain unfettered ownership of the Bitter policy and its death benefit. One option for Windsor was to enter into a written agreement, post-default, with Barnes whereby Windsor released Barnes and the Trust from all obligations in exchange for Barnes conveying outright ownership of the policy.

Windsor acknowledged that it did not do so.

Windsor's other option was "strict foreclosure," whereby Windsor agreed to accept the policy as full satisfaction of the Bitter loan pursuant to a "record authenticated" after default.
***
Windsor contends that in the context of the September 8, 2010 and January 14, 2011 letters from Windsor and its Counsel, and execution of the COO by Barnes

**constitutes an authenticated record evidencing that Windsor accepted the COO and surrender of the Policy in full satisfaction of the Trust's obligations under the financing documents. The record does not support this contention.**

**There is nothing in either the September 8, 2010 letter or the January 14, 2001 letter that expresses an acceptance by Windsor of the collateral in full satisfaction of the obligation. Both are silent on this point.**

**Windsor therefore did not satisfy the "strict foreclosure" requirement under § 9620(c)(2).**

**Just as was discussed above in connection with the Default Sale Right, nothing in the demand letters sent by counsel for Windsor or by Windsor itself contained a proposal stating that Windsor was prepared to accept the policy in full satisfaction of the liability owed to it; thus, the execution of the COO by Barnes also does not satisfy the proposal requirements of §9620(c)(2)(A)-©.**

American Arbitration Association April 8, 2014 Interim Award, at pgs. 6-7 [attached to [D.E.

#125] as Exhibit 73].

61.    Disputed.  The First Amended Complaint filed while the Bitter Action was still

pending in the United States District Court for the Northern District of California, specifically

took issue with the effectiveness of the "written assignment of rights under the Policy".  See,

First Amended Complaint filed in the Bitter Federal Court action, at ¶11 (g) and (h) [[D.E. #130]

Exhibit 27].

62.    Disputed as stated.  In the Bitter Arbitration, the Bitter Trustee argued that the

Bitter Trust was not in default at the time that Windsor sought to take ownership of the Bitter

Policy and, even if it was, **Windsor failed to satisfy the requirements of the "Default Sale**

**Right" provision contained in the Bitter Assignment and also failed to comply with the**

**"strict foreclosure" procedures under California Civil Code Section 9620**, California's

version of the Uniform Commercial Code ("UCC"), and therefore Windsor's rights rather were

28

that of a secured party entitled to recover only the monies it advanced for premiums, plus

interest, closing costs, and expenses, and was not entitled the death benefits under the Bitter

policy. American Arbitration Association April 8, 2014 Interim Award [attached to [D.E. #125]

as Exhibit 73]; Complaint [D.E. #1] [attached to [D.E. #125] as Exhibit 8]; and Defendants'

Answer, Affirmative Defenses and Counterclaim [D.E. #19],at ¶¶62 [attached to [D.E. #125] as

Exhibit 9].

     63.    Undisputed.    By way of further clarification, The Arbitration Panel specifically

found that "Windsor failed to comply with the Default Sales provision in the [Bitter] Collateral

Assignment Agreement and California Civil Code §9620." American Arbitration Association

April 8, 2014 Interim Award, at pg. 4 [attached to [D.E. #125] as Exhibit 73].

    The Arbitration Panel specifically held that Windsor failed to comply with the Default

Sales Provision in the Bitter Collateral Assignment for the following reasons:

> **There is no direct evidence in this record that Windsor notified Barnes [the Bitter Trustee] that by reason of the non-payment of the loan it intended to exercise the Default Sale Right provision in the Assignment Agreement.** *__Although the letter from Windsor's counsel of September 8, 2010 in its heading referenced the Assignment Agreement among other documents, the body of the letter makes reference to Section 6(a) of the Security Agreement as the basis for the demand that Barnes execute the COO transferring all ownership rights to Windsor as a matter of law.__*
>
> *__The rights granted to Windsor under the terms of Section 6(a) are solely to protect its secured interests and do not purport to give Windsor unfettered ownership of the policy or a right to keep any death benefits in excess of its secured interests.__* **Windsor argues that even though there may be no direct evidence, the conduct of the parties reflect that Barnes believed that the COO ended any interest the Trust might have in the policy and that Barnes never took any action that would reflect that he believed the Trust retained any right to the benefits once he delivered the COO. It also argues that Windsor took no steps against the Trust once it obtained the COO.**
>
> *__Because Section 6(a) contemplated the execution of a COO under circumstances wherein Barnes was not giving up all rights in the policy, its execution is at best ambiguous. Absent express notification to Barnes that Windsor was invoking its__*

29

> ***Default Sale Right, the record does not support a finding that Barnes' execution of the COO and surrender of the policy conveyed to Windsor unfettered title to the policy and the death benefit.***

American Arbitration Association April 8, 2014 Interim Award, at pg. 5 (emphasis added)

[attached to [D.E. #125] as Exhibit 73]

The Arbitration Panel further specifically held that Windsor failed to comply with

California Civil Code §9620 for the following reasons:

> **Under Cal. Civ. Code § 9620, Windsor had two options to obtain unfettered ownership of the Bitter policy and its death benefit. One option for Windsor was to enter into a written agreement, post-default, with Barnes whereby Windsor released Barnes and the Trust from all obligations in exchange for Barnes conveying outright ownership of the policy.**
>
> **Windsor acknowledged that it did not do so.**
>
> **Windsor's other option was "strict foreclosure," whereby Windsor agreed to accept the policy as full satisfaction of the Bitter loan pursuant to a "record authenticated" after default.**
> \*\*\*
> **Windsor contends that in the context of the September 8, 2010 and January 14, 2011 letters from Windsor and its Counsel, and execution of the COO by Barnes constitutes an authenticated record evidencing that Windsor accepted the COO and surrender of the Policy in full satisfaction of the Trust's obligations under the financing documents. The record does not support this contention.**
>
> **There is nothing in either the September 8, 2010 letter or the January 14, 2001 letter that expresses an acceptance by Windsor of the collateral in full satisfaction of the obligation. Both are silent on this point.**
>
> **Windsor therefore did not satisfy the "strict foreclosure" requirement under § 9620(c)(2).**
>
> **Just as was discussed above in connection with the Default Sale Right, nothing in the demand letters sent by counsel for Windsor or by Windsor itself contained a proposal stating that Windsor was prepared to accept the policy in full satisfaction of the liability owed to it; thus, the execution of the COO by Barnes also does not satisfy the proposal requirements of §9620(c)(2)(A)-©.**

American Arbitration Association April 8, 2014 Interim Award, at pgs. 6-7 [attached to [D.E. #125] as Exhibit 73].

      64.     Disputed as stated, in that the statement is incomplete.  See response to paragraph 63 above for further clarification.

      65.     Disputed in part.  The Arbitration Panel specifically held that Windsor failed to comply with the Default Sales Provision in the Bitter Collateral Assignment for the following reasons:

> **There is no direct evidence in this record that Windsor notified Barnes [the Bitter Trustee] that by reason of the non-payment of the loan it intended to exercise the Default Sale Right provision in the Assignment Agreement.** ***Although the letter from Windsor's counsel of September 8, 2010 in its heading referenced the Assignment Agreement among other documents, the body of the letter makes reference to Section 6(a) of the Security Agreement as the basis for the demand that Barnes execute the COO transferring all ownership rights to Windsor as a matter of law.***
>
> ***The rights granted to Windsor under the terms of Section 6(a) are solely to protect its secured interests and do not purport to give Windsor unfettered ownership of the policy or a right to keep any death benefits in excess of its secured interests.*** **Windsor argues that even though there may be no direct evidence, the conduct of the parties reflect that Barnes believed that the COO ended any interest the Trust might have in the policy and that Barnes never took any action that would reflect that he believed the Trust retained any right to the benefits once he delivered the COO.  It also argues that Windsor took no steps against the Trust once it obtained the COO.**
>
> ***Because Section 6(a) contemplated the execution of a COO under circumstances wherein Barnes was not giving up all rights in the policy, its execution is at best ambiguous.  Absent express notification to Barnes that Windsor was invoking its Default Sale Right, the record does not support a finding that Barnes' execution of the COO and surrender of the policy conveyed to Windsor unfettered title to the policy and the death benefit.***

American Arbitration Association April 8, 2014 Interim Award, at pg. 5 (emphasis added)

[attached to [D.E. #125] as Exhibit 73]

31

66.   Undisputed.  By way of further clarification, The Arbitration Panel specifically

held that Windsor did not satisfy the "strict foreclosure" requirement under California Civil Code

§9620 for the following reasons:

