**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

WINDSOR SECURITIES, LLC,

        Plaintiff,

   -against-

ARENT FOX, LLP and JULIUS
ROUSSEAU, III,

        Defendants.

Case No.  16-cv-01533 (GBD) (GWG)

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Peter N. Wang
Douglas S. Heffer
Adam G. Pence
Foley & Lardner LLP
90 Park Avenue
New York, New York 10016-1314
Tel:  (212) 682-7474
Fax:  (212) 682-2329

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

SUMMARY OF FACTS IN OPPOSITION TO PARTIAL SUMMARY JUDGMENT ............. 3

I.     Windsor Engages Rousseau After Investing in Premium Financing.................................. 3

II.    Rousseau Did Not Ignore the California Choice of Law Provisions in the
       Premium Finance Packages ............................................................................................. 5

III.   Rousseau's Advice with Regard to Securing Ownership of Acker, Collins,
       Coppock, and Stamatov Policies Was Based on Incorrect Information from
       Windsor........................................................................................................................... 5

IV.    Rousseau's Legal Work with Regard to Securing Ownership of the Bitter Policy
       Was Limited..................................................................................................................... 6

V.     The Bitter Litigation and Subsequent Arbitration ........................................................... 8

VI.    The Bitter Policy Aftermath And Defendants' Recommendations to Settle .................... 10

VII.   The Acker and Collins Litigations.................................................................................. 11

VIII.  The Coppock and Stamatov Litigations........................................................................... 12

IX.    Current Lawsuit ............................................................................................................. 12

X.     Defendants' Expert Testimony ....................................................................................... 13

ARGUMENT ................................................................................................................... 14

I.     Standard for Granting Summary Judgment ................................................................... 14

II.    Legal Malpractice Standard ........................................................................................... 15

III.   There are Disputed Issues of Material Fact that Preclude Summary Judgment .............. 16
       A.     Acker, Collins, Coppock, and Stamatov.............................................................. 17
       B.     Bitter ................................................................................................................... 17

IV.    Windsor Cannot Establish that Defendants Acted Negligently As a Matter of Law........ 18
       A.     There Can Be No Finding of Malpractice as a Matter of Law .............................. 18
       B.     Rousseau and Arent Fox Made Reasonable Strategic Decisions............................ 22
       C.     The Bitter Panel's and Underlying Court's Application of § 9-620 Was an
              Issue of First Impression and the Result Not Reasonably Foreseeable
              When Judgment Calls Were Made ....................................................................... 25

i

V.    Windsor Cannot Establish Causation or Related Damages ............................................. 28

    A.    Bitter .................................................................................................. 28

    B.    Acker and Collins, Coppock, and Stamatov ........................................ 29

CONCLUSION.......................................................................................................... 30

<u>Table of Authorities</u>

**Page(s)**

**Cases**

*180 Ludlow Dev. LLC v. Olshan Frome Wolosky LLP*,
No. 651473/2013, 2017 N.Y. Misc. LEXIS 3173 (Sup. Ct. N.Y. Cnty. Aug.
22, 2017) ..................................................................................................16, 21, 22

*Aurora Loan Servs., Inc. v. Posner, Posner & Assocs., P.C.*,
513 F. Supp. 2d 18 (S.D.N.Y. 2007) ..................................................................16, 28

*Baker v. Dorfman*,
No. 97 CIV. 7512 (DLC), 1998 U.S. Dist. LEXIS 14702 (S.D.N.Y. Sept. 17,
1998) ..................................................................................................19, 27

*Bernstein v. Oppenheim & Co.*,
160 A.D.2d 428 (1st Dep't 1990) .....................................................15, 22-23, 25

*Brookwood Cos., Inc. v. Alston & Bird LLP*,
146 A.D.3d 662 (1st Dep't 2017) ..................................................................25

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ..................................................................................................14

*Darby & Darby, P.C. v. VSI Int'l, Inc.*,
95 N.Y.2d 308 (2000) ..................................................................................................25

*Deb-Jo Constr., Inc. v. Westphal*,
210 A.D.2d 951 (4th Dep't 1994) ..................................................................19, 28

*Deitz v. Kelleher & Flink*,
232 A.D.2d 943 (3d Dep't 1996) ..................................................................19, 27

*Destefano v. MVN Assocs.*,
No. 10-cv-05441 (ALC), 2013 U.S. Dist. LEXIS 14428 (S.D.N.Y. Feb. 1,
2013) ..................................................................................................14

*DiPlacidi v. Walsh*,
243 A.D.2d 335 (1st Dep't 1997) ..................................................................29

*Dombrowski v. Bulson*,
19 N.Y.3d 347 (2012) ..................................................................................................15

*Greene v. Payne, Wood and Littlejohn*,
197 A.D.2d 664 (2d Dep't 1993) ..................................................................26

i

*Jackson v. Federal Express*,
   766 F.3d 189 (2d Cir. 2014)..................................................................14

*Joseph DelGreco & Co., Inc. v. DLA Piper L.L.P.*,
   899 F. Supp. 2d 268 (S.D.N.Y. 2012).....................................................23

*Katsaris v. Scelsi*,
   453 N.Y.S.2d 994 (Sup. Ct. Broome Cnty. 1982) ...................................19

*Koch v. Town of Brattleboro*,
   287 F.3d 162 (2d Cir. 2002).................................................................14

*Kranis v. Scott*,
   178 F. Supp. 2d 330 (E.D.N.Y. 2002) ...................................................16

*Levine v. Lacher & Lovell-Taylor*,
   256 A.D.2d 147 (1st Dep't 1998) ..........................................................29

*Logalbo v. Plishkin, Rubano & Baum*,
   163 A.D.2d 511 (2d Dep't 1990) ..........................................15, 19, 21, 25, 27

*Meador v. Albanese Law Office*,
   Case No. 5:08-CV-562, 2010 U.S. Dist. LEXIS 100243 (N.D.N.Y. Sept. 23,
   2010) ...........................................................................................16, 22, 25

*Merlin Biomed Asset Mgmt., LLC v. Wolf Block Schorr & Solis-Cohen LLP*,
   23 A.D.3d 243 (1st Dep't 2005) ............................................................16

*Northrop v. Thorsen*,
   46 A.D.3d 780 (2d Dep't 2007) ........................................................19, 27

*Rosner v. Paley*,
   65 N.Y.2d 736 (1985) .........................................................................22

*Rubinberg v. Walker*,
   252 A.D.2d 466 (1st Dep't 1998) ..........................................................23

*Schutz v. Kagan Lubic Lepper Finkelstein & Gold, LLP*,
   No. 12 Civ. 9459 (PAE), 2013 U.S. Dist. LEXIS 93762 (S.D.N.Y. July 2,
   2013) ...........................................................................................15

*Shaughnessy v. Baron*,
   151 A.D.2d 561 (2d Dep't 1989) ......................................................20, 25, 27

*Stanski v. Ezersky*,
   210 A.D.2d 186 (1st Dep't 1994) ..........................................................28

*Town of North Hempstead v. Winston & Strawn, LLP,*
   28 A.D.3d 746 (2d Dep't 2006) ...................................................................25, 29

*Trimboli v. Kinkel,*
   226 N.Y. 147 (1919) ................................................................................20, 25, 27

**Statutes**

California Uniform Commercial Code § 9-620 ........................................... *passim*

**Other Authorities**

Rule 56 of the Federal Rules of Civil Procedure .............................................14

Arent Fox, LLP ("Arent Fox") and Julius Rousseau, III ("Rousseau," and, collectively, with Arent Fox, "Defendants") submit this Memorandum of Law in opposition to the Motion for Partial Summary Judgment (the "Motion") as to liability on Count 1 of the complaint (the "Complaint"), filed by Plaintiff Windsor Securities, LLC ("Windsor").

## PRELIMINARY STATEMENT

Windsor's Motion for partial summary judgment must be denied. Its scattershot legal malpractice claim spans five years, four law firms, and five different underlying litigations.[1] More to the point, it is glaringly apparent that there are sharp factual disputes about what legal advice the Defendants were asked to give and whether the advice given deviated from the standard of care. On the key question of whether there was compliance with the UCC, Defendants' premium finance expert as well as its UCC expert, acknowledged as "pre-eminent" by Windsor's own expert, have both filed extensive reports detailing how Defendants' conduct never fell below the standard of care. Windsor's argument also depends on underlying adverse judicial cases involving four policies in which Defendants did not even serve as counsel.

