# EXHIBIT 1

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox

March 7, 2017

Page 1

IN THE UNITED STATES DISTRICT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------

WINDSOR SECURITIES, LLC   : CIVIL ACTION
          vs.             :
ARENT FOX, LLP, et al.,   : NO. 16-cv-01533 (GBD)
                          ------
            Tuesday, March 7, 2017
                  ------


        Videotape deposition of JULIUS ROUSSEAU,

III, ESQUIRE, held at the law offices of FOLEY &

LARDNER, LLP, 90 Park Avenue, New York, New York,

beginning at 9:06 a.m., on the above date, before

LANCE A. BRUSILOW, Registered Professional

Reporter and Approved Reporter for the United

States District Court.


                  ------


            brusilow + associates
         1528 Walnut Street, Ste. 400
            Philadelphia, PA 19102
               215.772.1717
              www.brusilow.com


                  ------

Julius Rousseau, III, Esq.                                Windsor Securities vs. Arent Fox

March 7, 2017

Page 2

APPEARANCES

ALAN L. FRANK LAW ASSOCIATES, P.C.
BY:  ALAN FRANK, ESQUIRE
     SEAN A. MELUNEY, ESQUIRE
1601 Gravesend Neck Road, Ste. 903
Brooklyn, NY  11229
ph: 215.935.1000
(afrank@alflaw.net)
(smeluney@alflaw.net)
Counsel for Plaintiffs


FOLEY & LARDNER LLP
BY:  PETER N. WANG, ESQUIRE
     ADAM G. PENCE, ESQUIRE
     DOUGLAS S. HEFFER, ESQUIRE
90 Park Avenue
New York, NY 10016-1314
ph: 212.338.3575
(pwang@foley.com)
(apence@foley.com)
(dheffer@foley.com)
Counsel for Defendants


ARENT FOX LLP
BY:  HUNTER T. CARTER, ESQUIRE
1675 Broadway
New York, NY  10019-5820
ph:  212.484.3900
(carter.hunter@arentfox.com)
Counsel for Arent Fox LLP

ALSO PRESENT:
Steven Prusky
Derek Rose, Videographer

------

Julius Rousseau, III, Esq.                              Windsor Securities vs. Arent Fox

March 7, 2017

Page 3

                            INDEX
WITNESS:  JULIUS ROUSSEAU, III, ESQUIRE
By Mr. Frank:                          Page 6

                          EXHIBITS

NO.               DESCRIPTION                    PAGE
1   Introduction                                 xx

2   Defendants' Answer, Affirmative Defenses
    and Counterclaims                            77
5   Financing Agreement                          51
10  Email dated April 29, 2009, with
    attachment                                   63

11  Email chain                                  xx

12  Email dated July 16, 20090                   114

14  Letter dated July 7, 2009                    120

15  Letter dated July 7, 2009                    120

16  Letter dated July 7, 2009                    120

17  Letter dated July 7, 2009                    120

18  Letter dated July 7, 2009                    120

20  Letter dated August 18, 2009                 137

21  Letter dated August 26, 2009                 137

22  Letter dated August 27, 2009                 137

23  Letter dated August 27, 2009                 137

27  Letter dated November 30, 2009               149

35  Email chain with attachments                 12

39  Letter dated May 26, 2010                    39
40  Letter dated April 7, 2011                   37

Julius Rousseau, III, Esq.                                      Windsor Securities vs. Arent Fox

March 7, 2017

Page 4

(EXHIBITS - CONT'D.)

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 44 | Letter dated September 8, 2010 | 152 |
| 45 | Letter dated January 14, 2011 | 170 |
| 50 | Title Change Confirmation | 99 |
| 59 | Interim Award | 163 |
| 60 | Email chain | 233 |
| 61 | Cover email dated April 15, 2014 with attachments | 243 |
| 62 | Email chain | xx |
| 63 | Letter dated June 1, 2014 | 251 |
| 64 | Letter dated June 1, 2014 | 251 |
| 65 | Letter dated June 1, 2014 | 251 |
| 66 | Letter dated June 1, 20140 | 251 |
| 76 | Pac Life vs Gordillo Order | 96 |
| 77 | John Hancock vs. Goss Order | 96 |
| 78 | John Hancock vs. Windsor Securities Order | 96 |
| 79 | Pac Life vs. Gordillo Order | 96 |
| 89 | Email chain | 248 |
| 90 | Notice of Videotape Deposition | 11 |
| 91 | Multipage document | 30 |
| 92 | Email dated December 19, 2013 | xx |
| 93 | Email chain | 215 |
| 94 | Plaintiff's Response to Defendants' First Set of Interrogatories | 258 |

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox

March 7, 2017

Page 58

```
 1                    MR. WANG:  When? Ever?

 2                    MR. FRANK:  Ever.

 3        A.   Yes.

 4        Q.   How so? What did you do?

 5        A.   I read legal memos prepared by different

 6   lawyers and had discussions with people working on

 7   the matters and who had done the research.

 8        Q.   So, how did you acquaint yourself with

 9   California Commercial Code Section 6920?

10        A.   I think you mean 9620.

11        Q.   9620, pardon me.

12        A.   I think you'll find in the file a

13   substantial amount of research that was done in

14   connection with that section.

15        Q.   How did you personally acquaint yourself

16   with California Commercial Code Section 9620?

17        A.   By reading -- by doing what I just told

18   you.

19        Q.   And when do you think you first

20   acquainted yourself with that section?

21        A.   During the foreclosure on the Garcia

22   policy in 2009 to 2010.

23        Q.   And prior to that, can we agree that you

24   had no personal experience in dealing with
```

Julius Rousseau, III, Esq.                                      Windsor Securities vs. Arent Fox

March 7, 2017

1      Q.  Do you think your team, by the end of

2   April 2009, understood that all of these were

3   subject to California law?

4      A.  I have no idea what we had by April of

5   2009, so I can't tell you.

6                 (Exhibit Rousseau-10 was marked

7        for identification)

8   BY MR. FRANK:

9      Q.  I showed you exhibit ten.  You're welcome

10  -- and I'm inviting you to look back at it.  It

11  was a summary.

12     A.  If it says we had it, then we possibly

13  did.  I don't know.  Is there something here that

14  says we had all ten loan documents, sets of loan

15  documents?

16     Q.  I'm asking you if you understood by the

17  time this email of April 29, 2009 was sent, you

18  believed California law applied to all of the

19  policies.

20     A.  I need that again.

21                 MR. WANG:  I'm sorry, you're

22        referring to the memo.  He's looking at the

23        -- you're referring to the email, Mr. Frank.

24        He's looking at a different document.

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox

March 7, 2017

Page 64

1    BY MR. FRANK:

2        Q.   So, your lawyer wants you to read because

3    he pointed to it while you were --

4                    MR. WANG:   You were pointing to

5            it, Mr. Frank.

6                    THE WITNESS:   I just want to hear

7            the question again and make sure I

8            understand the question, if he could read it

9            back.

10                    (The record was read by the court

11            reporter as requested)

12                    THE WITNESS:   I don't know if

13            there was ever a time where we believed that

14            California law applied -- well, first off, I

15            know California law didn't apply to the

16            policy, so that's the answer to your

17            question.

18    BY MR. FRANK:

19        Q.   To the loan financing package.

20        A.   Well, a financing package -- I don't know

21    if there was ever a time where we believed that

22    California law applied to all of them.

23        Q.   Well, what did you believe -- what state

24    law did you believe did apply to the financing

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox

March 7, 2017

Page 65

```
 1   paperwork?
 2        A.  Well, I think that our research -- and
 3   I've re-read it to refresh myself because I
 4   frankly don't recall without having read the
 5   research -- was that foreclosure proceedings would
 6   have to occur under the state law of the state
 7   where the policy was located.
 8        Q.  And when did you make that determination?
 9        A.  In 2009.
10        Q.  Was that in or around April of 2009, or
11   was that sometime thereafter?
12        A.  I don't know.
13        Q.  So, what state laws did you think apply
14   to foreclosure proceedings?
15        A.  As I said, it would be the law of the
16   state where the assets upon which you were
17   foreclosing was located.
18        Q.  So, did the law of Tennessee apply?
19        A.  To a foreclosure proceeding on a policy
20   in Tennessee? Yes.
21        Q.  So, one of Mr. Prusky's ten policies.
22        A.  I believe one of the policies, or maybe
23   more than one, was issued to an individual in
24   Tennessee.
```

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox

March 7, 2017

Page 66

1        Q.   How about the --

2        A.   But I don't know where the trust held the

3   policy.  So, it would ultimately depend on where

4   is the asset on which you're foreclosing.

