# EXHIBIT 11

Darin T. Judd (CA SBN 160475)
Russell F. Rowen (CA SBN 058178)
THOMPSON WELCH SOROKO & GILBERT LLP
3950 Civic Center Drive, Suite 300
San Rafael, CA 94903
Telephone:      (415) 448-5000
Facsimile:       (415) 448-5010
Email:           djudd@twsglaw.com

Lauren S. Antonino *(Appearance Pro Hac Vice)*
THE ANTONINO FIRM LLC
Six Concourse Parkway, Suite 2920
Atlanta, Georgia 30328
Telephone:      (770) 408-1229
Facsimile:       (866) 372-5586
Email:           lauren@antoninofirm.com

Attorneys for Defendant, Cross-Claimant, and Cross-Defendant
WINDSOR SECURITIES, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| PACIFIC LIFE INSURANCE COMPANY,<br><br>                    Plaintiff,<br><br>          vs.<br><br>MARIA ANA GORDILLO, as Trustee of the Erwin A. Collins Family Insurance Trust – 2008; and WINDSOR SECURITIES, LLC, a Nevada limited liability company,<br><br>                    Defendants. | Case No.        3:14-cv-03713-WHO<br><br>**DECLARATION OF STEVEN PRUSKY IN SUPPORT OF WINDSOR SECURITIES, LLC'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:        December 2, 2015<br>Time:        2:00 p.m.<br>Dept.:       Courtroom 2, 17th Floor<br>Judge:       Hon. William H. Orrick<br><br>Complaint Filed:        August 15, 2014 |
| AND RELATED CROSS-CLAIMS. | |

I, Steven Prusky, declare:

1.      I am the President of MFIP (Delaware), Inc. which is the Managing Member of Windsor Securities, LLC, a Nevada limited liability company ("Windsor"). I make this declaration of my own personal knowledge. If called as a witness, I would and could testify under oath to the truth of the

DECLARATION OF STEVEN PRUSKY IN SUPPORT OF WINDSOR SECURITIES, LLC'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

following statements:

2. Windsor was introduced to insurance premium financing in 2007-2008 by Joseph Aaron, who put Windsor in touch with insurance brokers Eugene Houchins III ("Mr. Houchins") and/or his father, Eugene Houchins II ("Houchins Sr."), through whom Windsor placed its first seven premium-financed policies. According to emails I received and applications for life insurance that either Mr. Houchins or Houchins Sr. signed which are part of the Premium Financing Agreement ("PFA") for the loan that Windsor financed, EEH Consulting, Inc. and Bonded Life Company, LLC, were two companies the Houchins family operated that were involved in the premium financing business (Houchins, Houchins, Sr. and their companies, together "Houchins"). Windsor was the lender on seven life insurance policies for Houchins' clients including the life insurance policy issued by Pacific Life Insurance Company ("PacLife") which is the subject of this lawsuit. I was involved in all those financings on behalf of Windsor.

3. Attached hereto as **Exhibit A** is a true and correct copy of the PFA that was entered into between Windsor, Erwin A. Collins, and the Erwin A. Collins Family Insurance Trust – 2008 (the "Insurance Trust"). This PFA was presented by Mr. Houchins, on his own or with Houchins, Sr., to the Insurance Trust, the insured Erwin A. Collins, and the trustee for the Insurance Trust, Maria Ana Gordillo (the "Trustee" or "Ms. Gordillo"), on or around April 15, 2008 (collectively the "Insurance Parties"). The same basic forms were used to prepare the PFAs for all seven financings Windsor did for Houchins' clients. Windsor did not know the Trustee or the Insurance Parties until Houchins presented the Insurance Trust and the Trustee to Windsor.

4. The PFA provides that the date on which the Loan has occurred shall be the "Financing Date." [Exhibit A, Page 11, Preamble.] This defined term operates within the Premium Financing Agreement to fix the "Maturity Date" of the loan. The Promissory Note signed by the Insurance Trust states in paragraph 3 that: "The Maturity Date is 820 days (approximately 27 months) from the date Lender disburses funds pursuant to the Financing Documents. It is estimated that the **Maturity Date is July 15, 2010**, although the exact date shall be dictated by the date of disbursement. The entire principal amount of this Note and all accrued but unpaid interest owed hereunder shall be due and payable by the Borrower on the earlier of (a) the Death Date, or (b) the Maturity Date." [**Exhibit A**, Page 30, ¶3.

DECLARATION OF STEVEN PRUSKY IN SUPPORT OF WINDSOR SECURITIES, LLC'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

(emphasis added).]

5.     Windsor began disbursing the funds under the Financing Agreement on April 30, 2008, as confirmed by the "Receipt of Funds Confirmation" signed by the Trustee on **April 30, 2008, which is Document 19 of 19 of the PFA**. The Maturity Date for the loan, based on the Financing Date, was therefore either July 29, 2010, which is 820 days after Windsor disbursed funds on April 30, 2008, or July 30, 2010, which is 27 months after funding.  In either case the maturity date of the loan had not arrived in January-March of **2010** when, as shown below, the signed the Ownership, Name, or Beneficiary Change Request forms (the "COO"), changing ownership to Windsor as part of a mutual walk away agreement, whereby Windsor obtained title to the policy and all benefits there-under free and clear of any further responsibility to the Trust in exchange for the Trust walking away from any and all financial responsibilities to Windsor under the PFA.

6.     I have reviewed the Declaration of Eugene Houchins III, filed in support of the Insurance Trust's Motion for Summary Judgment.  Mr. Houchins, in paragraph 3 of his declaration states that:  "In 2010, shortly before the loan from Windsor to the Trust was due to be repaid, the Trust informed Windsor of the fact that it was not willing to take over premium payments on the Policy and would not repay the loan when due.  That fact was communicated to Windsor by me, pursuant to the request of the trustee of the Trust, Maria Ana Gordillo ["Gordillo"], and the insured, Erwin A. Collins [the "Insured"]."  Mr. Houchins' declaration is not factually accurate regarding the timing because my conversations with Mr. Houchins regarding premiums due on the Collins policy occurred between January-February or March of 2010, not shortly before the loan was due.  The loan was due either July 29 or July 30, 2010 and did not go into default. I had asked Mr. Houchins early in 2010 to find out what the trustees wanted to do with the policies because I did not want to pay any premiums beyond whatever Windsor was required to pay. According to an email dated November 24, 2009 on which I was copied, my then counsel, Jule Rousseau, had also talked with Houchins Sr. at a life settlement conference several months earlier about my not wanting to pay premiums Windsor was not required to pay.  The November 24, 2009 email asks Houchins to find out what the trustees wanted to do and let us know. A true and correct copy of this email is attached hereto as **Exhibit B**.

