# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WINDSOR SECURITIES, LLC : | |
| : | Civil Action No. 16-cv-01533 (GBD) |
| **Plaintiff** : | |
| v. : | |
| : | |
| ARENT FOX, LLP : | |
| and : | |
| JULIUS ROUSSEAU, III, ESQUIRE : | |
| : | |
| **Defendants** : | |

## REPLY BRIEF IN SUPPORT OF PLAINTIFF WINDSOR SECURITIES, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY ON COUNT I - PROFESSIONAL NEGLIGENCE/LEGAL MALPRACTICE

Alan L. Frank, Esquire
Samantha A. Millrood, Esquire
Alan L. Frank Law Associates, P.C.
135 Old York Road
Jenkintown, PA 19046

1601 Gravesend Neck Rd
Suite 903, 2nd Fl.
Brooklyn, NY 11229

Tel: (215) 935-1000
Fax: (215) 935-1110
afrank@alflaw.net
smillrood@alflaw.net
Attorneys for Plaintiff Windsor Securities, LLC

Dated: October 2, 2018

# TABLE OF CONTENTS

**page**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    There Are No Issues of Fact That Preclude Plaintiff's Motion . . . . . . . . . . . . . . . . . . . . 2

    Windsor Has Established that Defendants Acted Negligently As a Matter of Law . . . . . . 8

# TABLE OF AUTHORITIES

**CASES**                                                                        Page(s)

*Blakely v. Tri-Cnty. Fin. Grp., Inc.,*
    2010 U.S. Dist. LEXIS 31568, 2010 WL 1286856 (N.D. Ill. Mar, 29, 2010) . . . . . . 11, 12

*Braunstein v. Gateway Management Services (In re Coldwave Systems, LLC),*
    368 B.R. 91 (Bankr. D. Mass., 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Chrysler Credit Corp. v. Mitchell,*
    94 A.D.2d 971, 464 N.Y.S.2d 96 (N.Y. App. Div. 1983) . . . . . . . . . . . . . . . . . . . . . . . . 10

*CIT Group/Equip. Fin., Inc. v. Landreth,*
    2007 U.S. Dist. LEXIS 93372, 2007 WL 4554224 (E.D. TN. Dec. 19, 2007) . . . . . . . . 11

*Convergys Corporation v. Keener,*
    276 Ga. 808 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Edwards v. Arthur Andersen LLP,*
    44 Cal. 4th 937 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Harty v. Lenci,*
    743 N.Y.S.2d 97, 294 A.D.2d 296 (1st Dept. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

In re Schwalb,
    347 B.R. 726 (Bankr. D.NV. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re King,*
    305 B.R. 152 (Bankr. S.D. N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re Martin-Musumeci,*
    1992 U.S. Dist. LEXIS 12390, 1992 WL 479514 (N.D. CA. July 30, 1992) . . . . . . . . . 10

*In re Crosby,*
    176 B.R.189 (B.A.P. 9th Cir. 1994) aff'd, 85 F.3d 634 (9th Cir. 1996) . . . . . . . . . . . . . 10

*Motors Acceptance Corp. v. Rozier,*
    278 Ga. 52 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Ortho Diagnostic Systems, Inc. v. Abbott Labs, Inc.,*
    920 F. Supp. 455 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Phillips v. Bronx Lebanon Hosp.*,
    701, N.Y.S.2d 403, 268 A.D.2d 318  (1st Dept. 2000) ........................... 2

*Polin v. Wisehart & Koch*,
    2004 U.S. Dist. LEXIS 17501, 2004 WL 1944721 (S.D.N.Y. Sept. 2, 2004) ......... 13

*R.S. Silver Enters. Co. v. Pascarella*,
    2010 Conn. Super. LEXIS 1850,  2010 WL 3259869 (Stamford-Norwalk JD Superior
    Court July 14, 2010)  ..................................................... 12

*Schweizer v. Mulvehill*,
    93 F. Supp. 2d 376 (S.D.N.Y. 2000) ........................................ 14

*Shopsin v. Siben & Siben*,
    268 A.D.2d 578, 702 N.Y.S.2d 610 (2d Dep't 2000) ........................... 14

*Siagha v. David Katz & Associates, LLP*,
    847 N.Y.S.2d 905 (Sup. Ct. N.Y. 2007) .................................... 2

*Smith v. Cmty. Nat'l Bank*,
    344 S.W.3d 561 (11th Court of Appeals TX 2011) ............................ 11

*Spector v. Mermelstein*,
    361 F. Supp. 30, 40 (S.D.N.Y. 1972), aff'd, 485 F.2d 474 (2d Cir. 1973) ........... 14

