**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

WINDSOR SECURITIES, LLC,

Plaintiff,

-against-

ARENT FOX LLP and
JULIUS ROUSSEAU, III,

Defendants.

Case No. 16-cv-01533 (GBD) (GWG)

**ORAL ARGUMENT REQUESTED**

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Peter N. Wang
Douglas S. Heffer
Adam G. Pence
Foley & Lardner LLP
90 Park Avenue
New York, New York 10016-1314
Tel: (212) 682-7474
Fax: (212) 682-2329

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........ 1

ARGUMENT ........ 1

1. Summary Judgment Is Appropriate ........ 1

2. Windsor's "Multiple Proximate Cause" Argument is Inapplicable and Does Not Preclude Summary Judgment ........ 5

3. The Factual Record Does Not Support Windsor's Arguments ........ 7

4. Windsor's Arguments Regarding Successor Counsel's Subsequent Representation in Acker and Collins are Meritless ........ 9

5. Windsor's Arguments Regarding Successor Counsel's Subsequent Representation in Coppock and Stamatov Are Weightless ........ 12

6. Windsor Provides No Valid Basis Why Its Other Claims Are Not Duplicative ........ 13

7. There is No Basis to Deny Defendants' Summary Judgment Motion, either Against Windsor's Claim for Disgorgement of Legal Fees or For Defendants' Counterclaims ........ 14

CONCLUSION ........ 15

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Albin v. Pearson*,
289 A.D.2d 272 (2d Dep't 2001) ........ 2

*AmBase Corp. v. Davis Polk & Wardwell*,
8 N.Y.3d 428 (2007) ........ 8

*Arbor Realty Funding, LLC v. Herrick, Feinstein LLP*,
2012 N.Y. Misc. LEXIS 6491 (Sup. Ct. N.Y. Cnty. Aug. 29, 2012) ........ 6

*Boye v. Rubin & Bailin, LLP*,
152 A.D.3d 1 (1st Dep't 2017) ........ 4

*C & F Pollution Control, Inc. v. Fidelity & Cas. Co. of New York*,
222 A.D.2d 828 (3d Dep't 1995) ........ 2

*Diamond v. Sokol*,
468 F. Supp. 2d 626 (S.D.N.Y. 2006) ........ 9, 13

*Feinberg v. Boros*,
Index No. 108498/2003, 2007 N.Y. Misc. LEXIS 9311 (Sup. Ct. N.Y. Cnty. Sept. 19, 2007) ........ 9, 13

*Katz v. Herzfeld & Rubin, P.C.*,
48 A.D.3d 640 (2d Dep't 2008) ........ 2, 5

*Kozmol v. Law Firm of Allen L. Rothenberg*,
241 A.D.2d 484 (2d Dep't 1997) ........ 2

*Minkow v. Sanders*,
82 A.D.3d 597 (1st Dep't 2011) ........ 4

*O'Connor v. State*,
126 A.D.2d 120 (3d Dep't 1987) ........ 6

*Perks v. Lauto & Garabedian*,
306 A.D.2d 261 (2d Dep't 2003) ........ 2, 6

*Red Zone LLC v. Cadwalader, Wickersham & Taft LLP*,
994 N.Y.S.2d 764 (Sup. Ct. N.Y. Cnty. 2013) ........ 9, 13

*Rudolf v. Shayne, Dachs, Stanisci, Corker & Sauer*,
8 N.Y.3d 438 (2007) ........ 14

*Schutz v. Kagan Lubic Lepper Finkelstein & Gold, LLP*,
No. 12-CV-9459, 2013 U.S. Dist. LEXIS 93762 (S.D.N.Y. July 2, 2013) ..............................6

*Skinner v. Stone, Raskin & Israel*,
724 F.2d 264 (2d Cir. 1983) ..............................6

*Somma v. Dansker & Aspromonte Assocs.*,
44 A.D.3d 376 (1st Dep't 2007) ..............................2

*Sommer v. Fed. Signal Corp.*,
79 N.Y.2d 540 (1992) ..............................6

**Statutes**

UCC § 9-620 .............................. *passim*

Arent Fox LLP ("Arent Fox") and Julius Rousseau, III ("Rousseau," and, collectively, with Arent Fox, "Defendants") submit this Reply Memorandum of Law in further support of their Motion for Partial Summary Judgment (the "Motion").[1]

## PRELIMINARY STATEMENT

Windsor's opposition actually confirms, rather than refutes, the fact that Successor Counsel had the opportunity to protect Windsor, and that, therefore, Defendants are not responsible for the outcomes of the litigations involving the Acker, Collins, Coppock, and Stamatov Policies, all of which transpired long after Defendants had been terminated. As Defendants established through undisputed material facts, it was Successor Counsel, after Arent Fox, who represented Windsor for years in four extensive litigations involving these Policies. Successor Counsel's substantial activities and strategic choices, all coming long after Arent Fox had been terminated, break the causal chain as a matter of law and, therefore, defeat Windsor's malpractice claim with regard to these four Policies.

