ALAN L. FRANK ●*+◊
KYLE M. KULZER*+
SAMANTHA A. MILLROOD*+
EVAN L. FRANK *+ℬ△
CHRISTOPHER R. KING*+‡
SUSAN B. PLINER*+
ROBERT E. GORDON *+△
DAVID M. D'ORLANDO *+
JORDAN E. FRANK *+
JACLYN H. FRANK *+ℬ
JEFFREY J. GOLDIN *+

PARALEGALS
DEBRA E. MCGUCKIN
DEE A. WILK
DAWN M. WELSH
LISBETH LOZADA

● Certified by the NJ Supreme Court
   as a Civil Trial Attorney
* MEMBER PA BAR
+ MEMBER NJ BAR
◊ MEMBER NY BAR
ℬ MEMBER FL BAR
‡ MEMBER DE BAR
¶ MEMBER CA BAR
△ REGISTERED PATENT ATTORNEY

# ALAN L. FRANK
# LAW ASSOCIATES, P.C.
## Attorneys at Law

135 OLD YORK ROAD
JENKINTOWN, PA 19046
(215) 935-1000
FAX NO. (215) 935-1110

NEW JERSEY OFFICE

1103 LAUREL OAK ROAD
SUITE 140
VOORHEES, NJ 08043

CENTER CITY PHILADELPHIA OFFICE

1515 MARKET STREET
SUITE 1200
PHILADELPHIA, PA 19102

DELAWARE OFFICE

ALAN L. FRANK LAW ASSOCIATES, P.A. (DE)
1007 N. ORANGE STREET
4TH FLOOR, THE MILL
WILMINGTON, DE 19801
(302) 300-4317

NEWTOWN OFFICE

41 UNIVERSITY DRIVE
SUITE 400
NEWTOWN, PA 18940

OF COUNSEL
JAMES W. PEARSON, JR.*+¶

E-MAIL ADDRESS:
afrank@alflaw.net

December 4, 2018

***VIA ECF***
The Honorable George B. Daniels
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

> ***RE:*** ***Windsor Securites, LLC v. Arent Fox, et al., Case No. 16-cv-1533(GBD)(GWG)***
> ***Plaintiff's Response to Defendants' December 3, 2018 Letter [D.E. 162]***

Dear Judge Daniels:

We represent the Plaintiff Windsor Securities, LLC ("Windsor") in the above referenced matter, and write in response to Defendants Arent Fox LLP and Julius Rousseau's December 3, 2018 "Clarification of Oral Argument" letter wherein Defendants' counsel "offers" and then proceeds to attempt to "point out evidence in the summary judgment record that bears on the question of whether the loans for the Acker, Collins, Coppock and Stamatov policies were in default" [D.E. 162] (hereinafter referred to as "Defendants' Argument Clarification Letter") .

First, Defendants did not seek permission to submit their Argument Clarification Letter, which clearly is a supplemental letter brief in support of Defendants' Motion for Partial Summary Judgment and in opposition to Plaintiff's Motion for Partial Summary Judgment as to Liability on Plaintiffs' Count I for Professional Negligence/Legal Malpractice, and is therefore violative of the Federal Rules of Civil Procedure and the Local Rules of this Court and should be stricken. However, to the extent this Court considers the Defendants' Argument Clarification Letter we ask that the Court also consider the following.

The Honorable George B. Daniels
December 4, 2018
-Page 2-

Defendants' Argument Clarification Letter is a desperate attempt to contrive a disputed issue of fact where none exists, and only serves to further establish the undisputed facts on which Plaintiff's Motion for Partial Summary Judgment is based, and on which it should be granted.

As explained during the argument and as further confirmed in Defendants' Argument Clarification Letter it is undisputed that:

(1) in or around January 2010, before the Premium Financed Loans from Windsor to each of the Acker, Coppock, Collins and Stamatov Trusts were due to be repaid (the "maturity date of the loans") the broker that procured these policies, Eugene Houchins III ("Houchins"), informed Windsor of the fact that the Trusts were not willing to take over premium payments on the Policies and did not intend to and would not repay the loans when due, and Windsor informed Defendants of the same. *See*, Defendants' Counter Statement to Plaintiff's Statement of Material Undisputed Facts, at ¶31 (admitting the same) [D.E. #144]; Affidavit of Eugene Houchins, III, dated March 22, 2017, at ¶8 [Ex. 10 to D.E. #125]; Declarations of Steven Prusky filed in the Acker and Collins Actions, at ¶4 [Exs. 11 and 12 to D.E. #125];

