**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

WINDSOR SECURITIES, LLC,                    :
                                            :
                          Plaintiff,        :          MEMORANDUM DECISION
          -against-                         :              AND ORDER
                                            :
ARENT FOX LLP and JULIUS ROUSSEAU III, ESQ., :       16 Civ. 1533 (GBD)
                                            :
                          Defendants.       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GEORGE B. DANIELS, United States District Judge:

Plaintiff Windsor Securities LLC ("Windsor") brings this action against Defendant Arent Fox LLP ("Arent Fox"), and one of its partners, Defendant Julius Rousseau III, Esq., asserting claims for legal malpractice, breach of contract, and breach of fiduciary duty arising from Defendants' advice to Windsor regarding premium finance loans to five insurance policies (the "Policies"). Defendants assert a counterclaim for unpaid legal fees. Windsor moves for summary judgment as to liability on its malpractice claim. (ECF No. 122.) Defendants cross-move for summary judgment on Windsor's breach of contract and breach of fiduciary duty claims, for partial summary judgment on Windsor's malpractice claim, and for summary judgment on Defendants' counterclaim for legal fees. (ECF No. 127.)

Windsor's motion is DENIED. Defendants' motion is GRANTED with respect to Windsor's breach of contract and breach of fiduciary duty claims and those portions of Windsor's malpractice claim and Defendants' counterclaim seeking fees unrelated to this action. Defendants' motion is DENIED in all other respects.

## I.   FACTUAL BACKGROUND

### A.   The Premium Financing of the Insurance Policies at Issue

In 2007 and 2008, Windsor made premium finance loans to ten insurance policies, five of which are at issue in this action. (Pl.'s 56.1 Stmt., ECF No. 124, ¶ 10.) The Policies were obtained by Joseph Acker, John Bitter, Erwin Collins, Robert Coppock, and Jane Stamatov with the assistance of Eugene Houchins, III. (*Id.* ¶ 4.) Houchins also assisted the insureds in creating trusts to hold the Policies (the "Trusts") and appointing Trustees to manage the Trusts. (*Id.* ¶ 5.)

Each Trust entered into a premium financing arrangement with Windsor, the terms of which were set forth in a package of several documents (the "Premium Financing Package"). (*Id.* ¶ 11.) The Premium Financing Packages included, among other things, a Security Agreement and an Assignment of Life Insurance Policy as Collateral (the "Assignment"). (*Id.* ¶ 13.) Under the terms of the Premium Financing Packages, Windsor agreed to loan each Trust the loan initiation fee and two years of insurance premiums at 15% annual interest. (*Id.* ¶ 14.) The Policies served as the collateral for the loans. (*Id.* ¶ 18.)

The Assignment in each Financing Agreement Package contains a provision entitled "Default Sale Right" (the "DSR Provision"), which states:

> Upon an occurrence of an Event of Default (as defined in the Agreement) that has not been remedied within the time period required in the Agreement, Assignee shall have the right (the "Default Sale Right") but not the obligation to accept, that in consideration of the full and complete satisfaction of the Liabilities (the sufficiency of which consideration is hereby acknowledged) Owner may make a full transfer and assignment of the Insurance Policy to Assignee and thereby forever relinquish any and all rights Owner may have thereunder, including without limitation any rights to cash surrender value and/or death benefit provided thereunder. Upon the exercise of this Default Sale Right, Assignee shall notify Insurer in writing and Insurer shall thereafter recognize Assignee as the sole lawful owner of the Insurance Policy.

(Pl.'s 56.1 Stmt. ¶ 21 (citations omitted).)

**B. Windsor's Engagement of Rousseau**

In 2008, Windsor was introduced to Rousseau, who was then with the law firm Herrick Feinstein, LLP ("Herrick"). (*Id.* ¶¶ 23–24.) On June 5, 2009, Windsor's principal, Steven Prusky, engaged Herrick to "provide general advice and representation to [Prusky] and Windsor in connection with a variety of corporate and lending transactions . . . including premium finance [sic] of life insurance policies and various lending and investment opportunities." (*Id.* ¶ 26.)

In 2010, Rousseau's colleague mailed a letter (the "Garcia Letter") to an insured, trust, and trustee on Windsor's behalf concerning a policy not at issue in this action. (Decl. of Samantha A. Millrood dated Aug. 23, 2018 ("Millrood Decl."), Ex. 20, ECF No. 125-23.) The letter states, in part, that "[Windsor] has declared you in default under the . . . Financing Agreement as a result of your failure to execute and deliver certain assignments of insurance policies" and that Windsor is "permitted under th[e] [loan] [a]greements and § 9620 *et seq.* of the UCC to retain the collateral in full satisfaction of the debt." (*Id.* at 1–2.) The letter further states that Windsor "hereby proposes under § 9621 of the UCC to retain the collateral in full satisfaction of the debt you owe" and requests that "you sign and return the original of this letter, which by its terms . . . transfers to [Windsor] all of your right, title, and interest in the collateral." (*Id.* at 2.)

Rousseau's colleague also provided him with draft Policy Relinquishment and Loan Satisfaction Agreements (the "Loan Satisfaction Agreements") for suggested use with the Policies. (Pl.'s 56.1 Stmt. ¶ 30; *see also* Millrood Decl., Exs. 38–41 & 45, ECF Nos. 125-41–44 & 125-48.) The draft agreements state, in part, that the borrower and beneficiary agree to "transfer, convey, and assign" the "Relinquished Assets" and collateral (i.e., insurance policy) to the lender, and that the lender "accepts the Relinquished Assets in full and complete satisfaction of the Borrower's

Obligations."[1]  (*See, e.g.*, Millrood Decl., Ex. 45, at AF0032287, §§ 2(a)–(b).)  The drafts also attached Mutual Releases as exhibits.  (*Id.* at AF003291–94.)

### C. Change of Ownership Forms for the Acker, Coppock, Collins, and Stamatov Policies

In January 2010, Houchins informed Windsor that the Acker, Coppock, Collins, and Stamatov Trusts did not intend to repay the loans when due.  (Pl.'s 56.1 Stmt. ¶ 31.)  After receiving this communication from Houchins, Windsor consulted with Rousseau.  (*Id.* ¶ 35.)

The parties dispute the nature of the advice that Rousseau provided.  Windsor claims that Rousseau "specific[ally] advi[sed]" Windsor to "treat[] Houchins' communication regarding the Trustees['] intention not to repay the loans . . . as an exercise of the . . . [DSR Provision]."  (Pl's 56.1 Stmt. ¶ 32.)  However, the evidence that Windsor cites does not support its claim.[2]

Defendants assert that Rousseau advised Prusky that there was "no need for the Trustees to exercise the Default Sale Right" because "the Trustees were walking away from the [P]olicies prior to any default."[3]  (Defs.' Resp. to Pl.'s 56.1 Stmt., ECF No. 144, ¶ 32.)  Defendants cite

---

[1] The term "Relinquished Assets" is defined as the Borrower's "rights, title, interest, claims, cash value, dividends, options, riders, benefits, privileges, and ownership in and to the Policy." (*See, e.g.*, Millrood Decl., Ex. 45, at AF0032286.)

[2] Windsor cites Rousseau's testimony that his "recollection was, each of those [P]olicies had been surrendered by the insureds voluntarily exercising their . . . default sale right and accepted by Windsor in full satisfaction." (Decl. of Samantha A. Millrood dated Sept. 17, 2018 ("Millrood Opp'n Decl."), Ex. 6, ECF No. 139-6, at 245:2–7.) But in the cited testimony, Rousseau was not describing advice that he gave Prusky. Rather, Rousseau was responding to the question, "*Sitting here today*, can you tell me if you're of the view that Windsor had to make an offer or have a default sale?" (Wang Decl., Ex. 12, ECF No. 130-12, at 244:21–23 (emphasis added).) Windsor also cites Prusky's declarations in the Acker and Collins Actions, which state, "After Windsor was informed the Insurance Trust would not pay the loan when due, it elected to exercise the [DSR] [P]rovision in the Premium Financ[ing] Agreement." (Millrood Decl., Ex. 11, ECF No. 125-11, ¶ 8; *id.*, Ex. 12, ECF No. 125-13, ¶ 8.) However, neither declaration provides any indication as to whether that election was based on advice from Rousseau.