> **Under Cal. Civ. Code § 9620, Windsor had two options to obtain unfettered
> ownership of the Bitter policy and its death benefit.  One option for Windsor was to
> enter into a written agreement, post-default, with Barnes whereby Windsor released
> Barnes and the Trust from all obligations in exchange for Barnes conveying
> outright ownership of the policy.**
>
> **Windsor acknowledged that it did not do so.**
>
> **Windsor's other option was "strict foreclosure," whereby Windsor agreed to accept
> the policy as full satisfaction of the Bitter loan pursuant to a "record authenticated"
> after default.**
> **\*\*\***
> **Windsor contends that in the context of the September 8, 2010 and January 14, 2011
> letters from Windsor and its Counsel, and execution of the COO by Barnes
> constitutes an authenticated record evidencing that Windsor accepted the COO and
> surrender of the Policy in full satisfaction of the Trust's obligations under the
> financing documents.  The record does not support this contention.**
>
> **There is nothing in either the September 8, 2010 letter or the January 14, 2001 letter
> that expresses an acceptance by Windsor of the collateral in full satisfaction of the
> obligation.  Both are silent on this point.**
>
> **Windsor therefore did not satisfy the "strict foreclosure" requirement under §
> 9620(c)(2).**
>
> **Just as was discussed above in connection with the Default Sale Right, nothing in
> the demand letters sent by counsel for Windsor or by Windsor itself contained a
> proposal stating that Windsor was prepared to accept the policy in full satisfaction
> of the liability owed to it; thus, the execution of the COO by Barnes also does not
> satisfy the proposal requirements of §9620(c)(2)(A)-©.**

American Arbitration Association April 8, 2014 Interim Award, at pgs. 6-7 [attached to [D.E.

#125] as Exhibit 73].

67.   Undisputed.  By way of further clarification, The panel held:

**Windsor contends that in the context of the September 8, 2010 and January 14, 2011 letters from Windsor and its Counsel, and execution of the COO by Barnes constitutes an authenticated record evidencing that Windsor accepted the COO and surrender of the Policy in full satisfaction of the Trust's obligations under the financing documents. The record does not support this contention.**

**There is nothing in either the September 8, 2010 letter or the January 14, 2001 letter that expresses an acceptance by Windsor of the collateral in full satisfaction of the obligation. Both are silent on this point.**

**Windsor therefore did not satisfy the "strict foreclosure" requirement under § 9620(c)(2).**

**Just as was discussed above in connection with the Default Sale Right, nothing in the demand letters sent by counsel for Windsor or by Windsor itself contained a proposal stating that Windsor was prepared to accept the policy in full satisfaction of the liability owed to it; thus, the execution of the COO by Barnes also does not satisfy the proposal requirements of §9620(c)(2)(A)-©.**

American Arbitration Association April 8, 2014 Interim Award, at pgs. 6-7 [attached to [D.E. #125] as Exhibit 73].

68.     Undisputed.

69.     Undisputed.  However and by way of further clarification, Defendants failed to advise Windsor that while the Premium Finance Packages called for annual interest of 15%, California law caps annual interest at 10%.  Steven Prusky, Dep. Tr. March 6, 2017, pg. 190:3-16 [attached to Millrood Declaration submitted herewith as Exhibit "1"]

70.     Disputed in part.  While it is undisputed that the Interim Award by the Panel does not cite to case law, it states "[t]he Panel has considered three days of testimony (February 13-15, 2014), several hours of closing argument on March 5, 2014, hundreds of exhibits, and the matter has been extensively briefed."  Further, it is specifically disputed that panel noted that there appeared to be no decisional authority on some of the key issues in the matter.  Rather, at page 5

33

of the Award the Panel states "Neither the parties nor independent research by the Panel has revealed any California decisional authority explaining what is meant by a 'record authenticated after default'."

## AFTERMATH OF THE BITTER ARBITRATION

71.     Undisputed. However, "to reach a settlement as soon as possible" is without context as to settlement terms, including an appropriate amount. By way of further clarification, although Rousseau advised Windsor to settle Bitter, Rousseau and Arent Fox assured Windsor that Windsor's ownership of the Acker , Collins, Coppock and Stamtov Policies was absolute and that Windsor would be, by virtue of the executed insurance Change of Ownership and Beneficiary Forms, and by operation of law, entitled to the death benefits for each Policy. Rousseau specifically suggested that requiring and/or obtaining any further documentation with respect to each of these Policies could "only cause more trouble."  Dep Tr. Steven Prusky March 6, 2017,  Pgs. 207:23-209:5 [attached to [D.E. #125] as Exhibit 1]; April 17, 2014 Email from Alan Dubin to Rousseau [attached to [D.E. #125] as Exhibit 53 (CONFIDENTIAL)]; July 31, 2014 Email Chain between Rousseau and Prusky (wherein Rousseau comments on the likelihood of success on each of the other policies)[attached to [D.E. #125] as Exhibit 57 (CONFIDENTIAL)]; July 14, 2014 Email Chain between Rousseau and Prusky [attached to [D.E. #125] as Exhibit 55 (CONFIDENTIAL)].

72.     Disputed in part.  While it is undisputed that Windsor, against Rousseau's initial advice ("it will only cause more trouble") and then with Rousseau's grudging acceptance after going back and forth with Rousseau for two (2) months, on June 1, 2014 sent letters to each of the Acker, Collins, Coppock and Stamatov Trustees, which reiterated what Rousseau and Arent

34

Fox had repeatedly advised Windsor, which was that Windsor had received full ownership of the Policy in 2010 in exchange for a full release of any financial obligations under the Loan. Letter to Collins Trustee [attached to [D.E. #125] as Exhibit 59 (CONFIDENTIAL)]; Letter to Acker Trustee [attached to [D.E. #125] as Exhibit 60 (CONFIDENTIAL)]; Letter to Coppock Trustee [attached to [D.E. #125] as Exhibit 61 (CONFIDENTIAL)]; Letter to Stamatov Trustee [attached to [D.E. #125] as Exhibit 62 (CONFIDENTIAL)]; April 18, 2014 Emails from to/from Alan Dubin and Rousseau [attached to [D.E. #125] as Exhibit 54 (CONFIDENTIAL)].

73.     Undisputed.

74.     Undisputed.

75.     Undisputed. By way of further clarification, on or about July 22, 2014, the Acker Trustee sent a letter to John Hancock Life Insurance Company wherein she asserted a claim to the death benefits under the Acker Policy. July 22, 2014 Letter [attached to [D.E. #125] as Exhibit 66 (CONFIDENTIAL)].

76.     Undisputed. By way of further clarification, on or about July 15, 2014, the Collins Trustee sent a letter to Pacific Life Insurance Company wherein she asserted a claim to the death benefits under the Collins Policy. July 15, 2014, Letter to Pacific Life [attached to [D.E. #125] as Exhibit 65].

77.     Disputed. On October 17, 2014, the Pacific Life Insurance Company filed a lawsuit for declaratory relief and interpleader in the United States District Court for the Northern District of California, Case No. 14-cv-03713-WHO (the "Collins Action") to determine the entitlements of the Collins Trust and Windsor in and to the death benefits due under the Collins Policy. Complaint [D.E. #1] [attached to [D.E. #125] as Exhibit 8]; and Defendants' Answer,

Affirmative Defenses and Counterclaims [D.E. #19], at ¶¶121 [attached to [D.E. #125] as Exhibit 9]; Pacific Life Interpleader Complaint in the Collins Action [attached to [D.E. #125] as Exhibit 101].

78.    Undisputed.

79.    Undisputed.

80.    Disputed.  Rousseau and Arent Fox assured Windsor that Windsor's ownership of these Policies was absolute and that Windsor would be, by virtue of the executed insurance Change of Ownership and Beneficiary Forms, and by operation of law, entitled to the death benefits for each Policy.  Rousseau specifically suggested that requiring and/or obtaining any further documentation with respect to each of these Policies could "only cause more trouble." Dep Tr. Steven Prusky March 6, 2017,  Pgs. 207:23-209:5 [attached to [D.E. #125] as Exhibit 1]; April 17, 2014 Email from Alan Dubin to Rousseau [attached to [D.E. #125] as Exhibit 53 (CONFIDENTIAL)]; July 31, 2014 Email Chain between Rousseau and Prusky (wherein Rousseau comments on the likelihood of success on each of the other policies)[attached to [D.E. #125] as Exhibit 57 (CONFIDENTIAL)]; July 14, 2014 Email Chain between Rousseau and Prusky [attached to [D.E. #125] as Exhibit 55 (CONFIDENTIAL)].