Like many legal malpractice cases, this case involves a former client unhappy with an adverse litigation outcome. Two years after entering the premium finance business in 2007, Steven Prusky, Windsor's principal, sought to take ownership of five life insurance policies (the "Policies") on the lives of John Bitter, Joe Acker, Erwin Collins, Robert Coppock, and Jane Stamatov (the "Insureds"). Each Policy was collateral for a Windsor loan that paid the premiums for the Policy. Under the loan agreements, borrowers had no liability for repayment beyond

---

[1] Windsor's legal malpractice claim is so overly broad and undifferentiated that it includes certain alleged acts for which Arent Fox cannot possibly be liable because, as described below, Rousseau was at another law firm, Herrick Feinstein, LLP ("Herrick") at the time. Indeed, Windsor has commenced a separate arbitration proceeding against Herrick, asserting a legal malpractice claim based on the same pre-Arent Fox legal work. Under the circumstances, it is patently insufficient to allege – and seek summary judgment – for those same claims against Arent Fox.

surrendering the Policies, meaning Windsor's only viable recourse, if the borrowers were unwilling to repay the loan, was to take possession of the Policy.

Around 2010, acting primarily on his own, and working through an untrustworthy broker who communicated directly with the Insureds, Prusky secured for Windsor a series of forms assigning ownership of the Policies to Windsor (the "Change of Ownership Forms"). Years later, one of the Insureds, Bitter, died, and a dispute arose over ownership of the Policy and entitlement to the related death benefit. In a resulting arbitration, the Panel awarded Windsor the full amount of its loan, together with interest, but did not award Windsor the entire death benefit, despite the fact that Windsor had been assigned ownership of the Policy after the loan went into default. As Defendants explained in their own summary judgment motion, no one could have anticipated the result because it was the first known decision of its kind.

After the Bitter Arbitration, Defendants encouraged Windsor to settle all potential disputes involving the remaining Policies on terms favorable to Windsor that Defendants had negotiated. Windsor, however, chose a different path, refusing to settle, terminating Defendants, and hiring new counsel. Everything that occurred thereafter was handled exclusively by Windsor and its replacement counsel. Windsor then proceeded to litigate aggressively in the disputes over the other four Policies. As a result of independent choices by new counsel – choices as to which Defendants had no role or input – Windsor did not prevail in those actions.

Windsor's Motion for partial summary judgment as to liability should be denied for several reasons. The critical material facts going to the heart of the liability question are in dispute, including what Defendants were asked to do and what Windsor's principal did on his own – that is, whether Windsor even sought or relied upon Rousseau's advice for purposes of obtaining ownership of any of the Policies. Furthermore, the evidence is in sharp conflict as to

whether Defendants, to the limited extent they were involved, deviated from the standard of care:

Defendants' experts have attested in their reports that Defendants' conduct did not deviate in any

way from the applicable standard of care.  Windsor's case is so weak that, as Defendants have

shown in their own summary judgment motion, there is a clear break in the chain of causation

between Defendants' alleged conduct and most of Windsor's claimed losses, warranting

dismissal of the majority of Windsor's claims.

## SUMMARY OF FACTS IN OPPOSITION TO PARTIAL SUMMARY JUDGMENT

Defendants incorporate by reference all of the factual background set forth in their own

summary judgment motion, including the facts outlined in the memorandum of law (ECF No.

128, hereinafter, "DMOL"), as well as the accompanying Rule 56.1 statement (ECF No. 129,

hereinafter "DSOF").[2] Defendants highlight the following fact issues that unquestionably

preclude Windsor's Summary Judgment Motion.

**I.    Windsor Engages Rousseau After Investing in Premium Financing**

There is a sharp factual dispute as to what Defendants were actually asked to do

throughout their years of representing Windsor.  For starters, Windsor did not even engage

Rousseau until long <u>after</u> it had loaned the premium payments for the Policies and signed all the

loan agreements, in 2008.  DSOF ¶ 24.  Under the loan documents Windsor used to make the

loans before Rousseau was consulted (hereinafter, the "Premium Finance Package"), each of the

five Insureds set up individual trusts (the "Trusts"), which owned the insurance policies and were

the actual borrowers of the funds used to pay the premiums.  DSOF ¶¶ 8-13.  Each Trust

appointed a trustee (the "Trustee").  DSOF ¶ 10.  Windsor's loans paid for the insurance

premiums during the roughly two-year term of the loans, and, at the maturity date, the Trusts

---

[2] Defendants also incorporate by reference their Statement of Countervailing Evidence in Opposition to Windsor's Motion (hereinafter, "DSCE") and Counterstatement in response to Windsor's 56.1 Statement.

could either repay the outstanding loan balance, with interest, or transfer ownership of the Policies to Windsor in full satisfaction of the loans. DSOF ¶¶ 15-16. The Collateral Assignment Agreement in the Premium Finance Package included a provision called the "Default Sale Right" (the "DSR"), which provided that if a Trust defaulted under the loan agreement, Windsor had the right, but not the obligation, to accept transfer of the life insurance policy in exchange for releasing the Trust from any financial obligations.[3]

Importantly, under the Premium Finance Package, absent fraud, the loans were non-recourse against each Insured, so Windsor's only recourse in the event the loan was not repaid was to pursue the Trust, and the sole asset of the Trust was the Policies. DSOF ¶¶ 11, 17-18. The Insureds, therefore, had no risk of liability for the premium finance loans; they just had to instruct each Policy's Trustee to turn over the Policy and thereafter Windsor took the risk of continuing to pay the premiums to preserve the death benefit, or allowing the Policy to lapse. *Id.*

It was not until around June 2009 that Windsor formally engaged Rousseau, then with Herrick, to provide advice about the loans. DSOF ¶ 24. By this time, Windsor was in danger of losing its investment. DSOF ¶¶ 20-23, 25-26. Rousseau warned Windsor that the loans were in jeopardy because the collateral Policies could be considered invalid under state laws that prohibit "STOLI" (Stranger-Originated Life Insurance) policies. DSOF ¶¶ 25-26. On top of that, Rousseau cautioned that it appeared the Insureds and Trustees had lied on the insurance application forms by stating they did not plan to use premium financing, meaning the Policies were potentially subject to rescission for fraud. DSOF ¶¶ 21-23, 27, 29. Rousseau performed

---

[3] **DEFAULT SALE RIGHT**: Upon an occurrence of an Event of Default (as defined in the Agreement) that has not been remedied within the time period required in the Agreement, Assignee shall have the right (the "**Default Sale Right**") but not the obligation to accept, that in consideration of the full and complete satisfaction of the Liabilities (the sufficiency of which consideration is hereby acknowledged) Owner may make a full transfer and assignment of the Insurance Policy to Assignee and thereby forever relinquish any and all rights Owner may have thereunder, including without limitation any rights to cash surrender value and/or death benefit provided thereunder. Upon the exercise of this Default Sale Right, Assignee shall notify Insurer in writing and Insurer shall thereafter recognize Assignee as the sole lawful owner of the Insurance Policy. DSOF ¶ 19.

certain legal services for Windsor to better secure its interest as a lender, including filing UCC statements and proffering collateral assignments to the insurers (in an attempt to get ahead of the potential application fraud issue).  DSOF ¶¶ 27-28.

Once Rousseau had taken these steps in 2009, however, Windsor enlisted his services with regard to the Policies much less frequently and took many important steps on its own, without first consulting Rousseau.  DSCE ¶¶ 8-9, 17, 19-28, 38-43.

## II.    Rousseau Did Not Ignore the California Choice of Law Provisions in the Premium Finance Packages

From his initial engagement, Rousseau was aware that the Premium Finance Packages included a clause stating that California law governed, but he recognized there was little to no connection between the Insureds, Trustees, and the state of California.  DSCE ¶¶ 1-4.  Both Rousseau and another attorney at Herrick, David Fox, concluded that California law likely did not apply to the Loans and that the biggest threat to Windsor was likely from a lawsuit, under the law of other states like Georgia, challenging whether Windsor had an insurable interest in these potential STOLI Policies.  DSCE ¶¶ 5-7; DSOF ¶¶ 25-26.  Rousseau repeatedly warned Windsor about this risk.  DSOF ¶¶ 25-26.