5        Q.   And did you also believe that the law of

6   the State of Georgia applied to foreclosure

7   proceedings in certain cases?

8        A.   Yes.

9        Q.   And was there ever a time after you

10   formed that initial belief that the state law of

11   Tennessee or the state law of Georgia might apply

12   where you changed your view and believed that, in

13   fact, the law of the State of California, and only

14   that law, applied to these foreclosure

15   proceedings?

16        A.   No.

17        Q.   And did you give advice to Mr. Prusky in

18   connection with your belief that the law of the

19   state where the foreclosure was taking place would

20   be applicable?

21        A.   Yes.

22        Q.   And did you expect Mr. Prusky to rely

23   upon that advice when you gave it to him?

24        A.   I gave him the advice as his lawyer.

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox

March 7, 2017

Page 68

```
 1                    (The record was read by the court
 2          reporter as requested)
 3                    MR. WANG:  Objection to the form
 4          of the question.
 5                    THE WITNESS:  Without trying to
 6          find the page, I am relatively certain that
 7          this loan document says these loan documents
 8          will be controlled by the State of
 9          California.  I believe all of the loan
10          documents said that.
11   BY MR. FRANK:
12       Q.  So, how does that square with your
13   belief, despite the papers saying that, that the
14   law of other states might apply to the actual
15   foreclosure proceedings?
16       A.  I don't know how you -- what do you mean,
17   how does it square with?
18       Q.  Did you think that, notwithstanding the
19   reference to California law in the loan financing
20   paperwork among the ten policies, that
21   nevertheless the law of some other state might
22   apply because the foreclosure proceeding might be
23   commenced in that state?
24       A.  I think I stated this earlier:  The law
```

Julius Rousseau, III, Esq.                                                    Windsor Securities vs. Arent Fox

March 7, 2017

Page 69

1    of the state where the asset was at the time of

2    foreclosure would be the governing law for

3    foreclosure on that particular policy,

4    irrespective of anything in the loan documents.

5        Q.  Did you believe that the foreclosure

6    proceeding itself could take place in a state

7    other than in California?

8        A.  Our legal conclusion was, as I've said,

9    to foreclose on a policy that's held by a trust in

10   the State of X, the lender is going to have to go

11   to the State of X and comply with the law of that

12   state to foreclose on that asset.

13       Q.  Did you give Mr. Prusky that advice?

14       A.  I'm certain that we did.

15       Q.  Can you think of any reason why Mr.

16   Prusky was not expected by you to follow that

17   advice?

18                MR. WANG:  I object to the form of

19   the question.

20       A.  He didn't follow that advice.  On Garcia,

21   who was in California, we didn't foreclose on any

22   policy.

23       Q.  Okay. Can you take a look at page

24   thirty-four, please, in exhibit five?  This

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox

March 7, 2017

Page 84

1          don't ask the same question.  The objection

2          is to the form of the question.

3                    MR. FRANK:  Thank you.

4    BY MR. FRANK:

5        Q.  You can answer.

6        A.  Again, I do not recall ever using that

7    term. I recall discussing the subject -- basically

8    all the subjects in the briefs.  Steven was very

9    involved in all aspects of the case.  We discussed

10   it all.

11       Q.  Now, the narrative answer at the bottom

12   of page two -- sorry, at the bottom of bottom one

13   also contains this sentence:  "Windsor has now

14   commenced this action despite the fact that it

15   failed to follow defendants' specific legal advice

16   and, after hiring new counsel, proceeded to employ

17   several questionable litigation strategies that

18   were ultimately responsible for Windsor's fate."

19          Can you tell me what specific legal

20   advice it was that you believe Mr. Prusky refused

21   to follow or failed to follow?

22       A.  I advised him that he could and should

23   settle with -- I believe it was Acker and Collins,

24   following their deaths, when we had a settlement

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox

March 7, 2017

Page 85

1    offer that would have settled those for five or

2    ten percent of the face amount.

3        Q.  Besides refusing Mr. Prusky's refusal to

4    settle with Acker or Collins, did he refuse to

5    follow any other specific advice that you gave

6    him?

7        A.  I can't recall anything as I sit here.

8        Q.  Did you give him advice to execute a

9    formal foreclosure that he refused to follow?

10       A.  I do not believe we discussed formal

11   foreclosure after the arbitration.

12       Q.  How about before?

13       A.  How about before?

14       Q.  Did you discuss -- did you tell Mr.

15   Prusky to exercise formal foreclosure proceedings

16   before the arbitration award?

17       A.  We, as a firm, gave him advice about

18   formal foreclosure procedures.

19       Q.  Did he refuse to follow it?

20       A.  I wouldn't use the word "refuse."  He

21   elected not to do that.  He made the decision not

22   to do that.

23       Q.  Did you tell him to do that?

24       A.  I did not tell him to do that.  I told

Julius Rousseau, III, Esq.                                Windsor Securities vs. Arent Fox

March 7, 2017

Page 86

1   him that that was the only -- well, I think the

2   memo is fairly clear.  There is a memo where I

3   explained to him that the cleanest way for him to

4   take over policies is foreclosure proceeding.

5       Q.  The only advice that is being represented

6   here at the bottom of page one of exhibit two,

7   which is defendants' answer affirmative defenses

8   and counterclaims, is that Mr. Prusky failed to

9   follow your advice and settle with Acker and

10  Collins.  Is that a fair statement?

11      A.  That's what I said before.  I believe

12  that's correct.

13      Q.  And can you tell me why you advised him

14  to settle with Acker and Collins?

15      A.  Why? Because I thought it was the

16  reasonable and smart thing to do.

17      Q.  Why?

18      A.  There were  a variety of reasons.

19      Q.  Tell me the reasons, please.

20      A.  Because primarily he and I both discussed

21  the fact that because Acker and Collins were

22  likely controlled by Gene Houchins, following the

23  award in the Bitter case Houchins was going to get

24  those individuals to try to claim the death

Julius Rousseau, III, Esq.                    Windsor Securities vs. Arent Fox
                        March 7, 2017

1   benefit and not allow it to follow it through to
2   Windsor; that the concern in every case I've had,
3   particularly with respect to lenders, is the
4   insurable interest risk; that you start with --
5   well, even before Arthur Kramer, the Leon Lobell
6   case, where the families sue, trying to recover
7   the death benefit on the basis of violation of
8   insurable interest law, as well as on the fact
9   that Georgia law, which certainly governed the
10  policy for those policies in Georgia, was likely
11  violated.
12          We argued that it wasn't, but that it
13  likely was violated and was going to lead to the
14  potential for litigation over the Georgia Life
15  Settlement Law.
16          There were probably other reasons, the
17  cost of litigation being one; and the fact that in
18  general, a ten percent death benefit or less
19  payment to make the family go away has been a
20  reasonable result for many investor groups to
21  avoid litigation.
22      Q.  Didn't you, in fact, tell Mr. Prusky not
23  to settle Acker and Collins because those cases
24  involved a voluntary walk-away and thereby were

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox
March 7, 2017

Page 88

1   distinguishable from Bitter and the arbitration

2   award in Bitter?

3        A.  Your statement as you read it is

4   incorrect.

5        Q.  Tell me why it's incorrect, please.

6        A.  We talked about the latter part of your

7   question, that those policies were in a completely

8   different position than the Bitter case, but we

9   also talked about the fact that, forget that,

10  you're likely to have litigation.

11         Because of Houchins and because you're

12  going to have litigation, the smart thing to do is

13  to get these things settled in an amount up to ten

14  percent, and that was my advice.