7.     Windsor communicated with Houchins because Houchins was the servicing agent on the

DECLARATION OF STEVEN PRUSKY IN SUPPORT OF WINDSOR SECURITIES, LLC'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

policies and Mr. Houchins had told me that communication was best served if I communicated through him, rather than directly to the trustees as they were going to discuss any matters with him before responding. I also knew the trustees were using Houchins to communicate information to Windsor since: (1) they were Houchins' clients; (2) Houchins was the servicing agent; and (3) the course of conduct with the Trusts was for Houchins to communicate information back and forth between them and us. For example, Houchins had facilitated the agreement to finance the premiums and handled the execution of the PFA. In addition, Houchins obtained HIPAA forms from the insureds and returned them to Windsor when Windsor requested medical information. Houchins also conveyed to Windsor, after being requested to speak to the Trusts to let Windsor know what they wanted to do, that the Trusts did not want to pay off their loans when they came due and did not plan to finance any premiums on the policy going forward. These are only email examples of communications Houchins conveyed on behalf of the Trusts. Houchins also returned Change of Ownership forms signed by the Trustees to Windsor.

8. The subject of premiums came up as additional premiums were coming due because Windsor was not required to pay all premiums on the insurance policy. As the Promissory Note provided, Windsor had the option but not the obligation whether to pay additional premiums beyond what was initially required, wherein it provided:

> FOR VALUE RECEIVED, **The Erwin A. Collins Family Insurance Trust-2008,** a Georgia trust **("Borrower"),** hereby promises to pay to the order of **Windsor Securities LLC,** a Nevada LLC **("Lender";** Lender and any other person who becomes a holder of this promissory note being referred to hereinafter sometimes as the "Holder"), the sum of ONE HUNDRED TWELVE THOUSAND SEVEN HUNDRED FIFTY Dollars ($112,750.00) , *or greater amount should Lender, <u>at its sole discretion,</u> choose to make additional premium payments on the Policy*, . . . . [**<u>Exhibit A</u>**, Page 30, Preamble. (emphasis added).]

9. The discussions about what the Collins Trust wanted to do in light of upcoming premiums were prior to the Maturity Date and before default.

10. Windsor had discussed with Houchins that it was willing to explore options with trustees on loans it had financed besides Windsor taking ownership. At this time, Houchins and I also discussed that additional premiums were coming due in 2010 and Houchins informed me that the Insurance Trust would not be making any premium payments nor was the Insurance Trust planning to repay the loan at the Maturity Date. The Trustee's Affidavit in this case shows that the Trustee asked

Houchins to communicate this information to Windsor.

11.     At or around this same time, Houchins informed me that several other trusts also were not planning to pay back the Loan or pay any premiums as well. I told Mr. Houchins that I was willing to work with trustees. It did not matter to me if they kept the policy by paying the loan (or in the case of one insured, negotiating for a small payoff discount before the loan came due), if we could sell the policy before maturity in a way that would pay Windsor off or come reasonably close, or if they wanted to do a mutual walk away then or wait longer to do so until their loan was due.  In my view, it was up to them which route they wanted to take, but I did say that Windsor was willing to do a mutual walk away that involved the Trust owing Windsor no further obligations to Windsor in exchange for which Windsor would own the policy and all rights thereunder free and clear of any obligations to the trusts, if they wanted to do a walk-away.

12.     I reiterated that I did not want to pay more premium payments that I had to, as my January 24, 2010 email shows.  A true and correct copy of this email is attached hereto in **Exhibit C.** The reason I did not want to pay more premiums than I had to unless there was a mutual walk away was that the more premiums Windsor paid for a policy that, at the time, could not be sold for a price close to the premiums I had advanced, the more Windsor was at risk for an increasing loss.  The only way that I felt comfortable keeping the policy and making premium payments going forward, I told Houchins, beyond what Windsor was obligated to do, was if Windsor, as sole owner and sole beneficiary of any rights under the policy, including to the death benefit payable in the future, could evaluate if there was a reasonable profit potential, which decision had to be made on a case by case basis.  Because the market for premium financed policies was weak at that time, I told Houchins that my intention at that time if I continued to pay premiums on the policies was probably to keep them in force until a death benefit was payable, but that I was not interested in funding the policies beyond what was required unless Windsor would have the sole right to the proceeds of the policy.  Even then, I did not know if I would make the decision going forward to keep all policies in effect because that decision had to be made down the line on a case-by-case basis. In one case, Windsor ultimately allowed a policy to lapse after having paid almost one million dollars in premiums because Windsor decided that the profit potential was too small in light of the risk of loss of the substantial premiums it would have had

DECLARATION OF STEVEN PRUSKY IN SUPPORT OF WINDSOR SECURITIES, LLC'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

to pay going forward to keep the policy in effect.

13.     Whenever Windsor elected to make premiums it was not required to, Windsor took a calculated risk that Windsor might some day make a profit. As an investment advisor, Windsor seeks a return of higher than 10-15% and was at risk for not recouping back its investment, much less a return of the 15% provided for in the Promissory Note.  As it turns out, in this case, the death benefit payable does result in Windsor's making a profit. Had Mr. Collins lived longer, however, Windsor very well may have suffered a loss.  There are other policies that are still extant where it is not clear if Windsor continues paying premiums, that Windsor will return a profit worth the risk for making additional premiums or, indeed, any profit at all.  There is risk that Windsor may, in fact, lose part of its investment in these policies.  It is certainly true that Windsor does not know how many more premiums it must make, or the additional investments involved, before these polices mature upon the death of the insured.