*Sullivan v. Nat'l Football League*,
    34 F.3d 1091 (1st Cir. 1994) .............................................. 15

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
    69 F. Supp. 2d 571 (S.D.N.Y. 1999) ....................................... 15

*Walter D. Peek Inc. v. Agee*,
    235 A.D.2d 790, 652 N.Y.S.2d 359 (3d Dep't 1997) ........................... 13

## RULES, STATUTES,  AND OTHER AUTHORITIES

California Commercial Code §9620 ..................................... 1, 9, 10, 12

Verstein, Andrew, Bad Policy for Good Policies: Article 9's Insurance Exclusion,
    17 CONN. INS. L.J. 287 (2011) ............................................. 9

## PRELIMINARY STATEMENT

Defendants Memorandum in opposition to Plaintiff's Motion for Partial Summary Judgment is simply revisionist history, and contains numerous truly outright misstatements which are contradicted by the pleadings, the evidence of record, and the prevailing law. Additionally, Defendants interject completely irrelevant facts in an attempt to manufacture a genuine issue of dispute, where absolutely none exists. Despite Defendants' attempts to confuse this Court with inconsequential facts, misdirections, and arguments that are clear red herrings, the undisputed facts on which Plaintiff's Motion for Partial Summary Judgment is based, and on which it should be granted, are simple and dispositive.

It is undisputed that (1) the Defendants represented and advised Plaintiff with respect to the five (5) policies at issue in this litigation, and specifically provided legal advice to Plaintiff as to the steps to take to obtain ownership and entitlement to the death benefits thereunder, which proved to be in error; (2) Defendants' failed to know and understand that under California law (applicable to the premium finance transactions by virtue of the choice of law provisions in the premium financing agreements) life insurance policies *are included* within the scope of California's commercial code, Article 9; (3) Defendants failed to follow and failed to advise the Plaintiff to follow the statutory repossession rules (California Code §9620) and the contractual Default Sales Provision in the Premium Financing Packages, which are clear and unambiguous; and (4) Defendants failed to document any agreement or mutual release between Plaintiff and the Trusts, whereby the Trusts agreed to forego any rights to the death benefits under the policies in exchange for being released from all loan obligations.  The foregoing directly and proximately caused Plaintiff, the secured party, to lose its entitlement to actual ownership of the collateral (the

1

insurance policies and death benefits thereunder).  This was malpractice as a matter of law and

the Defendants have failed to put forth any specific, admissible, or probative evidence that is a

basis to deny the Plaintiff's Motion for Summary Judgment as to Liability.

### There Are No Issues of Fact That Preclude Plaintiff's Motion

Defendants argue in their Opposition, relying on the Declaration of Rousseau[1], that there

are issues of fact that preclude summary Judgment as to liability, particularly, the "Defendants

limited role in Windsor's attempts to take ownership of the Policies."  With respect to the Acker,

Collins, Coppock and Stamatov policies, Defendants unbelievably represent to this Court that

they were not "asked to communicate" with "the Insureds, the Trustees, or with Houchins", were

not asked to "contact the respective insurers regarding the Change of Ownership forms", and

"Rousseau's only role was to provide Windsor advice based on the information Windsor

provided from Houchins–i.e. that the Insureds desired to walk away from the Policies before the

Premiums were due to be repaid."  Defendants' Opposition Memo of Law, pg. 17.

First, the evidence of record in this case establishes the falsity of Defendants' statements.

Plaintiff asked, and Rousseau did in fact communicate directly with the Insureds, the Trustees,

and with Houchins, on Plaintiff's behalf, regarding the Acker, Collins, Coppock and Stamatov

---

[1]Rousseau's Declaration and statements with regard to his "provision of limited legal services
with respect to the 5 policies at issue" directly contradicts his deposition testimony (he appeared
individually and as Arent Fox's Corporate Designee), and emails of record in this action, and should be
disregarded. New York case law has long provided that a party opposing summary judgment cannot be
heard to create an "issue of fact" with an affidavit that contradicts the witness's prior deposition
testimony, particularly where the affiant makes no attempt to explain the contradiction. See, *Phillips v.
Bronx Lebanon Hosp.*, 268 A.D.2d 318, 320 (1st Dept. 2000); *Harty v. Lenci*, 294 A.D.2d 296, 298 (1st
Dept. 2002) ("A party's affidavit that contradicts her prior sworn testimony creates only a feigned issue
of fact, and is insufficient to defeat a properly supported motion for summary judgment."); *Siagha v.
David Katz & Associates, LLP*, 847 N.Y.S.2d 905 at 10 (Sup. Ct.N.Y.Co. 2007) (collecting cases and
applying them in a legal malpractice action).