Windsor also fails to provide this Court any basis to deny the portions of Defendants' Motion seeking an order 1) holding that Windsor is not entitled to the return of legal fees paid to Rousseau's prior law firm, Herrick Feinstein, LLP ("Herrick") or the return of legal fees for work independent of Plaintiff's negligence claims; and 2) directing Windsor to pay Defendants' long outstanding legal fees for work that is also independent of the alleged negligence.

## ARGUMENT

### 1. Summary Judgment Is Appropriate

First and foremost, there are no genuine issues as to the facts material to the causation issue. While Windsor's Counterstatement goes to great lengths to manufacture disputed issues

[1] Defendants incorporate by reference all defined terms in their original motion papers (ECF Nos. 127-131), including their memorandum of law (hereinafter "DMOL").

of fact (ECF No. 140, hereinafter "WCSOF"), even a cursory review of those "disputes" shows that they are non-existent or immaterial.[2] With no issues of fact, this Court can decide, at the summary judgment stage, the question of proximate cause as a matter of law, and New York courts have done so in many cases, such as this one, where it is clear that subsequent counsel had sufficient opportunity to protect the client's interests.[3]

Acker and Collins

It is undisputed that Defendants were terminated on September 9, 2014, and Windsor litigated the Acker and Collins disputes for the next 18 months, represented entirely by Successor Counsel, until finally settling these cases in March and April 2016. SOF ¶¶ 92-96, 98-100, 140-143. During this time period, attorneys Darin Judd and Lauren Antonino, who had no experience in premium finance or life settlement, made litigation decisions that severed any possible chain of causation between Defendants' alleged malpractice and Windsor's purported damages. *Id.*; *see Somma v. Dansker & Aspromonte Assocs.*, 44 A.D.3d 376, 377 (1st Dep't 2007) (dismissing malpractice claim involving unfavorable settlement because replacement counsel had "sufficient time and opportunity to adequately protect plaintiff's rights" prior to settlement); *Katz v. Herzfeld & Rubin, P.C.*, 48 A.D.3d 640, 641 (2d Dep't 2008) (same).

So, for example, Successor Counsel had numerous opportunities in litigating these

---

[2] Windsor's Counterstatement is filled with responses in which Windsor asserts a material fact is disputed, but Windsor's subsequent explanation and citations to the record confirm there is no actual material dispute. *Comp* SOF ¶ 3 ("Based on what he had been told, Prusky was under the impression that Windsor could charge an above-market 15% interest rate on the loans") *with* WCSOF ¶ 3 ("Disputed. Steven Prusky testified that he was told, prior to making any of the premium finance loans at issue in this case, that he could earn '15% interest, or somewhere thereabouts' on the loans."); *see also* WCSOF ¶¶ 2, 4, 8, 13, 17, 22, 25, 57, 80-81, 85, 99, 103, 111, 115-119, 121, 123-125, 128, 131, 133-134, 144-145, 147-149, 154-162.

[3] *See, e.g.*, *Kozmol v. Law Firm of Allen L. Rothenberg*, 241 A.D.2d 484, 485-86 (2d Dep't 1997) (after dismissal for improper service, replacement counsel had 120 days to recommence dismissed action); *Albin v. Pearson*, 289 A.D.2d 272, 272-73 (2d Dep't 2001) (subsequent counsel had three years to rectify title search issue in mortgage foreclosure action); *Perks v. Lauto & Garabedian*, 306 A.D.2d 261, 262 (2d Dep't 2003) (successor counsel had two months to rectify supposed failure to investigate assets and insurance coverage of defendant driver in underlying action before unfavorable settlement); *C & F Pollution Control, Inc. v. Fidelity & Cas. Co. of New York*, 222 A.D.2d 828, 830 (3d Dep't 1995) (malpractice action against former counsel for failing to commence action within statute of limitations properly dismissed because subsequent counsel could have timely commenced lawsuit).

policies to escape the DSR and UCC § 9-620 issues arising from the Bitter Arbitration Panel by advancing the argument that neither the DSR nor § 9-620 applied because the Policies were transferred to Windsor prior to the Trusts defaulting on the loans. In fact, Successor Counsel actually raised that argument earlier during a mediation in Georgia (and Arent Fox earlier raised the issue several times with Windsor), but then abandoned it in court. SOF ¶¶ 103-111; Declaration of Peter Wang, dated October 2, 2018 ("Wang Reply Decl.") Ex. 1 (JUDD 127464).