(2) Rousseau specifically advised Windsor to treat Houchins' said communication as an exercise of the Premium Finance Packages' Default Sales Right[1]. Dep. Tr. Julius Rousseau, III, individually and as Corporate Designee for Arent Fox, March 7, 2017, pg. 245:2-7, 162:9-19 [Ex. 3 to D.E. #125] ("A. My recollection was, each of those policies [Acker, Coppock, Collins and Stamatov] had been surrendered by the insureds voluntarily exercising their -- and I'm saying insureds; trustees, trustees -- exercising their default sale right"; "Acker, Collins, Coppock: As I said, my recollection is that Houchins sent Steven signed forms and said these guys are giving up their policy. That's the default sell right provision under the loan agreement. That's what they were doing. You can call it a walk-away. Call it what you will, and those were done. As far as I

---

[1] *The Assignment of Life Insurance Policy as Collateral, at page 4 provides the following Default Sale Right:*

**DEFAULT SALE RIGHT. Upon an occurrence of an Event of Default (as defined in the Agreement) that has not been remedied within the time period required in the Agreement, Assignee shall have the right (the "Default Sale Right") but not the obligation to accept, that in consideration of the full and complete satisfaction of the Liabilities (the sufficiency of which consideration is hereby acknowledged) Owner may make a full transfer and assignment of the Insurance Policy to Assignee and thereby forever relinquish any and all rights Owner may have thereunder, including without limitation any rights to cash surrender value and/or death benefit provided thereunder. Upon the exercise of this Default Sale Right, Assignee shall notify Insurer in writing and Insurer shall thereafter recognize Assignee as the sole lawful owner of the Insurance Policy.**

[attached as Exhibits 23-27 (CONFIDENTIAL), Doc. #16 of 19, at pg. 4, to D.E. #125].

know, Steven got ownership process into the name of Windsor on those policies")[2]; Declarations of Steven Prusky filed in the Collins and Acker Action, at ¶8, [Exs. 11 and 12 to D.E. #125].

      (3)    Windsor, per Rousseau's specific advice to treat the communication as the Trustee's exercise of the loan Documents' Default Sales Right provision, demanded that each of the Trustees sign **_only_** the respective Insurance companies' change of ownership forms ("COO"), and each of the Acker, Collins, Coopock, and Stamatov Trustee executed the COO forms, which were accepted by each respective insurance company. See, Declaration of Steven Prusky filed in support of Motion for Summary Judgment in the Acker Action, at ¶8 [attached as Exhibit 11 to D.E. #125]; Declaration of Steven Prusky filed in support of Motion for Summary Judgment in the Collins Action, at ¶8 [attached to as Exhibit 12 (without Exhibits thereto as all Exhibits to the Declarations are separately referenced and identified herein) to D.E. #125]; Executed Stamatov COO [attached as Exhibits 85 and 86 to D.E. #125]; Executed Acker COO [attached as Exhibit 108 (CONFIDENTIAL) to D.E. #125]; Executed Coppock COO [attached as Exhibit 87 (CONFIDENTIAL) to D.E. #125]; Executed Collins COO [attached as Exhibit 91 (CONFIDENTIAL) to D.E. #125].

      (4)    The Change of Ownership forms executed by each the Acker, Collins, Coppock and Stamatov Trustees **_did not_** contain any language indicating or providing that the Trusts, Trustees, Insureds and/or Beneficiaries were making a full transfer and assignment of the Insurance Policy **_in consideration of the full and complete satisfaction of all liabilities and obligations_** under the Premium Finance Package, thereby forever relinquishing any and all rights they may have thereunder, including without limitation any rights to cash surrender value and/or death benefits under the Policies, nor did they indicate or provide that Windsor and/or the Trusts, Trustees, Insureds and/or Beneficiaries were releasing the other from all liabilities and obligations under the Premium Finance Package. See executed COOs for Acker Collins, Coppock and Stamatov [attached as Exhibits 85, 86, 87, 91, 107, 108 (CONFIDENTIAL) to D.E. #125]

      (5)    Rousseau and Arent Fox **_specifically assured_** Windsor that no other documentation, beside the respective Insurance Company's COO forms executed by each of the Trustees, was necessary from the Stamatov, Acker, Coppock and Collins Trusts, Insureds, and/or Beneficiaries for Windsor's unfettered ownership of the Policies and Windsor's absolute entitlement to the death benefits thereunder, and did not advise Windsor about application of the California Commercial Code and/or the default sales provisions contained therein, and did not counsel Windsor to obtain writings such as the Policy Relinquishment and Loan Satisfaction Agreements and Mutual Releases that had been previously drafted. Dep Tr. Julius Rousseau, individually and as Corporate Designee for Arent Fox, March 7, 2017, pgs. 160:17 to 161:22, 182:9-16, 245: 2-19 ("Q. When you told him [Prusky] that the change of ownership form