[3] It is undisputed that the Trusts were not in default at the time Houchins informed Windsor that the Trusts did not intend to repay the loans. (Pl.'s 56.1 Stmt. ¶ 34.) The parties dispute whether the Trusts' statements of their intent, in themselves, constituted a default. (*See* Mem. in Opp'n to Pl.'s Mot. for Partial Summ. J. ("Defs.' Opp'n"), ECF No. 143, at 11; Reply Brief in Supp. of Pl.'s Mot. for Partial Summ. J. ("Pl.'s

testimony from Prusky that "as we were approaching payment default," he and Rousseau "discussed that, through Mr. Houchins, most of the [I]nsureds were already telling us . . . the [T]rust was not going to pay off the loan, and that [Windsor] could assume ownership.  So we . . . talked about the transfers then, making sure they were done in the proper order." (Decl. of Peter N. Wang dated Aug. 23, 2018 ("Wang Decl."), Ex. 13, ECF No. 130-13, at 246:12–25.)

In 2010, Houchins collected Change of Ownership Forms ("COOs") from the Trustees for the Acker, Collins, Coppock, and Stamatov Policies that named Windsor as the owner and beneficiary of the Policies.[4] (Defs.' 56.1 Stmt., ECF No. 129, ¶ 36.)  The COOs were sent to and accepted by the insurers.  (*Id.* ¶ 37.)

After obtaining the COOs, Windsor mailed letters to Acker, Collins, and Coppock stating, "Please accept this letter as formal notification that pending our ownership of [the Policy], we are releasing you from any future financial obligations of our financial agreement." (Wang Decl., Ex. 46, ECF No. 130-46, at 5 (Acker); *id.*, Ex. 56, ECF No. 130-56, at 6 (Collins); Millrood Decl., Ex. 81, ECF No. 125-84 (Coppock).)  Windsor mailed letters to the Acker and Collins Trustees containing substantially identical language.[5]  The letters to the Trustees also state, "We want to

---

Reply"), ECF No. 154, at 15.)  However, this Court need not resolve that issue at this juncture because (as discussed *infra*) the parties have presented conflicting expert testimony raising an issue of fact to whether Defendants were negligent regardless of whether the Trusts were in default.

[4] Windsor claims that it "demanded that the Trustees sign" the COOs "per Rousseau's specific advice." (Pl.'s 56.1 Stmt. ¶ 33.)  However, Windsor's cited evidence does not support this claim.  Windsor relies solely on a paragraph of Prusky's declarations in the Acker and Collins Actions, which states, "After Windsor was informed the Insurance Trust would not pay the loan when due, it elected to exercise the [DSR] [P]rovision in the Premium Financ[ing] Agreement. Attached . . . is the [COO] then executed by the Insurance Trust and provided to Windsor." (Millrood Decl., Ex. 11, ¶ 8; Millrood Decl., Ex. 12 ¶ 8.) Neither declaration indicates that Plaintiff obtained the COO per Rousseau's advice.  At his deposition, Prusky testified that the COOs "may have been" sent to Rousseau "to make sure that it's the correct form," but Prusky could not recall "with certainty that they were or were not" sent to or reviewed by Rousseau. (Decl. of Peter N. Wang dated Sept. 17, 2018 ("Wang Opp'n Decl."), Ex. 2, ECF No. 146-2, at 295:8–16.)

[5] The record does not reflect whether a similar letter was sent to the Coppock and Stamatov Trustees or whether a letter was sent to Stamatov individually.

confirm that it is our understanding that you have signed the [COO] because you would rather irrevocably surrender ownership and be freed of financial obligations past and future[] than pay off your loan to Windsor." (Wang Decl., Ex. 46, at 6; *id.*, Ex. 56, at 5.)

In June 2010, Rousseau left Herrick to join Arent Fox. (Pl.'s 56.1 Stmt. ¶ 65.) However, the scope of Rousseau's engagement with Windsor did not change. (*Id.* ¶ 66–67.)

### D. The Change of Ownership Form for the Bitter Policy

On September 8, 2010, Rousseau sent a letter to Bitter and Gregory Barnes, Bitter's Trustee, which states, in part:

> As you know, the maturity date of the loan was July 10, 2010, and payment in full has not been received by [Windsor]. . . . Pursuant to the terms of the Security Agreement . . . , the collateral that was posted – the life insurance policy on the insured and all beneficial interests thereto – has become the property of [Windsor]. Section 6(a) of the Security Agreement authorizes and empowers [Windsor] to transfer the collateral and register it in [Windsor's] name by virtue of [the Trust's] failure to pay the loan at the maturity date.

(Pl.'s 56.1 Stmt. ¶ 74 (quoting Millrood Decl., Ex. 70, ECF No. 125-73).) Neither Bitter nor Barnes responded to the September 8, 2010 letter. (*Id.* ¶ 75.)

On January 14, 2011, Windsor sent a letter to Bitter and Barnes that states, in part, "It has been several months since our attorney, Mr. Rousseau, wrote to you asking for, among other things, the original insurance policy and Mr. Bitter's signature. . . . We ask one more time for your cooperation in sending us the paperwork we requested so that we can conclude our relationship in an amicable fashion."[6] (Millrood Decl., Ex. 74; *see also* Pl.'s 56.1 Stmt. ¶ 76 (quoting same).) On February 14, 2011, the Bitter Trustee executed a COO. (*Id.* ¶ 77.)

---

[6] Windsor asserts that it sent the January 14, 2011 letter "in accordance with Rousseau's advice." (Pl.'s 56.1 Stmt. ¶ 76.) However, in support of this assertion, Windsor cites only the letter itself, which does not state that it was sent pursuant to Rousseau's advice.

The parties dispute what advice that Rousseau gave Prusky regarding the COO. Windsor asserts that "Rousseau specifically advised Windsor that the surrender of the Bitter Policy effectuated complete ownership of, and entitlement to the death benefits under the Bitter Policy to Windsor." (Pl.'s 56.1 Stmt. ¶ 80.) In support of this assertion, Windsor cites Prusky's testimony that "Mr. Rousseau . . . believed, and made me believe, that I had secure claims on the full death benefit of th[e] [P]olicies," including the Bitter Policy. (Millrood Decl., Ex. 1, ECF No. 125-1, at 193:13–16.) Rousseau claims that he "never advised Prusky that Windsor needed only to obtain the [COO]" and "explained that the demand letter was merely the first step, and Windsor's next step would largely depend on the response to the letter." (Decl. of Julius Rousseau, III dated Sept. 17, 2018 ("Rousseau Opp'n Decl."), ECF No. 147, ¶ 3.)

## E. The Bitter Arbitration

On December 23, 2012, Bitter died. (Pl.'s 56.1 Stmt. ¶ 81.) When Windsor attempted to collect the death benefit on the Bitter Policy, Barnes filed a civil action (the "Bitter Action") against Windsor, claiming that Windsor did not have ownership of the Bitter Policy. (*Id.* ¶¶ 83–84.) The parties' dispute was later referred to arbitration (the "Bitter Arbitration"). (*Id.* ¶ 88.)