81.    Disputed.  Rousseau and Arent Fox assured Windsor that Windsor's ownership of these Policies was absolute and that Windsor would be, by virtue of the executed insurance Change of Ownership and Beneficiary Forms, and by operation of law, entitled to the death benefits for each Policy.  Rousseau specifically suggested that requiring and/or obtaining any further documentation with respect to each of these Policies could "only cause more trouble." Dep Tr. Steven Prusky March 6, 2017,  Pgs. 207:23-209:5 [attached to [D.E. #125] as Exhibit 1];

36

April 17, 2014 Email from Alan Dubin to Rousseau [attached to [D.E. #125] as Exhibit 53

(CONFIDENTIAL)]; July 31, 2014 Email Chain between Rousseau and Prusky (wherein

Rousseau comments on the likelihood of success on each of the other policies)[attached to [D.E.

#125] as Exhibit 57 (CONFIDENTIAL)]; July 14, 2014 Email Chain between Rousseau and

Prusky [attached to [D.E. #125] as Exhibit 55 (CONFIDENTIAL)].

## WINDSOR TERMINATES THE DEFENDANTS

82.   Undisputed.

83.   Disputed in part.  While it is undisputed that at one point Wood made the offer of

settlement recounted in this paragraph regarding the Acker and Collins Policies, those settlement

offers were thereafter withdrawn and the amounts the Acker and Collins Trustees were willing to

accept to settle increased substantially.  Dep Tr. Steven Prusky, pgs. 366:20-367:20 [attached to

Millrood Declaration submitted herewith as Exhibit "1"].

84.   Disputed.   Rousseau and Arent Fox repeatedly assured Windsor that Windsor's

ownership of the Acker and Collins Policies were absolute and that Windsor would be, by virtue

of the executed insurance Change of Ownership and Beneficiary Forms, and by operation of law,

entitled to the death benefits for each Policy.  Dep Tr. Steven Prusky March 6, 2017,  Pgs.

207:23-209:5 [attached to [D.E. #125] as Exhibit 1]; April 17, 2014 Email from Alan Dubin to

Rousseau [attached to [D.E. #125] as Exhibit 53 (CONFIDENTIAL)]; July 31, 2014 Email

Chain between Rousseau and Prusky (wherein Rousseau comments on the likelihood of success

on each of the other policies)[attached to [D.E. #125] as Exhibit 57 (CONFIDENTIAL)]; July

14, 2014 Email Chain between Rousseau and Prusky [attached to [D.E. #125] as Exhibit 55

(CONFIDENTIAL)].

37

However, as Steven Prusky testified, Rousseau advised that "If you can settle it [the Acker and Collins disputes], at a reasonable price, you know, you're not going to lose the cases, but you'll avoid hassles. So we tried that. He made the offers. They rejected them. I think he made them more than once. I know they upped their offer at least twice or their ask, twice." Dep Tr. Steven Prusky, pg. 367:7-20 [attached to Millrood Declaration submitted herewith as Exhibit "1"].

85.     Disputed. On August 19, 2014, Windsor, by and through Prusky, first contacted Darin T. Judd, Esquire regarding retaining him and his firm to represent Windsor in the case of Pacific Life Insurance Company v. Maria Ana Gordillo, as Trustee of the Erwin A. Collins Family Insurance Trust-2008 and Windsor Securities, LLC (the "Collins Matter"), wherein the Collins Trustee was contesting Windsor's entitlement to the death benefits under the Collins Policy. Declaration of Darin T. Judd filed in this action in Support of Windsor's Response to Defendants Motion to Compel Discovery [D.E. #60-2], at ¶7 [attached to [D.E. #130] as Exhibit 9 and to the [D.E. #125] as Exhibit 17]. At this same time, at the end of August of 2014, Prusky notified Judd that the Acker Trustee was also contesting Windsor's entitlement to the death benefits under the Acker Policy, similar to the Collins Matter, and that another lawsuit would likely be filed by John Hancock Life Insurance Company related thereto, also on which Defendants Rousseau and Arent fox provided the transactional legal advice. Declaration of Darin T. Judd filed in this action in Support of Windsor's Response to Defendants Motion to Compel Discovery [D.E. #60-2], at ¶8 [attached to [D.E. #130] as Exhibit 9 and to the [D.E. #125] as Exhibit 17]. In the latter part of August, 2014 Judd and his firm were retained to represent Windsor in the Collins Action and in any dispute over the Acker Policy. Declaration

38

of Darin T. Judd filed in this action in Support of Windsor's Response to Defendants Motion to Compel Discovery [D.E. #60-2], at ¶7-8 [attached to [D.E. #130] as Exhibit 9 and to the [D.E. #125] as Exhibit 17].

86.    Undisputed. However, and by way of further clarification, Judd was a senior litigation partner in a California firm, with substantial California litigation experience.

87.    Undisputed.

88.    Disputed. As stated in the Antonino Affidavit, Antonino was not engaged and did not represent Windsor regarding the disputes over the Acker and Collins Policies until June 2016, when she amended her original retainer agreement to provide that she would assist with discovery in the then pending Acker and Collins cases. Affidavit of Lauren Antonino filed in Support of Windsor's Response to Defendants Motion to Compel Discovery [D.E. #60-3], at ¶2 [attached to [D.E. #130] as Exhibit 10 and to the [D.E. #125] as Exhibit 18].

89.    Undisputed. However, and by way of clarification, Antonino did have experience with and was involved in insurance coverage disputes, and specifically with litigation regarding entitlement to death benefits under a life insurance policy. Dep Tr. Lauren Antonino, pgs. 16:20-17:18 [attached to the Millrood Declaration submitted herewith as Exhibit "2"]

90.    Undisputed.

91.    Disputed. By September 2014 the settlement in the Bitter Litigation had not yet been finalized and there was still outstanding open issues not yet resolved, including specifically, attorneys fees incurred in the Bitter Arbitration and language to be included in the settlement agreement. Judd Dep Tr., pg. 55:7- 10, 56:7-12 ( "Q. And what did you understand was the status of the settlement with Mr. Woods at the time that you substituted for Mr. Rousseau and

39

Arent Fox? A. Mr. Rousseau and Mr. Cryan – I might be saying his name incorrectly -- told us that they had a draft settlement agreement and that – that was still going -- in flux. Q. They told you it was "in flux"? A. Yes."). Judd Dep Tr. pgs. 63:12-65:21 ("But in your first call with Mr. Wood, did you indicate to him that Ms. Antonino would be working with you on any matters? A. I don't remember. Q. Mr. Wood did say that he had received a draft of the settlement agreement? A. I believe so, yes. Q. Did he indicate that it was -- seemed acceptable to him? A. I don't recall that. Q. Do you recall him -- did Mr. Wood indicate to you that he's prepared to go forward with the settlement? A. He did want to move forward with the settlement, but there was issues associated with the attorney fees that were a problem for him. Q. And what was that -- what was the issue that he indicated? A. What they would be and how they might be factored into a settlement. Q. And what attorneys fees was he talking about, as far as you understood? A. The attorneys' fees that you were incurred in the underlying arbitration in the Barnes Bitter matter. Q. Did he say that he had discussed that with -- did Mr. Wood say, in words or substance, that he and Mr. Rousseau had reached a general overall framework for a settlement, in substance? A. It wasn't finalized, no. He didn't say that -- they had exchanged the settlement agreement, but the issue -- the final issues and the resolution of the attorney fees were still outstanding. Q. And so he indicated to you that there was still an open item? A. Yes. Q. And – A. Not "item." There were items. Q. Well, what other items? A. The language of the settlement agreement. The attorney fee issues. And those were the primary things that he said were still outstanding. Q. Now, when you had spoken on the conference call with Mr. Rousseau and Mr. Cryan, they also gave you a status report, if you will, about the settlement; did they not? A. They -- this was the draft settlement agreement that they had prepared and sent to Mr. Wood,

40

and -- but, in terms of the status or where it was, it was still undone.  It wasn't done yet.  Q. And

that was the settlement agreement of the Barnes Bitter matter, correct?  A. Correct.") [attached to

Millrood Declaration submitted herewith as Exhibit "3"]

92.     Undisputed.

93.     Disputed.  On September 16, 2014 settlement in the Barnes/Bitter Litigation was

not yet finalized, there were still open issues that were being negotiated, and Windsor did not

"back out" of an "imminent settlement".  Judd Dep Tr., 55:7- 10, 56:7-12, 63:12-65:21, 108:17-

22 (" Q.   And did you tell him [Wood], in any of the communications that preceded this letter,

that you were withdrawing the separate settlement offer that had been made at $650,000 for the

Bitter case?  A.  I don't believe so.").