## III.   Rousseau's Advice with Regard to Securing Ownership of Acker, Collins, Coppock, and Stamatov Policies Was Based on Incorrect Information from Windsor

In late 2009 or early 2010, Eugene Houchins III ("Houchins"), the broker who had helped obtain the Policies for the Insureds, informed Windsor that the Insureds did not intend to repay the loans and had no interest in keeping the Policies.  DSOF ¶ 33.  Based on that factual representation – that the Insureds (and by extension the Trusts) intended to walk away from the Policies – Windsor, through Houchins, secured a Change of Ownership Form (a "Change of Ownership Form") from the Trustees.  DSOF ¶ 36.  At some point, Windsor consulted Rousseau, who explained that if Houchins was telling the truth and the Insureds really did want to walk

5

away from the Policies, these Change of Ownership Forms, if accepted and recorded by the insurers, should be sufficient to give Windsor ownership of the Policies.  DSOF ¶ 35.[4] Rousseau's advice was based entirely on the information provided by Windsor through Houchins.  DSOF ¶ 33.  In early 2010, Houchins secured these Change of Ownership Forms from four of the five Trustees – for Acker, Collins, Coppock, and Stamatov – prior to the loans becoming due.  DSOF ¶¶ 34, 36.  The Forms were sent to the respective insurers, which all accepted them.  DSOF ¶ 37.

Rousseau's role, therefore, with regard to the Change of Ownership Forms, was limited. Prusky – not Rousseau – communicated with Houchins directly, and Prusky, in turn, relied entirely on Houchins to communicate with the Insureds and Trustees regarding their intentions with regard to the Policies, to secure the Change of Ownership Forms, and, often, to forward the Forms to the relevant insurers.  DSOF ¶¶ 33-37; DSCE ¶¶ 38-43.  Rousseau had no role in securing the Change of Ownership Forms: Windsor never asked him to communicate with the Insureds or Trustees with regard to the Forms, never asked him to communicate with Houchins with regard to the Forms, and never asked him to forward the Change of Ownership Forms to the respective insurers.  *See supra*.  Windsor simply asked Rousseau a question about using the Change of Ownership Forms in connection with the Insureds walking away from the Policies, which he answered correctly, as the Defendants' experts agree, based on the information provided.

## IV.   Rousseau's Legal Work with Regard to Securing Ownership of the Bitter Policy Was Limited

The Bitter loan became past due around July 8, 2010, but Houchins indicated that Bitter might want to pay off the loan.  DSOF ¶¶ 44-45.  In August 2010, Rousseau (who by that time

---

[4] Defendants' expert witnesses concur with that conclusion.  *See infra* 13-14.

had moved from Herrick to Arent Fox) advised Windsor regarding its options, and, after a phone call among Rousseau, Prusky, and Houchins regarding Bitter's intent to repay the loan and keep the policy, Windsor decided to have Rousseau send the Bitter Trustee a letter demanding that the Trustee sign the Change of Ownership Form because the Trust was in default on the loan. DSOF ¶¶ 46-49; DSCE ¶¶ 12-13. At no point did Rousseau advise Windsor that it needed only to obtain a signed Change of Ownership Form to secure ownership of the Bitter Policy (because Bitter was refusing to walk away), and Rousseau explained to Windsor that the demand letter was merely a first step to get Bitter or the Trustee to act. DSCE ¶¶ 15-16; Declaration of Julius Rousseau, III, dated September 17, 2018 ("Rousseau Opp. Decl.") ¶ 13. Rousseau sent the letter on September 8, 2010, which received no response. DSOF ¶¶ 47; DSCE ¶¶ 13, 17.

With no response to the September 2010 letter, Windsor proceeded to try to secure ownership of the Bitter Policy itself, without Defendants' assistance, asserting its power of attorney rights under the Premium Finance Package and signing a Change of Ownership Form for the Policy. DSCE ¶ 17. The insurer, Pacific Life Insurance Company ("Pacific Life"), rejected Windsor's attempt to change the record ownership of the Policy. DSCE ¶ 18. On January 14, 2011, Windsor sent a letter to the Bitter Trustee itself. DSOF ¶ 48. On February 14, 2011, the Bitter Trustee responded to Windsor's January 14 letter and signed the Form. DSOF ¶¶ 46-49. Houchins told Windsor that he had forwarded the Change of Ownership Form to the insurer, but the insurer somehow never received or processed the Form. DSOF ¶¶ 49-50.

Again, apart from drafting the September 2010 Letter and reviewing the January 2011 Letter, Defendants had no role in what Windsor now claims was malpractice: securing the Bitter Change of Ownership Form. In fact, after around November 2010, Windsor did not ask Defendants to communicate with Bitter or the Trustee, did not ask them to communicate with

Houchins, and did not ask them to contact Pacific Life.  DSCE ¶¶ 17, 19-28.[5]  Windsor did all

that itself.  Prusky communicated with Houchins directly, and relied entirely on Houchins to

communicate with the Trustee and Bitter regarding the loan, to secure the Change of Ownership

Form, and to forward the Form to the relevant insurers.  DSCE ¶¶ 24-26.

After January 2011, when Rousseau reviewed a draft of Windsor's January 14 letter,

Defendants provided no further advice to or legal work for Windsor with regard to the Bitter

Policy until the subsequent litigation more than two years later.  DSCE ¶¶ 19-28.  In fact,

Rousseau was not even aware that the Trustee executed the Change of Ownership Form, let

alone whether Pacific Life recorded the Form.  DSCE ¶ 28.

## V.    The Bitter Litigation and Subsequent Arbitration

On December 23, 2012, Bitter died.  DSOF ¶ 51.  Windsor attempted to collect the death

benefit from Pacific Life, but learned that the Bitter Trust was still the record Policy owner.

DSOF ¶¶ 52-53.  On February 13, 2013, the Bitter Trust filed suit in California state court,

asserting the Bitter Trust was entitled to the Policy death benefit because (i) the Bitter Trust was

not in default on the loan, and (ii) the Change of Ownership Form had been procured by fraud.

DSOF ¶¶ 54-56.  There was no claim even asserted based upon any alleged non-compliance with

the UCC.  DSOF ¶ 55.

The case was eventually referred to arbitration before the AAA.  DSOF ¶ 60.  There, the

Bitter Trust argued, for the first time, that California law applied and that the Change of

Ownership Form did not meet the requirements of California Uniform Commercial Code

("UCC") § 9-620 and that the Form did not satisfy the DSR.  DSOF ¶¶ 19, 54-57, 62.  In

response to these arguments, Rousseau thoroughly assessed the situation, and analyzed the

---

[5] In November 2010, when Pacific Life refused to accept a form submitted by Windsor naming itself as a
beneficiary of the Bitter Policy, Rousseau contacted Pacific Life, which eventually accepted the form.  DSCE ¶ 18.

choice of law issue and the § 9-620 issue in consultation with colleagues.  DSCE ¶¶ 29-31.

Since Rousseau was concerned the Policy could be declared void under Georgia law, which

disfavored premium financed insurance policies such as this one, Rousseau made the judgment

to recommend that Windsor's better argument for the death benefit would be under California

law, even though Georgia's version of § 9-620 did not apply to life insurance policies, because of

the strength of his concern about rescission under Georgia law.  DSCE ¶¶ 5-6, 29-31.

     At the arbitration hearing, it was apparent that Houchins and the Bitter Trustee lied (a

conclusion with which Windsor fully agreed) and made the uncorroborated claim that the intent

of the Change of Ownership Form was never to transfer full ownership of the Policy but merely

to facilitate the sale of the Policy, so that the Trust could repay Windsor for the premium finance

loan and keep any excess funds.  DSCE ¶ 37.  Even though that testimony was contradicted by

documentary evidence, Rousseau predicted (and warned Windsor) that the Panel might

sympathetically rule for Bitter's widow and against Windsor as a matter of equity in awarding

the death benefit.  DSCE ¶¶ 35-36.

     That is exactly what happened.  On April 8, 2014, the Arbitration Panel entered its

decision (the "Bitter Arbitration Award").  DSOF ¶¶ 63-67.  The Panel held that because the two

demand letters did not provide express notification that Windsor was invoking the DSR, there

was no evidence that Windsor informed the Bitter Trustee that it was exercising the DSR.

Declaration of Peter N. Wang (the "Wang Decl."), dated August 13, 2018 (ECF No. 130) Ex. 5

at 5.  The Panel misinterpreted the DSR provision: the Panel held that Windsor failed to exercise

the DSR, but under the actual language of the provision it is the Trustee that exercises the DSR.

*Comp. id. with supra* n.2.  Similarly, the Panel explained that a lender essentially had two

options for proceeding after default under UCC § 9-620: either a lender could accept the

collateral in full satisfaction of the loan, but only if the debtor agrees to the terms of the acceptance of collateral in a "record authenticated after default," or the creditor could send the debtor an unconditional proposal to accept such conditions and then receive no response within 20 days. Wang Decl. Ex. 5 at 5-6. The Panel held that the demand letters contained nothing that expressed an "acceptance" by Windsor of the collateral in full satisfaction of the loan, and, similar to its analysis regarding the DSR, held that nothing in these letters contained a "proposal" stating that Windsor was prepared to accept the Policy in full satisfaction. *Id.* at 6-7. The Panel also overlooked the obvious and important fact that acceptance by Windsor of the Bitter Policy (via the Change of Ownership Form) was, due to the non-recourse provisions in the Premium Finance Package, in full satisfaction of the loan. DSOF ¶¶ 11, 17-18. The Panel awarded Windsor its rights as a secured creditor on the loan: the right to repayment of the full amount of the insurance premiums, interest at the maximum lawful rate of 10%, and certain expenses. The Panel awarded the remainder of the death benefit to the Bitter Trust. *Id.* at 7; DSOF ¶¶ 63, 69.