15       Q.  What do you mean by an amount up to ten

16  percent?

17       A.  As I tried to explain to you, ten percent

18  of face has been, I would say, kind of the going

19  rate to pay litigious families on Stoli, what I

20  call Stoli policies, S-t-o-l-i, as these were.

21       Q.  So, on a $2 million face amount policy,

22  it was your advice that Steven pay $200,000?

23       A.  Up to two hundred.  The settlement that I

24  advised him to take was actually a five percent

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox

March 7, 2017

Page 89

```
 1   settlement, which was offered to us in the
 2   June/July time frame on both Acker and Collins, so
 3   actually he would have gotten away with what I
 4   thought was a very good deal and I told him that.
 5       Q.  Is there anything in writing that
 6   reflects that?
 7               MR. WANG:  Reflects what, the.
 8       offer or his advice?
 9               MR. FRANK:  His advice.
10       A.  There were a series of emails and there
11   were a series of phone calls.  For much of this
12   time Steven was traveling.  He was in remote
13   locations two different times while the
14   negotiations were ongoing, so there is both email
15   communication as well as phone communication.
16       Q.  Where you told him you need to pay on
17   these two Stoli policies an amount up to ten
18   percent in order to have the family stop making
19   claims?
20               MR. WANG:  Objection to the form
21   of the question.  That's not what he said.
22       A.  What I already explained to you is what I
23   said.
24       Q.  Can you listen to my question and tell me
```

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox
March 7, 2017

Page 99

```
 1          if you can answer without invading
 2          privilege, feel free to do so.
 3               THE WITNESS:  You know, he didn't
 4          take the settlement.  I don't know that
 5          that's what you would call contributory
 6          negligence.  We've talked about that.
 7               The one thing that comes to mind
 8          is, he didn't get the ownership changed into
 9          the name of Windsor on the Bitter policy,
10          and that turned out, I think, to have been a
11          big problem and it may have had -- had that
12          happened, we may not have ever had to
13          litigate -- sorry.
14               Had the ownership been changed to
15          Windsor, there may have never been any
16          dispute with the Bitter and Barnes crowd.
17   BY MR. FRANK:
18       Q.  And you think that Mr. Prusky or Windsor
19   was contributorily negligent by failing to get the
20   ownership in the name of Windsor for the Bitter
21   policy?
22       A.  Again, he didn't -- Steven didn't -- he
23   got a change-of-ownership form signed by Greg
24   Barnes, but he didn't get his change of ownership
```

Julius Rousseau, III, Esq.                                Windsor Securities vs. Arent Fox

March 7, 2017

Page 100

1    processed by Pacific Life.  I think that had an

2    impact on what happened.

3                     MR. FRANK:  Exhibit fifty, please.

4                     (Exhibit Rousseau-50 was marked

5           for identification)

6    BY MR. FRANK:

7        Q.  This is exhibit fifty.  Tell me if you've

8    seen it before, please.

9        A.  I can't recall.

10       Q.  This was produced by us in discovery as

11   Bates-stamp number 1443 through and including. . .

12                    MR. WANG:  It's all over the

13          place.

14                    MR. FRANK:  1446 as well as 1448,

15          and 1268 through 1270.

16                    MR. WANG:  Are these several

17          different documents that you put together?

18          Because the Bates stamping --

19                    MR. FRANK:  I actually don't think

20          so.

21                    MR. WANG: The Bates stamps are

22          obviously not consecutive.

23                    THE WITNESS:  There are two

24          different documents here.

Julius Rousseau, III, Esq.                              Windsor Securities vs. Arent Fox

March 7, 2017

Page 102

1      Q.  Are you here as Arent Fox' designee to

2  respond to the averments made in the complaint?

3      A.  Well, to the extent it's part of the

4  deposition notice, I'm here to answer.

5      Q.  Can you turn to paragraph fifty, please,

6  which appears at page sixteen?

7      A.  Yes.

8      Q.  It says here -- that is to say, the

9  plaintiff has averred -- at paragraph fifty that

10  on February 14, 2011, as demanded by Rousseau,

11  Arent Fox and thereafter requested by Windsor, the

12  Bitter trustee executed an ownership name or

13  beneficiary change request," which is called

14  hereafter "the Bitter's COO."

15      Do you have a recollection of whether in

16  fact the Bitter trustee did in fact execute an

17  ownership name or beneficiary change request?

18      A.  Greg Barnes signed a form, change of

19  ownership form. The date will speak from the

20  document.  I can't recall the date.

21      Q.  Did you review the document?

22      A.  No -- well, I did in preparation for

23  trial.

24      Q.  Did you ever advise Windsor prior to

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox

March 7, 2017

Page 103

1   preparation for trial that the change of ownership
2   form signed by Mr. Barnes in connection with the
3   Bitter trust was insufficient?
4                    MR. WANG:   Objection to the form
5   of the question.
6        A.   You said prior to when?
7        Q.   Prior to preparing for the Bitter
8   arbitration.
9        A.   I don't believe I ever saw it.
10       Q.   Do you have any document that you
11  remember seeing or remember preparing where you
12  said "Steven, you must tender the certificate of
13  ownership signed by Mr. Barnes to the insurance
14  company" or anything like that?
15       A.   Do I have a document?
16       Q.   Yes.
17       A.   I don't believe so.
18       Q.   Did you ever tell him in writing prior to
19  the Bitter litigation that something was amiss or
20  wrong or in error with respect to the certificate
21  of ownership?
22       A.   He told me.  I did not tell him.
23       Q.   Who is "he," Steve Prusky?
24       A.   Yes.

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox
                                    March 7, 2017

1        Q.   What did he tell you?

2        A.   He told me he never got the ownership

3    change.

4        Q.   He told you in when, the fall of 2013?

5        A.   No. I believe it was around the time of

6    the interpleader action, whenever that was,

7    because the interpleader action, the carrier said

8    this policy is owned by Greg Barnes as trustee,

9    which I assumed incorrectly that it was owned by

10   Windsor.

11       Q.   Okay.  Besides what we've discussed with

12   respect to the Bitter policy, are you aware of any

13   other acts by Windsor by which, in your view, it

14   was contributorily negligent in its conduct in

15   connection with its direction of the contribution

16   to the above-referenced events?

17                MR. WANG:  Again, the same.

18   objection I made earlier with respect to those

19   legal conclusions.

20       A.   I'll let my lawyer argue over what's

21   contributory negligence.  We certainly advised him

22   that the cleanest way to proceed back in 2009 was

23   to institute foreclosure proceedings, which he

24   elected not to do.

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox

March 7, 2017

Page 115

1    his letter was not likely to cause either thing to

2    happen, but it gave Windsor a better shot than

3    doing nothing.

4                      (Exhibit Rousseau-12 was marked

5            for identification)

6    BY MR. FRANK:

7        Q.  Can you turn to exhibit twelve, please?

8    Thanks.  Exhibit twelve is the email from David

9    Fox to Steve Prusky, copy to you, that I thought

10   we were talking about with exhibit eleven.

11           So, I apologize to you, but do you

12   remember this David Fox email?

13       A.  I can't tell you I recall in July seeing

14   this email, but I've already told you about the

15   discussion that this email relates to.  I do

16   recall generally the subject matter of the email.

17       Q.  Do you have any reason to doubt that this

18   email reached you from David Fox?

19       A.  I'm sure it did.

20       Q.  Can you tell me why David Fox is

21   providing an analysis of Georgia law in this

22   email, please?

23       A.  He's looking at Georgia law because

24   several of the policies were held by trust in the

Julius Rousseau, III, Esq.                                   Windsor Securities vs. Arent Fox

March 7, 2017

Page 116

 1    State of Georgia.

 2        Q.   Okay.  And at this time did you

 3    individually believe that Georgia law was

 4    applicable to whatever it is you folks were

 5    discussing here in this email?

 6        A.   Yes, that's what the email talks about,

 7    is Georgia law.

 8        Q.   Do you remember what policy it was that

 9    this particular email addressed?