14.     Being in the investment business, I had to value at each payment date whether committing the funds there was the best use of funds relative to other options Windsor might have for a higher return. Once trustees who wanted to walk away signed over the policies and I owned the policies free and clear, without obligation to the Trust, my analysis was that the choice of whether Windsor would sell the policies, let the policies lapse or make additional premiums was Windsor's entirely to make.  If I had known that a Trust would claim that it could receive a portion of a death benefit over my principal plus 10% or 15% as the Promissory Note provided, my investment analysis would have been very different because Windsor was at risk for not receiving back its investment, much less a 15% return, if the insured lived so long that the death benefit exceeded the premiums paid or the interest rate needed to justify the investment.  In the Collins case, the policy limit was 2 million and Windsor had paid over $400,000 in premiums by 2014 when Mr. Collins died.  Had Mr. Collins lived, the premiums Windsor might have advanced were substantial.  The point here is that Windsor relied on the Trust's walking away from the policy in lieu of paying off the loan when it made further investment decisions over the four years after the policy was transferred to Windsor on the understanding that Windsor and Windsor alone would recoup any benefits if the death benefit became payable.  At the time the walk-away agreement was made, the secondary market for selling these policies was so soft, I had to

1  consider the death benefit option as I did not anticipate that selling the policies would produce a

2  sufficient return of capital. I told Mr. Houchins at the time that if I continued to pay the premiums

3  beyond what Windsor was required to do, which I was not going to do unless there was a mutual walk

4  away that resulted in Windsor owning the policies free and clear, I intended most likely to hold them

5  until the benefit became payable. Nonetheless, I let one policy lapse. Every payment on every in-force

6  policy was a calculated risk.

7       15.     There was no discussion or demand for transfer of the policy as collateral pursuant to the

8  security agreement; the proposal was for a transfer of full ownership of the Policy in exchange for

9  which the Insurance Trust would completely walk away from any financial obligations under the

10  original loan and Windsor would be the sole owner and have all rights to the insurance policy and all

11  benefits thereunder. Mr. Houchins told me he would talk to the Trustee about the option to do the

12  mutual walk away and get back with me, which he did. Later, Mr. Houchins communicated to me that

13  the Trustee agreed to Windsor's proposal and that the Insurance Trust would sign the COO which

14  effectuated transfer of complete ownership of the Policy to Windsor as part of our agreed walk-away.

15  At no time during this early 2010 time period did Mr. Houchins or the Trustee through Houchins use

16  the terms "anticipatory breach".

17       16.     [INTENTIONALLY OMITTED]

18       17.     The Trustee signed the COO for the Policy on May 11, 2010. [A true and correct copy of

19  the COO is attached hereto as **Exhibit D**.] All of these events confirmed to me that Mr. Houchins was

20  acting as the Trust's and Trustee's agent. Windsor signed and sent the written request to change the

21  beneficiary to Windsor on August 26, 2010, and PacLife provided confirmation of the Beneficiary

22  change request to Windsor and Houchins on September 1, 2010 [A true and correct copy of the COB

23  and its confirmation is attached hereto as **Exhibit E** and **Exhibit F**.]

24       18.     [INTENTIONALLY OMITTED]

25       19.     In January-March of 2010 Windsor did not believe that it needed an "assignment" of the

26  Insurance Policy to protect its collateral and did not ask for an assignment to do so. Windsor had

27  already received an assignment of the Insurance Policy at the inception of the Loan when the Trustee

28  signed the "ASSIGNMENT OF LIFE INSURANCE POLICY AS COLLATERAL" on April 15, 2008

DECLARATION OF STEVEN PRUSKY IN SUPPORT OF WINDSOR SECURITIES, LLC'S OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

(see **Exhibit A**, pages 119-124), and the "Assignment of Life Insurance Policy as Collateral"

(see **Exhibit A**, pages 125-127).

     20.    There are at least two reasons why Windsor believes the evidence shows that Mr.

Houchins is biased in favor of the Insurance Trust and prejudiced against Windsor.  First, there is

evidence that shows Houchins is concerned he may have liability to the Insurance Trust if the Trust does

not receive any of the death benefit as his admissions in the *Barnes/Bitter* case show:

> *Q: So you said Mr. Barnes was laying some blame on you.  Did you have any conversations about how to deal with that problem?*
>
> *A: I did.*
>
> *Q: What was it?*
>
> *A: I sought my legal counsel and he said, yeah, you might have a little liability here, and so I discussed it with [Barnes] and we came to an agreement.*

[A true and correct copy of the Arbitration Transcript Excerpts is attached hereto as **Exhibit G,** at

page 534: lns. 23-535: lns. 5 (emphasis added).]  The settlement agreement Houchins reached with

Barnes in his capacity as Trustee of the Bitter Insurance Trust was for Houchins to pay for all out-of-

pocket costs, the flat-fee charged by Barnes' attorney, arbitrator and arbitration fees, deposition costs,

and travel and lodging of Barnes' attorney incurred in the matter against Windsor in exchange for a

release from the Trust.   [A true and correct copy of the Agreement & Mutual Release is attached hereto

as **Exhibit H**.]  And second, Windsor believes that Mr. Houchins has a personal vendetta against

Windsor because Houchins lost their right to sell PacLife policies after I, on behalf of Windsor,

informed the insurance carriers that policies Houchins had procured were in fact premium financed,

despite the representation on the application for insurance that Houchins or his father submitted that

represented that the premiums were not financed.  [See **Exhibit A**, page 91.]  I made this disclosure to

PacLife, over the objection of Mr. Houchins, because I did not want the policies being voided due to

what I believed was an incorrect disclosure made by Mr. Houchins and the Trustee.  Such a voidance

would have meant a 100% loss of Windsor's investment and implicated Windsor in the fraud that

Houchins and the Trustee committed by mispresenting the existence or anticipation of premium

financing.  Premium financing is frowned upon by Pacific Life and most other insurance companies, and

Case No. 3:14-cv-03713-WHO         - 8 -

DECLARATION OF STEVEN PRUSKY IN SUPPORT OF WINDSOR SECURITIES, LLC'S OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

1   misrepresentation of such is valid reason to void the policies Upon information and belief, Houchins

2   lost its right to sell PacLife policies some time thereafter.

3       21.     The Insurance Company received the COO signed by the Trustee and confirmed the

4   change of ownership to Windsor on May 25, 2010.  [A true and correct copy of the May 25, 2010

5   Confirmation Letter is attached hereto as **Exhibit J**.]  As the owner of the Policy, Windsor

6   subsequently changed the beneficiary to itself, with the intent to receive the death benefit if it kept the

7   policy in effect until the benefit was payable.  Mr. Houchins, as writing agent on the Policy, was aware

8   of this fact.  At no time prior to the death of the Insured did the Insured, the Insurance Trust, the

9   Trustee, or anyone else connected to this action object to this transfer.  Further, at no point did the

10  Insured, the Insurance Trust, the Trustee, or anyone else connected to this action object to or otherwise

11  attempt to rescind the form appointing Windsor as the sole owner and sole beneficiary of the Policy.