Policies. See, Rousseau's July 7, 2009 Letters to each of the Insureds and their Trustees [Ex. 63

to D.E. #125]; Affidavit of Eugene Houchins, III, dated March 22, 2017 [Ex. 10 to D.E. #125, at

¶4 and 6] ("Starting approximately one year after the Insureds had purchased the policies and

received financing, I had direct communications with Windsor's attorney Julius Rousseau...As

each of the loans approached the end of their terms, i.e., as the financing agreements reached

their maturity date, Windsor and/or Rousseau, as Windsor's counsel, on the one hand, and I on

the other, had communicated by email concerning how Windsor, the Insureds, and the Trustees

wished to proceed"); Rousseau's 9-8-10 and 11-24-09 emails to Houchins regarding the premium

financed policies [AF 0003308; AF 0009474].

Second, contrary to Rousseau's Declaration and the Defendants' Opposition, it is

undisputed that in or around January 2010, before the Premium Financed Loans from Windsor to

each of the Trusts were due to be repaid, the Acker, Coppock, Collins and Stamatov Trusts, by

and through Houchins, informed Windsor of the fact that the Trusts were not willing to take over

premium payments on the Policies and would not repay the loans when due, and Windsor

informed Defendants of the same. See, Defendants' Counter Statement to Plaintiff's Statement

of Material Undisputed Facts, at ¶31 [D.E. #144]; Affidavit of Eugene Houchins, III, dated

March 22, 2017, at ¶8 [Ex. 10 to D.E. #125]; Declarations of Steven Prusky filed in the Acker

and Collins Actions, at ¶4 [Exs. 11 and 12 to D.E. #125]. It is further undisputed that Rousseau

specifically advised Windsor to treat Houchins' said communication as an exercise of the

Premium Finance Packages' Default Sales Right. Dep. Tr. Julius Rousseau, III, individually and

as Corporate Designee for Arent Fox, March 7, 2017, pg. 245:2-7 [Ex. 3 to D.E. #125] ("A. My

recollection was, each of those policies had been surrendered by the insureds voluntarily

3

exercising their -- and I'm saying insureds; trustees, trustees -- exercising their default sale right"); Declarations of Steven Prusky filed in the Collins and Acker Action, at ¶8, [Exs. 11 and 12 to D.E. #125].

Furthermore, whether or not Defendants communicated directly with the Insureds, the Trustees, or Houchins, and/or personally acquired the Change of Ownership Forms, and/or contacted the respective Insurers regarding the Change of Ownership Forms are total red herrings, as it is undisputed that: (1) Defendants advised Windsor to treat Houchins' communication regarding the Trustees for the Coppock, Collins, Acker and Stamatov Policies intention to not re-pay the loans at the maturity dates as an exercise of the Premium Finance Packages' Default Sales Right; (2) the Change of Ownership Forms were executed by each of the Acker, Collins, Coppock and Stamatov Insureds and Trustees; (3) the Change of Ownership Forms were accepted by each of their respective Insurers; (4) each of the respective insurers paid the death benefits under the Policies (except for the Coppock Policy as Coppock is still living); (5) Defendants were aware that the COOs executed by each of the Stamatov, Coppock, Acker, and Collins Trustees *__did not__* contain any language indicating or providing that the Trusts, Trustees, Insureds and/or Beneficiaries were making a full transfer and assignment of the respective Insurance Policies *in consideration of the full and complete satisfaction of the liabilities and obligations* under the Premium Finance Packages, *nor that they were forever relinquishing any and all rights they may have had thereunder* (including without limitation any rights to cash surrender value and/or death benefits under the Policies), *nor did they indicate or provide that Windsor and the Trusts, Trustees, Insureds and/or Beneficiaries were releasing the other*; (6) As confirmed by the record and not disputed by the Defendants,

4

Defendants did not suggest or advise that any other document(s) be executed or any other action be taken by Plaintiff to perfect its ownership in and/or entitlement to the death benefits under those Policies; (7) Defendants repeatedly advised and assured Plaintiff that its ownership of those Policies was absolute and that Windsor would be, by virtue of the executed COOs, and operation of law, absolutely entitled to the death benefits for each Policy, even after Defendants were aware of the arguments raised in the Bitter Arbitration; and (8) Defendants did nothing else whatsoever to memorialize any pre-default agreement between Plaintiff and the respective Trusts to transfer the policies in satisfaction of all obligations and liabilities under the Premium Finance Packages, despite having at their disposal multiple draft Loan Satisfaction Agreements and Releases in their Windsor file. See, Rousseau email to Alan Dubin dated April 14, 2014 ( "we need to advise the client on other cases where the borrowers surrendered the policies by signing COO forms, in each of the 4 key cases, *the ownership was actually processed by carrier...*") [Ex. 51 to D.E. #125]; Rousseau Dep Tr. pgs. 161-162:24, 182 [Ex. 3 to D.E. #125][2]; Executed COOs [Exs. 10, 13-16, 85-91 to D.E. #125]; Prusky Dep. Tr. pgs. 207-209 [Ex. 1 to D.E. #125]; [Exs. 53, 55, 57 to D.E. #125].