Instead, in Windsor's pleadings in Acker and Collins, Successor Counsel ignored the pre-default argument and relied solely on the argument that the Trusts had committed an anticipatory breach under the loan documents. SOF ¶¶ 103-111. Compounding the problem, Successor Counsel moved for summary judgment in both cases prior to the close of discovery, forsaking the opportunity to depose Houchins, the lone witness who could attest to the pre-default agreement, and foregoing the opportunity to collect any of the evidence necessary to establish the pre-default walkaway. SOF ¶¶ 112-117. When Windsor moved for summary judgment, Successor Counsel, again, focused on only one legal theory – that the Trusts had committed an anticipatory breach – missing entirely the obvious opportunity to raise the pre-default distinction and escape the DSR and UCC § 9-620 problems. *Id.* ¶¶ 112-123. Additionally, Successor Counsel had the clear opportunity to proffer additional releases provided by Windsor to the Acker and Collins Trustees that documented the fact that Windsor took ownership of the Policies in full satisfaction of the Trusts' financial obligations to Windsor, but did not do so. *Id.* ¶ 123.[4]

The crowning proof is the fact that the Acker and Collins Court confirmed the opportunity Successor Counsel had (and missed), when it ruled that Successor Counsel failed to preserve factual and legal arguments (SOF ¶¶ 135-138) that would have circumvented any

[4] Windsor's own UCC expert testified that a contemporaneous release would have been "highly significant" to § 9-620 issues. Transcript of the Deposition of Sandra Stern ("Stern Tr.") 178:7-180:8, 162:17-23, attached as Exhibit 35 to the Declaration of Peter Wang, dated August 13, 2018 (ECF No. 130 and, hereinafter, the "Wang Decl.").

potential DSR and UCC § 9-620 issues because the statute and contractual provision only apply after default. *See Minkow v. Sanders*, 82 A.D.3d 597, 598 (1st Dep't 2011) (affirming dismissal of legal malpractice case because defendants' "alleged failures … could have been remedied by successor counsel"); *Boye v. Rubin & Bailin, LLP*, 152 A.D.3d 1, 10 (1st Dep't 2017) ("It is clear that the proximate cause of any damages sustained by plaintiff was not the alleged malpractice of defendants, but rather the intervening and superseding failure of plaintiff's successor attorney … .") (citing *Pyne v. Block & Assocs.*, 302 A.D.2d 213, 213 (1st Dep't 2003)). As the Court declared in those cases, the failure to preserve those arguments was "dispositive" and "fatal." SOF ¶¶ 135-138.

Coppock and Stamatov

Windsor also does not rebut the material undisputed facts that demonstrate Successor Counsel had ample opportunity to take steps after the Bitter Arbitration to protect Windsor's interest in the Coppock and Stamatov Policies. Unlike Acker and Collins, Coppock and Stamatov were alive after the Arbitration and, according to Windsor's own experts, if Windsor had any concerns at that time about whether it had unfettered ownership of the Policies, Windsor could have conducted a public sale of the Policies and submitted a credit bid at the sale. DMOL 18-21. Windsor's response – that Defendants also could have held public sales of the Policies – entirely misses the point about Successor Counsel interrupting the chain of causation: once Windsor terminated Defendants, Successor Counsel unquestionably had the opportunity to protect Windsor, and that alone, without more, defeats any claim against Arent Fox based on these Policies. Windsor and Successor Counsel had the opportunity to conduct such public sales, but chose instead to commence actions against the Coppock and Stamatov Trusts, and then litigate these cases for over a year, racking up exorbitant legal fees, before settling with Stamatov

in March 2016 and with Coppock in July 2016, for the nominal sums of $12,000 each. SOF ¶¶ 146-148. As if to prove that Successor Counsel had the opportunity to protect Windsor through a public sale, Windsor was finally able to settle as soon as Successor Counsel threatened to hold the sale. And to further confirm that fact, counsel for the Trusts, Joseph Wood, based the settlement amount on what he thought the cost of each public sale would be. SOF ¶¶ 149; Transcript of the Deposition of Darin Judd ("Judd Tr.") 135:10-136:22, 176:13-178:14, attached as Exhibit 18 to the Wang Decl. A clearer case of replacement counsel having the opportunity to protect a client and therefore severing the chain of causation is difficult to imagine.