---

    [2]The Defendants make the argument in their Clarification Letter that Mr. Rousseau's deposition testimony "does not establish that there was a default, nor does it create an issue of fact". As the Court stated *Velez v. 111 Atlas Rest. Corp.*, 2016 U.S. Dist. LEXIS 107230 (E.D. N.Y. Aug. 11, 2016) " defendants do not ...provide any authority for their argument that a party's own admissions in sworn deposition testimony cannot form the basis for a finding by the court in the context of summary judgment."

reflects a change by the carrier once accepted on its books, that he need not worry any further about who owned the policy, because at that point you believed, once the COO was accepted by the carrier, that actual ownership resided with Windsor. Isn't that correct?   A.   Well, yes, that's correct.") [attached as Exhibit 3 to D.E. #125].

Based on the foregoing, irrespective of the fact that the Acker, Collins, Coppock and Stamatov Trustees indicated through Houchins that they wanted to walk away from the policies and executed the COOs before the maturity date on each of their loans (characterized by Defendants Argument Clarification Letter as a "pre-default" walkaway), the Defendants committed malpractice as a matter of law for five very specific reasons: (1) Defendants knew and understood that Windsor never spoke to the Trustees, that the indication that the Trustees wanted to "walk away" from the policies came from Houchins, who did not have the authority and could not bind the Trustees to an oral agreement; (2) Even assuming *arguendo*, despite the foregoing, that there was an oral agreement (which certainly there was not), Defendants failed to memorialize and/or document and/or advise Windsor to memorialize and/or document that the Trusts, Trustees, Insureds and/or Beneficiaries were making a full transfer and assignment of the Insurance Policy *in consideration of the full and complete satisfaction of all liabilities and obligations* under the Premium Finance Package, thereby forever relinquishing any and all rights they may have thereunder, including without limitation any rights to cash surrender value and/or death benefits under the Policies, ***despite the fact that Defendants had in their file multiple draft Policy Relinquishment and Loan Satisfaction Agreements and Mutual Releases that were provided to Rousseau for use with respect to these premium financed Policies***. See, draft Policy Relinquishment and Loan Satisfaction Agreements and Mutual Releases [attached as Exhibits 38-42, and 45 to [D.E. #125]; (3) Defendants advised Plaintiff to treat Houchin's communication as the Trustees' exercise of the Default Sales Right under the Loan Agreements, which *only* applied in the "Event of a Default", thereby making application of California Code 9620 absolute; (4) Defendants did not advise Windsor that as a result of treating the communication as an Exercise of the Default Sales Right that California's statutory repossession rules (California Code §9620) applied and did not follow the proscriptions thereof to obtain the collateral in satisfaction of the debt, despite having in their file a very specific memorandum outlining the "summary of the procedure for obtaining title to the insurance policies financed by Windsor" and a proposal which was made for the Garcia policy which complied with California Code 9620. See, July 16, 2009 Email from David Fox to Rousseau and Prusky [attached as Exhibit 44 (CONFIDENTIAL) to D.E. #125] and Garcia March 16, 2010 9620 Proposal to accept the Policy in full satisfaction, counter-signed on March 31, 2010 [attached as Exhibit 20 to D.E. #125]; and (5) despite being made aware of the failures to comply with California Code 9620 and the Financing Package's Default Sales Rights, and the consequences thereof, during the Bitter Arbitration, the Defendants declined the opportunity to attempt to rectify their errors and took no corrective action, and worse they dismissed Plaintiff's written concerns regarding said compliance in the Acker, Collins, Coppock and Stamatov Policies.

It is undisputed that the Defendants represented and advised Plaintiff with respect to the five (5) policies at issue in this litigation, and specifically provided legal advice to Plaintiff as to the steps to take to obtain ownership and entitlement to the death benefits thereunder, which proved to be in error. The foregoing directly and proximately caused Plaintiff, the secured party, to lose its entitlement to actual ownership of the collateral (the insurance policies and death benefits thereunder). This was malpractice as a matter of law and the Defendants have failed to

put forth any specific, admissible, or probative evidence that is a basis to deny the Plaintiff's Motion for Summary Judgment as to Liability.