On April 8, 2014, the arbitration panel issued an Interim Award, which found that the Trust remained the owner of the Bitter Policy because Windsor had failed to satisfy the requirements of the DSR Provision and California Commercial Code § 9620, a provision of California law applicable to secured transactions involving life insurance policies.[7] (*Id.* ¶¶ 92–93.) As to the

---

[7] Section 9620 provides that "a secured party may accept collateral in full or partial satisfaction of the obligation it secures only if," among other things, "the debtor consents to acceptance. . . ." Cal. Com. Code § 9620(a). As relevant here, "a debtor consents to an acceptance of collateral in full satisfaction of the obligation it secures" if:

> [T]he debtor agrees to the terms of the acceptance in a record authenticated after default or the secured party: (A) sends to the debtor after default a proposal that is unconditional or subject only to a condition that collateral not in the possession of the secured party be preserved or maintained; (B)

7

DSR Provision, the panel found that "[a]bsent express notification to Barnes that Windsor was invoking its Default Sale Right, the record does not support a finding that Barnes' execution of the COO and surrender of the [P]olicy conveyed to Windsor unfettered title to the [P]olicy and the death benefit." (Pl.'s 56.1 Stmt. ¶ 94 (quoting Millrood Decl., Ex. 73, ECF No. 125-76 ("Interim Award"), at 5).) The panel explained that, while the September 8, 2010 letter "makes reference to Section 6(a) of the Security Agreement, . . . because Section 6(a) contemplate[s] the execution of a COO under circumstances wherein Barnes was not giving up all rights in the [P]olicy, its execution is at best ambiguous." (*Id.*)

As to § 9620, the panel rejected Windsor's contention that "in the context of the September 8, 2010 and January 14, 2011 letters . . . the execution of the COO by Barnes constitutes an authenticated record," because the letters did not "express[] an acceptance by Windsor in full satisfaction of the obligation." (*Id.* ¶ 95 (quoting Interim Award at 7).) The panel also found that "nothing in the demand letters . . . contained a proposal stating that Windsor was prepared to accept the [P]olicy in full satisfaction of the liability owed to it." (*Id.*)

Prusky testified that, after the Interim Award, he asked Rousseau what could be done "to protect the other[] [Policies]" but that Rousseau was "very resistant." (Millrood Decl., Ex. 1, at 208:7–19.) Prusky told Rousseau he "want[ed] to write a letter" to the Trusts, and Rousseau responded, "I think you're going to do more harm than good, but if you want to do it, it's your call." (*Id.* at 208:20–209:5.) Rousseau testified that in discussing the possibility of sending letters

---

in the proposal, proposes to accept collateral in full satisfaction of the obligation it secures; and (C) does not receive a notification of objection authenticated by the debtor within 20 days after the proposal is sent.

Cal. Com. Code § 9620(c)(2).  Section 9602 provides that the rules in § 9620 cannot be waived by the debtor or obligor. *See id.* § 9602(10).

to the Trusts, "what I told Steven [Prusky] was, they're kind of like chicken soup: Not gonna hurt

to send them in any respect.  It might help, possibly, but it certainly will do no wrong, so do it."

(Wang Decl., Ex. 12, at 252:16–20.)

On June 1, 2014, Windsor sent letters to the Acker, Collins, Coppock, and Stamatov

Trustees stating, in part:

> According to our records, . . . you assigned the [P]olicy . . . to
> Windsor.  You may recall that this voluntary assignment of the
> [P]olicy was in exchange for Windsor's agreement that the
> assignment of the [P]olicy would constitute a complete satisfaction
> and discharge of the loan that Windsor had made to enable you to
> purchase the [P]olicy.

(Pl.'s 56.1 Stmt. ¶ 100 (citing Millrood Decl., Exs. 59–62).)

## F. The Acker and Collins Actions

After sending the June 1, 2014 letters, Windsor learned that Acker had died on April 15,

2014.  (*Id.* ¶ 101.)  Collins died on June 19, 2014.  (*Id.*)  In July 2014, the Acker and Collins

Trustees sent letters to their insurers asserting claims to the death benefits under the Policies.  (*Id.*

¶¶ 112, 125.)  Because Windsor also sought to claim the death benefits, the insurers each filed an

action (the "Collins Action" and "Acker Action," respectively) seeking a determination of who

was entitled to the death benefits. (Defs.' 56.1 Stmt. ¶¶ 113, 26.)

## G. Plaintiff's Retention of New Counsel

On September 9, 2014, Windsor terminated its relationship with Defendants. (*Id.* ¶ 92.)

Windsor retained Darin Judd to serve as substitute counsel in the Bitter Action.  (Millrood Decl.,

Ex. 17 ("Judd Decl."), ECF No. 125-20, ¶¶ 9–10.)  Judd also agreed to represent Windsor in the

Acker and Collins Actions. (Pl.'s 56.1 Stmt. ¶ 110.) In June 2015, Windsor retained Lauren Antonino and her law firm to assist Judd. (*Id.* ¶ 110.)

On July 8, 2015, Judd and Antonino (collectively, "Successor Counsel") moved for summary judgment in the Acker and Collins Actions, arguing that Windsor was entitled to the death benefits under the Policies or, in the alternative, for partial summary judgment on the grounds that it was entitled to repayment of all premiums, plus interest. (Defs.' 56.1 Stmt. ¶¶ 112–13.) On September 21, 2015, the court issued decisions denying Windsor's motions for full summary judgment but granting Windsor's motions for partial summary judgment. *See John Hancock Ins. Co. (U.S.A.) v. Goss*, No. 14 Civ. 4651 (WHO), 2015 WL 5569150 (N.D. Cal. Sept. 21, 2015) (Acker); *Pacific Life Ins. Co. v. Gordillo*, No. 14 Civ. 3713 (WHO), 2015 WL 5569432, at *4 (N.D. Cal. Sept. 21, 2015) (Collins).[8] In both decisions, the court rejected Windsor's "primary argument that together, the [Premium Finance Package] and the [COO] satisfy § 9620 as a legal matter." *Goss*, 2015 WL 5569150, at *1. The court explained that an "acceptance in a record authenticated after default" must "include the terms of the acceptance 'of collateral in full satisfaction of the obligation it secures.'" *Id.* at *5. The court found that because the COO "does not reflect any agreement to transfer the collateral in exchange for a satisfaction of the Trust's obligations," the Trust "cannot be considered to have consented under the terms of [§] 9620." *Id.* The court further found that the "lack of such language . . . also fails to satisfy the requirements of the DSR [Provision]." *Id.*

After the denial of Windsor's motions, the Acker and Collins Trusts each moved for summary judgment. (Pl.'s 56.1 Stmt. ¶¶ 121, 131.) In opposition to the Trusts' motions, Plaintiff

---

[8] Because the summary judgment decisions in the Acker and Collins cases are substantially identical, only the decisions discussing the Acker Policy are cited hereafter.

argued that "evidence . . . shows that a pre-default voluntary walk-away occurred or, at a minimum, that a fact question exists as to whether a mutual walk-away as agreed to [sic] exists." (Wang Decl., Ex. 45, ECF No. 130-45, at 13 (Acker); Wang Decl., ECF No. 130-55, at 13 (Collins).)  In its decisions' granting the Trusts' motions, the court found that "[t]he dispositive problem with Windsor's reliance on this alleged oral walk-away agreement is that Windsor did not plead it." *Goss*, 2015 WL 5569150, at *5.  However, the court also noted that the argument as to the existence of a pre-default agreement was premised on a "hodgepodge of highly attenuated evidence." *Id.* at *4.

After the summary judgment decisions were issued, the Acker and Collins Actions settled. (*Id.* ¶¶ 140, 142.)  Pursuant to the settlement agreements, Windsor received $720,648.34 on the Acker Policy and $788,835.00 on the Collins Policy.  (*Id.* ¶¶ 141, 143.)

### H. The Coppock and Stamatov Actions

In November 2014, in response to the June 1, 2014 letters, the Coppock and Stamatov Trustees sent letters to Windsor stating that they had contacted an attorney and disagreed that the Trusts had no rights to the Policies.  (Pl.'s 56.1 Stmt. ¶¶ 102–03.)  In January 2015, Windsor filed complaints against the Coppock and Stamatov Trusts seeking a declaratory judgment that Windsor was entitled to the death benefits.  (*Id.* ¶¶ 135, 138.)  Windsor also notified counsel for the Coppock and Stamatov Trustees that it planned to conduct a public sale of the Policies.  (Defs.' 56.1 Stmt. ¶ 147.)  After this notice was given, the parties agreed to settle.  (*Id.* ¶ 148.)  Pursuant to the settlement agreements, Windsor paid Coppock and Stamatov $12,000 each in exchange for ownership of the Policies.  (*Id.* ¶¶ 151, 153.)