94.     Undisputed.

95.     Undisputed.

96.     Undisputed.

97.     Undisputed.

## THE ACKER AND COLLINS LITIGATIONS

98.     Undisputed.  However, and by way of clarification, neither Successor Counsel,

Darin Judd (nor any other lawyers from his firm), nor Lauren Antonino (nor any lawyers from

her firm), ever gave transactional legal advice to Windsor with respect to the management of any

of the policies at issue in this litigation or perfecting entitlement to the benefits thereunder, which

was solely the province and responsibility of the Defendants.  Declaration of Darin T. Judd filed

in this action in Support of Windsor's Response to Defendants Motion to Compel Discovery

[D.E. #60-2], at ¶11 [attached to [D.E. #125] as Exhibit 17];  Affidavit of Lauren Antonino filed

in Support of Windsor's Response to Defendants Motion to Compel Discovery [D.E. #60-3], at ¶13 [attached to [D.E. #125] as Exhibit 18].

99.    Disputed. Defendants stated that they negotiated Acker and Collins on Windsor's behalf, prior to those matters being formally incorporated in a suit. Further, Defendants (and Rousseau's previous firm Herrick Feinstein) were the only counsel to ever give transactional legal advice to Windsor with respect to the management of the Collins and Acker Policies and perfecting entitlement to the death benefits thereunder, and this was solely the province and responsibility of the Defendants. Declaration of Darin T. Judd filed in this action in Support of Windsor's Response to Defendants Motion to Compel Discovery [D.E. #60-2], at ¶11 [attached to [D.E. #125] as Exhibit 17]; Affidavit of Lauren Antonino filed in Support of Windsor's Response to Defendants Motion to Compel Discovery [D.E. #60-3], at ¶13 [attached to [D.E. #125] as Exhibit 18]. The legal advice related to the perfecting of Windsor's security interest in Acker and Collins policies (and in fact each of the five life insurance policies at issue in this action) and the transfer of ownership as to the death benefit for each of these policies all occurred in the time period of 2008-2012, years prior to Successor Counsel's involvement and engagement by Windsor. Declaration of Darin T. Judd filed in this action in Support of Windsor's Response to Defendants Motion to Compel Discovery [D.E. #60-2], at ¶11 [attached to [D.E. #125] as Exhibit 17].

100.    Disputed as to the term "extensive". It is undisputed that Windsor engaged in litigation with respect to the Acker and Collins policies, as both Windsor and the Acker and Collins Trustees were claiming entitlement to the death benefits under the respective policies. Complaint [D.E. #1] [attached to [D.E. #125] as Exhibit 8]; and Defendants' Answer,

42

Affirmative Defenses and Counterclaims [D.E. #19] at ¶¶93, and at ¶¶121 [attached to [D.E. #125] as Exhibit 9]; John Hancock Interpleader Complaint in the Acker Action, Case No. 14-cv-04651-WHO, [attached to [D.E. #125] as Exhibit 98]; July 31, 2014 letter from John Hancock re competing claims to the Death Benefits [attached to [D.E. #125] as Exhibit 67]; Pacific Life Interpleader Complaint in the Collins Action [attached to [D.E. #125] as Exhibit 101].

101.   Undisputed.

102.   Undisputed.

103.   Disputed in part. While it is undisputed that in both cases the Acker and Collins Trustees asserted cross claims against Windsor, in those cross claims the Trustees alleged, in part, that neither the terms of the Security Agreement, nor any other portion of the Financing Agreement, provided that execution of the Assignment and the Insurance Company's Change of Ownership forms by the Trustee would make Windsor the outright owner of the Acker Policy, would entitle Windsor either to the entirety of the Death Benefit under the Policy or to any other amount in excess of the sum due to Windsor in its capacity as a secured lender, viz., the total of the amounts loaned by Windsor to the Trust, plus legal interest (10% per annum) thereon, plus Windsor's reasonable expenses, if any existed, incurred in enforcing and/or protecting its security interest. Answer and Cross Claim of Acker Trustee in Acker Action, Case No. 14-cv-04651-WHO [attached to [D.E. #125] as Exhibit 74]; Answer and Cross Claim of Collins Trustee in Collins Action, Case No. 14-cv-03713-WHO [Doc. #16] [attached to [D.E. #125] as Exhibit 76].

The Acker and Collins Trustees further argued in their Cross Claims that "subsequent to Windsor's having loaned to the Trust all of the monies for premium payments that Windsor was required to provide under the Financing Agreement, the Trust informed Windsor that the Trust

43

would not repay the loan when due. The Trust thereby committed an anticipatory breach of, and

default under, the Financing Agreement, entitling Windsor, pursuant to the Security Agreement

and to California law governing secured transactions like the one here at issue, to [only] the

[following] relief":

> (a) **to sell the Policy collateral at a noticed public or private sale, at which sale Windsor, the Trust, the Insured, or any other person or entity could bid in an effort to purchase the Policy;**
>
> (b) **to take from the proceeds of that sale a sum equal to the total of the amounts loaned by Windsor to the Trust, plus legal interest (10% per annum) thereon, plus Windsor's reasonable expenses, if any existed, incurred in enforcing and/or protecting its security interest;**
>
> © **to recover from the Trust, with no requirement of first having recourse to the Policy collateral, all monies owed by the Trust by Windsor; and**
>
> (d) **should sale of the Policy collateral not generate proceeds sufficient to pay what was owed by the Trust to Windsor, to recover from the Trust the amount of any such deficiency.**
>
> **Also pursuant to the terms of the Security Agreement and to California law governing secured transactions like the one here at issue, any proceeds of sale in excess of what was owed by the Trust to Windsor were required to be paid to the Trust by Windsor."**

Answer and Cross Claim of Acker Trustee in Acker Action, Case No. 14-cv-04651-WHO

[attached to [D.E. #125] as Exhibit 74]; Answer and Cross Claim of Collins Trustee in Collins

Action, Case No. 14-cv-03713-WHO [Doc. #16] [attached to [D.E. #125] as Exhibit 76].

104.    Undisputed. By way of further clarification, The Trust thereby committed an

anticipatory breach of, and default under, the Financing Agreement, entitling Windsor, pursuant

to the Security Agreement and to California law governing secured transactions like the one here

at issue, to [only] the [following] relief":

> (a) **to sell the Policy collateral at a noticed public or private sale, at which sale Windsor, the Trust, the Insured, or any other person or entity could bid in an effort to purchase the Policy;**

**(b)** **to take from the proceeds of that sale a sum equal to the total of the amounts loaned by Windsor to the Trust, plus legal interest (10% per annum) thereon, plus Windsor's reasonable expenses, if any existed, incurred in enforcing and/or protecting its security interest;**

**©** **to recover from the Trust, with no requirement of first having recourse to the Policy collateral, all monies owed by the Trust by Windsor; and**

**(d)** **should sale of the Policy collateral not generate proceeds sufficient to pay what was owed by the Trust to Windsor, to recover from the Trust the amount of any such deficiency.**

**Also pursuant to the terms of the Security Agreement and to California law governing secured transactions like the one here at issue, any proceeds of sale in excess of what was owed by the Trust to Windsor were required to be paid to the Trust by Windsor."**

Answer and Cross Claim of Acker Trustee in Acker Action, Case No. 14-cv-04651-WHO [attached to [D.E. #125] as Exhibit 74]; Answer and Cross Claim of Collins Trustee in Collins Action, Case No. 14-cv-03713-WHO [Doc. #16] [attached to [D.E. #125] as Exhibit 76].

105. Disputed in part. While it is undisputed that Wood and Houchins both represented to the Bitter Arbitration Panel that the Acker and Collins Trusts were not in default of their loan obligations, both Mr. Wood and Mr. Houchins explained that they later discovered, upon Wood undertaking representation of the Collins and Acker trusts, and still later, upon undertaking representation of the Coppock and Stamatov trusts, that their statements in that regard had been mistaken and corrected by way of the Supplemental Houchins Declaration filed in the Collins Action.

Specifically Wood testified "[n]ow, as to the being in default of the other people, Houchins had told me that they weren't in default and that's what I thought. And when I looked into it, once I took on those cases, i.e. the Acker and -- and Collins cases and found out what had

45

actually happened and did a little research, I realized that there was an anticipatory breach and

everybody acted after that anticipatory breach as if there had been a default and that was the law

in which I proceeded in and which the federal judge agreed with. Wood Dep. Tr., pg. 258:16-

259: 3 [attached to the Millrood Declaration submitted herewith as Exhibit "5"].