This was an unprecedented decision, as even the Panel itself recognized. DSOF ¶ 70.

## VI.   The Bitter Policy Aftermath And Defendants' Recommendations to Settle

On April 15, 2014, Acker died, and two months later, on June 19, 2014, Collins died. DSOF ¶¶ 73-74. In July 2014, the Acker Trustee sent a letter to the insurer on the Acker Policy, asserting a claim to the death benefit. DSOF ¶ 75. Around the same time, the Collins Trustee sent a similar letter to the insurer on the Collins Policy. DSOF ¶ 76.

Following the Bitter decision, Defendants began negotiations to settle, and to include the Acker and Collins disputes in the settlement. DSOF ¶¶ 79, 82-83. Around late July or early August 2014, Joseph Wood, counsel for all three estates, offered to settle the Bitter dispute by paying Windsor $650,000, with the estate keeping the remainder of the $2 million death benefit. DSOF ¶¶ 82-83, 91-92. Wood also offered to settle Acker and Collins, and let Windsor keep the

10

respective death benefits, if Windsor paid the Acker estate $50,000 and the Collins estate
$100,000. DSOF ¶ 83. Windsor agreed to settle Bitter, and Rousseau strongly advised Windsor
to settle the other two cases as soon as possible. DSOF ¶¶ 71, 80, 84; DSCE ¶¶ 44-45.

By September 9, 2014, however, Windsor terminated Defendants and, with new counsel
("Successor Counsel"), backed out of the settlement for Bitter, proposing instead a new global
settlement ($1.5 million to settle all disputes), which Wood promptly rejected. DSOF ¶¶ 93-95.
The Bitter matter was not settled until January 2015, under the same essential terms as
Defendants had negotiated. DSOF ¶¶ 91, 96-97. Meanwhile, Windsor refused to pay Arent Fox
more than $480,000 in unpaid legal fees. DSOF ¶¶ 154-62.

VII.    **The Acker and Collins Litigations**

After September 2014, as Defendants outlined in their own partial summary judgment
motion, Windsor's Successor Counsel engaged in aggressive litigation over the Acker, Collins,
Coppock, and Stamatov Policies rather than settle them, as proposed, for modest payments.
Among other things, Windsor's Successor Counsel failed to advance key factual and legal
arguments that clearly distinguished Acker and Collins from Bitter. DSOF ¶¶ 98-99, 101-143.
So, for example, Windsor argued that the Acker and Collins Trusts were in default under the loan
documents, despite the fact that the loans were not yet due when the Acker and Collins Trustees
executed the Change of Ownership Forms; by failing to argue that there was no default, Windsor
sacrificed the ability to argue that the DSR and § 9-620 did not even apply. DSOF ¶¶ 108, 118.
Furthermore, Successor Counsel also prematurely moved for summary judgment on this flawed
post-default theory without completing discovery (or deposing Houchins), or presenting the
Court all relevant evidence, including two pre-default releases that Windsor had sent both the
Insureds and Trustees for the Acker and Collins Policies. DSOF ¶ 123. As a result of these
missteps by Successor Counsel, Windsor lost the summary judgment motions, and the Court

relied on the same post-default reasoning as the Bitter Arbitration Panel.  DSOF ¶ 126.

After losing, Successor Counsel realized their error and tried to reverse course, arguing for the first time that the Trusts were not in default, but it was too late: the Court held that Windsor had waived these arguments by not preserving them in the initial pleadings.  DSOF ¶¶ 135-138.  As the Court explained, "Windsor's complete failure to plead the oral walk-away agreement it now rests its case on is fatal."  DSOF ¶ 138 (emphasis added).[6]  The Court granted the Trusts' summary judgment motion on the basis that Windsor had failed to preserve these arguments, and Windsor was forced to settle both Litigations.  DSOF ¶¶ 139-143.

## VIII.  The Coppock and Stamatov Litigations

Through Successor Counsel, Windsor preemptively filed two federal actions, asserting its absolute right to ownership of the Coppock and Stamatov Policies.  DSOF ¶ 146.  Over a year later, after extensive and expensive discovery, in March 2016, Windsor settled both cases by paying Coppock and Stamatov (who were still living) the nominal sum of $12,000 each (which Rousseau had recommended to Windsor years before).  DSOF ¶¶ 150-153.

## IX.  Current Lawsuit

On February 29, 2016, Windsor commenced this action against Defendants.  Windsor appears to allege that Defendants 1) failed to advise Windsor properly with regard to Windsor's rights under the loan documents; 2) failed to determine sufficiently the requirements for transfer of the ownership of the Policies; 3) failed to defend properly Windsor's rights in the Bitter Arbitration; and 4) failed to take appropriate action after the Bitter Arbitration to secure Windsor's ownership in the other four Policies.  Windsor now moves for partial summary judgment as to liability on its legal malpractice claim.

---

[6] Windsor would later complain to its Successor Counsel, that it viewed the waiver of this issue as hugely significant because the pre-default status of the loans should have been Windsor's "main argument."  DSOF ¶¶ 124-125.

## X.   Defendants' Expert Testimony

Defendants have presented two leading experts, on the application of Article 9 of the UCC and on the premium finance lending industry, who will testify at trial. These experts have issued sworn reports, detailing how Defendants' actions were reasonable at the time and certainly did not fall below the standard of care for an attorney in these circumstances.

Edwin Smith, who Windsor's own expert described as "most certainly" the "preeminent expert on Article 9," reported on § 9-620 and other UCC issues. Declaration of Peter N. Wang, dated September 17, 2018 (the "Wang Opp. Decl.") Ex. 6, Sandra Stern Tr. 21:4-10. Smith has reported that it was reasonable for Rousseau to question whether California law applied to the five Policies because the transaction did not appear to bear a "reasonable relation" to the state. Declaration of Edwin E. Smith, dated September 17, 2018 (the "Smith Opp. Decl."), Ex. 3 at 7-8. He has also reported that it was reasonable for Defendants to conclude, among other things, that the contractual provisions in the Premium Finance Package, Houchins' purported conversations with the Insureds and Trustees, and the recorded Change of Ownership Forms were enough to satisfy both the DSR and § 9-620. *Id.*, Ex. 1 at 6-10; Ex. 2 at 3-5. Finally, Smith has reported that it was reasonable – under basic contract principles and the UCC – to treat any pre-default agreements to walk away from the loans with the understanding that post-default requirements need not be met. *Id.*, Ex. 1 at 4-6; Ex. 2 at 2-3; Ex. 3 at 4-6.

James Maxson, one of the country's leading experts on premium finance lending has reported regarding standard practices within the industry, in particular that industry lenders regularly accept Change of Ownership Forms for the purpose of transferring ownership of a life insurance policy because it is customary in the industry to do so. Declaration of James W. Maxson, dated September 17, 2018 (the "Maxson Opp. Decl.") Ex. 1 at 11-12; Ex. 3 at 1-2, 5-6. He reported that insureds often walk away from an insurance policy rather than default on the

13

loan. *Id.*, Ex. 1 at 15; Ex. 2 at 4-7. He has also reported that it was reasonable for Rousseau to question whether California law applied to the five Policies. *Id.* Ex. 3 at 8-9. Maxson has further reported that Rousseau's concerns about Georgia law and the Bitter Policy were reasonable. *Id.*, Ex. 1 at 11, 12-14; Ex. 3 at 2-3.

Perhaps most important, both Smith and Maxson have concluded that Defendants could not reasonably have anticipated the Bitter Arbitration Award or the Acker and Collins court decisions because, prior to these holdings, there was no clear authority on how a California court would apply UCC § 9-620 in these circumstances or clear authority providing that a Change of Ownership Form, coupled with the language of the Premium Finance Package and the circumstances of the transactions, would not be enough to transfer title to the Policies. Smith Opp. Decl. Ex. 1 at 7-9; Maxson Opp. Decl. Ex. 1 at 9-16; Ex. 3 at 4-5.