10        A.   No.

11        Q.   Do you know if, in fact, this email

12    addressed all of the policies because they all

13    involved Mr. Houchins?

14        A.   I'm certain this letter was responding to

15    a question about those policies that were held by

16    trust in Georgia.

17        Q.   Which would have been all of them because

18    they were all executed in Georgia, or am I just

19    mistaken here?

20                    MR. WANG: Some of the trusts and

21           some of the insureds were not in Georgia.

22                    MR. FRANK:  Okay.

23    BY MR. FRANK:

24        Q.   So, this was not generally applicable to

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox
                              March 7, 2017

Page 143

1    September of 2009 and that of -- strike that.

2            Did you think, beginning on July 7 of

3    2009 and thereafter, that California Code Section

4    9620 applied to the Collins trustee?

5        A.  Well, I think it's clear I can say to you

6    we viewed the California Code as irrelevant to the

7    Collins trust and the Collins policy.

8        Q.  So, you don't think that 9620 applied to

9    the Collins trustee?  That is to say, beginning on

10   July 7, 2009?

11       A.  You mean 9620 in general, or do you mean

12   the California Code?

13       Q.  California, yes.

14       A.  Our view was that California law,

15   including the UCC or any other aspect of

16   California law, was irrelevant to the action that

17   our client needed to take to protect his interests

18   on all of the policies except for Garcia.

19       Q.  Is your view the same with respect to

20   Coppock?

21       A.  I think Garcia was the only policy in

22   California, so my view was the same for every

23   policy other than Garcia.

24            I think there may have been a question

Julius Rousseau, III, Esq.                                        Windsor Securities vs. Arent Fox
March 7, 2017

Page 155

1    signature,' which shows that Mr. Barnes is acting

2    in his capacity as trustee.  You're required to

3    forward the original policy to the lender."

4           What exactly were you doing here? Weren't

5    you trying to effectuate the paperwork associated

6    with what you believe to be at that time a valid

7    transfer of the ownership of this policy to

8    Windsor?

9       A.  At the time we were trying to get Bitter

10   and Barnes to either do what they said they were

11   going to do, which was to pay off the loan, or

12   agree to a default sell right, give us the policy.

13      Q.  Ownership of the policy?

14      A.  Absolutely.

15      Q.  Okay.  In retrospect, you now agree that

16   you didn't do that right.  Isn't that fair to say?

17      A.  Didn't do what right?

18      Q.  Communicate in writing to the trustee

19   that will, for and in exchange for ownership,

20   Windsor was relinquishing all of its rights and

21   claims against the trustee.  You didn't do that in

22   your letter of September 8, 2010.  Isn't that

23   correct?

24      A.  Again, the letter stated what needed to

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox

March 7, 2017

Page 157

```
 1   trustee of the Bitter trust, to pay off the loan.
 2   Is that right?
 3       A.  Well, I didn't believe that.  The loan
 4   documents had a cure period.  And it was our
 5   position that September 8th was beyond the cure
 6   period.
 7       Q.  Okay.
 8       A.  And the question was, had anything been
 9   done before the cure period to protect Bitter's
10   rights.
11       Q.  So, the only thing, really, the September
12   8, 2010 letter was designed to do was to collect
13   the trustee's signature to a document that, in
14   your view, transferred ownership to Windsor.
15   Isn't that right?
16       A.  Sent him a change-of-ownership form and
17   asked them to agree and sign it and send it to us.
18       Q.  And Mr. Barnes eventually did just that.
19   Am I right?
20       A.  No.
21       Q.  He didn't do that in February 2011?
22       A.  Barnes signed a document that was given
23   to him by Houchins in 2011.  It was not the
24   document that I sent to him.
```

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox

March 7, 2017

Page 159

```
 1              MR. WANG:  I'm letting this going
 2         on, but what you're doing is making your
 3         argument.  That's pretty apparent.  I think
 4         we -- I don't think that's appropriate
 5         questioning.
 6  BY MR. FRANK:
 7      Q.  Were you involved in circulating change
 8  of ownership forms to the remaining trustees?
 9      A.  I don't recall.
10      Q.  Do you have any recollection of Steven
11  Prusky individually doing that?
12      A.  My recollection is, in the early part of
13  2010 Steven got some change of ownership forms in.
14  Whether he sent them to me to look at or not, I
15  don't recall.  If there are some emails that talk
16  about it, I don't remember.
17      Q.  Did you ever evaluate, professionally
18  speaking, the manner in which the certificate of
19  ownership change forms were obtained?
20      A.  I don't believe there was any evaluation
21  when -- well, I should step back.  Policies were
22  different.  If you're talking Acker, Collins,
23  Coppock, I think those were simply done.  Houchins
24  took care of it, sent it to Steven. Whether Steven
```

Julius Rousseau, III, Esq.                                      Windsor Securities vs. Arent Fox

March 7, 2017

Page 160

1    sent it to me for my file at the time, I don't

2    recall.

3            Garcia obviously was difficult.  Some of

4    the others were different.

5        Q.  Were you involved in a -- strike that.

6    At the time of the collection of the certificate

7    of ownership forms, were you even aware that that

8    was going on?

9        A.  I'm pretty sure -- I'm not certain, but I

10   think some time entry in February 2010 bear out

11   that Steven and I talked about his getting COOs on

12   Acker, Collins, Coppock.  Like I say, I don't

13   recall seeing them.

14           I think he probably just said, hey,

15   Houchins sent these in to me because we were

16   expecting that to happen.

17       Q.  And at the time did you tell Steven that

18   he nevertheless had to comply with California code

19   Section 9620, and either directly by name or

20   substantively by telling Steven that he, in

21   writing, or that you on his behalf in writing, had

22   to offer a complete extinguishment of Windsor's

23   claims against the trustees in exchange for the

24   COOs?

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox

March 7, 2017

```
 1   BY MR. FRANK:

 2      Q.  I happened to bring a copy with me and an

 3   extra copy for your counsel.  Can you take a look

 4   at that now, please?  We've marked that as exhibit

 5   forty-five.

 6                (Exhibit Rousseau-45 was marked

 7          for identification)

 8   BY MR. FRANK:

 9      Q.  Is that the letter you're making

10   reference to?

11      A.  Well, I think it's the letter that you

12   cited me to in the award and it's the letter that

13   -- the January 14th letter.

14      Q.  Did you participate in the preparation of

15   this January 14, 2011 letter?

16      A.  I don't recall.

17      Q.  Did you see it on or about January 14,

18   2011?

19      A.  I don't recall.  I have a time entry on

20   or about that date, something about the letter,

21   but I don't recall what it was and what I saw.

22      Q.  Well, the letter that you authored on

23   September 8, 2010 -- strike that.

24                Do you have any recollection of following
```

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox

March 7, 2017

Page 171

1   up with respect to the request or demand that you

2   made in your September 8, 2010 letter?

3        A.   Following up with whom?

4        Q.   With the addressees:  Mr. Barnes or Mr.

5   Bitter or both.

6        A.   I don't believe there was any follow-up

7   with Bitter and Barnes from me.  I believe Steven

8   had further discussions.

9        Q.   Because as I understand your September 8,

10  2010 letter, you ask for signature and that the

11  document be returned, by Federal Express envelope,

12  to Windsor Securities, and then that didn't

13  happen.  Is that fair to say?

14       A.   That did not happen.

15       Q.   And you don't remember actually following

16  up yourself with respect to the non-compliance

17  with respect to your request.

18       A.   Correct.

19       Q.   But you do remember or you don't remember

20  that Mr. Prusky followed up in or around January

21  14, 2011?

22       A.   Like I say, I have a time entry right

23  around that day for three-tenths of an hour, and I

24  think the description was something about talking

Julius Rousseau, III, Esq.                                                 Windsor Securities vs. Arent Fox

March 7, 2017

Page 173

1   footnote, the next sentence is "Finally, as

2   demanded by Windsor and relying on the advice of

3   Houchins, Barnes executed an ownership-name or

4   beneficiary-change request on February 14, 2011

5   and subsequently surrendered the original policy

6   to Windsor."