12      22.     From May 25, 2010 through April 2014, nearly four years, Windsor repeatedly paid

13  premiums only after receiving lapse notices and just prior to a lapse of the Policy.  Windsor did not

14  follow this practice out of disregard, but to carefully protect its interest as full owner of the Policy and to

15  not overpay.  Had Windsor not made these minimum payments, the Policy would have lapsed and

16  Windsor would have lost 100% of its investment.  Windsor, alone, took the risk and that the ultimate

17  amount of premiums paid (unknown, since no one can know when an insured will die) would be worth

18  such risk.  Not once during this time period did Mr. Houchins or the Trustee communicate with me

19  about any concerns over the Policy or its potential lapse.  This was a stark contrast from what Mr.

20  Houchins did before Windsor became the owner of the Policy; during that period, Mr. Houchins

21  provided me frequent notifications regarding premiums due and potential lapse dates.

22      23.     In July of this year I attended the deposition of the Trustee.  In her deposition, Ms.

23  Gordillo testified that she learned that Mr. Collins had passed away when Houchins told her.  [A true

24  and correct copy of excerpts of the deposition of Maria Ana Gordillo is attached to the Declaration of

25  Darin Judd as **Exhibit 5**; see 109:1-25.]  From when Mr. Houchins told Ms. Gordillo that the Insured

26  had passed away until Mr. Houchins directed the Trustee to retain the Trust's current attorney which

27  was after the Trustee received a letter I had mailed the Trust a letter in mid June, the Trustee did not do

28  anything to make a claim on the Policy. [*Id.*]  The first time the Trustee through her attorney attempted

DECLARATION OF STEVEN PRUSKY IN SUPPORT OF WINDSOR SECURITIES, LLC'S OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

1   to assert a claim on the Policy was on approximately July 15, 2014 when she purportedly signed a letter

2   directed to the Insurance Company asserting a claim.  [*Id*.]  At no time in the months between Mr.

3   Collins' death and Ms. Gordillo's receipt of the June, 2014 letter from Windsor did the Trust assert any

4   claim to the Collins insurance policy.

5        24.    Not one insured or trustee, including Ms. Gordillo, has ever contacted Windsor during the

6   four-year period after their respective COOs were signed, before they hired counsel to respond to the

7   June 2014 letters I sent them.

8        25.    Mr. Houchins' declaration filed in the current motion asserts that: "After- and only after-

9   the fact that the Trust was not willing to take over premium payments on the Policy and would not

10   repay the loan when due had been communicated to Windsor, Windsor began demanding that Gordillo

11   execute, on behalf of the Trust and pursuant to the terms of the Financing Agreement, the assignment

12   documents that, in my lay understanding, would allow Windsor, subject to its continuing obligations to

13   the Trust under the Financing Agreement, to take title to, and beneficiary status under, the Policy. I

14   assisted Windsor in obtaining those documents from Gordillo."  This statement is factually inaccurate

15   for at least the following reasons:

16        a.    Windsor did not have the responsibility for making all premium payments on the

17   Policy, something Mr. Houchins, as the agent on the Policy, knew.  The Promissory Note enumerates

18   the loan amount as "the sum of ONE HUNDRED TWELVE THOUSAND SEVEN HUNDRED FIFTY

19   Dollars ($112,750.00), ***or greater amount should Lender, <u>at its sole discretion</u>, choose to make***

20   ***additional premium payments on the Policy***, . . . ."  [**<u>Exhibit A</u>**, Page 30, Preamble (emphasis added).]

21   Windsor prior to 2010 had previously fully funded the $112,750.00 and did not believe it was under a

22   further obligation to make additional premium payments on the Policy in 2010.

23        b.    I never discussed terms with Houchins, or demanded that the Trust execute "the

24   assignment documents that, . . . would allow Windsor, subject to its continuing obligations to the Trust

25   under the Financing Agreement, to take title to, and beneficiary status under, the Policy."

26        c.    Mr. Houchins' attempt to minimize his understanding of the proposal that the

27   Trust could transfer the policy in a mutual walk away whereby the Trust would be forgiven its

28   obligation to repay the loan by asserting his declaration is based on his "lay understanding" ignores that

1   he stood in a special relationship to the Trust, he being the licensed sale agent, and an agent for many

2   years, an expert on premium financing and an agent on dozens, possibly hundreds, of premium

3   financed policies, and his company being the serving agent for the Policy.

4       d.      I attended the deposition of Mr. Houchins on November 15, 2013, in his

5   deposition Mr. Houchins confirmed that he understood:

6       •      The Trustee for Collins executed the "collateral assignment" that allowed

7   Windsor to "take over the policy" because the Insurance Trust **no longer wanted to keep the Policy**;

8   and (A true and correct copy of excerpts of Mr. Houchins deposition is attached to the Declaration of

9   Darin Judd as Exhibit 3; see 44:13 - 45: 22).

10      •      ***Some of Houchins' clients tendered the policies prior to maturity in exchange***

11  ***for cancellation of the note related to the loan obtained for premium financing***. (Judd Dec, Exhibit 3,

12  at page: 123:5-12)(emphasis added).

13      e.      I attended the arbitration hearing where Mr. Houchins testified on January 15,

14  2014, in his testimony Houchins stated:

15      •      His clients, including the Collins Trust, before maturity signed the necessary

16  documents to transfer the Policy to Windsor and "walk away"; and (A true and correct copy of excerpts

17  from the Arbitration Testimony of Eugene Houchins III is attached to the Declaration of Darin Judd as

18  Exhibit 1; see: 580:6 - 582:21).

19      •      Houchins communicated to me in early 2010 that it was time to "sign over" the

20  policies that included the Collins  Policy, that he understood that his clients, including Collins, were

21  relinquishing the policies to Windsor, and that this signing over or relinquishment was occurring before

22  any default on the policies.  (Judd Dec, Exhibit 1, at 614:5 - 615:18).