With respect to the Bitter Policy, Defendants *unbelievably* argue that "Windsor *barely* involved the Defendants in any efforts to obtain title to the Bitter Policy". Contrary to Defendants' assertion, it is undisputed that: (1) On September 8, 2010, Rousseau and Arent Fox,

---

[2]Rousseau testified in this action, individually and as Defendant's Corporate Designee:

**Q.    When you told him [Prusky] that the change of ownership form reflects a change by the carrier once accepted on its books, that he need not worry any further about who owned the policy, because at that point you believed, once the COO was accepted by the carrier, that actual ownership resided with Windsor. Isn't that correct?**

**A.    Well, yes, that's correct.**

as counsel to Windsor, sent a letter to Bitter and Bitter's Trustee asserting an event of default for non-payment of the loan and explaining that, pursuant to Section 6(a) of the Security Agreement (which the Bitter Arbitration Panel found was the incorrect provision to cite as it was not the Default Sales Right Provision[3]), Windsor was entitled to a transfer of the collateral and registration of the collateral in Windsor's name; (2) *Upon Rousseau's review, and in accordance with Rousseau's advice*, on January 14, 2011, Windsor sent a letter to Bitter and the Bitter Trustee reiterating the assertions in Rousseau's September 8, 2010 letter, which prompted the Bitter Trustee's execution of the COO; (3) Rousseau specifically advised Windsor that the September 8, 2010 and January 14, 2011 letters, the executed Bitter COO and surrender of the Bitter Policy effectuated complete ownership of, and entitlement to the death benefits under the Bitter Policy to Windsor; and (4) Rousseau did not suggest or advise that any other document(s) be executed or any other action be taken by Windsor to perfect its ownership in and/or entitlement to the death benefits under the Bitter Policy, and did not discuss Section 9620 of the UCC or California Commercial Code or making a proposal to accept the policy in full satisfaction of all liabilities and obligations.  See, Dep Tr. Steven Prusky March 6, 2017, pgs. 193:12-17, 195:6-12, 196:3-14, 197:2-10 [Ex. 1 to D.E. #125]; Dep Tr. Julius Rousseau, pgs. 74:19-22, 152:11-18, 160:17 to 161:22 [Ex. 3 to D.E. #125]; December 19, 2013 Email from Rousseau to Prusky [Ex. 49 to D.E. #125]("If Barnes [the Bitter Trustee] had not signed the COO

---

[3]The Arbitration Panel stated in its Interim Award *"The rights granted to Windsor under the terms of Section 6(a) are solely to protect its secured interests and do not purport to give Windsor unfettered ownership of the policy or a right to keep any death benefits in excess of its secured interests....Because Section 6(a) contemplated the execution of a COO under circumstances wherein Barnes was not giving up all rights in the policy, its execution is at best ambiguous.".* Ex. 73 to [D.E. #125]

you would have held a sale and purchased policy on credit bid. We didn't have to follow this course after he signed"); Rousseau's September 8, 2010 letter [Ex. 70 to D.E. #125]; Windsor's January 14, 2011 letter [Ex.72 to D.E. #125].

Defendants state that "after January 2011, *when Rousseau reviewed a draft of Windsor's January 14, 2011 letter*, Defendants performed no further legal work on the Bitter Policy until the subsequent litigation over the death benefit" and "Windsor never asked Defendants to communicate with Bitter or the Bitter Trustee after September 2010, never asked Defendants to communicate with Houchins, and never asked Defendants to contact Pacific Life regarding the February 2011 Change of Ownership Form" . This is yet another attempt to confuse this Court: Windsor would have no reason or need, after being assured by its counsel that it had unfettered ownership of a policy (and continued to dutifully pay premiums based on such assurances), to consult with its counsel when there was no dispute raised by Bitter, the Bitter Trustee or the Bitter Beneficiary. There was no further communication with either Bitter, the Bitter Trustee, or Houchins on the issue, nor further legal work to be done until Bitter died and the Bitter Trustee was *for the first time* contesting Plaintiff's entitlement to the Bitter Policy death benefits and was making a claim thereto. Defendants' blatant misrepresentations and misdirection on this point is astonishing.