Simply put, Successor Counsel had years after Arent Fox was terminated to protect Windsor in the way Windsor now claims Defendants should have done in the weeks following the Bitter Arbitration. Even though Defendants will demonstrate at trial that they were in no way negligent in their handling of the Coppock and Stamatov Policies, Successor Counsel had ample opportunity to hold a public sale (or even to threaten a sale) after the Bitter Litigation, and that fact acts as an intervening and superseding cause of any alleged harm.[5] *Katz*, 48 A.D.3d at 641 (dismissing malpractice action because five-month period before alleged unfavorable settlement was more than sufficient for successor counsel to protect client's rights by pursuing remedies that former counsel allegedly did not pursue).

**2. Windsor's "Multiple Proximate Cause" Argument is Inapplicable and Does Not Preclude Summary Judgment**

Windsor cannot deny the opportunities Successor Counsel had to protect Windsor, and recognizes, as it must, that Successor Counsel's failure to assert the pre-default argument was determined to be "dispositive" in the underlying litigations. Windsor Opposition Brief (ECF No. 138 and, hereinafter, "Op. Br.") at 14-15. Instead, Windsor argues that Defendants are not

[5] As Defendants have explained, Successor Counsel and Windsor also could have, from the beginning, negotiated the same nominal settlements with Coppock and Stamatov, as Arent Fox had recommended. SOF ¶ 81.

entitled to summary judgment because the underlying adverse outcomes allegedly could have had "multiple" proximate causes. This argument misses the point. Irrespective of whether there ever can be "multiple" proximate causes of harm in some cases, the operative principle of New York law here is that "the introduction of new counsel serves as an intervening cause in a legal malpractice claim, severing the chain of causation between the negligent actions of an attorney and a plaintiff's injuries, so long as new counsel has 'sufficient opportunity to protect the plaintiffs' rights.'" *Schutz v. Kagan Lubic Lepper Finkelstein & Gold, LLP*, No. 12-CV-9459, 2013 U.S. Dist. LEXIS 93762, at *21 (S.D.N.Y. July 2, 2013) (emphasis added) (citing *Perks*, 306 A.D.2d at 262). As a matter of law, Windsor simply cannot prevail on those portions of its legal malpractice case that involve the Acker, Collins, Coppock, and Stamatov Policies.

None of the malpractice cases Windsor cites supporting its "multiple proximate cause" argument involve multiple attorneys, let alone subsequent representation. For example, in *Arbor Realty Funding, LLC v. Herrick, Feinstein LLP*, the other purported proximate causes of the client's harm were a crane collapse and the financial crisis. 2012 N.Y. Misc. LEXIS 6491, at *10-11 (Sup. Ct. N.Y. Cnty. Aug. 29, 2012). In *Skinner v. Stone, Raskin & Israel*, the other potential proximate cause was a state trial judge's decision to enter an allegedly defective default judgment and refusal to vacate it. 724 F.2d 264, 266 (2d Cir. 1983) (the Court, nevertheless, noted that the trial court's alleged mistake was still potentially a superseding rather than contributing cause). Windsor also cites inapposite non-malpractice cases that do not go to causation but to issues of recovery (i.e., joint and several liability). *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 556 (1992) (apportioning liability for fire damage to building); *O'Connor v. State*, 126 A.D.2d 120, 125 (3d Dep't 1987) (apportioning liability for bike accident).

Whether or not there can be more than one proximate cause of an injury, there is a clear

break in the necessary causal link for a legal malpractice claim, as a matter of law, when subsequent counsel has the opportunity to protect the client's interests after initial counsel's representation ends. *See supra* 2-5. Here, the injection of Successor Counsel in these circumstances severed the chain of causation because that replacement counsel chose whether to advise settlement or litigation, and made all the key decisions on whether to hold public sales or litigate, and madc decisions on how to litigate (for example, moving early for summary judgment, and conceding rather than challenging the "pre-default" issue). Successor Counsel's opportunities were numerous, which as a matter of law establishes that Defendants were not the "but for" cause of the alleged harm.