Finally, with respect to Defendants' Motion for Summary Judgment on their Counterclaim for unpaid fees of $480,095.25, the majority of the fees sought relate to "Bitter" and the "Barnes Litigation", both of which are at issue in Plaintiff's malpractice action and therefore summary judgment as to these fees is not appropriate. See, e.g. *Kirk v. Heppt*, 2009 U.S. Dist. LEXIS 80989 (S.D.N.Y. Sept. 1, 2009)("summary judgment should not be granted to an attorney on an account stated claim where the client asserts a plausible claim for malpractice").

However, as to the counterclaim for unpaid fees unrelated to any of the five (5) policies at issue in this litigation, there are issues fact which preclude Defendants request for Summary Judgement. More specifically, at paragraph 137 of Defendants Statement of Uncontested Material Facts Pursuant to Federal Rule of Civil Procedure and Local Rule 56.1 (A) [D.E. #INSERT] Defendants outline a total of unpaid fees of $6300 in the "Hathaway Rescission" matter and a total of unpaid fees of $3741.11 in the "Windsor v. Lincoln" matter.

Steven Prusky, Windsor's principal testified regarding the Defendants' negligence with respect to the Hathaway matter as follows:

A.   Are you asking me what's contained in the Complaint or just generally the problems with Hathaway?

Q.   Well, the Complaint speaks for itself. I don't need you to do that. I don't mean this to be a memory question, Mr. Prusky. I want to know, in your view, what Mr. Rousseau or his law firms did that was negligence committed - - constituted malpractice in connection with the Hathaway representation.

A.   Mr. Rousseau strongly encouraged me to pursue the case, even though, to my surprise, because it seemed to me that, although I didn't like it, Phoenix did have proper grounds to rescind when they did, so that would have been the costs involved in pursuing the case that proved pointless. Secondly, when Phoenix returned a premium check to me, Mr. Rousseau suggest that I sent it to him and not cash it. To my knowledge, it was never cashed. It was stale, And I forget it that was 18 or $20,000.00.

Deposition Transcript of Steven Prusky, dated March 6, 2017, pgs. 26:2-27:4 [attached as Exhibit 1 to D.E. #125]

Steven Prusky, further testified regarding the Defendants' negligence with respect to the Windsor v. Lincoln matter as follows:

A.   Mr, Rousseau handled a case for me against Lincoln, whereby a $1 Million Dollar policy was to my effect, reduced to half a million in this sense. By the time Mr. Rousseau finished settling the case with Lincoln, the agreement was that the death benefit would be lowered from a Million Dollars to 750,000, and I paid Mr.

Rousseau about 250,000.  So I was effectively out $500,000, if and when that policy matures, and assuming I collect on it.

Deposition Transcript of Steven Prusky, dated March 6, 2017, pgs. 104:23-105:10 [attached as Exhibit 1 to D.E. #125]

    A.    The [Lincoln] litigation that I recall...had to do with the fact that I did not receive a lapse notice, and Lincoln lapsed the policy.  Jule stepped in and filed suit, I believe against Lincoln, and -- I think I may have touched on this in my last -- in my -- the first part of this deposition in March -- and, again, to compress a lot of time and events, we reached a settlement with Lincoln Insurance.  And the result of that whole process was that the death benefit was reduced from a million dollars to $750,000. Mr. Rousseau was paid approximately $250,000 in legal fees.  And the policy was reinstated.

Deposition Transcript of Steven Prusky, dated October 4, 2017, pgs. 364:23-365:14 [attached as Exhibit 2 to D.E. #125]

Steven Prusky generally testified about Defendants' representation in both matters as follows:

    Q.    Why haven't you paid Mr. Rousseau and his firms the amounts outstanding in their bills?

    A.    I believe Mr. Rousseau ended up costing me million dollars through more advice and poor services, and that the money that I paid him was an overpayment.  The money that he owes me for the damage I occurred is more than that amount.

Deposition Transcript of Steven Prusky, dated March 6, 2017, pgs. 35:15-36:2 [attached as Exhibit 1 to D.E. #125]

It is Plaintiff's position that this testimony raises a genuine issue of material fact as to whether summary judgment is appropriate on Defendants' counterclaim related to the unpaid "Hathaway Rescission" matter fees and the unpaid "Windsor v. Lincoln" matter fees.

Thank you for the Court's time and attention to this matter and Your Honor's consideration of this response.

Respectfully,

ALAN L. FRANK

ALF:dm
cc:    All counsel of record via ECF