## II.   LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when "it 'might affect the outcome of the suit under the governing law.'" *Gayle*, 313 F.3d at 682 (quoting *Anderson*, 477 U.S. at 248).

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all inferences in that party's favor. *See Niagara*, 315 F.3d at 175. The court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Summary judgment is therefore "improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel*, 310 F.3d at 286.

However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)), and it "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114

(2d Cir. 1998)). "The 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).

## III.   NEITHER PARTY IS ENTITLED TO SUMMARY JUDGMENT AS TO LIABILITY ON PLAINTIFF'S MALPRACTICE CLAIM

"To prevail on a claim for legal malpractice under New York law, a plaintiff must establish: (1) attorney negligence; (2) which is the proximate cause of a loss; and (3) actual damages." *Nordwind v. Rowland*, 584 F.3d 420, 429 (2d Cir. 2009)).

Windsor argues that it is entitled to summary judgment as to liability on its malpractice claim because, as a matter of law, Defendants were negligent and their negligence proximately caused Windsor's damages. (*See* Mem. in Supp. of Pl.'s Mot. for Partial Summ. J. ("Pl.'s Mem."), ECF No. 123.) Defendants argue that they are entitled to summary judgment because, regardless of whether Defendants' actions were negligent, Defendants were not the proximate cause of any alleged damages. (Mem. in Supp. of Defs.' Mot. for Partial Summ. J. ("Defs.' Mem."), ECF No. 128.) Because there are triable issues of fact as to negligence and proximate cause, neither party is entitled to summary judgment as to liability on Windsor's malpractice claim.

### A. Negligence

"To show negligence, the plaintiff must demonstrate that the attorney's conduct 'fell below the ordinary and reasonable skill and knowledge commonly possessed by a member of his profession.'" *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (quoting *Grago v. Robertson*, 370 N.Y.S.2d 255, 258 (App. Div. 3d Dep't 1975)) (additional internal quotation marks omitted). However, an "attorney 'is not held to the rule of infallibility and is not liable for an honest mistake of judgment where the proper course is open to reasonable doubt.'" *Williams v. Havas*, No. 96 Civ. 7258, 1996 WL 626347, at *2 (2d Cir. Oct. 30, 1996)

(quoting *Grago*, 370 N.Y.S.2d at 258). "The choice 'among several reasonable courses of action does not constitute malpractice.'" *Id.* (quoting *Rosner v. Paley*, 481 N.E.2d 553, 554 (N.Y. 1985)).

"To establish the elements of proximate cause and actual damages, . . . the client must meet a 'case within the case' requirement, demonstrating that 'but for' the attorney's conduct the client would have prevailed in the underlying matter or would not have sustained any ascertainable damages." *Rubens v. Mason*, 387 F.3d 183, 190 (2d Cir. 2004) (quoting *Weil, Gotshal & Manges, LLP v. Fashion Boutique of Short Hills, Inc.*, 780 N.Y.S.2d 593, 596 (App. Div. 1st Dep't 2004)).

"In most cases, expert testimony must be introduced to establish the standard of care in the legal profession, whether the defendant failed to comply with that standard, and whether the defendant's negligence proximately caused any damages to the plaintiff." *O'Shea v. Brennan*, No. 02 Civ. 3396 (KNF), 2004 WL 1118109, at *3 (S.D.N.Y. May 19, 2004); *see also Sailam v. Nolan*, 116 F.3d 466 (Table), 1999 WL 311607, at *2 (2d Cir. 1997) ("Unless a juror's ordinary experience provides sufficient basis to assess the adequacy of the professional service, or the attorney's conduct falls below any standard of due care, expert testimony is necessary to establish that the attorney acted negligently.") (citation omitted). When there is "conflicting expert testimony, it [is] for the trier of fact to determine credibility and resolve other disputed facts." *Meador v. Albanese Law Office*, No. 08 Civ. 562 (DNH), 2010 WL 3807163, at *6 (N.D.N.Y. Sept. 23, 2010).

Plaintiff argues that Defendants were negligent in failing to: (1) understand that California law applied to the Policies; (2) ensure that the transfers of the Policies complied with the DSR Provision and § 9620; and (3) take action after the decision in the Bitter Arbitration to protect Windsor's rights in the other four Policies. The parties have presented "conflicting expert testimony" as to whether Defendants' conduct fell below the standard of care. The parties

also dispute the facts as to what advice was given by Defendants. Therefore, neither party is entitled to summary judgment as to liability on Plaintiff's malpractice claim.[9] *Meador*, 2010 WL 3807163, at *6.

### 1. Applicability of California Law

Rousseau testified that "in connection with the [COOs] that Houchins got and sent to [Prusky] in 2010, [Rousseau] did not advise Steven [Prusky] about the . . . Commercial Code of the State of California." (Millrood Decl., Ex. 3, ECF No. 125-3, at 161:1–5.) Windsor contends that not advising Windsor about California law was negligent, because the Policies contained California choice of law clauses. (Pl.'s Mem. at 23.) Defendants contend that Rousseau advised Prusky that "[t]he law of the state where the asset was at the time of foreclosure would be the governing law for foreclosure on that particular policy, irrespective of anything in the loan documents." (Wang Opp'n Decl., ECF No. 146-1, at 68:5–69:4.)

The parties' experts disagree as to whether this advice was below the standard of care. Sandra Stern, Plaintiff's expert on the Uniform Commercial Code ("UCC"), asserts that the choice of law rule applicable to Plaintiff's enforcement of its interest in the Policies is found in California Commercial Code § 1301.[10] (Stern Report at 7–8.) That section provides, in part, "when a

---

[9] The parties agree that the "relevant standard of care . . . is the 'ordinary and reasonable skill and knowledge commonly possessed by a member of the profession.'" (Pl.'s Mem. at 4 (quoting *Bernstein v. Oppenheim & Co.*, 554 N.Y.S.2d 487, 489 (App. Div. 1st Dep't 1990)); *see also* Defs.' Opp'n at 15 n.7 (quoting same).) While the parties' experts disagree as to whether Rousseau should be held to the standard of care of an "expert" in premium finance lending, the experts assert that their determinations as to whether Defendants were negligent remain the same regardless of which standard is applied. (*See* Millrood Decl., Ex. 33 ("Stern Report"), ECF No. 125-36, at 7; Decl. of Edwin E. Smith dated Sept. 17, 2018 ("Smith Decl."), Ex. 3 ("Smith Reply"), ECF No. 148-3, at 3–4.) Thus, this Court will apply the standard of care agreed upon by the parties.

[10] Section 1301 of the California's Commercial Code is substantively identical to § 1-301 of the UCC. The California Commercial Code differs from the UCC in that it applies Article 9, which governs security interests, to loans secured by insurance policies. (*Compare* Uniform Comm. Code § 9-109(d)(8), *with* Cal. Comm. Code § 9-109(d)(8).) However, the two provisions of Article 9 of the California Commercial Code

transaction bears a reasonable relation to this state and also to another state or nation, the parties may agree that the law . . . of this state . . . shall govern their rights and duties." (*Id.* at 7 (quoting Cal. Comm. Code § 1301(a).)  Thus, Stern asserts that Plaintiff's enforcement of its security interest in the Policies "is governed by the law chosen by the agreement of the parties – in this case, the law of the State of California." (*Id.* at 8.)  Edwin Smith, Defendants' UCC expert, contends that § 1301 only applies if a "transaction bears a reasonable relation to" California, and that the transactions at issue had "no meaningful relation to the State of California other than the [choice of law] clause." (Smith Reply at 8 (footnote omitted).)  Therefore, Smith contends, it was reasonable for Defendants to determine that "law of a jurisdiction other than California would most likely . . . appl[y]."[11] (*Id.*)

## 2. Transfer of the Acker, Collins, Coppock, and Stamatov Policies

It is undisputed that Prusky told Rousseau that he had learned from Houchins that the Acker, Collins, Coppock, and Stamatov Trusts did not intend to repay their loans when they became due. (Pl.'s 56.1 Stmt. ¶ 31.)  It is also undisputed that Rousseau advised that COOs signed by the Trustees, if accepted by each insurer, would suffice to pass title to the Policies to Windsor. (Defs.' 56.1 Stmt. ¶ 35; Pl.'s Resp. to Defs.' 56.1 Stmt., ECF No. 140, ¶ 35.)  The parties' experts disagree as to whether this advice was below the standard of care.  James Maxson, Defendants'

---

that are applicable here, §§ 9602 and 9620, are substantively identical to sections §§ 9-602 and 9-620 of the UCC.