Wood further explained in his Reply Expert report as follows:

**(1) I stated, during arguments in the Bitter arbitration, that while the Bitter trust
had defaulted on its loan from Windsor, the Collins, Acker, Coppock, and Stamatov
trusts had not done so. I later discovered, upon undertaking representation of the
Collins and Acker trusts, and still later, upon undertaking representation of the
Coppock and Stamatov trusts, that my statements in that regard had been mistaken.
Prior to and during the Bitter arbitration, I had no reason to investigate, and had
not investigated, anything having to do with either the Collins, Acker, Coppock, or
Stamatov trusts. Moreover, Eugene Houchins III had in the Bitter case
communicated to me, and testified to, his belief that those trusts had not defaulted,
and I had at that time no reason to think otherwise. Mr. Houchins later testified that
he had originally believed and testified – mistakenly, as it turned out – that there
could be no default absent a written notice of default from Windsor (something
which had occurred with regard to the Bitter trust but not with regard to the
Collins, Acker, Coppock, or Stamatov trusts), and changed his testimony about
whether defaults had occurred when he learned of the mistake.**

**(2) Upon undertaking representation of the Collins and Acker trusts, and still later,
upon undertaking representation of the Coppock and Stamatov trusts, I
investigated the underlying facts of those cases, researched California law on breach
of contract, and determined that in each case the trusts had committed an
anticipatory breach/default.**

**(3) I was able to demonstrate to the Court in the Collins and Acker cases that the
Collins and Acker trusts' communications to Windsor of their intention not to repay
their loans had comprised an anticipatory breach/default. That demonstration
turned mainly on the conduct of Windsor – carried out under the guidance of Mr.
Rousseau – following those communications. Specifically, Windsor treated those
communications as a default, demanding that the trustees sign change of ownership
and change of beneficiary forms and turn over the policies to Windsor. (The same
thing occurred with regard to the Coppock and Stamatov trusts.) Mr. Prusky
testified truthfully about those events with regard to the Collins and Acker Trusts,
leaving the attorneys who replaced Mr. Rousseau with no reasonable basis upon
which to argue otherwise.**

Reply Reports of Joseph Wood [attached to [D.E. #125] as Exhibits 32]; See also, Supplemental

Declaration Of Eugene Houchins III Submitted In Support Of Motion For Summary Judgment

Or, In The Alternative, For Partial Summary Adjudication, filed in the Collins Action, Case No.

3:14-cv-03713-WHO [Doc. #67, p. 2 of 4, internal pagination 1:5-2:1] [attached to the Millrood

Declaration submitted herewith as Exhibit "4"].

      106.     Undisputed.

      107.     Undisputed. However, and by way of further clarification, ***per Rousseau's***

***specific advice***, Windsor treated Houchins' communication regarding the Trustees for the Collins

and Acker Policies intention to not re-pay the loans before or at the maturity dates of their Loans

as an exercise of the Premium Finance Packages' Default Sales Right[2], which provided Windsor

with the right to accept the Insurance Trust's transfer of title of the insurance policy in full

satisfaction of the trust's financial obligations, thus allowing the Insurance Trust to walk away

---

[2]The Premium Finance Packages' Assignment of Life Insurance Policy as Collateral,
contains the following Default Sales Right:

**DEFAULT SALE RIGHT. Upon an occurrence of an Event of Default (as
defined in the Agreement) that has not been remedied within the time period
required in the Agreement, Assignee shall have the right (the "Default Sale Right")
but not the obligation to accept, that in consideration of the full and complete
satisfaction of the Liabilities (the sufficiency of which consideration is hereby
acknowledged) Owner may make a full transfer and assignment of the Insurance
Policy to Assignee and thereby forever relinquish any and all rights Owner may
have thereunder, including without limitation any rights to cash surrender value
and/or death benefit provided thereunder. Upon the exercise of this Default Sale
Right, Assignee shall notify Insurer in writing and Insurer shall thereafter recognize
Assignee as the sole lawful owner of the Insurance Policy.**

Acker, Collins, Bitter, Stamatov, and Coppock Premium Financing Agreement Packages
[attached to [D.E. #125] as Exhibits 23-27 (CONFIDENTIAL)], at Assignment of Life Insurance
Policy as Collateral, Doc. #16 of 19, at pg. 4.

from the loan without recourse, and explained the same in Windsor's Crossclaims in the Acker and Collins matters. Declaration of Steven Prusky filed in support of Motion for Summary Judgment in the Collins Action, United States District Court for the Northern District of California, Case No. 3:14-cv-03713-WHO [Doc. #31-2], at ¶8, [attached to [D.E. #125] as Exhibit 12 (without Exhibits thereto as all Exhibits to the Declarations are separately referenced and identified herein)]; Declaration of Steven Prusky filed in support of Motion for Summary Judgment in the Acker Action, Case No. 14-cv-04651-WHO [Doc. #30-2], at ¶8 [attached to [D.E. #125] as Exhibit 11]; Dep. Tr. Julius Rousseau, III, individually and as Corporate Designee for Arent Fox, March 7, 2017, pg. 245:2-7 [attached to Millrood Declaration submitted herewith as Exhibit "6"] ("A. My recollection was, each of those policies had been surrendered by the insureds voluntarily exercising their -- and I'm saying insureds; trustees, trustees -- exercising their default sale right")

      108.    Undisputed. However, and by way of further clarification, Windsor maintained that the Trusts were in default when the Trustees signed the Change of Ownership forms based on Defendants' specific advice. Dep. Tr. Julius Rousseau, III, individually and as Corporate Designee for Arent Fox, March 7, 2017, pg. 245:2-7 [attached to Millrood Declaration submitted herewith as Exhibit "6"] ("A. My recollection was, each of those policies had been surrendered by the insureds voluntarily exercising their -- and I'm saying insureds; trustees, trustees -- exercising their default sale right")

      109.    Undisputed.

      110.    Disputed. As the mediation statement provides, Windsor argued that Windsor obtained "clean title to [the Acker and Collins] policies as a result of the Trusts' surrender and/or

48

default sale of the policies" and " upon the occurrence of a triggering event, a default **[or in this case, a judicially admitted anticipatory default**], the Trustees each granted and vested in Windsor the ability to claim all rights vested in the Default Sales Right." See Windsor's mediation statement, at pgs. 2 and 16 (emphasis in original) [attached as Exhibit 24 to the [D.E. #130]].

111.   Disputed in part. While it is undisputed that Successor Counsel distinguished the circumstances in Acker and Collins from the circumstances in Bitter, the remaining characterizations in this paragraph are belied by the mediation statement. Windsor's mediation statement [attached as Exhibit 24 to the [D.E. #130]].

112.   Undisputed.

113.   Undisputed.

114.   Undisputed. However, and by way of clarification, as Ms. Antonino testified, Mr. Houchin's deposition in the Acker and Collins matters was going to be taken, but those cases settled before the deposition occurred. Further, as Ms. Antonino also testified, Successor Counsel reviewed the Houchins testimony in the Bitter Arbitration and his deposition from the Bitter/Barnes matter for use in the Acker and Collins Actions. Antonino Dep Tr. Pg. 180:10-181:8 [attached to Millrood Declaration submitted herewith as Exhibit "2"]

115.   Disputed in part. As Windsor's Memorandum of Points and Authorities in Opposition to Motion For Summary Judgment Or, in the Alternative, for Partial Summary Judgment in the Acker and Collins cases, which are cited to for the allegations in this paragraph, clearly state, Successor Counsel deposed Mr. Coppock in the *Collins* and *Acker* cases for

49

approximately 1 and ½ hours, but Mr. Coppock's deposition was continued because Mr.

Coppock informed Successor Counsel after his deposition started that he could only stay for 1 ½

hours and then had to leave to care for his sick wife (who has since passed away). See Windsor's

Memorandum of Points and Authorities in Opposition to Motion For Summary Judgment Or, in

the Alternative, for Partial Summary Judgment in the Acker and Collins cases, at footnote 8

[Attached to the [D.E. #130] as Exhibits 45 and 55].

116.   Disputed. As Windsor's Memorandum of Points and Authorities in Opposition to

Motion For Summary Judgment Or, in the Alternative, for Partial Summary Judgment in the

Acker and Collins cases, which are cited to for the allegations in this paragraph, clearly state,

after Mr. Coppock's deposition, Trust Counsel raised the issue of whether Windsor intended to

use the Coppock deposition in support of Windsor's then pending Motion for Summary

Judgment before the full thirty-day correction period was up. Windsor's Successor Counsel

agreed that Mr. Coppock could have the full thirty-day period to review and make corrections to

his deposition. Successor Counsel's agreement that the Coppock transcript would not be used in

support of Windsor's then pending Motion had no bearing on and did not preclude Windsor from

using, and in fact, Windsor did use Mr. Coppock's deposition testimony in support of Windsor's

Opposition to the Collins and Acker Trust's Motion for Summary Judgment based on whether a

voluntary walk-away agreement was reached before default. See, Windsor's Memorandum of

Points and Authorities in Opposition to Motion For Summary Judgment Or, in the Alternative,

for Partial Summary Judgment in the Acker and Collins cases, at pg. 6 wherein Mr. Coppock's

deposition testimony is cited [Attached to the [D.E. #130] as Exhibits 45 and 55].