## ARGUMENT

### I.  Standard for Granting Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure "allows a party to seek a judgment before trial on the grounds that all facts relevant to a claim(s) or defense(s) are undisputed and that those facts entitle the party to the judgment sought." *Jackson v. Federal Express*, 766 F.3d 189, 194 (2d Cir. 2014) (citations omitted); *Destefano v. MVN Assocs.*, No. 10-cv-05441 (ALC), 2013 U.S. Dist. LEXIS 14428, at *3 (S.D.N.Y. Feb. 1, 2013) (summary judgment proper only where "admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law"); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). This Court must "read all facts in the light most favorable to the non-moving party." *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002) (internal citations omitted).

As demonstrated below, Windsor has failed to present this Court a basis to grant any portion of Windsor's summary judgment motion.

## II.   Legal Malpractice Standard

To prevail at summary judgment on a claim of legal malpractice, even for liability purposes alone, a plaintiff must establish all elements of a malpractice claim through the submission of evidentiary proof in admissible form: (1) the duty of the professional to use such skill, prudence, and diligence as other members of the profession commonly exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury (i.e., the outcome would have been different "but for" the attorney's negligence); and (4) actual and ascertainable damage resulting from the professional's negligence. *Schutz v. Kagan Lubic Lepper Finkelstein & Gold, LLP*, No. 12 Civ. 9459 (PAE), 2013 U.S. Dist. LEXIS 93762, at *13-21 (S.D.N.Y. July 2, 2013); *Dombrowski v. Bulson*, 19 N.Y.3d 347, 350 (2012).[7]

A legal malpractice plaintiff moving for summary judgment has an extremely high burden because, ordinarily, the question of whether legal malpractice occurred is a question for the jury. *Logalbo v. Plishkin, Rubano & Baum*, 163 A.D.2d 511, 514 (2d Dep't 1990) (a plaintiff is only entitled to summary judgment "where there is no conflict at all in the evidence, the defendant's conduct fell below any permissible standard of due care, and the plaintiff's conduct was not really involved"). Further, expert testimony is generally required to prevail on a legal malpractice claim, and "exceptions" to this rule have only been recognized in rare circumstances in which the "ordinary experience of the fact finder provides sufficient basis for judging the adequacy of the professional service" or where "the attorney's conduct falls below any standard

---

[7] Throughout this litigation, including in its proffered expert reports, Windsor has claimed, without authority, that New York law requires attorneys with specialized practices to meet a higher standard of care. *See, e.g.*, Declaration of Samantha Millrood (ECF No. 125), Ex. 33 at 31-32 (citing law from other jurisdictions). In its memorandum of law (ECF No. 123, hereinafter, "Br."), Windsor apparently now concedes that the "relevant standard of care adopted by courts in this state is the 'ordinary and reasonable skill and knowledge commonly possessed by a member of the profession.'" (Br. 4) (citing *Bernstein v. Oppenheim & Co.*, 160 A.D.2d 428, 430 (1st Dep't 1990)).

of due care." *Kranis v. Scott*, 178 F. Supp. 2d 330, 334 (E.D.N.Y. 2002) (generally, plaintiff must introduce expert testimony to establish prima facie case sufficient for presentation to the jury); *Merlin Biomed Asset Mgmt., LLC v. Wolf Block Schorr & Solis-Cohen LLP*, 23 A.D.3d 243, 243 (1st Dep't 2005) (expert testimony necessary regarding standard of care of attorney drafting purchasing and marketing agreements in field of hedge funds and financial management companies because this subject not part of "jurors' ordinary, daily experience"). When expert testimony is required, summary judgment is inappropriate.[8]

Absent the above narrow exceptional circumstances, the issue of whether specific conduct constitutes legal malpractice requires a factual determination to be made by a jury, including an evaluation of expert testimony, which "is needed to demonstrate that the attorney failed to exercise the ordinary reasonable knowledge and skill commonly possessed by members of the legal profession." *180 Ludlow Dev. LLC v. Olshan Frome Wolosky LLP*, No. 651473/2013, 2017 N.Y. Misc. LEXIS 3173, at *17-18 (Sup. Ct. N.Y. Cnty. Aug. 22, 2017) (citing *Feldman v. Finkelstein & Partners, LLP*, 131 A.D.3d 505, 506-07 (2d Dep't 2015)).

Windsor fails to meet this high bar for summary judgment because there are numerous material issues of fact in dispute, and Windsor simply cannot, as a matter of law, establish any, let alone all, of the elements necessary to prevail on its legal malpractice claim.

## III.   There are Disputed Issues of Material Fact that Preclude Summary Judgment

Contrary to Windsor's conclusory contention otherwise, there are genuine issues of material fact, in particular the circumstances surrounding Defendants' limited role in Windsor's attempts to take ownership of the Policies. These disputed material facts clearly impact both (i)

---

[8] *Aurora Loan Servs., Inc. v. Posner, Posner & Assocs., P.C.*, 513 F. Supp. 2d 18, 22 (S.D.N.Y. 2007) (denying plaintiff summary judgment, even when defendants declined to provide expert report, because plaintiff's "expert testimony regarding negligence and causation will have to be evaluated by a finder of fact and summary judgment is therefore inappropriate"); *Meador v. Albanese Law Office*, Case No. 5:08-CV-562, 2010 U.S. Dist. LEXIS 100243, at *16 (N.D.N.Y. Sept. 23, 2010) (holding summary judgment "not warranted because of the conflicting expert testimony. It will be for the trier of fact to determine credibility and resolve other disputed facts").

whether Defendants' conduct ever fell below the standard of care and (ii) causation.

A.    Acker, Collins, Coppock, and Stamatov

Attorneys cannot breach a duty to do something they were not tasked by the client to do. With regard to the Acker, Collins, Coppock, and Stamatov Policies, Windsor did not ask Rousseau to communicate with Houchins or acquire the executed Change of Ownership Forms in 2009 and 2010 (and Arent Fox was not even involved at this point). *See supra* 5-6. Windsor never asked Rousseau to communicate with the Insureds or Trustees or with Houchins, and Windsor never asked Rousseau to contact the respective insurers regarding the Change of Ownership Forms. *See supra* 6. Instead, Windsor, on its own, enlisted the dishonest broker Houchins to do both of these things. *See supra* 5-6. Rousseau's only role was to provide Windsor advice based on the information Windsor provided from Houchins – i.e., that the Insureds desired to walk away from the Policies before the premiums were due to be repaid. *See supra* 5-6. Rousseau was not tasked with, and did not undertake, any communications with the Insureds, Trustees, or Houchins; as such, he is not responsible for any miscommunications among the Insureds, Trustees, and Houchins or any miscommunications between Houchins and Windsor. In fact, Rousseau's advice to Windsor was contingent on pre-default circumstances and the Insureds' supposed desire to walk away, which, as it later turned out, was either not true at the time or, more likely, was true at the time, but Houchins later disclaimed through fraudulent testimony. Simply put, Rousseau was responsible only for the advice he gave Windsor, not for the veracity of the information provided by Windsor through Houchins.

B.    Bitter

Defendants' actions with regard to the Bitter Policy are even more disputed. First, Rousseau never advised Windsor that obtaining the Change of Ownership Form alone would be enough to transfer title to the Bitter Policy after the loan came due. *See supra* 6-7. Rather,

Rousseau advised Windsor to secure the Change Form as a first, initial step intended to pressure the Bitter Trustee and Bitter to act. *See supra* 7. As Rousseau testified, what actions Windsor took next would depend on the Bitter Trustee's response. DSCE ¶ 15; Rousseau Opp. Decl. ¶ 13. Windsor, however, never followed up with Rousseau about the Bitter Policy until <u>years</u> later. *See supra* 7-8. In fact, after January 2011, when Rousseau reviewed a draft of Windsor's January 14, 2011 letter, Defendants performed no further legal work on the Bitter Policy until the subsequent litigation over the death benefit. *See supra* 8. Until Bitter died, Windsor did not even update Defendants about the dispute and never told Rousseau, or anyone else at Arent Fox, that the Bitter Trustee had executed the Change of Ownership Form. *See supra id.*

Similarly, Windsor barely involved Defendants in any efforts to obtain title to the Bitter Policy. Apart from the demand letters, Windsor communicated with Houchins directly, and relied entirely on Houchins to communicate with the Trustee and Bitter about the Policy. *See supra* 5-8. Even after two demand letters, Windsor still relied entirely on Houchins to communicate with the Trustee and Bitter, and accepted, without question or further investigation, Houchins' representations that Bitter agreed to relinquish the policy and that Houchins had sent the Change of Ownership Form to Pacific Life. *See supra id.* Windsor never asked Defendants to communicate with Bitter or the Trustee after September 2010, never asked Defendants to communicate with Houchins, and never asked Defendants to contact Pacific Life regarding the February 2011 Change of Ownership Form. *See supra* 7-8.