7          Question one:  Do you think that's an

8   accurate summary of what happened?

9       A.  Well, I recall testimony from Barnes and

10  Houchins that that happened, otherwise I don't

11  have any knowledge of that.

12      Q.  Do you have any reason to believe that

13  that's not an accurate summary of what was

14  happening?

15      A.  By some method, a document got sent to

16  Steven.  It was one of several different

17  change-of-owner forms, and I didn't see it, didn't

18  know where it came from until I heard later the

19  dialogue or the testimony between Houchins and

20  Barnes of what they did.

21      Q.  Did you know in or around February 14 of

22  2011 that Windsor received back an executed COO

23  from Mr. Barnes?

24      A.  I don't think so.

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox
March 7, 2017

Page 176

1           answers with a question.

2    BY MR. FRANK:

3        Q.   I'm asking now if you can tell me the

4    answer to my question, which is did you ever

5    object to anyone about the use of the COO in

6    February of 2011 with respect to the Bitter

7    transaction.  Did you ever object to that?

8                    MR. WANG:   Objection to the form

9    of the question.

10       A.   As I've said, I didn't see it.  I don't

11   know that I even know that one had been executed.

12   There was no one who would take my objection, and

13   I'm certain I didn't make an objection out of the

14   clear blue.

15       Q.   You actually asked for the COO to be used

16   by Mr. Barnes in your letter of September 8, 2010,

17   didn't you?

18                    MR. WANG:   I object to the form of

19   the question.

20       A.   I sent Barnes a form to sign, which he

21   did not sign and return.

22       Q.   Until February of '11.  Isn't that right?

23                    MR. WANG:   Are you asking by your

24   question it was the same form, Mr. Frank?

Page 177

```
 1      Q.  Mr. Rousseau?

 2                MR. WANG:  Objection.

 3      A.  As it turns out, when I saw the COO that

 4   Greg -- again, I'm not so sure he returned it. I

 5   think he sent it to Houchins and Houchins sent it

 6   to the insurance company, which ignored it.  That

 7   document is not the document that was attached to

 8   my letter.

 9      Q.  In your mind, did it make any meaningful

10   difference to use -- did the use of the Houchins

11   COO meaningfully matter, in your view, with

12   respect to the events before the mediation --

13   before the arbitration panel?

14      A.  Since the insurance company didn't accept

15   it and make Windsor the owner, it might have.  I

16   don't know why PAC Life did not accept it.

17      Q.  I want to switch to Acker for just a

18   second.  We've alleged at paragraph eighty-three

19   of the complaint -- if you want to turn to that,

20   you can, but I'll paraphrase -- that the Acker

21   trustee signed the certificate of ownership on

22   February 19, 2010.

23                Did you have any involvement with that?

24      A.  I think you and I talked about this
```

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox
March 7, 2017

Page 178

1    earlier.  My recollection is, I knew Steven was

2    getting back COO forms from Houchins and taking

3    care of it.  I don't recall anything more than

4    that.

5         Q.  Did you ever object to the use of the COO

6    by the Acker trustee in or around or immediately

7    following February 19, 2010?

8         A.  Again, I had no one to object to, and my

9    recollection is the insurance company, who was the

10   only relevant party, actually signed it and

11   changed the ownership.

12        Q.  So, did you tell Steven, "Okay, you have

13   a COO from the Acker trustee; you're good to go"?

14   Did you ever have such a conversation?

15        A.  I don't know.  I don't recall.

16        Q.  Did you ever tell Steven in or around

17   February 14 of 2011 "Okay, you have the executed

18   COO from Mr. Barnes for the Bitter trust; you're

19   good to go"?

20        A.  I'm certain I did not in February 2011.

21        Q.  Or any time thereafter.

22        A.  Like I say, I did not know that it had

23   been signed and returned and then -- actually, I'm

24   sorry, that it had been signed and sent to the

Julius Rousseau, III, Esq.                                  Windsor Securities vs. Arent Fox
                                 March 7, 2017

Page 179

1    company and rejected.  I did not know that until
2    after Bitter had died.
3        Q.  Okay. I want to talk to you about the
4    Collins policy for a minute.  Bear with me just
5    for a minute.
6            We've alleged at paragraph 113 of the
7    complaint -- and I'm inviting you to go there, if
8    you want, to see the words, but I'll paraphrase --
9    that the Collins trustee executed the certificate
10   of ownership change form on or around May 11,
11   2010.
12           Do you have any reason to believe that
13   the fact or facts that I've just summarized are
14   incorrect in my summary in any way?
15       A.  No, I have no view or opinion on that.  I
16   don't recall.
17       Q.  Were you ever aware in or around May of
18   2010 that the Collins trustee had executed a
19   certificate of ownership change form?
20       A.  I don't recall.
21       Q.  Did you ever object to Windsor's use of
22   the certificate of ownership change form executed
23   on or around May 11, 2010 by the Collins trustee?
24       A.  I'll give you the same answer as I did on

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox

March 7, 2017

 1  Acker:  I don't know that I knew about it.  I had

 2  no one to object to.

 3          As I understand it, the insurance company

 4  accepted it and didn't reject it, so there would

 5  be no basis for anyone to object.

 6      Q.  Did you ever say to Steven, "Steven, you

 7  got the executed certificate of ownership form

 8  from the Collins trustee; you're good to go"?

 9      A.  I don't recall.

10      Q.  Okay.  Is there anything in writing that

11  you have seen, anything you're aware of in this

12  entire record, which contains an objection on your

13  part to the use by Steven Prusky and/or Windsor of

14  a certificate of ownership change form with

15  respect to Bitter, Acker or Collins? Is there

16  anything like that out there?

17      A.  I'm not aware of anything.

18      Q.  And that is because -- I'm talking about

19  anything that you personally authored.  Are we

20  talking about the same thing here?

21      A.  Well, yes -- I've answered your question

22  about what I personally objected to.  I can't

23  foresee anyone to whom I would have objected, so I

24  don't think objection is -- I couldn't have

Julius Rousseau, III, Esq.                                   Windsor Securities vs. Arent Fox

March 7, 2017

Page 197

 1              THE WITNESS:  Yes and no.

 2   BY MR. FRANK:

 3      Q.   Okay. First tell me why it was yes,

 4   please.

 5      A.   Because we won the case.  We had the law.

 6   We had the facts.  We had the witnesses' testimony

 7   that we needed.  We had every box you checked to

 8   win the case.  So, we should have won the case.

 9   That's why I'm surprised.

10      Q.   And tell me why no, please.

11      A.   Because the panel had indicated to us

12   that they were looking at this in terms of a

13   windfall, which of course it is.

14          When somebody dies this early into the

15   term of the policy and the loan -- and it was

16   clear that, if you believe Barnes, he was only

17   putting this policy up to be sold and not giving

18   it away or anything, right?  That's what he says.

19          You can't make someone enter into a 9620

20   or any kind of agreement if you don't allow the

21   lender to enforce the lender's rights, as we were

22   trying to do under the loan documents.

23          So, if the panel decides they were

24   unfair -- this kid was coerced, he was pressured,

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox

March 7, 2017

Page 200

1  mouth, but it's been reported to me that when you

2  made a phone call to Mr. Prusky about the

3  decision, you were deeply -- it sounded to him

4  like you were deeply disappointed. Is that a fair

5  statement?

6       A.  Yes, I was disappointed.

7       Q.  He used the word "shocked."

8            MR. WANG:  I'm sorry, he used it.

9  to you or --

10      Q.  Mr. Prusky used the word "shocked," that

11  you had actually used the word "shocked" in

12  describing the outcome to him.  Is that correct?

13  Do you ever remember using the word "shocked"?

14      A.  I have no recollection.

15      Q.  Do you remember ever saying that "we were

16  screwed"?

17      A.  I don't recall it.

18      Q.  Do you think you wrote it in than email:

19  "We were screwed"?

20      A.  Possibly.

21      Q.  Before the decision came down on April 8,

22  did you tell Steven that there was a substantial

23  chance that the panel would come down the wrong

24  way?