23      26.      Houchins in paragraph 5 of his Declaration denies that he communicated and entered

24  into an oral agreement with Windsor on behalf of the Trust, acting both with the Trust's authority and

25  pursuant to its instruction.  This is untrue. As noted earlier, Houchins did communicate information

26  between the Trust and Windsor about what the Trust's options were and what it wanted to do in

27  response to the options.  In addition, Houchins cannot deny that Windsor had explained on multiple

28  occasions that it did not want to make any premium payments it was not required to.  Houchins'

DECLARATION OF STEVEN PRUSKY IN SUPPORT OF WINDSOR SECURITIES, LLC'S OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

1    deposition and arbitration testimony contradict Mr. Houchins' Affidavit. Mr. Houchins cannot also

2    truthfully deny that the Trustee in May 2010, before maturity of the loan, signed the document that

3    transferred the Policy to Windsor as the "new owner" with the right to change the sole beneficiary.  As

4    Houchins confirmed in his deposition and arbitration testimony, he understood and had explained to

5    trustees that one option was to "sign over," "walk away," and "relinquish" the Policy to Windsor.  And,

6    as Mr. Houchins' testimony regarding his conversation with the Bitter trustee showed, Mr. Houchins

7    had explained the option to sign over ownership of the policies was the trustee's option.

8         27.      In July of this year I attended the deposition of Robert S. Coppock, an insured on

9    another policy placed through Houchins in 2008.  [A true and correct copy of excerpts from the

10   deposition of Robert S. Coppock are attached to the Declaration of Darin Judd as **Exhibit 2**.]  Mr.

11   Coppock's deposition testimony also shows that Mr. Houchins explained the walk-away option to him.

12   [Judd Dec, **Exhibit 2**, page 43:4-9; page 45: 9-25; and page 46, 1-3.]

13        28.      Mr. Houchins, in paragraphs 7-9 of his Declaration, incorrectly states that Windsor

14   never communicated to him that Windsor was offering to forgive the loan, and then regurgitates

15   verbiage provided to him by legal counsel for the Trustee.  Windsor did inform Houchins that it was

16   willing to accept the transfer of the policy in lieu of the Trust paying of the loan, as noted above, with

17   Windsor having no further obligation to the Trust or the Trustee.

18        29.      Attached hereto is a transcript of a call I had with Houchins Sr. about my conversation

19   with Mr. Pawlik about options he had.  One of those was giving Windsor the policy in lieu of paying

20   the loan. See **Exhibit K** hereto.  I do not have transcripts of all calls that I make or receive for the

21   reasons explained at my deposition in the Barnes/Bitter case. See **Exhibit L** hereto.

22        30.      Also, out of an abundance of caution following the Barnes/Bitter arbitration, on June 18,

23   2014, I sent a letter to the Trustee confirming that Windsor had received full ownership of the Policy in

24   2010 in exchange for a full release of any financial obligations under the Loan.  (A true and correct

25   copy of the June, 2014 to the Trustee is attached hereto as **Exhibit M**.)  The Trustee never responded to

26   my letter.  I am aware that documents produced prior to deposition of Ms. Gordillo included a letter

27   drafted by her then attorney, dated in July of 2014, which purported to respond to the June, 2014 letter I

28   sent to the Trustee.  The first time I, or anyone on behalf of Windsor, had seen the July letter was in the

1  production in July of 2015.  Ms. Gordillo could not confirm that the letter of July of 2015 had ever

2  actually been sent.  Ms. Gordillo also confirmed that she relied heavily on Mr. Houchins regarding the

3  Policy, reconfirming Mr. Houchins' role.  [Judd Dec, **Exhibit 5**, page 16:8-12, 21:20-23:4, 24:20-26:3,

4  28:25-31:10; 43:5-44:17; 50:17-51:13, 62:1-63:10; 81:6-82:3; 87:6-92:5; 113:1-114:12; 125:22-129:2.]

5      31.    Windsor made all payments due under the Premium Financing Agreement and paid for

6  all the other premiums ever paid on the subject insurance policy.  The total amount loaned to the

7  Insurance Trust through the Maturity Date was $129,233.00.  Thereafter, Windsor made additional

8  premium payments comprising $294,333.45.  Accordingly, the total premium amount paid by Windsor

9  is $423,566.45.

10     32.    The interest at the legal rate (10%/annum) on the total amount loaned to the Trust

11  through November 10, 2015 is $616,274.96.  Thereafter, interest accrues at $117.66 per day.

12     33.    [INTENTIONALLY ADMITTED]

13     34.    My declaration in support of the Motion for Summary Judgment or Partial Summary

14  Judgment filed July 8, 2015, in paragraph 8 states:

> After Windsor was informed the Insurance Trust would not pay the loan
> when due, it elected to exercise the Default Sale provision in the Premium
> Financing Agreement. Attached hereto as Exhibit B is the Change of
> Ownership (Absolute Assignment) ("COO") then executed by the
> Insurance Trust and provided to Windsor. Windsor sent the COO to and
> registered it with John Hancock, which returned it to Windsor. At no time
> did the Insured, the Insurance Trust, the original trustee, successor trustee,
> or anyone else connected to this action object to this transfer and
> assignment.  Further, at no point did the Insured, the Insurance Trust, the
> original trustee or successor trustee, or anyone else connected to this
> action object to or otherwise attempt to rescind the form appointing
> Windsor as the owner and beneficiary of the Policy.

22  This portion of my declaration relates to the legal theory first introduced by the attorney for the

23  Insurance Trust in its Cross-claim that asserts that an "anticipatory breach" occurred in the period of

24  January-March of 2010 when Houchins advised that the Insurance Trust would not be making any

25  premium payments or repaying the loan.  At that time the notion of an "anticipatory breach" was never

26  raised.  The discussions, and the ultimate agreement, focused on a  voluntary transfer of the Policy to

27  Windsor as part of a mutual walk away.  The Motion for Summary Judgment filed by Windsor on July

28  8, 2015, focused strictly on a legal analysis of the Financing Agreement, and assumed for that argument,

DECLARATION OF STEVEN PRUSKY IN SUPPORT OF WINDSOR SECURITIES, LLC'S OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

the admission included by the Insurance Trust in its Cross-claim that it "defaulted" and that as a consequence of its default, Windsor had the right, without relying upon proving a consensual agreement, to effectuate a default sale per the Default Sale Provision, that expressly included a full release of its loan obligation was triggered, nothing more. I am informed and believe that the Answer filed by Windsor of the Cross-claim reaffirms the voluntary transfer in 2010 (see ¶10), and that the answer further expressly denies the allegation of an "anticipatory default" (see ¶18).

35.    Windsor sent a notice of default on only one policy following a borrower's failure to repay a loan and the passing of a maturity date—in *Barnes/Bitter*. [A true and correct copy of the Notice of Default sent in September of 2009 is attached hereto as **Exhibit N.**] None of the trusts in the four cases now pending indicated they wanted to pay off the loan or keep their respective policies.