The foregoing establishes that not one of the "facts" outlined in Defendants' Opposition Memo of Law raise an issue of genuine dispute which would preclude the entry of summary judgment in Plaintiff's favor as to liability on Plaintiff's Malpractice claim. Despite Defendants repeated attempts to confuse this Court, the facts upon which Plaintiff's claim for malpractice is based are extremely simple and clear, and beyond genuine dispute.

**Windsor Has Established that Defendants Acted Negligently As a Matter of Law**

Defendants next argue, that "even if there were no genuine issues of material fact" "Windsor still cannot establish that Defendants were negligent as a matter of law". Specifically, Defendants posit that "the underlying disputes involved various strategic choices by the Defendants as to issues of first impression regarding UCC § 9-620 and an ambiguous DSR Provision" and that "under New York Law, an attorney is not held to a rule of infallibility and is not liable for an honest mistake in judgment where the proper course is open to reasonable doubt". Def. Memo of Law, at pgs. 18, 20, 22. Contrary to Defendants' suggestions, strict foreclosure under either 9620 or the Premium Finance Package's Default Sales Right Provision are not issues of first impression, the law is not ambiguous, nor unclear with respect thereto, Defendant Rousseau was provided a memo with a precise "summary of the procedure for obtaining title to the insurance policies financed by Windsor", and multiple draft Policy Relinquishment and Loan Satisfaction Agreements and Mutual Releases for use with respect to Plaintiff's premium financed Policies, which Defendants had in their Windsor file and simply chose to ignore, and any strategic decisions by the Defendants were *not* honest mistakes in judgment that would relieve them of their liability for the clear malpractice that occurred here.

First, contrary to Defendants' argument, the contractual Default Sales Right provision in the Premium Finance Packages tracks the uniform version of §9620, which is in *no way* unclear or ambiguous. California Commercial Code Section 9620 (identical to UCC 9620) is absolutely clear and unambiguous, it provides:

8

**(1) A debtor consents to an acceptance of collateral in partial satisfaction of the obligation it secures only if The debtor agrees to the terms of the acceptance in a record authenticated after default; and (2) A debtor consents to an acceptance of collateral in full satisfaction of the obligation it secures only if the debtor agrees to the terms of the acceptance in a record authenticated after default or the secured party does all of the following: (A) Sends to the debtor after default a proposal that is unconditional or subject only to a condition that collateral not in the possession of the secured party be preserved or maintained. (B) In the proposal, proposes to accept collateral in full satisfaction of the obligation it secures. © Does not receive a notification of objection authenticated by the debtor within 20 days after the proposal is sent.**

In fact, in Rousseau's January 29, 2014 email he states, "My problem is that CA UCC may be best law we could hope for. It includes course of performance and industry practice, both of which support us, **and has good guidance in 9620 for the strict foreclosure that occurred.**" [Ex. 5 to D.E. #147]

Second, concerning the clarity, or alleged lack thereof, of Article 9, scholarly works explain that "Revised Article 9 of the Uniform Commercial Code is governing law for almost all security interest transactions in all states. **The product of extensive scholarly drafting and professional insights, the UCC is lauded for its clarity, coherence, and logic.**" Verstein, Andrew, *Bad Policy for Good Policies: Article 9's Insurance Exclusion*, 17 CONN. INS. L.J. 287, 289-290 (2011). As Plaintiff's UCC Expert Sandra Stern explained in her Rebuttal Expert Report "Section 9-620, which was based upon former 9-505, is a model of clarity", and"it is difficult to see what term or terms might be in any way ambiguous or might be contested in litigation" and "[t]he paucity of such litigation related to section 9-620 evidences the clear and unambiguous language of this section." [Ex. 34 to D.E. #125]

To the extent that California Code 9620 was in any way unclear, the Comments thereto specifically clarify that it will be strictly interpreted, that implicit consent is insufficient, and that

9

a debtor's voluntary surrender of collateral to a secured party and the secured party's acceptance

of possession of the collateral (which occurred by virtue of the execution of the COOS) does not

satisfy the statute.  See, Comments 3[4] and 5[5] to California Code §9620.

To the extent that California Code 9620 and the Comments thereto aren't absolutely

clear, which they are, there is ample case law in California and from across the County strictly

interpreting § 9620.  See, e.g., *In re Crosby*, 176 B.R.189 (B.A.P. 9th Cir. 1994) aff'd, 85 F.3d

634 (9th Cir. 1996)[6]; *In re Martin-Musumeci*, 1992 U.S. Dist. LEXIS 12390 (N.D. CA. July 30,

1992)[7]; *Chrysler Credit Corp. v. Mitchell*, 94 A.D.2d 971, 464 N.Y.S.2d 96, 97 (N.Y. App. Div.