### 3. **<u>The Factual Record Does Not Support Windsor's Arguments</u>**

Aware that the undisputed record demonstrates Successor Counsel's opportunity to protect its rights and Successor Counsel's impact on the underlying litigations, Windsor rehashes (almost verbatim) its long-winded narrative from its own summary judgment motion, misdirecting with minutia about events that are irrelevant because they occurred long before the litigations involving the four Policies. But more than irrelevant, there is no evidentiary support for many of the central planks in Windsor's factual narrative. For example, just as it did in its own summary judgment motion, Windsor continues to argue that if Rousseau had only used a more substantial release, Windsor would have, from the very beginning, "unambiguously obtained unfettered entitlement to the death benefits under each of the Policies." (Op. Br. 13). There is no factual support for this speculation. Crucially, Windsor presents no evidence that the Trustees would even have signed such a document, other than a self-serving affidavit from the dishonest Houchins (who has no personal knowledge that would allow him to make such an assertion), and Houchins only signed the affidavit in exchange for Windsor agreeing not to sue him for fraud. Declaration of Samantha Millrood, dated August 9, 2018 (ECF No. 125 and,

hereinafter, the "Millrood Decl.") Ex. 10; *see also AmBase Corp. v. Davis Polk & Wardwell*, 8 N.Y.3d 428, 436 (2007) (plaintiff cannot establish "but for" causation by relying on the speculative assertion of what a third party, with sole discretion to act, would have done if defendant attorney had performed differently).[6]

Similarly, there is no record of Rousseau, while at Herrick, advising Windsor that it was accepting transfer of each of the four Policies pursuant to a default of the Trust's obligation to repay the loan (Op. Br. 4-5), just as there is no record evidence that Successor Counsel advanced this theory in the Acker and Collins Litigations because it was what "Defendants had consistently posited." (*Id.* at 9). There is no record of Rousseau giving any such advice in 2009 or 2010 or asserting to any third party that these four loans were in default because of an anticipatory breach. On the contrary, Rousseau specifically told Windsor in 2014 that the "surrender [of the Policies] prior to default is an important difference [from Bitter]." Wang Reply Decl. Ex. 1 (JUDD 127464).[7]

Further, Windsor's one-page makeweight list of Defendants' purported errors includes many which purportedly occurred <u>before</u> Rousseau even joined Arent Fox. (Op. Br. 12). The factually flawed list is, in any event, beside the point: the critical focus here is on the opportunity that Successor Counsel had after Defendants were terminated in September 2014. As Defendants have established, Successor Counsel's opportunities to protect Windsor make

---

[6] David Fox, the author of one of the draft releases that Windsor references, also testified at his deposition that there is no single correct way under the UCC to transfer ownership of collateral or to demand transfer of collateral. Transcript of the Deposition of David Fox, 89:22-91:2, 116:20-119:4, attached as Exhibit 2 to the Wang. Decl.

[7] Instead of citing advice from 2009 or 2010, Windsor cites Rousseau's 2017 deposition testimony, where he references the Trusts "exercising their default sale right" as a short hand for the Acker and Collins Trusts voluntarily walking away from the Policies prior to the loans being due. (Op. Br. 15) (citing the transcript of the Deposition of Julius Rousseau, III, 245:2-7, attached as Exhibit 6 to the Declaration of Samantha Millrood, dated September 17, 2018 (ECF No. 139 and, hereinafter, the "Millrood Opp. Decl.")).

irrelevant whatever Herrick, Arent Fox, or Rousseau supposedly did before Successor Counsel stepped in and began representing Windsor in the disputes over the four Policies.

#### 4. Windsor's Arguments Regarding Successor Counsel's Subsequent Representation in Acker and Collins are Meritless

The Acker and Collins decisions are proof of a break in the causal link because they demonstrate Successor Counsel's opportunity to litigate the cases differently, to make arguments they failed to make, to conduct discovery they failed to take, and to move for summary judgment after, not before, taking that discovery.

In its opposition papers, Windsor cites inapposite cases where, unlike here, the purported intervening action was irrelevant to the underlying outcome, or the intervening action purportedly not taken by replacement counsel was likely impossible. For example, in *Red Zone LLC v. Cadwalader, Wickersham & Taft LLP*, the defendant allegedly failed to memorialize an oral agreement between the client and a third party. 994 N.Y.S.2d 764, 772-73 (Sup. Ct. N.Y. Cnty. 2013). Trial counsel's purported failure to introduce additional oral testimony at the litigation over the agreement was deemed irrelevant because the underlying court in making its decision relied only on the contracts and not on any parol evidence. *Id.* at 773. In the underlying cases at issue here, however, parol evidence would have been essential to determine the terms by which the Trustees tendered the Policies. Subsequent counsel in *Red Zone* did not depose "some potential witnesses," (*id.* at 775), but here, Successor Counsel failed to depose <u>the central witness</u>: Houchins. Also, the *Red Zone* defendant repeatedly consulted with subsequent counsel in the underlying litigation. *Id.* at 771.[8] There was no such consultation in this case.