[11] Defendants acknowledge that they did not challenge the application of California law to the Bitter Arbitration.  However, Defendants contend that this was a strategic decision.  Defendants explain that they had "serious concerns that the arbitration panel would find the Bitter Policy," which was issued in Georgia, "violated Georgia law (in particular, the Georgia Life Settlement[s] Act)." (Rousseau Opp'n Decl. ¶ 26; *see also id.*, Ex. 5 at AF0007754 ("We have a life policy issued in GA to GA trust . . . .").)  In light of these concerns, Defendants advised Prusky not to challenge the application of California law to the arbitration, and Prusky agreed. (*Id.* ¶¶ 27–28.)

premium financing expert, asserts that a "trustee's return of [a] signed [COO]" is a "recognized and accepted means of taking full and unfettered ownership of a policy pledged as collateral." (Decl. of James W. Maxson ("Maxson Decl.") dated Sept. 17, 2018, Ex. 1 ("Maxson Report"), ECF No. 149-1, at 10.) James Sinnott, Plaintiff's premium financing expert, asserts that "attorneys and lenders [have] deemed that a simple COO by itself [i]s not sufficient. The practice in the industry at the time was to obtain an express written relinquishment so as to remove any ambiguity." (Maxson Decl., Ex. 3 ("Maxson Reply"), ECF No. 149-3, at 2 (quoting Sinnott Rebuttal at 1).[12])

Windsor contends that Defendants' failure to obtain such a release was malpractice as a matter of law in light of the fact that the draft Loan Satisfaction Agreements and attached releases containing such language were in Rousseau's files. (Pl.'s Mem. at 15.) Defendants contend that they did not believe releases were required and note that neither the DSR Provision nor the text of § 9620 expressly requires a release. (Defs.' Opp'n at 26–27.)

The parties' experts disagree as to whether not obtaining a release was negligent. Smith, Defendants' UCC expert, asserts that "a lawyer in the community could reasonably have concluded" that the COOs were sufficient to transfer ownership of the Policies and that no "other release of the Trustee's obligations . . . was required." (Smith Decl. ("Smith Rebuttal"), Ex. 3, ECF No. 148-3, at 4.) But Stern, Plaintiffs' UCC expert, argues that "a 'lawyer in the community' . . . would have foreseen the risk that . . . the Trustee would state that by executing the COO, s(h)e intended only to enable [Windsor] to further perfect its security interest," and

---

[12] Sinnott's report and rebuttal report are not attached as an exhibit to Windsor's motion, but his reports are referenced in Windsor's opposition to Defendants' motion, (see Pl's Opp'n at 13), and are quoted in Defendants' experts' reports. (See, e.g., Maxson Reply at 2.)

would have required the Trustee to execute a document explaining that the transfer of the Policy was "in return for satisfaction/release of all obligations." (Stern Report at 38.)

### 3.    Transfer of the Bitter Policy

Defendants, acting on Windsor's behalf, sent the September 8, 2010 letter to Bitter and Barnes. (Pl.'s 56.1 Stmt. ¶ 74.) Windsor argues Defendants were negligent in drafting the letter because it "quoted and relied upon [§] 6(a) of the Security Agreement," rather than the DSR Provision in the Assignment and "fail[ed] to document [Windsor's] acceptance of the Bitter Policy *in full satisfaction of the Trust's obligations and liabilities to* [Windsor]." (Pl.'s Mem. at 12.)

The parties' experts disagree as to whether Defendants were negligent. Smith, Defendants' UCC expert, asserts that "a lawyer in the professional community . . . could have concluded that the Default Sale Right was being exercised even though Windsor's letter . . . did not expressly so state" because "the evidence shows that Windsor intended to acquire ownership of the . . . Policy and that the Default Sale Right [Provision] contemplated that Windsor could do so by . . . accepting a transfer document executed and delivered by the Trustee." (Smith Report at 9.) Smith further asserts that a lawyer in the community could conclude that there is no need "to state that the . . . acceptance was in full satisfaction of the secured obligations when the practical effect of the acceptance was that the debtor had no further liability" and the circumstances surrounding the transaction provided "further evidence that the transfer was in full satisfaction of the secured obligations." (*Id.* at 8.)

However, Stern, Plaintiff's UCC expert, claims Defendants were negligent in drafting the letter because "the Security Agreement provided . . . that the default rights were those provided under the State of California," and § 6(a) "does not enable the secured party to simply bypass the Article 9 requirements." (Stern Report at 20, 30.) According to Stern, to comply with Article 9,

Defendants should have included language in the letter stating that the transfer of the Policy was "in full satisfaction of the obligations owed" to Windsor. (Stern Report at 25; see also Millrood Decl., Ex. 34 ("Stern Rebuttal"), ECF No. 125-37, at 2.) Stern explains that "in fulfilling Article 9 requirements, it is sometimes necessary to use 'magic words,' i.e., precisely the words set forth in the statute." (*Id.* at 4. *But see* Maxson Report at 12 (concluding Defendants were not negligent in failing to "anticipate[] a[n] . . . arbitrator would . . . apply § 9620 in a[] strict constructionist manner such that only certain 'magic words' could be sufficient to satisfy its requirements").)

The nature of the advice that Defendants provided to Windsor as to the effect of the September 8, 2010 letter is disputed. Windsor claims that Defendants "assured Windsor that it had gained ownership to the Bitter Policy by reason of the Bitter Trust's default . . . , Rousseau's September 8, 2010 letter and Windsor's January 14, 2011 letter, and that such ownership became absolute when the Bitter Trustee executed the Bitter COO." (Pl.'s 56.1 Stmt. ¶ 90 (citing, *inter alia*, Millrood Decl., Ex. 1, at 193:13–16 ("Mr. Rousseau . . . believed, and made me believe, that I had secure claims on the full death benefit of . . . the Bitter Policy.").) Defendants, on the other hand, assert that Rousseau advised "Windsor was never the owner of the Bitter Policy but had a potential argument to the death benefit." (Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 90 (citing Wang Opp'n Decl., Ex. 1, at 266:18–267:6 (stating Rousseau advised that Windsor "had a strong position" regarding entitlement to the death benefit, but "was not the owner" of the Policy)).) Because there is a disputed issue of fact as to what advice Rousseau gave, this Court cannot determine as a matter of law whether the advice was negligent.

In the Bitter Arbitration, Defendants argued that the September 8, 2010 letter, coupled with the January 14, 2011 letter and the executed COO, satisfied the requirements of § 9620. (Interim Award at 2.) The parties' experts disagree as to whether Defendants' position in the Bitter

Arbitration was reasonable. Rousseau testified that he believed that language in the January 14, 2011 letter "suppresse[d] an acceptance by Windsor of the collateral in full satisfaction of the obligation" as required by § 9620. (Millrood Decl., Ex. 3, at 190:8–23.) Stern, Plaintiff's UCC expert, contends that Defendants could not have reasonably believed the letter constituted a § 9620 proposal because it did not contain "any language . . . suggesting that the liabilities of the Trust and the insured would be satisfied by completion of" the COO.