117.   Disputed in part. While it is undisputed that the Court stayed discovery, the

remaining allegations are disputed. As the Court stated in its September 3, 2015:

> **Also pending is the parties' Stipulation to extend discovery dates. Dkt. No. 44. It
> makes no sense to continue discovery until the order on the motion for summary
> judgment has issued, so discovery is STAYED pending that order, and the
> Stipulation is DENIED. A week after the order on the summary judgment motion
> has issued, the Court will hold a telephonic Case Management Conference to discuss
> the trial date and all scheduling issues related to it.**

See September 3, 2015 Order in Acker and Collins Actions.

118.   Disputed as stated. Windsor actually argued that the Acker and Collins Trusts

"judicially admitted anticipatory default" in their pleadings, as follows:

> "18. Subsequent to Windsor's having loaned to the Trust all of the monies
> for premium payments that Windsor was required to provide under the Financing
> Agreement, the Trust informed Windsor that the Trust would not repay the loan when
> due. ***The Trust thereby committed an anticipatory breach of, and default under, the
> Financing Agreement, . ..***"

Windsor's Points and Authorities in Support of Motion for Summary Judgment, Or, in the

Alternative, Partial Summary Judgment, in Acker and Collins Actions, at pg. 9 (citing Acker

Answer and Cross-Claim of, ¶18 , at 6) [attached to [D.E. #130] as Exhibits 39 and 49].

119.   Disputed in part. Windsor argued in the Collins and Acker Actions that the Acker

and Collins Trusts breached and therefore defaulted on their obligations to repay Windsor,

triggering Windsor's rights under the Premium Financing Packages' Default Sales Right, the

Trusts then executed the Change Of Ownership Forms. As a consequence of the

admitted conduct of Windsor and the Trusts, Windsor was entitled to the entire amount of

the death benefits under each of the Acker and Collins policies, and ***even if*** Section 9620 applied

to the Acker and Collins policies, then Section 9620 was satisfied. Windsor's Points and

51

Authorities in Support of Motion for Summary Judgment, Or, in the Alternative, Partial

Summary Judgment, in Acker and Collins Actions, at pg. 9 (citing Acker Answer and Cross-

Claim of, ¶18 , at 6) [attached to [D.E. #130] as Exhibits 39 and 49].

120.    Undisputed.

121.    Disputed in part. In Windsor' Motion for Summary Judgment, Or, in the

Alternative, Partial Summary Judgment, Successor Counsel specifically reserved argument on

whether the Trusts voluntarily assigned the death benefits to Windsor pre-default, at footnote 4

stating "This motion does not address whether the Insurance Trust voluntarily assigned the death

benefits to Windsor pre-default, but Windsor does not waive that issue." Windsor's Points and

Authorities in Support of Motion for Summary Judgment, Or, in the Alternative, Partial

Summary Judgment, in Acker and Collins Actions, at Footnote 4 [attached to [D.E. #130] as

Exhibits 39 and 49].

122.    Undisputed. However, and by way of clarification, Successor Counsel

specifically reserved its rights to raise the argument of a pre-default walkaway by the Acker and

Collins Trusts, and, in fact, filed a later Motion for partial Summary Judgement wherein

Successor Counsel specifically argued that an oral walk-away agreement was reached with the

Acker and Collins Trusts without the loans ever going into Default. Windsor's Memorandum of

Points and Authorities in Opposition to Motion for Summary Judgment Or, in the Alternative,

for Partial Summary Judgment in the Acker and Collins Actions [attached to [D.E. #130] as

Exhibits 45 and 55].

123.    Disputed. Attached to the Declarations of Steven Prusky and  Eric Harkins

[Windsor's Employee] submitted in Opposition to the Acker and Collins Trusts' Motion for

Summary Judgment, Or, in The Alternative, Windsor's Motion for Partial Summary Judgment, were the March 23, 2010 and May 18, 2010 letters sent to Acker/Acker Trustee and Collins/Collins Trustee.  However, and as explained more fully above in paragraphs 40 and 42, there is **_no_** evidence of record that proves receipt of either the March 23, 2010 or the May 18, 2010 Letters, and the Acker and Collins Trustees both  submitted a declarations wherein they specifically denied receiving the March 23, 2010 and May 18, 2010 Letters from Windsor. Declaration of Ronald Mark Goss filed in opposition of Motion for Summary Judgment in Acker Action, Case No. 14-cv-04651-WHO [Doc. #38](emphasis added) [attached to [D.E. #125] as Exhibit 14]; Declaration of Mary Ann Gordillo filed in support of Motion for Summary Judgment in the Collins Action, Case No. 3:14-cv-03713-WHO [Doc. 40](emphasis added) [attached to [D.E. #125] as Exhibit 13].

Moreover, Windsor's March 23, 2010 and May 18, 2010 letters to Acker and the Acker Trustee and Collins and the Collins Trustee, respectively, were not counter signed by either Acker, The Acker Trustee, and/or the Acker Beneficiary, or Collins, the Collins Trustee and/or the Collins Beneficiary, and the letters did not provide that Acker and/or the Acker Trust and/or the Acker Beneficiary or Collins and/or the Collins Trustee and/or the Collins Beneficiary agreed that they were providing and Windsor was accepting either the Acker Policy or the Collins' Policy **in full satisfaction of all liabilities and obligations under the Premium Finance Package, thereby forever relinquishing any and all rights they may have thereunder, including without limitation any rights to cash surrender value and/or death benefit under the Policy, and/or that they were mutually releasing the other from all liabilities and obligations under the Premium Finance Package.** Dep Tr. Julius Rousseau, individually and

53

as Corporate Designee for Arent Fox, March 7, 2017, pgs 161:14-18 [attached to [D.E. #125] as

Exhibit 3]; Declaration of Ronald Mark Goss filed in opposition of Motion for Summary

Judgment in Acker Action, Case No. 14-cv-04651-WHO [Doc. #38](emphasis added) [attached

to [D.E. #125] as Exhibit 14]; March 23, 2010 letter [attached as Exhibit 46 to [D.E. #130]];

Declaration of Mary Ann Gordillo filed in support of Motion for Summary Judgment in the

Collins Action, Case No. 3:14-cv-03713-WHO [Doc. 40](emphasis added) [attached to [D.E.

#125] as Exhibit 13]. May 18, 2010 letter [attached as Exhibit 56 to [D.E. #130]].

      124.    Disputed as stated. Prusky stated in a June 27, 2016 email to Judd that Judd

thought "he had preserved an issue", that "the Judge didn't think ;Judd] had preserved it." June

27, 2016 email from Steven Prusky to Darin Judd [attached to [D.E. #130] as Exhibit 15].

      125.    Disputed. The Acker and Collins Trusts' Opposition to Windsor's Motion for

Summary Judgment contained several arguments that speak for themselves (none of which were

that the Court should deny Windsor's Motion on the same basis as the Arbitration Panel),

including specifically that "Windsor's Motion for Summary Judgment Should Be Denied Both

on Statutory Grounds and Because There Remain Triable Issues of Material Fact". Acker and

Collins Opposition to Windsor's Motion for Summary Judgment [attached to [D.E. #130] as

Exhibits 40 and 50].

      126.    Undisputed. By way of further clarification, the Court's September 21, 2015

Orders in the Acker and Collins Actions denied Windsor's Motion for Summary Judgment,

specifically finding that "the Assignment does not constitute an exercise of the DSR, and the

purported acceptance of the insurance proceeds in full satisfaction of the Trust's debt does not

comply with section 9620 [of the California Commercial Code]". Acker Court's September 21,

2015 Order, Case No. 14-cv-04651-WHO [Doc. #68] [attached to [D.E. #125] as Exhibit 75];

Collins Court's September 21, 2015 Order [ Doc. #50] [attached to [D.E. #125] as Exhibit 77].

     127.    Undisputed.

     128.    Disputed. It is disputed that the Civil Minutes reflect any request to reopen

discovery. Rather the Court specifically held "No further discovery will be conducted at this

time. The Court will provide direction as to further discovery necessary to resolve any trailing

issues that are not disposed of by the ruling on the motions for summary judgment." September

29, 2015 Civil Minutes in Acker and Collins Actions [attached to [D.E. #130]s as Exhibits 43

and 53].