## IV.   Windsor Cannot Establish that Defendants Acted Negligently As a Matter of Law

Even if there were no genuine issues of material fact – and there are numerous – Windsor still cannot establish that Defendants were negligent as a matter of law.

### A.   There Can Be No Finding of Malpractice as a Matter of Law

Windsor fails to cite any cases under New York law where a court has held that a

defendant attorney in similar circumstances committed legal malpractice as a matter of law.  In truth, the cases Windsor cites are completely inapposite and involve simple, obvious attorney error where there was no question that the alleged malpractice fell below the standard of care (meaning expert testimony was unnecessary) and no question that the defendant attorney was liable.  These cases involve such obvious mistakes as a failure to follow "clear" and unambiguous contractual requirements or "established" and "settled" rules of law (*see supra* 15-16), a failure to adhere to an obvious statute of limitations,[9] or an altogether failure to file a document or respond to discovery.[10]

For example, in *Northrop v. Thorsen*, cited by Windsor, the Court granted summary judgment against an attorney who failed to follow a "clearly defined and firmly established rule" requiring the filing of a court application to approve settlement under New York Workers' Compensation Law.  46 A.D.3d 780, 782 (2d Dep't 2007).  This attorney even failed to file after being made aware of the requirement, on the excuse he was too busy to do so.  *Id.* at 781.  Similarly, in another cited case, *Logalbo*, the defendants provided timely oral notice of cancellation of a contract to buy real property and provided written notice that was sent but not received within the requisite time period.  163 A.D.2d at 513.  The sales contract, however, clearly required written notice to be received by the deadline, meaning the cancellation was invalid.  *Id.*  The Court granted summary judgment, noting that the requirement defendant

---

[9] *See, e.g., Baker v. Dorfman*, No. 97 CIV. 7512 (DLC), 1998 U.S. Dist. LEXIS 14702, at *2-4 (S.D.N.Y. Sept. 17, 1998) (failure to file timely notice of claim against city and failure to file complaint within applicable statute of limitations); *Deitz v. Kelleher & Flink*, 232 A.D.2d 943, 945 (3d Dep't 1996) (failure to commence lien foreclosure actions within one year of filing of liens, or to obtain court order extending liens); *Katsaris v. Scelsi*, 453 N.Y.S.2d 994, 996 (Sup. Ct. Broome Cnty. 1982) (holding failure to perfect appeal within allotted time "negligent" but denying plaintiff summary judgment as to liability because plaintiff could not establish requisite causation).

[10] *See, e.g., Deb-Jo Constr., Inc. v. Westphal*, 210 A.D.2d 951, 951 (4th Dep't 1994) (among other things, failure to file UCC financing statement with proper state department and failure to respond to notice to admit).

disregarded was a "long standing rule."[11]

Attempting to fit its case into the narrow line of legal malpractice cases discussed above, Windsor argues that it is entitled to summary judgment as to liability because Defendants supposedly failed to comply with "express provisions required in the contracts and clear statutory law," making a jury trial and the jury's weighing of expert testimony unnecessary. (Br. 5, 20).[12]  This statement is demonstrably flawed.  As described below, the underlying disputes involved various strategic choices by Defendants as to issues of first impression regarding UCC § 9-620 and an ambiguous DSR provision.  *Infra* at 25-28.  When he began representing the Bitter Trust to challenge the change of policy ownership, the Bitter Trust's counsel (now acting as one of Windsor's purported experts) did not even recognize any potential UCC issues or any issues with the effectiveness of the Change of Ownership Form under the loan documents, including the DSR.  DSOF ¶¶ 55-57.  Simply put, the factual evidence establishes that the alleged misconduct does not involve simple, obvious errors by an attorney that do not require trial or expert testimony, and the fact that Windsor's own expert failed to identify any potential issues for so long in the underlying litigations is strong proof of this.

Windsor also relies on *Red Zone LLC v. Cadwalader, Wickersham & Taft LLP*, but this case involved a defendant law firm that wholly failed to memorialize in a one-page side letter (at the client's request) a simple oral agreement between the client and a third party, the terms of which neither side, even after the fact, disputed.  994 N.Y.S.2d 764, 772-73 (Sup. Ct. N.Y. Cnty. 2013).  The Court held that summary judgment was appropriate, and that the plaintiff was not

---

[11] Windsor cites other similar cases. *See, e.g., Trimboli v. Kinkel*, 226 N.Y. 147, 150 (1919) (failure to apply "settled rules of law" by ignoring obvious problem with title to real property that "should be known to all conveyancers"); *Shaughnessy v. Baron*, 151 A.D.2d 561, 562 (2d Dep't 1989) (failure to comply with any of the contract terms that "clearly and unambiguously" set forth requirements for an assignment of a lease).

[12] Windsor has attached some of its expert reports as exhibits (*see* Millrood Decl. Exs. 30-35) but does not discuss these reports in its opening brief or incorporate any expert opinion in its Motion, other than a few inappropriate citations in the 56.1 Statement.

required to provide expert testimony because the defendant's conduct clearly fell below any standard of care. *Id.* at 772.

This case, however, could not be more different than *Red Zone*. Instead, it is much more analogous to *180 Ludlow Dev. LLC v. Olshan Frome Wolosky LLP*. In *Ludlow*, the plaintiff had engaged the defendant to draft a contract to purchase air rights over a neighboring property, including the right to construct a cantilever over the building on the adjacent property. 2017 N.Y. Misc. LEXIS 3173 at *1-2. After purchasing the rights, the plaintiff had to halt construction of the cantilever after the neighboring property owner refused to allow the plaintiff to install additional ventilation in the neighboring building to avoid building code violations for the cantilever. *Id.* at *9-11. In the subsequent litigation, a court ruled that the plaintiff only had an easement to cure code violations on the neighboring building, not to cure code violations for the plaintiff's building. *Id.* at *12-13. The plaintiff could not get a certificate of occupancy and was forced to sell the building "as is" at a huge loss *Id.* at *13-14.

The plaintiff then sued the defendant for malpractice, alleging the defendant should have included a provision in the sale contract that would have covered this scenario. At summary judgment, the court found that the defendant was not negligent because 1) he was engaged to draft the contracts not determine what easements were required; 2) the plaintiff was relying on a team of engineers, architects, and other attorneys for the specific code issues; 3) the plaintiff failed to notify the defendant of the need to install this additional ventilation when the plaintiff became aware of the issue; and 4) the hypothetical provision advanced by plaintiff was considered unique in that area of law (and there was no evidence that the neighboring property owner would have agreed to the provision anyway). *Id.* (distinguishing *Red Zone* and *Logalbo*).

Just as in *Ludlow*, in this case, there are serious questions – both factual and legal –

regarding what role Defendants actually played in Windsor's attempts to obtain title to the five Policies. *Supra* at 17-18. Defendants' role in the five underlying transactions was limited, Windsor failed to involve Defendants in the majority of its efforts to secure ownership of the Policies (instead relying on the broker Houchins), and there remains to this day a fundamental disparity regarding what Windsor and the Trustees understood the Change of Ownership Forms to mean. *See supra* 17-18. Windsor's failure to keep Defendants informed about the status of the Bitter dispute is sufficient basis, standing alone, to deny summary judgment with regard to the Bitter Policy. *180 Ludlow Dev. LLC*, 2017 N.Y. Misc. LEXIS 3173, at *18-24, 30.

Finally, two renowned experts in UCC issues and premium finance have reported as to the complicated nature of the legal malpractice questions here and concluded that Defendants' legal representation did not, at any point, fall below the applicable standard of care. Smith Opp. Decl. Exs. 1-3; Maxson Opp. Decl. Exs. 1-3; *see supra* 13-14. These reports too provide this Court an independent basis to deny Windsor's motion. *Meador*, 2010 U.S. Dist. LEXIS 100243, at *16 (summary judgment "not warranted because of the conflicting expert testimony. It will be for the trier of fact to determine credibility and resolve other disputed facts").