Julius Rousseau, III, Esq.                                   Windsor Securities vs. Arent Fox

March 7, 2017

Page 201

```
 1      A.  Steve and I talked about where the case

 2  was going repeatedly throughout the hearing.  We

 3  came back for our argument.  We get the comment

 4  about the windfall.  We're writing the brief. We

 5  talked about the pros and cons of the case.

 6          As I expressed to you earlier, we won the

 7  case on the law and on the facts.  We lost it on

 8  whatever the decision was to give the widow the

 9  money.

10          He and I both knew we had that risk and

11  we both talked about it, but I think he and I both

12  thought we're going to win because we presented

13  the winning case.

14      Q.  Mr. Rousseau, what part of this case did

15  you actually win? I'm confused here.  I really

16  mean that.  What part of this did you win?

17              MR. WANG:  Objection to the form.

18      Q.  The law, the facts, or both?

19      A.  Both.

20      Q.  How did you win anything? The death

21  benefits were given to the widow.  Isn't that

22  true?

23              MR. WANG:  I think you're

24          misunderstanding what he said.  I object.
```

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox

March 7, 2017

Page 202

1              MR. FRANK:  I appreciate that.

2  BY MR. FRANK:

3     Q.  Can you explain to me, please, how you

4  think you won the arbitration?

5     A.  I never said we won the arbitration.

6     Q.  Okay.

7     A.  We're talking about the time running up

8  until the decision came down.  That's what you

9  asked me about, what did I think when the decision

10  came down.

11         I told you and I told him -- and Steven

12  agreed with me -- that we presented all the facts

13  we wanted, got in everything we wanted.  We didn't

14  lose on any real issue of importance at the

15  hearing.  Their evidence from the other side was,

16  to me and Steve, both dishonest and disjointed.

17         In many respects it was completely

18  contradicted by other testimony from the same

19  witnesses on the law as for the reasons I

20  explained, and particularly on the loan documents.

21  We had everything we needed.

22         So, I say we won in the presentation of

23  the case.  We expected to win -- not an award, but

24  we had an arbitration panel which -- we know

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox

March 7, 2017

Page 203

1    arbitrators can be arbitrary.  Steve and I talked
2    about that at great length, how to get that out of
3    panels. They can do anything they want, and so --
4    look, I've been in enough arbitrations to know you
5    never know.
6        Q.  As have I.  Your comments are very much
7    appreciated, but let me ask you something:  If you
8    really thought this was riverboat gambling, so to
9    speak, with this arbitration panel that might be
10   arbitrary -- your word, not mine -- then why not
11   urge Steve to settle the Bitter case before the
12   arbitration award came down?
13       A.  I don't need to urge Steve to settle
14   anything in this case.
15       Q.  You didn't recommend that he try to
16   settle.  Is that right?
17       A.  You know, I don't recall ever talking
18   about settlement.  I don't think there was ever --
19   I think early on we offered them we'll give you
20   something.  Their response, I think:  No, we'll
21   get you your money and interest.
22           We were too far apart.  I don't think
23   Steven and I ever thought that there was a
24   settlement because Steven's view, at least in my

Julius Rousseau, III, Esq.                                          Windsor Securities vs. Arent Fox

March 7, 2017

 1   mind, was he needed to get close to the two

 2   million and that was never on the table.

 3       Q.   Did Joe ever try to settle this case

 4   during the hearing itself?

 5       A.   I don't recall what I would consider a

 6   substantive settlement discussion before the

 7   award.

 8       Q.   Did you during the hearing urge Steve

 9   Prusky not to settle, despite the understanding

10   that Joe wood had initiated a settlement dialogue?

11       A.   I'm certain I never urged him either to

12   settle or not to settle.

13       Q.   Okay. Do you think you did a good job

14   with that arbitration?

15       A.   That I did?

16       Q.   Yes.

17       A.   Yes.

18       Q.   I want to you ask about your views of Joe

19   Wood.  Do you think he did a good job?

20       A.   Joe was a good adversary.

21       Q.   Was he a competent lawyer?

22       A.   Yes.

23       Q.   Did he make any mistakes during the

24   arbitration that you can recall?

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox

March 7, 2017

Page 205

1        A.   No, I don't recall mistakes by Joe.

2        Q.   I'm trying to choose my words carefully

3    here:  I think you either hinted at or suggested

4    one or more of the other side's witnesses were

5    less than credible.  My words, but is that your

6    recollection?

7        A.   My words, Steven's words.

8        Q.   How many such witnesses do you think were

9    less than credible on the other side?

10       A.   Really, the two principal witnesses were

11   Houchins and Barnes.

12       Q.   And you thought Mr. Houchins lied?

13       A.   I did.

14       Q.   And you thought Mr. Barnes lied?

15       A.   I wasn't sure -- I was never really sure

16   about Barnes.  In some respects he seemed like a

17   kid out of his league and in other respects seemed

18   like a cagy operator working with Houchins to try

19   to game the system.  We never concluded one way or

20   the other.

21       Q.   Do you think Mr. Houchins actually

22   overtly lied?

23       A.   Yes, he did.

24       Q.   Can you give me an example or two?

Julius Rousseau, III, Esq.                                      Windsor Securities vs. Arent Fox

March 7, 2017

Page 214

 1   COO?

 2                  MR. WANG:   Objection to the form

 3   of the question.

 4       A.   My recollection is -- and as I've said

 5   before -- Houchins told Steven that the COO had

 6   been signed and sent to PAC Life.  He told him

 7   that sometime in February of 2011, thereabouts.

 8           Steven didn't actually become the record

 9   owner.  I don't know that he knew that.  I

10   certainly didn't know that.  When we were getting

11   ready for the hearing and he realized that he had

12   not gotten that process, he said, what could we

13   have done?

14           I said, well, if you couldn't have gotten

15   that done, you would have had to go through a

16   foreclosure process and isn't that right.  I'm

17   going to probably ask you to testify that if you

18   didn't think he'd voluntarily given up the policy,

19   you were going to go to foreclose.

20           I suspect that I asked Steven that

21   question at the hearing and I suspect that Steven

22   said, absolutely, if I didn't think they were

23   cooperating and exercising their default sale

24   right in this regard, I would have done that.

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox

March 7, 2017

Page 215

1          So, I think that's the basis for saying I
2     think we have a good-faith basis, but didn't do it
3     because he thought he had what he'd asked for.
4          Q.  I think you probably answered my next
5     question, but bear with me for just a minute.
6          Is there any point in time prior to
7     December 19, 2013 where you say to Steve Prusky
8     "Steven, just because you have the COO signed by
9     Barnes doesn't mean that you've satisfied the
10    default sale provisions of 9620 of the California
11    Code"?
12         Is there anything like that in the
13    written record that you remember?
14         A.  I don't recall anything of that nature.
15                   MR. FRANK:  I'll show you another
16         document.  This is number ninety-three.
17                   MR. WANG:  What number was the
18         last one?
19                   MR. FRANK:  Ninety-two.
20                   (Exhibit Rousseau-93 was marked
21         for identification)
22    BY MR. FRANK:
23         Q.  This appears to be an email sequence
24    begun by Sandra Marshall of AAA on July 14, and

Julius Rousseau, III, Esq.                          Windsor Securities vs. Arent Fox
                          March 7, 2017

Page 217

 1    Tuesday," but then you go on, "I still think you

 2    are unassailable, but I thought that - and still

 3    do - on Bitter.  I believe the surrender prior to

 4    default is important difference."

 5          Can you explain that wording, please?

 6      A.  Do you want me to explain why I used the

 7    word he used, "unassailable"?

 8      Q.  Yes, why you were of that view.

 9      A.  Well, I said I still thought the same

10    thing on Bitter, right?  The trustees skewed their

11    default sale rights, turned over the policies, and

12    I think my last sentence there is an important

13    distinction between what I understand the issues

14    with Acker and Collins to be and that there was no

15    default.

16          So, to the extent you might argue --

17    someone might argue the applicability of the

18    California UCC to either one of those, that

19    provision only applies after default.