36.    A true and correct copy of the March 30, 2010, letter sent by Windsor to Mr. Coppock is attached hereto as **Exhibit O.**

37.    In the *Bitter* case, Houchins emailed Windsor in July of 2010 about helping Windsor get a Change of Ownership ("COO") form signed by Mr. Bitter if Mr. Bitter did not pay off the loan. In that email, Houchins noted that, if needed, he would help Windsor "***complete the COO so you can have clean title.***" [A true and correct copy of the July 2010 email is attached hereto as **Exhibit P.**]

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct. Executed this 10th day of November, 2015, at Ardmore, Pennsylvania.


        /s/ Steven Prusky
        Steven Prusky


**ATTESTATION OF FILER**

I, Darin T. Judd, hereby attest that concurrence in the filing of the document has been obtained from each of the other signatories.

Dated: November 10, 2015             THOMPSON, WELCH, SOROKO & GILBERT, LLP


                        By:    /s/ Darin T. Judd
                               Darin T. Judd
                               Attorneys for Defendant, Cross-Claimant, and
                               Cross-Defendant
                               WINDSOR SECURITIES, LLC

**EXHIBIT B**

## Gene Houchins III

**From:** Gene Houchins [gene@bonded-life.com]
**Sent:** Tuesday, November 24, 2009 6:44 PM
**To:** 'MFIWSI'
**Cc:** 'Joseph Aaron'
**Subject:** RE: Acker, Coppock

Steven,

Sorry I won't be able to give a detailed response right now....I am walking out the door for a dinner engagement with my wife. I will read your email below in detail tonight and respond first thing in the AM, ....but I think we can come to a mutual agreement of cooperation.

Have a good night,
Gene

---

**From:** MFIWSI [mailto:mfiwsi@comcast.net]
**Sent:** Tuesday, November 24, 2009 6:26 PM
**To:** Eugene Houchins
**Cc:** Joseph Aaron
**Subject:** Acker, Coppock

Gene,

I hope all is well. As you noted in your email to Jule, we look to serve the interests of all involved, but particulary the clients -- the Insured and his Trust. (And, of course, I need to protect Windsor's interests.) To do so most efficiently, it makes sense to communicate directly with me. You can call or email. I don't mind if you Cc Joe Aaron, but Windsor is the appropraiet addressee.

Regarding Acker (and any others approaching year 3), I need something from the insurance company ASAP stating not the next year's premium, but *the minimum COI needed to keep the policy in force* (for a monthn, a quarter, a year). I would be happy to work with you to shop this and any policies, but to do so you need current medicals. A VOC can be acquired on short notice, as can LEs -- but **only WITH CURRENT medicals.** Please apprise me of the status of acquiring current medicals on all of your policies with me. -- I am asking that you assist us in getting curent medicals ASAP And please send me the premium notices. I will notify you as each payment is made.

If is easier or better for you -- you know your clients better than I -- I can send out a formal demand letter, which they would compel them to comply or default. I haven't done so in deference to you., but it's your call. Let me know how you'd prefer I handle it, and if you're doing so, in what time frame.

Thanks, and if we don't speak tomorrow have a good Thanksgiving.
-sgp



Exhibit
Houchins 220
Jane Rose Reporting
1-800-825-3341

1

Exhibit 220
Page 1 of 1

# EXHIBIT C

| From: | Gene Houchins |
|---|---|
| To: | "MFIWSI" |
| Subject: | RE: Update and misc info on cases |
| Date: | Friday, January 29, 2010 6:11:01 PM |

Steven,
I'm stepping out of the office for dinner with the family....I'll respond
over the weekend. But in short....total premiums paid on Acker is (65,458 +
52,500 + 11,453)....and it will fall back into Grace 1/20/10 or
2/20/10...depending on cash value in the policy.
Gene

-----Original Message-----
From: MFIWSI [mailto:mfiwsi@comcast.net]
Sent: Friday, January 29, 2010 5:30 PM
To: Gene Houchins
Subject: Re: Update and misc info on cases

This is very helpful, Gene. Thank you.

Since Acker is past due, either we sell it -- and I will if we can get a
decent price -- or they give me the COO. My assistant is gone: do you
recall how much I'm in for on Acker?

Coppock: looks like he's due on Tuesday, so unless he wants the policy, we
should get COO. Do you have an alternative?

Stamatov, Bitter, Collins: If they want to wait, that's fine. I don't want
to send in more premiums than I'm obligated for, however. Let me know.

Pawlik: great guy. i hope he lives a long time! But if he wants to pay
off the financing agreement or sign the COO, either is OK with me.

I'm willing to work with any of these guys, and welcome your comments.

-sgp

At 05:18 PM 1/29/2010, Gene Houchins wrote:
>26th Month Anniversary form Date of Issue:
>Acker - 1/20/10 (fyi.....Subagent has received $75 gross offer on the
>case. You might want to get insured/trustee cooperation and sell at this
>price. Maybe return a counteroffer to get closer to $100K)
>Coppock - 2/2/10 (He forwarded to us his updated APS yesterday. His PSA
>has increased a little, not good for past prostate cancer survivor, but LE
>will not change in our opinion if reordered)
>Stamatov - 3/28/10 (Trustee wants to wait until 26th month before giving
>COO)
>Bitter - 4/8/10 (No update except that no health change has occurred)
>Pawlik - 5/3/10 (Mentioned paying some (i.e. majority) of the loan back in
>order to keep the policy.)
>Collins - 5/4/10 (Faxed hipaa to us yesterday, and was forwarded onto
>you. No change in health as far as we know.)
>
>

Windsor-Acker000075

# EXHIBIT K

March 18, 2010

Welcome to MFI Associates and Windsor Securities.

All calls are being recorded, please wait on the line for system instructions.

If your party has a public extension, please dial it now, otherwise dial 0 for the operator or wait on the line for ….

Please hold while I transfer you.

(Music playing)

REC:   Good afternoon, MFI.

GH:    Yeah, this is Gene Houchins calling from Atlanta, is Steven Prusky available?

REC:   Hold on please.

GH:    Thanks.

(Music playing)

SP:    Hello.

GH:    Uh, Steven!

SP:    It sounds like Gene Sr.

GH:    Gene Sr., you got it!  How are you sir?

SP:    I'm very fine and yourself?

GH:    I'm fine, I'm fine.  We've got some of this Philadelphia weather here and so – are you guys getting a lot of rain?

SP:    We are – it's 60  degrees - I mean beautiful here.