---

[4]**Comment 3.  Conditions to Effective Acceptance. Subsection (a) contains the conditions necessary to the effectiveness of an acceptance of collateral. Subsection (a)(1) requires the debtor's consent. Under subsections (c)(1) and (c)(2), the debtor may consent by agreeing to the acceptance in writing after default. Subsection (c)(2) contains an alternative method by which to satisfy the debtor's–consent condition in subsection (a)(1). It follows the proposal –and–objection model found in former Section 9–505: The debtor consents if the secured party sends a proposal to the debtor and does not receive an objection within 20 days. Under subsection (c)(1), however, that silence is not deemed to be consent with respect to acceptances in partial satisfaction. Thus, a secured party who wishes to conduct a "partial strict foreclosure" must obtain the debtor's agreement in a record authenticated after default. In all other respects, the conditions necessary to an effective partial strict foreclosure are the same as those governing acceptance of collateral in full satisfaction.**

[5]**Comment 5.  Secured Party's Agreement; No "Constructive" Strict Foreclosure.. . .A debtor's voluntary surrender of collateral to a secured party and the secured party's acceptance of possession of the collateral does not, of itself, necessarily raise an implication that the secured party intends or is proposing to accept the collateral in satisfaction of the secured obligation under this section.**

[6]The Court held that secured creditors did not accept repossessed collateral in satisfaction of debt when they temporarily retained the collateral before sale but never carried out any of the steps required for strict foreclosure under California Commercial Code Section 9505(2) (predecessor to Section 9620). Stating "to qualify under California Commercial Code Section 9620, the secured party must generally send an express proposal to the debtor to accept the collateral".

[7]The Court stated "[u]nder § 9505(2) (predecessor to section 9620), the secured party has available to it the remedy of "strict foreclosure" in the event Debtor fails to make payments on the debt. "Strict foreclosure" allows the secured party to retain the collateral in full satisfaction of the debt. Section 9505(2) requires: (I) a default, (ii) the secured party to be in possession of the collateral, (iii) in cases not

1983)[8]; *Braunstein v. Gateway Management Services (In re Coldwave Systems, LLC)*, 368 B.R.

91, 95 (Bankr. D. Mass. 2007)[9]; *CIT Group/Equip. Fin., Inc. v. Landreth*, 2007 U.S. Dist. LEXIS

93372 (E.D. TN. Dec. 19, 2007)[10]; *Smith v. Cmty. Nat'l Bank*, 344 S.W.3d 561 (11th Court of

Appeals TX 2011)[11]; *Blakely v. Tri-Cnty. Fin. Grp., Inc.*,2010 U.S. Dist. LEXIS 31568,

WL1286856 (N.D. Ill. Mar, 29, 2010)[12]; *In re King*, 305 B.R. 152 (Bankr. S.D. N.Y. Feb. 3,

---

involving consumer goods, the secured party must send written notice to the debtor (in some cases other secured parties) that it proposes to retain the collateral in full satisfaction of the debt, and (iv) that the debtor or any other party entitled to notice be given twenty-one days after the proposal to object."

[8]The Court stated "an election to take the collateral in full satisfaction will not be implied; it must be made by written notice to the debtor."

[9]The court held that the attempted strict foreclosure of the debtor's patent under UCC § 9620 failed because silence was not consent in the case of a acceptance in partial satisfaction of a debt. The court also held that the recording with the USPTO did not obviate the need to perfect the security interest under the UCC.

[10]"the acceptance of collateral in full or partial satisfaction of the debt is governed by Article 9.... Subsection (a)[of 6A-9-620] sets forth four rigorous requirements, all of which must be met before a secured party may accept collateral in full or partial satisfaction of the debt..In the instant case, the secured party did not consent to the acceptance in an authenticated record or send a proposal to the debtor. Rather, an employee purportedly told the defendants over the telephone that a return of the collateral would constitute a satisfaction of the debt. "

[11]"Section 9.620 of the Texas UCC sets out the procedures by which a secured party can accept collateral in full or partial satisfaction of an obligation it secures...In addition, a secured party may accept collateral in full satisfaction of an obligation only if the debtor agrees to the terms of the acceptance in a record authenticated after default or the secured party sends to the debtor a proposal proposing to accept the collateral in full satisfaction of the obligation it secures and the secured party does not receive a notification of objection authenticated by the debtor within twenty days after the proposal is sent...Here, there was no indication in the stipulation or the agreed order that the parties intended the assignment of the collateral to constitute either full or partial satisfaction of the obligation secured by it. CNB did not consent to the assignment being an acceptance in full or partial satisfaction. "

[12]The Court held that the proposal or acceptance under California Commercial Code Section 9620 is "authenticated" within the meaning of the Section if it is "signed" and that the "Plaintiff had only his former counsel to blame for his failure to perform the statutory requirements..."