---

[8] Windsor's other cases are equally inapplicable. *Diamond v. Sokol*, 468 F. Supp. 2d 626, 642-43 (S.D.N.Y. 2006) (factual record entirely unclear whether court would have accepted from subsequent counsel an amended bill of particulars – including previously omitted lost earnings and future medical expenses); *Feinberg v. Boros*, Index No. 108498/2003, 2007 N.Y. Misc. LEXIS 9311, at *18-20 (Sup. Ct. N.Y. Cnty. Sept. 19, 2007) (defendants' arguments that subsequent counsel should have advised plaintiff to obtain agreement limiting effect of adverse arbitration ruling contradicted by record evidence that obtaining such agreement was unlikely).

Waiving the Pre-Default Argument

As Defendants demonstrated, one of the key errors of Successor Counsel – and an important factor in breaking the causal chain – was their failure to preserve, let alone assert, the argument that Windsor took ownership of the Acker and Collins Policies prior to a default on the loans. DMOL16-18. Successor Counsel certainly had more than sufficient opportunity to pursue this important pre-default distinction and present it to the underlying Court in the Acker and Collins Litigations, but it did not do so, a factor which the Court ultimately determined was "dispositive" and "fatal." SOF ¶¶ 105-07, 121, 137-38. Defendants' "transactional advice," given years before, was unrelated to Windsor's ability to present this argument. Further, the fact that Wood and Houchins reversed their positions on this issue from the Bitter Arbitration (where they conceded that the Acker and Collins Trusts were not in default on the loans) should have been a red flag to Successor Counsel that the better argument for Windsor was to point out that the DSR and UCC § 9-620 did not apply in the first place (and to grill these witnesses on their shifting and uncorroborated story before moving for summary judgment).[9]

Windsor concedes that while the failure to preserve the pre-default arguments may have been "dispositive" in the underlying Acker and Collins cases, Successor Counsel is not responsible for what happened in these litigations because the evidence proffered to establish a pre-default walkaway was "flimsy," and therefore the argument might not have been successful. (Op. Br. 14-15). Defendants, however, do not have to prove conclusively that Windsor would have won; it is enough for Defendants to demonstrate that Successor Counsel had the opportunity to protect Windsor's rights, and, therefore, Defendants' actions were not the "but

[9] Windsor notes that Successor Counsel included some references to the potential pre-default status of the loans in Windsor's Answer to the Crossclaims filed by the Trusts and in a short footnote in Windsor's own summary judgment papers. (Op. Br. 13-14). Yet, the underlying Court determined "as a matter of law" that Windsor had waived this pre-default argument by failing to take the proper steps to preserve it. SOF ¶¶ 135-38.

for" cause of Windsor's Acker and Collins "losses."[10] In any event, Windsor's argument is completely contradicted by the record. The undisputed facts establish that Windsor alone is responsible for any lack of evidence related to its walkaway agreements with the Trusts. DMOL 4-6, 9-11. Windsor enlisted Houchins, not Rousseau (or anyone else at Herrick, and certainly no one at Arent Fox), to contact the Insureds and Trustees and to finalize these agreements. SOF ¶¶ 36-43. Given the fact that Windsor had failed to document these transactions, Successor Counsel should have focused its discovery efforts on building the best record possible, not ignoring the pre-default issue and closing discovery before any relevant evidence could be collected.

Failing to Proffer Releases

Windsor cannot minimize the significance of Successor Counsel's belated proffer of the Acker and Collins releases by arguing that this strategy decision was irrelevant because these letters were not countersigned by the Trustees and because there were issues of fact regarding whether the Trusts received them. (Op. Br. 17-18). First, nothing in the DSR or § 9-620 requires the parties to use a single document to fulfill the requirements. *See, e.g.*, Expert Report of Edwin Smith (ECF No. 148-1) at 6-10; Rebuttal Expert Report of Edwin Smith (ECF No. 148-2) at 2-5. If the Trusts proffered the signed Change of Ownership Forms, and Windsor accepted these Forms and provided a signed release pursuant to that acceptance, the DSR and § 9-620 would both clearly be satisfied. Windsor's own expert, Sandra Stern, acknowledged as much at her deposition. Wang Decl. Ex. 35, Stern Tr. 178:7-180:8, 162:17-23; *see also* Wang Decl. Ex. 34 at 17-19. In any event, because the Trusts were not in default at the time, there