Defendants' UCC expert Smith opines that even if the January 14, 2011 letter did not constitute a formal § 9620 proposal "[i]t would not fall below the [s]tandard of [c]are for a lawyer in the professional community to have concluded that the execution and delivery by the Trustee of the COO constituted the Trustee's consent to the transfer of ownership of the . . . Policy to Windsor and, hence, that the Trustee consented in an authenticated record to Windsor's acceptance of the collateral." (Smith Report at 7.) Smith further asserts that a "lawyer in the professional community could . . . have interpreted Section [§ 9620] not to require that the debtor's consent must itself refer to the total satisfaction of the secured obligations if that satisfaction is evidenced by . . . surrounding circumstances." (*Id.* at 8.) Plaintiff's UCC expert Stern opines that a reasonable lawyer could not have concluded that the COO satisfied § 9620's requirement of an agreement in a "record authenticated after default," because it did not "state[] that (1) ownership of the collateral was being transferred to [Windsor]; and (2) that the obligations of the Trust (and, to the extent applicable, of the borrower) were being extinguished." (Millrood Decl., Ex. 35 ("Stern Reply"), ECF No. 125-38, at 2.)

## A. Inaction after the Bitter Arbitration

Windsor argues that Defendants were negligent in failing to advise Windsor to take further steps to secure its ownership of the remaining four Policies after the decision in the Bitter

Arbitration.[13]  (Pl.'s Mem. at 13–15.)  Defendants claim they had concluded further action was unnecessary, because "the contractual provisions in the Premium Finance Package, Houchins' purported conversations with the [i]nsureds and Trustees, and the recorded [COOs] were enough to satisfy both the DSR [Provision] and [§ 9620]."  (Defs.' Opp'n at 12.)

The parties' experts disagree as to whether this conclusion was reasonable.  As to the DSR Provision, Sinnott, Plaintiff's premium financing expert, contends that "[i]t is understood in the industry that in order to exercise the 'Default Sale Right'. . . the lender and borrower . . . must enter into an express agreement, . . . authenticated in writing, under which the borrower, in return for the lender's express agreement to relieve the borrower from any continuing obligation on the loan, agrees to relieve the lender from its obligation."  (Maxson Decl., Ex. 2 ("Maxson Reply"), ECF No. 149-2, at 2 (quoting Sinnott Report at 16).)  The COOs executed by the Trustees did not contain such language.  However, Maxson, Defendant's premium financing expert, notes that the DSR Provision does not contain a "requirement that 'express notification' be provided to the borrower in order for the lender to take ownership of the [P]olicy."  (Maxson Report at 10.)  Maxson asserts that by signing the COO, each Trustee, "in effect, proffered the [P]olicy to Windsor, and Windsor accepted the proffer by having those changes recorded with the carrier.  In the ordinary course of practice . . . , this act would have been deemed sufficient to satisfy the Default Sale Right [Provision]" and "to transfer legal and record ownership to Windsor."  (*Id.* at 11.)

As to § 9620, Defendants' UCC expert Smith opines that the Trustees' execution and delivery of the COOs to Windsor, coupled with the fact that the Trusts had no assets other than

---

[13] After the Bitter Arbitration, Windsor sent the June 1, 2014 letters.  Because, as discussed above, there is a triable issue of fact as to what advice Defendants gave Windsor regarding those letters, this Court cannot determine as a matter of law whether Defendants' advice was negligent.

the Policy, could have led a "lawyer in the professional community . . . [to] conclude[]" that there was an agreement "in a record authenticated by the debtor after default," as required by § 9620. (Smith Rebuttal at 3–4.) Smith also asserts that Defendants made a "strategic decision" not to take further action, because "Defendants had reasonably determined . . . [f]urther affirmative actions . . . would only increase the litigation risk." (Smith Reply at 6.) Plaintiff's UCC expert Stern contends "[i]t was below the standard of care . . . to have concluded that a court would have accepted a fragmentary record plus other facts, circumstances, and analyses as a substitution for the 'agreement' 'in a record' as required by [§ 9620]." (Stern Reply at 3.) Stern asserts that Defendants should have "take[n] steps that would unquestionably satisfy the [§] 9620 requirements," and that Defendants could have done so by "replicat[ing] the Garcia [L]etter, with appropriate policy-specific changes." (Stern Report at 28, 30.)

## B. Proximate Cause

"Where a plaintiff, on his own or through subsequent counsel, has 'sufficient time and opportunity' to adequately protect his rights, any alleged negligence by the former counsel cannot proximately cause that plaintiff's injury." *Prout v. Vladeck*, 316 F. Supp. 3d 784, 806 n.13 (S.D.N.Y. 2018) (quoting *Hufstader v. Friedman & Molinsek, P.C.*, 55 N.Y.S.3d 509, 510 (App. Div. 3d Dep't 2017)). Here, Defendants assert that Successor Counsel "made independent strategic litigation decisions that sever the chain of causation between Defendants' alleged malpractice and Windsor's purported damages." (Defs.' Mem. at 16.) But even if Successor Counsel had made the decisions that Defendants argue they should have, it cannot be determined

as a matter of law that Successor Counsel would have had an "opportunity to adequately protect [Windsor's] rights." *Prout*, 316 F. Supp. 3d at 806 n.13.

As to the Acker and Collins Actions, Defendants argue that Successor Counsel "ignor[ed] the pre-default walkaway in the pleadings" and did not raise "arguments . . . that the Acker and Collins Trusts . . . entered into pre-default walkaway agreements with Windsor" in Windsor's motions for summary judgment. (Defs.' Mem. at 16.) Defendants also argue that Successor Counsel should have proffered the letters sent to the Acker and Collins Trustees as further evidence of such an agreement. (*Id.*) However, this Court cannot determine, as a matter of law, whether this argument would have afforded Windsor the opportunity to protect its rights to the Policies or death benefits, particularly in light of the court's finding that the argument for such an agreement was premised on a "hodgepodge of highly attenuated evidence." *Goss*, 2015 WL 5569150, at *4.

Defendants further argue that Successor Counsel should not have "mov[ed] for summary judgment, prior to the close of discovery." (Defs.' Mem. at 16.) Defendants assert that, in doing so, Successor Counsel lost "the opportunity to depose Houchins, the lone witness who could attest to the pre-default agreement" and the "opportunity to collect any of the evidence necessary to establish the pre-default walkaway." (Reply Mem. in Supp. of Defs.' Mot. for Partial Summ. J. ("Defs.' Reply"), ECF No. 156.) But Defendants have not cited any evidence that Houchins would have provided such testimony. Nor have Defendants cited any other evidence that they hoped to obtain if discovery in the Acker and Collins actions were allowed to continue. Even if such evidence existed, this Court cannot determine as a matter of law whether it would have enabled Windsor to protect its rights to the death benefits for the Acker and Collins Policies.

As to Coppock and Stamatov, Defendants argue that because the insureds were still living, Successor Counsel "could have conducted a public sale to secure incontrovertible ownership of

the Policies." (Defs.' Mem. at 18–19.)  However, this Court cannot determine as a matter of law

that such a sale would have enabled Successor Counsel to protect Windsor's right to ownership of

the Policies.  There is some evidence to suggest that Plaintiff would not have prevailed at such a

sale.  Judd testified that "the Houchins group were saying they would purchase the [P]olicies, and

[Plaintiff] would lose [its] investment."  (Decl. of Peter N. Wang dated Oct. 2, 2018, Ex. 3, ECF

No. 157-3, at 178:11–14.)  Defendants note that "Judd, at his deposition, could not recall any

communications with Houchins on this point."  (Defs.' Reply at 12.)  However, Judd's inability to

recall specific communications impacts the weight that his testimony should be given, not whether

it is sufficient to raise an issue of fact.

     In addition to raising arguments regarding Successor Counsel, Defendants also argue that

"Windsor's own decisions . . . sever the causal link" because "Windsor refused to settle these

[l]itigations early, when it had the chance."  (Defs.' Mem. at 18.)  But Windsor argues that, absent

Defendants' negligence, the litigation would not have occurred at all.  Thus, even assuming that

Windsor's decisions not to settle increased its damages, they did not necessarily break the chain

of causation.  *See Baker v. Dorfman*, No. 97 Civ. 7512 (DLC), 1998 WL 642762, at *5 (S.D.N.Y

Sept. 17, 1998) (finding a plaintiff's "failure to settle the case is not an intervening cause" of his

damages).