     129.    Undisputed.

     130.    Disputed. While it is undisputed that in opposing the Acker and Collins Trusts'

Motions for Summary Judgment, Windsor asserted arguments that the Acker and Collins

Trustees signed Change of Ownership Forms prior to the maturity date for their respective loans,

it is disputed that this was the first time these arguments were asserted by Windsor. In Windsor'

Motion for Summary Judgment, Or, in the Alternative, Partial Summary Judgment, filed before

the opposition to the Trust's Motion for Summary Judgment, Successor Counsel specifically

reserved argument on whether the Trusts voluntarily assigned the death benefits to Windsor pre-

default, at footnote 4 stating "This motion does not address whether the Insurance Trust

voluntarily assigned the death benefits to Windsor pre-default, but Windsor does not waive that

issue." Windsor's Points and Authorities in Support of Motion for Summary Judgment, Or, in

the Alternative, Partial Summary Judgment, in Acker and Collins Actions, at Footnote 4

[attached to [D.E. #130] as Exhibits 39 and 49]. Further, as outlined in Windsor's Memorandum

of Points and Authorities in Opposition to Motion for Summary Judgment Or, in the Alternative,

for Partial Summary Judgment filed in the Acker and Collins Actions, Windsor referenced the

Voluntary Transfer issue in several places in its Answer to the Crossclaims filed by the Trusts,

and in its reply brief in support of its original Motion for Summary Judgment, Windsor noted

that its motion was premised on the argument that a default occurred for purposes of the motion,

since Windsor believed it could prevail as a matter of law even if the Trust's default argument

were accepted. Windsor's Memorandum of Points and Authorities in Opposition to Motion for

Summary Judgment Or, in the Alternative, for Partial Summary Judgment in the Acker and

Collins Actions, at pgs. 12-13 [attached to [D.E. #130] as Exhibits 45 and 55].

 131. Disputed as stated. Windsor argued that California Commercial Code §9620 does

not apply to pre-default agreements. Windsor's Memorandum of Points and Authorities in

Opposition to Motion for Summary Judgment Or, in the Alternative, for Partial Summary

Judgment in the Acker and Collins Actions, at pgs. [attached to [D.E. #130] as Exhibits 45 and

55].

 132. Disputed. Windsor argued in opposition to the Acker and Collins Trusts' Motions

for Summary Judgment that a walk-away agreement was reached without the loans ever going

into default, however the voluntary transfer before default assertion was neither new nor unplead.

Windsor's Memorandum of Points and Authorities in Opposition to Motion for Summary

Judgment Or, in the Alternative, for Partial Summary Judgment in the Acker and Collins

Actions, at pgs. [attached to [D.E. #130] as Exhibits 45 and 55].

 133. Disputed in part. While it is undisputed that Windsor offered testimony of Robert

Coppock as evidence to support its argument that a walk-away agreement was reached with the

Acker and Collins Trustees without the loans ever going into default, it is disputed that said

testimony was the only evidence offered or that any testimony from Mr. Coppock would be

determinative of whether the Acker and Collins Trustees entered into a pre-default walkaway

agreement.

      134.    Disputed in part. While it is undisputed that Windsor offered the March 23, 2010

and May 18, 2010 letters sent to Acker and the Acker Trustee and Collins and the Collins

Trustee, respectively, as evidence supporting its argument that a walk-away agreement was

reached with the Acker and Collins Trustees without the loans ever going into default, the

remaining allegations are disputed. However, and as explained more fully above in paragraphs

40 and 42, there is **_no_** evidence of record that proves receipt of either the March 23, 2010 or the

May 18, 2010 Letters, and the Acker and Collins Trustees both submitted a declarations wherein

they specifically denied receiving the March 23, 2010 and May 18, 2010 Letters from Windsor.

Declaration of Ronald Mark Goss filed in opposition of Motion for Summary Judgment in Acker

Action, Case No. 14-cv-04651-WHO [Doc. #38](emphasis added) [attached to [D.E. #125] as

Exhibit 14]; Declaration of Mary Ann Gordillo filed in support of Motion for Summary

Judgment in the Collins Action, Case No. 3:14-cv-03713-WHO [Doc. 40](emphasis added)

[attached to [D.E. #125] as Exhibit 13].

      Moreover, Windsor's March 23, 2010 and May 18, 2010 letters to Acker and the Acker

Trustee and Collins and the Collins Trustee, respectively, were not counter signed by Acker, The

Acker Trustee, and/or the Acker Beneficiary, or Collins, the Collins Trustee and/or the Collins

Beneficiary, and the letters did not provide that Acker and/or the Acker Trust and/or the Acker

Beneficiary or Collins and/or the Collins Trustee and/or the Collins Beneficiary agreed that they

57

were providing and Windsor was accepting either the Acker Policy or the Collins' Policy **in full satisfaction of all liabilities and obligations under the Premium Finance Package, thereby forever relinquishing any and all rights they may have thereunder, including without limitation any rights to cash surrender value and/or death benefit under the Policy, and/or that they were mutually releasing the other from all liabilities and obligations under the Premium Finance Package**. Dep Tr. Julius Rousseau, individually and as Corporate Designee for Arent Fox, March 7, 2017, pgs 161:14-18 [attached to [D.E. #125] as Exhibit 3]; Declaration of Ronald Mark Goss filed in opposition of Motion for Summary Judgment in Acker Action, Case No. 14-cv-04651-WHO [Doc. #38](emphasis added) [attached to [D.E. #125] as Exhibit 14]; March 23, 2010 letter [attached as Exhibit 46 to [D.E. #130]]; Declaration of Mary Ann Gordillo filed in support of Motion for Summary Judgment in the Collins Action, Case No. 3:14-cv-03713-WHO [Doc. 40](emphasis added) [attached to [D.E. #125] as Exhibit 13]. May 18, 2010 letter [attached as Exhibit 56 to [D.E. #130]].

135.    Undisputed.  However, and by way of further clarification, while the Court held Windsor's failure to plead was dispositive it further characterized the evidence offered to support the oral pre-default walkaway agreement as "a hodgepodge of highly attenuated evidence" that "is very flimsy...even to make a question of fact".   Collins Court's December 22, 2015 Order, at pg. 7 [ Doc. #70] [attached to [D.E. #125] as Exhibit 78]; December 22, 2015 Order in Acker granting the Trust's Motion for Summary Judgment, at pg. 7, Case No. 14-cv-04651-WHO [Doc. #95] [attached to [D.E. #125] as Exhibit 79]; Transcript of Oral Argument Proceeding in Acker and Collins Action dated December 2, 2015 [attached to [D.E. #130] as Exhibit 58].

136.    Undisputed.

58

137. Undisputed. However, and by way of further clarification, while the Court held Windsor's failure to plead was dispositive it further characterized the evidence offered to support the oral pre-default walkaway agreement as "a hodgepodge of highly attenuated evidence" that "is very flimsy...even to make a question of fact". Collins Court's December 22, 2015 Order, at pg. 7 [ Doc. #70] [attached to [D.E. #125] as Exhibit 78]; December 22, 2015 Order in Acker granting the Trust's Motion for Summary Judgment, at pg. 7, Case No. 14-cv-04651-WHO [Doc. #95] [attached to [D.E. #125] as Exhibit 79]; Transcript of Oral Argument Proceeding in Acker and Collins Action dated December 2, 2015 [attached to [D.E. #130] as Exhibit 58].

138. Undisputed. However, and by way of further clarification, while the Court held Windsor's failure to plead was dispositive it further characterized the evidence offered to support the oral pre-default walkaway agreement as "a hodgepodge of highly attenuated evidence" that "is very flimsy...even to make a question of fact". Collins Court's December 22, 2015 Order, at pg. 7 [ Doc. #70] [attached to [D.E. #125] as Exhibit 78]; December 22, 2015 Order in Acker granting the Trust's Motion for Summary Judgment, at pg. 7, Case No. 14-cv-04651-WHO [Doc. #95] [attached to [D.E. #125] as Exhibit 79]; Transcript of Oral Argument Proceeding in Acker and Collins Action dated December 2, 2015 [attached to [D.E. #130] as Exhibit 58].

Further, There does not appear to be a single document even arguably comprising a written agreement executed by the Trustees of the Collins Trust, the Acker Trust, the Coppock Trust, or the Stamatov Trust, respectively, either before or after default, under which the Trusts waived all rights in and to the death benefit in return for a forgiveness of their respective loans by Windsor. See Expert Rebuttal Report of Joseph Wood [attached to [D.E. #125] as Exhibit 31]. See Expert Rebuttal Report of Joseph Wood [attached to [D.E. #125] as Exhibit 31].