B.    Rousseau and Arent Fox Made Reasonable Strategic Decisions

Under New York Law, an attorney is not "held to the rule of infallibility and is not liable for an honest mistake of judgment where the proper course is open to reasonable doubt." *Bernstein*, 160 A.D.2d at 430 (citing *Grago*, 49 A.D.2d at 646 and *Rosner v. Paley*, 65 N.Y.2d 736, 738 (1985)). An error of judgment by an attorney if it involves the "selection of one among several reasonable courses of action does not constitute malpractice." *180 Ludlow Dev. LLC*, 2017 N.Y. Misc. LEXIS 3173, at *17 (quoting *Rosner*, 65 N.Y.2d at 738). An attorney, as a "general rule," may only be held liable for "ignorance of the rules of practice, failure to comply with conditions precedent to suit, or … neglect to prosecute or defend an action." *Bernstein*, 160

22

A.D.2d at 430 (citing *Grago*). New York courts apply the same analysis regardless of whether

the decision was made before or during trial, or in the capacity of a legal advisor.[13]

In *Stonewell Corp. v. Conestoga Title Ins. Co.*, an attorney was engaged to represent the

plaintiff in litigation stemming from plaintiff's interest in a commercial property subject to

forfeiture in two different federal proceedings: a bankruptcy proceeding in the Southern District

of New York and a criminal proceeding in the Middle District of Florida. 678 F. Supp. 2d 203,

206 (S.D.N.Y. 2010). Faced with the prospect of simultaneous proceedings, the attorney filed an

"innocent owner" petition in Florida after that Court issued a Preliminary Order of Forfeiture and

also requested an interim stay in New York, pending a ruling on the petition in Florida. *Id.* at

207, 211. The plaintiff unsuccessfully exhausted all legal remedies in Florida, and the Court

held he had no interest in the property. *Id.* at 208. The plaintiff then initiated a malpractice

action against the attorney claiming the above strategy was negligent. At summary judgment,

this Court soundly rejected the negligence theory, finding the attorney met the requisite standard

of care when faced with "highly complex and substantively overlapping" legal proceedings and

finding that the attorney reasonably identified the urgency of the Florida proceeding, where the

plaintiff could have lost his interest outright if not for the filing of the "innocent owner" petition,

and then reasonably sought a stay of the New York proceeding to prevent further legal

complications. *Id.* at 211 Ultimately, this Court held that summary judgment in favor of the

attorney was appropriate because the attorney, in difficult legal circumstances, selected a

reasonable strategic option, even though that strategy was not ultimately successful and other

---

[13] *See, e.g., Rosner*, 65 N.Y.S.2d at 737-38 (counseling regarding settlement of family trust including petitioning court for instructions/directions, advising to enter settlement agreement no more than an "error of judgment" and did not rise to malpractice as it was "one among several reasonable courses of action"); *Joseph DelGreco & Co., Inc. v. DLA Piper L.L.P.*, 899 F. Supp. 2d 268, 280 (S.D.N.Y. 2012) (strategic advice law firm gave during contract negotiations, bankruptcy counseling, and litigation forum evaluation protected); *Rubinberg v. Walker*, 252 A.D.2d 466, 467 (1st Dep't 1998) (decision not to submit clients' or their respective accountants' affidavits was reasonable in opposition to summary judgment given contents and evidentiary weight of affidavits).

options may have existed. *Id.*

There are many parallels to this case. Like the attorney in *Stonewell*, Rousseau and Arent Fox were faced with difficult decisions involving complicated legal issues. When providing what Windsor describes as "transactional advice" and during the Bitter Litigation, Rousseau made strategic decisions based on his interpretation of the Premium Finance Packages, what Windsor told him, and his experience in the premium finance industry. From his initial engagement at Herrick, Rousseau was concerned that Windsor, as a premium finance lender, did not have an insurable interest in the Policies. DSCE ¶¶ 5-6. Fellow Herrick attorney David Fox and Rousseau both understood that, while the Premium Finance Packages provided that California law applied to the loans, such choice of law provisions are only enforceable where there was a meaningful connection to the state, and because there was no such connection, California law likely did not apply to the loans for the Insureds and Trusts. DSCE ¶¶ 1-4.

During the Bitter Arbitration, when the Bitter estate first argued that California's UCC applied, Rousseau and Arent Fox attorneys carefully analyzed Windsor's legal arguments – i.e., whether California law actually did apply and whether the underlying facts would satisfy the requirements under UCC § 9-620. *See supra* 8-9. Defendants determined that, while there was a strong argument that California law did not apply, there was also a strong argument that the transaction nonetheless satisfied the California UCC. By comparison, under Georgia law, the risk was that the Bitter Policy could be declared void *ab initio*, leaving Windsor with nothing. *See supra* 9; DSCE ¶¶ 5-6, 29-30. Between the two, California law put Windsor in a relatively better place, in the Defendants' professional judgment. Based upon that judgment, and with Windsor's blessing, Windsor did not challenge the application of California law because there was a greater risk to Windsor under Georgia law, namely, the risk of losing the entire loan and

interest, as well as the death benefit. *See supra* 8-9.

None of the above decisions involve any "ignorance of the rules of practice, failure to comply with conditions precedent to suit, or … neglect to prosecute or defend an action." *Bernstein*, 160 A.D.2d at 430. Rather, the situation Windsor confronted (and created) required Rousseau and his team at Arent Fox to make strategic decisions based on the circumstances, which is not legal malpractice. *Brookwood Cos., Inc. v. Alston & Bird LLP*, 146 A.D.3d 662, 667 (1st Dep't 2017) (decision not to include statutory defense in patent case not malpractice when the inclusion of defense would have undercut an alternative argument).[14]

    C.    <u>The Bitter Panel's and Underlying Court's Application of § 9-620 Was an Issue of First Impression and the Result Not Reasonably Foreseeable When Judgment Calls Were Made</u>

New York law is clear that attorneys cannot be liable for failing to advise their clients with regard to an issue of first impression – i.e., a "novel and questionable theory " when the area is still "unsettled or debatable." *Darby & Darby, P.C. v. VSI Int'l, Inc.*, 95 N.Y.2d 308, 314-15 (2000) ("[A] legal malpractice action is unlikely to succeed when the attorney erred because an issue of law was unsettled or debatable. The perfect vision and wisdom of hindsight is an unreliable test for determining the past existence of legal malpractice.") (quoting *Mallen*, Recognizing and Defining Legal Malpractice, 30 SC L. REV. 203, 210 (1979)); *Town of North Hempstead v. Winston & Strawn, LLP*, 28 A.D.3d 746, 748 (2d Dep't 2006) (attorneys "cannot

---

[14] Finally, even if Defendants had ignored certain contractual terms, which they did not, Windsor is still not entitled to summary judgment because of the circumstances surrounding Defendants' role in securing the Change of Ownership Forms. In *Meador*, the Northern District of New York distinguished a line of cases – including three cases cited by Windsor: *Logalbo*, *Shaughnessy*, and *Trimboli* – finding attorneys negligent as a matter of law for disregarding express contract terms and other settled rules of law. *Meador*, 2010 U.S. Dist. LEXIS 100243, at *16. In that case, the plaintiffs alleged, *inter alia*, that the defendant law firm failed to follow the procedures in the Purchase Agreement for providing notice of the encumbrances to the seller (and affording the seller the opportunity to cure any defects). Denying plaintiffs' summary judgment motion, the court explained that the attorney's decision not to follow the notice to cure provisions and to forego the opportunity to cure the encumbrances was a "strategic choice" based on the information provided by the client (including a later client directive to terminate the contract) and the supposed agreement of the sellers to withdraw from the sale contract. *Id.* at *19-20. The Court reserved judgment as to whether this choice constituted legal malpractice but held that, based on the circumstances, the choice was clearly not negligent as a matter of law. *Id.* at *20.

be held liable for exercising their professional judgment on a question that was not elementary or conclusively settled by authority"). Simply put, failure to predict how a court or arbitration panel will rule is not malpractice. *Id.*

Defendants' UCC and premium finance experts have reported that, prior to the Bitter Arbitration and Acker and Collins Decisions, there was no clear authority on how a California court (much less an arbitration panel) would apply UCC § 9-620 in these circumstances; nor was there clear authority providing that a Change of Ownership Form, coupled with the language of the Premium Finance Package (and the related communications amongst the parties), would not be enough to transfer title to the Policies. Smith Opp. Decl. Ex. 1 at 7-9; Maxson Opp. Decl. Ex. 1 at 9-16; Ex. 3 at 4-5. The Bitter Arbitration Panel even noted in its Award that there did not seem to be any decisional authority on some of these key issues. *See, e.g.*, Wang Decl. Ex. 5 at 6. ("Neither the parties nor independent research by the Panel has revealed any California decisional authority explaining what is meant by a 'record authenticated after default.'").