20      Q.  And you told him that, didn't you? You

21    told Mr. Prusky all of that, didn't you?

22      A.  I wrote the sentence that we're talking

23    about.

24      Q.  And that the California UCC applies only

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox

March 7, 2017

Page 218

1   after there is a default.  Isn't that right?

2       A.  Well, I told him I believe the surrender

3   prior to default is an important difference.  What

4   else I had said to him on the subject, I don't

5   recall.

6       Q.  And that his position -- you agreed with

7   his statements and you agreed with his view that

8   with respect to these other policies, his position

9   was unassailable for those reasons, correct?

10      A.  Yes.

11      Q.  And we did produce the Judge Orrick

12  opinions.  We talked about them much earlier

13  today, seventy-six, seventy-seven, seventy-eight,

14  seventy-nine.  You didn't read them at any point

15  in time?

16      A.  No.

17      Q.  When you gave the "unassailable" advice

18  to Mr. Prusky here on July 14, 2014, it would have

19  been after the arbitration award was entered in

20  Bitter.  Is that right?

21      A.  This is after the award, and I believe --

22  I believe this hearing being set was either on the

23  motion to reconsider or on the attorney's fees.

24          You can check that, but if it were on the

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox

March 7, 2017

Page 239

 1       please.

 2              MR. WANG:  I'm trying to help you.

 3       Late-in-the-day assist.

 4              THE WITNESS:  But I've already

 5       answered.

 6              MR. WANG:  You had answered; he

 7       just hadn't remembered it.

 8              MR. FRANK:  Get sixty-one, please.

 9  BY MR. FRANK:

10      Q.  This is sixty-one.  The document begins

11  at Bates-stamp 26781 and continues for quite a few

12  pages, through 26806.  I'm interested only in the

13  first page.  Okay?

14      A.  Okay.

15      Q.  So, this is an email from Steve to you.

16  It's two days later, Tuesday, at 9 a.m. April 15:

17  "Jule, here are the other cases.  However, now

18  that I read the ruling, it is as I suspected:  all

19  of this documentation is irrelevant.  We need

20  something confirming the default sale right.  The

21  problems in Bitter were:  nothing in your

22  September 8, 2010 and 1/14/11 expressed an

23  acceptance of the COO as full satisfaction of

24  loan; nothing in the demand letters by counsel or

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox

March 7, 2017

Page 240

```
 1   Windsor contained a proposal stating...the COO was

 2   in acceptance as full satisfaction of liability';

 3   no written agreement post default; nothing in

 4   writing from Barnes that he consented to the deal.

 5   So, the question is now, do we simply send letters

 6   saying we accepted the COO(s) as collateral?  Or

 7   do we have to make an offer or have a default

 8   sale? The rest, as they say, is commentary."

 9          Did you see this email at the time?

10      A.   I'm sure I did.

11      Q.   What did you think about it?

12      A.   Can't tell you.

13      Q.   Do you have a recollection?

14      A.   My recollection is, we looked into both

15   his documents and then what, if anything, might be

16   the prudent thing to do.  We had a discussion with

17   him and it resulted in the spring-cleaning

18   letters.

19      Q.   So, on April 15 is your group springing

20   into action here at Aaron Fox to address the

21   remaining four policies?

22      A.   I don't really know what you mean. I

23   think my paralegal was pulling the documents so

24   that I could take look at them, then Steven sent
```

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox

March 7, 2017

Page 251

1   can't tell you -- I don't remember those letters

2   word-for-order to tell you specifically.

3        Q.  Do you have a recollection of forwarding

4   this language or something close to it to Mr.

5   Prusky?

6        A.  I don't have a recollection of it, but I

7   know that he and I talked about the language in

8   detail, so I must have.

9                    MR. FRANK:  Sixty-three,

10       sixty-four, sixty-five, sixty-six, please.

11                    (Exhibits Rousseau-63 through

12       Rousseau-66, inclusive, were marked for

13       identification)

14   BY MR. FRANK:

15       Q.  I think these letters are all

16   substantively identical, one to the next, dated

17   June 1, 2014.  They're addressed to the trustees

18   of Collins, Acker, Coppock and Stamatov.  Do you

19   remember seeing these letters?

20       A.  Yes.

21       Q.  Did you approve of the form of each of

22   these letters?

23       A.  My recollection is that Alan and I came

24   up with the form. We sent it to Steven. We talked

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox

March 7, 2017

Page 252

1   back and forth, and kind of the three of us agreed

2   that this was the language to be used.

3        Q.  Can you tell me why it took six weeks to

4   get from Mr. Prusky's request on the 15th of April

5   -- actually, the 14th the April -- indicating the

6   most important thing is to protect the other

7   policies and the fact that these didn't go out

8   until June 1, 2014?

9        A.  I don't recall why he waited until June

10  1st to send them out.  It may have been strategic.

11  It may have been tied to the motion to reconsider.

12  I really don't recall.

13       Q.  Did you urge him to send these

14  spring-cleaning letters, or was it the other way

15  around?

16       A.  My recollection is that what I told

17  Steven was, they're kind of like chicken soup:

18  Not gonna hurt to send them in any respect.  It

19  might help, possibly, but it certainly will do no

20  wrong, so do it.

21           But don't expect this is going to change

22  anything vis-a-vis their potential litigation

23  against you if they decide to lawyer-up and try to

24  pursue what Bitter had pursued.

Julius Rousseau, III, Esq.                                         Windsor Securities vs. Arent Fox

March 7, 2017

1      Q.  Besides these four letters and the

2   settlement efforts, are we in agreement that you

3   have no recollection of substantively addressing

4   the four remaining policies in any way?

5      A.  The which policies?

6      Q.  The four policies in any meaningful way?

7      A.  And as I said, Steven and I talked about

8   this a number of times.  We discussed in substance

9   his position, what he could and couldn't do, what

10  might or might not help.  And that was -- we spent

11  more time talking about it than it took for me to

12  write the letters and send then out.

13     Q.  On or around June 1, 2014 were you still

14  of the view that, despite the possibility of some

15  challenge in the form of litigation from the

16  trustees, that Mr. Prusky and Windsor Securities,

17  LLC had done all that there was to do, in your

18  view, to perfect Windsor Securities, LLC's actual

19  ownership of the four policies?

20              MR. WANG:  I object to the form of

21  the question.

22     A.  My view was, Windsor had done all it

23  could do.  My view was that the problems Windsor

24  faced had nothing to do with the default sale

Julius Rousseau, III, Esq.                          Windsor Securities vs. Arent Fox

March 7, 2017

Page 254

```
 1   right provisions.

 2       Q.  Or 9620.

 3       A.  Correct.

 4       Q.  Okay.

 5              MR. FRANK: We are actually making

 6          progress.

 7              MR. WANG:  Good to know at 4:00.

 8   BY MR. FRANK:

 9       Q.  Did you ever do any work in connection

10   with the policy insuring Mr. Cohen's life?

11       A.  I believe something -- I remember

12   discussing that policy.  Something must have come

13   up about it.  I don't recall what it was.

14       Q.  Did Mr. Prusky ever ask you to help him

15   with respect to the Cohen policy?

16       A.  Again, my recollection was that the agent

17   on that policy was Byron Frisch.  I believe I

18   corresponded with Byron. I may have talked to him

19   by phone.  My recollection is that it had

20   something to do with Cohen, but I don't recall

21   what.

22       Q.  Did you ever review the paperwork for the

23   Cohen insurance policy?

24       A.  I can't recall.
```

Page 266

1   simply the default sale right had been executed

2   and that was the basis for the right to title,

3   along with other defaults, frauds,

4   misrepresentations, etcetera, that had been made.

5           We also talked about the fact that we had

6   a problem with Georgia law and we had a problem

7   with Barnes saying he only signed this over to be

8   sold and not for Windsor to take formal title. And

9   we thought the panel would not believe Barnes on

10  that testimony, but that that was certainly an

11  issue.

12          So, I think that there is more to the

13  story and somewhat less to the story than you have

14  in sixty-one, but basically sixty-one is

15  reasonably accurate, that I thought and Steven

16  thought that we were going to win the case, as we

17  talked about earlier today.