GH:    Hey that sounds like Atlanta, that's good!

SP:    It sure does.  Maybe we are changing places.

GH:    Well we deserved that anyway don't we?  But anyway, I just wanted to let you know that I met with Steve Paulik, yesterday afternoon…

SP:    Uh, hum…

GH:    ….and….

Exhibit 260
Page 1 of 6

SP:     That would be the senior?

GH:     Yeah, the Senior, yeah and he wants to acquire that policy.

SP:     Okay, it's probably not a bad idea.

GH:     Well it really isn't because, you know, I meet with him briefly – I like the guy, I like the guy a lot so I see him, I see him fairly often and that's probably not a bad _____ and I know he had a conversation with you a week or so ago, but he was all over the…and you folks talked about a price, but he said, well, it was $103 or $110, well maybe it's $113.  Well…he said maybe you ought to call….I say maybe I ought to.

SP:     I, we actually didn't assigned a specific number, but I said was the loan amount, the loan documents called for this, given how I felt about him, you know, I've give him some modest discount.  But the issue for him really shouldn't be, you know, the discount, it should be he has to decide whether his family can afford it and whether they think it's worth it.  And I said, based on what little…..I said I'll be faced with the same choice you are, you know, if you give the policy to me in lieu of the loan, I'll make the same decision—do I pay premiums or not because it's not saleable at a profit so it's not worth your while to go off and try and sell a policy.  I said from what little I know, and I'm not privy to your finances, if I were, you know, I would talk it over with your wife and your kids.  If I was in your position, I'd probably buy the policy.

GH:     Well, I think that, I think it's really you more than me, but, maybe it's the expert from afar, you know how that goes, but I think that, yeah, and I think, I think he appreciates that.  He was sort of a little taken aback by the fact that gee, this guy up in Philadelphia, I don't know really likes me and really is advising me and you're saying the same thing, so maybe the two of you are right.  And yeah, that's what he told me.  And so, I said yeah, I think we are… I had to help him up off the couch yesterday…ah, it was kind a, it was kind of sad, you know?

SP:     He sounded pretty strong when I spoke to him, and he said he felt a lot better, but you know, just based on the stats that he gave me, you know, I can't imagine _____ what his _____ is, but I can't imagine it's super long.

GH:     No, I don't' think it is and I think it's probably deteriorating every day if you want to know the truth and, but, but anyway, what, any idea what, what do you think he ought to send you a check for or…

SP:     Yeah, the first thing we have to resolve is he'd have to have another premium payment made soon, so we'd have to resolve whether, who's going to make that premium payment.

GH:     All right.

SP:     Honestly, Gene, I don't have the loan documents in front of me, I guess I should look through it, um, as these notices have come in, um, I give it to my assistant and say, you know, make sure you remind me two weeks before they're due, I don't need to give the

Exhibit 260
Page 2 of 6

insurance company money in advance, so, you know, I don't rush to pay the premiums, I just need to make sure that if there's a screw up and there was once here, you know, the check got there, that there's enough time to fix that before the policy actually lapses. Um, so you may have information faster than I, but I, you know, let's go to the draw, and find out what's owed on the loan, when the premium is due and you know, and I'll mark off a few grand and if he wants to buy it, that's fine and quite honestly, if he doesn't and I apply this to him, I would prob…my inclination is if I get the policy in recourse, I'm going to keep it and find it and I didn't, know you, I, if he's the kind of guy I can _____ with, I would, you know, I can't…you know, it's really a question of are you going to get more out of the policy than, ah, than you put into it and the decision that I would make and I'd have to pay taxes on the pre, on the premium, on the receipt of the proceeds, so it's worth more than you guys than it is to me and I would keep it so, you know it's fine….

GH:    That's right.  That's exactly right.  I think he, I think he sort of talked about that or thought about that and he mentioned that to me.

SP:    I think the question is, and this is not my business, just so long as, you know, to the extent that you have a personal role with him, a personal relationship with him is, can he can afford to keep it?

GH:    I, I, I think he can.  I, I, I think he can and I know there's, there's um, um, there's four, let's see, there's three of them, there's two sons, three sons and a daughter, and the daughter, I know was um, is married to the former football coach at Southern Miss

SP:    Really.

GH:    …and has done quite well that way and I think he's with one of the pro teams now, as a defensive ____ coach or something.  So, I think he probably, I think he thinks he can, cause we talked about that some and um….

SP:    Well, that's the key thing, I just don't want to see him get in over his head.  If he can…

GH:    Yeah, I and I'm gonna make sure, I'm going to talk to him one more time to make sure that _____, and I'm going to talk to all of his kids too, to make….I don't have to do that, but I am.  What I….

SP:    It's beginning to come back to me a little bit now, I apologize, I'm having my senior moments, one of the things I did when I spoke to him was I pulled out the original illustration and, working from memory now, Gene, cause you may have it, and I said, ok, well, I think it called for something like $50K a year, I said so what they're saying here, Steve, is that if you were to pay a level amount, it's $50K a year, you don't have to pay that amount.  You can pay the minimum required each year, which for the first two years is going to be less than $50, and you know, if you're around in 15 years, it'll be a lot more than $50K, and I told him my very honest opin…what I just said to you, _____ I'd pay the least amount needed to pay to keep it in force, and you know, hold on to my money for as long as I can.

GH:   That's right.  So he give him cash value, that's, that's about the idea (?).

SP:   So I think that probably the best thing to do to give him the best advice before he pulls the trigger is we should, is run an illustration with minimum COI and see what the premiums will be for the next 2-3 years and I think we if do that, he would probably would be satisfied, could afford it and then he should pull the trigger, but let's just make sure he isn't getting in over his head.

GH:   I'll do that.  I think that's good advice.  Because I don't want him to—it would just break my heart, you know, if he did all this, if he laid out a $100,000 or whatever, …

SP:   Right.

GH:   …and then he says oh, oh, I just can't do this.  That would just, that would just break my heart.

SP:   And although he sounds like he's totally together, if he can get his wife on board too just to make sure she understands it or one of his sons, so that somebody else is giving him a perspective.  Although he said nothing in my conversations with him that would make me think that he's not on the ball.

GH:   No, and I think you're right.  I think it's all, you know, I don't think there's any beginnings of dementia or that sort of thing, I really don't.  And, and ah, but I, but I, he's just becoming physically fragile, I guess is a good word.  But I think his son is probably the one, and we've talked to him once and I want to talk to him again, um, and I think this idea is good!  I think your idea is good and we'll do that!