2004)[13]; *In re Schwalb*, 347 B.R. 726 (Bankr. D.NV. 2006)[14]; *Motors Acceptance Corp. v.*

*Rozier*, 278 Ga. 52 (2004)[15]; *R.S. Silver Enters. Co. v. Pascarella*, 2010 Conn. Super. LEXIS

1850 (Stamford-Norwalk JD Superior Court July 14, 2010)[16]. In fact, some of the foregoing case

law was described to Rousseau in a memo dated January 30, 2014 from his associate David

Bayles. [Ex. 6 to D.E. #147].

With all of the above-quoted authorities at their disposal, Defendants should have had no

problem whatsoever in figuring out what an arbitration panel or a federal court might be likely to

do in regard to the matters they were handling for Windsor. See, e.g. *Blakely v. Tri-Cnty. Fin.*

*Grp., Inc.*, 2010 WL 1286856 (N.D. Ill. Mar, 29, 2010)(interpreting California Code 9620)[17]

---

[13]In ruling on Debtor's UCC Article 9 argument, the Court held that because UVCC did not provide written notice of its intention to retain STK's assets in full satisfaction of the obligation, as required by New Hampshire's version of 9620 the Debtor's strict foreclosure argument must fail. Citing N.H. RSA 382-A:9-620 Official Comment No. 5 (which is identical to Comment 5 to California Code 9620).

[14]The Court held that a secured party's ability to "engage in a strict foreclosure is heavily circumscribed" and stated "Article 9 is explicit that a secured party must notify a debtor before any disposition, and is explicit on what that notice must contain."

[15]The Court stated "The UCC's statutory framework makes clear that repossession alone is not enough to extinguish the debtor's ownership in the collateral, but that a creditor must go through additional steps after repossession to obtain ownership...Also, O.C.G.A. §§ 11-9-620 to -622 allow a creditor to accept the collateral in full or partial satisfaction of the debt with the debtor's consent...This Court is to construe the statute to give sensible and intelligent effect to all of its provisions and to refrain from any interpretation which renders any part of the statute meaningless."

[16]The Court stated "Exhibit V would totally fail as "proposal" under 9-620(c)(2)(A). The August 26, 1999 note is not "unconditional." It says IF any payment is not made, etc. It identifies the debtor (R.S. Silver & Co., Inc.) simply as "Bob". It identifies the collateral simply as "the Riversedge project" and it fails to meet the requirement of 9-620(c)(2)(B) that the proposal must propose "to accept the collateral in full satisfaction of the obligation it secures". Exhibit V makes no mention whatsoever of cancelling or satisfying the $ 200,000 Note. And finally Exhibit V fails as a matter of law to be an adequate UCC Article 9 proposal to accept collateral because it is not a "proposal" in UCC terms at all."

[17]"In the absence of law by the California Supreme Court to meet the secured parties' contention, the Court looked to other jurisdictions to answer whether the subject communications qualified as a

What Defendants try to "make into an issue of first impression", is the application of 9620 where the collateral is a life insurance policy. This is a textbook example of a red herring. California's verison of Article 9 specifically *includes* within its scope transfers of interests in insurance policies[18]. California's version of Article 9, does not provide for one kind of collateral (with the exception of consumer goods) to be treated differently from another following default. Thus, any case construing section § 9620 to any type of collateral would be instructive and persuasive authority, and does not need to involve a life insurance policy, and interpretation of 9620 is unequivocally not an issue of first impression.

Despite the clarity of the applicable authorities, Defendants' claim that the law was "open to reasonable doubt" and therefore Defendants' strategic decisions cannot be deemed negligence as a matter of law. This is essentially an assertion of the "judgmental immunity" defense available in malpractice cases – but here it does not and cannot help the Defendants.

Under New York Law, although an attorney is not liable for committing "an honest mistake of judgment where the proper course is open to reasonable doubt," *Walter D. Peek Inc. v. Agee*, 235 A.D.2d 790, 652 N.Y.S.2d 359, 361 (3d Dep't 1997) (citation omitted), "it follows that when an attorney recommends an unreasonable course of conduct he may be liable." *Polin v. Wisehart & Koch*, 2004 U.S. Dist. LEXIS 17501 (S.D.N.Y. Sept. 2, 2004). For example, under New York law, an attorney may be liable due to his ignorance of the rules of practice *or his*

---

proposal."