---

[10] Windsor argues that Successor Counsel's failures are irrelevant because there are no written agreements and no oral communications between Windsor and the Trusts and, under the law, Houchins was unable to act as an agent of the Trusts. (Op. Br. 16). This argument is without merit: there are numerous documents evidencing the pre-default walkaway agreement, all of which Windsor highlighted in the underlying litigations. Declaration of Peter Wang, dated September 17, 2018 (ECF No. 146 and, hereinafter, the "Wang Opp. Decl.") Ex. 9 ¶¶ 6-18, 21-29, 35; Wang Opp. Decl. Ex. 11 ¶¶ 6-19, 22-29, 35; *see also* Wang Decl. Ex. 46, 56. As such, Houchins, as the intermediary, did not have to bind the Trusts for there to be an agreement between the Trusts and Windsor.

would be no need to comply with the DSR or § 9-620. The Change of Ownership Forms and releases would provide clear evidence of the walkaway agreement.[11] Successor Counsel unquestionably had the opportunity to timely submit the releases; the outcome of the Acker and Collins cases surely could have been different had they done so. This is more than enough to break the "but for" causal link to Rousseau's alleged conduct.

**5. Windsor's Arguments Regarding Successor Counsel's Subsequent Representation in Coppock and Stamatov Are Weightless**

Windsor did not put forward any evidence to dispute the material facts demonstrating that Successor Counsel had numerous opportunities to effect a public sale of the Coppock and Stamatov Policies and that, when Counsel finally threatened to hold a sale (after years of expensive litigation), Coppock and Stamatov immediately folded and settled for the cost of holding the sales. SOF ¶¶ 146-48,150-53. Instead, Windsor is left to try to argue that it could not have held a sale because Houchins said he would purchase the Policies, relying on Judd's unsubstantiated *post hoc* speculation. (Op. Br. 19). There is nothing in the record to support this speculation; Judd, at his deposition, could not recall any communications with Houchins on this point. Transcript of the Deposition of Darin Judd ("Judd Tr.") 177:17-179:22, attached as Exhibit 3 to the Wang Reply Decl. Judd also admitted that when Windsor did threaten to move forward with the sale, the cases immediately settled for nuisance value, and Judd could not articulate <u>any</u> theory as to what had changed with regard to Houchins' purported earlier representation. *Id.* 175:21-177:24; Wang Decl. Ex. 18, Judd Tr. 135:10-136:7.

There is simply no support for Windsor's argument that there are disputed facts relevant

[11] Steven Prusky and Windsor's employee, Eric Harkins, submitted sworn statements that these releases were sent to the Trustees. Whether the Trustees received these releases has little bearing on the evidentiary value of the documents in terms of establishing a pre-default walkway. Further, the Trustees never "specifically" denied receiving the releases. Instead, the Trustees, <u>before Windsor proffered the releases to the Court</u>, submitted general statements that Windsor never communicated the terms of an agreement to them before the June 2014 letters, and the Trustees provided no specific denial of receipt after Windsor proffered the releases. Millrood Decl. Exs. 13-14.

to whether Successor Counsel had the opportunity to protect Windsor by litigating differently and by holding a public sale of the Coppock and Stamatov Policies. (Op. Br. 19-20). Successor Counsel began representing Windsor in November 2014, when Coppock and Stamatov rejected the June 2014 letters, and did not settle Stamatov until March 2016 and Coppock until July 2016. SOF ¶¶ 150-53. Whatever opportunity to protect Windsor's rights that Defendants might have had between April 2014 and their termination in September 2014 is dwarfed by Successor Counsel's opportunity to protect Windsor's rights over the subsequent 18 to 24 months.

Again, Windsor's cited cases – *Red Zone*, *Feinberg*, and *Diamond* – are not relevant; those cases involved clear factual disputes regarding the relevance of the purported intervening action or whether the action not taken was even possible. *See supra* 9. Here, there is absolutely no question that Successor Counsel, at any point, could have held a public sale of the Coppock and Stamatov Policies (or at least threatened a public sale). And, the fact that the eventual threat of public sales achieved low settlements demonstrates conclusively the significance of pursuing these sales earlier, before engaging in expensive litigation for over a year. As a matter of law, Defendants cannot be held liable for the expenses incurred by Windsor during that period.