## IV. DEFENDANTS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT AS TO DAMAGES ON PLAINTIFF'S MALPRACTICE CLAIM

     Defendants assert that, as a matter of law, Defendants are not responsible for $103,268 in

legal fees they seek relating to premium financing advice because Windsor has failed to "establish

that these earlier fees would not have been incurred 'but for' the later alleged malpractice."[14]

---

[14] Although Plaintiff's expert report calculates its damages for these fees as $103,269, this appears to be a mathematical error, because the legal fees listed total $103,268.  (*See* Wang Decl., Ex. 36 ("Lunden Report"), ECF No. 130-36, at Ex. G.)

(Defs.' Mem. at 21–22.)  A report prepared by Charles Lunden, Windsor's damages expert, states that Plaintiff paid $28,022 in "[l]egal fees in 2008" for premium financing advice.  (Lunden Report at Ex. G.)  However, Windsor has acknowledged that the fees from 2008 were incurred in connection with "the possible creation and management of an unrelated fund."  (Pl.'s 56.1 Stmt. ¶ 27 n.6.)  Thus, Defendants are entitled to summary judgment on Plaintiff's claims for those fees.

Lunden's report indicates that the remaining $75,246 in premium financing fees relate to services performed in 2009 and 2013.  (Lunden Report Ex. G.)  It is undisputed that Rousseau advised Windsor regarding the Policies at issue in 2009.  (Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ 27.)  It is also undisputed Defendants represented Windsor in the Bitter Action filed in 2013.  (Pl.'s 56.1 Stmt. ¶¶ 84–85.)  Defendants argue that Plaintiff "refused to provide any . . . detail regarding the nature of the legal work associated with these fees."  (Defs.' Mem. at 22.)  But a mere lack of detail does not enable this Court to find, as a matter of law, that the fees are not attributable to the alleged malpractice.  Thus, Defendants are entitled to summary judgment as to Windsor's claim for $28,022 in fees incurred in 2008, but not as to the $75,246 incurred in 2009 and 2013.

Defendants also argue that, as a matter of law, Plaintiff is not entitled to recover the fees attributable to the Bitter Action and Arbitration, because those fees would have been "incurred . . . regardless of any alleged malpractice."  (Defs.' Mem. at 23.)  Defendants claim that "the record is clear that Barnes would have sued – for fraud unrelated to Arent Fox's conduct – regardless of the release he signed."  (Defs.' Mem. at 22.)  In support of this assertion, Defendants cite testimony from Barnes' counsel that "prior to the time [Barnes] filed this complaint" in the Bitter Action, "the issue was whether Mr. Bitter had somehow been properly [sic] deprived of the ability to pay off the loan . . . or whether [the Trustee] had somehow been improperly induced to sign these transfer documents."  (Wang Decl., Ex. 26, ECF No. 130-26, at 78:11–22.)  But

Defendants' "speculative assertion" as to what Barnes would have done cannot demonstrate a lack of "but for" causation. *Feroleto v. O'Connor*, No. 08 Civ. 554 (GLS) (RFT), 2011 WL 1770267, at *5 (N.D.N.Y. May 6, 2011).

Defendants also assert that "Pacific Life never recorded the [COO] from Houchins, so the Bitter Trust was still the owner of record, meaning Windsor could not have collected the death benefit without litigation." (Defs.' Mem. at 22.) However, Windsor contends that even if Houchins had ensured that the COO was recorded, litigation would have ensued because Defendants failed to ensure that the COO contained language stating that "the change in ownership . . . was 'in consideration of the full and complete satisfaction of the liabilities' under the Premium Financ[ing] Packages" or to have the Trusts execute releases to that effect. (Pl.'s Mem. at 3.) For the reasons explained above, there is at least a triable issue of fact as to whether the Bitter Litigation—and the fees incurred—were proximately caused by Defendants' negligence. Thus, Defendants are not entitled to summary judgment on Plaintiff's claims for such fees.

## V.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S BREACH OF CONTRACT AND BREACH OF FIDUCIARY DUTY CLAIMS

"New York law holds that, where a breach of contract or breach of fiduciary duty claim is premised on the same facts and seeks relief identical to that sought in a legal malpractice cause of action, such claims are redundant and should be dismissed." *MIG, Inc. v. Paul, Weiss, Rifkind, Wharton & Garrison, LLP*, 701 F. Supp. 2d 518, 532 (S.D.N.Y. 2010), *aff'd*, 410 F. App'x 408 (2d Cir. 2011); *see also Schutz v. Kagan Lubic Lepper Finkelstein & Gold LLP*, 552 F. App'x 79, 80 (2d Cir. 2014) ("New York courts have consistently held that . . . where, as here, the claims arise from the same facts and do not allege distinct damages," a plaintiff's "claim for breach fiduciary duty [i]s duplicative of the[] claim for legal malpractice."); *England v. Feldman*, No. 11 Civ. 1396 (CM), 2011 WL 1239775, at *5 (S.D.N.Y. Mar. 28, 2011) ("[W]here a claim for

negligence, breach of fiduciary duty, breach of contract, or failure to disclose a conflict of interest are premised on the same facts and seek the identical relief as a claim for legal malpractice, these claims are 'redundant and should be dismissed.'") (quoting *Nordwind v. Rowland*, 584 F.3d 420, 432–33 (2d Cir. 2009)).

Plaintiff argues that its breach of contract claim is not duplicative because it "based upon . . . multiple promises by Defendants of an assured result." (Pl.'s Mem. in Resp. to Defs.' Mot. ("Pl.'s Opp'n"), ECF No. 138, at 25.) While a "breach contract claim against an attorney based on a retainer agreement may be sustained . . . where the attorney makes an express promise . . . to obtain a specific result and fails to do so," Plaintiff has not alleged that any such promise was made here. *Pacesetter Commc'ns Corp. v. Solin & Breindel, P.C.*, 541 N.Y.S.2d 404, 406 (App. Div. 1st Dep't 1989)). Plaintiff claims that Defendants "assured Windsor that no documentation, beyond the respective Insurance Company's COO and Beneficiary forms executed by each of the Trustees, was necessary from the Stamatov, Acker, Coppock, and Collins Trusts, Insured, and/or Beneficiaries for Windsor's ownership of the Policies and absolute entitlement to the full death benefits thereunder." (Pl.'s Opp'n at 25 n.16.) Plaintiff also claims that "Defendants assured Windsor that it had gained ownership of the Bitter Policy by reason of the Bitter Trust's default . . . , Rousseau's September 18, 2010 [L]etter and Windsor's January 14, 2011 [L]etter, and such ownership became absolute when [Barnes] executed the Bitter COO and subsequently surrendered the Policy to Windsor." (*Id.* at 26 n.17.) But those "assur[ances]" are not promises of a particular result and are also alleged as part of the duty of care in Plaintiff's malpractice claim. (*See* Compl. ¶¶ 181(C) & (E) (alleging the professional "duties that Rousseau and Arent Fox owed to Windsor," included "[a]ssuring that the documents that it advised Windsor to have the . . . Trustees and Insureds execute and return to Windsor properly and unambiguously effectuated

transfer of ownership of the . . . Policies to Windsor and absolute entitlement to Windsor of the death benefits" and "[a]ccurately . . . advising Windsor as to the Trustees'/Trusts' entitlement to the death benefits . . . and the Trust's claims in the Bitter, Acker, Collins, Coppock, and Stamatov Actions").)