59

Nor did Windsor or Rousseau have any relevant oral communications with any of the Trustees. Expert Rebuttal Report of Joseph Wood [attached to [D.E. #125] as Exhibit 31]. (Citing to Declaration of Maria Ana Gordillo In Support Of Motion For Summary Judgment Or, In The Alternative, For Partial Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713-WHO, Document No. 55, pp. 3-5 of 6, internal pagination 3:1-5:14; Declaration of Ronald Mark Goss In Support Of Motion For Summary Judgment Or, In The Alternative, For Partial Summary Judgment, *John Hancock Life Insurance Company (U.S.A.) v. Ronald Mark Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al.*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-04651-WHO, Document No. 80, pp. 3-5 of 6, internal pagination 2:1-4:14; Eugene Houchins III Affidavit, produced in discovery, at pgs. 2-5.; Declaration Of Eugene Houchins III Submitted In Support Of Motion For Summary Judgment Or, In The Alternative, For Partial Summary Judgment, *Pacific Life Insurance Company v. Maria Ana Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case No. 3:14-cv-03713-WHO, Document No. 57, pp. 2-4 of 9, internal pagination 1:25-3:15).

Since the record reveals no written agreements and no oral communications between Windsor or Rousseau, on the one hand, and any of the Trustees, on the other, any "walkaway" argument would have to be based on the theory that Mr. Houchins – who did communicate with both Windsor and Rousseau – acted as the agent for the Trusts and, in that capacity, caused them to enter into binding walkaway agreements. However, a Trustee cannot legally delegate powers like those at issue here; thus Mr. Houchins, as a matter of law, could not have bound the Trusts to any such agreements. Expert Rebuttal Report of Joseph Wood [attached to [D.E. #125] as

Exhibit 31] (citing *Gonsalves v. Hodgson*, 38 Cal. 2d 91, 99 (1951); *Powers v. Ashton*, 45 Cal.

App. 3d 783, 789 (1975); *Neal v. Patten*, 47 Ga. 73, 79 (1872)).  Even if the Trustees legally

could have delegated to Mr. Houchins the power to bind the Trusts to such agreements, nothing

of the sort ever occurred.  Expert Rebuttal Report of Joseph Wood [attached to [D.E. #125] as

Exhibit 31] (citing Transcript of Proceedings of Hearing Day 3, January 15, 2014, *Gregory*

*Barnes, Jr. as Trustee of John L. Bitter Irrevocable Life Insurance Trust v. Windsor Securities,*

*LLC*, American Arbitration Association Case No. 74-148-000296-13-S1M, 475:9-476:20;

Declaration of Maria Ana Gordillo In Support Of Motion For Summary Judgment Or, In The

Alternative, For Partial Summary Judgment, *Pacific Life Insurance Company v. Maria Ana*

*Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*,  U.S.D.C., N.D. Cal., Case

No. 3:14-cv-03713-WHO, Document No. 55, p. 3 of 6, internal pagination 3:23-4:7; Declaration

of Ronald Mark Goss In Support Of Motion For Summary Judgment Or, In The Alternative, For

Partial Summary Judgment, *John Hancock Life Insurance Company (U.S.A.) v. Ronald Mark*

*Goss as Trustee of the Joe E. Acker Family Insurance Trust, et al.*, U.S.D.C., N.D. Cal., Case

No. 3:14-cv-04651-WHO, Document No. 80, p. 3 of 6, internal pagination 2:23-3:7; Declaration

Of Eugene Houchins III Submitted In Support Of Motion For Summary Judgment Or, In The

Alternative, For Partial Summary Judgment, *Pacific Life Insurance Company v. Maria Ana*

*Gordillo as Trustee of the Erwin A. Collins Family Insurance Trust*, U.S.D.C., N.D. Cal., Case

No. 3:14-cv-03713-WHO, Document No. 57, p. 3 of 9, internal pagination 2:10-16).

139.    Undisputed.  However, and by way of further clarification, subsequent thereto

there was extensive settlement negotiations.

140.    Undisputed.

61

141.    Disputed in part. While it is undisputed that Windsor received $720, 648.34, the amount available under the Acker policy because of interest was $1,135,928.80. Windsor's Interrogatory Responses, at #4 [attached to the [D.E. #130] as Exhibit 11].

142.    Undisputed.

143.    Disputed in part. While it is undisputed that Windsor received $816,334.54, the amount available under the Collins policy because of interest was $2,018,739.73. Windsor's Interrogatory Responses, at #4 [attached to the [D.E. #130] as Exhibit 11].

144.    Disputed in part. On November 4, 2014, the Coppock Trustee responded to Windsor's June 1, 2014 letter advising that he had contacted an unnamed attorney and claimed that he disagreed that the Coppock Trust had no rights to the Policy or any portion of it, though he did not dispute that the Trust had informed Windsor that it was not willing to repay the Loan. November 4, 2014 Coppock Trustee Letter [attached to [D.E. #125] as Exhibit 82].

145.    Disputed in part. On November 12, 2014, the Stamatov Trustee responded to Windsor's June 1, 2014 letter advising that he had contacted an unnamed attorney and that he disagreed that the Trust had no rights to the Policy or any portion of it, though he did not dispute that the Trust had informed Windsor that it was not willing to repay the Loan. November 12, 2014 Stamatov Trustee letter [attached to [D.E. #125] as Exhibit 83].

146.    Undisputed.

147.    Disputed in part. While it is undisputed that Windsor notified Wood that it would conduct a public sale of the Coppock and Stamtov policies, the timing of that notification is disputed, as Mr. Judd testified it was after December 2015. Judd Dep. Tr., pgs. 175-176 [attached to Millrood Declaration submitted herewith as Exhibit "3"].

62

148.    Disputed as stated.  Windsor settled with the Coppock and Stamatov Trusts, by paying each $12,000. Coppock Settlement Agreement [attached to [D.E. #125] as Exhibit 116 (CONFIDENTIAL)]; Stamatov Settlement Agreement [attached to [D.E. #125] as Exhibit 117 (CONFIDENTIAL)].

149.    Disputed as stated.  Judd testified at his deposition that there was circumstances that prevented Windsor from conducting public sales of the Coppock and Stamatov Policies at an earlier point in time, specifically because "the Houchins group were saying they would purchase the policies, and [if they did Windsor] would lose [its] investment." Judd Dep. Tr., pgs. 178:7-14 [attached to Millrood Declaration submitted herewith as Exhibit "3"].

150.    Undisputed.

151.    Undisputed.

152.    Undisputed.

153.    Undisputed.

### ARENT FOX'S LEGAL FEES

154.    Disputed.  Windsor has denied that any legal fees are due or owing to Arent Fox. Plaintiff's Answer and Affirmative Defenses to Arent Fox's Counterclaims, at ¶1 [attached to [D.E. #130] as Exhibit 7].

155.    Disputed.  Windsor has denied that any legal fees are due or owing to Arent Fox. Plaintiff's Answer and Affirmative Defenses to Arent Fox's Counterclaims [attached to [D.E. #130] as Exhibit 7].

156.    Disputed in part.  While it is undisputed that Arent Fox submitted invoices documenting legal services for which it was billing Windsor, it is disputed that any legal fees are

due or owing to Arent Fox. Plaintiff's Answer and Affirmative Defenses to Arent Fox's

Counterclaims [attached to [D.E. #130] as Exhibit 7].

157.    Disputed. It is disputed that any of the legal fees outlined in the Chart in this

paragraph are due or owing to Arent Fox. Plaintiff's Answer and Affirmative Defenses to Arent

Fox's Counterclaims [attached to [D.E. #130] as Exhibit 7].

158.    Disputed. Windsor paid Arent Fox over a Million Dollars in fees for legal

services provided, and there are no further legal fees due or owing to Arent Fox. Plaintiff's

Answer and Affirmative Defenses to Arent Fox's Counterclaims, at ¶1 [attached to [D.E. #130]

as Exhibit 7].

159.    Disputed. Windsor absolutely objected to the work associated with the

outstanding invoices and verbalized its objections on multiple occasions.

160.    Disputed. Windsor absolutely objected to the outstanding invoices and verbalized

its objections on multiple occasions

161.    Disputed as stated. Arent Fox is seeking fees for the Hathaway rescission dispute

and the Windsor v. Lincoln dispute in its Counterclaims.

162.    Disputed in part. While it is admitted that Arent Fox is seeking $480,095.25

in unpaid legal fees, it is disputed that the $480,095.25 Arent Fox is seeking is due and/or owing

by Windsor.

BY:    _____

Alan L. Frank, Esquire afrank@alflaw.net
Samantha A. Millrood, Esquire smillrood@alflaw.net
Alan L. Frank Law Associates, P.C.

Dated: September 17, 2018        Attorneys for Plaintiff Windsor Securities, LLC

64