Edwin Smith's report also explains that there is nothing in UCC § 9-620 providing that the "record authenticated" itself must refer to the full release of the debtor's loan obligations, and there is nothing in Article 9 of the UCC expressly prohibiting parties from agreeing, prior to default, that the acceptance of the collateral will be in full satisfaction of the loan obligations (and, as discussed below, the Premium Finance Package contained such language in the DSR), so long as there is a "record authenticated after default," and the parties completed the contemplated transfer. Smith Opp. Decl. Ex. 1 at 7-8. Clearly, the question of malpractice here is not subject to summary judgment. *See Greene v. Payne, Wood and Littlejohn*, 197 A.D.2d 664, 666-67 (2d Dep't 1993) (because legal malpractice claim involved pendent jurisdiction, a "subtle and complex" area of law, whether defendant attorneys were negligent was "an issue of

fact which must await resolution at trial").[15]

Further, nowhere in the DSR provision is there a requirement that Windsor had to provide a written release as contemplated by the Bitter Arbitration Panel (and later adopted by the Acker and Collins court). Instead, the DSR merely provides that Windsor shall have the right but not the obligation to accept transfer of the Policy "in consideration of the full and complete satisfaction of the Liabilities." DSOF ¶ 19. There is no specific language dictating what must be done to document or facilitate the transfer other than the requirement that Windsor "shall notify Insurer in writing and Insurer shall thereafter recognize [Windsor] as the sole lawful owner of the Insurance Policy." *Id.* This requirement was met. Through Houchins, notice was supposedly provided to all the relevant insurers, and if Pacific Life failed to record the Bitter Change of Ownership Form, the onus was on Windsor, not Defendants, who had never been tasked with it, to verify that Pacific Life received the Form and recorded it.

Windsor cites no case where a legal malpractice plaintiff prevailed on a claim involving an unsettled area of law or ambiguous contract provisions, let alone prevailed at the summary judgment stage. As outlined above, Windsor's cases all involved clear, simple statutory and contractual requirements that were not met. *See, e.g., Northrop v. Thorsen*, 46 A.D.3d 780, 782 (2d Dep't 2007) (failure to follow "clearly defined and firmly established rule"); *Logalbo*, 163 A.D.2d at 514 (disregarding "long-standing rule that written notice of cancellation must be received within the time prescribed") (emphasis added); *Shaughnessy*, 151 A.D.2d at 562 (failing to comply with clear and unambiguous contract notice terms); *Trimboli*, 226 N.Y. at 150 (failing to apply "settled rules of law"); *Baker*, 1998 U.S. Dist. LEXIS 14702, at *4 (failing to file complaint within the applicable statute of limitations); *Deitz*, 232 A.D.2d at 945 (failing to

---

[15] In contrast, Defendants' own motion for summary judgment on the Acker, Collins, Coppock, and Stamatov Policies relies on a completely different point – the clear break in the causal link. *See infra* 29-30; DMOL 15-21.

commence lien foreclosure actions within requisite time period); *Deb-Jo Constr., Inc.*, 210

A.D.2d at 951 (failing to file UCC financing statement with proper state department).

## V.   Windsor Cannot Establish Causation or Related Damages

Windsor oversimplifies this case and its burden to prevail at summary judgment.  Despite

its best efforts to obfuscate the standard, Windsor must establish, at this stage, <u>all</u> elements of

malpractice.  To prevail on its malpractice claim, Windsor must demonstrate that there is no

question of material fact or question of law as to whether Defendants' actions with regard to <u>each</u>

Policy proximately caused Windsor's actual and ascertainable damages. *Aurora Loan Servs.,*

*Inc.*, 513 F. Supp. 2d at 22 ("If [plaintiff] seeks damages on 164 different cases of negligence, it

is required to show proximate causation in 164 cases.").

Windsor has not established as a matter of law that Defendants were negligent – and it

never will – but, at this stage, it certainly has not established causation and related damages for

each Policy. *See Stanski v. Ezersky*, 210 A.D.2d 186, 186-87 (1st Dep't 1994) (attorney who

failed to effect proper service of process "negligent" but nevertheless denying summary

judgment on issue of liability because plaintiffs failed to demonstrate they "would have prevailed

in the underlying action … if the negligence had not occurred" and demonstrate actual damages).

### A.   <u>Bitter</u>

Windsor's Motion relies entirely on the Bitter Arbitration Award and the Acker and

Collins summary judgment orders, but these decisions alone do not establish, as a matter of law,

that Defendants were in any way negligent, let alone that "but for" the supposed negligence

Windsor would have prevailed in the underlying disputes.  Rousseau repeatedly warned Windsor

the loans were potentially subject to an insurable interest challenge.  DSCE ¶ 7.  One panel

member in the Bitter Arbitration admitted that the panel's job was to determine which side

would receive the "windfall," the Bitter widow or Windsor, the premium finance lender.  DSCE

28

¶¶ 32-33.  Another panel member spent time reviewing Georgia law, even though both sides agreed to proceed under California law.  DSCE ¶ 34.  In such circumstances, the only possible reason to examine Georgia law would have been to question the propriety of the loan itself.

There are also numerous intervening factors that preclude summary judgment at this stage and, ultimately, any finding of liability.  As discussed above, Defendants' role in Windsor securing the Bitter Change of Ownership Form was limited, and Windsor failed to keep Rousseau informed with regard to the dispute with Bitter and his Trustee.  *See supra* 17-18.  Defendants also were not responsible for sending the executed Change of Ownership Form to Pacific Life or ensuring that the insurer recorded the Form.  *See supra* 17-18.  As Rousseau testified at his deposition, Windsor likely could have avoided any litigation with the Trustee and the Bitter Estate if this Form had been recorded by Pacific Life.  Wang Opp. Decl., Ex. 1, Rousseau Tr. 99:8-100:2.

In the end, Windsor's misguided reliance on Houchins and its failure to include Defendants in its efforts to secure the Bitter Policy were the real cause of Windsor's alleged harm.  *See, e.g.*, *Levine v. Lacher & Lovell-Taylor*, 256 A.D.2d 147, 150 (1st Dep't 1998) (no causation in malpractice case where, among other things, client ignored attorney's advice); *Town of North Hempstead*, 28 A.D.3d at 748 ("Where, as here, a sophisticated client imposes a strategic decision on counsel, the client's action absolves the attorney from liability for malpractice."); *DiPlacidi v. Walsh*, 243 A.D.2d 335, 335 (1st Dep't 1997) (no causation in malpractice case in which the client's damages were due to its own actions).

B.    Acker and Collins, Coppock, and Stamatov

As Defendants explain in their own motion for partial summary judgment, the actions of Windsor's Successor Counsel and Windsor itself intervened and superseded any alleged

malpractice by Defendants with regard to the Acker, Collins, Coppock, and Stamatov disputes. See DMOL 15-21.

Windsor fails to address its causation problem other than with a short footnote on the final page of its opening brief, arguing that Successor Counsel did not provide any transactional advice regarding Windsor's attempts to obtain ownership of the Policies and that Counsel was "not retained until well after Bitter, Collins and Acker had died, well after the opportunity to remedy the Defendants' negligence had passed." (Br. 25, n.14). This argument is beside the point. If it really was too late for Successor Counsel to do anything to remedy Windsor's situation with regard to Acker and Collins, then it makes no sense why Windsor aggressively litigated these two cases for so long. And Windsor provides no explanation whatsoever as to why Successor Counsel made the strategy decisions they did or why those decisions do not sever the causal chain.[16]

Conspicuously absent from the above-referenced footnote was any reference to Coppock and Stamatov, who were still alive at the time Windsor, through Successor Counsel, voluntarily commenced litigations against their Trusts. As Defendants explained in their own summary judgment motion, Windsor could have taken other, inexpensive steps to secure ownership of those two Policies. Instead, it chose the path of additional costly litigation. DMOL at 18-21. Defendants are not responsible for that choice.

## CONCLUSION

For the foregoing reasons, and for the reasons set out in Defendants' own motion papers,

---

[16] To the extent Windsor claims that the pre-default argument was, for whatever reason, unavailable in these underlying litigations, it is noteworthy that Windsor's own expert on UCC and contractual matters, refused to take a position on the default status of the loans, which is, itself, a basis for this Court to deny Windsor's Motion with regard to the four Policies other than Bitter. Wang Opp. Decl. Ex. 6 (Stern Depo Tr.) 77:22-80:8; Ex. 7 at 1 (Stern Reply Expert Report).

the Court should deny Windsor's partial summary judgment motion.

Dated: New York, New York
      September 17, 2018

Respectfully submitted,

FOLEY & LARDNER LLP

By: _____

Peter N. Wang (PW 9216)
Douglas S. Heffer (DH 6082)
Adam G. Pence (AP 8621)
90 Park Avenue
New York, New York 10016
Tel: (212) 682-7474
Fax: (212) 687-2329
pwang@foley.com
dheffer@foley.com
apence@foley.com

Attorneys for Defendants
Arent Fox, LLP and Julius Rousseau, III