18      Q.  Let me break it down, then.  And I won't

19  belabor the point, but can we at least agree that

20  throughout the Bitter arbitration you assured

21  Windsor that it had gained ownership to the Bitter

22  policy?

23      A.  No, I explained to you that that's

24  incorrect.  He had not gained ownership.

Julius Rousseau, III, Esq.                                Windsor Securities vs. Arent Fox

March 7, 2017

Page 267

1       Q.   Rather, he had a strong position.

2       A.   He had a strong position to the death

3    benefit.

4       Q.   Okay.

5       A.   He was not the owner and was never going

6    to become the owner.

7               (Pause)

8               MR. FRANK:  We're just grabbing

9          the last few questions here to make sure we

10         haven't missed anything.  You'll let me know

11         on that one, okay? All right.  Let's go off

12         the record, please.

13              THE VIDEOGRAPHER:  The time is

14         4:15 p.m. We're going off the record.

15              (There was a discussion held off

16         the record)

17              MR. FRANK:  Let's talk outside

18         just for a minute, please.

19              (A brief recess was taken)

20              THE VIDEOGRAPHER:  The time is

21         4:31 p.m. We're going back on the record.

22    BY MR. FRANK:

23      Q.   Mr. Rousseau, can you tell me if in the

24    period leading up through and including the

Julius Rousseau, III, Esq.                                    Windsor Securities vs. Arent Fox

March 7, 2017

Page 276

CERTIFICATION


------


        I hereby certify that the testimony
and the proceedings in the aforegoing matter are
contained fully and accurately in the stenographic
notes taken by me and that the copy is a true and
correct transcript of the same.



                Lance A. Brusilow
                Registered Professional Reporter
                Certified Realtime Reporter



        The foregoing certification does
not apply to any reproduction of the same by any
means unless under the direct control and/or

supervision of the certifying shorthand reporter.




------

I, Julius Rousseau, hereby certify that I have read the transcript of my deposition testimony, given under oath on March 7, 2017, that the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct, subject to the below errata.

Julius Rousseau

Subscribed and sworn to before me
this ___3___ day of ___мАY___, 2017.

Notary Public

JANET AMERASINGHE
NOTARY PUBLIC, STATE OF NEW YORK
LICENSE NO. 01AM4789617
QUALIFIED IN NEW YORK COUNTY
COMMISSION EXPIRES 06/30/20 __19__

Julius Rousseau – Deposition of March 7, 2017 – Transcript Errata

| Page/Line | Transcription | Change | Reason for Change |
|---|---|---|---|
| 15:18 | "ans" | "and" | Mistranscription |
| 18:11 | "an undergraduate" | "undergraduate" | Misstatement |
| 18:20 | "Hunter" | "Hunton" | Mistranscription |
| 38:17 | "deposition" | "representation" | Misstatement |
| 43:15 | "Elliot" | "Elliott" | Misspelling |
| 44:21, 23 | "Elliot" | "Elliott" | Misspelling |
| 45:8 | "Elliot" | "Elliott" | Misspelling |
| 50:23 | "e" | "of" | Mistranscription |
| 57:20 | "or" | "on" | Mistranscription |
| 65:17 | "was" | "were" | Misstatement |
| 72:8 | "begun" | "began" | Mistranscription |
| 82:9 | "wasn't" | "was" | Mistranscription |
| 86:4 | "is foreclosure" | "is a foreclosure" | Misstatement |
| 95:16 | "should" | "should take" | Mistranscription |
| 105:9 | "most safe" | "safest" | Misstatement |
| 106:17 | "take" | "take on the other policies" | Misstatement |
| 114:13 | "assignment" | "assignments" | Mistranscription |
| 123:17 | "whatever" | "based on whatever" | Misstatement |

| Page/Line | Transcription | Change | Reason for Change |
|---|---|---|---|
| 124:21 | "sell" | "sale" | Mistranscription |
| 125:7-13 | "What's here is here. I don't know. I know there were demand letters in which what you just state was included in what I think was the September letter to the trust, but it may or may not be in the letter. I don't see it, but I think we can all agree what's here is here." | "What's here is here in Exhibit 14" | Misstatement |
| 126:5-8 | "Well, we did it in the September letter, so I don't know, again, if we had a strategy. This letter was for one purpose, and I don't recall it at the time, so …" | "This letter was for one purpose, and I don't recall it at this time, so …" | Misstatement |
| 126:20 | "so I can't tell you." | "so I can't tell you. It is clear from that letter that we did offer a release to all parties, not just the borrower, in connection with the breach that appeared to have occurred, if the policy were transmitted to Windsor." | Misstatement |
| 129:23 | "is to" | "to" | Mistranscription |
| 133:6-9 | "A. Yes, you just read me that paragraph in exhibit fourteen. Fourteen didn't give them the option to accept it. And you didn't know why, but it didn't have that in there, right?" | "A. Yes, you just read me that paragraph in exhibit fourteen.<br><br>Q. Fourteen didn't give them the option to accept it. And you didn't know why, but it didn't have that in there, right?" | Mistranscription |
| 134:3 | "sell" | "sale" | Mistranscription |
| 134:24-135:1 | "There is the subsequent letters. I believe they're dated September '09" | "No." | Misstatement |
| 136:7 | "sell" | "sale" | Mistranscription |
| 138:18-19 | "I believe it's there. We can look at the letters and see." | "Agreed" | Misstatement |

4840-6526-7783.1

| Page/Line | Transcription | Change | Reason for Change |
|---|---|---|---|
| 144:8 | "talking" | "taking" | Mistranscription |
| 146:22-23 | "Our recollection is the September letters" | "The closest language is in the July 7, 2009 letters where we offered in connection with the breach that had occurred to release all claims in return for the policy." | Misstatement |
| 149:7-12 | "Date, no.  Time period, yes.  I think there are other letters that we sent throughout the fall of 2009, and I may be getting some of the dates and places confused, but there was a series of things we were attempting to do for Windsor in that time period" | "The letters I have in mind were the July 7, 2009 letters." | Misstatement |
| 149:16-17 | "I recall letters in September, yes, but I say maybe it's August or October." | "The letters I have in mind were the July 7, 2009 letters." | Misstatement |
| 155:12 | "sell" | "sale" | Mistranscription |
| 156:16 | "it's" | "it was" | Misstatement |
| 160:3 | "difficult" | "different" | Mistranscription |
| 160:10 | "bear" | "bears" | Mistranscription |
| 162:8 | "aside" | "outside" | Mistranscription |
| 162:13 | "sell" | "sale" | Mistranscription |
| 172:9 | "To I suspect" | "No I suspect" | Mistranscription |
| 172:19 | "than" | "that" | Mistranscription |
| 172:21 | "September" | "sent" | Mistranscription |
| 176:11 | "know" | "knew" | Mistranscription |
| 177:16 | "it." | "it, or if it even received the form from Houchins." | Misstatement |
| 178:22 | "say" | "said" | Mistranscription |
| 182:6-7 | "would have" | "had" | Misstatement |
| 192:24 | "loan" | "the loan" | Mistranscription |
| 202:23 | "not an award" | "an award" | Misstatement |
| 206:19 | "were with" | "were" | Mistranscription |
| 208:20 | "in some cases kind of under" | "in some cases" | Misstatement |
| 217:10 | "skewed" | "executed" | Mistranscription |
| 222:17 | "case" | "cases" | Mistranscription |

3

| Page/Line | Transcription | Change | Reason for Change |
|-----------|---------------|--------|-------------------|
| 227:20 | "that was that" | "that was" | Mistranscription |
| 234:17 | "Aaron" | "Arent" | Mistranscription |
| 240:20 | "Aaron" | "Arent" | Mistranscription |
| 251:2 | "order" | "word" | Mistranscription |
| 261:6 | "Do" | "I do" | Mistranscription |
| 263:14 | "and we did" | " but we did not" | Misstatement |
| 265:11 | "it's" | "is" | Mistranscription |
| 265:15 | "how the" | "the" | Misstatement |

4