SP:   Okay.

GH:   And um…

SP:   Well keep me posted.  Worst case scenario is, is um, again, I don't have it in front of me but – the worst case scenario is I'll pay the next premium and because either way, you know…

GH:   Someone's gonna have to….

SP:   Someone's gonna have to pay it anyway so if it turns out that I fronted and he reimburses me for it, I don't really care.

GH:   Okay, it's…I think, what, what is it $10K, I don't know, I don't know what it is, but anyway, okay, that's what we'll do and you and I will talk.  You and I will talk in a few days.

SP:   Yeah.  Let me just give you one heads up.

GH:   Okay.

Exhibit 260
Page 4 of 6

SP:  I am leaving the country next Wednesday evening.  I will be accessible both by email and my office will be able to reach me but I'll be out for a couple of weeks.  So, if any paperwork…pardon me?

GH:  I said good for you!… I think.

SP:  Yeah, it's good for me.  It's gonna be a father-daughter trip.

GH:  Oh wonderful!

SP:  Yeah, every once and a while I get a chance to take one – I have 5 kids – every once and a while I get a chance to take one of them away.

GH:  Oh you got five kids?  I only have three.  Bless you, my friend.

SP:  That's why I say I'm so tired.  (Laughter)

GH:  Been there done that.  _____ getting a little older.

SP:  Yeah.

GH:  You told me you were like, 48? Well I'm 70.  I've kinda been there done that.

SP:  Yeah, I hear you.

GH:  That's wonderful!  That's great!

SP:  And these kind of trips, because I've been working like crazy, these kind of trips are probably really worthwhile….to get some quality time.

GH:  We'll see if we can't get it wrapped up.

SP:  And if not, it's not that big a deal, because you know, I'll be in communication and if i's need to be dotted or t's need to be crossed when I get back, um, or worse case scenario, something needs to be faxed to me then, you know, then I'm only 7 or 8 hours away.

GH:  We will, we will get it done but I – and so you're leaving next Wednesday, did you say?

SP:  I'm leaving next Wednesday night so I will be in the office Wednesday morning.

GH:  Okay.  All right.  Fine.  We'll get it resolved by then I'm sure.

SP:  Okay.

GH:  All right, I'll be in touch.  Thank you.

SP:  You got it, Gene.  Have a good night.

GH:  All right, bye-bye.

End of call.

Exhibit 260
Page 6 of 6

**EXHIBIT O**

X-CAA-SPAM: 00000
X-Authority-Analysis: v=1.1 cv=T4ed6xw20OTDTYr0H0w0eYBU0LRu2xbtFNKcKfGFcuY=
  c=1 sm=1 a=CSro6qX6FO8A:10 a=mHp45KioRlAA:10 a=Tj3wkTQpq+i+tsX1ftni+g==:17
  a=md6_xHmUgiJwMj1nnP8A:9 a=CxoDoOHZueGq9sun5oKD2bb_I5wA:4 a=CjuIK1q_8ugA:10
  a=SSmOFEACAAAA:8 a=Y2VNeNrzAAAA:8 a=yMhMjlubAAAA:8 a=TW66zc2HAAAA:8
  a=HQ31llbKAAAA:8 a=brymuF_W3hA_R3NPglIA:9 a=kVR3D2p0t9DZl-APokQA:7
  a=mHU2NQi9Ima7dcg5tMua9UnU5DUA:4 a=RqOAJGx8AAAA:8 a=X02qDDlAAAAA:20
  a=pFcll-O2W9PbIyF8LaQA:9 a=myKE4pGhIPxHtT4_nT8A:7
  a=ZfJH6Qqb7ZqSISWdh4kEw9YzE8EA:4 a=n3BslyFRqc0A:10 a=bhkaYMs-ANYA:10
  a=Tj3wkTQpq+i+tsX1ftni+g==:117
From: "Gene Houchins" <gene@bonded-life.com>
To: "'MFIWSI'" <mfiwsi@comcast.net>
Cc: "'bob coppock'" <coppock1934@earthlink.net>
Subject: Robert Coppock - Release Document Requested
Date: Tue, 30 Mar 2010 11:27:48 -0400
X-Mailer: Microsoft Office Outlook 12.0
thread-index: AcrQHY28xkWRMhfCQOGzVqXoifTFUQ==

Steven,

Attached you will find a VOC that confirms the Change-of-Ownership for the Robert Coppock PAC policy. Mr. Coppock is asking for a "release" to complete his file. Please send this to him at his TN address, or you can email it to me for forwarding. I have let Mr. Coppock know that you will be out-of-pocket until your return from Europe on April 7th.

I have cc'ed him on this email in case you need to contact him directly.

Thank you,
Gene

 Robert Coppock - PAC VOC 03192010.pdf

**Windsor Securities, LLC**
25 East Athens Avenue
Ardmore, PA 19003
----------
610-642-3100; 610-642-9709 (f)
mfiwsi@comcast

April 23, 2010

Robert S. Coppock
402 Ascot Court
Knoxville, TN  37923

Dear Mr. Coppock:

     Please accept this letter as formal notification that pending our ownership of policy #VF51701030, we are releasing you from any future obligations of our financial agreement.

Sincerely,

Steven G. Prusky, Managing Member
Windsor Securities, LLC

SGP:esh

enc.

**EXHIBIT P**

Sent: Monday, July 19, 2010 2:03 PM
To: Gene Houchins
Subject: Re:

Gene,
I'll get back to you on the price. (Though I'd like his latest medical to
confirm there's no significant change).
In the meantime, we'd like to start the process of a COO.
Thanks
-sgp

At 04:02 PM 7/18/2010, you wrote:
>Steven,
>
>I hope all is well.
>
>I assume you are getting these types of Grace Notices (see attached) for
>all of your cases. But I wasn't sure with this particular case since the
>policy is still owned by the trust albeit you have a CA on it. So
>therefore, I have forwarded the Grace Notice to be on the safe
>side. Please be aware that the Collins policy is also in Grace.
>
>Mr. Bitter left us a message late Friday evening. He will undoubtedly ask
>the price to keep the policy (they always do). Since you've paid
>additional premiums recently, let me know what the payoff price is (or the
>amount you would be willing to take to satisfy the loan). I will then
>communicate that with Mr. Bitter, and if needed, help complete the COO so
>you can have clean title. This seems to be a little overdue.
>
>Regards,
>Gene
>
>

Windsor-Acker001041