[18]Significant to this controversy, in most jurisdictions (48 out of 50 states) Article 9 does not apply at all to the transfer of an interest in an insurance policy. However, California's law departs from the uniform version, and specifically provides that insurance policies are specifically brought within the scope of its Article 9.

13

*failure to conduct adequate legal research*. *Shopsin v. Siben & Siben*, 268 A.D.2d 578, 702

N.Y.S.2d 610, 612 [*16] (2d Dep't 2000). An attorney may also be found negligent for failing to

advise his client adequately, since an attorney has a duty to keep his client well informed and

furnish him with all the "information material to the client's decision to pursue a given course of

action, or to abstain therefrom." *Spector v. Mermelstein*, 361 F. Supp. 30, 40 (S.D.N.Y. 1972),

aff'd, 485 F.2d 474 (2d Cir. 1973); *Schweizer v. Mulvehill*, 93 F. Supp. 2d 376, 397 (S.D.N.Y.

2000) (negligent or willful withholding of information material to the client's decision to pursue a

course of action is a breach of duty of due care). Here, the Defendants failed to do just that.

There is nothing debatable or unsettled about any of the following: (1) California law

applied to enforcement of the loans in question[19]; (2) the insurance policies were within the scope

of California's UCC; (3) Section 9620 thereof applied after default[20]; (4) there was a monetary

default in Bitter and an explicit exercise of the Default Sales Right in Acker, Collins, Coppock

and Stamatov, per Rousseau's advice; (5) a simple proposal, which could be signed by the

Trustee or to which it would have been bound by failure to respond - one that could easily be

found in a form book, and in fact was contained in Arent Fox's Windsor file, would have

satisfied the statute[21]; and (6) if Defendants believed that the law as to strict foreclosure was

---

[19]Defendants had only to consult such cases as *Convergys Corporation v. Keener*, 276 Ga. 808, 810 (2003), to learn that the parties' choice of law, California – which violated no public policy of the state in which the Trusts were located – would be enforced.

[20]Defendants should have researched and read the decision in *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 954 (2008), which holds that the specific language of the code would be deemed incorporated, verbatim, into the provisions of the Financing Agreements.

[21]Defendants had only to read the authorities quoted above, and outlined in their own research memorandums, to Windsor needed to enter into an "authenticated" agreement with each of the Trusts under which Windsor would relieve each Trust of any further liability on its loan in return for Windsor's being granted ownership of the Policy that was unfettered by any obligation to provide to the Trusts any

14

unclear or the proper course to obtain ownership of the policies at issue were open to reasonable debate, it had an obligation under the law to advise Plaintiff of the uncertainties in the situation so Windsor could decide how it wished to proceed.  Defendants did none of those things.  Worse, they dismissed Plaintiff's concerns regarding the Acker, Collins, Coppock and Stamatov Policies following the Bitter Arbitration Panel's ruling, and failed either to take, or recommend, appropriate corrective action in regard to those policies even after the Bitter arbitration panel – led by a retired federal judge – had made it crystal clear what was required.

Further, Defendants' suggestion that Summary Judgment cannot be entered because of their unsupported experts' opinions is also belied by prevailing law.  See, *Virgin Atl. Airways Ltd. v. British Airways PLC*, 69 F. Supp. 2d 571, 579 (S.D.N.Y. 1999)[22]; *Ortho Diagnostic Systems, Inc. v. Abbott Labs*, Inc., 920 F. Supp. 455, 471 (S.D.N.Y. 1996)[23] *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1105 (1st Cir. 1994)[24].

For the reasons outlined herein, in Plaintiff's Motion, and in Plaintiffs' Statement of Undisputed facts and Defendants' opposition, Plaintiff is entitled to Summary Judgment as to liability on its claim for malpractice.

---

amounts remaining from the proceeds of a public or private sale of the Policy, or any amounts remaining from the death benefit after Windsor had been paid what it was owed on the loan.

[22]("Expert testimony that is speculative is not competent proof and contributes 'nothing to a 'legally sufficient evidentiary basis...expert testimony without . . . a factual foundation cannot defeat a motion for summary judgment.");

[23]("In order to defeat a properly supported motion for summary judgment, a party may not rest on ...conclusory or incomplete expert analyses any more than it may rest on unsubstantiated allegations of its pleadings.")

[24](summary judgment must be granted if the opposition thereto "rest[s] solely on an expert's 'bottom line' conclusion, without some underlying facts and reasons, or a logical inference process to support the expert's opinion.")

Respectfully submitted,

Alan L. Frank, Esquire afrank@alflaw.net
Samantha A. Millrood, Esquire  smillrood@alflaw.net
Alan L. Frank Law Associates, P.C.
Attorneys for Plaintiff Windsor Securities, LLC

Dated: October 2, 2018

16