### 6. Windsor Provides No Valid Basis Why Its Other Claims Are Not Duplicative

In cursory fashion, Windsor claims that its Breach of Contract and Breach of Fiduciary Duty Claims are not duplicative, even though Windsor acknowledges these other claims are based on the same alleged facts. (Op. Br. 25-27). Windsor cites to no evidence that Defendants ever assured Windsor of a specific result (which is required to maintain a separate breach of contract claim); to the contrary, the record establishes that Rousseau repeatedly warned Windsor about the risks a premium finance lender faces during litigation. SOF ¶¶ 25, 26, 71. Windsor also points to no theory, let alone evidence, of any conflict of interest between Defendants and Windsor, other than its new baseless theory – launched for the first time in its opposition papers,

and found nowhere in the Complaint – that Defendants encouraged Windsor to pursue litigation to generate legal fees. (Op. Br. 27).

7. **There is No Basis to Deny Defendants' Summary Judgment Motion, either Against Windsor's Claim for Disgorgement of Legal Fees or For Defendants' Counterclaims**

Windsor's Improper Request for Disgorgement of Fees

Windsor posits no valid reason why it is entitled to a refund of fees incurred independent of the advice Windsor argues was malpractice. In particular, Arent Fox cannot be responsible for the return of legal fees paid to Herrick. There is simply nothing in the record that would allow Windsor to establish that these earlier fees would not have been incurred "but for" later acts alleged to constitute malpractice. *Rudolf v. Shayne, Dachs, Stanisci, Corker & Sauer,* 8 N.Y.3d 438, 443 (2007) (damages in malpractice action are not to provide windfall but to make "the injured client whole," including only those litigation expenses expended to "correct" defendant's error) (citations omitted). Windsor, in any event, can only look to Herrick for fees paid to Herrick, and it has done precisely that, commencing a separate proceeding against Herrick for return of the same fees based on the same alleged conduct. Wang Decl. Ex. 59.

Similarly, as a matter of law, Windsor is not entitled to the return of legal fees paid in the Bitter Litigation. The record is replete with undisputed evidence that litigation was inevitable, even if the Bitter Trustee had signed a complete release in the first place. Pacific Life never recorded the Change of Ownership Form from Houchins, so the Bitter Trust was still the owner of record, meaning Windsor could not have collected the death benefit without litigation. SOF ¶¶ 49-50. And when the Bitter Trustee sued, it claimed fraud unrelated to Arent Fox's conduct – regardless of the release he signed – demonstrating that litigation would have been brought (and fees incurred) whether or not Arent Fox had done anything different. SOF ¶¶ 55-56.

Defendants' Counterclaims

Windsor does not dispute the substantial evidence in the form of invoices that prove Arent Fox's counterclaims for unpaid fees and disbursements. Nor can it, because Windsor breached its obligations to pay costs and legal fees under the Retainer Agreement, under both contract and account stated theories. *See, e.g.*, DMOL 24-25; SOF ¶¶ 154-162; Declaration of Julius Rousseau, III, dated August 13, 2018 (ECF No. 131) Exs. 5-10. Two of the matters covered by the invoices, the Hathaway and Lincoln matters, are entirely independent of the facts alleged in the Complaint regarding Defendants purported malpractice. *See generally* Wang Decl. Ex. 1, Compl.; SOF ¶ 161. As for the Bitter Litigation (billed as "Bitter" and "Barnes Litigation"), Windsor would have incurred these legal fees regardless of whether the Bitter Trustee had signed a different release. DMOL 22-25.

It is thus irrelevant for Windsor to argue that a client may avoid fees when the client asserts a "plausible" malpractice claim. (Op. Br. 28-30). Whether Windsor is seeking disgorgement of fees paid or relief from its unpaid legal fees, it cannot avoid the portion of the fees at issue that are independent of any allegations of negligence (such as the initial premium finance work and the Hathaway and Lincoln matters). Similarly, the majority, if not all of the remaining fees at issue, are related to work that was inevitable regardless of any purported underlying malpractice. For example, the Bitter Arbitration (based *ab initio* on fraud, not on the UCC) would have happened regardless of any alleged negligence related to the transfer of the Bitter Policy, and Windsor has failed to articulate a specific "plausible" malpractice claim for Defendants' representation during that proceeding.

**CONCLUSION**

For the foregoing reasons, and for the reasons set out in Defendants' initial motion papers, the Court should grant Defendants' partial summary judgment motion.

Dated: New York, New York
October 2, 2018

Respectfully submitted,

FOLEY & LARDNER LLP

By: ______________________

Peter N. Wang (PW 9216)
Douglas S. Heffer (DH 6082)
Adam G. Pence (AP 8621)
90 Park Avenue
New York, New York 10016
Tel: (212) 682-7474
Fax: (212) 687-2329
pwang@foley.com
dheffer@foley.com
apence@foley.com

Attorneys for Defendants
Arent Fox, LLP and Julius Rousseau, III