Additionally, Plaintiff argues that its breach of fiduciary duty claim is not duplicative because it is based on "Defendants' encouraging Plaintiff to pursue litigation, in which Defendants[] should have known Plaintiff would not prevail, to increase [their] own fees to the Plaintiff's detriment." (Mem. at 27.) But Plaintiff concedes that it "includes the same allegations in its complaint for breach of fiduciary duty and legal malpractice." (*Id.*) Those allegations make clear that the litigation that Plaintiff claims Defendants encouraged it to pursue is the litigation that forms a basis for Plaintiff's malpractice claim (*Compare* Compl. ¶ 182(A) (alleging "Defendants breached their duty of care" by "failing to obtain a sufficient understanding of the Premium Finance Packages and . . . the risks inherent in litigation regarding the same"), *with id.* ¶ 187 (alleging Defendants' fiduciary duty "required . . . that they . . . take all action legally necessary and appropriate to protect Windsor's interests in the Premium Finance Policies and in the Bitter Action"). Similarly, the fees that Plaintiff claims were increased are the same fees that Plaintiff seeks to recover as part of the damages resulting from Defendants' alleged malpractice. (*Compare id.* ¶ 184 ("Had Defendants acted in conformity with the reasonable standard of care, . . . Windsor would have avoided the Bitter, Acker, Collins, Coppock and Stamatov Actions and legal fees and costs associated therewith."), *with id.* ¶¶ 188, 190 (alleging Defendants breached their fiduciary duty by, among other things, failing to "acknowledg[e] the potential liability and success of the Trustee's claims of entitlement in the Bitter Action and advising Windsor as to appropriate

options" and failing to "prevent further damage with respect to the Collins, Acker, Coppock and Stamatov Policies").

Because Plaintiff's claims for breach of contract and breach of fiduciary duty "arise from the same facts and do not allege distinct damages," they are duplicative of Plaintiff's legal malpractice claim and are therefore dismissed. *Schutz*, 552 F. App'x at 80.

## VI.   DEFENDANTS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT ON THEIR COUNTERCLAIM FOR LEGAL FEES

In addition to raising defenses to Windsor claims, Arent Fox has asserted a counterclaim against Defendants for $480,095.25 in legal fees. (Defs.' 56.1 Stmt. ¶ 162.)  "To prevail on its motion for summary judgment on [an] accounts-stated claim, [a party] must show that, as a matter of law, [the non-moving party] was the client for whom all the legal services were performed or that he had agreed to pay for all services rendered to [the client]." *LeBoeuf, Lamb, Greene & MacRae, LLP v. Worsham*, 185 F.3d 61, 64 (2d Cir. 1999).  "Such an agreement may be implied if 'a party receiving a statement of account keeps it without objecting to it within a reasonable time . . . .'" *Id.* (quoting *Chisolm-Ryder Co. v. Sommer & Sommer*, 421 N.Y.S.2d 455, 457 (App. Div. 4th Dep't 1999)).

Summary judgment may be inappropriate if the client asserts legal malpractice claims that "are sufficiently intertwined with the account stated claim so as to provide a bona fide defense." *Glassman v. Weinberg*, 62 N.Y.S.3d 54, 56 (App. Div. 1st Dep't 2017).  But "if the malpractice claim is not so intertwined, courts are not precluded from granting summary judgment." *Emery Celli Brinckerhoff & Abady, LLP v. Rose*, 974 N.Y.S.2d 422, 424 (App. Div. 1st Dep't 2013).

It is undisputed that Arent Fox regularly submitted invoices to Plaintiff seeking payment for legal services. (Defs.' 56.1 Stmt. ¶ 156.)  Defendants assert that several outstanding invoices have not been paid. (*Id.* ¶¶ 154, 162.)  In support of their counterclaim, Defendants have submitted

invoices reflecting services performed on the Acker, Bitter, and Collins Policies as well as on matters identified as "Sheldon Hathaway Rescission" (the "Hathaway Matter") and "Windsor v. Lincoln" (the "Lincoln Matter").[15]   (Rousseau Decl., Exs. 5–10, ECF Nos. 131-5–10.)  Defendants assert that Plaintiff received these invoices and did not object to or reject them.  (Defs.' 56.1 Stmt. ¶¶ 159–60.)  Windsor contends that it "objected to the outstanding invoices and verbalized its objections on multiple occasions."   (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶¶ 158–60.)   But such "[u]nsubstantiated claims of oral objections" are not sufficient to defeat summary judgment. *Cohen Lans LLP v. Naseman*, No. 14 Civ. 4045 (JPO), 2017 WL 477775, at *6 (S.D.N.Y. Feb. 3, 2017) (citations and internal quotation marks omitted).

Windsor also contends that Defendants are not entitled to summary judgment on any of the fees they seek because Windsor has asserted a malpractice claim.   (Pl.'s Mem. at 29–30.) However, Defendants assert that the Hathaway and Lincoln Matters are unrelated to the current dispute.  (Defs.' 56.1 Stmt. ¶ 161.)  Windsor cites no evidence to the contrary in its opposition.[16] Because Windsor has not shown that its malpractice claim in this action could provide a "bona fide defense" to Defendants' claims for $10,041.11 in fees on the Lincoln and Hathaway Matters, Defendants are entitled to summary judgment on those claims. *Glassman*, 62 N.Y.S.3d at 56.

---

[15] One of the invoices has "General" in the matter line.  However, the individual time entries make clear that the invoice is for work done on the Acker and Collins Actions and/or the Bitter Action and Arbitration. (Decl. of Julius Rousseau, III dated Aug. 23, 2018 ("Rousseau Decl."), Ex. 5, ECF No. 131-5.)

[16] In a supplemental letter, Windsor cites deposition testimony from Prusky.  (Letter from Alan L. Frank to this Court dated December 4, 2018 ("Dec. 4, 2018 Letter"), ECF No. 163.)  However, the cited testimony only serves to demonstrate that the Hathaway and Lincoln Matters are unrelated to the instant dispute. Prusky claims that in the Hathaway Matter, "Rousseau strongly encouraged [Prusky] to pursue [a] case" that "proved pointless" and advised Prusky to send a premium check to Rousseau rather than cash it. (Dec. 4 Letter at 6 (citation omitted).)  In the Lincoln Matter, Rousseau filed a suit that reduced the death benefit Prusky was entitled to receive from $1 million to $750,000 and caused Prusky to incur $250,000 in legal fees.  (*Id.* at 5–6 (citation omitted).)

Defendants' claims for fees relating to the Acker, Bitter, and Collins Actions are plainly related to the instant dispute. Nonetheless, Defendants contend that they are entitled to summary judgment on their claims for fees relating to the Bitter Action and Arbitration, because the action was "based *ab initio* on fraud." (Defs.' Reply at 15.) However, in the Complaint in the Bitter Action, the Trustee alleges that "repeatedly during the period from approximately July 1, 2010 through approximately February 2011, Windsor stated to [Barnes] . . . that [the Trust] had irrevocably lost all legal and equitable rights to and in the Death Benefit" under the Policy. (Wang Decl., Ex. 27, ECF No. 130-27, ¶ 11.) It is undisputed that Rousseau sent the September 8, 2010 letter to Barnes and Bitter. (Pl.'s 56.1 Stmt. ¶ 74.) Thus, the claims in the Bitter Action were based, in part, on the conduct that forms the basis of Windsor's malpractice claim. Because Windsor's malpractice claim is intertwined with the Acker, Bitter, and Collins Actions, Defendants are not entitled to summary judgment on their claims for fees in those actions.

## VII.   CONCLUSION

Plaintiff's motion for partial summary judgment, (ECF No. 122), is DENIED. Defendants' motion for partial summary judgment, (ECF No. 127), is GRANTED in part and DENIED in part. Defendants are entitled to summary judgment on Plaintiff's breach of contract claim, breach of fiduciary duty claim, and the portion of Plaintiff's malpractice claim seeking $28,022 in damages unrelated to the alleged malpractice. Defendants are also entitled to summary judgment on the portion of their counterclaim seeking $10,041.11 in fees unrelated to this action. Defendants' motion is denied in all other respects.

Dated: New York, New York
      March 27, 2019l

SO ORDERED.

*George B. Daniels*

GEORGE B. DANIELS
United States District Judge

31